NANCY SHER COHEN, SBN 81706
  ncohen@proskauer.com
RONALD A. VALENZUELA, SBN 210025
  rvalenzuela@proskauer.com
SHAWN S. LEDINGHAM, JR., SBN 275268
  sledingham@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, California 90067
Telephone:   (310) 557-2900
Facsimile:    (310) 557-2193

Attorneys for Plaintiffs
[See List of Plaintiffs, attached as Exhibit A]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

ALCOA INC.; ALPHA THERAPEUTIC CORPORATION; APPLIED MICRO CIRCUITS CORP.; ARLON, LLC; ASTRO ALUMINUM TREATING CO., INC.; BASF CORPORATION; BAXTER HEALTHCARE CORPORATION; CAL-TAPE & LABEL CO.; CALIFORNIA HYDROFORMING COMPANY, INC.; CINTAS CORPORATION; COLUMBIA SHOWCASE & CABINET COMPANY, INC.; COUNTY OF LOS ANGELES; CROSBY & OVERTON, INC.; DISNEY ENTERPRISES, INC.; FHL GROUP; FORENCO, INC.; GENERAL DYNAMICS CORPORATION; GULFSTREAM AEROSPACE CORPORATION; HEXCEL CORPORATION;HONEYWELL INTERNATIONAL INC.; INGERSOLL-RAND COMPANY; INTERNATIONAL PAPER COMPANY; JOHNS MANVILLE; KIMBERLY-CLARK WORLDWIDE, INC.; KINDER MORGAN LIQUIDS TERMINALS LLC; LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY; MASCO CORPORATION OF INDIANA; MATTEL, INC.; MERCK SHARP & DOHME CORPORATION; NBCUNIVERSAL MEDIA, LLC; PACIFIC BELL TELEPHONE COMPANY; PILKINGTON GROUP LIMITED; QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.; RAYTHEON COMPANY; REICHHOLD, INC.; RIO TINTO AUM COMPANY; SAFETY-KLEEN SYSTEMS, INC.; SCRIPTO-TOKAI CORPORATION; SEMPRA GLOBAL;

**COMPLAINT**

1. Cost Recovery, Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*;
2. Declaratory Judgment, Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* and Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202;
3. Continuing Public Nuisance, Cal. Civil Code §§ 3479–80

SHILEY, LLC; SIGNET ARMORLITE,
INC.; SOCO WEST, INC.; SONOCO
PRODUCTS COMPANY; SPARTON
TECHNOLOGY, INC.; TEXACO INC.;
TEXAS INSTRUMENTS
INCORPORATED; THE BOEING
COMPANY; THE DOW CHEMICAL
COMPANY; THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA; THE
SHERWIN-WILLIAMS COMPANY;
TRANE U.S., INC.; TRIMAS
CORPORATION; UNION OIL COMPANY
OF CALIFORNIA; UNIVAR USA INC.;
UNIVERSAL CITY STUDIOS LLC; AND
YORT, INC.

Plaintiffs,

v.

APC INVESTMENT CO.; ASSOCIATED
PLATING COMPANY; ASSOCIATED
PLATING COMPANY, INC.; BODYCOTE
THERMAL PROCESSING, INC.; BURKE
STREET HOLDINGS, LLC; POWERINE
OIL COMPANY; LAKELAND
DEVELOPMENT COMPANY (f/k/a
CENCO REFINING CO.); DALLAS SMITH
CORP.; CONTINENTAL HEAT
TREATING, INC.; CONTINENTAL
DEVELOPMENT COMPANY, LP;
CLAUDETTE EARL, AN INDIVIDUAL;
EARL MFG. CO., INC.; EL GRECO
WHOLESALE GROCERS, INC.;
EXXONMOBIL OIL CORPORATION.;
FERRO CORP.; FIRMENICH, INC.; FOSS
PLATING COMPANY, INC.; GORDON E.
MCCANN, AN INDIVIDUAL; LYNNEA R.
MCCANN, AN INDIVIDUAL; DARRELL
K. GOLNICK, AN INDIVIDUAL; CLARE
S. GOLNICK, AN INDIVIDUAL; CHERYL
A. GOLNICK, AN INDIVIDUAL;
KEKROPIA, INC.; MISSION LINEN
SUPPLY; MOMENTIVE SPECIALTY
CHEMICALS, INC.; WILLIAM K.
PALLEY, AN INDIVIDUAL; PALLEY
SUPPLY COMPANY; PALMTREE
ACQUISITION CORPORATION; PHIBRO-
TECH, INC.; PILOT CHEMICAL CORP.;
PMC SPECIALTIES GROUP, INC.; AND
UNION PACIFIC CORP., and Does 1 – 250,
INCLUSIVE

Defendants.

COMPLAINT

Plaintiffs Alcoa Inc.; Alpha Therapeutic Corporation; Applied Micro Circuits Corp.; Arlon, LLC; Astro Aluminum Treating Co., Inc.; BASF Corporation; Baxter Healthcare Corporation; Cal-Tape & Label Co.; California Hydroforming Company, Inc.; Cintas Corporation; Columbia Showcase & Cabinet Company, Inc.; County of Los Angeles; Crosby & Overton, Inc.; Disney Enterprises, Inc.; FHL Group; Forenco, Inc.; General Dynamics Corporation; Gulfstream Aerospace Corporation; Hexcel Corporation; Honeywell International Inc.; Ingersoll-Rand Company; International Paper Company; Johns Manville; Kimberly-Clark Worldwide, Inc.; Kinder Morgan Liquids Terminals LLC; Los Angeles County Metropolitan Transportation Authority; Masco Corporation of Indiana; Mattel, Inc.; Merck Sharp & Dohme Corporation; NBCUniversal Media, LLC; Pacific Bell Telephone Company; Pilkington Group Limited; Quest Diagnostics Clinical Laboratories, Inc.; Raytheon Company; Reichhold, Inc.; Rio Tinto AUM Company; Safety-Kleen Systems, Inc.; Scripto-Tokai Corporation; Sempra Global; Shiley, LLC; Signet Armorlite, Inc.; Soco West, Inc.; Sonoco Products Company; Sparton Technology, Inc.; Texaco Inc.; Texas Instruments Incorporated; The Boeing Company; The Dow Chemical Company; The Regents of the University of California; The Sherwin-Williams Company; Trane U.S., Inc.; TriMas Corporation; Union Oil Company of California; Univar USA Inc.; Universal City Studios LLC; and Yort, Inc. (collectively, "Plaintiffs"), by their attorneys, Proskauer Rose LLP, against Defendants APC Investment Co.; Associated Plating Company; Associated Plating Company, Inc. (f/k/a Associated Plating Acquisition Corp.); Bodycote Thermal Processing, Inc.; Burke Street Holdings, LLC; Powerine Oil Company; Lakeland Development Company (f/k/a Cenco Refining Co.); Dallas Smith Corp. (f/k/a Dallas Smith Service Corporation); Continental Heat Treating, Inc.; Continental Development Company, LP; Claudette Earl, an individual; Earl Mfg. Co., Inc.; El Greco Wholesale Grocers, Inc.; ExxonMobil Oil Corporation; Ferro Corp.; Firmenich, Inc.; Foss Plating Company, Inc.; Gordon E. McCann, an individual;

COMPLAINT

1   Lynnea R. McCann, an individual; Darrell K. Golnick, an individual; Clare S.

2   Golnick, an individual; Cheryl A. Golnick, an individual; Kekropia, Inc.; Mission

3   Linen Supply; Momentive Specialty Chemicals, Inc.; William K. Palley, an

4   individual; Palley Supply Company; Palmtree Acquisition Corporation; Phibro-

5   Tech, Inc.; Pilot Chemical Corp.; PMC Specialties Group, Inc.; and Union Pacific

6   Corp. and DOES 1 through 250 (collectively, "Defendants"), allege upon

7   knowledge as to themselves and upon information and belief as to others, the

8   following:

9   **NATURE OF THE ACTION**

10       1.      This is a civil action arising from environmental contamination caused

11   by Defendants and by which Plaintiffs seek cost recovery and a declaratory

12   judgment under sections 107(a) and 113(g)(2) of the federal Comprehensive

13   Environmental Response, Compensation and Liability Act, as amended 42 U.S.C.

14   §§ 9601-9675 ("CERCLA"), and for injunctive relief and compensatory damages

15   under California law.

16       2.      Groundwater underlying portions of the Whittier and Santa Fe Springs

17   communities is purportedly contaminated with high concentrations of numerous

18   substances that are hazardous to the environment and human health, including

19   hexavalent chromium and chlorinated and non-chlorinated solvents.  According to

20   the United States Environmental Protection Agency ("EPA"), action to address the

21   contamination is necessary to protect the public health and the environment.  EPA

22   has designated this regional groundwater contamination, which covers an area

23   approximately 4½ miles long, as Operable Unit No. 2 of the Omega Superfund Site

24   (the "OU-2 Facility").

25       3.      For decades, Defendants have owned properties or operated businesses,

26   or arranged for the treatment of wastes at businesses, that sit atop or very near the

27   OU-2 Facility at which substantial quantities of hazardous substances and hazardous

28   waste, including chlorinated and non-chlorinated solvents and hexavalent

- 2 -
COMPLAINT

1    chromium, have been spilled or discharged onto the ground and migrated downward
2    into the soil and groundwater.  These businesses include chemical manufacturing or
3    processing plants, industrial laundry operations, businesses that perform mechanical
4    work, painting, detailing and spot chroming on automobiles, oil production and
5    refining plants, manufacturing plants, and metal processing plants.  The soil and
6    groundwater underlying these source properties have been contaminated by
7    operations conducted there, resulting in multiple plumes of contamination that have
8    blended together into regional groundwater contamination.

9           4.     EPA has evaluated many Defendants in connection with the OU-2
10   Facility and has concluded that certain of them are potentially responsible parties
11   ("PRPs") warranting receipt of a Special Notice Letter ("SNL") from EPA.  In the
12   SNL sent to these Defendants (the "SNL Defendants"), the EPA identifies each
13   recipient as potentially liable under CERCLA Section 107 for the OU-2 Facility
14   groundwater contamination as well as past and future costs to clean up that
15   contamination, provides information concerning its basis for this conclusion, and
16   solicits offers from the SNL Defendants to (a) perform the OU-2 Facility remedial
17   design and remedial action selected by EPA and (b) pay the unreimbursed response
18   costs EPA has incurred in connection with the OU-2 Facility.  According to EPA,
19   the primary purposes of each SNL are to invoke the statutory moratorium on certain
20   EPA actions and to initiate formal settlement negotiations with the recipient for a
21   response action and the recovery of EPA's unreimbursed costs.

22          5.     EPA also utilizes General Notice Letters ("GNLs"), which inform the
23   recipient that EPA considers it potentially liable for cleanup costs at a Superfund
24   site and invite the recipient to discuss its involvement at the site.  Each GNL also
25   serves to begin or continue the process of information exchange, and to initiate the
26   process of "informal" negotiations with EPA.  Generally speaking, EPA issues a
27   GNL after concluding that there is sufficient information to name the recipient as a
28   PRP, and as a means to open a dialogue with EPA and to offer the recipient an

- 3 -
COMPLAINT

1    opportunity to explain why it should not receive an SNL.  EPA sent GNLs to several

2    PRP Defendants (the "GNL Defendants") that identify the GNL Defendants as

3    potentially liable under CERCLA Section 107 for the OU-2 Facility groundwater

4    contamination, and for past and future costs to clean up that contamination.  The

5    GNLs all requested responses as to the GNL Defendants' willingness to negotiate

6    regarding their potential liability for the OU-2 Facility response costs.

7    　　　　6.    Upon information and belief, EPA recognizes that there are a large

8    number of industrial properties that occupy the OU-2 Facility, continues to evaluate

9    whether there are additional source properties and PRPs as time and resources

10   allow, and encourages those persons and entities it has already named as PRPs to

11   perform the work necessary to identify other PRPs.

12   　　　　7.    Plaintiffs, or their predecessors, affiliated entities, assignees or

13   obligees, are companies that allegedly sent chemicals to Omega Chemical

14   Corporation ("Omega Chemical") in Whittier for appropriate processing and

15   recycling.  EPA contends that Omega Chemical failed to properly process, recycle

16   or dispose of those chemicals, resulting in groundwater contamination, and that

17   Plaintiffs are responsible to remediate the groundwater contamination underneath

18   the Omega Chemical property.

19   　　　　8.    EPA, however, has not limited Plaintiffs' responsibility for remediation

20   to the groundwater underneath the Omega Chemical property.  Because EPA

21   contends that the Omega Chemical property is one of multiple source properties of

22   the OU-2 Facility groundwater contamination, and that CERCLA imposes joint and

23   several liability for releases of hazardous substances in actions brought by the

24   government, EPA asserts that Plaintiffs are responsible for remediating the OU-2

25   Facility.

26   　　　　9.    Plaintiffs have each voluntarily incurred significant costs to investigate

27   the sources to, and the remediation of, the OU-2 Facility, collectively spending

28   millions of dollars to address it, and may incur millions of dollars more in future

- 4 -
COMPLAINT

1  response costs.  EPA has determined that the contaminated groundwater should be
2  contained, extracted, and treated so that it can be used in a beneficial manner.  This
3  remedy will require tens of millions of dollars in capital and operating expenditures
4  for years to come.  Upon information and belief, Defendants are responsible for
5  releases of hazardous substances to the OU-2 Facility groundwater and therefore
6  should bear the costs to clean up the resulting contamination.

7        10.    By this action, Plaintiffs seek to recover from Defendants the necessary
8  costs of response that Plaintiffs have incurred and will continue to incur in a manner
9  consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 *et seq*.,
10 caused by the release or threatened release of hazardous substances that have
11 contaminated the OU-2 Facility groundwater.  Plaintiffs also seek a declaratory
12 judgment that Defendants are liable for future response costs or damages that will be
13 binding on any subsequent actions to recover further response costs or damages.
14 Through this suit, Plaintiffs also seek an injunction requiring certain Defendants to
15 stop the release of the hazardous substances coming from the source properties they
16 own or operate and to remediate the soil and groundwater contamination at their
17 source properties to control the further spread and migration of the hazardous
18 substances in the OU-2 Facility groundwater.

19                              **PARTIES**
20    **A.    Plaintiffs**

21        11.    Plaintiff Alcoa Inc. is a corporation duly organized and existing under
22 the laws of the State of Pennsylvania with its principal place of business in New
23 York, New York.

24        12.    Plaintiff Alpha Therapeutic Corporation is a corporation duly organized
25 and existing under the laws of the state of California with its principal place of
26 business in New York, New York.

27        13.    Plaintiff Applied Micro Circuits Corp. is a corporation duly organized
28 and existing under the laws of the state of Delaware with its principal place of

business in Sunnyvale, California.

14.     Plaintiff Arlon, LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Bear, Delaware.

15.     Plaintiff Astro Aluminum Treating Co., Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in South Gate, California.

16.     Plaintiff BASF Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Florham Park, New Jersey.

17.     Plaintiff Baxter Healthcare Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Deerfield, Illinois.

18.     Plaintiff Cal-Tape & Label Co. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Anaheim, California.

19.     Plaintiff California Hydroforming Company, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in City of Industry, California.

20.     Plaintiff Cintas Corporation is a corporation duly organized and existing under the laws of the State of Washington with its principal place of business in Mason, Ohio.

21.     Plaintiff Columbia Showcase & Cabinet Company, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Sun Valley, California.

22.     Plaintiff County of Los Angeles is a public entity and duly constituted California governmental entity.

COMPLAINT

1    23.    Plaintiff Crosby & Overton, Inc. is a corporation duly organized and
2  existing under the laws of the State of California with its principal place of business
3  in Long Beach, California.

4    24.    Plaintiff Disney Enterprises, Inc. is a corporation duly organized and
5  existing under the laws of the State of Delaware with its principal place of business
6  in Burbank, California.

7    25.    Plaintiff FHL Group is a corporation duly organized and existing under
8  the laws of the State of California with its principal place of business in Palos
9  Verdes Estates, California.

10    26.    Plaintiff Forenco, Inc. is a corporation duly organized and existing
11  under the laws of the State of Illinois with its principal place of business in Chicago,
12  Illinois.

13    27.    Plaintiff General Dynamics Corporation is a corporation duly organized
14  and existing under the laws of the State of Delaware with its principal place of
15  business in Falls Church, Virginia.

16    28.    Plaintiff Gulfstream Aerospace Corporation is a corporation duly
17  organized and existing under the laws of the State of Georgia with its principal place
18  of business in Savannah, Georgia.

19    29.    Plaintiff Hexcel Corporation is a corporation duly organized and
20  existing under the laws of the State of Delaware with its principal place of business
21  in Stamford, Connecticut.

22    30.    Plaintiff Honeywell International Inc. is a corporation duly organized
23  and existing under the laws of the State of Delaware with its principal place of
24  business in Morristown, New Jersey.

25    31.    Plaintiff Ingersoll-Rand Company is a corporation duly organized and
26  existing under the laws of the State of New Jersey with its principal place of
27  business in Piscataway, New Jersey.

28

COMPLAINT

32.     Plaintiff International Paper Company is a corporation duly organized and existing under the laws of the State of New York with its principal place of business in Memphis, Tennessee.

33.     Plaintiff Johns Manville is a corporation duly organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado.

34.     Plaintiff Kimberly-Clark Worldwide, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Irving, Texas.

35.     Plaintiff Kinder Morgan Liquids Terminals LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas.

36.     Plaintiff Los Angeles County Metropolitan Transportation Authority is a public corporation and county commission, duly authorized by California law to plan, construct and operate public mass transit in the County of Los Angeles.

