1  NANCY SHER COHEN, SBN 81706
     ncohen@proskauer.com
2  RONALD A. VALENZUELA, SBN 210025
     rvalenzuela@proskauer.com
3  SHAWN S. LEDINGHAM, JR., SBN 275268
     sledingham@proskauer.com
4  PROSKAUER ROSE LLP
   2049 Century Park East, 32nd Floor
5  Los Angeles, California 90067
   Telephone:   (310) 557-2900
6  Facsimile:   (310) 557-2193

7  Attorneys for Plaintiffs
   [See List of Plaintiffs, attached as Exhibit A]
8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11  ALCOA INC.; ALPHA THERAPEUTIC           )  Case No.: 2:14-cv-06456 GW (Ex.)
    CORPORATION; APPLIED MICRO              )
12  CIRCUITS CORP.; ARLON, LLC; ASTRO       )  **SECOND AMENDED**
    ALUMINUM TREATING CO., INC.; BASF       )  **COMPLAINT**
13  CORPORATION; BAXTER HEALTHCARE          )
    CORPORATION; CAL-TAPE & LABEL           )
14  CO.; CALIFORNIA HYDROFORMING            )
    COMPANY, INC.; CINTAS                   )  1.  Cost Recovery (Owners and
15  CORPORATION; COLUMBIA SHOWCASE          )      Operators), Comprehensive
    & CABINET COMPANY, INC.; COUNTY         )      Environmental Response
16  OF LOS ANGELES; CROSBY &                )      Compensation and Liability
    OVERTON, INC.; DISNEY ENTERPRISES,      )      Act, 42 U.S.C. § 9601, et seq.;
17  INC.; FHL GROUP; FORENCO, INC.;         )  2.  Cost Recovery (Arrangers),
    GENERAL DYNAMICS CORPORATION;           )      Comprehensive
18  GULFSTREAM AEROSPACE                    )      Environmental Response
    CORPORATION; HERCULES                   )      Compensation and Liability
19  INCORPORATED; HEXCEL                    )      Act, 42 U.S.C. § 9601, *et seq.*;
    CORPORATION; HONEYWELL                  )  3.  Declaratory Judgment,
20  INTERNATIONAL INC.;                     )      Comprehensive
    INGERSOLL-RAND COMPANY;                 )      Environmental Response
21  INTERNATIONAL PAPER COMPANY;            )      Compensation and Liability
    JOHNS MANVILLE; KIMBERLY-CLARK          )      Act, 42 U.S.C. § 9601, *et seq.*
22  WORLDWIDE, INC.; KINDER MORGAN          )      and Declaratory Judgment
    LIQUIDS TERMINALS LLC; LOS              )      Act, 28 U.S.C. §§ 2201, 2202;
23  ANGELES COUNTY METROPOLITAN             )  4.  Abatement of Imminent and
    TRANSPORTATION AUTHORITY;               )      Substantial Endangerment,
24  MASCO CORPORATION OF INDIANA;           )      Resource Conservation and
    MATTEL, INC.; MERCK SHARP &             )      Recovery Act, 42 U.S.C. §
25  DOHME CORPORATION;                      )      6901, et seq.;
    NBCUNIVERSAL MEDIA, LLC; PACIFIC        )  5.  Continuing Public Nuisance,
26  BELL TELEPHONE COMPANY;                 )      Cal. Civil Code §§ 3479–80
    PILKINGTON GROUP LIMITED; QUEST         )
27  DIAGNOSTICS CLINICAL                    )
    LABORATORIES, INC.; RAYTHEON            )
28  COMPANY; RIO TINTO AUM COMPANY;)
    SAFETY-KLEEN SYSTEMS, INC.;             )

SCRIPTO-TOKAI CORPORATION;
SEMPRA GLOBAL; SHILEY, LLC;
SIGNET ARMORLITE, INC.; SOCO WEST,
INC.; SONOCO PRODUCTS COMPANY;
SPARTON TECHNOLOGY, INC.; TEXACO
INC.; TEXAS INSTRUMENTS
INCORPORATED; THE BOEING
COMPANY; THE DOW CHEMICAL
COMPANY; THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA; THE
SHERWIN-WILLIAMS COMPANY;
TRANE U.S., INC.; TRIMAS
CORPORATION; UNION OIL COMPANY
OF CALIFORNIA; UNIVAR USA INC.;
UNIVERSAL CITY STUDIOS LLC; AND
YORT, INC.

     Plaintiffs,

      v.

APC INVESTMENT CO.; ASSOCIATED
PLATING COMPANY; ASSOCIATED
PLATING COMPANY, INC.; BODYCOTE
THERMAL PROCESSING, INC.; BURKE
STREET, LLC; POWERINE OIL
COMPANY; CONTINENTAL HEAT
TREATING, INC.; CONTINENTAL
DEVELOPMENT COMPANY, LP;
CLAUDETTE EARL, AN INDIVIDUAL;
EARL MFG. CO., INC.; EXXONMOBIL OIL
CORPORATION.; FERRO CORP.;
FIRMENICH, INC.; FOSS PLATING
COMPANY, INC.; GORDON E. MCCANN,
AN INDIVIDUAL; LYNNEA R. MCCANN,
AN INDIVIDUAL; DARRELL K.
GOLNICK, AN INDIVIDUAL; CLARE S.
GOLNICK, AN INDIVIDUAL; CHERYL A.
GOLNICK, AN INDIVIDUAL; KEKROPIA,
INC.; MISSION LINEN SUPPLY;
MOMENTIVE SPECIALTY CHEMICALS,
INC.; WILLIAM K. PALLEY, AN
INDIVIDUAL; PALLEY SUPPLY
COMPANY; PALMTREE ACQUISITION
CORPORATION; PHIBRO-TECH, INC.;
PILOT CHEMICAL CORP.; PMC
SPECIALTIES GROUP, INC.; UNION
PACIFIC RAILROAD COMPANY; AND
FIRST DICE ROAD COMPANY, INC.;
HALLIBURTON AFFILIATES, LLC; and
Does 1 – 250, INCLUSIVE

     Defendants.

1    Plaintiffs Alcoa Inc.; Alpha Therapeutic Corporation; Applied Micro Circuits
2    Corp.; Arlon, LLC; Astro Aluminum Treating Co., Inc.; BASF Corporation; Baxter
3    Healthcare Corporation; Cal-Tape & Label Co.; California Hydroforming Company,
4    Inc.; Cintas Corporation; Columbia Showcase & Cabinet Company, Inc.; County of
5    Los Angeles; Crosby & Overton, Inc.; Disney Enterprises, Inc.; FHL Group; Forenco,
6    Inc.; General Dynamics Corporation; Gulfstream Aerospace Corporation; Hercules
7    Incorporated; Hexcel Corporation; Honeywell International Inc.; Ingersoll-Rand
8    Company; International Paper Company; Johns Manville; Kimberly-Clark
9    Worldwide, Inc.; Kinder Morgan Liquids Terminals LLC; Los Angeles County
10   Metropolitan Transportation Authority; Masco Corporation of Indiana; Mattel, Inc.;
11   Merck Sharp & Dohme Corporation; NBCUniversal Media, LLC; Pacific Bell
12   Telephone Company; Pilkington Group Limited; Quest Diagnostics Clinical
13   Laboratories, Inc.; Raytheon Company; Rio Tinto AUM Company; Safety-Kleen
14   Systems, Inc.; Scripto-Tokai Corporation; Sempra Global; Shiley, LLC; Signet
15   Armorlite, Inc.; Soco West, Inc.; Sonoco Products Company; Sparton Technology,
16   Inc.; Texaco Inc.; Texas Instruments Incorporated; The Boeing Company; The Dow
17   Chemical Company; The Regents of the University of California; The
18   Sherwin-Williams Company; Trane U.S., Inc.; TriMas Corporation; Union Oil
19   Company of California; Univar USA Inc.; Universal City Studios LLC; and Yort, Inc.
20   (collectively, "Plaintiffs"), by their attorneys, Proskauer Rose LLP, against
21   Defendants APC Investment Co.; Associated Plating Company; Associated Plating
22   Company, Inc. (f/k/a Associated Plating Acquisition Corp.); Bodycote Thermal
23   Processing, Inc.; Burke Street, LLC; Powerine Oil Company; Continental Heat
24   Treating, Inc.; Continental Development Company, LP; Claudette Earl, an individual;
25   Earl Mfg. Co., Inc.; ExxonMobil Oil Corporation; Ferro Corp.; Firmenich, Inc.; Foss
26   Plating Company, Inc.; Gordon E. McCann, an individual; Lynnea R. McCann, an
27   individual; Darrell K. Golnick, an individual; Clare S. Golnick, an individual; Cheryl
28   A. Golnick, an individual; Kekropia, Inc.; Mission Linen Supply; Momentive

- 1 -

1  Specialty Chemicals, Inc.; William K. Palley, an individual; Palley Supply Company;
2  Palmtree Acquisition Corporation; Phibro-Tech, Inc.; Pilot Chemical Corp.; PMC
3  Specialties Group, Inc.; Union Pacific Railroad Company; First Dice Road Company;
4  Halliburton Affiliates, LLC; and DOES 1 through 250 (collectively, "Defendants"),
5  allege upon knowledge as to themselves and upon information and belief as to others,
6  the following:

7  **NATURE OF THE ACTION**

8       1.    This is a civil action arising from environmental contamination caused
9  by Defendants and by which Plaintiffs seek cost recovery and a declaratory judgment
10  under sections 107(a) and 113(g)(2) of the federal Comprehensive Environmental
11  Response, Compensation and Liability Act, as amended 42 U.S.C. §§ 9601-9675
12  ("CERCLA"); abatement of an imminent and substantial endangerment to health or
13  the environment under section 7002 of the federal Resource Conservation and
14  Recovery Act, as amended 42 U.S.C. §§ 6901-6992k ("RCRA"); and injunctive relief
15  and compensatory damages under California law.

16       2.    Groundwater underlying portions of the Whittier and Santa Fe Springs
17  communities is purportedly contaminated with high concentrations of numerous
18  substances that are hazardous to the environment and human health, including
19  hexavalent chromium and chlorinated and non-chlorinated solvents.  According to the
20  United States Environmental Protection Agency ("EPA"), action to address the
21  contamination is necessary to protect the public health and the environment.  EPA has
22  designated this regional groundwater contamination, which covers an area
23  approximately 4½ miles long, as Operable Unit No. 2 of the Omega Superfund Site
24  (the "OU-2 Facility").

25       3.    For decades, Defendants have owned properties or operated businesses,
26  or arranged for the treatment of wastes at businesses, that sit atop or very near the
27  OU-2 Facility at which substantial quantities of hazardous substances and hazardous
28  waste, including chlorinated and non-chlorinated solvents and hexavalent chromium,

1    have been spilled or discharged onto the ground and migrated downward into the soil

2    and groundwater.  These businesses include chemical manufacturing or processing

3    plants, industrial laundry operations, businesses that perform mechanical work,

4    painting, detailing and spot chroming on automobiles, oil production and refining

5    plants, manufacturing plants, and metal processing plants.  The soil and groundwater

6    underlying these source properties have been contaminated by operations conducted

7    there, resulting in multiple plumes of contamination that have blended together into

8    regional groundwater contamination.

9            4.      EPA has evaluated many Defendants in connection with the OU-2

10   Facility and has concluded that certain of them are potentially responsible parties

11   ("PRPs") warranting receipt of a Special Notice Letter ("SNL") from EPA.  In the

12   SNL sent to these Defendants (the "SNL Defendants"), the EPA identifies each

13   recipient as potentially liable under CERCLA Section 107 for the OU-2 Facility

14   groundwater contamination as well as past and future costs to clean up that

15   contamination, provides information concerning its basis for this conclusion, and

16   solicits offers from the SNL Defendants to (a) perform the OU-2 Facility remedial

17   design and remedial action selected by EPA and (b) pay the unreimbursed response

18   costs EPA has incurred in connection with the OU-2 Facility.  According to EPA, the

19   primary purposes of each SNL are to invoke the statutory moratorium on certain EPA

20   actions and to initiate formal settlement negotiations with the recipient for a response

21   action and the recovery of EPA's unreimbursed costs.

22           5.      EPA also utilizes General Notice Letters ("GNLs"), which inform the

23   recipient that EPA considers it potentially liable for cleanup costs at a Superfund site

24   and invite the recipient to discuss its involvement at the site.  Each GNL also serves to

25   begin or continue the process of information exchange, and to initiate the process of

26   "informal" negotiations with EPA.  Generally speaking, EPA issues a GNL after

27   concluding that there is sufficient information to name the recipient as a PRP, and as a

28   means to open a dialogue with EPA and to offer the recipient an opportunity to

explain why it should not receive an SNL.  EPA sent GNLs to several PRP Defendants (the "GNL Defendants") that identify the GNL Defendants as potentially liable under CERCLA Section 107 for the OU-2 Facility groundwater contamination, and for past and future costs to clean up that contamination.  The GNLs all requested responses as to the GNL Defendants' willingness to negotiate regarding their potential liability for the OU-2 Facility response costs.

6.     Upon information and belief, EPA recognizes that there are a large number of industrial properties that occupy the OU-2 Facility, continues to evaluate whether there are additional source properties and PRPs as time and resources allow, and encourages those persons and entities it has already named as PRPs to perform the work necessary to identify other PRPs.

7.     Plaintiffs, or their predecessors, affiliated entities, assignees or obligees, are companies that allegedly sent chemicals to Omega Chemical Corporation ("Omega Chemical") in Whittier for appropriate processing and recycling.  EPA contends that Omega Chemical failed to properly process, recycle or dispose of those chemicals, resulting in groundwater contamination, and that Plaintiffs are responsible to remediate the groundwater contamination underneath the Omega Chemical property.

8.     EPA, however, has not limited Plaintiffs' responsibility for remediation to the groundwater underneath the Omega Chemical property.  Because EPA contends that the Omega Chemical property is one of multiple source properties of the OU-2 Facility groundwater contamination, and that CERCLA imposes joint and several liability for releases of hazardous substances in actions brought by the government, EPA asserts that Plaintiffs are responsible for remediating the OU-2 Facility.

9.     Plaintiffs have each voluntarily incurred significant costs to investigate the sources to, and the remediation of, the OU-2 Facility, collectively spending millions of dollars to address it, and may incur millions of dollars more in future

1  response costs.  EPA has determined that the contaminated groundwater should be

2  contained, extracted, and treated so that it can be used in a beneficial manner.  This

3  remedy will require tens of millions of dollars in capital and operating expenditures

4  for years to come.  Upon information and belief, Defendants are responsible for

5  releases of hazardous substances to the OU-2 Facility groundwater and therefore

6  should bear the costs to clean up the resulting contamination.

7          10.    EPA's proposal to contain regional groundwater to address the

8  contaminants that have already migrated away from Defendants' properties, however,

9  would not address the imminent and substantial endangerment to human health and

10  the environment that is presented by the failure of some of the Defendants to

11  implement source control measures to prevent groundwater exceeding health-based

12  levels from continuing to leave the source property as a result of contaminated on-site

13  soils or other on-site contamination including groundwater above health-based levels

14  that is directly below site sources.  The lack of adequate property source control at

15  numerous Defendant properties results in groundwater exceeding health-based levels

16  continuing to migrate into OU2.  The Defendants associated with those source

17  properties have thus far failed to adequately address the problem, despite having been

18  on notice of the contamination for a very long time.  In addition, without appropriate

19  monitoring to determine the extent of offsite groundwater contamination resulting

20  from each Defendants' handling of solid or hazardous waste at their properties,

21  including contaminated soils, and without measures to control the contamination at its

22  source, the contamination will continue to pose a threat to human health and the

23  environment, and swell the costs and duration of efforts to contain and eventually

24  clean-up the OU2 groundwater.

25          11.    By this action, Plaintiffs seek to recover from Defendants the necessary

26  costs of response that Plaintiffs have incurred and will continue to incur in a manner

27  consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 *et seq.*,

28  caused by the release or threatened release of hazardous substances that have

1   contaminated the OU-2 Facility groundwater.  Plaintiffs also seek a declaratory

2   judgment that Defendants are liable for future response costs or damages that will be

3   binding on any subsequent actions to recover further response costs or damages.

4   Through this suit, Plaintiffs also seek an injunction requiring certain Defendants to

5   stop the release of the hazardous substances coming from the source properties they

6   own or operate and to remediate the soil and groundwater contamination emanating

7   from their source properties to control the further spread and migration of the

8   hazardous substances in the OU-2 Facility.

9                                       **PARTIES**

10          **A.    <u>Plaintiffs</u>**

11          12.    Plaintiff Alcoa Inc. is a corporation duly organized and existing under

12   the laws of the State of Pennsylvania with its principal place of business in New York,

13   New York.

14          13.    Plaintiff Alpha Therapeutic Corporation is a corporation duly organized

15   and existing under the laws of the state of California with its principal place of

16   business in New York, New York.

17          14.    Plaintiff Applied Micro Circuits Corp. is a corporation duly organized

18   and existing under the laws of the state of Delaware with its principal place of

19   business in Sunnyvale, California.

20          15.    Plaintiff Arlon, LLC is a limited liability company duly organized and

21   existing under the laws of the State of Delaware with its principal place of business in

22   Bear, Delaware.

23          16.    Plaintiff Astro Aluminum Treating Co., Inc. is a corporation duly

24   organized and existing under the laws of the State of California with its principal

25   place of business in South Gate, California.

26          17.    Plaintiff BASF Corporation is a corporation duly organized and existing

27   under the laws of the State of Delaware with its principal place of business in Florham

28   Park, New Jersey.

18.   Plaintiff Baxter Healthcare Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Deerfield, Illinois.

19.   Plaintiff Cal-Tape & Label Co. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Anaheim, California.

20.   Plaintiff California Hydroforming Company, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in City of Industry, California.

21.   Plaintiff Cintas Corporation is a corporation duly organized and existing under the laws of the State of Washington with its principal place of business in Mason, Ohio.

22.   Plaintiff Columbia Showcase & Cabinet Company, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Sun Valley, California.

23.   Plaintiff County of Los Angeles is a public entity and duly constituted California governmental entity.

24.   Plaintiff Crosby & Overton, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Long Beach, California.

25.   Plaintiff Disney Enterprises, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Burbank, California.

26.   Plaintiff FHL Group is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Palos Verdes Estates, California.

27.   Plaintiff Forenco, Inc. is a corporation duly organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

1    28.    Plaintiff General Dynamics Corporation is a corporation duly organized

2    and existing under the laws of the State of Delaware with its principal place of

3    business in Falls Church, Virginia.

4    29.    Plaintiff Gulfstream Aerospace Corporation is a corporation duly

5    organized and existing under the laws of the State of Georgia with its principal place

6    of business in Savannah, Georgia.

7    30.    Plaintiff Hercules Incorporated is a corporation duly organized and

8    existing under the laws of the State of Delaware with its principal place of business in

9    Lexington, Kentucky.

10    31.    Plaintiff Hexcel Corporation is a corporation duly organized and existing

11    under the laws of the State of Delaware with its principal place of business in

12    Stamford, Connecticut.

13    32.    Plaintiff Honeywell International Inc. is a corporation duly organized

14    and existing under the laws of the State of Delaware with its principal place of

15    business in Morristown, New Jersey.

16    33.    Plaintiff Ingersoll-Rand Company is a corporation duly organized and

17    existing under the laws of the State of New Jersey with its principal place of business

18    in Piscataway, New Jersey.

19    34.    Plaintiff International Paper Company is a corporation duly organized

20    and existing under the laws of the State of New York with its principal place of

21    business in Memphis, Tennessee.

22    35.    Plaintiff Johns Manville is a corporation duly organized and existing

23    under the laws of Delaware with its principal place of business in Denver, Colorado.

24    36.    Plaintiff Kimberly-Clark Worldwide, Inc. is a corporation duly

25    organized and existing under the laws of the State of Delaware with its principal place

26    of business in Irving, Texas.

27

28

1   37.   Plaintiff Kinder Morgan Liquids Terminals LLC is a limited liability
2   company duly organized and existing under the laws of the State of Delaware with its
3   principal place of business in Houston, Texas.

4   38.   Plaintiff Los Angeles County Metropolitan Transportation Authority is a
5   public corporation and county commission, duly authorized by California law to plan,
6   construct and operate public mass transit in the County of Los Angeles.

7   39.   Plaintiff Mattel, Inc. is a corporation duly organized and existing under
8   the laws of the State of Delaware with its principal place of business in El Segundo,
9   California.

10   40.   Plaintiff Masco Corporation of Indiana is a corporation duly organized
11   and existing under the laws of the State of Indiana with its principal place of business
12   in Taylor, Michigan.

13   41.   Plaintiff Merck Sharp & Dohme Corporation is a corporation duly
14   organized and existing under the laws of the State of New Jersey with its principal
15   place of business in Whitehouse Station, New Jersey.

16   42.   Plaintiff NBCUniversal Media, LLC is a limited liability company duly
17   organized and existing under the laws of the State of Delaware with its principal place
18   of business in New York, New York.

19   43.   Plaintiff Pacific Bell Telephone Company is a corporation duly
20   organized and existing under the laws of the State of California with its principal
21   place of business in San Francisco, California.

22   44.   Plaintiff Pilkington Group Limited, formerly known as Pilkinton PLC, is
23   a private limited company duly organized and existing under the laws of England with
24   its principal place of business in Lathom, England.

25   45.   Plaintiff Quest Diagnostics Clinical Laboratories, Inc. is a corporation
26   duly organized and existing under the laws of the State of Delaware with its principal
27   place of business in Madison, New Jersey.

28

46.    Plaintiff Raytheon Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Waltham, Massachusetts.

47.    Plaintiff Rio Tinto AUM Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in South Jordan, Utah.

48.    Plaintiff Safety-Kleen Systems, Inc. is a corporation duly organized and existing under the laws of the State of Wisconsin with its principal place of business in Norwell, Massachusetts.

49.    Plaintiff Scripto-Tokai Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Ontario, California.

50.    Plaintiff Sempra Global is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in San Diego, California.

51.    Plaintiff Shiley, LLC is a limited liability company duly organized and existing under the laws of the State of California with its principal place of business in New York, New York.

52.    Plaintiff Signet Armorlite, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

53.    Plaintiff Soco West, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

54.    Plaintiff Sonoco Products Company is a corporation duly organized and existing under the laws of the State of South Carolina with its principal place of business in Hartsville, South Carolina.

55.   Plaintiff Sparton Technology, Inc. is a corporation duly organized and existing under the laws of the New Mexico with its principal place of business in Schaumberg, Illinois.

56.   Plaintiff Texaco Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in San Ramon, California.

57.   Plaintiff Texas Instruments Incorporated is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

58.   Plaintiff The Boeing Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

59.   Plaintiff The Dow Chemical Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Midland, Michigan.

60.   Plaintiff The Regents of the University of California is, and at all times relevant to this action was, pursuant to Article IX, Section 9, subdivisions (a) and (f) of the California Constitution, a California constitutional corporation, authorized and empowered to administer a public trust known as the University of California, with full powers of organization and government thereof, including all powers necessary or convenient for the effective administration of the trust with its principal place of business in Oakland, California.

61.   Plaintiff The Sherwin-Williams Company is a corporation duly organized and existing under the laws of the State of Ohio with its principal place of business in Cleveland, Ohio.

