1  David R. Isola, Esq., SBN 150311
2    disola@isolalaw.com
   Paul Hagen, Esq., SBN 164773
3    phagen@isolalaw.com
4  Stephen B. Ardis, Esq. SBN 162947
     sardis@isolalaw.com
5  ISOLA LAW GROUP, LLP
6  405 West Pine Street
   Lodi, California 95240
7  Telephone: (209) 367-7055
8  Facsimile: (209) 367-7056

9

10 Attorneys for Defendant and Third Party
   Plaintiff, POWERINE OIL COMPANY
11

12

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15

16 | ALCOA INC.; ALPHA THERAPEUTIC | ) Case No.: 2:14-CV-06456-GW-Ex
   | CORPORATION; APPLIED MICRO | )
17 | CIRCUITS CORP.; ARLON, LLC; | ) POWERINE OIL COMPANY'S
18 | ASTRO ALUMINUM TREATING CO., | ) FIRST AMENDED THIRD PARTY
   | INC.; BASF CORPORATION; BAXTER | ) COMPLAINT FOR:
19 | HEALTHCARE CORPORATION; CAL- | )
20 | TAPE & LABEL CO.; CALIFORNIA | )    1.  PUBLIC NUISANCE
   | HYDROFORMING COMPANY, INC.; | )    2.  EQUITABLE INDEMNITY
21 | CINTAS CORPORATION; COLUMBIA | )    3.  CONTRIBUTION
22 | SHOWCASE & CABINET COMPANY, | )
   | INC.; COUNTY OF LOS ANGELES; | ) Complaint Filed: August 14, 2014
23 | CROSBY & OVERTON, INC.; DISNEY | ) Amended Complaint Filed: November
24 | ENTERPRISES, INC.; FHL GROUP; | ) 24, 2014
   | FORENCO, INC.; GENERAL | ) Answer Filed: February 13, 2015
25 | DYNAMICS CORPORATION; | ) Second Amended Complaint Filed:
26 | GULFSTREAM AEROSPACE | ) March 11, 2015
   | CORPORATION; HERCULES | )
27 | INCORPORATED; HEXCEL | ) HON. GEORGE H. WU
28 |                              | )

FIRST AMENDED THIRD PARTY COMPLAINT - 1
2:14-CV-06456-GW-Ex

CORPORATION; HONEYWELL
INTERNATIONAL INC.; INGERSOLL-
RAND COMPANY; INTERNATIONAL
PAPER COMPANY; JOHNS MANVILLE;
KIMBERLY-CLARK WORLDWIDE,
INC.; KINDER MORGAN LIQUIDS
TERMINALS LLC; LOS ANGELES
COUNTY METROPOLITAN
TRANSPORTATION AUTHORITY;
MASCO CORPORATION OF INDIANA;
MATTEL, INC.; MERCK SHARP &
DOHME CORPORATION;
NBCUNIVERSAL MEDIA, LLC;
PACIFIC BELL TELEPHONE
COMPANY; PILKINGTON GROUP
LIMITED; QUEST DIAGNOSTICS
CLINICAL LABORATORIES, INC.;
RAYTHEON COMPANY; RIO TINTO
AUM COMPANY; SAFETY-KLEEN
SYSTEMS, INC.; SCRIPTO-TOKAI
CORPORATION; SEMPRA GLOBAL;
SHILEY, LLC; SIGNET ARMORLITE,
INC.; SOCO WEST, INC.; SONOCO
PRODUCTS COMPANY; SPARTON
TECHNOLOGY, INC.; TEXACO INC.;
TEXAS INSTRUMENTS
INCORPORATED; THE BOEING
COMPANY; THE DOW CHEMICAL
COMPANY; THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA; THE
SHERWIN-WILLIAMS COMPANY;
TRANE U.S., INC.; TRIMAS
CORPORATION; UNION OIL
COMPANY OF CALIFORNIA; UNIVAR
USA INC.; UNIVERSAL CITY STUDIOS
LLC; AND YORT, INC.,

Plaintiffs,

vs.

FIRST AMENDED THIRD PARTY COMPLAINT - 2
2:14-CV-06456-GW-Ex

1    APC INVESTMENT CO.; ASSOCIATED )
2    PLATING COMPANY; ASSOCIATED )
3    PLATING COMPANY, INC.; )
     BODYCOTE THERMAL PROCESSING, )
4    INC.; BURKE STREET, LLC; )
5    POWERINE OIL COMPANY; )
     CONTINENTAL HEAT TREATING, )
6    INC.; CONTINENTAL DEVELOPMENT )
7    COMPANY, LP; CLAUDETTE EARL, )
     AN INDIVIDUAL; EARL MFG. CO., )
8    INC.; EXXONMOBIL OIL )
9    CORPORATION; FERRO CORP.; )
10   FIRMENICH, INC.; FOSS PLATING )
     COMPANY, INC.; GORDON E. )
11   MCCANN, AN INDIVIDUAL; LYNNEA )
12   R. MCCANN, AN INDIVIDUAL; )
     DARRELL K. GOLNICK, AN )
13   INDIVIDUAL; CLARE S. GOLNICK, AN )
14   INDIVIDUAL; CHERYL A. GOLNICK, )
     AN INDIVIDUAL; KEKROPIA, INC.; )
15   MISSION LINEN SUPPLY; )
16   MOMENTIVE SPECIALTY )
     CHEMICALS, INC.; WILLIAM K. )
17   PALLEY, AN INDIVIDUAL; PALLEY )
18   SUPPLY COMPANY; PALMTREE )
19   ACQUISITION CORPORATION; )
     PHIBRO-TECH, INC.; PILOT )
20   CHEMICAL CORP.; PMC SPECIALTIES )
21   GROUP, INC.; UNION PACIFIC )
22   RAILROAD COMPANY; FIRST DICE )
     ROAD COMPANY, INC.; )
23   HALLIBURTON AFFILIATES, LLC; and )
24   DOES 1 through 250, inclusive, )
                                   )
25                Defendants. )
26                                     )
27 _____ )

28

POWERINE OIL COMPANY, INC. )
)
Third Party Plaintiff, )
)
vs. )
)
SILVEY & SILVEY, INC.; COPP PAVING )
COMPANY, INC.; COLETTE M. MEYER, )
MARIAN F. RAWLINS, DONALD E. )
RAWLINS AS TRUSTEES OF THE )
RAWLINS FAMILY TRUST; DEBORAH )
CORRINNE WELLS AND LEE BRYANT )
MARSTON, CO-TRUSTEES OF THE )
FRANCES M. MARSTON CREDIT )
SHELTER TRUST DATED JULY 14, )
2012; MARY E. HILER TRUSTEE OF )
THE HILER TRUST; COPLEY WEST )
COAST INDUSTRIAL/SANTA FE )
SPRINGS PROPERTY, L.L.C.; D. A. )
STUART COMPANY OF CALIFORNIA; )
GRIFFITH COMPANY; HALLIBURTON )
ENERGY SERVICES, INC.; KELLY PIPE )
CO., LLC; SE PIPE LINE )
CONSTRUCTION COMPANY; WILLIAM )
ROY ALLAN AND GAY D. ALLAN AS )
TRUSTEES OF THE ALLAN TRUST; )
ASHLAND INC.; WATER WELL )
SUPPLY; CASCADE PUMP COMPANY; )
GEARY FIVE LLC; and, ULTRAMAR )
INC., )
)
Third Party Defendants. )
)

Defendant and Third-Party Plaintiff, Powerine Oil Company, Inc.
("Powerine") alleges as its Third-Party Complaint against SILVEY & SILVEY,
INC.; COPP PAVING CO., INC.; COLETTE M. MEYER, MARIAN F.

RAWLINS, DONALD E. RAWLINS AS TRUSTEES OF THE RAWLINS FAMILY TRUST; DEBORAH CORRINNE WELLS AND LEE BRYANT MARSTON, CO-TRUSTEES OF THE FRANCES M. MARSTON CREDIT SHELTER TRUST DATED JULY 14, 2012; MARY E. HILER TRUSTEE OF THE HILER TRUST; COPLEY WEST COAST INDUSTRIAL/SANTA FE SPRINGS PROPERTY, L.L.C.; D.A. STUART COMPANY OF CALIFORNIA; GRIFFITH COMPANY; HALLIBURTON ENERGY SERVICES, INC.; KELLY PIPE CO., LLC; SE PIPE LINE CONSTRUCTION COMPANY; WILLIAM ROY ALLAN AND GAY D. ALLAN AS TRUSTEES OF THE ALLAN TRUST; ASHLAND INC., WATER WELL SUPPLY; CASCADE PUMP COMPANY; GEARY FIVE LLC, and ULTRAMAR INC. (collectively, "Third Party Defendants") as follows:

## NATURE OF THE ACTION

1.  This is a civil action arising from environmental contamination at and emanating from various parcels of real property in Santa Fe Springs, California and Norwalk California ("Source Property" or "Source Properties"). Third Party Defendants are the current and past owners and operators of the Source Properties, and are responsible for hazardous substances in soil and groundwater at and in the vicinity of these locations. Powerine seeks injunctive relief requiring each Third Party Defendant to abate the adverse environmental impacts attributable to its respective Source Property; Powerine also seeks indemnity, contribution, and compensatory damages arising from its past and future costs relating to the contamination.

2.  Between the early 1930s and mid-1990s, Powerine owned and operated an oil refinery on an approximately 55-acre parcel located at 12345 Lakeland Rd., Santa Fe Springs, California ("Former Powerine Refinery"). The United States Environmental Protection Agency ("EPA") has designated groundwater underlying the Former Powerine Refinery as part of Operable Unit No. 2 of the Omega Superfund Site ("OU-2 Facility"), which consists of groundwater contaminated with

high concentrations of numerous hazardous substances underlying an area that is approximately 4 1/2 miles long extending between the communities of Whittier, California and Norwalk, California.

