ROBERT P. DOTY (State Bar No. 148069)
rdoty@coxcastle.com
CHRIS GRIBBLE (State Bar No. 285337)
cgribble@coxcastle.com
COX, CASTLE & NICHOLSON LLP
50 California Street, Suite 3200
San Francisco, CA  94111
Telephone:   (415) 262-5100
Facsimile:   (415) 262-5199

Attorneys for Defendant
PALMTREE ACQUISITION CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCONIC INC., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> APC INVESTMENT CO., et al., <br><br> Defendants. | Case No. 2:14-CV-06456-GW(Ex.) <br><br> **MOVING DEFENDANTS' NOTICE OF MOTION; MOTION FOR SUMMARY JUDGMENT RE: STATUTE OF LIMITATIONS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> **DATE:      June 29, 2018** <br> **TIME:      8:30 a.m.** <br> **JUDGE:    The Honorable George Wu** <br> **PLACE:    Courtroom 9D** <br> **                  9th Floor** |

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10

MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

## **NOTICE OF MOTION**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 28, 2018 at 8:30 a.m. or as soon thereafter as counsel may be heard by the above Court, located at 350 West 1st Street, Los Angeles, CA, 90012, the Moving Defendants will move, and hereby do move, this Court for an order granting summary judgment against Plaintiffs on Plaintiffs First and Third Causes of Action (contribution and declaratory relief under CERCLA Section 113(f)).  This Motion is based upon this Notice of Motion and Motion For Order, the accompanying Memorandum of Points and Authorities in support thereof, the Declarations of Robert P. Doty and Sedina Banks, the Request for Judicial Notice, the Statement of Uncontroverted Facts and Conclusions of Law, and the Proposed Order, all filed concurrently herewith, and all of the pleadings, files, and records in this action, and upon such other matters as may be presented to the Court at the time of hearing.  This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on April 18, 2018.

Moving Defendants file this motion for summary judgment pursuant to Federal Rules of Civil Procedure, Rule 56, because undisputed facts demonstrate that Plaintiffs' contribution claims are time-barred by statute (42 U.S.C. § 9613(g)(3)(B).  Accordingly, the Moving Defendants' are entitled to a judgment as a matter of law. Moving Defendants respectfully requests this Court to grant summary judgment against Plaintiffs.

DATED:  April 30, 2018                    COX, CASTLE & NICHOLSON LLP


By:  ___/s/  Robert P. Doty_____
        Robert P. Doty
        Chris Gribble
        Attorneys for Defendants
        PALMTREE ACQUISITION
        CORPORATION

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
SAN FRANCISCO

071915\9666131v1                          - 1 -                         NOTICE OF MOTION
                                                                        2:14-CV-06456-GW-E

## **TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | STATEMENT OF FACTS | 3 |
| | A. The Site and the Parties | 3 |
| | B. The Nature of Plaintiffs' Claim | 4 |
| | C. The Response Costs Sought in This Action | 4 |
| | D. The Four Settlements Regarding the Omega Groundwater Plume Approved by Judge Hatter More Than Three Years Before the Instant Action was Filed in 2014 | 5 |
| | 1. Events Prior to the First (2001) Settlement | 5 |
| | 2. The 2001 Judicially Approved Settlement | 6 |
| | 3. The Period Between the 2001 Settlement and the Settlements Judicially Approved in 2006 and 2007 | 6 |
| | 4. The 2007 Judicially Approved Settlement | 7 |
| | a. Costs Addressed in The 2007 Settlement | 8 |
| | b. Definitions, Operative Provisions, and Scope of the Contract Documenting the 2007 Settlement | 9 |
| | 5. The Period Between March 2007 and the Final Settlement Approved by Judge Hatter (in 2010) | 11 |
| | 6. The 2010 Judicially Approved Settlement | 11 |
| III. | SUMMARY OF APPLICABLE LAW | 12 |
| | A. The Standard for Summary Judgment | 12 |
| | B. California's Rules for Contract Interpretation | 13 |
| | C. The Ninth Circuit's CERCLA § 113(g)(3)(B) Case Law | 13 |
| | 1. *Asarco v. Celanese Chemical* | 13 |
| | a. The Site and the Litigation | 14 |
| | b. The District Court's Opinion | 14 |
| | c. The Ninth Circuit's Opinion | 15 |
| | 2. *Whittaker Corp. v. United States* | 17 |
| IV. | ARGUMENT | 18 |
| | A. Element No. 1 is Satisfied Because Plaintiffs Seek Contribution. | 19 |
| | B. Element No. 2 is Clear—Groundwater Costs are the Focus of Plaintiffs' Claims | 19 |

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - i -          MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

C.    Element No. 4 is Satisfied Because All Four Omega-Related Settlements Were Judicially Approved More Than Three Years Before Plaintiffs Filed This Contribution Action..................................................................19

D.    Element No. 3 is Satisfied by a Straightforward Application of *ASARCO* to the Undisputed Facts. ...............................................................19

    1.    All of the Costs Now At Issue Are Within the Costs Addressed by the 2007 Settlement ..........................................................19

    2.    The 2007 Settlement is Comprehensive ............................................20

    3.    The 2007 Settlement Encompasses the Downgradient Properties Alleged to Give Rise to Plaintiffs' Claims.......................22

    4.    The Costs at Issue Do Not Qualify as a "Separate Set" Under Either *Whittaker* or *Capuano* .......................................................22

E.    The Other Judicially Approved Settlements Also Support Dismissal ......................23

V.    CONCLUSION .................................................................................................................25

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - ii -          MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*American Cyanamid v. Capuano*
  381 F.3d 6 (1st Cir. 2004) ............................................................18, 22, 24

*ASARCO, LLC v. Celanese Chem. Co.*
  2012 WL 2050253 (N.D. Cal. June 6, 2012) ............................13, 14, 15

*ASARCO, LLC v. Celanese Chem. Co.*
  792 F.3d 1203 (2015) ................................................................ passim

*Cavanaugh v. Southern California Permanente Medical Group, Inc.*
  583 F.Supp.2 1109 24 (C.D. Cal. 2008) ..................................................12

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ..............................................................................12

*Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*
  870 F.Supp.2d 881 (C.D. Cal. 2012) ....................................................13

*L'Garde, Inc. v. Raytheon Space and Airborne Systems*
  2013 WL 12113998 (C.D. Cal. 2013) ....................................................12

*Samson v. NAMA Holdings, LLC*
  637 F.3d 915 (9th Cir. 2011) ................................................................24

*United States v. Atlantic Research Corp.*
  551 U.S. 128 (2007) ..............................................................................24

*Whittaker Corp. v. United States*
  825 F.3d 1002 (2016 9th Cir.) ....................................................17, 18, 22

**State Cases**

*Bank of the West v. Superior Court*
  2 Cal.4th 1254 (1992) ..........................................................................13

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*
  69 Cal.2d 33 (1968) ..............................................................................13

**Federal Statutes**

42 U.S.C. § 107(a) ..................................................................................12

42 U.S.C. § 113 ......................................................................................12

42 U.S.C. § 113(f) ....................................................................................4

42 U.S.C. § 113(f)(2) ..............................................................................15

42 U.S.C. § 113(g)(3)(A) ........................................................................17

42 U.S.C. § 113(g)(3)(B) ................................................................ passim

42 U.S.C. § 122(g) ..................................................................................12

42 U.S.C. § 9601 ..................................................................................1, 4

42 U.S.C. § 9601(9)(B) ............................................................................4

42 U.S.C. § 9613(g)(3)(A) ......................................................................18

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10      - iii -      MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

42 U.S.C. § 9613(g)(3)(B)..................................................................................1, 16, 18

42 U.S.C. §107 ........................................................................................................17, 22

**State Statutes**

Cal. Civ. Code § 1636 ....................................................................................................13

Cal. Civ. Code § 1639 ....................................................................................................13

**Federal Regulations**

64 Fed. Register 2945 (19 January 1999)........................................................................9

**Federal Rule**

Fed. R. Civ. P. 56(c).....................................................................................................12

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                           - iv -                MOVING DEFENDANTS' P&A'S ISO MSJ
                                                                  2:14-CV-06456-GW-E

# I.   **INTRODUCTION**

This motion seeks a determination that Plaintiffs' first and third causes of action are barred by the three-year statute of limitations in 42 U.S.C. § 9613(g)(3)(B), the relevant provision within the statute that gives rise to this litigation (i.e., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* "CERCLA").

