EXHIBIT 1

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 300

[FRL–6220–5]

## National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 27

**AGENCY:** Environmental Protection Agency.

**ACTION:** Proposed rule.

---

**SUMMARY:** The Comprehensive Environmental Response, Compensation, and Liability Act (``CERCLA'' or ``the Act''), requires that the National Oil and Hazardous Substances Pollution Contingency Plan (``NCP'') include a list of national priorities among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States. The National Priorities List (``NPL'') constitutes this list. The NPL is intended primarily to guide the Environmental Protection Agency (``EPA'' or ``the Agency'') in determining which sites warrant further investigation to assess the nature and extent of public health and environmental risks associated with the site and to determine what CERCLA-financed remedial action(s), if any, may be appropriate. This rule proposes to add 11 new sites to the NPL, all to the General Superfund section. In addition, the rule withdraws one site from proposal to the NPL, from the General Superfund section.

**DATES:** Comments regarding any of these proposed listings must be submitted (postmarked) on or before March 22, 1999.

**ADDRESSES:** By Postal Mail: Mail original and three copies of comments (no facsimiles or tapes) to Docket Coordinator, Headquarters; U.S. EPA; CERCLA Docket Office; (Mail Code 5201G); 401 M Street, SW; Washington, DC 20460; 703/603–9232.

By Express Mail: Send original and three copies of comments (no facsimiles or tapes) to Docket Coordinator, Headquarters; U.S. EPA; CERCLA Docket Office; 1235 Jefferson Davis Highway; Crystal Gateway #1, First Floor; Arlington, VA 22202.

By E-Mail: Comments in ASCII format only may be mailed directly to superfund.docket@epa.gov. E-mailed comments must be followed up by an original and three copies sent by mail or express mail.

For additional Docket addresses and further details on their contents, see section II, ``Public Review/

Comment,'' of the Supplementary Information portion of this preamble.

**FOR FURTHER INFORMATION CONTACT:** Yolanda Singer, phone (703) 603–8835, State, Tribal and Site Identification Center, Office of Emergency and Remedial Response (Mail Code 5204G), U.S. Environmental Protection Agency, 401 M Street, SW, Washington, DC, 20460, or the Superfund Hotline, Phone (800) 424–9346 or (703) 412–9810 in the Washington, DC, metropolitan area.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
  A. What are CERCLA and SARA?
  B. What is the NCP?
  C. What is the National Priorities List (NPL)?
  D. How are Sites Listed on the NPL?
  E. What Happens to Sites on the NPL?
  F. How Are Site Boundaries Defined?
  G. How Are Sites Removed From the NPL?
  H. Can Portions of Sites Be Deleted from the NPL as They Are Cleaned Up?
  I. What is the Construction Completion List (CCL)?
II. Public Review/Public Comment
  A. Can I Review the Documents Relevant to This Proposed Rule?
  B. How do I Access the Documents?
  C. What Documents Are Available for Public Review at the Headquarters Docket?
  D. What Documents Are Available for Public Review at the Regional Dockets?
  E. How Do I Submit My Comments?
  F. What Happens to My Comments?
  G. What Should I Consider When Preparing My Comments?
  H. Can I Submit Comments After the Public Comment Period Is Over?
  I. Can I View Public Comments Submitted by Others?
  J. Can I Submit Comments Regarding Sites Not Currently Proposed to the NPL?
III. Contents of This Proposed Rule
  A. Proposed Additions to the NPL
  B. Status of NPL
  C. Withdrawal of Site From Proposal to the NPL
IV. Executive Order 12866
  A. What is Executive Order 12866?
  B. Is This Proposed Rule Subject to Executive Order 12866 Review?
V. Unfunded Mandates
  A. What is the Unfunded Mandates Reform Act (UMRA)?
  B. Does UMRA Apply to This Proposed Rule?
VI. Effect on Small Businesses
  A. What is the Regulatory Flexibility Act?
  B. Has EPA Conducted a Regulatory Flexibility Analysis for This Rule?
VII. National Technology Transfer and Advancement Act
  A. What is the National Technology Transfer and Advancement Act?
  B. Does the National Technology Transfer and Advancement Act Apply to This Proposed Rule?
VIII. Executive Order 13045
  A. What is Executive Order 13045?
  B. Does Executive Order 13045 Apply to This Proposed Rule?
IX. Paperwork Reduction Act
  A. What is the Paperwork Reduction Act?
  B. Does the Paperwork Reduction Act Apply to This Proposed Rule?
X. Executive Order 12875
  What Is Executive Order 12875 and Is It Applicable to This Proposed Rule?
XI. Executive Order 13084
  What Is Executive Order 13084 and Is It Applicable to This Proposed Rule?

## I. Background

### A. What Are CERCLA and SARA?

In 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601–9675 (``CERCLA'' or ``the Act''), in response to the dangers of uncontrolled releases of hazardous substances. CERCLA was amended on October 17, 1986, by the Superfund Amendments and Reauthorization Act (``SARA''), Pub. L. 99–499, 100 Stat. 1613 *et seq.*

### B. What Is the NCP?

To implement CERCLA, EPA promulgated the revised National Oil and Hazardous Substances Pollution Contingency Plan (``NCP''), 40 CFR part 300, on July 16, 1982 (47 FR 31180), pursuant to CERCLA section 105 and Executive Order 12316 (46 FR 42237, August 20, 1981). The NCP sets guidelines and procedures for responding to releases and threatened releases of hazardous substances, pollutants, or contaminants under CERCLA. EPA has revised the NCP on several occasions. The most recent comprehensive revision was on March 8, 1990 (55 FR 8666).

As required under section 105(a)(8)(A) of CERCLA, the NCP also includes ``criteria for determining priorities among releases or threatened releases throughout the United States for the purpose of taking remedial action and, to the extent practicable, taking into account the potential urgency of such action for the purpose of taking removal action.'' (``Removal'' actions are defined broadly and include a wide range of actions taken to study, clean up, prevent or otherwise address releases and threatened releases 42 U.S.C. 9601(23).)

### C. What Is the National Priorities List (NPL)?

The NPL is a list of national priorities among the known or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States. The list, which is appendix B of the NCP (40 CFR part 300), was required under section 105(a)(8)(B) of CERCLA, as amended by SARA. section

EXHIBIT 1
001

105(a)(8)(B) defines the NPL as a list of ``releases'' and the highest priority ``facilities'' and requires that the NPL be revised at least annually. The NPL is intended primarily to guide EPA in determining which sites warrant further investigation to assess the nature and extent of public health and environmental risks associated with a release of hazardous substances. The NPL is only of limited significance, however, as it does not assign liability to any party or to the owner of any specific property. Neither does placing a site on the NPL mean that any remedial or removal action necessarily need be taken. See Report of the Senate Committee on Environment and Public Works, Senate Rep. No. 46–848, 96th Cong., 2d Sess. 60 (1980), 48 FR 40659 (September 8, 1983).

The NPL includes two sections, one of sites that are generally evaluated and cleaned up by EPA (the ``General Superfund section''), and one of sites that are owned or operated by other Federal agencies (the ``Federal Facilities section''). With respect to sites in the Federal Facilities section, these sites are generally being addressed by other Federal agencies. Under Executive Order 12580 (52 FR 2923, January 29, 1987) and CERCLA section 120, each Federal agency is responsible for carrying out most response actions at facilities under its own jurisdiction, custody, or control, although EPA is responsible for preparing an HRS score and determining whether the facility is placed on the NPL. EPA generally is not the lead agency at Federal Facilities Section sites, and its role at such sites is accordingly less extensive than at other sites.

*D. How Are Sites Listed on the NPL?*

There are three mechanisms for placing sites on the NPL for possible remedial action (see 40 CFR 300.425(c) of the NCP): (1) A site may be included on the NPL if it scores sufficiently high on the Hazard Ranking System (``HRS''), which EPA promulgated as a appendix A of the NCP (40 CFR part 300). The HRS serves as a screening device to evaluate the relative potential of uncontrolled hazardous substances to pose a threat to human health or the environment. On December 14, 1990 (55 FR 51532), EPA promulgated revisions to the HRS partly in response to CERCLA section 105(c), added by SARA. The revised HRS evaluates four pathways: Ground water, surface water, soil exposure, and air. As a matter of Agency policy, those sites that score 28.50 or greater on the HRS are eligible for the NPL; (2) Each State may designate a single site as its top priority

to be listed on the NPL, regardless of the HRS score. This mechanism, provided by the NCP at 40 CFR 300.425(c)(2) requires that, to the extent practicable, the NPL include within the 100 highest priorities, one facility designated by each State representing the greatest danger to public health, welfare, or the environment among known facilities in the State (see 42 U.S.C. 9605(a)(8)(B)); (3) The third mechanism for listing, included in the NCP at 40 CFR 300.425(c)(3), allows certain sites to be listed regardless of their HRS score, if all of the following conditions are met:

• The Agency for Toxic Substances and Disease Registry (ATSDR) of the U.S. Public Health Service has issued a health advisory that recommends dissociation of individuals from the release.

• EPA determines that the release poses a significant threat to public health.

• EPA anticipates that it will be more cost-effective to use its remedial authority than to use its removal authority to respond to the release.

EPA promulgated an original NPL of 406 sites on September 8, 1983 (48 FR 40658). The NPL has been expanded since then, most recently on September 29, 1998 (63 FR 51882).

*E. What Happens to Sites on the NPL?*

A site may undergo remedial action financed by the Trust Fund established under CERCLA (commonly referred to as the ``Superfund'') only after it is placed on the NPL, as provided in the NCP at 40 CFR 300.425(b)(1). (``Remedial actions'' are those ``consistent with permanent remedy, taken instead of or in addition to removal actions. * * *'' 42 U.S.C. 9601(24).) However, under 40 CFR 300.425(b)(2) placing a site on the NPL ``does not imply that monies will be expended.'' EPA may pursue other appropriate authorities to remedy the releases, including enforcement action under CERCLA and other laws.

*F. How Are Site Boundaries Defined?*

The NPL does not describe releases in precise geographical terms; it would be neither feasible nor consistent with the limited purpose of the NPL (to identify releases that are priorities for further evaluation), for it to do so.

Although a CERCLA ``facility'' is broadly defined to include any area where a hazardous substance release has ``come to be located'' (CERCLA section 101(9)), the listing process itself is not intended to define or reflect the boundaries of such facilities or releases. Of course, HRS data (if the HRS is used to list a site) upon which the NPL

placement was based will, to some extent, describe the release(s) at issue. That is, the NPL site would include all releases evaluated as part of that HRS analysis.

When a site is listed, the approach generally used to describe the relevant release(s) is to delineate a geographical area (usually the area within an installation or plant boundaries) and identify the site by reference to that area. As a legal matter, the site is not coextensive with that area, and the boundaries of the installation or plant are not the ``boundaries'' of the site. Rather, the site consists of all contaminated areas within the area used to identify the site, as well as any other location to which contamination from that area has come to be located, or from which that contamination came.

In other words, while geographic terms are often used to designate the site (e.g., the ``Jones Co. plant site'') in terms of the property owned by a particular party, the site properly understood is not limited to that property (e.g., it may extend beyond the property due to contaminant migration), and conversely may not occupy the full extent of the property (e.g., where there are uncontaminated parts of the identified property, they may not be, strictly speaking, part of the ``site''). The ``site'' is thus neither equal to nor confined by the boundaries of any specific property that may give the site its name, and the name itself should not be read to imply that this site is coextensive with the entire area within the property boundary of the installation or plant. The precise nature and extent of the site are typically not known at the time of listing. Also, the site name is merely used to help identify the geographic location of the contamination. For example, the ``Jones Co. plant site,'' does not imply that the Jones company is responsible for the contamination located on the plant site.

EPA regulations provide that the ``nature and extent of the threat presented by a release'' will be determined by a Remedial Investigation/Feasibility Study (``RI/FS'') as more information is developed on site contamination (40 CFR 300.5). During the RI/FS process, the release may be found to be larger or smaller than was originally thought, as more is learned about the source(s) and the migration of the contamination. However, this inquiry focuses on an evaluation of the threat posed; the boundaries of the release need not be exactly defined. Moreover, it generally is impossible to discover the full extent of where the contamination ``has come to be located'' before all necessary studies and

EXHIBIT 1
002

remedial work are completed at a site. Indeed, the boundaries of the contamination can be expected to change over time. Thus, in most cases, it may be impossible to describe the boundaries of a release with absolute certainty.

Further, as noted above, NPL listing does not assign liability to any party or to the owner of any specific property. Thus, if a party does not believe it is liable for releases on discrete parcels of property, supporting information can be submitted to the Agency at any time after a party receives notice it is a potentially responsible party.

For these reasons, the NPL need not be amended as further research reveals more information about the location of the contamination or release.

*G. How Are Sites Removed From the NPL?*

EPA may delete sites from the NPL where no further response is appropriate under Superfund, as explained in the NCP at 40 CFR 300.425(e). This section also provides that EPA shall consult with states on proposed deletions and shall consider whether any of the following criteria have been met: (i) Responsible parties or other persons have implemented all appropriate response actions required; (ii) All appropriate Superfund-financed response has been implemented and no further response action is required; or (iii) The remedial investigation has shown the release poses no significant threat to public health or the environment, and taking of remedial measures is not appropriate. As of January 4, 1999, the Agency has deleted 181 sites from the NPL.

*H. Can Portions of Sites Be Deleted From the NPL as They Are Cleaned Up?*

In November 1995, EPA initiated a new policy to delete portions of NPL sites where cleanup is complete (60 FR 55465, November 1, 1995). Total site cleanup may take many years, while portions of the site may have been cleaned up and available for productive use. As of January 4, 1999, EPA has deleted portions of 15 sites.

*I. What Is the Construction Completion List (CCL)?*

EPA also has developed an NPL construction completion list (``CCL'') to simplify its system of categorizing sites and to better communicate the successful completion of cleanup activities (58 FR 12142, March 2, 1993). Inclusion of a site on the CCL has no legal significance.

Sites qualify for the CCL when: (1) Any necessary physical construction is

complete, whether or not final cleanup levels or other requirements have been achieved; (2) EPA has determined that the response action should be limited to measures that do not involve construction (e.g., institutional controls); or (3) The site qualifies for deletion from the NPL.

Of the 181 sites that have been deleted from the NPL, 172 sites were deleted because they have been cleaned up (the other 9 sites were deleted based on deferral to other authorities and are not considered cleaned up). In addition, there are 413 sites also on the NPL CCL. Thus, as of January 4, 1999, the CCL consists of 585 sites. For the most up-to-date information on the CCL, see EPA's Internet site at http://www.epa.gov/superfund.

**II. Public Review/Public Comment**

*A. Can I Review the Documents Relevant to This Proposed Rule?*

Yes, documents that form the basis for EPA's evaluation and scoring of sites in this rule are contained in dockets located both at EPA Headquarters in Washington, DC and in the appropriate Regional offices.

*B. How Do I Access the Documents?*

You may view the documents, by appointment only, in the Headquarters or the Regional 3 docket after the appearance of this proposed rule. The hours of operation for the Headquarters docket are from 9 a.m. to 4 p.m., Monday through Friday excluding Federal holidays. Please contact the Regional dockets for hours.

Following is the contact information for the EPA Headquarters docket: Docket Coordinator, Headquarters, U.S. EPA CERCLA Docket Office, Crystal Gateway #1, 1st Floor, 1235 Jefferson Davis Highway, Arlington, VA 22202, 703/603–9232. (Please note this is a visiting address only. Mail comments to EPA Headquarters as detailed at the beginning of this preamble.)

The contact information for the Regional dockets are as follows:

Jim Kyed, Region 1 (CT, ME, MA, NH, RI, VT), U.S. EPA Waste Management Records Center, HRC–CAN–7, J.F. Kennedy Federal Building, Boston, MA 02203–2211, 617/573–9656

Ben Conetta, Region 2 (NJ, NY, PR, VI), U.S. EPA, 290 Broadway, New York, NY 10007–1866, 212/637–4435

Kevin Wood, Region 3 (DE, DC, MD, PA, VA, WV), U.S. EPA Region 3, 1650 Arch Street, Philadelphia, PA 19103, Mail Code: 3HS33, 215/814–3303.

Sherryl Decker, Region 4 (AL, FL, GA, KY, MS, NC, SC, TN), U.S. EPA, 100 Alabama Street, SW, Atlanta, GA 30303, 404/562–8127

Region 5 (IL, IN, MI, MN, OH, WI), U.S. EPA, Records Center, Waste Management

Division 7–J, Metcalfe Federal Building, 77 West Jackson Boulevard, Chicago, IL 60604, 312/886–7570

Brenda Cook, Region 6 (AR, LA, NM, OK, TX), U.S. EPA, 1445 Ross Avenue, Mail Code 6SF–RA, Dallas, TX 75202–2733, 214/655–7436

Carole Long, Region 7 (IA, KS, MO, NE), U.S. EPA, 726 Minnesota Avenue, Kansas City, KS 66101, 913/551–7224

David Williams, Region 8 (CO, MT, ND, SD, UT, WY), U.S. EPA, 999 18th Street, Suite 500, Denver, CO 80202–2466, 303/312–6757

Carolyn Douglas, Region 9 (AZ, CA, HI, NV, AS, GU), U.S. EPA, 75 Hawthorne Street, San Francisco, CA 94105, 415/744–2343

David Bennett, Region 10 (AK, ID, OR, WA), U.S. EPA, 11th Floor, 1200 6th Avenue, Mail Stop ECL–115, Seattle, WA 98101, 206/553–2103

You may also request copies from EPA Headquarters or the appropriate Regional docket. An informal request, rather than a formal written request under the Freedom of Information Act, should be the ordinary procedure for obtaining copies of any of these documents.

*C. What Documents Are Available for Public Review at the Headquarters Docket?*

The Headquarters docket for this rule contains: HRS score sheets for each proposed site; a Documentation Record for each site describing the information used to compute the score; information for any site affected by particular statutory requirements or EPA listing policies; and a list of documents referenced in the Documentation Record. The Headquarters docket also contains an ``Additional Information'' document which provides a general discussion of the statutory requirements affecting NPL listing, the purpose and implementation of the NPL, and the economic impacts of NPL listing.

*D. What Documents Are Available for Public Review at the Regional Dockets?*

The Regional dockets for this rule contain all of the information in the Headquarters docket for those sites in its Region, plus, the actual reference documents containing the data principally relied upon and cited by EPA in calculating or evaluating the HRS scores for sites in that Region. These reference documents are available only in the Regional docket.

*E. How Do I Submit My Comments?*

Comments must be submitted to EPA Headquarters as detailed at the beginning of this preamble in the **ADDRESSES** section.

EXHIBIT 1
003

## F. What Happens to My Comments?

EPA considers all comments received during the comment period. Significant comments will be addressed in a support document that EPA will publish concurrently with the **Federal Register** document if, and when, the site is listed on the NPL.

## G. What Should I Consider When Preparing My Comments?

Comments that include complex or voluminous reports, or materials prepared for purposes other than HRS scoring, should point out the specific information that EPA should consider and how it affects individual HRS factor values or other listing criteria (*Northside Sanitary Landfill* v. *Thomas*, 849 F.2d 1516 (D.C. Cir. 1988)). EPA will not address voluminous comments that are not specifically cited by page number and referenced to the HRS or other listing criteria. EPA will not address comments unless they indicate which component of the HRS documentation record or what particular point in EPA's stated eligibility criteria is at issue.

## H. Can I Submit Comments After the Public Comment Period Is Over?

Generally, EPA will not respond to late comments. EPA can only guarantee that it will consider those comments postmarked by the close of the formal comment period. EPA has a policy of not delaying a final listing decision solely to accommodate consideration of late comments.

## I. Can I View Public Comments Submitted by Others?

During the comment period, comments are placed in the Headquarters docket and are available to the public on an "as received" basis. A complete set of comments will be available for viewing in the Regional docket approximately one week after the formal comment period closes.

## J. Can I Submit Comments Regarding Sites Not Currently Proposed to the NPL?

In certain instances, interested parties have written to EPA concerning sites which were not at that time proposed to the NPL. If those sites are later proposed to the NPL, parties should review their earlier concerns and, if still appropriate, resubmit those concerns for consideration during the formal comment period. Site-specific correspondence received prior to the period of formal proposal and comment will not generally be included in the docket.

## III. Contents of This Proposed Rule

### A. Proposed Additions to the NPL

Table 1 identifies the 11 sites in the General Superfund section being proposed to the NPL in this rule. This table follows this preamble. All sites are proposed based on HRS scores of 28.50 or above. The sites in Table 1 are listed alphabetically by State, for ease of identification.

### B. Status of NPL

A final rule published elsewhere in today's **Federal Register** finalizes 17 sites to the NPL; resulting in an NPL of 1,206 sites; 1,053 in the General Superfund section and 153 in the Federal Facilities section. With this proposal of 11 new sites, there are now 59 sites proposed and awaiting final agency action, 50 in the General Superfund section and 9 in the Federal Facilities section. Final and proposed sites now total 1,265.

### C. Withdrawal of Site From Proposal to the NPL

EPA is withdrawing the Rinchem Co., Inc. Site from proposal to the NPL from the General Superfund section.

