LATHROP GAGE LLP
Nancy Sher Cohen, Bar No. 81706
    ncohen@lathropgage.com
Ronald A. Valenzuela, Bar No. 210025
    rvalenzuela@lathropgage.com
1888 Century Park East, Suite 1000
Los Angeles, California 90067-1623
Telephone:  310.789.4600
Facsimile:   310.789.4601

John M. Terry (*admitted pro hac vice*)
    jterry@lathropgage.com
1515 Wynkoop Street, Suite 600
Denver, CO 80202
Telephone:   (720) 931-3200
Facsimile:    (720) 931-3201

Attorneys for Plaintiffs
Arconic Inc., et al.

**Lathrop Gage LLP**
**2345 Grand Boulevard, Suite 2200**
**Kansas City, Missouri 64108-2618**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCONIC INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>APC INVESTMENT CO., et al.,<br><br>    Defendants.<br><br>AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS | Case No. 2:14-cv-06456 GW (Ex.)<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: STATUTE OF LIMITATIONS**<br><br>Hearing Date: August 6, 2018<br>Time:            8:30 a.m.<br>Location:      Courtroom 9D, 9th Floor<br>                   350 W. 1st Street<br>                   Los Angeles, CA 90012<br><br>Judge:          Hon. George H. Wu |

# TABLE OF CONTENTS

Page

I. Introduction ............................................................................................... 1

II. Plaintiffs' Costs For Which Contribution Is Sought In This Action .............. 4

III. The 2007 Settlement ................................................................................ 6

IV. Argument ................................................................................................. 8

    A. The 2007 Settlement Did Not Trigger the Statute of Limitations ........ 9

        1. For an earlier settlement to trigger Section 113(g)(3)(B), a party must be obligated to pay response costs, or undertake a response action, under that settlement. .................................... 9

        2. Under the 2007 Settlement, Plaintiffs were not obligated to pay any response costs. ............................................................. 11

    B. Plaintiffs Did Not Have a Contribution Claim in 2007 ...................... 14

    C. Defendants' Interpretation Would Frustrate CERCLA's Purpose ..... 15

V. Conclusion ............................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asarco LLC v. Atl. Richfield Co.*,
    866 F.3d 1108 (9th Cir. 2017) ................................................................. 9, 10, 14

*Asarco, LLC v. Celanese Chem. Co.*,
    792 F.3d 1203 (9th Cir. 2015) ............................................................. 11, 13, 15

*Champion Labs., Inc. v. Metex Corp.*,
    No. 02-5284 (WHW), 2005 U.S. Dist. LEXIS 37068 (D. N.J. Jul. 8, 2005) ................................................................................................................ 14

*Cooper Industries v. Aviall Services*,
    543 U.S. 157 (2004) .......................................................................................... 14

*Unites States v. Atl. Research Corp.*,
    551 U.S. 128 (2007) ............................................................................................ 9

*Whittaker Corp. v. United States*,
    825 F.3d 1002 (9th Cir. 2016) ...................................................... 9, 10, 11, 12, 14

*Wilshire Westwood Associates v. Atl. Richfield Corp.*,
    881 F.2d 801 (9th Cir. 1989) ..................................................................... 10, 15

## I. Introduction

This action, filed in 2014, involves the Omega Chemical Superfund Site ("Omega Site"). Plaintiffs seek, *inter alia*, to hold Defendants, a group of current and former owners and operators of properties downgradient of the Omega Chemical Property ("Omega Property") and OU1 whose activities or properties contributed to the OU2 regional groundwater contamination, responsible under CERCLA Section 113 for Defendants' share of the costs related to the OU2 Consent Decree ("OU2 CD"), approved by this Court in March 2017.[1]

Defendants contend that Plaintiffs' CERCLA contribution claims are time barred in light of a 2007 private-party settlement (the "2007 Settlement") that OPOG, LLC and the Omega Chemical PRP Organized Group ("OPOG"), of whom Plaintiffs are members, entered into with a group of *de minimis* Omega Property Generator PRPs (the "*De Minimis* Generators") who sent hazardous substances to the Omega Chemical Corp. for recycling, treatment, or reuse. Incredibly, Defendants argue that this settlement with the *De Minimis* Generators, who contributed only 1.5% of the total volume of materials sent to Omega Chemical Corp., acts as a complete bar to all possible future contribution claims that Plaintiffs may have for all response costs and response actions, including OU2 costs.

