DAVID E. CRANSTON (SBN 122558)
dcranston@GreenbergGlusker.com
PETER A. NYQUIST (SBN 180953)
pnyquist@GreenbergGlusker.com
SEDINA L. BANKS (SBN 229193)
sbanks@GreenbergGlusker.com
SHERRY E. JACKMAN (SBN 274030)
sjackman@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:  310.553.3610
Fax:  310.553.0687

ATTORNEYS FOR DEFENDANT UNION PACIFIC
RAILROAD COMPANY
[Additional Counsel Listed on Following Page]

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCONIC INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>APC INVESTMENT CO., et al.,<br><br>Defendants. | Case No.  2:14-CV-06456-GW (Ex)<br>Assigned to Honorable George H. Wu<br><br>**JOINT NOTICES, MSJS, AND P&AS RE: CERCLA LIABILITY BY DEFS.<br>(A) PMC SPECIALTIES GROUP, INC. AND FERRO CORPORATION (PMC PROPERTY)<br>(B) UNION PACIFIC RAILROAD COMPANY (CHRYSLER PROPERTY),<br>(C) HALLIBURTON AFFILIATES, LLC.; INTERVENORS FIREMAN'S FUND INSURANCE COMPANY AND FEDERAL INSURANCE COMPANY, AS INSURERS OF PALLEY SUPPLY COMPANY; AND KEKROPIA, INC. (PATSOURAS PROPERTY)**<br><br>[Separate Statement of Uncontroverted Facts and Conclusions of Law; Declarations; Requests for Judicial Notice; and [Proposed] |

| | | |
|---|---|---|
| | | Orders/Judgments filed herewith] |
| | **Date:** | **May 17, 2021** |
| | **Time:** | **8:30 a.m.** |
| | **Judge:** | **The Honorable George Wu** |
| | **Place:** | **Courtroom 9D, 9th Floor** |

AND RELATED CROSS
ACTIONS, COUNTERCLAIMS
AND THIRD-PARTY
COMPLAINTS

Additional Counsel

WILLIAM D. WICK (SBN 063462)
bwick@ww-envlaw.com
ANNA L. NGUYEN (SBN 226829)
anguyen@ww-envlaw.com
WACTOR & WICK LLP
3640 Grand Avenue, Suite 200
Oakland CA 94610-2023
Telephone: (510) 465-5750
ATTORNEYS FOR DEFENDANT HALLIBURTON AFFILIATES, LLC

EARL L. HAGSTRÖM, ESQ. (SBN 150958)
ehagstrom@behblaw.com
DANIEL E. TROWBRIDGE, ESQ. (SBN 301301)
dtrowbridge@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone: (415) 397-9006
Facsimile: (415) 397-1339
ATTORNEYS FOR DEFENDANT PMC SPECIALTIES GROUP, INC. AND
FERRO CORPORATION

FARHEENA HABIB, ESQ. (SBN 243405)
fhabib@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone: (415) 397-9006
Facsimile: (415) 397-1339
ATTORNEYS FOR INTERVENERS FIREMAN'S FUND INSURANCE
COMPANY AND FEDERAL INSURANCE COMPANY, AS INSURERS FOR
PALLEY SUPPLY COMPANY

VICTOR J. OTTEN (SBN 165800)
vic@ottenlawpc.com
OTTEN LAW, PC
3620 Pacific Coast Hwy Suite 100
Torrance, CA 90505
Telephone: (310) 378-8533
Facsimile: (310) 347-4225
ATTORNEYS FOR DEFENDANT KEKROPIA, INC.

1

## **Moving Defendants' Notices of Motions and Motions**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

**PMC Property Defendants' Notice of Motion and Motion**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at 8:30 a.m. on May 17, 2021, or as or as soon thereafter as the as the matter may be heard, in Courtroom 9D, at 350 West 1st Street, Los Angeles, California, Defendant PMC Specialties, Inc. and FERRO CORPORATION (collectively "PMC"), shall move the Court for a judgment granting summary judgment in its favor and dismissing Plaintiffs claims  for relief under 42 U.S.C. section 9601, et seq. ("CERCLA"), including their first claim for relief for contribution under CERCLA, and their third claim for relief for declaratory judgment for contribution under CERCLA.

PMC makes this motion on the grounds that Plaintiff has not, and cannot demonstrate a causal connection between the hazardous substances released at the PMC Site and those same or substantially similar hazardous substances in the Omega OU-2 Plume.  Based on the available facts, Plaintiffs cannot establish the existence of a plausible migration pathway which would allow hazardous substances to migrate from the PMC Site to the Omega OU-2 Plume.   The available data demonstrates that no mixing, commingling, or intersection of the PMC Plume and the Omega OU-2 Plume has occurred.

In support of this motion, PMC presents this motion, the accompanying Moving Defendants' Memorandum of Points and Authorities, the Declaration of Earl Hagstrom and exhibits thereto, the Declaration of Richard Vogl and exhibits thereto, the Moving Defendants' Statement of Uncontroverted Facts and Conclusions of Law pursuant to Local Rule 56-1, the pleadings and records on file with the Court, oral argument, and any other matters that the parties may submit or the Court may deem appropriate.  PMC shall also lodge a proposed Judgment pursuant to Local Rule 56-1.

///

///

1    This motion is made following the conference of counsel pursuant to L.R. 7-
2    3 which took place on January 5, 2021.  Hagstrom Declaration, ¶ 9.

3

4    DATED:  January 14, 2021        BASSI EDLIN HUIE & BLUM LLP

5

6                                By:      /s/ Earl L. Hagström

7                                         Earl L. Hagström
                                          Daniel E. Trowbridge
8
                                          Attorneys for Defendants PMC Specialties
9                                         Group, Inc. and Ferro Corporation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

## **Chrysler Property Defendant Union Pacific's Notice of Motion and Motion**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 8:30 a.m. on May 17, 2021, or as or as soon thereafter as the as the matter may be heard, in the courtroom of the Honorable George H. Wu., United States District Judge, located in the United States Courthouse, Courtroom 9D, 350 West 1st Street, Los Angeles, California, defendant Union Pacific Railroad Company ("Union Pacific") will appear and move the Court for partial summary judgment against Plaintiffs on Plaintiffs' First and Third Causes of Action (contribution and declaratory relief) under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), Section 113(f) with respect to the Chrysler Property.  Union Pacific makes this Motion pursuant to Rule 56 of the Federal Rules of Civil Procedure and Central District Local Rule 56-1, on the grounds that the undisputed facts demonstrate that Plaintiffs' contribution claims fail as a matter of law because Union Pacific is not one of the categories subject to the liability provisions of CERCLA section 107(a).

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the accompanying Declarations of Sedina L. Banks, David Ruiz, and James A. Levy, Request for Judicial Notice, and all supporting evidence filed concurrently herewith, the accompanying Statement of Uncontroverted Facts and Conclusions of Law filed concurrently herewith, all of the records, pleadings and papers on file in this action, and upon such further oral or documentary evidence as may be presented at or before the hearing on this motion.

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

        The Motion is made following the conference of counsel for the parties

pursuant to Central District Local Rule 7-3, which took place on a Zoom video call

on January 5th.  Declaration of Sedina L. Banks, ¶ 38.


 DATED: January 14, 2021              GREENBERG GLUSKER FIELDS
                                      CLAMAN & MACHTINGER LLP


                          By:         /s/ Peter A. Nyquist
                                      _____
                                      David E. Cranston
                                      Peter A. Nyquist
                                      Sedina L. Banks
                                      Sherry E. Jackman
                                      *Attorneys for Defendant Union Pacific
                                      Railroad Company*

## Patsouras Property Defendants' Notice of Motion and Motion

TO ALL PARTIES AND TO ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 17, 2021 at 8:30 a.m., or as soon thereafter as the matter may be heard in Courtroom 9D, at 350 West 1st Street, Los Angeles, California before the Honorable George H. Wu, Defendant Halliburton Affiliates, LLC, Intervenors Fireman's Fund Insurance Company and Federal Insurance Company, as Insurers of Palley Supply Company, and Kekropia, Inc. (collectively, the "Patsouras Property Defendants") will and hereby do move this Court for Summary Judgment against Plaintiffs under Federal Rule of Procedure 56. Plaintiffs alleged that the Patsouras Property Defendants are liable under CERCLA for Plaintiffs' response costs for the OU-2 groundwater. The basis for the Motion is that Plaintiffs cannot prove that a hazardous substance which may have been released onto the Patsouras Property soil) has traveled from the soil surface to a depth of 35 to 74 feet below the surface to end up in the OU-2 groundwater.

This Motion is based on this Notice of Motion, the Moving Defendants' Common Statement of Facts and Summary, the Patsouras Property Defendants' Memorandum of Points and Authorities, the Declaration of William D. Wick and exhibits thereto, the complete record of this action, and any oral argument presented at the hearing on this Motion. This Motion is made following the conference of counsel pursuant to Local Rule 7-3 on January 5, 2021.

DATED:  January 14, 2021        WACTOR & WICK LLP


By:        /s/ William D. Wick
          William D. Wick

          Attorneys for Defendant Halliburton
          Affiliates, LLC

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1

2

DATED:  January 14, 2021          BASSI EDLIN HUIE & BLUM LLP

3

4

By:      /s/ Farheena A. Habib
Farheena A. Habib

5

6

7

8

Attorneys for Interveners Fireman's Fund
Insurance Company and Federal Insurance
Company, as Insurers for Palley Supply
Company

9

DATED:  January 14, 2021          OTTEN LAW, PC

10

11

By:      /s/ Victor Otten
Victor Otten

12

Attorneys for Defendant Kekropia, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP**
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1
2

**MOVING DEFENDANTS'**
**JOINT MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

I.    MOVING DEFENDANTS' COMMON STATEMENT OF FACTS

AND SUMMARY ................................................................................. 2

II.   MOVING DEFENDANTS' COMMON LEGAL STANDARDS ............... 4

    A.   SUMMARY JUDGMENT STANDARD ......................................... 4

    B.   CERCLA STANDARD ................................................................... 6

        1.   Plaintiffs Acknowledge that their CERCLA Claims Are
Dependent on Proving Moving Defendants' Responsibility for
Impacts to Groundwater in OU-2 ...................................... 6

        2.   Plaintiffs Must Prove that Each Moving Defendant is a
CERCLA "Covered Person" Responsible for Contaminant
Impacts to Groundwater in OU-2 ...................................... 6

        3.   In Two-Site CERCLA Cases Plaintiffs Must Prove a Hazardous
Substance Release from the Moving Defendant's Property Made
its Way Into the OU-2 Groundwater Plume ............................. 8

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

88151-00029/3942474.1

i

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

**PMC PROPERTY DEFENDANTS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT RE: CERCLA LIABILITY**

## TABLE OF CONTENTS

I.    PMC SUMMARY OF THE ARGUMENT ..................................................12

II.   PMC STATEMENT OF FACTS ............................................................14

    A.   PMC SITE HISTORY ................................................................14

    B.   RELEVANT ALLEGATIONS IN PLAINTIFFS' 5TH AMENDED
       COMPLAINT AND RESPONSES TO DISCOVERY ....................15

III.  SUMMARY OF APPLICABLE LAW ..........................................................18

    A.   LEGAL STANDARDS FOR MOTIONS FOR SUMMARY
       JUDGEMENT ............................................................................18

    B.   LEGAL STANDARDS IN TWO SITE CERCLA CASES .............18

IV.   ARGUMENT .......................................................................................18

    A.   DISTINCT MARKER CHEMICALS  PRESENT IN THE TWO
       PLUMES DEMONSTRATE THE PMC PLUME HAS NOT
       INTERSECTED, MIXED WITH, OR COMMINGLED WITH THE
       OMEGA OU-2 PLUME ..............................................................18

       1.   Benzene in Omega OU-2 Plume is not from the PMC Site....19

       2.   TCE, PCE and 1,1 DCE Were not Used at the PMC Site.......20

       3.   Solvents that Migrated onto the PMC Site from Upgradient
          Sources Have Not Migrated to the OU-2 Plume ....................20

    B.   GROUNDWATER FROM THE PMC SITE HAS NOT AND
       CANNOT INTERSECT THE OMEGA OU-2 PLUME ...................21

       1.   Groundwater from the PMC Site and Omega OU-2 Plume Flows
          Parallel to Each Other Cannot Intersect/Commingle ..............21

       2.   Low Permeability Sediments Also Prevent Commingling......22

    C.   TEST DATA AT THE PMC SITE CONFIRMS CONTAMINATION
       FROM PMC HAS NOT AND WILL NOT INTERSECT OR
       COMMINGLE WITH THE OMEGA OU-2 PLUME ....................23

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

D.  PLAINTIFFS' 5AC MISREPRESENTS THE BOUNDARIES OF THE PMC SITE AND THE OUTER EDGE OF THE OMEGA OU-2 PLUME ................................................................... 25

1.  Inaccurate Depiction of the Omega OU-2 Plume .................... 26

E.  PLAINTIFF HAS NOT AND CANNOT ESTABLISH THE EXISTENCE OF A PLAUSIBLE PATHWAY OR CAUSAL CONNECTION  BETWEEN THE PMC SITE  AND THE OMEGA OU-2 PLUME ................................................................... 27

1.  The PMC Plume has Migrated Too Short a Distance from the PMC Site to Encounter the Omega OU-2 Plume .................... 28

2.  Distinct Chemical Fingerprints of the OU-2 and PMC Plumes Demonstrate No Mixing of the Plumes as Occurred .............. 28

3.  Parallel Groundwater Flows and Low Permeability Sediments Prevent Commingling ............................................... 29

V.  PMC CONCLUSION ................................................................... 30

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

**CHRYSLER PROPERTY DEFENDANT UNION PACIFIC'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
RE: CERCLA LIABILITY**

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................. 32

   A.   UNION PACIFIC DID NOT OWN THE CHRYSLER PROPERTY AT THE TIME OF DISPOSAL OF ANY HAZARDOUS SUBSTANCES ................................................................................ 33

   B.   UNION PACIFIC DID NOT OPERATE THE CHRYSLER PROPERTY AT THE TIME OF DISPOSAL OF ANY HAZARDOUS SUBSTANCES ................................................................................ 34

   C.   PALMTREE ACQUISITION CORPORATION, AS SUCCESSOR IN INTEREST TO CATELLUS DEVELOPMENT CORPORATION, HAS ACKNOWLEDGED LIABILITY FOR THE DISPOSAL OF HAZARDOUS SUBSTANCES AT THE CHRYSLER PROPERTY 34

II.  STATEMENT OF FACTS ..................................................................... 35

   A.   THE CHRYSLER PROPERTY LOCATION ................................... 35

   B.   UNION PACIFIC'S OWNERSHIP OF THE CHRYSLER PROPERTY ................................................................................ 36

   C.   CHRYSLER'S OPERATIONS ON THE CHRYSLER PROPERTY 36

   D.   DISCOVERY OF CONTAMINATION ON THE CHRYSLER PROPERTY AFTER TERMINATION OF CHRYSLER'S TENANCY ................................................................................ 37

       1.   The Source of Contamination on the Chrysler Property is a 750-gallon Clarifier Operated by Chrysler in Connection with Chrysler's Body Works Building ............................................. 37

       2.   Chrysler Installed and Operated the Chrysler Clarifier after Union Pacific Sold the Chrysler Property ............................... 39

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

a.     Aerial Photographs Confirm that the Chrysler Clarifier was Installed After Union Pacific Sold the Chrysler Property ....................................................................... 40

b.     Site Plans Approved by the Los Angeles County Sanitation District on October 16, 1973 Confirm the Chrysler Clarifier was Not Installed on the Chrysler Property at that Time .................................................. 42

c.     Site Plans Approved by the Los Angeles County Sanitation District on January 31, 1974 Confirm the Chrysler Clarifier was Not Installed During Union Pacific's Ownership of the Chrysler Property .............. 42

E.     NO EVIDENCE OF A RELEASE OF HAZARDOUS SUBSTANCES IMPACTING GROUNDWATER EXISTS FROM EITHER THE NORTH CENTRAL PROPERTY, LASALLE PROPERTY OR MULTITENANT PROPERTY ........................................................ 44

F.     NO REGULATORY AGENCY HAS IDENTIFIED UNION PACIFIC AS A POTENTIALLY RESPONSIBLE PARTY ........................... 45

