LATHROP GPM LLP
Nancy Sher Cohen, Bar No. 81706
    nancy.cohen@lathropgpm.com
Ronald A. Valenzuela, Bar No. 210025
    ronald.valenzuela@lathropgpm.com
2049 Century Park East, Suite 3500S
Los Angeles, California 90067-1623
Telephone: (310) 789-4600
Facsimile:    (310) 789-4601

Attorneys for Plaintiffs
Arconic Inc. et al.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ARCONIC INC., et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>APC INVESTMENT CO., et al.,<br><br>                    Defendants.<br><br>AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS | Case No. 2:14-cv-06456 GW (Ex.)<br><br>**BRIEF NO. 2**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN ELEMENTS OF CERCLA LIABILITY**<br><br>**<u>Hearing</u>**:<br>Date:      May 17, 2021<br>Time:      8:30 a.m.<br>Place:      Courtroom 9D, 9th Floor<br>               350 W. 1st Street<br>               Los Angeles, CA 90012<br>Judge:     Hon. George H. Wu |

1
2

# TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ...................................................................... 1

II.     ORGANIZATION OF THIS BRIEF ........................................ 5

III.    BACKGROUND ....................................................................... 6

        A.    OU-2 Groundwater Contamination........................................ 6

        B.    Relevant Procedural History ................................................. 8

IV.     BACKGROUND FACTUAL ISSUES COMMON TO DEFENDANTS .... 10

        A.    Migration of soil contamination into OU-2. ........................ 10

              1.    The hydrogeology of the OU-2 Groundwater area. ................. 11

              2.    The ways in which hazardous substances move from Source
                    Property soil to OU-2 Groundwater. ......................... 11

        B.    Characteristics Common to Many of the Defendants' Source
              Properties........................................................................ 13

              1.    The levels of soil contamination vastly exceed soil
                    Environmental Screening Levels developed to protect
                    groundwater. ................................................ 13

              2.    Many of Defendants' operations took place when there was a
                    lack of understanding regarding threats to groundwater and
                    when practices and regulations necessary to protect the
                    groundwater resource were in their infancy. ............. 15

              3.    The vapor degreasers used at several Source Properties are well
                    known sources of groundwater contamination.......................... 17

              4.    Many of the Defendants have discharged process wastewater to
                    sewers, which inevitably leak.................................. 18

V.      THE ASSOCIATED PLATING SOURCE PROPERTY ............. 19

        A.    Overview .......................................................................... 19

              1.    Operations & Owners/Operators at the Property ..................... 19

              2.    Hazardous Substances Releases & Violations ......................... 23

        B.    Argument.......................................................................... 25

              1.    The Property constitutes or contains one or more CERCLA
                    "facilities." ...................................................... 25

27
28

i

2. Each of the Associated Plating Defendants falls within one of four classes of "persons" subject to the liability provisions of Section 107(a). ............................................................................... 26

    a. The Golnicks and Old Associated Plating are former "owners" and "operators," respectively, under CERCLA Section 107(a). ................................................................... 26

    b. APC Investment Co. and New Associated Plating are current "owners" and "operators," respectively, under CERCLA Section 107(a). ...................................................... 29

3. There has been a "release" or "threatened release" of hazardous substances from the Property into OU-2 Groundwater. ............ 29

    a. There have been releases of hazardous substances into the soils at the Property. .......................................................... 29

    b. The same hazardous substances in the soils at the Property are also in OU-2 Groundwater. ....................... 29

    c. A plausible migration pathway exists between the Property and OU-2 Groundwater. .................................. 30

        Subsurface soils at the Property present a migration pathway to OU-2 Groundwater. ............... 30

        The evidence also shows actual releases to OU-2 Groundwater from the Property. ..................... 31

        California's DTSC has concluded that the Property is a source of contamination in OU-2 Groundwater. .............................................................. 33

VI. EARL MFG. PROPERTY ........................................................................ 37

  A. Overview ........................................................................................... 37

    1. Operations & Owners/Operators at the Property ..................... 37

    2. Hazardous Substances Releases & Violations .......................... 39

      a. Claudette Earl is a "current owner" under CERCLA Section 107(a). ................................................................... 43

      b. Earl Mfg. is a "former operator" under CERCLA Section 107(a). ........................................................................... 43

    3. There was a "release" or "threatened release" of hazardous substances from the Property into OU-2 Groundwater. ............ 44

| | | | a. | There have been releases of hazardous substances into the soils at the Property. ...................................................... 44 |
| | | | b. | The same hazardous substances in the soils at the Property are also in OU-2 Groundwater. ....................... 44 |
| | | | c. | A plausible migration pathway exists between the Property and OU-2 Groundwater. ................................... 45 |

VII. THE PHIBRO-TECH SOURCE PROPERTY .............................................. 51

    A. Overview ........................................................................................... 51

        1. Summary of operations ............................................................. 51

        2. Owners and operators ............................................................... 54

        3. Summary of hazardous substance releases and violations ........ 55

    B. Argument ........................................................................................... 58

        1. The Property constitutes or contains one or more CERCLA facilities ................................................................................... 58

        2. Each of the Phibro-Tech Defendants falls within one of four classes of "persons" subject to the liability provisions of Section 107(a). ...................................................................................... 59

            a. Union Pacific qualifies as a "former owner" under CERCLA Section 107(a). ................................................ 59

            b. First Dice Road Co. is a "current owner" and Phibro-Tech, Inc. is a current "operator" at the Property under CERCLA. ...................................................................... 62

        3. There was a "release" or "threatened release" of hazardous substances from the Property into OU-2 Groundwater. ............ 66

            a. There have been releases of hazardous substances into the soils at the Property. ...................................................... 66

            b. The same hazardous substances in the soils at the Property are also in OU-2 Groundwater. ....................... 66

            c. A plausible migration pathway exists between the Property and OU-2 Groundwater. ................................... 67

                (1) Subsurface soils at the Property present a migration pathway to OU-2 Groundwater. ................................. 67

                (2) The evidence also shows actual releases to OU-2 Groundwater from the Property. ..................... 68

iii

(3) Federal and state regulatory authorities agree
that the Property is a source of OU-2 Groundwater
contamination. ..........................................................................70

VIII.   CHRYSLER/NU-CAR PROPERTY ...........................................................82

A.      Overview ......................................................................................82

1.      Operations & Owners/Operators at the Property .....................82

2.      Hazardous Substances Releases & Violations ..........................85

B.      Argument......................................................................................87

1.      The Chrysler Source Property constitutes or contains one or
more CERCLA facilities. ..........................................................88

2.      Union Pacific falls within the four classes of "persons" subject
to the liability provisions of Section 107(a) because it is a
former "owner" of the Property.................................................88

3.      There was a "release" of hazardous substances from the
Property into OU-2. ...................................................................91

a.      There have been releases of hazardous substances into
soils at the Property. .......................................................91

b.      The same hazardous substances in the soils at the
Property are also in OU2 Groundwater...........................91

c.      A plausible migration pathway exists between the
Property and OU2 Groundwater. ....................................92

IX.     PATSOURAS PROPERTY .........................................................................97

A.      Overview ......................................................................................97

B.      Argument....................................................................................100

1.      The Property constitutes or contains one or more CERCLA
facilities......................................................................................100

2.      Kekropia falls within one of the four classes of "persons"
subject to the liability provisions of Section 107(a)................101

3.      There has been a "release" of hazardous substances from the
Property into OU-2 Groundwater. ...........................................101

a.      There have been releases of hazardous substances into
soils at the Property. .....................................................101

b.      The same hazardous substances in the soils at the
Property are also in OU-2 Groundwater. ......................104

c.    A plausible—if not actual—migration pathway exists
between the Property and OU-2 Groundwater............. 104

X.    CONCLUSION ............................................................................. 108

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3000 E. Imperial, LLC v. Robertshaw Controls Co.*,
   No. 08-cv-3985 PA, 2010 U.S. Dist. LEXIS 138661at (C.D. Cal.
   Dec. 29, 2010) ......................................................................26, 42, 59, 88

*Am. Int'l Specialty Lines Co. v. U.S.*,
   Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590 (C.D. Cal.
   June 30, 2010)...................................................................................*passim*

*Am. Int'l Specialty Lines Ins. Co. v. United States*,
   No. CV 09-01734 AHM RZX, 2010 WL 2635768 (C.D. Cal. Jun.
   30, 2010)......................................................................................................59

*In the Matter of Associated Plating Co. Inc.*,
   Dkt. ..............................................................................12, 13, 14, 33

*Briggs & Stratton Corp. v. Concrete Sales & Servs.*,
   20 F. Supp. 2d 1356 (M.D. Ga. 1998)......................................................29

*Burlington N. R. Co. v. Woods Indus., Inc.*,
   815 F. Supp. 1384 (E.D. Wash. 1993) ................................................48, 68

*Carrier Corp. v. Piper*,
   460 F. Supp. 2d 827 (W.D. Tenn. 2006).................................................27

*City of Los Angeles v. San Pedro Boat Works*,
   635 F.3d 440 (9th Cir. 2011)......................................................43, 62, 91, 101

*City of Wichita v. Trustees of the Apco Oil Corp.*,
   306 F. Supp. 2d 1040 (D. Kan. 2003) ................................................27, 32

*State of Calif. ex. rel. Dept. of Toxic Substances Control v. Neville
   Chemical Co.*,
   213 F. Supp. 2d 1115 (C.D. Cal. 2002)...................................................62

*Lincoln Props. v. Higgins*,
   CIV. No. S-91-760 DFL/GGH, 1993 U.S. Dist. LEXIS 1251, at
   *66-69 (E.D. Cal. Jan. 18, 1993)......................................................27, 61, 89

*Marks v. Minnesota Mining and Mfg. Co.*,
   187 Cal. App. 3d 1429 (1986)..................................................................65

iv

*Maryland Undercoating Co. v. Payne*,
  603 F.2d 477 (4th Cir. 1979) ............................................................. 83

*Philadelphia Elec. Co. v. Hercules, Inc.*,
  762 F.2d 303 (3d Cir. 1985) ............................................................. 63

*Pinal Creek Grp. v. Newmont Mining Corp.*,
  218 F.R.D. 652 (D. Ariz. 2003) ........................................................ 62

*Stoumbos v. Kilimnik*,
  988, F.2d 949 (9th Cir. 1993) .......................................................... 65

*Tosco Corp. v. Koch Indus., Inc.*,
  216 F.3d 886 (10th Cir. 2000) ............................................... 28, 60, 91

*U.S. v. Alcan Alum. Corp.*,
  964 F.2d 252 (3d Cir. 1992) ............................................................. 62

*U.S. v. Maryland Bank & Trust Co.*,
  632 F. Supp. 573 (D. Md. 1986) ...................................................... 29

*U.S. v. Sterling Centrecorp*,
  960 F. Supp. 2d 1025 (E.D. Cal. 2013) ....................................... 63, 64

*United States v. Bestfoods*,
  524 U.S. 51 (1998) .......................................................................... 44

*United States v. Hardage*,
  761 F. Supp. 1501 (W.D. Okla. 1990) ............................................ 103

*Wiegmann & Rose Int'l Corp. v. NL Indus., Inc.*,
  No. C 88-4817 FMS, 1991 U.S. Dist. LEXIS 20181 (N.D. Cal. July
  24, 1991) ......................................................................................... 62

**Statutes**

42 U.S.C. § 9601(9) ............................................................ 25, 26, 59, 100

42 U.S.C. § 9601(9)(A) ................................................................... 43

42 U.S.C. §§ 9601(20)(a)(ii) ................................................... 44, 91, 101

42 U.S.C. § 9601(21) ....................................................................... 43

42 U.S.C. §§ 9601(29), 6903(3) ...................................................... 44

42 U.S.C. § 9607(1) ................................................................ 29

42 U.S.C. § 9607(2) ................................................................ 29

42 U.S.C. § 9607(a) ........................................................... 30, 31

42 U.S.C. § 9607(a)(1) ............................................................ 62

CERCLA Section 101(22), 42 U.S.C. § 9601(22) .................... 44

CERCLA Section 107 ........................................................... 8, 29

CERCLA Section 107(a) ................................................. *passim*

CERCLA Section 107(a)(2) ............................................... 28, 91

CERCLA Section 113(f) ............................................................. 8

**Other Authorities**

40 C.F.R. 270.1(c) ................................................................... 65

40 C.F.R. § 270.1(c) (2018) ..................................................... 51

40 C.F.R. § 302.4 ........................................................... *passim*

270 C.F.R. 270.72(d) ............................................................... 65

40 CFR §261.24i ...................................................................... 81

48 Fed. Reg. 14248 ................................................................. 66

50 Fed. Reg. 13456 ................................................................. 15

1    **I.      INTRODUCTION**

2           This is an environmental lawsuit involving a contaminated site east of Los

3    Angeles, the Omega Chemical Corp. Superfund Site ("Omega Superfund Site"). In

4    most Superfund actions involving multiple parties like this one, the central question

5    is who should pay to remediate the contamination. And as is often the case, one

6    party agrees to step up to pay those costs while the other responsible parties drag

7    their feet while protesting: "I didn't do it, and even if I did, my contamination is

8    insignificant." But the evidence against these recalcitrants typically says otherwise

9    and easily satisfies the low threshold for establishing liability under the federal

10   Superfund statute, the Comprehensive Environmental Response, Compensation and

11   Liability Act ("CERCLA"). This case is no different.

12          EPA has identified groundwater contamination at the Omega Superfund Site,

13   designating it Operable Unit No. 2, or OU-2.[1] SUMF 1. The area overlying the OU-

14   2 Groundwater has a decades-long history of commercial-industrial activity. All of

15   the parties in this lawsuit are associated with various properties where such

16   operations occurred, properties that have been contaminated with hazardous

17   substances and that have been subject to governmental investigation and/or

18   oversight because of the contamination. Plaintiffs stepped up and have already

19   incurred millions of dollars to address the OU-2 Groundwater contamination.

20   Defendants refused to contribute. So Plaintiffs sued defendants under CERCLA to

21   require them to bear some of the costs to address the OU-2 Groundwater

22   contamination because they bear some of the responsibility for it.

23   _____

24   [1] OU-2, is defined in the September 2011 EPA OU-2 Record of Decision and in the
     March 31, 2017 OU-2 Consent Decree, entered between Plaintiffs and EPA; it is
25   composed of contaminated groundwater generally downgradient of OU-1,
     commingled with chemicals released from properties near or within the OU-2
26   boundary, which is shown graphically in both the 2011 EPA Record of Decision
     and the 2017 Consent Decree (hereafter, "OU-2 Groundwater"). SUMF 2.
27

28

Plaintiffs now bring this motion for partial summary judgment (the "Motion") against 14 defendants ("Defendants") associated with 5 different properties ("Source Properties").[2] Plaintiffs seek the following three judicial determinations:

(1)    whether each Source Property is, or contains, a CERCLA "facility;"

(2)    whether each Defendant falls within one of four classes of "persons;" subject to the liability provisions of CERCLA Section 107(a); and

(3)    whether there has been a "release," or "threatened release," of hazardous substances from each Source Property into OU-2 Groundwater. As noted in Plaintiffs' Legal Standard Brief filed in support of this Motion, the bar for proving each of the judicial determinations sought is low—and easily met here.

There can be no dispute that each Source Property is, or contains, a CERCLA facility: hazardous substances were used and stored at each Source Property for years, decades in many instances, and those substances have been detected in the soils there. This is more than sufficient to establish that the properties themselves qualify as a "facility" under CERCLA's extraordinarily broad definition of that term, namely, an area where hazardous substances have come to be located.

Nor is there any doubt that each Defendant is a current or former owner or operator of those facilities. Each Defendant has either stipulated to this fact or admitted as much in response to discovery requests. And as to the former owners and operators of those facilities (i.e., Associated Plating Co., the Golnick family, Earl Mfg., and Union Pacific) there is ample evidence establishing that there was a disposal of hazardous substances at the properties when they owned and/or operated them.

---

[2] The remaining defendants (referred to in this Motion as simply "defendants") have either settled, been dismissed, stipulated to facts supporting the judgment sought by this Motion, or whose liability plaintiffs chose not to pursue via summary judgment at this time.

1    There is also little dispute that there have been releases of hazardous
2    substances into OU-2 Groundwater from Defendants' Source Properties and
3    frequently threatened releases continue to occur today. Operations began at each of
4    the Source Properties decades ago, long before current environmental protections
5    were built into normal operating practices. As the environmental regulatory
6    structure evolved in the United States, many of the Defendants were subject to
7    repeated enforcement by governmental agencies for their poor waste handling
8    practices and discharges that violated federal, state, or local laws. To cite just a
9    handful of examples:

10   • operators at the Phibro-Tech Source Property were cited multiple times
11     for illegal chemical discharges of liquids and wastewater from its
12     chemical manufacturing and reprocessing operations to the bare
13     ground, including dumping hexavalent chromium to the ground;
14   • operators at the Associated Plating Source Property were cited
15     multiple times for discharging wastewater from plating operations into
16     the street or onto the ground and for discharging wastewater
17     containing heavy metals that exceeded permitted levels into the sewer;
18   • for over twenty-five years, Defendant Earl Mfg. Co., Inc. illegally
19     placed waste solvent from its vapor degreaser into an underground
20     storage tank from which it admits hazardous substances reached the
21     underlying soils;
22   • when Union Pacific owned the Chrysler Source Property, there was a
23     documented release of wastewater to land containing *7.5 million times*
24     the levels of hexavalent chromium considered by the State Water
25     Boards today to be protective of the beneficial use of groundwater; and
26   • at the Patsouras Source Property, clarifiers reportedly containing
27     black, oily liquids resembling waste oil were discovered flowing from
28     the property into the streets.

- 3 -

1       Available soil sampling data at the Source Properties unequivocally show

2  those properties have been contaminated with hazardous substances. Contaminants

3  in the soil at each of these properties were found at levels that significantly

4  exceed—in some instances by orders of magnitude—the soil screening levels

5  developed by federal and state regulatory authorities to be protective of

6  groundwater. At a minimum, then, the hazardous substances in soils at the Source

7  Properties constitute a threatened release of hazardous substances to OU-2

8  Groundwater, which is sufficient to impose CERCLA liability on the Defendants.

9       Although Plaintiffs need only show that there exists a plausible migration

10  pathway between the soils at the Source Properties and OU-2 Groundwater, the

11  evidence shows more, namely that releases to soil at the Source Properties has

12  reached OU-2 Groundwater. The subsurface in the geographic area above the OU-2

13  Groundwater, and where the Source Properties are located, is part of a recharge area

14  – an area where water from precipitation and other shallow water sources (like

15  leaking sewers) percolate through the soils to replenish the OU-2 Groundwater.

16       Moreover, given that hazardous substances have been detected in soils at

17  each Source Property in concentrations that exceed the environmental screening

18  levels protective of groundwater, there is little doubt that there is a pathway for

19  these substances to reach OU-2 Groundwater. In fact, in many instances, hazardous

20  substances have been detected in soils at the Source Properties at various depths

21  beginning in shallow soils and continuing all the way down to the water table, or at

22  depths where the water table used to be when earlier operations at the Source

23  Properties took place.

24       Other evidence further supports the conclusion that soil contamination at the

25  Source Properties has reached OU-2 Groundwater. The sampling locations where

26  hazardous substances have been detected in the soil and groundwater at

27  Defendants' Source Properties often align with known or suspected onsite sources

28  of that contamination, such as the former locations of equipment like degreasers,

clarifiers, and storage tanks. This can hardly be a coincidence. Further, sampling from water monitoring wells located downgradient of Source Properties frequently show higher concentrations of hazardous substances as compared to samples drawn from wells located upgradient of those properties – a telltale sign of onsite Source Property releases of those hazardous substances.

But the Court need not take Plaintiffs' word for it. Some of the Defendants' own environmental consultants have concluded that those Defendants' historical operations have contaminated OU-2 Groundwater. Also, each of the Source Properties has been the subject of federal or state regulatory actions to address the contamination. In some instances, regulatory agencies have been concerned – for decades – about environmental contamination at those properties, and have concluded that some of the contamination in OU-2 Groundwater originated from the Defendants' Source Properties. For example, EPA has concluded that the Phibro-Tech Source Property is a "known source" of contamination in OU-2 Groundwater.

In light of this incontrovertible evidence, Plaintiffs respectfully submit that the Court should grant this Motion and find against each Defendant on the three judicial determinations that Plaintiffs seek.

## II.     ORGANIZATION OF THIS BRIEF

Given the length of this brief, necessitated by the number of Defendants and Source Properties involved, Plaintiffs offer the following short explanation concerning how this brief is organized.

**Section III** provides background on the OU-2 Groundwater contamination at issue and a summary of this case's procedural history relevant to the Motion.

**Section IV** provides a summary of facts that are common to more than one of the Source Properties at issue.

**Sections V through IX** discuss each of the Source Properties, setting out the

legal and evidentiary support entitling Plaintiffs to partial summary judgment as to

each of the three judicial determinations sought against Defendants.

### III.    BACKGROUND

####    A.    OU-2 Groundwater Contamination

Since at least the 1950s, the geographic area overlying the OU-2

Groundwater has been widely used for commercial-industrial purposes. *See* Pls.'

Request for Judicial Notice in Supp. of Mot. for Partial Summ. J. re Defendants'

Liability ("RFJN"), Ex. 1 at 36 ("OU-2 RI"); Dkt. No. 770-2, Ex. A at 28. These

industrial activities have included chemical processing and distribution plants, oil

production and refinery facilities, dry cleaners and industrial laundry operations,

metal processing and plating, railroad operations, machine shops, and numerous

other industrial uses, many of which stored and used significant quantities of

hazardous substances and generated large volumes of hazardous-substance

containing waste. *Id.*; Ex. 1 at pp. 47-48, 52-54.

In 2001, EPA began investigating the OU-2 Groundwater contamination.

Dkt. No. 770-2, Ex. A; RFJN, Ex. 2. EPA's work to determine the nature, extent,

and sources of the contamination and the appropriate response to that contamination

culminated in a "remedial investigation" and a "feasibility study." Dkt. No. 770-2.

In the OU-2 Remedial Investigation, completed in August 2010, EPA concluded

that the OU-2 Groundwater is contaminated with numerous hazardous substances

originating from multiple, independent sources. RFJN, Ex. 1 at 33, 47-48, 52-54,

58, 60. These sources include the Phibro-Tech Source Property, Chrysler Source

Property, and Earl Mfg. Source Property, which EPA describes as "known sources"

of the OU-2 Groundwater contamination.[3] *Id.*

The hazardous substances detected in OU-2 Groundwater include, but are not

_____

[3] As the OU-2 RI, notes, however, "the investigation may have not identified all
sources of contamination within the OU-2 area, and the EPA may conduct
additional investigations in the future." RFJN, Ex. 1 at 60.

1  limited to, Tetrachloroethylene ("PCE") and Trichloroethylene ("TCE"). *Id*. at 42-

2  44. These hazardous substances have been detected in OU-2 Groundwater at

3  concentrations exceeding levels considered by the government to be protective of

4  groundwater. *Id*.

5         The following year, in September 2011, EPA issued its OU-2 Record of

6  Decision ("ROD"), selecting a groundwater containment pump-and-treat interim

7  remedy designed to prevent further geographic expansion of OU-2 Groundwater

8  contamination. Dkt. No. 770-2, Ex. A at 70-73. Having selected this interim

9  remedy, EPA turned its attention to implementing it. In 2012, EPA issued Special

10 Notice Letters ("SNLs") regarding the OU-2 Groundwater remedy to numerous

11 PRPs, including Plaintiffs and many Defendants.[4] *See e.g.,* RFJN, Exs. 3, 4. The

12 letters: provided notice that EPA had selected the groundwater containment remedy

13 described in the OU-2 ROD; identified recipients as liable under CERCLA for the

14 costs of implementing that remedy; invited the recipients to participate in formal

15 negotiations with EPA to reach a settlement to conduct or finance the remedy; and

16 demanded that the recipients reimburse EPA's past response costs of over $16

17 million. *Id*.

18        Plaintiffs began negotiations with EPA shortly after receiving an SNL. Those

19 talks ultimately culminated in a consent decree, entered by this Court on March 31,

20

---

21 [4] Under CERCLA, EPA is not required to send notice letters to all entities that

22 contributed contamination to OU-2 Groundwater and the Agency has not done so.
   EPA acknowledges that there are state-led actions to clean up known source

23 properties that are continuing to contribute to the OU-2 Groundwater contamination

24 and that those actions must work in parallel with the EPA OU-2 groundwater
   containment remedy. *See* Dkt. 770-2, Ex. A at 17, 24-25. Thus, the fact that certain

25 Defendants, such as the current or former owners or operators of the Associated

26 Plating and Patsouras Source Properties, have not received SNLs does not mean
   that those Defendants have escaped regulatory oversight concerning the

27 contamination at their properties.

28

2017, that resolved Plaintiffs' liability to the United States and California Department of Toxic Substances Control ("DTSC") for certain work to address the OU-2 Groundwater contamination and for certain costs incurred by those governments ("OU-2 Consent Decree").[5] *See* RFJN, Ex. 5.

### B.   Relevant Procedural History

Plaintiffs filed this lawsuit in 2014 asserting several claims, including a cost recovery claim under CERCLA Section 107. *See* Dkt. No. 1. After settling with the federal and state governments, as described above, Plaintiffs amended their complaint to substitute a contribution claim under CERCLA Section 113(f) in place of their cost recovery claim. *See* Dkt No. 526. Plaintiffs allege that each named defendant is associated with a property that is a source of the OU-2 Groundwater contamination. *Id.* Plaintiffs seek reimbursement from defendants for costs Plaintiffs have incurred, and will incur, under the OU-2 Consent Decree beyond their fair share of those costs. *Id*.

In 2017, the parties agreed to bifurcate the current proceedings into two phases, where certain elements of defendants' liability for contributing to the contamination in the OU-2 Groundwater would be litigated in the current phase, and the amount of Plaintiff's response costs and the issue of allocating defendants' equitable share of those costs would be litigated in the next phase. *See* Dkt. Nos. 529, 569, 602, 615; Valenzuela Decl. ¶ 2-8. The parties also agreed to meet and confer to attempt to reach agreement on a stipulated set of facts relating to defendants' liability and to dispose of, through summary-judgment motion practice, those facts that they could not agree upon. *Id.*

Over the next several months, Plaintiffs engaged in extensive negotiations with defendants to avoid motion practice on defendants' liability for contributing to

---

[5] DTSC is the lead state agency for the Omega Superfund Site. *See* RFJN, Ex. 5 at 99 (Mar. 31, 2017 Consent Decree entered in *Abex Aerospace, et al. v. United States, et al.*, No. 2:16-cv-02696 [Dkt. No. 19-1] ("OU-2 CD") at 1:22).

the OU-2 Groundwater contamination. *See* Decl. of Ronald A. Valenzuela In Supp. of Mot. for Summ. J. ("Valenzuela Decl.") ¶¶ 2-8. Plaintiffs made clear to each defendant during these negotiations that stipulating to contributing to the OU-2 Groundwater contamination was essential to avoiding the instant motion and moving on to the next phase of litigation. *Id.*; *see also* Dkt. Nos. 602, 615.

