1  **SSL LAW FIRM LLP**
   Zachary R. Walton (SBN 181041)
2  zack@ssllawfirm.com
   Robert M. Martin III (SBN 235489)
3  rob@ssllawfirm.com
4  505 Montgomery Street, Suite 620
   San Francisco, CA 94111
5  Tel:  (415) 814-6400
6  Fax  (415) 814-6401

7
8  *Attorneys for Defendants*
   PHIBRO-TECH, INC., and FIRST DICE ROAD COMPANY,
9  and Acting Liaison Counsel for Defendants

10 *See additional counsel listing on following page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARCONIC INC., et al. | Case No. 2:14-cv-06456 GW (E) |
| Plaintiffs, | **BRIEF NO. 1** |
| v. | **OPPOSING DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT [COMMON LEGAL ISSUES]** |
| APC INVESTMENT CO., *et al*. | |
| Defendants, | Hearing Date: May 17, 2021 |
| AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS. | Time: 8:30 a.m.<br>Place: Courtroom 9D, 9th Fl.<br>Judge: Hon. George H. Wu |

# ADDITIONAL COUNSEL LISTING

Christopher G. Foster (SBN 119142)
cfoster910@gmail.com
One South Orange Grove Boulevard No. 2
Pasadena, CA 91105
Tel: (626) 799-4950
*Attorneys for Defendants*
APC INVESTMENT COMPANY, ASSOCIATED PLATING COMPANY, ASSOCIATED PLATING COMPANY, INC., CLARE GOLNICK, CHERYL GOLNICK, DARRELL GOLNICK, GORDON MCCANN, AND LYNNEA MCCANN

Tammy M. J. Hong (SBN 241660)
tmjhong@ddsffirm.com
DEMETRIOU, DEL GUERCIO, SPRINGER & FRANCIS, LLP
915 Wilshire Boulevard, Suite 2000
Los Angeles, California 90017
Tel: (213) 624-8407
Fax (213) 624-0174
*Attorneys for Defendants*
CLAUDETTE A. EARL and EARL MANUFACTURING COMPANY

David E. Cranston (SBN 122558)
dcranston@GreenbergGlusker.com
Peter A. Nyquist (SBN 180953)
pnyquist@GreenbergGlusker.com
Sedina L. Banks (SBN 229193)
sbanks@GreenbergGlusker.com
Sherry E. Jackman (SBN 274030)
sjackman@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Tel: (310) 553-3610
Fax: (310) 553-0687
*Attorneys for Defendants*
UNION PACIFIC RAILROAD COMPANY

Victor J. Otten (SBN 165800)
vic@ottenlawpc.com
OTTEN LAW, PC
3620 Pacific Coast Highway, #100
Torrance, California 90505
Tel: (310) 378-8533
Fax: (310) 347-4225
*Attorneys for Defendant*
KEKROPIA, INC.

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. COMMON LEGAL STANDARD ..................................................................... 2

    A. Summary Judgment Standard ............................................................... 2

III. LEGAL ARGUMENT ........................................................................................ 3

    A. Plaintiffs Improperly Seek To Establish In This Phase Of The Litigation Common Liability For Response Costs ............................... 3

    B. Plaintiffs Must Establish More Than A Plausible Pathway If They Seek To Establish As A Matter Of Law Common Liability For Response Costs ..................................................................................... 6

    C. Common Liability For Plaintiffs' Response Costs Cannot Exist As A Matter Of Law ...................................................................................... 11

IV. CONCLUSION ................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Estate of Pepper ex rel. Deeble v. Whitehead,* 686 F3d 658 (8th Cir. 2012) .......... 3

*McMillan v. City of New York,* 711 F.3d 120 (2d Cir. 2013) ................................ 3

*S. Ins. Co. v. Affiliated FM Ins. Co.,* 830 F.3d 337 (5th Cir. 2016).......................... 2

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) .................................................. 3