37.     Plaintiff Mattel, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in El Segundo, California.

38.     Plaintiff Masco Corporation of Indiana is a corporation duly organized and existing under the laws of the State of Indiana with its principal place of business in Taylor, Michigan.

39.     Plaintiff Merck Sharp & Dohme Corporation is a corporation duly organized and existing under the laws of the State of New Jersey with its principal place of business in Whitehouse Station, New Jersey.

40.     Plaintiff NBCUniversal Media, LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

COMPLAINT

1    41.    Plaintiff Pacific Bell Telephone Company is a corporation duly

2 organized and existing under the laws of the State of California with its principal

3 place of business in San Francisco, California.

4    42.    Plaintiff Pilkington Group Limited, formerly known as Pilkinton PLC,

5 is a private limited company duly organized and existing under the laws of England

6 with its principal place of business in Lathom, England.

7    43.    Plaintiff Quest Diagnostics Clinical Laboratories, Inc. is a corporation

8 duly organized and existing under the laws of the State of Delaware with its

9 principal place of business in Madison, New Jersey.

10    44.    Plaintiff Raytheon Company is a corporation duly organized and

11 existing under the laws of the State of Delaware with its principal place of business

12 in Waltham, Massachusetts.

13    45.    Plaintiff Reichhold, Inc. is a corporation duly organized and existing

14 under the laws of the State of Delaware with its principal place of business in

15 Durham, North Carolina.

16    46.    Plaintiff Rio Tinto AUM Company is a corporation duly organized and

17 existing under the laws of the State of Delaware with its principal place of business

18 in South Jordan, Utah.

19    47.    Plaintiff Safety-Kleen Systems, Inc. is a corporation duly organized and

20 existing under the laws of the State of Wisconsin with its principal place of business

21 in Norwell, Massachusetts.

22    48.    Plaintiff Scripto-Tokai Corporation is a corporation duly organized and

23 existing under the laws of the State of Delaware with its principal place of business

24 in Ontario, California.

25    49.    Plaintiff Sempra Global is a corporation duly organized and existing

26 under the laws of the State of Delaware with its principal place of business in San

27 Diego, California.

28    50.    Plaintiff Shiley, LLC is a limited liability company duly organized and

COMPLAINT

existing under the laws of the State of California with its principal place of business in New York, New York.

51.     Plaintiff Signet Armorlite, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

52.     Plaintiff Soco West, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

53.     Plaintiff Sonoco Products Company is a corporation duly organized and existing under the laws of the State of South Carolina with its principal place of business in Hartsville, South Carolina.

54.     Plaintiff Sparton Technology, Inc. is a corporation duly organized and existing under the laws of the New Mexico with its principal place of business in Schaumberg, Illinois.

55.     Plaintiff Texaco Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in San Ramon, California.

56.     Plaintiff Texas Instruments Incorporated is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

57.     Plaintiff The Boeing Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

58.     Plaintiff The Dow Chemical Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Midland, Michigan.

59.     Plaintiff The Regents of the University of California is, and at all times relevant to this action was, pursuant to Article IX, Section 9, subdivisions (a) and (f)

- 10 -
COMPLAINT

of the California Constitution, a California constitutional corporation, authorized and empowered to administer a public trust known as the University of California, with full powers of organization and government thereof, including all powers necessary or convenient for the effective administration of the trust with its principal place of business in Oakland, California.

60. Plaintiff The Sherwin-Williams Company is a corporation duly organized and existing under the laws of the State of Ohio with its principal place of business in Cleveland, Ohio.

61. Plaintiff Trane U.S., Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Piscataway, New Jersey.

62. Plaintiff TriMas Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Bloomfield Hills, Michigan.

63. Plaintiff Union Oil Company of California is a corporation duly organized and existing under the laws of the State of California with its principal place of business in San Ramon, California.

64. Plaintiff Univar USA Inc. is a corporation duly organized and existing under the laws of the State of Washington with its principal place of business in Downers Grove, Illinois.

65. Plaintiff Universal City Studios LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Universal City, California.

66. Plaintiff Yort, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Andover, Massachusetts.

**B.** __Defendants__

67. Each Defendant falls into one of four categories: (i) a PRP that received

- 11 -
COMPLAINT

1   an SNL from EPA in connection with its ownership of, or operational activities at, a

2   contamination source property ("Source Property"); (ii) a PRP that received a GNL

3   from EPA in connection with its ownership of, or operational activities at, a Source

4   Property; (iii) a PRP that has not yet received a notice letter from EPA; or (iv) a

5   PRP that received an SNL from EPA because it sent chemicals to Omega Chemical.

### 1.   Special Notice Letter Defendant PRPs & Other PRPs Associated With SNL Source Properties

#### a.   *Bodycote SNL Source Property*

9   68.   Defendant Bodycote Thermal Processing, Inc. ("Bodycote") is a

10  corporation duly organized and existing under the laws of the Delaware with its

11  principal place of business in Dallas, Texas.  As alleged more fully herein, Bodycote

12  is a current or previous "owner" or "operator," as those terms are defined under

13  CERCLA, of the Bodycote Source Property, as that term is defined below in

14  Paragraph 119.  Upon information and belief, Bodycote is a successor-in-interest to

15  Techni-Braze, Inc.

#### b.   *Chrysler SNL Source Property*

17  69.   Defendant Burke Street Holdings, LLC ("Burke Street") is a limited

18  liability corporation duly organized and existing under the laws of the State of

19  California with its principal place of business in Santa Fe Springs, California.  As

20  alleged more fully herein, Burke Street is a current or previous "owner" or

21  "operator," as those terms are defined under CERCLA, of the Chrysler Source

22  Property, as that term is defined below in Paragraph 130.

23  70.   Upon information and belief, Defendant Dallas Smith Corp. (f/k/a

24  Dallas Smith Service Corporation) ("Dallas Smith") is a corporation duly organized

25  and existing under the laws of the State of Indiana with its principal place of

26  business in Greencastle, Indiana.  As alleged more fully herein, Dallas Smith is a

27  current or previous "owner" or "operator," as those terms are defined under

28  CERCLA, of the Chrysler Source Property.

COMPLAINT

1      71.     Defendant Palmtree Acquisition Corporation ("Palmtree") is a

2 corporation duly organized and existing under the laws of the State of Delaware

3 with its principal place of business in Denver, Colorado.  As alleged more fully

4 herein, Palmtree is a current or previous "owner" or "operator," as those terms are

5 defined under CERCLA, of the Chrysler Source Property.  Upon information and

6 belief, Palmtree is a successor-in-interest to Southern Pacific Industrial

7 Development Company.

8      72.     Defendant Union Pacific Railroad Company. ("Union Pacific") is a

9 corporation duly organized and existing under the laws of the State of Delaware

10 with its principal place of business in Omaha, Nebraska.  As alleged more fully

11 herein, Union Pacific is a current or previous "owner" or "operator," as those terms

12 are defined under CERCLA, of the Chrysler Source Property.  Upon information

13 and belief, Union Pacific is a successor-in-interest to Pacific Electric Railway

14 Company and Southern Pacific Railroad.

15         *c.*    *Earl Mfg. SNL Source Property*

16      73.     Defendant Claudette Earl is an individual.  As alleged more fully

17 herein, Claudette Earl is a current or previous "owner" or "operator," as those terms

18 are defined under CERCLA, of the Earl Mfg. Source Property, as that term is

19 defined below in Paragraph 146.

20      74.     Defendant Earl Mfg. Co., Inc. ("Earl Mfg.") is a corporation duly

21 organized and existing under the laws of the State of California with its principal

22 place of business in Santa Fe Springs, California.  As alleged more fully herein, Earl

23 Mfg. is a current or previous "owner" or "operator," as those terms are defined

24 under CERCLA, of the Earl Mfg. Source Property.

25         *d.*    *Foss Plating SNL Source Property*

26      75.     Defendant Foss Plating Company, Inc. ("Foss Plating") is a corporation

27 duly organized and existing under the laws of the State of California with its

28 principal place of business in Santa Fe Springs, California.  As alleged more fully

COMPLAINT

1   herein, Foss Plating is a current or previous "owner" or "operator," as those terms
2   are defined under CERCLA, of the Foss Plating Source Property, as that term is
3   defined below in Paragraph 159.

        e.    *Mission Linen SNL Source Property*

5        76.    Defendant Mission Linen Supply ("Mission Linen") is a corporation
6   duly organized and existing under the laws of the State of California with its
7   principal place of business in Santa Barbara, California.  As alleged more fully
8   herein, Mission Linen is a current or previous "owner" or "operator," as those terms
9   are defined under CERCLA, of the Mission Linen Source Property, as that term is
10  defined below in Paragraph 171.

        f.    *Phibro-Tech SNL Source Property*

12       77.    Defendant Phibro-Tech, Inc. ("Phibro-Tech") is a corporation duly
13  organized and existing under the laws of the state of Delaware with its principal
14  place of business in Teaneck, New Jersey.  As alleged more fully herein, Phibro-
15  Tech is a current or previous "owner" or "operator," as those terms are defined
16  under CERCLA, of the Phibro-Tech Source Property and an arranger of hazardous
17  waste disposal at the Phibro-Tech Source Property, as that term is defined below in
18  Paragraph 184.  Upon information and belief, Phibro-Tech is a successor-in-interest
19  to Southern California Chemical (f/k/a Pacific Western Chemical Company).

20       78.    As alleged more fully herein, Defendant Union Pacific is a current or
21  previous "owner" or "operator," as those terms are defined under CERCLA, of the
22  Phibro-Tech Source Property.

        g.    *Pilot Chemical SNL Source Property*

24       79.    Defendant Pilot Chemical Corp. ("Pilot") is a corporation duly
25  organized and existing under the laws of the State of California with its principal
26  place of business in Santa Fe Springs, California.  As alleged more fully herein,
27  Pilot is a current or previous "owner" or "operator," as those terms are defined
28  under CERCLA, of the Pilot Chemical Source Property and former owner of the

- 14 -
COMPLAINT

1    Pilot Chemical Source Property, as that term is defined below in Paragraph 203.

2              **2.      GNL Defendant PRPs & Other PRPs Associated with GNL**
                         **Source Properties**
3

4                        *a.      Continental GNL Source Property*

5          80.    Defendant Continental Heat Treating, Inc. ("Continental") is a

6    corporation duly organized and existing under the laws of the State of California

7    with its principal place of business in Santa Fe Springs, California.  As alleged more

8    fully herein, Continental is a current or previous "owner" or "operator," as those

9    terms are defined under CERCLA, of the Continental Source Property, as that term

10   is defined below in Paragraph 221.

11         81.    Defendant Continental Development Company, L.P. ("Continental

12   Development") is a limited partnership duly organized and existing under the laws

13   of the State of California with its principal place of business in Santa Fe Springs,

14   California.  As alleged more fully herein, Continental Development is a current or

15   previous "owner" or "operator," as those terms are defined under CERCLA, of the

16   Continental Source Property.

17                       *b.      Mobil Jalk Fee GNL Source Property*

18         82.    Defendant ExxonMobil Oil Corporation ("ExxonMobil") is a

19   corporation duly organized and existing under the laws of the State of New York

20   with its principal place of business in Irving, Texas.  As alleged more fully herein,

21   ExxonMobil is a current or previous "owner" or "operator," as those terms are

22   defined under CERCLA, of the Mobil Jalk Fee Source Property, as that term is

23   defined below in Paragraph 233.  Upon information and belief, ExxonMobil is a

24   successor-in-interest to General Petroleum Corporation and Mobil Oil Corporation

25   (f/k/a Socony Mobil Oil Company, f/k/a Standard Oil Company of New York).

26             **3.      Non-Notice Letter Defendant PRPs**

27                       *a.      Associated Plating Source Property*

28         83.    Defendant APC Investment Company ("APC") is a corporation duly

1  organized and existing under the laws of the State of California with its principal

2  place of business in Reno, Nevada.  As alleged more fully herein, APC is a current

3  or previous "owner" or "operator," as those terms are defined under CERCLA, of

4  the Associated Plating Source Property, as that term is defined below in Paragraph

5  245.

6      84.    Defendant Associated Plating Company, Inc. (f/k/a Associated Plating

7  Acquisition Corp.) ("Associated Plating Inc.") is a corporation duly organized and

8  existing under the laws of the State of Delaware with its principal place of business

9  in Santa Fe Springs, California.  As alleged more fully herein, Associated Plating

10  Inc. is a current or previous "owner" or "operator," as those terms are defined under

11  CERCLA, of the Associated Plating Source Property.

12      85.    Defendant Associated Plating Company ("Associated Plating") is a

13  corporation duly organized and existing under the laws of the State of California

14  with its principal place of business in Santa Fe Springs, California.  As alleged more

15  fully herein, Associated Plating is a current or previous "owner" or "operator," as

16  those terms are defined under CERCLA, of the Associated Plating Source Property.

17      86.    Defendant Gordon E. McCann is an individual, who, upon information

18  and belief, resides in Santa Ana, California.  As alleged more fully herein, Gordon

19  McCann is a current or previous "owner" or "operator," as those terms are defined

20  under CERCLA, of the Associated Plating Source Property.

21      87.    Defendant Lynnea R. McCann is an individual, who, upon information

22  and belief, resides in Santa Ana, California.  As alleged more fully herein, Lynnea

23  R. McCann is a current or previous "owner" or "operator," as those terms are

24  defined under CERCLA, of the Associated Plating Source Property.

25      88.    Defendant Darrell K. Golnick is an individual, who, upon information

26  and belief, resides in Carlsbad, California.  As alleged more fully herein, Darrell K.

27  Golnick is a current or previous "owner" or "operator," as those terms are defined

28  under CERCLA, of the Associated Plating Source Property.

COMPLAINT

1    89.    Defendant Clare S. Golnick is an individual, who, upon information
2    and belief, resides in Reno, Nevada.  As alleged more fully herein, Clare S. Golnick
3    is a current or previous "owner" or "operator," as those terms are defined under
4    CERCLA, of the Associated Plating Source Property.

5    90.    Defendant Cheryl A. Golnick is an individual, who, upon information
6    and belief, resides in Reno, Nevada.  As alleged more fully herein, Cheryl A.
7    Golnick is a current or previous "owner" or "operator," as those terms are defined
8    under CERCLA, of the Associated Plating Source Property.

9                   b.    *Cenco Refining Source Property*

10    91.    Defendant Lakeland Development Company, formerly known as Cenco
11    Refining Co. ("Lakeland Development"), is a corporation duly organized and
12    existing under the laws of the State of Delaware with its principal place of business
13    in Santa Fe Springs, California.  As alleged more fully herein, Lakeland
14    Development is a current or previous "owner" or "operator," as those terms are
15    defined under CERCLA, of the Cenco Refining Source Property, as that term is
16    defined below in Paragraph 257.

17    92.    Defendant Powerine Oil Company ("Powerine") is a corporation duly
18    organized and existing under the laws of the State of California with its principal
19    place of business in Santa Fe Springs, California.  As alleged more fully herein,
20    Powerine is a current or previous "owner" or "operator," as those terms are defined
21    under CERCLA, of the Cenco Refining Source Property.

22                   c.    *Patsouras Source Property*

23    93.    Defendant El Greco Wholesale Grocers, Inc. ("El Greco") is a
24    corporation duly organized and existing under the laws of the State of California
25    with its principal place of business in Santa Fe Springs, California.  As alleged more
26    fully herein, El Greco is a current or previous "owner" or "operator," as those terms
27    are defined under CERCLA, of the Patsouras Source Property, as that term is
28    defined below in Paragraph 274.

COMPLAINT

1

94.     Defendant Kekropia, Inc. ("Kekropia") is a corporation duly organized

2

and existing under the laws of the State of California with its principal place of

3

business in Santa Fe Springs, California.  As alleged more fully herein, Kekropia is

4

a current or previous "owner" or "operator," as those terms are defined under

5

CERCLA, of the Patsouras Source Property.

6

95.     Defendant Palley Supply Company ("Palley Supply") is a corporation

7

duly organized and existing under the laws of the State of California with its

8

principal place of business in Los Angeles, California.  As alleged more fully herein,

9

Palley Supply is a current or previous "owner" or "operator," as those terms are

10

defined under CERCLA, of the Patsouras Source Property.

11

96.     Defendant William K. Palley is an individual.  As alleged more fully

12

herein, William K. Palley is a current or previous "owner" or "operator," as those

13

terms are defined under CERCLA, of the Patsouras Source Property.

14

*d.*     *PMC Source Property*

15

97.     Defendant Ferro Corp. ("Ferro") is a corporation duly organized and

16

existing under the laws of the State of Ohio with its principal place of business in

17

Mayfield Heights, Ohio.  As alleged more fully herein, Ferro is a current or previous

18

"owner" or "operator," as those terms are defined under CERCLA, of the PMC

19

Source Property, as that term is defined below in Paragraph 287.

20

98.     Defendant PMC Specialties Group, Inc. ("PMC") is a corporation duly

21

organized and existing under the laws of the State of Delaware with its principal

22

place of business in Cincinnati, Ohio.  As alleged more fully herein, PMC is a

23

current or previous "owner" or "operator," as those terms are defined under

24

CERCLA, of the PMC Source Property.

25

**4.     SNL Defendant PRPs Firmenich and Momentive**

26

99.     Defendant Firmenich, Inc. ("Firmenich") is a corporation duly

27

organized and existing under the laws of the State of New Jersey with its principal

28

place of business in Geneva, Switzerland.  As alleged more fully herein, Firmenich

COMPLAINT

is an "arranger," as that term is defined under CERCLA, of hazardous waste disposal at the Omega Chemical property.  Upon information and belief, Firmenich obtained a partial interest in MCP Industrial Food Products ("MCP") and is a successor-in-interest to MCP.