62.   Plaintiff Trane U.S., Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Piscataway, New Jersey.

63.     Plaintiff TriMas Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Bloomfield Hills, Michigan.

64.     Plaintiff Union Oil Company of California is a corporation duly organized and existing under the laws of the State of California with its principal place of business in San Ramon, California.

65.     Plaintiff Univar USA Inc. is a corporation duly organized and existing under the laws of the State of Washington with its principal place of business in Downers Grove, Illinois.

66.     Plaintiff Universal City Studios LLC is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Universal City, California.

67.     Plaintiff Yort, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Andover, Massachusetts.

**B.     Defendants**

68.     Each Defendant falls into one of four categories: (i) a PRP that received an SNL from EPA in connection with its ownership of, or operational activities at, a contamination source property ("Source Property"); (ii) a PRP that received a GNL from EPA in connection with its ownership of, or operational activities at, a Source Property; (iii) a PRP that has not yet received a notice letter from EPA; or (iv) a PRP that received an SNL from EPA because it sent chemicals to Omega Chemical.

**1.     Special Notice Letter Defendant PRPs & Other PRPs Associated With SNL Source Properties**

*a.     Bodycote SNL Source Property*

69.     Defendant Bodycote Thermal Processing, Inc. ("Bodycote") is a corporation duly organized and existing under the laws of the Delaware with its principal place of business in Dallas, Texas.  As alleged more fully herein, Bodycote

1   is a current or previous "owner" or "operator," as those terms are defined under

2   CERCLA, of the Bodycote Source Property, as that term is defined below in

3   Paragraph 120.  As alleged more fully herein, Bodycote is a "person" and is, or was, a

4   generator, transporter, or owner or operator of a "treatment," "storage," or "disposal"

5   facility who has contributed or is contributing to the past or present handling,

6   "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous

7   waste," as those terms are defined under RCRA.  Upon information and belief,

8   Bodycote is a successor-in-interest to Techni-Braze, Inc.

9   *b.   Chrysler SNL Source Property*

10       70.     Defendant Burke Street, LLC ("Burke Street") is a limited liability

11   corporation duly organized and existing under the laws of the State of California with

12   its principal place of business in Santa Fe Springs, California.  As alleged more fully

13   herein, Burke Street is a current or previous "owner" or "operator," as those terms are

14   defined under CERCLA, of the Chrysler Source Property, as that term is defined

15   below in Paragraph 138.

16       71.     Defendant Palmtree Acquisition Corporation ("Palmtree") is a

17   corporation duly organized and existing under the laws of the State of Delaware with

18   its principal place of business in Denver, Colorado.  As alleged more fully herein,

19   Palmtree is a current or previous "owner" or "operator," as those terms are defined

20   under CERCLA, of the Chrysler Source Property.  Upon information and belief,

21   Palmtree is a successor-in-interest to Southern Pacific Industrial Development

22   Company.

23       72.     Defendant Union Pacific Railroad Company. ("Union Pacific") is a

24   corporation duly organized and existing under the laws of the State of Delaware with

25   its principal place of business in Omaha, Nebraska.  As alleged more fully herein,

26   Union Pacific is a current or previous "owner" or "operator," as those terms are

27   defined under CERCLA, of the Chrysler Source Property.  Upon information and

28

1   belief, Union Pacific is a successor-in-interest to Pacific Electric Railway Company

2   and Southern Pacific Railroad.

3                          *c.*      *Earl Mfg. SNL Source Property*

4           73.     Defendant Claudette Earl is an individual.  As alleged more fully herein,

5   Claudette Earl is a current or previous "owner" or "operator," as those terms are

6   defined under CERCLA, of the Earl Mfg. Source Property, as that term is defined

7   below in Paragraph 154.  As alleged more fully herein, Claudette Earl is a "person"

8   and is, or was, a generator, transporter, or owner or operator of a "treatment,"

9   "storage," or "disposal" facility who has contributed or is contributing to the past or

10  present handling, "storage," "treatment," transportation, or "disposal" of a "solid

11  waste" or "hazardous waste," as those terms are defined under RCRA.

12          74.     Defendant Earl Mfg. Co., Inc. ("Earl Mfg.") is a corporation duly

13  organized and existing under the laws of the State of California with its principal

14  place of business in Santa Fe Springs, California.  As alleged more fully herein, Earl

15  Mfg. is a current or previous "owner" or "operator," as those terms are defined under

16  CERCLA, of the Earl Mfg. Source Property.  As alleged more fully herein, Earl Mfg.

17  is a "person" and is, or was, a generator, transporter, or owner or operator of a

18  "treatment," "storage," or "disposal" facility who has contributed or is contributing to

19  the past or present handling, "storage," "treatment," transportation, or "disposal" of a

20  "solid waste" or "hazardous waste," as those terms are defined under RCRA.

21                         *d.*      *Foss Plating SNL Source Property*

22          75.     Defendant Foss Plating Company, Inc. ("Foss Plating") is a corporation

23  duly organized and existing under the laws of the State of California with its principal

24  place of business in Santa Fe Springs, California.  As alleged more fully herein, Foss

25  Plating is a current or previous "owner" or "operator," as those terms are defined

26  under CERCLA, of the Foss Plating Source Property, as that term is defined below in

27  Paragraph 176.  As alleged more fully herein, Foss Plating is a "person" and is, or

28  was, a generator, transporter, or owner or operator of a "treatment," "storage," or

1    "disposal" facility who has contributed or is contributing to the past or present

2    handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or

3    "hazardous waste," as those terms are defined under RCRA.

4                        *e.*    *Mission Linen SNL Source Property*

5          76.    Defendant Mission Linen Supply ("Mission Linen") is a corporation

6    duly organized and existing under the laws of the State of California with its principal

7    place of business in Santa Barbara, California.  As alleged more fully herein, Mission

8    Linen is a current or previous "owner" or "operator," as those terms are defined under

9    CERCLA, of the Mission Linen Source Property, as that term is defined below in

10   Paragraph 194.

11                       *f.*    *Phibro-Tech SNL Source Property*

12         77.    Defendant Phibro-Tech, Inc. ("Phibro-Tech") is a corporation duly

13   organized and existing under the laws of the state of Delaware with its principal place

14   of business in Teaneck, New Jersey.  As alleged more fully herein, Phibro-Tech is a

15   current or previous "owner" or "operator," as those terms are defined under

16   CERCLA, of the Phibro-Tech Source Property and an arranger of hazardous waste

17   disposal at the Phibro-Tech Source Property, as that term is defined below in

18   Paragraph 207.  Upon information and belief, Phibro-Tech is a successor-in-interest

19   to Southern California Chemical Company (f/k/a Pacific Western Chemical

20   Company).  As alleged more fully herein, Phibro-Tech is a "person" and is, or was, a

21   generator, transporter, or owner or operator of a "treatment," "storage," or "disposal"

22   facility who has contributed or is contributing to the past or present handling,

23   "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous

24   waste," as those terms are defined under RCRA.

25         78.    As alleged more fully herein, Defendant Union Pacific is a current or

26   previous "owner" or "operator," as those terms are defined under CERCLA, of the

27   Phibro-Tech Source Property.  As alleged more fully herein, Union Pacific is a

28   "person" and is, or was, a generator, transporter, or owner or operator of a

- 15 -

1    "treatment," "storage," or "disposal" facility who has contributed or is contributing to

2    the past or present handling, "storage," "treatment," transportation, or "disposal" of a

3    "solid waste" or "hazardous waste," as those terms are defined under RCRA.

4         79.    Defendant First Dice Road Company ("First Dice") is a limited

5    partnership duly organized and existing under the laws of the State of California with

6    its principal place of business in Santa Fe Springs, California.  As alleged more fully

7    herein, Defendant First Dice is a current or previous "owner" or "operator," as those

8    terms are defined under CERCLA, of the Phibro-Tech Source Property.  As alleged

9    more fully herein, First Dice is a "person" and is, or was, a generator, transporter, or

10   owner or operator of a "treatment," "storage," or "disposal" facility who has

11   contributed or is contributing to the past or present handling, "storage," "treatment,"

12   transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms

13   are defined under RCRA.

14              *g.*     *Pilot Chemical SNL Source Property*

15        80.    Defendant Pilot Chemical Corp. ("Pilot") is a corporation duly

16   organized and existing under the laws of the State of California with its principal

17   place of business in Santa Fe Springs, California.  As alleged more fully herein, Pilot

18   is a current or previous "owner" or "operator," as those terms are defined under

19   CERCLA, of the Pilot Chemical Source Property and former owner of the Pilot

20   Chemical Source Property, as that term is defined below in Paragraph 234.  As

21   alleged more fully herein, Pilot is a "person" and is, or was, a generator, transporter,

22   or owner or operator of a "treatment," "storage," or "disposal" facility who has

23   contributed or is contributing to the past or present handling, "storage," "treatment,"

24   transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms

25   are defined under RCRA.

26

27

28

**2.** **GNL Defendant PRPs & Other PRPs Associated with GNL Source Properties**

*a.* *Continental GNL Source Property*

81.    Defendant Continental Heat Treating, Inc. ("Continental") is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Continental is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Continental Source Property, as that term is defined below in Paragraph 257.  As alleged more fully herein, Continental is a "person" and is, or was, a generator, transporter, or owner or operator of a "treatment," "storage," or "disposal" facility who has contributed or is contributing to the past or present handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under RCRA.

82.    Defendant Continental Development Company, L.P. ("Continental Development") is a limited partnership duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Continental Development is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Continental Source Property.  As alleged more fully herein, Continental Development is a "person" and is, or was, a generator, transporter, or owner or operator of a "treatment," "storage," or "disposal" facility who has contributed or is contributing to the past or present handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under RCRA.

*b.* *Mobil Jalk Fee GNL Source Property*

83.    Defendant ExxonMobil Oil Corporation ("ExxonMobil") is a corporation duly organized and existing under the laws of the State of New York with its principal place of business in Irving, Texas.  As alleged more fully herein, ExxonMobil is a current or previous "owner" or "operator," as those terms are

- 17 -

1   defined under CERCLA, of the Mobil Jalk Fee Source Property, as that term is

2   defined below in Paragraph 276.  As alleged more fully herein, ExxonMobil is a

3   "person" and is, or was, a generator, transporter, or owner or operator of a

4   "treatment," "storage," or "disposal" facility who has contributed or is contributing to

5   the past or present handling, "storage," "treatment," transportation, or "disposal" of a

6   "solid waste" or "hazardous waste," as those terms are defined under RCRA.  Upon

7   information and belief, ExxonMobil is a successor-in-interest to General Petroleum

8   Corporation and Mobil Oil Corporation (f/k/a Socony Mobil Oil Company, f/k/a

9   Standard Oil Company of New York).

10              **3.      Non-Notice Letter Defendant PRPs**

11                   *a.      Associated Plating Source Property*

12        84.      Defendant APC Investment Company ("APC") is a corporation duly

13   organized and existing under the laws of the State of California with its principal

14   place of business in Reno, Nevada.  As alleged more fully herein, APC is a current or

15   previous "owner" or "operator," as those terms are defined under CERCLA, of the

16   Associated Plating Source Property, as that term is defined below in Paragraph 296.

17   As alleged more fully herein, APC is a "person" and is, or was, a generator,

18   transporter, or owner or operator of a "treatment," "storage," or "disposal" facility

19   who has contributed or is contributing to the past or present handling, "storage,"

20   "treatment," transportation, or "disposal" of a "solid waste" or "hazardous waste," as

21   those terms are defined under RCRA.

22        85.      Defendant Associated Plating Company, Inc. (f/k/a Associated Plating

23   Acquisition Corp.) ("Associated Plating Inc.") is a corporation duly organized and

24   existing under the laws of the State of Delaware with its principal place of business in

25   Santa Fe Springs, California.  As alleged more fully herein, Associated Plating Inc. is

26   a current or previous "owner" or "operator," as those terms are defined under

27   CERCLA, of the Associated Plating Source Property.  As alleged more fully herein,

28   Associated Plating Inc. is a "person" and is, or was, a generator, transporter, or owner

or operator of a "treatment," "storage," or "disposal" facility who has contributed or is contributing to the past or present handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under RCRA.

86.     Defendant Associated Plating Company ("Associated Plating") is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Associated Plating is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Associated Plating Source Property.  As alleged more fully herein, Associated Plating is a "person" and is, or was, a generator, transporter, or owner or operator of a "treatment," "storage," or "disposal" facility who has contributed or is contributing to the past or present handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under RCRA.

87.     Defendant Gordon E. McCann is an individual, who, upon information and belief, resides in Santa Ana, California.  As alleged more fully herein, Gordon McCann is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Associated Plating Source Property.  As alleged more fully herein, Gordon McCann is a "person" and is, or was, a generator, transporter, or owner or operator of a "treatment," "storage," or "disposal" facility who has contributed or is contributing to the past or present handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under RCRA.

88.     Defendant Lynnea R. McCann is an individual, who, upon information and belief, resides in Santa Ana, California.  As alleged more fully herein, Lynnea R. McCann is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Associated Plating Source Property.  As alleged more fully herein, Lynnea McCann is a "person" and is, or was, a generator, transporter, or

1  owner or operator of a "treatment," "storage," or "disposal" facility who has

2  contributed or is contributing to the past or present handling, "storage," "treatment,"

3  transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms

4  are defined under RCRA.

5        89.    Defendant Darrell K. Golnick is an individual, who, upon information

6  and belief, resides in Carlsbad, California.  As alleged more fully herein, Darrell K.

7  Golnick is a current or previous "owner" or "operator," as those terms are defined

8  under CERCLA, of the Associated Plating Source Property.  As alleged more fully

9  herein, Darrell Golnick is a "person" and is, or was, a generator, transporter, or owner

10  or operator of a "treatment," "storage," or "disposal" facility who has contributed or is

11  contributing to the past or present handling, "storage," "treatment," transportation, or

12  "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under

13  RCRA.

14        90.    Defendant Clare S. Golnick is an individual, who, upon information and

15  belief, resides in Reno, Nevada.  As alleged more fully herein, Clare S. Golnick is a

16  current or previous "owner" or "operator," as those terms are defined under

17  CERCLA, of the Associated Plating Source Property.  As alleged more fully herein,

18  Clare Golnick is a "person" and is, or was, a generator, transporter, or owner or

19  operator of a "treatment," "storage," or "disposal" facility who has contributed or is

20  contributing to the past or present handling, "storage," "treatment," transportation, or

21  "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under

22  RCRA.

23        91.    Defendant Cheryl A. Golnick is an individual, who, upon information

24  and belief, resides in Reno, Nevada.  As alleged more fully herein, Cheryl A. Golnick

25  is a current or previous "owner" or "operator," as those terms are defined under

26  CERCLA, of the Associated Plating Source Property.  As alleged more fully herein,

27  Cheryl Golnick is a "person" and is, or was, a generator, transporter, or owner or

28  operator of a "treatment," "storage," or "disposal" facility who has contributed or is

- 20 -

1   contributing to the past or present handling, "storage," "treatment," transportation, or

2   "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under

3   RCRA.

4           *b.*  *Cenco Refining Source Property*

5      92.  Defendant Powerine Oil Company ("Powerine") is a corporation duly

6   organized and existing under the laws of the State of California with its principal

7   place of business in Santa Fe Springs, California.  As alleged more fully herein,

8   Powerine is a current or previous "owner" or "operator," as those terms are defined

9   under CERCLA, of the Cenco Refining Source Property as that term is defined below

10  in Paragraph 316.  As alleged more fully herein, Powerine is a "person" and is, or was,

11  a generator, transporter, or owner or operator of a "treatment," "storage," or

12  "disposal" facility who has contributed or is contributing to the past or present

13  handling, "storage," "treatment," transportation, or "disposal" of a "solid waste" or

14  "hazardous waste," as those terms are defined under RCRA.

15          *c.*  *Patsouras Source Property*

16     93.  Defendant Kekropia, Inc. ("Kekropia") is a corporation duly organized

17  and existing under the laws of the State of California with its principal place of

18  business in Santa Fe Springs, California.  As alleged more fully herein, Kekropia is a

19  current or previous "owner" or "operator," as those terms are defined under

20  CERCLA, of the Patsouras Source Property, as that term is defined below in

21  Paragraph 338.  As alleged more fully herein, Kekropia is a "person" and is, or was, a

22  generator, transporter, or owner or operator of a "treatment," "storage," or "disposal"

23  facility who has contributed or is contributing to the past or present handling,

24  "storage," "treatment," transportation, or "disposal" of a "solid waste" or "hazardous

25  waste," as those terms are defined under RCRA.

26     94.  Defendant Palley Supply Company ("Palley Supply") is a corporation

27  duly organized and existing under the laws of the State of California with its principal

28  place of business in Los Angeles, California.  As alleged more fully herein, Palley

1    Supply is a current or previous "owner" or "operator," as those terms are defined

2    under CERCLA, of the Patsouras Source Property.  As alleged more fully herein,

3    Palley Supply is a "person" and is, or was, a generator, transporter, or owner or

4    operator of a "treatment," "storage," or "disposal" facility who has contributed or is

5    contributing to the past or present handling, "storage," "treatment," transportation, or

6    "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under

7    RCRA.

8          95.    Defendant William K. Palley is an individual.  As alleged more fully

9    herein, William K. Palley is a current or previous "owner" or "operator," as those

10   terms are defined under CERCLA, of the Patsouras Source Property.  As alleged more

11   fully herein, William Palley is a "person" and is, or was, a generator, transporter, or

12   owner or operator of a "treatment," "storage," or "disposal" facility who has

13   contributed or is contributing to the past or present handling, "storage," "treatment,"

14   transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms

15   are defined under RCRA.

16         96.    Defendant Halliburton Affiliates, LLC ("Halliburton") is a limited

17   liability corporation duly organized and existing under the laws of the State of

18   Delaware with its principal place of business in Houston, Texas.  As alleged more

19   fully herein, Halliburton is a current or previous "owner" or "operator," as those terms

20   are defined under CERCLA, of the Patsouras Source Property.  Upon information and

21   belief, Halliburton is a successor by merger to the liabilities of The Rucker Company

22   ("Rucker"), then a California corporation liable under CERCLA as a current or

23   previous "owner" or "operator," as those terms are defined under CERCLA, of the

24   Patsouras Source Property.  Upon information and belief, in 1999, Halliburton

25   Affiliates Corporation and Rucker (then known as Baroid Equipment, Inc.) merged

26   and the surviving company, Halliburton Affiliates Corporation, assumed the

27   liabilities of both constituent companies.  Upon information and belief, in 2002,

28   Halliburton Affiliates Corporation was converted into a limited liability company

- 22 -

1   named Halliburton Affiliates, LLC, which retained the liabilities of Halliburton

2   Affiliates Corporation.

3                   *d.*      *PMC Source Property*

4        97.     Defendant Ferro Corp. ("Ferro") is a corporation duly organized and

5   existing under the laws of the State of Ohio with its principal place of business in

6   Mayfield Heights, Ohio. As alleged more fully herein, Ferro is a current or previous

7   "owner" or "operator," as those terms are defined under CERCLA, of the PMC

8   Source Property, as that term is defined below in Paragraph 362. As alleged more

9   fully herein, Ferro is a "person" and is, or was, a generator, transporter, or owner or

10   operator of a "treatment," "storage," or "disposal" facility who has contributed or is

11   contributing to the past or present handling, "storage," "treatment," transportation, or

12   "disposal" of a "solid waste" or "hazardous waste," as those terms are defined under

13   RCRA.

14        98.     Defendant PMC Specialties Group, Inc. ("PMC") is a corporation duly

15   organized and existing under the laws of the State of Delaware with its principal place

16   of business in Cincinnati, Ohio. As alleged more fully herein, PMC is a current or

17   previous "owner" or "operator," as those terms are defined under CERCLA, of the

18   PMC Source Property.

19             **4.     SNL Defendant PRPs Firmenich and Momentive**

20        99.     Defendant Firmenich, Inc. ("Firmenich") is a corporation duly organized

21   and existing under the laws of the State of New Jersey with its principal place of

22   business in Geneva, Switzerland. As alleged more fully herein, Firmenich is an

23   "arranger," as that term is defined under CERCLA, of hazardous waste disposal at the

24   Omega Chemical property. Upon information and belief, Firmenich obtained a

25   partial interest in MCP Industrial Food Products ("MCP") and is a

26   successor-in-interest to MCP.

27        100.    Upon information and belief, Defendant Momentive Specialty

28   Chemicals, Inc. (f/k/a Hexion Specialty Chemicals, Inc. and n/k/a Hexion Inc.)

1  ("Momentive") is a corporation duly organized and existing under the laws of the

2  State of New Jersey with its principal place of business in Columbus, Ohio.  As

3  alleged more fully herein, Momentive is an "arranger," as that term is defined under

4  CERCLA, of hazardous waste disposal at the Omega Chemical property.  Upon

5  information and belief, Momentive, through its affiliate, Hexion Specialty Chemicals,

6  Inc., obtained a partial interest in MCP and is a successor-in-interest to MCP.

7       **C.    Doe Defendants**

8       101.   Plaintiffs are ignorant of the true names and capacities of the defendants

9  sued fictitiously as DOES 1 through 100, inclusive, and therefore sue these

10  defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege

11  their true names and capacities when ascertained, but are presently informed and

12  believe that each of the fictitiously named defendants is an owner, member, or

13  affiliate of a named Defendant with such unity of interest and ownership that the

14  separate personalities between the Doe Defendant and the named Defendant no

15  longer exist and that failure to disregard their separate identities would result in fraud

16  or injustice.

17       102.   Plaintiffs are ignorant of the true names and capacities of the defendants

18  sued fictitiously as DOES 101 through 250, inclusive, and therefore sue these

19  defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege

20  their true names and capacities when ascertained, but are presently informed and

21  believe that each of the fictitiously named defendants is a person or entity that

22  arranged for the disposal of hazardous substances at a Source Property, which is

23  responsible in some manner for some or all of the acts alleged herein.

24                    **JURISDICTION AND VENUE**

25       103.   This is a civil action arising under the Comprehensive Environmental

26  Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*

27  and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, et

28

1   seq.  This Court has original jurisdiction pursuant to 42 U.S.C. § 9613(b), 42 U.S.C. §
2   6972(a), and 28 U.S.C. § 1331.

3       104.   In addition, the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202,
4   and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to
5   grant Plaintiffs declaratory relief.

6       105.   This Court has jurisdiction over Plaintiff's public nuisance cause of
7   action under the doctrine of supplemental jurisdiction and 28 U.S.C. § 1367, because
8   this claim arises out of the same set of operative facts and as the federal claims.

9       106.   Venue is proper in this district pursuant to Section 113(b) of CERCLA,
10  42 U.S.C. § 9613(b), and Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the
11  releases of hazardous substances and endangerment to health and environment which
12  give rise to the claims asserted herein occurred in this district.