3.  On or about March 11, 2015, Plaintiffs herein filed their Second Amended Complaint against Powerine alleging that the Former Powerine Refinery is responsible for contributing substances that are hazardous to the environment and human health to a region that is referred to as the "Southern Area" of the OU-2 Facility.

4.  Third Party Defendants are the current and prior owners and operators of properties and businesses that sit atop or very near the Southern Area of the OU-2 Facility that are responsible for spilling or discharging hazardous substances onto the ground. These hazardous substances have migrated downward into the soil and groundwater. The soil and groundwater underlying these Source Properties have been contaminated by operations conducted there, resulting in multiple plumes of contamination that have blended together into regional groundwater contamination.

5.  Third Party Defendants have failed to implement source control measures to prevent hazardous substances in excess of health-based levels from entering groundwater underlying and in the vicinity of their respective Source Properties. The lack of adequate source control at the Third Party Defendants' sites results in groundwater exceeding health-based levels continuing to migrate into the Southern Area of the OU–2 Facility. By this action, Powerine seeks to compel Third Party Defendants to stop the release of hazardous substances from their respective Source Properties, and to participate in remediating their contributions to the hazardous substances in the Southern Area of the OU-2 Facility.

/ / /

/ / /

/ / /

/ / /

**PARTIES**

6.  Powerine Oil Company is a corporation duly organized and existing under the laws of the State of California with its principal place of business in New York, New York.

7.  Powerine is informed and believes and thereon alleges that Third Party Defendant Silvey & Silvey, Inc. ("Silvey") is a corporation, duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Silvey is a current owner of the "Kobra Source Property" as that term is defined below in paragraph 30.

8.  Powerine is informed and believes and thereon alleges that Third Party Defendant Copp Paving Co, Inc. ("Copp") is a corporation, duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Copp is a current of the "Kobra Source Property" as that term is defined below in paragraph 31.

9.  Powerine is informed and believes and thereon alleges that Third Party Defendants Colette M. Meyer, Marian F. Rawlins and Donald E. Rawlins in their individual rights or as trustees of the Rawlins Family Trust are residents of Los Angeles County, California, and are current owners of the "Kalico 1 Source Property" as that term is defined below in paragraph 48 and of the "Kalico 3 Source Property" as that term is defined below in paragraph 65.

10.  Powerine is informed and believes and thereon alleges that Third Party Defendants Deborah Corrinne Wells and Lee Bryant Marston, Co-Trustees of the Frances M. Marston Credit Shelter Trust Dated July 14, 2012 are individuals residing in Los Angeles County, California were owners of the "Kalico 3 Source Property" as that term is defined below in paragraph 64.

11.  Powerine is informed and believes and thereon alleges that Third Party Defendant Mary E. Hiler Trustee of the Hiler Trust is an individual residing in Los

Angeles County, California and is a current owner of the "Kalico 3 Source Property" as that term is defined below in paragraph 64.

12.    Powerine is informed and believes and thereon alleges that Third Party Defendant Copley West Coast Industrial/Santa Fe Springs Property, L.L.C., ("Copley") is a limited liability corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Copley is a current owner of the "Copley Source Property" as that term is defined below in paragraph 83.

13.    Powerine is informed and believes and thereon alleges that Third Party Defendant D.A. Stuart Company of California ("D.A. Stuart") is a corporation, duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, D.A. Stuart is a current owner of the "Torco Source Property" as that term is defined below in paragraph 97.

14.    Powerine is informed and believes and thereon alleges that Third Party Defendant Griffith Company is a corporation, duly organized and existing under the laws of the State of California with its principal place of business in Los Angeles, California.  As alleged more fully herein, Griffith Company is a current owner of the "Griffith Source Property" as that term is defined below in paragraph 111.

15.    Powerine is informed and believes and thereon alleges that Third Party Defendant Halliburton Energy Services, Inc. ("Halliburton") is a corporation, duly organized and existing under the laws of the State of Delaware, with its principal place of business in Houston, Texas.  As alleged more fully herein, Halliburton is a previous owner and operator of the "Halliburton Source Property" as that term is defined below in paragraph 124.

16.    Powerine is informed and believes and thereon alleges that Third Party Defendant Kelly Pipe Co, LLC ("Kelly Pipe") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business

FIRST AMENDED THIRD PARTY COMPLAINT - 8
2:14-CV-06456-GW-Ex

in Santa Fe Springs, California.  As alleged more fully herein, Kelly Pipe is a current owner of the "Kelly Source Property" as that term is defined below in paragraph 131.

17.  Powerine is informed and believes and thereon alleges that Third Party Defendant SE Pipe Line Construction Company ("SE Pipe Line") is a corporation duly organized and existing under the laws of the State of California, with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, SE Pipe Line is a current or previous owner or operator of the "SE Pipe Line Source Property" as that term is defined below in paragraph 151.

18.  Powerine is informed and believes and thereon alleges that Third Party Defendants William Roy Allan and Gay D. Allan in their individual rights or as trustees of the Allan Trust ("Allan Trust") are residents of Orange County, California and are the current owners of the "Strecker Source Property" as that term is defined below in paragraph 163.

19.  Powerine is informed and believes and thereon alleges that Third Party Defendant Ashland Inc. ("Ashland") is a corporation, duly organized and existing under the laws of the State of Kentucky, and qualified to do business in the State of California.  As alleged more fully herein, Ashland is a previous owner or operator of the "Ashland Source Property" as that term is defined below in paragraph 169.

20.  Powerine is informed and believes and thereon alleges that Third Party Defendant Water Well Supply is a corporation, duly organized and existing under the laws of the State of California, with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Water Well Supply is a current or previous owner or operator of the "Water Well Supply Source Property" as that term is defined below in paragraph 177.

21.  Powerine is informed and believes and thereon alleges that Third Party Defendant Cascade Pump Company is a corporation, duly organized and existing under the laws of the State of California, with its principal place of business in Santa

Fe Springs, California.  As alleged more fully herein, Cascade Pump is a current or previous owner or operator of the Geary Five LLC Source Property as that term is defined below in paragraph 179.

22.   Powerine is informed and believes and thereon alleges that Third Party Defendant Geary Five LLC is a limited liability company, duly organized and existing under the laws of the State of California, with its principal place of business in Santa Fe Springs, California. As alleged more fully herein, Geary Five is a current or previous owner or operator of the "Geary Five LLC Source Property" as that term is defined below in paragraph 177.

23.   Powerine is informed and believes and thereon alleges that Third Party Defendant Ultramar Inc. ("Ultramar") is a corporation, duly organized and existing under the laws of the State of Nevada, and qualified to do business and doing business in the State of California. As alleged more fully herein, Ultramar is a current or previous owner" or operator of the "Caminol Source Property" as that term is defined below in paragraph 185.

## JURISDICTION & VENUE

24.    This Court has jurisdiction over Powerine's Public Nuisance, Contribution, and Equitable Indemnity claims for relief under the doctrine of supplemental jurisdiction and 28 U.S.C. §1367 because these claims arise out of the same set of operative facts as the federal claims asserted against Powerine in Plaintiffs' Amended Complaint.

25.   Because the events giving rise to Powerine's claims for relief took place in this judicial district, venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

## FACTUAL ALLEGATIONS

26.   In August 1997, the California Regional Water Quality Control Board – Los Angeles Region ("Regional Board") issued Cleanup and Abatement Order No.

97-118 directing Powerine to undertake the investigation and remediation of all adverse impacts to soil and groundwater caused by oil refining and marketing operations at and in the vicinity of the Former Powerine Refinery.

27.   Pursuant to its obligations under Cleanup and Abatement Order No. 97-118, Powerine has conducted extensive environmental investigative activities in the area consisting of approximately Florence Boulevard (City of Santa Fe Springs) to the north, Norwalk Boulevard (City of Santa Fe Springs and City of Norwalk) to the west, Imperial Highway (City of Norwalk) to the south, and Shoemaker Road (City of Santa Fe Springs) to the east ("Powerine Investigation").

28.   As the result of the Powerine Investigation, Powerine developed a Remedial Action Plan approved by the Regional Board to remediate soil and groundwater underlying the Former Powerine Refinery.  The Remedial Action Plan for the Former Powerine Refinery, which is presently being implemented, is designed and intended to eliminate the Former Powerine Refinery as a continuing source of adverse impacts to groundwater within the Southern Area of the OU-2 Facility.

29.   As the result of the Powerine Investigation, Powerine has characterized the extent of its own contribution of hazardous substances to groundwater within the Southern Area of the OU-2 Facility. Also as the result of the Powerine Investigation, Powerine identified the Third Party Defendants' Source Properties that are discharging hazardous substances to groundwater within the Southern Area of the OU-2 Facility; these Source Properties are not affiliated with Powerine, Powerine's historic operations, or the Former Powerine Refinery. A significant portion of the relief that Plaintiffs seek from Powerine arises from discharges at the Third Party Defendants' respective Source Properties.

/ / /

/ / /

*The Kobra Source Property*

30.  Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating on, located at, or adjacent to 12017 Greenstone Avenue, and 12027 Greenstone Avenue, Santa Fe Springs, California, more specifically identified by Assessor's Parcel Numbers APN: 8026-020-074 and APN: 8026-020-075 (collectively referred to as the "Silvey Properties").

31.  Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from the property and from businesses operating on, located at, or adjacent to 12027 Greenstone Avenue, Santa Fe Springs, California, more specifically identified by Assessor's Parcel Number: APN: 8026-020-80 (the "Copp Property").

32.  Powerine is informed and believes and thereon alleges that the Silvey Properties and the Copp Property jointly comprised a facility known as the "Kobra Dump Site," referred to herein as the "Kobra Source Property."