Both causes of action address "regional" groundwater contamination (or the "plume") emanating from the Omega Chemical Corporation Superfund Site in Whittier.   Plaintiffs began working on the plume more than 20 years ago, began litigating contribution claims for their cleanup costs almost 15 years ago, and filed this untimely contribution lawsuit (their third contribution action) in 2014.   CERCLA's statute of limitations does not permit plaintiffs' serial contribution litigation.   As the Ninth Circuit noted in *ASARCO, LLC v. Celanese Chem. Co.,* 792 F.3d 1203, 1215 (2015), such litigation frustrates one of CERCLA's objectives—the "diligent prosecution of contribution claims."

The application of CERCLA's statute of limitations, Section 113(g)(3)(B), involves four inquiries:  (1) the nature of the claim asserted; (2) the cleanup costs sought; (3) the existence of a judicially approved settlement with respect to those costs; and (4) the time elapsed between the judicially approved settlement and the commencement of the claimant's action.   Undisputed facts establish each element here as follows.

Plaintiffs' CERCLA claim is explicitly stated as one for contribution throughout the operative (Fifth Amended) complaint, starting on the caption page.

Paragraphs 2, 9, and 11 of that complaint tie the costs at issue to "regional" groundwater contamination.   Those paragraphs explain that Plaintiffs primarily seek "tens of millions in capital and operating expenditures" to pump and treat the impacted groundwater for "years to come."

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                              - 1 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
                                                                         2:14-CV-06456-GW-E

1    As to the last two elements – the timing and scope of prior settlements – more

2  than <u>seven</u> years have elapsed between the judicial approval of an agreement allocating

3  all of the cleanup costs for the Omega Superfund Site (the "2007 Settlement") and the

4  filing of this action.

5    The agreement documenting the 2007 Settlement does all of the following.  It

6  defines "Site" to mean the <u>entire</u> Superfund site, thus including the regional plume

7  (which the Court has heard the parties call Operable Unit 2, or "OU-2").  The

8  agreement defines "Regional Response Work" to mean cleanup efforts "request[ed]" or

9  "demand[ed]" by regulatory agencies regarding "regional groundwater contamination

10  alleged to be attributed to the Site."  It provides that "Regional Response Work" is a

11  "Settled Matter," not an "Excluded Matter."  Finally, it allocates "responsibilities" for

12  the "Site," and for the "Settled Matters," including cleanup costs "associated with the

13  Site" to Plaintiffs via their unincorporated association (OPOG) and a guaranty

14  agreement making 67 OPOG members jointly and severally liable if OPOG falters.

15    Before Judge Hatter approved the 2007 Settlement, EPA was already saying all

16  of the following: (1) the plume was miles long; (2) it was caused, in part, by businesses

17  <u>other</u> than the Omega processing plant; (3) it included chemicals not linked to the

18  Omega processing plant; and (4) it could be remediated by pumping and treating the

19  impacted water at a projected cost of $97.5 million, with approximately $91.1 million

20  corresponding to pumping and treating the "regional" plume.

21    When presented with a similarly comprehensive, decades-spanning settlement

22  agreement, Judge Alsup of the Northern District of California granted summary

23  judgment based on Section 113(g)(3)(B).  The Ninth Circuit affirmed in *ASARCO*.

24    Moving Defendants submit that they are entitled to the same relief here, and a

25  judgment should be entered in their favor and against Plaintiffs on the first and third

26  causes of action.

27  / / /

28  / / /

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10        - 2 -        MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

## II.   STATEMENT OF FACTS

### A.   The Site and the Parties[1]

This lawsuit arises from an approximately 4.5-mile "plume" of contaminated groundwater situated south/southwest of the former Omega Chemical Corporation processing plant in Whittier.  *SUF*, ¶ 1; Dkt. 526 ("*Fifth AC*"), ¶ 2.[2]  For the Court's reference, illustrative maps are provided in Tab A showing OU-1, OU-2, and the alleged downgradient source properties to which the Moving Defendants are linked in the *Fifth AC*.  The *Declaration of Sedina L. Banks In Support of Defendants' Motion for Summary Judgment Re: Statute of Limitations*, filed herewith, explains how the maps were created.

EPA proposed the Omega processing plant and the associated groundwater plume for inclusion on CERCLA's National Priorities List (also called the "Superfund" list) in 1998, with the listing becoming final in 1999.  *Doty Dec.*, Ex. 1, p. 1 and Ex. 2, p. 3:28-4:1.  The site was listed because of the "high level of hazardous substances in the groundwater."  *Doty Dec.*, Ex. 3, 2:24-3:5 (pleading submitted to Judge Hatter by the Department of Justice).

---

[1] Moving Defendants are Associated Plating Company, Associated Plating Company, Inc., Gordon E. McCann, Lynnea R. McCann, Darrell K. Golnick, Clare S. Golnick, Cheryl A. Golnick, Bodycote Thermal Processing, Claudette Earl, Earl Manufacturing Company, Inc., Halliburton Affiliates, Fireman's Fund Insurance Company and Federal Insurance Company Interveners for Palley Supply Company, Ferro Corporation, PMC Specialties Group, Inc., Palmtree Acquisition Corporation, Phibro-Tech and First Dice Road Company, Foss Plating Company, and Union Pacific Railroad Company.

[2] Facts necessary to the motion are cited to the *Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment Re: Statute of Limitations* ("S*UF*").  For convenience, the corresponding exhibits in the *Declaration of Robert P. Doty in Support of Defendants' Motion for Summary Judgment Re: Statute of Limitations* (*"Doty Dec."*) are included in the citation.  Where the nature of the underlying evidence is not evident from the context, a brief parenthetical reference is provided for clarity.  Facts provided as background and context are cited to the *Doty Dec.* and its exhibits.  Lengthy exhibits are limited to the cover page and relevant pages.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                - 3 -                MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1    Plaintiffs arranged for chemical wastes to be sent to the former Omega

2  processing plant for recycling and/or disposal. *Fifth AC*, ¶ 7. As so-called "arranger"

3  or "generator" "PRPs" (CERCLA nomenclature for "potentially responsible parties"),

4  Plaintiffs face potentially joint and several liability for the entire Omega Superfund

5  Site. *SUF*, ¶ 2; *Fifth AC*, ¶¶ 7–8.[3]

6    Plaintiffs allege that properties overlying the OU-2 groundwater, and located

7  downgradient from the Omega processing plant, have contributed to the contamination,

8  and that some of defendants' properties allegedly contributed chemicals that are

9  different from the chemicals released at the Omega processing plant (e.g., hexavalent

10  chromium). *SUF*, ¶ 3; *Fifth AC*, ¶ 3.

11    **B.    The Nature of Plaintiffs' Claim**

12    The caption page on the operative complaint lists "Contribution; Comprehensive

13  Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*" as

14  the first cause of action. *SUF*, ¶ 4; *Fifth AC*, caption page. The First Claim for Relief

15  is styled "Contribution Under CERCLA," and Paragraph 405 roots that claim in Section

16  113(f). *SUF*, ¶ 5; *Fifth AC* at p.97:17-19 and ¶ 405. The Third Claim for Relief seeks

17  declaratory judgment "for contribution" based on Section 113(f). *SUF*, ¶ 6; *Fifth AC*, ¶

18  426. Plaintiffs filed this action on August 15, 2014. *SUF*, ¶ 7; Dkt No. 1.