## IV. Executive Order 12866

### A. What Is Executive Order 12866?

Under Executive Order 12866, (58 FR 51735 (October 4, 1993)) the Agency must determine whether a regulatory action is "significant" and therefore subject to OMB review and the requirements of the Executive Order. The Order defines "significant regulatory action" as one that is likely to result in a rule that may: (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

### B. Is This Proposed Rule Subject to Executive Order 12866 Review?

No, the Office of Management and Budget (OMB) has exempted this regulatory action from Executive Order 12866 review.

## V. Unfunded Mandates

### A. What Is the Unfunded Mandates Reform Act (UMRA)?

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal Agencies to assess the effects of their regulatory actions on State, local, and tribal governments and the private sector. Under section 202 of the UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year. Before EPA promulgates a rule for which a written statement is needed, section 205 of the UMRA generally requires EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted. Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

### B. Does UMRA Apply to This Proposed Rule?

No, EPA has determined that this rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and tribal governments in the aggregate, or by the private sector in any one year. This rule will not impose any federal intergovernmental mandate because it imposes no enforceable duty upon State, tribal or local governments. Listing a site on the NPL does not itself impose any costs. Listing does not mean that EPA necessarily will undertake

EXHIBIT 1
004

remedial action. Nor does listing require any action by a private party or determine liability for response costs. Costs that arise out of site responses result from site-specific decisions regarding what actions to take, not directly from the act of listing a site on the NPL.

For the same reasons, EPA also has determined that this rule contains no regulatory requirements that might significantly or uniquely affect small governments. In addition, as discussed above, the private sector is not expected to incur costs exceeding $100 million. EPA has fulfilled the requirement for analysis under the Unfunded Mandates Reform Act.

## VI. Effect on Small Businesses

### A. What Is the Regulatory Flexibility Act?

Under the Regulatory Flexibility Act (RFA), 5 U.S.C. 601 *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA), EPA generally is required to conduct a regulatory flexibility analysis describing the impact of the rule on small entities.

### B. Has EPA Conducted a Regulatory Flexibility Analysis for This Rule?

No. Under section 605(b) of the RFA, EPA is not required to prepare a regulatory flexibility analysis if the Agency certifies that the rule will not have a substantial economic impact on a substantial number of small entities.

While this rule proposes to revise the NPL, an NPL revision is not a typical regulatory change since it does not automatically impose costs. As stated above, adding sites to the NPL does not in itself require any action by any party, nor does it determine the liability of any party for the cost of cleanup at the site. Further, no identifiable groups are affected as a whole. As a consequence, impacts on any group are hard to predict. A site's inclusion on the NPL could increase the likelihood of adverse impacts on responsible parties (in the form of cleanup costs), but at this time EPA cannot identify the potentially affected businesses or estimate the number of small businesses that might also be affected.

The Agency does expect that placing the sites in this proposed rule on the NPL could significantly affect certain industries, or firms within industries, that have caused a proportionately high percentage of waste site problems. However, EPA does not expect the listing of these sites to have a significant economic impact on a substantial number of small businesses.

In any case, economic impacts would occur only through enforcement and cost-recovery actions, which EPA takes at its discretion on a site-by-site basis. EPA considers many factors when determining enforcement actions, including not only a firm's contribution to the problem, but also its ability to pay. The impacts (from cost recovery) on small governments and nonprofit organizations would be determined on a similar case-by-case basis.

For the foregoing reasons, I hereby certify that this proposed rule, if promulgated, will not have a significant economic impact on a substantial number of small entities. Therefore, this proposed regulation does not require a regulatory flexibility analysis.

## VII. National Technology Transfer and Advancement Act

### A. What Is the National Technology Transfer and Advancement Act?

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (NTTAA), Public Law 104–113, section 12(d) (15 U.S.C. 272 note), directs EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. The NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards.

### B. Does the National Technology Transfer and Advancement Act Apply to This Proposed Rule?

No. This proposed rulemaking does not involve technical standards. Therefore, EPA did not consider the use of any voluntary consensus standards.

## VIII. Executive Order 13045

### A. What Is Executive Order 13045?

Executive Order 13045: ``Protection of Children from Environmental Health Risks and Safety Risks'' (62 FR 19885, April 23, 1997) applies to any rule that: (1) is determined to be ``economically significant'' as defined under E.O. 12866, and (2) concerns an environmental health or safety risk that EPA has reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, the Agency must evaluate the environmental health or safety effects of the planned rule on children, and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives considered by the Agency.

### B. Does Executive Order 13045 Apply to This Proposed Rule?

This proposed rule is not subject to E.O. 13045 because it is not an economically significant rule as defined by E.O. 12866, and because the Agency does not have reason to believe the environmental health or safety risks addressed by this section present a disproportionate risk to children.

## IX. Paperwork Reduction Act

### A. What Is the Paperwork Reduction Act?

According to the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.*, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information that requires OMB approval under the PRA, unless it has been approved by OMB and displays a currently valid OMB control number. The OMB control numbers for EPA's regulations, after initial display in the preamble of the final rules, are listed in 40 CFR part 9. The information collection requirements related to this action have already been approved by OMB pursuant to the PRA under OMB control number 2070–0012 (EPA ICR No. 574).

### B. Does the Paperwork Reduction Act Apply to This Proposed Rule?

No. EPA has determined that the PRA does not apply because this rule does not contain any information collection requirements that require approval of the OMB.

## X. Executive Order 12875

### What Is Executive Order 12875 and Is It Applicable to This Proposed Rule?

Under Executive Order 12875, EPA may not issue a regulation that is not required by statute and that creates a mandate upon a State, local or tribal government, unless the Federal government provides the funds necessary to pay the direct compliance costs incurred by those governments, or EPA consults with those governments. If EPA complies by consulting, Executive Order 12875 requires EPA to provide to the Office of Management and Budget a description of the extent of EPA's prior consultation with representatives of affected State, local and tribal governments, the nature of their concerns, any written communications from the governments, and a statement supporting the need to issue the regulation. In addition, Executive Order 12875 requires EPA to develop an effective process permitting elected

EXHIBIT 1
005

officials and other representatives of State, local and tribal governments ``to provide meaningful and timely input in the development of regulatory proposals containing significant unfunded mandates.''

This proposed rule does not create a mandate on State, local or tribal governments. The rule does not impose any enforceable duties on these entities. Accordingly, the requirements of section 1(a) of Executive Order 12875 do not apply to this rule.

## XI. Executive Order 13084

*What Is Executive Order 13084 and Is It Applicable to This Proposed Rule?*

Under Executive Order 13084, EPA may not issue a regulation that is not required by statute, that significantly or uniquely affects the communities of Indian tribal governments, and that imposes substantial direct compliance costs on those communities, unless the Federal government provides the funds necessary to pay the direct compliance costs incurred by the tribal governments, or EPA consults with those governments. If EPA complies by consulting, Executive Order 13084 requires EPA to provide to the Office of Management and Budget, in a separately identified section of the preamble to the rule, a description of the extent of EPA's prior consultation with representatives of affected tribal governments, a summary of the nature of their concerns, and a statement supporting the need to issue the regulation. In addition, Executive Order 13084 requires EPA to develop an effective process permitting elected officials and other representatives of Indian tribal governments ``to provide meaningful and timely input in the development of regulatory policies on matters that significantly or uniquely affect their communities.''

This proposed rule does not significantly or uniquely affect the communities of Indian tribal governments because it does not significantly or uniquely affect their communities. Accordingly, the requirements of section 3(b) of Executive Order 13084 do not apply to this rule.

| State | Site name | City/county |
|---|---|---|
| AL | American Brass, Inc | Headland. |
| CO | Vasquez Boulevard and I–70 | Denver. |
| LA | Central Wood Preserving Co | Slaughter. |
| LA | Ruston Foundary | Alexandria. |
| MD | 68th Street Dump/Industrial Enterprises | Rosedale. |
| MO | Armour Road | North Kansas City. |
| MO | Newton County Wells | Newton County. |
| MO | Pools Prairie | Neosho. |
| NC | Georgia-Pacific Corporation Hardwood Sawmill | Plymouth. |
| NY | Stanton Cleaners Area Ground Water Contamination | Great Neck. |
| VA | Former Nansemond Ordnance Depot | Suffolk. |

Number of Sites Proposed to General Superfund Section: 11.

## List of Subjects in 40 CFR Part 300

Environmental protection, Air pollution control, Chemicals, Hazardous substances, hazardous waste, Intergovernmental relations, Natural resources, Oil pollution, penalties, Reporting and recordkeeping requirements, Superfund, Water pollution control, Water supply.

**Authority:** 33 U.S.C. 1321(c)(2); 42 U.S.C. 9601–9657; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Dated: January 11, 1999.

**Timothy Fields, Jr.,**

*Acting Assistant Administrator, Office of Solid Waste and Emergency Response.*

[FR Doc. 99–1021 Filed 1–15–99; 8:45 am]

BILLING CODE 6560–50–P

EXHIBIT 1
006

# EXHIBIT 2

JOHN C. CRUDEN
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

DEBORAH A. GITIN (CA Bar No. 284947)
KARL J. FINGERHOOD (PA Bar No. 63260)
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
301 Howard Street, Suite 1050
San Francisco, California 94105
Telephone: (415) 744-6488
Facsimile: (415) 744-6476
Email: Deborah.Gitin@usdoj.gov

*Attorneys for Plaintiff United States of America*

*(Names and addresses of attorneys continued on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORNIA, on behalf of the Department of Toxic Substances Control and Toxic Substances Control Account, <br><br> Plaintiffs, <br><br> v. <br><br> ABEX AEROSPACE, et al., <br><br> Defendants. | Case No. 2:16-cv-02696 -GW-E <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE** <br><br> Judge: Hon. George H. Wu <br><br> Date: December 5, 2016 <br> Time: 8:30 a.m. <br> Courtroom: 10 (Spring St.) |

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
001

1  HOPE SCHMELTZER
2  Assistant Regional Counsel
   U.S. Environmental Protection Agency
3  Region 9
   75 Hawthorne Street
4  San Francisco, California 94105
5  Tel: (415) 972-3218
   Email: Schmeltzer.Hope@epa.gov
6
7        *Of Counsel for Plaintiff United States of America*
8
   KAMALA D. HARRIS
9  Attorney General of California
   SARAH E. MORRISON
10 Supervising Deputy Attorney General
11 OLIVIA W. KARLIN (CA Bar No. 150432)
   Deputy Attorney General
12 300 South Spring Street, Suite 1702
13 Los Angeles, California 90013
   Tel.: (213) 897-0473
14 Fax: (213) 897-2802
15 Email: Olivia.Karlin@doj.ca.gov
16
17       *Attorneys for Plaintiff State of California*
         *Department of Toxic Substances Control and Toxic Substances Control*
18       *Account*
19
20       TO ALL PARTIES AND THEIR COUNSEL OF RECORD:
21 PLEASE TAKE NOTICE THAT, on December 5, 2016 at 8:30 a.m., or as soon
22 thereafter as counsel may be heard, the United States of America ("United States")
23 and the State of California, on behalf of the Department of Toxic Substances
24 Control and Toxic Substances Control Account ("DTSC") (collectively
25 "Plaintiffs"), will appear in the Courtroom of the Honorable George H. Wu, Room
26 10, 312 N. Spring St., Los Angeles, CA 90012, and will move pursuant to Local
27 Rule 7, for entry of a proposed Consent Decree recently lodged with the Court,
28 relating to Operable Unit 2 ("OU2") of the Omega Chemical Corporation
   Superfund Site ("Site"):

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
002

1    The Plaintiffs filed a Complaint in this action on April 20, 2016, asserting

2  claims for injunctive relief and recovery of costs under Sections 106(a) and 107 of

3  the Comprehensive Environmental Response, Compensation, and Liability Act of

4  1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606(a) and 9607, and Section 7003

5  of the Resource Conservation and Recovery Act, as amended ("RCRA"), 42

6  U.S.C. § 6973.  (Doc. No. 1)  The Plaintiffs simultaneously lodged a Consent

7  Decree that would resolve the civil claims alleged in the Complaint.  (Docs. No. 4

8  and 4-1)[1]  Pursuant to 28 C.F.R. § 50.7, the United States Environmental

9  Protection Agency ("EPA") and DTSC published notice of the Consent Decree in

10  the Federal Register on April 27, 2016, and accepted public comments for a period

11  of thirty (30) days thereafter.  81 Fed. Reg. 24885-01 (Apr. 27, 2016).  The

12  comments received are attached to the Memorandum in support of this Motion as

13  Exhibits M through R, and responses to those comments are provided within the

14  text of the Memorandum and as an attachment to Exhibit D of the Memorandum.

15  The United States also held a public meeting near the Site, on August 18, 2016;

16  there were no questions from the public at that meeting.  *See* Memorandum Ex. U

17  (public meeting transcript).  Accordingly, for the reasons described in the

18  supporting Memorandum below, the United States and DTSC respectfully request

19  the Court to enter the Consent Decree.

20    This motion is based upon this Notice, the attached Memorandum, and the

21  Declarations of Wayne Praskins, Marie Ortesi, and Sayareh Amirebrahimi, which

22

23

24  ───────────────────

25  [1] The Plaintiffs subsequently filed a Notice of Errata Concerning Proposed Consent
Decree and a proposed Corrected Consent Decree, to reflect ministerial changes
26  made to the proposed Consent Decree with all signatories' agreement.  (Docs. No.
19 and 19-1) (Oct. 6, 2016).  All references to the Consent Decree in the attached
27  Memorandum are intended to refer to the proposed Corrected Consent Decree
(Doc. No. 19-1), which is attached to the Memorandum in support of this Motion
28  as Exhibit A.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
003

1  appear as Exhibits B through D to the Memorandum.  The Defendants do not

2  oppose this motion.

3       The positions laid out in the Stipulation Re: Limited Intervention Regarding

4  Motion to Enter Consent Decree (Doc. No. 20) and the Court's Order entering that

5  stipulation (Doc. No. 21) reflect the conference of Plaintiffs, Defendants, and

6  Anticipated Intervenors' counsel pursuant to Local Rule 7-3 as of the time of filing

7  of that stipulation, October 11, 2016.  The Anticipated Intervenors have stated an

8  intention to file an opposition to this Motion.

9       Pursuant to Local Rule 7-20, the Plaintiffs are submitting a Proposed Order

10  relating to entry of the Consent Decree.  However, the Plaintiffs respectfully

11  request that this Court, in lieu of signing the Proposed Order, instead enter the

12  Consent Decree by signing page 86 of the Consent Decree, which is attached to the

13  Memorandum as Exhibit A.

14                               JOHN C. CRUDEN
                                 Assistant Attorney General
15                               Environment & Natural Resources Division
16

17  Dated: October 20, 2016      /s/ Deborah A. Gitin
                                 DEBORAH A. GITIN
18                               Environmental Enforcement Section
19                               Environment & Natural Resources Division
                                 United States Department of Justice
20

21  Dated: October 20, 2016      /s/ Olivia W. Karlin
                                 OLIVIA W. KARLIN
22                               Deputy Attorney General
23                               Attorney for the State of California
24                               Department of Toxic Substances Control
                                 and Toxic Substances Control Account
25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
004

1  JOHN C. CRUDEN
2  Assistant Attorney General
   U.S. Department of Justice
3  Environment and Natural Resources Division

4  DEBORAH A. GITIN (CA Bar No. 284947)
   KARL J. FINGERHOOD (PA Bar No. 63260)
5  Senior Counsel
6  Environmental Enforcement Section
   Environment and Natural Resources Division
7  301 Howard Street, Suite 1050
   San Francisco, California 94105
8  Telephone: (415) 744-6488
   Facsimile: (415) 744-6476
9  Email: Deborah.Gitin@usdoj.gov

10    *Attorneys for Plaintiff United States of America*

11

12 *(Names and addresses of attorneys continued on following page)*

13            UNITED STATES DISTRICT COURT
14            CENTRAL DISTRICT OF CALIFORNIA
15                 WESTERN DIVISION

16 | UNITED STATES OF AMERICA, and          | Case No. 2:16-cv-2696 -GW-E
17 | STATE OF CALIFORNIA, on behalf of the  |
   | Department of Toxic Substances Control and | **MEMORANDUM IN**
18 | Toxic Substances Control Account,       | **SUPPORT OF PLAINTIFFS'**
19 |                                         | **MOTION TO ENTER**
   |                 Plaintiffs,             | **CONSENT DECREE**
20 |                                         |
21 | v.                                      | Judge: Hon. George H. Wu
22 | ABEX AEROSPACE, et al.,                 |
23 |                                         | Date: December 5, 2016
   |                 Defendants.             | Time: 8:30am
24 |                                         | Courtroom: 10 (Spring St.)

25

26

27

28

EXHIBIT 2
005

HOPE SCHMELTZER
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 9
75 Hawthorne Street
San Francisco, California 94105
Tel: (415) 972-3218
Email: Schmeltzer.Hope@epa.gov

  *Of Counsel for Plaintiff United States of America*

KAMALA D. HARRIS
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General
OLIVIA W. KARLIN (CA Bar No. 150432)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel.: (213) 897-0473
Fax: (213) 897-2802
Email: Olivia.Karlin@doj.ca.gov

  *Attorneys for Plaintiff State of California*
  *Department of Toxic Substances Control and Toxic Substances Control*
  *Account*

EXHIBIT 2
006

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND .....................................................................................2

      A.   The Site .........................................................................................2

      B.   The Settling Defendants................................................................3

      C.   Procedural History .......................................................................3

           1.  Brief Description of Prior Settlements and Response Actions .......... 3

           2.  The 2011 Record of Decision (ROD) for OU2 .................................. 4

           3.  General/Special Notice for Operable Unit 2 ..................................... 5

           4.  Lodging of this Proposed Consent Decree (Including Comments) .. 5

III.  SUMMARY OF THE PROPOSED CONSENT DECREE ...........................6

      A.   Work Commitments.......................................................................6

      B.   Past and Future Response Costs; Additional Financial
           Commitments ................................................................................8

      C.   Covenants Not to Sue and Contribution Protection for Matters
           Addressed .....................................................................................8

      D.   Cost-Sharing Between the United States and OPOG Members for
           "Certain Noticed PRPs".................................................................9

      E.   Other Agreements Regarding Future Settlements ...................................10

IV.   ARGUMENT............................................................................................10

      A.   Under the Applicable Legal Standard, the Court's Inquiry Is
           Deferential ..................................................................................12

      B.   The Settlement Is Fair...............................................................14

           1.  The Fairness of This Settlement Should be Assessed in the
               Aggregate........................................................................... 14

           2.  The Settlement is Procedurally Fair...................................... 15

           3.  The Settlement is Substantively Fair ................................... 17

      C.   The Settlement is Reasonable ....................................................20

      D.   The Settlement is Harmonious with CERCLA and RCRA..................21

      E.   The Public Comments Received Do Not Provide a Reason Not to Enter
           the Consent Decree .....................................................................21

EXHIBIT 2
007

1        1.   Comments Re Fairness/Reasonableness of Consent Decree........... 21

2        2.   Requests for Edits to Consent Decree ..................................................... 24

3        3.   Other Technical Comments Regarding Statement of Work ........... 25

4   V.     CONCLUSION.................................................................................................25

EXHIBIT 2
008

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**

4

*Alcoa, Inc., et al, v. APC Investments Co., et al.*,

5

   2:14-cv-06456-GW (C.D. Cal.) ................................................... 2, 6, 10, 11, 15

6

*Amoco Oil Co. v. Dingwell*,

7

   690 F.Supp. 78 (D. Maine 1988).........................................................................19

8

*Arizona v. City of Tucson*,

9

   761 F.3d 1005 (9th Cir. 2014)..................................................................... 13, 17

10

*Burlington Northern & Santa Fe Ry. Co. v. United States*,

11

   129 S.Ct. 1870 (2009) .........................................................................................23

12

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,

13

   710 F.3d 946 (9th Cir. 2013)...............................................................................12

14

*Citizens for a Better Env't v. Gorsuch*,

15

   718 F.2d 1117 (D.C. Cir. 1983)..........................................................................13

16

*Marine Forests Soc. v. California Coastal Comm'n*,

17

   36 Cal.4th 1 (Cal. 2005) .....................................................................................16

18

*Officers for Justice v. Civil Service Comm'n*,

19

   688 F.2d 615 (9th Cir. 1982) ......................................................................... 13-14

20

*People ex rel. Lockyer v. Superior Court (Cole National Corp.)*,

21

   122 Cal.App.4th 1060 (Ct. App. 2004) ..............................................................16

22

*S.E.C. v. Randolph*,

23

   736 F.2d 525 (9th Cir. 1984) ..............................................................................12

24

*United States v. Aerojet General Corp.*,

25

   606 F.3d 3d 1142, 1150 (9th Cir. 2010) .............................................................14

26

*United States v. Akzo Coatings of Amer., Inc.*,

27

   949 F.2d 1409 (6th Cir. 1991) ..................................................................... 13, 20

28

*United States v. Albert Inv. Co.*,

   58 5F.3d 1386, 1396 (10th Cir. 2009) ................................................................14