During the July 12, 2018 hearing on Defendants' Motion for Summary Judgment Re: Statute of Limitations ("Motion"), the Court issued a tentative ruling denying the Motion ("Tentative") but ordered supplemental briefs concerning the categories of costs Plaintiffs' seek in this action. Set forth below is the requested cost information and an explanation of how the costs differ from OU1-related costs that were the subject of Plaintiffs' previous cost recovery efforts.

However, Plaintiffs respectfully submit that in connection with Defendants'

---

[1] Some costs were expended prior to the entry of the OU2 CD, these costs were necessary to allow Plaintiffs to successfully negotiate the OU2 CD. Decl. of Gene A. Lucero In Supp. of Supplemental Brief ("Lucero Decl.") ¶ 17.

Lathrop Gage LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618

Motion, the parties have previously submitted sufficient cost information to support denial of the Motion – with prejudice. The 2007 Settlement cannot possibly have triggered the statute of limitations for Plaintiffs' pending OU2 contribution claim. Under CERCLA's statutory framework and relevant Supreme Court authority interpreting it, a PRP must have paid, or had a duty to make a payment, under a private-party, judicially approved settlement for that settlement to trigger the statute of limitations on a subsequent CERCLA contribution claim. Simply being a party to that settlement does not trigger the statute of limitations. And here, Plaintiffs paid <u>nothing</u> under the 2007 Settlement nor had any duty to make any payment.

At most, Plaintiffs had a future, contingent responsibility to pay certain response costs relating to "regional groundwater work" – if, and only if – the settling *De Minimis* Generators were later held responsible for those response costs. That assumption, however, cannot possibly have triggered the applicable statute of limitations for two reasons. First, as a matter of law, it is not enough that an obligation to make a payment <u>might, or might not, arise in the future</u>. If Congress had intended for a contingent liability to trigger the statute of limitations, it would have started the limitations period for parties that have been sued under CERCLA Sections 106 or 107 as soon as such a lawsuit was filed. Congress did not do so, and Defendants offer no authority providing that a contingent assumption of responsibility, by itself, is enough to trigger Section 113(f)(3)(B).

Second, even if the Court concludes that OPOG's contingent obligation to assume the *De Minimis* Generators' responsibilities for "regional response work" might trigger the statute of limitations, that obligation never arose. A careful review of the 2007 Settlement agreement ("2007 Settlement Agreement") reveals that the 2007 Settlement imposed 4 key conditions – all of which had to be met before Plaintiffs were required to pay for any OU2 response costs pursuant to that settlement. All of those conditions were not met. Most importantly, the <u>*De Minimis* Generators had no responsibilities for "regional response work, that is, to</u>

investigate or remediate, or pay to investigate or remediate, OU2– either in 2007 or when this action was filed.[2]

There is utterly no evidence that the *De Minimis* Generators were obligated in 2007 under any government-issued requirement, request, demand, General Notice Letter, or Special Notice Letter ("SNL") to investigate or remediate, or pay to investigate or remediate, OU2. Nor did the *De Minimis* Generators have any such responsibility at the time Plaintiffs filed this action. In fact, the *De Minimis* Generators expressly denied any such liability. *See* Doty Decl., Ex. 6 at 28, 36 (2007 Agreement §§ 1.02, 7.03). Moreover, as the 2007 Agreement expressly provides, the *De Minimis* Generators never expected that Plaintiffs would have to undertake any of the *De Minimis* Generators' responsibilities at the Omega Site, at least with respect to the lead agency, EPA, because EPA advised the *De Minimis* Generators that it would not pursue them any further if they settled with OPOG (*see id.* at 28(2007 Agreement § 1.02.)), which, obviously, they did.