III.   ARGUMENT ........................................................................ 46

A.     UNION PACIFIC IS NOT A CERCLA POTENTIALLY RESPONSIBLE PARTY AND IS THEREFORE ENTITLED TO PARTIAL SUMMARY JUDGMENT .............................................. 46

1.     Union Pacific is Not a Current Owner of the Chrysler Property ....................................................................... 47

2.     Union Pacific is Not a Past or Current Operator of the Chrysler Property At the Time of Disposal of Any Hazardous Substance ....................................................................... 47

3.     There is No Evidence that Union Pacific Owned the Chrysler Property at the Time of Disposal of any Hazardous Substance 49

IV.    CONCLUSION ........................................................................ 51

**PATSOURAS PROPERTY DEFENDANTS**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT RE: CERCLA LIABILITY**

### TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 54

II.   SUMMARY JUDGMENT AND CERCLA STANDARDS ...................... 56

III.  FACTS ........................................................................................................ 57

      A.   THE OMEGA CHEMICAL SITE AND OU-2 GROUNDWATER
           PLUME ............................................................................................. 57

      B.   THE PATSOURAS PROPERTY ...................................................... 57

      C.   PATSOURAS PROPERTY ENVIRONMENTAL
           INVESTIGATIONS AND REMEDIATION ................................... 58

      D.   PLAINTIFFS' EVIDENCE .............................................................. 60

           1.   1970 Rinsewater Release ....................................................... 60

           2.   1970 Alleged Discharge of Wastes from Steam Cleaning ...... 61

           3.   1988 Alleged Discharge of Clarifier Contents ...................... 61

IV.   DR. KULLA'S EXPERT REPORT ........................................................... 62

      A.   THE PROPERTY IS NOT A CONTRIBUTING SOURCE OF
           HAZARDOUS SUBSTANCES TO OU-2 ...................................... 62

      B.   PLAINTIFFS' ALLEGATIONS ARE UNSUPPORTABLE ........... 62

           1.   The Property Soil Sampling Data Refute Plaintiffs' Allegations
                ................................................................................................. 63

           2.   The Groundwater Data Refute Plaintiffs' Allegations ............ 64

V.    CONCLUSION ........................................................................................... 65

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

1

# TABLE OF AUTHORITIES

2

**CASES**

3

*ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,
120 F.3d 351 (2d Cir. 1997) ........................................................ 49, 51

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................ 4

*Asarco, LLC v. Cemex, Inc.*,
21 F.Supp.3d 784 (W.D. Texas 2014) ........................................... 10

*Carson Harbor Village, Ltd., v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) (en banc) ...................................passim

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
287 F. Supp. 2d 1118 (C.D. Cal. 2003) ........................................... 7

*Castaic Lake Water Agency v. Whittaker Corp.*,
272 F.Supp.2d 1053 (C.D. Cal. 2003) ........................... 10, 14, 17, 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................... 4, 50

*City of Colton v. American Promotional Events, Inc.-West*,
614 F.3d 998 (9th Cir. 2010) ........................................................... 7

*Cleveland v. Policy Mgmt. Sys. Corp.*,
526 U.S. 795 (1999) ............................................................................ 4

*Dedham Water Co. v. Cumberland Farms Dairy*,
972 F.2d 453 (1st Cir. 1992) ........................................................... 7

*FTC v. Stefanchik*,
559 F.3d 924 (9th Cir 2009) ........................................................... 5

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
629 F. Supp. 2d 175 (D. Conn. 2009) .......................................... 8, 9

*Kalamazoo River Study Group v. Rockwell Int'l*,
3 F. Supp. 2d 815 (W.D. Mich. 1997) .......................................... 8, 9

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*,
171 F.3d 1065 (6th Cir. 1999) .................................................passim

*Miranda v. City of Cornelius*,
429 F.3d 858 (9th Cir. 2005) ........................................................... 4

*Motley v. Parks*,
432 F.3d 1072 (9th Cir. 005) (en banc) .......................................... 5

*New York v. Shore Realty Corp.*,
759 F.2d 1032 (2d Cir. 1985) ......................................................... 49

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000)...................................................................... 4

*Redevelopment Agency of the City of Stockton v. BNSF Ry. Co.*,
  643 F.3d 668 (9th Cir. 2011)....................................................................... 48

*Solutia, Inc. v. McWane, Inc.*,
  No. 1:03-cv-1345-PWG, 2012 WL 2031350 (N.D. Ala. June 1,
  2012)...................................................................................................... 8, 9, 10

*T. W. Elec. Serv., Inv., v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987)......................................................................... 5

*Thomas v. FAG Bearings*,
  846 F. Supp. 1382 (W.D. Mo. 1994).......................................................... 8

*Thornhill's Publ'g Co., Inc. v. GTE Corp.*,
  594 F.2d 730 (9th Cir. 1979)......................................................................... 5

*U.S. v. Bestfoods*,
  524 U.S. 51 (1998)....................................................................................... 48

**STATUTES**

42 U.S.C. § 6903(3)........................................................................................ 49

42 U.S.C. § 9607...................................................................................*passim*

42 U.S.C. § 9601.................................................................... 9, 49, 60, 62

53 Fed.Reg. 5298, 5301 (Feb. 23, 1988)............................... 4, 14, 52

FED. R. CIV. P. 56............................................................................. 6, 7, 50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

viii

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

1

**MOVING DEFENDANTS'**

2

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

I.   **MOVING DEFENDANTS' COMMON STATEMENT OF FACTS AND SUMMARY**

Plaintiffs disposed of thousands of tons of hazardous wastes at the former Omega Chemical facility (now the epicenter of the Omega Superfund Site) over a 15-year period.  Plaintiffs' toxic wastes contaminated not only the soil and groundwater at and under the Omega Site itself, but also contaminated the groundwater flowing *from* the Site—a plume of contamination that now extends at least *four and a half miles* downgradient of the Omega Site.  The contaminated groundwater plume was designated by the U.S. Environmental Protection Agency ("EPA") as "Operable Unit 2," or "OU-2" for short.

EPA identified the Plaintiffs as the primary culprits of the OU-2 contamination for their waste disposed at the Omega facility, and EPA's environmental contractor, CH2M Hill, confirmed after years of investigation that Plaintiffs' waste releases from the former Omega Chemical facility are "the main source of contamination in OU-2."[1]

For more than a decade, EPA has been investigating and identifying other parties that owned or operated on properties in the path of the OU-2 plume to assess whether operations or spills on any of those properties during the parties' ownership or operation of the property may have resulted in the incremental addition of hazardous substances to the mass of Plaintiffs' contaminants already present in the OU-2 plume.  These parties are referred to as "potentially responsible parties" or "PRPs".

After identifying the universe of PRPs, EPA sent two types of letters to the PRPs: "General Notice Letters" and "Special Notice Letters." These letters inform

---

[1] Final Remedial Investigation/Feasibility Study Reports, Omega Chemical Corporation Superfund Site, Operable Unit 2, Los Angeles County, California, Volume 1, CH2M HILL, Aug. 2010, § 8.1.2, p. 8-4; Declaration of Sedina L. Banks, Exhibit 34.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

the PRPs regarding their identification as a PRP, their potential liability at the Omega Superfund site, information regarding the site and other PRPs, and negotiations for the cleanup of the site.[2]  EPA policy provides that General Notice Letters "should be sent to *all* parties where there is sufficient evidence to make a preliminary determination of potential liability under §107 of CERCLA."  53 Fed.Reg. 5298, 5301 (Feb. 23, 1988) (emphasis added).  EPA sends out a Special Notice Letter when it is ready to negotiate with PRPs to clean up a site.[3]

Significantly, EPA has not identified the Moving Defendants as PRPs for their respective properties at issue (the "Properties") and has not issued any General Notice Letters or Special Notice Letters to any of the Moving Defendants for their properties.

Moving Defendants now seek summary judgment or partial summary judgment that they have no liability under CERCLA[4] for the OU-2 groundwater contamination for the same reason EPA so concluded: there is no evidence that Moving Defendants are responsible under CERCLA for any hazardous substances impacting the OU-2 groundwater plume.[5]

---

[2] https://www.epa.gov/enforcement/superfund-notice-liability-letters
[3] *Id.*
[4] This phase of the litigation concerns only certain elements of CERCLA liability, as explained in the May 2017 Parties Joint Status Conference Report.  *See* Dkt. 615 at 1:10-2:4. However, if successful, Moving Defendants' motions would wholly dispose of CERCLA claims against them by establishing that Plaintiffs lack sufficient evidence of one or more elements of CERCLA liability.
[5] Moving Defendant Union Pacific Railroad Company ("Union Pacific") advances arguments slightly different than those of the other Moving Defendants, as detailed in greater detail Union Pacific's Memorandum of Points and Authorities.  Union Pacific's principal argument is that Plaintiffs cannot establish Union Pacific is a CERCLA liable party because the only plausible source of OU-2 groundwater contamination was a clarifier installed on the Chrysler Property after Union Pacific sold the Chrysler Property.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California  90067

## II. MOVING DEFENDANTS' COMMON LEGAL STANDARDS

### A. SUMMARY JUDGMENT STANDARD

A party against whom relief is sought may move for summary judgment on all or part of the claim.  FED. R. CIV. P. 56(a).  The moving party is entitled to summary judgment if the pleadings, discovery and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Miranda v. City of Cornelius,* 429 F.3d 858, 860 n.1 (9th Cir. 2005).  As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The moving party can meet its initial burden by pointing out the absence of evidence from the non-moving party.  The moving party need not disprove the other party's case.  *Celotex*, 477 U.S. at 325.  Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'"  *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).  The moving party can also produce "evidence negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment [but instead] must set forth, by affidavit or as otherwise

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1
2

provided in Rule 56, specific facts showing that there is a
genuine issue for trial.

3
4
5

*T. W. Elec. Serv., Inv., v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted) (citing, among other cases, *Celotex,* 477 U.S. at 323).

6
7
8
9
10
11
12
13
14
15
16
17
18

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *See FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir 2009).  In addition, the evidence presented by both parties must be admissible. *See* Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Thornhill's Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).  In judging evidence at the summary judgment stage, courts do not make credibility determinations or weigh conflicting evidence and must view all evidence and draw all inferences in the light most favorable to the nonmoving party.  *See T. W. Elec.,* 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)); *see also Motley v. Parks,* 432 F.3d 1072, 1075, n.1 (9th Cir. 005) (en banc*) (overruled on other grounds by U.S. v. King,* 687 F. 3d 1189 (2012).

19
20
21
22
23
24

Summary judgment should be granted in favor of the Moving Defendants on Plaintiffs' CERCLA claims in the Fifth Amended Complaint because the Plaintiffs cannot establish that Moving Defendants are CERCLA potentially responsible parties and/or that releases of hazardous substances from Moving Defendants' Properties impacted OU-2, for which Plaintiffs allege they have incurred response costs.

25
26
27
28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**B.    CERCLA STANDARD**

     **1.    Plaintiffs Acknowledge that their CERCLA Claims Are Dependent on Proving Moving Defendants' Responsibility for Impacts to Groundwater in OU-2**

Plaintiffs have alleged claims against the Moving Defendants for contribution under CERCLA § 113(f)(1) and declaratory relief under CERCLA § 113(g)(2) on the basis of impacts to groundwater in OU-2.  Plaintiffs allege that the operations of each of the Moving Defendants resulted in hazardous substances "being placed onto the ground or into the soil at or near" the Properties. (FAC, ¶ 354) and that "the hazardous substances present in the soil at [the Properties] have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater."  (FAC, ¶ 355).  On that basis, Plaintiffs seek recovery of costs "to address the contamination contributed to the OU-2 Facility by Defendants." (FAC, ¶¶ 404).

Thus, Plaintiffs acknowledge that merely showing that there were releases of hazardous substances into the *soil* on the Properties does not establish liability, because the Plaintiffs have not incurred (and will not incur) response costs cleaning up the Properties' soil.  Instead, Plaintiffs must prove their allegation that "hazardous substances present in the soil" at the Properties during the Moving Defendants' ownership or operation of the Properties "have migrated and continue to migrate downward" *into the OU-2 groundwater*.

     **2.    Plaintiffs Must Prove that Each Moving Defendant is a CERCLA "Covered Person" Responsible for Contaminant Impacts to Groundwater in OU-2**

To establish a prima facie case for liability under CERCLA, Plaintiffs must prove that each Moving Defendant is a "covered person" (i.e., liable under CERCLA) within the meaning of CERCLA Section 107(a)(1) or (2), 42 U.S.C. § 9607(a)(1) or (2).  Thus, a Moving Defendant is only liable if it owns or operates,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1   or owned or operated at the time of disposal of hazardous substances, a facility

2   "from which there is a release, or a threatened release *which causes the incurrence*

3   *of response costs*, of a hazardous substance." 42 U.S.C. § 9607(a)(4)(emphasis

4   added).[6]   Because Plaintiffs are seeking the recovery of response costs associated

5   with the contamination of the groundwater in OU-2, Plaintiffs must prove there was

6   a release of hazardous substances from the Moving Defendants' Properties that

7   ended up in the OU-2 groundwater for which the Moving Defendant is responsible

8   as either a (1) current owner or operator of the property or (2) owner or operator of

9   the property at the time of the disposal of the hazardous substance which impacted

10   the OU-2 groundwater plume.  CERCLA Section 107(a)(1), (2), 42 U.S.C. §

11   9607(a)(1), (2). [7]

12         Here, Plaintiffs cannot prove an essential element of their CERCLA

13   contribution claim—that there was a release of a hazardous substance onto the

14   Moving Defendants' Properties that then traveled into OU-2 groundwater for which

15   the Moving Defendant is responsible, thereby causing Plaintiffs to incur response

16   costs.  42 U.S.C. §9607(a)(4).  *City of Colton v. American Promotional Events,*

17   *Inc.-West,* 614 F.3d 998, 1002-03 (9th Cir. 2010); *Carson Harbor Village, Ltd., v.*

18   *Unocal Corp.,* 270 F.3d 863, 870-71 (9th Cir. 2001) (en banc); *Carson Harbor*

19   *Village, Ltd. v. Unocal Corp.,* 287 F. Supp. 2d 1118, 1186 (C.D. Cal. 2003)

20   (CERCLA "requires that plaintiff establish a causal link between the release for

21   which defendant is responsible, and the response costs incurred by plaintiff.")

22

23   [6] *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy*, 972 F.2d 453 (1st Cir.

24   1992); Acushnet Co. v. Coaters, Inc., 937 F. Supp. 988, 994 (D. Mass. 1996).

     [7] However, if the hazardous substance which made its way to OU-2 was contained

25   in a petroleum product, it would be excluded from the CERCLA definition of

26   "hazardous substance" and would *not* be a basis for imposing CERCLA liability on

27   any of the Defendants.  CERCLA Section 101(14), 42 U.S.C. § 9601(14)(the term

28   "hazardous substance" does not include "petroleum, including crude oil or any

     fraction thereof").

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**3.**  **In Two-Site CERCLA Cases Plaintiffs Must Prove a Hazardous Substance Release from the Moving Defendant's Property Made its Way Into the OU-2 Groundwater Plume**

A CERCLA "two-site" case, such as this one, is a case in which the plaintiff "contends not that the defendant directly dumped or otherwise disposed of its wastes at the site but rather that hazardous materials migrated there from the defendant's facility or from a different dumpsite elsewhere." *Solutia, Inc. v. McWane, Inc.,* No. 1:03-cv-1345-PWG, 2012 WL 2031350, at *8 (N.D. Ala. June 1, 2012). In such two-site cases, "it may be 'much less obvious how [a defendant] could be responsible for contamination of the [site where the plaintiff has incurred response costs.]'" *Id.* Thus, in two-site cases, Courts require plaintiffs to prove that a release for which the defendant is responsible at one site (here, the soil on each Moving Party's Property) caused the contamination of the second site (here, the OU-2 groundwater). *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065 (6th Cir. 1999); *Innis Arden Golf Club v. Pitney Bowes, Inc.,* 629 F. Supp. 2d 175, 185-86 (D. Conn. 2009); *Thomas v. FAG Bearings,* 846 F. Supp. 1382, 1386-87 (W.D. Mo. 1994). As held by the Sixth Circuit, the mere *possibility* that the contamination from the defendant's site caused contamination on the plaintiff's site is insufficient to create a material fact as to causation. *Kalamazoo River Study Group,* 171 F.3d at 1072-73, affirming, *Kalamazoo River Study Group v. Rockwell Int'l,* 3 F. Supp. 2d 815 (W.D. Mich. 1997).