Ultimately, Plaintiffs were only able to secure such stipulations from three defendants: Bodycote Thermal Processing, Inc., Palmtree Acquisition Corp., and Foss Plating Co., Inc. *See* Docket Nos. 596, 675, 678. Defendants Earl Mfg., Co., Inc., and Claudette Earl were willing to stipulate to facts supporting the first two judicial determinations sought by the instant Motion, namely, the "facility" and "owner/operator" elements of CERCLA liability, but they would not stipulate to contributing to OU-2 Groundwater contamination. *See* Dkt. Nos. 597 and 609.

As to the remaining defendants, Plaintiffs have settled with, or are in the process of settling with, nine of them since the inception of this lawsuit, one, William Palley, was voluntarily dismissed, and Plaintiffs have chosen not to move against four defendants at this time, PMC Specialties Group, Inc., Ferro Corp., Palley Supply Co., and Halliburton Affiliates, LLC.[6] *See* Dkt Nos. 534, 600, 757, 766, 774, and 858. This Motion, therefore, seeks partial summary judgment against 15 Defendants associated with five Source Properties, as summarized in the chart below.[7]

---

[6] Defendants that have settled are Burke Street, LLC; Continental Heat Treating, Inc., Continental Development Company, LP; ExxonMobil Oil Corporation; Firmenich, Inc.; Mission Linen Supply; Momentive Specialty Chemicals, Inc.; and Pilot Chemical Corp. Defendant Powerine Oil Co. has reached an agreement in principle with Plaintiffs and thus is not participating in the instant motion practice. Plaintiffs reserve their right to seek partial summary judgment against Powerine, with the Court's approval, should the parties be unable to consummate their settlement.

[7] Defendant William K. Palley was voluntarily dismissed from this case. *See* Dkt. No. 534.

| Source Property | Defendants | |
|---|---|---|
| Phibro-Tech | Phibro-Tech, Inc.<br>First Dice Road Co.<br>Union Pacific Railroad Co. | |
| Earl Mfg. | Earl Mfg. Co., Inc.<br>Claudette Earl | |
| Associated Plating | APC Investment Co.<br>Associated Plating Co.<br>Associated Plating Co., Inc.<br>Gordon E. McCann | Lynnea R. McCann<br>Darrell K. Golnick<br>Clare S. Golnick<br>Cheryl A. Golnick |
| Chrysler | Union Pacific Railroad Co. | |
| Patsouras | Kekropia, Inc. | |

## IV.   BACKGROUND FACTUAL ISSUES COMMON TO DEFENDANTS

### A.   Migration of soil contamination into OU-2.

The undisputed evidence shows that the hazardous substances present in Source Property soils have already migrated to OU-2 Groundwater or have a clear migration pathway to OU-2 Groundwater. This conclusion is supported by two basic elements: (1) the hydrogeology of the OU-2 Groundwater area; and (2) the ways in which hazardous substances move from Source Property soil to OU-2 Groundwater. *See* Expert Report of R. D. Mutch, Jr., P.Hg., P.E. filed in support of Plaintiffs' Motion ("Mutch Report"), Vol. 1, Section. 2.

#### 1.   The hydrogeology of the OU-2 Groundwater area.

OU-2 lies in a "recharge" area, an area where groundwater is replenished by rain penetrating the surface soils and moving downward through soil to the water table. Mutch Report, at 2-6. This recharge can be supplemented by other property-generated water sources such as leaking clarifiers, lagoons, or sewers. *Id.* Importantly, the permeability of the soils that exist above the water table of OU-2

1    Groundwater are such that they would not prevent hazardous substances, at

2    concentrations that significantly exceed levels protective of groundwater, as is the

3    case here, from moving downward into OU-2 Groundwater. *Id.*

4            **2.     The ways in which hazardous substances move from Source**

5                    **Property soil to OU-2 Groundwater.**

6            The hazardous substances at Defendants' Source Properties can exist in two

7    basic forms. *See, generally,* Mutch Report § 2.4. They can be dissolved in water (a

8    "dissolved plume"). For example, wastewater or wash water resulting from

9    industrial or commercial operations at a property that contains mostly water with a

10   low percentage of hazardous substances would generate a dissolved plume.

11   Alternatively, these substances can be released as relatively pure chemical

12   compounds with densities much heavier than water (known as "DNAPL") or

13   densities much lighter than water ("LNAPL").[8]

14           Hazardous substances move through soil differently depending upon which

15   form they are in: dissolved, DNAPL, or LNAPL. Dissolved plumes move through

16   soil in the same way that precipitation will move through soil, percolating

17   downward with the water. DNAPL and LNAPL chemicals move through soil a

18   different way, relying on subsurface features in the soil that act as conduits, such as

19   root holes and desiccation cracks in clays and silts that are typical in soils in the

20   OU-2 Groundwater area. These secondary features allow DNAPL and LNAPL

21   chemicals to migrate directly through the soils without first dissolving in water.

22           Residual soil contamination, present for many years at virtually every Source

23   Property, allows continued releases or threats of releases to OU-2 Groundwater.

24   And, even where a Defendant has undertaken some remediation of property soil

25   _____

26   [8] "DNAPL" stands for Dense Non-Aqueous Phase Liquid and "LNAPL" stands for
     Light Non-Aqueous Phase Liquid. Because DNAPL is dense, it most often pools at

27   the bottom of a groundwater aquifer. By contrast, lighter density LNAPLs typically
     remain near the top surface of an aquifer.

28

1    contamination, if the remediation occurred long after the initial release of the
2    substances to impacted soils, those earlier releases would have reached OU-2
3    Groundwater prior to the time of any remediation. That has occurred at virtually
4    each of the Defendant Source Properties.

5           Various federal and state regulatory authorities have reached the same
6    conclusion about the relationship between Source Property soil contamination and
7    OU-2 Groundwater. As EPA has determined, OU-2 Groundwater "is an aquifer
8    with potential for contaminants to migrate to aquifers used for municipal and
9    domestic drinking water." *See* RFJN, Ex. 1 at 72 (OU-2 Feasibility Study); *see also*
10   Exs. 1 at 39, 56 (OU-2 Remedial Investigation) (EPA concluding that contaminants
11   at identified source areas have infiltrated into the subsurface and migrated generally
12   downward by gravity through the vadose zone), 6 at 444 (Letter from Yvonne
13   Sanchez, DTSC Section Chief, to Michael Evans, President, New Associated
14   Plating, enclosing proposed Corrective Action Consent Agreement, *In the Matter of*
15   *Associated Plating Co. Inc.*, Dkt. HWCA: SPRD 02/03 SCC-4293 (Jan. 14, 2003)
16   ("Jan. 14, 2003 DTSC Letter") at 3) (including finding of fact that contaminants at
17   the Associated Plating Property "have migrated or may migrate" through
18   subsurface soils and have "already migrated to the groundwater"), 7 at 471 (Letter
19   from Paula Rasmussen, Regional Water Quality Control Board-Los Angeles
20   ("RWQCB-LA") Asst. Exec. Officer to Claudette Earl enclosing draft Cleanup and
21   Abatement Order, Order No. R4-2013-0012 (May 16, 2013) ("May 16 RWQCB-
22   LA Letter")). Put simply, the hydrogeology of OU-2 presents a generally
23   unobstructed pathway for hazardous substances disposed of or released at the
24   Defendants' Source Properties to reach OU-2 Groundwater.

25      **B.      Characteristics Common to Many of the Defendants' Source
26               Properties**

27           **1.     The levels of soil contamination vastly exceed soil
28                   Environmental Screening Levels developed to protect**

**groundwater.**

To help assess environmental threats and facilitate decisions on the need for investigation and remediation at contaminated properties, both the EPA and California Regional Quality Control Board, San Francisco ("RWQCB-SF"), have developed environmental screening levels ("ESLs").[9] *See, generally,* Mutch Report § 3.2. The ESLs are values for chemical concentrations in various environmental media (e.g., soil, groundwater, soil vapor, air, etc.) that can be compared to the chemical concentration levels found in the corresponding media at a contaminated property to evaluate the threats posed by the contamination.[10] *See, e.g.,* RFJN, Ex. 8, 10.

---

[9] EPA calls these screening levels "Regional Screening Levels" while the RWQCB-SF calls them "Tier 1 Environmental Screening Levels." These screening levels have been prepared for different environmental media including contaminated soils, contaminated groundwater, and soil vapor. *See* Mutch Report §§ 3.2.1 - 3.2.3. For convenience, both EPA and RWQCB-SF screening levels will be referred to in the Motion as simply "ESLs." The ESLs developed by the RWQCB-SF are generally used by all California RWQCBs, including the RWQCB-LA, which is overseeing groundwater remediation at many properties within OU-2. *See, e.g.,* RWQCB-LA, Brownfields Cleanup and Redevelopment Agency Program, https://www. waterboards.ca.gov/losangeles/water_issues/programs/remediation/brownfields.html#intro, last visited Dec. 18, 2020 (providing link to ESLs developed by RWQCB-SF).

[10] With one exception, the soil screening levels (as well as those for soil gas and groundwater) that are referenced in this Motion are those developed by the RWQCB-SF given that the Source Properties are located in this state and the California State and Regional Boards have regulatory responsibility for this state's water quality. *See* Mutch Report § 3. The RWQCB-SF has not developed generic soil screening levels for metals. *Id.*, at 3-6. Accordingly, the soil screening levels for metals (e.g., hexavalent chromium) referenced in this Motion are those developed by EPA. *Id.*, at 3-7 to 3-8. Table 3-1 in the Mutch Report summarizes the ESLs used by RWQCB-SF for organics and the ESLs used by EPA for metals to address those soil contamination levels that can represent a threat to groundwater.

ESLs for soils, called "soil screening levels," have been developed to protect against different types of exposure concerns, as for example, exposure through dermal contact or leaching to groundwater. *See* Mutch Report § 3.2.1. In the instant Motion, the relevant soil ESLs are the latter type, i.e., those calculated specifically to be protective of groundwater; they are used to identify levels of contaminants in soil that pose a threat of migration to groundwater at levels that would preclude the use of the groundwater for drinking water or result in other exposure pathways of concern. *See* RFJN, Exs. 9. Accordingly, if the concentration of soil contamination at one of the Defendants' Source Properties exceeds the ESL for that substance, that contamination threatens OU-2 Groundwater and is reasonably likely to adversely impact it. *Id.*; *see also* Mutch Report, at 3-3 to 3-7. The more the concentration of a hazardous substance detected in soils exceeds the pertinent soil screening level, the greater the likelihood of actual groundwater contamination approaches certainty. *Id.* As explained below, multiple hazardous substances have been detected in the soil at the Defendants' Source Properties in concentrations that vastly exceed the soil screening levels.[11]

### 2. Many of Defendants' operations took place when there was a lack of understanding regarding threats to groundwater and when practices and regulations necessary to protect the groundwater resource were in their infancy.

As explained by Plaintiffs' expert, Robert Mutch, until the mid- to late 1970s, chlorinated solvents were not understood to be major groundwater contaminants. *See* Mutch Report, at 2-16 to 2-19. A better understanding of their mechanisms of transport in subsurface soils and the means to sample and analyze

---

[11] Plaintiffs do not contend that exceedances of ESLs constitute evidence that soil contamination at a particular property *has impacted* OU-2 Groundwater. Instead, they are yet another line of evidence leading to the conclusion that the magnitude of those hazardous substance releases to soil constitutes a highly plausible migration pathway to OU-2 Groundwater. *See* Mutch Report, at 3-1.

1    groundwater contaminants at levels now known to be problematic did not come

2    about until the 1980s, years after the start of operations at most of these Source

3    Properties. *Id*.

4         Further, many waste management practices that would be deemed

5    unacceptable and not protective today were considered scientifically acceptable

6    prior to the 1980s. *See id.*, at 2-19. For example, recommendations for the disposal

7    of chlorinated solvents used to include pouring them directly on dry soil so they

8    could evaporate. Also, prior to 1985, most types of spills or discharges of hazardous

9    substances did not have to be reported to the pertinent regulatory authority. *See* 50

10   Fed. Reg. 13456 (EPA rule regarding notification requirements for releases of

11   reportable quantities of hazardous substances to all environmental media finalized

12   in 1985); Cal. Health & Safety Code § 25507 (Deering 2018) (statute requiring

13   handler of hazardous materials to immediately report a release or threatened release

14   of the material did not become effective until 1986). Accordingly, there were likely

15   many more spills and discharges of hazardous substances at the Defendants' Source

16   Properties during this earlier time frame, but they were simply never documented or

17   required to be disclosed to regulatory officials. *Id.*

18       As knowledge began to evolve concerning the threat to groundwater posed

19   by chlorinated solvents, how they migrate through soils, and how to more

20   accurately monitor and screen for them at low parts per billion concentration levels

21   in groundwater, a significant statutory and regulatory infrastructure was developed

22   in the 1980s to address these issues. *See id.,* at 2-17 to 2-18. It was only after this

23   legal framework was in place that federal, state, and local governments were able to

24   enforce those laws and regulations against polluters. Since the late 1970s, both the

25   technical understanding of groundwater contamination, its sources, and remedies,

26   and the legal and regulatory tools to address those issues have continued to evolve

27   together, where developments in one have influenced the other.  Unfortunately, by

28   then, serious environmental damage had already been done. *See id.*, at 2-19.

1    Against this historical context, it is hardly surprising that industrial and

2    commercial activities at the vast majority of source properties that utilized

3    hazardous substances such as chlorinated solvents and generated hazardous

4    substance-containing wastes prior to the 1980s have resulted in significant

5    environmental contamination. Nor is it surprising that the contemporaneous record

6    of disposals and releases of hazardous substances prior to the 1980s is not as robust

7    as one might expect given the extent of contamination.

8         **3.    The vapor degreasers used at several Source Properties are
             well known sources of groundwater contamination.**
9

10    Several Source Properties discussed in this Motion utilized vapor degreasers

11    in their respective operations. Generally, a vapor degreaser is a piece of industrial

12    equipment used to remove grease or other soluble impurities from the surfaces of

13    metal parts.[12] It typically consists of a tank which holds significant quantities of

14    solvent, usually, PCE, 1,1,1-TCA or TCE, that is heated to boiling point to generate

15    vapors. The parts to be cleaned are immersed in the vapor; the solvent vapors

16    condense on the parts and dissolve the impurities. Vapor degreasers are almost

17    invariably equipped with water separators to protect the equipment, a simple

18    container that receives condensed solvent and moisture collected in a trough from

19    inside the tank. The separator, which works on simple gravity principles, returns the

20    liquid solvent back to the tank and decants the "water" from the system.[13]

21

22    _____

       [12] A general description of vapor degreasers and their operation are included in
23    Murphy, Brian L., Vapor degreasing with chlorinated solvents, Environmental
       Forensics Vol. 17, No. 4, pp. 282-293 (2016); and American Soc'y for Testing and
24    Materials, *Handbook of Vapor Degreasing* (1962) which are attached as Exhibits 1
       and 2 to the Lintecum Declaration.
25

26    [13] This separator water invariably contains significant concentrations of dissolved
       solvent, such as PCE or TCE, and also routinely contains free product if the water
27    separator is not properly calibrated or maintained. *See* Mutch Report, at 4-26;
       Lintecum Decl. Ex. 1 at 20-21 (Murphy, at 288-89).
28

1    Vapor degreasers, such as those in use at several of the Defendants' Source

2    Properties, can release solvents to the environment in several ways. *See* Mutch

3    Report, at 4-26. These include spills during filling of degreasers with fresh solvent,

4    spills during removal of spent solvent or still bottoms from degreasers,

5    malfunctions of the degreaser leading to release of PCE or other degreasing

6    solvents, disposal of separator water or condensate (containing PCE or TCE) to the

7    ground or to leaky sewers, acid build-up in the solvent leading to corrosion and

8    release of PCE or other degreasing solvents from the degreaser unit or from drums

9    or tanks used to temporarily store the new or spent solvent, and/or roof top venting

10   of PCE vapors.[14] *Id.*; Lintecum Decl. Ex. 1 at 20-21 (Murphy, at 288-89).

11   The presence of vapor degreasers at several Source Properties is significant

12   for purposes of determining the Defendants' liability. Vapor degreasers, using PCE

13   or other solvents, have an "abysmal" record of causing groundwater contamination

14   as a result of releases of solvents at or near the location of the equipment. *See*

15   Mutch Report, at 4-26 to 4-27; *see also* Lintecum Decl., Ex. 1 at 20-22 (Murphy, at

16   288-90); RFJN, Ex. 11 at 529-530, 532, 534 (Dept. of Toxic Substances Control,

17   Calif. Environmental Protection Agency, Investigation and Remediation of Plating

18   Facilities (May 2011) ("DTSC Report on Plating Facilities") at 1-2, 9, A-4).

19       **4.    Many of the Defendants have discharged process wastewater**
20             **to sewers, which inevitably leak.**

21   The subject of whether sewers constructed from vitrified clay, concrete and

22   other materials leak into their surroundings has been extensively studied. *See* Mutch

23   Report, at 5-9 to 5-10. These studies have shown that such sewers are permeable

24

25   [14] Vapor emissions can end up in on-property groundwater by (1) condensing of
26   solvent vapors onto roof top vent pipes or other roof top structures and subsequent
     run-off into the roof drainage system, and (2) becoming entrained in rainfall, which
27   then drains to the ground. *Id.* at 4-26 to 4-27.

28

and are invariably subject to some level of leakage or "exfiltration."[15] *Id.* This is reflected in municipality sewer regulations which accept that some level of leakage is inevitable. *Id.* (noting a Public Works that set a leakage rate not to exceed 200 gallons per inch diameter per mile per day).

Thus, older vitrified clay and concrete sewer pipes are not a *possible* means of leakage to the subsurface, they are a *certain* source of exfiltration of wastewater to the subsurface. *Id.* This is particularly important in an area of recharge such as the one at issue in this matter.  As a result, as further studies relating specifically to chlorinated solvent leakage from sewers have shown, solvents and solvent-containing wastewaters disposed of in sewers can and have leaked into the surrounding soils and groundwater. *Id.*; *see also* RFJN, Ex. 12 (San Francisco Bay (Region 2) Water Quality Control Plan at 4-92) (noting that most significant historical impacts of leaking sewer lines are often associated with use of chlorinated solvents chemicals transported through leaking sanitary sewer lines may be released and migrate to surrounding aquifers). A similar situation occurs with wastewater containing hexavalent chromium and other dissolved metals. Defendants' discharge of chlorinated solvent containing wastewater and hexavalent chromium containing wastewater to sewers at their Source Properties, then, are near-certain sources of disposals and releases of hazardous substances into the environment.

### SOURCE PROPERTY SPECIFIC ARGUMENTS AND EVIDENCE

Below, Plaintiffs present argument and evidence relating to each of the five Source Properties and the Defendants associated with those properties. Each section provides: (A) a general overview of the owners and operators at the property and

---

[15] Indeed, in a 2000 study of sewer leakage in four states, California vitrified clay pipes were determined to release between 5,283 and 5,649 gallons per inch diameter per mile per day. Thus, 1,000 feet of six-inch, vitrified clay sewer pipe in California over the course of a year would, using the lower end of this range of average exfiltration rates, leak 2.19 million gallons of wastewater. *See* Mutch Report, at 5-9 to 5-10. Exfiltration rates in other states were significantly higher. *Id.*

1  the industrial operations conducted there, as well as a summary of the releases of

2  hazardous substances and environmental regulatory violations that occurred; and

3  (B) Plaintiffs' legal argument as to why it is entitled to partial summary judgment

4  as to each of the judicial determinations sought by this Motion.

5  **V.    THE ASSOCIATED PLATING SOURCE PROPERTY**

6      **A.    Overview**

7          **1.    Operations & Owners/Operators at the Property**

8      The Associated Plating Source Property (hereafter, for purposes of this

9  Section V, the "Property") is located at 9636 Ann Street in Santa Fe Springs. Pls.

10  Statement of Material Facts ("SUMF") 3. For over forty years, since 1978, the

11  Property has been the location of metal plating operations, where metal objects are

12  coated with another metal to increase the object's hardness, corrosion resistance, or

13  visual brilliance. SUMF 5, 8.

14      The Property has had two owners and two operators during this period. From

15  1977 to 1990, the Property was owned by the Golnick family, Stanley and Margaret

16  Golnick, their three children and their children's spouses (collectively, the

17  "Golnicks"). SUMF 3. Since 1990, APC Investment Co., a private corporation held

18  by members of the Golnick family, has owned the Property. SUMF 7. Associated

19  Plating Company ("Old Associated Plating"), a business privately owned by

20  members of the Golnick family, ran the metal plating business at the Property from

21  1978 to 1999. SUMF 5. Since then, Associated Plating Company, Inc. ("New

22  Associated Plating") has operated at the Property. SUMF 8. A chart summarizing

23  the Property owners and operators from 1977 to the present (the "Associated

24  Plating Defendants") is included below.

25      Metal plating operations invariably involve the use of CERCLA hazardous

26  substances,[16] and such is the case here: PCE, chromium, and nickel, all of which are

27

28

[16] *See* RFJN, Ex. 11 (DTSC, Investigation and Remediation of Plating Facilities

CERCLA hazardous substances, were used at the Property. SUMF 9; 40 C.F.R. § 302.4. Indeed, Old Associated Plating was using PCE no later than 1980 and at least 15,000 pounds annually in 1994 and 1998 (*see* RFJN, Exs. 17, 18), and New Associated Plating continued to use PCE at least through 2000 and into 2001 (Lintecum Decl. Exs. 8, 13). Arsenic, another CERCLA hazardous substance (40 C.F.R. § 302.4), is also commonly used, or emitted, in metal plating operations. RFJN, Ex. 11 at 530, 531 (DTSC Plating Facilities, at 2, 7).

Hexavalent chromium was also used. New Associated Plating used a process called chem film, which involves dipping parts in a sodium dichromate solution that contains hexavalent chromium. Lintecum Decl., Exs. 4, 5. The dipped parts are then rinsed in deionized water creating a chromate rinse. *See id*, Ex. 5. New Associated Plating used chem film to plate parts from at least 2003 to 2015. *Id*. It likely used it before 2003. *Id*., Ex. 16.

Operations at the Property included the use of equipment typically associated with releases of hazardous substances at plating companies, including plating tanks and a 200-gallon above-ground storage tank ("AST") for PCE that remained at the Property until at least late 2001. *See, e.g.,* Lintecum Decl., Exs. 6, 13. One or more PCE vapor degreasers were also used extensively at the Property. At least one was installed in 1978 and New Associated Plating did not stop using a PCE vapor degreaser until 2001. RFJN, Ex. 19; Lintecum Decl., Ex. 16 at 612 (Evans Dep. Tr. 57:6-22). At least one of the degreasers was operated eight hours per day, five or six days per week and was permitted by the State to operate for as long as 10 hours per day. *See* Lintecum Decl., Exs. 4, 5; RFJN, Ex. 20.

Operations at the Property also generated significant quantities of PCE waste (e.g., 15,200 to 18,900 pounds) which was regularly removed from the vapor degreaser and pumped on a monthly or bimonthly basis into drums that were stored

_____

(May 2011) (hereafter "DTSC Plating Facilities"), at viii and 2).

in the waste treatment storage area until a waste hauler picked them up. Lintecum Decl., Ex. 5; RFJN, Ex. 21. Operations conducted by Old Associated Plating involved wastewater monitoring requirements for PCE and nickel, and New Associated Plating held permits for industrial wastewater discharge that required monitoring of nickel and chromium. RFJN, Exs. 22-25.

**Summary Owner/Operator Chart**

| Year | Owner | Operator |
|------|-------|----------|
| 1977 | Clare Golnick, Cheryl Golnick, Darrell Golnick, Gordon McCann, and Lynnea McCann, Stanley Golnick, Margaret Golnick, Mary Golnick[17] | N/A |
| 1978-1982 | Clare Golnick, et al. | SAG Plating, Inc.[18] (Old Associated Plating) |
| 1982-1990 | Clare Golnick, et al. | Associated Plating Co. (Old Associated Plating) |
| 1990-1999 | APC Investment Co. | Associated Plating Co. (Old Associated Plating) |
| 1999 to present | APC Investment Co. | Associated Plating Co., Inc.[19] |

[17] Plaintiffs have not asserted any claims against Stanley Golnick, Margaret Golnick, or Mary Golnick. *See* Fifth Am. Compl. [Dkt. No. 526] at ¶¶ 68-100. Plaintiffs understand that Stanley and Margaret Golnick are deceased, and Mary Golnick is no longer married to Darrell Golnick. *See* Lintecum Decl., Ex. 3, 91.

[18] Stanley and Margaret Golnick first began operating the metal plating business as SAG Plating, Inc. *See* Lintecum Decl., Ex. 3. In July 1982, SAG Plating, Inc. was merged into its parent corporation, Associated Plating Co. *Id.* Given that Associated Plating Co. is the successor-in-liability to SAG Plating, Inc., to avoid confusion, Plaintiffs refer to the two companies collectively as "Old Associated Plating."

[19] When the plating business was acquired from Old Associated Plating in 1999, the acquiring entity was Associated Plating Acquisition Corp, which changed its name to Associated Plating Company, Inc. in 2000. RFJN, Ex. 26.

| | (New Associated Plating) |
|---|---|

### 2.     Hazardous Substances Releases & Violations

Old and New Associated Plating have received numerous violation notices from the Santa Fe Springs Fire Department, DTSC, and EPA and have been required to change certain of its practices or ways of managing environmental threats since operations at the Property began in 1978. *See* Mutch Report, at 4-6 to 4-8. For example, Old Associated Plating received multiple notices of violation for discharging wastewater to the sewer that contained heavy metals that exceeded amounts allowed by permit beginning in the early 1980s; it entered into a settlement with DTSC in 1997 to resolve its liability for treating cyanide waste without a permit; and it was required to construct a secondary containment system in 1989 to mitigate potentially contaminated runoff at the Property. *See* RFJN, Exs. 27, 28. Old Associated Plating was also cited for washing parts and discharging wastewater to the street, before the existence of any secondary containment system, for the illegal discharge of plating liquids to the ground, and it admitted that sulfuric acid had been released at the Property over a period of "many years." *See* RFJN, Exs. 30, at 724, 32 at 730, 31 at 725, 727; Lintecum Decl., 11 at 536.

The poor housekeeping continued when New Associated Plating took over. For example, a 2000 DTSC inspection report notes several violations involving the inadequate handling and storage of hazardous wastes; in 2002, discharges to ground in the drum storage area and failure to remove waste from containment areas were identified; in 2003, New Associated Plating was cited for failing to label chromate rinse and storing it in unsealed containers at the Property; it was cited for accumulation of hazardous waste in secondary containment structures, and it was required to install containment structures on the plating line. *See* RFJN, Exs. 21,

33-39. A summary of many of the known releases of hazardous substances and reported violations is attached as Appendix A at the end of this Section.