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................ 2

*Asarco, LLC v. Cemex, Inc.*, 21 F. Supp. 3d 784 (W.D. Texas 2014) ..................... 7

*Aydin Corp. v. Loral Corp.,* 718 F.2d 897 (9th Cir. 1983)....................................... 2

*Castaic Lake Water Agency v. Whittaker Corp.,*
    272 F. Supp. 2d 1053 (C.D. Cal. 2003)............................................................. 7, 8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).......................................................... 2

*Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451 (1992) ............. 3

*Fresno Motors, LLC v. Mercedes Benz USA, LLC,*
    771 F.3d 1119 (9th Cir. 2014).......................................................................... 2, 3

*Great Am. Ins. Co. v. Evans*, 269 F. Supp. 151 (N.D. Cal. 1967)....................... 4, 5

*Innis Arden Golf Club v. Pitney Bowes, Inc.,*
    629 F. Supp. 2d 175 (D. Conn. 2009) .............................................................. 9, 10

*Ironwood Homes, Inc. v. Bowen,* 719 F. Supp. 2d 1277 (D. Or. 2010) ................... 4

*J & J Sports Productions, Inc. v. Rivera*, No. 6:13-CV-01996-AA, 2014 WL
    2809844 (D. Or. June 18, 2014) ........................................................................... 4

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*,
    171 F.3d 1065 (6th Cir. 1999)........................................................................... 5, 9

*McSherry v. City of Long Beach,* 584 F.3d 1129 (9th Cir. 2009) ............................ 3

*Miranda v. City of Cornelius,* 429 F.3d 858 (9th Cir. 2005).................................... 2

*Motley v. Parks,* 432 F.3d 1072 (9th Cir. 005).......................................................... 2

*Solutia, Inc. v. McWane, Inc.*, 2012 WL 2031350 (N.D. Ala. June 1, 2012) .... 9, 10

*Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978 (9th Cir. 2007) ........................... 3

*T. W. Elec. Serv. Inc. v. Pac. Electric. Conractors Assoc.,*
    809 F.2d 626 (9th Cir. 1987) ........................................................................ 2
*Thomas v. FAG Bearings,* 846 F. Supp. 1382, 1386-87 (W.D. Mo. 1994) ............. 9

**Statutes**

42 U.S.C. § 9613(f)(1) ............................................................................................. 4
CERCLA § 113(f)(1) ............................................................................................... 4

**Rules**

FED. R. CIV. P. 56(a) ............................................................................................... 2

## I. INTRODUCTION

For over fifteen years, Plaintiffs disposed of thousands of tons of hazardous wastes at the former Omega Chemical facility (the releases from which define the Omega Superfund Site). Plaintiffs' toxic wastes contaminated not only the soil and groundwater at and under the Omega Property itself, but also severely contaminated the groundwater flowing *from* the property—a contaminant plume (the "Omega Plume") that has migrated over many years and now extends at least *four and a half miles* downgradient of the Omega Property. The Omega Plume was designated by the United States Environmental Protection Agency ("EPA") as found within the boundaries of "Operable Unit 2," or "OU-2" for short.[1]

EPA identified the Plaintiffs as the primary culprits of the groundwater contamination found within the boundaries of OU-2, as a result of hazardous substance releases from the Omega facility that created the Omega Plume. EPA's environmental contractor, CH2M Hill, confirmed after years of investigation that Plaintiffs' wastes released from the former Omega Chemical facility are "the main source of contamination in OU-2 [i.e., the Omega Plume]."[2] In the face of their