100.   Upon information and belief, Defendant Momentive Specialty Chemicals, Inc. (f/k/a Hexion Specialty Chemicals, Inc.) ("Momentive") is a corporation duly organized and existing under the laws of the State of New Jersey with its principal place of business in Columbus, Ohio.  As alleged more fully herein, Momentive is an "arranger," as that term is defined under CERCLA, of hazardous waste disposal at the Omega Chemical property.  Upon information and belief, Momentive, through its affiliate, Hexion Specialty Chemicals, Inc., obtained a partial interest in MCP and is a successor-in-interest to MCP.

## C.   Doe Defendants

101.   Plaintiffs are ignorant of the true names and capacities of the defendants sued fictitiously as DOES 1 through 100, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained, but are presently informed and believe that each of the fictitiously named defendants is an owner, member, or affiliate of a named Defendant with such unity of interest and ownership that the separate personalities between the Doe Defendant and the named Defendant no longer exist and that failure to disregard their separate identities would result in fraud or injustice.

102.   Plaintiffs are ignorant of the true names and capacities of the defendants sued fictitiously as DOES 101 through 250, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained, but are presently informed and believe that each of the fictitiously named defendants is a person or entity that arranged for the disposal of hazardous substances at a Source Property, which is

COMPLAINT

1 | responsible in some manner for some or all of the acts alleged herein.

2 | **JURISDICTION AND VENUE**

3 | 103.   This is a civil action arising under the Comprehensive Environmental

4 | Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*

5 | This Court has original jurisdiction pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C.

6 | § 1331.

7 | 104.   In addition, the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202,

8 | and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to

9 | grant Plaintiffs declaratory relief.

10 | 105.   This Court has jurisdiction over Plaintiff's public nuisance cause of

11 | action under the doctrine of supplemental jurisdiction and 28 U.S.C. § 1367,

12 | because this claim arises out of the same set of operative facts and as the federal

13 | claims.

14 | 106.   Venue is proper in this district pursuant to Section 113(b) of CERCLA,

15 | 42 U.S.C. § 9613(b), because the releases of hazardous substances and

16 | endangerment to health and environment which give rise to the claims asserted

17 | herein occurred in this district.

18 | **FACTUAL ALLEGATIONS**

19 | **A.   OU-2 Facility Regional Groundwater Contamination**

20 | 107.   EPA has concluded that the groundwater underlying portions of

21 | Whittier and Santa Fe Springs, California is contaminated with hazardous

22 | substances.  Although the concentration of chemicals in the groundwater vary

23 | throughout the region, the contamination extends approximately 4½ miles and is

24 | roughly bordered by Whittier Boulevard to the north, Imperial Highway to the

25 | south, Bloomfield Avenue and Santa Fe Springs Road to the east and several blocks

26 | west of the 5 and 605 freeways.  The chemicals in the groundwater include:

27 | • Antimony;

28 | • Arsenic;

COMPLAINT

1   • Benzene;

2   • Chloroform;

3   • Chromium;

4   • Hexavalent chromium;

5   • Total chromium;

6   • 1,2-Dibromo-3-chloropropane ("DBCP");

7   • 1,1-Dichloroethane ("1,1-DCA");

8   • 1,2-Dichloroethane ("1,2-DCA);

9   • 1,1-Dichloroethene ("1,1-DCE");

10  • Cis-1,2-dichloroethene ("c-1,2-DCE");

11  • Methylene chloride ("DCM");

12  • Cis-1,3-dichloropropene ("c-1,3-DCP");

13  • Trans-1,3-dichloropropene ("t-1,3-DCP");

14  • Bis (2-ethylhexyl) phthalate ("DEHP");

15  • 1,4-Dioxane;

16  • 1,2-Dibromoethane ("EDB");

17  • Carbon tetrachloride;

18  • Trichlorofluoromethane ("Freon 11");

19  • 1,1,2-Trichloro-1,2,2-trifluoroethane ("Freon 113");

20  • Isopropyl alcohol ("IPA");

21  • Manganese;

22  • Mercury;

23  • Methyl tert-butyl ether ("MTBE");

24  • N-nitrosodimethylamine ("NDMA");

25  • Nickel;

26  • 1,1,2,2-Tetrachloroethane;

27  • Tetrachloroethylene ("PCE");

28  • Selenium;

COMPLAINT

1    • 1,1,1-Trichloroethane ("1,1,1-TCA");

2    • 1,1,2-Trichloroethane ("1,1,2-TCA");

3    • Trichloroethylene ("TCE");

4    • Thallium; and

5    • Vinyl chloride.

6    Each of these substances is a "hazardous substance" as that term is defined under

7    CERCLA.  The groundwater is also contaminated with aluminum; perchlorate;

8    1,2,3-Trichloropropane ("TCP"); chlorides; nitrates; sulfates; and dissolved solids,

9    as well as any other hazardous substances identified by EPA from time to time as

10   contaminants of concern in the OU-2 Facility.  Upon information and belief, EPA

11   contends that exposure to one or more of these substances poses a risk to human

12   health and safety.  Because hazardous substances were deposited, stored, disposed

13   of, placed, or otherwise came to be located in groundwater underlying portions of

14   the Whittier and Santa Fe Springs communities, this area is a "facility" within the

15   meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

16       108.   Historically, the land that sits atop the OU-2 Facility has been used

17   mostly for industrial or commercial purposes.  The area includes chemical

18   manufacturing and processing plants, oil refinery and oil production facilities,

19   including wells and pipelines, industrial laundry operations, metal processing plants,

20   railroad operations, gas stations and machine shops, many of which involved storage

21   of significant quantities of chemicals for use in operations.

22       109.   Certain Defendants currently operate, or formerly operated, such

23   businesses, or currently own, or formerly owned, the property on which those

24   businesses operated.  Other Defendants arranged for the treatment or disposal of

25   wastes at businesses that sit on top of or very near to the OU-2 Facility.

26       110.   State and regulatory agencies have identified the properties owned by

27   Defendants, or upon which they operated, as well as the Omega Chemical property,

28   as sources of the OU-2 Facility groundwater contamination.  They have identified

COMPLAINT

1   numerous instances of releases of hazardous substances, such as PCE, TCE, 1,1-

2   DCE and hexavalent chromium, onto the ground and into the soil at and underneath

3   those properties.

4       111.   EPA believes that the subsurface directly beneath these source areas

5   consists of portions of permeable soil containing lower concentrations of water,

6   resulting in migration of contaminants generally downward by gravity.  As the

7   contaminants in the soil sink to lower depths and reach the saturated zone, the

8   contaminants travel laterally and downgradient with the flow of the groundwater.

9       112.   EPA reports that it has searched and reviewed records and state and

10  local agency files, performed field investigations at several of the confirmed and

11  potential source areas of the OU-2 Facility groundwater contamination, and has

12  determined that many source areas of significantly contaminated soil and

13  groundwater have likely contributed contaminants to the OU-2 Facility.  EPA has

14  issued SNLs to Defendants Phibro-Tech, Inc.; Union Pacific; Bodycote; Pilot

15  Chemical; Mission Linen; Foss Plating; Earl Mfg.; Claudette Earl; Palmtree

16  Acquisition Corporation; Burke Street; Firmenich; and Momentive, identifying each

17  of these Defendants as potentially liable for past and future costs to remediate the

18  contaminated regional groundwater.  Upon information and belief, the content of

19  EPA's Remedial Investigation / Feasibility Study, and the SNLs themselves, provide

20  information concerning the basis for EPA's belief that these Defendants have

21  contributed to the OU-2 Facility and the SNLs invite the SNL Defendants to discuss

22  with EPA the future cleanup work.

23      113.   Also, EPA has sent GNLs to Defendants Continental and ExxonMobil.

24  In the letters, EPA identifies the recipients as potentially liable for past and future

25  costs to remediate the contaminated regional groundwater.

26      114.   The majority of the groundwater contamination at the OU-2 Facility is

27  limited to the upper portion of the groundwater aquifer.  The groundwater within the

28  OU-2 Facility area is used as a source of drinking water by several municipal and

COMPLAINT

private water purveyors, although the current drinking water wells in the OU-2 area draw water primarily from deeper portions of the aquifer than are currently affected by the contamination.  The contamination, however, if left unabated, could spread into other portions of the aquifer that are sources of drinking water.  Upon information and belief, groundwater production well monitoring data on file with the California Department of Public Health show that these production wells have had low levels of contamination dating back to 1985.  The water purveyors have installed and maintain wellhead treatment systems on affected production wells to remove contaminants to acceptable regulatory levels.  If left unabated, the contamination may also, upon information and belief, affect soil, around or adjacent to the contaminated groundwater, that is not already impacted, including but not limited to soil at or underneath public property and infrastructure.

115.   EPA has concluded that the contamination described above poses a threat to public health, welfare and the environment and that a response to address the contamination is therefore necessary.  Accordingly, EPA has identified a groundwater pump-and-treat system that is intended to remove contaminant mass from the groundwater, limit the movement of contaminated groundwater, and prevent any further spreading of hazardous substances to uncontaminated areas of the aquifer and nearby water production wells (the "Selected Remedy").  Implementing the Selected Remedy is estimated to cost in the tens of millions of dollars.

116.   EPA contends that Plaintiffs, which sent chemicals to Omega Chemical for proper treatment, processing and disposal, and others, should bear the costs of the Selected Remedy, as well as past costs EPA has incurred in connection with the OU-2 Facility.

117.   Beginning no later than 2009, each Plaintiff has incurred significant costs to monitor, assess and evaluate the OU-2 Facility, to investigate the environmental conditions associated with the OU-2 Facility, including the sources

COMPLAINT

1  of contamination, to identify PRPs, and to evaluate the means to address the

2  contamination.  Plaintiffs collectively have incurred millions of dollars to date in

3  such costs.  In addition, Plaintiffs have spent and may in the future spend significant

4  sums to address the contamination contributed to the OU-2 Facility by Defendants

5  that may affect soil, around or adjacent to the contaminated groundwater, that is not

6  already impacted, including but not limited to soil at or underneath public property

7  and infrastructure.  These costs have neither been reimbursed nor indemnified, nor

8  are they duplicative of any costs incurred by any other person, entity, or

9  governmental entity in connection with the OU-2 Facility.

10  **B.  Defendants Have Contributed to the OU-2 Facility Regional Groundwater Contamination**

12  118.  Each of the source properties set forth below is located above or

13  adjacent to the OU-2 Facility.  Upon information and belief, each is a source of the

14  OU-2 Facility groundwater contamination.  The approximate locations of the source

15  properties are shown in the attached Exhibit B.

16  **1.  The SNL Defendants' Source Properties**

17  *a.  The Bodycote Source Property – 11845 Burke Street*

18  119.  Upon information and belief, releases of contamination have occurred

19  from property located at and/or adjacent to 11845 Burke Street, Santa Fe Springs,

20  California and businesses operating thereon (the "Bodycote Source Property").

21  i.  Source Property Ownership and Operation

22  120.  Since at least 1966, Defendant Bodycote (including its predecessor

23  company, Techni-Braze, Inc.) has been conducting metalwork operations at the

24  Bodycote Source Property, such as heat treating of metal, metal brazing, metal

25  testing, and metal coating.  Bodycote purchased the Bodycote Source Property in

26  1997 and remains the current owner today.

27  121.  Operations of the type Bodycote conducted frequently involved the use

28  of halogenated solvents.  Before a part can be heat treated or coated, it must be

COMPLAINT

cleaned of foreign substances, such as oil and grease.  A device called a vapor degreaser is generally used to do so.  A typical vapor degreaser boils a halogenated solvent (such as PCE, TCE, 1,1,1-TCA, or Freon 11) to create a hot vapor into which metal, glass, or plastic items are immersed to remove grease, fats, oils, wax, or soil.  Although vapor degreasers often reuse the vapor after it cools and condenses, the process generates hazardous waste in the form of residual liquid solvent and sludge that must either be disposed of or treated.  The storage and use of solvents in vapor degreasers has historically been associated with spills, leaks and releases into the environment.

               ii.       <ins>Disposal & Releases of Hazardous Substances</ins>

122.   Upon information and belief, hazardous substances, including waste oil and the solvents PCE and TCE were stored, used, or were otherwise present in hazardous waste at the Bodycote Source Property.  From 1980 (when Bodycote's predecessor installed a vapor degreaser at the Bodycote Source Property) to at least 1998 (when Bodycote reported it had ceased using chlorinated solvents on the property), Bodycote and its predecessor used PCE and TCE in connection with Bodycote's metalworking operations.  During the time it operated the degreaser, Bodycote estimated it was using approximately 55 gallons a month of PCE in degreasing operations.

123.   Bodycote has repeatedly been found in violation of hazardous substance regulations.  In 1984 and 1989, the Los Angeles County Department of Health Services issued notices of violation regarding Bodycote's predecessor's practices for storage and disposal of PCE, waste oil, and other hazardous waste.  In 1998, the Santa Fe Springs Fire Department inspected the Bodycote Source Property and found numerous violations, including unsafe storage of hazardous waste, disposal of solvent-soaked towels in the garbage, and improper storage of PCE and TCA, all of which were found to be a failure of Bodycote's responsibility to

- 26 -

COMPLAINT

1    "minimize possibility of … sudden and non-sudden release of hazardous waste to
2    soil, air, or water."

3        124.   Bodycote's operations and waste disposal practices resulted in one or
4    more hazardous substances, including but not limited to PCE, being placed onto the
5    ground or into the soil at or near the Bodycote Source Property.  Soil samples taken
6    at the Bodycote Source Property have detected benzene; 1,1-DCE; PCE; TCE; and
7    toluene.  A historical analysis of the property by Bodycote's consultant led the
8    consultant to conclude that chronic spilling of PCE had occurred behind the main
9    building on the property and in the northwest corner of the property, and that the
10   resulting soil contamination was the source of local groundwater contamination.
11   Soil samples taken at the Bodycote Source Property have repeatedly shown PCE
12   contamination at much higher concentrations in soil in the areas where Bodycote
13   stored and used the solvent.  During an assessment of the Bodycote Source Property
14   in 1991, oily stains were observed under and around the degreaser on the property.
15   Later that year, in August 1991, another assessment found PCE in the soil on the
16   property and concluded that there had been a release of PCE from storage containers
17   or degreasing operations and that the release had contaminated the soil and
18   underlying groundwater on the property.

19       125.   Upon information and belief, the hazardous substances present in the
20   soil at the Bodycote Source Property have migrated and continue to migrate
21   downward into the saturated zone beneath the property and have come to be located
22   in the groundwater, resulting in contamination of the groundwater with benzene;
23   1,1-DCA; 1,2-DCA; 1,1-DCE; 1,1,1,2-tetrachloroethane; PCE; TCA; 1,1,1-TCA;
24   1,1,2-TCA; TCE; 1,4-dioxane; and toluene.  An investigation of the property in
25   1995 concluded that soil contamination at the Bodycote Source Property extended to
26   the groundwater.  Groundwater samples taken at the Bodycote Source Property have
27   found PCE contamination at much higher concentrations in the areas where
28   Bodycote stored and used PCE.  In 2007, Bodycote's environmental consultants

COMPLAINT

1   concluded that the presence of 1,1-DCA; 1,2-DCA; 1,1-DCE; and TCA in

2   groundwater on the property were attributable to the chemical degradation of PCE

3   released from the property.

4   126.   Upon information and belief, wastewater containing hazardous

5   substances, including chromium, was discharged by Bodycote and its predecessor

6   from the Bodycote Source Property into a drain channel, where it migrated

7   downward into the saturated zone and came to be located in the regional

8   groundwater.  In 1975, the Regional Water Quality Control Board and the Los

9   Angeles County Sanitation District each determined that Bodycote's predecessor,

10  Techni-Braze, was discharging wastewater from the Bodycote Source Property

11  containing chromium in excess of permitted amounts; the Sanitation District also

12  detected chlorinated hydrocarbons in the wastewater.

13  127.   Because hazardous substances were deposited, stored, disposed of, or

14  placed, or otherwise came to be located at the Bodycote Source Property, the

15  Bodycote Source Property is a "facility" within the meaning of Section 101(9) of

16  CERCLA, 42 U.S.C. § 9601(9).

17  128.   Groundwater monitoring data indicates that the contaminants in the

18  groundwater from the soil at the Bodycote Source Property have migrated offsite in

19  the same general direction as the groundwater flow.  Assessments of the property in

20  1991 and 1995 analyzed contamination from Bodycote's operations and concluded

21  that the contamination may have migrated offsite.

22  129.   In 2010, EPA cited with approval investigations that had concluded that

23  contamination at the Bodycote Source Property with PCE and its degradation

24  products, such as TCE, was caused by spills or leaks from Bodycote's storage of

25  PCE or related operations, and that the contamination had migrated offsite.  In or

26  around September 2012, Plaintiffs allege on information and belief, EPA sent an

27  SNL to Bodycote, which, among other things, identifies Bodycote as a PRP for the

28  OU-2 Facility groundwater contamination and solicits an offer for Bodycote to

- 28 -
COMPLAINT

1  perform the OU-2 Facility remedial design and remedial action and pay EPA's
2  unreimbursed response costs.

3         b.      *The Chrysler Source Property*

4      130.   Upon information and belief, releases of contamination have occurred
5  from property, and businesses operating thereon, located at and/or adjacent to the
6  former address 12140 Slauson Ave., Santa Fe Springs, California.  The original
7  property has since been subdivided and has come to be known as the La Salle
8  Property, Central Property, North-Central Property and MultiTenant Property, more
9  specifically identified, respectively, by Assessor's Parcel Numbers 8168-002-412;
10  8168-002-403 through 405, 8168-002-405, and 8168-002-418 and 419; 8168-002-
11  412, and 8168-002-803 and 804; and 8168-002-402 (the "Chrysler Source
12  Property").