13                          **FACTUAL ALLEGATIONS**

14      A.    **OU-2 Facility Regional Groundwater Contamination**

15      107.   EPA has concluded that the groundwater underlying portions of Whittier
16  and Santa Fe Springs, California is contaminated with hazardous substances.
17  Although the concentration of chemicals in the groundwater vary throughout the
18  region, the contamination extends approximately 4½ miles and is roughly bordered
19  by Whittier Boulevard to the north, Imperial Highway to the south, Bloomfield
20  Avenue and Santa Fe Springs Road to the east and several blocks west of the 5 and
21  605 freeways.  The chemicals in the groundwater include but are not limited to:

22   • Antimony;

23   • Arsenic;

24   • Benzene;

25   • Chloroform;

26   • Chromium;

27   • Hexavalent chromium;

28   • Total chromium;

1    • 1,2-Dibromo-3-chloropropane ("DBCP");

2    • 1,1-Dichloroethane ("1,1-DCA");

3    • 1,2-Dichloroethane ("1,2-DCA);

4    • 1,1-Dichloroethene ("1,1-DCE");

5    • Cis-1,2-dichloroethene ("c-1,2-DCE");

6    • Methylene chloride ("DCM");

7    • Cis-1,3-dichloropropene ("c-1,3-DCP");

8    • Trans-1,3-dichloropropene ("t-1,3-DCP");

9    • Bis (2-ethylhexyl) phthalate ("DEHP");

10   • 1,4-Dioxane;

11   • 1,2-Dibromoethane ("EDB");

12   • Carbon tetrachloride;

13   • Trichlorofluoromethane ("Freon 11");

14   • 1,1,2-Trichloro-1,2,2-trifluoroethane ("Freon 113");

15   • Isopropyl alcohol ("IPA");

16   • Manganese;

17   • Mercury;

18   • Methyl tert-butyl ether ("MTBE");

19   • N-nitrosodimethylamine ("NDMA");

20   • Naphthalene;

21   • Nickel;

22   • 1,1,2,2-Tetrachloroethane;

23   • Tetrachloroethylene ("PCE");

24   • Selenium;

25   • 1,1,1-Trichloroethane ("1,1,1-TCA");

26   • 1,1,2-Trichloroethane ("1,1,2-TCA");

27   • Trichloroethylene ("TCE");

28   • Thallium;

1     • Toluene; and

2     • Vinyl chloride.

3   Each of these substances is a "hazardous substance" as that term is defined under

4   CERCLA and, when discarded, a "solid waste", and potentially a "hazardous waste",

5   as those terms are defined under RCRA.  The groundwater is also contaminated with

6   aluminum; perchlorate; 1,2,3-Trichloropropane ("TCP"); chlorides; nitrates; sulfates;

7   and dissolved solids, as well as any other hazardous substances identified by EPA

8   from time to time as contaminants of concern in the OU-2 Facility.  Upon information

9   and belief, EPA contends that exposure to one or more of these substances poses a

10  risk to human health and safety.  Because hazardous substances were deposited,

11  stored, disposed of, placed, or otherwise came to be located in groundwater

12  underlying portions of the Whittier and Santa Fe Springs communities, this area is a

13  "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

14          108.   Historically, the land that sits atop the OU-2 Facility has been used

15  mostly for industrial or commercial purposes.  The area includes chemical

16  manufacturing and processing plants, oil refinery and oil production facilities,

17  including wells and pipelines, industrial laundry operations, metal processing and

18  heat treating plants, railroad operations, gas stations, and machine shops, many of

19  which involved storage of significant quantities of chemicals for use in operations.

20          109.   Certain Defendants currently operate, or formerly operated, such

21  businesses, or currently own, or formerly owned, the property on which those

22  businesses operated.  Other Defendants arranged for the treatment or disposal of

23  wastes at businesses that sit on top of or very near to the OU-2 Facility.  In addition,

24  ExxonMobil, Continental Development, Continental, Associated Plating Inc., APC,

25  Associated Plating, Cheryl Golnick, Clare Golnick, Darrell Golnick, Gordon

26  McCann, Lynnea McCann, Claudette Earl, Earl Mfg., Ferro, PMC, Foss Plating,

27  Bodycote, Powerine, Kekropia, Palley Supply, William Palley, Pilot, Phibro-Tech,

28  Union Pacific, and First Dice (collectively, the "RCRA Defendants") each

1    contributed or is contributing to the past or present handling, "storage," "treatment,"

2    transportation, or "disposal" of a "solid waste" or "hazardous waste," as those terms

3    are defined under RCRA.

4         110.   State and regulatory agencies have identified the properties owned by

5    Defendants, or upon which they operated, as well as the Omega Chemical property, as

6    sources of the OU-2 Facility groundwater contamination.  They have identified

7    numerous instances of releases of hazardous substances, such as PCE, TCE, 1,1-DCE

8    and hexavalent chromium, onto the ground and into the soil at and underneath those

9    properties.

10        111.   EPA believes that the subsurface directly beneath these source areas

11   consists of portions of permeable soil containing lower concentrations of water,

12   resulting in migration of contaminants generally downward by gravity.  As the

13   contaminants in the soil sink to lower depths and reach the saturated zone, the

14   contaminants travel laterally and downgradient with the flow of the groundwater.

15        112.   EPA reports that it has searched and reviewed records and state and local

16   agency files, performed field investigations at several of the confirmed and potential

17   source areas of the OU-2 Facility groundwater contamination, and has determined

18   that many source areas of significantly contaminated soil and groundwater have likely

19   contributed contaminants to the OU-2 Facility.  EPA has issued SNLs to Defendants

20   Phibro-Tech, Inc.; Union Pacific; Bodycote; Pilot Chemical; Mission Linen; Foss

21   Plating; Earl Mfg.; Claudette Earl; Palmtree Acquisition Corporation; Burke Street;

22   Firmenich; and Momentive, identifying each of these Defendants as potentially liable

23   for past and future costs to remediate the contaminated regional groundwater.  Upon

24   information and belief, the content of EPA's Remedial Investigation / Feasibility

25   Study, and the SNLs themselves, provide information concerning the basis for EPA's

26   belief that these Defendants have contributed to the OU-2 Facility and the SNLs

27   invite the SNL Defendants to discuss with EPA the future cleanup work.

28

113.   Also, EPA has sent GNLs to Defendants Continental and ExxonMobil. In the letters, EPA identifies the recipients as potentially liable for past and future costs to remediate the contaminated regional groundwater.

114.   The majority of the groundwater contamination at the OU-2 Facility is limited to the upper portion of the groundwater aquifer.  The groundwater within the OU-2 Facility area is used as a source of drinking water by several municipal and private water purveyors, although the current drinking water wells in the OU-2 area draw water primarily from deeper portions of the aquifer than are currently affected by the contamination.  The contamination, however, if left unabated, could spread into other portions of the aquifer that are sources of drinking water.  Upon information and belief, groundwater production well monitoring data on file with the California Department of Public Health show that these production wells have had low levels of contamination dating back to 1985.  The water purveyors have installed and maintain wellhead treatment systems on affected production wells to remove contaminants to acceptable regulatory levels.  If left unabated, the contamination may also, upon information and belief, affect soil, around or adjacent to the contaminated groundwater, that is not already impacted, including but not limited to soil at or underneath public property and infrastructure.

115.   EPA has concluded that the contamination described above poses a threat to public health, welfare and the environment and that a response to address the contamination is therefore necessary.  Accordingly, EPA has identified a groundwater pump-and-treat system that is intended to remove contaminant mass from the groundwater, limit the movement of contaminated groundwater, and prevent any further spreading of hazardous substances to uncontaminated areas of the aquifer and nearby water production wells (the "Selected Remedy").  Implementing the Selected Remedy is estimated to cost in the tens of millions of dollars.

116.   The contamination at and near the source properties at which the RCRA Defendants contributed or are contributing to the handling, storage, treatment,

1  transportation, or disposal of solid or hazardous wastes continues to migrate away

2  from those source properties presenting an imminent and substantial endangerment to

3  human health and the environment.  Upon information and belief, the RCRA

4  Defendants have long been on notice of the contamination but they have failed to

5  adequately address it.  The Selected Remedy does not address the need to control the

6  continuing release of hazardous substances to groundwater from those source

7  properties ("Source Control"), nor is it intended to.  In fact, EPA has indicated that the

8  OU2 interim remedy would need to operate indefinitely without property source

9  control and it has recognized the importance of source controls for successful

10  long-term remediation.

11      117.   EPA contends that Plaintiffs, which sent chemicals to Omega Chemical

12  for proper treatment, processing and disposal, and others, should bear the costs of the

13  Selected Remedy, as well as past costs EPA has incurred in connection with the OU-2

14  Facility.

15      118.   Beginning no later than 2009, each Plaintiff has incurred significant

16  costs to monitor, assess and evaluate the OU-2 Facility, to investigate the

17  environmental conditions associated with the OU-2 Facility, including the sources of

18  contamination, to identify PRPs, and to evaluate the means to address the

19  contamination.  Plaintiffs collectively have incurred millions of dollars to date in such

20  costs.  In addition, Plaintiffs have spent and may in the future spend significant sums

21  to address the contamination contributed to the OU-2 Facility by Defendants that may

22  affect soil, around or adjacent to the contaminated groundwater, that is not already

23  impacted, including but not limited to soil at or underneath public property and

24  infrastructure.  These costs have neither been reimbursed nor indemnified, nor are

25  they duplicative of any costs incurred by any other person, entity, or governmental

26  entity in connection with the OU-2 Facility.

27

28

**B.     Defendants Have Contributed to the OU-2 Facility Regional Groundwater Contamination**

119.   Each of the source properties set forth below is located above or adjacent to the OU-2 Facility.  Upon information and belief, each is a source of the OU-2 Facility groundwater contamination.  The approximate locations of the source properties are shown in the attached Exhibit B.

**1.     The SNL Defendants' Source Properties**

*a.     The Bodycote Source Property – 11845 Burke Street*

120.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 11845 Burke Street, Santa Fe Springs, California and businesses operating thereon (the "Bodycote Source Property").

i.     Source Property Ownership and Operation

121.   Since at least 1966, Defendant Bodycote (including its predecessor company, Techni-Braze, Inc.) has been conducting metalwork operations at the Bodycote Source Property, such as heat treating of metal, metal brazing, metal testing, and metal coating.  Bodycote purchased the Bodycote Source Property in 1997 and remains the current owner today.

122.   Operations of the type Bodycote conducted frequently involved the use of halogenated solvents.  Before a part can be heat treated or coated, it must be cleaned of foreign substances, such as oil and grease.  A device called a vapor degreaser is generally used to do so.  A typical vapor degreaser boils a halogenated solvent (such as PCE, TCE, 1,1,1-TCA, or Freon 11) to create a hot vapor into which metal, glass, or plastic items are immersed to remove grease, fats, oils, wax, or soil.  Although vapor degreasers often reuse the vapor after it cools and condenses, the process generates hazardous waste in the form of residual liquid solvent and sludge that must either be disposed of or treated.  The storage and use of solvents in vapor degreasers has historically been associated with spills, leaks and releases into the environment.

- 31 -

ii.   Disposal & Releases of Hazardous Substances

123.   Upon information and belief, hazardous substances, including waste oil and the solvents PCE and TCE were stored, used, or were otherwise present in hazardous waste at the Bodycote Source Property.  From 1980 (when Bodycote's predecessor installed a vapor degreaser at the Bodycote Source Property) to at least 1998 (when Bodycote reported it had ceased using chlorinated solvents on the property), Bodycote and its predecessor used PCE and TCE in connection with Bodycote's metalworking operations.  During the time it operated the degreaser, Bodycote estimated it was using approximately 55 gallons a month of PCE in degreasing operations.

124.   Bodycote has repeatedly been found in violation of hazardous substance regulations.  In 1984 and 1989, the Los Angeles County Department of Health Services issued notices of violation regarding Bodycote's predecessor's practices for storage and disposal of PCE, waste oil, and other hazardous waste.  In 1998, the Santa Fe Springs Fire Department inspected the Bodycote Source Property and found numerous violations, including unsafe storage of hazardous waste, disposal of solvent-soaked towels in the garbage, and improper storage of PCE and TCA, all of which were found to be a failure of Bodycote's responsibility to "minimize possibility of … sudden and non-sudden release of hazardous waste to soil, air, or water."

125.   Bodycote's operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to PCE, being placed onto the ground or into the soil at or near the Bodycote Source Property.  Soil samples taken at the Bodycote Source Property have detected benzene; 1,1-DCE; PCE; TCE; and toluene.  A historical analysis of the property by Bodycote's consultant led the consultant to conclude that chronic spilling of PCE had occurred behind the main building on the property and in the northwest corner of the property, and that the resulting soil contamination was the source of local groundwater contamination.  Soil samples taken at the Bodycote Source Property have repeatedly shown PCE

1    contamination at much higher concentrations in soil in the areas where Bodycote

2    stored and used the solvent.  During an assessment of the Bodycote Source Property

3    in 1991, oily stains were observed under and around the degreaser on the property.

4    Later that year, in August 1991, another assessment found PCE in the soil on the

5    property and concluded that there had been a release of PCE from storage containers

6    or degreasing operations and that the release had contaminated the soil and

7    underlying groundwater on the property.

8         126.   Upon information and belief, the hazardous substances present in the

9    soil at the Bodycote Source Property have migrated and continue to migrate

10   downward into the saturated zone beneath the property and have come to be located in

11   the groundwater, resulting in contamination of the groundwater with benzene;

12   1,1-DCA; 1,2-DCA; 1,1-DCE; 1,1,1,2-tetrachloroethane; PCE; TCA; 1,1,1-TCA;

13   1,1,2-TCA; TCE; 1,4-dioxane; and toluene.  An investigation of the property in 1995

14   concluded that soil contamination at the Bodycote Source Property extended to the

15   groundwater.  Groundwater samples taken at the Bodycote Source Property have

16   found PCE contamination at much higher concentrations in the areas where Bodycote

17   stored and used PCE.  In 2007, Bodycote's environmental consultants concluded that

18   the presence of 1,1-DCA; 1,2-DCA; 1,1-DCE; and TCA in groundwater on the

19   property were attributable to the chemical degradation of PCE released from the

20   property.

21        127.   Upon information and belief, wastewater containing hazardous

22   substances, including chromium, was discharged by Bodycote and its predecessor

23   from the Bodycote Source Property into a drain channel, where it migrated downward

24   into the saturated zone and came to be located in the regional groundwater.  In 1975,

25   the Regional Water Quality Control Board and the Los Angeles County Sanitation

26   District each determined that Bodycote's predecessor, Techni-Braze, was discharging

27   wastewater from the Bodycote Source Property containing chromium in excess of

28

permitted amounts; the Sanitation District also detected chlorinated hydrocarbons in the wastewater.

128.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Bodycote Source Property, the Bodycote Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

129.   Groundwater monitoring data indicates that the contaminants in the groundwater from the soil at the Bodycote Source Property have migrated offsite in the same general direction as the groundwater flow.  Assessments of the property in 1991 and 1995 analyzed contamination from Bodycote's operations and concluded that the contamination may have migrated offsite.

130.   In 2010, EPA cited with approval investigations that had concluded that contamination at the Bodycote Source Property with PCE and its degradation products, such as TCE, was caused by spills or leaks from Bodycote's storage of PCE or related operations, and that the contamination had migrated offsite.  In or around September 2012, Plaintiffs allege on information and belief, EPA sent an SNL to Bodycote, which, among other things, identifies Bodycote as a PRP for the OU-2 Facility groundwater contamination and solicits an offer for Bodycote to perform the OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed response costs.

iii.   Continuing Migration of Contaminants

131.   As alleged above, releases of contaminants have occurred at the Bodycote Source Property and are continuing to occur.  The contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

132.   Bodycote has not taken adequate steps to remediate the onsite and near-site soils, resulting in a continuing source for contaminant migration.  It has not adequately monitored the extent to which contaminants continue to migrate from the

1  Bodycote Source Property into offsite groundwater, and the Bodycote Source

2  Property does not have a groundwater monitoring system in place that is sufficient to

3  demonstrate that releases from the property to regional groundwater above

4  health-based levels have been fully controlled.

5       133.   In 2005, the following OU2 contaminants were detected: PCE in 15 wells

6  at concentrations ranging from 1.4 µg/l to 12,000 µg/l; 1,1,1-TCA in 2 wells at 1.9

7  µg/l and 3.0 µg/l; TCE in several wells at levels from 12 µg/l to 42 µg/l; and 1,1-DCE

8  in five wells at 8 µg/l, 9.8 µg/l, 15 µg/l, 3.6 µg/l, and 5.6 µg/l.

9       134.   The 2011 concentration trend for PCE in wells MW-8, MW-6, MW-12,

10  and MW-7 suggests continuing migration of onsite source materials from the

11  Bodycote Source Property above health-based levels.

12       135.   The 2011 PCE detections in the boundary well MW-7 at 500 µg/l

13  represents offsite migration of contaminants from the Bodycote Source Property at

14  100 times the maximum contaminant level ("MCL").   Other readings on the

15  downgradient side of the property were even higher.

16       136.   Wells MW-2 and MW-3, which are identified as "deeper" groundwater

17  wells, also exhibit concentrations of PCE above the MCL.

18       137.   The lack of offsite monitoring wells in the "shallow" aquifer precludes

19  an appropriate evaluation of the lateral and vertical delineation of offsite groundwater

20  contamination, making it impossible to optimize any source control remedy to ensure

21  the remedy actually prevents offsite migration of contaminants above health-based

22  levels from the Bodycote Source Property.

23           b.   *The Chrysler Source Property*

24       138.   Upon information and belief, releases of contamination have occurred

25  from property, and businesses operating thereon, located at and/or adjacent to the

26  former address 12140 Slauson Ave., Santa Fe Springs, California.  The original

27  property has since been subdivided and has come to be known as the La Salle

28  Property, Central Property, North-Central Property and Multitenant Property, more

1  specifically identified, respectively, by Assessor's Parcel Numbers 8168-002-412;

2  8168-002-403 through 405, 8168-002-405, and 8168-002-418 and 419;

3  8168-002-412, and 8168-002-803 and 804; and 8168-002-402 (the "Chrysler Source

4  Property").

5                                   i.    Source Property Ownership

6        139.   Beginning no later than 1888, Defendant Union Pacific, or a predecessor

7  company or subsidiary of Defendant Union Pacific, began acquiring portions of the

8  Chrysler Source Property, and by no later than 1966 had acquired title to the entire

9  Chrysler Source Property.

10       140.   In 1974, Southern Pacific Industrial Development Company, a

11 predecessor to Defendant Palmtree, acquired title to the Chrysler Source Property.

12       141.   In 2000, Defendant Burke Street acquired a portion of the Chrysler

13 Source Property and by 2002 Burke Street had acquired the entire Central Property

14 portion of the Chrysler Source Property.  In December 2009, Burke Street admitted,

15 in response to an EPA CERCLA Section 104(e) request, that as of that time, it had not

16 engaged in any cleanup activities of the Chrysler Source Property.

17                                  ii.    Source Property Operation

18       142.   Beginning in 1963, certain entities conducted automobile preparation

19 operations at the Chrysler Source Property.  At this time, there were six buildings

20 onsite and by 1966 there were a total of nine buildings on the central and northwestern

21 portions of the Chrysler Source Property and a portion of the site was covered by

22 asphalt and used for automobile storage.  By 1979 there were 17 buildings onsite and

23 hundreds of cars parked at the Chrysler Source Property.  Operations included body

24 and mechanical work, tune-ups, front-end alignment, emissions control testing,

25 painting, washing, detailing, performance testing, and spot chroming.

26       143.   Beginning in approximately 1963, Pacific Electric leased a portion of the

27 Chrysler Source Property, approximately 27.67 acre in size, to Dallas Smith Service

28

1   Corporation ("Dallas Smith"), which conducted various automobile preparation
2   operations at the site including those operations set forth in Paragraph 142 above.

3      144.   In 1967, Defendant Union Pacific (then known as Southern Pacific
4   Company) leased the 27.67 acre Dallas Smith portion of the Chrysler Source Property
5   plus an additional 11.90 acres to the Chrysler Realty Corporation, which continued
6   conducting automobile preparation operations under the name Nucar Prep Systems at
7   the Chrysler Source Property, including those operations set forth in Paragraph 142
8   above.  Chrysler operated at the Chrysler Source Property under various names
9   including Nucar Prep Systems, Chrysler Corp. – California Emission Test Facility,
10  Nu Car Prep System Inc., Chrysler Shelby Center, and Pre-Check Corp.

11     145.   In 1988, Chrysler ceased operations at the Chrysler Source Property, and
12  as of 1999, car preparation structures at the Chrysler Source Property had been razed
13  and the property had been redeveloped into office and warehouse buildings.

14                        iii.     Disposal & Releases of Hazardous Substances

15     146.   Upon information and belief, hazardous substances were disposed of at
16  the Chrysler Source Property between 1963 and 1988.  According to at least one
17  report, as well as Material Safety Data Sheets maintained by companies operating at
18  the Chrysler Source Property during this period, compounds present there included
19  detergents and flammable solvents; chlorinated hydrocarbons, including TCE and
20  PCE used for degreasing parts and washing cars and trucks, and MEK; purgeable
21  halocarbons, toluene, xylenes, butyl alcohol; emulsifiers; acetone; metals; new and
22  used motor oil from car maintenance operations; and acrylic and enamel paint from
23  spray paint operations.  Chrysler used hexavalent chromium (and, potentially, other
24  chromium compounds) at the Chrysler Source Property and stored waste chromium
25  for transportation off-site.

26     147.   Upon information and belief, Dallas Smith obtained Industrial Waste
27  Disposal Permits to dispose of liquid waste or wastewater generated in connection
28  with its operations to the sanitary sewer, and a storm drain located on or adjacent to

the property.  In 1970, and again in 1976, public agencies found Chrysler to be in violation of water discharge permits for disposing of hexavalent chromium (and, potentially, other chromium compounds) into a storm drain.  No later than 1973, Chrysler used and disposed of solvents, cosmoline (rust-preventative) remover, and wastewater at the Chrysler Source Property.  Chrysler improperly disposed of hazardous paint residue into a storm drain on or near the Chrysler Source Property, improperly placed hazardous wastes in the garbage for disposal, and used both TCE and PCE at the Chrysler Source Property for cosmoline removal in or before 1985.  In addition to operating seven licensed underground storage tanks containing various chemicals, Chrysler operated at least two unlicensed and undocumented underground storage tanks sometime between 1967 and 1985.

148.   During the closure of the Chrysler Source Property in 1988, approximately 1,000 cubic yards of soil contaminated with hazardous substances were removed from the property, in addition to two undocumented, rusted storage tanks.  An investigation that same year uncovered soil contaminated with TCE and other hazardous substances.  In 1989, an assessment of the Chrysler Source Property concluded that the likelihood that the soil was contaminated around the plant's plumbing and drainage systems was high, and indeed, PCE was detected in the soil later that year.