33.  Powerine is informed and believes and thereon alleges that from at least 1961 and continuing through 1972, the Kobra Source Property was permitted by the County of Los Angeles Industrial Waste Division, Permit No. 2639 dated March 16, 1961 and operated as a Class II solid waste disposal facility.  Powerine is informed and believes and thereon alleges that during the dump's operations, the Kobra Source Property was used for the disposal of, among other things, semi-liquids such as dry mud cake from oil field sumps, paint sludge, oil soaked excelsior and/or straw used to absorb hydrocarbon oils from waste water and rotary drilling muds from oil field drilling operations.

34.  Powerine is informed and believes and thereon alleges that no liners or leachate recovery system was utilized in the waste disposal operations that occurred at the Kobra Source Property.

35.    Powerine is informed and believes and thereon alleges that former operations conducted at the Kobra Source Property also included fueling services consisting of a least one underground storage tank ("UST") and a dispenser area.

36.    Powerine is informed and believes and thereon alleges that hazardous substances, including but not limited to    1,1,1,TCA, 1,1-dichloroethene, 1,2-dichloroethene, 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone, freon, methyl ethyl ketone, benzene, and toluene were stored, used, or were otherwise present at the Kobra Source Property.

37.   Powerine is informed and believes and thereon alleges that the operations and waste disposal practices at the Kobra Source Property have resulted in one or more hazardous substances, including but not limited to 1,1,1,TCA, 1,1-dichloroethene, 1,2- dichloroethene, 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone, freon, methyl ethyl ketone, benzene, and toluene, being placed onto the ground or into the soil at or near the Kobra Source Property.

38.    Powerine is informed and believes and thereon alleges that in approximately 1990, a 10,000 gallon diesel underground storage tank was removed from the Kobra Source Property.  Powerine is informed and believes and thereon alleges that soil sampling conducted in the area of the former underground storage tank revealed the presence of numerous hazardous substances.

39.   Powerine is informed and believes and thereon alleges that beginning in approximately 1990, a Solid Waste Assessment Test ("SWAT") was conducted for the Kobra Source Property and by Environmental Solutions, Inc. ("ESI") at the direction of the Regional Board.

40.    The SWAT program included the installation of four ground water monitoring wells and two suction lysimeters.

41.    Analytical results of groundwater samples indicated the presence of elevated petroleum hydrocarbon contaminants, fuel type hydrocarbon contaminants (including benzene, toluene, total xylenes and ethylbenzene).  Chlorinated

hydrocarbons including but not limited to trichloroethylene and Cis 1,2 dichloroethene were also detected. Additionally, 1,2 dichlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorobenzene, vinyl acetate and vinyl chloride were also detected.

42.   Analytical results from samples collected from the lysimeter indicated that at least ten chlorinated, aromatic or solvent type hydrocarbon compounds were detected in the vadose zone soil moisture samples.  Four compounds detected in the soil moisture (acetone, benzene, 1,2-dichlorobenzene and 1,4-dichlorobenzene) were also detected in groundwater samples collected during the SWAT program.

43.   Powerine is informed and believes and thereon alleges that in approximately 1993, the Regional Board required further evaluation of the potential for leaching from the Kobra Source Property. Additionally, the Regional Board required that a corrective action plan be developed for the site.

44.   Powerine is informed and believes and thereon alleges that in response to the Regional Board's 1993 requirements, Advanced GeoEnvironmental, Inc. ("AGE") conducted monitoring and sampling activities in July and early August of 1994. Groundwater sampling conducted by AGE detected elevated concentrations of benzene as well as concentrations of toluene, ethylbenzene and total xylenes in groundwater.

45.   Powerine is informed and believes and thereon alleges that groundwater sampling conducted by AGE in January 1997 and September 1998 revealed concentrations of benzene in groundwater in excess of regulatory standards.

46.   Powerine is informed and believes and thereon alleges that the hazardous substances present in the soil at the Kobra Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with 1,2-dichlorobenzene, 1,4-dichlorobenzene,acetone and benzene,

posing a continuing threat to the regional groundwater and the health of area residents.

47.  Powerine is informed and believes and thereon alleges that the extent of on-site contamination at the Kobra Source Property has not been fully delineated vertically and laterally.  Powerine is informed and believes and thereon alleges that Third Party Defendants Silvey and Copp have not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor have Third Party Defendants Silvey and Copp adequately monitored the extent to which contaminants continue to migrate from the Kobra Source Property into off-site groundwater.  The Kobra Source Property does not have an adequate groundwater monitoring system in place that is sufficient to demonstrate that releases from the Kobra Source Property to regional groundwater above health-based levels has been fully controlled.

### Kalico 1 Source Property

48.  Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating on, located at, or adjacent to 11801 Greenstone Avenue, Santa Fe Springs, California, more specifically identified by Assessor's Parcel Number APN: 8026-020-054 (the "Kalico 1 Source Property").

49.  Powerine is informed and believes and thereon alleges that from at least 1954 and continuing through 1956, the Kalico 1 Source Property was permitted by the County of Los Angeles Industrial Waste Division, Permit No. 1303 dated November 16, 1954 and operated as a Class III solid refuse disposal dump.

50.  Powerine is informed and believes and thereon alleges that no liners or leachate recovery system was utilized in the waste disposal operations that occurred at the Kalico 1 Source Property.

51.  Powerine is informed and believes and thereon alleges that from at least 1999 and continuing to the present, Colette M. Meyer, Marian F. Rawlins and

1  Donald E. Rawlings in their individual rights or as trustees of the Rawlins Family
2  Trust have owned the Kalico 1 Source Property.

3       52.   Powerine is informed and believes and thereon alleges that hazardous
4  substances, including but not limited to   1,1,1,TCA, 1,1-dichloroethene, 1,2-
5  dichloroethene, 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone, freon, methyl
6  ethyl ketone, benzene, and toluene were stored, used, or were otherwise present at
7  the Kalico 1 Source Property.

8       53.   Powerine is informed and believes and thereon alleges that the operations
9  and waste disposal practices at the Kalico 1 Source Property have resulted in one or
10 more hazardous substances, including but not limited to 1,1,1,TCA, 1,1-
11 dichloroethene, 1,2- dichloroethene, 1,2-dichlorobenzene, 1,4-dichlorobenzene,
12 acetone, freon, methyl ethyl ketone, benzene, and toluene, being placed onto the
13 ground or into the soil at or near the Kalico 1 Source Property.

14      54.   Powerine is informed and believes and thereon alleges that the hazardous
15 substances present in the soil at the Kalico 1 Source Property have migrated and
16 continue to migrate downward into the saturated zone beneath the property and have
17 come to be located in the groundwater, resulting in contamination of the
18 groundwater with 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone and benzene.

19      55.   Powerine is informed and believes and thereon alleges that beginning in
20 approximately 1990, a SWAT was conducted for the Kalico 1 Source Property by
21 ESI at the direction of the Regional Board.

22      56.   The SWAT program included the installation of four ground water
23 monitoring wells and two suction lysimeters.

24      57.   Analytical results of groundwater samples indicated the presence of
25 elevated petroleum hydrocarbon contaminants, fuel type hydrocarbon contaminants
26 (including benzene, toluene, total xylenes and ethylbenzene). Chlorinated
27 hydrocarbons including but not limited to trichloroethylene and Cis 1,2
28 dichloroethene were also detected. Additionally, 1,2 dichlorobenzene, 1,3-

dichlorobenzene, 1,4-dichlorobenzene, vinyl acetate and vinyl chloride were also detected.

58.   Analytical results from samples collected from the lysimeter indicated that at least ten chlorinated, aromatic or solvent type hydrocarbon compounds were detected in the vadose zone soil moisture samples.  Four compounds detected in the soil moisture (acetone, benzene, 1,2-dichlorobenzene and 1,4-dichlorobenzene) were also detected in groundwater samples collected during the SWAT program.

59.   Powerine is informed and believes and thereon alleges that in approximately 1993, the Regional Board required further evaluation of the potential for leaching from the Kalico 1 Source Property. Additionally, the Regional Board required that a corrective action plan be developed.

60.   Powerine is informed and believes and thereon alleges that in response to the 1993 Regional Board requirements, AGE conducted monitoring and sampling activities at the Kalico 1 Source Property in July and early August of 1994. Groundwater sampling conducted by AGE detected elevated concentrations of benzene as well as concentrations of toluene, ethylbenzene and total xylenes in groundwater.

61.   Powerine is informed and believes and thereon alleges that groundwater sampling conducted by AGE in January 1997 and September 1998 revealed concentrations of benzene in groundwater in excess of regulatory standards.

62.   Powerine is informed and believes and thereon alleges that the hazardous substances present in the soil at the Kalico 1 Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone and benzene, posing a continuing threat to the regional groundwater and the health of area residents.

63.  Powerine is informed and believes and thereon alleges that the extent of on-site contamination at the Kalico 1 Source Property has not been fully delineated vertically and laterally.  Powerine is informed and believes and thereon alleges that Third Party Defendants Colette M. Meyer, Marian F. Rawlins and Donald E. Rawlings in their individual rights or as trustees of the Rawlins Family Trust have not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor have Third Party Defendants Colette M. Meyer, Marian F. Rawlins and Donald E. Rawlings in their individual rights or as trustees of the Rawlins Family Trust adequately monitored the extent to which contaminants continue to migrate from the Kalico No. 1 Source Property into off-site groundwater. The Kalico 1 Source Property does not have an adequate groundwater monitoring system in place that is sufficient to demonstrate that releases from the Kalico 1 Source Property to regional groundwater above health-based levels has been fully controlled.

### *Kalico 3 Source Property*

64.  Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at, or adjacent to 12201 Greenstone Avenue, Santa Fe Springs, California, more specifically identified by Assessor's Parcel Number APN: 8026-020-017 (the "Northern Kalico 3 Property").

65.  Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at, or adjacent to 12201 Greenstone Avenue, Santa Fe Springs, California, more specifically identified by Assessor's Parcel Number APN: 8026-041-035, referred to herein as the "Southern Kalico 3 Property".  The Northern Kalico 3 Property and the Southern Kalico 3 Property shall be collectively referred to as the "Kalico 3 Source Property."