19    **C.    The Response Costs Sought in This Action**

20    Paragraph 9 of the operative complaint refers to "tens of millions of dollars in

21  capital expenditures for years to come" and "millions" of dollars of costs already

22  incurred (without specifying what work those past costs relate to). *SUF*, ¶ 8; *Fifth AC*,

23  ¶ 9. The "tens of millions" are linked to pumping and treating contaminated

24  groundwater. *SUF*, ¶ 9; *Fifth AC*, ¶9. In a 2016 Fact Sheet, EPA depicts the

25

---

26  [3]A CERCLA "facility" is defined to include the area where the hazardous substances
have "otherwise come to be located," 42 U.S.C. § 9601(9)(B), so an arranger PRP that
27  sent chemicals to the Omega processing plant faces potentially joint and several
28  liability for the regional plume, however long it turns out to be.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                                - 4 -                          MOVING DEFENDANTS' P&A'S ISO MSJ
                                                                                2:14-CV-06456-GW-E

remediation system as including extraction wells, conveyance piping, and treatment equipment. *SUF*, ¶ 10; *Doty Dec.*, Ex. 5, p. 6, Fig. 3; *compare Fifth AC* ¶¶ 118, 402-403 (discussing the 2016 Consent Decree (referred to as the "OU-2 Consent Decree" in the *Fifth AC*) which is, in turn, referenced in EPA's 2016 Fact Sheet). Paragraph 2 of the *Fifth AC* focuses on "hexavalent chromium and chlorinated and non-chlorinated solvents" as contaminants of concern (*SUF*, ¶ 11; *Fifth AC*, ¶ 2), with a longer, alphabetical list provided in Paragraph 106 (*Fifth AC*, ¶ 106).

### D. The Four Settlements Regarding the Omega Groundwater Plume Approved by Judge Hatter More Than Three Years Before the Instant Action was Filed in 2014

#### 1. Events Prior to the First (2001) Settlement

In 1994, the State of California began issuing notice letters to Omega PRPs. *Doty Dec.*, Ex. 6, p. 2:9-13 (history discussed in settlement approval motion). On or about December 21, 1994, more than 100 Omega PRPs formed an unincorporated association known as "OPOG" to respond collectively to claims asserted against them by EPA, among others. *Doty Dec.*, Ex. 6, p. 2:14-19.[4]

In May 1995, EPA issued a CERCLA Unilateral Administrative Order ("UAO-95-15") noting the potential for contamination from the Omega processing plant to impact drinking water wells as far as three miles downgradient from the Omega processing plant. *Doty Dec.*, Ex. 7, p. 10:3-11. UAO-95-15 required, among other things, "groundwater sampling" sufficient "to determine the nature and extent of contamination." *Doty Dec.*, Ex. 7, p. 13:5-7. It also states that the respondents were jointly and severally liable. *Doty Dec.*, Ex. 7, p. 2:14-16.

In October 1996, a consultant's report was submitted to EPA pursuant to UAO-95-15. Using "predictive analysis," Plaintiffs' consultants discussed a plume extending

---

[4] OPOG stands for Omega PRPs Organized Group. Background on its formation and functioning were provided to the Court in a 2017 declaration by OPOG's common counsel, Gene Lucero, Esq., filed in the related *United States v. Abex* matter. *Doty Dec.*, Ex. 8, ¶ 2.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 5 -          MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1  approximately 3,000 feet from the Omega processing plant and also discussed potential

2  contributing downgradient sources. *Doty Dec.*, Ex. 9, p. 6, second bullet point. Emails

3  from 1998 document Plaintiffs' consultants discussing PRPs associated with properties

4  located between the Omega processing plant and the McKesson property, which is

5  approximately two miles downgradient of the Omega processing plant. *Doty Dec.*, Ex.

6  10 (EPA correspondence to OPOG describing a report that "ID[s] businesses/properties

7  in the Whittier/Santa Fe Springs area that may contribute to gw contam., many of which

8  are in the omega plume") and Ex. 11 (consultant confirming awareness of

9  downgradient source properties).[5]

10      In June 2000, a memo by Plaintiffs' consultants documents discussion of two

11  specific downgradient source properties—the Techni-Braze/Bodycote property and the

12  Earl Manufacturing property. *Doty Dec.*, Ex. 12, p. 2-3. Both of those properties are

13  involved in the instant action. *Fifth AC*, ¶¶ 73 and 135.

<b>2.  The 2001 Judicially Approved Settlement</b>

15      On February 28, 2001, Judge Hatter approved a settlement (styled as a Consent

16  Decree) in an action filed by EPA in late 2000 (Case No. 2:00-cv-12471). *SUF*, ¶ 12;

17  *Doty Dec.* Ex. 13. That settlement provides for, among other things, further testing

18  downgradient from OU-1 (which was then referred to as the "Phase 1a" area). *SUF*, ¶

19  13; *Doty Dec.*, Ex. 13, appendix A, Task 3.

<b>3.  The Period Between the 2001 Settlement and the Settlements Judicially Approved in 2006 and 2007</b>

21      In June 2003, an EPA contractor (Weston) issued a report describing the plume

22  as nearly 2.2 miles long and potentially contributed to by 6 sources other than the

23  Omega processing plant. *Doty Dec.*, Ex. 15, pp. 2-1, 4-12, 4-13. In September 2003,

24  another EPA contractor (Dr. Thomas Perina of the CH2M Hill firm) documented his

25  discussion with the Plaintiffs' consultants regarding "[p]otential sources of

---

[5] For backround on the McKesson site see the Declaration Nancy Wilms filed in the *United States v. Abex* matter. *Doty Dec.*, Ex. 14, ¶¶ 3-5.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO
071915\9653910v10                    - 6 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1  contamination at" a drinking water well approximately one mile downgradient from the

2  Omega processing plant. *Doty Dec.*, Ex. 16, p. 1 first bullet point.

3       In January 2004, EPA invited OPOG's common counsel, Mr. Lucero, among

4  others, to an upcoming informational meeting. *Doty Dec.* Ex. 17. PowerPoint slides

5  for that meeting note "statute of limitations." *Doty Dec.*, Ex. 17A. EPA's PowerPoint

6  slides also include a cost estimate of approximately $89,200,000. *Doty Dec.*, Ex. 17A.

7  The slides note February 12, 2004, as the meeting date. Doty Dec., Ex. 17, cover slide.

8       On February 27, 2004, OPOG and an affiliated limited liability company filed

9  the first contribution action regarding the Omega Superfund Site. *SUF*, ¶ 14; *Doty*

10  *Dec.*, Ex. 18. [6] The complaint defines "Omega Site" to mean the Omega Chemical

11  Corporation Superfund Site, located in Whittier, California. *Doty Dec.*, Ex. 18, ¶ 2.

12  The complaint alleges that the defendants were liable for contribution for "all past and

13  future response actions and costs." *SUF*, ¶ 15; *Doty Dec.*, Ex. 18, ¶156.

14       Correspondence and memoranda from the spring and summer of 2004 document

15  an exchange of positions concerning the cost estimate Dr. Tomas Perina prepared for

16  EPA in April 2004 (the details of Dr. Perina's cost estimate are addressed in the next

17  section). *SUF*, ¶ 16; *Doty Dec.*, Ex's. 4, 19, and 20. EPA correspondence in August

18  2004 notes "a Statute of Limitations (SOL) deadline regarding [OPOG's] ability to

19  recover costs from other parties." *Doty Dec.*, Ex. 21, p. 1. From August 2004 until

20  mid-2006, OPOG and various other generators negotiated settlements. *Doty Dec.*, Ex.

21  6, p. 3:9-19; *id.*, Ex. 22 (Cohen Dec. submitted to Judge Hatter in 2006). ¶ 8.

22       **4.    The 2007 Judicially Approved Settlement**

23       What is referred to here as the 2007 Settlement was executed in 2006, and its

24  approval was entered on the Docket No. 33 March 9, 2007. *SUF*, ¶ 17; *Doty Dec.*, Ex.

25  23.

26  ///

27
28  [6] Paragraph 5 identifies OPOG as an "unincorporated" association whose members "could otherwise sue in this action in their own right."