EXHIBIT 2
009

*United States v. Allegheny-Ludlum Indus., Inc.*,

   517 F.2d 826 (5th Cir. 1975) ...............................................................13

*United States v. Bechtel Corp.*,

   648 F.2d 660 (9th Cir. 1981) ...............................................................13

*United States v. Cannons Eng'g Corp.*,

   *(Cannons I)*, 720 F. Supp. 1027 (D. Mass. 1989) ........................ 12, 13

*United States v. Cannons Eng'g Corp.*,

   *(Cannons II)*, 899 F.2d 79 (1st Cir. 1990).....................................11-14, 16-18, 20

*United States v. Charles George Trucking, Inc.*,

   34 F.3d 1081 (1st Cir. 1994) ...............................................................14

*United States v. Charter International Oil Company*,

   83 F.3d 510 (5th Cir. 1996) .......................................................... 17, 18

*United States v. Chevron U.S.A., Inc.*,

   380 F.Supp.2d 1104 (N.D. Cal. 2005).................................................15

*United States v. Consolidation Coal Co.*,

   184 F.Supp.2d 723 (S.D. Ohio 2002)..................................................19

*United States v. Davis*,

   261 F.3d 1 (1st Cir. 2001) ........................................................... 11, 19

*United States v. Davis*,

   31 F.Supp.2d 452 (D.R.I. 1998) .........................................................19

*United States v. Fort James Operating Co.*,

   313 F.Supp.2d 902 (E.D. Wis. 2004) ..................................................18

*United States v. GenCorp Inc.*,

   935 F. Supp. 928 (N.D. Ohio 1996) ....................................................14

*United States v. Kramer*,

   19 F.Supp.2d 273 (D.N.J. 1998)................................................... 14, 20

*United States v. Mid-State Disposal Inc.*,

   131 F.R.D. 573 (W.D. Wis. 1990).......................................................14

EXHIBIT 2
010

*United States v. Montrose Chem. Corp. of Calif.*,

    50 F.3d 741 (9th Cir. 1995) .................................................. 12-14, 17, 18

*United States v. Oregon*,

    913 F.2d 576 (9th Cir. 1990) ................................................. 13, 15

*United States v. R.W. Meyer, Inc.*,

    889 F.2d 1497 (6th Cir. 1989) ..................................................23

*Williams v. Vukovich*,

    720 F.2d 909 (6th Cir. 1983) .....................................................16

**Statutes**

42 U.S.C. § 6973 .........................................................................21

42 U.S.C. § 9606(a) .......................................................................3

42 U.S.C. § 9607 ..................................................................... 3, 23

42 U.S.C. §9613(f)(1) .............................................................. 11, 23

42 U.S.C. § 9613(f)(2) ..................................................................11

42 U.S.C. § 9622(a) .....................................................................12

42 U.S.C. § 9622(d)(1).................................................................12

42 U.S.C. § 9622(e) .......................................................................5

42 U.S.C. § 9622(g)(7).................................................................9

**Rules**

Federal Rule of Civil Procedure 58 ..........................................25

**Regulations**

64 Fed. Reg. 2950-01 (Jan. 19, 1999)..........................................4

81 Fed. Reg. 24885-01 (Apr. 27, 2016)........................................6

EXHIBIT 2
011

## I. __INTRODUCTION__

Plaintiffs, the United States and DTSC, request that this Court enter the proposed Consent Decree described in the Notice of Motion above and set forth as Exhibit A to this Motion. This Consent Decree is highly favorable to the public interest: it requires the 237 Settling Defendants to collectively fund and perform substantial groundwater cleanup at OU2 of the Omega Chemical Corporation Superfund Site, at an estimated cost of $70 million, and does not provide a Site-wide or OU2-wide release of liability to any Settling Defendant. All viable parties, both settlors and nonsettlors, remain potentially available to perform additional cleanup work at OU2 in the future. The Consent Decree also recovers over $8 million of the unreimbursed OU2 past costs that EPA and DTSC have already expended.[1]

The Settling Defendants – the 65 members of the Omega PRP Organized Group ("OPOG"), 169 additional parties that sent waste to the Omega Chemical Corporation, and three mid-plume owner/operators – organized themselves to present a joint settlement offer to EPA and DTSC, as is encouraged by CERCLA. They have collectively agreed to perform an estimated $70 million worth of cleanup work ("the Work") under EPA's oversight. The Work includes groundwater extraction and treatment in the northern and central portions of the groundwater plume, which span approximately three miles – roughly two-thirds of the plume's current lateral extent. Ex. D (Decl. of Wayne Praskins) ¶8. The Settling Defendants also commit to perform investigative work necessary to guide EPA's remedial decision in the lower portion of the plume, and to pay EPA's and DTSC's oversight costs for the Work, preventing additional public costs from mounting.

---

[1] EPA's unreimbursed OU2 past costs are approximately $23 million and DTSC's are $70,000. Ex. B (Decl. of Marie Ortesi) ¶6; Ex. C (Decl. of Sayareh Amirebrahimi) ¶4.

EXHIBIT 2
012

The Plaintiffs received four adverse public comments from nonsettling PRPs that have not been sued by the Plaintiffs at OU2 but are defendants in the private *Alcoa* litigation.[2] Most of these comments concern intra-defendant issues that are not germane to the Court's consideration of the fairness of this settlement. Under the highly deferential judicial review standard afforded to EPA consent decrees, the Court should find this Consent Decree to be fair, reasonable, and consistent with the objectives of CERCLA and RCRA, and should enter the Consent Decree.

## II.  BACKGROUND

### A.  The Site

The Site includes the location of the former Omega Chemical Corporation ("Omega Chemical"), a refrigerant and solvent recycling and treatment facility located in Whittier, California, and an area of groundwater contamination extending four miles or more to the south and west. Omega Chemical operated from approximately 1976 to 1991, handling primarily chlorinated hydrocarbons and chlorofluorocarbons. Drums and bulk loads of waste solvents and chemicals from various industrial activities were processed at the facility to form commercial products. As a result of these operations, subsurface soil and groundwater have high concentrations of PCE, TCE, other chlorinated hydrocarbons, Freons, and other contaminants. Ex. A (Consent Decree), App. A (Record of Decision), §2.1.

EPA commonly divides complex Superfund sites into Operable Units ("OUs") to facilitate organization of remedial action. The Omega Site has three such units. OU1 includes the former Omega Chemical facility and immediate vicinity. OU2 – the subject of this Consent Decree – includes the contamination in groundwater downgradient of OU1 that originated from the Omega Chemical facility, which contamination has commingled with chemicals released at other source areas/facilities at the Site to form a regional groundwater plume. OU3

---

[2] *Alcoa, Inc., et al, v. APC Investments Co., et al.*, 2:14-cv-06456-GW (C.D. Cal.).

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
013

1  refers to vapor intrusion from the Omega Site into several buildings on and near

2  the Omega property.   Ex. A (Consent Decree) ¶G; *id.* Appendix A (Record of

3  Decision) §2.1.  Pursuant to prior Consent Decrees and an Administrative Order on

4  Consent ("AOC"), OPOG is leading the OU1 and OU3 investigation and cleanup.

5  Exs. E-G (prior Consent Decrees and AOC).  EPA has, to date, led the

6  investigation for OU2.

7       **B.**    **The Settling Defendants**

8       The Settling Defendants include over 200 parties ("generators" or

9  "arrangers") that sent wastes to the Omega Chemical facility.  Sixty-five of these

10  generators are members of OPOG, and are considered "Settling Work Defendants"

11  for purposes of this Consent Decree.  *See* Ex. A (Consent Decree), App. E.  An

12  additional 169 generators (and two other parties, described later in this paragraph)

13  have "cashed out" to OPOG members via internal agreements and are denominated

14  "Settling Cash Defendants" for purposes of this Consent Decree.  *Id.,* App. D.

15  However, these parties have <u>not</u> "cashed out" to the United States in exchange for

16  a full release of liability at OU2 or at the Site; rather, they have received covenants

17  and contribution protection for past response costs, future response costs related to

18  the Work, and the Work performed by Settling Work Defendants.  *Id.* ¶¶59-60.

19       The Settling Defendants also include three parties (Settling Work Defendant

20  McKesson Corporation, and Settling Cash Defendants Burke Street LLC and the

21  related Stadler Family Limited Partnership) who owned or operated facilities

22  within OU2, downgradient of Omega Chemical.  Doc. No. 1 (Complaint), ¶¶20-25.

23      **C.**    **Procedural History**

24            **1.**    **Brief Description of Prior Settlements and Response Actions**

25       EPA issued an initial administrative order in 1995 pursuant to which 147

26  parties, many of which later formed OPOG or associated with OPOG, removed the

27  barrels of waste from the Omega Chemical facility.  Ex. H (1995 order, as

28  amended).  EPA then placed the Site on the National Priorities List ("NPL"), a list

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
014

of the most highly contaminated Superfund sites, in 1999.  *See* 64 Fed. Reg. 2950-01 (Jan. 19, 1999).  EPA also entered into consent decrees in 2001 and 2010, in which OPOG members and associated settling cash defendants agreed to pay a portion of EPA's OU1 past costs and to perform the OU1 remedial design/remedial action work.  OPOG members have also performed work at OU3 pursuant to a 2009 AOC.  Exs. E-G.

Several federal agencies, including the military services, the U.S. Department of Agriculture, and the U.S. Department of Energy, were among the hundreds of generators that sent waste to the Omega Chemical facility; these federal defendants settled out to OPOG in 2006 for any claims OPOG members might have against them at the Site.  Ex. I (federal defendants' settlement).  EPA was not a party to that settlement.

## 2.    The 2011 Record of Decision (ROD) for OU2

On September 20, 2011, EPA issued the *Interim Action Record of Decision – Omega Chemical Corporation Superfund Site Operable Unit 2, Los Angeles, County, California 9/20/11* ("ROD"), which selects as the Interim Remedy for OU2 a groundwater pump-and-treat system intended to limit further movement of contaminated groundwater.  The overall objective of the ROD is to protect human health and the environment by preventing further spreading of the contaminated groundwater to as yet uncontaminated portions of the aquifer and nearby production wells.  *See* Ex. A (Consent Decree), App. A (ROD), §1.4.  The ROD also reflects that there are known sources that have contributed to groundwater contamination within the OU2 plume but for which cleanup actions have not yet been selected, as well as other potential but unconfirmed source areas contributing to the contamination; and that additional data is needed to identify a complete list of sources and remedial actions.  *Id.*  Components of the remedy in the ROD include the installation of extraction wells; construction of groundwater treatment facilities and associated piping; delivery of treated water to one or more local

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
015

drinking water purveyors, or, if EPA determines the required agreements cannot be reached in a timely manner, reinjection of the treated water into the aquifer;[3] and installation of new monitoring wells. The ROD identifies three general areas in which extraction wells may be appropriate: the Northern Extraction Area, Central Extraction Area, and Leading Edge Area.[4] *Id.* §2.9.2.

### 3. General/Special Notice for Operable Unit 2

From 2007 to 2010, and again in 2012 and 2013, EPA sent General Notice Letters notifying recipients that EPA had identified them as PRPs at OU2. In 2012, following issuance of the ROD, EPA sent out Special Notice Letters, as authorized by Section 122(e) of CERCLA, to previously identified PRPs, explaining why EPA believed them liable, informing them of EPA's plan for OU2 cleanup, and inviting them to participate in negotiations with EPA to conduct cleanup work and pay past and future costs. *See* Ex. D (Praskins Decl.) ¶10 (describing notice letters and categories of nonsettling parties who received them); *see also* 42 U.S.C. § 9622(e) (describing process generally).

### 4. Lodging of this Proposed Consent Decree (Including Comments)

The Plaintiffs concluded negotiations with the Settling Defendants by simultaneously filing a Complaint and lodging this Consent Decree on April 20, 2016. (Docs. No. 1 and 4.) The Complaint, which seeks cost recovery and

---

[3] EPA has since determined that reclamation and spreading are also acceptable uses of the treated water, and removed the preference for delivery of the treated water to local drinking water purveyors. *See* Ex. J (Explanation of Significant Differences, issued on June 10, 2016) ("ESD").

[4] As described below, *see infra* at 7, the Consent Decree Work is a subset of the potential remedial work described in the ROD, but does not alter that ROD except insofar as reflected in the ESD, *see supra* n.3.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
016

declaratory and injunctive relief at OU2, names only the Settling Defendants.  The Plaintiffs have not brought contested litigation against any nonsettling OU2 PRP.

The Plaintiffs published notice of the Consent Decree in the Federal Register on April 27, 2016, and accepted public comments for a period of 30 days thereafter.  81 Fed. Reg. 24885-01 (Apr. 27, 2016).  Seven public comments were received, one of which has since been withdrawn.  *See* Ex. K (withdrawal of Mission Linen Supply Company comment); Ex. L (Tr. of *Alcoa* hearing), at 16 (announcing agreement in principle between Mission Linen and OPOG).  Four of the remaining six comments are from PRPs (Palmtree Acquisition Corporation, Phibro-Tech, Inc./First Dice Road Company, Pilot Chemical Corp., and Union Pacific Railroad Company) that have not been sued by the United States, but that have received Special Notice Letters from the United States and that are defendants to the private *Alcoa* case brought by OPOG members; two comments are from water providers (Golden State Water Company and the Water Replenishment District of Southern California)[5].  The first four comments, but not the two water providers' comments, raise objections to the fairness of the Consent Decree.  These six comments are attached as Exhibits M through R.   The United States also held a public meeting in Whittier, near the Site, on August 18, 2016.  A transcript is attached; there were no questions from the public, only from DTSC staff.  *See* Ex. U (public meeting transcript).

## III.   SUMMARY OF THE PROPOSED CONSENT DECREE

### A.   Work Commitments

The 65 members of OPOG, together with McKesson Corporation, are the Settling Work Defendants and have committed to perform the entirety of the Work

---

[5] One other comment, from a neighboring hospital (Presbyterian Intercommunity Hospital, Inc.), was sent as a letter to EPA rather than through the formal comment process.  This letter and EPA's response are briefly described below at page 25, note 14, and are also attached as Exhibits S and T.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
017

described in the Consent Decree and accompanying Statement of Work ("SOW"). Ex. A (Consent Decree), ¶7; *id.* App. B (SOW). The Work defined in the Consent Decree and the SOW does not cover the entirety of the potential remedial action described in the ROD. Ex. A ¶O; *id.* Apps. A and B (ROD and SOW). Rather, the Work covers the full cleanup described in the ROD for the Northern Extraction Area, the Central Extraction Area, a portion of the Leading Edge Area, and additional investigation work in the Leading Edge Area. *Id.* ¶¶O-P. The work to be performed will include the design, construction, and operation of one or more groundwater extraction and treatment systems to remediate the Northern Extraction Area, the Central Extraction Area, and the northern portion of the Leading Edge Area. *Id.* Additional investigation is planned before designing and implementing the remedial action for the most distant portion of the Leading Edge Area, where the extent of contamination is more uncertain. Accordingly, the SOW requires such additional investigation work but does not require remedial design or remedial action in the Leading Edge Area. *Id.; see also* Ex. D (Praskins Decl.) ¶¶8-9. Such further remedial design or remedial action remains within the scope of the ROD – the Consent Decree does not purport to change the ROD's scope – but is outside the scope of what the Settling Defendants will be performing pursuant to the Consent Decree.[6]

The remedy that the Settling Defendants have agreed to fund and perform constitutes approximately two-thirds of the geographical span of the interim remedial action identified in the ROD, as well as the investigative work to assist EPA in determining whether to implement the remaining portion of the ROD or later to propose a change to that portion. Ex. D (Praskins Decl.) ¶¶8-9. This

---

[6] EPA has not determined who will be responsible for any further work needed in the Leading Edge Area. The Consent Decree explicitly states that it does not resolve Settling Defendants' responsibility for any such further work. Ex. A (Consent Decree) ¶P.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
018

remedy will address the groundwater contamination in OU2 to mitigate threats to human health and the environment posed by the presence of volatile organic compounds (*e.g.*, PCE and TCE) and other contaminants in the groundwater. *See* Ex. A (Consent Decree), App. A (ROD) §§2.4.2, 2.1.

### B. Past and Future Response Costs; Additional Financial Commitments

The Settling Defendants will pay the United States $8 million in Past Response Costs that will be placed in the Omega Site special account, and will also pay DTSC $70,000 in past costs. Ex. A (Consent Decree) ¶28. EPA's unreimbursed OU2 past costs as of the date of Consent Decree lodging were approximately $23 million, and DTSC's unreimbursed OU2 past costs were $70,000. Ex. B (Ortesi Decl.) ¶6; Ex. C (Amirebrahimi Decl.) ¶4. In addition, the cost-sharing provisions described below provide that if OPOG recovers funds from certain other nonsettling PRPs in the future, those funds will be shared in part with EPA to continue to defray EPA past costs. *See infra* at 9-10.

The Settling Work Defendants will pay the future response costs incurred by EPA and DTSC in overseeing the response actions covered by the proposed Consent Decree. *See* Ex. A (Consent Decree) ¶29. They will also provide a performance guarantee equivalent to the estimated cost of the Work, $70 million. *Id.* ¶21.

### C. Covenants Not to Sue and Contribution Protection for Matters Addressed

In exchange for the actions to be performed and the payments that will be made pursuant to the proposed Consent Decree, Settling Defendants will receive covenants not to sue under CERCLA Sections 106 and 107 and RCRA Section 7003, and for parallel state provisions, for Plaintiffs' past OU2 response costs, Plaintiffs' future OU2 response costs related to the Work, and the Work performed by the Settling Defendants. *Id.* ¶¶59-60. The Consent Decree states that Settling Defendants are entitled to contribution protection under Section 113(f)(2) of

EXHIBIT 2
019

CERCLA for the same "matters addressed" in the Consent Decree.  *Id.* ¶81 (Effect of Settlement) and ¶4 (definition of Matters Addressed).  Other matters are subject to Plaintiffs' reservations of rights.  *Id.* ¶¶61-62, 64.

### D. Cost-Sharing Between the United States and OPOG Members for "Certain Noticed PRPs"

The Consent Decree sets forth several provisions to facilitate settlement with additional parties.  First, OPOG members and the United States have agreed to a cost-sharing method for additional costs recovered from "Certain Noticed PRPs," regardless of whether it is the United States or OPOG that receives such payments, so long as the United States finds those payments to be fair, reasonable, and consistent with statutory goals.

Paragraph 75 of the Consent Decree provides for EPA and OPOG to share any payments recovered from certain other noticed PRPs, according to the following formula: OPOG will receive the first $6 million gross from these PRPs; after the first $6 million, costs recovered from these PRPs will be shared between EPA (receiving 30% of these costs) and OPOG (70%).  There is a cap of $7 million on remittances to EPA (beyond the $8 million past costs payment that Settling Defendants themselves are making in this Consent Decree).  In addition, PRPs who settle as "ability-to-pay" parties[7] will not be subject to this cost sharing formula; any settlement money from such parties will go to EPA.  Ex. A, App. G.  The cost-sharing terms also do not include nonsettling parties who were generators of waste sent to the Omega facility; however, the group of Settling Cash Defendants may later be expanded to include such generators via subsequent modification of the Consent Decree.  Ex. A, ¶79.

---

[7] Pursuant to Section 122(g)(7) of CERCLA, 42 U.S.C. § 9622(g)(7), EPA may make a determination that a PRP lacks the ability to pay its fair share of CERCLA liability, and then may enter into a settlement with such a party that reflects its limited ability to pay.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
020

The list of Certain Noticed PRPs is not an exhaustive list of those parties EPA views as PRPs; it is merely the list of PRPs for which OPOG and the United States have reached an explicit agreement about how to split future monetary settlements related to the matters addressed in this Consent Decree. Thus, a settlement that a Certain Noticed PRP reaches with either OPOG or EPA will be honored by the other, subject only to the requirement that EPA determine the settlement fair, reasonable, and consistent with CERCLA. At least two Certain Noticed PRPs have already availed themselves of this procedure; Burke Street LLC (and the associated Stadler Family Limited Partnership) joined the instant Consent Decree shortly before lodging, and Mission Linen has recently announced an agreement in principle with OPOG, which, if approved by United States officials, will result in an amendment to the Consent Decree to add parties, subject to Court approval. Ex. L (Tr. of *Alcoa* Hearing, at 16).

### E.     Other Agreements Regarding Future Settlements

If EPA settles with additional OU2 parties in the future, all Settling Defendants commit to provide those future settlors the same covenants and releases as they provide to each other in this Consent Decree. *Id.* ¶78. Nothing in this Consent Decree limits the liability of, or future work obligations that may be required from, PRPs – either those settling herein or non-settling PRPs – with respect to the balance of work required to complete the ROD. *Id.* ¶P.

## IV.    ARGUMENT

The inquiry into whether an EPA environmental consent decree is fair, reasonable, and consistent with the purposes of the statute is deferential and is based on the particular issues presented by each site and settlement:

> Congress intended, first, that the judiciary take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions. [T]here can be no easy-to-apply check list of relevant factors.