Given this, none of the costs Plaintiffs seek in this action arise from its contingent obligation to assume any of the *De Minimis* Generators' responsibilities for "regional response work," because there are no such costs. This fact is borne out by the Cost Table summarizing the response costs that Plaintiffs are seeking in this action. The Table shows that those costs were OPOG's, not any incurred by the *De Minimis* Generators for "regional response work." Further, Plaintiffs did not themselves accept responsibility for OU2 contamination under the 2007 Settlement; nothing in the 2007 Settlement required Plaintiffs to investigate or remediate OU2, as the Court's Tentative holds (*see* Tentative at 20), and Plaintiffs had not otherwise

---

[2] Even had the *De Minimis* Generators been required to pay for "regional response work," OPOG, not its individual members, had to assume that responsibility in the first instance. *See* Decl. of Robert Doty In Supp. of Defs.' Mot. for Summ. J ("Doty Decl."), Ex. 6 at 30-31 (2007 Agreement §§ 2.16, 3.01(b)); Lucero Decl., Ex. B. (OPOG Members Assurance).

agreed in 2007 to investigate or remediate that contamination. Defendants' Motion may be denied with prejudice based upon these facts alone.

But Defendants' Motion fails for another reason, without reaching the question whether the 2007 Settlement triggered the statute of limitations: Plaintiffs did not have a CERCLA contribution claim at that time. As Defendants acknowledge, only two "avenues" existed for bringing a contribution claim: being sued for OU2 under CERCLA Sections 106 or 107, or entering into a judicially approved settlement for OU2 with the government. Neither condition existed when the 2007 Settlement was approved, so Plaintiffs lacked Article III standing to initiate a CERCLA contribution claim. This, therefore, Plaintiffs submit, is a second, independent basis for denying Defendants' Motion—with prejudice.

## II. Plaintiffs' Costs For Which Contribution Is Sought In This Action

In response to the Court's request for a description of the OU2 costs Plaintiffs have expended and for which they are seeking contribution in this action, Plaintiffs have provided the Cost Table attached at Exhibit 1. The Table provides, by year, a brief summary of the activities that Plaintiffs understood EPA was performing with respect to OU2, the activities that OPOG was performing with respect to OU2, and the total dollars OPOG spent in that year on OU2 activities. *See* Decl. of Jack Keener In Supp. of Supplemental Brief ("Keener Decl.") ¶¶ 4-8. Plaintiffs' total OU2 costs spent to date is approximately $16.5 million, excluding costs directly associated with this lawsuit.[3]

As the Table indicates, none of these costs were expended prior to 2009, when EPA triggered OPOG's OU2-related work by asking for public comments on its draft OU2 Remedial Investigation report.[4] Additionally, none of these costs arise

---

[3] By contrast, prior to 2012, EPA had expended about $30 million to perform its OU2 tasks, including completing the RI/FS and Record of Decision ("ROD") and identifying the PRPs that received Special Notice Letters in 2012. Keener Decl. ¶ 8.

[4] As Plaintiffs have advised this Court, if some of the pre-OU2 CD costs are

out of any obligations resulting from the 2007 Settlement with the *De Minimis* Generators as discussed further in Section IV.

The Table also shows that Plaintiffs are not attempting in this action to recover any costs they incurred in connection with the Omega Site prior to 2009, because no pre-2009 OPOG costs relate to OU2.[5] Additionally, Plaintiffs are not attempting to seek contribution from Defendants for any costs that Plaintiffs have incurred under the 2007 Settlement, as there are no such costs. Finally, Plaintiffs are not seeking to recover any of their costs relating to the Omega Site other than a

---

determined not to be necessary OU2 CD costs, Plaintiffs contend that they would be recoverable under Section 107. *See* Sept. 8, 2016 Tr. at 16:6 to 17:7. In fact, when Plaintiffs initiated this action in 2014, their CERCLA claims were asserted as Section 107 claims (which Defendants never challenged as time-barred). At that time, Plaintiffs were not subject to either of the statutory conditions necessary to bring a Section 113 claim: they had not been sued for OU2 under Sections 106 or 107 and had not settled with the federal or state government for OU2. It was not until 2016, when the government lodged the OU2 CD and filed its companion complaint, that one of those conditions arose, namely, being subject to a Section 106 and 107 claim for OU2, thus giving rise to a claim under Section 113(f)(1). Now that the OU2 CD has been judicially approved, Plaintiffs' contribution claim may also be justiciable under Section 113(f)(3)(B). Plaintiffs take no position on this issue, and the Court need not decide which provision gives rise to Plaintiffs' contribution claim for statute-of-limitations purposes, as the applicable triggering event and limitations period under both provisions are the same. Nor must the Court decide whether all of the costs identified in the Table are recoverable under CERCLA. That question will be adjudicated in a subsequent phase.