In *Kalamazoo River*, the plaintiff alleged that water flowing across the defendant's property became contaminated with PCBs in soil and then traveled through a drainage ditch before ultimately discharging into a lake where the plaintiff had incurred response costs. *Kalamazoo River*, 171 F.3d at 1067. The defendant did not deny the presence of PCBs at its property, and sampling of the drainage ditch revealed PCB contamination extending at least 1,500 feet from the defendant's property in the direction of the lake. *Id.* at 1068-69. The district court

granted defendant's motion for summary judgment because the plaintiff could point to no evidence establishing that "water did in fact flow down the ditch in sufficient quantity to carry PCBs from the northern part of the ditch to [the lake]." *Kalamazoo River,* 3 F. Supp. 2d at 822.

The Sixth Circuit affirmed, holding:

> In a 'two-site' case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up.

*Kalamazoo River,* 171 F.3d at 1068 (citations omitted).

The Sixth Circuit also affirmed the district court's conclusion that the plaintiff's proof that it was *possible* that PCBs could have moved from the drainage ditch to the lake was *insufficient* to create a material fact as to causation:

> [The plaintiff] has created, at most, a question of fact as to whether or not there was a *possibility* that water flowed all the way down the ditch to Morrow Lake… KSG's entire theory of liability on behalf of [the defendant] is based upon the assumption that water flowed down the ditch to Morrow Lake. This assumption, however, is based solely on speculation and possibility. *The existence of a possibility does not create a material issue of fact for trial* because [the plaintiff] bears the burden of proof to show that [the plaintiff] *did* contribute to PCBs in the Kalamazoo River, not that it is *possible* that it might have contributed to the PCBs.

*Id.* at 1072 (emphasis added).

The same result based on similar analysis in a two-site case was reached in *Innis Arden Golf Club v. Pitney Bowes, Inc.* and *Solutia, Inv. v. McWane, Inc., supra.*

In *Innis Arden Golf Club*, the Court granted defendants' motion for summary judgment because plaintiff failed to establish causation, acknowledging that "[o]ther courts confronted with an issue of causation as framed in this manner similarly recognize that a plaintiff must provide some evidence linking its response costs to the targeted off-site release of contaminants." *Innis Arden Golf Club*, 629

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

9

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

F. Supp. 2 at 185-187 (citations omitted).  In *Solutia, Inc.*, the court held that

> it is not sufficient in alleged migration cases merely to show that the defendant's wastes contain materials similar to those found at the site; otherwise a defendant might be liable under CERCLA to pay for the cleanup of any dumpsite in the country that happened to contain a substance similar to that in the defendant's wastes.  Rather, the plaintiff has the burden to present evidence that will 'provide the necessary causal link between [the defendant's] activities and the contamination which is the subject of [the] suit.' In cases of actual contamination, there must be sufficient evidence from which a jury might reasonably find that it is "more probable than not" that the defendant's wastes did migrate to the site where the plaintiff incurred response costs, not merely that there was some "possibility" that they reached the site.

*Solutia, Inc.*, 2012 WL 2031350 at *8 (citations omitted).

The Ninth Circuit has not yet ruled on the standard of proof to be applied in two-site CERCLA cases,[8] but no matter what standard is applied, CERCLA itself "always" requires the Plaintiffs to prove that a hazardous substance release from the Moving Defendant's facility for which the Moving Defendant is responsible made its way into the OU-2 groundwater plume, such that it *"causes the incurrence of response costs"* by Plaintiffs.  42 U.S.C. § 9607(a)(1)-(4); *Asarco, LLC v. Cemex, Inc.*, 21 F.Supp.3d 784, 807 (W.D. Texas 2014).  Plaintiffs cannot do so.[9]

_____

[8] In the absence of Ninth Circuit guidance, district courts have grappled with the "difficult" issue of causation in "two-site" CERCLA cases, with one judge crafting the standard that a plaintiff must show "a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." *Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1066 (C.D. Cal. 2003).  Another District Court which applied the *Castaic* "plausible migration pathway" standard noted that a "possible" migration pathway" is *not* a "plausible migration pathway." *Asarco, LLC v. Cemex, Inc.*, 21 F.Supp.3d 784, 807 (W.D. Texas 2014)(emphasis added).

[9] As indicated earlier, Union Pacific's principal case for summary judgment as to the Chrysler Property is slightly different from the other Moving Defendants. Union Pacific maintains that Plaintiffs cannot establish Union Pacific is a CERCLA liable party because the only plausible source of OU-2 groundwater contamination from the Chrysler Property was a clarifier which was installed after Union Pacific sold the Chrysler Property.

1

**PMC PROPERTY DEFENDANTS' MEMORANDUM OF POINTS**

2

**AND AUTHORITIES IN SUPPORT OF MOTION FOR**

3

**SUMMARY JUDGMENT RE: CERCLA LIABILITY**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

## I.   PMC SUMMARY OF THE ARGUMENT

No chemicals used by PMC at the PMC Site have migrated to the Omega OU-2 Plume.  No chemicals that migrated on to the PMC Site from sources upgradient of the PMC Site have migrated to the Omega OU- 2 Plume.  Multiple lines of scientific evidence support this finding.  Benzene and Naphthalene, the two chemicals used by PMC attenuate to non-detect concentrations a short distance downgradient from the PMC Site and therefore have not reached the Omega OU-2 Plume.  The non-detects for benzene in monitoring wells demonstrate that PMC is not the source of the trace amounts of benzene in the Omega OU-2 Plume.

Volatile Organic Compounds, TCE, PCE and 1,1 DCE that migrated onto the PMC Site from a source or sources located upgradient of the PMC Site have decreased to non-detect at monitoring wells MW-22 and MW-23 located between 350 and 425 feet downgradient of the PMC Site.  A distance over 1500 feet short of the outer edge of the Omega OU-2 Plume.

The downgradient extent of the PMC Plume has been defined and it is well short of the outer edge of the Omega OU-2 Plume.  PMC continues to work with the California Department of Toxic Substances Control to remediate and monitor the PMC Site under an approved Remedial Action Plan.

Moreover, a 32 story high (350 feet) 2500 foot plus wide Anticline (Dome like structure), mapped by the U.S. Geological Survey in 2014 and the California State Division of Mines 1943, sits between the PMC Site and the Omega OU-2 Plume.  The Anticline deflects groundwater flow on either side of it such that groundwater in the OU-2 Plume located west of the Anticline and groundwater on the east (PMC side) flow parallel to each other making it impossible for groundwater from the PMC Site to intersect or commingle with the Omega OU-2 Plume.

In addition, sediments that lie between the PMC Site and the outer most edge of the Omega OU-2 Plume are comprised of low permeability shales that inhibit

groundwater flow.  The low permeability sediments and the Anticline create natural barriers to groundwater flow from the PMC Site to the Omega OU-2 Plume.

EPA did *not* identify the PMC Site as a property which may have contributed any contaminants to the OU-2 plume; EPA has not issued a General Notice Letter to PMC nor has EPA issued a Special Notice Letter to PMC.  The decision not to issue 'Notice Letters" to PMC is an important factor in support of PMC's position that no chemicals from its Site have comingled or will comingle with the Omega OU-2 Plume.  It is longstanding EPA policy that General Notice Letters "should be sent to *all parties where there is sufficient evidence to make a preliminary determination of potential liability under §107 of CERCLA*."  53 Fed. Reg. 5298, 5301 (Feb., 23 1988) (emphasis added).  The fact that EPA, after numerous studies, decided not to issue a Notice Letter to PMC underscores the lack of evidence in support of Plaintiffs' CERCLA claims against PMC.

It is equally important to note that when EPA determined it had "*sufficient evidence*" to issue "Notice Letters" it did so in this case.  EPA's decision not issue a General Notice Letter or a Special Notice Letter to PMC demonstrates agreement by EPA that no chemicals from the PMC Site have reached or threaten to reach the OU-2 Plume.

Yet another line of evidence in support of PMC's position is the final Remedial Investigation Report prepared by EPA's environmental Consultant (CH2M Hill), which identified many properties that likely contributed hazardous substances to the OU-2 Plume, but like EPA it did not identify the PMC Site as an on-going or historical source of hazardous substances to the OU-2 Plume.

EPA and CH2MHill did however identify the former Omega Chemical Facility as the "main source of contamination at OU-2".  Hazardous substances found in the OU-2 Plume were sent to the Omega Chemical Facility (aka OU-1) by Plaintiffs, thus making them the source of contamination that is the basis of their lawsuit.

MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

In discovery responses, Plaintiffs **do not even state** that contaminants from the PMC Site have traveled or migrated to the Omega OU-2 Plume. Furthermore, despite having years to update their discovery responses with facts, as required, Plaintiffs did not and could not, because there are none. Plaintiffs are bound by and limited to their factually unsupported statement that such contamination "**may have**" intersected the Omega OU-2 Plume. No expert declaration can change this and now be used to create a disputed material fact. "**May have**" intersected is not sufficient for Plaintiffs to meet their burden of proof under *Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1066 (C.D. Cal. 2003) or *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065 (6th Cir. 1999).

PMC seeks summary judgment because it has no liability under CERCLA for the OU-2 Plume contamination for the same reason EPA and its contractor so concluded: there is no evidence indicating that a hazardous substance from the PMC Site has made its way into or commingled with the OU-2 Plume.

## II.    PMC STATEMENT OF FACTS

### A.    PMC SITE HISTORY

The PMC Site is located on 9.1 acres comprised of 10 parcels with separate Assessor Parcel Numbers and located at 10051 Romandel Avenue, Santa Fe Springs, California. Declaration of Richard Vogl in Support of PMC's Motion for Summary Judgment, ("Vogl Decl.") ¶ 12a. The PMC Site was operated as a chemical manufacturing plant operated by others beginning in approximately 1938 until 1986 when PMC operations began. *Id.* ¶ 12b. Operations at the PMC Site were discontinued in 1992. *Id.* PMC manufactured phenolic compounds, and cresylic and naphthenic acids and included the use of naphthenic, cresylic, and sulfonic acids, and benzene. *Id*.

The PMC Site has been subject to California Department of Health Services (DHS) oversight since 1988 and California Department of Toxic Substances

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Control (DTSC) oversight since approximately 2006, resulting in PMC undertaking and completing multiple site assessment actions. *Id.* ¶ 12c. Site characterization is complete and preparation for remediation is ongoing including the submittal and approval by DTSC of a Remedial Action Plan in 2020. *Id.* A Remedial Design Implementation Plan (RDIP) was submitted in late 2020, including a response to DTSC comments, and is anticipated to be approved by DTSC in early 2021, with additional remedial activity implementation beginning as soon as approval is obtained. *Id.* PMC's decommissioning activities began in April 1993. *Id.* The site operational equipment, all storage tanks, including 171 above-ground storage tanks and conveyance piping and structures were demolished and/or removed by November 1993. *Id.* ¶ 12e, 21-23. Following the demolition, the PMC Site was capped with asphalt and rolled base material and engineering controls were placed in certain areas to prevent rainwater from causing chemicals to leach in the soil and groundwater. *Id.*

## B.  RELEVANT ALLEGATIONS IN PLAINTIFFS' 5TH AMENDED COMPLAINT AND RESPONSES TO DISCOVERY

In the 5th Amended Complaint ("5AC") Plaintiffs rely heavily on the U.S. Environmental Protection Agency's ("EPA") evaluation and identification of several defendants as potentially responsible parties with respect to the Omega OU-2 Plume. Plaintiffs' allegations assert or at a minimum are intended to strongly imply that a defendant who received either Special Notice Letter or General Notice Letter from EPA is a liable party. PMC did not receive any letter from EPA. Declaration of Earl Hagstrom in Support of PMC's Motion for Summary Judgment re: CERCLA Liability ("Hagstrom Decl."), Ex. B, 5AC ¶ 4, 5, 68-84 ("5AC"). As such Plaintiffs' assertion on its face only serves to support PMC's position that it is not a liable party.

Despite an exhaustive investigation of the Omega Chemical Site (OU-1) and the Omega OU-2 Plume, EPA never identified Ferro Corporation or PMC

MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Specialties Group, Inc. (collectively, "PMC") as a responsible party, or even a potentially responsible party with respect to the Omega OU-2 Plume.  PMC is identified as "Non-Notice Letter Defendant PRPs," in Plaintiffs operative 5AC.  Plaintiffs' claims in the 5AC rest almost exclusively on allegations made on "information and belief" that releases of contamination occurred from or adjacent to the PMC Site.  5AC ¶ 97-98, 367, 372.

Plaintiffs allege that certain disposals occurred at the PMC Site during the time it was owned or operated by PMC.  5AC ¶ 375-378.  Notably, Plaintiffs identify the chemicals allegedly released or disposed of at the PMC Site, between 1987-1992, as benzene, cresol, MEK, phenol, propylene, styrene, and sulfuric acid.  5AC ¶ 373.  Again, relying only on information and belief, Plaintiffs conclude without any basis that contaminants have migrated into the soil and the groundwater, and have migrated offsite to support its claim that PMC is a source of contamination [in the Omega OU-2 Plume] by way of another downgradient property.  5AC ¶¶ 379-386.  While Plaintiffs allege that the VOCs TCE, PCE, and 1, 1-DCE were also detected in soils at the PMC Property, they only allege that Benzene and toluene migrated to the Oil Field Reclamation Project ("OFRP") Site, which sits in between the PMC Site and the Omega OU-2 Plume to the west and downgradient of the PMC Site.  5AC ¶¶ 383, 386.

In written discovery responses, Plaintiffs repeat these allegations as to chemicals detected at the PMC Site, but simply take for granted, without evidence that contaminants migrated from the PMC Site to the Omega OU-2 Plume.  In their discovery responses, Plaintiffs' **do not even state** that contaminants from the PMC Site have traveled or migrated to the Omega OU-2 Plume.  Plaintiffs solely rely upon a factually unsupported statement that such contamination "**may have**" intersected the Omega OU-2 Plume.  While these vague and factually unsupported allegations may get Plaintiffs by a Motion to Dismiss, they cannot and do not withstand the scrutiny required to withstand a Motion for Summary Judgement.

1    Plaintiffs have only vaguely alleged that "groundwater contamination from the

2    [PMC Site] **may intersect** OU-2 given that the groundwater flow direction from

3    that property has been determined to be to the southwest."  Hagstrom Decl., Ex. C,

4    Ferro Corp.'s Interrogatories to Plaintiffs, No. 3-4, Ex. D Plaintiffs' Supplemental

5    Resp. to Ferro Corp.'s Interrogatories to Plaintiffs, No. 3-4; Ex. E, PMC

6    Interrogatories to Plaintiffs, No. 3, Ex. F, PMC Supp. Resp. to PMC's

7    Interrogatories to Plaintiffs, No. 3.  That contaminated groundwater from PMC

8    "may intersect OU-2" does not establish a causal connection or plausible pathway

9    between contamination in OU-2 and the PMC Site.

10          Plaintiffs' have not and cannot meet their burden of proof under either

11   *Castaic Lake* or *Kalamazoo*.  Plaintiffs must present facts, not conjecture.

12          While Plaintiffs' vaguely allege that "each of the source properties is located

13   above or adjacent to the OU-2 Facility," its allegations against PMC regarding the

14   OFRP Site demonstrate that unlike all of the other source properties alleged by

15   Plaintiffs, the PMC Site is not actually above or adjacent to the Omega OU-2

16   Plume.  5AC ¶ 119, *See* 5AC, Ex. B.  On Ex. B to the 5AC Plaintiffs erroneously

17   depict the PMC Site as being significantly closer to the Omega OU-2 Plume than it

18   actually is when the property lines as surveyed are shown.  As shown, the property

19   boundaries as surveyed by a licensed surveyor the PMC Site sits more than 3000

20   feet to the west.  Declaration of Richard Vogl in Support of PMC's Motion for

21   Summary Judgment ("Vogl Decl."), ¶ 17. Ex. G and H.

22          Plaintiffs have not offered any evidence or factual basis for its allegation that

23   the PMC chemicals may have intersected, mixed with and/or commingled with the

24   Omega OU-2 Plume, because it has failed to establish or even affirmatively allege

25   the existence of any plausible migration pathway or a causal connection between

26   the PMC Site to the Omega OU-2 Plume its claims lack merit and PMC's Motion

27   for Summary Judgement must be granted. The available data demonstrates that no

28   mixing, commingling, or intersection of the PMC Plume and the Omega OU-2

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Plume has occurred.  Vogl Decl. ¶¶ 10 -23.