As one might expect given the above-described poor handling of hazardous substances, numerous contaminants have been detected in soil and soil gas samples taken at the Property. These include hexavalent chromium, nickel, arsenic, PCE, TCE, DCE, and vinyl chloride. *See* Mutch Report, at 4-11 to 4-14. Importantly, these hazardous substances have been detected at concentrations that exceed, by multiple orders of magnitude in several instances, soil screening levels protective the groundwater. *See id*. These same substances also have been detected in groundwater below the Property at levels exceeding groundwater screening levels. *Id.* at 4-12 to 4-16; *see also, e.g.,* Lintecum Decl., Exs. 7, 20, 22.

Indeed, for many years, environmental contamination at the Property has been a major concern of DTSC.  That agency has concluded that releases of hazardous substances from historical operations at the Property have contaminated the soil and likely migrated into OU-2 Groundwater. RFJN, Ex. 40.

**B.    Argument**

Plaintiffs are entitled to partial summary judgment as to the three judicial determinations sought against the Associated Plating Defendants. There is no dispute as to any of the material facts establishing that: (1) the Property constitutes or contains one or more CERCLA "facilities;" (2) each of the Associated Plating Defendants falls within one of four classes of "persons" subject to the liability provisions of Section 107(a) as current or former "owners" or "operators;" and (3) there has been a release, or threatened release, of hazardous substances from the Property into OU-2 Groundwater.

**1.    The Property constitutes or contains one or more CERCLA "facilities."**

Given the extensive use, handling, and storage of hazardous substances at the

- 23 -

Property, the "facility element" is easily satisfied. As noted above (*see* SectionA.1, *supra*), both Old Associated Plating and New Associated Plating extensively used PCE, from the late 1970's through 2001, in connection with cleaning metal parts in a vapor degreaser located on the Property.[20]. Both companies also used nickel at the Property. *See id*. New Associated Plating's use of chromium dates back at least as far as 2001 when it installed a tank for hexavalent chromium containing rinse associated with the cadmium plating process. Lintecum Decl., Ex. 16. Hexavalent chromium also continued in use from at least 2003 until the present time as part of the chem film process. *Id.*, Ex. 5.

Hexavalent chromium, arsenic, nickel, PCE, and vinyl chloride have been found in the soil at the Property. *See* SUMF 10. Each of these substances qualifies as a CERCLA "hazardous substance." *See* 40 C.F.R. § 302.4 (2018)). Thus, the Property constitutes or contains one or more CERCLA "facilities." SUMF 9, 10; *see* 42 U.S.C. § 9601(9); *3000 E. Imperial,* 2010 U.S. Dist. LEXIS 138661at *3, 7 (contaminated property is a CERCLA "facility"); *Saporito,* 684 F. Supp. 2d at 1053 (plating business is a "facility"); *Am. Int'l Specialty Lines*, 2010 U.S. Dist. LEXIS 65590, at *61-62, 68-69 (equipment and storage containers at plant qualify as "facilities").

> **2.    Each of the Associated Plating Defendants falls within one of four classes of "persons" subject to the liability provisions of Section 107(a).**
>
> > **a.    The Golnicks and Old Associated Plating are former "owners" and "operators," respectively, under CERCLA Section 107(a).**

The Golnicks held fee title to the Property from 1977 until 1990, and Old Associated Plating operated the metal plating business located there from 1978

---

[20] Other equipment and infrastructure at the Property that involved the use of hazardous substances, such as plating line tanks, clarifiers, trenches, and chemical storage areas also qualify as CERCLA "facilities." *See* 42 U.S.C. § 9601(9).

1  until late 1999. *See* SUMF 3, 5. Thus, these Defendants qualify as former owners

2  and operators, respectively, that are liable under CERCLA provided that there was

3  at least one "disposal" of hazardous substances during their ownership or operation

4  period. There was.

5      Old Associated Plating has admitted that it allowed sulfuric acid, a CERCLA

6  hazardous substance (*see* 40 C.F.R. § 302.4), to leak into the environment for

7  "many years."[21] Lintecum Decl., Ex. 11, at 535-536. Also, Old Associated Plating

8  was permitted to discharge wastewater containing, among other substances,

9  chromium, nickel, and PCE to sewers, which are permeable and prone to

10  exfiltration (*see* Mutch Report, at 5-9 to 5-10), and the company was cited multiple

11  times for improper discharges of wastewater having exceedances of heavy metals,

12  including nickel and copper.[22] *See* Mutch Report, at 4-6 to 4-8. It was also cited for

13  washing parts and discharging the wastewater to the street. *See* Section A.2, *supra*.

14  Discharging these hazardous substances in a manner where they may enter into the

15  environment constitutes a "disposal" under CERCLA; placement directly onto soil

16  or groundwater is not required. *See Lincoln Props. v. Higgins,* CIV. No. S-91-760

17  DFL/GGH, 1993 U.S. Dist. LEXIS 1251, at *66-69 (E.D. Cal. Jan. 18, 1993).

18      In addition, soil and soil gas sampling at the Property shows significant

19  detections of PCE where the vapor degreaser and PCE storage tank were formally

20  located. *See* Lintecum Decl., Ex. 4, 6. Given all of the ways that PCE could be

21  released from storage tanks and vapor degreasers, it is implausible that these units

22  operated by Old Associated Plating could have operated for over 20 years without

23

24  [21]A disposal of *any* CERCLA hazardous substance is sufficient to qualify a former
    owner or operator as a responsible person under CERCLA; "[t]here is no

25  requirement that the substance deposited by the individual held liable is the
    substance that actually is released or causes the contamination." *Carrier Corp. v.*

26  *Piper,* 460 F. Supp. 2d 827, 834-35 (W.D. Tenn. 2006).

27  [22] Copper is a CERCLA hazardous substance as are copper-containing wastewaters.

28  *See* 40 C.F.R. § 302.4.

resulting in some contamination of soils and OU2 Groundwater resulting from onsite spills or disposals. Mutch Report at 4-25 to 4-27; *see also City of Wichita v. Trustees of the Apco Oil Corp.*, 306 F. Supp. 2d 1040, 1075 (D. Kan. 2003) (evidence of PCE soil and groundwater contamination at location of possible source of spills of PCE enough to establish spill occurred during former owner/operator's presence at contaminated property).

The lack of adequate secondary containment structures at the Property during much of the time that Old Associated operated there also supports the conclusion that there were one or more disposals of CERCLA hazardous substances at the Property during that period. *See* Mutch at 4-3, 4-26. Surface runoff in contact with contaminated soils or soil/sludges from paved areas of the Property can lead to contaminated soil and groundwater. *See, e.g.,* RFJN, Ex. 11. Even secondary containment structures designed to mitigate against wastewater or contaminated storm water runoff to unpaved areas of a property, when those structures are unlined, cracked or damaged, may be a source of releases (*id.* at 531, 535), and here, a secondary containment system was not constructed at the Property until 1989, years after Old Associated Plating had begun operating there. *See* RFJN, Ex. 29.

Thus, there is ample support upon which the Court may conclude that one or more other CERCLA hazardous substances were disposed of between 1978 and 1990.[23] SUMF 6; *see Tosco Corp.*, 216 F.3d at 892-93 (circumstantial evidence sufficient to establish a "disposal" under CERCLA Section 107(a)(2)). Accordingly, the Golnicks and Old Associated Plating are liable under CERCLA as past owners and operators, respectively. 42 U.S.C. § 9607(2); *see, e.g., Briggs &*

---

[23] Old Associated Plating continued these disposals at the Property even after 1990 when the Golnicks sold the Property. In 1994, for example, the Santa Fe Springs Fire Department cited Old Associated Plating for illegally discharging plating liquids to the ground releasing a noxious odor. *See* RFJN, Ex. 32.

*Stratton Corp. v. Concrete Sales & Servs.*, 20 F. Supp. 2d 1356 (M.D. Ga. 1998) (former metal plating owners and operators liable under CERCLA).

        **b.**    **APC Investment Co. and New Associated Plating are current "owners" and "operators," respectively, under CERCLA Section 107(a).**

APC Investment Company currently holds fee title to the Property, and New Associated Plating is the current operator of the plating business located there. *See* SUMF 7, 8. This is sufficient to establish that each of these Defendants falls within the class of persons that may be liable under Section 107. 42 U.S.C. § 9607(1); *U.S. v. Maryland Bank & Trust Co.*, 632 F. Supp. 573, 577 (D. Md. 1986).

    **3.**    **There has been a "release" or "threatened release" of hazardous substances from the Property into OU-2 Groundwater.**

        **a.**    **There have been releases of hazardous substances into the soils at the Property.**

There is no dispute that soils at the Property are contaminated with various CERCLA hazardous substances, such as hexavalent chromium, nickel, arsenic, PCE, and its daughter product vinyl chloride. SUMF 10. The presence of hazardous substances in subsurface soils at the Property is sufficient evidence that CERCLA "releases" have occurred. *See, e.g., Am. Int'l Specialty Lines Co. v. U.S.*, Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590, at *61 (C.D. Cal. June 30, 2010).

        **b.**    **The same hazardous substances in the soils at the Property are also in OU-2 Groundwater.**

Hexavalent chromium, nickel, arsenic, PCE, and its daughter product vinyl chloride have been detected in the Property soils and in OU-2 Groundwater below and downgradient of the Property. SUMF 10, 11. These undisputed facts are sufficient to establish the first two prongs of the *Castaic Lake* test. *See* 272 F. Supp. 2d at 1067.

c.     **A plausible migration pathway exists between the
Property and OU-2 Groundwater.**

iii.     **Subsurface soils at the Property present a
migration pathway to OU-2 Groundwater.**

The hydrogeology of OU-2 presents a generally unobstructed pathway for
hazardous substances disposed of or released at the Property to reach OU-2
Groundwater. *See See* Section IV.A & B.1, *supra supra*; Mutch Report, at 2-4 to 2-
9. Certainly, nothing in the subsurface soils at the Property presents an
impenetrable barrier to the migration into OU-2 Groundwater given that hazardous
substance concentrations in soil vastly exceed screening levels that were developed
to be protective of groundwater. *Id.*, at 2-4 to 2-8; 3-3 to 3-7; and § 4.3.

Concentrations of contaminants detected in the soils at the Property are too
high to credibly contend that there is no plausible pathway for those chemicals to
reach OU-2 Groundwater. In fact, they exceed soil ESLs in both shallow and deeper
soils. Hexavalent chromium was detected in concentrations as high as 9,500 μg/kg,
PCE was detected at 35,000 μg/kg, vinyl chloride at 2,000 μg/kg, arsenic at 33,000
μg/kg, and nickel at 460,000 μg/kg. Mutch Report, Table 4-4. These concentrations
exceed the soil ESLs protective of groundwater by anywhere between 17 times the
ESL for nickel to an astounding 14,000 times the soil ESL for hexavalent
chromium. *Compare* Mutch Report, Tables 3-1 and 4-4. At a minimum, these
exceedances establish that there is a *threatened* release from soil to OU-2
Groundwater, which is enough to establish liability. 42 U.S.C. § 9607(a) (liability
rests upon a "release[] *or a threatened release*" of hazardous substances) (italics
added).

ii.     **The evidence also shows *actual* releases to OU-2
Groundwater from the Property.**

But the best evidence of a ***plausible*** migration pathway between the soils at

- 28 -

the Property and OU-2 Groundwater are the uncontroverted facts establishing that the contamination in soils at the Property **has actually entered** OU-2 Groundwater. PCE, for example, has been detected in soil samples drawn from a monitoring well boring designated as "MW-4" at depths of 10, 15, 25, and 35 feet below ground surface ("bgs") where the depth to the water table is 33 feet bgs, demonstrating that soil contamination extended to the depth of the historical groundwater table (determined to be between 34 bgs to 38 bgs) and was also found in the groundwater at that location. *See* RFJN, Exs. 40, 95. In other words, PCE has been detected at the Property from the shallow soils all the way down to the water table.[24] *Id.*; Mutch Report, at 4-22.

The *location* of soil and soil gas contamination at the Property also clearly points to an onsite source at the Property. In 2004, PCE and TCE were detected in soil, and PCE daughter products vinyl chloride, cis-1,2-DCE and trans-1,2-DCE were detected in soil gas, near the former location of the vapor degreaser. RFJN, Ex. 6. The presence of PCE and certain of its breakdown products also were detected in soil gas in the vicinity of the former PCE AST. Lintecum Decl., Ex. 6.

Additionally, a comparison of groundwater samples taken at wells across the

---

[24] A consultant retained by New Associated Plating contends that a migration pathway would be "retarded" by a 4-inch thick historical concrete pad buried approximately 7 feet below the ground at the Property. *See* Lintecum Decl., Exs. 21, 95. But this theory does not hold up. Soil samples detected PCE, arsenic, chromium, and nickel both above and below the pad. *See* Mutch Report, at 4-9 to 4-11. Indeed, the PCE level in soil below the slab was detected at 6,700 μg/kg (83 times the soil ESL value), and arsenic was detected at 27,000 μg/kg (93 times the soil ESL). *Id.* and Tables 3-1, 4-4. This is unsurprising. Concrete slabs are prone to leakage at expansion points and almost invariably develop cracks from shrinkage or settlement. *Id.*, at 4-9. This historical slab had been installed many years prior to Old Associated Plating's operations. The slab does not serve as an impenetrable barrier to groundwater or contaminant migration. *Id.* at 4-11. In fact, New Associated Plating's own consultants concede that the pad would not completely stop vertical migration through the subsurface soils, as concrete can age and crack. *See* Lintecum Decl., Exs. 6, 21, 95.

1    Property indicates an onsite source of PCE. The OU-2 Groundwater generally flows

2    in a south, southwesterly direction. *See id.*, Ex. 7. Concentrations of PCE that were

3    detected in groundwater samples from MW-4, a well in the *southern* portion of the

4    Property, were higher than concentrations detected in groundwater samples taken

5    from MW-1, a well in the *northern* portion of the Property. *See* Lintecum Decl.,

6    Exs. 7, 22. These data, along with the PCE soil contamination data, indicate a PCE

7    source originating on the Property. *See* Mutch Report at 4-16 to 4-17, Table 4-6;

8    *see City of Wichita*, 306 F. Supp. 2d at 1065, 1069 (concluding that comparison of

9    groundwater samples taken at wells across a contaminated property was one of

10   several factors establishing defendant's property as source of groundwater

11   contamination).

12        The same is true for vinyl chloride and nickel. Concentrations of those

13   hazardous substances detected in groundwater samples taken in 2006 and 2007

14   from MW-4 are higher than the concentrations detected in samples from an

15   upgradient well, MW-1. *See* Mutch Report, at 4-16 to 4-18, Tables 4-7 and 4-8; *see*

16   *also* Lintecum Decl., Exs. 7, 22.

17                    **iii.    California's DTSC has concluded that the**

18                              **Property is a source of contamination in OU-2**

19                              **Groundwater.**

20        DTSC has been concerned about the environmental impact of the hazardous

21   substances released at the Property for over 20 years, since at least 1997 when it

22   entered into a settlement with Old Associated Plating regarding the unauthorized

23   treatment of cyanide bearing wastewater at the Property. *See, e.g.,* RFJN, Ex. 28. A

24   few years later, in 2003, DTSC contacted New Associated Plating indicating that

25   report prepared by URS Corporation, New Associated Plating's environmental

26   consultant, "established the fact that the soil and groundwater at the … [Property]

27   have been contaminated with Constituents of Concern … released from the

28   operations at the … [Property]." *See* RFJN, Ex. 6 at 442. Enclosed with the letter

1   was a proposed Corrective Action Consent Agreement ("Proposed CAO") under

2   which New Associated Plating was required to undertake certain work at the

3   Property. *Id.* The Proposed CAO, in a section titled "Factual Findings," stated that

4   hazardous substances "have already migrated to the groundwater." *Id.* at 444.

5       New Associated Plating and DTSC subsequently entered into a Corrective

6   Action Consent Agreement substantially similar to the Proposed CAO. *See* RFJN,

7   Ex. 42. The Corrective Action Consent Agreement, signed by New Associated

8   Plating President Michael Evans, includes a section titled "Factual Findings,"

9   which states that hazardous substances identified at the Property include metals and

10  VOCs, and that hazardous substances "have already migrated or may migrate from

11  the … [Property] into the environment through the following pathways: subsurface

12  soils, groundwater ... [and] rain surface runoff water." *Id.* at 443-444.

13      Again, in 2013, DTSC advised New Associated Plating that VOCs detected

14  in the soil and groundwater at a single location at the Property "is indicative that

15  VOCs have likely migrated to groundwater from the [Property]." *See* RFJN, Ex. 40.

16  Even New Associated Plating's own consultants have admitted that PCE

17  contamination in the groundwater "is most likely due to an on-site source." *See*

18  Lintecum Decl., Ex. 7, at 482, 486.

19      The evidence, at a minimum, leaves no doubt that a *plausible* migration

20  pathway between Property soils and OU-2 Groundwater has been present for

21  decades. SUMF 12. In the face of this evidence, the Associated Plating Defendants

22  cannot credibly argue that hazardous substances released into the Property soils at

23  levels very significantly above soil ESLs necessary to protect groundwater have not

24  been released into OU-2 Groundwater or that, at the very least, a threatened release

25  into OU-2 Groundwater does not exist.

26

27

28

# Appendix A

# Violations and Documented Releases for the Associated Plating Source Property[25]

| Date | Description | Reference |
|---|---|---|
| 3/11/1981 | Associated Plating issued an Order to Comply to cease discharging peroxide rinse water to the street. | County of Los Angeles – Department of County Engineer. Inspector's Report for Associated Plating 9636 Ann St. Santa Fe Springs, CA. 3/11/1981. |
| 2/23/1983 | Associated Plating issued a citation for washing parts and discharging waste water to the street. Company instructed to discharge through existing industrial waste system at the property. | County of Los Angeles – Department of County Engineer. Inspector's Report for Associated Plating 9636 Ann St. Santa Fe Springs, CA. 2/28/1983. |
| 4/17/1984 | Associated Plating issued multiple violations for discharge exceedances of heavy metals including nickel. | County Sanitation Districts of Los Angeles County. Final Notice of Violation of Industrial Wastewater Discharge Regulations for Associated Plating Co. No. 31628. April 17, 1984. |
| 8/30/1989 | Associated Plating Company was required by the Los Angeles County Department of Health to construct a secondary containment system along the east boundary of the Property to mitigate runoff to adjacent properties. | Maule, D.F. (Associated Plating Co.), 1989. Completion of Secondary Containment System. Letter to Brenda Wright (LA County Hazardous Waste Control Program). August 30, 1989. |
| 11/5/1992 | Pre-transport related generator violations were noted by DTSC | United States Environmental Protection Agency (USEPA). 2004. RCRA Compliance Evaluation Inspection Report – Associated Plating Co. 9636 Ann Street Santa Fe Springs, CA. January 27, 2004. |
| 5/1994 | Phase I Preliminary Site Assessment performed.  This study identified two adjacent facilities (Unocal and Dayton Superior Concrete Company) at which leaking underground storage tanks (USTs) had been reported. | Geohazard, 1994. Phase I Preliminary Site Assessment for the property located at 9636 Ann Street, Santa Fe Springs, CA (GII Project No. 9401). October 17, 1994. |
| 11/28/1994 | Notice of violation from the Santa Fe Springs Fire Department citing illegal discharge of plating liquids to the ground and causing noxious odor. | SFSFD. 11/28/1994. Haz-Mat Request for Service - Associated Plating Ann Street. |
| 12/30/1996 | Releases of sulfuric to the ground, including off-site. | Letter from Associated Plating to DTSC enclosing Phase I Environmental Assessment Checklist, 12/30/1996 |
| 12/12/1997 | Associated Plating entered into a Consent Agreement with DTSC for treating cyanide wastewater without a permit. | DTSC Consent Order, 12/1997 |
| 3/10/2000 | Notice of violation from the Santa Fe Springs Fire Department citing need to install containment structures on the plating line. | SFSFD. 3/10/2000. Notice of violation and order to comply for Associated Plating Ann Street. |
| 11/2/2000 & 11/6/2000 | Inspection report noted 7 violations including handling and storage of hazardous wastes during a facility walkthrough. | California Department of Toxic Substances Control. Inspection Report for Associated Plating Acquisition Corporation 9636 Ann St. Santa Fe |

---

[25] *See* Mutch Report, Table 4-3.

| Date | Description | Reference |
|---|---|---|
|  | One of the violations includes the following text: *"On or about November 2, 2000, Associated Plating failed to maintain and operate the facility to minimize the possibility of any unplanned sudden or nonsudden release of hazardous waste or hazardous waste constituents to air or soil which could threaten human health and environment."* | Springs, CA. 11/3/2001. |
| 2/6/2002 and 2/7/2002 | SFSFD inspection report indicates: *"discharge to ground in drum storage area – broken drum"* and *"small amount of chrome-treating w/o (sic) permit"*<br><br>It also indicates a violation regarding notification of hazardous waste treatment and the narrative indicates chrome treatment and nickel treatment<br><br>It also indicates a violation related to removing spills, leaks, and accumulated precipitation from containment area in a timely manner and the narrative indicates *"Nickel on ground"*<br><br>Notice of violation from the SFSFD indicated releases of hazardous wastes. It listed *"deteriorating/leaking drum, Nickel waste on ground, High pH materials on ground"* | SFSFD, 2002a. Inspection Report. February 6, 2002.<br><br>SFSFD, 2002b. Notice of Violation and Order to Comply for Associated Plating Ann St. February 7, 2002. |
| 11/17/2003 | Inspection report noted numerous violations, including open and unlabeled 15-gallon carboys containing spent nickel, open and unlabeled buckets, carboys, and other containers, some as large as 55-gallon drums, containing "chromate rinse used in processing" as well as "rinse water from chromate processing," "evaporated chrome rinses," and "dehydrated rinses from chromate treatment," and an open and unlabeled 55-gallon drum of "in process sulfuric acid."<br><br>A representative of Associated Plating reported that "the pipes which convey the electroless nickel plating solution expand due to the heat generated in the Facility, and leak solution."<br><br>Inspectors noted "21 55-gallon drums of spent electroless nickel plating solution . . . in the stripping area. … The immediate stripping room consisted of a … bermed area covered with a grate . . . the area beneath the grating was filled with liquid" that was later determined to qualify as a RCRA corrosive hazardous waste. | United States Environmental Protection Agency (USEPA). 2004. RCRA Compliance Evaluation Inspection Report – Associated Plating Co. 9636 Ann Street Santa Fe Springs, CA. January 27, 2004. |
| 12/22/2003 | Letter from facility representative to EPA indicated that the liquid in a bucket that was open and unlabeled at the time of inspection, was "chromate rinse used in processing." | Crane, Diana F (Associated Plating) 2003. Letter to Clint Seiter (USEPA). December 22, 2003. |
| 1/5/2004 | The "Findings of Fact" section of the DTSC Corrective Action Consent Agreement mentions "Vapor Degreaser Area" and indicates that "further | DTSC. 2004. Corrective Action Consent Agreement in the matter of Associated Plating Co. Inc. 9336 Ann Street, Santa Fe |

| Date | Description | Reference |
|---|---|---|
| | investigation is needed to determine the nature and extent of any release of hazardous waste or hazardous waste constituents" | Springs, CA 90670.  January 5, 2004. |
| 3/18/2004 | Notice of Violation stemming from 11/17/2003 inspection. Violations reference unlabeled "chromate rinse" in 9 containers. | USEPA. Notice of Violation to Associated Plating Co. 9636 Ann St. Santa Fe Springs, CA. 3/18/2004.<br><br>United States Environmental Protection Agency (USEPA). 2004. RCRA Compliance Evaluation Inspection Report – Associated Plating Co. 9636 Ann Street Santa Fe Springs, CA. January 27, 2004. |
| 6/2/2004 | EPA letter with this date lists several violations from a 11/17/2003 inspection including the one related to the open container referenced above in the 12/22/2003 letter of Diana Crane. | Henning, L., 2004 (USEPA). Letter to Diana Crane (Associated Plating). June 2, 2004. |
| 9/2005 | New APC pays $16,5000 to settle with EPA for hazardous waste violations, discovered on November 17, 2003 inspection, involving illegally storing nickel plate stripping solution, acidic waste, waste water, spent filters, and filter cake. | Mazza S., 2005. Company Settles EPA Case, Whittier Daily News, September 22, 2005. |
| 3/7/2006 | Notice of violation from the Santa Fe Springs Fire Department indicated releases of hazardous wastes and accumulation of these wastes in secondary containment structures. Waste is ordered to be removed and properly disposed of. | SFSFD. 3/7/2006. Notice of violation and order to comply for Associated Plating Ann Street. |
| 2/3/2010 | Lists two violations including storing waste for more than 90 days | Santa Fe Springs Department of Fire-Rescue, 2010. Inspection Report and Notice of Violation. February 3, 2010. |

## VI.    EARL MFG. PROPERTY

### A.    Overview

#### 1.    Operations & Owners/Operators at the Property

The Earl Mfg. Property (hereafter, for purposes of this Section VI, the "Property") is located at 11862 Burke Street, Santa Fe Springs, California. SUMF 13. For nearly 40 years, from the 1960s to 2001, the Property was the site of a plant, operating as Earl Mfg. Co., Inc. ("Earl Mfg.") that manufactured transmission jacks, spark plug cleaners, and testers, and machined aluminum castings. SUMF 14.

The Property has had several owners over the years, all of whom are intimately associated with Earl Mfg. For approximately thirty years, the Property was owned by William Earl, founder and owner of Earl Mfg., and his wife Dot, and by a family trust directed by Mr. Earl.[26] *See* Lintecum Decl., Ex. 43. In 1990, after Mr. Earl died, Earl Mfg. and the Property were transferred to William and Dot's daughter, Defendant Claudette Earl. *Id.*; Lintecum Decl., Ex. 25. Ms. Earl continued to operate Earl Mfg. Co. for another 11 years, until 2001. SUMF 13. She had significant knowledge of, and was actively involved in managing, those operations. *See, e.g.,* Lintecum Decl., Exs. 84, 85. She currently owns the Property and leases it to a machine shop which is not involved in this lawsuit. *Id.*, Ex. 25.

Earl Mfg.'s operations at the Property involved the use of various chlorinated solvents, such as PCE, TCE, and 1,1,1-TCA, all of which qualify as CERCLA "hazardous substances." SUMF 16; 40 C.F.R. § 302.4. From at least 1966 to 1992, Earl Mfg. operated a vapor degreaser to clean manufactured parts utilizing PCE as the primary solvent. *See* Lintecum Decl., Exs. 24, 26. For a period, Earl Mfg. used a solvent called Rho-Perc 235, which consisted mostly of PCE, but it also contained TCE. RFJN, Ex. 45; Lintecum Decl., Ex. 45. Earl Mfg.'s operations in the mid-

---

[26] The estates of William and Dot Earl and the Earl family trust are not parties to this lawsuit.

1  1970s also included a 100-gallon dip tank which utilized PCE. RFJN, Ex. 49.