---

[1] EPA's "Interim Action Record of Decision for Operable Unit 2 Omega Chemical Corporation Superfund Site," dated September 20, 2011 ("OU-2 ROD"), states: "Operable Unit (OU) 2 of the Site is the contamination in groundwater generally downgradient and originating from the former Omega Chemical Corporation (Omega Chemical) facility in Whittier, California, much of which has commingled with chemicals released at other areas overlaying the OU2 groundwater plume." (https://semspub.epa.gov/work/09 /1128496.pdf.) Thus, according to EPA, OU-2 consists of groundwater where contaminants from the Omega Property have commingled with contaminants sourced from other properties. More specifically, the "boundaries" for OU-2 as reflected by Figure 2 of the OU-2 ROD only depict where on the surface other sources *must* be located and where under the surface that commingling *may* have occurred. (*Id.,* p. 121 of pdf, "OU2 Extent of Tetrachloroethylene (PCE) Groundwater Contamination").

[2] Final Remediation Investigation/Feasibility Study Reports, Omega Chemical Corporation Superfund Site, Operable Unit 2, Los Angeles County, California, Volume 1, CH2M HILL, Aug. 2010, § 8.1.2, p. 8-4 (attached to Declaration of Robert B. Martin III ("Martin Dec."), Exhibit 1, filed concurrently with this brief.

overwhelming culpability for funding cleanup costs for the Omega Site, Plaintiffs now seek Partial Summary Judgment as to Certain Elements of CERCLA Liability against Opposing Defendants, alleging in part "there has been a **release or threatened release** of hazardous substances from the soils at each Defendant's Source Property **into OU-2 Groundwater**." (Plaintiffs' Common Issues Brief, 3:19-24, emphasis in original)

## II. COMMON LEGAL STANDARD

### A. Summary Judgment Standard

A party against whom relief is sought may move for summary judgment on all or part of the claim. FED. R. CIV. P. 56(a). The moving party is entitled to summary judgment if the pleadings, discovery and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Miranda v. City of Cornelius,* 429 F.3d 858, 860 n.1 (9th Cir. 2005). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. That is, where there is evidence to the contrary that could cause reasonable persons to disagree on whether the facts claimed by the moving party are true, a "genuine dispute" exists.[3]

In judging evidence at the summary judgment stage, courts do not make credibility determinations or weigh conflicting evidence and must view all evidence and draw all inferences in the light most favorable to the nonmoving party.[4] The

---

[3] *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir. 1983); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Fresno Motors, LLC v. Mercedes Benz USA, LLC,* 771 F.3d 1119, 1125 (9th Cir. 2014); *S. Ins. Co. v. Affiliated FM Ins. Co.*, 830 F.3d 337, 343-44 (5th Cir. 2016).

[4] *See T. W. Elec. Serv. Inc. v. Pac. Electric. Contractors Assoc.,* 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)); *see also Motley v. Parks,* 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (*en banc*), *overruled on other grounds by U.S. v. King,* 687 F.3d 1189 (9th Cir. 2012).

opposing party's version of any disputed issue of fact is presumed correct.[5] Competing inferences create a "genuine" dispute. Even when the basic facts are undisputed, if reasonable minds can arrive at two inconsistent inferences from those facts, summary judgment should be denied.[6] As the moving party with the burden of proof on the issue of Defendants' liability, Plaintiffs "must affirmatively demonstrate that no reasonable trier of fact could find other than for" them. *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

### III.  LEGAL ARGUMENT

#### A.  PLAINTIFFS IMPROPERLY SEEK TO ESTABLISH IN THIS PHASE OF THE LITIGATION COMMON LIABILITY FOR RESPONSE COSTS

In 2017, the parties agreed to segregate this litigation into phases. Specifically, the parties agreed this phase would be limited to whether: (1) each Defendant's property is a "facility," (2) there was a release or threatened release of hazardous substances at or from each Defendant's property into any part of OU-2 (as opposed to the Omega Plume), and (3) each Defendant falls within one of four classes of "persons" subject to liability under CERCLA, 42 U.S.C. Section 9607(a).[7] The parties agreed to defer to a later phase "whether the release or

---

[5] *Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451 (1992); *McSherry v. City of Long Beach,* 584 F.3d 1129, 1135 (9th Cir. 2009); *McMillan v. City of New York,* 711 F.3d 120, 123 (2d Cir. 2013).