13         i.      Source Property Ownership

14      131.   Beginning no later than 1888, Defendant Union Pacific, or a
15  predecessor company or subsidiary of Defendant Union Pacific, began acquiring
16  portions of the Chrysler Source Property, and by no later than 1966 had acquired
17  title to the entire Chrysler Source Property.

18      132.   In 1974, Southern Pacific Industrial Development Company, a
19  predecessor to Defendant Palmtree, acquired title to the Chrysler Source Property.

20      133.   In 2000, Defendant Burke Street acquired a portion of the Chrysler
21  Source Property and by 2002 Burke Street had acquired the entire Central Property
22  portion of the Chrysler Source Property.  In December 2009, Burke Street admitted,
23  in response to an EPA CERCLA Section 104(e) request, that as of that time, it had
24  not engaged in any cleanup activities of the Chrysler Source Property.

25         ii.      Source Property Operation

26      134.   Beginning in 1963, certain entities conducted automobile preparation
27  operations at the Chrysler Source Property.  At this time, there were six buildings

28

- 29 -
COMPLAINT

1    onsite and by 1966 there were a total of nine buildings on the central and
2    northwestern portions of the Chrysler Source Property and a portion of the site was
3    covered by asphalt and used for automobile storage.  By 1979 there were 17
4    buildings onsite and hundreds of cars parked at the Chrysler Source Property.
5    Operations included body and mechanical work, tune-ups, front-end alignment,
6    emissions control testing, painting, washing, detailing, performance testing, and spot
7    chroming.
8            135.   Beginning in approximately 1963, Pacific Electric leased an
9    approximately 27.67 acre portion of the Chrysler Source Property to Defendant
10   Dallas Smith, which conducted various automobile preparation operations there,
11   including those operations at the site, including operations set forth in paragraph 134
12   above.
13           136.   In 1967, Defendant Union Pacific (then known as Southern Pacific
14   Railroad) leased the 27.67 acre Dallas Smith portion of the Chrysler Source
15   Property plus an additional 11.90 acres to the Chrysler Realty Corporation, which
16   continued conducting automobile preparation operations under the name Nucar Prep
17   Systems at the Chrysler Source Property, including those operations set forth in
18   paragraph 134 above.  Chrysler operated under various names including Nucar Prep
19   Systems, Chrysler Corp. – California Emission Test Facility, Nu Car Prep System
20   Inc., Chrysler Shelby Center, and Pre-Check Corp., at the Chrysler Source Property.
21           137.   In 1988, Chrysler ceased operations at the Chrysler Source Property,
22   and as of 1999, car preparation structures at the Chrysler Source Property had been
23   razed and were replaced by office and warehouse buildings.
24                          iii.    Disposal & Releases of Hazardous Substances
25           138.   Upon information and belief, hazardous substances were disposed of at
26   the Chrysler Source Property between 1963 and 1988.  According to at least one
27   report, as well as Material Safety Data Sheets from the Chrysler Source Property,
28   compounds used there included detergents and flammable solvents; chlorinated

hydrocarbons, including TCE and PCE used for degreasing parts and washing cars and trucks and MEK; purgeable halocarbons, toluene, xylenes, butyl alcohol; emulsifiers; acetone; metals; new and used motor oil from car maintenance operations; and acrylic and enamel paint from spray paint operations.  Chrysler used hexavalent chromium (and, potentially, other chromium compounds) at the Chrysler Source Property and stored waste chromium for transportation off-site.

139.   Upon information and belief, Defendant Dallas Smith applied for and obtained Industrial Waste Disposal Permits to dispose of liquid waste or wastewater generated in connection with its operations to the sanitary sewer, as well as a storm drain located on or adjacent to the property.  In 1970, and again in 1976, public agencies found Chrysler to be in violation of water discharge permits for disposing of chromium into a storm drain.  No later than 1973, Chrysler used and disposed of solvents, cosmoline (rust-preventative) remover, and wastewater at the Chrysler Source Property.  Chrysler improperly disposed of hazardous paint residue into a storm drain on or near the Chrysler Source Property, improperly placed hazardous wastes in the garbage for disposal, and used both TCE and PCE at the Chrysler Source Property for cosmoline removal in or before 1985.  In addition to operating seven licensed underground storage tanks containing various chemicals, Chrysler operated a number of unlicensed and undocumented underground storage tanks sometime between 1967 and 1985.

140.   During the closure of the Chrysler Source Property in 1988, approximately 1,000 cubic yards of soil contaminated with hazardous substances were removed from the property, in addition to two undocumented, rusted storage tanks.  An investigation that same year uncovered soil contaminated with TCE and other hazardous substances.  In 1989, an assessment of the Chrysler Source Property concluded that the likelihood that the soil was contaminated around the plant's plumbing and drainage systems was high, and indeed, PCE was detected in the soil later that year.

141.   In 1990 and 1991, an investigation was conducted of soil near and under a former 750-gallon clarifier at the Chrysler Source Property that had been removed from the body works building at the property in 1988.  At the time the soil was removed, visibly stained soil with a chemical odor was observed.  The soil was contaminated with high levels of: TCE; PCE; chloroform; 1,1-DCA; 1,1,1-TCA and 1,2-DCE, and the contamination extended 33 feet below ground surface to the depth groundwater was first encountered.  At the time, stockpiled soil was also tested and found to be contaminated with: 1,1-DCE; 1,2-DCE; Freon-11; PCE; TCA; and TCE and soil gas was found to be contaminated with: 1,1-DCE; PCE; and Freon 11.  Approximately 1,000 cubic yards of contaminated soil, extending down to the top of the groundwater table, was removed.  An assessment of the Chrysler Source Property that same year also found oily sludge and extensive staining in the carwash area of the plant.  In addition, a plume of contaminants was found to exist in the soil extending out from the clarifier.  Tests of other parts of the Chrysler Source Property in 1991also showed soil contaminated with chromium and PCE.  In 1992, during the installation of sewers at the Chrysler Source Property, contaminated soil was discovered and removed.  The same year, additional soil contaminated with hazardous substances was discovered and removed.  In 1996, PCE was found to still be present in the soil at the Chrysler Source Property.

142.   Upon information and belief, the hazardous substances in the soil at the Chrysler Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater – specifically, chromium, PCE, TCE, TCA, DCA, DCE 1,1-DCE, 1,2-DCE and Freon-11.  In 1990 and 1991, investigations of groundwater under a 750-gallon clarifier at the Chrysler Source Property revealed that the groundwater beneath the clarifier contaminated with: 1,1-DCE, Freon 11, PCE, TCA, and TCE.  Tests of other parts of the Chrysler Source Property in 1991 showed groundwater contaminated with chromium, DCE, 1,1-DCE, 1,2-DCE, Freon 11, PCE, TCA, and

- 32 -
COMPLAINT

1   TCE.  The same year, wells at the Chrysler Source Property showed higher levels of

2   some chlorinated solvents than did wells located upgradient of the plant.  Additional

3   groundwater testing between 1994 and 1999 indicated that the groundwater at the

4   Chrysler Source Property was contaminated with: 1,1-DCE, 1,2-DCE, Freon 11,

5   Freon 113, PCE, and TCE.

6       143.   Because hazardous substances were deposited, stored, disposed of, or

7   placed, or otherwise came to be located at the Chrysler Source Property, the

8   Chrysler Source Property is a "facility" within the meaning of Section 101(9) of

9   CERCLA, 42 U.S.C. § 9601(9).

10      144.   Upon information and belief, contaminants in the groundwater from the

11  soil at the Chrysler Source Property have migrated offsite in the same general

12  direction as the groundwater flow.

13      145.   In 2010, the EPA concluded that based on elevated concentrations of

14  PCE, TCE, and 1,1-DCE in soil, the Chrysler Source Property is a source of

15  groundwater contamination by these compounds.  In or around February 2009, EPA

16  sent a GNL to Chrysler LLC, which, among other things, identifies Chrysler LLC as

17  a PRP for the OU-2 Facility groundwater contamination, requests a response as to

18  Chrysler LLC's willingness to negotiate with EPA regarding its potential liability

19  for OU-2 Facility response costs, and requests certain information about the status

20  of Chrysler LLC's activities.  In or around September 2012, Plaintiffs allege on

21  information and belief, EPA sent SNLs to Burke Street and Palmtree as successors

22  to Chrysler LLC.  Among other things, the SNLs identify those Defendants as PRPs

23  for the OU-2 Facility groundwater contamination, and solicits offers from Burke

24  Street and Palmtree to perform the OU-2 Facility remedial design and remedial

25  action, and pay EPA's unreimbursed response costs.

26           c.   _The Earl Mfg. Source Property – 11862 Burke Street_

27      146.   Upon information and belief, releases of contamination have occurred

28  from property located at and/or adjacent to 11862 Burke Street, Santa Fe Springs,

COMPLAINT

1   California and businesses operating thereon (the "Earl Mfg. Source Property").

2                   i.        Source Property Ownership and Operation

3       147.   Upon information and belief, Defendant Earl Mfg. began operations at

4   the Earl Mfg. Source Property in 1960.  At the time, the Earl Mfg. Source Property

5   was owned by William E. Earl and Dot A. Earl.  Earl Mfg. manufactured springs,

6   spark plugs, jacks and other machined parts.

7       148.   In 1990, William E. Earl and Dot A. Earl granted the property to

8   Defendant Claudette Earl, who remains the current owner.

9       149.   In 2000, Defendant Earl Mfg. ceased operations at the Earl Mfg.

10  Source Property.

11                  ii.       Disposal & Releases of Hazardous Substances

12      150.   Upon information and belief, hazardous substances were disposed of at

13  the Earl Mfg. Source Property between 1960 and 2000.

14      151.   Earl Mfg.'s operations involved significant use of solvents, such as:

15  TCE; DCA; and 1,1,1-TCA, as well as 400 to 500 gallons of PCE annually, which

16  was stored in a 500-gallon aboveground storage tank.  Waste PCE and a mixture of

17  chlorinated solvent wastes were stored in a rusted 1,000-gallon underground storage

18  tank.  Earl Mfg. also used other solvents.

19      152.   In 1966, Defendant Earl Mfg. installed a vapor degreaser at the Earl

20  Mfg. Source Property that was used until 1992.  Waste from the degreaser was

21  stored onsite in the 1,000-gallon underground storage tank.  A cooling tower located

22  on the roof of the vapor degreaser room was discharged daily into the public sewer.

23  Beginning in 1976, degreasing operations also involved use of a 100-gallon PCE dip

24  tank.

25      153.   In 1989, the Los Angeles County Department of Health Services issued

26  a Notice of Violation and Order to Comply to Defendant Earl Mfg. to, among other

27  things, segregate waste cooling oil from spent solvent waste, and recommended a

28  containment area to prevent oily runoff into a nearby Creek.

154.   In 1997, a rusted steel underground storage tank was removed from the Earl Mfg. Source Property.  The tank reportedly was used to store PCE and a metalworking coolant with the trade name "Trim Sol".  However, sludge found in the tank during removal contained more than 20 volatile organic compounds ("VOCs"), including: PCE, TCE, 1,1-DCA, 1,2-DCA, DCM, 1,1,1-TCA, toluene, and vinyl chloride.  Contemporaneous soil sampling detected PCE, TCE, and 1,1-DCA in the soil under the tank.  In 2012, additional soil samples collected from the Earl Mfg. Source Property revealed the presence of elevated levels of PCE and TCE.

155.   Upon information and belief, the hazardous substances present in the soil at the Earl Mfg. Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater – specifically, PCE, TCE, and 1,1-DCA.  Because of the elevated concentrations of contaminants in the soil, the Santa Fe Springs Fire Department in 1997 referred Defendant Earl Mfg. to the Regional Water Quality Control Board, stating that the contaminants indicated a potential threat to groundwater.  In 1999, groundwater tests conducted at the Earl Mfg. Source Property revealed PCE and TCE contamination at concentrations higher than background levels.  Groundwater samples collected in 2012 also revealed 1,1-DCA, 1,1-DCE, PCE, and TCE contamination.  In 2013, the Regional Water Quality Control Board issued a draft cleanup and abatement order to Defendant Claudette Earl, stating that a VOC groundwater plume had originated at the Earl Mfg. Source Property and had migrated offsite.

156.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Earl Mfg. Source Property, the Earl Mfg. Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

157.   Upon information and belief, contaminants in the groundwater from the

- 35 -

1   soil at the Earl Mfg. Source Property have migrated offsite in the same general

2   direction as the groundwater flow.  In 2013, the Regional Water Quality Control

3   Board concluded that a plume of VOCs originating at the property had migrated

4   offsite, affecting offsite groundwater resources.

5        158.   In 2010, EPA concluded that the Earl Mfg. Source Property was a

6   source of TCE and PCE, as well as of 1,1-DCA and 1,1-DCE contamination in the

7   OU-2 Facility.  In or around September 2012, Plaintiffs allege on information and

8   belief, EPA sent an SNL to Claudette Earl and one to Earl Mfg., which, among other

9   things, identify those Defendants as PRPs for the OU-2 Facility groundwater

10   contamination and solicit a offers for Claudette Earl and Early Mfg. to perform the

11   OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed

12   response costs.

13              *d.*      <u>*The Foss Plating Source Property – 8140 Secura Way*</u>

14        159.   Upon information and belief, releases of contamination have occurred

15   from property located at and/or adjacent to 8140 Secura Way, Santa Fe Springs,

16   California and businesses operating thereon (the "Foss Plating Source Property").

17              i.      <u>Source Property Ownership and Operation</u>

18        160.   Upon information and belief, in or around 1960, Foss Plating purchased

19   the Foss Plating Source Property and, as of 1968, was operating on the property.

20   Defendant Foss Plating conducted metal plating operations at the Foss Plating

21   Source Property, consisting primarily of chrome and nickel plating of parts and

22   metal polishing.

23        161.   In 2002, Devr Properties, a company related to Foss Plating, purchased

24   portions of the Foss Plating Source Property, including portions of the property

25   upon which hazardous waste was stored.  Devr Properties leased back the portion of

26   the property it had purchased to Foss Plating, which continued its operations on the

27   property until 2005.

28

COMPLAINT

ii.   <u>Disposal & Releases of Hazardous Substances</u>

162.   Upon information and belief, hazardous substances were disposed of at the Foss Plating Source Property between 1960 and 2005.

163.   Metal plating is the process by which a thin surface coating of one metal is applied to a part by placing the part in a bath of chemical plating solution, with or without the use of an electric current.  Metal plating generates wastewater containing chromium and other metals as well as toxic organic chemicals.  Additionally, before a part can be plated, it is typically cleaned of foreign substances, such as oil and grease, using a vapor degreaser and a solvent, resulting in solvent waste.

164.   Upon information and belief, beginning in 1968 until 1994 or 1995 (when Foss Plating reportedly removed its vapor degreasing system), Foss Plating operated one or more vapor degreasers on the property that used PCE until 1985, and thereafter used 1,1,1-TCA.  Each month, Foss Plating used approximately 120 gallons of solvent in its degreasing operations, and generated approximately 35-40 gallons of solvent sludge.  Additionally, Foss Plating used compounds containing hexavalent chromium to plate items with that metal.

165.   Foss Plating has repeatedly been found in violation of hazardous substance regulations.  In 1983, Foss Plating was cited for discharging wastewater from the property that contained chromium, and in 1999, Foss Plating was cited for discharging wastewater containing hexavalent chromium (and, potentially, other chromium compounds).  In 1989, Foss Plating was issued a notice of violation for disposing of solvent sludge with wastewater.  In 1998, Foss Plating was informed that its hazardous substance storage and containment procedures, including its containment of chemicals used in plating, were out of compliance with regulatory requirements.

166.   Upon information and belief, Foss Plating's operations and waste disposal practices resulted in one or more hazardous substances, including but not

1  limited to the solvents PCE and 1,1,1-TCA and chromium, being placed onto the
2  ground or into the soil at or near the Foss Plating Source Property.  Soil and soil
3  vapor samples taken at the Foss Plating Source Property have detected: chloroform;
4  hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCE;
5  nickel; PCE; 1,1,1-TCA; and TCE.  Soil contaminated with PCE and hexavalent
6  chromium was concentrated around one of the plating lines and a trench drain on the
7  property, which a consultant of Foss Plating concluded was the likely source of a
8  plume of chromium contamination in the soil under the plant.  Soil samples taken
9  near Foss Plating's wastewater treatment system revealed PCE and high levels of
10 chromium.  During a joint inspection by the California Department of Toxics
11 Substance Control ("DTSC") and the Santa Fe Springs Fire Department, inspectors
12 found the ground around the plating line soaked with plating solution and found
13 evidence of releases of PCE, chromium, and nickel to the soil on the property.  In
14 2003, a corroded clarifier was removed from the property and contemporaneous soil
15 samples found the soil contaminated with chromium.

16     167.   Upon information and belief, the hazardous substances present in the
17 soil at the Foss Plating Source Property have migrated and continue to migrate
18 downward into the saturated zone beneath the property and have come to be located
19 in the groundwater, resulting in contamination of the groundwater with: chloroform;
20 hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCE;
21 PCE; and TCE.  In 2006, a consultant for Foss Plating concluded that, based on Foss
22 Plating's historical use of PCE and chromium and the contamination data, Foss
23 Plating could be a source of groundwater contamination on the property.

24     168.   Because hazardous substances were deposited, stored, disposed of, or
25 placed, or otherwise came to be located at the Foss Plating Source Property, the Foss
26 Plating Source Property is a "facility" within the meaning of Section 101(9) of
27 CERCLA, 42 U.S.C. § 9601(9).