149.   In 1990 and 1991, an investigation was conducted of soil near and under a former 750-gallon clarifier at the Chrysler Source Property that had been removed from the body works building at the property in 1988.  At the time the soil was removed, visibly stained soil with a chemical odor was observed.  The soil was contaminated with high levels of: TCE; PCE; chloroform; 1,1-DCA; 1,1,1-TCA and 1,2-DCE, and the contamination extended 33 feet below ground surface ("bgs") which was the depth groundwater was first encountered.  At the time, stockpiled soil was also tested and found to be contaminated with: 1,1-DCE; 1,2-DCE; Freon-11; PCE; TCA; and TCE.  Soil gas samples were found to contain: 1,1-DCE; PCE; and

1    Freon 11.  Approximately 1,000 cubic yards of contaminated soil, extending down to

2    the top of the groundwater table, was removed. The plume of contaminants was found

3    to exist in the soil extending out from the clarifier.  An assessment of the Chrysler

4    Source Property that same year also found oily sludge and extensive staining in the

5    carwash area and detail building of the plant.  Tests of other parts of the Chrysler

6    Source Property in 1991 also showed soil contaminated with chromium, Freon 11,

7    1,1-DEC, and PCE.  In 1992, during the installation of sewers at the Chrysler Source

8    Property, contaminated soil was discovered and removed.  The same year, additional

9    soil contaminated with hazardous substances was discovered and removed.  In 1996,

10   PCE was found to still be present in the soil at the Chrysler Source Property.

11   150.   Upon information and belief, the hazardous substances in the soil at the

12   Chrysler Source Property have migrated and continue to migrate downward into the

13   saturated zone beneath the property and have come to be located in the groundwater –

14   specifically, chromium, PCE, TCE, TCA, DCA, DCE 1,1-DCE, 1,2-DCE and

15   Freon-11.  In 1990 and 1991, investigations of groundwater under a 750-gallon

16   clarifier at the Chrysler Source Property revealed that the groundwater beneath the

17   clarifier was contaminated with: 1,1-DCE, Freon 11, PCE, TCA, and TCE.  Tests of

18   other parts of the Chrysler Source Property in 1991 showed groundwater

19   contaminated with chromium, 1,1-DCE, 1,2-DCE, Freon 11, 1,2-DCA, PCE, TCA,

20   and TCE.  The same year, wells at the Chrysler Source Property showed higher levels

21   of some chlorinated solvents than did wells located upgradient of the plant.

22   Additional groundwater testing between 1994 and 1999 indicated that the

23   groundwater at the Chrysler Source Property was contaminated with: 1,1-DCE,

24   1,2-DCE, Freon 11, Freon 113, PCE, and TCE.

25   151.   Because hazardous substances were deposited, stored, disposed of, or

26   placed, or otherwise came to be located at the Chrysler Source Property, the Chrysler

27   Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42

28   U.S.C. § 9601(9).

1    152.   Upon information and belief, contaminants in the groundwater from the

2    soil at the Chrysler Source Property have migrated offsite in the same general

3    direction as the groundwater flow.

4    153.   In 2010, the EPA concluded that based on elevated concentrations of

5    PCE, TCE, and 1,1-DCE in soil, the Chrysler Source Property is a source of

6    groundwater contamination by these compounds.  In or around February 2009, EPA

7    sent a GNL to Chrysler LLC, which, among other things, identifies Chrysler LLC as a

8    PRP for the OU-2 Facility groundwater contamination, requests a response as to

9    Chrysler LLC's willingness to negotiate with EPA regarding its potential liability for

10   OU-2 Facility response costs, and requests certain information about the status of

11   Chrysler LLC's activities.  In or around September 2012, Plaintiffs allege on

12   information and belief, EPA sent SNLs to Burke Street and Palmtree as successors to

13   Chrysler LLC.  Among other things, the SNLs identify those Defendants as PRPs for

14   the OU-2 Facility groundwater contamination, and solicits offers from Burke Street

15   and Palmtree to perform the OU-2 Facility remedial design and remedial action, and

16   pay EPA's unreimbursed response costs.

17              c.   *The Earl Mfg. Source Property – 11862 Burke Street*

18   154.   Upon information and belief, releases of contamination have occurred

19   from property located at and/or adjacent to 11862 Burke Street, Santa Fe Springs,

20   California and businesses operating thereon (the "Earl Mfg. Source Property").

21              i.   Source Property Ownership and Operation

22   155.   Upon information and belief, Defendant Earl Mfg. began operations at

23   the Earl Mfg. Source Property in 1960.  At the time, the Earl Mfg. Source Property

24   was owned by William E. Earl and Dot A. Earl.  Earl Mfg. manufactured springs,

25   spark plugs, jacks and other machined parts.

26   156.   In 1990, William E. Earl and Dot A. Earl granted the property to

27   Defendant Claudette Earl, who remains the current owner.

28

157.   In 2000, Defendant Earl Mfg. ceased operations at the Earl Mfg. Source Property.

ii.      Disposal & Releases of Hazardous Substances

158.   Upon information and belief, hazardous substances were disposed of at the Earl Mfg. Source Property between 1960 and 2000.

159.   Earl Mfg.'s operations involved significant use of solvents, such as: TCE; DCA; and 1,1,1-TCA, as well as 400 to 500 gallons of PCE annually, which was stored in a 500-gallon aboveground storage tank.  Waste PCE and a mixture of chlorinated solvent wastes were stored in a rusted 1,000-gallon underground storage tank.  Earl Mfg. also used other solvents. Earl Mfg.'s operations also included the use and/or waste generation of several halogenated solvents including: PCE which was used in a vapor degreaser and stored in a 500-gallon storage tank adjacent to the degreaser and in a bulk storage area; TCE which was maintained in the TCE storage area; 1,1,1-TCA which was likely used in conjunction with the onsite paint booth; and waste solvent mixtures containing a dicloroethane.

160.   In 1966, Defendant Earl Mfg. installed a vapor degreaser at the Earl Mfg. Source Property that was used until 1992.  Waste solvent from the degreaser and Trim-Sol waste oil was reportedly stored onsite in the 1,000-gallon underground storage tank.  Water from a cooling tower located on the roof of the vapor degreaser room was discharged daily into the public sewer.  Beginning in 1976, degreasing operations also involved use of a 100-gallon PCE dip tank.

161.   In 1989, the Los Angeles County Department of Health Services issued a Notice of Violation and Order to Comply to Defendant Earl Mfg. to, among other things, segregate waste cooling oil from spent solvent waste, and recommended a containment area to prevent oily runoff into a nearby Creek.

162.   In 1997, the 1,000 gallon underground storage tank was removed from the Earl Mfg. Source Property. Upon removal, the tank was inspected and found to be moderately rusty.  The tank reportedly was used to store PCE and a metalworking

1    coolant with the trade name "Trim Sol".  However, sludge found in the tank during

2    removal contained more than 20 volatile organic compounds ("VOCs"), including:

3    PCE, TCE, 1,1-DCA, 1,2-DCA, DCM, 1,1,1-TCA, toluene, and vinyl chloride.

4    Contemporaneous soil sampling detected PCE, TCE, and 1,1-DCA in the soil under

5    the tank.  In 2012, additional soil samples collected from the Earl Mfg. Source

6    Property revealed the presence of elevated levels of PCE and TCE.

7         163.   Upon information and belief, the hazardous substances present in the

8    soil at the Earl Mfg. Source Property have migrated and continue to migrate

9    downward into the saturated zone beneath the property and have come to be located in

10   the groundwater – specifically, PCE, TCE, and 1,1-DCA.  Because of the elevated

11   concentrations of contaminants in the soil, the Santa Fe Springs Fire Department in

12   1997 referred Defendant Earl Mfg. to the Regional Water Quality Control Board,

13   stating that the contaminants indicated a potential threat to groundwater.  In 1999,

14   groundwater tests conducted at the Earl Mfg. Source Property revealed PCE and TCE

15   contamination at concentrations higher than background levels.  Groundwater

16   samples collected in 2012 also revealed 1,1-DCA, 1,1-DCE, PCE, and TCE

17   contamination.  In 2013, the Regional Water Quality Control Board issued a draft

18   cleanup and abatement order to Defendant Claudette Earl, stating that a VOC

19   groundwater plume had originated at the Earl Mfg. Source Property and had migrated

20   offsite.

21        164.   Because hazardous substances were deposited, stored, disposed of, or

22   placed, or otherwise came to be located at the Earl Mfg. Source Property, the Earl

23   Mfg. Source Property is a "facility" within the meaning of Section 101(9) of

24   CERCLA, 42 U.S.C. § 9601(9).

25        165.   Upon information and belief, contaminants in the groundwater from the

26   soil at the Earl Mfg. Source Property have migrated offsite in the same general

27   direction as the groundwater flow.  In 2013, the Regional Water Quality Control

28

- 42 -

1  Board concluded that a plume of VOCs originating at the property had migrated

2  offsite, affecting offsite groundwater resources.

3      166.    In 2010, EPA concluded that the Earl Mfg. Source Property was a source

4  of TCE and PCE, as well as of 1,1-DCA and 1,1-DCE contamination in the OU-2

5  Facility.  In or around September 2012, Plaintiffs allege on information and belief,

6  EPA sent an SNL to Claudette Earl and one to Earl Mfg., which, among other things,

7  identify those Defendants as PRPs for the OU-2 Facility groundwater contamination

8  and solicit a offers for Claudette Earl and Early Mfg. to perform the OU-2 Facility

9  remedial design and remedial action and pay EPA's unreimbursed response costs.

10                    iii.    Continuing Migration of Contaminants

11      167.    As alleged above, releases of contaminants have occurred at the Earl

12  Mfg. Source Property and are continuing to occur.  The contaminants continue to

13  migrate away from the property, posing a continuing threat to the regional

14  groundwater and the health of area residents.

15      168.    Neither Claudette Earl nor Earl Mfg. has taken adequate steps to

16  remediate the onsite and near-site soils, from which contaminants are migrating.

17  Neither has adequately monitored the extent to which contaminants continue to

18  migrate from the Earl Mfg. Source Property into offsite groundwater.  The Earl Mfg.

19  Source Property does not have a groundwater monitoring system in place that is

20  sufficient to demonstrate that releases from the property to regional groundwater

21  above health-based levels have been fully controlled.  Upon information and belief,

22  Claudette Earl is and has been aware of the contamination occurring at the property,

23  which she owns or owned.

24      169.    Site soils at the Earl Mfg. Source Property are highly contaminated.  Soil

25  samples collected and analyzed during removal of an underground storage tank from

26  the property in 1997 found both PCE and 1,1-DCA in soil samples collected beneath

27  the former tank.  PCE was detected from samples taken at both the east end and the

28  west end of the tank at 1,470 µg/kg and 422,000 µg/kg respectively.  1,1-DCA was

1    detected at the west end of the tank at 228 µg/kg. The detection limit at the east end of

2    the tank was 25,000 µg/kg. The soil samples were collected at four feet below the

3    tank which was 10 feet below grade. PCE was detected in 12 out of 28 soil vapor

4    samples clustered around the former tank excavation at a maximum reading of

5    257 µg/l.

6        170.    In 1998, soil samples collected at 11.5 and 20 feet "- from beneath the

7    former underground storage tank at the Earl Mfg. Source Property were found to

8    contain PCE at 270 µg/kg and 950 µg/kg, respectively. Soil samples also contained

9    elevated levels of 1,1-DCA, TCE, and 1,1,1-TCA.

10       171.    Follow up soil sampling in 2012 in the vicinity of the former degreaser at

11   the Earl Mfg. Source Property included sampling to a depth of 30 feet, where PCE

12   was detected in all six samples from the vapor degreaser area ranging from 40 µg/kg

13   (25 feet) to 180,000 µg/kg (20 feet). PCE was also detected in four of six samples

14   collected from the former exterior TCE storage area (10 µg/kg at 5 feet to 84 µg/kg at

15   25 feet) and in four of six samples collected at the former 1,000 gallon waste solvent

16   underground storage tank (130 µg/kg at 5 feet to 22 µg/kg at 10 feet).

17       172.    In 2014, PCE and TCE were detected throughout the area under the

18   former operations building at the Earl Mfg. Source Property, with particularly high

19   levels below the area of the former vapor degreaser.

20       173.    There are three wells onsite. MW-1 is downgradient of the other two

21   wells. In 1999, this well contained 13,700 µg/l of PCE and 1,730 µg/l of TCE.

22       174.    Hydropunch sampling was performed at the Earl Mfg. Source Property

23   in 2012 in three locations along the southern portion of the property (the former 1,000

24   gallon underground storage tank ("UST"), the exterior TCE storage area, and the

25   former degreaser) with results for PCE in groundwater ranging from 2,000 to 3,000

26   µg/l and TCE ranging from 240 to 340 µg/l.

27       175.    There has been no offsite sampling to delineate the lateral and vertical

28   extent of groundwater contamination leaving the Earl Mfg. Source Property above

1   health-based levels and an adequate groundwater sampling network has not been

2   installed.

3                        *d.*     <u>*The Foss Plating Source Property – 8140 Secura Way*</u>

4        176.   Upon information and belief, releases of contamination have occurred

5   from property located at and/or adjacent to 8140 Secura Way, Santa Fe Springs,

6   California and businesses operating thereon (the "Foss Plating Source Property").

7                     i.     <u>Source Property Ownership and Operation</u>

8        177.   Upon information and belief, in or around 1960, Foss Plating purchased

9   the Foss Plating Source Property and, as of 1968, was operating on the property.

10   Defendant Foss Plating conducted metal plating operations at the Foss Plating Source

11   Property, consisting primarily of chrome and nickel plating of parts and metal

12   polishing.

13        178.   In 2002, Devr Properties, a company related to Foss Plating, purchased

14   portions of the Foss Plating Source Property, including portions of the property upon

15   which hazardous waste was stored. Devr Properties leased back the portion of the

16   property it had purchased to Foss Plating, which continued its operations on the

17   property until 2005.

18                   ii.     <u>Disposal & Releases of Hazardous Substances</u>

19        179.   Upon information and belief, hazardous substances were disposed of at

20   the Foss Plating Source Property between 1960 and 2005.

21        180.   Metal plating is the process by which a thin surface coating of one metal

22   is applied to a part by placing the part in a bath of chemical plating solution, with or

23   without the use of an electric current. Metal plating generates wastewater containing

24   chromium and other metals as well as toxic organic chemicals. Additionally, before a

25   part can be plated, it is typically cleaned of foreign substances, such as oil and grease,

26   using, for example, a vapor degreaser and a solvent, resulting in solvent waste.

27        181.   Upon information and belief, beginning in 1968 until 1994 or 1995

28   (when Foss Plating reportedly removed its vapor degreasing system), Foss Plating

1  operated one or more vapor degreasers on the property that used PCE until 1985, and

2  thereafter used 1,1,1-TCA.  Each month, Foss Plating used as much as 120 gallons of

3  solvent in its degreasing operations, and generated as much as 35-40 gallons of

4  solvent sludge.  Additionally, Foss Plating used compounds containing hexavalent

5  chromium to plate items with that metal as part of the chromium plating process.

6       182.  Foss Plating has repeatedly been found in violation of hazardous

7  substance regulations.  In 1983, Foss Plating was cited for discharging wastewater

8  from the property that contained chromium, and in 1999, Foss Plating was cited for

9  discharging wastewater containing hexavalent chromium (and, potentially, other

10  chromium compounds).  In 1989, Foss Plating was issued a notice of violation for

11  disposing of solvent sludge with wastewater.  In 1998, Foss Plating was informed that

12  its hazardous substance storage and containment procedures, including its

13  containment of chemicals used in plating, were out of compliance with regulatory

14  requirements.

15       183.  Upon information and belief, Foss Plating's operations and waste

16  disposal practices resulted in one or more hazardous substances, including but not

17  limited to the solvents PCE and 1,1,1-TCA and chromium, being placed onto the

18  ground or into the soil at or near the Foss Plating Source Property.  Soil and soil vapor

19  samples taken at the Foss Plating Source Property have detected: chloroform;

20  hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCE;

21  nickel; PCE; 1,1,1-TCA; and TCE.  Soil contaminated with PCE and hexavalent

22  chromium was concentrated around one of the plating lines and a trench drain on the

23  property, which a consultant of Foss Plating concluded was the likely source of a

24  plume of chromium contamination in the soil under the plant.  Soil samples taken near

25  Foss Plating's wastewater treatment system revealed PCE and high levels of

26  chromium.  During a joint inspection by the California Department of Toxics

27  Substance Control ("DTSC") and the Santa Fe Springs Fire Department, inspectors

28  found the ground around the plating line soaked with plating solution and found

1   evidence of releases of PCE, chromium, and nickel to the soil on the property.  In

2   2003, a corroded clarifier was removed from the property and contemporaneous soil

3   samples found the soil contaminated with chromium.

4          184.   Upon information and belief, the hazardous substances present in the

5   soil at the Foss Plating Source Property have migrated and continue to migrate

6   downward into the saturated zone beneath the property and have come to be located in

7   the groundwater, resulting in contamination of the groundwater with: chloroform;

8   hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCE;

9   PCE; and TCE.  In 2006, a consultant for Foss Plating concluded that, based on Foss

10  Plating's historical use of PCE and chromium and the contamination data, Foss

11  Plating could be a source of groundwater contamination on the property.

12         185.   Because hazardous substances were deposited, stored, disposed of, or

13  placed, or otherwise came to be located at the Foss Plating Source Property, the Foss

14  Plating Source Property is a "facility" within the meaning of Section 101(9) of

15  CERCLA, 42 U.S.C. § 9601(9).

16         186.   Upon information and belief, contaminants in the soil and in the

17  groundwater from the soil at the Foss Plating Source Property have migrated offsite in

18  the same general direction as the groundwater flow.  In 2003, DTSC concluded that

19  hazardous wastes released at the Foss Plating Source Property had migrated, or may

20  migrate, offsite through soil, surface water, groundwater, air, particulate matter, and

21  water run-off channels.

22         187.   In 2010, EPA concluded that hexavalent chromium, PCE, and TCE had

23  been released at the Foss Plating Source Property, and indicated that investigations

24  had concluded that Foss Plating was a contributor to soil and groundwater

25  contamination with chromium, PCE, and zinc.  In or around September 2012,

26  Plaintiffs allege on information and belief, EPA sent an SNL to Foss Plating, which,

27  among other things, identifies Foss Plating as a PRP for the OU-2 Facility

28  groundwater contamination, and solicits an offer for Foss Plating to perform the OU-2

1   Facility remedial design and remedial action and pay EPA's unreimbursed response

2   costs.

3                           iii.    Continuing Migration of Contaminants

4        188.   As alleged above, releases of contaminants have occurred at the Foss

5   Plating Source Property and are continuing to occur.  The contaminants continue to

6   migrate away from the property, posing a continuing threat to the regional

7   groundwater and the health of area residents.

8        189.   Foss Plating has not taken adequate steps to remediate the onsite and

9   near-site soils, from which contaminants are migrating.  Nor has Foss Plating

10  adequately monitored the extent to which contaminants continue to migrate from the

11  Foss Plating Source Property into offsite groundwater.  The Foss Plating Source

12  Property does not have a groundwater monitoring system in place that is sufficient to

13  demonstrate that releases from the property to regional groundwater above

14  health-based levels have been fully controlled.

15       190.   Site soils at the Foss Plating Source Property are highly contaminated.

16  In 1999, PCE was detected up to 48 ppb in very shallow soils at the property.  In 2004,

17  concentrations for hexavalent chromium were widespread with the highest reading at

18  807 ppm at a 10 foot depth. In 2006, hexavalent chromium was found in certain

19  borings up to 1,800 ppm.  Soil vapor data in 2006 indicated PCE to depths of 15 feet

20  bgs.

21       191.   The extent of onsite soil contamination at the Foss Plating Source

22  Property has not been fully delineated both vertically and laterally.  There remain

23  numerous potential onsite contamination sources including historical degreaser

24  operations, the plating room area, the underground clarifier, and the overall

25  wastewater treatment system.

26       192.   The Foss Plating Source Property has three onsite wells.  MW-3 is

27  downgradient of the other two and is located approximately 80 feet within the

28  downgradient property boundary and contains the highest concentrations of PCE at

1  490 µg/l.  Hexavalent chromium has been detected in groundwater at concentrations

2  greater than 900 µg/l.

3      193.  There are no offsite groundwater monitoring wells and the lateral and

4  vertical extent of offsite groundwater contamination from the Foss Plating Source

5  Property has not been assessed.

6          e.  *The Mission Linen Source Property – 11904-11920 East*

7              *Washington Boulevard*

8      194.  Upon information and belief, releases of contamination have occurred

9  from property located at and/or adjacent to 11904-11920 East Washington Boulevard,

10  Santa Fe Springs, California and businesses operating thereon (the "Mission Linen

11  Source Property").

12          i.  Source Property Ownership and Operation

13      195.  From approximately 1960 to 1973, Whittier Laundry Company operated

14  a dry cleaning business on the Mission Linen Source Property.  In 1973, Defendant

15  Mission Linen acquired the Mission Linen Source Property, and began conducting

16  industrial laundry operations on or about that same year.

17      196.  Defendant Mission Linen ceased operations at the Mission Linen Source

18  Property by 1992 but, upon information and belief, continues to own the property.

19          ii.  Disposal & Releases of Hazardous Substances

20      197.  Upon information and belief, hazardous substances were disposed of at

21  the Mission Linen Source Property between 1960 and 1992.

22      198.  Dry cleaning operations routinely involve the use of solvents to remove

23  stains from fabrics.  After World War II, PCE became the most popular and primary

24  solvent used by most dry cleaners in the United States.  Other solvents used at dry

25  cleaning facilities may include 1,1,1-TCA and TCE.  The clothes are cleaned in a

26  liquid solution consisting mostly of solvent, usually PCE, with very little water if any

27  (hence, the term "*dry* cleaning").  These solvents are ordinarily stored in large

28

- 49 -

1    underground storage tanks.  Large dry cleaning facilities may purchase more than

2    2,000 gallons of PCE each year.

3          199.   Used solvent is typically distilled and purified on the property so that it

4    can be reused.  This process separates the solvent from waste residues like detergents,

5    dye, dirt and oil, and involves the use of filters to purify the solvent.  Still residue from

6    this process and used filters, both of which contain solvent and certain solvent

7    residues, like PCE, are hazardous waste that must be properly disposed.  Large dry

8    cleaning facilities may generate more than 2,000 pounds of hazardous waste each

9    month, which is often stored onsite before being disposed.

10         200.   Wastewater and cooling water generated in the dry cleaning process also

11   contain solvents that must be properly disposed or treated.  Dry cleaning facilities

12   have been known to dispose of water containing PCE or other solvents into shallow

13   disposal systems such as dry wells and septic systems, sewer systems and settling

14   basins.

15         201.   Industrial laundries may also generate waste containing solvents and

16   metals, such as hexavalent chromium.  Industrial laundries receive and launder rags

17   and industrial wipes from a wide variety of industrial operations, many of which are

18   soaked in solvents and contain metal waste.  These hazardous substances are removed

19   from the rags and wipes during laundering and must be disposed of by the laundry.

20         202.   Several sumps located at the Mission Linen Source Property were found

21   to contain: PCE; 1,1,1-TCA; 1,1-DCE; t-1,2-DCE; chromium; and zinc.  Mission

22   Linen used numerous underground storage tanks on the property to store fuel and

23   waste oil at least until 1987.  When those tanks were removed in 1987, soil under the

24   tanks was found to be contaminated with hazardous substances.  In 1993, the Los

25   Angeles County Fire Department issued a notice of violation to Mission Linen for

26   improper waste storage practices.  In 1996, soil at the Mission Linen Source Property

27   was found to be contaminated and a plume of PCE was identified beneath the Source

28   Property.  A 2000 property assessment also identified PCE in the soil at the Mission

1   Linen Source Property.  Soil samples taken at the Mission Linen Source Property in

2   2010 revealed the presence of benzene, c-1,2-DCE, PCE, and TCE.  Even after a soil

3   vapor extraction system had removed 430 pounds of PCE from the soil on the

4   property, PCE contamination was still prevalent in the soil.  Soil vapor samples taken

5   at the Mission Linen Source Property in 2013 continued to show the presence of

6   xylene contamination.