66.  Powerine is informed and believes and thereon alleges that from at least 1956 and continuing through 1962, the Kalico 3 Source Property was permitted and operated as a solid waste disposal facility by the County of Los Angeles Industrial Waste Division, Permit No. 2265 dated May 17, 1960.

67.  Powerine is informed and believes and thereon alleges that operations at the Kalico 3 Source Property included the acceptance and disposal of certain liquids including but not limited to paint in drums, drilling muds, sludge from automobile wash racks, and cutting oils.  Powerine is informed and believes and thereon alleges that no liners or leachate recovery system was utilized in the waste disposal operations that occurred at the Kalico 3 Source Property.

68.  Powerine is informed and believes and thereon alleges that from at least 1993 and continuing to the present, Third Party Defendants Colette M. Meyer, Marian F.  Rawlins and Donald E. Rawlings in their individual rights or as trustees of the Rawlins Family Trust have owned the Southern Kalico 3 Property.

69.  Powerine is informed and believes and thereon alleges that from at least 1993 and continuing to the present, Third Party Defendants Deborah Corrinne Wells and Lee Bryant Marston, Co-Trustees of the Frances M. Marston Credit Shelter Trust Dated July 14, 2012 have owned the Northern Kalico 3 Property.

70.  Powerine is informed and believes and thereon alleges that from at least 1993 and continuing to the present, Third Party Defendant Mary E. Hiler Trustee of the Hiler Trust has owned the Northern Kalico 3 Property.

71.  Powerine is informed and believes and thereon alleges that hazardous substances, including but not limited to   1,1,1,TCA, 1,1-dichloroethene, 1,2-dichloroethene, 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone, freon, methyl ethyl ketone, benzene, and toluene were stored, used, or were otherwise present at the Kalico 3 Source Property.

72.  Powerine is informed and believes and thereon alleges that the operations and waste disposal practices at the Kalico 1 Source Property have resulted in one or

1  more hazardous substances, including but not limited to 1,1,1,TCA, 1,1-
2  dichloroethene, 1,2- dichloroethene, 1,2-dichlorobenzene, 1,4-dichlorobenzene,
3  acetone, freon, methyl ethyl ketone, benzene, and toluene, being placed onto the
4  ground or into the soil at or near the Kalico 1 Source Property.

5      73.  Powerine is informed and believes and thereon alleges that the hazardous
6  substances present in the soil at the Kalico 3 Source Property have migrated and
7  continue to migrate downward into the saturated zone beneath the property and have
8  come to be located in the groundwater, resulting in contamination of the
9  groundwater with 1,2-dichlorobenzene, 1,4-dichlorobenzene,acetone and benzene.

10     74.  Powerine is informed and believes and thereon alleges that beginning in
11 approximately 1990, a SWAT was conducted for the Kalico 3 Source Property by
12 ESI at the direction of the Regional Board.

13     75.   The SWAT program included the installation of four groundwater
14 monitoring wells and two suction lysimeters.

15     76.   Analytical results of groundwater samples indicated the presence of
16 elevated petroleum hydrocarbon contaminants, fuel type hydrocarbon contaminants
17 (including benzene, toluene, total xylenes and ethylbenzene). Chlorinated
18 hydrocarbons including but not limited to trichloroethylene and Cis 1,2
19 dichloroethene were also detected. Additionally, 1,2 dichlorobenzene, 1,3-
20 dichlorobenzene, 1,4-dichlorobenzene, vinyl acetate and vinyl chloride were also
21 detected.

22     77.  Analytical results from samples collected from the lysimeter indicated
23 that at least ten chlorinated, aromatic or solvent type hydrocarbon compounds were
24 detected in the vadose zone soil moisture samples.  Four compounds detected in the
25 soil moisture (acetone, benzene, 1,2-dichlorobenzene and 1,4-dichlorobenzene) were
26 also detected in groundwater samples collected during the SWAT program.

27     78.   Powerine is informed and believes and thereon alleges that in
28 approximately 1993, the Regional Board required further evaluation of the potential

for leaching from the Kalico 3 Source Property. Additionally, the Regional Board required that a corrective action plan be developed.

79.  Powerine is informed and believes and thereon alleges that in response to the 1993 Regional Board requirements, AGE conducted monitoring and sampling activities at the Kalico 3 Source Property in July and early August of 1994. Groundwater sampling conducted by AGE detected elevated concentrations of benzene as well as concentrations of toluene, ethylbenzene and total xylenes in groundwater.

80.  Powerine is informed and believes and thereon alleges that groundwater sampling conducted by AGE in January 1997 and September 1998 revealed concentrations of benzene in groundwater in excess of regulatory standards.

81.  Powerine is informed and believes and thereon alleges that the hazardous substances present in the soil at the Kalico 3 Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with 1,2-dichlorobenzene, 1,4-dichlorobenzene, acetone and benzene, posing a continuing threat to the regional groundwater and the health of area residents.

82.  Powerine is informed and believes and thereon alleges that the extent of on-site contamination at the Kalico 3 Source Property has not been fully delineated vertically and laterally.  Powerine is informed and believes and thereon alleges that Third Party Defendants Colette M. Meyer, Marian F. Rawlins and Donald E. Rawlings in their individual rights or as trustees of the Rawlins Family Trust, have not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor have Third Party Defendants Colette M. Meyer, Marian F. Rawlins and Donald E. Rawlings in their individual rights or as trustees of the Rawlins Family Trust, Deborah Corrinne Wells and Lee Bryant Marston, Co-Trustees of the Frances M. Marston Credit Shelter Trust Dated July 14, 2012, and

1  Mary E. Hiler Trustee of the Hiler Trust adequately monitored the extent to which
2  contaminants continue to migrate from the Kalico 3 Source Property into off-site
3  groundwater.  The Kalico 3 Source Property does not have an adequate groundwater
4  monitoring system in place that is sufficient to demonstrate that releases from the
5  Kalico 3 Source Property to regional groundwater above health-based levels has
6  been fully controlled.

7  *Copley Source Property*

8  83.   Powerine is informed and believes and thereon alleges that releases of
9  hazardous substances have occurred from property and businesses operating thereon,
10  located at, or adjacent to 11333 Greenstone Avenue, Santa Fe Springs, California,
11  more specifically identified by Assessor's Parcel Number APN: 8026-001-068 (the
12  "Copley Source Property").

13  84.   Powerine is informed and believes and thereon alleges that from at least
14  the 1920s and continuing for several decades thereafter, the Copley Source Property
15  was operated as a steel storage facility as well as truck maintenance and repair
16  facility. Operations included truck maintenance and repair, and fueling services
17  consisting of USTs and a fueling dispenser.

18  85.   Powerine is informed and believes and thereon alleges that two large
19  above-ground storage tanks ("ASTs") were present on the property dating back to at
20  least the mid 1920's.  Powerine is informed and believes and thereon alleges that an
21  abandoned dry hole oil well was previously located at the south central portion of the
22  Copley Source Property.

23  86.   Powerine is informed and believes and thereon alleges that a five foot
24  deep concrete lined pit was utilized as a clarifier and was located below the wood
25  slats overlaying the floor at the western portion of the truck maintenance facility at
26  the Copley Source Property.

27  87.   Powerine is informed and believes and thereon alleges that the operations
28  and waste disposal practices at the Copley Source Property have resulted in one or

more hazardous substances, including but not limited to petroleum hydrocarbons being placed onto the ground or into the soil at or near the Copley Source Property.

88.   Powerine is informed and believes and thereon alleges that the hazardous substances present in the soil at the Copley Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with petroleum hydrocarbons.

89.   Powerine is informed and believes and thereon alleges that from at least 1996 and continuing to the present Copley has owned the Copley Source Property.

90.   Powerine is informed and believes and thereon alleges that in or about August of 1990 four USTs were removed from the southeast portion of the Copley Source Property, and that soil samples collected from beneath these USTs revealed the presence of elevated levels of petroleum hydrocarbons.

91.   Powerine is informed and believes and thereon alleges that in or about February 1991, contaminated soils were excavated, treated on site and then used to backfill the excavations at the Copley Source Property. Powerine is informed and believes and thereon alleges that during these excavations, at least 100 cubic yards of contaminated soil was left in place due to access constraints.

92.   Powerine is informed and believes and thereon alleges that in or about November 1995, sampling of shallow soils in the vicinity of the truck maintenance facility at the Copley Source Property revealed the presence of Total Recoverable Petroleum Hydrocarbons ("TRPH") at approximately 12 inches below ground surface.

93.   Powerine is informed and believes and thereon alleges that in or about November 1995, six hydropunch groundwater samples were collected from the Copley Source Property and revealed the presence of gasoline range volatile fuel hydrocarbons in four of the six samples at the Copley Source Property.

94.   Powerine is informed and believes and thereon alleges that in or about March 1996, twelve hydro-punch groundwater samples were collected which revealed groundwater contamination throughout the Copley Source Property. Results of these groundwater samples revealed significant gasoline range hydrocarbon contamination up to 2,651 parts per billion (ppb).   Powerine is informed and believes and thereon alleges that these groundwater samples collected at the Copley Source Property also contained petroleum hydrocarbons including but not limited to, benzene, ethylbenzene, and xylene.

95.   As alleged above, releases of contaminants have occurred at the Copley Source Property and are continuing to occur.  Powerine is informed and believes and thereon alleges that the contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

96.   Powerine is informed and believes and thereon alleges that the extent of on-site contamination at the Copley Source Property has not been fully delineated vertically and laterally.  Powerine is informed and believes and thereon alleges that Third Party Defendants Copley has not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor has Third Party Defendant Copley adequately monitored the extent to which contaminants continue to migrate from the Copley 3 Source Property into off-site groundwater.  The Copley Source Property does not have an adequate groundwater monitoring system in place that is sufficient to demonstrate that releases from the Copley Source Property to regional groundwater above health-based levels has been fully controlled.