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10    - 7 -    MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

a.   <u>**Costs Addressed in The 2007 Settlement**</u>

The settlement approval motion papers for the 2007 Settlement (a memorandum of points and authorities and two declarations) reference the $101.5 million cost estimate prepared by Dr. Perina in April 2004. *SUF*, ¶ 18; *Doty Dec.*, Ex. 7, ¶ 9; *id.*, Ex. 22, ¶ 10; *id.*, Ex. 24, ¶ 6. Plaintiffs' discovery responses confirm that the cost estimate referenced in the settlement approval motion papers was derived from Dr. Perina's April 2004 memo (hereafter, "Dr. Perina's Memo" or the "Memo"). *SUF*, ¶ 19; *Doty Dec.*, Ex. 25, Response No. 3.

Dr. Perina's Memo describes the plume as being "at least" 2.5 miles long. *SUF*, ¶ 19; *Doty Dec.*, Ex. 19, p. 2. His estimate assumes "extraction and treatment of contaminated groundwater," which Dr. Perina characterized as "pump and treat" using a "complex treatment train" to address the mixture of chemicals in the plume. *SUF*, ¶ 21; *Doty Dec.*, Ex. 19, p. 2-3. The Memo lists extraction wells, water conveyance pipelines, and a treatment plant as the main components of the remediation system. *SUF*, ¶ 22; *Doty Dec.*, Ex. 19, p. 3. Dr. Perina's Memo assumes "the pump and treat system [would] operate [for] 30 years" (with soil remediation taking 3 years). *SUF*, ¶ 23; *Doty Dec.*, Ex. 19, p. 3. The Memo lists both PCE (tetrachloroethylene) and hexavalent chromium, as well as contaminants that "may be identified in the future," as chemicals of concern. *SUF*, ¶ 24; *Doty Dec*, Ex. 19, p. 2-3.

Dr. Perina's estimate for soil remediation costs was $3.9 million, with the groundwater pump and treat work costing $97.5 million (including $500,000 to purchase land for a treatment plant). *SUF*, ¶ 25; *Doty Dec.*, Ex. 19, p. 5, Tab. 1. A 2005 EPA memo (from which the first map in Tab A was taken) and a related 2005 EPA Fact Sheet document $6.4 million as the estimate for the cost for pumping and treating OU-1's groundwater. *SUF*, ¶ 26; *Doty Decl.*, Ex. 26, p. 2. Subtracting $6.4 million from $97.5 million leaves $91.1 million.

//

//

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                          - 8 -                          MOVING DEFENDANTS' P&A'S ISO MSJ
                                                                           2:14-CV-06456-GW-E

b.    **Definitions, Operative Provisions, and Scope of the Contract Documenting the 2007 Settlement**

Section 2.03 of the settlement agreement defines the "Claims" addressed to include "liabilities of any nature . . . that are based on or arise from the Site." *SUF*, ¶ 27; *Doty Dec.*, Ex. 6A. § 2.03.[7] "Site" is defined to mean "the Omega Chemical Corporation Superfund Site listed on the National Priorities List on January 19, 1999, 64 Fed. Reg. 2945." *SUF*, ¶ 28; *Doty Dec.*, Ex. 6A, § 2.19. Section 2.16 defines "Regional Response Work" to mean work that the "Governments require the Parties, or any of them, to perform, or which they perform at the request or demand of the Governments or any of them, regarding regional groundwater contamination alleged to be attributed to the Site." *SUF*, ¶ 29; *Doty Dec.*, Ex. 6A, § 2.16.[8]

Sections 5.01 and 5.02 address "Settled Matters" and "Excluded Matters," respectively. The former are mutually released in Section 5.01. *SUF*, ¶ 30; *Doty Dec.*, Ex. 6, § 5.01. The latter are defined in Section 5.02 with Section 5.02 (j) excluding Regional Response Work from Excluded Matters and thus making it part of the Settled Matters. *SUF*, ¶ 31; *Doty Dec.*, Ex. 6A, §§ 5.01, 5.02(j).

Section 3.01 provides that except for the Excluded Matters (and certain ministerial actions), the settling defendants were relieved of all "responsibilities" for the Site, "including but not limited to, all response costs associated with the Site." *SUF*, ¶ 32; *Doty Dec.*, Ex. 6A, § 3.01. Sixty-seven OPOG members executed a joint and several performance guaranty backstopping the commitments made by the OPOG entities. *SUF*, ¶ 33; *Doty Dec.*, Ex. 6 (Exs. D, E to Settlement papers).[9]

[7] For easier reference, a stand-alone copy of the settlement agreement is provided in *Doty Dec.* Exhibit 6A.

[8] Section 2.09 defines "Governments' to mean the federal government, the State of California, including two of its main environmental regulatory agencies, and local government entities. *SUF*, ¶ 39; *Doty Dec.*, Ex. 6A, § 2.19.

[9] At his recent deposition, the attorney representing the settling defendants testified as follows in response to a question about the guaranty: "[W]e wanted – because OPOG

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 9 -          MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1   Sections 5.03, 6.01, and 2.21 preserve rights to further recovery from third
2   parties and one group of the settling defendants, with recoveries against third parties
3   helping to determine the thresholds at which the one group of settling defendants had to
4   start and stop making further payments. *SUF*, ¶ 34; *Doty Dec.*, Ex. 6A, §§ 5.03, 6.01,
5   2.21.  Beginning at $70 million of "Total Collective Costs," and up to a cap at $93
6   million, the settling defendants listed on Exhibit A to the settlement agreement are
7   obligated to make specified additional payments. *SUF*, ¶ 35; *Doty Dec.*, Ex. 6A, §
8   5.03.  Total Collective Costs are defined (in Section 2.21) to include, among other
9   things, costs attributable to "(c) PRPs from whom the [plaintiffs have or do] otherwise
10  settle with, . . . and (e) PRPs from whom the [plaintiffs] recover[ ] through litigation to
11  judgment." *SUF*, ¶ 36; *Doty Dec.*, Ex. 6A, § 2.21. [10]

12      Judge Hatter was told that the 2007 settlement resolved claims "regarding
13  responsibilities for the Omega Site, including claims for response costs under the
14  completed UAO 95-15, [OU-1] Response Work called for under the [2001] Consent
15  Decree, as amended, and any future Regional Response Work, except as specially
16  limited in the Settlement Agreement." *SUF*, ¶ 37, 38; *Doty Dec.*, Ex. 6, p. 4-5.  And at
17  no point in the process, up to an including a summer 2017 discussion regarding the
18  Consent Decree approved by this Court in 2017, has any representative of Plaintiffs

19

20  was an unincorporated association, we wanted to make sure that the members of OPOG
21  would provide the assurances . . . [s]o – so there was somebody we could hold to the
    assurances." *Doty Dec.*, Ex. 27, 29:18 – 30:3. Section 7.05 of the settlement agreement
22  provides those guarantors can be sued for injunctive relief if the nominal plaintiffs fail
23  to perform. *Doty Dec.*, Ex. 6, § 7.05.

24  [10] In October 2006, OPOG and OPOG LLC entered into a similar settlement agreement
25  with certain federal "arranger" PRPs to resolve claims asserted in the first contribution
    action and a substantially identical action filed in 2005 as case no. 2:05-cv-00754-RGK.
26  *Doty Dec.*, Ex. 27.  That settlement also defines "Site" to mean the entire Omega
27  Superfund Site, and it resolves claims for "groundwater contamination that may be
    emanating from the Site." *Doty Dec.*, Ex. 28, ¶¶ 4, 5.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 10 -          MOVING DEFENDANTS' P&A'S ISO MSJ
                                                  2:14-CV-06456-GW-E

1  ever advised counsel for the settling defendants (Albert Cohen, Esq.) that "Regional

2  Response Work," as defined in the 2007 Settlement, encompassed something less than

3  the full plume at this Superfund Site.  Nor have Plaintiffs' representatives claimed to

4  their counter-parties, that the costs for Regional Response Work were distinct from the

5  tens of millions of dollars for OU-2 work described in EPA's 2016 Fact Sheet (which

6  address the work now being started to pump and treat OU-2).  *Doty Dec.*, Ex. 27, p.