EXHIBIT 2
021

*United States v. Cannons Eng'g Corp. (Cannons II)*, 899 F.2d 79, 85-86 (1st Cir. 1990).

At this Site, cooperative PRPs have stepped forward to perform the majority of OU2 work. They are not the only PRPs responsible for the contamination at OU2, but they are the only parties that have volunteered to perform the remedy. This Work commitment is at the heart of the proposed Consent Decree, and serves CERCLA's policies of promoting cleanup, encouraging settlement, and encouraging PRPs to perform work. CERCLA permits and even directs EPA to provide incentives for those parties that settle early, even if this means that later settlors or nonsettlors bear disproportionate liability. *Cannons II* at 91-92 (citing 42 U.S.C. § 9613(f)(2)). Here, the risk of any disproportionality is borne by the Settling Defendants, who did not cause 100% of the need for the Work but are agreeing to perform it. The Settling Defendants are performing the Consent Decree Work in its entirety, at their own expense, bearing the risk of overruns, and are paying EPA and DTSC oversight costs for that work; they may pursue contribution claims against nonsettling parties within the scope of the Work they are performing, but such claims are subject to contested litigation in other proceedings (including the *Alcoa* case), and will only be successful in those proceedings if the Court determines that the Settling Defendants have in fact shouldered liability in excess of their equitable shares. 42 U.S.C. § 9613(f)(1). The only compromise that Plaintiffs are making in this Consent Decree is in allowing an $8 million payment from the Settling Defendants out of EPA's estimated $23 million unreimbursed OU2 past costs. It is not uncommon for EPA to compromise past costs in work settlements, especially for early settlors. *United States v. Davis*, 261 F.3d 1, 48 (1st Cir. 2001) ("CERCLA clearly anticipated that some settlements . . . would cover only a portion of the total cleanup costs for a hazardous waste site."); *see also Cannons II* at 91-92. This $8 million reduces the costs, dollar for dollar, for which any subsequent settlors or nonsettlors may be held jointly and

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
022

severally liable to EPA.  Plaintiffs are continuing to pursue settlement with additional parties.

This Consent Decree was the product of approximately two years of arm's length negotiation between the Plaintiffs, represented by litigation counsel at the U.S. Department of Justice and the California Attorney General's Office, and many sophisticated Settling Defendants.  There was no procedural or substantive unfairness.  The remedy is technically reasonable, and the Consent Decree accomplishes a great deal of remedial work, furthering the public interest and the objectives of CERCLA and RCRA.  The Court should approve this settlement.

## A. Under the Applicable Legal Standard, the Court's Inquiry Is Deferential

The standard for approval of a CERCLA federal settlement is whether it is "reasonable, fair, and consistent with the purposes that CERCLA is intended to serve."  *United States v. Montrose Chem. Corp. of Calif.*, 50 F.3d 741, 743 (9th Cir. 1995) (quoting *Cannons II* and legislative history) (internal quotations omitted).  Approval of a settlement is committed to the informed discretion of the district court.  *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  Such discretion should be "exercised in light of the strong policy in favor of voluntary settlement of litigation."  *United States v. Cannons Eng'g Corp. ("Cannons I")*, 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990) ("*Cannons II*"); *see also Randolph*, 736 F.2d at 529.  CERCLA has explicit provisions favoring settlement, especially settlements in which PRPs agree to perform work.  42 U.S.C. §§ 9622(a), 9622(d)(1); *see also Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.* 710 F.3d 946, 971 (9th Cir. 2013) ("'[O]ne of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation.'") (internal citations omitted).

Courts show deference to an agency's expertise when reviewing a proposed settlement.  *Cannons I*, 720 F. Supp. at 1035; *Randolph*, 736 F.2d at 529.  That policy is "strengthened when a government agency charged with protecting the

EXHIBIT 2
023

public interest 'has pulled the laboring oar in constructing the proposed settlement,'" as the Department of Justice and EPA have done here. *Montrose*, 50 F.3d at 746 (quoting *Cannons II*, 899 F.2d at 84); *Arizona v. City of Tucson*, 761 F.3d 1005, 1013 (9th Cir. 2014) (stating that EPA is owed considerable deference). As the Ninth Circuit stated, while "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, a district court reviewing a proposed consent decree 'must refrain from second guessing the Executive Branch.'" *Montrose*, 50 F.3d at 746 (quoting *Cannons II*, 899 F.2d at 84). The balancing of competing interests reflected in a proposed settlement "must be left, in the first instance, to the discretion of the Attorney General." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).

"A consent decree is essentially a settlement agreement subject to continued judicial policing. It is not a decision on the merits . . . , but is the product of negotiation and compromise." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (citations and internal quotations omitted). Accordingly, in reviewing a consent decree, a court should not substitute its own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *United States v. Akzo Coatings of Amer., Inc.*, 949 F.2d 1409, 1425 and n.12 (6th Cir. 1991). Nor should it inquire "whether the settlement is one which the court itself might have fashioned, or considers as ideal," *Cannons II,* 899 F.2d at 84, or seek to determine whether the proposed settlement provides for "every benefit that might someday be obtained in contested litigation," *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 850 (5th Cir. 1975). Rather, the Court should approve the settlement if it determines that the settlement is fair and reasonable, and resolves the controversy in a manner consistent with the public interest. *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1126 (D.C. Cir. 1983); *Oregon*, 913 F.2d at 580. In conducting its review, the trial court may not modify the terms of the parties' agreement – it may only approve or reject the settlement as a whole. *Officers for*

EXHIBIT 2
024

*Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). The Court need not conduct discovery or an evidentiary hearing. *See United States v. Albert Inv. Co.*, 585 F.3d 1386, 1396 (10th Cir. 2009) (cited with approval in *United States v. Aerojet General Corp.*, 606 F.3d 3d 1142, 1150 (9th Cir. 2010)); *Cannons II* at 94; *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081,1085 (1st Cir. 1994).

### B. <u>The Settlement Is Fair</u>

To assess the fairness of a settlement, the Court must look to both procedural and substantive fairness. *Montrose*, 50 F.3d at 746.

### 1. The Fairness of This Settlement Should be Assessed in the Aggregate

In evaluating a settlement in which a large number of settling defendants negotiated among themselves to bring a joint offer to the United States, the Court need not inquire into the individual shares of each settling defendant. Rather, the Plaintiffs and the Court may assess the fairness of the settlement as a whole. *See Charles George Trucking, Inc.*, 34 F.3d at 1086 (stating that court may consider fairness in the aggregate for groups of settlors, and "endors[ing], in general, EPA's practice of negotiating with a representative group of PRPs and then permitting the group members to divide the burden of the settlement among themselves"); *see also United States v. Kramer*, 19 F.Supp.2d 273, 282 (D.N.J. 1998) ("Instead, both [federal and state] plaintiffs engaged in the well-recognized (and practically imperative) practice of negotiating an overall settlement with a representative group of PRP's."); *United States v. GenCorp Inc.*, 935 F. Supp. 928, 934-35 (N.D. Ohio 1996) (approving settlement despite objection that it did not disclose "the settlement amounts, the proportion of liability assessed to each party, and the rationale for such determinations"); *United States v. Mid-State Disposal Inc.*, 131 F.R.D. 573, 577 (W.D. Wis. 1990) (court need not "scrutinize the allocation of liability among the potentially responsible parties").

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
025

1   This principle is further strengthened here, where no party is finally cashing

2   out its liability to the United States or DTSC.  Accordingly, the objections raised

3   by commenters regarding EPA's lack of knowledge of the individual shares paid

4   by the 171 "Settling Cash Defendants" are irrelevant.  The Plaintiffs have, and the

5   Court has, sufficient evidence to judge the fairness of the settlement as a whole, by

6   comparing what the defendants are providing in this settlement – an open-ended

7   Work commitment, plus payments toward past costs and payment of all future

8   oversight costs for the Work – to what they are getting: a covenant for the Work

9   performed and for past costs.  Knowing the exact dollar amount paid by each of

10  171 individual settling cash defendants, who are jointly and severally liable to the

11  Plaintiffs, could not materially influence the Court's view of the Consent Decree's

12  fairness as a whole.  These intra-defendant issues are potentially relevant to the

13  private-party *Alcoa* case but are not germane to the Consent Decree's fairness.[8]

14          **2.      The Settlement is Procedurally Fair**

15          Courts typically first examine procedural fairness to determine whether the

16  negotiation process was "fair and full of adversarial vigor."  *United States v.*

17  *Chevron U.S.A., Inc.*, 380 F.Supp.2d 1104, 1111 (N.D. Cal. 2005) (citation

18  omitted).  As the Ninth Circuit concluded in *United States v. Oregon*, if a

19  settlement is the product of good faith, arm's length negotiations, as this settlement

20  is, see above at page 12, it is "presumptively valid and the objecting party has a

21  'heavy burden of demonstrating that the decree is unreasonable.'"  *Oregon*, 913

22  _____

23      [8] This structure has been followed in previous consent decrees at the Omega

24  Site.  Exs. E, F (2001 and 2010 OU1 Consent Decrees).  The Omega OU1 Consent

25  Decrees involved roughly the same settling PRPs (OPOG members as "settling

    work defendants," with some changes in membership over time, and many of the

26  same additional "settling cash defendants").  In those Consent Decrees, OPOG

27  members also agreed to perform the cleanup work and pay for EPA's ongoing

    costs, and defendants also received a covenant for the work performed.  Ex. E, ¶¶

28  7, 42-43, 71-72, and Apps. C-D; Ex. F, ¶¶ 6, 48-49, 79-80, and Apps. C-D.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
026

F.2d at 581 (quoting *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)); *see also Cannons II*, 899 F.2d at 87.

Construed generously, one of the submitted comments – that of Palmtree Acquisition Company – raises concerns of procedural fairness, albeit only with unsupported allegations. First, Palmtree asserts that the government is inappropriately self-dealing because a group of federal agencies that were among the hundreds of generators that sent hazardous substances to the Omega Chemical facility previously settled out their liability to OPOG. *See* Ex. I (federal defendants' settlement). The fairness of the 2006 settlement was not challenged at the time, and may not be challenged here. It is common for United States agencies to be PRPs at an EPA Superfund Site. The fact that United States agencies were among the previous settlors does not somehow make the instant Consent Decree between the United States, on behalf of EPA, and the Settling Defendants procedurally inappropriate. This concern, which is discussed further in Section IV.E.1.f. below in the context of responses to specific comments, is unfounded. Similarly, Palmtree's assertion that DTSC is inappropriately settling with itself because California state agencies appear among the list of settling defendants in this Consent Decree misconstrues the relationship among California agencies. The State of California does not have a unitary system of government, but instead a system of divided executive power. *Marine Forests Soc. v. California Coastal Comm'n*, 36 Cal.4th 1, 31 (Cal. 2005). Accordingly, each individual state agency is considered a separate legal entity, and custody and control over materials by one state agency is not imputed to a separate state entity such as DTSC. *People ex rel. Lockyer v. Superior Court (Cole National Corp.)*, 122 Cal.App.4th 1060, 1078 (Ct. App. 2004) ("Each agency or department of the state is established as a separate entity, under various state laws or constitutional provisions."). Also unfounded is Palmtree's insinuation that the United States has relinquished control of EPA's future settlements to OPOG. This is not the case. Rather, the Consent Decree

EXHIBIT 2
027

provides that if EPA settles with any PRP, OPOG must supply its own releases and covenants to that defendant, unless OPOG wishes to oppose entry of the EPA consent decree with a future settlor.  If OPOG settles with a PRP, EPA may only provide its covenants and contribution protection to that settlor if EPA is satisfied that the settlement is fair, reasonable, and consistent with the statutes.[9]

### 3.    The Settlement is Substantively Fair

The leading cases regarding the standard for entry for a CERCLA Consent Decree – most notably the Ninth Circuit case *Montrose*, and the First Circuit case *Cannons Engineering* – concern situations in which parties paid fixed dollar amounts to fully and finally settle their liability to the United States at a Superfund site.  In fact, all cases relied upon by the commenters – *Montrose*, *Arizona v. Tucson*,[10] and *Charter International Oil*[11] – exhibit this fact pattern.  It is not surprising that courts, in evaluating such "cash-out" settlements, will assess

---

[9] The Plaintiffs further note that OPOG is not a monolith.  It is a group currently comprising 65 members, which also has associated with the McKesson Corporation and 171 Settling Cash Defendants.  The OPOG parties and generator Settling Cash Defendants are similarly situated only insofar as they all sent waste to the Omega Chemical facility – they include large corporations, public agencies, and individuals, who sent widely varying types and amounts of waste.  OPOG's membership has varied over time.  *Compare, e.g.*, Exs. E, F (2001 and 2010 Consent Decrees), App. D, *with* Ex. A (current Consent Decree), App. F.

[10] *Arizona v. Tucson* presents particularly different facts from those at issue here.  The *Arizona* court was careful to note that its review of a state consent decree was less deferential than that of an EPA consent decree.  Any verbiage in *Arizona* about whether that consent decree would have passed muster had EPA been a party is *dicta*.  In addition, the case concerned a settlement in which numerous parties were declared "*de minimis*" and given full site releases in exchange for a payment of money, the Court held, without sufficient documentation.  *Arizona*, 761 F.3d at 1009, 1012-13.  This Consent Decree involves no *de minimis* parties, no parties receiving a full site release, and the performance of significant cleanup work by the settling parties.  The facts of *Arizona* in no way resemble those of the case at bar.

[11] *United States v. Charter International Oil Company*, 83 F.3d 510 (5th Cir. 1996).

substantive fairness by comparing the amount the settlors are paying to the amount of total site costs, and ascertaining that that proportion bears some relation to the settlors' proportionate share of liability for overall site costs. *See, e.g., Montrose* at 747 (comparing "the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then . . . factor[ing] into the question any reasonable discounts . . . that may be justified"). Even in cash-out settlements, such a calculation is not formulaic. *Id.; Cannons II* at 88.

This, in contrast, is a settlement for cleanup, rather than a settlement for a fixed amount of money. The Settling Defendants are early volunteers, taking on open-ended liability for cleanup in exchange for a limited covenant. Here, EPA's discretion to compromise past costs (or any other aspect of its claims) for those settlors is at its height: "[T]wo frequently encountered reasons warranting departure from strict formulaic comparability are the uncertainty of future events and the timing of particular settlement decisions. Common sense suggests that a PRP's assumption of open-ended risks may merit a discount on comparative fault . . . . By the same token, the need to encourage (and suitably reward) early, cost effective settlements . . . can affect the construct." *Cannons II* at 88.[12]

In this case, EPA has not even departed from rough proportionality. The Settling Defendants are collectively providing an estimated $78 million in value – a projected $70 million in work value (though the cost of the work may in time

_____

[12] As a general matter, EPA is permitted to offer incentives for early settlement, leaving later settlors with disproportionate liability; such incentives are explicitly contemplated by the statute and are not considered unfair. *See Charter Oil*, 83 F.3d at 515 ("[CERCLA's] statutory framework contemplates that [responsible parties] who do not join in a first-round settlement will be left with the risk of bearing a disproportionate share of liability."); *Cannons II*, 899 F.2d at 91; *United States v. Fort James Operating Co.*, 313 F.Supp.2d 902, 909 (E.D. Wis. 2004) ("Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlors.").

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
029

exceed that projection, and thus the settlors are taking on an open-ended risk) and over $8 million in past costs – and receiving covenants not to sue and contribution protection for an estimated $93 million worth of the United States' and DTSC's CERCLA claims ($70 million worth of Work plus approximately $23 million in past costs). Taking the Work and past costs together, the $78 million they are contributing represents 84% of the $93 million for which they are receiving covenants not to sue. This is an exceedingly robust share, when we take into account how many parties are outside the settlement and the fact that the only compromise being made by the public is that of EPA past costs. One party who is outside the settlement is Dennis O'Meara, the owner/operator of the Omega Chemical Facility. In reported cases at Superfund sites where landfills or recycling facilities are the source parcels of contamination, courts making formal allocations of liability have typically assigned substantial shares of overall site liability to the owners/operators of those source parcels. *See, e.g.*, *Amoco Oil Co. v. Dingwell*, 690 F. Supp. 78, 80, 87 (D. Maine 1988), *aff'd*, 884 F.2d 629 (1st Cir. 1989); *United States v. Davis*, 31 F.Supp.2d 45, 50-52 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001); *United States v. Consolidation Coal Co.*, 184 F.Supp.2d 723, 725 (S.D. Ohio 2002) (*aff'd in part, vacated in part on other grounds*, 345 F.3d 409 (6th Cir. 2003)).

In addition, EPA guidance provides that in cases where some parties are insolvent or otherwise unable to pay, settling defendants may, on appropriate facts, be credited up to 25% of site costs for what would have been the insolvent parties' fair share. *See* EPA's *Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals*, available at https://www.epa.gov/sites/production/files/2013-10/documents/orphan-share-rpt.pdf, at 4). There are insolvent PRPs for OU2. *See*, *e.g.*, Ex. A (Consent Decree) ¶77 (referencing bankruptcy of former OPOG member Reichhold Holdings US, Inc.). Courts addressing settlements may also

EXHIBIT 2
030

take such factors into account.  *United States v. Kramer*, 19 F.Supp.2d 273, 288 (D.N.J. 1988) (taking into account insolvent owner/operator share).

Also outside the settlement are many other non-settling generators of waste sent to the Omega Chemical Facility, and owner/operators throughout the plume.[13] In total, the nonsettling parties represent a variety of sources of liability and environmental contamination at OU2 – owner/operator of the Omega Facility, generators of waste sent to the Omega Facility, and owner/operators of industrial parcels throughout OU2.  *See* Ex. D (Praskins Decl.) ¶¶10-12.

The paramount aspect of fairness is fairness to the public.  *Akzo Coatings*, 949 F.2d at 1435.  That element is manifestly met here, where the cleanup Work is guaranteed at the Settling Defendants' expense.  Further, no commenter has articulated a way in which this settlement is unfair to that commenting party.  The settlement is procedurally and substantively fair.

## C.    The Settlement is Reasonable

In a work settlement such as this, reasonableness is satisfied if the remedy put forth is technically adequate to meet the remedial goals, and if comments on this technical aspect were taken into account.  *Cannons II* at 89-90.  The public had the opportunity to comment on the ROD in 2011, and EPA addressed those comments; while the Statement of Work in the Consent Decree does not encompass the entire geographical scope described in the ROD, it is consistent

---

[13] *See* Ex. D (Praskins Decl.) ¶10 (describing categories of parties that have received General and/or Special Notice Letters, indicating that EPA views them as PRPs at OU2.  These nonsettlors include, among others: (a) many generators that sent waste to the Omega Chemical Facility; (b) the four adverse commenters in this case (Palmtree Acquisition Corporation, Phibro-Tech, Inc./First Dice Road Company, Pilot Chemical Corp., and Union Pacific Railroad Company), which are or were owner/operators of industrial facilities in the plume; (c) Continental Heat Treating and ExxonMobil, owner/operators of downgradient industrial facilities within the Leading Edge Area; and (d) Angeles Corp. and related entities, owner/operators of a facility near the Northern/Central Area boundary.  *Id.*

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
031

with the ROD. The attached "Response to Technical Comments" addresses any technical comments submitted regarding the Consent Decree. Ex. D (Praskins Decl.), Attachment A (Response to Technical Comments). These comments do not challenge the technical adequacy of the remedy.

### D. The Settlement is Harmonious with CERCLA and RCRA

As described above, the explicit objectives of CERCLA include: securing environmental cleanup to protect human health and the environment; encouraging PRPs to perform cleanup; recovering previously expended EPA costs; and encouraging early settlement to avoid the expenditure of public money and time on unnecessary litigation. Upon entry of the Consent Decree, the OU2 Work can begin. Because the settlement accomplishes substantial cleanup, protects human health and the environment, does so at PRPs' expense, provides for the payment of significant past costs and of oversight costs, and avoids contested litigation, this Consent Decree meets all the goals of CERCLA.

The Consent Decree also settles EPA's claims under section 7003 of RCRA, 42 U.S.C. § 6973, concerning the potential for imminent and substantial endangerment to health or the environment. This Consent Decree is consistent with the purposes of Section 7003, because it abates the risk of such endangerment to the environment. *See* 42 U.S.C. § 6973. No comments were specific to RCRA concerns. *See* Exs. M-R (public comments).

### E. The Public Comments Received Do Not Provide a Reason Not to Enter the Consent Decree

All comments received are attached to this Motion. Exs. M-R. The following discussion groups the comments by subject area.

#### 1. Comments Regarding Fairness/Reasonableness of Consent Decree

a. Comment: Because individual Settling Cash Defendants' payments are not disclosed, EPA, the Court, and the public do not have sufficient information to assess the fairness of the settlement. (Palmtree, Pilot, Union Pacific, Phibro-Tech)

EXHIBIT 2
032

1          <u>Response</u>: For the reasons stated in Section IV.B.1 above, Plaintiffs and the

2    Court need only assess the fairness of the settlement as a whole, without examining

3    the individual amounts that each defendant paid the defendant group.