[5] As the Table shows, EPA, not OPOG, was investigating the regional groundwater contamination prior to 2009. The Table also shows that, as EPA concluded its investigation and selected a remedy, OPOG began to incur OU2 costs, slowly at first, but then at an increased rate as EPA proceeded to pursue PRPs for that remedy and negotiate a settlement. To wit: In 2011 after many years of investigation, EPA issued a ROD for the regional groundwater portion of the Omega Site, referring to the regional groundwater contamination as OU2, and setting forth the regional groundwater remedy for the first time. In 2012, EPA sent out SNLs inviting a set of PRPs to open negotiations with EPA to undertake the OU2 response action. OPOG entered into negotiations with EPA in 2013, reaching a settlement in principle in late 2014 and entering into the OU2 CD in 2016. Lucero Decl. ¶ 5.

- 5 -

share of their OU2 costs. For context, Plaintiffs had expended approximately $16 million in OU1 costs as of 2007. And today, Plaintiffs have expended approximately $50 million in OU1 and OU3-related costs in total. None of those costs are at issue in this case. Lucero Decl. ¶ 18.

### III. The 2007 Settlement

In 2001, individual members of OPOG resolved their liability with the United States under a Consent Decree for certain OU1-related work required under that CD.[6] In 2004, to avoid running afoul of the 3-year statute of limitations for a contribution claim for those OU1-related costs (which are not being sought in this action), OPOG (but not the individual members of OPOG) and the LLC (which had been assigned claims by certain OPOG members) sued the *De Minimis* Generators and other generators for contribution.[7] The *De Minimis* Generators were a group of 53 entities that had not, prior to the 2007 Settlement, contributed any money towards the ongoing OU1 remediation required under the 2001 OU1 CD between EPA and OPOG members. Relative to other generators at the Omega Site, the *De Minimis* Generators' contribution to the contamination was small, representing about 2% of the total number of Omega Property generator PRPs and 1.5% of the total volume of materials sent to Omega Chemical Corp. for processing.[8]

To resolve OPOG's claims against them, the *De Minimis* Generators settled, paying roughly $1.63 million under the 2007 Settlement.[9] *See* Decl. of Robert Doty

---

[6] Except where noted, the facts summarized here are drawn from Plaintiffs' Opposition. References to supporting evidence for these facts are contained therein.
[7] Counsel for Plaintiffs unintentionally, but incorrectly, has indicated that the 2004 lawsuit asserted only a Section 113 claim. In fact, the 2004 complaint was amended in 2005 to include both a 113 and a 107 claim. Lucero Decl. ¶ 8, n.2.
[8] By contrast, in 2007, OPOG members were larger-volume generators. At the time, there were about 77 OPOG members representing roughly 52% of the total volume of materials sent to Omega Chemical Corp. by all Omega Property generators.
[9] OPOG reserved its rights to reassert future claims against a subset of the *De Minimis* Generators under narrow circumstances. Doty Decl., Ex. 6 at 30-31.

- 6 -

In Supp. of Defs.' Mot. for Summ. J ("Doty Decl."), Ex. 6 at 31, 95-100 (2007 Agreement § 3.01(b) & Exs. A, B). In return, and as an incentive to settlement, OPOG and OPOG, LLC provided a Site-wide release. Such releases in settlements involving smaller contributors at Superfund sites are frequently provided. Indeed, EPA commonly provides such releases in its settlements with *de minimis* PRPs.

OPOG, LLC, OPOG, and individual OPOG members paid nothing under the 2007 Settlement. *Id.* at 31 (2007 Agreement § 3.01(b)). However, as a further incentive to settle, OPOG assumed all of the *De Minimis* Generators' future, contingent responsibilities at the Omega Site. *Id.* (2007 Agreement § 3.01(a)). This included responsibilities for response costs and for "regional response work," defined as "work that the [federal or state] Governments <u>require</u> the. . .[*De Minimis* Generators], or any one of them to perform, or which they <u>perform at the request or demand of the Governments</u> . . . regarding regional groundwater contamination alleged to be attributed to the [Omega] Site." *Id.* at 30 (2007 Agreement § 2.16 (emphasis added). Certain individual OPOG members (including some, though not all, of Plaintiffs in this action) also provided an assurance that those members would assume the *De Minimis* Generators' responsibilities if OPOG failed to perform.[10] Lucero Decl. ¶¶ 9-10, Exs. A, B (Exs. D, E to 2007 Agreement).