## III.   SUMMARY OF APPLICABLE LAW

### A.   LEGAL STANDARDS FOR MOTIONS FOR SUMMARY JUDGEMENT

The relevant legal standard for Summary Judgement has been set forth in the Moving Defendants' Common Statement.

### B.   LEGAL STANDARDS IN TWO SITE CERCLA CASES

To establish their prima facie case here Plaintiffs must prove there is a plausible pathway or causal connection between hazardous substances released at the PMC and those same or substantially similar hazardous substances in the Omega OU-2 Plume. Plaintiffs cannot.  Under the available facts Plaintiffs cannot meet their burden and demonstrate that any release which occurred at the PMC Property has intersected, mixed with, or commingled with the Omega OU-2 Plume under either the *Castaic Lake*, *Kalamazoo*, and the cases cited in section II of Moving Defendants' Common Legal Standards.

In "two-site" CERCLA cases the mere allegation that similar chemicals may exist at two different sites a thousand or more feet apart is not enough to meet that burden.  Plaintiffs must prove that a causal link or plausible pathway exists between the PMC Site and the Omega OU-2 Plume, and they have not.

Summary judgment in PMC's favor is warranted and should be granted because the facts establish that the contamination in the Omega OU-2 Plume did not come from the PMC Site. Vogl Decl., ¶¶ 10-23.

## IV.   ARGUMENT

### A.   DISTINCT MARKER CHEMICALS  PRESENT IN THE TWO PLUMES DEMONSTRATE THE PMC PLUME HAS NOT INTERSECTED, MIXED WITH, OR COMMINGLED WITH THE OMEGA OU-2 PLUME

The chemical fingerprints of the Omega OU-2 Plume and the PMC Plume do

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

not match.  The distinct chemical and physical characteristics of each plume demonstrate the PMC Plume has not reached, commingled or intersected the Omega OU-2 Plume.  Vogl Decl., ¶ 10e-f; 14.  Each plume has Marker Chemicals.[1]  Marker Chemicals for the Omega OU-2 Plume are the VOCs, trichloroethylene ("TCE"), perchloroethylene ("PCE"), and 1, 1 dichloroethene ("1, 1-DCE") (collectively "Omega OU-2 Marker Chemicals"), chemicals that were not used at the PMC Site.  *Id.* ¶¶ 10e, 11c, 19a(viii).  The Marker Chemicals for the PMC Plume are naphthalene and benzene.  *Id.* ¶ 10f, 12g; *See Also*, Ex. F2.

A review of the historical available data from OMEGA OU-1, the source area for groundwater contaminants in the Omega OU-2 Plume, show the presence of the Omega OU-2 Marker Chemicals, which are consistently detected at the same magnitude in both OU-1 and OU-2.  *Id.*, ¶ 20f, Ex. P; Q1; Q2, *See Also*, Ex. F2 and Hagstrom Decl., ¶ 3, Ex. A, Final RI/FS Reports, Omega Chemical Corporation Superfund Site, OU-2, Los Angeles County, California, Volume 1, CH2M HILL, Aug. 2010, § 8.1.2, p. 8-4.  By contrast, the PMC Plume is characterized by detections of benzene and naphthalene and an outer edge or maximum downgradient reach defined by test results from groundwater samples that are non-detect for these chemicals in monitoring wells located within a few hundred feet downgradient of the PMC Site.

The same maximum downgradient reach or outer edge of TCE, PCE and 1,1 DCE, which migrated onto the PMC Site from upgradient sources, is also defined by non-detect test results in monitoring wells located less than 450 feet from the PMC Site.  Vogl Decl., ¶ 19a(viii), 20e, Ex. I2.

## 1.   Benzene in Omega OU-2 Plume is not from the PMC Site

The benzene and naphthalene plume originating from the PMC Site attenuates to non-detect concentrations within 800 feet downgradient from the PMC Site and therefore do not commingle with the any of the three potential

---

[1] Those chemicals most frequently detected at the highest concentrations.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

downgradient sources or the Omega OU-2 Plume.  Vogl Decl., ¶ 20a-e, Ex. Q-1. The trace amount of benzene in the Omega OU-2 Mid-plume and benzene in these three downgradient areas are likely from gasoline or light end hydrocarbon releases on the numerous properties with underground storage tanks and/or Leaky Underground Storage Tank ("LUST"), and other chemical releases.  *Id.*, ¶ 20d-g, Ex. Q-1.  These three releases at locations have been documented and are downgradient from the PMC Site; the three locations, include a pipeline release of gasoline that McClaren/Hart Described in the OFRP Groundwater Study; a release at a former drum recycler, the Beaumon Trust Property, which washed out thousands of drums collected from industrial sites and illegally dumped over 60 volatile, semi-volatile, and metals-containing chemical compounds on a single town lot; as well as a LUST site at the Yellow Freight Property.  Vogl Decl., ¶ 20d-e, Ex. Q-1.  In addition to these releases, there are approximately 25 properties with former or current underground storage tanks located within the Omega OU-2 Plume and in the region downgradient from the PMC Site.  Vogl Decl., ¶ 20d-e, Ex. Q-1. The existence of these sources with known releases, further downgradient from the downgradient monitoring wells from the PMC Site showing non-detects for benzene, demonstrate that PMC is not the source of the trace amounts of benzene in the Omega OU-2  Plume.

### 2.    TCE, PCE and 1,1 DCE Were not Used at the PMC Site

PMC did not use TCE, PCE, or 1,1 DCE in its operations. *Id.* ¶ 10e, 19a(viii), Ex. E.

### 3.    Solvents that Migrated onto the PMC Site from Upgradient Sources Have Not Migrated to the OU-2 Plume

TCE, PCE and 1,1 DCE have migrated onto the PMC Site from a source or sources located upgradient of the PMC Site.  Vogl Decl. ¶ 19a(viii), Ex. I1, I2, J, R. Monitoring wells MW 21, MW 22, and MW 23 are located approximately 350 to 450 feet downgradient and off of the PMC Site.  *Id.*  MW-21 is the most upgradient

of these three wells.  *Id.*  While MW-21, the most upgradient of these monitoring wells shows low concentrations of TCE, PCE and 1,1 DCE, the concentration levels decrease to non-detect at further downgradient wells M-22 and M-23.  *Id.* The decreasing concentration levels of these chemicals from MW-21 to MW-22 and MW-23, the latter two of which are non-detect demonstrate these three chemicals have not migrated  more than 450 off of the PMC Site.  A distance far short of the outer edge of the Omega OU-2 Plume, which is over 2000 feet from the PMC Site. *Id.* ¶¶ 19a(viii), 20e, Ex C.

**B.     GROUNDWATER FROM THE PMC SITE HAS NOT AND CANNOT INTERSECT THE OMEGA OU-2 PLUME**

**1.     Groundwater from the PMC Site and Omega OU-2 Plume Flows Parallel to Each Other Cannot Intersect/Commingle**

On information and belief, Plaintiffs vaguely allege that contaminants in the soil and in groundwater have migrated "in the same general direction as the regional groundwater flow."  5AC ¶ 367.  While Plaintiffs do not specify what direction that might be in the 5AC in its responses to discovery, they generally allege the groundwater direction near the PMC Site is to the southwest.  Hagstrom Decl., ¶¶5-8, Ex. C, Ferro Corp.'s Interrog. to Plaintiffs, No. 3-4, Ex. D, Plaintiffs' Supp. Resp. to Ferro Corp.'s Interrog. to Plaintiffs, No. 3-4; Ex. E, PMC Interrog. to Plaintiffs, No. 3, Ex. F, PMC Supp. Resp. to PMC's Interrog. to Plaintiffs, No. 3. Groundwater flow immediately adjacent to the PMC does trend in a southwest direction as it leaves the PMC Site.  Vogl Decl. ¶ 19a(vi).

However, the direction of groundwater flow from the PMC Site is deflected to the south - southeast when it runs into the Santa Fe Springs Anticline ("Anticline"), causing it to run parallel to the Omega OU-2 Plume.  Vogl Decl. ¶ 10a, 12f.  The Anticline is a 32-story high (350 feet) 2000 plus foot wide dome that lies between the PMC Site and the Omega OU-2 Plume.  *Id.*  The Anticline physically separates the Omega OU-2 Plume on its Western flank from

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

groundwater on its Eastern flank. *Id.* ¶ 12f, Exs. C, K, L, M, N. The Anticline causes the both the flow of the Omega OU-2 Plume and groundwater that may have originated at the PMC Site to bend and flow in a southerly direction maintaining their parallel paths. *Id.*

Groundwater flow direction on and near the PMC Site has been monitored since at least 1999. *Id.* ¶ 12f. Additional sampling has occurred since the early 1990s from other groundwater monitoring wells, downgradient to cross-gradient from the PMC Site, including the OFRP. *Id.* As depicted in the figure below, the Anticline caused the groundwater flow direction at the approximate center of the Omega OU-2 Plume, which is roughly at the crest of the Anticline, to turn to the south. *Id.* ¶ 19a (i)-(v). The Anticline separates both plumes, and causes groundwater flow direction to remain parallel. *Id.* ¶ 19a (i)-(v), Ex. C. The Omega OU-2 Plume migrates to and is influenced by the west side of the Anticline, while the groundwater from the PMC Site migrates on the east side of the Anticline. *Id.* ¶ 19a (v). A 2014 United States Geological Survey report recognizes this change in direction, noting that "The Trend of the OU2 plume….turns to the south at about the location of the Santa Fe Springs Anticline." *Id.* ¶ 19a (i)-(iv), Ex. N-M.

**2.      Low Permeability Sediments Also Prevent Commingling**

Additionally, the East Side of the Anticline, where the PMC Site sits, is characterized by soil types with low hydraulic conductivity, or permeability, in hydrogeology terms, hydraulic conductivity is characterized as a set of "K-values," which estimate the rate of migration in feet per day. Vogl Decl. ¶ 19a(vi), Ex. O. The higher the K-value, the higher level of hydraulic conductivity, and the faster groundwater will move through the sediment. *Id.* As depicted in the figure below, the K-values immediately southwest of the PMC Site are extremely low, meaning the soils on the east flank of the Anticline, which lies between the PMC Site and the Omega OU-2 Plume, are relatively impermeable. *Id.* ¶ 19a(vi), Ex O. The low permeability of the east flank of the Anticline inhibits groundwater flow and the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1 Anticline itself then causes the plume to "deflect" or change direction from

2 generally southwest to south.



Vogl. Decl., Ex. O.

## C. TEST DATA AT THE PMC SITE CONFIRMS CONTAMINATION FROM PMC HAS NOT AND WILL NOT INTERSECT OR COMMINGLE WITH THE OMEGA OU-2 PLUME

Groundwater monitoring data at and adjacent to the PMC Site demonstrates PMC Plume has migrated too short a distance offsite to possibly intersect, mix with, or commingle with the Omega OU-2 Plume. Vogl Decl., ¶ 10b. The PMC Plume did not and does not have a large enough chemical mass to have migrated far enough off site to commingle with or intersect the Omega OU-2 Plume. *Id.,* ¶ 19. Additionally, PMC has removed the source of contamination cutting off the source of contaminates for the PMC Plume. *Id.,* ¶ 21. PMC Site operations ceased in the early 1990s, and demolition activities were completed by November, 1993. *Id.,* ¶ 21. Additional actions, including capping the property with asphalt, were taken to prevent rainwater infiltration into subsurface soils, minimizing or eliminating the leaching of chemicals to groundwater. *Id.* ¶ 21, Ex. S.

PMC is conducting further remediation leading to the ultimate closure of the PMC Site, and has been proceeding under the supervision of the DTSC since it

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

entered into a 2006 Voluntary Cleanup Agreement. *Id.,* ¶ 22, Ex. F2. Extensive site investigation has been performed to evaluate the PMC Site, including the collection of over 800 samples for analysis of soil, soil gas, and groundwater, all in compliance with DTSC approved work plans. *Id.,* ¶ 22, Ex. F2.

The data collected pursuant to its DTSC monitored remediation demonstrates the PMC Plume could not have intersected or commingled with the Omega OU-2 Plume. The monitoring data shows that the PMC Plume is stable or shrinking in size, and stable or decreasing in concentration due to source removal and natural attenuation. *Id.,* ¶ 21, Ex. F2. This data, including data from groundwater monitoring wells on Bloomfield Avenue north of Telegraph Road showing non-detects provide additional support that the groundwater plume associated with the PMC Site is defined, and does not approach or threaten to impact the Omega OU-2 Plume. *Id.,* ¶¶ 12a-f; 23. These wells lie approximately 750-800 feet from the PMC Site. The edge of the Omega OU-2 Plume lies an additional 1000 to 1800 feet from these wells. *Id.* ¶ 23, Ex. C

The relatively low K-values in the areas immediately surrounding the PMC Site retard the migration of contaminants limiting the distance the contaminants can travel in soil or groundwater. As depicted on Ex. O above, the K values in the area immediately adjacent to the PMC Site are low, on the order of 2, 3 or 5 feet per day. *Id.* ¶¶ 19(v)-(vi). By contrast, the K values on the west side of the Anticline, in the flow path of the Omega OU-2 Plume, are magnitudes of order higher, ranging from 40 to 60 feet per day. *Id.* The relatively low K values surrounding the PMC Site substantially limit the distance that contaminants can travel so as to render any intersection of the plumes improbable.

The non-detect test results for PMC Marker Chemicals as well as TCE, PCE and 1,1 DCE, the Omega OU-2 Marker Chemicals, in downgradient monitoring wells located a short distance from the PMC Site confirm that the outer or maximum edge of the PMC Plume is more than 2000 feet distant from the outer

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1  edge of the Omega OU-2 Plume.  *Id.* ¶ 20e, Ex. C.

2  ### D. **PLAINTIFFS' 5AC MISREPRESENTS THE BOUNDARIES OF**

3  **THE PMC SITE AND THE OUTER EDGE OF THE OMEGA**

4  **OU-2 PLUME**

5  Plaintiffs inaccurately map the PMC Site on Ex. B of the 5AC in an effort to

6  misconstrue both the boundaries of the PMC Site and the areas of the Site that were

7  used for chemical processes or storage.  The true property boundaries as surveyed

8  and the areas actually used for processing and storage are shown on Ex. G below

9  and on Exs. H and I.  Vogl Decl., Ex. G, H, I.  In Ex. G the yellow boundary

10 illustrates the property line drawn by Plaintiffs which incorrectly enlarges the PMC

11 Site by including properties that are not and have never been owned or operated by

12 PMC.  *Id.* ¶ 15a-b.  Further, the actual operational boundaries, depicted by the red

13 border lines are the only areas of the PMC on which chemicals were used or stored.

14 *Id.*  While simple physical proximity can be a factor the more significant factor with

15 regard to commingling of groundwater is the Omega OU-2 Plume's upgradient

16 location, opposite the direction of the groundwater flow direction and the direction

17 the PMC Plume is traveling.  *Id.* ¶ 15a-b.  An additional error on 5AC-Ex. B depicts

18 the PMC Site as larger than it is.  The areas identified in pink shade on Ex. G show

19 areas that were historically used for parking or were vacant.  *Id.* ¶ 15a-b.  Vogl



27 Decl., Ex. G.

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

### 1.   Inaccurate Depiction of the Omega OU-2 Plume

The boundaries of the Omega OU-2 Plume as represented by Plaintiffs incorrectly show the east side of the Omega OU-2 Plume in close proximity to the PMC Site.  Vogl Decl. ¶ 16a-b.  As depicted in Ex. B to Plaintiffs' 5AC, the eastern edge of Omega OU-2 Plume boundary appears to be drawn using a mapping method that widens and lengthens the extent of the plume area to its maximum possible extent, closely bordering wells where no chemicals are found. *Id.* ¶ 16a-b, Ex. C.  This mapping method greatly overestimates the extent of the Omega OU-2 Plume.  A more accurate method would have been to interpolate the boundary based on the two outermost data points (wells with detected concentrations and wells with "Non-Detect" concentrations), draw the boundary halfway between the two data points, or draw the boundary just beyond the well with and actual detected concentration.  *Id.* ¶ 16b.  The dashed Omega OU-2 Plume boundary drawn by CH2MHill indicates that this boundary as drawn was inferred or estimated.  *Id.* ¶ 16b.  A more accurate depiction of the plume, is shown in the figure below.  The red dashed line represents the plume boundary, based on actual detections of contaminants in well locations shown.  *Id.*, Ex. C.  In between the Actual Boundary, and the boundary hypothesized by Plaintiffs, there is a large area where no data exists.  When taking into account the actual groundwater monitoring data, the boundary of the Omega OU-2 Plume is approximately 2000 feet way from the PMC Site, roughly 20 times further than depicted on Plaintiffs' 5AC Ex. B.