2        The solvent used in the vapor degreaser was stored in a 500-gallon above-

3  ground storage tank. *See* Lintecum Decl., Ex. 26. TCE was stored in drums at the

4  Property as well. *Id.*, Ex. 24.

5        Earl Mfg. used 1,1,1-TCA at the Property in the 1990s. It was used as a paint

6  reducer, or thinner, in the paint booth and as a cleaner. Lintecum Decl., Exs. 27, 28.

7        Waste generated by Earl Mfg. in connection with operations at the Property

8  also contained hazardous substances, including chlorinated solvents. Waste 1,1,1-

9  TCA and various wastes containing PCE and TCE were shipped off-site. *See, e.g.,*

10 Lintecum Decl., Exs. 29, 30. Also, used waste solvent from the vapor degreaser was

11 deposited into a 1,000-gallon UST after its installation in 1973, along with waste

12 lubricating oil (*a/k/a* "Trim-Sol"). Lintecum Decl., Ex. 26. Incredibly, the Earl

13 Defendants did not notify the consultants charged with removing the UST in 1997

14 that it contained waste chlorinated solvents. *Id.*, Ex. 31. Once the consultants

15 detected potentially harmful vapors emanating from the sludge at the tank bottom,

16 they immediately stopped work and demanded that Ms. Earl advise them

17 specifically what was in the tank before resuming work. *Id.*

18                    **Summary Owner/Operator Chart**

| Year | Owner | Operator |
|------|-------|----------|
| 1960-1973 | William and Dot Earl | Earl Mfg. Co. Inc. |
| 1973-1990 | Earl Family Trust | Earl Mfg. Co. Inc. |
| 1990-2001 | Claudette Earl | Earl Mfg. Co. Inc. |
| 2001 to present | Claudette Earl | FTR Associates |

25    **2.    Hazardous Substances Releases & Violations**

26        Earl Mfg. was cited numerous times by governmental entities for violations

27 associated with its use and handling of hazardous substances and waste at the

28 Property. These violations, which date back as far as the 1980s, include improperly

storing, handling, and labeling hazardous materials at the Property.[27] *See, e.g.,* RFJN, Exs. 51, 52.

The Santa Fe Springs Fire Department was so concerned about Earl Mfg.'s irresponsible conduct in handling hazardous substances that it referred the Property to the Los Angeles County Regional Water Quality Control Board for oversight and possible corrective action. *See* RFJN, Ex. 53. In the referral, the Fire Department noted "the existence of a serious threat to groundwater from halogenated volatile organic compounds (HVOCs) at this … [Property]." *Id.* The Earl Defendants were well aware of the referral. *Id.* Ex. 54. Their efforts to address the contamination over the ensuing years, however, was woefully inadequate, prompting the Water Board to issue a Cleanup and Abatement Order in 2015. *See* RFJN, Ex 55; *see also* Mutch Report, at 6-24 to 6-25; Lintecum Decl., Ex. 33. A summary of many of the known releases of hazardous substances at the Property and reported violations is attached as Appendix B at the end of this Section.

Despite the Earl Defendants' inadequate investigation of the extent of contamination at the Property, there is no doubt that there is significant contamination in the soils. PCE, TCE, 1,1-DCA, and other VOCs have been detected in soils and soil vapor at the Property. *See* RFJN, Exs. 26, 32, 34; Lintecum Decl., Ex. 92. Tellingly, these soil samples show extremely high concentrations of hazardous substances on this Property with concentrations of PCE as high as 422,000 µg/kg in soil samples located beneath the former 1,000-gallon

---

[27] These problems continued under the new operator at the Property, FTR Associates, Inc. After FTR Associates Inc. began operations in 2001, the Santa Fe Springs Fire Department issued multiple Notices of Violation involving, among other things, failure to characterize hazardous waste and to obtain hazardous waste permits, improper storage of hazardous wastes, and failure to obtain storm water permits. *See e.g.,* RFJN, Exs. 48-50. But the Property's owner, Defendant Claudette Earl, has continued to largely ignore the environmental damage being done due to operations at her Property. *See id.*, Ex. 56; Lintecum Decl., Ex. 25.

1   UST where waste PCE and other chlorinated solvents had been dumped. *See* RFJN,

2   Ex. 32. TCE has also been detected in soil samples in concentrations as high as

3   1,100 µg/kg, which significantly exceeds soil screening levels. *Id.*, Ex. 33.[28]

4          PCE and TCE are in the groundwater beneath the Property as well.

5   Concentrations of PCE as high as 13,700 µg/L were detected in groundwater

6   samples at the Property, TCE, 1,1-DCE and cis-1,2-DCE, have also been detected

7   in the groundwater at very elevated levels. *See* RFJN, Exs. 36, 91.

8          Plaintiffs are not alone in charging that the Property is a source of the OU-2

9   Groundwater contamination. Both EPA and the California Regional Water Quality

10  Control Board have reached the same conclusion. In its 2010 OU-2 Remedial

11  Investigation Report, EPA determined that "the site of the former Earl

12  Manufacturing facility is a source of TCE and PCE, and also of 1,1-DCA and 1,1-

13  DCE contamination in OU2."[29] *See* RFJN, Ex. 1. A few years later, the Regional

14  Water Quality Control Board issued a Clean-up and Abatement Order to Defendant

15  Claudette Earl, finding that the "VOCs plume in groundwater **originating from the**

16  **site** has migrated offsite, affecting more groundwater resources …." *See id.*, Ex. 51

17  (emphasis added). And as recently as June 2019, the Board repeated that "[o]ff-site

18  impacts to . . . groundwater from releases at the … [Property] have been confirmed

19  …." *Id.*, Ex. 57.

20          **C.    Argument**

21          Plaintiffs are entitled to partial summary judgment as to the three judicial

22  _____

23  [28] While Earl Mfg. continued to dump and store wastes classifying as federal
    hazardous wastes into the former UST between 1986 until 1997, there is no record

24  that Earl Mfg. ever applied for or received a hazardous waste permit for the former

25  waste UST.

26  [29] In 2012, EPA issued Special Notice Letters to Claudette Earl and Earl Mfg.,
    identifying them as responsible parties under CERCLA for the OU-2 Groundwater

27  contamination. *See* Plaintiffs' and Defendants Claudette Earl and Earl Mfg.

28  Stipulation of Undisputed Facts ("Stipulation") (Dkt No. 597) ¶¶ 14-15, Exs. A, B.

1    determinations sought against Earl Mfg. and Claudette Earl. There is no dispute as

2    to any of the material facts establishing that: (1) the Property constitutes or contains

3    one or more CERCLA "facilities;" (2) Earl Mfg. and Claudette Earl fall within one

4    of the four classes of "persons" subject to the liability provisions of Section 107(a)

5    as current or former "owners" or "operators;" and (3) there has been a release or

6    threatened release of hazardous substances from the Property into OU-2

7    Groundwater.

8                    **1.       The Earl Mfg. Source Property constitutes or contains one**

9                              **or more CERCLA facilities**

10        Earl Mfg. and Claudette Earl do not dispute that the Property qualifies as a

11   "facility" under CERCLA. They have stipulated that "[o]ne or more Hazardous

12   Substances [as that term is defined under CERCLA], or waste containing

13   Hazardous Substances, have come to be located at the Earl Mfg. Property." *See*

14   Plaintiffs' and Defendants Claudette Earl and Earl Mfg. Stipulation of Undisputed

15   Facts ("Stipulation") (Dkt No. 597) ¶ 8. They also admit that hazardous substances

16   have been found in an underground storage tank at the Property, and that those

17   substances are in the soil at the Property. *See id.* ¶¶ 7-11.

18        These admissions are well supported by the record. PCE and TCE have been

19   found in the soil at the Property, both of which are CERCLA "hazardous

20   substances." *See* SUMF 17; 40 C.F.R. § 302.4. PCE and TCE were also detected in

21   sludge samples taken from the 1,000-gallon UST at the Property, and PCE and a

22   solvent containing PCE and TCE were stored in an above-ground storage tank, and

23   TCE was stored in drums there as well. *See* Section A.1, *supra*. Thus, there can be

24   no dispute that the Property is or contains a CERCLA facility. SUMF 16, 17; *see*

25   *3000 E. Imperial,* 2010 U.S. Dist. LEXIS 138661 at *3, 7 (contaminated property is

26   a CERCLA "facility"); *Am. Int'l Specialty Lines*, 2010 U.S. Dist. LEXIS 65590, at

27   *61-62, 68-69 (storage containers at plant qualify as "facilities"); 42 U.S.C.

28   § 9601(9)(A) ("'facility' means … any … storage container").

1
2
3

**2.     Claudette Earl and Earl Mfg. fall within one of the four
classes of "persons" subject to the liability provisions of
Section 107(a).**

4
5

**a.     Claudette Earl is a "current owner" under CERCLA
Section 107(a).**

6
7
8
9
10
11
12

Claudette Earl has stipulated that she is a "person," as defined under
CERCLA, who currently owns the Earl Mfg. Property. Stipulation ¶¶ 2-3, 13; *see
also* 42 U.S.C. § 9601(21) (defining "person" as, among other things, "an
individual"). As the current holder of fee title to the Property, Defendant Claudette
Earl indisputably falls within the class of persons subject to liability under
CERCLA. *See City of Los Angeles v. San Pedro Boat Works,* 635 F.3d 440, 451-52
(9th Cir. 2011) (fee title owner of real property is a "current owner").

13
14

**b.     Earl Mfg. is a "former operator" under CERCLA
Section 107(a).**

15
16
17
18
19
20

Earl Mfg. admits that it was a California corporation that used to
manufacture springs, spark plugs, jacks, and other machined parts at the Property
from about the mid-1960s until at least 2000. Stipulation ¶¶ 4-6. It also admits that
it "was responsible for the day-to-day management of those operations, including
control over the use, storage, disposal and handling of chemicals and other
substances involved in the operations at the Earl Mfg. Property." *Id.* ¶ 6.

21
22
23
24
25
26
27
28

Earl Mfg. further admits that during the time it operated at the Property there
was a "disposal" of hazardous substances there. SUMF 15. Specifically, it admits,
echoing the statutory definition of the term "disposal," that "[b]etween 1960 and
2000, one or more Hazardous Substances was discharged, deposited, injected,
dumped, spilled, leaked, or placed into the soil at the Earl Mfg. Property."
Stipulation ¶ 10; *see also* 42 U.S.C. §§ 9601(29), 6903(3) (defining "disposal").
Earl Mfg., therefore, falls within the definition of a "former operator" under
CERCLA. *See* 42 U.S.C. §§ 9601(20)(a)(ii) (defining "operator" as "any person …

1    operating … [a CERCLA] facility), 9607(21) (defining "person to include corporate

2    entities), 9607(a)(2) (operator during time of a disposal is liable under CERCLA);

3    *United States v. Bestfoods,* 524 U.S. 51, 66-67 (1998) (operator is "someone who

4    directs the workings of, manages, or conducts the affairs of a facility," particularly

5    someone who manage[s], direct[s], or conduct[s] operations specifically related to

6    pollution").

7            **3.    There was a "release" or "threatened release" of hazardous
8    substances from the Property into OU-2 Groundwater.**

9            **a.    There have been releases of hazardous substances into
     the soils at the Property.**

10       Earl Mfg. and Claudette Earl expressly admit that "[o]ne or more Hazardous

11   Substances have been 'released,' as that term is defined under CERCLA Section

12   101(22), 42 U.S.C. § 9601(22), into the soil at the Earl Mfg. Property." SUMF 17;

13   Stipulation ¶ 9. They further admit that "Hazardous Substances have been detected

14   in the soil at the Earl Mfg. Property." *Id* ¶ 11. However, these Defendants refuse to

15   admit that the extensive contamination in the soil at the Property has been released,

16   or there remains today a threatened release, into OU-2 Groundwater. Defendants'

17   position on this point is baffling given the indisputable evidence establishing that

18   hazardous substances in Property soils have impacted OU-2 Groundwater.

19           **b.    The same hazardous substances in the soils at the
20   Property are also in OU-2 Groundwater.**

21       PCE and TCE were used by Earl Mfg. and have been detected in both the

22   Property soils and in OU-2 Groundwater below and downgradient of the Property.

23   SUMF 18. These undisputed facts are sufficient to establish the first two prongs of

24   the *Castaic Lake* test. *See* 272 F. Supp. 2d at 1067.

25           **c.    A plausible migration pathway exists between the
26   Property and OU-2 Groundwater.**

27       Irrefutable evidence shows that there is a plausible, if not certain, migration

28   pathway from the soil at the Property to OU-2 Groundwater. SUMF 19. The

1   permeability of the subsurface soils underneath the Property does not present a

2   barrier to the downward migration of contaminants—detected at concentrations

3   significantly exceeding soil screening levels—into OU-2 Groundwater. *See* Section

4   IV.A & B.1, *supra*; Mutch Report, at 2-4 to 2-9. PCE was detected in relatively

5   shallow soils at the Property in concentrations as high as 422,000 µg/kg—a

6   concentration that is over 5,200 times the soil screening level for PCE that is

7   protective of groundwater. *See* Lintecum Decl., Ex. 32; *compare* Mutch Report,

8   Tables 3-1 and 6-4. PCE was also detected as deep as 20 feet bgs at 180,000 µg/kg,

9   which is over 2,200 times the soil screening level protective of groundwater.

10  Lintecum Decl., Ex. 33; *compare* Mutch Report, Tables 3-1 and 6-4. TCE was

11  similarly detected in soils at 20 feet bgs in a concentration that is 13 times the TCE

12  soil screening level. *See id.*

13          Indeed, there is evidence of soil contamination at the Property from relatively

14  shallow soils all the way down to the water table. Sampling from three separate soil

15  borings at the Property, designated as SB-7, SB-8, and SB-9, detected PCE at five-

16  foot intervals from 5 feet bgs down to 25 feet bgs. *See* Lintecum Decl. Ex. 33.

17  Sampling from the same three soil borings detected TCE at each of these depths as

18  well. *See id.* Historical groundwater levels at the Property are estimated to be as

19  shallow as 24 or 25 feet below the ground surface, and the water table was as

20  shallow as 28 feet in 1999, two years before Earl Mfg. stopped operating there. *Id.*

21  Exs. 32, 54, 53. Moreover, these three soil borings are located near suspected onsite

22  sources of releases to soils at the Property. SB-7, SB-8, and SB-9 surround the

23  location of the former PCE vapor degreaser and 500-gallon PCE above-ground

24  storage tank. *Id.*, Ex. 33.

25          Groundwater sampling at the Property tells a similar tale. Sampling of a

26  groundwater monitoring well in 1999 near the former waste underground storage

27  tank shows the maximum PCE concentration measured on the Property of 13,700

28  µg/L. Lintecum Decl., Ex. 91. Moreover, groundwater sampling conducted by EPA

1  as part of its OU-2 Remedial Investigation detected significantly higher

2  concentrations of PCE and TCE in samples taken immediately downgradient of the

3  Property and lower concentrations of PCE and TCE in upgradient groundwater

4  samples. *See* RFJN, Ex. 1, at 45 (OU-2 RI at 5-10). One would expect to find such

5  a pattern where an onsite source at the Property is contributing to contamination in

6  OU-2 Groundwater as the groundwater flows underneath the Property.

7        EPA and the Regional Water Quality Control Board have also concluded that

8  the hazardous substances released to soils at the Property have impacted OU-2

9  Groundwater. After a nine-year investigation of OU-2 conducted by EPA to

10  evaluate the nature and extent of the groundwater contamination and contamination

11  sources at the Omega Superfund Site, EPA consultant CH2MHill identified the Earl

12  Mfg. Property as a "known source" of the contamination in OU-2 Groundwater.

13  RFJN, Ex. 1, at 34, 45 (OU-2 RI at 1-8, 5-10). CH2MHill "concluded that the site

14  of the former Earl Manufacturing facility is a source of TCE and PCE …

15  contamination in OU2," as well as a source of 1,1-DCA and 1,1-DCE, daughter

16  products of PCE and TCE. *Id.*

17        More recently, the California Regional Water Quality Control Board echoed

18  that same conclusion. The Board developed a draft Cleanup and Abatement Order

19  in 2013 naming Claudette Earl as a "Discharger" that "caused or permitted waste to

20  be discharged or deposited where it is, or probably will be discharged into the

21  waters of the state …." *See* RFJN, Ex. 51, at 950 (Draft Cleanup and Abatement

22  Order No. R4-2013-0012 at 1). The draft order further provides that "PCE and TCE

23  have been detected in groundwater at concentrations up to 13,700 µg/L and 1,7300

24  µg/L, respectively, (*id.* at 953 (Order at 4), and "[t]he VOCs plume in groundwater

25  *originating* from the … [Property] has migrated offsite, affecting more groundwater

26  sources; and has not been adequately delineated." (*id.* (italics added)). The draft

27  order concludes: "Substantial evidence indicates that the Dischargers caused or

28  permitted waste to be discharged into waters of the State and is therefore

1    appropriately named as a responsible party in this Order." *Id.* at 955.

2    Despite efforts by Defendant Claudette Earl to avoid or otherwise limit her

3    responsibility under the draft Order, the Board issued its final Cleanup and

4    Abatement Order on January 14, 2015. The findings and conclusions of the draft

5    order essentially remained unchanged in the final order: Ms. Earl was determined to

6    be responsible for causing or permitting VOCs at the Property to contaminate OU-2

7    Groundwater. *See* RFJN, Ex 55. The Board further ordered that Ms. Earl

8    "[i]mplement a cleanup and abatement program for the cleanup of wastes in soil

9    matrix, soil vapor, and groundwater and the abatement of the effects of the

10   discharges of waste on the beneficial use of water." *Id.*

11   To date, no such cleanup has occurred. RFJN, Ex. 59. In fact, since 1997,

12   despite knowledge of significant contamination at this Property, Claudette Earl and

13   Earl Mfg. made no efforts to conduct any meaningful investigation, let alone

14   remediation, of soil contamination at the Property for two decades. Limited

15   investigation efforts began (begrudgingly) only three years ago. *See* RFJN, Ex 55;

16   Lintecum Decl., Ex. 33; Mutch Report, at 6-12, 6-14, 6-16, 6-24 to 6-25. For

17   example, there had been only five soil borings collected prior to 2017 and only two

18   shallow borings prior to 2012. *See* Mutch Report, at 6-12.

19   Put simply, given the Earl Defendants' failure to take seriously the

20   environmental releases at the Property, hazardous substances detected in soils at the

21   Property remain there today in concentrations that exceed the soil screening levels

22   developed to protect groundwater. Thus, setting aside the evidence of *actual*

23   releases of hazardous substances into OU-2 Groundwater, the *threat* of additional

24   releases into OU-2 Groundwater remains significant today. *See, e.g., Burlington N.*

25   *R. Co. v. Woods Indus., Inc.*, 815 F. Supp. 1384, 1392 (E.D. Wash. 1993) (buried

26   materials that threaten groundwater constituted threatened release subjecting

27   defendant to liability).

28

# Appendix B

# Violations and Documented Releases for the Earl Mfg. Source Property[30]

| Date | Description | Reference |
|------|-------------|-----------|
| 3/21/1984 | A notice of violation issued by the County of Los Angeles Department of Health Services, indicated unauthorized discharge of paint to ground surfaces near the paint booth. | RWQCB, Los Angeles. 5/16/2013. Draft Cleanup and Abatement Order No. R4-2013- 0012 for former Earl Manufacturing, 11862 Burke St, Santa Fe Springs, California. |
| 4/12/1987 | A letter from the Regional Water Quality Control Board indicates: *"A complaint received by this Board recently indicates that your facility may be illegally discharging wastewater from its cooling tower to the storm drain."* | Wong, N. (California Regional Water Quality Control Board- Los Angeles Region), 1987. Waste Discharge Requirements - Discharge of Cooling Tower Water At The Earl Manufacturing Facility. Letter to Frank Lescrinier (Earl Manufacturing). April 12, 1987. |
| 3/11/1988 | Handwritten note from this date states *"Discharge permit has been granted, but this requires monthly, quarterly, and annual monitoring and reporting. Eliminate reporting/monitoring by eliminating discharge to channel. Reduce cooling tower discharge to 2-3 gal/day and discharge to sanitary sewer. Same with drinking fountain drain next to degreaser. Third source of discharge to channel thru (sic) same drain pipe must be identified and eliminated."* | Unknown Author, 1988. Cooling Tower Waste Discharge. March 11, 1988. |
| 5/9/1989 | A notice of violation issued by the LAC Department of Health services to Earl Manufacturing Company for: <br> • Storing hazardous waste for longer than 90 days <br> • Failure to store hazardous waste is compatible containers <br> • Failure to properly label all hazardous waste containers <br> • Failure to segregate waste cooling oil from spent solvent waste <br> • Requirement to provide analysis for UST waste <br> • Recommend containment to prevent oily runoff from reaching Sorensen Creek. | County of Los Angeles Department of Health Services – Hazardous Materials Control Program. 5/9/1989. Notice of Violation and Order to Comply for Earl Mfg Co. 11862 Burke St. Santa Fe Springs, CA. |
| 9/2/1992 | This 1992 letter from Ecotek to Claudette Earl indicates that the disposal of a solution containing Almco 3 "on the grassy area of Earl Mfg" is not a proper disposal method | Johnson, R. V. (Ecotek), 1992, Disposal Strategies for Aqueous Solutions Containing "Almco 3" Abrasive Compound. Letter to Claudette Earl (Earl Manufacturing). September 2, 1992 |
| 10/24/1997 | Letter from the Santa Fe Springs Fire Department to the LA Regional Water Quality Control Board regarding concern on the serious threat of | Letter from Santa Fe Springs Fire Department to LA Regional Water Quality Control Board dated October 24, 1997. |

---

[30] *See* Mutch Report, Table 6-3.

| Date | Description | Reference |
|---|---|---|
| | groundwater impacts from the operations at the Property as a result of measurements taken during the UST removal. SFSFD suggests oversight by the RWQCB on possible corrective action. The SFSFD states:<br><br>*"SFSFD finds reason for great concern regarding potential ground water threats from this release, and asks that your agency expedite oversight of any corrective action at this site to minimize impacts to groundwater in the Santa Fe Springs City area, and to please keep the SFSFD informed of your actions at this site."*<br><br>Letter also notes that sludge contains very high VOC levels. | |
| 12/2/1997 | Letter from the CA RWQCB to Earl Manufacturing noting that the RWQCB will be reviewing site inspections and assessments previously conducted at the Property. These reviews will be used in support of corrective action measures and possible remedial action at the Property. | Dickerson, D.A. (CA RWQCB), 1997. Letter to Claudette Earl (Earl Manufacturing), December 2, 1997. |
| 7/12/2000 | An NOV from this date requests Claudette Earl to provide a description of all remaining hazardous materials and waste and how they will be disposed of. | Santa Fe Springs Fire Department, 7/12/2000. Notice of Violation and Order to Comply to Earl Manufacturing Co., Inc. 11862 Burke. |
| 8/8/2000 | A letter from this date from the Regional Water Quality Control Board to Claudette Earl states:<br><br>*". . . we have determined that the previous chemical use at this facility has resulted in soil and groundwater contamination, but the full lateral and vertical extent of soil and groundwater contamination has not been adequately defined."* | Geroch, J. (CA RWQCB), 2000. Letter to Claudette Earl (Earl Manufacturing), August 8, 2000. |
| 2/12/2002 | A notice of violation issued by the Santa Fe Springs Fire Department to FTR Associates Inc. for:<br>• Disposal of unknown materials in 55-gal drum stored outdoors<br>• Failure to send copies of previous waste disposal receipts<br>• Failure to obtain a hazardous waste generator permit | Santa Fe Springs Fire Department. 2/12/2002. Inspection Report & Notice of Violation to FTR Associates Inc. 11862 Burke Street Santa Fe Springs, CA 90670. |
| 4/18/2005 | A notice of violation issued by the Santa Fe Springs Fire Department to FTR Associates Inc. for:<br>• Failure to update chemical inventory<br>• Failure to properly manage used oil. Two 55-gal drums of waste oil/water stored outside and in small buckets. | Santa Fe Springs Fire Department. 4/18/2005. Inspection Report & Notice of Violation to FTR Associates Inc. 11862 Burke Street Santa Fe Springs, CA 90670. |
| 3/1/2008 | A notice of violation issued by the Santa Fe Springs Fire Department to FTR Associates Inc. for:<br>• Failure to obtain a hazardous waste generator permit<br>• Multiple violations concerning the storage, handling, and labeling of hazardous waste | Santa Fe Springs Fire Department. 3/11/2008. Inspection Report & Notice of Violation to FTR Associates Inc. 11862 Burke Street Santa Fe Springs, CA 90670. |

| Date | Description | Reference |
|---|---|---|
| | • Failure to implement best management practices to mitigate potential stormwater runoff from the Property | |
| 5/3/2008 | A notice of violation issued by the Santa Fe Springs Fire Department to FTR Associates Inc. for:<br>• Failure to make a hazardous waste determination on process waste sludge<br>• Failure to comply with chemical inventory requirements. | Santa Fe Springs Fire Department. 5/13/2008. Inspection Report & Notice of Violation to FTR Associates Inc. 11862 Burke Street Santa Fe Springs, CA 90670. |
| 3/2/2011 | A notice of violation issued by the Santa Fe Springs Fire Department to FTR Associates Inc. for:<br>• Failure to obtain hazardous waste generator permit<br>• Failure to perform hazardous waste determination<br>• Failure to properly label hazardous waste<br>• Failure to submit hazardous waste business plan<br>• Failure to obtain an industrial waste permit<br>• Failure to obtain stormwater permit | Santa Fe Springs Fire Department. 3/7/2011. Inspection Report & Notice of Violation to FTR Associates Inc. 11862 Burke Street Santa Fe Springs, CA 90670. |
| 5/16/2013 | Draft Cleanup and Abatement Order to Earl Manufacturing outlines a source of PCE and TCE to groundwater and soils from the Property and indicates that the plume has moved off the Property and is not sufficiently delineated.<br><br>*"Historical industrial operations at Earl Manufacturing (site) from the early 1960s to 2001 resulted in the discharge of wastes, including volatile organic compounds (VOCs), particularly tetrachloroethene (PCE), trichloroethene (TCE) and other waste constituents of concern to the environment"* | California Regional Water Quality Control Board - Los Angeles. 2013. Draft cleanup and abatement order No. R4-2013- 0012 for former Earl Manufacturing, 11862 Burke St, Santa Fe Springs, California. May 16, 2013. |
| 10/10/2013 | Requirement for Earl Manufacturing to conduct a soil vapor survey and vapor intrusion evaluation at the Property. | Rasmussen, P. (CA RWQCB), 2013b. Letter to Claudette Earl (Earl Manufacturing), October 10, 2013. |

- 47 -

## VII.   THE PHIBRO-TECH SOURCE PROPERTY

### A.   Overview

#### 1.   Summary of operations

The Phibro-Tech Source Property (hereafter, for purposes of this Section VII, the "Property") is located at 8851 Dice Road, Santa Fe Springs, California, a parcel covering almost 5 acres. SUMF 20. For six decades, since at least 1958 and long before many environmental regulations and modern procedures for safe hazardous waste handling were developed, the Property has been the location of an inorganic chemical manufacturing and waste chemical reprocessing plant, and, since 1980, has been considered by EPA and California as a RCRA-regulated hazardous waste treatment, storage and disposal facility that may not operate without a RCRA hazardous waste permit. SUMF 23; 40 C.F.R. § 270.1(c) (2018). The facility is currently operating under a 1991 RCRA permit that expired in 1996.