[6] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fresno Motors, LLC, supra,* 771 F.3d at 1125 [summary judgment improper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts" (internal quotes omitted)]; *Estate of Pepper ex rel. Deeble v. Whitehead,* 686 F3d 658, 667-68 (8th Cir. 2012).

[7] *See* Parties' Joint Status Conference Report filed on April 21, 2017 (Dkt. 600), the Parties' Supplemental Joint Status Conference Report filed on April 26, 2017 (Dkt. 602), and the Parties' Joint Status Conference Report filed on May 22, 2017 (Dkt. 615).

threatened release caused Plaintiffs to incur response costs that were necessary and consistent with the National Contingency Plan" (the "Deferred Element"), at which point Plaintiffs would necessarily have to prove that each Defendant's contaminants that reached OU-2 commingled with the Omega Plume.[8]

This conclusion follows from the legal requirement that to be entitled to contribution pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), Plaintiffs must prove a common liability for the same harm.[9] Put another way, there are multiple sites or multiple harms in the OU-2 area, each subject to site-specific cleanup requirements under regulatory oversight (in fact each of the Defendants' properties is currently being remediated under regulatory oversight, or has completed a State-approved response action). As among all of these sites there is no common liability and, correspondingly, no contribution remedy between any of the parties without commingling of contaminants from their respective sites.[10] *See J & J Sports Productions, Inc. v. Rivera*, No. 6:13-CV-01996-AA, 2014 WL 2809844, at *6 (D. Or. June 18, 2014) ("As such, [a] party seeking contribution must prove it has a 'common liability' with the party from whom the contribution is sought…. Because common liability is lacking … motion [for summary judgment] is granted as to … contribution claim."); *Ironwood Homes, Inc. v. Bowen,* 719 F. Supp. 2d 1277, 1293 (D. Or. 2010) (party seeking contribution must prove it has

---

[8] Defendants do not concede that Plaintiffs can satisfy this Deferred Element.
[9] Restatement Third § 23(a); *Ironwood Homes, Inc. v. Bowen,* 719 F. Supp. 2d 1277, 1293 (D. Or. 2010); *see also Great Am. Ins. Co. v. Evans*, 269 F. Supp. 151, 154 (N.D. Cal. 1967) ("The right of contribution, where it exists, presupposes a common liability which is shared by the joint tortfeasors on a pro-rata basis.").
[10] Apparently, under Plaintiffs' theory of the case, they are subject to contribution for cleaning up each of Defendant's sites and each Defendant has a contribution claim against all the other defendants. Such sharing makes no sense so long as the sites exist independent of each other. This situation must be distinguished from Plaintiffs' 2004 contribution claim against others who, as did Plaintiffs, sent materials to the Omega Property. There, common liability necessarily existed and Plaintiffs accepted the liability of the others in exchange for monetary payments.

"common liability" with party from whom contribution is sought.); *Great Am. Ins. Co. v. Evans*, 269 F. Supp. 151, 154 (N.D. Cal. 1967) ("The right of contribution, where it exists, presupposes a common liability which is shared by the joint tortfeasors on a pro-rata basis").

As addressed in Defendants' property-specific Oppositions, in at least some instances, Plaintiffs cannot prove that hazardous substances released from the Defendants' properties to soil actually reached any OU-2 groundwater. Beyond this, Plaintiffs have not submitted any evidence that hazardous substances released from any Defendant's property have commingled with the Omega Plume, which is the contaminant plume originating from the Omega Property. Additionally, as to the Deferred Element, Plaintiffs have yet to prove the incurrence of response costs to address any alleged commingling of any release of contaminants from Defendants' Properties into OU-2 groundwater that mixed with the Omega Plume. That determination is not yet at issue in this phase of the case. In short, Plaintiffs cannot establish as a matter of law that common liability exists under CERCLA for any OU-2 response costs they have incurred or may incur.