28     169.   Upon information and belief, contaminants in the soil and in the

- 38 -

COMPLAINT

1   groundwater from the soil at the Foss Plating Source Property have migrated offsite

2   in the same general direction as the groundwater flow.  In 2003, DTSC concluded

3   that hazardous wastes released at the Foss Plating Source Property had migrated, or

4   may migrate, offsite through soil, surface water, groundwater, air, particulate matter,

5   and water run-off channels.

6         170.   In 2010, EPA concluded that hexavalent chromium, PCE, and TCE had

7   been released at the Foss Plating Source Property, and cited with approval

8   investigations that had concluded that Foss Plating was a contributor to soil and

9   groundwater contamination with chromium, PCE, and zinc.  In or around September

10   2012, Plaintiffs allege on information and belief, EPA sent an SNL to Foss Plating,

11   which, among other things, identifies Foss Plating as a PRP for the OU-2 Facility

12   groundwater contamination, and solicits an offer for Foss Plating to perform the

13   OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed

14   response costs.

15               *e.*      *The Mission Linen Source Property – 11904-11920 East*
                        *Washington Boulevard*

16         171.   Upon information and belief, releases of contamination have occurred

17   from property located at and/or adjacent to 11904-11920 East Washington

18   Boulevard, Santa Fe Springs, California and businesses operating thereon (the

19   "Mission Linen Source Property").

20               i.      Source Property Ownership and Operation

21         172.   From approximately 1960 to 1973, Whittier Laundry Company

22   operated a dry cleaning business on the Mission Linen Source Property.  In 1973,

23   Defendant Mission Linen acquired the Mission Linen Source Property, and began

24   conducting industrial laundry operations on or about that same year.

25         173.   Defendant Mission Linen ceased operations at the Mission Linen

26   Source Property by 1992 but, upon information and belief, continues to own the

27   property.

28

COMPLAINT

ii.    Disposal & Releases of Hazardous Substances

174.    Upon information and belief, hazardous substances were disposed of at the Mission Linen Source Property between 1960 and 1992.

175.    Dry cleaning operations routinely involve the use of solvents to remove stains from fabrics.  After World War II, PCE became the most popular and primary solvent used by most dry cleaners in the United States.  Other solvents used at dry cleaning facilities may include 1,1,1-TCA and TCE.  The clothes are cleaned in a liquid solution consisting mostly of solvent, usually PCE, with very little water if any (hence, the term "*dry* cleaning").  These solvents are ordinarily stored in large underground storage tanks.  Large dry cleaning facilities may purchase more than 2,000 gallons of PCE each year.

176.    Used solvent is typically distilled and purified on the property so that it can be reused.  This process separates the solvent from waste residues like detergents, dye, dirt and oil, and involves the use of filters to purify the solvent.  Still residue from this process and used filters, both of which contain solvent and certain solvent residues, like PCE, are hazardous waste that must be properly disposed.  Large dry cleaning facilities may generate more than 2,000 pounds of hazardous waste each month, which is often stored onsite before being disposed.

177.    Wastewater and cooling water generated in the dry cleaning process also contain solvents that must be properly disposed or treated.  Dry cleaning facilities have been known to dispose of water containing PCE or other solvents into shallow disposal systems such as dry wells and septic systems, sewer systems and settling basins.

178.    Industrial laundries may also generate waste containing solvents and metals, such as hexavalent chromium.  Industrial laundries launder rags and industrial wipes from a wide variety of industrial operations, many of which are soaked in solvents and contain metal waste.  These hazardous substances are

1   removed from the rags and wipes during laundering and must be disposed of by the
2   laundry.

3       179.   Several sumps located at the Mission Linen Source Property were
4   found to contain: PCE; 1,1,1-TCA; 1,1-DCE; t-1,2-DCE; chromium; and zinc.
5   Mission Linen used numerous underground storage tanks on the property to store
6   fuel and waste oil at least until 1987.  When those tanks were removed in 1987, soil
7   under the tanks was found to be contaminated with hazardous substances.  In 1993,
8   the Los Angeles County Fire Department issued a notice of violation to Mission
9   Linen for improper waste storage practices.  In 1996, soil at the Mission Linen
10  Source Property was found to be contaminated and a plume of PCE was identified
11  beneath the Source Property.  A 2000 property assessment also identified PCE in the
12  soil at the Mission Linen Source Property.  Soil samples taken at the Mission Linen
13  Source Property in 2010 revealed the presence of benzene, c-1,2-DCE, PCE, and
14  TCE.  Even after a soil vapor extraction system had removed 430 pounds of PCE
15  from the soil on the property, PCE contamination was still prevalent in the soil.  Soil
16  vapor samples taken at the Mission Linen Source Property in 2013 continued to
17  show the presence of xylene contamination.

18      180.   Upon information and belief, the hazardous substances present in the
19  soil at and underneath the Mission Linen Source Property, including: PCE; c-1,2-
20  DCE; t-1,2-DCE; 1,1-DCE; and TCE, have migrated and continue to migrate
21  downward into the saturated zone beneath the Mission Linen Source Property and
22  have come to be located in the groundwater.  A property assessment conducted in
23  2000 found PCE in the groundwater at the Mission Linen Source Property and
24  concluded that it had migrated there from the soil at the Mission Linen Source
25  Property.  TCE and 1,1-DCE were also discovered in groundwater on the property.
26  EPA has previously concluded that the Mission Linen Source Property has impacted
27  groundwater with PCE and TCE, and confirmed that c-1,2-DCE, 1,1-DCE, and 1,2-
28  DCA are present in groundwater.

COMPLAINT

181.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Mission Linen Source Property, the Mission Linen Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

182.   Groundwater monitoring data indicates that the contaminants in the groundwater from the soil at the Mission Linen Source Property have migrated offsite in the same general direction as the groundwater flow.  In 2005, data showed that the concentrations of PCE in the groundwater near the Mission Linen Source Property were highest just downgradient from the former dry cleaning building.

183.   In 2010, EPA concluded that Mission Linen had impacted groundwater with PCE and TCE and concluded that the company was a source of contamination to the OU-2 Facility.  In or around September 2012, Plaintiffs allege on information and belief that EPA sent an SNL to Mission Linen, which, among other things, identifies Mission Linen as a PRP for the OU-2 Facility groundwater contamination, and solicits an offer for Mission Linen to perform the OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed response costs.

*f.*   *The Phibro-Tech Source Property – 8851 Dice Road*

184.   Upon information and belief, releases of contaminants have occurred from property located at and/or adjacent to 8851 Dice Road, Santa Fe Springs, California and businesses operating thereon (the "Phibro-Tech Source Property").

i.   Source Property Ownership and Operation

185.   Since 1957, Defendant Phibro-Tech and its predecessor companies have conducted chemical manufacturing and reprocessing operations at the Phibro-Tech Source Property, consisting primarily of the manufacture of inorganic chemicals, both from raw ingredients and from used chemicals and hazardous wastes sent to the property.  Inorganic chemicals are typically used for industrial or manufacturing purposes.  Chemical manufacture inherently carries with it the risk of chemical releases to the environment and the EPA has noted that one of the most

COMPLAINT

1   frequently released hazardous wastes from inorganic chemical manufacturing
2   operations is chromium.

3       186.   In 1957, a predecessor to Defendant Phibro-Tech named Pacific
4   Western Chemical Company (renamed Southern California Chemical Company in
5   1959) began operating at the Phibro-Tech Source Property, leasing the property
6   from Pacific Electric Railway Company.  Pacific Electric Railway merged into
7   Defendant Union Pacific (then known as Southern Pacific Railroad) in 1965.

8       187.   In 1961, the predecessor to Union Pacific entered into an agreement
9   with Phibro-Tech's predecessor, the Southern California Chemical Company, to
10   construct, maintain, and operate an industrial railway spur on the property to
11   facilitate rail shipments to and from the Phibro-Tech Source Property and, in 1964,
12   the two companies entered into a lease for the related property.

13       188.   Since at least 1963, Phibro-Tech and its predecessors have received
14   hazardous waste on the property for use in chemical manufacturing.  Upon
15   information and belief, Does 101 through 250 generated hazardous waste and
16   arranged for its disposal and/or treatment at the Phibro-Tech Source Property.

17       189.   In 1984, CP Chemicals, Inc. purchased the Phibro-Tech Source
18   Property and Southern California Chemical became a subsidiary of CP Chemicals.
19   Shortly after the purchase, a Santa Fe Springs city official observed that key
20   management of the plant—including those directly responsible for improper
21   discharges of hazardous waste—were the same personnel who had held those
22   positions prior to the purchase.

23       190.   In 1985, Union Pacific deeded the property that CP Chemicals had
24   purchased to First Dice Road Company, a subsidiary of CP Chemicals and corporate
25   affiliate of Phibro-Tech.

26       191.   In 1994, after several name changes, the operating company on the
27   property was renamed Phibro-Tech, Inc.

28

COMPLAINT

ii.     Disposal & Releases of Hazardous Substances

192.   Upon information and belief, significant quantities of hazardous substances, including hexavalent chromium and other chromium compounds and PCE were stored, used, or were otherwise present in hazardous waste at the Phibro-Tech Source Property.  Since at least 1963, Phibro-Tech and its predecessors have also received hazardous waste on the property for use in chemical manufacturing.

193.   Upon information and belief, the operators of the Phibro-Tech Source Property have had a long history of improper waste handling, storage, and disposal techniques, which have resulted in disposal of hazardous substances at the Phibro-Tech Source Property since at least 1957, and significant releases into the environment.  In 1959, Phibro-Tech's predecessor received a notice of violation for numerous egregious waste disposal practices, including discharging hexavalent chromium through a pipe that emptied onto land adjacent to the property and dumping hexavalent chromium on the ground at the entrance to the property; the company readily admitted to both violations.

194.   Phibro-Tech received numerous notices of violation and complaints for its active discharge of hazardous waste onto the railroad right-of-way on the property and failing to maintain adequate containment processes to keep waste from spilling onto the right-of-way.  Ultimately, a misdemeanor charge was pressed against Phibro-Tech's predecessor for discharging waste onto the right-of-way, public streets, and private property.  In 1987, the Los Angeles County District Attorney brought another criminal charge against Phibro-Tech's predecessor for additional statutory hazardous waste violations.

195.   In 2000 and 2003, Phibro-Tech received notices of violation for discharging wastewater with excessive amounts of toxic organic chemicals.  In 2003, DTSC found numerous waste storage violations at the Phibro-Tech Source Property, including Phibro-Tech's storage of approximately nine thousand drums of hazardous waste on the property, almost three times the number of drums Phibro-

COMPLAINT

1    Tech was authorized to store.  In 2009 and 2011, Phibro-Tech again was found to be

2    in violation of hazardous waste storage requirements.

3        196.   Phibro-Tech's operations and waste disposal practices resulted in one

4    or more hazardous substances, including but not limited to hexavalent chromium,

5    being placed onto the ground or into the soil at or near the Phibro-Tech Source

6    Property.  Soil and soil gas samples collected at the Phibro-Tech Source Property

7    have revealed the presence of: barium; benzene; cadmium; chloroform; hexavalent

8    chromium (and, potentially, other chromium compounds); total chromium; copper;

9    1,1-DCA; 1,2-DCA; 1,1-DCE; 1,2-DCE; c-1,2-DCE; t-1,2-DCE; DCM;

10   ethylbenzene; nickel; PCE; polychlorinated biphenyls; 1,1,1-TCA; TCE; toluene;

11   xylene; and zinc.  Soil contaminated with hexavalent chromium has been found to

12   be especially high near a former chromic acid underground storage tank, a

13   wastewater pond, the railroad tracks, and a drum storage area.  In 1961, Phibro-

14   Tech's predecessor was using an unlined sludge pond on the property, was cited for

15   discharging sludge that contained 19.5% volatile solids, including chromium, into a

16   sewer.

17       197.   In 1968, county inspectors observed visible evidence that wastewater

18   had been discharged to the ground on the property.  The inspectors also learned that

19   an exposed sump on the property that was designed to store tank spillage and leaks

20   for recovery, overflowed during wet weather events.  Upon information and belief,

21   the contents of the sump contained hazardous substances that spilled onto the

22   adjacent railroad and into a field, where it was absorbed into the ground.  On or

23   before May 21, 1976, waste liquids were discharged at the Phibro-Tech Source

24   Property, which resulted in saturation of the soil with numerous chemicals,

25   including solvents and chromium.  In 1984, a sewer line at the Phibro-Tech Source

26   Property leaked, discharging wastewater to the ground, where it formed a small

27   pond, and led to the nearby reporting of a solvent odor.  In 1985, a consultant

28   concluded that chromium contamination in the soil may have originated from a

1  combination of surface spillage, waste water ponds, and a leaking hexavalent

2  chromium underground storage tank.  An assessment of the property two years later

3  found extensive evidence of leakage and spillage, including chemical discoloration

4  of most of the pavement and equipment in the process areas, leading to the

5  conclusion that a wastewater pond and chromium underground storage tank were

6  potential sources of contamination.

7        198.   Upon information and belief, the hazardous substances present in the

8  soil at the Phibro-Tech Source Property have migrated and continue to migrate

9  downward into the saturated zone beneath the property and have come to be located

10  in the groundwater, resulting in contamination of the groundwater with: benzene;

11  cadmium; chloroform; hexavalent chromium and other chromium compounds; total

12  chromium; copper; 1,1-DCA; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM;

13  ethylbenzene; PCE; 1,1,1-TCA; TCE; toluene; xylene; and zinc.  As early as 1968,

14  the Los Angeles Department of County Engineers, upon inspection of the property,

15  concluded that historically poor waste handling practices and the deteriorated state

16  of the plant and its containment system had created a critical groundwater pollution

17  problem at the plant.  In 1993, two plumes of contaminated groundwater were

18  determined to originate on the property: a TCE plume and a chromium plume, both

19  of which originated in the vicinity of a former chromic acid underground storage

20  tank.  In 1994, EPA and DTSC concluded that ponds at the Phibro-Tech Source

21  Property had contributed to cadmium, chromium, and high-volatility organic

22  compound contamination of the regional aquifer.  A Phibro-Tech consultant

23  likewise concluded in 2005 that a former underground storage tank, a spent

24  container storage area, drainage ditch, and the railroad dumping location were

25  potential sources of halogenated VOCs and chromium contamination, with the ditch

26  and railroad dumping being the most likely sources.  In 2013, DTSC concluded that

27  TCE contamination of the groundwater on the property originated from a release of

28  chlorinated solvents including TCE on the property.

COMPLAINT

199.   Defendant Union Pacific (then known as Southern Pacific Railroad) was aware of the contamination occurring at the Phibro-Tech Source Property, which Union Pacific then owned, as early as 1968 when Union Pacific reported to Phibro-Tech's predecessor that a very large quantity of chemical substance had saturated the roadbed and ground under the industrial railroad spur, and concluded that chemical wastes had been allowed to flow onto the ground for an extended period of time.  Despite knowledge of the contamination occurring on the property, upon information and belief, Union Pacific did not curb its tenants' practices, take steps to mitigate the spread of contaminants or remediate the contamination that was already present on its property.

200.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Phibro-Tech Source Property, the Phibro-Tech Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

201.   Upon information and belief, contaminants in the groundwater from the soil at the Phibro-Tech Source Property have migrated offsite in the same general direction as the groundwater flow.  In 1994, EPA and DTSC concluded that groundwater data indicated hazardous substances such as 1,2-DCA, chromium, and TCE were migrating downgradient from two ponds at the Phibro-Tech Source Property.

202.   Plaintiffs allege on information and belief that in or around September 2012, EPA sent SNLs to Phibro-Tech and Union Pacific, which, among other things, identify those Defendants as PRPs for the OU-2 Facility groundwater contamination and solicit offers for Phibro-Tech and Union Pacific to perform the OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed response costs.

COMPLAINT

g.    *The Pilot Chemical Source Property – 11756 Burke Street*

203.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 11756 Burke Street, Santa Fe Springs, California and businesses operating thereon (the "Pilot Chemical Source Property").

i.    <u>Source Property Ownership and Operation</u>

204.   Defendant Pilot Chemical began operating a chemical manufacturing plant at the Pilot Chemical Source Property in 1951, and acquired the Pilot Chemical Source Property in 1966.

205.   Defendant Pilot Chemical's operations at the Pilot Chemical Source Property included the manufacture of chemicals, such as: detergents and emulsifiers. Chemicals used in the process of Defendant Pilot Chemical's operations included 1,2-DCA; toluene; and xylene.  1,4-Dioxane is a common byproduct associated with the manufacture of these chemicals and was included in the hazardous materials inventory filed by Defendant Pilot Chemical in 2000,  and is a constituent of concern at the OU-2 Facility.

206.   In 2008, Defendant Pilot Chemical ceased operations at the Pilot Chemical Source Property.

ii.    <u>Disposal & Releases of Hazardous Substances</u>

207.   Upon information and belief, hazardous substances were disposed of at the Pilot Chemical Source Property between 1951 and 2008.

208.   Defendant Pilot Chemical's operations at the Pilot Chemical Source Property generated approximately 13,000 gallons of wastewater per day, including such chemicals as alkyl and alkyl aryl sulfonates and sulfates, amides, and detergent mixtures.  Pilot Chemical also generated other chemical waste, such as sulfonic acid, sulfuric acid, and xylene.

209.   As of 1975, Defendant Pilot Chemical's operations at the Pilot Chemical Source Property involved the use of a wide variety of raw chemicals, including: ammonia; caustic soda; coconut oil; detergent alkylate; diethanolamine;

COMPLAINT

1   maleic anhydride; sodium bisulfate; sodium sulfate; sulfur dioxide; sulfur trioxide;

2   sulfuric acid; triethanolamine; and xylene.