7       203.   Upon information and belief, the hazardous substances present in the

8   soil at and underneath the Mission Linen Source Property, including: PCE;

9   c-1,2-DCE; t-1,2-DCE; 1,1-DCE; and TCE, have migrated downward into the

10  saturated zone beneath the Mission Linen Source Property and have come to be

11  located in the groundwater.  A property assessment conducted in 2000 found PCE in

12  the groundwater at the Mission Linen Source Property and concluded that it had

13  migrated there from the soil at the Mission Linen Source Property.  TCE and 1,1-DCE

14  were also discovered in groundwater on the property.  EPA has previously concluded

15  that the Mission Linen Source Property has impacted groundwater with PCE and

16  TCE, and confirmed that c-1,2-DCE, 1,1-DCE, and 1,2-DCA are present in

17  groundwater.

18      204.   Because hazardous substances were deposited, stored, disposed of, or

19  placed, or otherwise came to be located at the Mission Linen Source Property, the

20  Mission Linen Source Property is a "facility" within the meaning of Section 101(9) of

21  CERCLA, 42 U.S.C. § 9601(9).

22      205.   Groundwater monitoring data indicates that the contaminants in the

23  groundwater from the soil at the Mission Linen Source Property have migrated offsite

24  in the same general direction as the groundwater flow.  In 2005, data showed that the

25  concentrations of PCE in the groundwater near the Mission Linen Source Property

26  were highest just downgradient from the former dry cleaning building.

27      206.   In 2010, EPA concluded that Mission Linen had impacted groundwater

28  with PCE and TCE and concluded that the company was a source of contamination to

1  the OU-2 Facility.  In or around September 2012, Plaintiffs allege on information and

2  belief that EPA sent an SNL to Mission Linen, which, among other things, identifies

3  Mission Linen as a PRP for the OU-2 Facility groundwater contamination, and

4  solicits an offer for Mission Linen to perform the OU-2 Facility remedial design and

5  remedial action and pay EPA's unreimbursed response costs.

6  *f.*      *The Phibro-Tech Source Property – 8851 Dice Road*

7  207.   Upon information and belief, releases of contaminants have occurred

8  from property located at and/or adjacent to 8851 Dice Road, Santa Fe Springs,

9  California and businesses operating thereon (the "Phibro-Tech Source Property").

10  i.      Source Property Ownership and Operation

11  208.   Since 1957, Defendant Phibro-Tech and its predecessor companies have

12  conducted chemical manufacturing and reprocessing operations at the Phibro-Tech

13  Source Property, consisting primarily of the manufacture of inorganic chemicals, both

14  from raw ingredients and from used chemicals and hazardous wastes sent to the

15  property.  Inorganic chemicals are typically used for industrial or manufacturing

16  purposes.  Chemical manufacture inherently carries with it the risk of chemical

17  releases to the environment and the EPA has noted that one of the most frequently

18  released hazardous wastes from inorganic chemical manufacturing operations is

19  chromium.

20  209.   In 1957, a predecessor to Defendant Phibro-Tech named Pacific Western

21  Chemical Company (renamed Southern California Chemical Company in 1959)

22  began operating at the Phibro-Tech Source Property, leasing the property from

23  Pacific Electric Railway Company.  Pacific Electric Railway merged into Defendant

24  Union Pacific (then known as Southern Pacific Company) in 1965.

25  210.   In 1961, the predecessor to Union Pacific entered into an agreement with

26  Phibro-Tech's predecessor, the Southern California Chemical Company, to construct,

27  maintain, and operate an industrial railway spur on the property to facilitate rail

28

1    shipments to and from the Phibro-Tech Source Property and, in 1964, the two

2    companies entered into a lease for the related property.

3        211.   Since at least 1963, Phibro-Tech and its predecessors have received

4    hazardous waste on the property for use in chemical manufacturing.  Upon

5    information and belief, Does 101 through 250 generated hazardous waste and

6    arranged for its disposal and/or treatment at the Phibro-Tech Source Property.

7        212.   In 1984, CP Chemicals, Inc. purchased the Phibro-Tech Source Property

8    and Southern California Chemical became a subsidiary of CP Chemicals.  Shortly

9    after the purchase, a Santa Fe Springs city official observed that key management of

10   the plant—including those directly responsible for improper discharges of hazardous

11   waste—were the same personnel who had held those positions prior to the purchase.

12       213.   In 1985, Union Pacific, then known as the Southern Pacific

13   Transportation Company, deeded the property that CP Chemicals had purchased to

14   Defendant First Dice, a subsidiary of CP Chemicals and corporate affiliate of

15   Phibro-Tech.

16       214.   In 1994, after several name changes, the operating company on the

17   property was renamed Phibro-Tech, Inc.

18                        ii.    Disposal & Releases of Hazardous Substances

19       215.   Upon information and belief, significant quantities of hazardous

20   substances, including hexavalent chromium and other chromium compounds and

21   PCE were stored, used, or were otherwise present in hazardous waste at the

22   Phibro-Tech Source Property.  Since at least 1963, Phibro-Tech and its predecessors

23   have also received hazardous waste on the property for use in chemical

24   manufacturing.

25       216.   Upon information and belief, the operators of the Phibro-Tech Source

26   Property have had a long history of improper waste handling, storage, and disposal

27   techniques, which have resulted in disposal of hazardous substances at the

28   Phibro-Tech Source Property since at least 1957, and significant releases into the

1    environment.  In 1959, Phibro-Tech's predecessor received a notice of violation for

2    numerous egregious waste disposal practices, including discharging hexavalent

3    chromium through a pipe that emptied onto land adjacent to the property and dumping

4    hexavalent chromium on the ground at the entrance to the property; the company

5    readily admitted to both violations.

6         217.   Phibro-Tech received numerous notices of violation and complaints for

7    its active discharge of hazardous waste onto the railroad right-of-way on the property

8    and failing to maintain adequate containment processes to keep waste from spilling

9    onto the right-of-way.  Ultimately, a misdemeanor charge was pressed against

10   Phibro-Tech's predecessor for discharging waste onto the right-of-way, public

11   streets, and private property.  In 1987, the Los Angeles County District Attorney

12   brought another criminal charge against Phibro-Tech's predecessor for additional

13   statutory hazardous waste violations.

14        218.   In 2000 and 2003, Phibro-Tech received notices of violation for

15   discharging wastewater with excessive amounts of toxic organic chemicals.  In 2003,

16   DTSC found numerous waste storage violations at the Phibro-Tech Source Property,

17   including Phibro-Tech's storage of approximately nine thousand drums of hazardous

18   waste on the property, almost three times the number of drums Phibro-Tech was

19   authorized to store.  In 2009 and 2011, Phibro-Tech again was found to be in violation

20   of hazardous waste storage requirements.

21        219.   Phibro-Tech's operations and waste disposal practices resulted in one or

22   more hazardous substances, including but not limited to hexavalent chromium, being

23   placed onto the ground or into the soil at or near the Phibro-Tech Source Property.

24   Soil and soil gas samples collected at the Phibro-Tech Source Property have revealed

25   the presence of: barium; benzene; cadmium; chloroform; hexavalent chromium (and,

26   potentially, other chromium compounds); total chromium; copper; 1,1-DCA;

27   1,2-DCA; 1,1-DCE; 1,2-DCE; c-1,2-DCE; t-1,2-DCE; DCM; ethylbenzene; nickel;

28   PCE; polychlorinated biphenyls; 1,1,1-TCA; TCE; toluene; xylene; and zinc.  Soil

1   contaminated with hexavalent chromium has been found to be especially high near a

2   former chromic acid underground storage tank, a wastewater pond, the railroad

3   tracks, and a drum storage area.  In 1961, Phibro-Tech's predecessor was using an

4   unlined sludge pond on the property, was cited for discharging sludge that contained

5   19.5% volatile solids, including chromium, into a sewer.

6       220.   In 1968, county inspectors observed visible evidence that wastewater

7   had been discharged to the ground on the property.  The inspectors also learned that

8   an exposed sump on the property that was designed to store tank spillage and leaks for

9   recovery, overflowed during wet weather events.  Upon information and belief, the

10  contents of the sump contained hazardous substances that spilled onto the adjacent

11  railroad and into a field, where it was absorbed into the ground.  On or before May 21,

12  1976, waste liquids were discharged at the Phibro-Tech Source Property, which

13  resulted in saturation of the soil with numerous chemicals, including solvents and

14  chromium.  In 1984, a sewer line at the Phibro-Tech Source Property leaked,

15  discharging wastewater to the ground, where it formed a small pond, and led to the

16  nearby reporting of a solvent odor.  In 1985, a consultant concluded that chromium

17  contamination in the soil may have originated from a combination of surface spillage,

18  wastewater ponds, and a leaking hexavalent chromium underground storage tank.  An

19  assessment of the property two years later found extensive evidence of leakage and

20  spillage, including chemical discoloration of most of the pavement and equipment in

21  the process areas, leading to the conclusion that a wastewater pond and chromium

22  underground storage tank were potential sources of contamination.

23      221.   Upon information and belief, the hazardous substances present in the

24  soil at the Phibro-Tech Source Property have migrated and continue to migrate

25  downward into the saturated zone beneath the property and have come to be located in

26  the groundwater, resulting in contamination of the groundwater with: benzene;

27  cadmium; chloroform; hexavalent chromium and other chromium compounds; total

28  chromium; copper; 1,1-DCA; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM;

- 55 -

ethylbenzene; PCE; 1,1,1-TCA; TCE; toluene; xylene; and zinc.  As early as 1968, the Los Angeles Department of County Engineers, upon inspection of the property, concluded that historically poor waste handling practices and the deteriorated state of the plant and its containment system had created a critical groundwater pollution problem at the plant.  In 1993, two plumes of contaminated groundwater were determined to originate on the property: a TCE plume and a chromium plume, both of which originated in the vicinity of a former chromic acid underground storage tank. In 1994, EPA and DTSC concluded that ponds at the Phibro-Tech Source Property had contributed to cadmium, chromium, and high-volatility organic compound contamination of the regional aquifer.  A Phibro-Tech consultant likewise concluded in 2005 that a former underground storage tank, a spent container storage area, drainage ditch, and the railroad dumping location were potential sources of halogenated VOCs and chromium contamination, with the ditch and railroad dumping being the most likely sources.  In 2013, DTSC concluded that TCE contamination of the groundwater on the property originated from a release of chlorinated solvents including TCE on the property.

222.   Defendant Union Pacific (then known as Southern Pacific Company) was aware of the contamination occurring at the Phibro-Tech Source Property, which Union Pacific then owned, as early as 1968 when Union Pacific reported to Phibro-Tech's predecessor that a very large quantity of chemical substance had saturated the roadbed and ground under the industrial railroad spur, and concluded that chemical wastes had been allowed to flow onto the ground for an extended period of time.  Despite knowledge of the contamination occurring on the property, upon information and belief, Union Pacific did not curb its tenants' practices, take steps to mitigate the spread of contaminants or remediate the contamination that was already present on its property.

223.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Phibro-Tech Source Property, the

1    Phibro-Tech Source Property is a "facility" within the meaning of Section 101(9) of
2    CERCLA, 42 U.S.C. § 9601(9).

3        224.   Upon information and belief, contaminants in the groundwater from the
4    soil at the Phibro-Tech Source Property have migrated offsite in the same general
5    direction as the groundwater flow.  In 1994, EPA and DTSC concluded that
6    groundwater data indicated hazardous substances such as 1,2-DCA, chromium, and
7    TCE were migrating downgradient from two ponds at the Phibro-Tech Source
8    Property.

9        225.   Plaintiffs allege on information and belief that in or around September
10   2012, EPA sent SNLs to Phibro-Tech and Union Pacific, which, among other things,
11   identify those Defendants as PRPs for the OU-2 Facility groundwater contamination
12   and solicit offers for Phibro-Tech and Union Pacific to perform the OU-2 Facility
13   remedial design and remedial action and pay EPA's unreimbursed response costs.
14   Plaintiffs further allege on information and belief that EPA sent an SNL to First Dice,
15   which, among other things, identifies First Dice as a PRP for the OU-2 Facility
16   groundwater contamination, and solicits an offer for First Dice to perform the OU-2
17   Facility remedial design and remedial action and pay EPA's unreimbursed response
18   costs.

19                          iii.   Continuing Migration of Contaminants

20       226.   As alleged above, releases of contaminants have occurred at the
21   Phibro-Tech Source Property and are continuing to occur.  The contaminants
22   continue to migrate away from the property, posing a continuing threat to the regional
23   groundwater and the health of area residents.

24       227.   Neither Union Pacific, nor First Dice, nor Phibro-Tech has taken
25   adequate steps to remediate the onsite and near-site soils, from which contaminants
26   are migrating.  None has adequately monitored the extent to which contaminants
27   continue to migrate from the Phibro-Tech Source Property into offsite groundwater.
28   The Phibro-Tech Source Property does not have an off-site downgradient

1   groundwater monitoring system in place that is sufficient to demonstrate that releases

2   from the property to regional groundwater above health-based levels have been fully

3   controlled.  Upon information and belief, Union Pacific and First Dice are and have

4   been aware of the contamination occurring at the property, which they own or owned.

5       228.   Phibro-Tech Source Property soils continue to adversely impact

6   groundwater.  In 2001, a TCE footprint was identified at the Phibro-Tech Source

7   Property that extended northeast-southwest approximately between the spent

8   container storage area ("SCSA") and the plate and frame filter press.  Concentrations

9   ranged up to 62 µg/l.  A deeper footprint extended northeast-southwest approximately

10  between the SCSA and the southern end of Pond 1 with concentrations under the

11  SCSA up to 452 µg/l.

12      229.   Soil impacts were identified in 2007 from 103 soil samples collected to a

13  depth of 75 feet bgs.  The five most commonly detected halogenated VOCs were

14  TCE, 1,1-DCA, c-1,2-DCE, 1,1-DCE, and PCE.  The highest TCE reading was

15  12,000 µg/kg at 30 feet bgs.  Hexavalent chromium levels ranged from 0.22 mg/kg

16  (14 feet bgs) to 330 mg/kg (43 feet bgs).

17      230.   Wells at the Phibro-Tech Source Property boundaries are impacted by

18  TCE and PCE above MCLs for those contaminants.

19      231.   The upgradient well to downgradient well concentration trend for onsite

20  wells is consistent with continuing contribution to groundwater from identified source

21  areas at the Phibro-Tech Source Property.

22      232.   In January 2012, concentrations of PCE and TCE in the southern

23  Phibro-Tech Source Property boundary wells (MW-05, MW-07, and MW06B) were

24  reported to be above MCL levels. The data trend for TCE in MW-06D (which is

25  screened in the Lower Hollydale Aquifer) marks an increasing trend.  Based on data

26  in the surrounding area, these results and trends are attributable to the Phibro-Tech

27  Source Property.

28

1      233.   The lack of an adequate downgradient (offsite) monitoring well network

2   to evaluate continuing contribution represents a significant data gap in the site

3   conceptual model and an inability to accurately assess the quantity of mass

4   contribution to regional groundwater impacts.  Today there are no offsite

5   groundwater wells and insufficient property boundary wells.  There is no adequate

6   well system capable of defining the lateral and vertical extent of current contaminants

7   originating from the Phibro-Tech Source Property.

8              g.   *The Pilot Chemical Source Property – 11756 Burke Street*

9      234.   Upon information and belief, releases of contamination have occurred

10   from property located at and/or adjacent to 11756 Burke Street, Santa Fe Springs,

11   California and businesses operating thereon (the "Pilot Chemical Source Property").

12                     i.      Source Property Ownership and Operation

13      235.   Defendant Pilot Chemical began operating a chemical manufacturing

14   plant at the Pilot Chemical Source Property in 1951, and acquired the Pilot Chemical

15   Source Property in 1966.

16      236.   Defendant Pilot Chemical's operations at the Pilot Chemical Source

17   Property included the manufacture of chemicals, such as: detergents and emulsifiers.

18   Chemicals used in the process of Defendant Pilot Chemical's operations included

19   1,2-DCA; toluene; and xylene.  1,4-Dioxane is a common byproduct associated with

20   the manufacture of these chemicals and was included in the hazardous materials

21   inventory filed by Defendant Pilot Chemical in 2000, and is a constituent of concern

22   at the OU-2 Facility.

23      237.   In 2008, Defendant Pilot Chemical ceased operations at the Pilot

24   Chemical Source Property.

25                     ii.     Disposal & Releases of Hazardous Substances

26      238.   Upon information and belief, hazardous substances were disposed of at

27   the Pilot Chemical Source Property between 1951 and 2008.

28

239.   Defendant Pilot Chemical's operations at the Pilot Chemical Source Property generated approximately 13,000 gallons of wastewater per day, including such chemicals as alkyl and alkyl aryl sulfonates and sulfates, amides, and detergent mixtures.  Pilot Chemical also generated other chemical waste, such as sulfonic acid, sulfuric acid, and xylene.

240.   As of 1975, Defendant Pilot Chemical's operations at the Pilot Chemical Source Property involved the use of a wide variety of raw chemicals, including: ammonia; caustic soda; coconut oil; detergent alkylate; diethanolamine; maleic anhydride; sodium bisulfate; sodium sulfate; sulfur dioxide; sulfur trioxide; sulfuric acid; triethanolamine; and xylene.

241.   As of 1986, Defendant Pilot Chemical stored: C10-C12 alkylbenzene; C10-C13 alkylbenzene; ammonia; sodium hydroxide; sulfur dioxide; and xylene in underground storage tanks at the Pilot Chemical Source Property.  Benzene and toluene were also stored on the property during this time.

242.   Upon information and belief, hazardous substances used, stored, or otherwise present in hazardous waste in the chemical manufacturing operations at the Pilot Chemical Source Property include:  alkylbenzene; benzene; chloroform; chromium; 1,4-dioxane; linear alkyl benzene sulphonic acid ("LABSA"); toluene; and toluene sulfonic acid.

243.   Defendant Pilot Chemical has a long history of improper waste storage and handling of hazardous substances.  Upon information and belief, as of 1954, Defendant Pilot Chemical was disposing of liquid industrial waste into dry wells at the Pilot Chemical Source Property.  In 1959, a fatal fire occurred at the Pilot Chemical Source Property, resulting in the spillage of large amounts of hazardous chemicals.  The fire broke out in the area of the plant where the solvent toluene was converted into acid.  Toluene and toluene sulfonic acid, which spilled during the fire, were so dangerous that they reportedly dissolved the shoes of the firefighters who responded to the scene.  In 1960, a Los Angeles County inspector detected explosive

1   gas in the sewer at the Pilot Chemical Source Property, the cause of which was

2   believed to be a leaking toluene container.  In 1970, Defendant Pilot Chemical was

3   issued a notice of violation and was ordered to clean up chemical deposits at the Pilot

4   Chemical Source Property resulting from the discharge of chemicals into the ground.

5   In 1976, Defendant Pilot Chemical was issued a cleanup and abatement order in

6   response to a chemical spill that had occurred at the Pilot Chemical Source Property.

7       244.   Upon information and belief, Defendant Pilot Chemical's operations and

8   waste disposal practices resulted in one or more hazardous substances being placed

9   onto the ground or into the soil at or near the Pilot Chemical Source Property.  These

10   substances included but not limited to: benzene; toluene; and 1,2-DCA.  An

11   inspection of the Pilot Chemical Source Property in 1981 found that tanks used for

12   holding or mixing LABSA were leaking and spilling onto unpaved ground, resulting

13   in LABSA ponding near the tanks.  The LABSA tanks were still leaking during a

14   1985 inspection of the property.  In 1984, Defendant Pilot Chemical was found to

15   have improperly disposed of wastewater containing excessive amounts of

16   ethylbenzene and xylene.  In 1985, a CERCLA property inspection found a stream of

17   chemicals running from the Pilot Chemical Source Property onto railroad tracks

18   adjacent to the property.

19       245.   In 1988, the Los Angeles Department of Public Works was informed of a

20   release of benzene and xylene from an underground storage tank at the Pilot Chemical

21   Source Property.  Soil samples taken that year in the vicinity of underground storage

22   tanks showed elevated levels of xylene.  Upon information and belief, the 1,2-DCA

23   present in the soil at the Pilot Chemical Source Property is the result of spills

24   associated with Defendant Pilot Chemical's manufacture of styrene-maleic anhydride

25   copolymers on the Pilot Chemical Source Property and from leaks or spills from an

26   old emergency wastewater storage tank.

27       246.   In 1989, an inspector observed discolored soil in an area of the Pilot

28   Chemical Source Property where raw chemical materials were stored, noted that

- 61 -

1    small spills had accumulated in the area, and observed that pumps and pipes were

2    leaking.  In 1990, five underground storage tanks were removed from the Pilot

3    Chemical Source Property.  The soil in the vicinity of those tanks was found to be

4    contaminated with VOCs.  In 1992, two aboveground storage tanks that had held

5    detergent alkylate containing alkylbenzene were removed from the Pilot Chemical

6    Source Property.  The soil in the vicinity of the tanks was contaminated by spills from

7    piping and pumps associated with the tanks.  Other soil on the property was also

8    found to be contaminated with hazardous substances.  Approximately 2,140 tons of

9    contaminated soil was removed from the Pilot Chemical Source Property in 1992.

10        247.    As of 2009, a soil vapor extraction system that began operating at the

11    Pilot Chemical Source Property in 2006 had extracted approximately 3,637 pounds of

12    VOCs from soil on the property.  Soil vapor samples taken that year showed that,

13    despite the removal of almost two tons of VOCs from the soil, the soil on the property

14    was still contaminated with: benzene; chloroform; 1,2-DCA; PCE; TCE; and vinyl

15    chloride.  An additional 8,919 pounds of VOCs were removed from the soil by vapor

16    extraction between January 2011 and April 2012.  In 2010, an underground storage

17    tank was removed from the Pilot Chemical Source Property.  This underground

18    storage tank, which was the source of the 1,2-DCA contamination, was the old

19    emergency waste water tank that stopped being used in the 70s but was forgotten

20    about until it was closed in place in 1992 and finally removed in 2010.  This provided

21    a continuing source of contamination for over 30 years.  Soil samples taken in the

22    vicinity of the tank showed elevated levels of 1,2-DCA.  During the demolition of

23    portions of the Pilot Chemical Source Property in 2011, PCE was found in soil in the

24    vicinity of a clarifier, beneath a warehouse pad, beneath a terra cotta clay pipe, near a

25    wastewater interceptor, and in a parking lot.  Benzene was also detected in the soil.  In

26    2013, soil samples at the Pilot Chemical Source Property showed the presence of:

27    benzene; chloroform; 1,2-DCA; 1,1-DCE; c-1,2-DCE; DCM; PCE; and TCE.

28

248.    Upon information and belief, the hazardous substances present in the soil at the Pilot Chemical Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater – specifically: PCE; TCE; 1,2-DCA; c-1,2-DCE; ethylbenzene; Freon 11; benzene; and chloroform.  In 1988, it was determined that soil contamination extended below the water table, and groundwater was found to be contaminated with benzene: chloroform; and 1,2-DCA.  Groundwater sampling subsequently conducted at the Pilot Chemical Source Property in the 1990s detected the presence of: benzene; chloroform; 1,2-DCA; ethylbenzene; PCE; and TCE.  The concentrations of 1,2-DCA were highest near the area where the UST was removed in 2010, suggesting that the UST was the source of the contamination.  Further sampling of the groundwater at the Pilot Chemical Source Property in 2009 and 2012 detected: benzene; chloroform; 1,2-DCA; c-1,2-DCE; PCE; and TCE.  In 2013, groundwater sampling detected: chloroform; chromium; 1,2-DCA; 1,1-DCE; c-1,2-DCE; Freon 11; PCE; and TCE.