***Torco Source Property***

97.   Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at and/or adjacent to 12247 Lakeland Road, Santa Fe Springs, California,

1   more specifically identified by Assessor's Parcel Number APN: 8009-022-047 (the
2   "Torco Source Property").

3       98.   Powerine is informed and believes and thereon alleges that from at least
4   1942-1956 the Torco Source Property was developed and used as a re-refinery
5   facility.  Powerine is informed and believes and thereon alleges that processes during
6   re-refinery operations required filtration of oil through clay.  Powerine is informed
7   and believes and thereon alleges that as a result of this process, spent oily clay was
8   disposed of in a pit at the rear of the Torco Source Property.

9       99. Powerine is informed and believes and thereon alleges that from at least
10   1960 and continuing for several decades, the Torco Source Property was used for the
11   manufacturing, production, storage and blending of high performance motor oil and
12   oil products, including blending and packaging of motor oils, industrial oils and
13   automatic transmission fluids.

14       100. Powerine is informed and believes and thereon alleges that from at least
15   1989 and continuing to the present, D.A. Stuart has owned the Torco Source
16   Property.

17       101. Powerine is informed and believes and thereon alleges that hazardous
18   substances, were stored, used, or were otherwise present at the Torco Source
19   Property, and that the operations and waste disposal practices at the Torco Source
20   Property have resulted in one or more hazardous substances, including but not
21   limited to petroleum hydrocarbons, being placed onto the ground or into the soil at or
22   near the Torco Source Property.

23       102. Powerine is informed and believes and thereon alleges that the hazardous
24   substances present in the soil at the Torco Source Property have migrated and
25   continue to migrate downward into the saturated zone beneath the property and have
26   come to be located in the groundwater, resulting in contamination of the
27   groundwater with petroleum hydrocarbons.

28

103. Powerine is informed and believes and thereon alleges that in or about March and April of 1987, Conservtech installed 14 borings and collected soil samples at the Torco Source Property.  Analysis of these soil samples detected petroleum hydrocarbons in excess of 1,000 parts per million at the Torco Source Property.

104. Powerine is informed and believes and thereon alleges that in or about February 1989, Applied Geosystems installed five additional borings at the Torco Source Property.  Under directives of the Los Angeles County Department of Health Services, one boring was drilled in each of the areas previously identified as containing elevated petroleum hydrocarbon concentrations. Soil samples again revealed the presence of petroleum hydrocarbons.

105. Powerine is informed and believes and thereon alleges that Applied Geosystems also drilled two slant borings to assess the conditions beneath the tank farm at the Torco Source Property and soil samples collected in this area revealed petroleum hydrocarbon contamination in this area.

106. Powerine is informed and believes and thereon alleges that in or about May 1990 ERI, collected soil samples at the Torco Source Property from between 1-3 feet below ground surface. Analysis of these soil samples detected elevated petroleum hydrocarbons in the soil.

107. Powerine is informed and believes and thereon alleges that in or about June 1990, ERI removed a 7500 gallon underground diesel tank and the associated piping from the Torco Source Property. Powerine is informed and believes and thereon alleges that in or about July 1990 ERI removed a 1000 gallon underground waste oil tank from the Torco Source Property.

108. Powerine is informed and believes and thereon alleges that in or about October 1990, an area south and east of the main building at the Torco Source Property was excavated in an attempt to remove soil containing petroleum hydrocarbon contamination.   Powerine is informed and believes and thereon alleges

that during this investigation an additional area of hydrocarbon bearing soil was detected south of the building  as well as along the eastern portion of the Torco Source Property.

109. Powerine is informed and believes and thereon alleges that in or about June and July 1992 ERI drilled an additional 11 borings at the Torco Source Property.  These soil samples revealed the presence of petroleum hydrocarbons as well as benzene, toluene, ethylbenzene and xylene.

110. As alleged above, releases of contaminants have occurred at the Torco Source Property and are continuing to occur. Powerine is informed and believes and thereon alleges that the contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

111. Powerine is informed and believes and thereon alleges that the extent of on-site contamination at the Torco Source Property has not been fully delineated vertically and laterally.  Powerine is informed and believes and thereon alleges that Third Party Defendant D.A. Stuart Company has not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor has Third Party Defendant D.A. Stuart Company adequately monitored the extent to which contaminants continue to migrate from the Torco Source Property into off-site groundwater.  The Torco Source Property does not have an adequate groundwater monitoring system in place that is sufficient to demonstrate that releases from the Torco Source Property to regional groundwater above health-based levels has been fully controlled.

### *Griffith Source Property*

112. Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at, and/or adjacent to 12200 South Bloomfield Avenue, Santa Fe Springs,

1   more specifically identified by Assessor's Parcel Number 8026-042-013 (the
2   "Griffith Source Property").

3       113. From at least 1974 and continuing to at least May 1990, "Marathon Steel
4   Company" owned and/or occupied the Griffith Source Property.  Uses of the
5   property by Marathon Steel Company during this time included outside storage of
6   gasoline in one or more 55 gallon drums.  There were also two 10,000 gallon USTs
7   in use from at least 1974.

8       114. From at least 1990 and continuing to the present, Griffith Company has
9   owned and/or occupied the Griffith Source Property.  During this time the site was
10  has been as a corporate office, including a yard and a shop. In or about July 1991,
11  two 10,000 gallon USTs were installed, one for gasoline the other for diesel, and
12  four ASTs were installed to store oil and lubricants.

13      115. Powerine is informed and believes and thereon alleges that hazardous
14  substances, including gasoline and diesel fuel were stored, used, or were otherwise
15  present at the Griffith Source Property.  Operations and waste disposal practices
16  resulted in one or more hazardous substances, including but not limited to total
17  petroleum hydrocarbons as diesel, being placed onto the ground or into the soil at or
18  near the Griffith Source Property.  Upon information and belief, the hazardous
19  substances present in the soil at the Griffith Source Property have migrated and
20  continue to migrate downward into the saturated zone beneath the property and have
21  come to be located in the groundwater, resulting in contamination of the
22  groundwater with diesel-range petroleum hydrocarbons.

23      116. On or about May 29, 2003, the Santa Fe Springs Fire Department
24  ("SFSFD") inspected the Griffith Source Property which revealed a number of
25  violations of the UST system regulations for both of the tanks and the piping.  These
26  violations included the absence of properly functioning audible and visual UST
27  system alarms, UST system releases not reported/recorded, that sensors for the UST
28  system leak detection were not placed at the earliest opportunity, and automatic line

leak detectors were not certified annually.  Further violations included no approved monitoring plan, and no current emergency response plan, all as required by law.

117. The May 2003 UST Inspection Report noted that the dispenser's "spill buckets were not tested because they were already tested 2/3/03 and both failed."  It also noted that "a line leak detector test was written as a violation on their [Griffith's] 12/17/01 report.  ...  The piping integrity test was not performed + is still under Second Notice of Violation due 5/30/03."

118. The May 2003 UST Inspection Report specifically noted that "the diesel dispenser is leaking into the soil and may not be used until the leak is repaired," and that "the diesel leak must be reported in accordance with" regulations. The diesel dispenser was red-tagged and secured.

119. During the summer of 2003, the UST system's piping and two dispensers were replaced.  In September 2003, two soil samples were taken, one from beneath each of the gasoline and diesel dispensers. The sample from beneath the diesel dispenser detected diesel concentrations.

120. On June 24, 2004, the SFSFD issued a letter to Griffith Company regarding its review of an October, 2003 "UST Sampling Report" describing the soil sampling activities associated with the UST Modification Permit's "UST upgrade work."  The letter recommended that no further action related to the UST modification was required at the time, but concurred with the report's "recommendation that the soils beneath the dispensers be further evaluated when the UST system or it's dispensers are permanently removed or site usage changes."

121. As alleged above, releases of contaminants have occurred at the Griffith Source Property and may be continuing to occur.  Based on the confirmed detection of TPH-diesel beneath the diesel dispenser, the long-time storage of gasoline and diesel fuels on the property, and the lack of overfill protection until 1998, there is a high likelihood that there have been releases of both gasoline and diesel fuels at the site.  These petroleum hydrocarbon contaminants continue to migrate away from the

Griffith Source Property, posing a continuing threat to the regional groundwater and the health of area residents.

122. Griffith Company has not taken adequate steps to remediate the on-site and near-site soils from which the contaminants are migrating. Nor has Griffith Company adequately monitored the extent to which contaminants continue to migrate from the Griffith Source Property into off-site groundwater. The Griffith Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels have been fully controlled.

123. Site soils at the Griffith Source Property are contaminated. Specific soil data from soil sampling activities in September 2003 are that total petroleum hydrocarbons as diesel were found in concentrations of 1080 mg/km (or ppm).

124. The extent of on-site contamination at the Griffith Source Property has not been fully delineated vertically or laterally. There remain other potential on-site contamination sources, including two 10,000 gallon underground storage tanks. Does not have an adequate groundwater monitoring system in place that is sufficient to demonstrate that releases from the Griffith Source Property to regional groundwater above health-based levels has been fully controlled.

**The Halliburton Source Property**

125. Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at, or adjacent to South 12320 Bloomfield Avenue, Santa Fe Springs, more specifically identified by Assessor's Parcel Numbers 8026-042-021 (the "Halliburton Source Property").

126. From at least 1940 until at least 1995, Halliburton owned and/or occupied the Halliburton Source Property. During this time the Halliburton Source Property was used as an oil field services facility.

127. Powerine is informed and believes and thereon alleges that hazardous substances, including volatile organic compounds ("VOCs") and total petroleum hydrocarbons ("TPH") were stored, used, or were otherwise present at the Halliburton Source Property.  Halliburton's operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to VOCs and TPH being placed onto the ground or into the soil at or near the Halliburton Source Property.  Upon information and belief, the hazardous substances present in the soil at the Halliburton Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with VOCs and TPHs.