7  58:6-59:16 (deposition testimony).

**5.  The Period Between March 2007 and the Final Settlement Approved by Judge Hatter (in 2010)**

9  The first Omega-related contribution lawsuit, filed as Case No. 2:04-cv-01340-

10  JWJx (Plaintiffs, via OPOG versus other arranger PRPs) remained open and active,

11  with periodic filings by various parties until 2010.  *Doty Dec.*, Ex. 29.  The last

12  substantive docket entry was dated January 19, 2010.  *Doty Dec.*, Ex. 29.

13  During the 34-month period, between Judge Hatter's approval of the 2007

14  settlement and the closing of the docket in that first contribution lawsuit, EPA copied

15  OPOG's counsel on August 2007 correspondence alleging that the Angeles Chemical

16  Co. property (which sits adjacent to the McKesson property) was contributing to the

17  plume.  *Doty Dec.*, Ex. 30.  EPA characterized the plume as four miles long in a

18  February 2008 Fact Sheet.  *Doty Dec.*, Ex. 31.  And in February 2009, EPA copied

19  OPOG's counsel on correspondence listing five downgradient source properties

20  targeted in the *Fifth AC*.  *Doty Dec.*, Ex. 30 (Phibro-Tech, Foss, Site A/Chrysler, Pilot,

21  and Mission Linen).

**6.  The 2010 Judicially Approved Settlement**

23  On October 6, 2010, EPA, numerous "Settling Work Defendants" (many of

24  whom are Plaintiffs in the instant action) and other parties that would make only cash

25  payments entered into a Consent Decree (Dkt. No. 8) in connection with a Section 107

26  cost recovery action filed by EPA earlier that year (*U.S. v. Alcoa Inc.*, Case No. 2:10-

27  cv-05051-TJH-PLA).  *SUF*, ¶ 40; *Doty Dec.*, Ex. 32.  The consent decree defines "Site"

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 11 -          MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1  to mean the "Omega Chemical Corporation Superfund Site, listed on the National

2  Priorities List on January 19, 1999, 64 Fed. Reg. 2950." *SUF*, ¶ 41; *Doty Dec.*, Ex. 32,

3  p. 10:21-22.  It separately defines OU-1 to have the same meaning as "Phase 1a Area,"

4  defined as "the area of soil and groundwater contamination within and below the

5  Omega Property and extending downgradient approximately 100 feet southwest of

6  Putnam Street, Whittier, California." *Doty Dec.*, Ex. 32, pp. 7:26-27, 8:16-21.

7  Paragraph 88 provides that the "Settling Defendants agree not to assert any claims or

8  causes of action under Section 107(a) and 113 of CERCLA that they may have for all

9  matters relating to the Site against any person that has entered or in the future enters

10  into a final CERCLA Section 122(g) *de minimis* settlement, or a final settlement based

11  on limited ability to pay, with EPA with respect to the Site." *SUF*, ¶ 42; *Doty Dec.*, Ex.

12  32, ¶ 88; *id.*, Ex. 32, ¶4, at 10:21-22.

13  ### III.   SUMMARY OF APPLICABLE LAW

14  ### A.   The Standard for Summary Judgment

15  Summary judgment is proper when "the pleadings, the discovery and disclosure

16  materials on file, and any affidavits show that there is no genuine issue as to any

17  material fact and that the movant is entitled to judgment as a matter of law."

18  Fed.R.Civ.P. 56(c); *Cavanaugh v. Southern California Permanente Medical Group,*

19  *Inc.,* 583 F.Supp.2d 1109, 1123-24 (C.D. Cal. 2008).  Once the moving party presents

20  evidence demonstrating the absence of any genuine issues of material fact, the burden

21  shifts to the non-moving party to set forth, by admissible evidence, specific facts

22  showing there is a genuine issue for trial.  *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317,

23  325 (1986); *Cavanaugh,* 583 F.Supp.2 at 1123-24 (citing *T.W. Elect. Serv., Inc. v. Pac.*

24  *Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987)).  Speculative testimony, or

25  a mere "scintilla" of evidence, is insufficient to meet this burden.  *L'Garde, Inc. v.*

26  *Raytheon Space and Airborne Systems,* 2013 WL 12113998, at *6 (C.D. Cal. 2013).

27  //

28  //

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                    - 12 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
                                                              2:14-CV-06456-GW-E

**B.     California's Rules for Contract Interpretation**

Under California law, "the mutual intention of the parties at the time the contract is formed governs interpretation."  Cal. Civ. Code § 1636; *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1264 (1992).  The intent of the parties is determined by the written provisions of the contract, *ASARCO,* 792 F.3d at 1212, in light of "the circumstances under which [the contract] was made, and the matter to which it relates."  Cal. Civ. Code § 1639; *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 39-40 (1968).

Courts also consider post-contracting, pre-dispute conduct and statements of parties to help ascertain their understanding of an agreement.  *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II,* 870 F.Supp.2d 881, 922 (C.D. Cal. 2012).  Extrinsic evidence is provisionally considered to determine whether the contract is ambiguous.  *L'Garde, Inc. v. Raytheon Space and Airborne Systems,* 2013 WL 12113998, at *8 (citing *Solis v. Kirkwood Resort Co.,* 94 Cal.App.4th 354, 360 (2001) and *Dore v. Arnold Worldwide, Inc.,* 39 Cal.4th 384, 393 (2006)).  Where no material factual dispute exists, courts do not hesitate to interpret contracts as a matter of law.  *Id.*

**C.     The Ninth Circuit's CERCLA § 113(g)(3)(B) Case Law**

The Ninth Circuit addressed Section 113(g)(3)(B) head-on in a 2015 decision, *ASARCO*, and used the analysis in *ASARCO* in a 2016 case, *Whittaker*, that involved a closely related issue.  We discuss each below, focusing on *ASARCO* because it presents the same question presented by this motion.

**1.     *Asarco v. Celanese Chemical***

In *ASARCO,* the Ninth Circuit affirmed a district court's decision dismissing (on summary judgment) a CERCLA contribution claim under Section 113(g)(3)(B).  The district court's decision is reported at *ASARCO, LLC v. Celanese Chem. Co.,* 2012 WL 2050253 (N.D. Cal. June 6, 2012, Hon. William H. Alsup).

/ / /

/ / /

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                  - 13 -                  MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

### a.   The Site and the Litigation

*ASARCO* arises from a contaminated smelter site on the shoreline of San Pablo Bay. 2012 WL 2050253, *1. The investigation and cleanup process began in the mid-1970s and was supervised by state regulatory agencies. *Id.* at *2. Tens of millions of dollars will be spent over several decades to clean up contaminated soil and groundwater at the site. *Id.* at *2-3.

An initial round of litigation over the site was resolved through a judicially approved settlement allocating cleanup costs among three PRPs using different formulae for each of two broad categories of costs—the implementation of four "Interim Remedial Measures" ("IRMs") and a general category designated as "other remediation costs." *Id.* at *2. The "other" category included future costs for remediation measures deemed "necessary and appropriate," with all post-agreement requirements imposed by state regulators qualifying as "necessary and appropriate." *Id.* at *2. The settlement was approved in 1989. *Id.*

More than a decade later, one of the parties to the 1989 settlement, ASARCO, filed a contribution action against PRPs that had not been named as defendants in the first round of litigation. *Id.* at *3. ASARCO filed its contribution action in 2011, two years after entering into a (2009) judicially approved settlement with one of the state regulatory agencies. *Id.* at *3.

CNA, one of the PRPs sued for CERCLA contribution by ASARCO in 2011 moved for summary judgment. CNA argued that ASARCO's contribution claim was barred by Section 113(g)(3)(B), because more than three years had elapsed between the 1989 judicial approval of a settlement over the site and the 2011 filing of ASARCO's contribution action. *Id.*

### b.   The District Court's Opinion

Judge Alsup ruled that ASARCO's contribution claim was time-barred. *Id.* at *9. He noted that more than three years had passed between judicial approval of the settlement ending the initial litigation (1989) and the filing (in 2011) of ASARCO's

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                                    - 14 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1   contribution action.  In addition, he concluded that the costs for which ASARCO

2   sought contribution were within the scope of costs addressed in the 1989 settlement.