4    b.     <u>Comment</u>: EPA has not disclosed its past cost figure, other than stating in its

5    Complaint that OU2 unreimbursed past costs exceed $20 million.  (Union Pacific)

6          <u>Response</u>: The estimated figure is $23 million.  Ex. B (Ortesi Decl.) ¶¶6-7.

7    c.     <u>Comment</u>: EPA should issue an Explanation of Significant Differences or a

8    ROD Amendment to Address Changes to the Remedy.  (Union Pacific)

9          <u>Response</u>: The Consent Decree, lodged in April 2016, included a statement

10   of EPA's intent to do so.  Ex. A (Consent Decree), at ¶L.  EPA issued this ESD on

11   June 10, 2016.  The ESD is available on EPA's website, and a copy is also attached

12   to this motion.  Ex. J; *see also supra* at 5, n.3.

13   d.     <u>Comment</u>: The Settling Defendants' payment of $8 million in past costs

14   against approximately $20 million in unreimbursed past costs, an approximately

15   40% share, "seems unfair and unreasonable." (Union Pacific)

16         <u>Response</u>: For the reasons stated above in Section V.A.3, a strict numerical

17   analysis is not necessary on these facts.  To the extent that the Court does find it

18   appropriate, the numbers that should be compared are the total value of the Settling

19   Defendants' commitment – at least $78 million – and the total value of the liability

20   Plaintiffs agree not to pursue in return – $93 million.  Thus, the Settling

21   Defendants are agreeing to perform approximately 84% – not 40% – of the total

22   value for which they are receiving covenants not to sue in this settlement.

23   e.     <u>Comment</u>: State of California may not sue and settle with itself.  (Palmtree)

24         <u>Response:</u> See *supra* at 16 (description of state's non-unitary nature).

25   f.     <u>Comment</u>: There is an unfair partnership between US and OPOG. (Palmtree)

26   This comment suggests that, because of the previous federal defendants'

27   settlements, it is inappropriate for EPA to engage in cost-sharing agreements with

28   OPOG regarding future settlement monies that may be received from Certain

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
033

1  Noticed PRPs.  The comment also asserts that EPA has "outsourced the cost
2  recovery process."

3      Response: The first assertion – that there is somehow self-dealing in the
4  juxtaposition of the existence of the federal defendants' settlement with OPOG in
5  2006, to which EPA was not party, and the current Consent Decree, in which the
6  only money received by the United States is placed in Superfund-specific special
7  accounts for use at the Site – is without merit.  The federal agencies that were
8  among the hundreds of parties that sent waste to the Omega Chemical facility
9  resolved their liability in a settlement that was public, Court-approved, and did not
10 draw adverse comment at the time.  Its fairness may not be re-litigated now.

11      The second accusation is equally unjustified.  OPOG and McKesson have
12 signed up to do all the work for which they are being released, subject only to their
13 rights to seek contribution (to be determined in other non-EPA litigation) from
14 other PRPs.  The United States may, pursuant to CERCLA's statutory framework
15 of joint and several liability to the United States, look to one or a group of settlors
16 and then leave them to pursue contribution against others. 42 U.S.C. §§ 9607,
17 9613(f)(1); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1506-08 (6th Cir.
18 1989); *see also Burlington Northern & Santa Fe Ry. Co. v. United States,* 129
19 S.Ct. 1870, 1880-81 (2009) ("[D]efendants seeking to avoid joint and several
20 liability bear the burden of proving that a reasonable basis for apportionment
21 exists.").  The agreement between the United States and OPOG as to how money
22 should be shared from certain future settlors is merely a device to facilitate future
23 agreements, and is part of the complex consideration in this negotiated Consent
24 Decree.  The cost-sharing agreement is made public here, and is not part of a secret
25 partnership.  Furthermore, OPOG is not in charge of settlements: the Further
26 Settlors paragraph makes it clear that, if the United States deems someone a future
27 settlor, then OPOG must offer covenants to those settlors upon entry of the future
28 consent decree.  Ex. A (Consent Decree) ¶78.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
034

g.     Comment: Jurisdiction section "includes language that seems calculated to serve OPOG's litigation interests rather than the public interest." (Palmtree)

Response: This comment references language in Paragraph 1 of the Consent Decree: "As provided for under Section 113(g)(2) of CERCLA . . . this action constitutes an 'initial action for the recovery of costs' at the Site within the meaning of that section, and any subsequent action by Plaintiff to recover any response costs under CERCLA Section 107 . . . for the Site, not addressed by this Consent Decree, constitutes a 'subsequent action.'"  The commenter misconstrues this Paragraph, which is included to make it clear that Settling Defendants acknowledge that this Complaint tolls the statute of limitations for the United States' claims against them at OU2, regardless of whether those claims are confined to matters addressed in this Consent Decree.  This obviates the need for Plaintiffs to secure tolling agreements from Settling Defendants for any remaining OU2 claims.  Its purpose is analogous to that of the uncontroversial sentence in the same paragraph that says settlors "waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District" – it manifests agreement not to litigate certain issues, saving transaction costs.

## 2.     Requests for Edits to Consent Decree

This Court may not modify the Consent Decree, but must either enter or decline to enter it as written.  *See supra* at 13-14.  However, certain comments invited edits to the Consent Decree.  Plaintiffs decline to edit the Consent Decree.

a.     Comment: Consent Decree does not expressly designate settling parties as parties potentially responsible for Leading Edge. (Union Pacific)

Response: There is no compelling reason to redraft the paragraph cited by Union Pacific (Consent Decree ¶5b).  It is clear from the Consent Decree as a whole that no party has been released from liability for the Leading Edge.  This negotiated document does not, as the comment asserts, "reflect a finding that contamination in the LE is solely attributable to GNL and SNL recipients."  There

may be additional liable PRPs beyond that group. Identifying these will be part of EPA's proceeding stepwise to analyze contamination and liability in different portions of the Site based on available data. Nothing in the Consent Decree limits the universe of PRPs who may be held responsible for Leading Edge contamination, including settlors as well as nonsettlors and parties not yet noticed.

The water provider commenters have also raised potential edits to the description of the Work, which are addressed in the attached Response to Technical Comments. Ex. D (Praskins Decl.), Attachment A.

### 3. Other Technical Comments Regarding Statement of Work

Several commenters raised additional comments about technical aspects of the Statement of Work. These comments are addressed in the attached Response to Technical Comments. Ex. D (Praskins Decl.), ¶13 and Attachment A.[14] Many of them regard issues that will be worked out in the remedial design process, and such comments will be further taken into account at the appropriate time. *Id.* The comments do not suggest that the settlement is not fair, reasonable, or consistent with the objectives of CERCLA and RCRA.

## V. CONCLUSION

The Consent Decree is fair, reasonable, and consistent with CERCLA and RCRA. Plaintiffs request that this Court enter the Consent Decree, preferably by signing page 86 of the Consent Decree, or else by issuing the attached Proposed Order, and by directing the Clerk to enter judgment pursuant to Federal Rule of Civil Procedure 58.

---

[14] Presbyterian Intercommunity Hospital's short informal comment, submitted by letter to EPA, asked only whether the OU2 Consent Decree alters the OU1 remedy. EPA responded that it does not. Exs. S and T (letter and response).

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
036

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

October 20, 2016
Date

/s/ Deborah A. Gitin
DEBORAH A. GITIN
KARL J. FINGERHOOD
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

FOR THE STATE OF CALIFORNIA on behalf of the CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL AND TOXIC SUBSTANCES CONTROL ACCOUNT

KAMALA D. HARRIS
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General

October 20, 2016
Date

/s/ Olivia W. Karlin
OLIVIA W. KARLIN
Deputy Attorney General
Attorneys for the State of California
Department of Toxic Substances Control and Toxic Substances Control Account

1

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
037

1  OF COUNSEL FOR THE UNITED STATES OF AMERICA:
2  Hope Schmeltzer
   Assistant Regional Counsel
3  U.S. Environmental Protection Agency
4  Region 9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

EXHIBIT 2
038

**PROOF OF SERVICE**

*U.S. and State of California v. Abex Aerospace, et al.*

**United States District Court, Central District of California**

Case No.: 2:16-cv-02696-GW-E

I am an attorney at the United States DOJ Environmental Enforcement Section. My business address is 301 Howard Street, Suite 1050, San Francisco, CA 94105. I am over the age of 18 years and not a party to this action.

I hereby certify that on October 20, 2016, I electronically filed the following documents with the Clerk of the Court using CM/ECF, thereby serving these documents on all counsel who have appeared via the Court's electronic filing system.

- PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE
- PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO ENTER CONSENT DECREE
- PROPOSED ORDER

**DECLARATION OF DEBORAH A. GITIN**

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 20, 2016.

/s/ Deborah A. Gitin
DEBORAH A. GITIN

1

PROOF OF SERVICE TO PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CD

EXHIBIT 2
039

EXHIBIT 3

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

PAUL CIRINO
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: (202) 514-1542
Facsimile: (202) 514-8865

Attorneys for Federal Defendants

ORIGINAL

— FILED —
CLERK, U.S. DISTRICT COURT

OCT - 2 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6          NO
JS-2/JS-3
Scan Only

LODGED
CLERK, U.S. DISTRICT COURT
JUN 26 2006
CENTRAL DISTRICT OF CALIFORNIA
BY                DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| OMEGA CHEMICAL PRP GROUP LLC, and OMEGA CHEMICAL PRP GROUP, | Civ. No. 2:04-CV-01348-TJH-JWJ |
| Plaintiffs, | STIPULATION FOR ENTRY OF SETTLEMENT AGREEMENT AND CONSENT ORDER; ORDER THEREON |
| v. | |
| AARON THOMAS CO., INC. et al., | Honorable Terry J. Hatter, Jr. |
| Defendants. | |

DOCKETED ON CM

OCT - 3 2006

BY          005

For good and valuable consideration, consisting of the resolution of claims
in the above-captioned action and of the mutual promises, covenants, and
obligations contained in the attached Settlement Agreement and Consent Order
(the "Agreement"), Plaintiffs Omega Chemical PRP Group LLC and Omega
Chemical PRP Group (jointly, "Plaintiffs") and the United States of America, on

33

EXHIBIT 3
001

behalf of Defendants Federal Prison Industries (t/a Unicor), the United States Coast Guard, the USDA Forest Service, the Department of the Army, the Department of the Air Force, the United States Defense Logistics Agency, the United States Department of Energy, the United States Department of Veterans Affairs, and the National Aeronautics and Space Administration (collectively, the "Federal Defendants"), appearing through their respective counsel in the above-captioned action, hereby stipulate and agree as follows:

1. The parties to the Agreement are Plaintiffs and the Federal Defendants (collectively, the "Parties"). A true copy of the Agreement is attached hereto as Exhibit A.

2. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

3. The Court has personal jurisdiction over the Federal Defendants.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). The acts and occurrences which give rise to this action occurred in Los Angeles County, California, which is in the Central District of California.

5. This is a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq., concerning the Omega Chemical Superfund Site located in Whittier, California (the "Site"). The Site is a former refrigerant/solvent recycling facility that operated from 1976 to 1991. As a result of these operations, the Site's subsurface soil and groundwater have high concentrations of tetrachloroethene

STIPULATION FOR ENTRY OF SETTLEMENT
AGREEMENT AND CONSENT ORDER                    2

EXHIBIT 3
002

1  (PCE), trichloroethene (TCE), other chlorinated hydrocarbons, and freon.  Due to

2  the high level of hazardous substances in the groundwater, the United States

3
   Environmental Protection Agency placed the Site on the National Priorities List on
4

5  January 19, 1999.

6      6.  On November 24, 2000, the United States, on behalf of the United States

7  Environmental Protection Agency ("EPA"), filed a Complaint in this Court against

8
   dozens of potentially responsible parties.  United States of America v. Abex
9
   Aerospace Division, No. 2:00-CV-12471-TJH-JWJ (C.D. Cal.).  The Complaint
10

11 alleged that the defendants were liable pursuant to Sections 106 and 107 of

12 CERCLA, 42 U.S.C. §§ 9606, 9607, to perform certain response actions at the Site

13
   and for certain unrecovered response costs incurred by the United States.
14

15     7.  On February 28, 2001, the Court in the Abex Aerospace action entered a

16 Consent Decree between the United States and numerous potentially responsible

17 parties.  Under this agreement, certain of those parties – referred to in the Consent

18 Decree as the "Settling Defendants" – agreed to pay a portion of EPA's past costs

19
   and perform various response actions, including a Remedial Investigation and
20

21 Feasibility Study of onsite soils, an Engineering Evaluation and Cost Analysis

22 addressing groundwater contamination in the principal area of contamination, and

23 the installation of three groundwater monitoring wells.[1]

24 ─────────────────────

25      [1]  The United States, on behalf of the United States Environmental
   Protection Agency, and the Settling Defendants will soon be lodging a proposed
26 First Amendment to the Consent Decree, in order to add additional work to the
27 work required under the present Consent Decree.

28 STIPULATION FOR ENTRY OF SETTLEMENT
   AGREEMENT AND CONSENT ORDER                  3

EXHIBIT 3
003

8.  The Settling Defendants in the <u>Abex Aerospace</u> action are members of the Plaintiff organizations in this case.  On February 27, 2004, Plaintiffs commenced this contribution action against numerous defendants, including the Federal Defendants, alleging claims under Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607, 9613.

9.  The Complaint alleges that as a result of the release or threatened release of hazardous substances, Plaintiffs have incurred response costs in excess of $6,500,000.  (Compl. ¶ 164.)

10.  The Complaint seeks, among other things, a money judgment for reimbursement of past response costs incurred by Plaintiffs as well as a declaration that the defendants are liable for response costs to be incurred by Plaintiffs in the future.  (Compl. at 27-28.)

11.  After good-faith negotiations, the Parties have agreed to terms embodied in the Agreement.

12.  Pursuant to the Agreement, the United States will pay Plaintiff Omega Chemical PRP Group the sum of $1,728,269.23 as the United States' share of Plaintiffs' claimed past and future response costs at the Site.  (Agreement ¶ 10(a).) Plaintiffs, in turn, will release and forever discharge the United States from all "Covered Matters" related to the Site.  (Agreement ¶ 7.)

13.  The Agreement further provides that the Parties agree that the United States is entitled to contribution protection under CERCLA and any other applicable law.  (Agreement ¶ 9(a).)

STIPULATION FOR ENTRY OF SETTLEMENT
AGREEMENT AND CONSENT ORDER                    4

EXHIBIT 3
004

14. The Parties agree that the Agreement is just, fair, adequate, and an equitable resolution of all claims concerning the Site.

15. A copy of this document along with the Agreement is being served upon all known potentially responsible parties with respect to the Site, as set forth on the Certificate of Service submitted herewith.

16. The Parties respectfully request that the Court refrain from entering the Consent Order hereon until thirty (30) days after lodging, so that potentially responsible parties have sufficient opportunity to file written objections to the Court's entry of the Consent Order.

WHEREFORE, the Parties respectfully request that the Court enter the Consent Order as set forth below.

Dated: June 20, 2006                    Respectfully submitted,

                                        KEITH F. MILLHOUSE
                                        Millhouse Law Group
                                        Attorneys for Plaintiff
                                        Omega Chemical PRP Group

                                        SUE ELLEN WOOLDRIDGE
                                        Assistant Attorney General
                                        Environment & Natural Resources Division

                                        PAUL CIRINO
                                        Environmental Defense Section
                                        U.S. Department of Justice
                                        P.O. Box 23986
                                        Washington, D.C. 20026-3986
                                        Telephone: (202) 514-1542
                                        Facsimile: (202) 514-8865

STIPULATION FOR ENTRY OF SETTLEMENT                    5
AGREEMENT AND CONSENT ORDER

EXHIBIT 3
005

**CONSENT ORDER**

Pursuant to the parties' request, the Court has allowed for a 30-day period for the filing of objections to the relief requested herein. Having received no such objections, and upon consideration of the foregoing, the Court hereby finds that the Agreement (attached hereto as Exhibit A) is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Agreement is hereby APPROVED.

The United States is entitled to contribution protection for Covered Matters, as defined in the Agreement, pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), the Uniform Comparative Fault Act, and any other applicable provision of federal or state law, whether by statute or common law.

All claims against the United States in this action, whether alleged in the complaint or as a cross-claim or third-party claim, or otherwise, are hereby dismissed with prejudice.

There being no just reason for delay, this Court expressly directs, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, ENTRY OF FINAL JUDGMENT in accordance with the terms of the Agreement.

Plaintiffs and the United States shall each bear their own costs and expenses, including attorneys' fees, in this case.

Dated: _10/2/06_

HON. TERRY J. HATTER JR.
United States District Judge

STIPULATION FOR ENTRY OF SETTLEMENT
AGREEMENT AND CONSENT ORDER

6

EXHIBIT 3
006

# EXHIBIT A

## to Stipulation for Entry of Settlement Agreement and Consent Order

EXHIBIT 3
007

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

OMEGA CHEMICAL PRP GROUP LLC )
and OMEGA CHEMICAL PRP GROUP, )
                                )
        Plaintiffs,             )
                                )
            v.                  )    Civ. No. 2:04-CV-01340-TJH-JWJ
                                )
AARON THOMAS CO., INC. et al.,  )
                                )
        Defendants.             )
_____)

## SETTLEMENT AGREEMENT AND CONSENT ORDER

This Settlement Agreement and Consent Order (the "Agreement") is made,

as of the Effective Date of this Agreement, as defined in Paragraph 3 below,

between Omega Chemical PRP Group LLC and Omega Chemical PRP Group

(jointly, "Plaintiffs") and Defendant United States of America ("United States"),

collectively referred to as "the Parties," as defined herein.

WHEREAS, Plaintiffs have commenced an action titled *Omega Chemical*

*PRP Group LLC et al. v. Aaron Thomas Company, Inc.* and bearing Civil Action

Number 2:04-CV-01340-TJH-JWJ in the United States District Court for the

Central District of California ("the Action");

WHEREAS, the Action involves claims by Plaintiffs under the

Comprehensive Environmental Response, Compensation, and Liability Act of

EXHIBIT 3
008

1980, 42 U.S.C. §§ 9601-9675, as amended by the Superfund Amendments and

Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986)

(hereinafter "CERCLA"), together with other claims, seeking to recover certain

costs they have allegedly incurred in response to the release or threatened release

of hazardous substances at the Omega Chemical Corporation Superfund Site (the

"Site"), and seeking a declaration as to the various Defendants' liability for costs to

be incurred in the future;

WHEREAS, the Parties desire to enter into this Agreement to have a full and

final resolution of any and all claims that have been or could hereafter be asserted

against the United States in connection with the Site and to avoid the complication

and expense of further litigation of such claims concerning the Site;

WHEREAS, the Parties agree that the payment of the sum of $1,728,269.23

from the United States to the Plaintiffs as called for under this Agreement,

represents payment of the United States fair and equitable share of liability for

waste sent to the Site by the United States;

WHEREAS, the Parties agree that this Agreement is fair, reasonable and in

the public interest; and

WHEREAS, the United States enters into this Agreement as a final

settlement of all claims against the United States in connection with the Site and

2

EXHIBIT 3
009

does not admit any liability arising from occurrences or transactions pertaining to the Site,

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that:

1.    The Parties to this Agreement are Plaintiffs and the United States.

2.    This Agreement applies to, is binding upon, and inures to the benefit of Plaintiffs (and its successors, assigns, and designees) and the United States.

3.    <u>Effective Date</u>. The effective date of this Agreement shall be the date this Agreement is approved by the Court.

4.    <u>The Site</u>. The "Site" means the Omega Chemical Corporation Superfund Site in Whittier, California.

5.    <u>Covered Matters</u>. "Covered Matters" means any and all past or future claims that have been or could hereafter be asserted by Plaintiffs against the United States arising out of or in connection with the waste sent by the United States to the Site. Such claims include, but are not limited to, contamination at the Site, including any claims for off-site soil and groundwater contamination that may be emanating from the Site.

6.    <u>United States</u>. "United States" means the United States of America, including all of its departments, agencies, and instrumentalities. The United States specifically includes, but is not limited to, the Department of Defense; the

3

EXHIBIT 3
010

Department of the Army; the Department of the Navy; the Department of the Air Force; the United States Coast Guard; the Defense Logistics Agency; the United States Department of Agriculture; the USDA Forest Service; the United States Department of Veterans Affairs; the United States Department of Energy (including Lawrence Livermore National Laboratory); the United States Department of Justice; the United States Bureau of Prisons; Federal Prison Industries, Inc. (t/a Unicor); and the National Aeronautics and Space Administration, including the contractor operating the Jet Propulsion Laboratory, a federally funded research and development center and national laboratory.

7. <u>Release and Covenant Not to Sue by Plaintiffs.</u> Upon approval and entry of this Agreement by the Court and payment of the settlement funds by the United States, Plaintiffs hereby forever release, discharge, and covenant and agree not to assert (by way of the commencement of an action, the joinder of the United States in an existing action or in any other fashion) any and all claims, causes of action, suits or demands of any kind whatsoever in law or in equity which it may have had, or hereafter have, including, but not limited to, claims under CERCLA sections 107 and 113, against the United States with respect to Covered Matters except as otherwise provided herein.