Thus, a plain reading of the 2007 Agreement shows that Plaintiffs' assumption of the *De Minimis* Generators' OU2 responsibilities were contingent upon four conditions occurring: (1) the government determining that "work" with respect to "regional groundwater contamination" was necessary; (2) the government determining that the *De Minimis* Generators were responsible for such work; (3) the

---

[10] To be clear, the subset of Plaintiffs here who provided an assurance are <u>not</u> arguing that they had no obligations under Provision 3.01(a) of the agreement. Plaintiffs simply contend that the parties to that agreement expressly contemplated that the *De Minimis* Generators would look first to OPOG and would look to the subset of Plaintiffs who provided the assurance only if OPOG failed to perform.

- 7 -

1 government requiring, requesting or demanding that the *De Minimis* Generators
2 perform that work; <u>and</u> (4) OPOG failing to assume the *De Minimis* Generators'
3 responsibility for that work. Those conditions did not occur.

4     At the time Plaintiffs entered into the 2007 Settlement, Plaintiffs were not
5 aware of any judgment against the *De Minimis* Generators arising from their
6 sending chemicals to Omega, nor were they aware of any other suits pending
7 against *De Minimis* Generators relating to the Omega Site. Lucero Decl. ¶ 15. Nor
8 is there evidence in the record indicating that the *De Minimis* Generators have been
9 sued since 2007 in connection with the Omega Site, that the federal or state
10 governments have presented to the *De Minimis* Generators any request or demand
11 that those generators perform or pay for an "regional response work," or that the *De*
12 *Minimis* Generators ever tendered any such request or demand to OPOG.

13     Contrary to Defendants' characterization of the 2007 Settlement, Plaintiffs
14 never accepted **any** responsibility for the contamination at the site under that
15 agreement. Doty Decl., Ex. 6 at 31 (2007 Agreement § 3.01(a)). Plaintiffs did not
16 accept responsibility for OU2 contamination, did not agree to investigate or
17 remediate that contamination, and nothing in the settlement, as the Court's tentative
18 holds, required Plaintiffs to investigate or remediate OU2.[11] *Id.* In fact, the parties
19 expressly denied any such liability. *Id.* at 28, 36 (2007 Agreement §§ 1.02, 7.03).

20 **IV. Argument**

21     In its Tentative denying Defendants' Motion and during the July 12 hearing
22 on the Motion, the Court's central question was whether the response costs
23 Plaintiffs seek in this lawsuit were "covered" by the 2007 Settlement. They are not,

---

[11] As Plaintiffs' counsel observed during the July 12 hearing, the Tentative may have inadvertently adopted Defendants' mischaracterization of provision 3.01(a). *See* Tentative and 18 (stating that OPOG and OPOG, LLC "assumed the 'responsibilities' pertaining to the [Omega] Site"). OPOG did not assume all responsibilities. It assumed only the *De Minimis* Generators' share of responsibility at the Omega Site and only under contingent and limited conditions.

- 8 -

1  as the attached Cost Table helps demonstrate. Moreover, at that time, Plaintiffs did
2  not have standing to bring a contribution claim for OU2 costs. Thus, the 2007
3  Settlement did not trigger the statute of limitations under Section 113(g)(3)(B).

    **A.    The 2007 Settlement Did Not Trigger the Statute of Limitations**
         **1.    For an earlier settlement to trigger Section 113(g)(3)(B), a party must be obligated to pay response costs, or undertake a response action, under that settlement.**

Defendants contend that the only nexus required under Section 113(g)(3)(B) between a pending contribution claim and an earlier, private-party settlement is that the pending claim be "with respect to" the costs "addressed" under the earlier settlement. This interpretation is untenable in light of the Supreme Court's decision in *Unites States v. Atl. Research Corp.,* 551 U.S. 128 (2007) and its progeny and is inconsistent with the statute when read as a whole, as the Court must. *Id.* at 135.