1
2
3
4
5
6
7
8
9
10

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067



Vogl. Decl., Ex. C.

11

### E.   PLAINTIFF HAS NOT AND CANNOT ESTABLISH THE EXISTENCE OF A PLAUSIBLE PATHWAY OR CAUSAL CONNECTION  BETWEEN THE PMC SITE  AND THE OMEGA OU-2 PLUME

12
13
14
15
16

Plaintiffs rely almost exclusively on unsupported allegations that contaminants the PMC Site "may intersect" the OU-2 Plume to support their claim that contamination from the PMC Site has migrated 1000s of feet through low permeability sediments and up and over a 350 foot high 2000 foot wide Anticline to commingle with the Omega OU-2 Plume.  Hagstrom Decl., ¶¶ 5-8, Ex. C, Ferro Corp.'s Interrog. to Plaintiffs, No. 3-4, Ex. D, Plaintiffs' Supp. Resp. to Ferro Corp.'s Interrog. to Plaintiffs, No. 3-4; Ex. E, PMC Interrog.to Plaintiffs, No. 3, Ex. F, PMC Supp. Resp. to PMC's Interrog. to Plaintiffs, No. 3.  Plaintiffs make these allegations despite data demonstrating contaminant concentrations in the PMC Plume become non-detect within a few hundred feet of the PMC Site, 1000s of feet short of the edge of the Omega OU-2 Plume; EPA's decision not to send PMC Notice Letters, the location of the PMC Site more than 2000 feet from the Omega

17
18
19
20
21
22
23
24
25
26
27
28

OU-2 Plume and the geologic barriers between PMC and the OU-2 Plume.

**1.    The PMC Plume has Migrated Too Short a Distance from the PMC Site to Encounter the Omega OU-2 Plume**

Contaminants in the PMC Plume have simply not migrated far enough off the PMC Site to intersect the Omega OU-2 Plume.  The past and ongoing removal and remedial work performed at the source areas of the PMC further serve to limit the distance the PMC Plume would have or could have traveled.  Vogl Decl. ¶ 12b. PMC Site operations ceased in the early 1990s and demolition activities were completed by November 1993.  *Id.* ¶ 21, Ex. S.  Additional engineering controls were implemented to prevent rainwater from infiltrating subsurface soil, minimizing or eliminating the leaching of chemicals in soil to groundwater.  *Id.*  It continues to implement further remedial measures under the supervision of DTSC.

The PMC Plume does not have a large enough chemical mass to have migrated a sufficient distance to intersect the Omega OU-2 Plume.  *Id.* ¶ 19(viii), Ex. J.  Groundwater monitoring data from wells instead on the PMC Site, and downgradient demonstrate that the PMC Plume, has migrated less than 1000 feet to the southwest, well short of the Omega OU-2 Plume.  *Id.*  Additionally, although solvents from upgradient sites have migrated to the PMC Site, the decreasing concentrations, which ultimately reach non-detect at the monitoring wells less than 450 feet off of the PMC Site in a downgradient direction show that TCE, PCE and 1,1 DCE have not migrated far enough off of the PMC Site to intersect or commingle with the Omega Ou-2 Plume which is several thousand feet from those wells.  *Id.* and Ex. I.

**2.    Distinct Chemical Fingerprints of the OU-2 and PMC Plumes Demonstrate No Mixing of the Plumes as Occurred**

The chemical fingerprints of the Omega OU-2 Plume and the PMC Plume show completely different compositions.  While the Omega OU-2 Plume primarily consists of the solvents, PCE, TCE and 1,1 DCE, these chemicals were not used at

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

the PMC Site, and did  not migrate more than 450 feet off of the PMC Site.  Vogl. Decl. ¶ 20a-f, Ex. I, Q-1 and Q-2.  By contrast, the PMC Plume is primarily characterized by benzene and naphthalene.  *Id.* ¶ 20g, Ex. Q-1, Q-2.  The completely different chemical makeup of the two plumes demonstrates mixing or commingling has not occurred.  *Id.*

### 3.   Parallel Groundwater Flows and Low Permeability Sediments Prevent Commingling

Groundwater from the PMC Site has not and will not intersect, mix with, or commingle with the Omega OU-2 Plume because the groundwater flow direction become parallel to each other before the groundwater from the PMC Site comes near the maximum outer edge of the Omega OU-2 Plume.  Vogl Decl. ¶¶ 10a, 12f, 19(i)-(v), Ex. C, M, N.  Shortly after groundwater travels off-the PMC Site, it is deflected by the Anticline to a south, south easterly direction, at which point it continues to run parallel to the Omega OU-2 Plume.  *Id.*  Just as the groundwater direction from the PMC Site is influenced by the Anticline, the Omega OU-2 Plume, which is on the western side of the Anticline opposite the PMC is similarly influenced.  *Id.* ¶ 19(iv).  As reported by the United States Geological Survey in 2014 the "trend of the OU-2 plume is inferred to parallel the shallow groundwater gradient, which trends southwest from the former Omega Facility, turns to the south at about the location of the [Anticline] crest, and then trends to the southeast…"  *Id*. The presence of this Anticline alters groundwater flow direction on both its east and west side and causes the groundwater  of the east side to flow parallel to the Omega OU-2 Plume rather than cross-gradient in the direction of the Omega OU-2 Plume.

Additionally, the very low conductivity and transmissibility of the sediments found between the PMC Site and the Omega OU-2 Plume inhibit the flow and direction of groundwater from the PMC Site, preventing the two plumes from intersecting, mixing or commingling.  The composition of the sediment at the edge of the PMC Site and on the eastern flank of the Anticline prevents the flow of

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1    groundwater from the PMC Site from traveling towards the Omega OU-2 Plume,

2    and from mixing with the Omega OU-2 Plume on the other side of the Anticline.

3    Vogl Decl. ¶ 19(vi), Ex. O. The low transmissibility of the sediment at the

4    boundary of the PMC Site also serves to substantially retard the migration of the

5    PMC Plume off site.  *Id*.  The areas immediately southwest and south of the PMC

6    Site have K-values of just 2 and 3 feet per day, moving towards areas with K-values

7    of 5 and 7.5 per day.  *Id*.  By contrast, on the other side of the Anticline, the K-

8    values are 40 and 60 feet per day.  *Id*.  The low conductivity not only influences the

9    direction of the groundwater flow, but also substantially retards its migration.

10   **V.    PMC CONCLUSION**

11          PMC has demonstrated through multiple lines of scientific evidence that

12   there is no causal connection or plausible migration pathway from the PMC Site to

13   the Omega OU-2 Plume, a conclusion supported by EPA and its consultant

14   CH2MHill.

15

16    DATED:  January 14, 2021              BASSI EDLIN HUIE & BLUM LLP

17

18                                  By:        /s/ Earl L. Hagström

19                                         Earl L. Hagström
                                           Daniel E. Trowbridge
20
                                           Attorneys for Defendants PMC Specialties
21                                         Group, Inc. and Ferro Corporation

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California  90067

## <u>CHRYSLER PROPERTY DEFENDANT UNION PACIFIC'S</u>
## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>
## <u>IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u>
## <u>RE: CERCLA LIABILITY</u>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

## I.    **INTRODUCTION**

In this action, Plaintiffs attempt to hold Union Pacific Railroad Company ("Union Pacific") responsible for the release of hazardous substances that occurred in connection with Chrysler's operations <u>after</u> Union Pacific[1] sold the property leased by Chrysler (the "Chrysler Property")[2] in January 1974.  Plaintiffs seek contribution (First Cause of Action) and declaratory relief (Third Cause of Action) under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") against Union Pacific on the alleged basis that Plaintiffs have and will incur costs to address groundwater contamination originating from the Chrysler Property.  *See, e.g.*, Plaintiffs' Fifth Amended Complaint ("FAC") ¶¶ 9, 138 (Dkt. 526).  Partial summary judgment should be granted in favor of Union Pacific because Plaintiffs have not – and cannot – demonstrate that the Chrysler Property was a source of contamination impacting groundwater when Union Pacific owned or operated on the property.  In other words, Union Pacific is not one of the categories subject to the liability provisions of CERCLA section 107(a) (also known as a "potentially responsible party" or "PRP") with respect to the Chrysler Property.

To prevail on their CERCLA claims, Plaintiffs concede they must establish a release of hazardous substances from a defendant's site impacted the regional

---

[1] Unless otherwise noted, Union Pacific and its predecessors shall be collectively referred to as "Union Pacific."

[2] As used herein, "Chrysler Property" is defined as the real property located at 12020-12310 Slauson Avenue in Santa Fe Springs, California 90670 (designated by the Los Angeles County Assessor's office as Assessor Identification Numbers ["AINs"] 8168-002-402, 8168-002-412 and 8168-002-417); 12012-12128 Burke Street in Santa Fe Springs, California 90670 (designated by AINs 8168-002-403 to 405, 8168-002-407, 8168-002-418, and 8168-002-419); and 12103 Burke Street in Santa Fe Springs, California 90670 (designated by AINs 8168-002-803 to 804).

groundwater in OU-2.[3]  (Dkt. 615, n. 2).[4]  Thus, a mere release to the "environment" or soils is insufficient to confer CERCLA liability upon a defendant if such release did not impact groundwater in OU-2.  Therefore, Union Pacific cannot be liable for any CERCLA response costs absent a release of hazardous substances during Union Pacific's ownership of or operation on the Chrysler Property which impacted OU-2.  *See* CERCLA, 42 U.S.C. § 9607(a)(1), (2).  Plaintiffs cannot make such a showing.  Indeed, Plaintiffs cannot even establish that a release of hazardous substances to the environment occurred prior to 1974.

A.   <u>**UNION PACIFIC DID NOT OWN THE CHRYSLER PROPERTY AT THE TIME OF DISPOSAL OF ANY HAZARDOUS SUBSTANCES**</u>

The contemporaneous site investigations found, and the Los Angeles Regional Water Quality Control Board ("Regional Water Board" or "RWQCB") – the state regulatory agency with oversight responsibility of investigative activities at the Chrysler Property and other regional facilities – agreed, that the only known source of *potential* groundwater contamination originating from the Chrysler Property was a 750-gallon clarifier (the "Chrysler Clarifier") used in connection with Chrysler's Body Works building.  SUF. No. 111.  The Chrysler Clarifier was not installed until 1983 at the earliest.  Union Pacific sold the Chrysler Property in January 1974, almost a full decade before Chrysler installed the Chrysler Clarifier.  *See* SUF No. 113.  There is no other evidence of any disposal of hazardous substances at the Chrysler Property which potentially impacted OU-2

[3] As used herein, Operable Unit 2 (or "OU-2") refers to the contamination in groundwater generally downgradient and originating from the former Omega Chemical Corporation facility in Whittier, California, which has commingled with other sources, and includes those portions of the groundwater plume underlying the Chrysler Property.

[4] In the May 25, 2017, Parties' Joint Status Conference Report, Plaintiffs asserted that "whether hazardous substance releases from Defendants' respective source properties have contaminated regional groundwater in impacted OU2…should be litigated during the current phase."  (Dkt. 615, n. 2).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

groundwater.  Nor is there any evidence of any disposal of hazardous substances to OU-2 groundwater when Union Pacific owned the Chrysler Property.  Indeed, there is no evidence of any release of hazardous substances to the environment from the Chrysler Property prior to 1974.

## B. UNION PACIFIC DID NOT OPERATE THE CHRYSLER PROPERTY AT THE TIME OF DISPOSAL OF ANY HAZARDOUS SUBSTANCES

Furthermore, there is no evidence that Union Pacific ever operated on the actual Chrysler Property, other than on a right-of-way that went through a portion of the property.  SUF No. 107.  However, based on historical maps and aerial photographs, the right-of-way was removed by the early 1960s prior to the construction of buildings on the site.  SUF No. 108.  There is no evidence that any hazardous substances were disposed of in connection with the operation of the right-of-way.

## C. PALMTREE ACQUISITION CORPORATION, AS SUCCESSOR IN INTEREST TO CATELLUS DEVELOPMENT CORPORATION, HAS ACKNOWLEDGED LIABILITY FOR THE DISPOSAL OF HAZARDOUS SUBSTANCES AT THE CHRYSLER PROPERTY

In contrast to Union Pacific, which has never been identified by the United States Environmental Protection Agency ("EPA") or any State regulatory agency as a PRP at the Chrysler Property, defendant Palmtree Acquisition Corporation ("Palmtree") has acknowledged its liability under CERCLA for releases of hazardous substances at the Chrysler Property.  In response to EPA's General Notice Letter and Request for Information for the Omega Chemical Superfund Site dated May 15, 2009, Palmtree – in its capacity as successor in interest to Catellus Development Corporation ("Catellus"), acknowledged that the source of contamination on the Chrysler Property was the Chrysler Clarifier which Chrysler,

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

34                         MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

"a former Catellus tenant," operated on the Chrysler Property.  Banks Decl., Exh. 33, p. 213 [Palmtree EPA Response].  Moreover, Palmtree has stipulated to certain facts regarding liability under CERCLA Section 113 for this phase.  *See* Plaintiffs' and Defendant Palmtree Acquisition Corporation's Stipulation of Undisputed Facts Re Liability Under CERCLA Section 113, 42 U.S.C. § 9613 (Dkt. 678) ("Palmtree Liability Stipulation").  In the Palmtree Liability Stipulation, Palmtree admitted that sometime during its predecessor's ownership of the Chrysler Property "in connection with operations conducted at the Chrysler Property," there was a disposal of hazardous substances.  *Id*. ¶ 8.  Thus, notwithstanding Union Pacific's lack of liability at the Chrysler Property, at least one viable PRP will retain responsibility for any share of liability ultimately assigned to this facility.

In sum, because Plaintiffs have not and cannot show that Union Pacific owned or operated on the Chrysler Property when there was release of hazardous substances, let alone a release impacting the regional groundwater in OU-2, Plaintiffs' CERCLA claims fail as a matter of law and partial summary judgment should be granted in Union Pacific's favor.

## II.   STATEMENT OF FACTS

### A.   THE CHRYSLER PROPERTY LOCATION

The Chrysler Property was formerly known as 12140 Slauson Avenue, Santa Fe Springs, California.  FAC ¶ 138.  The original Chrysler Property was subdivided into four properties identified as the LaSalle Property, North Central Property, Multitenant Property, and the Central Property.  FAC ¶ 138, Declaration of Sedina L. Banks ("Banks Decl.,"), Exh. 16 [Map].   For site closure purposes, the Regional Water Board treated each of these four parcels separately.  The Central Property, also referred to by the EPA as "Site A," is located at approximately 12128 Burke Street, Santa Fe Springs, CA.  Banks Decl., Exh. 34, p. 219, [Remedial Investigation/Feasibility Study ("RI/FS")].  Even though the FAC includes all four properties in the definition of the Chrysler Property (FAC ¶ 138), EPA has only

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1  identified the Central Property (Site A) as a potential source of groundwater

2  contamination.   Banks Decl., Exh. 34, pp. 217-18 [RI/FS].

3  **B.    UNION PACIFIC'S OWNERSHIP OF THE CHRYSLER**

4  **PROPERTY**

5  Union Pacific acquired the various parcels that comprise the approximately

6  40-acre Chrysler Property through a series of transactions from 1888 through 1967.

7  SUF No. 100.  On January 21, 1974, Union Pacific's predecessor, Southern Pacific

8  Transportation Company, transferred the entire Chrysler Property to Southern

9  Pacific Company (formerly known as S.P. Inc.) ("New Southern Pacific

10  Company").  SUF No. 101.  New Southern Pacific Company is not a predecessor of

11  Union Pacific.  SUF No. 102.  Therefore, Union Pacific did not own the Chrysler

12  Property after January 21, 1974.

13  **C.    CHRYSLER'S OPERATIONS ON THE CHRYSLER**

14  **PROPERTY**

15  Chrysler conducted auto preparation operations on the Chrysler Property

16  from in or around 1965 through 1988.  SUF. No. 106.  The majority of Chrysler's

17  operations were conducted on the Central Property.  Banks Decl., Exh. 21, p. 167

18  [Final Converse Report].  Chrysler's operations on the site included "body work,

19  mechanical work, tune-up, front-end alignment, emissions control testing, painting,

20  washing, detailing, and road performance tests."  Banks Decl., Exh. 32, p. 209

21  [Closure Letter].  Based on aerial photographs, Chrysler's operations expanded in

22  the 1980s with the construction of new infrastructure on the Chrysler Property.