While the facility has been allowed to operate under this expired permit during the last twenty-five years, its current operator, Phibro-Tech, Inc. ("Phibro-Tech"), has continued to violate both the conditions of the permit and the hazardous waste regulations. When DTSC proposed issuance of a renewal permit about 10 years ago, the public reaction against issuance of a renewal permit was very strong, and DTSC has not yet issued a renewal permit.[31]

Products produced at the facility include ferrous and ferric chloride, copper

---

[31] *See, e.g.,* Santa Fe Springs and Los Nietos Residents Oppose Permit Extension and Expansion for Phibro Tech Hazardous Waste Facility in Santa Fe Springs, Business Wire (Oct. 18, 2010) available online at https://www.businesswire.com/news/home/20101018007256/en/Santa-Fe-Springs-and-Los-Nietos-Residents-Oppose-Permit-Extension-and-Expansion-for-Phibro-Tech-Hazardous-Waste-Facility-in-Santa-Fe-Springs;  Tucker, Liza, Keep the Client Happy, Golden Wasteland, Consumer Watchdog at 32, available at https://consumerwatchdog.org/search/node?keys=golden%20wasteland&page=4 (calling Phibro-Tech a "serial environmental violator").

oxide and copper sulfate, zinc sulfate, etchants, solder strippers, brighteners, conditioners, and other specialty products used in the aerospace and electronics industries. Lintecum Decl., Exs. 43, 53. As of the mid-1970s, materials utilized to produce products included chlorine, sodium hydroxide, zinc oxide, sulfuric acid, hydrochloric acid, aqua ammonia, scrap iron, alkaline etchant, chromic sulfuric etchant, copper oxide, copper sulfate, and zinc sulfate. RFJN, Ex. 58; Lintecum Decl., Ex. 48. These manufacturing raw materials included large volumes of waste chemicals sent to the facility for reprocessing.[32]

Chromium and hexavalent chromium have been utilized in processes at the Property for decades. Lintecum Decl., Exs. 39, 48. In fact, Phibro-Tech employees have testified that a significant part of Phibro-Tech's business was to accept waste streams that contain hexavalent chromium to be used as raw materials in manufacturing etchants. *See* Lintecum Decl., Ex. 52 (Dep. Tr. D. Thaete 17:2-20). Chemicals associated with operations at the Property also included chromic acid and chromic-sulfuric acid solutions. *Id*., Ex. 48. A leaking 3,000-gallon underground storage tank ("UST") containing chrome etching solution was located at the Property as were numerous ponds and lagoons used to manage chromium-containing wastes.[33] *Id*., Exs. 48, 49.

Wastes generated from manufacturing and reprocessing operations have included wastewater containing chromic and sulfuric acid, wastewater contaminated with chromium, iron chloride solutions containing arsenic and nickel, pond sludge. *See* Lintecum Decl., Exs. 43, 44, 68.

---

[32] According to one DTSC document, the volume of aqueous waste received at the Property for reprocessing has been enormous, on the order of **35 million gallons annually**. *See* RFJN, Ex. 60.

[33] Use of chromium at the Property is also evident from the fact that Phibro-Tech and its predecessors obtained permits to dispose of chrome-bearing wastes and to discharge chromium recovery by-products to the sewer system. *See* Lintecum Decl., Exs. 39, 48, 50.

1    For decades, the facility relied upon ground-based units for reprocessing

2    chemicals and for waste management. These ground-based units included both

3    lined and unlined lagoons and ponds. *See* RFJN, Exs. 62, 63. While the use of some

4    of the ground-based units ceased by the mid-1980s, waste remained in these units

5    and the units, which still contained hazardous substances, did not complete closure

6    for many years after the mid-1980s. *Id.*, Ex. 74. Above ground and underground

7    storage tanks, sumps, and 55-gallon drums were also widely used to manage

8    chemicals and waste. Lintecum Decl., Ex. 90 (12/20/71 SCC Engineering

9    Evaluation).

10                           **2.    Owners and operators**

11    The Property has had two owners since 1903, and the chemical

12    manufacturing plant has had essentially one owner for purposes of CERCLA

13    liability. Defendant Union Pacific Railroad Company's predecessors-in-interest

14    (collectively, "Union Pacific") owned the Property from 1903 until 1985.[34] SUMF

15    20. Defendant First Dice Road Company ("First Dice") has owned it since 1985.

16    SUMF 22. The chemical manufacturing and reprocessing business has been run by

17    Defendant Phibro-Tech and its predecessors-in-interest, which have leased the

18    Property, since at least 1958.[35] SUMF 23. A summary of the pertinent Property

19    owners and operators (collectively, the "Phibro-Tech Defendants") is included in

20    the table that follows.

21                        **Summary Owner/Operator Chart**

| Year | Owner | Operator |
|------|-------|----------|
| 1903-1911 | Pacific Electric Land Co. | N/A |

24    _____

25    [34] The predecessors include Pacific Electric Land Co., Pacific Electric Railway Co., Southern Pacific Co., and Southern Pacific Transportation Co. *See* SUMF 20.

26    [35] Phibro-Tech contends that it is not the successor-in-interest to the company that

27    operated the chemical plant prior to 1984, but as explained below, the facts establish otherwise.

28

| 1911-1958 | Pacific Electric Railway Co. | N/A |
|---|---|---|
| 1958-1959 | Southern Pacific Co. | Southern California Chemical Co. ("Old SCC")[36] |
| 1959-1969 | Southern Pacific Co. | Old SCC |
| 1969-1984 | Southern Pacific Transportation Co. | Old SCC |
| 1984-1985 | Southern Pacific Transportation Co. | Southern California Chemical Co., Inc. ("New SCC") /Phibro-Tech, Inc.[37] |
| 1985-present | First Dice Road Co.[38] | Phibro-Tech, Inc. |

### 3.    Summary of hazardous substance releases and violations

From the late 1950s through today, government officials have repeatedly and consistently identified large numbers of operational environmental violations and an extensive number of releases of hazardous substances to the ground. There are numerous documented violations for improper waste handling, both on the Property

---

[36] Two related companies by the name of Southern California Chemical Company operated the chemical manufacturing and reprocessing plant at the Property, so to avoid confusion, the first such company, which operated from at least 1958 to 1984, is referred to here as "Old SCC."

[37] Phillip Brothers Chemicals, Inc. ("Phillips") purchased Old SCC in 1984 and immediately assigned its interest in the business to its subsidiary, C.P. Chemicals, Inc., which assigned that interest to its newly formed affiliate, Southern California Chemical Co., Inc. ("New SCC"). *See* Lintecum Decl., Exs. 88 (1984 Purchase Agreement) 89 (Assignments). Through a series of transactions, including a merger and name change, Phibro-Tech became the successor-in-interest to New SCC, a fact that Phibro-Tech has admitted in its discovery responses in this case. *Id.*, Ex. 47 (PTI Interrog. Responses).

[38] In 1984, as part of the transaction to sell its business, Old SCC entered into an agreement with Union Pacific to buy the Property and in 1985, assigned that interest to First Dice, a corporate affiliate of Phibro-Tech. *See* Lintecum Decl., Ex. 88-89. Union Pacific subsequently granted the Deed to the Property to First Dice. SUMF 20, 22.

1   and adjacent to the Property. *See* Lintecum Decl., Ex. 39.[39] For example, in 1959,

2   the facility received a notice of violation for releasing hexavalent chromium to the

3   ground on the Property and on adjacent properties. *Id.* In fact, the improper

4   discharge of wastes to the adjacent railroad right of way continued for two decades

5   with many occurrences recorded. *See id.,* at 40, 41, 42; RFJN, Exs. 97-100.

6       Release of waste from Property operations to sewers has also caused

7   problems. In 1969, the LA County Sanitation District ordered Old SCC to cease

8   discharging to the sewer because of high concentrations of metals including

9   chromium, nickel, and copper. *See* Lintecum Decl., Ex. 39. In July 1978, a failure

10  of SCC's wastewater treatment system resulted in the overflow and discharge of

11  industrial waste, including to areas surrounding the Property. *Id.* (at 4-4).

12      By 1968, two years before the formation of the USEPA, a local governmental

13  agency reportedly noted that the Property may have "critical ground water pollution

14  problems due to ground disposal of toxic wastes," and almost 20 years later, an

15  EPA investigator reportedly described the business as "a shoddily run operation …

16  that has attempted to circumvent all regulatory processes … and has taken a very

17  callous approach to matters of environmental quality." *See* Lintecum Decl., Ex. 39;

18  RFJN, Ex. 64. Compliance remained a problem into the 1980s. *Id.* In a 1987 RCRA

19  Facility Assessment performed for EPA after the Property's land owner changed,

20  facility operations remained highly problematic. The 1987 report noted a long

21  history of poor housekeeping practices including numerous spills, leaking tanks and

22  drums, improper disposal practices, and discharges to the railroad right of way.

23  Lintecum Decl., Ex. 43. The report, based on a visual site inspection, summarized

24  _____

25  [39] This report identified many of the onsite releases but was far less complete in
    identifying documented releases that impacted adjacent offsite locations.

26  Importantly, as of the date of the report, there was limited or no documentation that
    the full extent of these releases had been investigated or that necessary remedial

27  actions had been taken to address the releases.

28

the situation as one with "much evidence of leakage and spillage of product or waste materials." *Id.*

The documentation of releases and violations is extensive over decades and over all ownership and operator time periods.[40] Indeed, in March 2017, the California Attorney General filed a complaint against Phibro-Tech seeking civil penalties and injunctive relief and alleging, among other things, that Phibro-Tech has failed to maintain and operate its business to minimize the possibility of a release of hazardous waste, illegally transferred or offloaded incoming hazardous waste liquids without taking precautions to contain leaks and spills, and stored hazardous waste on cracked and uncoated surfaces exposing the soil beneath.[41] A complete account of the recorded violations and known releases at the Property is too extensive to be recounted here, so a summary is provided in Appendix C.

When governmental agencies began to require assessments of the environmental condition at the Property, the sampling revealed heavy contamination in the soil. Importantly, many of the detected hazardous substances, including hexavalent chromium, PCE, TCE, 1,2-DCA, and cis-1,2-DCE, were identified at concentrations that exceeded soil screening levels by tens, hundreds, thousands, and even millions of times the soil levels protective of groundwater that have been adopted by EPA and the RWQCB-LA. SUMF 25; *see also* Mutch Report § 8.2.3. These same chemicals have been detected in groundwater beneath the

---

[40] Documents reporting these observations include Lintecum Decl., Exhibits 39, 87, as well as RFJN, Exhibit 64.

[41] The First Amended Complaint ("FAC"), in *People of the State of Calif. v. Phibro-Tech, Inc.*, No. BC655177, Sup. Ct. of the State of Calif., Cty. of Los Angeles, is attached as Exhibit 65 to Plaintiffs' RFJN. Phibro-Tech also allegedly failed to maintain integrity of groundwater monitoring wells and made false statements regarding its storage and processing of certain hazardous waste. *Id.* This case was settled in early 2019 and Phibro-Tech paid just under $500,000 is civil penalties. *See* Jan. 31, 2019 DTSC News Release available online at https://dtsc.ca.gov/wp-content/uploads/sites/31/2019/02/News_Release_T-1-19.pdf.

Property. *Id.* § 8.2.4. Federal and state environmental regulatory agencies widely agree that hazardous substances, including hexavalent chromium and VOCs, have migrated from the Property soils into OU-2 Groundwater and continue to pose a threat.

### B. Argument

Plaintiffs are entitled to partial summary judgment as to the three judicial determinations sought against the Phibro-Tech Defendants. There is no dispute as to any of the material facts establishing that: (1) the Property constitutes or contains one or more CERCLA "facilities;" (2) each of the Phibro-Tech Defendants falls within one of four classes of "persons" subject to the liability provisions of Section 107(a) as current or former "owners" or "operators;" and (3) there has been a release of hazardous substances from the Property into OU-2 Groundwater.

### 1. The Property constitutes or contains one or more CERCLA facilities.

As noted above, chromium and hexavalent chromium have been utilized in processes at the Property for decades. *See* Section A.1, *supra*. A solvent tank was located at the Property, and Phibro-Tech has identified PCE waste as one of the federal hazardous wastes handled at the Property. *See* RFJN, Exs. 67, 68.

Various equipment, structures, and tanks associated with the use, handling, and storage of hazardous substances are located at the Property. *See* Section A.1, *supra*. SUMF 24. These included a solvent tank and a leaking 3,000-gallon underground storage tank ("UST") containing chrome etching solution as well as numerous ponds and lagoons used to manage chromium-containing wastes. *Id.*

Hexavalent chromium, 1,1,1-TCA, PCE, TCE and 1,1-DCE, cis-1,2-DCE, and trans-1,2-DCE, have been found in the soil at the Property. Mutch Report §8.2.3. Each of these substances qualifies as a "hazardous substance" under CERCLA. *See* 40 C.F.R. § 302.4.

Given these undisputed facts, the Property unquestionably constitutes a CERCLA "facility" and contains many others. *See* 42 U.S.C. § 9601(9) (defining "facility" to include ponds and lagoons); *3000 E. Imperial, LLC v. Robertshaw Controls Co.*, No. 08-cv-3985 PA, 2010 U.S. Dist. LEXIS 138661 at *3, 7 (C.D. Cal. Dec. 29, 2010) (contaminated property qualifies as CERCLA "facility"); *Am. Int'l Specialty Lines Ins. Co. v. United States*, No. CV 09-01734 AHM RZX, 2010 WL 2635768, at *21 (C.D. Cal. Jun. 30, 2010) (buildings, equipment, infrastructure qualify as facilities).

### 2. Each of the Phibro-Tech Defendants falls within one of four classes of "persons" subject to the liability provisions of Section 107(a).

#### a. Union Pacific qualifies as a "former owner" under CERCLA Section 107(a).

Union Pacific held fee title to the Property from 1903 until 1985, which included a period of almost three decades when the chemical manufacturing and reprocessing business operated there. SUMF 20. During that period, there were multiple "disposals" of CERCLA hazardous substances. SUMF 21. Discharges of chemicals to the ground are documented in every decade from the 1950s through the mid-1980s when Union Pacific sold the Property. *Id.* For example, there was extensive use at the Property of waste management units such as ponds, lagoons, and clarifiers, which are common sources of disposals at contaminated properties.[42] *See Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000) (use of ponds provides circumstantial evidence of disposal) *see also* Mutch Report, at 8-5.

---

[42] One such pond, for example, a 36,000-gallon pond designated as "Pond 1," was used for many years at the Property to treat wastewater containing numerous hazardous substances, including chromium, chrome sulfide, and chromic-sulfuric acid. *See* RFJN, Ex. 62. Although Pond 1 was lined with concrete during at least some of the time it was used, a 1986 visual inspection of the pond revealed that "several cracks in the base … [were] clearly visible … cracks through which the wastewater [in the pond] may have leaked into the groundwater." RFJN, Ex. 63.

In addition:

- Old SCC was cited in 1959 for dumping hexavalent chromium to ground on the Property (*see* Lintecum Decl., Ex. 39 (CDM, Current Conditions Report, (Jun. 8, 1990));

- in the 1960s, sludge containing chrome, volatile solids, iron, aluminum, and phosphate was discharged to the sewer system; inspectors found visible evidence of wastewater discharge to ground; and the operator was ordered to stop discharging to the sewer given high concentrations of chromium, copper, nickel, zinc, and iron in the wastewater (*id.*);

- in 1968, an inspector's memo noted visible evidence of wastewater discharge to the ground, including run-off onto the right of way and into an adjacent field where it percolated into the ground (*id.*);

- in the 1970s, the operator was cited for discharging wastes from a holding pond, via siphoning hoses, onto the railroad right-of-way at the Property; chrome, copper and iron in wash water from carboy and tank truck wash areas were drained to a sump; the company was the subject of a Cleanup and Abatement Order issued by the RWQCB-LA for discharging waste liquids containing chromium, acids, neutralizers, solvents, various salts of copper, zinc and/or iron "in such a manner to cause saturation of the soil" (*id.*); and

- in 1982, local regulatory authorities identified chromium in a soil sample taken proximate to the drum storage area near the railroad tracks at the Property and in a second soil sample taken under the tracks near the drain pipe outlet at the Property (*id.*, Ex. 59 (Los Angeles Dept. of County Engineers, Chemical Analysis Request (July 12, 1982)).

Observations of significant staining of soils and pavement at the Property also have been widely reported. *See* Lintecum Decl., Exs. 39, 43; RFJN, Ex. 96.

Union Pacific cannot credibly deny disposals occurred during the time it

1  owned the Property. Documents show that Union Pacific knew that disposals of

2  copper, nickel, among other hazardous substances, were occurring at the Property

3  as far back as 1968, including disposals that "saturated" the ground. *See* Lintecum

4  Decl., Exs. 40, 41, and 42.

5      Evidence that hazardous substances have been placed directly on the ground

6  or into the groundwater is not required to establish a "disposal" under CERCLA;

7  discharging hazardous substances in a manner where they *may* enter the

8  environment, including disposals into sewers, constitutes a disposal. *See Lincoln*

9  *Props. v. Higgins,* CIV. No. S-91-760 DFL/GGH, 1993 U.S. Dist. LEXIS 1251, at

10  \*66-69 (E.D. Cal. Jan. 18, 1993). Here, there is ample evidence of both spills

11  directly to ground and discharges where hazardous substances could enter the

12  environment. Accordingly, Union Pacific is liable under CERCLA Section 107(a)

13  as a "former owner."

       **b.**    **First Dice Road Co. is a "current owner" and Phibro-**
14                 **Tech, Inc. is a current "operator" at the Property**
                **under CERCLA.**
15

16      It is undisputed that First Dice is the current fee title holder of the Property

17  and that Phibro-Tech currently operates the chemical manufacturing and

18  reprocessing business located there. SUMF 22, 23. These facts, alone, establish that

19  these two Defendants fall within one of the four classes of "persons" that may be

20  liable under CERCLA, namely, current "owners" and "operators." 42 U.S.C.

21  § 9607(a)(1); *City of Los Angeles v. San Pedro Boat Works,* 635 F.3d 440, 451-52

22  (9th Cir. 2011) (current holder of fee title is CERCLA "owner"); *State of Calif. ex.*

23  *rel. Dept. of Toxic Substances Control v. Neville Chemical Co.*, 213 F. Supp. 2d

24  1115, 1124-25 (C.D. Cal. 2002) (chemical manufacturing plant operator liable

25  under CERCLA). Although CERCLA does not require Plaintiffs to establish that

26  disposals and releases have occurred at the Property as a result of Phibro-Tech's

27  operations (*Wiegmann & Rose Int'l Corp. v. NL Indus., Inc.,* No. C 88-4817 FMS,

28  1991 U.S. Dist. LEXIS 20181, at \*43 (N.D. Cal. July 24, 1991)), there is no doubt

they have occurred for decades, including in recent years. *See, e.g.,* RFJN, Ex. 65.

Phibro-Tech has denied liability for contamination at the Property that
occurred when Old SCC operated the chemical plant. However, Phibro-Tech's
denial has no bearing on its liability as the current operator, as Plaintiffs need not
establish that Phibro-Tech caused the contamination at the Property. *See, e.g., Pinal
Creek Grp. v. Newmont Mining Corp.,* 218 F.R.D. 652, 656 n. 3 (D. Ariz. 2003)
(citing *California v. Campbell,* 319 F.3d 1161 (9th Cir. 2003); *see also U.S. v.
Alcan Alum. Corp.*, 964 F.2d 252, 265 (3d Cir. 1992) ("virtually every court that
has considered the question has held that a CERCLA plaintiff need not establish a
direct causal connection between the defendant's hazardous substances and the
release"). Nevertheless, Plaintiffs believe it important to clarify that Phibro-Tech's
denial is not merely legally inconsequential for purposes of this Motion, it is also
factually incorrect. Phibro-Tech is the successor to Old SCC's environmental
liabilities at the Property.

When Phillips, the predecessor-in-interest to New SCC and Phibro-Tech,
purchased Old SCC, it was well aware of the actual and potential environmental
liabilities arising from the chemical manufacturing and reprocessing operations
conducted at the Property. *See* Lintecum Decl. Ex. 95.  Notwithstanding this,
Phillips assumed all of Old SCC's liabilities with the exception of five liabilities
expressly enumerated, and defined as the "Excluded Liabilities," under the
purchase agreement.[43] *Id.* Ex. A.  The five "Excluded Liabilities" were: (1) two

---

[43] Successor liability exists when "the parties have, through agreements, words, or
conduct, indicated their intent to shift liability from one party to another."  *U.S. v.
Sterling Centrecorp,* 960 F. Supp. 2d 1025, 1035 (E.D. Cal. 2013).  This intent is
"based on all of the circumstances surrounding the transaction," and a buyer of
assets need not expressly state that it is assuming "all" liabilities. *Id.* at 1036; *see
also Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 309-10 (3d Cir. 1985)
(unless a liability "comes within one of the express exceptions, [the defendant] may
be held to have assumed it").

loans owed by Old SCC; (2) certain tax liability; (3) liability arising from two
lawsuits pending in Illinois state court and a dispute involving Old SCC's sale of a
plant in New Jersey; (4) legal expenses incurred in the sale of Old SCC to Phillips;
and (5) liability arising from the ownership of a parcel of real estate in Illinois. *Id*.
Thus, environmental liabilities arising from the chemical manufacturing and
reprocessing operations conducted at the Property were **not** among the Excluded
Liabilities that Old SCC retained. *Id.* In fact, in assuming the lease between Old
SCC and the then Property owner, Union Pacific, New SCC expressly agreed to
indemnify Union Pacific for any leaks, spills, pollution, and hazardous waste
deposits at the Property. *Id.* Exs. 88, 99.

　　　Phillips's assumption of all environmental liabilities arising from the
Property is further reflected in the purchase price it paid for Old SCC. Under the
purchase terms, Phillips paid a premium, over and above the net value of Old
SCC's business assets, in exchange for Old SCC's agreement to retain the five
"Excluded Liabilities" described above. *Id*. Ex. 88. Nowhere in the purchase
agreement is there any indication that Old SCC demanded, and Phillips agreed to
pay, a premium for Old SCC to retain any environmental liabilities.[44] *Id.* Both
parties knew that the Property was contaminated (*see id.*, Ex. 95), and given the
significant liability arising from that contamination, it is inconceivable that Phillips
would have entered into a purchase agreement that failed to explicitly disavow
responsibility for that contamination, if that was truly Phillips' intention. Indeed, far
from denying that it assumed any of Old SCC's environmental liabilities, Phillips
and its successors-in-interest have expressly held themselves out as ***the same***

---

[44] In addition, Phillips purchased all of Old SCC's insurance policies, a further
indication that Phillips intended to assume all of Old SCC's liabilities except the
five "Excluded Liabilities." *See Sterling Centrecorp*, 960 F. Supp. 2d at 1038 (court
may infer from assignment of insurance that seller did not anticipate any further
need for coverage from losses of any kind).

*company* that had been manufacturing and reprocessing chemicals at the Property since the 1950s. *Id.* Ex. 100.

New SCC's post-sale conduct further supports the conclusion that it assumed Old SCC's environmental liabilities.[45] After the purchase, New SCC continued to operate the chemical manufacturing and reprocessing business as if it were Old SCC. New SCC took control of all operations necessary to run the business including patents, leases, licenses, mortgages, contracts, equipment, distribution, waste services, purchase of materials, and bank loans and notes. Lintecum Decl. Exs. 88. New SCC conducted the same business operations at the same location using the same "Southern California Chemical Company, Inc." name, employing the same key personnel, and even using the same letterhead and telephone number.[46] *Id*. Exs. 88, 96, 97 (Otterbach Dep. Tr. 12:21 to 13:2, 19:15-23), 51 (T.

---

[45] This post-sale conduct is not only evidence of Phillips's and New SCC's assumption of Old SCC's environmental liabilities, it also supports the conclusion that the purchase was either a de facto merger or New SCC's mere continuation of Old SCC's business. The hallmarks of a de facto merger are: (1) buyer's continuation of the enterprise of the seller corporation; (2) buyer's assumption of the seller's obligations that are ordinarily necessary for the uninterrupted continuation of the seller's normal business operations; (3) the seller ceases its ordinary business operations, liquidates, and dissolves; and (4) continuity of shareholders. *Sterling Centrecorp,* 960 F. Supp. 2d at 1042-43. The absence of any one of these factors does not preclude a finding of a de facto merger. *See Marks v. Minnesota Mining and Mfg. Co.*, 187 Cal. App. 3d 1429, 1436-37 (1986) (finding de facto merger despite no continuity of shareholders). In determining whether successor liability exists under the mere continuation theory, the court looks at two factors: common identity of the officers, directors and stockholders in the two companies, and sufficiency of consideration running to the seller corporation in light of the assets sold. *Stoumbos v. Kilimnik,* 988, F.2d 949, 962 (9th Cir. 1993).

[46] In addition to retaining all of Old SCC's key personnel, New SCC assumed all of Old SCC's obligations towards those employees, including group life and health insurance benefits, and Old SCC's policies regarding sick-leave, vacation, and holidays. *Id.*, Ex 88.

King Dep. Tr. 22:25 to 23:3), 98, 100. New SCC did nothing to distinguish itself from Old SCC, and, as indicated above, actually held itself out as the same company that had been operating at the Property for decades.[47] *Id.* Exs. 96, 100. Indeed, New SCC even continued to operate under Old SCC's interim status RCRA permit application without providing the required revised permit application to EPA prior to any change of ownership or control of Old SCC.[48] *Id.* Ex. 95; 270 C.F.R. 270.72(d), as reported in 48 Fed. Reg. 14248. Given that Old SCC's environmental compliance officer stayed on in the same position with New SCC after the purchase (*id.* Ex. 51 (T. King Dep. Tr. 14:7-18, 21:15-17)), one has to assume that both Old and New SCC were aware of the pre-sale revised application requirement, and they concluded that the sale of Old SCC did not constitute a change of ownership or control for purposes of the statute.

Put simply, all of the evidence points to one conclusion: the sale of Old SCC, which dissolved shortly after the sale (*id.* Ex. 98),[49] to New SCC was intended to be, and operated as, a seamless continuation of the chemical manufacturing and reprocessing business at the Property, with New SCC absorbing all of Old SCC's liabilities except a handful of clearly enumerated "excluded liabilities" that did not

---

[47] Given that New SCC essentially stepped into the shoes of Old SCC, acquired Old SCC's goodwill, and barred Old SCC from competing with it (Lintecum Decl., Ex. 88), the small price that Phillips paid for Old SCC appears to have been wholly insufficient, a tell-tale sign that New SCC was a mere continuation of Old SCC.