The Sixth Circuit confirmed in *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) that the existence of a single harm is a prerequisite to the recovery of response costs:

> "In a 'two-site' case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up."

Prior to the filing of their motion for summary judgment, Plaintiffs represented to the Court that the current phase is about "whether hazardous substance releases from Defendants' respective source properties have contaminated regional groundwater and impacted OU-2." (Dkt. 615, n. 2). And by OU-2, Plaintiffs mean, based on the definition in their Motion, all groundwater that

is downgradient of OU-1.[11] In this regard, Plaintiffs' expert, Robert Mutch, testified that "OU-2" is all groundwater at or below the water table inside the outline or boundaries set by EPA and is not at all synonymous with the Omega Plume.[12] In fact, Mr. Mutch did not even evaluate whether hazardous substances in OU-2 have commingled with contaminants comprising the Omega Plume.[13]

To be abundantly clear, Plaintiffs' position is and has been that the only issue with respect to certain Defendants' alleged CERCLA liability being addressed in this phase is whether "there has been a **release or threatened release** of hazardous substances from the soils at each Defendant's Source Property **into OU-2 Groundwater**." (Plaintiffs' Common Issues Brief, 3:19-24, emphasis in original.) Plaintiffs are not entitled to address whether there has been any commingling of alleged contaminant releases from each Defendant's property with the Omega Plume, that in turn may have caused the incurrence of response costs. To the extent Plaintiffs seek summary judgment on that issue, it is beyond the scope of this phase of the litigation.

### B. PLAINTIFFS MUST ESTABLISH MORE THAN A PLAUSIBLE PATHWAY IF THEY SEEK TO ESTABISH AS A MATTER OF LAW COMMON LIABILITY FOR RESPONSE COSTS

Plaintiffs acknowledge that this is a "two-site" case ("where the release or threatened release of a hazardous substance occurs at one location and the plaintiff incurs response costs at another").[14] The Ninth Circuit has not yet ruled on the

---

[11] Plaintiffs' Common Issues Brief, 2:2-4.
[12] Mutch Depo, Ex. at p.52 l. 21-25; p. 53 l. 1-13, 21-25; p.54 l. 1-11; p. 150 l. 9-23; p. 151 l. 1-10, Martin Dec., Ex. 2.
[13] Mutch Depo. at p. 62 l. 10 ("It [if constituents came from the Omega Property] wasn't a principal concern,…"); p. 64 l. 4-6 ("I don't particularly care, honestly, whether those upgradient constituents at a particular property came from the Omega site or came from ten other sites."); p. 73 l. 12-21 ("Q. You were not asked to opine on whether COCs originating at defendants' properties had mixed with COCs originating from the Omega property? A. Not in those particular terms, no."), *Id.*
[14] Plaintiffs' Common Issues Brief, 11:21-25.

standard of proof to be applied in two-site CERCLA cases.

In the absence of Ninth Circuit authority, Plaintiffs rely on a district court case, *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053 (C.D. Cal. 2003), as the appropriate framework for evaluating Defendants' alleged liability under CERCLA. In *Castaic*, Judge Matz stated that a plaintiff must show "a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." *Id.* at 1066. A "*possible*" migration pathway, however, is *not* a "*plausible*" migration pathway. *Asarco, LLC v. Cemex, Inc.*, 21 F. Supp.3d 784, 807 (W.D. Tex. 2014) (applying the *Castaic* framework) (emphasis added). If the plaintiff meets this burden, the defendant "must then proffer evidence sufficient to create a genuine issue of fact as to its ability to disprove causation."[15]

Importantly, the minimal causal nexus set forth in *Castaic* does not apply either in this phase of the litigation or, more generally, to the circumstances presented by this case.