3       210.   As of 1986, Defendant Pilot Chemical stored: C10-C12 alkylbenzene;

4   C10-C13 alkylbenzene; ammonia; sodium hydroxide; sulfur dioxide; and xylene in

5   underground storage tanks at the Pilot Chemical Source Property.  Benzene and

6   toluene were also stored on the property during this time.

7       211.   Upon information and belief, hazardous substances used, stored, or

8   otherwise present in hazardous waste in the chemical manufacturing operations at

9   the Pilot Chemical Source Property include:  alkylbenzene; benzene; chloroform;

10  chromium; 1,4-dioxane; linear alkyl benzene sulphonic acid ("LABSA"); toluene;

11  and toluene sulfonic acid.

12      212.   Defendant Pilot Chemical has a long history of improper waste storage

13  and handling of hazardous substances.  Upon information and belief, as of 1954,

14  Defendant Pilot Chemical was disposing of liquid industrial waste into dry wells at

15  the Pilot Chemical Source Property.  In 1959, a fatal fire occurred at the Pilot

16  Chemical Source Property, resulting in the spillage of large amounts of hazardous

17  chemicals.  The fire broke out in the area of the plant where the solvent toluene was

18  converted into acid.  Toluene and toluene sulfonic acid, which spilled during the

19  fire, were so dangerous that they reportedly dissolved the shoes of the firefighters

20  who responded to the scene.  In 1960, a Los Angeles County inspector detected

21  explosive gas in the sewer at the Pilot Chemical Source Property, the cause of which

22  was believed to be a leaking toluene container.  In 1970, Defendant Pilot Chemical

23  was issued a notice of violation and was ordered to clean up chemical deposits at the

24  Pilot Chemical Source Property resulting from the discharge of chemicals into the

25  ground.  In 1976, Defendant Pilot Chemical was issued a cleanup and abatement

26  order in response to a chemical spill that had occurred at the Pilot Chemical Source

27  Property.

28

COMPLAINT

213.  Upon information and belief, Defendant Pilot Chemical's operations and waste disposal practices resulted in one or more hazardous substances being placed onto the ground or into the soil at or near the Pilot Chemical Source Property. These substances included but not limited to: benzene; toluene; and 1,2-DCA.  An inspection of the Pilot Chemical Source Property in 1981 found that tanks used for holding or mixing LABSA were leaking and spilling onto unpaved ground, resulting in LABSA ponding near the tanks.  The LABSA tanks were still leaking during a 1985 inspection of the property.  In 1984, Defendant Pilot Chemical was found to have improperly disposed of wastewater containing excessive amounts of ethylbenzene and xylene.  In 1985, a CERCLA property inspection found a stream of chemicals running from the Pilot Chemical Source Property onto railroad tracks adjacent to the property.

214.  In 1988, the Los Angeles Department of Public Works was informed of a release of benzene and xylene from an underground storage tank at the Pilot Chemical Source Property.  Soil samples taken that year in the vicinity of underground storage tanks showed elevated levels of xylene.  Upon information and belief, the 1,2-DCA present in the soil at the Pilot Chemical Source Property is the result of spills associated with Defendant Pilot Chemical's manufacture of styrene-maleic anhydride copolymers on the Pilot Chemical Source Property and from leaks or spills from an old emergency wastewater storage tank.

215.  In 1989, an inspector observed discolored soil in an area of the Pilot Chemical Source Property where raw chemical materials were stored, noted that small spills had accumulated in the area, and observed that pumps and pipes were leaking.  In 1990, five underground storage tanks were removed from the Pilot Chemical Source Property.  The soil in the vicinity of those tanks was contaminated with VOCs.  In 1992, two aboveground storage tanks that had held detergent alkylate containing alkylbenzene were removed from the Pilot Chemical Source Property.  The soil in the vicinity of the tanks was contaminated by spills from

COMPLAINT

1   piping and pumps associated with the tanks.  Other soil on the property was also

2   found to be contaminated with hazardous substances.  Approximately 2,140 tons of

3   contaminated soil was removed from the Pilot Chemical Source Property in 1992.

4        216.   As of 2009, a soil vapor extraction system installed at the Pilot

5   Chemical Source Property three years earlier had extracted approximately 3,637

6   pounds of VOCs from soil on the property.  Soil vapor samples taken that year

7   showed that, despite removal of almost two tons of VOCs from the soil, the soil on

8   the property was still contaminated with: benzene; chloroform; 1,2-DCA; PCE;

9   TCE; and vinyl chloride.  An additional 8,919 pounds of VOCs were later removed

10  from the soil by vapor extraction between January 2011 and April 2012.  In 2010, an

11  underground storage tank was removed from the Pilot Chemical Source Property.

12  Soil samples taken in the vicinity of the tank showed elevated levels of 1,2-DCA.

13  During the demolition of portions of the Pilot Chemical Source Property in 2011,

14  PCE was found in soil in the vicinity of a clarifier, beneath a warehouse pad,

15  beneath a terra cotta clay pipe, near a wastewater interceptor, and in a parking lot.

16  Benzene was also detected in the soil.  In 2013, soil samples at the Pilot Chemical

17  Source Property showed the presence of: benzene; chloroform; 1,2-DCA; 1,1-DCE;

18  c-1,2-DCE; DCM; PCE; and TCE.

19       217.   Upon information and belief, the hazardous substances present in the

20  soil at the Pilot Chemical Source Property have migrated and continue to migrate

21  downward into the saturated zone beneath the property and have come to be located

22  in the groundwater – specifically: PCE; TCE; 1,2-DCA; c-1,2-DCE; ethylbenzene;

23  Freon 11; benzene; and chloroform.  In 1988, it was determined that soil

24  contamination extended below the water table, and groundwater was found to be

25  contaminated with benzene: chloroform; and 1,2-DCA.  Groundwater sampling

26  subsequently conducted at the Pilot Chemical Source Property in the 1990s detected

27  the presence of: benzene; chloroform; 1,2-DCA; ethylbenzene; PCE; and TCE.  The

28  concentrations of 1,2-DCA were highest near a container on the property,

suggesting that the container was the source of the contamination.  Further sampling of the groundwater at the Pilot Chemical Source Property in 2009 and 2012 detected: benzene; chloroform; 1,2-DCA; c-1,2-DCE; PCE; and TCE.  In 2013, groundwater sampling detected: chloroform; chromium; 1,2-DCA; 1,1-DCE; c-1,2-DCE; Freon 11; PCE; and TCE.

218.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Pilot Chemical Source Property, the Pilot Chemical Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

219.   Upon information and belief, contaminants, both measured and not yet measured, in the soil and in the groundwater from the soil at the Pilot Chemical Source Property have migrated offsite in the same general direction as the groundwater flow.

220.   Plaintiffs allege on information and belief that in or around September 2012, EPA sent an SNL to Pilot Chemical, which, among other things, identifies Pilot Chemical as a PRP for the OU-2 Facility groundwater contamination, and solicits an offer for Pilot Chemical to perform the OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed response costs.

## 2.   The GNL Defendants' Source Properties

### a.   *The Continental Source Property – 10643 South Norwalk Boulevard*

221.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 10643 South Norwalk Boulevard, Santa Fe Springs, California and businesses operating thereon (the "Continental Source Property").

COMPLAINT

i.    Source Property Ownership and Operation

222.   Defendant Continental conducts metalwork operations at the Continental Source Property, consisting primarily of heat treating of metal, and has done so there since at least 1969.

223.   Defendant Continental Development purchased the Norwalk Boulevard property in 2002, and, upon information and belief, remains the property owner today.

ii.    Disposal & Releases of Hazardous Substances

224.   Upon information and belief, significant quantities of hazardous substances, including hexavalent chromium and the solvents PCE and 1,1,1-TCA, were stored, used, or were otherwise present at the Continental Source Property. Upon information and belief, from 1969 (when Continental installed two vapor degreasers at the Continental Source Property) until at least 1994 (when Continental reported it had ceased conducting vapor degreasing on the property), Continental generated approximately 2,200 gallons of waste PCE annually in connection with its metal treating operations.

225.   Continental used a cooling tower at the Continental Source Property that, upon information and belief, contained hexavalent chromium, consistent with other similar metalworking operations that typically used chromium in cooling towers until the South Coast Air Quality Management District prohibited such use in 1990.

226.   Continental has repeatedly been found to be in violation of hazardous substance regulations.  In 1988, the Santa Fe Springs Fire Department issued a notice of violation as a result of Continental's discharge of "blow down" water from its cooling tower to the street.  In 1989, the Los Angeles County Fire Department issued a notice of violation following Continental's disposal of waste oil onto the ground and overfilling of hazardous waste containers.  Additionally, Continental was known to store waste PCE in 55-gallon drums.  In 1994, the Los Angeles

- 53 -

1  County Fire Department investigated the location at the property where Continental

2  had operated a vapor degreaser at the Continental Source Property and found

3  evidence of spills, leaks, and sloppy practices.  Based on its findings, the Los

4  Angeles County Fire Department issued a notice of violation and order to develop a

5  plan to address the contamination was issued.  At a rate of almost once a year, for

6  the nine years between 1999 and 2008, the Santa Fe Springs Fire Department issued

7  seven notices of violation for Continental's releases of chemicals resulting from the

8  overflow of chemicals used in metal plating and Continental's improper storage of

9  hazardous waste.

10      227.   Upon information and belief, Continental has had repeated catastrophic

11  accidents or conducted operations in a manner that resulted in sudden discharges of

12  hazardous waste, including but not limited to illegal discharge of PCE into

13  subsurface soil.  In the ten months between October 2, 1987 and August 1, 1988,

14  there were *three* fires that started in Continental's degreaser tank that, upon

15  information and belief, resulted in spills or other releases of chlorinated solvents.  In

16  1986, the cooling tower pump at the Continental Source Property broke, resulting in

17  an overflow of a blue-green chemical mixture into the street.  In 1987, an earthquake

18  caused Continental's cooling tower pump to break again, resulting in another

19  discharge of chemicals to the street.

20      228.   Continental's operations and waste disposal practices resulted in one or

21  more hazardous substances, including but not limited to chromium, PCE, and TCE,

22  being placed onto the ground or into the soil at or near the Continental Source

23  Property.  Soil and soil gas samples taken at the Continental Source Property have

24  detected: benzene; chromium; 1,2-DCE; c-1,2-DCE; t-1,2-DCE; PCE; toluene; and

25  vinyl chloride.  Upon information and belief, the wastewater released from the

26  cooling tower in the leaks of 1986 and 1987, as well as the discharge to the street in

27  1988, contained chromium.  Soil samples taken at the Continental Source Property

28

COMPLAINT

1   have repeatedly shown PCE contamination at much higher concentrations in soil in

2   the areas where Continental conducted its degreasing operations.

3          229.   Upon information and belief, the hazardous substances present in the

4   soil at the Continental Source Property have migrated and continue to migrate

5   downward into the saturated zone beneath the property and have come to be located

6   in the groundwater, resulting in contamination of the groundwater with: benzene; c-

7   1,2-DCE; t-1,2-DCE; PCE; toluene; and vinyl chloride.  An investigation of the

8   property in 1997 concluded that soil contamination at the Continental Source

9   Property extended to the groundwater.

10         230.   Because hazardous substances were deposited, stored, disposed of, or

11  placed, or otherwise came to be located at the Continental Source Property, the

12  Continental Source Property is a "facility" within the meaning of Section 101(9) of

13  CERCLA, 42 U.S.C. § 9601(9).

14         231.   Data indicates that the contaminants in the groundwater from the soil at

15  the Continental Source Property have migrated offsite, both in the groundwater in

16  the same general direction as the groundwater flow, as well as through the soil.  The

17  Los Angeles County Fire Department concluded that chlorinated hydrocarbons

18  could have migrated offsite from Continental's degreasing operations.

19         232.   In 2010, EPA concluded that Continental was a potential source of

20  PCE, TCE, and their degradation products in the regional groundwater.  In or around

21  December 2013, EPA sent a GNL to Continental, which, among other things,

22  identifies Continental as a PRP for the OU-2 Facility groundwater contamination,

23  and requests a response as to Continental's willingness to negotiate regarding its

24  liability for the OU-2 Facility response costs.

25              b.      *The Mobil Jalk Fee Source Property – 10607 Norwalk*
                       *Boulevard*
26

27         233.   Upon information and belief, releases of contamination have occurred

28  from property located at and/or adjacent to the former address 10607 Norwalk

COMPLAINT

1  Boulevard, Santa Fe Springs, California and businesses operating thereon (the
2  "Mobil Jalk Fee Source Property").

3                  i.        <u>Source Property Ownership and Operation</u>

4       234.   Since 1922, the Mobil Jalk Fee Source Property has been used for oil
5  extraction, production, transportation and storage operations.  General Petroleum
6  Corporation, a predecessor company to Defendant ExxonMobil, acquired the Mobil
7  Jalk Fee Source Property in 1922 and conducted oil drilling operations there until
8  the 1940s.

9       235.   In 1926, the Standard Oil Company of New York (or "Socony"),
10 purchased General Petroleum Corporation and became the owner of the property.
11 Socony changed its name to Socony Mobil Oil Company in 1955, which in turn
12 became the Mobil Oil Corporation in 1966.

13      236.   As of 1941, Hathaway Company was operating at the Mobil Jalk Fee
14 Source Property, constructing and operating oil wells.  Upon information and belief,
15 Hathaway Company leased the Mobil Jalk Fee Source Property from ExxonMobil's
16 predecessors.  In 1971, Hathaway Company merged into a company called Pyramid
17 Oil Company.  Following reorganization in 1985, the merged entity's Southern
18 California operations were spun off into a new Hathaway Company, which
19 continued to operate at the Mobil Jalk Fee Source Property until in or around 1999.
20 All operations at the Mobil Jalk Fee Source Property ceased around 2000.

21      237.   In 1988, Mobil Oil gifted the Mobil Jalk Fee Source Property to Mobil
22 Foundation, Inc., and, through a series of transactions in 1999 and 2000, Mobil
23 Foundation subdivided the property and sold it.

24             ii.      <u>Disposal & Releases of Hazardous Substances</u>

25      238.   Upon information and belief, hazardous substances were disposed of at
26 the Mobil Jalk Fee Source Property between 1922 and 2000.

27      239.   From 1938 to until at least 1956, a portion of the Mobil Jalk Fee Source
28 Property was used as a "boneyard" dumping area for metal refuse, including, upon

1   information and belief, refuse containing chromium. As early as 1988, preliminary

2   investigations of the Mobil Jalk Fee Source Property identified several

3   environmental areas of concern and areas requiring further assessment.

4        240.   Upon information and belief, the operations and hazardous substances

5   handling practices of ExxonMobil, its predecessors, and its lessees have resulted in

6   one or more hazardous substances, including but not limited to chromium and the

7   solvents PCE and TCE, being released to the ground or into the soil at or near the

8   Mobil Jalk Fee Source Property.  Soil and soil vapor samples taken at the Mobil Jalk

9   Fee Source Property have detected: chloroform; chromium; 1,1-DCA; 1,1-DCE; c-

10  1,2-DCE; t-1,2-DCE; DCM; Freon 11; 1,1,2,2-tetrachloroethane; PCE; TCE; and

11  vinyl chloride.  In 1988, halogenated VOCs were detected in soil samples taken

12  from the property.  In 1991, soil samples were taken from various portions of the

13  Mobil Jalk Fee Source Property revealed the presence of PCE, TCE and c-1,2-DCE

14  in the portion of the property that had formerly operated as an aboveground storage

15  tank farm.  Additionally, chromium was found in the "boneyard," where metal

16  refuse was dumped, and both benzene and chromium have been detected in soil

17  from the former tank farm area.  EPA observed that operations at the Mobil Jalk Fee

18  Source Property included the dumping of materials from trucks on an unpaved lot.

19  Soil samples taken at the Mobil Jalk Fee Source Property in 1995 found PCE

20  contamination at the northern end of the property, near a former trucking operations

21  area.  In 1998, approximately 2,600 tons of near-surface soil that was contaminated

22  with chlorinated solvents was removed from the Mobil Jalk Fee Source Property.

23       241.   Upon information and belief, the hazardous substances present in the

24  soil at the Mobil Jalk Fee Source Property have migrated and continue to migrate

25  downward into the saturated zone beneath the property and have come to be located

26  in the groundwater, resulting in contamination of the groundwater with: chloroform;

27  chromium; 1,1-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; Freon 11; PCE; TCE; and

28  vinyl chloride.

COMPLAINT

242.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Mobil Jalk Fee Source Property, the Mobil Jalk Fee Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

243.   Upon information and belief, contaminants in the groundwater from the soil at the Mobil Jalk Fee Source Property have migrated offsite in the same general direction as the groundwater flow.

244.   In 2010, EPA concluded that the Mobil Jalk Fee Source Property is a source of PCE, TCE, and their daughter products that are present in groundwater within the OU-2 Facility.  In or around December 2013, EPA sent a GNL to ExxonMobil, which, among other things, identifies ExxonMobil as a PRP for the OU-2 Facility groundwater contamination, requests a response as to ExxonMobil's willingness to negotiate regarding its liability for the OU-2 Facility response costs, and requests certain information about the status of ExxonMobil's activities.

### 3.   The Non-Notice Letter Defendants' Source Properties

#### a.   *The Associated Plating Source Property – 9636 Ann Street*

245.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 9636 Ann Street, Santa Fe Springs, California and businesses operating thereon (the "Associated Plating Source Property").