249.    Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Pilot Chemical Source Property, the Pilot Chemical Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

250.    Upon information and belief, contaminants, both measured and not yet measured, in the soil and in the groundwater from the soil at the Pilot Chemical Source Property have migrated offsite in the same general direction as the groundwater flow.

251.    Plaintiffs allege on information and belief that in or around September 2012, EPA sent an SNL to Pilot Chemical, which, among other things, identifies Pilot Chemical as a PRP for the OU-2 Facility groundwater contamination, and solicits an offer for Pilot Chemical to perform the OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed response costs.

iii.    Continuing Migration of Contaminants

252.   As alleged above, releases of contaminants have occurred at the Pilot Chemical Source Property and are continuing to occur.  The contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

253.   Pilot has not taken adequate steps to remediate the onsite and near-site soils, resulting in a continuing source for contaminant migration.  It has not adequately monitored the extent to which contaminants continue to migrate from the Pilot Chemical Source Property into offsite groundwater, and the Pilot Chemical Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels have been fully controlled.

254.   Recent data continue to show high levels of contaminants in shallow and deep soils at the Pilot Chemical Source Property with concentrations of hydrocarbons in soil gas greater than 100,000 ppbv and concentrations of 1,2-DCA in both shallow and deep soil gas ranging from 500 to 120,000 ppbv.

255.   The most downgradient well at the Pilot Chemical Source Property, MW-9, has consistently demonstrated TCE concentrations greater than 100 µg/l. Improved data are needed to characterize the source of the TCE currently found in MW-9.  Additionally, an additional downgradient monitoring well location is necessary to delineate the lateral and vertical extent of off-site Contaminant migration into groundwater.

256.   Total chromium was found in limited on-site soil sampling at the Pilot Chemical Source Property.  Moreover, hexavalent chromium and total chromium were found in limited on-site groundwater sampling.  Given the presence of hexavalent chromium above health-based levels in the regional groundwater, it is important to fully characterize hexavalent chromium in soils and groundwater at this property.

2. **The GNL Defendants' Source Properties**

      a. <u>*The Continental Source Property – 10643 South Norwalk Boulevard*</u>

257.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 10643 South Norwalk Boulevard, Santa Fe Springs, California and businesses operating thereon (the "Continental Source Property").

      i. <u>Source Property Ownership and Operation</u>

258.   Defendant Continental conducts metalwork operations at the Continental Source Property, consisting primarily of heat treating of metal, and has done so there since at least 1969.

259.   Defendant Continental Development purchased the Norwalk Boulevard property in 2002, and, upon information and belief, remained the property owner until 2013, when Continental purchased the Continental Source Property.  Upon information and belief, Continental is currently the property owner.

      ii. <u>Disposal & Releases of Hazardous Substances</u>

260.   Upon information and belief, significant quantities of hazardous substances, including hexavalent chromium and the solvents PCE and 1,1,1-TCA, were stored, used, or were otherwise present at the Continental Source Property. Upon information and belief, from 1969 (when Continental installed two vapor degreasers at the Continental Source Property) until at least 1994 (when Continental reported it had ceased conducting vapor degreasing on the property), Continental generated approximately 2,200 gallons of waste PCE annually in connection with its metal treating operations.

261.   Continental used a cooling tower at the Continental Source Property that, upon information and belief, contained hexavalent chromium, consistent with other similar metalworking operations that typically used chromium in cooling towers until the South Coast Air Quality Management District prohibited such use in 1990.

262.   Continental has repeatedly been found to be in violation of hazardous substance regulations.  In 1988, the Santa Fe Springs Fire Department issued a notice of violation as a result of Continental's discharge of "blow down" water from its cooling tower to the street.  In 1989, the Los Angeles County Fire Department issued a notice of violation following Continental's disposal of waste oil onto the ground and overfilling of hazardous waste containers.  Additionally, Continental was known to store waste PCE in 55-gallon drums.  In 1994, the Los Angeles County Fire Department investigated the location at the property where Continental had operated a vapor degreaser at the Continental Source Property and found evidence of spills, leaks, and sloppy practices.  Based on its findings, the Los Angeles County Fire Department issued a notice of violation and order to develop a plan to address the contamination.  Between 1999 and 2008, at a rate of almost once a year, the Santa Fe Springs Fire Department issued seven notices of violation to Continental for releases of chemicals resulting from the overflow of chemicals used in metal plating and Continental's improper storage of hazardous waste.

263.   Upon information and belief, Continental has had repeated catastrophic accidents or conducted operations in a manner that resulted in sudden discharges of hazardous waste, including but not limited to illegal discharge of PCE into subsurface soil.  In the ten months between October 2, 1987 and August 1, 1988, there were *three* fires that started in Continental's degreaser tank that, upon information and belief, resulted in spills or other releases of chlorinated solvents.  In 1986, the cooling tower pump at the Continental Source Property broke, resulting in an overflow of a blue-green chemical mixture into the street.  In 1987, an earthquake caused Continental's cooling tower pump to break again, resulting in another discharge of chemicals to the street.

264.   Continental's operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to chromium, PCE, and TCE, being placed onto the ground or into the soil at or near the Continental Source

Property.  Soil and soil gas samples taken at the Continental Source Property have contained: benzene; chromium; 1,2-DCE; c-1,2-DCE; t-1,2-DCE; PCE; toluene; and vinyl chloride.  Upon information and belief, the wastewater released from the cooling tower in the leaks of 1986 and 1987, as well as the discharge to the street in 1988, contained chromium.  Soil samples taken at the Continental Source Property have repeatedly shown PCE contamination at high concentrations in soil in the areas where Continental conducted its degreasing operations.  There are also very high concentrations of PCE in soil gas at 15' bgs in the northwest corner of the site where the liquid chemical storage area was.

265.   Upon information and belief, the hazardous substances present in the soil at the Continental Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with: benzene; c-1,2-DCE; t-1,2-DCE; PCE; toluene; and vinyl chloride.  An investigation of the property in 1997 concluded that soil contamination at the Continental Source Property extended to the groundwater.

266.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Continental Source Property, the Continental Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

267.   Data indicates that the contaminants in the groundwater from the soil at the Continental Source Property have migrated offsite, both in the groundwater in the same general direction as the groundwater flow, as well as through the soil.  The Los Angeles County Fire Department concluded that chlorinated hydrocarbons could have migrated offsite from Continental's degreasing operations.

268.   In 2010, EPA concluded that Continental was a potential source of PCE, TCE, and their degradation products in the regional groundwater.  In or around December 2013, EPA sent a GNL to Continental, which, among other things,

1    identifies Continental as a PRP for the OU-2 Facility groundwater contamination, and

2    requests a response as to Continental's willingness to negotiate regarding its liability

3    for the OU-2 Facility response costs.

4                          iii.    Continuing Migration of Contaminants

5          269.   As alleged above, releases of contaminants have occurred at the

6    Continental Source Property and are continuing to occur.  The contaminants continue

7    to migrate away from the property, posing a continuing threat to the regional

8    groundwater and the health of area residents.

9          270.   Neither Continental nor Continental Development has taken adequate

10   steps to remediate the onsite and near-site soils, from which contaminants are

11   migrating.  Neither has adequately monitored the extent to which contaminants

12   continue to migrate from the Continental Source Property into offsite groundwater.

13   The Continental Source Property does not have a groundwater monitoring system in

14   place that is sufficient to demonstrate that releases from the property to regional

15   groundwater above health-based levels have been fully controlled.  Upon information

16   and belief, Continental and Continental Development are and have been aware of the

17   contamination occurring at the property, which each owns or once owned.

18         271.   In 1995 and 1997, TCE and PCE were detected in the vicinity of the

19   former vapor degreaser at the Continental Source Property at depths from the surface

20   down to 60 feet bgs (the depth of groundwater) which ranged from 7.7 µg/kg to 4,759

21   µg/kg and 31 µg/kg – 7,514 µg/kg, respectively.  The highest concentrations were at

22   the surface which would indicate spillage; however, levels stayed high throughout the

23   soil column.

24         272.   Soil vapor sampling at the Continental Source Property in 1996 and

25   1997 identified PCE (1.172 mg/L) and TCE (103 µg/L) impacts to depths down to the

26   maximum depth analyzed, 35 feet bgs.  Soil vapor sampling performed in 2011

27   continues to demonstrate significant impacts in soil vapor to depths of 90 feet bgs.

28   PCE was detected at 15 feet bgs at 12,742 µg /l.

273.   In 2010, soil sampling at the Continental Source Property confirmed chlorinated solvent impacts to soils at the property at depths between the surface and 90 feet bgs.  Additional soil sampling in 2011 and 2012 indicate PCE (up to 3.51 mg/kg at 30 feet bgs) and TCE (up to 206 µg/kg at 35 feet bgs) impacts in soils from the surface to depths up to 95 feet bgs.  Significant subsurface soil contamination was also present for other chlorinated materials.

274.   PCE contamination down to groundwater levels was detected at the Continental Source Property as early as 1995.  Monitoring has found concentrations for PCE (up to 338 µg/L) and TCE (up to 224 µg/L) in onsite wells continuing to exceed health-based levels by significant levels across the site.  Other VOCs, including benzene, chloroform, 1,1-DCA, c-1,2-DCA, t-1,2-DCA, 1,2-DCA, 1,1-DCE, and vinyl chloride have been recorded as frequently exceeding California environmental screening levels during every monitoring period and at every well, between August 2010 and October 2013.

275.   There are no offsite wells associated with the property to provide for an assessment of the lateral and vertical extent of contaminants leaving the Continental Source Property and entering the regional groundwater.  Without an adequate offsite groundwater monitoring network, it is not possible to evaluate the extent to which any source control activities will prevent the continued release of contaminants to groundwater above health-based levels.

b.   *The Mobil Jalk Fee Source Property – 10607 Norwalk Boulevard*

276.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to the former address 10607 Norwalk Boulevard, Santa Fe Springs, California and businesses operating thereon (the "Mobil Jalk Fee Source Property").

i.      <u>Source Property Ownership and Operation</u>

277.   Since 1922, the Mobil Jalk Fee Source Property has been used for oil extraction, production, transportation and storage operations.  General Petroleum Corporation, a predecessor company to Defendant ExxonMobil, acquired the Mobil Jalk Fee Source Property in 1922 and conducted oil drilling operations there until the 1940s.

278.   In 1926, the Standard Oil Company of New York (or "Socony"), purchased General Petroleum Corporation and became the owner of the property. Socony changed its name to Socony Mobil Oil Company in 1955, which in turn became the Mobil Oil Corporation in 1966.

279.   As of 1941, Hathaway Company was operating at the Mobil Jalk Fee Source Property, constructing and operating oil wells.  Upon information and belief, Hathaway Company leased the Mobil Jalk Fee Source Property from ExxonMobil's predecessors.  In 1971, Hathaway Company merged into a company called Pyramid Oil Company.  Following reorganization in 1985, the merged entity's Southern California operations were spun off into a new Hathaway Company, which continued to operate at the Mobil Jalk Fee Source Property until in or around 1999.  All operations at the Mobil Jalk Fee Source Property ceased around 2000.

280.   In 1988, Mobil Oil gifted the Mobil Jalk Fee Source Property to Mobil Foundation, Inc., and, through a series of transactions in 1999 and 2000, Mobil Foundation subdivided the property and sold it.

ii.      <u>Disposal & Releases of Hazardous Substances</u>

281.   Upon information and belief, hazardous substances were disposed of at the Mobil Jalk Fee Source Property between 1922 and 2000.

282.   From 1938 to until at least 1956, a portion of the Mobil Jalk Fee Source Property was used as a "boneyard" dumping area for metal refuse, including, upon information and belief, refuse containing chromium. As early as 1988, preliminary

- 70 -

1    investigations of the Mobil Jalk Fee Source Property identified several environmental

2    areas of concern and areas requiring further assessment.

3         283.   Upon information and belief, the operations and hazardous substances

4    handling practices of ExxonMobil, its predecessors, and its lessees have resulted in

5    one or more hazardous substances, including but not limited to chromium and the

6    solvents PCE and TCE, being released to the ground or into the soil at or near the

7    Mobil Jalk Fee Source Property.  Soil and soil vapor samples taken at the Mobil Jalk

8    Fee Source Property have detected: chloroform; chromium; 1,1-DCA; 1,1-DCE;

9    c-1,2-DCE; t-1,2-DCE; DCM; Freon 11; 1,1,2,2-tetrachloroethane; PCE; TCE; and

10   vinyl chloride.  In 1988, halogenated VOCs were detected in soil samples taken from

11   the property.  In 1991, soil samples were taken from various portions of the Mobil

12   Jalk Fee Source Property revealed the presence of PCE, TCE and c-1,2-DCE in the

13   portion of the property that had formerly operated as an aboveground storage tank

14   farm.  Additionally, chromium was found in the "boneyard," where metal refuse was

15   dumped, and both benzene and chromium have been detected in soil from the former

16   tank farm area.  EPA observed that operations at the Mobil Jalk Fee Source Property

17   included the dumping of materials from trucks on an unpaved lot.  Soil samples taken

18   at the Mobil Jalk Fee Source Property in 1995 found PCE contamination at the

19   northern end of the property, near a former trucking operations area.  In 1998,

20   approximately 2,600 tons of near-surface soil that was contaminated with chlorinated

21   solvents was removed from the Mobil Jalk Fee Source Property.

22        284.   Upon information and belief, the hazardous substances present in the

23   soil at the Mobil Jalk Fee Source Property have migrated and continue to migrate

24   downward into the saturated zone beneath the property and have come to be located in

25   the groundwater, resulting in contamination of the groundwater with: chloroform;

26   chromium; 1,1-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; Freon 11; PCE; TCE; and

27   vinyl chloride.

28

285.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Mobil Jalk Fee Source Property, the Mobil Jalk Fee Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

286.   Upon information and belief, contaminants in the groundwater from the soil at the Mobil Jalk Fee Source Property have migrated offsite in the same general direction as the groundwater flow.

287.   In 2010, EPA concluded that the Mobil Jalk Fee Source Property is a source of PCE, TCE, and their daughter products that are present in groundwater within the OU-2 Facility.  In or around December 2013, EPA sent a GNL to ExxonMobil, which, among other things, identifies ExxonMobil as a PRP for the OU-2 Facility groundwater contamination, requests a response as to ExxonMobil's willingness to negotiate regarding its liability for the OU-2 Facility response costs, and requests certain information about the status of ExxonMobil's activities.

iii.   Continuing Migration of Contaminants

288.   As alleged above, releases of contaminants have occurred at the Mobil Jalk Fee Source Property and are continuing to occur.  The contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

289.   ExxonMobil has not taken adequate steps to remediate the onsite and near-site soils, from which contaminants are migrating.  Nor has ExxonMobil adequately monitored the extent to which contaminants continue to migrate from the Mobil Jalk Fee Source Property into offsite groundwater.  The Mobil Jalk Fee Source Property does not have an offsite downgradient groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels have been fully controlled.

290.   Soil sampling at the Mobil Jalk Fee Source Property in 1994 indicated PCE (up to 55 ppm) and TCE (up to 2.7 ppm) impacts in soils up to depths of 48 feet

1  and 30 feet bgs, respectively.  Soil sampling in 1995 identified PCE and TCE impacts

2  to depths of 55 feet and 40 feet bgs, respectively.  Soil sampling in 1997 identified

3  PCE and TCE impacts to depths of 60 feet bgs.

4      291.  In 2000, piping that had been associated with crude oil transport, four oil

5  wells, above-ground storage tanks from the former tank farm, and some soil were

6  removed from the Mobil Jalk Fee Source Property.  A total of 63 trenches were dug

7  and excavated in seven areas across the site from depths ranging from 6 feet to 24 feet

8  bgs.  After the soil and pipe removal activities had taken place, PCE-impacted soil

9  was found up to 2.5 ppm at 8 feet below grade.  Soil sampling performed in 2011

10  during installation of wells MW-6, -7, and -8 showed TCE and PCE contamination at

11  a wide range of depths.  Soil and soil vapor testing in 2012 also showed very elevated

12  PCE and TCE levels and showed increasing soil concentrations with depth.

13  Continued investigation at the Mobil Jalk Fee Source Property shows highly

14  contaminated soils at a wide range of depths.

15      292.  Soil vapor sampling at the Mobil Jalk Fee Source Property from 2012 to

16  2013 to depths of 82 feet bgs identified PCE at every depth sampled from 5 feet to 82

17  feet bgs ranging from 120 mg/m3 to 48,000 mg/m3.  TCE was also detected in every

18  sample, at every depth, ranging from 9.8 mg/m3 to 580 mg/m3.

19      293.  Groundwater concentrations for PCE, and TCE in wells at the Mobil Jalk

20  Fee Source Property are detected at concentrations up to 1800 µg/l, and 255 µg/l

21  respectively, orders of magnitude above health-based levels.

22      294.  Since the early 2000s, there has not been a clear upgradient well to

23  compare onsite contaminant levels to and to determine what, if any, upgradient

24  sources there are.  Previously, groundwater concentrations across the property

25  (upgradient to downgradient) for PCE and TCE showed an increasing trend of

26  contamination as water moved across the property.  In 2011, MW-6B, downgradient

27  of the majority of Mobil Jalk Fee Source Property soil contamination, contained

28  concentrations of PCE at 1200 µg/l.  In addition, MW9A, B, and C are also

1  downgradient of historic practices which resulted in soil contamination.  In

2  November 2011, these groundwater results also significantly exceeded PCE MCLs.

3      295.   The Mobil Jalk Fee Source Property has gone for many years with high

4  levels of contaminated soils remaining in the ground onsite below the level of the

5  previous excavations.  These soils continue to act as a continuing source of

6  groundwater contamination.  There has been no meaningful effort made to control

7  source soils below depths of 15 feet to 24 feet bgs.

8      **3.**　　**The Non-Notice Letter Defendants' Source Properties**

9        *a.*　　*The Associated Plating Source Property – 9636 Ann Street*

10      296.   Upon information and belief, releases of contamination have occurred

11  from property located at and/or adjacent to 9636 Ann Street, Santa Fe Springs,

12  California and businesses operating thereon (the "Associated Plating Source

13  Property").

14          i.　　Source Property Ownership and Operation

15      297.   Since at least 1978, various defendants have leased the Associated

16  Plating Source Property from other defendants and have conducted specialty metal

17  plating operations at the Associated Plating Source Property, consisting primarily of

18  electroplating and electroless plating of metal parts for military, electronic, aerospace,

19  and commercial uses.  Electroplating is the process by which a thin surface coating of

20  one metal is applied to a part made of another metal by placing the part in a bath of

21  chemical plating solution and using an electric current to transfer metal ions.

22  Electroless plating likewise deposits a thin metal coating on a part by immersing it in

23  a chemical plating solution without the use of electric current.  Electroplating and

24  electroless plating both generate wastewater containing chromium and other metals as

25  well as toxic organic chemicals.  Additionally, before a part can be plated, it is

26  typically cleaned of foreign substances, such as oil and grease, using a vapor

27  degreaser and a solvent, resulting in solvent waste.

28

- 74 -

298.   In 1977, the owners of Associated Plating, Defendants Gordon McCann, Lynnea McCann, Darrell Golnick, Clare Golnick and Cheryl Golnick (collectively, the "Golnicks"), purchased the Associated Plating Source Property.  From 1978 to 1993, the Golnicks leased the Associated Plating Source Property to Associated Plating, though in 1990, Defendant Mary Golnick had transferred her interest in the property to Darrell Golnick.

299.   In 1993, Defendant APC purchased the Associated Plating Source Property.  APC continued to lease the Associated Plating Source Property to Associated Plating until 1999, when Defendant Associated Plating Inc. purchased the operating company.

300.   Since 1999, Associated Plating Inc. (at times operating as Associated Plating Acquisition Corp.) has leased the Associated Plating Source Property from APC and continued plating operations on the property.

                ii.     <u>Disposal & Releases of Hazardous Substances</u>

301.   Upon information and belief, hazardous substances were disposed of at the Associated Plating Source Property since 1978.

302.   Since 1981, when Associated Plating installed a vapor degreaser at the Associated Plating Source Property, Associated Plating and Associated Plating Inc. used PCE in connection with their plating operations.  Additionally, Associated Plating Inc. and, upon information and belief, Associated Plating used compounds containing chromium to plate items with that metal.

303.   The Defendants associated with the Associated Plating Source Property have repeatedly been found in violation of hazardous substance regulations.  In 1983, Associated Plating was cited for discharging wastewater used in parts washing into the street.  In 2001, the DTSC concluded that Associated Plating Inc. had violated numerous hazardous substances regulations, including improper waste storage and handling procedures.  In 2000 and 2002, the Santa Fe Springs Fire Department issued notices of violation to Associated Plating Inc. for improper storage of hazardous

waste and for releases of chemicals, including leaking drums and unpermitted discharge of run-off water into the sewer. In 2002, the Santa Fe Springs Fire Department also discovered that Associated Plating Inc. was treating chromium waste without a permit. In 2007, the Santa Fe Springs Fire Department issued yet another notice of violation when it discovered a chemical mixture containing chromium in a trench at the Associated Plating Source Property. In 2003, 2005, and 2010, EPA found Associated Plating Inc. in violation of numerous hazardous waste handling and storage requirements, including storage of hazardous waste without a permit and storage of hazardous waste in open containers.

304.   Associated Plating's and Associated Plating Inc.'s operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to PCE and chromium, being placed onto the ground or into the soil at or near the Associated Plating Source Property. Soil samples taken at the Associated Plating Source Property have contained: benzene; chloroform; hexavalent chromium (and, potentially, other chromium compounds); 1,1-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM; MTBE; PCE; TCE; toluene; and vinyl chloride. In 2000, the Santa Fe Springs Fire Department cited Associated Plating Inc. for unpermitted discharge of run-off water into the sewer. In 2002, the Santa Fe Springs Fire Department observed leaking chemical drums at the Associated Plating Source Property. In 2007, a liquid chemical mixture was found in a trench at the Associated Plating Source Property that contained chromium.

305.   Upon information and belief, the hazardous substances present in the soil at the Associated Plating Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with PCE and vinyl chloride. In 2012, DTSC determined that the high level of vinyl chloride in the soil at the Associated Plating Source Property indicated the property was a likely source of

vinyl chloride in the groundwater.  In 2013, DTSC observed that PCE contamination on the property extended through the soil to the groundwater level.

306.   Because hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Associated Plating Source Property, the Associated Plating Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

307.   Upon information and belief, contaminants in the groundwater from the soil at the Associated Plating Source Property have migrated offsite in the same general direction as the groundwater flow.

iii.   Continuing Migration of Contaminants

308.   As alleged above, releases of contaminants have occurred at the Associated Plating Source Property and are continuing to occur.  The contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

309.   Neither Associated Plating Inc. nor Associated Plating nor APC nor the Golnicks has taken adequate steps to remediate the onsite and near-site soils, from which contaminants are migrating.  None has adequately monitored the extent to which contaminants continue to migrate from the Associated Plating Source Property into offsite groundwater.  The Associated Plating Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels have been fully controlled.  Upon information and belief, APC and the Golnicks are and have been aware of the contamination occurring at the property, which they own or owned.