128. Improvements and infrastructure on the Halliburton Source Property was demolished between April and July 1998. This activity generated approximately 7,000 tons of excavated, contaminated soil from various locations about the site, and groundwater monitoring has been undertaken at the Halliburton Source Property from September 1997 through March 2000. Results indicate the site is contaminated with VOCs and TPHs.

129. The Regional Board states that the groundwater beneath the Halliburton Source Property is contaminated with VOCs and TPHs, both from previous operations at the Halliburton Source Property, and from an up-gradient source. On July 24, 2002, the Regional Board stated in its "Remediation Section Case Review Form" that "Halliburton is required to participate in a region-wide groundwater cleanup in the future to abate the cumulative effect of multiple sources of groundwater contamination in the Santa Fe Springs area."

130. As alleged above, releases of contaminants have occurred at the Halliburton Source Property and are continuing to occur. Groundwater contamination including TPHs and VOCs is confirmed on the Halliburton Source Property.  The contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

131. Halliburton has not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor has Halliburton adequately monitored the extent to which contaminants continue to migrate from the Halliburton Source Property into off-site groundwater. The Halliburton Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels has been fully controlled.

### The Kelly Pipe Source Property

132. Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at, or adjacent to 11700 Bloomfield Avenue, Santa Fe Springs, more specifically identified by Assessor's Parcel Number 8026-018-010 (the "Kelly Pipe Source Property").

133. From at least 1973 and continuing to the present, Kelly Pipe Company, LLC owned and/or operated the Kelly Pipe Source Property.  During this time the Kelly Pipe Source Property was used as a pipe fabrication and modification facility.

134. Powerine is informed and believes and thereon alleges that hazardous substances, including TPH and VOCs were stored, used, or were otherwise present at the Kelly Pipe Source Property.  Kelly Pipe's operations and waste disposal practices resulted in one or more hazardous substances, including but not limited to TPH and VOCs, being placed onto the ground or into the soil at or near the Kelly Pipe Source Property.  Upon information and belief, the hazardous substances present in the soil at the Kelly Pipe Source Property have migrated and continue to migrate downward into the saturated zone beneath the Property and have come to be located in the groundwater, resulting in contamination of the groundwater with TPH and VOCs.

135. Kelly Pipe's operations on the Kelly Pipe Property included fabricating, modifying and distributing various types of steel and plastic pipes, including asphalt

coated pipes; processes also included machining on pipes using chlorinated solvents and cutting oil.

136. During approximately 1973 to 1989, Kelly Pipe operated and maintained three USTs on the Kelly Pipe Source Property.  One of these was a 10,000 gallon UST used for gasoline, another 10,000 gallon UST used for diesel fuel, and the third was a 2,000 gallon UST used for both gasoline and diesel at various times.

137. On or about August 16, 1988, Kelly Pipe applied to the City of Santa Fe Springs Fire Department for a permit to remove two USTs. On or about August 23, 1988 the two 10,000 gallon USTs were removed.  Soil samples taken during this removal process indicated the soil was contaminated with diesel fuel.  On or about December 20, 1988 the 2,000 gallon UST was removed.  Soil samples subsequently conducted revealed diesel fuel hydrocarbon contamination was present in the 2,000 gallon tank pit.

138. On or about February 6, 1989, approximately 150 cubic yards of hydrocarbon-contaminated soil was excavated and removed from the 2,000 gallon tank pit. Soil samples taken during this removal process indicated the majority of the contamination present was diesel fuel. A chemical oxidation treatment procedure was implemented; samples subsequently taken showed that further treatment was required to decontaminate a quarter of the soil tested, however there is no evidence of any such further treatment or decontamination.

139. The environmental consulting firm that conducted the 1988-89 investigation at the Kelly Pipe Source Property, Environmental Geotechnical Services, determined that the cause of the contamination was the catastrophic failure of the piping associated with both (a) the two 10,000 gallon UST system, estimated to have occurred between 1976 and 1979, and (b) the 2,000 gallon UST system, estimated to have occurred between 1978 and 1981.

140. On or about September 8, 1995, the Los Angeles County Department of Public Works ("LADPW") conducted a Hazardous Materials Underground Storage

inspection of the Kelly Pipe operations on the Kelly Source Property. Reported violations of regulations applicable to UST systems include failure to maintain leak detection records for the previous 12 months, no third party certification of leak detection method, no certification of financial responsibility, and no maintenance certificate for the UST monitoring system, as required by law.

141. On or about January 30, 1996, the LADPW sent Kelly Pipe a "Notice of Non-Compliance Hazardous Materials Underground Storage Permit" for the Kelly Source Property operations. Reported violations of regulations applicable to UST systems include failure to submit proof of both certification of financial responsibility, and certification for leak alert/monitoring systems, as required by law.

142. In November 1998, the City of Santa Fe Springs Fire Department inspected the Kelly Pipe Source Property. Reported violations of regulations applicable to the 10,000 gallon diesel UST system include failure to test the integrity of the tank and of the pressurized piping within the previous 12 months, failure to certify a monitor for the tank or the piping within the previous 12 months, failure to annually maintain or calibrate leak detection equipment, failure to install a mechanical or an electronic line leak detector, and failure to conduct continuous sump monitoring for the piping, as required by law.

143. As a result of this November 1998 inspection, the City of Santa Fe Springs Fire Department sent Kelly Pipe a Notice of Violation ("NOV") regarding its operations on the Kelly Source Property. The NOV instructed Kelly Pipe to use control and practices which prevent spillage and overflows from tank systems.

144. In December 1998, Kelly Pipe obtained a permit from the City of Santa Fe Springs for UST "modification" including mechanical leak detection and testing, and 'upgrade' including an overfill prevention system.

145. On or about January 5, 1999, the City of Santa Fe Springs Fire Department sent Kelly Pipe another NOV regarding its operations on the Kelly Source Property. Reported violations of regulations applicable to UST systems

include failure to install an automatic line leak detector on UST pressurized piping, and failure to install an overfill protection valve infill tube, as required by law.

146. On or about April 25, 1999 the Regional Board sent Kelly Pipe a letter requesting that it test for MTBE on the Kelly Pipe Source Property and submit a report. A follow-up letter was sent on or about September 19, 2000, requesting submittal of the then-delinquent soil investigation report.

147. On or about August 14, 2000, an inspection of the UST systems on the Kelly Pipe Source Property was conducted. Reported violations of regulations applicable to the 10,000 gallon diesel UST system include failure to test the integrity of the tank and of the pressurized piping within the previous 12 months, failure to submit an annual inventory reconciliation, failure to calibrate meters annually, and failure to perform manual gauging weekly, no mechanical leak detector with an automatic flow restrictor, and no documentation showing leak alarms having been recorded and/or reported, as required by law.

148. In May 2003, accumulations of surficial liquid and asphaltic cutting oil from the concrete surface surrounding several pipe threading machines were removed from the Kelly Pipe Source Property. Soil borings were subsequently conducted in the area and analyzed, with several areas of elevated concentrations of both TRPHs and VOCs found to be of environmental concern, requiring additional site assessment. There is no evidence of any such additional site assessment occurring.

149. On or about March 23, 2005, the City of Santa Fe Springs Fire Department inspected the Kelly Pipe Source Property. Reported violations of regulations applicable to the 10,000 gallon diesel UST system include failure to record monthly inspections, failure to maintain the system's spill containers in good condition and liquid free, failure to ensure the spill container's drain is functional, and failure to certify the automatic line leak detector, as required by law.

150. As alleged above, releases of contaminants have occurred at the Kelly Pipe Source Property and are continuing to occur.  The Kelly Pipe regulatory record is replete with violations of the laws associated with UST systems and their integrity, particularly as to contaminant leak occurrence, detection and reporting. The contaminants continue to migrate away from the Kelly Pipe Source Property, posing a continuing threat to the regional groundwater and the health of area residents.

151. Kelly Pipe has not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor has Kelly Pipe adequately monitored the extent to which contaminants continue to migrate from the Kelly Pipe Source Property into off-site groundwater.  Site soils in several areas at the Kelly Pipe Source Property near the former pipe threading machines contained concentrations of both TRPHs and VOCs sufficiently elevated to be of environmental concern. The extent of on-site contamination at the Kelly Pipe Source Property has not been fully delineated, and there is not a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels has been fully controlled.

### *The SE Source Property*

152. Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at, and adjacent to 11832 Bloomfield Avenue, Santa Fe Springs, more specifically identified by Assessor's Parcel Number 8026-019-013 (the "SE Source Property").

153. SE Pipe Line has owned and/or occupied the SE Source Property since at least the mid-1980's. During this time uses of the site included construction, engineering, and maintenance of fuel and oil transmission and distribution pipelines.

154. Powerine is informed and believes and thereon alleges that hazardous substances, including TPH and associated other contaminants were stored, used, or were otherwise present at the SE Source Property.  SE Pipe Line's operations and

waste disposal practices resulted in one or more hazardous substances, including but not limited to total petroleum hydrocarbons and associated contaminants, being placed onto the ground or into the soil at or near the SE Source Property.  Upon information and belief, the hazardous substances present in the soil at the SE Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with TPHg, TPHd, BTEX compounds, MTBE, and organic lead, among other hazardous substances.

155. Fuels historically stored underground on the SE Source Property include gasoline of two different ages, the older including lead and the newer including oxygenates, and diesel fuel. By 1984, three UST systems were in operation on the SE Source Property, including one 10,000 gallon gasoline tank, one 2,000 gallon gasoline tank, and one 2,000 gallon diesel tank. Associated dispenser islands for these tanks had been installed as late as 1968. In 1984 these three tanks were abandoned in place by filling with slurry.  No soil investigation or tank integrity testing was done in conjunction with this abandonment.