3        Judge Alsup rejected ASARCO's argument that its contribution claim was viable

4   because the 1989 settlement "was not . . . an agreement to finance or perform 'final'

5   remedial tasks." *Id.* at *7.  He similarly rejected ASARCO's claim that it was seeking

6   "new and future costs' based on 'new information' not contemplated by the 1989 . . .

7   settlement." *Id.*  Drawing on what he called "useful guidance" from cases construing

8   the concept of "covered matters" (the lynchpin of Section 113(f)(2)'s contribution

9   protection mechanism), Judge Alsup determined that the 1989 settlement was a

10  "comprehensive settlement" whose terms "contemplated future and final remedial

11  costs." *Id.* at *7-8.  The 1989 settlement therefore triggered the three-year window for

12  filing contribution claims, and that window closed in 1992, long before ASARCO filed

13  its contribution action.  *Id.* at * 8.  In support of this conclusion, Judge Alsup

14  emphasized the settlement's use of broad categories of costs, which collectively

15  covered both past and future work.  *Id.*

16            **c.**   **The Ninth Circuit's Opinion**

17       The Ninth Circuit affirmed, 792 F.3d 1203, ruling as follows on three issues

18  relevant here:   (1) under Section 113(g)(3)(B), <u>all</u> judicially approved settlements

19  trigger a three-year limitations period, *id.* at 1209-11; (2) once time-barred, costs cannot

20  be revived or resuscitated by a subsequent judicially approved settlement, *id.* at 1214-

21  15; and (3) Judge Alsup had correctly determined that the costs ASARCO sought via its

22  2011 contribution action were covered by the 1989 settlement. *Id.* at 1212-14.  Each

23  point is discussed below.

24       On the first point, the Ninth Circuit rejected, as contrary to "the plain language of

25  the statute," ASARCO's claim that a judicially approved settlement among private

26  parties was the wrong kind of agreement to start the three-year clock in Section

27  113(g)(3)(B). *Id.* at 1211.  In so doing, the Ninth Circuit rejected ASARCO's invitation

28  to read "additional conditions" into the "plain language" of Section 113(g)(3)(B). *Id.*

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10

- 15 -

MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1   The Ninth Circuit refused to create exceptions to the clear terms used in Section
2   113(g)(3)(B) because doing so would improperly "subject PRPs to litigation at any time
3   following a private party settlement." Further, the court noted that ASARCO could
4   have sued CNA (and the other PRPs it sued in 2011) in the litigation that produced the
5   1989 settlement.

6        On the second point, the court observed that ASARCO was effectively "seeking
7   successive contribution," by claiming that its 2011 contribution action was authorized
8   by Section 113(f)(3)(B) and a judicially approved settlement between ASARCO and
9   state regulators executed many years after the first judicially approved settlement. *Id.*
10  at 1214-15. The Ninth Circuit characterized such successive contribution lawsuits as
11  "circumvent[ing] the statute of limitations." *Id.* at 1215. The court noted that allowing
12  time-barred claims to be revived would frustrate the statutory intent behind Section
13  113(g)(3)(B)—i.e., getting responsible parties to the bargaining table "sooner rather
14  than later." *Id.* (citing *RSR Corp. v. Commercial Metals Co.,* 496 F.3d 552 (6th Cir.
15  2007)).

16       On the third point—the judicially approved settlement being "with respect to"
17  (see 42 U.S.C. § 9613(g)(3)(B)) the costs later sought via contribution—the Ninth
18  Circuit agreed with Judge Alsup's assessment of the broad nature of the 1989
19  settlement. The Ninth Circuit noted that the 1989 settlement had a comprehensive
20  "procedure for allocating past and future costs." *Id.* at 1212. The clean-up work
21  underlying ASARCO's contribution claim "was included in the [1989 settlement
22  agreement]," with that agreement "function[ing] much like a declaratory judgment
23  would." *Id.* at 1213. [confirm pin] The fact that the full list of work tasks and costs
24  were unknown at the time "does not mean that the [1989 agreement] was less than
25  comprehensive." *Id.* The Ninth Circuit said there was no need for agreement to
26  "distinguish" among the various sources of the contamination. *Id.*

27  / / /
28  / / /

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 16 -          MOVING DEFENDANTS' P&A'S ISO MSJ
                                           2:14-CV-06456-GW-E

## 2. *Whittaker Corp. v. United States*

*Whittaker Corp. v. United States,* 825 F.3d 1002 (9th Cir. 2016), evaluates whether certain cleanup costs were recoverable via "cost recovery" (under CERCLA Section 107) or via contribution under Section 113.  In its *Whittaker* opinion, the Ninth Circuit characterized the application of the Section 113(g)(3)(A) and (B) statute of limitations triggers as being "closely related" to the issue presented in that case.  *Id.* at 1010.

Whittaker had sued the United States government in 2013 to recover costs Whittaker incurred for investigating and cleaning up the "Bermite" site, where Whittaker had done work for the Department of Defense.  Whittaker explicitly alleged that the expenses it sought were separate from groundwater investigation and cleanup costs addressed in Whittaker's [2007] settlement with parties referred to as the *Castaic Lake* plaintiffs.  *Id.* at 1005.  The United States moved to dismiss, and the district court granted that motion based on Section 113(g)(3)(B).  *Id.*

The Ninth Circuit reversed.  It held that Whittaker could pursue "cost recovery" under Section 107 for its cleanup costs if the costs in question were truly separate from the costs addressed in Whittaker's settlement with the *Castaic Lake* plaintiffs.  The Ninth Circuit noted that "Whittaker <u>explicitly alleged</u> that [the expenses it was seeking] were separate from the costs" addressed in the earlier settlement.  *Id.* at 1005.  Given the procedural posture of the case, the Ninth Circuit was required to take that "factual allegation[ ] . . . as true and construe it in the light most favorable to the plaintiff."  *Id.* at 1006.  Consistent with that factual assumption/rule of law, Whittaker could bring a Section 107 cost recovery claim, because the costs it was seeking were assumed entirely outside the scope of Whittaker's settlement with the *Castaic Lake* plaintiffs.  *Id.* at 1013.  As a result, Whittaker's action was subject to a six-year limitations period, as opposed to the three-year period for contribution actions, and therefore Whittaker's claim was not time barred.  *Id.*

/ / /

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                - 17 -                MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

In discussing the case law applying the statute of limitations, and the facts it assumed to be true, the Ninth Circuit focused repeatedly on different "sets of expenses," *id.* at 1011; *id.* at 1012, and whether a given "set of expenses" had, or had not, been addressed in a prior judicially approved settlement or in a judgment.  It cited the First Circuit's decision in *American Cyanamid v. Capuano*, 381 F.3d 6 (1st Cir. 2004), as illustrating a fact pattern with different sets of costs, such that the claimant was not time barred.  In *Capuano,* the statute of limitations was potentially triggered by an April 1988 judgment.  *Id.* at 12 (noting date of the judgment); *compare* 42 U.S.C. § 9613(g)(3)(A) (subsection listing judgments as a trigger).  The later, potentially time-barred claim involved groundwater costs.  381 F.3d at 10-11.  A contribution claim for the later set of costs was not barred by the three-year limitations period because at the time of the judgment none of the regulatory agencies had even investigated the groundwater to know if it was contaminated.  *Id.* at 14 ("in 1988 [regulators] had not assessed whether there was groundwater contamination" at the site).

The *Whittaker* decision also cites to *RSR Corp.*, which as noted above is also discussed in *ASARO.*   The Ninth Circuit's *Whittaker* decision characterizes *RSR Corp.* as demonstrating that a set-by-set approach to determining if costs are time-barred is utilized by other circuits. 825 F.3d at 1012.