4

EXHIBIT 3
011

8. <u>Excluded Matters</u>. The following Claims and Liabilities are Excluded Matters that are not subject to the release and covenant not to sue provisions (the United States reserves all of its rights with respect to the Excluded Matters):

      a.    Claims and Liabilities for natural resource damage pursuant to CERCLA Section 107(f) or any equivalent State law;

      b.    Claims and Liabilities by any person for death, personal injury or disease, loss of future or past wages or income, loss of consortium, property damage, diminution in value, or economic loss, whether based on negligence, strict liability, abnormally dangerous activity,
statute or other law, including but not limited to assault, battery, nuisance, trespass, negligence, strict liability, products liability and infliction of emotional distress and/or fear;

      c.    Claims and Liabilities arising under or with regard to California's Safe Drinking Water and Toxic Enforcement Act of 1986, popularly known as "Proposition 65," California's Unfair Business Practices Act pursuant to Cal. Bus. Code Section 17200, and any rules, regulations, orders or notices promulgated or issued thereunder;

      d.    Claims and Liabilities arising from future events or occurrences caused directly by the United States that create a release or threat of a release of hazardous substances, expressly excluding from the foregoing, events and

EXHIBIT 3
012

occurrences caused by or to the extent contributed to by Plaintiffs or the United

States during the course of or as a result of the work to be performed hereunder;

and

   e.  Obligations, liabilities or duties imposed by this Agreement or

actions to enforce or for breach of this Agreement.

   f.  Nothing in this Agreement shall be deemed to negate, diminish

or otherwise impact any rights or claims that the United States Environmental

Protection Agency may have against any party to this Agreement.  In addition,

nothing in this Agreement shall be deemed to negate, diminish or otherwise impact

any rights that the Plaintiffs may have with respect to the United States

Environmental Protection Agency, including, but not limited to the right to assert

any defenses, objections, off-sets, claims, causes of action, demands, or the like,

whether statutory, equitable, common law, known, unknown, accrued or

unaccrued.

  9.  <u>Protection Against Claims</u>.

   a.  The Parties acknowledge and agree that the payment to be made

by the United States pursuant to this Agreement represents a good faith

compromise of disputed claims and that the compromise represents a fair,

reasonable, and equitable discharge for the Covered Matters addressed in this

Agreement.  With regard to any claims for costs, damages or other claims against

6

EXHIBIT 3
013

the United States for Covered Matters, the Parties agree that the United States is entitled to, as of the effective date of this Agreement, contribution protection pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), the Uniform Comparative Fault Act, and any other applicable provision of federal or state law, whether by statute or common law, extinguishing the United States' liability to persons not party to this Agreement. Any rights the United States may have to obtain contribution or otherwise recover costs or damages from persons not party to this Agreement are preserved.

b.      The Parties agree to join in and/or support, as may be appropriate, such legal proceedings as necessary to secure the Court's approval and entry of this Agreement and to secure and maintain the contribution protection contemplated in this Agreement.

c.      Should any third party bring an action against the United States for Covered Matters, the Parties agree to cooperate in asserting the aforementioned contribution protection set forth in Section 9(a) as a complete defense to such action. Should a court find the aforementioned protection does not apply to bar the claims against the United States, then Plaintiffs agree that they will assume responsibility for any soil and/or groundwater contamination attributed to the waste sent to the Site by the United States; excluding only assumption of responsibility for those matters identified as Excluded Matters in Paragraph 8 of

7

EXHIBIT 3
014

this Agreement. By agreeing to assume responsibility for any soil and/or groundwater contamination attributed to the waste sent to the Site by the United States, Plaintiffs agree that such waste shall be attributed to Plaintiffs, and Plaintiffs shall be liable for any payments or work obligations associated with such waste.

10.  Payment.

a.  Within 120 days after the effective date of this Agreement, the United States will pay $1,728,269.23 to Plaintiffs.   Payment shall be made by Electronic Funds Transfer in accordance with instructions provided by Plaintiffs. The aforesaid payment represents the United States' fair and equitable share of liability for waste sent to the Omega Site by the United States.

b.  If such payment is not made in full within one hundred and twenty (120) days after the Effective Date of this Agreement, then interest on the unpaid balance shall be paid commencing on the 121st day after the Effective Date. Interest shall accrue at the rate specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26 of the United States Code.

c.  Said payment by the United States is subject to the availability of funds appropriated for such purpose. No provision of this Agreement shall be interpreted as or constitute a commitment or requirement that the United States

8

EXHIBIT 3
015

obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341.

11. <u>Covenant Not to Sue by United States and Reservation</u>. The United States hereby releases and covenants not to sue Plaintiffs for Covered Matters, except the United States specifically reserves its right to assert against Plaintiffs any claims or actions regarding the Site brought on behalf of the United States Environmental Protection Agency or a natural resource trustee.

12. <u>Entire Understanding of the Parties</u>. This Agreement constitutes the entire understanding of the Parties with respect to its subject matter. No claimed additions to or modifications or amendments of this Agreement, or any claimed waiver of any of its terms or conditions, shall be effective unless in writing and signed by the Parties.

13. <u>Effect of Settlement/Entry of Judgment.</u>

a. This Agreement was negotiated and executed by Plaintiffs and the United States in good faith and at arms length and is a fair and equitable compromise of claims, which were vigorously contested. This Agreement shall not constitute or be construed as an admission of liability by the United States. Nor is it an admission or denial of any factual allegations set out in the Complaint or an admission of violation of any law, rule, regulation, or policy by any of the Parties to this Agreement.

9

EXHIBIT 3
016

b. Upon approval and entry of this Agreement by the Court, this

Agreement shall constitute a final judgment among the Parties.

14. <u>Representative Authority</u>. The individuals signing this Agreement on

behalf of the Parties hereby certify that they are authorized to bind their respective

party to this Agreement.

For the PLAINTIFFS:

Date: 4-18-2006

Keith F. Millhouse, Esquire
Millhouse Law Group
2815 Townsgate Road, Suite 330
Westlake Village, California 91361
(805) 230-2280

For the UNITED STATES:

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

Date: April 18, 2006

Paul Cirino, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 514-1542

10

EXHIBIT 3
017

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

OMEGA CHEMICAL PRP GROUP LLC )
and OMEGA CHEMICAL PRP GROUP, )
                                )
          Plaintiffs,           )
                                )
     v.                         )    Civ. No. 2:04-CV-01340-TJH-JWJ
                                )
AARON THOMAS CO., INC. et al.,  )
                                )
          Defendants.           )
_____)

## ORDER

UPON CONSIDERATION OF THE FOREGOING, the Court hereby finds

that the foregoing Agreement is fair and reasonable, both procedurally and

substantively, consistent with applicable law, in good faith, and in the public

interest. The foregoing Agreement is hereby APPROVED.

The United States is entitled to contribution protection for Covered Matters,

as defined in the foregoing Agreement, pursuant to Section 113(f) of CERCLA, 42

U.S.C. § 9613(f), the Uniform Comparative Fault Act, and any other applicable

provision of federal or state law, whether by statute or common law.

All claims against the United States in this action, whether alleged in the

complaint or as a cross-claim or third-party claim, or otherwise, are hereby

dismissed with prejudice.

EXHIBIT 3
018

There being no just reason for delay, this Court expressly directs, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, ENTRY OF FINAL JUDGMENT in accordance with the terms of this Agreement, SIGNED and ENTERED this _____ day of _____, ____.

Plaintiffs and the United States shall each bear their own costs and expenses, including attorneys' fees, in this case.

Dated: _____        _____
                                        Hon. Terry J. Hatter, Jr.
                                        UNITED STATES DISTRICT JUDGE

2

EXHIBIT 3
019

# PROOF OF SERVICE BY MAILING

1

2      I am over the age of 18 and not a party to the within action. I am employed

3 by the Environmental Defense Section, Environmental and Natural Resources

4 Division, United States Department of Justice. My business street address is 601

5 D Street, N.W., Suite 8000, Washington, D.C. 20004.

6      On June 26, 2006, I served the **Stipulation for Entry of Settlement**

7 **Agreement and Consent Order; Order Thereon** on the persons or entities

8 named on the attached service list by enclosing a copy in an envelope addressed as

9 shown on the attached service list and placing the envelope for collection and

10 mailing on the date and at the place shown below following our ordinary office

11 practices. I am readily familiar with the practice of this office for collection and

12 processing collection and mailing, it is deposited in the ordinary course of

13 business within the United States Postal Service in a sealed envelope with postage

14 fully prepaid.

15      Date of mailing: June 26, 2006. Place of mailing: Washington, D.C.

16 Person(s) and/or Entity(is) To Whom Mailed: All persons and entities named on

17 the attached service list.

18      I declare under penalty of perjury under the laws of the United States of

19 America that the forgoing is true and correct.

20      Executed on: June 26, 2006 at Washington, D.C.

21

22

23                                    *Paul Cirino*

24                                    Paul Cirino

25

26

27

28

EXHIBIT 3
020

## SERVICE LIST

Gary Lyman
Amcast International Corp.
1205 Weigala Court
Fort Wayne, Indiana 46814

Bruce Del Mar
Del Mar Avionics
1621 Alton Parkway
Irvine, CA 92606

City Manager
City of Whittier
13230 Penn Street
Whittier, California 90602

Alexander M. Cutler
Eaton Corporation
1111 Superior Avenune
Cleveland, OH 44114

Peter W. Johnson
Foamex International
1000 Columbia Avenue
Linwood, PA 19061

Tracy Rich
National Broadcasting Company, Inc.
3000 W. Alameda Ave.
Burbank, CA 91523

James Gaiser
Gaiser Tool Company
4544 McGrath Street
Ventura, CA  93003

Paul Samson
NCR Corporation
101 W. Schantz Ave.
Dayton, OH 45479

Thomas A. Waltermire
PolyOne Corporation
200 Public Square
Suite 36-5000
Cleveland, OH 44114

Gerald R. Graham
Reed & Graham, Inc.
690 Sund Street
San Jose, CA 95126

Yudie Fishman, President
REGENT MFG.
11905 Regentview Avenue
Downey, CA 90241

Steven Mines, President
MARCROSS INDUSTRIES
24979 Lewis and Clark Road
Hidden Hills, CA 91304

President
MARCROSS INDUSTRIES
2997 E. Maria Street
Rancho Dominguez, CA 90221

Jeffrey Isroff, President
DIGMOR INC.
6418 Shady Creek Court
Fort Wayne, IN  46814

William Lassleben
CITY STEEL TREATING
13215 E Penn St
Whittier, CA 90602

Denese Boyer
CITY STEEL TREATING
13005 Los Nietos Rd.
Santa Fe Springs, CA 90670

1

EXHIBIT 3
021

Nina Sullivan
CITY STEEL TREATING
10831 Arroyo Drive
Whittier, CA 90604

Daniel Fishman
REGENT MFG.
11905 Regentview Ave
Downey, CA 90241

Maurice Benson
MARCROSS INDUSTRIES
6615 E. Pacific Coast Highway
Long Beach, CA 90803

Michael Hanson, Superintendent
FRESNO UNIFIED SCHOOL DISTRICT
2309 Tulare Street
Fresno, CA 93721

CABOT CORPORATION
c/o Prentice-Hall Corporation System
PO Box 526036
Sacramento, CA 95852

Ronald Naples, CEO
QUAKER CHEMICAL CORPORATION
Elm & Lee Streets
Conshohocken, PA 19428

G. Kelly Martin
DURA PHARMACEUTICALS, INC.
Elan Pharmaceuticals Inc.
800 Gateway Blvd.
Suite F
South San Francisco, CA 94080

CSC - LAWYERS
QUAKER CHEMICAL CORPORATION
2730 Gateway Oaks Drive
Suite 100
Sacramento, CA 95833

Walter M. Schey
PUTZMEISTER INC
Law Office of Walter M. Schey
1 Embarcadero Center
Suite 1020
San Francisco, CA 94111

David Adams
PUTZMEISTER INC
1733 90th Street
Sturtevant, WI 53177

CITY OF IRVINE
c/o Richard Montevideo. Esq.
Rutan & Tucker LLP
611 Anton Boulevard
14th Floor
Costa Mesa, CA 92626

Jack Jue
I COAT COMPANY
12020 Mora Drive Suite 2
Santa Fe Springs, CA 90670

Allison Hart, City Manager
CITY OF IRVINE
1 Civic Center Plaza
Irvine, CA 92623

Kirk Weaver, President & CEO
NORTHSTAR ELECTRONICS, INC.
NEI Realization, Inc.
f/k/a/ orthstar Electronics, Inc.
c/o FXI Corporation
910 Rankin Road
Suite E
Houston, TX 77073

Kennett Burnes, President
CABOT CORPORATION
Two Seaport Lane
Suite 1300
Boston, MA 02210

EXHIBIT 3
022

Theodore Schmid, President
NORTHSTAR ELECTRONICS, INC.
Moore Electro Assembly
3566 Corporate Court
San Diego, CA 92123

Bruce Mullis
NORTHSTAR ELECTRONICS, INC.
Moore Electro-Assembly
10160 Vista De La Cruz
La Mesa, CA 92041

Cam Gardner
DURA PHARMACEUTICALS, INC.
5880 Pacific Center Blvd
San Diego, CA 92121

Nancy Chaudhary
NORTHSTAR ELECTRONICS, INC.
3566 Corporate CT #2
San Diego, CA 92123

C T Corporation System
DOMESTIC LINEN
818 West Seventh St.
Los Angeles, CA 90017

Bruce Colton, President
Domestic Uniform Rental
dba Domestic Linen Supply Co. Inc.
30555 Northwestern Highway
Suite 300
Farmington Hills, MI 48334

DURA PHARMACEUTICALS, INC.
c/o National Registered Agents
2030 Main Street
Suite 1030
Irvine, CA 92614

Jack Snyder
DURA PHARMACEUTICALS, INC.
4292 Sturgeon Court
San Diego, CA 92130

Cam L. Garner
DURA PHARMACEUTICALS, INC.
IMMUTECH INC.
7475 Lusk Blvd
San Diego, CA 92121

Ronald Young
KEY MECHANICAL
SERVICECOMPANY16872
Edgewater LN
Huntington Beach, CA 92649

Eugene Levan
Levan Specialty Corp.
BERTOLINI CORP.
2750 E 2nd Street
Long Beach, CA 90803

James D. Fraser, Esq.
I COAT COMPANY
Lewis Brisbois Bisgaard and Smith
221 N. Figueroa
Los Angeles, CA 90012

Joyce Brooks
SUMMIT ENVIRONMENTAL
CORP.
3033 West Mission Rd.
Alhambra, CA 91803

Jack Jue
I COAT COMPANY
2842 S. Grand Ave.
Los Angeles, CA 90007

Chris Basom
SUMMIT ENVIRONMENTAL
CORP.
29911 Aventura
Suite D
Rancho Santa Margarita, CA 92688

EXHIBIT 3
023

Finn Moller
SUMMIT ENVIRONMENTAL CORP.
606 Wilshire Blvd
Suite 206
Santa Monica, CA 90401

Finn Moller, President
SUMMIT ENVIRONMENTAL CORP.
11718 Barrington Court
#706
Los Angeles, CA 90049

Finn Moller
SUMMIT ENVIRONMENTAL CORP.
1238 Amalfi Dr
Pacific Palisades, CA 90272

President James D. Gale
J AND S LABORATORIES
INCORPORATED
37 Teague Drive
Salem, NH 03079

C T Corporation System
SUMMIT ENVIRONMENTAL CORP.
818 West Seventh St.
Los Angeles, CA 90017

Ronald J. Young
KEY MECHANICAL SERVICE
COMPANY
10905 Laurel Avenue
Santa Fe, CA 90670

Brad Bunch, Esq.
Bertolini Corp.
McCollum & Bunch
5250 N Palm Ave Ste 330
Fresno, CA 93704

E. Milton Bevington, President
SERVIDYNE INCORPORATED
2500 Peachtree Rd.
Suite 104
Atlanta, GA 30305

Robyn Johns
SERVIDYNE INCORPORATED
502 N Santa Fe Ave.
Suite D
Vista, CA 92083

Timothy Gale, President
J AND S LABORATORIES
INCORPORATED
49 Pelham Rd
Salem NH, NH 3079

Timothy Gale
J AND S LABORATORIES
INCORPORATED
521 East D St.
Wilmington, CA 90744

Paul Fong, President
Fong & Fong Printers and
Lithographers Inc.
3009 65th Street
Sacramento, CA 95820

SERVIDYNE INCORPORATED
CT Corporation Systems
818 West Seventh Street
Los Angeles, CA 90017

William Butler
GIUMARRA VINEYARDS
CORPORATION
11220 Edison Highway
Edison, CA 93220

M. Fong
Fong & Fong Printers and
Lithographers Inc.
3009 65th St
Sacramento, CA 95820

Joseph F. Klein, President
GRAYCON, INC.
232 8th Ave.
City of Industry, CA 91746

4

EXHIBIT 3
024

Herbert L. Marks, President
HLM Labeling Incorporated
6096 Barry Drive
Cypress, CA 90630

John Pugliese, Vice President
Holly Decorations Inc.
650 Lillard Drive
Sparks, NV 89434

Bill Butler
Guimarra Vineyards Corporation
P.O. Bin 1969
Bakersfield, CA 93303

Edward H. Scott, President
Holly Decorations Inc.
5905 Franktown Rd
Carson City, NV 89704

Richard McDonald
GROUP ONE LABEL, INC.
10880 Thienes Avenue
So. El Monte, CA 91733

Lynn Arayata
BEVELITE ADLER
14824 So. Main St.
Gardena, CA 90248

David R. Puopolo, President
Group One Label Inc.
1224 Gentilly Place
Oak Park, CA 91377

Ruben Ruiz
ARRAL INDUSTRIES, INC.
2101 Carrillo Privado
Ontario, CA 91761

Richard Vitelle
AEROSCIENTIFIC CORPORATION
2151 Anchor Court
Newbury Park, CA 91320

Louis Arranaga, President
Arral Industries Inc.
9794 Megan Terrace
Escondido, CA 92026

Frank Enterante, President
ARROWHEAD BRASS PRODUCTS,
INC.
5147 Alhambra Avenue
Los Angeles, CA 90032

John H. Caballero, Esq.
BETTERBILT CHEMICALS, INC
Schiada & Caballero
12070 Telegraph Road Suite 103
Santa Fe Springs, CA 90670

William Feldhorn, President
Auto Coach Inc.
6219 Ramirez Mesa Drive
Malibu, CA 90265

Wesley Base
Western Circuits Inc.
15111 Pipeline Ave. #63
Chino, CA 91709

Gayl Swinehart
BETTERBILT CHEMICALS, INC
1455 Palomares Ave.
La Verne, CA 91750

James Pinto
BEVELITE ADLER
Action Printed Circuits
11645 Caminito Magnifica
San Diego, CA 92131

G. Robert Tatum III
VITAREL MICROELECTRONICS,
INC.
6828 Nancy Ridge Dr.
San Diego, CA 92121

5

EXHIBIT 3
025

Robert Nobles
BOB NOBLES CHEVROLET, INC.
17110 High Road
Sonoma, CA 95476

Robert L. Nobles.
Bob Nobles Chevrolet Inc.
687 West Napa Street
Sonoma, CA 95476

John Klopp
CHIERA, INC.
1656 Bon View
Ontario, CA 91761

Charles J. Lyon
Cast Metal Finishing
7350 E. Compton Blvd.
Paramount, CA 90723

John H. Klopp
CHIERA, INC.
dba Pacific Mechanical Service
48 Falls Road
Mt. Baldy, CA 91759

Mario Mendoza, President
Western Circuits Inc.
12450 Hammack Street
Los Angeles, CA 90066

Joel O. Darner, II, President/CEO
Darner Motor Sales Inc.
837 West Main Street
Mesa, AZ 85213

Stephen E. Nash, President/CEO
Waltco Engineering Company
401 West Redondo Beach Blvd.
Gardena, CA 90248

Joel Darner, II
DARNER MOTOR SALES, INC.
4144 E Hackamore Ct.
Mesa, AZ 85205

James R. Weinel, President
BEVELITE ADLER
Gemini Inc.
103 Mensing Way
Cannon Falls, MN 55009

Frank Robinson, President
Robinson Helicopter Company Inc.
2901 Airport Dr.
Torrance, CA 90505

James P. Kossler, Superintendent-
President
PASADENA CITY COLLEGE
1570 E. Colorado Blvd.
Pasadena, CA 91106

Wayne R. Ulberg, President
Petro Lock Inc.
45315 N. Trevor Avenue
Lancaster, CA 93534

President Per Tonnesen
VITAREL MICROELECTRONICS,
INC.
7580 Britannia Court
San Diego, CA 92154

President James M. Jennison
Photo Chemical Products of
California, Inc.
4841 Chino Ave.
Chino, CA 91710

Ronald Wilcox
Photo Chemical Products of
California, Inc.
5075 Edison Avenue
Chino, CA 91710