Contribution under CERCLA must be understood in its traditional sense, as one joint tortfeasor suing another because the first one thinks he or she **paid too much** for a common liability that they both share. *Id.* at 138-39. ("Contribution is defined as the tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determine as a percentage of fault. . . .). The Ninth Circuit has repeatedly adopted this definition of contribution in interpreting CERCLA. *See, e.g., Whittaker Corp. v. U.S.*, 825 F.3d 1002, 1007 (9th Cir. 2016) ("A party uses contribution to get reimbursed for being made to pay more than its fair share to someone else . . . ."); *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1116 (9th Cir. 2017) (same). Incorporating this definition of contribution into Section 113(g)(3)(B) compels the conclusion that a PRP's contribution claim for response costs is time-barred only if that PRP is seeking to be reimbursed for paying more than its fair share of the response costs <u>that it was obligated to pay under the earlier settlement</u>.[12] 42 U.S.C.

---

[12] A PRP that must undertake a "response" action under a settlement necessarily

- 9 -

§9613(g)(3)(B); *Atl. Research,* 551 U.S. at 138-39.

This interpretation is supported by CERCLA's statutory framework for a PRP's rights to recover response costs. Only two circumstances permit a PRP to obtain contribution for response costs: when it must pay money to satisfy a judgment or to satisfy a settlement. *See Atl. Richfield Co.*, 866 F.3d at 1116-17. Alternatively, if a PRP seeks response costs that it has directly incurred, <u>without</u> being subject to a judgment or settlement, it must pursue them under a Section 107 claim, which has a <u>different</u> statute of limitations. *Id.*; 42 U.S.C. §113(g)(2)(A)(B); *see also Whittaker Corp.*, 825 F.3d at 1007. Put simply, where a PRP is party to a judicially approved settlement but has no obligation to pay response costs under that settlement, CERCLA does not afford that PRP the ability to obtain contribution under Section 113, so Section 113(g)(3)(B)'s statute of limitations would not apply. *Id.*; *see also Whittaker Corp.,* 825 F.3d at 1008-09 (right to contribution is limited to costs for which PRP has been found liable); *accord Atl. Richfield Co.*, 866 F.3d at 1118, 1121 (predicate for seeking contribution for settlement with government is that settlement require PRP to take a response action or incur a response cost).

Defendants have not cited to any decision holding otherwise. Moreover, Defendants' interpretation leads to an absurd result. Under it, <u>any</u> judicially approved settlement, <u>even one that a PRP is not a party to</u>, could trigger the 3-year statute of limitations for that PRP. The Court may not adopt such a strained interpretation. *Wilshire Westwood Associates v. Atl. Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989)("court must look beyond the express language of a statute where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result").

---

incurs "response" costs to implement it. *See* 42 U.S.C. §9601(25) (defining "response"); *Atl. Richfield Co.,* 866 F.3d at 1115-17 (describing recovery of response costs). It follows that a settlement requiring a response action may trigger Section 113(g)(3)(B).

### 2. Under the 2007 Settlement, Plaintiffs were not obligated to pay any response costs.

Plaintiffs made no payment under the 2007 Settlement, and Defendants have never disputed this. Instead, they argue that Plaintiffs' <u>contingent</u> obligation under that settlement to assume certain unknown responsibilities that <u>might</u> be required or requested of the *De Minimis* Generators in the future is sufficient to trigger the statute of limitations. Defendants are wrong for two reasons.

First, a <u>contingent</u> obligation cannot, as a matter of law, trigger Section 113(g)(3)(B). Section 113(f)(1) allows a party to *initiate* a contribution action if it is sued under Section 106 or 107. 42 U.S.C. §9613(f)(1); *Whittaker Corp.*, 825 F.3d at 1006. Thus, a party may maintain a contribution action *before* it is actually found liable for any responses costs. *Id.* However, the statute of limitations for that claim does not begin to run until that party's *contingent* liability is reduced to an *actual* judgment or settlement. 42 U.S.C. §9613(g)(3)(B); *Asarco, LLC v. Celanese Chem. Co.,* 792 F.3d 1203, 1210 (9th Cir. 2015). Had Congress intended the statute of limitations to be triggered when a <u>contingent</u> obligation to pay arises, it would have provided that the statute of limitations was triggered as soon as a party is sued under Section 106 or 107. But Congress chose not to, and Defendants offer no authority holding that a *contingent* obligation alone triggers the statute of limitations under Section 113(g)(3)(B).

Defendants' reliance on Plaintiffs' <u>contingent</u> obligation to trigger 113(g)(3)(B) fails for a second reason: that obligation never arose. Defendants incorrectly argued during the July 12 hearing that the risk Plaintiffs "were paid to take" has "come to fruition" through the OU2 CD. *See* Jul. 12, 2018 Tr. at 8:17-25. Their error is clear from a careful reading of the 2007 Agreement.