23  Compare Banks Decl., Exhs. 14 and 15 [Aerial Photos].

24  There is no evidence that Union Pacific ever operated on the actual Chrysler

25  Property, other than on a right-of-way that went through a portion of the property.

26  SUF No. 107.  The right-of-way was removed sometime between 1962 and 1964

27  before any buildings were constructed on the Chrysler Property.   SUF No. 108.

28

**D.    DISCOVERY OF CONTAMINATION ON THE CHRYSLER**
**PROPERTY AFTER TERMINATION OF CHRYSLER'S**
**TENANCY**

   **1.    The Source of Contamination on the Chrysler Property is a**
   **750-gallon Clarifier Operated by Chrysler in Connection**
   **with Chrysler's Body Works Building**

In 1988, Chrysler terminated its leasehold of the Chrysler Property and demolished all buildings and removed all structures, including clarifiers.  SUF No. 109.  Chrysler contracted with Colorado Pacific Inc. to remove the tanks and clarifiers in 1988.  Banks Decl., Exh. 17, p. 140 [Tank Removal Report]. Petroleum Industry Consultants provided geologic oversight to monitor the tank removal, excavation and draft a tank removal report.  *Id*.  The tank removal report, dated March 31, 1988, depicts the locations and sizes of the removed clarifiers (the "Tank Removal Report").  *Id*.

After the demolition of all of the buildings, Catellus – the then-owner of the Chrysler Property – contracted with Converse Environmental West ("Converse") to conduct an environmental investigation of the Chrysler Property prior to redevelopment.  Banks Decl., Exh. 19, p. 155 [Catellus Letter].  Preliminary site investigations uncovered soil contamination beneath the area of the Chrysler Clarifier – a former 750-gallon clarifier "used by Chrysler in conjunction with Chrysler's auto body repair shop" referred to as the "Body Works Building." Banks Decl., Exhs. 18, p. 147 and 21, p. 161 [Converse Reports].   Upon the discovery of the visibly stained soil, "[i]n 1990, Converse Consultants excavated approximately 1,000 cubic yards of impacted soil from the former location of CL-2" (the Chrysler Clarifier).  Banks Decl., Exhs. 32, p. 209 [Closure Letter] and 21, pp. 169-70 [Converse Report].

In a report dated December 28, 1990, Converse presented Catellus with the preliminary results of its soil and groundwater investigation (the "Preliminary

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Converse Report"). Banks Decl., Exh. 18 [Preliminary Converse Report]. The Preliminary Converse Report confirmed that the Chrysler Clarifier was a source of volatile organic compound ("VOC") contamination. *Id.*

Based on the results from the Preliminary Converse Report, in January of 1991, Catellus notified the Regional Water Board and other regulatory agencies of the discovery of "stained soils directly beneath and extending outward from the site of a former underground concrete 'clarifier' installed and operated by Chrysler." Banks Decl., Exhs. 19, p. 155 and 20, p. 158 [Catellus Letters]. Catellus included with its notice letter a copy of the Preliminary Converse Report. *See, e.g.*, Banks Decl., Exh. 20, p. 158 [Catellus Letter].

Converse continued "to investigate the source(s) and extent of soil and ground water contamination identified beneath and in the vicinity of the 750 gallon clarifier, previously used by Chrysler at their Body Works Building." Banks Decl., Exh. 21, p. 161 [Final Converse Report]. Converse's findings are discussed in its Final Report – Soil and Ground Water Investigation dated August 29, 1991 (the "Final Converse Report"). *Id.* The Final Converse Report concluded that there was contamination "in the soil beneath and extending outward from the location of the removed [Chrysler] clarifier." *Id.*, p. 171.

In the early to mid-1990's, Catellus engaged Dames & Moore to conduct an additional site investigation of the Central Property to obtain site closure. Banks Decl., Exh. 24 [Phase II]. In 1996, Dames & Moore prepared a Phase II Investigation of the Central Property portion of the Chrysler Property. *Id.* In its final Phase II Investigation Report dated September 6, 1996, Dames & Moore concluded "[t]here is no indication that the groundwater contamination results from an onsite source and it is our opinion that the VOCs detected in onsite monitoring wells are due to offsite sources." *Id.*, p. 187.

Based on the prior site investigations, Catellus requested a "no further action" determination from the Regional Water Board for the Chrysler Property on

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

December 14, 1998.  Banks Decl., Exh. 26 [Closure Request].  In the closure request, Catellus stated that the Chrysler Property "had been impacted by a leaking clarifier at a facility operated by Chrysler Nu-Car Prep." *Id*., p. 193.  The Regional Water Board granted closure for the Central Property portion of the Chrysler Property on August 6, 1999.  Banks Decl., Exh. 32 [Closure Letter].  In its "no further action" letter, the Regional Water Board identified the Chrysler Clarifier as the source of the contamination on the Central Property. *Id*., p. 209.

At noted above, subsequently, there has been no evidence of any other potential sources of contamination on the Chrysler Property.  Moreover, in response to EPA's General Notice Letter and Request for Information for the Omega Chemical Superfund Site dated May 15, 2009, defendant Palmtree, as successor to Catellus, acknowledged the source of contamination on the Chrysler Property was the Chrysler Clarifier which Chrysler, "a former Catellus tenant," operated on the Property.  Banks Decl., Exh. 33, p. 213 [Palmtree EPA Response].  Palmtree also stipulated to certain facts regarding liability under CERCLA Section 113 for this phase and admitted that sometime during its predecessor's ownership of the Chrysler Property "in connection with operations conducted at the Chrysler Property," there was a disposal of hazardous substances.  Palmtree Liability Stipulation ¶ 8 (Dkt. 678).

## 2. **Chrysler Installed and Operated the Chrysler Clarifier after Union Pacific Sold the Chrysler Property**

The conclusion from the previous site investigations, Catellus' notice letters to the regulatory agencies, the Regional Water Board's "no further action" letter and Palmtree's May 15, 2009 letter to EPA is that the sole source of the contamination discovered on the Chrysler Property was the 750-gallon Chrysler Clarifier operated by Chrysler during it tenancy. *See, e.g*., SUF No. 111.  The location of the Chrysler Clarifier is depicted in several of the historical site investigation reports as being in the former Chrysler Body Works building.   SUF

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

No. 112. Based on aerial photographs and contemporaneous documents, Union Pacific did not own the Chrysler Property when Chrysler installed and operated the Chrysler Clarifier.

        *a.*      *<u>Aerial Photographs Confirm that the Chrysler Clarifier was Installed After Union Pacific Sold the Chrysler Property</u>*

      The Preliminary Converse Report and Final Converse Report depict the location of the Chrysler Clarifier as being under an addition or overhang of the Body Works building. Banks Decl., Exhs. 18, p. 152 and 21, p. 174 [Converse Reports]; Ruiz Decl., ¶¶ 5 & 6. Figure 5 of the Preliminary Converse Report and Figure 10 of the Final Converse Report are identical aerial photographs with handwritten notations depicting the location of the Chrysler Clarifier. *Id.*



      The Preliminary Converse Report explains that the "clarifier location was confirmed by a licensed land surveyor who surveyed the area where soil was affected by the hydrocarbon compounds and superimposed the location" on the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

aerial photograph (i.e., Figure 5 in the Preliminary Converse Report and Figure 10 in the Final Converse Report).  Banks Decl., Exh. 18, pp. 147-48 [Preliminary Converse Report].  The location of the Chrysler Clarifier as being within the Body Works building is consistent with the Tank Removal Report's general depiction of its location.  Banks Decl., Exh. 17, p. 145 [Tank Removal Report].

Figure 10 of the Final Converse Report shows that there was an addition or overhang installed on Chrysler's Body Works building which housed the 750-gallon clarifier.  Banks Decl., Exh. 21, p. 174 [Final Converse Report]; Ruiz Decl.,



¶ 5.   Historical aerial photographs of the Chrysler Property show that Chrysler did not install this addition to the Body Works building until sometime between 1983 and 1987.  Banks Decl., Exhs. 14 and 15 [Aerial Photos]; Ruiz Decl., ¶¶ 11-16. An aerial photograph from 1983 shows that the Body Works building does not have the addition.  Banks Decl., Exh. 14 [Aerial Photo], Ruiz Decl., ¶ 13.  In contrast, an aerial photograph from 1987 shows the addition to the Body Works building as depicted in Figure 10 of the Final Converse Report.  *Cf.* Banks Decl., Exh. 15 [Aerial Photo] to Banks Decl., Exh. 21, p. 174 [Final Converse Report], Ruiz Decl., ¶ 15.

For all the foregoing reasons, there is no basis to dispute that the 750-gallon

Chrysler Clarifier was not present until years after Union Pacific sold the Chrysler Property.  SUF No. 113.  The aerial photos also show that during this time period Chrysler expanded its operations by adding on to the existing buildings at the Chrysler Property.

> b.  *Site Plans Approved by the Los Angeles County Sanitation District on October 16, 1973 Confirm the Chrysler Clarifier was Not Installed on the Chrysler Property at that Time*

On October 16, 1973, the Los Angeles County Sanitation District approved detailed site plans in connection with Chrysler's Industrial Wastewater Discharge Permit No. 787.  Banks Decl., Exhs. 8 [Site Plan Map] and 7 [Approval Letter].  The clarifier associated with Permit No. 987 was for a "new car wash."  Banks Decl., Exh. 7, pp. 105 [Approval Letter].  Although we do not know the precise date the clarifier was installed, there is a March 19, 1974 letter to the Santa Fe Springs Building Department which discusses that the wrong-sized drain line was installed for the clarifier for the carwash.  Banks Decl., Exh. 12, p. 123 [Letter].  As this is discussing ongoing construction issues for the clarifier, the letter indicates that the clarifier was not installed or operational until after Union Pacific sold the Chrysler Property.

The approved plans associated with Permit No. 987 also depict the location of all current and proposed clarifiers and other structures on the Chrysler Property.  Banks Decl., Exh. 8 [Site Plan Map].  The plans do not depict the Chrysler Clarifier.  *Id*.; Ruiz Decl., ¶¶ 7 & 8.

> c.  *Site Plans Approved by the Los Angeles County Sanitation District on January 31, 1974 Confirm the Chrysler Clarifier was Not Installed During Union Pacific's Ownership of the Chrysler Property*

On January 31, 1974, the Los Angeles County Sanitation District approved

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1

2

3

4

5

6

detailed site plans in connection with Chrysler's Industrial Wastewater Discharge Permit Nos. 926, 927 and 928.  Banks Decl., Exhs. 10 [Plan Approval], 11 [Site Plan Map] and 13, p. 126 [Map].  The approved plans depict the location of all current and proposed clarifiers and other structures on the Chrysler Property.  Banks Decl., Exhs. 11 [Site Plan Map] and 13, p. 126 [Map]; Ruiz Decl., ¶¶ 7 & 8.  The plans are marked as approved as of January 31, 1974 – 10 days after Union



Pacific sold the Chrysler Property.  Banks Decl., Exh. 11 [Site Plan Map]; Ruiz Decl., ¶ 7.  The plans do not show a 750-gallon clarifier (or any sized clarifier) located in or even adjacent to the Body Works building at that time.  Banks Decl., Exh. 11 [Site Plan Map]; Ruiz Decl., ¶¶ 7-10.

The County of Los Angeles did not issue the permits for the clarifiers associated with Industrial Wastewater Discharge Permit Nos. 926, 927 and 928 until April 2, 1974 – several months after Union Pacific sold the Chrysler Property.  Banks Decl., Exh. 13 [Permit Approval].

1
2
3
4

**E.    NO EVIDENCE OF A RELEASE OF HAZARDOUS
       SUBSTANCES IMPACTING GROUNDWATER EXISTS FROM
       EITHER THE NORTH CENTRAL PROPERTY, LASALLE
       PROPERTY OR MULTITENANT PROPERTY**

5
6
7
8
9
10
11
12

Even though Plaintiffs include the North Central Property, LaSalle Property, and Multitenant Property in its definition of the Chrysler Property in the FAC, there is no evidence that any release of hazardous substances impacting groundwater originated from these properties.  Banks Decl., Exh. 34, p. 217-18 [RI/FS].  Both EPA and the Regional Water Board identify the only potential source of groundwater contamination on the Chrysler Property as originating from the Central Property (aka "Site A").  Banks Decl., Exh. 34, p. 217-18 [RI/FS] and SUF No. 111.

13
14
15
16

Dames & Moore conducted site investigations of the North Central Property, LaSalle Property, and Multitenant Property on behalf of Catellus.  Banks Decl., Exhs. 22, 23, and 25 [Site Investigations].  These investigations concluded that the properties were not a source of soil or groundwater contamination:

17
18
19

- North Central Property:  "an onsite source [of VOCs] has not been identified."  Banks Decl., Exh. 25, p. 191 [North Central Property Assessment].

20
21
22
23

- LaSalle Property:  "former site features located on the LaSalle property (such as the clarifier) have not adversely impacted soil and groundwater."  Banks Decl., Exh. 22, p. 176 [LaSalle Property Assessment].

24
25
26

- Multitenant Property:  "No evidence for an onsite source of VOCs has been detected."  Banks Decl., Exh. 23, p. 184 [Multitenant Property Assessment].

27
28

Importantly, the Regional Water Board relied on these assessments in granting complete "no further action" status for the North Central Property, LaSalle

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Property, and Multitenant Property.  Banks Decl., Exhs. 27, 28, and 30 [Closure Letters].  In its no further action determinations, the Regional Water Board also did not identify any of these properties as being even a potential source of groundwater contamination.  *Id*.

The Central Property was the only property the Regional Water Board identified as a potential source of groundwater contamination (emanating from the Chrysler Clarifier).  Banks Decl., Exh. 32 [Closure Letter].  The Regional Water Board, however, also recognized that data "indicated an upgradient groundwater contamination plume was migrating on-site."  *Id*., p. 210.

## F.   NO REGULATORY AGENCY HAS IDENTIFIED UNION PACIFIC AS A POTENTIALLY RESPONSIBLE PARTY

No regulatory agency has identified Union Pacific as a PRP for any contamination on the Chrysler Property.  Throughout its oversight of the Chrysler Property, the Regional Water Board never identified Union Pacific as responsible for the contamination.  Likewise, EPA never identified Union Pacific as a potentially responsible party under CERCLA with respect to the Chrysler Property. FAC ¶ 153.

As discussed by Plaintiffs in the FAC, "EPA evaluated many of the Defendants in connection with the OU-2 Facility and has concluded that certain of them are potentially responsible parties."  FAC ¶ 4.  Plaintiffs have intimated both in the FAC and their Opposition to Defendants' Motion for Summary Judgment Re: Statute of Limitations (the "SOL Opp.") that they relied on EPA's assessment of the potentially responsible parties in determining who is liable and who to name in this action. *See, e.g*., FAC ¶¶ 4, 5; SOL Opp., p. 1, ln. 26-p. 2, ln.5; p. 10, ln. 25-26; p. 17, ln. 28-p.18, ln. 3 (Dkt. 770).  With respect to the Chrysler Property, however, EPA has only identified Chrysler, Palmtree, and Burke Street as potentially responsible parties for the "OU-2 Facility groundwater contamination." FAC ¶ 153.  EPA has never identified Union Pacific as a potentially responsible

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1   party.  *See* FAC ¶ 153.