[48] As indicated above, RCRA requires anyone who owns or operates a facility, like the Phibro-Tech chemical plant, where hazardous waste is treated, stored, or disposed to have a permit. *See* 40 C.F.R. 270.1(c). And, after November 1984, RCRA required the new owner or operator to be responsible for investigation and cleanup of all releases from solid or hazardous waste management units, both onsite and offsite.

[49] The California Secretary of State's Business Portal confirms that Old SCC (then known as King Resources, Inc.) promptly dissolved after the sale. *See https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=00354448-16386873.*

include Old SCC's environmental liabilities.

**3.      There was a "release" or "threatened release" of hazardous substances from the Property into OU-2 Groundwater.**

**a.      There have been releases of hazardous substances into the soils at the Property.**

Solvents like PCE and TCE were present in soils at the Property, and hexavalent chromium was utilized in processes for many years. *See* Section A, *supra*. TCE, PCE, cis-1,2-DCE, 1,1-DCA, and hexavalent chromium have been detected in soils at the Property. SUMF 25. The presence of hazardous substances in subsurface soils at the Property is sufficient evidence that CERCLA "releases" have occurred. *See, e.g., Am. Int'l Specialty Lines Co. v. U.S.*, Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590, at \*61 (C.D. Cal. June 30, 2010).

**b.      The same hazardous substances in the soils at the Property are also in OU-2 Groundwater.**

The hazardous substances detected in the soils at the Property, TCE, PCE, cis-1,2-DCE, 1,1-DCA, and hexavalent chromium, are also in OU-2 Groundwater. SUMF 26. Thus, the first two prongs of the *Castaic Lake* test are satisfied. *See Castaic Lake,* 272 F. Supp. 2d at 1067.

**c.      A plausible migration pathway exists between the Property and OU-2 Groundwater.**

**i.      Subsurface soils at the Property present a migration pathway to OU-2 Groundwater.**

Hazardous substances disposed of or released at the Property have a generally unimpeded pathway to reach OU-2 Groundwater given that OU-2 is a known recharge area. *See* Sections IV.A & B.1, *supra*; Mutch Report, at 2-4 to 2-9. The subsurface soils at the Property pose no barrier to the downward migration of contaminants detected at concentrations in Property soils that *significantly exceed* screening levels developed to be protective of groundwater. *Id.* PCE was detected at a concentration of 10,000 µg/kg, which is more than 125 times its soil screening

level. *See* Lintecum Decl., Ex. 54 and *compare* Mutch Report, Tables 3-1 and 8-4. Hazardous substance cis-1,2-DCE was detected at a concentration of 5,500 µg/kg, which is more than 29 times the soil screening level. *See* Lintecum Decl., Ex. 49 and *compare* Mutch Report, Tables 3-1 and 8-4. TCE was detected at a level that was **1,294 times** its soil screening level. And hexavalent chromium was detected at a concentration of 3,200,000 µg/kg, which is a shocking **47.8 million times** the soil screening level for that substance. *See* Lintecum Decl., Ex. 56 and *compare* Mutch Report, Tables 3-1 and 8-4.

Detections of these contaminants were not isolated to shallow soils but extended much deeper, as in the case of hexavalent chromium which was detected—at a concentration that exceeded the soil screening level by multiple orders of magnitude—over 40 feet bgs. *See* Lintecum Decl., Ex. 55. Importantly, at the time that these samples were drawn, depth to OU-2 Groundwater at the Property was estimated to be around 55 feet bgs. *Id.* At a minimum, the presence of these hazardous substances, at these significant concentrations, constitute a *threatened* release to OU-2 Groundwater, which is itself a sufficient basis upon which the Phibro-Tech Defendants may be held liable. *See, e.g., Burlington N. R. Co. v. Woods Indus., Inc.*, 815 F. Supp. 1384, 1392 (E.D. Wash. 1993) (buried materials that threaten groundwater constituted threatened release subjecting defendant to liability).

### ii. The evidence also shows *actual* releases to OU-2 Groundwater from the Property.

The locations of soil and soil vapor detections of hazardous substances at the Property align with known or suspected onsite sources. For example, some of the highest concentrations of hexavalent chromium in the soil were detected near the former chromic acid UST. *See* Lintecum Decl., Exs. 55, 56; *see also* Mutch Expert Report, Figs. 8-5, 8-6. Additionally, the distribution of soil gas concentrations of chlorinated solvents, including TCE and 1,1-DCE, cis-1,2-DCE, and trans-1,2-

1   DCE, demonstrate a maximum in the northwestern area of the Property ten to

2   twenty feet bgs.[50] *See* Mutch Report, at 8-39. This is not only consistent with a

3   source area in soil on the Property (*id.*), but Phibro-Tech's own environmental

4   consultant has acknowledged as much in including extraction wells for a soil vapor

5   extraction system in the same northwestern portion of the Property (*see* Lintecum

6   Decl., Ex. 59. Indeed, these chlorinated solvent concentrations in soil gas are not

7   only spatially aligned with elevated VOC concentrations in the soil, **but they also**

8   **generally line up with elevated VOC concentrations in the OU-2 Groundwater**

9   beneath the northwestern portion of the Property indicating a completed pathway of

10  hazardous substances from the surface, through the soil, and into OU-2

11  Groundwater. *See* Mutch Report, at 8-39.

12          Further, groundwater samples taken from wells in the middle and

13  downgradient portions of the Property generally show higher concentrations of

14  hazardous substances as compared with samples from wells upgradient of the

15  Property. *See* Mutch Report, at 8-27. One would expect these results if there were

16  sources of hazardous substances at the Property, given that the OU-2 Groundwater

17  beneath the Property generally flows southwest. *See, e.g.,* RFJN, Ex. 62.

18          For example, elevated levels of hexavalent chromium have been observed in

19  wells near the middle of the Property (near the location of the former chromic acid

20  UST and Pond 1) and in wells toward the downgradient portion of the Property.

21  Mutch Report, at 8-27, Fig. 8-8. These levels are greater than those observed in

22  upgradient wells both on and off the property. *Id.* Similarly, levels of chlorinated

23  solvents TCE, 1,1-DCE and 1,1,1-TCA in the OU-2 groundwater beneath the

24  Property are generally greater in wells near the middle of the Property versus

25  [50] The Phibro-Tech Defendants cannot credibly argue that the detections of

26  chlorinated solvents in soil gas in this area can be attributed to a source upgradient

27  (i.e., north) of the Property. The concentrations generally *decrease* moving off the
    Property to the north. *See* Mutch Expert Report at 8-39.

28

1   upgradient wells. *Id.,* at 8-33 to 8-35, Table 8-11. These data, coupled with what we

2   know about possible source areas at the Property and elevated soil screening levels,

3   indicate that some of the contaminants in OU-2 Groundwater are coming from

4   releases at the Property. [51] *Id.*

5                        **iii.    Federal and state regulatory authorities agree
                                   that the Property is a source of OU-2
6                                  Groundwater contamination.**

7

8          According to one of Phibro-Tech's environmental consultants, EPA has been

9   concerned about contamination at the Property since at least 1983. *See* Lintecum

10  Decl., Ex. 39. And as early as 1987, EPA's consultants suspected Pond 1 as a

11  possible source of groundwater contamination. RFJN, Ex. 43. After extensively

12  investigating OU-2, EPA concluded that the Property was a source of the

13  contamination in OU-2 Groundwater, noting that groundwater monitoring since

14  1985 had identified three contaminant plumes emanating from the Property,

15  including one consisting of hexavalent chromium and one of chlorinated solvents.[52]

16  *See* RFJN, Ex. 1. Shortly thereafter, EPA issued a Special Notice Letter ("SNL") to

17  each of the Phibro-Tech Defendants identifying the Property as a source of the OU-

18  2 Groundwater contamination. *See* RFJN, Exs. 4, 69, 70.

19  _____

20  [51] A comparison of detections of TCE and Freon 11 in groundwater samples from
    upgradient wells and detections of those two substances in samples drawn from
21  downgradient wells, wells in the middle of the Property, further indicate an onsite
    source of TCE. *See* Mutch Report, at 8-34. Samples drawn from the upgradient
22  wells show that TCE and Freon 11 are in the groundwater before it reaches the
    Property. *Id.* Samples drawn from wells in the middle of the Property still include
23  detections of TCE and Freon 11 but now there is far more TCE than Freon 11 in the
    groundwater, strongly suggesting a source at the Property that is releasing TCE to
24  OU-2 Groundwater. *Id.*
25
26  [52] The third plume consists of benzene, toluene, ethylbenzene and xylene. *Id.*
    Plaintiffs do not currently seek partial summary judgment as to the Phibro-Tech
27  Defendants' liability under CERCLA based upon releases of these four substances
    from the Property to OU-2, but Plaintiffs reserve their rights to do so in the future.
28

The Regional Water Quality Control Board ("RWQCB-LA") has also long been concerned that chemical manufacturing and reprocessing operations at the Property have resulted in groundwater contamination. In 1978, the RWQCB-LA issued a Clean Up and Abatement Order to Phibro-Tech's predecessor-in-interest, Old SCC, finding that the soil at the Property was "saturated" with various hazardous substances, including chromium and solvents that threatened to drain or otherwise be carried to groundwater. *See* RFJN, Ex. 71. The RQWCB-LA subsequently identified Pond 1 as a possible contributor to groundwater contamination (*see id.*, Ex. 63), and more recently indicated in a "Fact Sheet" that the soil and OU-2 groundwater contamination at the Property, which included hexavalent chromium and VOCs, was "associated with the storage, treatment, transfer and manufacture of both volatile organic chemicals (VOCs) and inorganic chemicals (*id.*, Ex. 61).

DTSC reached this same conclusion no later than 1994. RFJN, Ex. 72 ("PTI [Phibro-Tech] is responsible for … chromium and portions of the VOC contaminants found in the ground water beneath the facility"). A year later, DTSC initiated a Class III Permit Modification requiring Phibro-Tech to "implement corrective measures selected by DTSC and U.S. Environmental Protection Agency … includ[ing] pumping and treating of extracted groundwater." *See* RFJN, Ex. 60. Specifically, Phibro-Tech was required to pump "contaminated ground water … to maximize extraction of hexavalent chromium and other contaminants," including VOCs. *Id*. Indeed, DTSC recently disputed Phibro-Tech's assertion in the company's Quarterly Groundwater Sampling Monitoring Reports that the VOC plume beneath the Property likely originated from a different source located upgradient of the Property. *See* RFJN, Ex. 73. DTSC instructed Phibro-Tech to *revise* this statement in future reports to specify that the Property was "a source of the VOC releases to soil and groundwater…." *Id.* And in 2013, DTSC concluded that "there has been a release to ground water of $Cr^{+6}$ [hexavalent chromium] and

TCE from Pond 1 and the former UST, and the releases have most likely migrated to the southwest in the groundwater ….” *See* RFJN, Ex. 74.

Indeed, a DTSC inspection in 2014 discovered that Phibro-Tech may have created yet another, *direct* migration pathway for contaminants at the Property to reach OU-2 Groundwater. *See* RFJN Decl., Exs. 74. As reported by DTSC, the upper sections of casing of two groundwater monitoring wells were loose and could easily be moved side to side. *Id.* (at 11). In permitting these wells to be compromised, Phibro-Tech had “failed to maintain the integrity of the monitoring wells to prevent the wells from acting as a conduit for contaminant transport.” *Id.* DTSC ordered Phibro-Tech to refurbish these wells. *Id.*

DTSC also observed that 25 monitoring wells had multiple broken, missing, damaged, or improperly installed components. *Id.* This too compromised the integrity of those wells and “allowed surface water and wash down water to enter the well vaults” and permitted “entry of contaminants from the surface to the . . . [soil] … or groundwater … beneath the [Property]. *Id.* In fact, inspectors observed surface water “contaminated with a red colored residue” in well vaults. *Id.* DTSC ordered Phibro-Tech to immediately make the necessary repairs. *Id.* (at 12).

The report does not indicate how long these serious violations had persisted, so it is unclear whether and to what extent contaminants from the surface of the Property were swept down the compromised wells and entered OU2-Groundwater. But in light of how polluted the Property is, and the direct route to OU-2 Groundwater provided by the wells, these damaged wells, at a minimum, presented a *threatened* release of hazardous substances to OU-2 Groundwater.

In sum, given the consensus among federal and state environmental regulatory agencies that the Property is a source of contamination in OU-2 Groundwater, and the extensive evidence of threatened and actual releases from the Property into OU-2 Groundwater, any attempt by the Phibro-Tech Defendants to deny responsibility for that contamination would ring hollow. SUMF 27.

## Appendix C

## Violations and Documented Releases for the Phibro-Tech Source Property[53]

| Date | Description | Reference |
|------|-------------|-----------|
| 1959 - 1989 | "Chronology of Critical Events" section of the Current Conditions Report lists the following violations/releases:<br><br>• **8/1959:** L.A. County Engineer issues inspector's report and Notice of Violation for dumping hexavalent chromium to ground on the Property along road entrance and on adjacent properties.<br>• **12/1960:** Santa Fe Springs City engineer notifies SCC that it must meet sewer system requirements, noting discharge of run-off is possibly contaminating ground at facility.<br>• **1961:** L.A. County Engineer issues complaint of sludge discharge to sewer system which contains 19.5% volatile solids, iron, aluminum, phosphate and chrome<br>• **1964:** Inspector's report indicates a highly caustic waste is spilled to ground and that an acid waste is being used as a dust control on the service road (entrance road).<br>• **1966:** SCC receives complaint of discharge to railroad tracks.<br>• **2/17/1966:** Inspector's report indicates that SCC will install a catch basin to prevent spillages and leaks to ground in bottling and washing area.<br>• **1968:** L.A. County Engineer distributes interoffice memorandum stating that SCC facility may have "critical ground water pollution problems due to ground disposal of toxic wastes."<br>• **11/15/1968:** Inspector's memorandum notes visible evidence of wastewater discharge to ground. Run-off noted as discharging to railroad right of way and into an adjacent field where it percolated into the ground. Memorandum also notes that up-grading of plant operations is in progress.<br>• **9/22/1969:** Inspector's memorandum indicates run-off is continuing to be discharged to railroad right of way.<br>• **12/13/1969:** L.A. County Sanitation District orders SCC to stop discharging to the sewer due to high concentrations of copper, chromium, nickel, zinc, and iron, attributing upset of county sludge treatment plant(s) to SCC and requiring submittal of plans to improve discharge levels. | Camp Dresser & McKee, Inc. 1990. Current Conditions Report, RCRA Facility Investigation Southern California Chemical June 8, 1990. |

[53] *See* Mutch Report, Table 8-3.

| Date | Description | Reference |
|------|-------------|-----------|
| | • **1971:** SCC denied Industrial Waste Discharge Permit for sewer.<br>• **1975:** L.A. County Engineer registers complaint that firm has had a long history of discharging wastes to the railroad right of way.<br>• **6/5/1975:** Inspector's report indicates no clean-up actions taken on industrial wastewater discharged to the railroad right of way. Notice of Violation and Order to Comply by 6/23/15 issued.<br>• **4/7/1976:** Notice of violation and Order to Comply issued instructing SCC to immediately cease and desist from depositing sludge from the final discharge settling pond to the bermed pit on the property and to remove to a legal point of discharge. In addition, SCC is instructed to immediately remove wastewater and contaminated dirt from the storm drain-ditch parallel to the railroad right of way to a legal point of disposal.<br>• **12/30/1977:** Violation issued for contaminated stormwater run-off to railroad right of way.<br>• **1/3/78:** RWQCB issues Violation Cease and Desist Order for discharge of wastes from the holding pond into the railroad right of way indicating that wastes flowed to the drainage ditch with discharge being facilitated via two hoses siphoning the pond.<br>• **7/16/1978:** Failure of SCC's wastewater treatment system connections causes overflow and discharge of industrial wastes to public streets and private property in the area east of Norwalk Boulevard and south of Slauson Avenue, including Palley Supply Company, the railroad right of way and the storm drain system at Burke Street. In August of the same year, County of Los Angeles Department of County Engineer-Facilities informs SCC that a misdemeanor complaint has been filed by the District Attorney's office for the 7/16/78 industrial waste liquid spill.<br>• **7/24/1978:** County of Los Angeles Department of County Engineer-Facilities requests District Attorney's office to issue a complaint against SCC for allowing the continued existence of discharged industrial wastes.<br>• **8/8/1978:** RWQCB issues a Clean-up and Abatement Order (#78-1) to SCC in response to an intentional or negligent discharge on or about 5/21/76 of waste liquids waste liquids containing acids, neutralizers, solvents, various salts of copper, zinc, iron, and/or chromium, and other similar materials at various locations at and adjacent to the facility in such a manner as to cause saturation of the soil.<br>• **2/22/1984:** DHS conducts a facility inspection and identifies 9 violations of the Hazardous Waste Control Law and the Code of Federal Regulations. | |

| Date | Description | Reference |
|------|-------------|-----------|
| | • **8/10/1984:** DHS, L.A. District Attorney's office, Sanitation District, and Engineer's office conduct joint site inspection to look for violations of the Hazardous Waste Control Law. Discharges were noted, samples taken and a Notice of Violation and Directive to Comply was sent to SCC.  According to a Supplemental Report prepared by Keith Cambridge, *"several discharges were observed on and off-site."*  A general opinion was expressed that *"many areas had discharges as a [result] of poor housekeeping, leaking containers or leaking drums."* A blue plastic 55-gallon container with *"blue-green soil"* was noted as having *"fallen from the storage location and spilt its contents to the neighboring property."*<br>• **10/19/1984:** Failure of SCC's sewer line causes discharge of approximately 500 gallons of industrial wastewater, reportedly identified as ammonium dioxide.<br><br>The full list of violations/releases from the RCRA Facility Investigation is presented in Appendix C. | |
| 1966 – 1981 | "Chronology of Critical Events" section of the Current Conditions Report lists several instances within this time period where liquids/wastes were released to the railroad right of way running along the southern boundary of the property.<br><br>"Discharges to Railroad Right of Way" section provides additional information from this time period related to releases to the railroad right of way. | Camp Dresser & McKee, Inc. 1990. Current Conditions Report, RCRA Facility Investigation Southern California Chemical June 8, 1990. |
| 1968 | Sewer stoppages noted due to discharges of process waste sludge.  At a November 11, 1968 inspection, evidence of waste water discharges to the ground surface were noted.  It was also ascertained that during wet weather, there was overflow of sumps containing water from a large process tank area with discharge to an adjacent railroad right of way.<br><br>It is stated in the letter: *"It appears that because of the deteriorating state of the plants, waste handling, and surface containment facilities a critical underground water pollution problem may exist at the plant."* | Garcia R., C. (L.A. County Engineer's Office), 1968. Southern California Chemical Company, I-4245-1H South Dice Road Santa Fe Springs. Memorandum to Mr. Carroll D. Smith. November 15, 1968. |
| 1971 | In a 1971 engineering evaluation document, the following potential sources of contamination were noted:<br>• chrome, copper, and iron in the carboy wash area. Wastewater drains into a sump<br>• copper, iron, and chrome from tank truck wash area. Wash water drains into a sump. | Southern California Chemical Co., Inc. 1971. Engineering Evaluation. December 20, 1971. |
| 1983 | From a November 1987, preliminary assessment:<br><br>*"EPA became involved in this site in response to a complaint (7), received July 1983, regarding the* | Department of Health Services, Toxic Substance Control Division. 1987. Preliminary Assessment Southern |

| Date | Description | Reference |
|---|---|---|
| | *company's questionable disposal practice of waste chemicals to the soil and blending of heavy metal waste into their product material. The complainant alleged that SCCC's copper sulfate algaecide, which was contaminated with heavy metals, was used to treat Los Angeles water supplies (4). In a summary report obtained through the Los Angeles Sanitation District (LCSD), the complainant stated that SCC was previously cited for dumping ferric chloride along railroad tracks, routinely transporting hazardous waste without the proper documentation, releasing ammonia and chlorine to the atmosphere during nighttime operations and washing hazardous waste spills to the storm sewer drain (4).*<br><br>*On July 7, 1983, EPA verified that past disposal and spills had occurred on site. This information had previously been reported from an inspection conducted by the Los Angeles County Health Department who found evidence of soil contamination off-site in a railroad culvert (4). On August 3, 1983, the complainant informed LCSD that SCCC probably disposed waste ferric chloride, chrome sulphuric acid and hydrochloric acid along the railroad tracks (4). The complainant stated on August 8, 1983, that SCCC might continue to dump their product if it is not sold. It was reported that the green rocks on the railroad tracks adjacent to SCCC is from copper chloride, and the orange rocks is from ferric chloride disposal. Some waste materials are transported from SCCC to BKK for disposal (4)."* | California Chemical Company.  November 30, 1987. |
| 10/27/1983 | Analysis of an aerial photograph from this date revealed stains along railroad tracks at the south perimeter of the Property.  It also revealed stains in the drum wash area | United State Environmental Protection Agency. 1984. Aerial photographic analysis of a waste study site Santa Fe Springs, California. TS-AMD-84028. |
| 11/21/1984 | Supplemental Report by Keith Cambridge of inspection of SCC facility:<br> Many areas had discharges as a results [sic] of poor housekeeping, leaking containers or leaking drums. At the northern part of the property, where the hazardous waste was stored, 1-blue plastic 55-gallon container with blue-green soil had fallen from the storage location and split  it's [sic] contents to the neighboring property (SC-B-1). Cambridge asked Seymour how long have those particular drums been at that specific site, Seymour's reply was about one month. Cambridge then asked Seymour, "If the drum which had fallen over and split had occurred less than one month ago?" Seymour's reply was "yes"; therefore, indicating a current discharge off-site. There also appeared to be discharges to a soil mound area, next to the aforementioned barrels, which appeared to be of a copper solution (SC-A-2). | Letter to Department of Health Services from SCC, dated 11/21/1984 and attachments. |

| Date | Description | Reference |
|---|---|---|
| | Samples were collected on and off-site. An overtruned and spilled drum was found to have 390,000 ppm of copper. That translates to 39% copper.<br>A leak from the copper sulphate process area consisting of a dried "crust" was found to have 71,000 ppm of copper, which translates to 7.1% copper. | |
| No Date | In their November 1987 report, the Department of Health Services state: *"It is evident from the data that ground water contamination has occurred in the vicinity of monitoring well #4. Possible sources include spilled chemicals onto surface soils (prior to SCCC's extensive concrete paving), the wastewater pond, and a suspected leaking hexavalent chromium underground storage tank, which was removed over ten years ago. The soil that was removed could possibly be part of the soil mound. Based upon the current data obtained and SCCC's records and sample results, the most probable source of contamination is the suspected leaking underground storage tank which contained the chromium. Precise definition of the source(s) and extent of the contamination can only come from further testing and analysis (15)."* | Department of Health Services, Toxic Substance Control Division. 1987. Preliminary Assessment Southern California Chemical Company.  November 30, 1987. |
| 9/1987 | A 1987 RCRA Facility Assessment identifies 60 solid waste management units.  The assessment noted:<br>• a history of poor housekeeping practices<br>• numerous documented reports of spills from process areas, leaking tanks and drums, improper disposal practices, discharges to the railroad right of way, and violations of sanitary/storm sewer discharges<br>• leakage and spillage of waste materials and discoloration/staining of pavement and containment was noted during a July 15, 1987 visual site inspection<br>• possible releases to soil from copper cement drying pond No. 7 (Unit 4. l), and rainwater holding pond No. 3 (Unit 4.2) as indicated by results of soil sampling and site inspection observations.  Soil boring and groundwater monitoring results have identified the inactive Pond No. 1 (Unit 4.4), and the old chromic-sulfuric underground storage tank (Unit 4.12) as possible sources of metals contamination.<br>• units with past release potentials to soil, groundwater, surface water, and air due to inadequate containment include the former three stage clarifier (Unit 4.9), the RCRA-regulated drum storage area (Unit 4.20), and the five drum storage areas (Units 4.21 through 4.25), which were identified during the visual site inspection. The drum storage areas still have ongoing release potentials to these environmental media | A.T. Kearney, Inc. and Science Application International Corporation. 1987.  RCRA Facility Assessment Southern California Chemical Company, Inc. September 1987. |
| February and July 1988 | Inspections revealed that secondary containment structures in the copper sulfate area, the ammonia etch area, the ferric chloride area, and the wastewater treatment plant, appeared to be used in a manner as to | Chase, D. M. (Department of Health Services, Toxic Substance Control Division), 1988. Report of Violations. Letter to Gregor Otterbach (Southern |

| Date | Description | Reference |
|------|-------------|-----------|
| | be primary containments, in that waste waters were allowed to stand or flow in contact with the containment structures. | California Chemical Co.). September 23, 1988. |
| 12/8/1988 | 1988 RCRA Section 3008(h) consent order states the following:<br>• Respondent handled hazardous wastes at the facility that included wastes that exhibit the characteristic of EP-toxicity for chromium as identified in 40 CFR §261.24i<br>• On the basis of monitoring well results, the order indicates releases of cadmium, hexavalent chromium, and organic compounds to the groundwater.<br>• Soil sample analysis support release of nickel and hexavalent chromium to the soil.<br>• According to Respondent, property records indicate that organic compounds have never been used at the Facility | United State Environmental Protection Agency. 1988. Administrative Order of Consent. U.S. EPA Docket No. RCRA-09-89-0001. In the matter of CP Chemicals, Inc. 8851 Dice Road, Santa Fe Springs, CA 90670-0188. EPA ID No. CAD008488025. December 8, 1988. |
| 11/8/1989 | Letter from Attorney General John K. Van De Kamp indicates:<br><br>*"The violations cited and those observed but not cited have led us to believe that, although SCC has recently sought to cooperate with us and the EPA, it still has serious "housekeeping" problems, such as failing to manage adequately its hazardous waste so as to prevent hazardous waste spills."* | Van De Kamp, J. K., 1989. Corrective Action Order Against C. P. Chemicals. Letter to E. Oyarzo (Heller, Ehrman, White & McAuliffe). November 8, 1989. |
| May, 2012 | DTSC Inspection Report: PTI consolidated manifested hazardous waste filter cakes at the staging area which is a not permitted or authorized area by the DTSC<br><br>PTI tested hazardous waste in Tank C-40 which is not an authorized unit by the DTSC. Two liquid samples collected from Tank C-40 indicated levels of copper above. the 2,500 mg/kg regulatory limit and pH concentration above 12.5. | DTSC Inspection Report, Phibro-Tech, Inc. May, 2012. |
| May and June, 2013 | DTSC Inspection Report: PTI transferred or offloaded manifested hazardous waste from tanker trucks into plastic totes on a roadway not authorized by the DTSC. The road is located outside and north of ERS-1. After transferring the hazardous waste liquid into the totes, it is then stored in ERS-1 for up to a year prior to treatment.<br><br>Mr. Thaete corroborated the finding and stated that they have been offloading the incoming hazardous waste liquids from the tanker truck into totes outside ERS-1 for about 30 years. | DTSC Inspection Report, Phibro-Tech, Inc. May and June, 2013. |
| 10/9/2014 | RCRA Groundwater Operation and Maintenance Inspection: DTSC has concluded that significant $C^{+6}$ was found in on-site monitoring wells MW-14S and MW-19S and is consistent with a release and | DTSC, Groundwater Operation and Maintenance (O&M) Inspection Report, October 9, 2014 |