First, *Castaic*'s "plausible migration" pathway discussion referred to the "causation" element of CERCLA liability which, as noted above, is not at issue in this phase of the litigation – i.e., whether or not a release of hazardous substances from a defendant's facility caused Plaintiffs to incur response costs. *Castaic*, 272 F. Supp. 2d at 1062.[16] In other words, this issue of causation is part of the Deferred

---

[15] *Castaic* at 1066. Notably, in *Castaic*, unlike here, the plaintiffs were downgradient owners of drinking water wells. They detected perchlorate in their wells and incurred response costs treating the contamination. The plaintiffs claimed that contamination from the defendant's upgradient site migrated (the contamination "had come to be located") to plaintiffs' downgradient sites (i.e., their water supply wells). Here, the Omega Property is upgradient of all of the Defendants' facilities. The Plaintiffs in this case are generators that sent tons of hazardous waste to the Omega facility, and not downgradient owners or operators of facilities where hazardous substances have come to be located.

[16] The court's analysis was set forth in section 3 of the court's opinion, titled "3. Did the release of Perchlorate at the Whittaker-Bermite Site Cause Plaintiffs to

Element that will be litigated in a subsequent phase of the litigation.

Second, unlike in *Castaic*, in this case Plaintiffs are the responsible parties for the upgradient source. In fact, the case the *Castaic* court found "most instructive" illustrates why:

> "The plaintiff must prove only that contaminants which were once in the custody of the defendant *could have travelled onto the plaintiff's land*, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) *on plaintiff's land* caused the plaintiff to incur response costs."[17]

Plaintiffs cannot allege that hazardous substances from Defendants' properties migrated in groundwater upgradient towards the Omega Property, nor do they allege that hazardous substances from Defendants' properties migrated in groundwater to any downgradient facility that Plaintiffs own or operate. Plaintiffs solely allege that Defendants caused releases of hazardous substances to soil, which in turn impacted OU-2 groundwater.

Finally, while Plaintiffs allege that OU-2 groundwater is a CERCLA "facility," the *Castaic* court held otherwise. The defendant in *Castaic* brought counterclaims against the downgradient plaintiffs as potentially responsible parties on the basis that the contaminated groundwater in the area was a CERCLA "facility." The court disagreed: "Groundwater is neither a 'site' nor an 'area,' at least as those terms are commonly understood."[18] The court ruled that to characterize the groundwater as a facility "stretches the definition beyond reason and common sense." *Id.*

---

Incur Response Costs?" *Castaic*, *infra*, at 1062-1068.

[17] *Id.* at 1065, quoting *Western Assocs. Ltd. Pshp. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 681 (4th Cir. 1995) (emphasis added, citations omitted).

[18] *Id.* at 1076. The court referenced Webster's Third New International Dictionary, "(defining 'site' as 'the original or fixed position of a thing,' 'the local position of a building, town, monument or similar work ….,' etc.; defining 'area' as 'a level or relatively level piece of unoccupied or unused ground' or 'a definitely bounded piece of ground set aside for a specific use or purpose')."

Instead, a CERCLA "two-site" case—or, more accurately, a "multi-site" case, such as this one—is a case in which the plaintiff "contends not that the defendant directly dumped or otherwise disposed of its wastes at the site but rather that hazardous materials migrated there from the defendant's facility or from a different dumpsite elsewhere." *Solutia, Inc. v. McWane, Inc.*, 2012 WL 2031350, at *8 (N.D. Ala. June 1, 2012). In multi-site cases, because "it may be 'much less obvious how [a defendant] could be responsible for contamination of the [site where the plaintiff has incurred response costs],'" some courts have required plaintiffs to prove that a release for which the defendant is responsible at one site (here, the soil on each Defendant's property) caused the contamination of the second site (here, the Omega Plume). *Id.*; *see also Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065 (6th Cir. 1999); *Innis Arden Golf Club v. Pitney Bowes, Inc.,* 629 F. Supp. 2d 175, 185-86 (D. Conn. 2009); *Thomas v. FAG Bearings,* 846 F. Supp. 1382, 1386-87 (W.D. Mo. 1994).