##### i.   Source Property Ownership and Operation

246.   Since at least 1978, various defendants have leased the Associated Plating Source Property from other defendants and have conducted specialty metal plating operations at the Associated Plating Source Property, consisting primarily of electroplating and electroless plating of metal parts for military, electronic, aerospace, and commercial uses.  Electroplating is the process by which a thin surface coating of one metal is applied to a part made of another metal by placing the part in a bath of chemical plating solution and using an electric current to

1   transfer metal ions.  Electroless plating likewise deposits a thin metal coating on a

2   part by immersing it in a chemical plating solution without the use of electric

3   current.  Electroplating and electroless plating both generate wastewater containing

4   chromium and other metals as well as toxic organic chemicals.  Additionally, before

5   a part can be plated, it is typically cleaned of foreign substances, such as oil and

6   grease, using a vapor degreaser and a solvent, resulting in solvent waste.

7       247.   In 1977, the owners of Associated Plating, Defendants Gordon

8   McCann, Lynnea McCann, Darrell Golnick, Clare Golnick and Cheryl Golnick

9   (collectively, the "Golnicks"), purchased the Associated Plating Source Property.

10  From 1978 to 1993, the Golnicks leased the Associated Plating Source Property to

11  Associated Plating, though in 1990, Defendant Mary Golnick had transferred her

12  interest in the property to Darrell Golnick.

13      248.   In 1993, Defendant APC purchased the Associated Plating Source

14  Property.  APC continued to lease the Associated Plating Source Property to

15  Associated Plating until 1999, when Defendant Associated Plating Inc. purchased

16  the operating company.

17      249.   Since 1999, Associated Plating Inc. (at times operating as Associated

18  Plating Acquisition Corp.) has leased the Associated Plating Source Property from

19  APC and continued plating operations on the property.

20              ii.     Disposal & Releases of Hazardous Substances

21      250.   Upon information and belief, hazardous substances were disposed of at

22  the Associated Plating Source Property since 1978.

23      251.   Since 1981, when Associated Plating installed a vapor degreaser at the

24  Associated Plating Source Property, Associated Plating and Associated Plating Inc.

25  used PCE in connection with their plating operations.  Additionally, Associated

26  Plating Inc. and, upon information and belief, Associated Plating used compounds

27  containing chromium to plate items with that metal.

28

COMPLAINT

252.   The Defendants associated with the Associated Plating Source Property have repeatedly been found in violation of hazardous substance regulations.  In 1983, Associated Plating was cited for discharging waste water used in parts washing into the street.  In 2001, the DTSC concluded that Associated Plating Inc. had violated numerous hazardous substances regulations, including improper waste storage and handling procedures.  In 2000 and 2002, the Santa Fe Springs Fire Department issued notices of violation to Associate Plating Inc. for improper storage of hazardous waste and for releases of chemicals, including leaking drums and unpermitted discharge of run-off water into the sewer.  In 2002, the Santa Fe Springs Fire Department also discovered that Associate Plating Inc. was treating chromium waste without a permit.  In 2007, the Santa Fe Springs Fire Department issued yet another notice of violation when it discovered a chemical mixture containing chromium in a trench at the Associated Plating Source Property.  In 2003, 2005, and 2010, EPA found Associate Plating Inc. in violation of numerous hazardous waste handling and storage requirements, including storage of hazardous waste without a permit and storage of hazardous waste in open containers.

253.   Associated Plating's and Associated Plating Inc.'s operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to PCE and chromium, being placed onto the ground or into the soil at or near the Associated Plating Source Property.  Soil samples taken at the Associated Plating Source Property have detected: benzene; chloroform; hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM; MTBE; PCE; TCE; toluene; and vinyl chloride.  In 2000, the Santa Fe Springs Fire Department cited Associate Plating Inc. for unpermitted discharge of run-off water into the sewer.  In 2002, the Santa Fe Springs Fire Department observed leaking chemical drums at the Associate Plating Source Property.  In 2007, a liquid chemical mixture was found in a trench at the Associated Plating Source Property that contained chromium.

COMPLAINT

254.   Upon information and belief, the hazardous substances present in the soil at the Associated Plating Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with: benzene; hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCA; c-1,2-DCE; t-1,2-DCE; MTBE; PCE; TCE; toluene; and vinyl chloride.  In 2012, DTSC determined that the high level of vinyl chloride in the soil at the Associated Plating Source Property indicated the property was a likely source of vinyl chloride in the groundwater.  In 2013, DTSC observed that PCE contamination on the property extended through the soil to the groundwater level.

255.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Associated Plating Source Property, the Associated Plating Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

256.   Upon information and belief, contaminants in the groundwater from the soil at the Associated Plating Source Property have migrated offsite in the same general direction as the groundwater flow.

b.   *The Cenco Refining Source Property – 12345-12354 Lakeland Road*

257.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 12345-12354 Lakeland Road, Santa Fe Springs, California and businesses operating thereon (the "Cenco Refining Source Property").

i.   Source Property Ownership and Operation

258.   In the late 1930s, Rothschild Oil Company, predecessor to Defendant Powerine, acquired the Cenco Refining Source Property, and in 1936, the County of Los Angeles approved the Cenco Refining Source Property location for oil refinery

1   operations.  Processing operations produced leaded and unleaded gasoline, aviation
2   fuel, jet fuel, diesel fuel, petroleum cake, kerosene, coke and sulfur.

3       259.   In 1995, oil refining operations ceased at the Cenco Refining Source
4   Property.

5       260.   In 1998, Cenco Refining Company acquired the property and plant
6   from Defendant Powerine.  In 2004, it changed its name to Lakeland Development
7   Company, and began operating on the property.  Upon information and belief, as of
8   2009, Defendant Lakeland Development was still the property owner and operator at
9   the Cenco Refining Source Property, manufacturing biodiesel and performing
10  wastewater treatment.

11      261.   Upon information and belief, Lakeland Development continued as the
12  owner of the Cenco Refining Source Property until at least 2010, but no longer owns
13  any interest in the property.

14                          ii.      Disposal & Releases of Hazardous Substances

15      262.   Upon information and belief, hazardous substances were disposed of at
16  the Cenco Refining Source Property when each of the Defendants owned or
17  operated it.

18      263.   As of 1975, the Cenco Refining Source Property was discharging 11.8
19  million gallons of wastewater to a storm drain at the plant per day.  As of 1990,
20  Defendant Powerine's operations at the Cenco Refining Source Property included
21  use of chlorinated solvents and chromium.  Between 1993 and 2008, Defendants
22  Powerine and Lakeland Development shipped hazardous waste from the Cenco
23  Refining Source Property containing benzene; chromium; PCE; and other solvents.

24      264.   As of 1996, carbon tetrachloride and PCE were stored at the Cenco
25  Refining Source Property.  As of 1997, Defendant Powerine used a solvent at the
26  Cenco Refining Source Property containing: benzene; lead; MEK; PCE; and TCE.
27  It also used 1,2-DCA and PCE, which were stored in above-ground tanks.  For years
28

COMPLAINT

1   after the plant closed, chemicals were stored onsite with the purported intention that

2   Defendant Powerine eventually would resume operations.

3      265.   Other hazardous substances stored, used, or were otherwise present in

4   the hazardous waste in the refining operations at the Cenco Refining Source

5   Property between 1936 and 2012 include:  arsenic; benzene; chloroform; chromium;

6   hexavalent chromium; copper; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM;

7   dibenz[a,h]anthracene; Freon 113; MEK; poly-aromatic hydrocarbons ("PAHs");

8   sulfides; 1,1,1-TCA; 1,1,2-TCA; thiols; thiosulfate; toluene; and vinyl chloride.

9      266.   The Cenco Refining Source Property has a history of extensively and

10   pervasively failing to safely handle and store chemicals and hazardous waste.

11   During a 1996 inspection of the Cenco Refining Source Property, for example, an

12   ongoing spill of oily water was observed and Defendant Powerine was issued a

13   notice of violation for failure to document handling of solvents.  In 1997, the

14   Regional Water Quality Control Board ordered Defendant Powerine to clean up the

15   property in order to abate the offsite migration of contaminants from the property.

16      267.   In 1999, an assessment conducted by the Santa Fe Springs Fire

17   Department concluded that more than 50% of the 1,800 containers at the plant were

18   in violation of waste management requirements.  In 2000, the Santa Fe Springs Fire

19   Department investigated over 1,000 drums at the Cenco Refining Source Property,

20   the contents of some of which were not ascertainable, and many of which were in

21   various stages of decay and corrosion.  Many drum labels indicated that the drums

22   contained waste generated as early as 1995.  Some drums had rusted, others were

23   bulging, and at least one had ruptured.  Hundreds of drums that once held hazardous

24   materials were empty.  Employees of Defendant Powerine were unable to identify

25   the contents of many unlabeled drums.  Many drums had been left open and spills

26   were observed on the ground.

27      268.   Upon information and belief, Defendants Powerine's and Lakeland

28   Development's operations and waste disposal practices resulted in one or more

COMPLAINT

hazardous substances, including but not limited to: PCE; TCE; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM; 1,1,1,2-tetrachloroethane; benzene; chromium; chloroform; and vinyl chloride, being placed onto the ground or into the soil at or near the Cenco Refining Source Property.  In 1986, soil samples taken at the Cenco Refining Source Property contained benzene, chromium and PCE.  In 1990, during an inspection of the Cenco Refining Source Property's hazardous waste area, drums labeled "unknown solid" were found to have corroded and leaked, resulting in the presence of an oily residue in the run-off water surface area.  Between 1988 and 1993, Defendant Powerine disposed of approximately 1,163 pounds of carbon tetrachloride at the Cenco Refining Source Property.  In 1996, soil samples taken at the Cenco Refining Source Property contained benzene and 1,1,1-TCA.  In 1997, 1,2-DCA was detected in soil near storage tanks at the Cenco Refining Source Property.  Other contaminants found in soil samples taken in 1997 included benzene.  In 1999, soil samples were taken at the Cenco Refining Source Property containing hexavalent chromium (and, potentially, other chromium compounds) and PCE.  In 2003, Defendant Lakeland Development disclosed that wastewater from the Cenco Refining Source Property contained benzene, MTBE and other VOCs.

269.   In 2000, the Santa Fe Springs Fire Department concluded that there had been historical contamination at the Cenco Refining Source Property with halogenated VOCs and that test results also suggested a recent release of TCE on the property.  In 2006 and 2007, soil and soil gas samples taken from the Cenco Refining Source Property were found to be contaminated with: benzene; chloroform; 1,2-DCA; c-1,2-DCE; t-1,2-DCE; 1,1,1,2-tetrachloroethane; MTBE; hexavalent chromium; PCE; and TCE; and vinyl chloride.  Soil tested from the Cenco Refining Source Property that same year contained total chromium, and samples taken from the Cenco Refining Source Property in 2009 and 2012 revealed that the soil was contaminated with numerous high-volatility organic compounds, including: chloroform; c-1,2-DCE; t-1,2-DCE; DCM; 1,1,1,2-tetrachloroethane;

1   PCE; TCE; and vinyl chloride.  Benzene, hexavalent chromium (as well as,

2   potentially, other chromium compounds), total chromium, and MTBE were also

3   detected.

4       270.   Upon information and belief, the hazardous substances present in the

5   soil at the Cenco Refining Source Property have migrated and continue to migrate

6   downward into the saturated zone beneath the property and have come to be located

7   in the groundwater, specifically: PCE; TCE; 1,2-DCA; c-1,2-DCE; t-1,2-DCE;

8   1,1,1-tetrachloroethane; benzene; chromium; chloroform; and vinyl chloride.

9   Groundwater samples taken in 1986 from multiple wells across the property all

10   contained benzene and some contained 1,2-DCA.  Between 1987 and 1996,

11   benzene, 1,2-DCA, PCE; and TCE were detected in groundwater samples taken

12   from the Cenco Refining Source Property.  In 1995, an assessment of the Cenco

13   Refining Source Property found that contaminants, including VOCs, had been

14   released to the groundwater.

15       271.   In 2002, groundwater samples taken from the Cenco Refining Source

16   Property were found to contain: benzene; chloroform; c-1,2-DCE; PCE; and TCE.

17   In 2006 and 2007, groundwater samples were found to be contaminated with:

18   benzene; 1,4-dioxane; chloroform; hexavalent chromium; 1,1-DCE; 1,1-DCA; 1,2-

19   DCA; c-1,2-DCE; t-1,2-DCE; ethylbenzene; MTBE; PCE; TCE; vinyl chloride and

20   xylene.  Halogenated VOCs were concentrated near a storm water impoundment

21   area and two storage tanks; high concentrations of PCE and TCE were found near a

22   laboratory and a tank on the property; and 1,2-DCA was found in the middle of a

23   storage tank area.  Groundwater monitoring at the Cenco Refining Source Property

24   since 2010 has revealed the presence of: benzene; 1,2-DCA; 1,1-DCE; c-1,2-DCE;

25   t-1,2-DCE; PCE; TCE; and vinyl chloride.

26       272.   Because hazardous substances were deposited, stored, disposed of, or

27   placed, or otherwise came to be located at the Cenco Refining Source Property, the

28

COMPLAINT

1    Cenco Refining Source Property is a "facility" within the meaning of Section 101(9)

2    of CERCLA, 42 U.S.C. § 9601(9).

3      273. Upon information and belief, contaminants in the soil and in the

4    groundwater from the soil at the Cenco Refining Source Property have migrated

5    offsite in the same general direction as the regional groundwater flow.

6          *c.*  *The Patsouras Source Property – 11630-11700 Burke*

7            *Street*

8      274. Upon information and belief, releases of contamination have occurred

9    from property located at and/or adjacent to 11630-11700 Burke Street, Santa Fe

10   Springs, California and businesses operating thereon (the "Patsouras Source

11   Property").

12         i.  Source Property Ownership

13     275. In 1973, Defendant William K. Palley acquired the Patsouras Source

14   Property.

15     276. In 1995, Defendant Kekropia (owned by Larry Patsouras) acquired the

16   Patsouras Source Property and remains as the current property owner.

17         ii.  Source Property Operation

18     277. As of 1958 and until at least 1973, Globe International, then known as

19   Globe Oil Tools Co. (collectively, "Globe"), operated at the Patsouras Source

20   Property, manufacturing oil well drilling equipment and tools.

21     278. In 1973, Defendant Palley Supply and its owner, Defendant William K.

22   Palley, began operations at the Patsouras Source Property, performing maintenance

23   and warehousing of aircraft and hydraulic equipment.  Defendants Palley Supply

24   and William K. Palley ceased operations at the Patsouras Source Property in 1987.

25     279. In 1997, Defendant El Greco and its owner, Larry Patsouras, began

26   operating on the Patsouras Source Property as a wholesale grocery warehouse, and

27   continue to operate there today.

28

COMPLAINT

###### iii.     Disposal & Releases of Hazardous Substances

280.   Upon information and belief, hazardous substances were disposed of at the Patsouras Source Property when each of the Defendants owned or operated it.

281.   The Patsouras Source Property has a long history of operators improperly handling and storing hazardous substances.  In 1970, Globe International was issued a notice of violation for disposing of rinse water containing hexavalent chromium to the ground at the Patsouras Source Property.  In 1978, Defendant William K. Palley received a notice of violation for disposing of industrial wastewater from steam cleaning operations into a sanitary sewer.  In 1987, a criminal complaint was filed against Defendant William K. Palley by the Los Angeles County Department of Health Services for hazardous waste practices at the Patsouras Source Property.  In 1988, Defendant William K. Palley pled guilty to the illegal transportation and disposal of hazardous waste.  In addition, as of 1988, two subsurface clarifiers at the Patsouras Source Property had been abandoned full of waste.  During a rainstorm that year, the clarifiers overflowed, spilling to the ground.  The Santa Fe Springs Fire Department ordered Defendant William K. Palley to dispose of approximately 3,500 gallons of waste in the clarifiers and drums on the property.

282.   Contamination is greatest near the area of the property where fourteen containers were used to store paint and other hazardous substances.

283.   Upon information and belief, Globe's and Defendants Palley Supply's, William K. Palley's, El Greco's, and Kekropia's operations and waste disposal practices resulted in the generation of one or more hazardous substances, including but not limited to: arsenic; barium; carbon tetrachloride; chloroform; chromium; cobalt; copper; 1,1-DCE; PCE and TCE being placed onto the ground or into the soil at or near the Patsouras Source Property.  In 1994, soil samples at the Patsouras Source Property indicated the soil was contaminated with: chloroform; chromium; PCE; and TCE.  The highest levels of contamination were near the clarifiers and a

COMPLAINT

storage shed where hazardous chemicals had been stored.  An environmental consultant issued a report stating that soil remediation was necessary in those areas. In 2006, chromium was detected in soil at the Patsouras Source Property.  In 2009, soil samples revealed that the soil was contaminated with: carbon tetrachloride; chloroform; 1,1-DCE; PCE; and TCE.  In 2013, soil from the Patsouras Source Property was tested for heavy metals, and was determined to be contaminated with: arsenic; barium; chromium; cobalt; copper; nickel; vanadium; and zinc.

284.   Upon information and belief, the hazardous substances present in the soil at the Patsouras Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, specifically, PCE, TCE, 1,1-DCE,  chloroform, and hexavalent chromium.  A groundwater sample taken in 1994 detected the presence of chromium, PCE, and TCE in concentrations that exceeded drinking water standards. Groundwater monitoring at the Patsouras Source Property from 1995 to 2012 has found the groundwater on the property to be contaminated with: chloroform; hexavalent chromium; 1,1-DCE; PCE and TCE.

285.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Patsouras Source Property, the Patsouras Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

286.   Upon information and belief, contaminants in the soil and in the groundwater from the soil at the Patsouras Source Property have migrated offsite in the same general direction as the regional groundwater flow.

d.   <u>*The PMC Source Property – 10051 Romandel Avenue*</u>

287.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 10051 Romandel Avenue, Santa Fe Springs, California and businesses operating thereon (the "PMC Source Property").