310.   Soil samples that have been collected from the Associated Plating Source Property demonstrate significant releases of contaminants.  Soil samples collected in the 2004 and 2005 time period were focused on soils depths less than 10 feet. Concentrations of PCE, TCE, and vinyl chloride in those shallow soils exhibited high levels of contamination.

311.   Levels found in shallow soil gas sampling performed at the Associated Plating Source Property in 2004 and 2005 also support the need to conduct assessment of the deeper soils.

312.   DTSC has determined that the high level of vinyl chloride in soil indicates the Associated Plating Source Property is a likely source of the vinyl chloride that has been detected in groundwater.

313.   Upon information and belief, no work plan for the Associated Plating Source Property exists that would fully characterize the lateral and vertical extent of contamination in onsite soils deeper than 35 feet bgs and in groundwater below the property and emanating from the property in a downgradient direction into the regional groundwater.

314.   Determination of the lateral and vertical extent of contaminants in soil and groundwater, both onsite at the Associated Plating Source Property and offsite, is necessary to complete the site conceptual model and adequately define necessary remedial activities.  This includes careful characterization of hexavalent chromium.

315.   The lack of well placement along the southern boundary of the property, downgradient from the former vapor degreasers, as well as offsite, precludes an adequate understanding of the continuing impact of Associated Plating Source Property soil contamination on offsite groundwater.

b.   _The Cenco Refining Source Property – 12345-12354 Lakeland Road_

316.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 12345-12354 Lakeland Road, Santa Fe Springs, California and businesses operating thereon (the "Cenco Refining Source Property").

i.   Source Property Ownership and Operation

317.   In the late 1930s, Rothschild Oil Company, predecessor to Defendant Powerine, acquired the Cenco Refining Source Property, and in 1936, the County of

1    Los Angeles approved the Cenco Refining Source Property location for oil refinery
2    operations.  Processing operations produced leaded and unleaded gasoline, aviation
3    fuel, jet fuel, diesel fuel, petroleum cake, kerosene, coke and sulfur.

4        318.   In 1995, oil refining operations ceased at the Cenco Refining Source
5    Property.

6        319.   In 1998, Defendant Powerine sold the property and plant.

7              ii.   <u>Disposal & Releases of Hazardous Substances</u>

8        320.   Upon information and belief, hazardous substances were disposed of at
9    the Cenco Refining Source Property when each of the Defendants owned or operated
10   it.

11       321.   As of 1975, the Cenco Refining Source Property was discharging 11.8
12   million gallons of wastewater to a storm drain at the plant per day.  As of 1990,
13   Defendant Powerine's operations at the Cenco Refining Source Property included use
14   of chlorinated solvents and chromium.  Between 1993 and 1998, Defendant Powerine
15   shipped hazardous waste from the Cenco Refining Source Property containing
16   benzene; chromium; PCE; and other solvents.

17       322.   As of 1996, carbon tetrachloride and PCE were stored at the Cenco
18   Refining Source Property.  As of 1997, Defendant Powerine used a solvent at the
19   Cenco Refining Source Property containing: benzene; lead; MEK; PCE; and TCE.  It
20   also used 1,2-DCA and PCE, which were stored in above-ground tanks.  For years
21   after the plant closed, chemicals were stored onsite with the purported intention that
22   Defendant Powerine eventually would resume operations.

23       323.   Other hazardous substances stored, used, or were otherwise present in
24   the hazardous waste in the refining operations at the Cenco Refining Source Property
25   between 1936 and 2012 include:  arsenic; benzene; chloroform; chromium;
26   hexavalent chromium; copper; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM;
27   dibenz[a,h]anthracene; Freon 113; MEK; poly-aromatic hydrocarbons ("PAHs");
28   sulfides; 1,1,1-TCA; 1,1,2-TCA; thiols; thiosulfate; toluene; and vinyl chloride.

324.   The Cenco Refining Source Property has a history of extensively and pervasively failing to safely handle and store chemicals and hazardous waste.  During a 1996 inspection of the Cenco Refining Source Property, for example, an ongoing spill of oily water was observed and Defendant Powerine was issued a notice of violation for failure to document handling of solvents.  In 1997, the Regional Water Quality Control Board ordered Defendant Powerine to clean up the property in order to abate the offsite migration of contaminants from the property.

325.   In 1999, an assessment conducted by the Santa Fe Springs Fire Department concluded that more than 50% of the 1,800 containers at the plant were in violation of waste management requirements.  In 2000, the Santa Fe Springs Fire Department investigated over 1,000 drums at the Cenco Refining Source Property, the contents of some of which were not ascertainable, and many of which were in various stages of decay and corrosion.  Many drum labels indicated that the drums contained waste generated as early as 1995.  Some drums had rusted, others were bulging, and at least one had ruptured.  Hundreds of drums that once held hazardous materials were empty.  Employees of Defendant Powerine were unable to identify the contents of many unlabeled drums.  Many drums had been left open and spills were observed on the ground.

326.   Upon information and belief, Defendants Powerine's operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to: PCE; TCE; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; DCM; 1,1,1,2-tetrachloroethane; benzene; chromium; chloroform; and vinyl chloride, being placed onto the ground or into the soil at or near the Cenco Refining Source Property. In 1986, soil samples taken at the Cenco Refining Source Property contained benzene, chromium and PCE.  In 1990, during an inspection of the Cenco Refining Source Property's hazardous waste area, drums labeled "unknown solid" were found to have corroded and leaked, resulting in the presence of an oily residue in the run-off water surface area.  Between 1988 and 1993, Defendant Powerine disposed of

approximately 1,163 pounds of carbon tetrachloride at the Cenco Refining Source Property.  In 1996, soil samples taken at the Cenco Refining Source Property contained benzene and 1,1,1-TCA.  In 1997, 1,2-DCA was detected in soil near storage tanks at the Cenco Refining Source Property.  Other contaminants found in soil samples taken in 1997 included benzene.  In 1999, soil samples were taken at the Cenco Refining Source Property containing hexavalent chromium (and, potentially, other chromium compounds) and PCE.  In 2003, Lakeland Development disclosed that wastewater from the Cenco Refining Source Property contained benzene, MTBE and other VOCs.

327.   In 2000, the Santa Fe Springs Fire Department concluded that there had been historical contamination at the Cenco Refining Source Property with halogenated VOCs and that test results also suggested a recent release of TCE on the property.  In 2006 and 2007, soil and soil gas samples taken from the Cenco Refining Source Property were found to be contaminated with: benzene; chloroform; 1,2-DCA; c-1,2-DCE; t-1,2-DCE; 1,1,1,2-tetrachloroethane; MTBE; hexavalent chromium; PCE; and TCE; and vinyl chloride.  Soil tested from the Cenco Refining Source Property that same year contained total chromium, and samples taken from the Cenco Refining Source Property in 2009 and 2012 revealed that the soil was contaminated with numerous high-volatility organic compounds, including: chloroform; c-1,2-DCE; t-1,2-DCE; DCM; 1,1,1,2-tetrachloroethane; PCE; TCE; and vinyl chloride.  Benzene, hexavalent chromium (as well as, potentially, other chromium compounds), total chromium, and MTBE were also detected.

328.   Upon information and belief, the hazardous substances present in the soil at the Cenco Refining Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, specifically: PCE; TCE; 1,2-DCA; c-1,2-DCE; t-1,2-DCE; 1,1,1,2-tetrachloroethane; benzene; chromium; chloroform; and vinyl chloride. Groundwater samples taken in 1986 from multiple wells across the property all

1   contained benzene and some contained 1,2-DCA.  Between 1987 and 1996, benzene,

2   1,2-DCA, PCE; and TCE were detected in groundwater samples taken from the

3   Cenco Refining Source Property.  In 1995, an assessment of the Cenco Refining

4   Source Property found that contaminants, including VOCs, had been released to the

5   groundwater.

6       329.   In 2002, groundwater samples taken from the Cenco Refining Source

7   Property were found to contain: benzene; chloroform; c-1,2-DCE; PCE; and TCE.  In

8   2006 and 2007, groundwater samples were found to be contaminated with: benzene;

9   1,4-dioxane; chloroform; hexavalent chromium; 1,1-DCE; 1,1-DCA; 1,2-DCA;

10  c-1,2-DCE; t-1,2-DCE; ethylbenzene; MTBE; PCE; TCE; vinyl chloride and xylene.

11  Halogenated VOCs were concentrated near a storm water impoundment area and two

12  storage tanks; high concentrations of PCE and TCE were found near a laboratory and

13  a tank on the property; and 1,2-DCA was found in the middle of a storage tank area.

14  Groundwater monitoring at the Cenco Refining Source Property since 2010 has

15  revealed the presence of: benzene; 1,2-DCA; 1,1-DCE; c-1,2-DCE; t-1,2-DCE; PCE;

16  TCE; and vinyl chloride.

17      330.   Because hazardous substances were deposited, stored, disposed of, or

18  placed, or otherwise came to be located at the Cenco Refining Source Property, the

19  Cenco Refining Source Property is a "facility" within the meaning of Section 101(9)

20  of CERCLA, 42 U.S.C. § 9601(9).

21      331.   Upon information and belief, contaminants in the soil and in the

22  groundwater from the soil at the Cenco Refining Source Property have migrated

23  offsite in the same general direction as the regional groundwater flow.

24                 iii.   <u>Continuing Migration of Contaminants</u>

25      332.   As alleged above, releases of contaminants have occurred at the Cenco

26  Refining Source Property and are continuing to occur.  The contaminants continue to

27  migrate away from the property, posing a continuing threat to the regional

28  groundwater and the health of area residents.

333.   Powerine has not taken adequate steps to remediate the onsite and near-site soils, from which contaminants are migrating, including soil and groundwater contamination originating from the 12354 Lakeland Property and contamination caused due to the interconnecting pipelines to the former Marine Terminal.  Nor has Powerine adequately monitored the extent to which contaminants continue to migrate from the Cenco Refining Source Property into offsite groundwater.  The Cenco Refining Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels have been fully controlled.

334.   Recent soil samples collected in 20 boring drilled to 90 feet bgs at the Cenco Refining Source Property detected concentrations of VOCs; PAHs; benzene, toluene, ethylbenzene, and xylenes ("BTEX") and metals in significant concentrations that in some cases were orders of magnitude above regulatory limits. TCE was found in site soils to depths of 70 feet at 100 µg/kg with 840 µg/kg found at 30 feet bgs, 1,2-DCA which was at 190 µg/kg (90 feet bgs), 1,1,2-TCA at 340 µg/kg (80 feet bgs) and chloroform which was 2.3 mg/kg (60 feet bgs).

335.   In 2006, there was a soil gas survey at 221 locations at the Cenco Refining Source Property to a depth of 50 feet bgs.  All 2 feet, 5 feet and 10 feet bgs samples were analyzed for VOCs and seventeen wells were analyzed for total petroleum hydrocarbons ("TPH"), VOCs, oxygenates, and hexavalent chromium. The highest concentrations of PCE and TCE were located just west of the laboratory. Another area of high concentration was near the crude unit and boiler feed water tank. Another location of 1,2-DCA was the middle of the west tank farm.

336.   The significant concentrations of BTEX, VOCs, and PAHs detected in onsite and downgradient wells demonstrate continued offsite migration of contaminants from the Cenco Refining Source Property, as demonstrated in MW-503B and MW-504.

337.   The presence of free product in wells demonstrate the presence of substantial source mass of contaminants at the Cenco Refining Source Property.

c.   *The Patsouras Source Property – 11630-11700 Burke Street*

338.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 11630-11700 Burke Street, Santa Fe Springs, California and businesses operating thereon (the "Patsouras Source Property").

i.   Source Property Ownership

339.   In 1969, a predecessor to Defendant Halliburton named Rucker acquired the Patsouras Source Property from Globe Oil Tools Company ("Globe").  Upon information and belief, as of 1970, Globe was a subsidiary of Rucker and, as of 1971, Globe held itself out to be a "division" of Rucker.

340.   In 1972, William D. Palley and Defendant William K. Palley acquired the Patsouras Source Property from Rucker.  In 1973, Defendant William K. Palley obtained sole ownership of the property.

341.   In 1984, Defendant William K. Palley deeded the Patsouras Source Property to the RCR Family Trust.  In 1985, the RCR Family Trust deeded the Patsouras Source Property back to Defendant William K. Palley.

342.   In 1995, Defendant Kekropia (owned by Larry Patsouras) acquired the Patsouras Source Property and remains as the current property owner.

ii.   Source Property Operation

343.   As of 1958 and until at least 1972, Globe (sometimes doing business as Globe International, Inc.) operated at the Patsouras Source Property, manufacturing and treating oil well drilling equipment and tools.  Those operations included the cleaning of parts before and after heat treating and painting, and as of 1970, a steam cleaner and a 100-gallon degreaser had been installed to clean parts.  These operations

- 84 -

1    generated between 500 to 1,000 gallons of waste per week, including cleaning and

2    degreasing solutions, as well as dissolved metals.

3         344.   In 1973, Defendant Palley Supply and its owner, Defendant William K.

4    Palley, began operations at the Patsouras Source Property, performing maintenance

5    and warehousing of aircraft and hydraulic equipment.  Defendants Palley Supply and

6    William K. Palley ceased operations at the Patsouras Source Property in 1987.

7         345.   In 1997, El Greco Wholesale Grocers, Inc. and its owner, Larry

8    Patsouras, began operating on the Patsouras Source Property as a wholesale grocery

9    warehouse, and continue to operate there today.

10                          iii.    Disposal & Releases of Hazardous Substances

11        346.   Upon information and belief, hazardous substances were disposed of at

12   the Patsouras Source Property when each of the Defendants owned or operated it.

13        347.   The Patsouras Source Property has a long history of operators

14   improperly handling and storing hazardous substances.  In 1970, when the site was

15   owned by Defendant Halliburton's predecessor, Rucker, Globe was issued a notice of

16   violation for disposing of rinse water containing hexavalent chromium from its metal

17   treating operations to the ground at the Patsouras Source Property.  Additionally, at

18   that time Globe was also discharging wastes from its steam cleaning operations to the

19   ground.  In 1978, Defendant William K. Palley received a notice of violation for

20   disposing of industrial wastewater from steam cleaning operations into a sanitary

21   sewer.  In 1987, a criminal complaint was filed against Defendant William K. Palley

22   by the Los Angeles County Department of Health Services for hazardous waste

23   practices at the Patsouras Source Property.  In 1988, Defendant William K. Palley

24   pled guilty to the illegal transportation and disposal of hazardous waste.  In addition,

25   as of 1988, two subsurface clarifiers at the Patsouras Source Property had been

26   abandoned full of waste.  During a rainstorm that year, the clarifiers overflowed,

27   spilling to the ground.  The Santa Fe Springs Fire Department ordered Defendant

28

- 85 -

1  William K. Palley to dispose of approximately 3,500 gallons of waste in the clarifiers

2  and drums on the property.

3      348.  Contamination is greatest near the area of the property where fourteen

4  containers were used to store paint and other hazardous substances.

5      349.  Upon information and belief, Globe's, Rucker's (predecessor to

6  Defendant Halliburton) and Defendants Palley Supply's, William K. Palley's, and

7  Kekropia's operations and waste disposal practices resulted in the generation of one

8  or more hazardous substances, including but not limited to: arsenic; barium; carbon

9  tetrachloride; chloroform; chromium; cobalt; copper; 1,1-DCE; PCE and TCE being

10  placed onto the ground or into the soil at or near the Patsouras Source Property.  In

11  1994, soil samples at the Patsouras Source Property indicated the soil was

12  contaminated with: chloroform; chromium; PCE; and TCE.  The highest levels of

13  contamination were near the clarifiers and a storage shed where hazardous chemicals

14  had been stored.  An environmental consultant issued a report stating that soil

15  remediation was necessary in those areas.  In 2006, chromium was detected in soil at

16  the Patsouras Source Property.  In 2009, soil samples revealed that the soil was

17  contaminated with: carbon tetrachloride; chloroform; 1,1-DCE; PCE; and TCE.  In

18  2013, soil from the Patsouras Source Property was tested for heavy metals, and was

19  determined to be contaminated with: arsenic; barium; chromium; cobalt; copper;

20  nickel; vanadium; and zinc.

21      350.  Upon information and belief, the hazardous substances present in the

22  soil at the Patsouras Source Property have migrated and continue to migrate

23  downward into the saturated zone beneath the property and have come to be located in

24  the groundwater, specifically, PCE, TCE, 1,1-DCE, chloroform, and hexavalent

25  chromium.  A groundwater sample taken in1994 detected the presence of chromium,

26  PCE, and TCE in concentrations that exceeded drinking water standards.

27  Groundwater monitoring at the Patsouras Source Property from 1995 to 2012 has

28

1    found the groundwater on the property to be contaminated with: chloroform;

2    hexavalent chromium; 1,1-DCE; PCE and TCE.

3         351.   Because hazardous substances were deposited, stored, disposed of, or

4    placed, or otherwise came to be located at the Patsouras Source Property, the

5    Patsouras Source Property is a "facility" within the meaning of Section 101(9) of

6    CERCLA, 42 U.S.C. § 9601(9).

7         352.   Upon information and belief, contaminants in the soil and in the

8    groundwater from the soil at the Patsouras Source Property have migrated offsite in

9    the same general direction as the regional groundwater flow.

10                      iv.   Continuing Migration of Contaminants

11        353.   As alleged above, releases of contaminants have occurred at the

12   Patsouras Source Property and are continuing to occur.  The contaminants continue to

13   migrate away from the property, posing a continuing threat to the regional

14   groundwater and the health of area residents.

15        354.   Neither Kekropia nor Palley Supply nor William Palley has taken

16   adequate steps to remediate the onsite and near-site soils, from which contaminants

17   are migrating.  None has adequately monitored the extent to which contaminants

18   continue to migrate from the Patsouras Source Property into offsite groundwater.

19   Upon information and belief, Kekropia and William Palley are and have been aware

20   of the contamination occurring at the property, which they own or owned.  The

21   Patsouras Source Property does not have a groundwater monitoring system in place

22   that is sufficient to demonstrate that releases from the property to regional

23   groundwater above health-based levels have been fully controlled.

24        355.   There are numerous potential source areas at the Patsouras Source

25   Property including the cooling tower area, the stained soil area, the clarifier/historical

26   paint/steam cleaning area, the hazardous chemical storage shed, and the storm water

27   clarifier.  The characterization of the lateral and vertical extent of soil impacts from

28   VOCs and hexavalent chromium remains incomplete after twenty years.

356.   In 1994, PCE and TCE were identified at significant levels in deep soils at the Patsouras Source Property.  Chromium was also detected in site soils to depths of 35 feet bgs.

357.   Soil taken from certain areas of the Patsouras Source Property in 2006, to approximately 20 feet bgs, have been found to contain arsenic.

358.   In 2009, a soil gas survey was conducted at the Patsouras Source Property.  The soil vapor exposure pathways and the consistent detections at the 15 foot interval confirm the need to perform assessment of soil impacts at the 20 to 50 foot intervals.

359.   PCE concentrations in MW-4, the most downgradient well at the Patsouras Source Property, continue to exceed the MCL.  Hexavalent chromium levels have also been high in this well and from July 2009 through June 2012, the downgradient well has displayed the highest hexavalent chromium readings. However, this well is not downgradient of all of the various onsite source areas and MW-3, which is located adjacent to the former storage shed has the highest concentrations of hexavalent chromium.

360.   The impacts of the remaining site soils on groundwater in the central portion of the Patsouras Source Property and along the southern portion of the property (within the downgradient flow direction) is not known as there are no monitoring wells in this area.

361.   The lack of a sentinel well downgradient of MW-4 and at the central portion of the southern Patsouras Source Property boundary does not allow for reasonable delineation of the lateral and vertical extent of impact to both onsite and offsite groundwater.

d.   *The PMC Source Property – 10051 Romandel Avenue*

362.   Upon information and belief, releases of contamination have occurred from property located at and/or adjacent to 10051 Romandel Avenue, Santa Fe Springs, California and businesses operating thereon (the "PMC Source Property").

i.    Source Property Ownership and Operation

363.   From 1947 to 1992, certain entities conducted manufacturing operations at the PMC Source Property, manufacturing chemicals sold to other companies for the production of plastics, solvents, hydraulic fluids, gasoline additives, and paints.

364.   Sometime in or after 1947, a chemical company called Productol, Inc. purchased the PMC Source Property and conducted chemical manufacture operations there, involving, among other substances, cresylic acid, naphthenic acid, and alkylated phenols.

365.   In or about 1976, Defendant Ferro acquired the PMC Source Property and continued chemical manufacturing operations until 1986.

366.   In 1986, Defendant PMC acquired the Productol division and the PMC Source Property from Ferro and continued chemical manufacturing operations until 1992.

ii.    Disposal & Releases of Hazardous Substances

367.   Upon information and belief, hazardous substances were disposed of at the PMC Source Property when Defendants Ferro and PMC owned or operated it.

368.   While wastewater was disposed into the sewer at the PMC Source Property pursuant to a permit requiring treatment of the water before discharge, on multiple occasions in the 1970s (both before and after Ferro acquired the property), wastewater containing impermissible chemical levels was discharged.  EPA records indicate that, between 1987 and 1992, cresol, MEK, phenol, propylene, styrene, and sulfuric acid were disposed of at the PMC Source Property.  In 2011, EPA concluded that cresol and phenol had been disposed of at the PMC Source Property.

369.   For a few months in 1981, the PMC Source Property was licensed for the treatment of hazardous waste.  That year, a survey of the PMC Source Property noted chemical drums stored on unpaved surfaces and the potential for runoff during a storm.

1    370.   In 1981 and 1985, soil contamination at the PMC Source Property was

2  observed and resulted in a notice of violation from the California Department of

3  Health Services.  Some time prior to 1986, employees of Defendant Ferro observed

4  benzene ponding near a storage tank at the PMC Source Property.  In 1986, after

5  Defendant PMC acquired the PMC Source Property, a fire at the plant damaged 12

6  chemical storage tanks.  In 1987, a storage tank was removed from the PMC Source

7  Property and soil underneath the tank was found to be contaminated with: benzene;

8  ethylbenzene; and other chemicals.  The presence of benzene in the soil was

9  determined to be the likely result of surface spillage from pipes associated with other

10  nearby tanks.  In 1988, benzene was observed ponding near two tanks at the PMC

11  Source Property that was attributed to a leaking pipe.  In 1988, Defendant PMC

12  ceased using a chemical storage tank at the PMC Source Property that had two cracks

13  in the side and a one-inch hole in the bottom.  Analysis of the tank's contents

14  indicated that it had held benzene, p-cresol, ethylbenzene and 2-4-dimethylphenol.

15    371.   Between 1986 and 1992, soil investigations at the PMC Source Property

16  revealed the presence of numerous hazardous substances, including: benzene;

17  ethylbenzene; PCE; TCE; toluene; naphthalene; and 1,1,2-TCA.  Several of these

18  substances, including, benzene; PCE; TCE; toluene; and 1,1,2-TCA, were found just

19  below abandoned and removed chemical tanks.  Soil sampling at the PMC Source

20  Property in 2007 found benzene and TCE in the soil.  Benzene concentrations were

21  most significant near the former cresylic acid plant, the former alkylated phenol plant,

22  and the southern tanks.