156. In August 1998, three UST systems with their associated hardware were removed from the SE Source Property.  These included one 20,000 gasoline UST, one 10,000 gallon gasoline UST, and one 10,000 gallon diesel UST.  The dispensers for these tanks were located in the same area as the aforementioned slurry-filled USTs. Characterization was not fully completed to delineate the lateral or vertical extents of the impacted soil.

157. In September 1998, two rounds of soil sampling were performed to investigate the vertical and lateral extents of impacts near the dispenser island. Analytical soil sample results from these removal and excavation efforts showed elevated concentrations of TRPH, TPHs, TPHmo, xylenes and organic lead. Approximately 50 cubic yards of impacted soil was disposed of.  Characterization

1   was not fully completed to delineate the lateral or vertical extents of the impacted

2   soil.

3       158. In December 1998, two of the aforementioned three slurry-filled 2,000

4   gallon USTs were removed under directive of the Santa Fe Springs Fire Department.

5   Approximately 140 tons of impacted soil was excavated. Analytical soil sample

6   results indicated elevated concentrations of TPHg, BTEX compounds and MTBE.

7       159. In February 2011, Powerine's groundwater monitoring well "W-15A"

8   located near the SE Source Property contained concentrations of gasoline-related

9   compounds that had dramatically increased over and above all prior sampling events.

10  By July, free-phase petroleum hydrocarbons ("FPPH") were detected at thicknesses

11  greater than one foot.  The FPPH contained a mixture of fuels, including two types

12  of gasoline (one older and leaded, the other newer with oxygenates) as well as diesel

13  fuel.

14      160. Fuels historically stored underground on the SE Source Property include

15  gasoline of two different ages, the older including lead and the newer including

16  oxygenates, and diesel fuel. The profile of the various fuels stored in and on the SE

17  Source Property correlates nearly exactly with the profile of the fuel products

18  detected in samples from Powerine's well W15-A.

19      161. As alleged above, releases of contaminants have occurred at the SE

20  Source Property and are continuing to occur.  Four UST's and their associated

21  system hardware responsible for the releases were removed, and characterization of

22  the remaining soils was not fully completed.  The contaminants continue to migrate

23  away from the property, posing a continuing threat to the regional groundwater and

24  the health of area residents.

25      162. SE Pipe Line has not taken adequate steps to remediate the on-site and

26  near-site soils from which contaminants are migrating, nor has SE Pipe Line

27  adequately monitored the extent to which contaminants continue to migrate from the

28  SE Source Property into off-site groundwater.  The SE Source Property does not

1   have a groundwater monitoring system in place that is sufficient to demonstrate that

2   releases from the property to regional groundwater above health-based levels has

3   been fully controlled.

4       163. Site soils at the SE Source Property are contaminated with TPHg, TPHd,

5   BTEX compounds, MTBE, and organic lead among other hazardous substances. The

6   extent of on-site contamination at the SE Source Property has not been fully

7   delineated, and there is not a groundwater monitoring system in place that is

8   sufficient to demonstrate that releases from the property to regional groundwater

9   above health-based levels have been fully controlled.

10  ***Strecker Source Property***

11      164. Powerine is informed and believes and thereon alleges that releases of

12  hazardous substances have occurred from property and businesses operating thereon,

13  located at, or adjacent to 11922 Bloomfield Avenue, Santa Fe Springs, more

14  specifically identified by Assessor's Parcel Number 8026-019-010 (the "Strecker

15  Source Property").

16      165. From at least the early 1970's and continuing through at least the mid-

17  1980's, Strecker Construction ("Strecker") owned and/or occupied the Strecker

18  Source Property.  During this time the Strecker Source Property was used the

19  headquarters, project staging, and maintenance facility for a road resurfacing

20  operations. From approximately 1988 and continuing to the present, Roy Allen

21  Slurry Seal, Inc. has occupied the Strecker Source Property, and has used the

22  property as the headquarters, project staging, and maintenance facility for road

23  resurfacing operations.

24      166. Powerine is informed and believes and thereon alleges that hazardous

25  substances, including petroleum hydrocarbons were stored, used, or were otherwise

26  present at the Strecker Source Property.  Strecker's operations and waste disposal

27  practices resulted in one or more hazardous substances, including but not limited to

28  petroleum hydrocarbons, being placed onto the ground or into the soil at or near the

Strecker Source Property.  Upon information and belief, the hazardous substances present in the soil at the Strecker Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater with petroleum hydrocarbons.

167. From at least February 1972 until approximately 1987, Strecker used four tanks in its UST system to store and dispense diesel and gasoline fuels. On or about February 18, 1972, the City of Santa Fe Springs Fire Department issued a permit to Strecker for three USTs; two 4,000 gallon tanks for gasoline, and one 10,000 gallon tank for diesel. On or about December 1, 1987 four USTs were removed from the Strecker Source Property. Also removed were a clarifier system and two pump (or dispenser) islands. No records have been located permitting the fourth tank, recorded as either 900 or 1,000 gallons in capacity.

168. Soil sampling conducted incident the removal of the USTs exhibited elevated concentrations of TRPH, TPHg, and TPHd up to 68,400 mg/kg, 1,450 mg/kg, and 11,500 mg/kg, respectively. Despite the fact that these concentrations suggest a strong likelihood for impacts to underlying groundwater, there has never been any investigation of impacts to groundwater at or from the Strecker Source Property. While some limited soil removal was conducted in the area where the USTs had been located, there is no indication that source control was achieved so as to eliminate continuing impacts to groundwater.

169. Third Party Defendant Allan Trust has not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating, nor has Allan Trust adequately monitored the extent to which contaminants continue to migrate from the Strecker Source Property into off-site groundwater.  The Strecker Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels has been fully controlled.

1

*Ashland Source Property*

2      170. Powerine is informed and believes and thereon alleges that releases of

3  hazardous substances have occurred from property and businesses operating thereon,

4  located at, or adjacent to a location formerly known as 10505 South Painter, in Santa

5  Fe Springs, California, since subdivided and now identified as 13161-13198

6  Sandoval Street and 13157-13195 Flores Street, and more specifically identified by

7  Assessor's Parcel Numbers 8011-014-54 through 8011-014-74 and 8011-014-76 (the

8  "Ashland Source Property").

9      171. From at least 1962 and continuing through 2001, Ashland owned the

10  Ashland Source Property. During Ashland's ownership, the Ashland Source Property

11  was used as a chemical blending, repackaging, storage and distribution facility and

12  waste storage and transfer facility, including numerous fixed above ground and

13  underground storage tanks and tank and barrel storage areas.

14      172. Subsequent to closing of the Ashland facility in early 2002, the property

15  was sold to Painter Business Park LLC, who subdivided and redeveloped the

16  property as Painter Business Park, an industrial park consisting of 16 separate

17  parcels.

18      173. Powerine is informed and believes and thereon alleges that hazardous

19  substances, including industrial chemicals and wastes, new and spent halogenated

20  and non-halogenated solvents, alcohols, ketones, glycols, caustics, chromium

21  compounds and hydrocarbon compounds were stored, used, or were otherwise

22  present at the Ashland Source Property. Ashland's operations and waste disposal

23  practices resulted in various hazardous substances, including but not limited to those

24  described above, being placed onto the ground or into the soil at or near the Ashland

25  Source Property.

26      174. By at least 1988, environmental investigation at, around and below the

27  Ashland Source Property had established that hazardous substances were present in

28  the soil at the Ashland  Source Property, and had migrated and continue to migrate

downward into the saturated zone underneath the property, and have come to be located in the groundwater, resulting in contamination of the groundwater with various substances, including without limitation TPH, and tetrachloroethene, trichloroethene, vinyl chloride, and related products and by-products of the natural dechlorination of these compounds.

175. Since 1988 and continuing to the present, Ashland has undertaken a variety of investigation activities and remedial measures to respond to these soil and groundwater impacts at and around the Ashland Source Property, pursuant to directives issued by the Regional Board.

176. As alleged above, releases of contaminants have occurred at the Ashland Source Property and are continuing to occur. The contaminants continue to migrate away from the property, posing a continuing threat to the regional groundwater and the health of area residents.

177. Ashland has not taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating. Nor has Ashland adequately characterized and monitored the extent to which contaminants continue to migrate from the Ashland Source Property into off-site groundwater. The Ashland Source Property does not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the property to regional groundwater above health-based levels has been fully controlled.

***Water Well Supply Source Property***

***Geary Five LLC Source Property***

178. Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon, located at 11234 South Norwalk Boulevard, more specifically identified by Assessor's Parcel Number 8025-001-015 (the "Water Well Supply Source Property"), and the adjacent property located at 11212 South Norwalk Boulevard,

more specifically identified by Assessor's Parcel Number 8025-001-014 (the "Geary Five LLC Source Property").

179. From at least 1967 and continuing through the present, Water Well Supply owned and operated the Water Well Supply Source Property as a shop and maintenance facility for water well drilling and maintenance equipment and supplies. Until approximately 1998, Water Well Supply also operated a fueling services facility at the site consisting of USTs and a dispenser. The fueling services facility was removed in 1998.

180. Powerine is informed and believes and thereon alleges that in the early 1970's through at least 1978, Cascade Pump operated a machine shop facility at the Geary Five LLC Source Property, and that an UST located under the Geary Five LLC Source Property was removed in 1998. From 2012 and continuing to the present, Geary Five LLC has owned the Geary Five LLC Source Property, which is presently vacant.

181. Powerine is informed and believes and thereon alleges that hazardous substances, including petroleum, hydrocarbons and chlorinated hydrocarbons were stored, used, or were otherwise present at the Water Well Supply Source Property and adjacent Geary Five LLC Source Property. The operations and waste disposal practices of Water Well Supply and Cascade Pump resulted in hazardous substances, including but not limited to petroleum, hydrocarbons, and chlorinated hydrocarbons being placed onto the ground or into the soil at or near the Water Well Supply Source Property and adjacent Geary Five LLC Source Property. Upon information and belief, the hazardous substances present in the soil and in soil vapor at the properties have migrated and continue to migrate downward into the saturated zone under the properties and have come to be located in the groundwater, resulting in contamination of the groundwater with petroleum, hydrocarbons, and chlorinated hydrocarbons.