## IV.   ARGUMENT

### Moving Defendants are Entitled to Summary Judgment on Plaintiffs' Contribution Claims Because Undisputed Facts Establish Each of the Elements in Section 113(g)(3)(B)

Section 113(g)(3)(B) provides as follows:  "No action for contribution for any response costs or damages may be commenced more than 3 years after— . . . (B) entry of a judicially approved settlement with respect to such costs or damages."  As noted in the Introduction, *supra,* the application of Section 113(g)(3)(B) thus involves a four-part inquiry:   (1) the nature of the claim asserted; (2) the cleanup costs sought; (3) the existence of a judicially approved settlement with respect to those costs; and (4) the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                                  - 18 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

time elapsed between the judicially approved settlement and the commencement of the claimant's contribution action. Undisputed facts establish that each element is satisfied here. We discuss them in the following order: 1, 2, 4, and then 3 because only 3 requires substantial discussion.

**A.      Element No. 1 is Satisfied Because Plaintiffs Seek Contribution.**

The First and Third Causes of Action in the Fifth Amended Complaint present claims labeled as contribution under CERCLA Section 113(f). *Fifth AC*, ¶¶ 405, 426

**B.      Element No. 2 is Clear—Groundwater Costs are the Focus of Plaintiffs' Claims.**

It is undisputed that Paragraphs 2, 9, and 11 of the operative complaint, among others, tie Plaintiffs' contribution claims to costs associated with contamination in "regional" groundwater. *Fifth AC,* ¶¶ 2, 9, 11.

**C.      Element No. 4 is Satisfied Because All Four Omega-Related Settlements Were Judicially Approved More Than Three Years Before Plaintiffs Filed This Contribution Action.**

This action was filed in August 2014, so August 2011 is the critical date for purposes of applying Section 113(g)(3)(B). There is no dispute that Judge Hatter approved Omega-related settlements in early 2001, late 2006, March 2007, [Dkt. No. 38 in Case No. 2:04-cv-01340-TJH-E], and 2010 [Dkt. No. 8 in Case No. 2:10-cv-05051-TJH-PLA].

**D.      Element No. 3 is Satisfied by a Straightforward Application of *ASARCO* to the Undisputed Facts.**

**1.      All of the Costs Now At Issue Are Within the Costs Addressed by the 2007 Settlement**

The operative complaint here refers to "tens of millions" of dollars to pump and treat a miles-long groundwater plume for "years to come" because of contamination from chlorinated and non-chlorinated solvents, hexavalent chromium, and other chemicals. *Fifth AC,* ¶ 9. EPA's most recent Fact Sheet includes a schematic diagram illustrating a system of extraction wells, conveyance pipes, and treatment equipment to

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                          - 19 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
                                                                     2:14-CV-06456-GW-E

1   accomplish that pump and treat operation, at a cost of some $70 million. *Doty Dec.* Ex.

2   5 at 6 (schematic diagram); *id.* at 2 ($70 million cost projection).

3       The motion papers submitted to Judge Hatter in late 2006 to obtain his approval

4   of the 2007 Settlement identify a $101.5 million set of costs based on Dr. Perina's April

5   2004. *SUF*, ¶ 19 (discovery response confirming the link between the settlement

6   approval apapers and Dr. Perina's memo). Dr. Perina's Memo links the groundwater

7   problem to approximately $97.5 million. EPA's 2005 Fact Sheet put a $6.4 million

8   price tag on pumping and treating groundwater at OU-1, leaving $91 million—or "tens

9   of millions" as alleged in the *Fifth AC*—as the estimated cost for OU-2. *Fifth AC*, ¶ 9.

10  The text and supporting tables in Dr. Perina's Memo identify capital costs, as well as 30

11  years of operations and maintenance costs, for extraction wells, conveyance piping, and

12  treatment equipment targeting chlorinated and non-chlorinated solvents, hexavalent

13  chromium, and other chemicals. The system envisioned by Dr. Perina matches EPA's

14  schematic as well as the allegations in the *Fifth AC*. Dr. Perina's Memo referenced a

15  plume that was miles long (*Doty Dec.*, Ex. 19, p. 2) and for which there were multiple

16  sources of contamination (*Doty Dec.*, Ex. 20, p. 1). The *Fifth AC* describes the same

17  plume.

18              **2.    The 2007 Settlement is Comprehensive**

19      The motion papers submitted to Judge Hatter explained that the 2007 Settlement

20  resolved the settling parties "against each other with regard to their responsibilities for

21  the Omega Site, including claims for response costs under the completed UAO 95-15

22  work, [OU-1] Response Work called for under the Consent Decree . . . , and any future

23  Regional Response Work, except as specifically limited in the Settlement Agreement".

24  *Doty Dec.*, Ex. 6, Memo of P&A's, p. 4:15-16 to 5:3; *compare ASARCO*, 792 F.3d at

25  1212 ("The Wickland Agreement settled the dispute between ASARCO and Wickland

26  over the Selby Site").

27      As made clear in, among other places, Section 2.21 (the definition of "Total

28  Collective Costs"), the 2007 Settlement addresses both past and future cost. *Doty Dec.*

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                    - 20 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
                                                              2:14-CV-06456-GW-E

1   Ex. 6A §2.21 ("Total Collective Costs" includes "costs that have been or are in the

2   future expended "by Plaintiffs via OPOG and by others"). Those future costs are then

3   accounted for in the formula used to define the payments required of the settling parties

4   listed on Exhibit A to the agreement. *Doty Dec.* Ex. 6A, §3.01(b)(1). The 2007

5   Settlement makes "Regional Response Work" a "Settled Matter" and defines it to

6   include whatever work that the "Governments <u>require</u> the Parties, or any one of them to

7   perform, <u>or which they perform at the request</u> or demand of the Governments

8   . . . regarding regional groundwater contamination alleged to be attributed to the Site."

9   *Doty Dec.* Ex. 6A, § 2.16. There is no geographic limit imposed on that term—not the

10   2.5-miles mentioned in Dr. Perina's Memo and not any current or future operable

11   unit(s) defined by EPA.

12        The 2007 Settlement transfers all "responsibilities" associated with the cleanup

13   process (i.e., everything other than ministerial/record-keeping responsibilities),

14   "including, <u>but not limited to,</u> all response costs." *SUF*, ¶32; *Doty Dec.*, Ex. 6A, §

15   3.01. It does that with an unambiguous purpose—freeing some of the settling parties

16   from being "pursued" by EPA (and leaving the others to be targets of EPA's pursuit).

17   *Doty Dec.*, Ex. 6A, §1.02). Being free from EPA's "pursuit" was no small matter. As

18   of 2007, EPA had pursued Omega PRPs with administrative orders (UAO 95-15) and

19   litigation.

20        Because OPOG is merely a shell through which Plaintiffs, and other PRPs

21   manage their collective efforts, the 2007 Agreement is backed by a sweeping, joint and

22   several, guaranty agreement. Finally, the Agreement provides that except for fraud,

23   OPOG accepted the risk that "the facts or law forming the basis for" the agreement

24   might later prove "different from the facts or law [then] believed by the parties to the

25   Agreement." *Id.* § 5.04.

26   / / /

27   / / /

28   / / /

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 21 -          MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

### 3. The 2007 Settlement Encompasses the Downgradient Properties Alleged to Give Rise to Plaintiffs' Claims

The Ninth Circuit noted that the settlement agreement in *ASARCO* included the part of the site giving rise to ASARCO's claim against CNA, the so-called Virginia Chemicals area. 792 F.3d at 1213. The same is true here. Dr. Perina's 2004 memos note that his cost estimate for groundwater included multiple sites downgradient from the Omega processing plant and chemicals not linked to the Omega plant. *Doty Dec.* Ex. 19 and 20. Furthermore, the settlement approval papers submitted to Judge Hatter explicitly stated that the settlement accounted for "orphan shares." *Doty Dec.* Ex. 6, Memo of P&A's at 9:22-25.