Roosevelt L. Larks, President
R and R Industrial Waste Haulers Inc.
c/o R & R Trucking Inc.
16181 Highway 930
Prairieville, LA 70769

6

EXHIBIT 3
026

Roosevelt Larks Sr.
R AND R INDUSTRIAL WASTE
HAULERS, INC.
4047 So. Dalton Ave.
Los Angeles, CA 90062

Arnon Raphael
RAPHAEL, INC.
1914 So. Raymond St.
Los Angeles, CA 90007

Arnon Raphael, President
RAPHAEL, INC.
7734 Woodrow Wilson Dr.
Los Angeles, CA 90046

Yoora Heo
RAPHAEL, INC.
25399 The Old Road
Suite 17306
Stevenson Ranch, CA 91381

E. Scott
HOLLY DECORATIONS, INC.
906 E Sixtieth St
Los Angeles, CA 90001

Lee Usrey
Painting & Stripping Corporation Of
America
10051 Greenleaf
Santa Fe Springs, CA 90670

William H. Thomas
UTILITY BODY COMPANY
1727 16th Street
Oakland, CA 94607

Kurt Robinson
ROBINSON HELICOPTER
COMPANY, INC.
2901 Airport Drive
Torrance, CA 90505

Steve Sherlin, President
SNAECO SPECIALTY
CORPORATION
4233 Alonzo Avenue
Encino, CA 91316

Fred Hayward
Solder Station-One Inc.
c/o Heartland Technology Inc.
330 N. Jefferson Ct.
Suite 305
Chicago, IL 60661

Fred Hayward
SOLDER STATION-ONE, INC.
2231 W. Cape Cod Way
Santa Ana, CA 92703

David R. Gibbs, President
SOUTHWEST CHEMICAL CO.
159 Linde Circle
Marina, CA 93933

David Gibbs
SOUTHWEST CHEMICAL CO.
521 South K Street
Imperial, CA 92251

C T Corporation System
THE FAIRCHILD CORPORATION
818 West Seventh Street
Los Angeles, CA 90017

William D. Zollars
Yellow Freight Systems, Inc.
10990 Roe Avenue
Shawnee Mission, Kansas 66202

Thomas L. Schulman
Burtin Urethane
200 W. Santa Ana Blvd.
Suite 200
Santa Ana, CA 92701

7

EXHIBIT 3
027

Eric I. Steiner, President
THE FAIRCHILD CORPORATION
45025 Aviation Drive
Suite 400
Dulles, VA 20166

Gary Rodrigues
VALLEY MOTOR CENTER, INC.
10639 Glen Oakes Blvd.
Unit B
Pacoima, CA 91331

Devin R. Wilder
WILDER'S PAINTING
2446 Rice Avenue
West Sacramento, CA 95691

IMO INDUSTRIES, INC.
CSC - Lawyers Incorporating Service
PO Box 526036
Sacramento, CA 95852

Thomas O'Brien
Sr. Vice President, General Counsel
IMO INDUSTRIES, INC.
997 Lenox Drive
Suite 111
Lawrenceville, NJ 08648

M. David Brown, President
JACKSON CORPORATION
3447 Union Pacific Ave.
Los Angeles, CA 90023

Kenneth Benbassat
JACKSON CORPORATION
10100 Santa Monica Blvd.
Suite 2200
Los Angeles, CA 90067

Per Tonnesen
VITAREL MICROELECTRONICS, INC.
6828 Nancy Ridge Drive
San Diego, CA 92121

CT Corporation System
USAIRWAYS, INC.
818 West Seventh
Los Angeles, CA 90017

John J. Lee
Korpac-USA
c/o Astron Comdesk Inc.
501 Gerhold Lane
Placentia, CA 92870

Thomas R. Roll, Attorney
KORPAC-USA
Myers & Porter LLP
38 Technology
Suite 250
Irvine, CA 92618

John Lee
KORPAC-USA
16823 S. Denker Ave.
Gardena, CA 90247

Billy Ly
Laguna Laboratories Inc.
1300 Normandy Place
Santa Ana, CA 92705

Nancy Welty
Petro Lock Inc
45315 Trevor Ave.
Lancaster, CA 93534

Wilbert G. Dugan, President
Laguna Laboratories Inc.
c/o Rand Precision Optics
1307 East Pomona Street
Santa Ana, CA 90067

Gary Rodrigues, President
Valley Motor Center Inc.
14954 Oxnard Street
Van Nuys, CA 91411

8

EXHIBIT 3
028

Ronald Usrey, President
Painting & Stripping Corporation of
America
10051 Greenleaf Avenue
Santa Fe Springs, CA 90670

Randall Joseph Taylor, President
Mid-Cal Painting & Drywall Inc.
786 Cambridge Dr.
Santa Barbara, CA 93111

Randall Taylor
MID-CAL PAINTING & DRYWALL,
INC.
990 S. Fairview Ave.
Goleta, CA 93117

Mei-Ling Chen
MINSON CORPORATION
1441 Peerless Way
Montebello, CA 90640

John Wallach, Vice President
Minson Corporation
1441 Peerless Way
Montebello, CA 90640

Michael White
MNEMONICS INC.
5301 Pacific Boulevard
Huntington Park, CA 90255

Brian Leck. Esq.
Mnemonics Inc.
c/o Allen Matkins Leck Gamble & Mallory
515 South Figueroa St.
7th Floor
Los Angeles, CA 90071

Victor Salazar
OMNI METAL FINISHING, INC.
11665 Coley River Cir.
Fountain Valley, CA 92708

MNEMONICS INC.
1608 Sierra Madre Circle
Placentia, CA 92670

Victor M. Salazar
Omni Metal Finishing Inc.
11665 Coley River Circle
Fountain Valley, CA 92708

Edward Smith, President & CEO
SMTEK International Inc.
for Aeroscientific Corporation
200 Science Drive
Moorpark, CA 93021

Chris Leason
BUD'S OIL SERVICE
Gallagher & Kennedy
2575 Camelback Road
Phoenix, AZ 85016

Stephen Hogg
BUD'S OIL SERVICE
6235 S. 37th Street
Phoenix, AZ 85042

Peter McGraw, Esq.
Archer Norris
2033 North Main Street
Suite 800
Walnut Creek, CA 94596

Albert M. Cohen, Esq.
Loeb & Loeb
10100 Santa Monica Blvd.
Suite 2200
Los Angeles, CA 90067

Pradeep Kumar
Quality Fabrication
9631 Irondale Avenue
Chatsworth, CA 91311

9

EXHIBIT 3
029

Christopher Tribull
Sierracin Corp.
12780 San Fernando Road
Sylmar, CA 91342

Wynnsan Moore
W&B Marketing, Inc.
1744 Dapplegray Road
Bell Canyon, CA 91307

10

EXHIBIT 3
030

EXHIBIT 4



May 19, 2004                                                                                                                          002-10287-00

SFUND RECORDS CTR
**2238412**

Mr. Albert M. Cohen, Esq.
Smiland & Khachigian
601 West Fifth Street, Seventh Floor
Los Angeles, California 90071

Subject:   Response to United States Environmental Protection Agency
           Conceptual Remedial Action Cost Estimate for the Omega Chemical Superfund Site,
           Whittier, California

Dear Mr. Cohen:

As requested, LFR Levine·Fricke (LFR) has prepared this letter to comment on the United States
Environmental Protection Agency's (USEPA) conceptual remedial action cost estimate for the
Omega Chemical Superfund Site in Whittier, California. These comments are based on LFR's
review of the Technical Memorandum prepared by CH2MHill entitled "Conceptual Cost Estimate
for Site-Wide Remedial Action, Omega Chemical Superfund Site" and dated April 6, 2004.

In general, LFR believes that the costs presented in CH2MHill's memorandum are based on
incorrect and "worst case" assumptions regarding the nature and extent of contamination
originating from the Omega Site, and unrealistic assumptions regarding remedial technologies and
associated costs. In fact, EPA's Guidance Document entitled "Superfund Program; Early De
Minimis Waste Contributor Settlements" dated July 1, 1992, states that:"A Region should use
available site and cost information to develop a best estimate of future response costs for the de
minimis settlement." This estimate should be based on reasonable judgment and generate a "best
estimate" not "worst case" cost estimate.

For example, CH2MHill assumes that the groundwater plume emanating from the Omega Site is
2.5 miles long, 0.75 mile wide, and 50 feet thick, and uses these assumptions to calculate a volume
of impacted groundwater attributable to the Omega Site and develop the costs for remediation of
the groundwater. This then leads to CH2MHill's assertion that pumping at 1,900 gallons per
minute (gpm) would be required to address this area of impacted groundwater. However, the actual
extent of groundwater contamination that may have emanated from the Omega Site and the
associated remedial costs that may be needed to address this contamination appear to be
dramatically less than assumed by CH2MHill.

EXHIBIT 4
001
EPA002636



LFR's specific concerns regarding the USEPA's Conceptual Costs are presented below.

## Extent of Contamination

Studies by USEPA's own contractor, Weston Solutions (Weston), have documented the presence of multiple additional sources of groundwater contamination in the area of and downgradient from the Omega Site. These previously undocumented sources and many other known sources of contamination in the area have released the same primary chemicals found at the Omega Site, such as tetrachloroethene (PCE), trichloroethene (TCE), cis-1,2-dichloroethene (cis-1,2-DCE), 1,1-DCE, and Freon compounds. Releases from these additional downgradient sources have resulted in multiple plumes of groundwater contamination that are not attributable to the Omega Site. The extent of the plume of groundwater contamination possibly originating from the Omega Site is much less than 2.5 miles long and 0.75 mile wide.

The additional "hot spot" sources of groundwater contamination identified by Weston ("Phase 2 Groundwater Characterization Study"; June 2003) include the following:

1. The area north of Baldwin Place, more than 1,200 feet northwest of the Omega Site, where TCE has been found at concentrations as high as 960 micrograms per liter ($\mu$g/l). TCE, PCE, and other volatile organic compounds (VOCs) from this location have migrated toward the southwest, resulting in a plume that is much wider than that which would be attributable solely to the Omega Site.

2. The area near B-103, approximately 1,000 feet west of the Omega Site, where TCE in groundwater (as high as 7,000 $\mu$g/l) exceeds that found at the Omega Site, and also migrates toward the southwest. The presence of elevated concentrations of chromium (greater than 60 $\mu$g/l) in groundwater from well MW-6A is also indicative of a separate source in the area. Elevated chromium concentrations are not found at the Omega Site.

3. The area near PP078, PP006, and B101, west and northwest of the Omega Site, where higher PCE levels range from 1,100 to 2,100 $\mu$g/l.

4. The area near the intersection of Byron and Rivera Roads, approximately 2,300 to 2,600 feet west-southwest of the Omega Site. A "hot spot" of PCE was found in this area with concentrations as high as 5,100 $\mu$g/l.

5. The area near Rivera Road and Secura Way, where PCE has been found at levels up to 580 $\mu$g/l.

6. The area along Dice Road, north of Los Nietos Road, approximately 5,000 feet southwest of the Omega Site, where elevated concentrations of several VOCs have been found in groundwater migrating toward the south and southwest. These VOCs include PCE (3,300 $\mu$g/l),

EXHIBIT 4
002
EPA002637



TCE (780 µg/l), cis-1,2-DCE (1,400 µg/l), 1,1-DCE (2,900 µg/l), Freon-11 (61 µg/l), and Freon-113 (61 µg/l).

The same Weston report also indicates that: "Other active sites with known chlorinated hydrocarbon contamination in groundwater are present within the OU-2 study area, particularly beyond one mile from the Omega site. Many of these sites are administered under programs of the Regional Water Quality Control Board and the California Department of Toxic Substances Control" (Weston Solutions, June 2003).

The presence of these additional sites has resulted in the formation of multiple overlapping plumes of PCE, TCE, DCE, and other contaminants, and the migration of those contaminant plumes in the area southwest of and apparently downgradient from the Omega Site. The concentrations of VOCs in the vicinity of some of these additional sources are also similar to or higher than those found in groundwater at the Omega Site. As a result, these (and other) additional sources have greatly increased the area and volume of groundwater contamination beyond that which may have originated from the Omega Site.

As also noted by Weston, there are "many" sites in the OU-2 study area that are being administered by the Regional Water Quality Control Board (RWQCB) and Department of Toxic Substances Control (DTSC), and it is likely that additional investigations have been conducted at those sites to document the impacts of these additional sources. It is also likely that decisions regarding the need for groundwater remediation, possibly including groundwater extraction and treatment, have been or will be made by those agencies. Therefore, it is not reasonable to conclude at this time that groundwater extraction and treatment will be required, or is even warranted, throughout the large area assumed by CH2MHill.

As a result, it is not appropriate to conclude that the extent of groundwater contamination originating from the Omega Site is 2.5 miles by 0.75 mile, and in fact the actual extent of the Omega Site plume is likely only a fraction of that size. Therefore, the scope of possible groundwater remedial actions assumed by CH2MHill and the resulting costs would also be dramatically reduced if they are intended to address only that contamination which may have originated from the Omega Site. If groundwater extraction and treatment were to be implemented, the scope and costs of that remedial technology would be directly related to the size and depth of the area of impacted groundwater. If the area of impacted groundwater possibly originating from the Omega Site is four or five times less than that assumed by CH2MHill, this would reduce costs accordingly.

**Groundwater Treatment Alternatives**

In their cost calculations, CH2MHill has assumed that multiple treatment technologies will be required to treat groundwater, resulting in an overly complex and expensive treatment system. The proposed technologies include: air-stripping to remove VOCs, advanced oxidation process (AOP) to remove 1,4-dioxane and VOCs, liquid-phase granular activated carbon (LGAC) to remove

EXHIBIT 4
003
EPA002638



VOCs, biological treatment (fluidized bed reactor) to address perchlorate, and pH adjustment to remove hexavalent chromium. It is highly unlikely that such a complex series of treatment alternatives operating would be used because of the difficulty in implementation and excessive costs. Often, use of lower order treatment systems grouped in series can be more cost-effective than progressing to a higher order technology. A more in-depth evaluation of treatment alternatives and pilot testing is necessary before meaningful costs can be developed.

Some contaminants in groundwater, such as chromium and perchlorate, have not been shown to be associated with the Omega Site. The highest concentrations of chromium (90 to 100 µg/l) are found over 1,000 feet from the Omega Site in the area of an additional source of VOCs, and very few monitoring wells have been found to contain chromium above its drinking water maximum contaminant level (MCL; 50 µg/l). Based on groundwater monitoring data, it is unlikely that chromium concentrations in groundwater will necessitate treatment.

Perchlorate has been found only slightly above its California Department of Health Services (DHS) Action Level of 6 µg/l in one monitoring well (6.2 µg/l in MW-07) located upgradient of the Omega Site. All other groundwater samples collected in the third quarter 2003 sampling event were below the DHS Action Level for perchlorate. It is unreasonable, therefore, to assume that groundwater treatment would be required for perchlorate, particularly as CH2MHill has assumed would be required for the entire 1,900-gpm treatment system.

More importantly, experience at other similar sites and monitoring data from the Omega Site area indicate that not all of these technologies will be required to treat groundwater. As indicated, it is not likely that treatment will be required for chromium or perchlorate. This would have a dramatic impact on costs, as the capital and operations and maintenance (O&M) costs alone for perchlorate removal are very high. Additionally, even if groundwater extraction and treatment were implemented, it is unlikely that air stripping, AOP, and LGAC would all be required. More likely, some reduced combination of these technologies would be used to efficiently treat the water.

CH2MHill appears to assume that a system comprised of all of these treatment technologies will be required to process 1,900-gpm for at least 30 years. Furthermore, they indicate that they used "average contaminant levels" and that "There has been no effort to account for the change in contaminant concentrations with time,..." In addition, CH2MHill appears to assume that groundwater sampling and treatment system O&M activities will not change with time.

While CH2MHill does not provide the data upon which they relied to determine "average contaminant levels," it is generally known that contaminant concentrations do not remain constant with time during remediation. In fact, it is expected that groundwater concentrations should decrease with time if the remedial system is correctly designed and implemented. Such expected decreases in groundwater contaminant concentrations would translate directly to reduced variable costs such as carbon consumption, electricity, and treatment chemicals. Similarly, costs for groundwater monitoring are also known to generally decrease with time.

EXHIBIT 4
004
EPA002639



## Remedial Cost Estimates

The uncertainty included in the cost estimate presented by CH2MHill is excessive. In the Limitations section of the subject document, CH2MHill indicates that "The conceptual cost estimates prepared for the groundwater extraction and treatment for the Omega Site are based on gross assumptions regarding the nature and extent of contamination, and possible RA scenarios." They also note that "The RI at the Omega site is ongoing..." and "the FS had not yet been initiated." As a result, CH2MHill concluded "the actual remedial costs for the Omega site will be different than the estimate presented herein, possibly by more than an order of magnitude."

An evaluation of the sample of historical Superfund costs shown in Attachment B-1 of the Technical Memorandum indicates that, on average, both the capital and O&M costs estimated for the Omega Site are significantly higher than the highest costs included in the Attachment. Although CH2MHill did correct for a flow rate increase (see Attachment A-3), the average annual flow rate used for the comparison was only 120,000,000 gallons (228 gpm at 100% uptime). This is reportedly the average flow rate compiled from 32 groundwater treatment systems that either have operated or are currently operating at Superfund sites. Given that the average groundwater flow rate at the Superfund sites is only 228 gpm, CH2MHill's proposed flow rate of 998,640,000 gallons per year or 1,900 gpm is unrealistic and inconsistent with flow rate data from other Superfund sites and from other groundwater remediation sites in the Los Angeles area. In sum, the flow rates are greatly exaggerated and, therefore, the estimated remediation costs are greatly exaggerated.

A more practical strategy would be to develop realistic cost estimates and use insurance products to manage the risk inherent in environmental cleanup projects. Insurance is generally available to cover possible remedial cost overruns that may be caused by changing regulatory conditions, discovery of more of the same or new contaminants, inflation, and other factors.

In addition to the already conservative criteria used to develop their cost estimate, which include assumptions of unrealistic plume size, pumping rates, and treatment technologies, CH2MHill also applies very high cost contingency factors. They apply a Cost Basis Contingency (20%) and a Concept Scope Contingency (20%) to the total capital cost for groundwater extraction and treatment. This increased the total capital cost by approximately $7.5 million.

As mentioned previously, perchlorate above DHS levels was detected in only one monitoring well located upgradient from the Omega Site. It is unlikely that such low perchlorate levels would require a separate treatment unit as specified by CH2MHill. Eliminating the biological fluidized bed treatment system and the ancillary tanks, pumps, and metering systems will reduce the groundwater treatment capital costs by approximately $2.4 million and annual O&M costs by an estimated $200,000 to $300,000.

The presence of elevated concentrations of chromium (greater than 50 µg/l) in groundwater are not found at the Omega Site. As a result, it should not be necessary to treat groundwater from the site

EXHIBIT 4
005
EPA002640



for chromium. Subtracting the capital and annual O&M costs directly attributed to chromium treatment would reduce the overall costs by $170,000 and $255,000, respectively.

CH2MHill assumed that multiple treatment technologies would be required to treat the entire groundwater plume. By reducing the size and number of treatment methods to address only that contamination which may have originated from the Omega Site, significant cost savings can be realized. Treatment technologies should be simplified and based on a combination of LGAC and air stripping followed by advanced oxidation, or air stripping followed by LGAC. CH2MHill's assumed that advanced oxidation would be necessary to treat 1,4 dioxane; however, there is not sufficient data to determine, if in fact, such treatment would be required. Eliminating advanced oxidation from the cost estimate would reduce groundwater treatment capital costs by nearly $1 million and annual O&M costs by more than $300,000.

If you have any questions regarding the contents of this letter, please do not hesitate to contact the undersigned at (510) 596-9511.

Sincerely,


Thomas M. Johnson, R.G., C.H.G.
Senior Principal Hydrogeologist

EXHIBIT 4
006
EPA002641

# EXHIBIT 5

# ⬥EPA Omega Chemical Superfund Site

U.S. Environmental Protection Agency  •  Region 9  •  San Francisco, CA  •  May 2016

## EPA Updates Cleanup Plan for the Omega Chemical Site
### Agreement Reached for Design, Construction and Operation of Groundwater Cleanup Facilities

## Introduction

This "Explanation of Significant Differences" (ESD) updates the United States Environmental Protection Agency's (EPA) groundwater cleanup plan for the Omega Chemical Corporation Superfund Site Operable Unit 2 located in the cities of Whittier, Santa Fe Springs, and Norwalk, California. The term operable unit is explained on page 3. EPA signed the cleanup plan, known as a Record of Decision (ROD), in September 2011. The primary elements of the 2011 cleanup plan remain unchanged. The cleanup will still require the construction and operation of groundwater extraction wells and water treatment facilities as described further on pages 2-3.

This ESD makes four changes to the 2011 cleanup plan:

1. The ESD expands the possible uses of the groundwater after it has been pumped to the surface and the contaminants removed. There are now four options: i) delivery to an existing "reclaimed" water system for irrigation and industrial use; ii) return to the groundwater basin using "reinjection" wells; iii) return to the groundwater basin using an existing "spreading basin;" and iv) delivery to one or more water purveyors for use as drinking water. These four end-uses are referred to in this update as "reclaimed use," "reinjection," "spreading," and "drinking water use," respectively.