The 2007 Agreement provides that, with respect to regional groundwater contamination, OPOG will assume the *De Minimis* Generators' responsibilities,

- 11 -

including response costs, for "work that the [federal or state] Governments <u>require</u> the . . . [*De Minimis* Generators] to perform, or which <u>they perform at the request or demand of the Governments</u> . . . ." *See* Doty Decl., Ex. 6 at 30-31 (2007 Agreement §§ 2.16, 3.01(a)). Thus, Plaintiffs' assumption of liabilities at the Omega Site under the agreement is not unbounded. Plaintiffs have no obligation to do anything under the 2007 Settlement absent (1) some action by the government against the *De Minimis* Generators and (2) OPOG's failure to assume that obligation. *See, e.g., Whittaker Corp.*, 825 F.3d at 1008-1009 ("A person entitled to recover contribution may recover no more than the amount paid to the plaintiff in excess of the person's comparative share of responsibility.").

Defendants, however, have not presented any evidence, and Plaintiffs are unaware of any, establishing that at the time Plaintiffs entered into the 2007 Settlement, the *De Minimis* Generators were obligated under any government-issued requirement, request, demand, General Notice Letter, or Special Notice Letter to investigate or remediate, or pay to investigate or remediate, OU2. In fact, the *De Minimis* Generators *twice* expressly denied all such liability at the time they executed the 2007 Agreement. *Id.* at 28, 36 (2007 Agreement §§ 1.02, 7.03).

Nor is there any evidence in the record that the *De Minimis* Generators had incurred any responsibilities for "regional response work" at the time Plaintiffs filed this action.[13] Indeed, both Plaintiffs and the *De Minimis* Generators never expected that Plaintiffs would ever have to undertake any of the *De Minimis* Generators' responsibilities at the Omega Site, at least with respect to the EPA, the lead agency

---

[13] The *De Minimis* Generators were added as parties to the OU2 CD in April 2018. *See* Apr. 5, 2018 Civil Mins. in *United States, et al. v. Abex Aerospace, et al.*, 16-cv-2696 ("*Abex*") [Dkt. No. 55]. Their obligations under the CD are only administrative (e.g., keeping records, providing access). *See* Pls.' Req. for Judicial Not. In Supp. of Opp'n, Ex. K at 932-33 (OU2 CD at 37-38). Ministerial duties are specifically excluded from OPOG's assumption of the *De Minimis* Generators' responsibilities under the 2007 Agreement. *See* Doty Decl., Ex. 6 at 31.

- 12 -

at the Omega Site. Both in the agreement and in the motion papers submitted to Judge Hatter by the parties seeking approval of the 2007 Settlement, the *De Minimis* Generators expressly provided that they were entering into the agreement in reliance upon EPA's representation that if Plaintiffs and the *De Minimis* Generators were successful in negotiating with OPOG, '**then EPA will not pursue . . . [the *De Minimis* Generators] further** . . . ."[14] *See* Doty Decl., Ex. 6 at 28 (2007 Agreement § 1.02); Ex. 6 at 12 (Mot. for Good Faith Settlement Determination at 3:11-17) and Ex. 22 at 8 (Cohen Decl. at 3:16-21).

In this respect, the settlement in *Celanese* does not differ from the 2007 Settlement merely by degree; it differs in kind. In *Celanese*, although the nature of certain future work and the dollar figure for certain future costs were unknown at the time of the agreement, Asarco's obligation to perform that work and pay those costs were certain and had arisen, because under that agreement Asarco committed to "share the costs of implementing a part of the Remedial Action Plan incorporated into the settlement agreement." *Celanese*, 792 F.3d at 1212. Here, neither Plaintiffs nor the *De Minimis* Generators had any obligation to perform any response work or to make any payment of response costs when the court approved the 2007 Settlement (*see, e.g.,* Tentative at 20), and they still don't. Hence, there was no OU2 responsibility for OPOG or for Plaintiffs or anyone else to assume.

The Cost Table further demonstrates this indisputable conclusion. Not a single entry in that Table reflects a cost incurred by the *De Minimis* Generators for "regional response work." Such costs simply don't exist and never existed.