2   **III.    ARGUMENT**

3       **A.    UNION PACIFIC IS NOT A CERCLA POTENTIALLY**

4            **RESPONSIBLE PARTY AND IS THEREFORE ENTITLED TO**

5            **PARTIAL SUMMARY JUDGMENT**

6           There is no evidence that Union Pacific is a CERCLA "potentially

7   responsible party" as required to establish liability under CERCLA for the Chrysler

8   Property.  To prevail on its claims for contribution (First Claim) and declaratory

9   relief (Third Claim) under CERCLA, Plaintiffs must prove that (1) the Chrysler

10  Property is a facility, (2) there was a release or threatened release of hazardous

11  substances at or from the Chrysler Property impacting groundwater in OU2, (3) that

12  the release or threatened release caused Plaintiffs to incur response costs that were

13  necessary and consistent with the National Contingency Plan and (4) Union Pacific

14  is a "responsible party" subject to CERCLA liability under 42 U.S.C. Section

15  9607(a).  *Carson Harbor Village Ltd. v. Unocal Corp.*, 270 F.3d 863, 870-71 (9th

16  Cir. 2001); *see also* (Dkt. 615, n. 2).  Without conceding any of the foregoing

17  elements, specifically, the Plaintiffs cannot prove the fourth element.[5]  The

18  uncontroverted evidence demonstrates that Union Pacific is not a responsible party

19  subject to CERCLA liability and, therefore, is entitled to partial summary

20  judgment.

21          CERCLA, Section 9607(a), sets out the "four classes of persons subject to

22  the liability provisions."  *Id.* at 871 (citations omitted).  A CERCLA "responsible

23  party" includes (1) any current "owner and operator" of the site at issue and (2)

24  "any person who at the time of disposal of any hazardous substance owned or

25  
_____

26  [5] Whether Plaintiffs incurred response costs that were necessary and consistent with
    the National Contingency Plan is not at issue in this phase of the litigation.  *See*
    Parties' Joint Status Conference Report filed on April 21, 2017 (Dkt. 600), the
27  Parties' Supplemental Joint Status Conference Report filed on April 26, 2017 (Dkt.
    602), and the Parties' Joint Status Conference Report filed on May 22, 2017 (Dkt.
28  615).  Union Pacific does not admit that Plaintiffs can satisfy this element.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

operated any facility at which such hazardous substances were disposed of." CERCLA, 42 U.S.C. § 9607(a)(1), (2).[6]  In the FAC, Plaintiffs allege that Union Pacific is a CERCLA responsible party because it is a "current or previous 'owner' or 'operator,'" of the Chrysler Property.  FAC ¶ 72.  As discussed below, Union Pacific does not fall within either of these categories.

### 1.  Union Pacific is Not a Current Owner of the Chrysler Property

Plaintiffs admit that Union Pacific does not currently own the Chrysler Property.  SUF No. 103.  Therefore, Union Pacific cannot be held liable as a "current owner" of the Chrysler Property.

### 2.  Union Pacific is Not a Past or Current Operator of the Chrysler Property At the Time of Disposal of Any Hazardous Substance

In discovery responses, Plaintiffs have alleged that Union Pacific and/or its predecessors may be current operators of the Chrysler Property or operators of the Chrysler Property at the time hazardous substances were disposed of based on the alleged presence of railroad tracks "at or near" the Chrysler Property and that "a railroad right of way may have crossed a portion" of the Chrysler Property that Union Pacific operated.  Banks Decl., Exh. 36, pp. 240-42 [Plaintiffs' RFA Response].  Neither allegation supports finding Union Pacific liable as a past or current operator of the Chrysler Property at the time of disposal of any hazardous substance.

The CERCLA "facility" or site at issue is the Chrysler Property.  FAC ¶¶ 72 and 138.  Accordingly, to hold Union Pacific liable as a responsible party, Plaintiffs must prove that Union Pacific currently operates the Chrysler Property or operated

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

---

[6] Responsible parties also include any "arrangers" or "transporters."  CERCLA, 42 U.S.C. § 9607(a)(3),(4).  Plaintiffs have not alleged that Union Pacific is an "arranger" or "transporter."  FAC ¶ 72.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

the Chrysler Property at the time of disposal of any hazardous substances.  42 U.S.C. § 9607(a)(1), (2).  It is immaterial whether Union Pacific operates or ever operated railroad tracks "near" the Chrysler Property.  Therefore, alleged operation of railroad tracks near the Chrysler Property cannot be grounds for Union Pacific's CERCLA liability.

The only historical tracks of any kind "at" the Chrysler Property was a right-of-way that was removed at the latest approximately six decades ago.  SUF No. 108.  Historical maps from the early 1960s and aerial photographs show that the right-of-way was removed between 1962 and 1964, prior to the construction of buildings on the Chrysler Property.  Banks Decl., Exhs. 2 [1964 Map], 5 [1967 Map], 3 and 4 [Aerial Photos], Ruiz Decl., ¶¶ 17-22.  As the right-of-way is currently non-operational, Union Pacific cannot be a "current" operator of the Chrysler Property.

Finally, there is absolutely no evidence that Union Pacific's past operation of the right-of-way caused a disposal of any hazardous substances.  The right-of-way was not even in existence at the time that Chrysler conducted its operations on the Chrysler Property.  Under CERCLA, in order to be liable as an "operator" an entity "must manage, direct or conduct operations specifically relating to pollution, that is, operations having to do with the leakage or disposal of the hazardous waste."  *U.S. v. Bestfoods*, 524 U.S. 51, 66-67 (1998).  Since there is no evidence that Union Pacific's operations of the right-of-way caused the disposal of any hazardous substances, Union Pacific cannot be liable as a "past operator" of the Chrysler Property.  *Id.*; *see also Redevelopment Agency of the City of Stockton v. BNSF Ry. Co.*, 643 F.3d 668, 680 (9th Cir. 2011) (holding that railroads with right-of-way over contaminated property were not operators as defined by CERCLA because they did not conduct operations related to the contamination).

For the foregoing reasons, Union Pacific cannot be held liable as a past or present operator of the Chrysler Property.

3.    **There is No Evidence that Union Pacific Owned the Chrysler Property at the Time of Disposal of any Hazardous Substance**

The scope of potential liability for a past owner of a property is "more limited" than that of a current owner. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985). Liability under CERCLA for past ownership does not extend to all former owners of a facility. Liability applies only to those former owners who owned the facility "at the time of disposal of any hazardous substance." *Id.*; 42 U.S.C. § 9607(a)(2). Here, because Plaintiffs are seeking contribution for regional groundwater contamination, the hazardous substances must also have impacted the groundwater. There is no evidence that Union Pacific or its predecessors owned the Chrysler Property at the time of disposal of any hazardous substance that have impacted groundwater or otherwise.

CERCLA, 42 U.S.C. § 9601(29), defines "disposal" in reference to the definition in the Solid Waste Disposal Act, which states, in pertinent part, "[t]he term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land or water so that such ... hazardous waste ... may enter the environment." 42 U.S.C. § 6903(3). Thus, to support a "*prima facie*" case against Union Pacific, Plaintiffs must "establish that a spill, discharge, leak, etc., occurred at the time [Union Pacific] controlled the site." *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997) (upholding grant of summary judgment in defendants' favor because plaintiff did not establish that a disposal occurred during defendants' ownership of the property); *Carson Harbor Village Ltd.*, 270 F.3d at 875 (to hold defendant liable as a past owner, "there must have been a 'discharge, deposit, injection, dumping, spilling, leaking, or placing' of contaminants on the property during their ownership").

While Union Pacific owned the Chrysler Property, there is no evidence that

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Union Pacific owned the Chrysler Property "at the time of disposal of any hazardous substance" such that Union Pacific may be classified as a CERCLA "responsible party."  CERCLA, 42 U.S.C. § 9607(a)(2); *Carson Harbor Village Ltd.*, 270 F.3d at 875.  Plaintiffs admit there has been ample time to take discovery, asserting to the Court: "Plaintiffs have engaged in extensive discovery concerning Defendants' liability and have done so at great effort and expense, including propounding or responding to over 150 interrogatories, several hundred document requests and taking more than three dozen depositions."  Joint Status Conference Statement, p. 4, ln. 12-15 (Dkt. 731).  None of these efforts have revealed evidence that Union Pacific should be liable as a past owner.[7]

Again, the only *potential*[8] source of groundwater contamination originating from the Chrysler Property is from the Chrysler Clarifier.  SUF No. 111.  As

_____

[7] In "Plaintiffs' Responses to Defendant Union Pacific Railroad Company's First Set of Interrogatories," while Plaintiffs describe various physical features on the Chrysler Property (such as clarifiers, drainage features, tanks), they fail to identify a single release of hazardous substances to the environment during Union Pacific's ownership of the Chrysler Property, much less a release that impacted groundwater. Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, *answers to interrogatories*, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (emphasis added.) The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

[8] Union Pacific does not admit that any groundwater contamination originated from the Chrysler Property.  In 1996, Dames & Moore prepared a Phase II Investigation of the Central Property portion of the Chrysler Property.  In its final Phase II Investigation Report dated September 6, 1996, Dames & Moore concluded "[t]here is no indication that the groundwater contamination results from an onsite source and it is our opinion that the VOCs detected in onsite monitoring wells are due to offsite sources."  Banks Decl., Exh. 24, p. 187 (D&M Phase II – Central Property UPRR127878)  Whether groundwater contamination originated from the Chrysler Clarifier is immaterial, because Union Pacific sold the Chrysler Property before the Chrysler Clarifier was installed.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

discussed above, at the time that Union Pacific sold the Chrysler Property on January 21, 1974, the Chrysler Clarifier was not yet installed on the Chrysler Property. Therefore, Union Pacific did not and could not have owned the Chrysler Property "at the time of disposal of any hazardous substance."

There is no other evidence showing that a disposal of any hazardous substances occurred during Union Pacific's ownership of the Chrysler Property or that such disposal has impacted groundwater. Without such evidence, Plaintiffs simply cannot make a prima facie showing that Union Pacific is a "potentially responsible party" under CERCLA. *Carson Harbor Village Ltd.*, 270 F.3d at 875; *ABB Indus. Sys., Inc.,* 120 F.3d at 356. For the foregoing reasons, Union Pacific cannot be held liable as a past owner of the Chrysler Property.

## IV. **CONCLUSION**

As set forth above, Plaintiffs have offered no evidence whatsoever that hazardous substances were released to the environment at the Chrysler Property during Union Pacific's ownership or operation of the Chrysler Property, let alone that any such alleged release impacted groundwater. Rather, the only known source of potential groundwater contamination from the Chrysler Property originated from the Chrysler Clarifier, which was indisputably installed <u>after</u> Union Pacific sold the property. Therefore, there is no evidentiary basis to support an allegation that hazardous substances impacting groundwater occurred during Union Pacific's ownership or operation of the Chrysler Property. As such, Union Pacific is not and cannot be deemed a responsible party under CERCLA. For these reasons, Union

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES, MSJS, AND PS&AS ISO MSJS

1  Pacific's motion for partial summary judgment as to Plaintiffs' First and Third

2  Causes of action with respect to the Chrysler Property should be granted.

3

4    DATED: January 14, 2021      GREENBERG GLUSKER FIELDS
                                 CLAMAN & MACHTINGER LLP

5

6

7                      By:      /s/ Peter A. Nyquist

8                          David E. Cranston
                        Peter A. Nyquist

9                          Sedina L. Banks
                        Sherry E. Jackman

10                          *Attorneys for Defendant Union Pacific
                        Railroad Company*

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PATSOURAS PROPERTY DEFENDANTS'**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**MOTION FOR SUMMARY JUDGMENT RE: CERCLA LIABILITY**

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

I.      **INTRODUCTION**

The dispositive question for this motion is:

***Did hazardous substances which may have been released onto the soil decades ago at the Patsouras Property (which sits atop the path of the contaminated Omega OU-2 groundwater plume) travel from the soil surface to a depth of 35 to 74 feet to end up in the OU-2 groundwater?***

The answer—from the governmental agencies, environmental consultants, and the retained expert who have investigated the Patsouras Property and whether it has had any impact on the OU-2 groundwater plume—is:

***No.***

Neither of the two governmental agencies with authority for regulating (and expertise in assessing) groundwater contamination in this matter has answered the question affirmatively.  To the contrary:

- The U.S. Environmental Protection Agency, after investigating properties overlying the plume which may have contributed to the OU-2 contamination, issued notice letters to those owners and operators of properties which may have contributed, in accordance with EPA's policy to issue notice letters "to *all* parties where there is *sufficient evidence to make a preliminary determination* of *potential* liability under §107 of CERCLA."[1]  However, EPA did *not* issue a notice letter to the Patsouras Property Defendants.  EPA's environmental consultant, CH2M Hill, investigated potential source properties and identified properties located over the OU-2 groundwater plume which were sources of chlorinated VOCs (PCE, TCE, 1,1,-DCE) and non-chlorinated VOCs to groundwater, but did *not* identify the Patsouras Property as an on-going or historical source of chemicals to the OU-2

---

[1] 53 Fed. Reg. 5298, 5301 (Feb. 23, 1988)(emphasis added).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

groundwater.

- The Los Angeles Regional Water Quality Control Board formally and explicitly concluded that the Property is *not* contributing to the OU-2 contamination, issuing a "No Further Action Letter" to current property owner Defendant Kekropia, Inc., approving and executing a deed restriction for the Property, and ordering Kekropia to remove existing groundwater monitoring wells because they were unnecessary. Moreover, the environmental consultants who have thoroughly investigated the Property, have likewise concluded that the Property has *not* been a source of any contamination to the OU-2 groundwater:

- Biophysics Environmental Assessments, Inc. concluded: "*No threat exists to groundwater from metals, solvents, and total petroleum hydrocarbons*, based upon the low level and isolated low volume of all potentially hazardous materials identified," and the concentrations of petroleum and solvents at the Property "had *insufficient mass for vertical migration*, with sorption and desorption, in excess of a few feet." [2]

- Environmental Audit, Inc.— after investigating the Property *for more than 15 years*—concluded: "*Chlorinated compounds are not generally identified in soil at the Site* but are present in ground water at concentrations that are *consistent with the regional impact to ground water* (see Section 3.0). In EAI's opinion *the chlorinated compounds detected in ground water at the Site are not the result of former site activities*." [3]

---

[2] Ex. G to Declaration of William D. Wick (Wick Decl.), PTFS00023607 (emphasis added).

[3] Ex. D to Wick <u>Decl.</u>, p. 21 (PTFS00024533)(emphasis added).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1    Retained expert Dr. Jean Kulla—a geologist with a Ph.D. in geochemistry
2  and decades of experience assessing soil and groundwater contamination—was
3  asked to review the data and assess whether the Patsouras Property has been or is
4  contributing any hazardous substances to the OU-2 groundwater plume.  Dr. Kulla
5  corroborated the conclusions of the governmental agencies and the environmental
6  consultants, concluding that the Patsouras property has not contributed and is not
7  contributing hazardous substances to the OU-2 groundwater.

8    The Patsouras Property Defendants can be liable to Plaintiffs under CERCLA
9  *only* if hazardous substances which may have been released onto the Property soil
10  traveled 35 to 74 feet[4] below ground surface and then entered into the OU-2
11  groundwater (causing Plaintiffs to incur response costs).  That has not happened
12  here.  This Motion for Summary Judgment should be granted.

**II.    SUMMARY JUDGMENT AND CERCLA STANDARDS**

14    The Patsouras Property Defendants incorporate the Summary Judgment
15  Standard and CERCLA Standard from the Moving Defendants' Common
16  Statement of Facts and Summary.

17    Plaintiffs have alleged a claim against the Patsouras Property Defendants for
18  contribution under CERCLA § 113(f)(1)[5] and a related claim for declaratory
19  judgment.[6]  Plaintiffs have also alleged a claim under the Resource Conservation
20  and Recovery Act (RCRA) against Palley Supply Co., William Palley, and
21  Kekropia, Inc.[7]  If the Patsouras Property Defendants prevail and obtain summary
22  judgment on the CERCLA claims, the RCRA claims against certain of the

---

[4] The *minimum* depth from soil surface to the groundwater under the
Property has been more than 35 feet; the groundwater depth has fluctuated over the
relevant period and has been as deep as 74.7 feet below ground surface. Id.
[5] Ex. A to Wick Decl. ("First Claim for Relief," FAC ¶¶ 396-407).
[6] *Id.* ("Third Claim for Relief," (FAC ¶¶ 424-426).
[7] *Id.* ("Second Claim for Relief," (FAC ¶¶ 408-423).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1  Patsouras Property Defendants fail as well.[8]

2  III.  **FACTS**

3  A.  **THE OMEGA CHEMICAL SITE AND OU-2 GROUNDWATER**

4  **PLUME**

5  The Patsouras Property Defendants incorporate the Common Statement of

6  Facts from the Moving Defendants' Common Statement of Facts and Summary.

7  B.  **THE PATSOURAS PROPERTY**

8  The Patsouras Property (Property) is an 8.5-acre parcel located at 11630-

9  11700 Burke Street in Santa Fe Springs, California.[9]  From 1968 to 1972, Globe

10  Oil Tools Company operated on the Property, manufacturing and maintaining oil

11  well drilling equipment and tools.[10]  Plaintiffs allege that in 1969 a predecessor to

12  Defendant Halliburton Affiliates, LLC named Rucker acquired the Patsouras

13  property.[11]  In 1972, William D. Palley and Defendant William K. Palley acquired

14  the property from Rucker, and a Palley family member (or the Family Trust) owned

15  the Property until 1995; the Property was used as a government surplus warehouse,

16  by industrial auctioneers, by a plastic reprocessing business and by a paper and box

17  company.[12]  Defendant Kekropia, Inc. (Kekropia) acquired the Property in 1995

18  and the Property has been used for wholesale grocery warehouse and a tattoo artist

19  supply business.[13]

20

21

22

23  [8] Plaintiffs cannot show that there is a current "imminent and substantial
endangerment" from the Patsouras Property to the OU-2 groundwater when the Los

24  Angeles Regional Water Quality Control Board has formally concluded otherwise.
Ex. B and Ex. I to Wick Decl.

25  [9] Ex. A to Wick Decl. (FAC ¶ 344).