| Date | Description | Reference |
|------|-------------|-----------|
| | migration of Cr$^{+6}$ from the former chromic acid UST (UST) or from Pond·1. Further evidence is not available beyond these two on-site wells because additional down gradient monitoring wells are necessary to assess the release.<br>DTSC has determined that a historic TCE release to soil and ground water has occurred at the Facility. Further monitoring of the release is not · available beyond wells MW-14S and MW-19S because additional down gradient monitoring wells are necessary.<br>GSU concludes that there has been a release to ground water of Cr$^{+6}$ and TCE from Pond 1 and the former UST, and the releases have most likely migrated to the southwest in the groundwater and have not been investigated. | |
| On or about 5/16/2013 | *"Phibro-Tech violated Health and Safety Code section 25200.19 by transferring or offloading incoming hazardous waste liquids from tanker trucks into totes without using a containment device or other system capable of collecting and containing leaks and spills that may reasonably be anticipated to occur during loading' and unloading operations. totes."* | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017. |
| On or about 4/8/2014 | *"Phibro-Tech failed to properly maintain and operate the Facility to minimize hazardous waste and/or hazardous waste constituent releases into the environment in violation of California Code of Regulations, title 22, section 66264.3 1"* as evidenced by a fire in the Facility baghouse. | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017. |
| On or about 9/23/2014 | *"Phibro-Tech failed to properly maintain and operate the Facility to minimize hazardous waste and/or hazardous waste constituent releases into the environment in violation of California Code of Regulations, title 22, section 66264.3 1"* as evidenced by cracks and gaps in the area Phibro-Tech refers to as its Truck Loading/Unloading Area and observation of solid pieces of hazardous waste and numerous stains on the pavement east of the S-Area and west of the Dryer Room | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017. |
| On or about 6/29/2015, and 6/30/2015 | *"Phibro-Tech failed to adequately record the location of each hazardous waste within the Facility and the quantity of hazardous waste at each location as required by California Code of Regulations, title 22, section 66264.73. subdivisions (b)(1) and (b)(2)"* | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017. |
| 6/29/15 and 9/23/2015 | There were two instances where inspectors observed Phibro-Tech failing to provide a containment system with a base that is free of cracks or gaps in violation of California Code of Regulations, title 22, section 66264.175, subdivision (b)(1) | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017. |
| On or about 8/28/2015 and 12/15/2015 | *"Phibro-Tech failed to properly maintain and operate the Facility to minimize hazardous waste and/or hazardous waste constituent releases into the environment in violation of California Code of Regulations, title 22, section 66264.3 1"* as evidenced | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017. |

| Date | Description | Reference |
|------|-------------|-----------|
| | by the observation of hazardous waste (copper carbonate) on the ground. | |
| On or about 4/28/2015 | *"Phibro-Tech failed to maintain the integrity of the groundwater monitoring wells to prevent the wells from acting as a conduit for contaminant transport in violation of California Code of Regulations, title 22, sections 66264.97, subdivision (b)(4). Two of Phibro-Tech's 35 groundwater monitoring wells, wells MW-4 and MW-09, could be moved from side to side without significant effort, indicating the casing was compromised in those wells."*<br><br>*"Twenty-five out of Phibro-Tech's 35 groundwater monitoring wells had one or more of the following: worn out or missing well* [vault] *fault* [sic] *gasket seals; missing or broken bolts; damaged well caps; and/or improperly installed or non-functional looking well casing caps….The non-functioning well components allowed surface water and wash down water to enter the well faults* [sic]*. In some cases, surface water filled the well faults* [sic] *to above the level of the well casing caps. Surface water contaminated with a red-colored residue was found in well faults* [sic]*."* | Superior Court of the State of California, 2017. First Amended Complaint For Civil Penalties And Injunctive Relief. Case No. BC655177, August 17, 2017.<br><br>DTSC Letter to Phibro-Tech and Inspection Report, October 9, 2014 (Exhibit 8 to D. Thaete deposition) |
| No Date | The Department and U.S. EPA have concluded that the cadmium, chromium and portions of the VOC contamination originated from the PTI facility. Specifically, ground water and soils data suggest that Ponds 1 and 2 contributed to the cadmium, chromium and halogenated VOC contamination in the Hollydale Aquifer. This conclusion is based on the following information: (i) lack of a low permeability clayey zone immediately under Ponds 1 and 2 to intercept releases, (ii) an historical rise in groundwater levels under Ponds 1 and 2 suggesting that wastewater from the units reached the groundwater and (ii) elevated contaminant concentrations in groundwater immediately downgradient of Ponds 1 and 2. An increase in groundwater level in the Hollydale Aquifer just beneath Ponds 1 and 2 coincides with elevated concentrations of cadmium, chromium, and halogenated VOC compounds detected in the ground water at monitoring well MW-4. PTI indicates in the RFI Reports that chromium-and chloride-containing wastewater was contained in Ponds 1 and 2. | California Environmental Protection Agency, Department of Toxic Substances Control, Region 3 and U.S. Environmental Protection Agency, Region 9. 1994. Draft statement of basis for Phibro-Tech, Inc. a.k.a. Southern California Chemical a.k.a. Entech Recovery, Inc. 8851 Dice Road Santa Fe Spring, California CAD008488025. October 4, 1994. |
| | The key halogenated VOC contaminant detected in the ground water most often is TCE. Ground water data suggests that there is a general increase in TCE concentrations across the property in the downgradient direction. | |
| No Date | As part of Phase I study, presence of a black slag-like deposit in the interval from ground surface to 7 feet below the ground surface was noted at approximately 20 percent of the sampling locations. A foundry casting facility was reportedly in operation at the | Camp Dresser & McKee Inc., 1992a. RCRA Facility Investigation Phase I Report Southern California Chemical Santa Fe Springs, California. May 29, 1992. |

| Date | Description | Reference |
|------|-------------|-----------|
|  | property during the late 1940s to the early 1950s. SCC has theorized that this material is composed of foundry sand |  |

# VIII.  CHRYSLER/NU-CAR PROPERTY

## A.    Overview

### 1.    Operations & Owners/Operators at the Property

The Chrysler Source Property (hereafter, for purposes of this Section VIII, the "Property") is a 40-acre piece of real property, formerly utilizing the address of 12140 Slauson Avenue, Santa Fe Springs, CA 90670. SUMF 28. In early 1964, and continuing until 1988, the Property (mostly the central portion of the Property) was used to prepare newly manufactured cars for distribution to dealerships for sale. Such "prep work" included body work, mechanical work, tune-up, front-end alignment, emissions control testing, painting, washing, detailing, and road performance tests. Lintecum Decl., Exs. 62, 63. Operations at the Property were extensive; between 3,000 to 5,000 cars were prepped there every month. *See* RFJN, Ex. 77.

Various entities conducted these operations, including Dallas Smith Service Corporation, Automotive Precheck, and New Car Preparation System, Inc. Lintecum Decl., Exs. 62, 63. None of these companies are still in business, having dissolved years ago, and none is a party to this lawsuit.

The Property had two owners between 1964 and 1988 when it was used for car prep work: Defendant Union Pacific Railroad Company ("Union Pacific")[54] and predecessors-in-interest to Defendant Palmtree Acquisition Corp. ("Palmtree").[55]

---

[54] More specifically, predecessors-in-interest to Union Pacific owned the Property. Lintecum Decl., Ex. 60. Those entities began purchasing portions of the Property beginning in 1888. *Id.* By the time car prep operations began at the Property in 1964, Union Pacific's predecessors-in-interest had purchased most of the Property, including the central portion of the Property where the majority of car prep operations were conducted, and had purchased the entire 40 acres by 1967. *Id.* Some car prep related operations took place on a parcel known as the LaSalle Property to the east of the central portion. *Id.* Ex. 70.

[55] Plaintiffs have not moved against Palmtree for partial summary judgment, In

1    SUMF 28. Union Pacific owned the Property until 1974, when it transferred it to

2    Palmtree's predecessor-in-interest. *Id.*

3         Car prep operations at the Property involved the use of various hazardous

4    substances. Solvents, for example, were used to remove cosmoline, a waxy

5    substance applied to the new automobiles to protect them from rust and minor body

6    damage until they were delivered for sale to auto dealers. Lintecum Decl., Ex. 63

7    (1973 permit application by New Car Prep for industrial wastewater discharge

8    listed "decosmoline" and solvent as raw materials that would be used and

9    discharged to the sewer system from the carwash); *see also Maryland Undercoating*

10   *Co. v. Payne,* 603 F.2d 477, 479 (4th Cir. 1979) (describing decosmolining as the

11   removal of the protective coating on vehicles when processing them for distribution

12   to importers, distributors and dealers). Operations also included painting and spot

13   plating using chromium, a process often used to plate steel auto bumpers with

14   chrome (*see, e.g.,* RFJN Decl., Ex. 79.

15        Wastes generated from car prep operations at the Property contained

16   hazardous substances. Wastewater from carwash operations contained solvents, and

17   plating operations generated liquid wastes containing hexavalent chromium. .

18   Operations at the Property also included the use of waste management units

19   associated with releases of hazardous substances into the environment, such as

20   clarifiers, clay and concrete sewers, and underground storage tanks.  Lintecum

21   Decl., Exs. 62, 63; RFJN, Exs. 77, 78, 80-82. Concrete clarifiers at the Property

22   _____

23   January 2018, Palmtree stipulated to facts supporting the three judicial

24   determinations Plaintiffs seek in this Motion (*see* Docket No. 678). This obviated
     the need to participate in this motion practice and advancing Palmtree to Phase II of

25   this action relating to the issues of Plaintiffs' response costs and allocation.

26   References in this Motion to events that occurred at the Property during Palmtree's
     ownership are included simply to provide background and context to facilitate a

27   thorough understanding of the Property and events that occurred during Union

28   Pacific's ownership.

(there were seven in all) were used to remove solids from floor rinse down and carwash water going to the sewer, and at least one of the clarifiers, designated as CL-2, received waste streams carrying solvents. *See* Lintecum Decl., Ex. 63. Underground storage tanks were also reportedly used to dispose of waste oils, which are known to commonly contain solvents. *Id.* (at 20, 38). Five, 550-gallon USTs holding waste oil were located in the southeastern portion of the Property. *Id*., Exs. 63, 71. One of Defendant's environmental consultants concluded that because the car-prep operator did not recycle solvents and, according to the government, "inappropriately" disposed of waste in the trash, "it is likely that a number of automotive products other than waste oil . . . were disposed in the waste oil USTs." *Id.*, Ex. 63.

Much of the waste generated at the Property was discharged to an underground network of permeable clay or concrete piping for disposal to the sewer, and floor washdown, as well as waste water from car wash operations, were discharged to ground and to storm drains for disposal to a flood control channel abutting the southern portion of the Property. *Id.,* Ex. 63; RFJN, Exs. 80. This disposal infrastructure undoubtedly allowed hazardous substances, and waste containing hazardous substances, to be released into the soils at and near the Property. *See* Mutch Report, at 5-9 to 5-11. Even Defendant Palmtree's former consultants, nearly 25 years ago, expressed concern that some of these management approaches presented significant risk of releases of hazardous substances to soils at the Property. *See* Lintecum Decl., Ex. 62.

### 2.    Hazardous Substances Releases & Violations

Operators at the Property were cited numerous times for improper hazardous substance and hazardous waste handling, storage, and disposal practices which prompted government investigative and enforcement activities. In 1964, the operator at the Property, Dallas Smith Service Corp., was cited for discharging

1   wastewater from the carwash to the sewer without an interceptor. *See* Lintecum

2   Decl., Ex. 63. Automotive Precheck was cited in 1970 for a discharge of liquid

3   waste containing hexavalent chromium to the storm drain. *See id.*, Exs. 62, 63. A

4   sample of the discharge water contained 150,000 µg/l of hexavalent chromium—an

5   amount millions of times greater than the 0.02 µg/l level that the Regional Water

6   Quality Control Board considers protective in groundwater. *Id.* During Union

7   Pacific's ownership of the Property, operators were cited numerous other times for

8   violating various permits or regulations. *Id.*

9       Chrysler was cited several more times in the 1970s and 1980s for improper

10  management of hazardous substance at its facility. In 1976, New Car Prep Systems,

11  Inc. ("New Car Prep") was ordered to discontinue discharging wastewater to the

12  ground during car washing operations. *Id.*, Ex. 63. New Car Prep was washing

13  vehicles on a concrete pad that did not drain to the sewer but was instead ponding

14  on the surrounding surfaces and running off to the storm drain. *Id.* Things had not

15  improved much nearly ten years later. New Car Prep was cited in 1985 for

16  disposing paint residue and wash liquids to the storm drain, storing hazardous

17  materials in leaking containers, and disposing of hazardous wastes, paint sludge,

18  and body putty in the trash. *Id.* A table summarizing known releases of hazardous

19  substance and documented violations is included below at Appendix D.

20      Solvents like PCE, TCE, and cis-1,2-DCE have been detected in the soil at

21  the Property, including near locations where solvents were known to have been

22  used or disposed and at levels that significantly exceed the soil ESLs. SUMF 30.

23  The groundwater in OU-2 beneath the Property is also contaminated with PCE,

24  TCE, and cis-1,2-DCE.  SUMF 31.

25      Investigation of soil and groundwater contamination at the Property began in

26  the late 1980s, after car prep operations had ceased. *See* Lintecum Decl., Ex. 93.

27  Although these investigations show the presence of a number of hazardous

28  substances in soil and groundwater, the investigations were seriously deficient in a

- 80 -

1   number of ways. To begin with, despite (1) a chrome plating operation onsite and

2   (2) a documented release of hexavalent chromium in 1970 that vastly exceeded the

3   groundwater ESL, no testing of hexavalent chromium was undertaken at the

4   property. Mutch Report, at 5-13, 5-16 to 5-19. Nor was testing undertaken for other

5   metals commonly found in certain colors of car paint. *Id.*, at 5-19. And despite the

6   overwhelming evidence of the use of degreasers, volatile organic compounds, and

7   other chemicals used at the facility, early investigations inexplicably did not test for

8   such compounds. *Id.*, at 5-16 to 5-19. Even one of Palmtree's former environmental

9   consultants recognized the inadequacy of these investigations, noting that the

10  investigation performed at the Property "was not adequate to detect … chemicals

11  (such as metals, VOCS, and SVOCs) that were used onsite and possibly disposed

12  into the onsite waste oil tanks and clarifiers."[56]

13       Subsequent investigations incorporated some VOC testing, which (as noted

14  above) revealed the presence of VOCs in soils and groundwater. However, because

15  these investigations were performed long after the removal of waste management

16  units such as USTs and clarifiers, and removal of large amounts of impacted soil,

17  they likely reflect lower concentrations than would have been present historically.

18  Mutch Report, at 5-16 to 5-18. Particularly with respect to groundwater, given the

19  presence of groundwater at shallower depths historically, the groundwater

20  investigations performed closer in time to the removal are far more representative

21  of historical groundwater conditions than later investigations. Mutch Report, at 5-

22  19.

23       Despite the lack of adequate investigation into the full extent of

24

25  [56] The failure to investigate the extent of metals in the soil and groundwater at the
26  Property is particularly baffling given that what little investigation was done
    detected concentrations of metals, such as arsenic and vanadium, in soil and
27  groundwater at concentrations that exceeded ESLs. *See, e.g.,* Lintecum Decl., Ex.
28  66; Mutch Report, Tables 5-5, 5-6).

1  contamination at the Property, there is more than ample evidence that releases of

2  hazardous substances into soils at the Property have impacted OU-2 Groundwater.

3  Indeed, the United States Environmental Protection Agency has concluded that the

4  central portion of the Property where the majority of car prep operations were

5  conducted is a source of the hazardous substances in OU-2 Groundwater.

6      **B.    Argument**

7          The undisputed material facts establish that: (1) the Property constitutes or

8  contains one or more CERCLA "facilities;" (2) Union Pacific falls within one of

9  four classes of "persons" subject to the liability provisions of Section 107(a) as a

10  "former owner" during the time when there was a disposal of hazardous substances

11  at the Property, and (3) there has been a release of hazardous substances from the

12  Property into OU-2 Groundwater. Accordingly, Plaintiffs are entitled to partial

13  summary judgment as to the three judicial determinations sought against Defendant

14  Union Pacific.

15
16      **1.    The Chrysler Source Property constitutes or contains one or more CERCLA facilities.**

17          There is little doubt that CERCLA hazardous substances were used, disposed

18  of or otherwise located at the Property. Operators were known to have utilized

19  "…acrylic and enamel paints for spray paint operations, detergents and flammable

20  solvents, chlorinated hydrocarbons including PCE and TCE used for degreasing

21  and car wash operations." Lintecum Decl., Ex. 94. And as noted above in Section

22  A, liquid wastes generated at the Property during Union Pacific's ownership also

23  contained hazardous substances including hazardous substances present in sewers

24  and clarifiers. *Id.* Soil and groundwater sampling at the Property further show that

25  hazardous substances, including chromium and PCE, have come to be located there.

26  *Id.*

27          Given these facts, the Property constitutes and contains one or more

28

CERCLA "facilities." Plaintiffs are entitled to a determination against Union Pacific on this issue. *See 3000 E. Imperial,* 2010 U.S. Dist. LEXIS 138661at *3, 7; *Am. Int'l Specialty Lines*, 2010 U.S. Dist. LEXIS 65590, at *61-62, 68-69.

### 2. Union Pacific falls within the four classes of "persons" subject to the liability provisions of Section 107(a) because it is a former "owner" of the Property.

Beginning no later than 1963, Union Pacific's predecessors-in-interest held fee title to the portion of the Property where car-prep operations were conducted and held fee title to the entire Property from 1967 to September 1974. SUMF 28. Further, there were multiple "disposals" of CERCLA hazardous substances at the Property during Union Pacific's ownership. SUMF 29.

Waste water from operations at the Property contained solvents and hexavalent chromium (*see* Section A, *supra*), and disposal practices at the Property during Union Pacific's ownership presented multiple opportunities for solvents to enter into the environment.[57] *See Lincoln Props. v. Higgins,* CIV. No. S-91-760 DFL/GGH, 1993 U.S. Dist. LEXIS 1251, at *66-69 (E.D. Cal. Jan. 18, 1993) (so long as hazardous substances are discharged in a manner in which they may enter the environment, a "disposal" has occurred; direct placement onto soil or into water is not required to qualify as "disposal").

Waste water from car wash operations went directly to ground where it could seep through cracks in concrete-paved areas or structures, like the car wash conveyor belt trenches, or run off onto unpaved areas and into storm drains that emptied into the flood control channel located south of the Property. Lintecum Decl., Exs. 62, 63. Discharges to that channel were also prone to impacts to the environment through direct impact to exposed soils beneath the channel, through

---

[57] The liquid wastes generated at the Property when Union Pacific owned it were significant. According to waste discharge permit applications, discharges in 1964 were estimated to be 60,000 gallons per day. RFJN, Exs. 80, 82. In 1973, discharges from washdown alone was estimated at 24,000 per day. *Id.*, Ex. 78.

seepage from cracked concrete or at expansion joints, or through exfiltration. *Id.*; Mutch Report, at 5-9 to 5-11.

Further, solvents, or waste water contaminated with solvents, from onsite operations were discharged to concrete clarifiers and carried through permeable clay or concrete pipes to the sanitary sewer, raising concerns amongst environmental consultants that "a significant potential exists for impact to underlying soils from these systems." Lintecum Decl., Exs. 62, 64; Mutch Report, at 5-8 to 5-11. In 1971, for example, the operator at the Property, Automotive Precheck, was directed by L.A. County Department of Public Works to promptly clean three sewer traps "heavy with oil and solvent" in violation of the permits regulating discharges of carwash water and floor washdown from several buildings. Lintecum Decl., Ex. 63; RFJN, Ex. 83. Indeed, heavily stained soils throughout the Property, including soils in the car wash conveyor belt trenches, and soil contamination beneath clarifiers, establish that these contaminants actually entered the environment. Lintecum Decl., Exs. 62, 63.

Hexavalent chromium was also disposed of at the Property during Union Pacific's ownership. Two different consultants reported that liquid waste containing high levels of hexavalent chromium was improperly discharged to a storm drain in 1970. *Id.*, Exs. 62, 63; RFJN, Ex. 88. One consultant reported that the liquid waste originated from the spot plating area. Lintecum Decl., Ex. 63. Whether these reports refer to the same discharge, or separate discharges, is unclear.[58] However, what is clear is that discharges of liquid waste to the storm drain at the Property present at least two opportunities for hazardous substances in those waste streams to enter the

---

[58] It well may have been more two separate disposals of hexavalent chromium. Prior to 1970, the operator allowed liquid waste from the spot plating area to discharge to the storm drain, as evidenced by its receipt of a Notice of Violation on March 2, 1970 for discharging liquid waste containing hexavalent chromium to the storm drain and in response to the notice, it plugged the drain. Lintecum Decl., Ex. 63.

environment. Exposed soil in or near the drain itself or cracks in that structure provide one avenue. The flood channel, as described above, provides another.

This evidence provides more than enough support upon which the Court may infer that it is more likely than not that one or more CERCLA hazardous substances, such as PCE and hexavalent chromium, was disposed of at the Property when Union Pacific owned it. *See Tosco Corp.*, 216 F.3d at 892-93 (circumstantial evidence sufficient to establish a "disposal" under CERCLA Section 107(a)(2)). Accordingly, Union Pacific is a "person" that qualifies as a "former owner" of the Property. 42 U.S.C. § 9601(20)(A)(ii) (defining "owner"), (21) (corporations are "persons" under CERCLA); *see also City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 451-52 (9th Cir. 2011) (fee title owner of real property is "owner" under CERCLA).

### 3. There was a "release" of hazardous substances from the Property into OU-2.

#### a. There have been releases of hazardous substances into soils at the Property.

Solvents, like PCE and TCE, were used at the Property (*see* Section A.1, *supra*), and, as one would expect from the poor housekeeping described above (*see* Section A.2, *supra*), they are in the soils in concentrations that exceed soil screening levels. SUMF 30. PCE was detected in concentrations 47 times the level at which soils can adversely impact underlying groundwater, and the maximum concentrations of PCE detected in the soil occurred in samples taken from the below the former location of a clarifier, designated as CL-2. Lintecum Decl., Ex. 64; Mutch Report, at 5-17. The presence of hazardous substances in subsurface soils at the Property is sufficient evidence that CERCLA "releases" have occurred. *See, e.g., Am. Int'l Specialty Lines Co. v. U.S.*, Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590, at *61 (C.D. Cal. June 30, 2010).

#### b. The same hazardous substances in the soils at the Property are also in OU2 Groundwater.

1    Hazardous substances used at the Property, and found in significant

2    concentrations in the soil there, include PCE and TCE. SUMF 30. These same

3    substances are in OU-2 Groundwater below and downgradient of the Property.

4    SUMF 31. Thus, the first two prongs of the *Castaic Lake* test, establishing: (i)

5    contaminants at the Property; and (ii) the same contaminants in OU-2 Groundwater,

6    are easily satisfied. *Castaic Lake,* 272 F. Supp. 2d at 1067.

7              **c.      A plausible migration pathway exists between the Property and OU2 Groundwater.**

8    The Chrysler Property, like all the other Source Properties at issue in this

9    case, sits atop an area where the soils underneath the Property allow for surface

10   infiltration to the underlying groundwater. *See* Section IV.A & B.1, *supra*; Mutch

11   Report, at 2-4 to 2-9. Moreover, the soils beneath the Property pose no reasonable

12   barrier to the migration of hazardous substances to OU-2 Groundwater when those

13   substances have been detected at levels that exceed the soil screening levels by at

14   least an order of magnitude, as has been the case here. *See* Mutch Report, at 5-26 to

15   5-28. SUMF 32. In fact, the evidence indicates that hazardous substances, such as

16   PCE, TCE, and 1,1-DCE, ***have in fact migrated*** from the subsurface soils to OU-2.

17   Hazardous substances have been detected in soils at the Property all the way down

18   to the water table.

19   PCE, TCE, and 1,1-DCE have been detected in the soils "beneath and

20   extending outward" from the location of clarifier CL-2, which was located near the

21   paint, body work and car washing operations. Lintecum Decl., Ex. 64; Mutch

22   Report, at 5-20. These hazardous substances were detected in soils below that

23   clarifier "at several depths *down to the water table,*" depths of 22, 28, and at 33 feet

24   bgs. – "where groundwater exists." *Id.* (emphasis added).

25   Groundwater testing at the Property further confirms that clarifier CL-2 was

26   an onsite source of contamination to OU-2 Groundwater. Samples drawn from

27   downgradient wells detected PCE in higher concentrations than samples drawn

28

from upgradient wells, indicating an onsite PCE source. Mutch Report, at 5-23 to 5-25. For example, groundwater monitoring well designated as GW-3, which is located directly downgradient of clarifier CL-2, has been shown to consistently have the highest concentrations of VOCs, which is "a clear indication," according to Defendant Palmtree's former consultants, "that these contaminants have entered groundwater at that location and that there is a potential for the other former clarifiers to be a source of VOCs in soil and groundwater."[59] Lintecum Decl., Ex. 63. Groundwater samples taken from other monitoring wells located near clarifier CL-2 also had higher concentrations of hazardous substances as compared to wells immediately upgradient of that location. Mutch Report, at 5-23 to 5-25.

The United States EPA found the same, telling pattern. In its 2010 OU-2 Remedial Investigation Report, EPA concluded that in "1990 and 1991 sampling, the concentrations of chlorinated hydrocarbons in groundwater samples taken from wells downgradient of the former clarifiers at [the Property] were typically higher compared to the concentrations in samples collected upgradient."[60] RFJN, Ex. 1. And like Palmtree's former environmental consultants, EPA has determined that releases of hazardous substances at the Property have contributed to the contamination in OU-2 Groundwater. In its OU-2 Remedial Investigation report, EPA puts it plainly: "contamination in soil and the elevated concentrations of PCE, TCE, and 1,1-DCE suggest that Site A *is a source of groundwater contamination* by these compounds." *Id.* (emphasis added).

Thus, the evidence shows that hazardous substances **have migrated** from the

---

[59] In fact, monitoring well GW-3 had the highest concentrations of PCE of all monitoring wells sampled in the 1991-1992 period. Lintecum Decl., Ex. 63.