In *Kalamazoo River*, the plaintiff alleged that water flowing across the defendant's property became contaminated with PCBs in soil and then traveled through a drainage ditch before ultimately discharging into a lake where the plaintiff had incurred response costs. *Kalamazoo River*, 171 F.3d at 1067. The defendant did not deny the presence of PCBs at its property, and sampling of the drainage ditch revealed PCB contamination extending at least 1,500 feet from the defendant's property in the direction of the lake. *Id.* at 1068-69. The district court granted defendant's motion for summary judgment because the plaintiff could point to no evidence establishing that "water did in fact flow down the ditch in sufficient quantity to carry PCBs from the northern part of the ditch to [the lake]." *Id.,* at 822.

The Sixth Circuit affirmed the district court's conclusion that the plaintiff's proof that it was *possible* that PCBs could have moved from the drainage ditch to the lake was *insufficient* to establish an undisputed material fact as to causation:

> "[The plaintiff] has created, at most, a question of fact as to whether or not there was a *possibility* that water flowed all the way down the ditch to Morrow Lake… KSG's entire theory of liability on behalf of [the defendant] is based upon the assumption that water flowed down the ditch to Morrow Lake. This assumption, however, is based solely on speculation and possibility. *The existence of a possibility does not create a material issue of fact for trial* because [the plaintiff] bears the burden of proof to show that [the plaintiff] *did* contribute to PCBs in the Kalamazoo River, not that it is *possible* that it might have contributed to the PCBs."

*Id.* at 1072 (emphasis added).

Other multi-party CERCLA cases are likewise instructive in establishing an appropriate framework for evaluating the alleged liability of PRP defendants. In *Innis Arden Golf Club*, the Court granted defendants' motion for summary judgment because plaintiff failed to establish causation, acknowledging that "[o]ther courts confronted with an issue of causation as framed in this manner similarly recognize that a plaintiff must provide some evidence linking its response costs to the targeted off-site release of contaminants." *Innis Arden Golf Club*, 629 F. Supp. 2 at 185-187 (citations omitted).

In *Solutia, Inc.*, the court held:

> "it is not sufficient in alleged migration cases to show that the defendant's wastes contain materials similar to those found at the plaintiff's site; otherwise a defendant might be liable under CERCLA to pay for the cleanup of any dumpsite in the country that happened to contain a substance similar to that in the defendant's wastes. Rather, the plaintiff has the burden to present evidence that will 'provide the necessary causal link between [the defendant's] activities and the contamination which is the subject of [the] suit.' In cases of actual contamination, there must be sufficient evidence from which a jury might reasonably find that it is "more probable than not" that the defendant's wastes did migrate to the site where the plaintiff incurred response costs, not merely that there was some "possibility" that they reached the site."

*Solutia, Inc.*, 2012 WL 2031350 at *8 (citations omitted).

When evaluating non-contiguous sites, and in particular the relationship of

{2316-00002/01070279;3}   10   OPPOSING DEFENDANTS' BRIEF NO. 1: JOINT OPPOSITION TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

upgradient and downgradient contaminant releases, a plaintiff seeking contribution under CERLCA must prove via direct evidence that hazardous substance released from a defendant's facility caused the incurrence of response costs. Plaintiffs have not presented any evidence that any releases of hazardous substances from any Defendant's property have commingled with the Omega Plume. In the absence of such evidence, Plaintiffs are not entitled to summary judgment.