- 68 -
COMPLAINT

i. Source Property Ownership and Operation

288. From 1947 to 1992, certain entities conducted manufacturing operations at the PMC Source Property, manufacturing chemicals sold to other companies for the production of plastics, solvents, hydraulic fluids, gasoline additives, and paints.

289. In 1947, a company called Productol, Inc., a predecessor-in-interest to Ferro and PMC, converted an existing plant on the PMC Source Property into a chemical manufacturing plant, producing cresylic acid, naphthenic acid, and alkylated phenols.

290. In or about 1976, Defendant Ferro acquired Productol and the PMC Source Property and continued chemical manufacturing operations until 1986.

291. In 1986, Defendant PMC acquired the Productol division and the PMC Source Property from Ferro and continued chemical manufacturing operations until 1992.

ii. Disposal & Releases of Hazardous Substances

292. Upon information and belief, hazardous substances were disposed of at the PMC Source Property when Defendants Ferro and PMC owned or operated it.

293. While wastewater was disposed into the sewer at the PMC Source Property pursuant to a permit requiring treatment of the water before discharge, on multiple occasions in the 1970s (both before and after Ferro acquired the property), wastewater containing impermissible chemical levels was discharged. EPA records indicate that, between 1987 and 1992, cresol, MEK, phenol, propylene, styrene, and sulfuric acid were disposed of at the PMC Source Property. In 2011, EPA concluded that cresol and phenol had been disposed of at the PMC Source Property.

294. For a few months in 1981, the PMC Source Property was licensed for the treatment of hazardous waste. That year, a survey of the PMC Source Property noted chemical drums stored on unpaved surfaces and the potential for runoff during a storm.

COMPLAINT

295.   In 1981 and 1985, soil contamination at the PMC Source Property was observed and resulted in a notice of violation from the California Department of Health Services.  Some time prior to 1986, employees of Defendant Ferro observed disposed of benzene ponding near a storage tank at the PMC Source Property.  In 1986, after Defendant PMC acquired the PMC Source Property, a fire at the plant damaged 12 chemical storage tanks.  In 1987, a storage tank was removed from the PMC Source Property and soil underneath the tank was found to be contaminated with: benzene; ethylbenzene; and other chemicals.  The presence of benzene in the soil was determined to be the likely result of surface spillage from pipes associated with other nearby tanks.  In 1988, benzene was observed ponding near two tanks at the PMC Source Property that was attributed to a leaking pipe.  In 1988, Defendant PMC ceased using a chemical storage tank at the PMC Source Property that had two cracks in the side and a one-inch hole in the bottom.  Analysis of the tank's contents indicated that it had held benzene, p-cresol, ethylbenzene and 2-4-dimethylphenol.

296.   Between 1986 and 1992, soil investigations at the PMC Source Property revealed the presence of: benzene; ethylbenzene; PCE; and TCE.  Benzene; PCE; TCE; toluene; and 1,1,2-TCA in particular were found just below abandoned and removed chemical tanks.  Soil sampling at the PMC Source Property in 2007 found benzene and TCE in the soil.  Benzene concentrations were most significant near the former cresylic acid plant, the former alkylated phenol plant, and the southern tanks.

297.   Upon information and belief, the hazardous substances present in the soil at the PMC Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, specifically: TCE; benzene; ethylbenzene; p-cresol; and 2-4-dimethylphenol.  For example, groundwater testing at the PMC Source Property in 1988 found: benzene; ethylbenzene; TCE; and xylene.  In 1995, the California Regional Water Quality Control Board concluded that the operations at the PMC

COMPLAINT

1  Source Property contaminated the soil and groundwater on the property, degrading

2  the water quality.  In 1999, soil and groundwater testing at the PMC Source Property

3  found contamination with: benzene; p-cresol; and 2-4-dimethylphenol.  Benzene

4  was noted as being concentrated primarily in areas near former storage tanks, a

5  loading area, and a storage area, and as migrating downgradient in the groundwater.

6  In 2007, groundwater testing found contamination including benzene, TCE and PCE

7  breakdown products.  Groundwater analysis completed in the region indicates that

8  benzene and toluene have migrated downgradient from the PMC Source Property.

9       298.   Because hazardous substances were deposited, stored, disposed of, or

10 placed, or otherwise came to be located at the PMC Source Property, the PMC

11 Source Property is a "facility" within the meaning of Section 101(9) of CERCLA,

12 42 U.S.C. § 9601(9).

13      299.   Upon information and belief, contaminants in the soil and in the

14 groundwater from the soil at the PMC Source Property have migrated offsite in the

15 same general direction as the regional groundwater flow.  Groundwater samples

16 taken in 1999 found elevated levels of contaminants in offsite wells downgradient

17 from the former cresylic acid plant.  In 2007, a consultant concluded that a plume of

18 benzene and VOCs originating from the property was migrating downgradient.

19                    **4.     SNL PRPs Firmenich and Momentive**

20      300.   Upon information and belief, releases of contamination have occurred

21 from the Omega Chemical property, located at 12504 and 12512 Whittier

22 Boulevard, Whittier, California, (the "Omega Chemical Property").

23                    *a.     Source Property Ownership and Operation*

24      301.   From 1976 to 1995, Omega Chemical (including a successor company

25 formed in 1991, when Omega Chemical filed for bankruptcy) conducted chemical

26 treatment operations on the property, including operations that included the storage,

27 consolidation, and treatment of commercial and industrial wastes, primarily solvent

28 and refrigerant (Freons) waste.

302.   In 1987, Omega Chemical purchased the 12504 Whittier Boulevard property and the neighboring 12512 Whittier Boulevard property (the southern portion of the Omega Chemical Property).  Van Owen Holdings LLC purchased the Omega Chemical Property in 2003.

b.   *Disposal & Releases of Hazardous Substances*

303.   Upon information and belief, significant quantities of hazardous substances, including isopropyl alcohol ("IPA"), were stored or were otherwise present in hazardous waste at the Omega Chemical Property.  From 1976 to 1995, Omega Chemical conducted chemical treatment operations on the property, including operations at the Omega Chemical Property that included the storage, consolidation, and treatment of commercial and industrial wastes received from other entities, including Defendants Firmenich's and Momentive's predecessor-in-interest, MCP Industrial Food Products.

304.   Upon information and belief, Defendants Firmenich's and Momentive's predecessor-in-interest, MCP, owned or otherwise possessed hazardous waste, including flammable waste isopropyl alcohol from concentrate production processes conducted in connection with MCP's flavoring and food processing plant in Anaheim, California, that was generated between 1989 and 1992.

305.   Hazardous waste manifests demonstrate that MCP intentionally provided for the treatment of its hazardous waste at the Omega Chemical Property, or otherwise arranged for the delivery of IPA to the property, shipping hazardous waste to the property between 1989 and 1992.  The manifests, which purport to be executed by a representative of Omega Chemical, demonstrate that MCP's hazardous waste was received at the Omega Chemical Property.

306.   According to EPA, there have been numerous instances of releases of hazardous substances to the soil and groundwater at and near the Omega Chemical Property from spills and leaks of various chemicals at the Omega Chemical Property

COMPLAINT

1  resulting in soil and groundwater contaminated with chlorinated and non-chlorinated
2  solvents.

3      307.   Contaminants from the Omega Chemical Property are reported to have
4  migrated offsite in the same general direction as the groundwater flow.  EPA has
5  concluded that VOCs, such as PCE and TCE, in soil and groundwater have migrated
6  from the Omega Chemical Property.  Upon information and belief, the rate and
7  extent of this migration were increased and exacerbated by the presence of waste
8  IPA, which MPA sent to the Omega Chemical Property in large quantities.  IPA
9  functions as a "co-solvent," which increases the solubility of solvents, such as PCE
10  and TCE, and facilitates movement of those solvents through soil and groundwater.

11     308.   In or around September 2012, on information and belief, that EPA sent
12  SNLs to Firmenich and Momentive, which, among other things, identify those
13  Defendants as PRPs for the OU-2 Facility groundwater contamination and solicit
14  offers for Firmenich and Momentive to perform the OU-2 Facility remedial design
15  and remedial action and pay EPA's unreimbursed response costs.

16                    **FIRST CLAIM FOR RELIEF**
17  **Cost Recovery Under CERCLA – Against All Defendants, Except Firmenich,**
18                **Inc. and Momentive Specialty Chemicals, Inc.**

19     309.   Plaintiffs repeat and re-allege paragraphs 1 through 308 above, as
20  though fully set forth herein.

21     310.   Plaintiffs bring this claim for cost recovery pursuant to Section 107 of
22  CERCLA, 42 U.S.C. § 9607.

23     311.   Each Defendant is a "person" within the meaning of Section 101(21) of
24  CERCLA, 42 U.S.C. § 9601(21).

25     312.   Upon information and belief, each Defendant is a covered person
26  within the meaning of one or more of Section 107(a)(1), (2), (3), or (4), 42 U.S.C.
27  § 9607(a)(1), (2).

28

313.   Upon information and belief, each Defendant Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

314.   Upon information and belief, releases and/or threatened releases of hazardous substances into the environment have occurred at each Source Property within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9602(22).

315.   Plaintiffs have undertaken, and continue to undertake, actions to address the OU-2 Facility groundwater contamination in response to releases or threatened releases of hazardous substances from the Source Property facilities, and have incurred and will incur necessary costs of response consistent with the NCP.

316.   Plaintiffs have incurred substantial costs that constitute necessary costs of response incurred in a manner consistent with the NCP under 42 U.S.C. § 9607(a)(4)(B) (the "Response Costs") to remediate hazardous substances.

317.   Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), by this action, Plaintiffs are entitled to cost recovery from Defendants in connection with the OU-2 Facility, and Defendants are liable for all response costs incurred by Plaintiffs or which Plaintiffs may incur.

318.   Plaintiffs are also entitled to attorneys' fees, including private attorney general fees pursuant to California Code of Civil Procedure § 1021.5.

319.   Plaintiffs are entitled to interest on the amount recovered on this claim pursuant to 42 U.S.C. § 9607(a)(2).

320.   Notice of this action is being provided to the Administrator of the Environmental Protection Agency and the United States Attorney General, pursuant to 42 U.S.C. § 9613(l).

## SECOND CLAIM FOR RELIEF

### Cost Recovery Under CERCLA – Against Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals, Inc.

321.   Plaintiffs repeat and re-allege paragraphs 1 through 320 above, as though fully set forth herein.

COMPLAINT

322. Plaintiffs bring this claim for cost recovery pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

323. Each of Defendants Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals, Inc. is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

324. Upon information and belief, each of Defendants Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals, Inc. is a covered person within the meaning of Section 107(a)(3), as a person who by contract or agreement or otherwise arranged for the disposal or treatment of hazardous substances at a facility owned or operated by another entity, 42 U.S.C. § 9607(a)(3).

325. Upon information and belief, releases and/or threatened releases of hazardous substances into the environment have occurred at the Phibro-Tech Source Property and the Omega Chemical Property within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9602(22).

326. Plaintiffs have undertaken, and continue to undertake, actions to address the OU-2 Facility groundwater contamination in response to releases or threatened releases of hazardous substances from the Phibro-Tech Source Property and the Omega Chemical Property, and have incurred and will incur necessary costs of response consistent with the NCP.

327. Plaintiffs have incurred substantial costs that constitute necessary costs of response incurred in a manner consistent with the NCP under 42 U.S.C. § 9607(a)(4)(B) to remediate hazardous substances.

328. Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), by this action, Plaintiffs are entitled to cost recovery from each of Defendants Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals, Inc. in connection with the OU-2 Facility groundwater contamination, and those Defendants are liable for all response costs incurred by Plaintiffs or which Plaintiffs may incur.

COMPLAINT

329.   Plaintiffs are also entitled to attorneys' fees, including private attorney general fees pursuant to California Code of Civil Procedure § 1021.5.

330.   Plaintiffs are entitled to interest on the amount recovered on this claim pursuant to 42 U.S.C. § 9607(a)(2).

331.   Notice of this action is being provided to the Administrator of the Environmental Protection Agency and the United States Attorney General, pursuant to 42 U.S.C. § 9613(l).

## THIRD CLAIM FOR RELIEF

### Declaratory Judgment on Liability for Response Costs – Against All Defendants

332.   Plaintiffs incorporate and re-allege paragraphs 1 through 331 above, as though fully set forth herein.

333.   Plaintiffs bring this declaratory relief claim pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607(a), 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

334.   An actual and substantial controversy has arisen between Plaintiffs and Defendants regarding their respective rights and obligations for the Response Costs that have been incurred and the Response Costs that will be incurred to respond to the releases of contaminants from the Source Property facilities.

335.   Until such time as remediation of the OU-2 Facility is complete, additional Response Costs will be needed to respond to the OU-2 Facility. Defendants are jointly and severally liable for payment of those Response Costs.

336.   Pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. §§ 2201, 2202, Plaintiffs seek and are entitled to a declaratory judgment against Defendants that each of them, jointly and severally, are liable to Plaintiffs for past and future Response Costs incurred by Plaintiffs in connection with the OU-2 Facility.

COMPLAINT

**FOURTH CLAIM FOR RELIEF**

**Continuing Public Nuisance – Against All Defendants**

337.   Plaintiffs incorporate and re-allege paragraphs 1 through 336 above, as though fully set forth herein.

338.   Plaintiffs bring this public nuisance claim pursuant to California Civil Code §§ 3479 and 3480.

339.   The contamination of the groundwater in the Santa Fe Springs and Whittier regions constitutes a nuisance within the meaning of Section 3479 of the California Civil Code in that it has interfered and continues to interfere with the public's use and enjoyment of the groundwater supply and right to an unpolluted water supply, including, according to the EPA, posing a continuing threat to the region's drinking water supply.

340.   As a result of the groundwater contamination, Plaintiffs have been forced to incur Response Costs and will be forced to incur further Response Costs, an injury that is separate and distinct from the injury suffered by the public.

341.   The OU-2 Facility groundwater contamination can be reasonably abated.  EPA has developed the Selected Remedy, which is intended to remove contaminant mass from the groundwater, limit the movement of contaminated groundwater, and prevent any further spreading of hazardous substances to uncontaminated areas of the aquifer and nearby water production wells.  Further, the contamination at each of the Defendant Source Properties and ongoing practices that have resulted, and may result in the release or threatened release of hazardous substances from the Source Properties into the groundwater, may be reasonably controlled or mitigated to prevent such releases or threatened releases.

342.   As an actual and proximate cause of the public nuisance created and/or maintained by Defendants, Plaintiffs have and will continue to incur removal, remediation, and related expenses.

COMPLAINT

343.   Pursuant to California Civil Code §§ 3281 and 3479 *et seq.*, Plaintiffs seek from all Defendants and are entitled to receive compensatory damages, including for all response costs incurred by Plaintiffs or which Plaintiffs may incur.

344.   Notwithstanding the reasonable possibility of abating the public nuisance, Defendants have not abated and are not abating the public nuisance, though each knew or should have known, at the time each owned or operated at the Source Property, about the nuisance and the conditions contributing to it, permitting contamination to spread through the soil and groundwater.  Plaintiffs have no adequate remedy at law to address the ongoing and progressive interference with the public's use and enjoyment of the OU-2 Facility regional groundwater supply and right to an unpolluted drinking water supply and resulting increased response costs.

345.   Plaintiffs therefore seek injunctive relief restraining and enjoining the each of the Defendants, with the exception of Defendants Firmenich and Momentive, from maintaining or contributing to the public nuisance described herein and requiring each of them to promptly and competently take such action as is necessary to abate that public nuisance.

346.   Plaintiffs are also entitled to attorneys' fees, including private attorney general fees pursuant to California Code of Civil Procedure § 1021.5.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in its favor and against Defendants, to the extent authorized by law, as follows:

(1)   ON THE FIRST CLAIM FOR RELIEF, for recovery of all Response Costs incurred in connection with the OU-2 Facility consistent with the National Contingency Plan, including pre-judgment interest thereon as allowed by law;

(2)   ON THE SECOND CLAIM FOR RELIEF, for recovery of all Response Costs incurred in connection with the OU-2 Facility consistent with the National Contingency Plan, including pre-judgment interest thereon as allowed by law;

COMPLAINT

1    (3)    ON THE THIRD CLAIM FOR RELIEF, for a judicial declaration that

2 Defendants are jointly and severally liable for all Response Costs incurred and to be

3 incurred in connection with the OU-2 Facility consistent with the National

4 Contingency Plan;

5    (4)    ON THE FOURTH CLAIM FOR RELIEF, for an injunction requiring

6 Defendants to remediate the OU-2 Facility groundwater contamination as generally

7 described in paragraphs 10, 110 and 337 above, and to prevent the continuing

8 release of hazardous substances from the Non-Omega Source Properties into the

9 groundwater, as generally described above in paragraphs 10 and 341;

10    (5)    ON THE FOURTH CLAIM FOR RELIEF, for compensatory damages

11 in an amount to be determined at trial;

12    (6)    ON THE FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF,

13 for attorneys' fees, including private attorney general fees pursuant to California

14 Code of Civil Procedure § 1021.5;

15    (7)    AS TO ALL CLAIMS FOR RELIEF, for all costs and expenses

16 incurred in this action, to the extent provided for by law;

17    (8)    AS TO ALL CLAIMS FOR RELIEF, for such other and further relief

18 as the Court may deem just and proper.

19 DATED: August 15, 2014              PROSKAUER ROSE LLP
                                     NANCY SHER COHEN
20                                   RONALD A. VALENZUELA
                                     SHAWN S. LEDINGHAM, JR.
21

22                                   By: _____

23                                        Nancy Sher Cohen

24                                   Attorneys for Plaintiffs

25

26

27

28

- 79 -
COMPLAINT