23    372.   Upon information and belief, the hazardous substances present in the

24  soil at the PMC Source Property have migrated and continue to migrate downward

25  into the saturated zone beneath the property and have come to be located in the

26  groundwater, specifically: TCE; benzene; ethylbenzene; p-cresol; naphthalene; and

27  2-4-dimethylphenol.  For example, groundwater testing at the PMC Source Property

28  in 1988 found: benzene; ethylbenzene; TCE; and xylene.  In 1995, the California

1    Regional Water Quality Control Board concluded that the operations at the PMC

2    Source Property contaminated the soil and groundwater on the property, degrading

3    the water quality.  In 1999, soil and groundwater testing at the PMC Source Property

4    found contamination with: benzene; p-cresol; and 2-4-dimethylphenol.  Benzene was

5    noted as being concentrated primarily in areas near former storage tanks, a loading

6    area, and a storage area, and as migrating downgradient in the groundwater.  In 2007,

7    groundwater testing found contamination including benzene and PCE breakdown

8    products, including TCE, which breaks down to 1,2-DCE, which in turn breaks down

9    to vinyl chloride, which breaks down to ethylene which breaks down to acetylene.

10   Groundwater analysis completed in the region indicates that benzene and toluene

11   have migrated downgradient from the PMC Source Property.

12        373.    Because hazardous substances were deposited, stored, disposed of, or

13   placed, or otherwise came to be located at the PMC Source Property, the PMC Source

14   Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C.

15   § 9601(9).

16        374.    Upon information and belief, contaminants in the soil and in the

17   groundwater from the soil at the PMC Source Property have migrated offsite in the

18   same general direction as the regional groundwater flow.  Groundwater samples taken

19   in 1999 found elevated levels of contaminants in offsite wells downgradient from the

20   former cresylic acid plant.

21                          iii.    Continuing Migration of Contaminants

22        375.    As alleged above, releases of contaminants have occurred at the PMC

23   Source Property and are continuing to occur.  The contaminants continue to migrate

24   away from the property, posing a continuing threat to the regional groundwater and

25   the health of area residents.

26        376.    Neither Ferro nor PMC has taken adequate steps to remediate the onsite

27   and near-site soils, from which contaminants are migrating.  Neither has adequately

28   monitored the extent to which contaminants continue to migrate from the PMC

1    Source Property into offsite groundwater.  The PMC Source Property does not have a

2    groundwater monitoring system in place that is sufficient to demonstrate that releases

3    from the property to regional groundwater above health-based levels have been fully

4    controlled.

5           377.   The PMC Source Property infrastructure is extremely complicated and

6    the investigative history is incomplete.  There is no complete conceptual site model

7    for the property.

8           378.   Significant VOCs and semivolatile organic compounds ("SVOCs") are

9    present in soils at the PMC Source Property to depths of 40'bgs.  Benzene, toluene,

10   PCE, 1,1,2-TCA, and TCE have been detected up to a maximum of 48 ppm (30 feet

11   bgs), 26 ppm (20 feet bgs), 2.9 ppm (2 feet bgs), 90 ppm (2 feet bgs), and 97 ppm (2

12   feet bgs).  In 1990, toluene was found at 26,000 µg/kg at 20 feet bgs. PCE in 2007 was

13   found at 7,000 µg/kg at 30-45 feet bgs.  High levels of 1,1-DCE were also found in

14   deep soils.

15          379.   As with the investigations of soil and soil vapor impacts, the

16   groundwater analytical history at the PMC Source Property is incomplete.  The

17   distribution of VOCs in the groundwater is poorly defined.  Extremely high levels of

18   benzene and toluene and SVOCs in groundwater have frequently resulted in elevated

19   method detection limits for VOCs which leaves open data gaps and no information as

20   to the fate and transport of detected VOCs in soils.  However, evidence from a

21   downgradient site, OFRP, has confirmed that releases of benzene and toluene from

22   the PMC Source Property are impacting offsite downgradient groundwater.

23          380.   In 1995, the Regional Water Quality Control Board determined that

24   previous operations at the PMC Source Property had contaminated both soil and

25   groundwater beneath the facility.  In 2007, concentrations of 1,1-DCE, TCE,

26   c-1,2-DCE, and benzene were detected in groundwater above MCLs.

27          381.   Given the expansive use of chemicals at the PMC Source Property over

28   decades and the lack of existing data on soil and groundwater impacts, adequate site

1    characterization is needed to fully characterize the vertical and horizontal impacts of

2    contaminations in soil so that adequate source control can occur.  Also, given the long

3    operating history at this property, a groundwater monitoring system capable of

4    evaluating the lateral and vertical extent of offsite contamination above health-based

5    levels from this site is necessary.  Groundwater wells installed on the OFRP site to the

6    west and downgradient of the PMC Source Property found levels of benzene and

7    toluene orders of magnitude above MCLs coming from upgradient.  Upon

8    information and belief, the source of contamination at the OFRP site is the PMC

9    Source Property.

10                    **4.      SNL PRPs Firmenich and Momentive**

11           382.   Upon information and belief, releases of contamination have occurred

12    from the Omega Chemical property, located at 12504 and 12512 Whittier Boulevard,

13    Whittier, California, (the "Omega Chemical Property").

14                    *a.      Source Property Ownership and Operation*

15           383.   From 1976 to 1995, Omega Chemical (including a successor company

16    formed in 1991, when Omega Chemical filed for bankruptcy) conducted chemical

17    treatment operations on the property, including operations that included the storage,

18    consolidation, and treatment of commercial and industrial wastes, primarily solvent

19    and refrigerant (Freons) waste.

20           384.   In 1987, Omega Chemical purchased the 12504 Whittier Boulevard

21    property and the neighboring 12512 Whittier Boulevard property (the southern

22    portion of the Omega Chemical Property).  Van Owen Holdings LLC purchased the

23    Omega Chemical Property in 2003.

24                    *b.      Disposal & Releases of Hazardous Substances*

25           385.   Upon information and belief, significant quantities of hazardous

26    substances, including isopropyl alcohol ("IPA"), were stored or were otherwise

27    present in hazardous waste at the Omega Chemical Property.  From 1976 to 1995,

28    Omega Chemical conducted chemical treatment operations on the property, including

                                              - 93 -

1    operations at the Omega Chemical Property that included the storage, consolidation,

2    and treatment of commercial and industrial wastes received from other entities,

3    including Defendants Firmenich's and Momentive's predecessor-in-interest, MCP

4    Industrial Food Products.

5         386.   Upon information and belief, Defendants Firmenich's and Momentive's

6    predecessor-in-interest, MCP, owned or otherwise possessed hazardous waste,

7    including flammable waste isopropyl alcohol from concentrate production processes

8    conducted in connection with MCP's flavoring and food processing plant in

9    Anaheim, California, that was generated between 1989 and 1992.

10        387.   Hazardous waste manifests demonstrate that MCP intentionally

11   provided for the treatment of its hazardous waste at the Omega Chemical Property, or

12   otherwise arranged for the delivery of IPA to the property, shipping hazardous waste

13   to the property between 1989 and 1992.  The manifests, which purport to be executed

14   by a representative of Omega Chemical, demonstrate that MCP's hazardous waste

15   was received at the Omega Chemical Property.

16        388.   According to EPA, there have been numerous instances of releases of

17   hazardous substances to the soil and groundwater at and near the Omega Chemical

18   Property from spills and leaks of various chemicals at the Omega Chemical Property

19   resulting in soil and groundwater contaminated with chlorinated and non-chlorinated

20   solvents.

21        389.   Contaminants from the Omega Chemical Property are reported to have

22   migrated offsite in the same general direction as the groundwater flow.  EPA has

23   concluded that VOCs, such as PCE and TCE, in soil and groundwater have migrated

24   from the Omega Chemical Property.  Upon information and belief, the rate and extent

25   of this migration were increased and exacerbated by the presence of waste IPA, which

26   MPA sent to the Omega Chemical Property in large quantities.  IPA functions as a

27   "co-solvent," which increases the solubility of solvents, such as PCE and TCE, and

28   facilitates movement of those solvents through soil and groundwater.

390.   In or around September 2012, on information and belief, that EPA sent SNLs to Firmenich and Momentive, which, among other things, identify those Defendants as PRPs for the OU-2 Facility groundwater contamination and solicit offers for Firmenich and Momentive to perform the OU-2 Facility remedial design and remedial action and pay EPA's unreimbursed response costs.

**FIRST CLAIM FOR RELIEF**

**Cost Recovery Under CERCLA (Owners and Operators) – Against All Defendants, Except Firmenich, Inc., and Momentive Specialty Chemicals, Inc.**

391.   Plaintiffs repeat and re-allege Paragraphs 1 through 390 above, as though fully set forth herein.

392.   Plaintiffs bring this claim for cost recovery pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

393.   Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

394.   Upon information and belief, each Defendant is a covered person within the meaning of one or more of Section 107(a)(1), (2), (3), or (4), 42 U.S.C. § 9607(a)(1), (2).

395.   Upon information and belief, each Defendant Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

396.   Upon information and belief, releases and/or threatened releases of hazardous substances into the environment have occurred at each Source Property within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9602(22).

397.   Plaintiffs have undertaken, and continue to undertake, actions to address the OU-2 Facility groundwater contamination in response to releases or threatened releases of hazardous substances from the Source Property facilities, and have incurred and will incur necessary costs of response consistent with the NCP.

398.   Plaintiffs have incurred substantial costs that constitute necessary costs of response incurred in a manner consistent with the NCP under 42 U.S.C. § 9607(a)(4)(B) (the "Response Costs") to remediate hazardous substances.

399.   Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), by this action, Plaintiffs are entitled to cost recovery from Defendants in connection with the OU-2 Facility, and Defendants are liable for all response costs incurred by Plaintiffs or which Plaintiffs may incur.

400.   Plaintiffs are also entitled to attorneys' fees, including private attorney general fees pursuant to California Code of Civil Procedure § 1021.5.

401.   Plaintiffs are entitled to interest on the amount recovered on this claim pursuant to 42 U.S.C. § 9607(a)(2).

402.   Notice of this action is being provided to the Administrator of the Environmental Protection Agency and the United States Attorney General, pursuant to 42 U.S.C. § 9613(l).

**SECOND CLAIM FOR RELIEF**

**Cost Recovery Under CERCLA (Arrangers) – Against Phibro-Tech, Inc.;**
**Firmenich, Inc.; and Momentive Specialty Chemicals, Inc.**

403.   Plaintiffs repeat and re-allege Paragraphs 1 through 402 above, as though fully set forth herein.

404.   Plaintiffs bring this claim for cost recovery pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

405.   Each of Defendants Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals, Inc. is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

406.   Upon information and belief, each of Defendants Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals, Inc. is a covered person within the meaning of Section 107(a)(3), as a person who by contract or agreement or

1  otherwise arranged for the disposal or treatment of hazardous substances at a facility
2  owned or operated by another entity, 42 U.S.C. § 9607(a)(3).

3       407.   Upon information and belief, releases and/or threatened releases of
4  hazardous substances into the environment have occurred at the Phibro-Tech Source
5  Property and the Omega Chemical Property within the meaning of Section 101(22) of
6  CERCLA, 42 U.S.C. § 9602(22).

7       408.   Plaintiffs have undertaken, and continue to undertake, actions to address
8  the OU-2 Facility groundwater contamination in response to releases or threatened
9  releases of hazardous substances from the Phibro-Tech Source Property and the
10  Omega Chemical Property, and have incurred and will incur necessary costs of
11  response consistent with the NCP.

12       409.   Plaintiffs have incurred substantial costs that constitute necessary costs
13  of response incurred in a manner consistent with the NCP under 42 U.S.C. §
14  9607(a)(4)(B) to remediate hazardous substances.

15       410.   Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. §
16  9607(a)(4)(B), by this action, Plaintiffs are entitled to cost recovery from each of
17  Defendants Phibro-Tech, Inc., Firmenich, Inc., and Momentive Specialty Chemicals,
18  Inc. in connection with the OU-2 Facility groundwater contamination, and those
19  Defendants are liable for all response costs incurred by Plaintiffs or which Plaintiffs
20  may incur.

21       411.   Plaintiffs are also entitled to attorneys' fees, including private attorney
22  general fees pursuant to California Code of Civil Procedure § 1021.5.

23       412.   Plaintiffs are entitled to interest on the amount recovered on this claim
24  pursuant to 42 U.S.C. § 9607(a)(2).

25       413.   Notice of this action is being provided to the Administrator of the
26  Environmental Protection Agency and the United States Attorney General, pursuant
27  to 42 U.S.C. § 9613(l).

28

**THIRD CLAIM FOR RELIEF**

**Declaratory Judgment on Liability for Response Costs – Against All Defendants**

414.   Plaintiffs incorporate and re-allege Paragraphs 1 through 413 above, as though fully set forth herein.

415.   Plaintiffs bring this declaratory relief claim pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607(a), 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

416.   An actual and substantial controversy has arisen between Plaintiffs and Defendants regarding their respective rights and obligations for the Response Costs that have been incurred and the Response Costs that will be incurred to respond to the releases of contaminants from the Source Property facilities.

417.   Until such time as remediation of the OU-2 Facility is complete, additional Response Costs will be needed to respond to the OU-2 Facility. Defendants are jointly and severally liable for payment of those Response Costs.

418.   Pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. §§ 2201, 2202, Plaintiffs seek and are entitled to a declaratory judgment against Defendants that each of them, jointly and severally, are liable to Plaintiffs for past and future Response Costs incurred by Plaintiffs in connection with the OU-2 Facility.

**FOURTH CLAIM FOR RELIEF**

**Abatement of Imminent and Substantial Endangerment Under RCRA – Against ExxonMobil Oil Corporation; Continental Development Company, LP; Continental Heat Treating, Inc.; Associated Plating Company, Inc.; APC Investment Co.; Associated Plating Company; Cheryl Golnick; Clare Golnick; Darrell Golnick; Gordon McCann; Lynnea McCann; Claudette Earl; Earl Mfg. Co., Inc.; Ferro Corp.; PMC Specialties Group, Inc.; Foss Plating Company, Inc.; Bodycote Thermal Processing, Inc.; Powerine Oil Company; Kekropia, Inc.; Palley Supply Co.; William Palley; Pilot Chemical Co.; Union Pacific Railroad Company; First Dice Road Company; and Phibro-Tech, Inc.**

- 98 -

419.   Plaintiffs repeat and re-allege Paragraphs 1 through 418 above, as though fully set forth herein.

420.   Plaintiffs bring this claim for abatement of imminent and substantial endangerment to health or the environment pursuant to Section 7002 of RCRA, 42 U.S.C. § 6972.

421.   Each of the RCRA Defendants is a person within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

422.   Each of the RCRA Defendants is a past or present generator, past or present transporter, or past or present owner or operator of a solid waste treatment, storage, or disposal facility.

423.   Each of the RCRA Defendants has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of a solid or hazardous waste, within the meaning of Sections 1004(3), 1004(5) and 1004(27) of RCRA, 42 U.S.C. §§ 6903(3), (5), (27).

424.   The RCRA Defendants have failed to implement adequate Source Control at the source properties with which they are associated, including but not limited to: cessation of improper waste handling, storage, and treatment procedures; remediation of soil and groundwater at the source property; monitoring of the spread of groundwater contamination away from the source property through the installation and operation of an adequate network of site boundary and offsite monitoring wells; reporting of monitoring well data; and implementation of groundwater containment systems to prevent additional contaminated groundwater above health-based levels from leaving the source property.

425.   As a result of the RCRA Defendants' failure to implement adequate Source Control, groundwater contamination above health-based levels originating at the source properties with which they are associated has migrated and continues to migrate away from the Site, expanding the scope of the contamination.  Additionally, the RCRA Defendants' failure to implement adequate monitoring at and

1  downgradient from the source properties has impeded assessment of the scope of the

2  migration of contaminants downgradient from the source properties.

3       426.   The presence of the contaminants in the soil, saturated subsurface zone,

4  and in the groundwater, the migration of those contaminants away from the source

5  properties, and the RCRA Defendants' failure to implement adequate Source Control

6  presents or may present an imminent and substantial endangerment to human health

7  or the environment.

8       427.   Each of the contaminants handled, stored, treated, transported, or

9  disposed of by the RCRA Defendants (either directly or by contributing to the

10  handling, storage, treatment, transportation, or disposal) is a solid waste because,

11  among other reasons, each of those contaminants is discarded material resulting from

12  industrial or commercial operations.

13      428.   Each of the contaminants handled, stored, treated, transported, or

14  disposed of by the RCRA Defendants (either directly or by contributing to the

15  handling, storage, treatment, transportation, or disposal), when discarded, is a "solid

16  waste", and potentially a "hazardous waste", as those terms are defined under RCRA

17  because, among other reasons, each of those contaminants may pose a present or

18  potential hazard to human health or the environment when improperly managed

19  because of its quantity, concentration, or physical or chemical characteristics.

20      429.   Plaintiffs provided notice of the actual and threatened endangerment,

21  injury and damage alleged herein by mailing Notices of Endangerment and Intent to

22  Sue Pursuant to Resource Conservation and Recovery Act § 7002(a)(1)(B) ("RCRA

23  Notices") to EPA's Administrator and Regional Administrator, the Director of

24  California's Department of Toxic Substances Control, and all RCRA Defendants.

25      430.   Each of the RCRA Defendants received a RCRA Notice on or before

26  December 9, 2014.

27      431.   Plaintiffs waited at least ninety days after the RCRA Defendants' receipt

28  of the RCRA Notices before bringing this cause of action against each of them.

432.   Pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), by this action, Plaintiffs are entitled to an injunction ordering the RCRA Defendants to abate the imminent and substantial endangerment to health and the environment by determining the extent of offsite groundwater contamination resulting from handling of solid or hazardous waste and implementing soil and groundwater source control sufficient to prevent continued migration of hazardous constituents to groundwater above health-based levels.

433.   Plaintiffs are also entitled to the costs of litigation, including private attorney general fees pursuant to California Code of Civil Procedure § 1021.5 and attorney fees, expert witness fees, and other costs pursuant to Section 7002(e) of RCRA, 42 U.S.C. § 6972(e).

434.   Notice of this action is being provided to the EPA Administrator and the United States Attorney General, pursuant to Section 7002(b)(2)(F) of RCRA, 42 U.S.C. § 6972(b)(2)(F).

### FIFTH CLAIM FOR RELIEF

### Continuing Public Nuisance – Against All Defendants

435.   Plaintiffs incorporate and re-allege Paragraphs 1 through 434 above, as though fully set forth herein.

436.   Plaintiffs bring this public nuisance claim pursuant to California Civil Code §§ 3479 and 3480.

437.   The contamination of the groundwater in the Santa Fe Springs and Whittier regions constitutes a nuisance within the meaning of Section 3479 of the California Civil Code in that it has interfered and continues to interfere with the public's use and enjoyment of the groundwater supply and right to an unpolluted water supply, including, according to the EPA, posing a continuing threat to the region's drinking water supply.

438.   As a result of the groundwater contamination, Plaintiffs have been forced to incur Response Costs and will be forced to incur further Response Costs, an injury that is separate and distinct from the injury suffered by the public.

439.   The OU-2 Facility groundwater contamination can be reasonably abated. EPA has developed the Selected Remedy, which is intended to remove contaminant mass from the groundwater, limit the movement of contaminated groundwater, and prevent any further spreading of hazardous substances to uncontaminated areas of the aquifer and nearby water production wells.  Further, the contamination at each of the Defendant Source Properties and ongoing practices that have resulted, and may result in the release or threatened release of hazardous substances from the Source Properties into the groundwater, may be reasonably controlled or mitigated to prevent such releases or threatened releases.

440.   As an actual and proximate cause of the public nuisance created and/or maintained by Defendants, Plaintiffs have and will continue to incur removal, remediation, and related expenses.

441.   Pursuant to California Civil Code §§ 3281 and 3479 *et seq.*, Plaintiffs seek from all Defendants and are entitled to receive compensatory damages, including for all response costs incurred by Plaintiffs or which Plaintiffs may incur.

442.   Notwithstanding the reasonable possibility of abating the public nuisance, Defendants have not abated and are not abating the public nuisance, though each knew or should have known, at the time each owned or operated at the Source Property, about the nuisance and the conditions contributing to it, permitting contamination to spread through the soil and groundwater.  Plaintiffs have no adequate remedy at law to address the ongoing and progressive interference with the public's use and enjoyment of the OU-2 Facility regional groundwater supply and right to an unpolluted drinking water supply and resulting increased response costs.

443.   Plaintiffs therefore seek injunctive relief restraining and enjoining each of the Defendants, with the exception of Defendants Firmenich and Momentive, from

1    maintaining or contributing to the public nuisance described herein and requiring

2    each of them to promptly and competently take such action as is necessary to abate

3    that public nuisance.

4        444.    Plaintiffs are also entitled to attorneys' fees, including private attorney

5    general fees pursuant to California Code of Civil Procedure § 1021.5.

6                                **PRAYER FOR RELIEF**

7        WHEREFORE, Plaintiffs demand judgment in its favor and against

8    Defendants, to the extent authorized by law, as follows:

9        (1)    ON THE FIRST CLAIM FOR RELIEF, for recovery of all Response

10    Costs incurred in connection with the OU-2 Facility consistent with the National

11    Contingency Plan, including pre-judgment interest thereon as allowed by law;

12        (2)    ON THE SECOND CLAIM FOR RELIEF, for recovery of all Response

13    Costs incurred in connection with the OU-2 Facility consistent with the National

14    Contingency Plan, including pre-judgment interest thereon as allowed by law;

15        (3)    ON THE THIRD CLAIM FOR RELIEF, for a judicial declaration that

16    Defendants are jointly and severally liable for all Response Costs incurred and to be

17    incurred in connection with the OU-2 Facility consistent with the National

18    Contingency Plan;

19        (4)    ON THE FOURTH CLAIM FOR RELIEF, for an injunction ordering

20    the RCRA Defendants to abate the imminent and substantial endangerment to health

21    and the environment;

22        (4)    ON THE FIFTH CLAIM FOR RELIEF, for an injunction requiring

23    Defendants to remediate the OU-2 Facility groundwater contamination as generally

24    described in Paragraphs 11, 432, and 443 above, and to prevent the continuing release

25    of hazardous substances from the Non-Omega Source Properties into the

26    groundwater, as generally described above in Paragraphs 10-11, 116, 425-26, 439,

27    and 442;

28

(5)     ON THE FIFTH CLAIM FOR RELIEF, for compensatory damages in an amount to be determined at trial;

(6)     ON THE FIRST, SECOND, FOURTH AND FIFTH CLAIMS FOR RELIEF, for attorneys' fees, including private attorney general fees pursuant to California Code of Civil Procedure § 1021.5;

(7)     AS TO ALL CLAIMS FOR RELIEF, for all costs and expenses incurred in this action, to the extent provided for by law;

(8)     AS TO ALL CLAIMS FOR RELIEF, for such other and further relief as the Court may deem just and proper.

DATED: March 11, 2015                    PROSKAUER ROSE LLP


                                         By:   /s/  Nancy Sher Cohen


                                         Attorneys for Plaintiffs