182. In May 1999, during removal of underground fuel storage tanks at the Water Well Supply Source Property and the adjacent Geary Five LLC Source Property, workers discovered petroleum and hydrocarbon compounds in the soil surrounding the excavation. Further investigation of soil and groundwater at these locations revealed concentrations of various contaminants in excess of regulatory limits, including petroleum hydrocarbons, and chlorinated hydrocarbons.

183. Groundwater samples taken from under the Water Well Supply and Geary Five LLC Source Properties during the period from 2002 through 2012 have contained trichloroethene and dichloroethene, benzene, toluene, ethylbenzene, and xylenes, and related and degradation products of these compounds in excess of regulatory thresholds.

184. As alleged above, releases of contaminants have occurred at the Water Well Supply Source Property and the Geary Five LLC Source Property, and are continuing to occur. The contaminants continue to migrate away from the properties, posing a continuing threat to the regional groundwater and the health of area residents.

185. Neither Water Well Supply nor Geary Five LLC has taken adequate steps to remediate the on-site and near-site soils from which contaminants are migrating. Neither Water Well Supply nor Geary Five LLC has adequately monitored the extent to which contaminants have migrated and continue to migrate from the Water Well Supply Source Property and the Geary Five LLC Source Property into off-site groundwater. The Water Well Supply Source Property and the Geary Five LLC Source Property do not have a groundwater monitoring system in place that is sufficient to demonstrate that releases from the properties to regional groundwater above health-based levels has been fully controlled.

***The Caminol Source Property***

186. Powerine is informed and believes and thereon alleges that releases of hazardous substances have occurred from property and businesses operating thereon,

located at, and adjacent to 11401 Greenstone Avenue in Santa Fe Springs, California, more specifically identified by Assessor's Parcel Number 8026-018-023 (the "Caminol Source Property").

187. Ultramar is the successor by acquisition of Beacon Oil Company that had previously operated under the names "The Caminol Company, Ltd." or "Caminol Company," and which owned and operated an oil refinery at the Caminol Source Property from approximately 1931 to 1949, during which time hazardous substances were used and disposed on or released from this facility.

188. From 1959 and continuing to at least the 1990s, Riverside Steel owned the Caminol Source Property, and operated a facility for fabrication and storage of steel construction components, during which time hazardous substances were used and disposed on or released from the facility.

189. Powerine is informed and believes and thereon alleges that hazardous substances, including petroleum hydrocarbons and chlorinated hydrocarbons were stored, used, or were otherwise present at the Caminol Source Property. The operations and waste disposal practices of Beacon, as Ultramar's predecessor, and of Riverside Steel, resulted in one or more hazardous substances, including but not limited to petroleum hydrocarbons, chlorinated hydrocarbons, lead and other metals being placed onto the ground or into the soil at or near the Caminol Source Property. Upon information and belief, the hazardous substances present in the soil at the Caminol Source Property have migrated and continue to migrate downward into the saturated zone under the property and have come to be located in the groundwater, resulting in contamination of the groundwater with petroleum hydrocarbons, chlorinated hydrocarbons, lead, and other metals.

190. Powerine is informed and believes and thereon alleges that a Phase II Environmental Site Assessment was conducted at the Caminol Source Property in 2003, which indicated impacts from chemical compounds and the need for further response actions.  Response actions, including characterization of impacts to soil,

1   soil vapor, and groundwater within the Caminol Source Property, have been
2   conducted under supervision of the Regional Board since at least 2006.

3   191. The characterization work to date has established the presence of
4   petroleum products and wastes, chlorinated solvents, and lead and other metals in
5   soil and soil vapor and in groundwater at concentrations above regulatory limits.
6   These compounds include benzene, ethylbenzene, toluene and xylenes, and related
7   compounds and degradation byproducts of these compounds; metals including
8   arsenic and lead; and tetrachlorethene, trichloroethene, related compounds and
9   degradation byproducts of these compounds. Notwithstanding directives to do so,
10  responsible parties have not yet undertaken actions to characterize the scope and
11  extent of groundwater impacts emanating off-site from the Caminol Source Property.

12  192. As alleged above, releases of contaminants have occurred at the Caminol
13  Source Property and are continuing to occur. The contaminants continue to migrate
14  away from the property, posing a continuing threat to the regional groundwater and
15  the health of area residents. Neither Ultramar nor Riverside Steel have taken
16  adequate steps to remediate the on-site and near-site soils from which contaminants
17  are migrating. Neither Ultramar nor Riverside Steel has adequately monitored the
18  extent to which contaminants continue to migrate from the Caminol Source Property
19  into off-site groundwater. The Caminol Source Property does not have a
20  groundwater monitoring system in place that is sufficient to demonstrate that
21  releases from the property to regional groundwater above health-based levels has
22  been fully controlled.

### FIRST CLAIM FOR RELIEF

**(Public Nuisance – Against All Third Party Defendants)**

25  193. Plaintiff refers to and realleges the matters set forth in
26  paragraphs 1 through 192 above and incorporates them herein by reference.

27  194. The hazardous substances that are discharging to the Southern Area of
28  the OU-2 Facility from each Third Party Defendant's Source Property constitute a

public nuisance under California Civil Code §§ 3479 and 3480 because these conditions are injurious to health, constitute an obstruction to the free use of property, and interfere with the comfortable enjoyment of life or property.

195. This public nuisance affects an entire community or neighborhood, or a considerable number of people at the same time because it threatens the health and safety of all those who come near contaminated soils as described herein, or who use waters from public sources affected by groundwater that is now or is now threatened to be contaminated with the hazardous substances described above.

196. As a proximate result of the nuisance conditions at and around each Third Party Defendant's Source Property, Powerine has incurred and continues to incur special damages distinct from those incurred by the public because Powerine has been compelled under governmental authority to respond to groundwater contamination caused by the acts and omissions of the Third Party Defendants.

## SECOND CLAIM FOR RELIEF

### (Equitable Indemnity – Against All Third Party Defendants)

197. Powerine refers to and realleges the matters set forth in paragraphs 1 through 196 above and incorporates them herein by reference.

198. The liability, if any, that Powerine may have to Plaintiffs or to any other person or entity, including without limitation, any governmental or regulatory agency, relating to the Southern Area of the OU-2 Facility is the result of the acts or omissions of Third Party Defendants.

199. If and to the extent Powerine is liable to Plaintiffs or to any person, entity, or governmental agency relating to the Southern Area of the OU-2 Facility, Powerine's liability is, under equitable principles, derivative and secondary to the direct and primary liability arising from the actions, omissions, or conduct of Third Party Defendants. Each Third Party Defendant is accordingly bound and obligated to indemnify and hold harmless Powerine for costs or damages that have been, or will be incurred by Powerine in response to releases of hazardous

substances to the Southern Area of the OU-2 Facility that were caused or contributed to by Third Party Defendants.

<b><u>THIRD CLAIM FOR RELIEF</u></b>

<b>(Contribution– Against All Third Party Defendants)</b>

200. Powerine refers to and realleges the matters set forth in paragraphs 1 through 199 above and incorporates them herein by reference.

201. Section 1432 of the California Civil Code provides in pertinent part: "a party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all may require a proportionate contribution from all the parties joined with him."

202. As a direct and proximate result of releases of hazardous substances to the Southern Area of the OU-2 Facility from each Third Party Defendant's Source Property as alleged above, Powerine has and will continue to incur response costs in connection with groundwater contamination in the Southern Area of the OU-2 Facility in excess of Powerine's proportionate responsibility for such contamination.

203. Powerine is entitled to contribution from each Third Party Defendant, according to common law principles of comparative fault and equitable allocation of loss and under applicable state statutory law, based on the releases of hazardous substances from each Third Party Defendant's Source Property to the Southern Area of the OU-2 Facility.

<b><u>PRAYER FOR RELIEF</u></b>

Based on the foregoing, Third Party Plaintiff prays for judgment against each Third Party Defendant as follows:

**<u>FIRST CLAIM FOR RELEIF</u>**

1.     For a judgment directing that nuisance conditions at each Source Property be abated such that each Source Property ceases discharging hazardous substances to the Southern Area of the OU-2 Facility.

2.    For a judgment directing Third Party Defendants to remediate hazardous substances already discharged to the Southern Area of the OU-2 Facility from their Source Properties.

3.    For reimbursement to Powerine's insurers of costs incurred to investigate hazardous substances in the Southern Area of the OU-2 Facility that did not originate from the Former Powerine Refinery or from Powerine's operations.

**SECOND CLAIM FOR RELIEF**

1.    For a judgment directing Third Party Defendants to equitably indemnify Powerine for costs or damages that have been, or will be, incurred by Powerine in response to Plaintiffs' claims against Powerine for hazardous substances in the Southern Area of the OU-2 Facility that did not originate from the Former Powerine Refinery or from Powerine's operations.

**THIRD CLAIM FOR RELIEF**

1.    For contribution from each Third Party Defendant for response costs that have been or will be incurred by Powerine in response to Plaintiffs' claims against Powerine for hazardous substances in the Southern Area of the OU-2 Facility that did not originate from the Former Powerine Refinery or from Powerine's operations.

**ALL CLAIMS FOR RELIEF**

1.    For such other and further relief as this Court deems just and proper.


Respectfully submitted,

Dated: March 20, 2015          ISOLA LAW GROUP, LLP

By: /s/DAVID R. ISOLA_____
        DAVID R. ISOLA

Attorneys for Defendant and Third Party Plaintiff, POWERINE OIL COMPANY