### 4. The Costs at Issue Do Not Qualify as a "Separate Set" Under Either *Whittaker* or *Capuano*

In *Whittaker*, the procedural posture of the case required the Ninth Circuit to accept as true the allegation that the costs sought were wholly separate and distinct from the costs addressed in a prior settlement. 825 F3 at 1005-06. Here, despite five bites at the apple leading up to and including the *Fifth AC*, Plaintiffs have never asserted that a single dime of what they seek to recover falls outside the purview of the 2007 Settlement (or any of the other settlements they have participated in either directly or via OPOG.) Their failure to do so is particularly noteworthy given that such an allegation might have saved their imperiled, and then abandoned, Section 107 claim. Nor could any such allegation of separate sets of costs survive scrutiny, because they have never told their counter-parties in the 2007 Settlement that the agreement did not cover any of the costs at issue now. *Doty Dec.*, Ex. 27, 75:19-76:1.

In *Capuano*, the First Circuit emphasized the fact that the groundwater costs it held to be not time-barred related to contamination for which the investigation had not begun when the settlement in question was executed and approved. *Compare Capuano*, 381 F.3d at 12 (judgment regarding soil remediation costs and potentially triggering the statute of limitations entered April 20, 1998); *id.* at 14 ("in 1998 [state and federal regulators] had not assessed whether there was groundwater contamination at "the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                                      - 22 -                      MOVING DEFENDANTS' P&A'S ISO MSJ
                                                                                          2:14-CV-06456-GW-E

1  site"). Here, groundwater contamination was a focus beginning in the 1995 UAO. It

2  was the reason the site was listed on the Superfund list in 1999. *Doty Dec.*, Ex. 3, 2:24-

3  3:5 (pleading submitted to Judge Hatter by the Department of Justice). And it

4  accounted for approximately 90% of the projected cleanup costs dealt with in the 2007

5  settlement.

6       From every perspective discussed by Judge Alsup and the Ninth Circuit in their

7  *ASARCO* opinions, Plaintiffs lose. The costs for which they seek contribution could not

8  be more squarely within the scope of the 2007 Settlement. Further, as was the case in

9  *ASARCO*, Plaintiffs have had ample opportunity, including but not limited to their two

10 prior contribution actions, to sue the Moving Defendants. Their consultants were

11 discussing some of the Moving Defendants as early 2000, and EPA was copying Mr.

12 Lucero on correspondence identifying still more of the Moving Defendants within two

13 years of the 2007 Settlement. *SUF*, ¶ 16; *Doty Dec.* Ex. 4 and 20; *compare ASARCO*,

14 792 F.3d at 1207 (noting that ASARCO had not brought the other PRPs into the initial

15 litigation).

16     **E.     The Other Judicially Approved Settlements Also Support Dismissal**

17       In light of the Ninth Circuit's admonition that CERCLA was never intended to

18 authorize this sort of successive contribution lawsuits, summary judgment is particularly

19 appropriate here. The settlement approved in 2001 not only (1) required Plaintiffs to

20 keep working on the regional plume, but also (2) focused them on the statute of

21 limitations triggered by that Settlement. *Doty Dec.* Ex. 13 at 9 (Dkt. 9) 2001 Consent

22 Decree defining "Work" to require installation of monitoring wells downgradient of OU-

23 1); *id.* Ex. 17 (January 2004 EPA correspondence copied to multiple OPOG counsel and

24 enclosing EPA PowerPoint slides noting the statute of limitations issue).

25       It would thus strain credulity to suggest that Plaintiffs were not focused on the

26 statute of limitations triggered by the 2001 Settlement. Indeed, and not coincidentally,

27 they had OPOG file the first contribution lawsuit one day short of the third anniversary

28 of Judge Hatter's approval of the 2001 settlement. *Compare Doty Dec.* Ex. 13 and Ex.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10                                    - 23 -                    MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1  18 (caption pages showing the date of entry of the first settlement and filing of the first

2  contribution lawsuit).

3       Furthermore, by using the 2001 Settlement to launch not one but two

4  contribution lawsuits (in 2004 and 2005) seeking all costs associated with the "Site"

5  (defined to be the entire Omega Superfund Site), Plaintiffs were necessarily

6  acknowledging liability for all of the "Site" costs, including the regional plume that has

7  been front and center from the get-go.[11]  The essence of the contribution claims

8  triggered by the 2001 settlement (i.e., the claims asserted in the 2004 and 2005

9  contribution lawsuits) was, after all, allocation of the common liability that the

10  Plaintiffs faced.  *See United States v. Atlantic Research Corp.,* 551 U.S. 128, 138-39

11  (2007) (as used in CERCLA, contribution is a "tortfeasor's right to collect from others

12  responsible for the same tort").  Plaintiffs' knowledge of the regional plume issue and

13  their efforts to obtain contribution in connection with their liability for those costs

14  present a fact pattern different from the *Capuano* decision and any claim now that the

15  2001 settlement did not trigger limitations for the entire Omega Superfund Site would

16  fail by principles of judicial estoppel.[12]

17       Had their time not already expired, the settlement approved in 2010 would

18  independently bar Plaintiffs' contribution claims here.  That judicially approved

19  settlement, in a Section 107 action brought on behalf of EPA, defines "Site" to mean

20  the entire Omega Superfund Site.  *Doty Dec.* Ex. 32 at 1:9-10.  Paragraph 88 in the

21  settlement provides that the Settling Defendants there, including many if not all

22  Plaintiffs, "waive all claims" they may have for "matters relating to the Site" against

---

23  [11] Both the 2004 and 2005 contribution actions were resolved through judicially

24  approved settlements that included the entire Omega Superfund Site, encompassed "any

25  and all claims" not excluded, and be defined "Covered Matters" to include the

26  groundwater contamination.

27  [12 ]  *Samson v. NAMA Holdings, LLC,* 637 F.3d 915, 935 (9th Cir. 2011) provides the

    Ninth Circuit's three-part framework for judicial estoppel, which Moving Defendants

28  will address if need be in their Reply.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10

- 24 -

MOVING DEFENDANTS' P&A'S ISO MSJ
2:14-CV-06456-GW-E

1 parties that had reached settlements "with EPA with respect to the Site." *Id.* ¶ 88. The

2 settlement thus addresses <u>all</u> Site costs, and more than three years elapsed between

3 Judge Hatter's approval of that settlement and the filing of the instant action.

## V.  **CONCLUSION**

5 The Ninth Circuit made clear in *ASARCO* that (1) Section 113(g)(3)(B) is

6 intended to prevent successive contribution litigation, (2) all judicially approved

7 settlements trigger the three-year limitations period in Section 113(g)(3)(B), and (3)

8 once a set of costs has become time-barred, that set cannot be revived by a later

9 judicially approved settlement. All of those determinations apply in full measure here

10 and compel dismissal.

11 Moreover, this is a case, like *ASARCO*, where the claimants have no one but

12 themselves to blame for their predicament. Plaintiffs here clearly could have sued the

13 Moving Defendants within three years of the 2001 Settlement or the 2007

14 Settlement. Indeed, they even had an active Omega contribution lawsuit, in Judge

15 Hatter's courtroom, for 34 months after the 2007 Settlement was approved.

16 Plaintiffs are thus betrayed by their own Fifth Amended Complaint in two fatal

17 respects. Their complaint never alleges that the costs they seek now are outside the

18 scope of their prior settlements, and it never claims they could not have sued anytime

19 after 2007, let alone after 2001.

20 Therefore, Moving Defendants are entitled to a determination, as a matter of law,

21 that Plaintiffs' first and third causes of action are barred by Section 113(g)(3)(B). Those

22 claims should now be dismissed with prejudice.

23 DATED:  April 30, 2018          COX, CASTLE & NICHOLSON LLP

24

25                                By: */s/ Robert P. Doty*
                                   _____
                                   Robert P. Doty
26                                 Chris Gribble
                                   Attorneys for Defendants
27                                 PALMTREE ACQUISITION CORPORATION

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

071915\9653910v10          - 25 -          MOVING DEFENDANTS' P&A'S ISO MSJ
                                           2:14-CV-06456-GW-E