2. The ESD removes a preference established in the ROD for a drinking water use;

3. The ESD adds a new drinking water standard, the 10 micrograms per liter (µg/L) State of California Maximum Contaminant Level (MCL) for hexavalent chromium, as a potential treatment requirement. Hexavalent chromium is one of 13 "chemicals of concern" in the groundwater; and

4. The ESD updates EPA's cleanup cost estimates to reflect the new treatment requirement for hexavalent chromium, the more stringent treatment requirement for 1,4-dioxane described in the 2011 ROD, and to correct an error in the 2011 cost estimate. The chemical 1,4-dioxane is another "chemical of concern" in the groundwater.

These changes are further described on pages 3–7. EPA is not selecting an end-use for the treated groundwater at this time. The end-use will be chosen during the design process for the cleanup facilities. EPA will oversee the design, construction, and operation of the groundwater wells and water treatment facilities to ensure that its cleanup goals are met no matter which end-use is chosen.



**Figure 1:** Location map of the Omega Chemical Superfund Site

## Reason for this Explanation of Significant Differences

If and when significant changes are needed in a Superfund cleanup plan, and the changes do not fundamentally modify a remedy, EPA informs the community through a document known as an "Explanation of Significant Differences." This is a requirement in the Superfund law and regulations (Section 117(c) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and §300.435(c)(2)(i) of the National Contingency Plan [NCP]). This fact sheet and an updated site Administrative Record have been prepared to meet the requirements in §300.435(c)(2)(i), including public participation requirements. Documents have been added to the Administrative Record in accordance with §300.825(a)(2) of the NCP.

EXHIBIT 5
001
UPRR119867

# ANNOUNCEMENT:
## AGREEMENT REACHED FOR DESIGN, CONSTRUCTION AND OPERATION OF GROUNDWATER CLEANUP FACILITIES

In April 2016, EPA reached final agreement with 66 "Potentially Responsible Parties" (PRPs) to spend an estimated $70 million to implement the majority of EPA's 2011 Record of Decision. The agreement, a Federal Consent Decree, is awaiting approval by the Federal District Court. See the U.S. Department of Justice webpage at https://www.justice.gov/enrd/consent-decrees for a copy of the agreement and information on the public comment process. The comment period began on the day the notice was published in the Federal Register, April 27, 2016, and ends on May 27, 2016.

Design work on the new water treatment systems, groundwater extraction wells, and pipelines is expected to begin later this year after court approval of the agreement and continue in 2017, with construction expected to begin in 2018. During the design process, final decisions will be made on groundwater extraction locations and rates, water treatment technologies, and end-use of the treated groundwater.

EPA has identified more than 500 companies as PRPs for the Omega cleanup. PRPs are also paying for cleanup work occurring as part of OU1 and OU3.

## Site Background

The Omega Chemical Corporation Site includes soil contamination at the former Omega Chemical facility in Whittier, California and an area of groundwater contamination extending at least four miles to the south and west. The Site is located in the coastal plain of Los Angeles County, California in the Central Groundwater Basin. The groundwater contamination is believed to result from spills, leaks, and poor chemical handling practices at the Omega Chemical facility and at other industrial operations in the area.

Omega Chemical operated a refrigerant and solvent recycling facility in Whittier, California from 1976 to 1991. Other industrial operations believed to have contributed to the groundwater contamination include dry cleaners, metal plating facilities, solvent and chemical distributors, and waste recyclers.

Contaminants present in the soil and/or groundwater at the Site include perchloroethyne (PCE), trichloroethene (TCE), 1,1-dichloroethene, 1,2-dichloroethane, Freon 11, Freon 113, 1,4-dioxane, and hexavalent chromium. The depth to groundwater (the "water table") varies across the site from about 20 to 110 feet below ground. Contaminated groundwater extends to a depth of 200 feet or more below ground.

In 1999, EPA added the site to the Superfund National Priorities List. In 2001, EPA began its "remedial investigation" into the sources, nature, and extent of contamination at the site. The investigation has included the installation of more than 60 groundwater monitoring wells, the periodic collection and analysis of groundwater samples from new and existing monitoring wells, and other testing. The remedial investigation also made use of additional groundwater data collected as part of investigations of contaminated properties in Whittier, Santa Fe Springs, and Norwalk overseen by two State agencies, the Los Angeles Regional Water Quality Control Board and the Department of Toxic Substances Control (DTSC).

In 2010, EPA completed a feasibility study to evaluate six possible cleanup actions known as "remedial alternatives." One of remedial alternatives was to take no-action. Another provided limited remediation of the contamination. The other four alternatives called for more aggressive "plumewide" groundwater pump-and-treat systems to prevent the spread of the contaminated groundwater into less contaminated or uncontaminated areas. They differ primarily in the end-use of the water. Table 1 provides cost estimates for the no-action alternative, the limited remedial alternative, and the four "plumewide" remedial alternatives.

Also in 2010, EPA published a proposed cleanup plan that described EPA's preferred remedial alternative. After considering public comments on the plan, EPA selected a remedy that combined elements of two of the remedial alternatives (Alternatives #4 and #6). EPA's selected remedy was a groundwater pump and treat system that includes the following components:

- Construction and operation of one or more groundwater extraction wells to pump contaminated groundwater to the surface;

Omega Chemical Superfund Site

**EXHIBIT 5**
002

UPRR119868

- Construction and operation of water treatment facilities to remove PCE, TCE, and other contaminants from the groundwater;

- Construction of pipelines and other conveyance systems to transport groundwater to the water treatment facilities;

- Delivery of the treated groundwater to one or more drinking water purveyors or reinjection of the treated water into the aquifer;

- Administrative or legal controls ("Institutional Controls") to minimize the risk that future pumping from other groundwater wells in the area would interfere with the cleanup; and

- Contruction of new groundwater monitoring wells and monitoring of new and existing wells.

EPA's selected remedy is an interim action, meaning that EPA intends to adopt a final remedy after the cleanup facilities described in the 2011 ROD have been constructed, operated, and evaluated for some period of time. The selected remedy is described in more detail in the 2011 ROD.

## Description of Significant Differences

Additional Options for Use of Treated Groundwater
The remedy selected in the 2011 ROD calls for the delivery of treated water to one or more water purveyors for use as drinking water if agreements with the water purveyors could be reached in a timely manner. If agreements could not be reached, the ROD allows for the reinjection of the treated water into the groundwater basin.

Two other end-uses of the treated water were considered in EPA's 2010 feasibility study but not included as part of the selected remedy. The two alternative uses were:   1) delivery of the water to an existing recycled or reclaimed water system that supplies non-potable water for irrigation and industrial use; and 2) delivery to an existing "spreading basin" in or near the San Gabriel River to return the treated water to the groundwater basin. Spreading basins are abandoned pits or other areas managed to promote the percolation of water into groundwater basins. These end-use options correspond to Alternatives #3 and #5 in the 2011 ROD.

In the 2011 ROD, delivery of water to an existing reclaimed water system was found to be as effective as delivering water for drinking water use or reinjection, but less implementable and more expensive. The demand for reclaimed water was, at the time the ROD was completed, reported to be too low to use all of the water to be produced by the cleanup, particularly during wetter winter periods.

Delivery to an existing groundwater spreading basin was found to be as effective and implementable as drinking water use or reinjection, but higher in cost.

Recent discussions with potential end-users of the treated groundwater suggest that spreading and reclaimed use, the two options not included in the ROD, may be less expensive and/or more implementable than described in the ROD.

Reclaimed use and spreading now appear likely to be similar in cost to drinking water and reinjection. The higher costs of spreading and reclaimed use estimated in the 2010 feasibility study were due to an assumption that a higher level of treatment would be needed for these end-use options compared to drinking water use or injection. This assumption added more than $10 million (as a present value estimate) to the 2010 cost estimates. (Most of the difference was for periodic replacement of ion exchange resin and chemicals to adjust the pH of the treated water.) This assumption reflected the absence, at the time the estimate was prepared (2010), of a Federal or State drinking water standard for hexavalent chromium. This changed following completion of the feasibility study when the State of California established an MCL of 10 µg/L for hexavalent chromium in July 2014. With the adoption of

## Omega Chemical Site "Operable Units"

EPA divides large or complicated cleanups into multiple "operable units" ("OUs"). EPA manages the Omega Site as three OUs, designated OU1, OU2, and OU3. Cleanup efforts are underway or planned at all three. OU1 addresses contaminated soil and groundwater at and near the former Omega Chemical property in Whittier, CA. OU2, the subject of this ESD, addresses groundwater contamination generally downgradient (south and west) of OU1. OU3 addresses "vapor intrusion" (the movement of volatile contaminants from contaminated soils or groundwater into overlying structures). Groundwater cleanup and soil vapor extraction systems began operating as part of OU1 and/or OU3 in 2009. They have removed more than 9,000 pounds of contaminants from the soil and groundwater and reduced vapor intrusion into overlying buildings.

EXHIBIT 5
3   003
UPRR119869

## Table 1. Omega Chemical OU2 Cost Estimates

| Alternative | Description | Cost Estimates in 2011 ROD[1] (millions) | | | Revised (2016) Cost Estimates (millions) | | |
|---|---|---|---|---|---|---|---|
| | | Capital[6] | Annual O&M[2] | Present Value[3] | Capital[6] | Annual O&M[2] | Present Value[3] |
| 1 | No-Action Alternative | $0 | $0 | $0 | $0 | $0 | $0 |
| 2 | Limited Extraction with Drinking Water End-use | $29.2 | $2.0 | $53.6 | $33.5 | $2.2 | $60.7 |
| 3 | Plume-wide Extraction with Reclaimed Water End-use[5] | $40.1 | $3.7 | $86.6 | $43.0 | $3.0 | $80.8 |
| 4 | Plume-wide Extraction with Reinjection[5] | $41.4[4] | $2.6[4] | $73.2[4] | $45.0 | $2.6 | $77.6 |
| 5 | Plume-wide Extraction with Discharge to Spreading Basins[5] | $41.6 | $3.3 | $82.9 | $45.2 | $2.6 | $77.6 |
| 6 | Plume-wide Extraction with Drinking Water End-use[5] | $38.4 | $2.5 | $69.2 | $43.2 | $2.6 | $75.0 |

**Notes for table**

1. ROD = Record of Decision
2. O&M = operation and maintenance costs
3. Present value estimates assume 30 years of operation and a discount rate of 7%.
4. There was an error in the cost estimate for Alternative 4 presented in the 2010 feasibility study and 2011 ROD. The corrected estimate is $77.6 million (i.e., the estimated cost of Alternative 4 has not increased).
5. The 2011 ROD, as modified by this update, allows implementation of Alternatives 3 – 6.
6. Capital costs are one-time labor, equipment, and material costs associated with the cleanup.

## Table 2: Summary of Changes to EPA's Omega Chemical OU2 Remedy

| Remedy Component | Changes made by this Explanation of Significant Differences (ESD), if any |
|---|---|
| Remedial Objectives | Same as in 2011 Record of Decision (ROD) |
| Groundwater Extraction and Treatment | Same as in 2011 ROD |
| Use of the Treated Water | ROD allows potable use or reinjection. ESD adds reclaimed and spreading as other possible uses of the treated groundwater. |
| Preference for Use of the Treated Water | ROD includes preference for potable use. ESD removes preference. |
| "Applicable or Relevant and Appropriate Requirements" ("ARARs") | ESD adds the 10 microgram per liter State of California Maximum Contaminant Level (MCL) for hexavalent chromium as a new ARAR. |
| Project Costs | This ESD revises the cost estimate for the drinking water end-use upward to reflect the new standard for hexavalent chromium and the 1 ug/L Notification Limit for 1,4-dioxane. (The 1 ug/L Notification Limit is described in the 2011 ROD but not reflected in the 2011 cost estimates.) The ESD also provides a higher cost estimate for Alternative 4 resulting from correction of an error in the 2010 feasibility study and 2011 ROD. Finally, the ESD revises the cost estimates for the reclaimed and spreading uses downward to reflect new water treatment requirements and technology assumptions. |

the MCL, it is likely that all of the end-use options will need a comparable level of treatment. EPA has revised the cost estimates, resulting in similar estimates for injection, spreading, and drinking water uses. See Table 1. The cost estimate for reclaimed use is still higher, reflecting the assumption that replenishment fees would need to be paid for reclaimed use but not for the other end-uses.

Reclaimed use also appears to be more implementable than described in the 2010 feasibility study and 2011 ROD due to projected increases in the demand for reclaimed water. The Central Basin Municipal Water District (CBMWD), the owner of the reclaimed water system, projects that the demand for reclaimed water will increase by an average of about 1,000

acre-feet per year over the next ten years from the current level of about 5,000 acre-feet per year. The cleanup is expected to produce about 1,800 acre-feet per year of treated groundwater. That means that all four end-use options are similar in implementability.

This ESD adds two potential uses of the groundwater after it has been pumped to the surface and the contaminants removed: reclaimed use and spreading. With the changes made in this update, the treated groundwater may be used for one or a combination of four end-use options: reclaimed, injection, spreading, or direct potable use. As shown in Table 1, the costs of the cleanup are now estimated to range from $75 to $81 million depending on the selected end-use.

**Removal of Preference for Drinking Water Use**

The ROD includes a preference for use of the treated groundwater as drinking water. In the 2010 feasibility study, the estimated cost of drinking water end-use ($69 million) was lower than the other end-uses ($73 to $87 million). The effectiveness and implementability of the drinking water end-use was found to be similar to the other end-use options with the one exception for reclaimed use noted above.

The updated cost estimates included in this ESD no longer support a preference for drinking water end-use. The updated cost estimate for the drinking water end-use is $75 million, compared to updated estimates for the other three end-uses of $78 to $81 million. A drinking water use does not offer a clear cost savings considering the uncertainty in these estimates. In addition,



**Figure 2:** Planned Omega Chemical OU2 Groundwater Extraction Locations

## Statutory Determinations

The cleanup plan remains protective of human health and the environment and will continue to meet all applicable or relevant and appropriate requirements identified in the 2011 Record of Decision, as updated by this ESD and as required by CERCLA Section 121(d).

EXHIBIT 5
5   005
UPRR119871

## Continued Groundwater Monitoring

Since the cleanup plan was adopted in 2011, EPA has periodically collected and analyzed groundwater samples from an extensive network of monitoring wells to provide up to date data for the cleanup. Results for 2012, 2013, and 2014 are available in a Groundwater Monitoring Report available on the EPA site webpage (in the Documents and Reports section). In December 2015, a group of PRPs collected and analyzed groundwater samples. Those results are also available on the EPA site webpage.

the effectiveness and implementability of drinking water as an end use no longer appear to be superior to the reclaimed water end-use given the increased demand for reclaimed water.

In the absence of a clear advantage in the effectiveness, cost, or implementability of a drinking water use, EPA is removing the preference for drinking water use.

### Additional "Applicable or Relevant and Appropriate Requirement" (ARAR) and Performance Standards

The 2011 ROD identifies Federal and State MCLs as potential ARARs for the treatment of groundwater extracted as part of the remedy. An MCL is the maximum concentration of a chemical allowed in a public drinking water system. An ARAR is a Federal or State standard, requirement, criterion, or limitation that a Superfund cleanup must attain, unless EPA waives the requirement. See http://www.epa.gov/superfund/applicable-or-relevant-and-appropriate-requirements-arars for more information. A State MCL may be an ARAR if it is more stringent than the federal MCL for the same chemical or if no federal MCL exists. This ESD adopts the new State of California MCL of 10 µg/L for hexavalent chromium as potentially relevant and appropriate for the treatment of extracted groundwater. This hexavalent



**Figure 3:** Possible groundwater treatment technologies

chromium MCL was adopted by the State in 2014.

Federal MCLs are specified in CFR Part 141.61 and 40 CFR 141.62. California MCLs are specified in the California Code of Regulations (CCR) Title 22 §§ 64431, 64444.

The 2011 ROD includes a preliminary list of performance standards. They specify maximum chemical concentrations in the treated groundwater for the two end uses specified in the ROD (drinking water use and reinjection).

If the treated water is used as drinking water, performance standards are expected to be equal to or less than MCLs and, for 1,4-dioxane, equal to or less than the California Notification Level. Notification levels are health-



## Drinking Water Quality

Six water utilities provide tap water to homes and businesses in Whittier, Santa Fe Springs, and Norwalk. The water may be imported from the Colorado River or Northern California, or pumped from groundwater wells. Regardless of the source, all tap water is tested regularly prior to distribution to the public to ensure it meets State and Federal drinking water standards. Local water suppliers prepare annual Consumer Confidence Reports that provide information on the quality of the water supplied to homes and businesses in their service areas.

EXHIBIT 5
006
UPRR119872

## Initial EPA Cleanup Efforts

In 1995 and 1996, EPA oversaw efforts to remove approximately 3,000 abandoned drums of hazardous waste and other potential sources of contamination left at its Whittier property when Omega Chemical Corporation stopped operating. After adding the site to the National Priorities List in 1999, EPA began efforts to clean up contaminated soil and groundwater at the site. The cleanup is expected to take decades to complete



based advisory levels established by the State Water Resources Control Board Division of Drinking Water (DDW) for chemicals in drinking water that lack MCLs. EPA adopted the Notification Level for 1,4-dioxane as a "To Be Considered" criterion in the 2011 ROD.

If the treated water is used for reinjection, reclaimed use, or spreading, performance standards may be more stringent than MCLs to comply with the Regional Water Quality Control Board's "Water Quality Control Plan for the Los Angeles Region" (the "Basin Plan"). The Basin Plan, identified as an ARAR in the 2011 ROD, includes the State Water Resources Control Board Resolution 68-16 ("Statement of Policy with Respect to Maintaining High Quality Water in California"). Final performance standards for all end-uses will be established during design based on the end-use, water quality at the end-use location, and other factors.

Updated Cost Estimates

The cost estimates in the ROD do not account for the new State drinking water standard for hexavalent chromium or the reduction in the Notification Level for 1,4-dioxane from 3 to 1 μg/L. Table 1 provides revised cost estimates for the each potential end-use to reflect the new hexavalent chromium MCL, the lower treatment goal for 1,4-dioxane, and to correct an error in the 2011 cost estimate for Alternative 4.

To reflect the adoption of the hexavalent chromium MCL, and facilitate comparisons of the estimated costs of each end-use option, the revised cost estimates assume the use of reverse osmosis for all end-uses. The 2010 feasibility study assumed the use of ion exchange and reverse osmosis for the reclaimed and spreading end-uses, reverse osmosis for reinjection, and nanofiltration for the drinking water end-use. The assumed

change in water treatment technology also eliminates the need for equipment to adjust the pH of the water.

To reflect the lower Notification Level for 1,4-dioxane, the revised cost estimates add additional 1,4-dioxane treatment capacity for all end-uses. This change increases both capital and operation and maintenance costs. Additional details on the revised cost estimates are provided in a January 2016 technical memorandum included in the Administrative Record.



## Support Agency Review

The California Department of Toxic Substances Control is the support agency for the Omega cleanup. DTSC has reviewed and concurs with the changes in this ESD.

EXHIBIT 5
7   007
UPRR119873

EXHIBIT 5

008
UPRR11987

# ♺ EPA Omega Chemical Superfund Site

## EPA Updates Cleanup Plan for the Omega Chemical Site
### Agreement Reached for Design, Construction, and Operation of Groundwater Cleanup Facilities

## For More Information

**Jackie Lane**
EPA Community
Involvement Coordinator
U.S. EPA Region 9
Direct: (415) 972–3236
Toll-free: (800) 231–3075
lane.jackie@epa.gov

**Omega Chemical OU2**
**Wayne Praskins**
EPA Project Manager
U.S. EPA Region 9
(415) 972–3181
*praskins.wayne@epa.gov*

**Omega Chemical OU1 & OU3**
Rosemarie Caraway
EPA Project Manager
U.S. EPA Region 9
(415) 972–3158
*caraway.rosemarie@epa.gov*

**For Legal Matters**
**Hope Schmeltzer**
EPA Assistant Regional Counsel
(415) 972–3218
*schmeltzer.hope@epa.gov*

Additional information about the Omega Chemical Superfund Site is available on the site web page located at: **www.epa.gov/superfund/omegachemical**. The Administrative Record for the site is available at the Whittier Public Library
7344 S. Washington Avenue
Whittier, CA 90602
(562) 567-9900

**U.S. EPA Superfund Records Center**
75 Hawthorne Street, Suite 3110
San Francisco, CA 94105
(415) 947–8717

 *Printed on 30% Postconsumer Recycled/Recyclable Paper*

*Address Service Requested*

*Penalty for Private Use, $300*
*Official Business*

United States Environmental Protection Agency, Region 9
75 Hawthorne Steet (SFD-6-3)
San Francisco, CA 94105
Attn: Jackie Lane (Omega 5/16)

Permit No. G-35
U.S. EPA
**PAID**
POSTAGE & FEES
FIRST-CLASS MAIL