---

[14] Plaintiffs are not arguing that the precise amount of response costs owed by a PRP must be known before the statute of limitations is triggered. The uncertainty of the nature of future work that a PRP must perform or the dollar figure of future costs that a PRP must pay will not delay the running of the statute of limitations. *Celanese*, 792 F.3d at 1213. *Celanese*, however, does not hold that where a PRP currently has no duty to pay or to perform any work, and may never have that duty, the statute of limitations for a claim for such work or costs has been triggered.

- 13 -

Accordingly, the 2007 Settlement does not bar Plaintiffs' contribution claims.

### B. Plaintiffs Did Not Have a Contribution Claim in 2007

Although the Court's Tentative did not address the issue whether Plaintiffs had the ability to bring a CERCLA contribution claim in 2007, the issue is dispositive and warrants a brief discussion here.

In *Cooper Industries v. Aviall Services*, 543 U.S. 157 (2004), the Supreme Court held that one of two conditions must be met for a PRP to have a CERCLA contribution claim. 543 U.S. at 167 ("[T]o assert a contribution claim under §113(f), a party must satisfy the conditions of either §113(f)(1) or §113(f)(3)(B)."). Defendants acknowledge this. *See* Reply at 3:12 to 4:4. However, neither of those two conditions existed when Judge Hatter approved the 2007 Settlement.

Plaintiffs could not proceed under Section 113(f)(3)(B), because they had not settled their liability for OU2 with the federal or state government. *See Atl. Richfield Co.,* 866 F.3d at 1124 (to trigger statute of limitations, settlement with government must resolve PRP's responsibility for matters addressed under the settlement with certainty and finality); *see also* Tentative at 20-21 (lack of supporting evidence for argument that 2001 OU1 CD triggered limitations period for OU2 claim precludes granting Defendants' Motion on this issue). Nor could Plaintiffs proceed under Section 113(f)(1), which requires that a PRP be sued under Sections 106 or 107 to gives rise to a contribution claim. 42 U.S.C. §9613(f)(1); *Whittaker*, 825 F.3d at 1006. Plaintiffs had not been sued under either provision.

Plaintiffs, therefore, lacked Article III standing to initiate a contribution action, and any attempt to maintain that claim in federal court likely would have resulted in its dismissal. *See, e.g., Champion Labs., Inc. v. Metex Corp.*, No. 02-5284 (WHW), 2005 U.S. Dist. LEXIS 37068, at *11-12 (D. N.J. Jul. 8, 2005) (dismissing Section 113(f)(1) contribution claim asserted by party that had not been sued under CERCLA Sections 106 or 107). Accordingly, the statute of limitations could not have begun to run on a contribution claim that did not exist.

### C. Defendants' Interpretation Would Frustrate CERCLA's Purpose

In interpreting CERCLA, courts must consider that statute's purpose and goals of facilitating the remediation of hazardous waste sites and resolution of liability for the related costs, especially through negotiated settlements. *Celanese*, 792 F.3d at 1210. Further, the court must assure that the proposed interpretation would not frustrate the statute's purpose. *Wilshire Westwood*, 881 F.2d at 804.

Adopting Defendants' interpretation would have a profound, deleterious effect on EPA's ability to administer the Superfund Program. As explained in Plaintiffs' Opposition, CERCLA's policies to encourage PRP-led remediation to maximize the amount of site cleanup would be frustrated, because PRPs would be unwilling to settle with the government to undertake a defined set of response work if doing so would jeopardize their ability to pursue a range of settlements, including ones like the 2007 Settlement, with PRPs responsible for the defined work scope. Accordingly, Plaintiffs respectfully submit that the Court should, before ruling on the pending motion, provide the federal government with an opportunity to comment on this issue. This Court has jurisdiction over the government in the related *Abex* matter and therefore has the authority to invite the government's input.

### V. Conclusion

As the attached Table helps demonstrate, under the 2007 Settlement, Plaintiffs were not obligated to pay any of the OU2 response costs that they seek in this action. Accordingly, Plaintiffs submit that Defendants may not slingshot a routine, *de minimis* settlement—with parties that sent only about 1.5% of the total volume of materials to Omega Chemical Corp.—to completely bar this action and all possible future contribution claims Plaintiffs may have at the Omega Site.

Dated: July 19, 2018   Lathrop Gage LLP

By: /s/ Nancy Sher Cohen
Nancy Sher Cohen
Attorneys for Plaintiffs Arconic Inc., et al.

- 15 -