26  [10] Ex. B to Wick Decl.

27  [11] Ex. A to the Wick Decl. (FAC ¶ 344).

    [12] Ex. B to Wick Decl.

28  [13] *Id.*

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

57  MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

C.   **PATSOURAS PROPERTY ENVIRONMENTAL INVESTIGATIONS AND REMEDIATION**

In 1994, AIG Environmental Consultants performed a Phase I Environmental Site Assessment of the Property.  AIG concluded that "the greatest potential risk to the subject property" was not the property itself, but the upgradient properties (the "total of 37 sites less than ¼ mile away whose potential off-site contamination may have impacted the Property") and recommended additional investigation.[14]

After acquiring the Property, Kekropia retained Environmental Audit, Inc. (EAI) to conduct an environmental investigation of the Property.  EAI's investigation indicated that "the majority of the soil contamination is heavy end petroleum product."[15]  EAI considered a variety of in-situ technologies for remediation of the heavy end petroleum hydrocarbons in the soil, but determined that they were impracticable "for the relatively small volume of contaminated soil at the Site."[16]  Therefore, EAI recommended excavation and off-site disposal of the impacted soil.[17]

Most hydrocarbon-impacted soil in the upper ten feet and fuel underground storage tanks and clarifiers were removed from the Property.[18]

In 2006, Biophysics Environmental Assessments, Inc. ("BEA") performed confirmation testing and removal of environmentally impacted soil identified in previous site testing.  BEA concluded:

- *"[N]o threat exists to groundwater from metals, solvents and total petroleum hydrocarbons, based upon the low level and isolated low volume of all potentially hazardous materials* identified in initial

---

[14] Ex. C to Wick Decl.
[15] Ex. H to Wick Decl.
[16] *Id.*
[17] *Id.* at p. 12 (PTFS00022453).
[18] Ex. B to Wick Decl.

testing by EAI in 1994."[19]

- Concentrations of petroleum and solvents "had insufficient mass for vertical migration, with sorption and desorption, in excess of a few feet."[20]

- "[N]o mass of petroleum hydrocarbons and no measurable mass of chlorinated solvents are present in the soil column with capability for migration to the groundwater by moisture migration through adsorption and partitioning."[21]

EAI concluded that "TGPH-G, TPH-D, and TPH-O have never been identified in ground water" at the Patsouras Property. "Chlorinated compounds are not generally identified in soil at the Site but are present in ground water at concentrations that are consistent with the regional impact to ground water (see Section 3.0). In EAI's opinion *the chlorinated compounds detected in ground water at the Site are not the result of former site activities*."[22]

On January 4, 2017, the Los Angeles Regional Water Quality Control Board Issued a "No Further Action" letter to Kekropia, concluding that the cleanup was complete to "assure protection of human health and waters of the State at and near the Site for their beneficial uses."[23] The Regional Board also executed and approved, by and for the benefit of the Regional Board, the Covenant and Environmental Restriction for the Property, stating as follows:

> Chlorinated solvent compounds present in the groundwater beneath the Site appear to be consistent with the site area regional chlorinated solvent impacts; no dissolved or free phase total petroleum hydrocarbons have been detected in the groundwater.[24]

---

[19] Ex. G to Wick Decl. (emphasis added).
[20] *Id.*
[21] *Id.*
[22] Ex. D to Wick Decl. (emphasis added).
[23] *Id.*
[24] Ex. I to Wick Decl., p. 2.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

### D.   PLAINTIFFS' EVIDENCE

Plaintiffs' evidence of releases of hazardous substances onto the Patsouras Property is remarkably thin.  Plaintiffs allege three releases to the Property soil (FAC ¶ 352), one of which identifies a release of a hazardous substance:

#### 1.   1970 Rinsewater Release

Plaintiffs allege that in 1970, "Globe was issued a notice of violation for disposing rinse water containing hexavalent chromium from its metal treating operations to the ground" at the Patsouras Property.  (FAC ¶ 352.)[25]

After receiving the notice, the Globe plant manager "stated that he would have discharge discontinued at once," and Globe moved at warp speed to submit—*four days* after receiving the notice of violation—a formal application to the County Engineer for approval of an industrial waste disposal system to channel liquid waste into the sewer after passing through two interceptors.[26]  The application was approved, the County determined that the disposal system was "constructed according to cleared plans," and the County issued Industrial Waste Disposal Permit No. 4485 to Globe to discharge into the sewer washdown and wastes from manufacturing and processing oil well drilling tools.[27]

Did that 1970 release of rinsewater impact the OU-2 groundwater?

No.  Fifteen years of soil sampling on the Patsouras Property confirmed that the chromium levels in all the samples were within background levels (concentration ranges normally found in natural, uncontaminated soil), except for a single sample from two feet below ground surface which was only slightly above background levels.[28]

Was hexavalent chromium detected in the OU-2 groundwater plume in wells

---

[25] Ex. E to Wick Decl., at PTFS00022295, PTSF00022298.

[26] *Id.,* at PTFS00022293-22294.

[27] *Id.,* at PTFS00022291, PTFS00022288.

[28] Ex. K to Wick Decl.

on the Patsouras Property?  Yes, but only at trace concentrations *below* stringent State of California Maximum Contaminant Levels for drinking water of 10 micrograms per liter.[29]  There would be no basis for anyone to incur CERCLA response costs to remediate the OU-2 groundwater for chromium concentrations which would be safe to drink under stringent drinking water standards.  Moreover, the evidence indicates that those low concentrations were not the result of a release from the Patsouras Property, but from the major upgradient source of hexavalent chromium, the Foss Plating Property, identified by EPA's environmental consultant, CH2M Hill.[30]  So, there would be no basis for anyone to incur response costs to remediate the OU-2 groundwater for chromium under the Patsouras Property.

### 2.  1970 Alleged Discharge of Wastes from Steam Cleaning

The FAC alleges that "…at that time [1970] Globe was also discharging wastes from its steam cleaning operations to the ground."  (FAC, ¶ 352).  Plaintiffs provide no identification of what hazardous substance, if any, was contained in the "waste from its steam cleaning operations."

### 3.  1988 Alleged Discharge of Clarifier Contents

The FAC alleges that in 1988, during a rainstorm, two subsurface clarifiers "full of waste" overflowed, "spilling to the ground." (FAC, ¶ 352).

A notice of violation from the Santa Fe Springs Fire Department dated May, 18, 1988, alleged that the "Company's sewer lateral plugged," that "industrial wastewater overflowed from the collection sump and from the two abandoned clarifiers on Master Box Co. property," and that "Oil from the 2 clarifiers spilled onto Master Box Co. access loading area."[31]

A notice of violation from the Santa Fe Springs Fire Department dated May,

---

[29] *Id.*
[30] Ex. K to Wick Decl., at p. 7.
[31] Ex. F to Wick Decl.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

MOVING DEFENDANTS' JOINT NOTICES,
MSJS, AND PS&AS ISO MSJS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

19, 1988, alleged that the clarifier contained "excessive oil/grease/solids."[32] Petroleum is excluded from the definition of "hazardous substance" under CERCLA.[33] And even if there had been any hazardous substances released, they have not made their way to into OU-2 groundwater.

## IV.   DR. KULLA'S EXPERT REPORT

Dr. Jean Kulla has a Ph.D. in Geochemistry and more than 25 years of experience assessing contaminated soil and groundwater.  An internationally-recognized expert in hydrogeochemistry, Dr. Kulla was asked to assess whether the Patsouras Property has been or is contributing hazardous substances to the Omega Groundwater Plume (OU-2) underlying the Property.

### A.   THE PROPERTY IS NOT A CONTRIBUTING SOURCE OF HAZARDOUS SUBSTANCES TO OU-2

Dr. Kulla reviewed more than ninety (90) reports with soil and groundwater data from the Property, neighboring properties, and the Omega Site.  Her conclusion was that "there is no evidence, historical or more recent, that shows that the Patsouras Property has been, is, or threatens to be a contributing source of hazardous substances to OU-2."[34]

### B.   PLAINTIFFS' ALLEGATIONS ARE UNSUPPORTABLE

Plaintiffs allege "specifically" that five hazardous substances —PCE, TCE, 1,1-DCE, chloroform, and hexavalent chromium—were released onto the Property

---

[32] *Id.*

[33] 42 U.S.C. § 9601(40)("petroleum, including crude oil or any fraction thereof," is excluded from the definition of "hazardous substance").

[34] Ex. K to Wick Decl., p. 1.  In fact, the data indicate that the PCE in the soil gas is the result of volatilization from the regionally-contaminated groundwater; higher concentrations of PCE and TCE soil gas vapor at the deeper depth, closer to the regionally-contaminated OU-2 groundwater, with decreasing concentration upward to shallow depth, is consistent with Fick's Law.  Ex. D to Wick Decl., pp. 17-18.

soil and have migrated from the soil surface into OU-2.[35]

1.    **The Property Soil Sampling Data Refute Plaintiffs' Allegations**

Dr. Kulla demonstrates that the Property soil data contradict Plaintiffs' assertions.  On the West Parcel of the Property, at least 123 soil samples were taken between 1994 and 2010, and *no PCE, TCE, 1,1-DCE, or chloroform were detected*.[36]  Total chromium was detected, but at concentrations so low they were within background levels for regional soils—within concentration ranges normally found in natural, uncontaminated soil.[37]  On the East Parcel of the Property, at least 137 soil samples were taken between 1994 and 2010.  PCE and TCE were found in *only a few soil samples at very low concentrations*[38] and *no 1,1-DCE, or chloroform was detected*.[39]  *Chromium was detected, but within background ranges.*[40]

In other words, there simply is no evidence of Plaintiffs' allegations of a release of PCE, TCE, 1,1-DCE, chloroform, or hexavalent chromium on the Property that could impact OU-2.  Those hazardous substances were either not detected at all or, in the case of PCE and TCE, detected in trace amounts in only a few of 260 total samples—*not* releases that would cause groundwater contamination 35 to 74 feet below ground surface.

Indeed, as Dr. Kulla observed, the primary compounds found on the Property were heavy petroleum hydrocarbons and arsenic.[41]  The heavy petroleum

---

[35] Ex. A to Wick Decl. (FAC ¶ 355).

[36] *Id.*, p. 3.

[37] *Id.*

[38] *Id.*  The maximum concentration of PCE was 0.51 mg/kg and of TCE was 0.27 mg/kg.

[39] *Id.*

[40] *Id.*

[41] *Id.*, p. 4.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

hydrocarbons did not make their way to OU-2 groundwater, wouldn't be soluble in the groundwater if they had, and aren't hazardous substances under CERCLA in any event.[42]  The arsenic concentrations found in the soil were within background levels for regional soils, "indicating that the arsenic on the Property is naturally occurring."[43]

## 2.   The Groundwater Data Refute Plaintiffs' Allegations

The groundwater sampling data contradict Plaintiffs' assertions as well. PCE concentrations in the upgradient wells were greater than or similar to concentrations in the wells on the Property in all the groundwater samples (except for one sample in 2013).[44] These data indicate that the Property is not a source of PCE to groundwater. Instead, the PCE contamination in groundwater beneath the Property "is due to regional groundwater contamination originating from the Omega Site and additional PCE contributions sourced from neighbor-ing and upgradient properties including from Site F and Techni-Braze."[45]

TCE concentrations TCE in the upgradient wells were greater than or similar to the TCE concentrations in the wells on the Property in all the groundwater samples (except for one sample in 2012). These data indicate that the Property is not a source of TCE to groundwater.[46]

Numerous environmental consultants and regulators have evaluated the soil and groundwater data relating to the Patsouras Property and upgradient properties, and Dr. Kulla notes: "*None of those involved with direct investigations of the Property have found evidence of chemicals from the Property impacting or having*

---

[42]  42 U.S.C. § 9601(40)("petroleum, including crude oil or any fraction thereof," is excluded from the definition of "hazardous substance").

[43] *Id.*, p. 4.

[44] *Id.*, p. 6.

[45] *Id.*

[46] *Id.*, p. 7.

*impacted the underlying groundwater.*"[47]

## V.   CONCLUSION

The EPA has notified numerous parties that they are PRPs because their properties may be contributing hazardous substances to OU-2 groundwater, but EPA has elected *not* to notify the Patsouras Defendants.

EPA's environmental consultant, CH2M Hill, identified properties located over the OU-2 groundwater plume which were sources of hazardous substances to groundwater, but did *not* identify the Patsouras Property as an on-going or historical source of hazardous substances to the groundwater.

The Regional Water Quality Control Board formally concluded that the Patsouras Property is *not* contributing to the OU-2 plume.

The environmental consultants who have investigated the Property concluded that hazardous substances have not migrated from the soil surface to 35 to 74 feet below ground surface to the OU-2 groundwater.

Environmental consultant BEA concluded that the low level and isolated low volume of all potentially hazardous substances identified posed no threat to groundwater, and "had *insufficient mass for vertical migration*, with sorption and desorption, in excess of a few feet" (with the depth of groundwater ranging from about 35 feet to more than 74 feet below ground surface).  Environmental consultant EAI came to the same conclusion: the hazardous substances detected in groundwater were *not* a result of former activities on the Property.

Dr. Kulla corroborates the agency and consultant conclusions.

For Plaintiffs to recover their OU-2 response costs from the Patsouras Property Defendants, any hazardous substances which may have been released onto the soil decades ago at the Patsouras Property would have to have traveled from the soil surface to a depth of 35 to 74 feet below ground surface to end up in the OU-2

---

[47] *Id.*

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

groundwater.  And that simply has not happened.  Therefore, the Patsouras Property Defendants' Motion for Summary Judgment should be granted.


DATED:  January 14, 2021          WACTOR & WICK LLP


By:          /s/ William D. Wick
             _____
             William D. Wick

             Attorneys for Defendant Halliburton
             Affiliates, LLC

DATED:  January 14, 2021          BASSI EDLIN HUIE & BLUM LLP


By:          /s/ Farheena A. Habib
             _____
             Farheena A. Habib

             Attorneys for Interveners Fireman's Fund
             Insurance Company and Federal Insurance
             Company, as Insurers for Palley Supply
             Company


DATED:  January 14, 2021          OTTEN LAW, PC


By:          /s/ Victor Otten
             _____
             Victor Otten
             Attorneys for Defendant Kekropia, Inc.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

1

## <u>CERTIFICATION OF CONCURRENCE FROM ALL SIGNATORIES</u>

2

I, Peter A. Nyquist, am the ECF user whose ID and password are being used

3 to file this MOVING DEFENDANTS' JOINT NOTICES, MSJS and PS&AS ISO

4 MSJS. In compliance with C.D. Cal. Civ. L.R. 5-4.3.4(a)(2)(i), I hereby attest that I

5 have obtained the concurrence of each signatory to this document.

6

7 DATED: January 14, 2021             GREENBERG GLUSKER FIELDS
                                      CLAMAN & MACHTINGER LLP
8

9

10                       By:          /s/ Peter A. Nyquist
                              _____
11                                    David E. Cranston
                                      Peter A. Nyquist
12                                    Sedina L. Banks
                                      Sherry E. Jackman
13
                                      Attorneys for Defendant Union Pacific
14                                    Railroad Company

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067