[60] In its Remedial Investigation, EPA focused its attention on a portion of the Property, not the entire site. It focused on the central portion of the Property given the clear presence of releases to OU-2 Groundwater from the CL-2 clarifier, an area that also included a significant portion of the car prep operations, referring to that portion of the Property as "Site A." *See* RFJN, Ex. 1.

soils at the Property into OU-2 Groundwater. EPA, and at least one of defendants' environmental consultants, believes so too, and the company that purchased the Property from Union Pacific, Palmtree, has stipulated to facts supporting this determination. Even though the same car-prep operations and same types of environmental regulatory violations occurred during both Union's Pacific's and Palmtree's ownership, Union Pacific apparently would have the Court believe that *none* of the hazardous substances at the Property, not a drop, reached the ground during its ownership at levels sufficient to reach, or threaten to reach, OU-2 Groundwater. The evidence plainly shows otherwise.

# Appendix D

## Violations and Documented Releases for the Chrysler Nu-Car Property[61]

| Date | Description | Reference |
|------|-------------|-----------|
| 1/14/1964 | On this date, the Dallas Smith Service Corp. received a violation for discharging carwash wastewater to the sewer without the proper interceptor. An interceptor was subsequently installed. | Dames & Moore, 1992a. Remedial Investigation Workplan, Catellus Development Corporation, Central Property 12140 Slauson Avenue, Santa Fe Springs, California. January 10, 1992. |
| 1966 - 1976 | Review of the City of Santa Fe Springs Fire Department records indicated that violations of industrial waste discharge permits were recorded in 1966, 1970, and 1976<br><br>The inspector's report for the 1966 violation describes the presence of a *"heavy layer of hydrocarbons"* in the pretreatment system outlet chamber. | McLaren Environmental Engineering. 1989. Property transaction environmental assessment of Chrysler Land, 12140 Slauson, Santa Fe Springs, California, CA037120 for Santa Fe Pacific Realty Corporation. January 11, 1989. |
| 1970 | Violation was recorded when a sample of discharge water from the car wash storm drain was found to contain 150 ppm chromium.  In response, wastewater was diverted to a pretreatment interceptor to reduce the chromium level in the discharge. | McLaren Environmental Engineering. 1989. Property transaction environmental assessment of Chrysler Land, 12140 Slauson, Santa Fe Springs, California, CA037120 for Santa Fe Pacific Realty Corporation. January 11, 1989. |
| 3/2/1970 | Department of Health Services has a notice of violation on file from this date by the Los Angeles County Engineer to Chrysler New Car Prep Systems, Inc. concerning the improper discharge of liquid waste to the storm drain from the spot plating area (near the front-end building).  The concentration of total dissolved solids and chromium was in excess of allowable limits. | Dames & Moore. 1992a. Remedial Investigation Workplan, Catellus Development Corporation Central Property 12140 Slauson Avenue, Santa Fe Springs, California. January 10, 1992. Los Angeles County Department of County Engineer, Notice of Violation and Order to Comply, Mar. 2, 1970. Los Angeles County Department of County Engineer, Notice of Non-Compliance, February 3, 1971. |
| 2/1971 | Automotive Precheck Corp. (part of Chrysler New Car Prep) was directed to clean sewer traps in violation of the industrial waste permit by being *"heavy with oil and solvent."* | |
| 05/21/1976 | According to a Dames & Moore workplan: *"New Car Prep Systems was ordered to discontinue discharging wastewater to the ground surface. Trucks and vans were being washed on a concrete pad that did not drain to the sewer. Wash water was allowed to pond on the surrounding surfaces and run off to the stormdrain. New Car Prep Systems responded in June, 1976 that they had decided to discontinue carwashing operations on the concrete pad."* | |
| 6/11/1976 | Letter to the county engineer states:<br><br>*"In response to the Notice of Violation dated May 21, 1976; our company has decided to discontinue the car washing operation at the violation site. Therefore, there will be no wastewater generated at the violation* | Gladysz, A. H. (NuCar Prep System, Inc), 1976. Violation File 5805-1H. Letter to C. G. Brisley, Jr., (County Engineer, Los Angeles). June 11, 1976. |

---

[61] *See* Mutch Report, Table 5-4.

| Date | Description | Reference |
|------|-------------|-----------|
| | *site or discharged into the existing storm drain system.*" | |
| 1/1977 | New Car Prep Systems cited for violation of Industrial Wastewater Discharge permits.  Reporting of/analysis for critical permit parameters was not done. Oil and grease concentration were excessive. Better maintenance of cleanouts was recommended. | Dames & Moore. 1992a. Remedial Investigation Workplan, Catellus Development Corporation Central Property 12140 Slauson Avenue, Santa Fe Springs, California. January 10, 1992. |
| 7/12/1985 | From Dames & Moore review of Los Angeles County Department of Health Services files:<br><br>*"Chrysler New Car Prep was sent a notice of violation on July 12,1985 and directed to correct the following violations to the State Health and Safety Code: (1) disposal of paint residue and wash liquids to the storm drain…"*<br><br>Report instructs Nu Car Prep to stop leaking hazardous waste containers "at once," discontinue disposal of hazardous waste (paint residue and liquid washings) to the storm drain, and, stop treating hazardous waste for longer than 90 days without written permission. The inspector further orders Nu Car Prep to *"[p]rovide this office with a plan to contain hazardous waste at this property . . . Discontinue immediately the disposal of hazardous waste (paint sludge liquid) Bondo (Putty) into trash."* | Also, Los Angeles Department of Public Health Hazardous Waste Inspection, July 1985.<br>County of Los Angeles Department of Health Services, Inspection Report to J. Parker Re Nu Car Prep, 12140 E. Slauson Avenue, Santa Fe Springs, California (July 12, 1985) |
| 3/31/1998 | During tank removal, there was visual and olfactory evidence of soil contamination noted at tank 1 (3,000 gasoline UST), location 4 (750 gallon concrete clarifier, location 15 (500 gallon concrete clarifier), location 16 (4 550 gallon waste oil USTs), and location 17 (550 gallon waste oil UST). Only TPH was measured. (pages3-4) About 1,000 cy of contaminated soil was excavated. | Tank Removal Geologic Report, prepared by Petroleum Industry Consultants, Inc., March 31, 1988 |
| 1/4/1991 | Discloses a recent discovery of halogenated, aromatic and other petroleum hydrocarbons "in soil and gw at the Property." States contamination was found while conducted due diligence prior to construction on the Property. Stained soils were found directly below and outward from a former underground concrete clarifier installed and operated by Chrysler. It was associated with auto body repair shop and removed in 1988. Testing confirmed presence of halogenated and petroleum hydrocarbons in soil. Gw wells also showed 1,1 DCE, PCE and TCE and other chemicals. 1/14/91 notes depth to groundwater is 33' bgs with south to southwest gw flow direction. Notes that TPH was up to 18,000 ppm at 22' bgs and gw impacts for chlorinated compounds above MCLs. | Letter from Catellus to RWQCB and Los Angeles County DHS attaching data from Converse Environmental Consultants. January 4, 1991. Notes from Catellus dated January 14, 1991. |
| No Date | Public Works records contained notices of violation of NuCar Prep's industrial wastewater permit requirements.  Violations of concern include discharging wastewater from the spot plating area containing hexavalent chromium at 150 ppm to a | McLaren Environmental Engineering. 1989. Property transaction environmental assessment of Chrysler Land, 12140 Slauson, Santa Fe Springs, California, CA037120 for Santa Fe Pacific Realty |

| Date | Description | Reference |
|------|-------------|-----------|
| | storm drain and discharging carwash wastewater to the ground surface. | Corporation. January 11, 1989. |

1  **IX.   PATSOURAS PROPERTY**

2       **A.    Overview**

3       The Patsouras Source Property (hereafter, for purposes of this Section IX, the

4  "Property") is located at 11630 – 11700 Burke Street in Santa Fe Springs,

5  California, occupying approximately 8.5 acres. SUMF 33. Defendant Kekropia, Inc.

6  ("Kekropia") currently holds title to the Property, having purchased it in 1995. *Id*.

7       When it bought the Property, Kekropia, and that company's owner Larry

8  Patsouras, knew that it was contaminated. RFJN, Ex. 84. An assessment prepared

9  by environmental consultants retained by Kekropia catalogued the decades-long

10 operations conducted there that involved extensive, and improper, use, handling,

11 and storage of hazardous substances, including PCE and hexavalent chromium, as

12 well as discharges of waste containing such hazardous substances into the soils.

13 Lintecum Decl. Ex. 73.

14      Since at least 1958,[62] the Property was used to manufacture oil well drilling

15 equipment and tools by a company which no longer exists, Globe Oil Tool, Inc.

16 ("Globe Oil").[63] Lintecum Decl., Ex. 77. Globe Oil conducted tooling and heat

17 treating of oil tools, bits, and devices, manufacturing hundreds of devices and

18 pieces of equipment each month. RFJN, Ex. 85. The metal heat treating operations

19 generated wastewater heavily contaminated with hexavalent chromium. RFJN,

20 Decl., Exs. 85, 93, 94. Globe Oil used a degreaser and steam cleaned newly

21

22 ――――――――――――
[62] The start of operations on this Property may have begun decades earlier.
23 Historical aerial photographs show that the main plant buildings were present and
   operations were active as early as 1938. *See* Mutch Report, at 7-18, Figure 7-12.
24 That earlier start date is consistent with a determination made by the County of Los
   Angeles Department of Health Services in 1988 that brick clarifiers present on the
25 Property were built prior to World War II. *See* RFJN, Ex. 87.
26
[63] Globe Oil Tools, Inc. also owned the Property before selling it to its parent
27 corporation, Rucker Company, which Plaintiffs contend is the predecessor-in-
   interest to Defendant Halliburton Affiliates, LLC ("Halliburton").
28

manufactured parts and equipment, which created waste streams contaminated with
hazardous substances. Lintecum Decl., Ex. 77; RFJN, Ex. 85. After 1970, the waste
streams were run through permeable concrete or brick subsurface clarifiers, units
now known to commonly result in subsurface releases, to settle out solids before
being discharged to the public sewer system. Lintecum Decl., Exs. 73, 77. In 1988,
the Los Angeles County of Engineers described the two brick clarifiers, which were
built before World War II, as having "long since lost their integrity to withhold any
of its [*sic*] contents." RFJN, Ex. 87. Moreover, prior to 1970, the sewer system at
this Property was not complete, and certain wastes were discharged directly to the
ground. *Id.*, Ex. 88; Lintecum Decl., Ex. 75.

From 1973 to 1987, Defendant Palley Supply Company, a forfeited
California corporation, used the Property for hydraulics and hydraulic equipment
maintenance, government surplus, and warehousing. Lintecum Decl., Exs. 78, 83;
RFJN, Ex. 86. Palley Supply failed to properly use and maintain the subsurface
clarifiers, allowing improper storage of waste oil and solvents in these units to
overflow during rainstorms. Lintecum Decl., Ex. 73; RFJN, Ex. 87. In 1987, the
County of Los Angeles Department of Health Services filed a criminal complaint
against Palley Supply's owner for maintaining two subsurface structures containing
a black oily liquid resembling waste oil. Lintecum Decl., Ex. 77.

Both the Los Angeles County Fire Department and Santa Fe Springs Fire
Department periodically conducted inspections of the Property and cited Globe Oil
and Palley Supply for numerous violations. *See* Section B.3.a, *infra*. Despite the
years of known poor hazardous substances handling and waste disposal practices,
meaningful efforts to investigate environmental contamination at the Property did
not begin until 1994, decades after repeated and ongoing releases of hazardous
substances from former operations at the Property. Lintecum Decl., Ex. 73.
Although those early 1990s investigations were far from adequate, they clearly
showed that hazardous substances, including PCE, TCE, and chromium, including

hexavalent chromium, were present in both soils and groundwater at the Property.
*Id.,* Exs. 73, 76. In 1997, the Regional Water Quality Control Board-Los Angeles
took over as the lead agency responsible for overseeing site mitigation and
anticipated remedial efforts at the Property. RFJN, Ex. 89. A table summarizing
known releases of hazardous substance and documented violations is included
below at Appendix E.

When it bought the Property, Kekropia knew that very little had been done to
investigate the environmental contamination and nothing had been done to fully
characterize the contamination or meaningfully remediate the Property. Lintecum
Decl., Exs. 72, 76. Although some steps have been taken at the Property in recent
years to help mitigate against continuing releases of hazardous substances from
Property soils into OU-2 Groundwater, nothing has been done to address the
decades of historical releases of hazardous substances that have already contributed
to the OU-2 Groundwater contamination that Plaintiffs have spent millions of
dollars, and will continue to incur tens of millions of dollars more, to address
pursuant to EPA's selected remedy.

## B.   Argument

Plaintiffs are entitled to partial summary judgment as to the three judicial
determinations sought against Kekropia. There is no dispute as to any of the
material facts establishing that: (1) the Property constitutes or contains a CERCLA
"facility;" (2) Kekropia falls within one of the four classes of "persons" subject to
the liability provisions of Section 107(a) as current "owners;" and (3) there has
been a release of hazardous substances from the Property into OU-2 Groundwater.

### 1.   The Property constitutes or contains one or more CERCLA facilities.

Under CERCLA, a "facility" includes "any site or area where a hazardous
substance has been deposited, stored, disposed of, or placed, or otherwise come to

be located." 42 U.S.C. § 9601(9). The soil and groundwater testing at the Property unequivocally shows that numerous hazardous substances, including PCE and total chromium, have been detected in soil and groundwater at the Property. SUMF 34, 35. Thus, the Property qualifies as a CERCLA "facility."

**2. Kekropia falls within one of the four classes of "persons" subject to the liability provisions of Section 107(a).**

As the current holder of fee title to the Property, Defendant Kekropia, a California corporation, falls within the class of persons subject to liability under CERCLA. SUMF 33; 42 U.S.C. § 9601(20)(A)(ii) (defining "owner" as an owner of a facility), (21) (corporations are "persons" under CERCLA); *see also City of Los Angeles v. San Pedro Boat Works,* 635 F.3d 440, 451-52 (9th Cir. 2011) (fee title owner of real property is "current owner" under CERCLA).

**3. There has been a "release" of hazardous substances from the Property into OU-2 Groundwater.**

**a. There have been releases of hazardous substances into soils at the Property.**

The Property has been subject to enforcement actions for discharges and other mishandling of hazardous substances into soils since at least 1970. In March 1970, Globe Oil was issued a Notice of Violation from the Los Angeles County Engineer, Industrial Waste Division, for discharging industrial wastes to the ground. RFJN, Decl., Exs. 76, 90; Lintecum Decl., Exs. 75, 78. The discharge included rinse water from the heat-treating operations, which contained dissolved solids concentrations above the allowable limit for ground disposal and hexavalent chromium at 19.5 parts per million, a level many orders of magnitude higher than the current level considered protective in groundwater. RFJN, Decl., Ex. 76; Mutch Report, Tables 3-1, 7-4. Given that sewers were not installed and utilized at this Property until 1970, these releases likely were ongoing from the start of operations until the sewer system was installed. RFJN, Ex. 88; Lintecum Decl., Ex. 75.

In 1978, Palley Supply received a Notice of Violation for discharging industrial waste from its steam cleaning operation to the public sewer system through clarifiers installed at the Property by Globe Oil. Lintecum Decl., Ex. 78. In 1987, the Los Angeles County Department of Health Services filed a criminal complaint against Palley for the presence of the two subsurface structures, clarifiers, containing a black oily liquid resembling waste oil. *Id.*, Ex. 73. A year later, an inspection report noted that the clarifiers were filled with trash and oil, and that waste was discharging to the street. RFJN, Ex. 101. Additionally, numerous environmental issues were noted in a 1994 Phase I investigation, including: stained ground surface in the southwest corner of the Property in the area of four partially-filled 55-gallon drums. Lintecum Decl., Ex. 73. The investigation also noted that ponded or discharged liquids were observed historically in the central part of the southern portion of the Property. *Id.*

As one might expect, the mishandling of hazardous substances at the Property resulted in releases of those substances into the environment. RFJN, Ex. 91. As noted above, PCE and chromium, as well as other CERCLA hazardous substances, have been detected in soil at the Property. SUMF 34. The mere presence of hazardous substances in an environmental media at a site, such as subsurface soils, is sufficient evidence that CERCLA "releases" have occurred. *See, e.g., Am. Int'l Specialty Lines Co. v. U.S.*, Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590, at *61 (C.D. Cal. June 30, 2010); *United States v. Hardage,* 761 F. Supp. 1501, 1510 (W.D. Okla. 1990). And here, many of the highest concentrations of hazardous substances that were detected in soil and groundwater at the Property were contained in samples collected in the vicinity of known, onsite sources of releases to the environment, such as the clarifiers used by Globe Oil and Palley Supply. Lintecum Decl., Exs. 79, 80, 81. As noted (*see* Section A.1, *supra*), the current owner was well aware of the presence of contamination at this Property when he first became its owner. Shortly after purchase, Mr. Patsouras was directed

1    to "determine the nature, concentration, and the vertical and lateral extent of

2    contamination and legally dispose or remediate all contaminated materials or soils

3    to either non-detectable or natural background concentration levels." RFJN, Ex. 84.

4        The levels of hazardous substances in soils at the Property have been

5    confirmed in various investigations beginning in the 1980s. Levels of PCE, TCE,

6    chromium, 1,2,3-TCP, arsenic, and vanadium have all been identified as present in

7    the subsurface at levels above soil ESLs, meaning that these levels exceed those

8    considered protective of groundwater. *See* Lintecum Decl., Ex. 79; Mutch Report,

9    Tables 3-1, 8-4. Soil gas sampling has also confirmed the presence of PCE and

10   TCE in soils at the Property. *See* Lintecum Decl., Ex. 78; Mutch Report, Table 8-6.

11   This sampling of soil vapor shows a pattern of elevated concentrations of soil gas

12   PCE, as well as other chlorinated VOCs such as TCE (a daughter product of PCE),

13   that are localized in a portion of the Property with high PCE soil levels, signifying a

14   definitive onsite source of these hazardous substances. Mutch Report, at 7-17.

15
16   **b.    The same hazardous substances in the soils at the
                Property are also in OU-2 Groundwater.**

17   Chromium, PCE, and TCE have been detected in the subsurface soils at the

18   Property, and there is evidence that historical operations there involved the use of

19   chromium and chlorinated solvents. SUMF 35. Thus, the first two prongs of the

20   *Castaic Lake* test are easily met here. *Castaic Lake* test. *See* 272 F. Supp. 2d at

21   1067.

22
23   **c.    A plausible—if not actual—migration pathway exists
                between the Property and OU-2 Groundwater.**

24   There is no question that since the initial industrial use of this Property over

25   fifty years ago, there has been a plausible migration pathway for hazardous

26   substances in the subsurface soils at the Property to reach OU-2 Groundwater.

27   SUMF 36. The entire OU-2 Groundwater area lies in a recharge area defined as an

28   area where water from precipitation and other shallow water sources, such as

1   leaking sewers and clarifiers, reaches the underlying groundwater from surface

2   infiltration. *See* Section IV.A & B.1, *supra*; Mutch Report, at 2-4 to 2-9.

3          As discussed above, levels of PCE and TCE previously detected at this

4   Property exceed soil ESLs that are protective of groundwater by very significant

5   amounts. The extremely high soil concentrations of these compounds demonstrate

6   that there is a plausible migration pathway for these substances to have reached

7   OU-2 Groundwater at levels that exceed protective levels for groundwater. *See*

8   Mutch Report, at 2-4 to 2-9, 7-8 to 7-12, 7-23 to 7-26.

9          Although soil investigations were extremely limited for chromium with

10  virtually no soil samples analyzed for hexavalent chromium (*see* Mutch Report, at

11  7-11 to 7-12), significant chromium levels were found in the area of the clarifiers

12  and hexavalent chromium was found in OU-2 Groundwater below the Property.[64]

13  Lintecum Decl., Exs. 79, 80, 81, 79. In fact, the highest concentrations of

14  hexavalent chromium detected in groundwater beneath the Property were drawn

15  from monitoring wells in the middle of the Property—where clarifiers had been

16  located. Lintecum Decl., Ex. 80; Mutch Report, at 7-14 to 7-16 and Table 7-5.

17  Hexavalent chromium is particularly insidious to the environment in numerous

18  respects, not the least of which is its high mobility in subsurface soils. Mutch

19  Report, at 8-31. And yet no one associated with the Property, including its current

20  owner, Defendant Kekropia, ever bothered to test whether the hexavalent form of

21  chromium was present in the soils despite knowing that waste containing

22  hexavalent chromium had been generated at the Property and had been discharged

23  directly to ground in 1970 and likely for years prior to 1970. *Id.*, at 7-11 to 7-12.

24

_____

25  [64] Another stark example of Kekropia's failure to adequately investigate the nature

26  and extent of contamination at the Property is the lack of any meaningful inquiry
    into the apparent extensive use of lagoons, notorious sources of groundwater

27  contamination, for waste management at the Property. Mutch Report, at 7-3, 7-18 to

28  7-22.

1    In fact, the extent of soil contamination demonstrates not only a plausible

2 pathway to groundwater but an *actual pathway* to OU-2 Groundwater. PCE was

3 detected in a boring near a storage shed on the Property at depths of 10, 15, 20, and

4 24 feet bgs. Lintecum Decl., Ex. 82; Mutch Report, at 7-10 to 7-11. This the last

5 soil sample taken before the groundwater table which, at that time, was present at

6 around 30 feet bgs. *Id.* The Los Angeles County Fire Department, as long ago as

7 1996, reached the same conclusion, noting that "VOC's [*sic*] in this area have been

8 found to extend to GW [groundwater]." RFJN, Ex. 92.

9    A separate boring also revealed elevated levels of PCE in soil samples

10 extending vertically through the soils to the effective depth of the groundwater

11 table, further indicating a completed pathway of PCE from subsurface soils to OU-2

12 Groundwater. Mutch Report, at 7-10 to 7-11. The boring was located near an

13 abandoned clarifier at the Property, and samples from 15, 20, and 25 feet bgs

14 detected PCE with the highest concentration of PCE, 510 µg/kg, a level exceeding

15 the soil screening level, present in the sample taken from 25 feet bgs.[65] *Id.* Given

16 that the water table was historically higher than its level when those samples were

17 drawn, perhaps as a high as 25 feet bgs, the contamination detected at that depth

18 supports an actual pathway by which soil contamination reached OU-2

19 Groundwater. *Id.*

20    Of course, Plaintiffs need only show that there is a *plausible* migration

21 pathway; they need not establish that Defendants' hazardous substance releases

22 *actually* migrated into OU-2 Groundwater. The point in offering evidence of actual

23 migration here is to make clear that Defendants, including Kekropia, cannot

24 credibly deny the existence of a plausible migration pathway to OU-2 Groundwater.

25 Kekropia is a responsible party under CERCLA for contributing to the

26 contamination in OU-2 Groundwater and should pay its fair share of the costs

27 _____

28 [65] TCE was also found in this same boring at 10 feet bgs at a level of 270 µg/kg. *Id.*

1   incurred under the OU-2 Consent Decree to address that contamination.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Appendix E

## Table of Violations and Documented Releases for the Patsouras Property[66]

| Date | Description | Reference |
|------|-------------|-----------|
| 3/20/1970 | Notice of Violation (NOV) issued to Globe for discharging industrial waste to the ground. Discharge was from steam cleaning operation and rinse water from metal heat treating.<br><br>Samples of these wastes were analyzed and the rinse water from the heat-treating operation contained dissolved solids concentrations above the allowable limit for ground disposal. The analytical results indicate a hexavalent chromium concentration in the rinse water sample of 19.5 parts per million (equal to 19.5 mg/L).<br><br>At some time after this, Globe installed a connection to the sanitary sewer that passed through two three-compartment interceptors/clarifiers. | Grancich, J. B., 1970. Globe Oil Tools Co. 11630 Burke St. Santa Fe Springs, Calif. April 15, 1970.<br><br>County of Los Angeles Department of County Engineer, Industrial Waste Division, 1970. Chemical Analysis, Job Number 3240.10. March 17, 1970.<br><br>Environmental Audit, Inc. (EAI), 2009. Summary of Site Assessments, Soil Gas Survey, Human Health Screening Evaluation, and Work Plan 11630-11700 Burke Street Santa Fe Springs, CA 90670 (RWQCB SCP Case No. 1238). March 2009. |
| 1973 | Vernon Fire Marshall indicated he had many issues with Palley Supply Company when they were in Vernon. He took them to court to enforce aisle and exit maintenance as well as good housekeeping | Santa Fe Springs Fire Department, 1973. Memorandum to Richard H. Weaver. May 15, 1973. |
| 1978 | NOV to Palley for discharging industrial waste from steam cleaning operation to public sewer system through the interceptors installed by Globe described above. | Environmental Audit, Inc. (EAI), 2009. Summary of Site Assessments, Soil Gas Survey, Human Health Screening Evaluation, and Work Plan 11630-11700 Burke Street Santa Fe Springs, CA 90670 (RWQCB SCP Case No. 1238). March 2009. |
| 1987 | Los Angeles County Department of Health Services requested a criminal complaint against Palley for the presence of the two subsurface structures (interceptors/clarifiers) containing a black oily liquid resembling waste oil. These operations were ceased in 1987. | |
| 5/18/88 | Inspection report from this date notes that the clarifiers were filled with trash and oil and waste was discharging to street | 1988. Inspection Record for Talco Plastics. May 18, 1988. |
| 6/28/1994 | Stained ground surface noted in southwest corner of the property in the area of four partially-filled 55-gallon drums. | AIG Consultants, 1994. Phase I Environmental Site Assessment - Industrial Buildings 11630 – 11700 Burke Street, Santa Fe Springs, California 90670. June 30, 1994. |
| No Date | Historical property use for industrial activities resulted in discharges or waste to the subsurface, including total petroleum hydrocarbons (TPH), volatile organic compounds (VOCs), and metals listed in Title 22 of the California Code of Regulations. Specifically, the wastes discharged to the subsurface at the property has been associated with storage and use of petroleum products, solvents, metal product manufacturing/ fabrication, and use of multiple | Regional Water Quality Control Board, Los Angeles Region. 2017. No Further Action--With Environmental Restriction. Letter to Mr. Larry Patsouras. January 4, 2017. |

---

[66] *See* Mutch Report, Table 7-3.

| Date | Description | Reference |
|------|-------------|-----------|
|      | clarifiers. |           |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## X.   CONCLUSION

For decades, historical operations at Defendants' Source Properties, including the poor handling of hazardous substances, have polluted the environment. Hazardous substances released into the soils at their Source Properties have reached OU-2 Groundwater, or threaten to, and so Defendants should contribute towards the costs to address that contamination.

As an important first step towards compelling such contribution, Plaintiffs respectfully submit that the Court should grant this Motion. Through their ownership of their Source Properties, or the operation of businesses located there, Defendants are responsible parties under CERCLA for contributing to the OU-2 Groundwater contamination. It is long past time for Defendants to stop sitting by idly while Plaintiffs incur tens of millions of dollars to address the contamination that Defendants helped create.

Dated: January 14, 2021                    Lathrop GPM LLP

By:    /s/ Nancy Sher Cohen
Nancy Sher Cohen
Ronald A. Valenzuela
Attorneys for Plaintiffs
Arconic Inc. et al.