### C. COMMON LIABILITY FOR PLAINTIFFS' RESPONSE COSTS CANNOT EXIST AS A MATTER OF LAW

For avoidance of any doubt, opposing Defendants are compelled to point out that Plaintiffs' expert Mr. Mutch admits he has not yet made any attempt to address the potential commingling with the Omega Plume of hazardous substances that reached OU-2 groundwater and allegedly originated from any Defendant's property.[19] In that regard, he confirmed he understood what constituted OU-2 or OU-2 groundwater in the same way as it was understood by Plaintiffs — i.e., any groundwater below the water table and within the outline or boundaries established by EPA for OU-2.[20] Mr. Mutch readily admits that, given the huge surface area and volume of water comprising OU-2, there could be areas where no contamination exists, along with areas where no contaminants migrated from the Omega Property. By his own admission, this would mean the absence of commingling of any contaminant releases from the Defendants' properties with the Omega Plume.[21] Mr.

---

[19] Mutch Depo. at p. 62 l. 10 ("It [if constituents came from the Omega Property] wasn't a principal concern,…"); p. 64 l. 4-6 ("I don't particularly care, honestly, whether those upgradient constituents at a particular property came from the Omega site or came from ten other sites."); p. 73 l. 12-21 ("Q. You were not asked to opine on whether COCs originating at defendants' properties had mixed with COCs originating from the Omega property? A. Not in those particular terms, no."), attached as Martin Decl., Ex. 2 (also includes pages for following Mutch Depo. citations).

[20] Mutch Depo. at p. 52 l. 21-25; p. 53 l. 1-13, 21-25; p. 54 l. 1-11; p. 150 l. 9-23; p. 151 l. 1-10.

[21] Mutch Depo. at p. 68 l. 9-25; p. 69 l. 1-8, 17-25; p. 70. L. 1-4; p. 72 l. 11-19.

Mutch further testified there are different and distinct aquifers (separated by aquitards) in OU-2 (as he had defined the term)[22] and that for the first 100 feet under the surface of OU-2 the geology is stratigraphically complex and heterogeneous.[23]  As a result, he testified there could be portions of what he considered to be OU-2 that did not contain hazardous substances, or did not include hazardous substances that originated from the Omega Facility, and therefore are not part of the Omega Plume.[24]

    Mr. Mutch further testified that he was unable to identify where hazardous substances released at and originating from the Omega Property had come to be located in OU-2, and whether there had been commingling of hazardous substances from the Omega Property that had come to be located in OU-2 with any hazardous substances allegedly released into OU-2 from any Defendant's Property.[25]  In fact, according to Mr. Mutch, he didn't "particularly care, honestly, whether those upgradient constituents at a particular property came from the Omega site …" .[26]

    While not directly at issue during this phase of the litigation, based on Mr. Mutch's admissions, Plaintiffs lack sufficient evidence to establish any "pathway" necessary to demonstrate common liability for response costs. Therefore, even if common liability for response costs were at issue in this phase of the litigation, Plaintiffs' motion as to every Defendant should be denied because Plaintiffs have presented no evidence that hazardous substances that may have been released from Defendants' properties have commingled with hazardous substances originating from the Omega Property, namely the Omega Plume.

---

[22] Mutch Depo. at p. 55 l. 2 to P. 56 l. 25.
[23] Mutch Depo. at p. 57 l. 1-4, 11-15; p.68 l. 8-25.
[24] Mutch Depo. at p. 68 l. 9-25; p. 69 l. 1-8, 17-25; p. 70. L. 1-4; p. 72 l. 11-19.
[25] *See* Fn. 13, *supra*.
[26] Mutch Depo. at p. 64 l. 4-6, Martin Dec., Ex. 2.

## IV. CONCLUSION

For the foregoing reasons, and the reasons set forth in each Defendant's property-specific Opposition brief, Plaintiffs' Motion for Partial Summary Judgment should be denied.

DATED: February 25, 2021

SSL LAW FIRM LLP

By: /s/ Robert B. Martin III
Robert B. Martin III

Attorneys for Defendants Phibro-Tech, Inc. and First Dice Road Company
And Acting Liaison Counsel for Defendants