1
2
3
4
5

LATHROP GPM LLP
Nancy Sher Cohen, Bar No. 81706
  nancy.cohen@lathropgpm.com
Ronald A. Valenzuela, Bar No. 210025
  ronald.valenzuela@lathropgpm.com
2049 Century Park East, Suite 3500S
Los Angeles, California 90067-1623
Telephone: (310) 789-4600
Facsimile:   (310) 789-4601

6
7

Attorneys for Plaintiffs
Arconic Inc. et al.

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

WESTERN DIVISION

| | |
|---|---|
| 11 ARCONIC INC., et al., | Case No. 2:14-cv-06456 GW (Ex.) |
| 12           Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO JOINT MOTIONS FOR SUMMARY JUDGMENT RE: CERCLA LIABILITY BY DEFENDANTS' PMC SPECIALTIES GROUP, INC. ET AL.** |
| 13 v. | |
| 14 APC INVESTMENT CO., et al., | |
| 15           Defendants. | |
| 16 | |
| 17 | **Hearing**: |
| 18 | Date:    May 17, 2021 |
| 19 | Time:    8:30 a.m. |
| 20 | Place:   Courtroom 9D, 9th Floor<br>350 W. 1st Street<br>Los Angeles, CA 90012 |
| 21 | Judge:  Hon. George H. Wu |
| 22 AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS | |
| 23 | |
| 24 | |

25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................1

II.    COMMON ISSUES OF LAW & FACT ........................................................4

    A.    Defendants Have Articulated the Wrong Legal Standard.............................4

        1.    CERCLA causation is established through evidence of a "plausible migration pathway." ............................................................5

        2.    Defendants Misunderstand CERCLA's Definition of "Covered Person." ...................................................................................8

    B.    COMMON ISSUES OF FACT .........................................................10

        1.    Groundwater Hydrogeology ....................................................10

            a.    The hydrogeology of the OU-2 Groundwater area. ............................11

            b.    The ways in which hazardous substances move from Source Property soil to OU-2 Groundwater.........................................11

        2.    The levels of soil contamination vastly exceed soil Environmental Screening Levels developed to protect groundwater. .......................13

III.    THE CHRYSLER SOURCE PROPERTY ....................................................15

    A.    Overview .................................................................................15

    B.    Argument .................................................................................16

        1.    Union Pacific has applied the wrong legal standard in support of its summary-judgment motion. ..................................................16

        2.    There were multiple "disposals" of hazardous substances at the Chrysler Property during Union Pacific's ownership of the property. ...........17

            a.    During Union Pacific's ownership of the property, there were multiple disposals of waste water containing solvents. ......................18

            b.    Hexavalent chromium disposals occurred during Union Pacific's ownership of the property. ..................................................19

            c.    Disposals of hazardous substances during Union Pacific's ownership of the Chrysler Property resulted in releases, or threatened releases, to OU-2 Groundwater..........................................21

        3.    Union Pacific's claim that Clarifier 2 was installed at the Chrysler Property after Union Pacific sold that property is without merit....................23

            a.    Mr. Ruiz's opinion concerning when Clarifier 2 was installed is unsupported by the evidence................................................24

            b.    The 1973 and 1974 site plans show that Clarifier 2 had been installed on the Chrysler Property when Union Pacific owned it. ...................................................................................28

IV.    PATSOURAS SOURCE PROPERTY .........................................................31

    A.    Overview.................................................................................31

    B.    Argument .................................................................................32

        1.    Contrary to Defendants' contention, there have been significant disposals at the Patsouras Property. ..............................................32

a.    The property has been the site of industrial operations since at least 1941. ....................................................................32

b.    Globe Oil and Palley Supply Company polluted the property for decades. ................................................................34

2.    There have been releases of hazardous substances from the Patsouras Property into OU-2 Groundwater. .....................................................37

a.    There have been releases of hazardous substances into the soils at the property. ..........................................................37

i.    Defendants' contention that the chromium levels in soils at the property are within background levels is meritless. ..............................................................38

ii.   Defendants grossly mischaracterize the PCE and TCE soil data. ..............................................................40

iii.  Defendants ignore the fact that the investigations into the potential impact of contaminants in the soil at the property have been woefully inadequate. ...............................42

b.    A plausible, if not actual, migration pathway exists between the property and OU-2 Groundwater ............................................43

c.    The Los Angeles County and Santa Fe Springs Fire Departments have concluded that VOCs from historical operations at the property have impacted OU-2 Groundwater. ...........45

d.    There is no merit to Defendants' contention that groundwater data establishes that the Patsouras Property is not a source of OU-2 Groundwater contamination. ........................................47

3.    Defendants' position that the Patsouras Property did not impact or threaten to impact OU-2 Groundwater finds little support from the governmental agencies and environmental consultants identified in their motion. ....................................................................................50

a.    The governmental agencies have reached no conclusions concerning past releases from the property to OU-2 Groundwater. ..........................................................50

b.    The conclusions reached by Dr. Kulla and Defendants' other environmental consultants are fundamentally flawed. ........................51

V.    PMC SOURCE PROPERTY .................................................................53

A.    Overview................................................................................53

B.    Argument ..............................................................................55

1.    Groundwater at and near the PMC Property flows into OU-2 Groundwater. ..........................................................................55

2.    PMC's contention that the groundwater at and near its property runs parallel to OU-2 Groundwater is without merit...............................57

a.    Mr. Vogl's groundwater flow maps are unsubstantiated. ..................57

b.    Mr. Vogl has failed to consider the impact of the OU-2 Groundwater containment remedy on groundwater flow. ..................58

c. The Santa Fe Springs Anticline is not a "barrier" that prevents groundwater at and near the PMC Property from flowing into OU-2 Groundwater. ...................................................................60

d. The low permeability of soils in the area of the PMC Property do not prevent groundwater from that property from reaching OU-2. ................................................................................61

3. The PMC Plume has impacted, and threatens to impact, OU-2 Groundwater. ...................................................................61

a. Benzene and other CERCLA hazardous substances have been detected in the soils at the PMC Property and in the groundwater underneath it. ..........................................61

b. The PMC Plume has migrated into OU-2 Groundwater. ....................62

c. PMC cannot redraw the boundary of OU-2 Groundwater to suit their litigation goals. .............................................63

d. PMC's suggestion that remediation has been underway for years is inaccurate. ...............................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Int'l Specialty Lines Co. v. U.S.*,
  Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590 (C.D. Cal. June 30, 2010)....................38

*AmeriPride Services, Inc. v. Valley Industrial Services, Inc.*,
  No. 00-cv-113-MCE-EFB, 2016 WL 3753267 (E.D. Cal. Jul. 13, 2016) ......................7

*AmeriPride Servs. v. Tex. Eastern Overseas, Inc.*,
  782 F.3d 474 (9th Cir. 2015) .........................................................................................5

*Artesian Water Co. v. New Castle County*,
  659 F.Supp. 1269 (D.Del. 1987)....................................................................................6

*Asarco LLC v. Atl. Richfield Co.*,
  No. CV 12-53-H-DLC, 2018 U.S. Dist. LEXIS 106722 (D. Mont. Jun. 26, 2018) ......7

*Boeing Co. v. Cascade Corp.*,
  207 F.3d 1177 (9th Cir. 2000) .......................................................................................7

*Carrier Corp. v. Piper*,
  460 F. Supp. 2d 827 (W.D. Tenn. 2006).........................................................................9

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
  270 F.3d 863 (9th Cir. 2001) ......................................................................................5, 9

*Castaic Lake Water Agency v. Whittaker Corp.*,
  272 F.Supp.2d 1053 (C.D.Cal. 2003) .................................................................6, 7, 8, 43

*City of Los Angeles v. San Pedro Boat Works*,
  635 F.3d 440 (9th Cir. 2011) .......................................................................................21

*City of Moses Lake v. U.S.*,
  458 F. Supp. 2d 1198 (E.D. Wash. 2006) .......................................................................7

*Diamond X Ranch LLC v. Atl. Richfield Co.*,
  No. 13-cv-00570-MMD-WGC, 2017 U.S. Dist. LEXIS 160845 (D. Nev. Sept. 29,
  2017) ..............................................................................................................................7

*Housing Auth. Of L.A. v. PCC Technical Indus.*,
  No. 11-1626 FMO (CWx), 2015 U.S. Dist. LEXIS 192127, at *39 (C.D. Cal. Jan.
  26, 2015) .......................................................................................................................20

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
  629 F. Supp. 2d 175 (D. Conn. 2009)..............................................................................8

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*,
    171 F3d 1065 (6th Cir. 1999) ....................................................................8

*New York v. Westwood-Squibb Pharm. Co.*,
    138 F. Supp. 2d 372 (W.D.N.Y. 2000) ...............................................10, 11

*Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement and Power Dist.*,
    39 F. Supp. 3d 1059 (D. Ariz. 2014) ..........................................................7

*Solutia, Inc. v. McWare, Inc*.
    No. 1:03-cv-1345-PWG, 2012 WL 2031350 (N.D. Ala. Jun. 1, 2012).......................8

*U.S. v. Wash. State Dep't of Transp.*,
    No. 08 5722RJB, 2010 U.S. Dist. LEXIS 121759 (W.D. Wash. Nov. 17, 2010) ..........7

*Voggenthaler v. Md. Square LLC*,
    724 F.3d 1050 (9th Cir. 2013) .....................................................................9

*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*,
    622 F. Supp. 2d 918 (N.D. Cal. 2009) ........................................................7

**Statutes**

42 U.S.C. § 9601(20)(A)(ii) .................................................................................21

42 U.S.C. §§ 9607(29), 6903(3) ............................................................................9

42 U.S.C. § 9607(a) .............................................................................................5

42 U.S.C. § 9607(a)(2) ..........................................................................................9

CERCLA Section 107(a) .............................................................................5, 9, 58

**Other Authorities**

40 C.F.R. § 302.4 .........................................................................................37, 61

Fed. R. Civ. P. 26(a)(2)(B) .................................................................................59

# I.    INTRODUCTION

Moving defendants in this environmental lawsuit are companies associated with three different contaminated properties at the Omega Chemical Superfund Site. None denies that industrial operations were conducted at their properties, and none denies that those operations polluted the soils at the properties.

Defendant Union Pacific Railroad Company ("Union Pacific") used to own a piece of land that is referred to in this lawsuit as the "Chrysler Property." The property is known by that name because the Chrysler car company, and others, would prep, paint, spot chrome, and use solvents to clean new cars at a rate of 3,000 to 5,000 each month before sending them to dealerships. EPA has determined that the property is a known source of groundwater contamination designated as Operable Unit 2, or "OU-2" of the Omega Superfund Site.[1]

Defendants Halliburton Affiliates, LLC ("Halliburton"), Palley Supply Company, and Kekropia, Inc. are associated with the "Patsouras Property," which gets its name from Kekropia's owner, Larry Patsouras. Industrial operations at that property date back to 1941, maybe earlier, when a company called Globe Oil Tools Company made tools and oil drilling bits and conducted heat treating at the property. Halliburton is the successor to the company that bought Globe Oil. Palley Supply Company took over in the 1970s performing hydraulics maintenance and other industrial operations. Its owner faced a criminal complaint for not properly maintaining a waste management unit and eventually the company had to forfeit its right to do business for not paying its business taxes. Kekropia is the current owner of

---

[1] OU-2, is defined in the September 2011 EPA OU-2 Record of Decision and in the March 31, 2017 OU-2 Consent Decree, entered between Plaintiffs and EPA; it is composed of contaminated groundwater generally downgradient of OU-1, commingled with chemicals released from properties near or within the OU-2 boundary, which is shown graphically in both the 2011 EPA Record of Decision and the 2017 Consent Decree (hereafter, "OU-2 Groundwater").

the property. Kekropia had to excavate and remove contaminated soils at the property in 1998, 2006, 2010, and 2014.

Defendants Ferro Corp. and PMC Specialties Group, Inc. used to own and operate a chemical plant at the "PMC Property." Ferro Corp. operated the plant for about ten years then sold the property and business to PMC Specialties Group who operated the chemical plant for about 6 years before shutting it down in the early 1990s. Since then, for almost 30 years, the California Department of Toxic Substances Control has been pursuing PMC Specialties Group to remediate the contamination at the property resulting from the operations there.

Plaintiffs sued these defendants, and others, for contribution under CERCLA to recover a portion of the millions of dollars they have incurred, and the tens of millions more they will incur, under a consent decree Plaintiffs entered into with the federal and state governments to address the OU-2 Groundwater contamination, including constructing and maintaining a pump-and-treat groundwater containment remedy.[2] Plaintiffs contend that defendants share responsibility for that contamination, so they should help pay to address it.

Moving Defendants now seek summary judgment, arguing that there is no evidence that they are responsible under CERCLA for any hazardous substances impacting OU-2 Groundwater.[3] *See* Joint Motions for Summary Judgment ("Mot."), at 3. However, the record shows otherwise.

---

[2] Plaintiffs are parties that have been cooperating with the EPA to address the contamination at the Omega Chemical Corporation Superfund Site, a site named after the now-defunct chemical treatment and recycling company, Omega Chemical, that badly mishandled the chemicals its thousands of customers, like Plaintiffs, sent there for proper management.

[3] Moving Defendants make much of the fact that EPA did not issue Special Notice Letters to them, identifying them as liable for the OU-2 Groundwater contamination. The assertion is an empty one for four reasons. First, the objective of the search for potentially responsible parties, or "PRPs," which is a prelude to issuing Special Notice

- Despite Union Pacific's contentions to the contrary, multiple, significant disposals of hazardous substances occurred when Union Pacific owned the Chrysler Property, and although Plaintiffs are not required to prove that those disposals reached OU-2 Groundwater, the record establishes that they did.

- Halliburton, Kekropia, and Palley Supply Company contend that there are only "trace amounts" of hazardous substances in the soils at the Patsouras Property, and these minute amounts cannot possibly migrate to OU-2 Groundwater. But the Patsouras Defendants ignore the fact that the property was subject to multiple discharges to ground in the decades that

_____

Letters, is to enhance EPA's success in negotiating with PRPs to conduct the response activity under EPA's oversight. Because Plaintiffs stepped up early to address the OU-2 Groundwater contamination, that goal was accomplished with the entry of the 2017 OU-2 Consent Decree without the need for a complete PRP search. *See, e.g.,* PRP Search Manual, U.S. EPA, Office of Enforcement and Compliance Assurance, EPA 330-B-17-001(Sept. 2017), at 5-6 (available online at https://www.epa.gov/sites/production/files/2017-10/documents/prp-search-man-cmp-17_0.pdf). Second, nothing precludes EPA from issuing a Special Notice Letter to the Moving Defendants; it may still do so and has continued to issue additional notice letters after the initial round of Special Notice Letters was issued in 2012. Third, EPA is not obligated to issue such notices to every PRP responsible for environmental contamination, and often, it does not do so for a variety of reasons, some having nothing to do with whether a party is responsible for the contamination. Finally, in this instance, EPA has been well aware, since 2014, that Plaintiffs are pursuing a CERCLA action against the moving defendants to compel them to pay their fair share of costs to address the OU-2 Groundwater contamination; thus, there is less urgency for EPA to pursue parties that are already subject to "private enforcement" of CERCLA's strict liability statute. *See also* Superfund Program Implementation Manual, Fiscal Year 2019, U.S. EPA, Office of Land and Emergency Management, OLEM 9200.3-154 (Dec. 14, 2018), at X-7 2 (available online at https://semspub.epa.gov/work/HQ/100001805.pdf); Clay, Don R., Asst. Admin. For Solid Waste and Emergency Response, Integrated Timeline for Superfund Site Management (Jun. 11, 1990), at 2 (available online at https://nepis.epa.gov/Exe/ZyPDF.cgi/P100CYTB.PDF?Dockey=P100CYTB.PDF).

Globe Oil and Palley Supply operated there. Indeed, the soil contamination was so bad, they had to excavate and remove it—four times—and they did so only after the contaminants had been in those soils for 20, 30, 40 years, leaching to groundwater.

- PMC Specialties Group and Ferro Corp. admit that contaminants from operations at the property have impacted groundwater and that the contaminated groundwater has migrated offsite. However, they contend that the PMC Property sits outside the boundary of OU-2, and the contaminated groundwater leaving the PMC Property will never impact OU-2 Groundwater because it flows parallel to OU-2 Groundwater. This contention is without merit. Contaminated groundwater leaving the PMC Property *has* impacted OU-2 Groundwater, and most certainly will continue to do so when the OU-2 Groundwater containment remedy becomes operational and further draws in the contaminated groundwater emanating from the PMC Property.

Accordingly, Plaintiffs respectfully submit that Defendants' motion should be denied.

## II.   COMMON ISSUES OF LAW & FACT

### A.   Defendants Have Articulated the Wrong Legal Standard

The parties agree upon the four elements of CERCLA liability. To prove liability, a contribution plaintiff must prove: (1) the location containing "hazardous substances" qualifies as a "facility," as that term is defined under CERCLA; (2) a "release" or "threatened release" of hazardous substances from that facility has occurred; (3) the plaintiff incurred response costs as a result of the release or threatened release and those costs were "necessary" and "consistent with the national contingency plan;" and (4) the defendant is within one of four classes of "persons"

subject to the liability provisions of Section 107(a). *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 871-72 (9th Cir. 2001); *AmeriPride Servs. v. Tex. Eastern Overseas, Inc.*, 782 F.3d 474, 489-90 (9th Cir. 2015) ("The liability of the defendant in . . . [a] contribution action is . . . defined by § 9607(a)"). However, throughout their brief, Defendants' misstate the burden of proof that Plaintiffs must meet to prove: (1) the causation requirement under CERCLA, and (2) that a defendant is a "covered person" under the fourth element set out above. *See* Mot., pg. 8.

### 1.   CERCLA causation is established through evidence of a "plausible migration pathway."

As to the causation requirement, Defendants incorrectly argue that Plaintiffs must establish that the hazardous substances released from Defendants' properties actually ended up in OU-2 Groundwater. *See id.* (stating that, on summary judgment, "[c]ourts require plaintiffs to prove that a release for which the defendant is responsible at one site. . . <u>caused</u> the contamination of the second site.") (emphasis added). This is categorically <u>not</u> the burden of proof applicable here—Plaintiffs do not have to trace the hazardous substances from Defendants' land into OU-2 Groundwater; Plaintiffs do not have to show actual causation; and Plaintiffs do not have to show that Defendants' actions caused the release or threatened release of hazardous substances from their land. In fact, Plaintiffs do not even have to show that there has been a release of hazardous substances from Defendants' properties into OU-2 Groundwater — CERCLA imposes liability for a *threatened* release as well. 42 U.S.C. § 9607(a).

District courts in the Ninth Circuit instead require a CERCLA plaintiff to make a *prima facie* showing only that there is a "plausible migration pathway" for hazardous substances which were once on defendant's land to travel to plaintiff's

land[4] and that the plaintiff incurred costs to clean up hazardous substances from its land that are similar to those once existing on defendant's land. *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053, 1065 (C.D.Cal. 2003) (internal citations and quotations omitted). CERCLA plaintiffs are not required to prove that the hazardous substances on Defendants' land actually did travel this pathway. *See id.* Instead, once a plaintiff has made this *prima facie* showing, the burden of proof falls on the defendant to *disprove* that hazardous substances from its land reached the plaintiffs' property.[5] *See id.* This "burden-shifting approach is in keeping with CERCLA's broad remedial purpose and is consistent with the 'minimum causal nexus' most courts require under CERCLA." *Castaic Lake*, 272 F.Supp.2d at 1066 (internal citations and quotations omitted). *See also Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1282 (D.Del. 1987) (requiring plaintiffs to "fingerprint" individual defendant's waste would allow potentially responsive parties "to avoid financial responsibility for the cleanup").

Thus, in a two-site CERCLA case such as this, Plaintiffs meet their burden on summary judgment if they (a) identify a contaminant in OU-2 Groundwater, (b) identify the same (or chemically similar) contaminant at Defendants' Property (e.g., in the soil there), and (c) provide evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to OU-2 Groundwater. *Castaic Lake*, 272 F.Supp. 2d at 1066.

Defendants claim that district courts in the Ninth Circuit are "grappling" with the question of the appropriate burden of proof (it is not) and suggest that this Court should instead apply an impossibly high standard requiring Plaintiffs to show the

---

[4] The same analysis applies when the hazardous substances travel to property or groundwater which the plaintiff may not own but is still responsible to clean up.

[5] Or property or groundwater which the plaintiff is responsible to clean up.

1   hazardous substances from Defendants' land *actually reached* OU-2 Groundwater and

2   that this occurred during the time that each Defendant owned or operated the land. *See*

3   Mot. at 10, n.8.

4        Any alleged confusion in the Ninth Circuit regarding the standard of proof to be

5   shown by a CERCLA plaintiff in a two-site case is in Defendants' minds only.

6   *Castaic Lake* has been followed in this district for nearly 20 years and has been

7   adopted by federal courts throughout the Ninth Circuit.[6] The *Castaic Lake* court

8   considered, and disregarded, decisions from other courts applying Defendants'

9   proposed standard—as one can imagine, tracing the journey of one Defendant's

10  release of PCE, for example, as it travels through the subsurface soil of Defendants'

11  land to an underground plume of contaminated groundwater would be a daunting, if

12  not impossible, undertaking. Thus, the court held a burden-shifting approach,

13  requiring proof only of a "plausible migration pathway," was a better way to achieve

14  CERCLA's remedial goals. Requiring a CERCLA plaintiff to make a showing that

15  contaminants from the defendant's land actually reached the contaminated site would

16  give "irresponsible defendants" an absolute defense to any and all liability and is not

17  the standard used in the Ninth Circuit. *See Boeing Co. v. Cascade Corp.*, 207 F.3d

18  1177, 1185 (9th Cir. 2000). It would also encourage entities to avoid adequate testing

---

22  [6] *See also U.S. v. Wash. State Dep't of Transp.*, No. 08 5722RJB, 2010 U.S. Dist.
23  LEXIS 121759, at *3-4 (W.D. Wash. Nov. 17, 2010); *City of Moses Lake v. U.S.*, 458
    F. Supp. 2d 1198, 1237-38 (E.D. Wash. 2006); *Walnut Creek Manor, LLC v. Mayhew*
24  *Ctr., LLC*, 622 F. Supp. 2d 918, 927 (N.D. Cal. 2009); *Diamond X Ranch LLC v. Atl.*
    *Richfield Co.*, No. 13-cv-00570-MMD-WGC, 2017 U.S. Dist. LEXIS 160845, at *43-
25  44 (D. Nev. Sept. 29, 2017); *AmeriPride Services, Inc. v. Valley Industrial Services,*
    *Inc.*, No. 00-cv-113-MCE-EFB, 2016 WL 3753267, at *2, 5 (E.D. Cal. Jul. 13, 2016);
26  *Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement and Power Dist.*,
27  39 F. Supp. 3d 1059, 1074 (D. Ariz. 2014); *Asarco LLC v. Atl. Richfield Co.*, No. CV
28  12-53-H-DLC, 2018 U.S. Dist. LEXIS 106722 at *76, 80 (D. Mont. Jun. 26, 2018).

of property throughout ownership or operation, the precise opposite of the statute's goals.

Perhaps recognizing that the causal nexus required under *Castaic Lake* is a "minimal one," Defendants have gone beyond this circuit in search of a more stringent standard. For example, they seize on the Sixth Circuit's decision in *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F3d 1065 (6th Cir. 1999) for the proposition that a plaintiff must do more than show it was *possible* for defendants' hazardous substances to migrate to the site where plaintiffs were required to clean the contamination. The court in *Solutia, Inc. v. McWare, Inc*. No. 1:03-cv-1345-PWG, 2012 WL 2031350 (N.D. Ala. Jun. 1, 2012) adopted a similar more-than-a-possibility standard. *Id.*, 2012 WL 2031350 at *8. However, the *Castaic Lake* court considered the standard applied in *Kalamazoo River* and declined to adopt it. 272 F. Supp. 2d at 1066 n.15. Thus, neither *Kalamazoo* nor *Solutia* represent the standard adopted by courts in this circuit.[7] Thus, this Court need not be distracted by Defendants' efforts to impose a standard that does not apply in this circuit.

### 2. Defendants Misunderstand CERCLA's Definition of "Covered Person."

Defendants also misstate what Plaintiffs must prove to establish that a former owner or operator is a "covered person" under CERCLA. They suggest that Plaintiffs must provide evidence of two facts. First, Plaintiffs must establish that there was a "disposal" of a hazardous substance at Defendants' properties when each owned or operated at that property. Second, Defendants contend that Plaintiffs must establish that these disposals or releases to soil "impacted" OU-2 Groundwater. *See e.g.,* Mot. at 6-7. Defendants are wrong; that is not the law. However, even if that were the law, Defendants still cannot prevail on their pending motions.

---

[7] *Innis Arden Golf Club v. Pitney Bowes, Inc*., 629 F. Supp. 2d 175 (D. Conn. 2009) is similarly inapt, as in that case plaintiff failed to make *any* showing of causation.

CERCLA Section 107(a) provides that a "covered person" who is subject to liability is "any person who at the time of *disposal* of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2); *Carson Harbor*, 270 F.3d at 871-72 (noting "covered person" element of CERCLA liability requires proof of "disposal" when former owner or operator was involved at the facility). Contrary to Defendants' contention, the "covered person" element does not include a further requirement that the disposal by a former owner or operator must migrate into the environment, whether soil or groundwater, to qualify the former owner or operator as a responsible party under CERCLA. And none of the cases cited by Defendants in their brief have interpreted the "covered person" element to include such a requirement.

In fact, such a requirement is **precluded** under CERCLA's definition of the term "disposal" and the Ninth Circuit's interpretation of that term. "Disposal" is generally defined as the dumping, spilling, or discharging of any solid waste or hazardous waste so that it "may enter the environment." 42 U.S.C. §§ 9607(29), 6903(3). There is no requirement that the solid waste or hazardous waste **actually enter the environment** to qualify as a CERCLA "disposal." *See Voggenthaler v. Md. Square LLC,* 724 F.3d 1050, 1064-65 (9th Cir. 2013). Thus, to establish that Defendants are "covered persons" under Section 107(a)(2), Plaintiffs need not show that a disposal entered the environment, let alone migrated through the soil at their properties and actually entered OU-2 Groundwater. *See, e.g., Carrier Corp. v. Piper,* 460 F. Supp. 2d 827, 834-35 (W.D. Tenn. 2006) ("There is no requirement that the substance deposited by the individual held liable is the substance that actually is released [into the environment] or causes contamination.").[8]

---

[8] And as noted above, even as to the "release element," CERCLA does not require that a contribution plaintiff "tie" or "trace" a release of a hazardous substance to any particular defendant. Plaintiffs need only show that there has been *a* release, or

Here, Defendants are conflating two separate and distinct elements of CERCLA liability: a "disposal," which relates to the "covered person" element, and a "release," which relates to the "causation" element. CERCLA's definitions of the terms "disposal" and "release" are somewhat similar, but they are not identical. When a party **disposes** of a hazardous substance or a hazardous waste, the substance or waste is essentially put in a position where it "may enter the environment," whereas when a party **releases** a hazardous substance or a hazardous waste, there is no question that it has gone "into the environment." *New York v. Westwood-Squibb Pharm. Co.*, 138 F. Supp. 2d 372, 383–84 (W.D.N.Y. 2000).

Thus, as to the "covered person" element of CERCLA liability, the only questions for this Court in deciding whether any of the Moving Defendants qualify as a former owner or operator are: (a) whether those Defendants did, in fact, own the property or operate there (a fact that none of the Moving Defendants dispute), and (b) whether there is evidence of a disposal of hazardous substances at the property during the time the Moving Defendants used to own the Property or operate there. As explained below, there is ample evidence of such disposals. And even though Plaintiffs are not required to show those disposals resulted in releases or threatened releases to OU-2 Groundwater, there is ample evidence that such releases or threatened releases to OU-2 Groundwater in fact occurred as a result of their disposals or releases.

**B.   COMMON ISSUES OF FACT**

**1.   Groundwater Hydrogeology**

Because groundwater contamination is at the center of this case, Plaintiffs believe that providing a brief summary of the basic concepts of hydrogeology may

---

threatened release, from the Defendants' properties into OU-2 Groundwater – irrespective of who caused the release.

10

facilitate the Court's review of the pending joint motions. Those two basic concepts are: (1) the hydrogeology of the OU-2 Groundwater area; and (2) the ways in which hazardous substances move from Source Property soil to OU-2 Groundwater.

### a.     The hydrogeology of the OU-2 Groundwater area.

OU-2 Groundwater lies in a "recharge" area, an area where groundwater is replenished by rain penetrating the surface soils and moving downward through soil to the water table. *See* Expert Report of R. D. Mutch, Jr., P.Hg., P.E. (Docket No. 903-204) ("Mutch Report"), Jan. 14, 2021, at 2-6. This recharge can be supplemented by other property-generated water sources such as leaking clarifiers, lagoons, or sewers. *Id.* Importantly, the permeability of the soils that exist above the water table of OU-2 Groundwater are such that they would not prevent hazardous substances, at concentrations that significantly exceed levels protective of groundwater, as is the case here, from moving downward into OU-2 Groundwater. *Id.*

### b.     The ways in which hazardous substances move from Source Property soil to OU-2 Groundwater.

The hazardous substances at Defendants' Source Properties can exist in two basic forms. *See, generally,* Mutch Report § 2.4. They can be dissolved in water (a "dissolved plume"). For example, wastewater or wash water resulting from industrial or commercial operations at a property that contains mostly water with a low percentage of hazardous substances would generate a dissolved plume. Alternatively, these substances can be released as relatively pure chemical compounds with densities much heavier than water (known as "DNAPL") or densities much lighter than water ("LNAPL").[9]

---

[9] "DNAPL" stands for Dense Non-Aqueous Phase Liquid and "LNAPL" stands for Light Non-Aqueous Phase Liquid. Because DNAPL is dense, it most often pools at the bottom of a groundwater aquifer. By contrast, lighter density LNAPLs typically remain near the top surface of an aquifer.

Hazardous substances move through soil differently depending upon which form they are in: dissolved, DNAPL, or LNAPL. Dissolved plumes move through soil in the same way that precipitation will move through soil, percolating downward with the water. DNAPL and LNAPL chemicals move through soil a different way, relying on subsurface features in the soil that act as conduits, such as root holes and desiccation cracks in clays and silts that are typical in soils in the OU-2 Groundwater area. These secondary features allow DNAPL and LNAPL chemicals to migrate directly through the soils without first dissolving in water.

Residual soil contamination, present for many years at virtually every Source Property, allows continued releases or threats of releases to OU-2 Groundwater. And, even where a Defendant has undertaken some remediation of property soil contamination, if the remediation occurred long after the initial release of the substances to impacted soils, those earlier releases would have reached OU-2 Groundwater prior to the time of any remediation. That has occurred at virtually each of the Defendant Source Properties.

Various federal and state regulatory authorities have reached the same conclusion about the relationship between Source Property soil contamination and OU-2 Groundwater. As EPA has determined, OU-2 Groundwater "is an aquifer with potential for contaminants to migrate to aquifers used for municipal and domestic drinking water." *See* RFJN, Ex. 1 at 72 (OU-2 Feasibility Study); *see also* Exs. 1 at 39, 56 (OU-2 Remedial Investigation) (EPA concluding that contaminants at identified source areas have infiltrated into the subsurface and migrated generally downward by gravity through the vadose zone), 6 at 444 (Letter from Yvonne Sanchez, DTSC Section Chief, to Michael Evans, President, New Associated Plating, enclosing proposed Corrective Action Consent Agreement, *In the Matter of Associated Plating Co. Inc.*, Dkt. HWCA: SPRD 02/03 SCC-4293 (Jan. 14, 2003) ("Jan. 14, 2003 DTSC Letter") at 3) (including finding of fact that contaminants at the

Associated Plating Property "have migrated or may migrate" through subsurface soils and have "already migrated to the groundwater"), 7 at 471 (Letter from Paula Rasmussen, Regional Water Quality Control Board-Los Angeles ("RWQCB-LA") Asst. Exec. Officer to Claudette Earl enclosing draft Cleanup and Abatement Order, Order No. R4-2013-0012 (May 16, 2013) ("May 16 RWQCB-LA Letter")). Put simply, the hydrogeology of OU-2 presents a generally unobstructed pathway for hazardous substances disposed of or released at the Defendants' Source Properties to reach OU-2 Groundwater.

### 2. The levels of soil contamination vastly exceed soil Environmental Screening Levels developed to protect groundwater.

To help assess environmental threats and facilitate decisions on the need for investigation and remediation at contaminated properties, both the EPA and California Regional Quality Control Board, San Francisco ("RWQCB-SF"), have developed environmental screening levels ("ESLs").[10] *See, generally,* Mutch Report § 3.2. The ESLs are values for chemical concentrations in various environmental media (e.g., soil, groundwater, soil vapor, air, etc.) that can be compared to the chemical concentration levels found in the corresponding media at a contaminated property to

---

[10] EPA calls these screening levels "Regional Screening Levels" while the RWQCB-SF calls them "Tier 1 Environmental Screening Levels." These screening levels have been prepared for different environmental media including contaminated soils, contaminated groundwater, and soil vapor. See Mutch Report §§ 3.2.1 - 3.2.3. For convenience, both EPA and RWQCB-SF screening levels will be referred to in the Motion as simply "ESLs." The ESLs developed by the RWQCB-SF are generally used by all California RWQCBs, including the RWQCB-LA, which is overseeing groundwater remediation at many properties within OU-2. See, e.g., RWQCB-LA, Brownfields Cleanup and Redevelopment Agency Program, https://www. waterboards.ca.gov/losangeles/water_issues/programs/remediation/brownfields.htm l#intro, last visited Dec. 18, 2020 (providing link to ESLs developed by RWQCB-SF).

evaluate the threats posed by the contamination.[11] *See, e.g.,* RFJN, Ex. 8, 10. ESLs for soils, called "soil screening levels," have been developed to protect against different types of exposure concerns, as for example, exposure through dermal contact or leaching to groundwater. *See* Mutch Report § 3.2.1. In the instant Motion, the relevant soil ESLs are the latter type, i.e., those calculated specifically to be protective of groundwater; they are used to identify levels of contaminants in soil that pose a threat of migration to groundwater at levels that would preclude the use of the groundwater for drinking water or result in other exposure pathways of concern. *See* RFJN, Exs. 9. Accordingly, if the concentration of soil contamination at one of the Defendants' Source Properties exceeds the ESL for that substance, that contamination threatens OU-2 Groundwater and is reasonably likely to adversely impact it. *Id.*; *see also* Mutch Report, at 3-3 to 3-7. The more the concentration of a hazardous substance detected in soils exceeds the pertinent soil screening level, the greater the likelihood of actual groundwater contamination approaches certainty. *Id.* As explained below, multiple hazardous substances have been detected in the soil at the Defendants' Source Properties in concentrations that vastly exceed the soil screening levels.[12]

---

[11] With one exception, the soil screening levels (as well as those for soil gas and groundwater) that are referenced in this Motion are those developed by the RWQCB-SF given that the Source Properties are located in this state and the California State and Regional Boards have regulatory responsibility for this state's water quality. See Mutch Report § 3. The RWQCB-SF has not developed generic soil screening levels for metals. Id., at 3-6. Accordingly, the soil screening levels for metals (e.g., hexavalent chromium) referenced in this Motion are those developed by EPA. Id., at 3-7 to 3-8. Table 3-1 in the Mutch Report summarizes the ESLs used by RWQCB-SF for organics and the ESLs used by EPA for metals to address those soil contamination levels that can represent a threat to groundwater.

[12] Plaintiffs do not contend that exceedances of ESLs constitute evidence that soil contamination at a particular property *has impacted* OU-2 Groundwater. Instead, they are yet another line of evidence leading to the conclusion that the magnitude of those hazardous substance releases to soil constitutes a highly plausible migration pathway to OU-2 Groundwater. *See* Mutch Report, at 3-1.

## III.   THE CHRYSLER SOURCE PROPERTY

### A.   Overview

As set forth fully in Plaintiffs' Motion for Partial Summary Judgment (Docket No. 903-002), in early 1964, and continuing until 1988, the Chrysler Property was used to prepare newly manufactured cars for distribution to dealerships for sale. Such "prep work" included body work, mechanical work, tune-up, front-end alignment, emissions control testing, painting, washing, detailing, and road performance tests. Those operations involved the use of various hazardous substances and generated extensive waste contaminated with hazardous substances such as hexavalent chromium and solvents. Although the Chrysler Property had two owners when the property was used for car prep operations, Union Pacific Railroad Company ("Union Pacific") and defendant Palmtree Acquisition Corp., the operations, materials used, and wastes generated remained the same throughout both ownership periods.

No one disputes that the car prep operations resulted in contamination of the soils at the Chrysler Property. The contamination was so extensive that EPA concluded in 2010 that the property was a known source of releases of hazardous substances from soils at the property into OU-2 Groundwater.[13]

---

[13] Union Pacific, and the other Moving Defendants, Halliburton Affiliates, LLC, Palley Supply Company, Kekropia, Inc., PMC Specialties Group, Inc., and Ferro Corp., make much of the fact that EPA did not issue Special Notice Letters to them, identifying them as liable for the OU-2 Groundwater contamination. The assertion is an empty one for four reasons. First, the objective of the search for potentially responsible parties, or "PRPs," which is a prelude to issuing Special Notice Letters, is to enhance EPA's success in negotiating with PRPs to conduct the response activity under EPA's oversight.  Because Plaintiffs stepped up early to address the OU-2 Groundwater contamination, that goal was accomplished with the entry of the 2017 OU-2 Consent Decree without the need for a complete PRP search. *See, e.g*., PRP Search Manual, U.S. EPA, Office of Enforcement and Compliance Assurance, EPA 330-B-17-001(Sept. 2017), at 5-6 (available online at https://www.epa.gov/sites/production/files/2017-10/documents/prp-search-man-cmp-

Yet now, Union Pacific—which owned the property for a decade when the car prep operations took place—takes the untenable position that not a single drop of any hazardous substance was placed anywhere on the property and not a single drop was released to the soils and impacted OU-2 Groundwater. This contention is particularly surprising since car prep operations at the property during Union Pacific's ownership occurred prior to the imposition of even the earliest environmental regulations focused on hazardous waste disposal practices protective of the environment. Based on this magical thinking, Union Pacific argues that it does not qualify as a "covered person," or "responsible party," under CERCLA and is, therefore, entitled to summary judgment. Union Pacific is wrong.

## B.   Argument

### 1.   Union Pacific has applied the wrong legal standard in support of its summary-judgment motion.

Like the other Moving Defendants, Union Pacific contends that to establish a defendant's liability as a *former* owner or operator under CERCLA, Plaintiffs must

---

17_0.pdf). Second, nothing precludes EPA from issuing a Special Notice Letter to the Moving Defendants; it may still do so and has continued to issue additional notice letters after the initial round of Special Notice Letters was issued in 2012. Third, EPA is not obligated to issue such notices to every PRP responsible for environmental contamination, and often, it does not do so for a variety of reasons, some having nothing to do with whether a party is responsible for the contamination. Finally, in this instance, EPA has been well aware, since 2014, that Plaintiffs are pursuing a CERCLA action against the moving defendants to compel them to pay their fair share of costs to address the OU-2 Groundwater contamination; thus, there is less urgency for EPA to pursue parties that are already subject to "private enforcement" of CERCLA's strict liability statute. *See also* Superfund Program Implementation Manual, Fiscal Year 2019, U.S. EPA, Office of Land and Emergency Management, OLEM 9200.3-154 (Dec. 14, 2018), at X-7 2 (available online at https://semspub.epa.gov/work/HQ/100001805.pdf); Clay, Don R., Asst. Admin. For Solid Waste and Emergency Response, Integrated Timeline for Superfund Site Management (Jun. 11, 1990), at 2 (available online at https://nepis.epa.gov/Exe/ZyPDF.cgi/P100CYTB.PDF?Dockey=P100CYTB.PDF).

show: (a) a disposal of hazardous substances occurred during Union Pacific's ownership of the Chrysler Property, and (b) that disposal reached OU-2 Groundwater. In its motion, Union Pacific does not substantively address the second prong of this purported test but instead proceeds to collapse the two and never really addresses either prong separately.

As noted above (*see* Section _, *supra*), Union Pacific has misstated the law. Plaintiffs do not have to establish that a disposal of hazardous substances that occurred during Union Pacific's ownership eventually reached OU-2 Groundwater. Plaintiffs need only establish that a disposal occurred during Union Pacific's ownership and there was *a* release, or threated release, into OU-2 Groundwater at this property. Plaintiffs are not required to "trace" the release back to a specific Defendant.

Here, the record shows that multiple disposals occurred during Union Pacific's ownership of the Chrysler Property. And even if Union Pacific's interpretation of CERCLA's legal standard was correct (which it is not), its motion would still fail. The disposals and releases to soils that occurred during Union Pacific's ownership tenure, from approximately 1964 to 1974, did in fact result in releases, or threatened releases, to OU-2 Groundwater.

### 2. There were multiple "disposals" of hazardous substances at the Chrysler Property during Union Pacific's ownership of the property.

Extensive car prep operations at the Chrysler Property from the early 1960s to 1974 resulted in multiple disposals of CERCLA hazardous substances at the property when Union Pacific owned the property, including disposals of solvents and hexavalent chromium.

a.     **During Union Pacific's ownership of the property, there were multiple disposals of waste water containing solvents.**

Waste water that was sent to the sewer system on the property constituted multiple pre-1974 disposals. Solvents, or waste water contaminated with solvents, from onsite operations were discharged to concrete clarifiers and carried through permeable clay or concrete pipes to the sanitary sewer, raising concerns amongst environmental consultants that "a significant potential exists for impact to underlying soils from these systems." Decl. of William F. Ford ("Ford Decl."), Ex. 2, at 16, 18 (McLaren Environmental Engineering, Property Transaction Environmental Assessment, Jan. 11, 1989, at 13, 15); *see also* Ex. 6, at 63, 66, 68 (Dames & Moore, Remedial Investigation Workplan, Jan. 10, 1992, at 13, 20, 37) (floor washdown and liquid car wash waste sent to sewer); RFJN, Exs. 80 (Los Angeles County Dept. of Engineers, Industrial Waste Disposal Permit No. 3369, May 28, 1964) (discharge of waste water to sewer), 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971) (same).

The "significant potential" for impacts to soils from these systems is an understatement. By 1971, there were *seven* clarifiers on the Chrysler Property. RFJN, Ex. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971). And given the permeability of all sewer pipes, contaminated waste water carried through those pipes were virtually certain to reach the environment in relatively short order. *See* Mutch Report, Jan. 14, 2021, at 5-9 to 5-10 (noting that 1,000 feet of six-inch, vitrified clay sewer pipe, like the pipe present at the Chrysler Property, could conservatively leak 2.19 million gallons of wastewater over the course of a year).[14]

---

[14] Discharges to the flood control channel were also prone to impacts to the environment through direct impact to exposed soils beneath the channel, through

Poor housekeeping only compounded the threat posed by these disposals. In 1966, the operator at the property, Dallas Smith, was cited for violating its industrial waste discharge permit after inspectors discovered a "heavy layer of hydrocarbons" in the outlet chamber of a clarifier.[15]  Ford Decl., Ex. 2 at 16 (McLaren Environmental Engineering, Property Transaction Environmental Assessment, Jan. 11, 1989, at 13). And in 1971, the operator at the property, Automotive Precheck, was directed by L.A. County Department of Public Works to promptly clean three sewer traps "heavy with oil and solvent" in violation of the permits regulating discharges of carwash water and floor washdown from several buildings. RFJN, Ex. 83 (Los Angeles County, County Engineer, Notice of Non Compliance); Ford Decl., Ex. 6, at 61 (Dames & Moore, Remedial Investigation Workplan, Jan. 10, 1992, at 9). Not surprisingly, Union Pacific's motion does not mention these incidents, nor any of the other solvent disposals described above.

### b. Hexavalent chromium disposals occurred during Union Pacific's ownership of the property.

Waste water containing hexavalent chromium was discharged to the ground in 1970. *See* Pls.' Request for Judicial Notice in Support of Opp'n to Defendants' Mot. for Summ. J. ("Opp'n RFJN"), Ex. 14, at 116 (Notice of Violation, File No. I-5805-1 H, Mar. 2, 1970). The operator at the property at the time, Automotive Precheck Corp., received a Notice of Violation from the Los Angeles County Department of Engineers, Pollution Control Division, ordering Automotive Precheck Corp. to immediately stop discharging liquid waste to the storm drain. *Id*. A sample of the

---

seepage from cracked concrete or at expansion joints, or through exfiltration. See Mutch Report, Jan. 14, 2021, at 5-8 to 5-11 (Docket No.903-204).

[15] Indeed, the threat of disposals may have been far greater in the early years of car prep operations at the Chrysler Property. In 1964, the operator, Dallas Smith Service Corp., was cited for discharging liquid waste from the carwash to the sewer *without a proper clarifier*. RFJN, Ex. 81 (Los Angeles County Industrial Waste Div., Notice, Jan. 14, 1964).

waste indicated that it contained 150 mg/L of hexavalent chromium, a concentration that "greatly exceed[ed] the allowable limitation." *Id*. The high level of hexavalent chromium detected in the sample is unsurprising given that the waste at issue came from spot plating operations, where one would expect significant use of chromium. *See* RFJN, Ex. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971) (identifying spot chrome building); Ford Decl., Ex. 6, at 64 (Dames & Moore, Remedial Investigation Workplan, Jan. 10, 1992, at 14) (spot chroming performed at property).

The 1970 disposal of hexavalent chromium presented at least two opportunities for hazardous substances in the liquid waste to enter the environment: exposed soil in or near the discharge area and exposed soil in or near the storm drain or joints or cracks in the drain. And although a single disposal of hexavalent chromium is enough under CERCLA to attach liability (*Housing Auth. Of L.A. v. PCC Technical Indus.*, No. 11-1626 FMO (CWx), 2015 U.S. Dist. LEXIS 192127, at *39 (C.D. Cal. Jan. 26, 2015) (citing *Kasier Alum. & Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342-43 (9th Cir. 1992))), there were surely multiple disposals of hexavalent chromium during this period. For years prior to 1970, the operator at the property allowed liquid waste from the spot plating area to discharge to the storm drain and into the flood control channel, and it was not until the operator received the March 1970 Notice of Violation described above that it plugged the drain. *See* Ford Decl., Ex. 6, at 59 (Dames & Moore, Remedial Investigation Workplan, Jan. 10, 1992, at 6). In fact, there appears to have been multiple disposals in 1970 alone. More than one consultant retained to assess the contamination at the Chrysler Property reported that liquid waste containing high levels of hexavalent chromium was improperly discharged to a storm drain in 1970. Ford Decl., Exs. 2, at 16 (McLaren Environmental Engineering, Property Transaction Environmental Assessment, Jan.

11, 1989, at 13), 6, at 59-60 (Dames & Moore, Remedial Investigation Workplan, Jan. 10, 1992, at 6, 8).

Given that there were *multiple* clarifiers at the Chrysler Property during Union Pacific's ownership, extensive discharges to ground, storm drains, the flood control channel, and sewers, and known discharges of hexavalent chromium to ground, Union Pacific cannot credibly claim that there is no evidence of disposals of hazardous substances at the Chrysler Property during the time Union Pacific owned it. Union Pacific is a "covered person" under CERCLA.[16]  42 U.S.C. §  9601(20)(A)(ii) (defining "owner"), (21) (corporations are "persons" under CERCLA); *see also City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 451-52 (9th Cir. 2011) (fee title owner of real property is "owner" under CERCLA).

> **c.    Disposals of hazardous substances during Union Pacific's ownership of the Chrysler Property resulted in releases, or threatened releases, to OU-2 Groundwater.**

Plaintiffs are not required to establish that disposals during Union Pacific's ownership of the property reached OU-2 Groundwater. Nevertheless, the current record leads to only one conclusion: those disposals *did* result in releases, or threatened releases, to OU-2 Groundwater[17]

---

[16] Union Pacific contends that it is a *former owner* of the Chrysler Property and not a *current* owner or a current or former *operator* at the property. For purposes of this motion, Plaintiffs do not contend that Union Pacific is the current owner or operator of the property. However, Union Pacific was responsible for constructing and maintaining the sewer system (which is itself a CERCLA "facility") at the Chrysler Property when car prep operations were conducted there. Accordingly, Plaintiffs reserve their rights to seek contribution from Union Pacific under a "former operator" theory of liability at trial, if necessary.

[17] The facts referenced in this section, and the supporting evidence, are more fully set forth in Plaintiffs' Motion for Partial Summary Judgment at pages 77 to 91and the expert report of Robert Mutch at pages 5-1 to 5-38.

As noted above, from about 1964 to 1974, disposals of hazardous substances at the property were extensive and ongoing—which is not surprising given that car prep operations were no small endeavor. Around 1971, for example, the operator was prepping 3,000 to 5,000 cars every month and generating nearly 24,000 gallons a day of liquid waste just from floor washdown at the property. *See* RFJN, Exs. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971, at 1), 78 (Los Angeles County Sanitation Dist., Permit for Industrial Wastewater Discharge, Nov. 21, 1973, at 1).

Hazardous substances, including chlorinated solvents, have been detected in the soils at the Chrysler Property in concentrations that significantly exceed the screening levels developed to be *protective* of groundwater. Moreover, soil contamination was found all the way down to the water table near the area where Nottingham clarifier No. 2 and Clarifier 2 were located. Groundwater sampled from downgradient monitoring wells show higher concentrations of PCE than groundwater samples from upgradient wells, and EPA has concluded that the Chrysler Property is a known source of OU-2 Groundwater contamination.

Union Pacific brushes all this off and makes much of the fact that the company it sold the Chrysler Property to, defendant Palmtree Acquisition Corp., "has acknowledged its liability under CERCLA for releases of hazardous substances at the Chrysler Property" and "admitted" there was a disposal of hazardous substances in connection with operations at the property. *See* Mot. at 34-35. But this finger-pointing by Union Pacific is ludicrous given that: Union Pacific owned the property nearly as long as Palmtree did, the operations conducted at the property when Palmtree owned it were identical to those conducted when Union Pacific was the landlord, the operators at the property when Union Pacific owned the property were cited for significant violations associated with the use, storage, or disposal of hazardous substances no fewer times than when Palmtree owned the property; and the regulations for handling,

storing, and disposing of hazardous substances were more stringent when Palmtree owned the property than when Union Pacific did.

In short, it is simply not credible to contend that the same operations at the Chrysler Property over a 24-year period resulted in extensive and ongoing disposals and releases to soil, but only the disposals that occurred *after* 1974, when Union Pacific sold the property, ever reached OU-2 Groundwater. Those pre-1974 disposals did not simply disappear.

### 3. Union Pacific's claim that Clarifier 2 was installed at the Chrysler Property after Union Pacific sold that property is without merit.

In its motion, Union Pacific argues that the only potential disposal of hazardous substances at the Chrysler Property originated from the clarifier referred to as "Clarifier 2," or the "Chrysler Clarifier." *See, e.g.*, Mot. at 33, 34, 39, 50. That clarifier, Union Pacific contends, was installed *after* Union Pacific sold the property in 1974, so any disposal originating from that clarifier must have occurred when Union Pacific was no longer the property owner.

Given the multiple disposals of waste water containing solvents and hexavalent chromium that was discharged to ground, storm drains, the flood control channel, and sewers, Union Pacific's argument about Clarifier 2 is pure distraction. Union Pacific would qualify as a "covered person" under CERCLA regardless of whether "Clarifier 2" was installed after Union Pacific sold the property. Union Pacific cannot credibly contend that Clarifier 2 was the "only known source of potential groundwater contamination originating from the Chrysler Property." And in fact, Union Pacific's attempt to show that Clarifier 2 was built after 1983 fails as well.

In support of its theory, Union Pacific offers two pieces of "evidence:" (i) a declaration by an imagery analyst, David Ruiz, who opines that Clarifier 2 was installed no earlier than 1983, and (ii) certain site plans and maps of the Chrysler

Property that purport to show that Clarifier 2 had not been installed by 1974, when Union Pacific sold the property. *See* Mot. at 39-43. Neither piece of evidence, however, establishes that Clarifier 2 was installed after 1974.

> ### a.   Mr. Ruiz's opinion concerning when Clarifier 2 was installed is unsupported by the evidence.

Mr. Ruiz contends that two figures from a consultant's report place the location of Clarifier 2 "inside" an addition constructed on the southeastern side of the Body Works Building at the Chrysler Property. *See* Declaration of D. Ruiz (Docket No. 902-02) ¶¶ 4-6. He then presents two aerial photographs showing the Body Works Building, one taken in 1983 in which the addition has not yet been constructed and a second photograph taken in 1987 which shows the completed addition. *Id.* ¶ 15. From this, Mr. Ruiz infers that Clarifier 2 could not have been built prior to 1974, because the addition to the Body Works Building that "housed" the clarifier did not exist until sometime after 1983. *Id.* ¶¶ 11-16.

The linchpin of Mr. Ruiz's opinion is false; numerous documents indicate that Clarifier 2 was located *outside* the Body Works Building, not inside of it or in any other enclosed area. *See, e.g.*, Ford Decl., Exs. 1, at 11 (Petroleum Industry Consultants, Inc., Tank Removal Geological Report, Mar. 31, 1988, Figure 2B), 2, at 14-15 (McLaren Environmental Engineering, Property Transaction Environmental Assessment, Jan. 11, 1989, at 6 & Figure 1), 4, at 43 (Converse Environmental West, Final Report—Soil & Groundwater Investigation, Aug. 29, 1991, Figure Map 5). Even the documents upon which Mr. Ruiz bases his opinion that the clarifier was inside the building do not support that opinion.

**The Tank Removal Report**. During his deposition, Mr. Ruiz testified that a 1988 report describing the removal of several clarifiers at the Chrysler Property, specifies that Clarifier 2 was located inside the Body Works Building. *See* Ford Decl., Ex. 3, at 23 (D. Ruiz Dep. Tr. at 48:8-23). That document, however, includes a site

map indicating that the clarifier was located *outside* the Body Works Building. *Id.*, Ex. 1, at 11 (Petroleum Industry Consultants, Inc., Tank Removal Geological Report, Mar. 31, 1988, Figure 2B).

Moreover, the report notes the extensive work required to remove the concrete clarifier and assess the soil contamination in the surrounding vicinity—work that would have been difficult to accomplish inside a building. *Id.* at _ [Report at 2-4]. Removal and excavation required the use of cranes and a track-mounted backhoe, and yet nowhere in the report is there any indication that a portion of the Body Works Building, nor any other structure, had to be dismantled to allow the heavy machinery access to the work area. *Id.* Indeed, shortly after the clarifier was removed, environmental consultants inspected the Chrysler Property and found the Body Works Building fully intact. *See* Ford Decl., Ex. 2, at 13, 15 (McLaren Environmental Engineering, Property Transaction Environmental Assessment, Jan. 11, 1989, at 1, 6).

**The 1990 and 1991 Converse Reports**. Mr. Ruiz claims that a figure included in two environmental consultant reports establishes that Clarifier 2 was located inside the Body Works Building. *See* Ruiz Decl., at 4-5; Ford Decl., Ex. 3, at 21-22 (D. Ruiz Dep. Tr. at 41:5 to 42:6). That figure consists of a photograph of the area near the Body Works Building with a notation purporting to specify the location of Clarifier 2 inside the building and the roughly 27-feet deep pit that was excavated to assess the surrounding soil contamination. *See* Ruiz Decl., at 4-5. However, a site map in one of those environmental reports, the August 1991 Converse Environmental West, Final Report—Soil & Groundwater Investigation, places the clarifier *outside* of the building. *See* Ford Decl., Ex. 4, at 43 (Converse Environmental West, Final Report— Soil & Groundwater Investigation, Aug. 29, 1991, Figure Map 5).

The accuracy of the figure in both reports is suspect for additional reasons. First, it is unclear who placed the notation on the figure purporting to signify the former location of Clarifier 2. Although the earlier report, the December 1990

Converse Environmental West, Preliminary Report—Soil & Groundwater Investigation, indicates that a surveyor assessed the Chrysler Property and identified that location, when asked about this during his deposition, Mr. Ruiz expressed skepticism and concluded that the notation likely had been made by someone other than a surveyor. Ford Decl., Ex. 3, at 30-33 (95:24 to 98:2).

Moreover, the Preliminary Report notes that Clarifier 2 had already been removed by the time the surveyor assessed the property. *See* Ford Decl., Ex. 5, at 46 (Converse Environmental West, Preliminary Report—Soil & Groundwater Investigation, Dec. 28, 1990, at 1). As Mr. Ruiz acknowledged, the surveyor was examining the large, excavated area of soil contamination, not the clarifier which was long gone. *Id*., Ex. 3, at 34 (D. Ruiz Dep. Tr. at 101:3-7). And far from "confirming" the former location of Clarifier 2, all of the maps and figures in both the Preliminary and Final Reports that purport to identify that location include the qualifications "estimated" and "approximate" when describing that location. *Id*., Exs. 5, at 50-52 (Converse Environmental West, Preliminary Report—Soil & Groundwater Investigation, Dec. 28, 1990, at Figs. 2, 4 & 5), 4, at 42, 44-45 (Converse Environmental West, Final Report—Soil & Groundwater Investigation, Aug. 29, 1991, Figs. 3, 7, & 10); *see also* Ex. 3, at 34 (D. Ruiz Dep. Tr. at 101:8-22).

Mr. Ruiz has acknowledged that he was not an expert on clarifiers, or industrial sewer systems more generally, and, in fact, could not describe what a clarifier physically looked like. Ford Decl., Ex. 3, at 20, 22 (D. Ruiz Depo Tr. 35:4-7, 42:7-14). With due respect to Mr. Ruiz, his lack of knowledge in these areas helps explain why he concluded that Clarifier 2 was an above-ground clarifier located inside the Body Works Building.

These types of relatively small, on-site clarifiers almost invariably sit below ground surface to facilitate connection to underground sewer lines carrying waste water to the clarifier for pretreatment before disposal to the sewer. *See* Mutch Rebuttal

Report, at _. Concrete clarifiers like those used in the 1960s and 1970s at the Chrysler Property, are not ordinarily installed inside a building or other enclosed structure. *Id*.; *see also* RFJN, Ex. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971) (noting the size of the clarifiers at the property during this time). There simply is no need to place an above-ground clarifier inside a building and doing so presents multiple problems. Mutch Rebuttal Report, at _. It makes maintenance more difficult and disruptive to ongoing operations, not to mention presents an odor nuisance for workers. *Id*. It also significantly increases the costs of removing or replacing the clarifier, as any such change would almost certainly require destroying or dismantling the building in which the clarifier is located. *Id*.

In short, the evidence presented by Union Pacific does not support Mr. Ruiz's opinion that Clarifier 2 was inside the Body Works Building. As such, the 1983 and 1987 aerial photographs are of no use in trying to identify the location of that clarifier. Below-ground clarifiers would not appear anywhere in those photographs. And as Mr. Ruiz has acknowledged, the photographs are not detailed enough to show manholes (*see* Mutch Rebuttal Report, at _ (below-ground clarifiers require manholes to gain access to the unit for maintenance and repair)), that would allow one to identify the location of any clarifiers on the property, including Clarifier 2.[18]

Accordingly, Union Pacific's "housed clarifier" theory falls apart. The construction of the addition to the Body Works Building sometime in the 1980s does **not** establish the date on which Clarifier 2 was installed.

---

[18] Mr. Ruiz's attempted to defend his contention that Clarifier 2 was installed indoors failed in another respect. He surmised that if Clarifier 2 was outside and below-ground, it would be capped with a concrete pad that would be visible on the ground surface in aerial photographs. Ford Decl., Ex. 3, at 25-26, 35_(D. Ruiz Dep. Tr. at 50:24-51:16 and 121:16-19). No such pads appear anywhere in the 1983 or 1987 aerial photographs, however, and Mr. Ruiz had to concede that outdoor clarifiers existed at the property during the time the photographs were taken. *Id*.

b. **The 1973 and 1974 site plans show that Clarifier 2 had been installed on the Chrysler Property when Union Pacific owned it.**

Union Pacific argues that site plans and maps purporting to depict the Chrysler Property in 1973 and 1974 do not show a clarifier in or near the Body Works Building, and this proves that Clarifier 2 had not yet been built.[19] This is inaccurate. Those plans and maps, as well as other documents, do, in fact, depict a clarifier near the southeast corner the Body Works Building. RFJN, Exs. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971, at 2, 4); , at _ (Los Angeles County Dept. of County Engineer, Industrial Waste Survey, Dec. 14, 1976, at 2); Declaration of Sedina Banks ("Banks Decl."), Exs. 11 (Docket No. 902-18), at 121, 13 (Docket No. 902-20), at 126. Documents describe that clarifier as a "Nottingham Interceptor," or separator, and place it just southeast of the Body Works Building. RFJN, Exs. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971, at 2, 4); , at  (Los Angeles County Dept. of County Engineer, Industrial Waste Survey, Dec. 14, 1976, at 2); Banks Decl., Ex. 13 (Docket No. 902-20), at 126. Moreover, several documents identify that clarifier as "No. 2." *Id*.

It is unclear whether the clarifier identified in these early documents is the same clarifier that environmental consultant reports later identified as being a source of soil contamination near the Body Works Building, namely, "Clarifier 2." The Nottingham Interceptor (or clarifier) No. 2 from the early 1970s is described as a 1,200 or 1,250-gallon clarifier whereas Clarifier 2 is described in the removal report as being smaller, a 750-gallon unit, but that does not help distinguish them. The clarifiers would have looked very similar in size and the Nottingham clarifier from the early 1970s could have easily been incorrectly sized when it was removed in 1988. Union Pacific's

---

[19] Mr. Ruiz advances the same contention in his report. See Ruiz Report ¶¶ 7-10.

28

expert, Mr. Ruiz, certainly believes there were two different clarifiers, though he does not know when Nottingham Interceptor No. 2 was installed or when it was removed, if ever.[20]  Ford Decl., Ex. 3, at 24-25, 27, 29 (D. Ruiz Dep. Tr. at 49:13 to 50:5; 53:12-21, 62:7-19).

But what seems even less likely is that there were two clarifiers in use in the same area or that the 1,200-gallon Nottingham No. 2 clarifier was removed and then replaced with the 750-gallon Clarifier 2. There simply are not any documents that support either scenario. As Chrysler's own brief shows, installation of a new clarifier on the property required written regulatory approval, site plan maps, and documentation relating to the permitting of the clarifier. *See* Mot. at 42-43. No such record exists for the installation of a new Clarifier 2 sometime after 1983, as alleged by Union Pacific. Moreover, the Tank Removal Report indicates that only *one* clarifier near the Body Works Building was removed in 1988. *See* Ford Decl., Ex. 1, at 11 (Petroleum Industry Consultants, Inc., Tank Removal Geological Report, Mar. 31, 1988, Figure 2B). And Union Pacific has offered no documentary evidence indicating when the Nottingham clarifier No. 2 was removed.

What is clear is that both clarifiers, if indeed there was a second clarifier installed after Union Pacific sold the property, were near the Body Works Building and within the vicinity of the extensive soil contamination discovered when the clarifiers were removed in 1988.[21]  Compare Ford Decl., Ex. 4, at 43 (Converse Environmental West, Final Report—Soil & Groundwater Investigation, Aug. 29,

---

[20] Of course, the basis for Mr. Ruiz's conclusion that there were two different clarifiers is the erroneous assumption that the 750-gallon clarifier was *inside* the Body Works Building, whereas the 1,200-gallon clarifier is depicted as located outside of that building. Ford Decl., Ex. 3, at 27-28_(D. Ruiz Dep. Tr. at 53:22 to 54:4).

[21] Mr. Ruiz testified that he cannot say whether that soil contamination originated from the 1,200-gallon clarifier or the 750-gallon one. Ford Decl., Ex. 3, at 28_(D. Ruiz Dep. Tr. at 54:8-19).

1991, Figure Map 5) with RFJN, Ex. 77 (Los Angeles County Dept. of Engineers, Resurvey of Industrial Waste Survey, Oct. 21, 1971, at 4). Thus, either clarifier, or both, may have been the source of that soil contamination.

The Court need not resolve these questions to decide Union Pacific's motion. The 1973 and 1974 site plans and maps do not support that motion. Instead, they show the presence of a clarifier, before Union Pacific sold the property, in the same area where extensive soil contamination, extending all the way down to groundwater, was detected. Union Pacific's motion must be denied.

## IV.   PATSOURAS SOURCE PROPERTY

### A.   Overview

For over 50 years, beginning in the 1940s, the property located at 11630-11700 Burke Street, Santa Fe Springs, California (the "Patsouras Property") has been the site of industrial operations which included metal tools and oil drill bits manufacturing, heat treating, steam cleaning, and hydraulics maintenance. Rinse water from operations, which undoubtedly contained hexavalent chromium from the heat-treating operations based upon a 1970 analysis, was discharged to ground for decades until that waste water was diverted to the sewer. Numerous clarifiers were used at the property in connection with operations, some made of brick and which pre-dated World War II. By the late 1970s, many of those clarifiers fell into disrepair and were filled with industrial waste that overflowed onto the street when it rained. Others were simply abandoned rather than properly closed and removed.

Despite the known discharges of hazardous substances to ground, and the poor maintenance and mishandling of waste management units, the property was not assessed for environmental contamination until 1994, over two decades after Globe Oil received its first Notice of Violation from the City of Santa Fe Springs for improper discharge of wastewater to the ground. Further investigations followed, but efforts to characterize the property and assess contamination of the groundwater were limited with regard to contaminants and geographic extent and –  importantly – occurred decades after hazardous substance releases at the property. Still, those investigations revealed areas impacted with volatile organic compounds in soils where many of the clarifiers were located. Soil contamination in that area, which included PCE and TCE, was found at depths down to, or very nearly down to, the water table. Chromium was also detected at the property and hexavalent chromium was detected in the groundwater under the location of the former clarifiers.

Defendants Kekropia, Inc. the current owner of the property, Palley Supply Company, a former operator, and Halliburton Affiliates, LLC, successor-in-interest to former owner and operator Globe Oil Tools, the metal tools and oil drill bits manufacturer (collectively, the "Patsouras Defendants" or "Defendants"), insist "nothing to see here, the contaminated soils have been removed, groundwater was never affected, and all's well." More specifically, they contend that there is no evidence that Globe Oil or Palley Supply disposed of any hazardous substances at the Patsouras Property. In response to the undisputed discharge of hexavalent chromium to the ground and 1988 releases of industrial waste to the ground, Defendants claim that it was quickly cleaned up and none of these hazardous substances was found in the soils at the property (though no one ever really looked for it until decades after these discharges). Any hazardous substances detected in the soils, they claim, are simply too minute, mere trace amounts, that could not possibly migrate to OU-2 Groundwater. Moreover, to be held liable under CERCLA, they argue, Plaintiffs must trace past disposals by Globe Oil and Palley Supply from the surface, through the soils, and all the way down into OU-2 Groundwater. This, the Patsouras Defendants contend, Plaintiffs cannot do, entitling those Defendants to summary judgment.

The Patsouras Defendants are wrong on the law and the facts.

**B.** **Argument**

    **1.** **Contrary to Defendants' contention, there have been significant disposals at the Patsouras Property.**

        **a.** **The property has been the site of industrial operations since at least 1941.**

Globe Oil Tools Company ("Globe Oil") manufactured oil well drilling equipment and tools at the Patsouras Property since at least 1941, and perhaps as early

32

as the 1930s.[22] *See* Pls.' Request for Judicial Notice ("RFJN"), Exs. _ - _ (building permits for oil tool manufacturing plant on Sorenson Lane); Decl. of Ronald A. Valenzuela March 4, 2021 ("Valenzuela Decl."), Exs. 2, at 6 (Oil Tool Group in Holding Unit, Los Angeles Times, April 13, 1930), 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3); Expert Report of R. D. Mutch, Jr., P.Hg., P.E., Jan. 14, 2021 (Docket No. 903-204) ("Mutch Report"), at 7-18 & Figs. 7-1, 7-12 (Docket No. 903-210) (1928 map indicating Burke Street used to be named Sorenson Lane & 1938 aerial photograph). Globe Oil conducted tooling and heat treating of oil tools, bits, and devices, manufacturing hundreds of devices and pieces of equipment each month. RFJN, Ex. 85 (Industrial Waste Survey, Jun. 19, 1970). The metal heat treating operations generated wastewater heavily contaminated with hexavalent chromium. *Id.*; *see also*, Exs. 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application), 94 (J. Whaley, Globe Oil Tools, Letter to Dept. of County Engineer, Mar. 24, 1970).

Globe Oil used a degreaser and steam cleaned newly manufactured parts and equipment, which created waste streams contaminated with hazardous substances. Valenzuela Decl., Ex. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3); RFJN, Ex. 85 (Industrial Waste Survey, Jun. 19, 1970). Those hazardous substances likely included chlorinated solvents, given the common usage of those solvents in the metal fabricating industry during the pertinent time and the fact such solvents were found in the soil near the clarifiers used to process liquid waste streams at the Patsouras Property. *See* Valenzuela Decl., Ex. 7, at 50 (Environmental Audit, Inc., Subsurface Investigation Report, Dec. 18, 1995, at 12); Mutch Rebuttal Report, at _. After 1970, the waste streams were run through

---

[22] Globe Oil Tools, Inc. also owned the Property before selling it to its parent corporation, Rucker Company, which Plaintiffs contend is the predecessor-in-interest to Defendant Halliburton Affiliates, LLC ("Halliburton").

permeable concrete or brick subsurface clarifiers, units now known to commonly result in subsurface releases, to settle out solids before being discharged to the public sewer system. Valenzuela Decl., Exs. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3), 4, at 28 (AIG Consultants, Inc., Phase I Environmental Assessment, Jun. 30, 1994, at 18). Prior to discharge to the sewer system, it appears these waste waters were managed directly on the ground for decades. *Id.*

From 1973 to 1987, Defendant Palley Supply Company, a forfeited California corporation, used the Property for hydraulics and hydraulic equipment maintenance, government surplus, and warehousing. Valenzuela, Ex. 9, at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2), 14, at 140-142 (W. Palley Dep. Tr. at 20:9 to 21:5; 69:19-23). Industrial waste from steam cleaning operations by Palley Supply was discharged to the sanitary sewer through one or more clarifiers that had been present on the property since Globe Oil Tools operated there. Valenzuela, Ex. 9, at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2).

   **b.**  **Globe Oil and Palley Supply Company polluted the property for decades.**

The Patsouras Property has been subject to enforcement actions for discharges and other mishandling of hazardous substances into soils since the 1970s. In March 1970, Globe Oil was issued a Notice of Violation for discharging industrial wastes to the ground. RFJN, Exs. 88 (Los Angeles County, Dept. of County Engineer, Notice of Violation, Mar. 20, 1970), 90 (Los Angeles County, Dept. of County Engineer, Chemical Analysis, Mar. 17, 1970); Valenzuela Decl., Ex. 6, at 46 (J.B. Granich, Memorandum to T.T. Otteson, Apr. 15, 1970). The discharge included rinse water from the heat-treating operations containing hexavalent chromium at 19.5 parts per

34

million, a level 975,000 times higher than the current level considered protective in groundwater. *Id.*; Mutch Report, at 7-7.

In their motion, Defendants suggest that this 1970 violation was the first—or only—time that rinse water containing hexavalent chromium had been discharged to ground, arguing that Globe Oil worked at "warp speed" to stop the discharge and route the waste to the sewer after passing through clarifiers. But this is simply not credible. As noted, sewers were not installed and utilized at this Property until 1970 (*see* Section A.1, *supra*), and thus these discharges, presumably to the lagoons on the property, likely were ongoing for 30 or 40 years, from the start of operations, in the 1930s or 1940s, until the sewer system was installed.

Nor did diverting the rinse water to clarifiers and then the sewer eliminate disposals of hexavalent chromium at the property. Clarifiers leak and are common sources of groundwater contamination.[23] *See* Mutch Report, at 2-6, 3-5. Sewer pipes made of vitrified clay, the common material used during the early and middle part of the 20th century, also invariably leak, either through cracks, pipe joints, or simply via exfiltration. *See* Mutch Report, Jan. 14, 2021, at 5-9 to 5-10, 5-30. Given the permeability of these units and infrastructure, contaminated waste water carried through those systems is virtually certain to reach the environment. *Id.* Moreover, the 1970 industrial waste survey noted that the interceptors generated 15-20 cubic yards of sediments monthly which needed to be removed. In other words, waste was

---

[23] Globe Oil, and later Palley supply, utilized *multiple* clarifiers on the Patsouras Property. *See, e.g.,* Valenzuela, Ex. 9, at 79, 81 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 5, 7). Two of them were of such vintage and type that it is inconceivable that they did not release their hazardous contents into the environment. In 1988, the Los Angeles County of Engineers described two brick clarifiers, built *before* World War II, as having "long since lost their integrity to withhold any of its [*sic*] contents." RFJN, Ex. 87 (A. Medina, Chief, Hazardous Materials Program, Los Angeles County DHS, Letter to C. Sjoberg, Aug. 18, 1988), at 1).

continuously present in the clarifiers. *See* RFJN, Ex. 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application, May 18, 1970, at 1).

The disposals continued after Globe Oil stopped operating at the property. In 1978, Palley Supply received a Notice of Violation for discharging industrial waste water from its steam cleaning operation to the public sewer system through clarifiers installed at the Property by Globe Oil. Valenzuela Decl., Ex. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3). In 1987, the County of Los Angeles Department of Health Services filed a criminal complaint against Palley Supply's owner for maintaining two subsurface structures containing a black oily liquid resembling waste oil. *Id.* A year later, on May 18, 1988, an inspection report noted that the abandoned clarifiers were filled with trash and oil, and that during a rainstorm, "industrial waste" was overflowing and discharging to the street. *Id.*; RFJN, Ex. 101 (Inspection Record for Talco Plastics, May 18, 1988). Palley Supply received two additional notices of violation on the same day, one for excessive waste in two abandoned clarifiers and another notice of violation for overflow from a sump and two abandoned clarifiers, due to a plugged sewer line, that was discharging to ground at the property's access and loading area.[24] RFJN, Exs. _ (Santa Fe Springs Fire Dept., Environmental Protection Div. Notice of Violation No. 74, May 18, 1988) and _ (Santa Fe Springs Fire Dept., Environmental Protection Div. Notice of Violation No. 75, May 18, 1988).

As to the May 1988 discharges from the clarifiers, the Patsouras Defendants argue that it is unclear whether the overflows contained CERCLA hazardous substances, and, in any event, those disposals could not possibly have migrated to

---

[24] It is unclear from the various records whether they are describing the same overflow or separate ones.

OU-2 Groundwater.[25] Mot, at 61-62. Of course, Palley Supply never bothered to investigate the contents of the discharge from the clarifiers (just like it never bothered to properly maintain those clarifiers), and, like all Defendants in this matter, the Patsouras Defendants contend that their failure to investigate or assess a particular spill or discharge entitles them to evade responsibility for it.

But more importantly, as noted above (*see* Section _, *supra*), Plaintiffs are not required to "trace" a disposal by identifying when and which hazardous substances reached OU-2 Groundwater. Plaintiffs need only show that *a* release, or threatened release, from the property to OU-2 Groundwater has occurred, regardless of who may have been responsible for the release to soils. Proving a release to OU-2 Groundwater is not a heavy burden. Plaintiffs need only show that the same hazardous substances in the soils at the Property are also in OU-2 Groundwater and that a plausible migration pathway exists between the Property and OU-2 Groundwater. Here, Plaintiffs have met that standard.

> **2.  There have been releases of hazardous substances from the Patsouras Property into OU-2 Groundwater.**
>
> **a.  There have been releases of hazardous substances into the soils at the property.**

As one might expect, the mishandling of hazardous substances at the Patsouras Property resulted in releases of those substances into the environment. PCE, TCE, and chromium have been detected in the soil at the property. Defendants do not dispute that these chemicals qualify as CERCLA "hazardous substances." 40 C.F.R. § 302.4.

PCE, TCE, chromium, nickel and vanadium, as well as other hazardous substances, have all been identified as present in the subsurface at levels above soil

---

[25] Defendants make this same specious argument with respect to the March 1970 release of rinse water heavily contaminated with hexavalent chromium, arguing that the 1970 disposal could not have migrated to OU-2 Groundwater. Mot. at 60.

screening levels, meaning that these substances are present in soils at the Patsouras Property at levels that exceed those known to be protective of groundwater. *See* Valenzuela Decl., Exs. 5, at 43-45 (Professional Service Industries, Phase II Preliminary Contamination Assessment, Aug. 18, 1994, at 13 & Table 3), 9, at 85-88 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, Table 1), 10, at 98-103 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 1); Mutch Report, Tables 3-1, 7-4. The mere presence of hazardous substances in an environmental media at a site, such as subsurface soils, is sufficient evidence that CERCLA "releases" have occurred.[26] *See, e.g., Am. Int'l Specialty Lines Co. v. U.S.*, Case No. CV 09-01734, 2010 U.S. Dist. LEXIS 65590, at *61 (C.D. Cal. June 30, 2010).

        **i.**      **Defendants' contention that the chromium levels in soils at the property are within background levels is meritless.**

Defendants' expert, Dr. Jean Kulla, opines that a concentration of 71.1 mg/kg for total chromium, found at 2 feet below ground surface ("bgs"), is only "slightly above background levels." *See* Jean B. Kulla, Expert Opinion on the Patsouras Property (902-86) ("Kulla Report"), at 3. However, Dr. Kulla's declaration offers no basis for her statement, no rationale, no analysis, nor any authority for opining that 71.1 mg/kg for total chromium is only "slightly above background levels. Id. In fact, Dr. Kulla never even says what those background levels are. *Id.*

---

[26] Soil gas sampling has also confirmed the presence of PCE and TCE in soils at the Property. *See* Valenzuela Decl., Ex. 9, at 89-93 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 11 & Tables 8, 9); Mutch Report, Table 7-6. Indeed, sampling of soil vapor shows a pattern of elevated concentrations of soil gas PCE, as well as other chlorinated VOCs such as TCE (a daughter product of PCE), that are localized in a portion of the Property with high PCE soil levels, signifying a definitive onsite source of these hazardous substances. Mutch Report, at 7-17 to 7-18.

According to the U.S. Geological Survey, background levels of total chromium roughly range from 30 to 36 mg/kg. *See* Smith, D.B. et al., U.S.G.S., Geochemical and Mineralogical Data for Soils of the Conterminous United States: U.S. Geological Survey Data Series 801, 19 (available at http://pubs.usgs.gov/ds/801/). These USGS reported levels are higher than the background levels at and near defendant Phibro-Tech, Inc.'s facility, as reported by that defendant's consultant, namely, 20 to 24 mg/kg. *See* RFJN, Ex. _, at _ (Camp Dresser & McKee Inc., RCRA Facility Investigation Phase II Report, Apr. 23, 1993, Table 4-1 [Lintecum 54]). Apparently, Dr. Kulla believes that concentrations that are *more than twice* the background levels of total chromium, as reported by the USGS and one of the defendant's consultants qualify as "slightly above background levels."

More importantly, Dr. Kulla, and the Patsouras Defendants, utterly ignore the fact that the total chromium concentrations detected in soil at the Patsouras Property could include significant concentrations of hexavalent chromium. The environmental consultants that have assessed the property over the years did not adequately analyzed soil samples for hexavalent chromium. *See* Mutch Report, at 7-12 to 7-1. More generally, testing of soils for hexavalent chromium, total chromium, and other metals was extremely limited. *See* Mutch Report, at 7-9, 7-13. For example, of the 31 locations sampled between 1994 and 1999, where dozens of samples were taken, only 1 was analyzed for hexavalent chromium. *Id.* at 7-12.

This is significant. Background levels of hexavalent chromium at and near defendant Phibro-Tech, Inc.'s facility, as reported by that defendant's consultant, range from 1 to 2 mg/kg. *See* RFJN, Ex. _, at _ (Camp Dresser & McKee Inc., RCRA Facility Investigation Phase II Report, Apr. 23, 1993, Table 4-1 [Lintecum 54]). A concentration of 71.1 mg/kg is *orders of magnitude higher* than the background levels reported by Phibro-Tech, Inc.'s consultant. Given these facts, it is baffling that Dr.

Kulla would so cavalierly brush aside a detected concentration of 71.1 mg/kg for total chromium.[27]

### ii. Defendants grossly mischaracterize the PCE and TCE soil data.

Defendants contend that releases to soils of PCE and TCE at the property could not possibly have impacted OU-2 Groundwater, because of the 137 soil samples taken at the eastern parcel of the property, "only a few" detected PCE or TCE. This characterization is misleading for two reasons. First, it minimizes the importance of the detections of PCE and TCE. When pressed during her deposition, Dr. Kulla begrudgingly acknowledged that of the 137 soil samples taken, all the samples where PCE and TCE were detected were drawn from the former location of clarifiers and storage shed – areas that are widely considered to be onsite sources of contamination, areas impacted with volatile organic compounds such as PCE and TCE, and areas that

---

[27] Defendants have also misstated the background levels for arsenic, another hazardous substance detected in elevated concentrations at the Patsouras Property. Dr. Kulla contends that the level of arsenic which is "characteristic of background for regional soils" is 55 mg/kg. *See* Kulla Report, at 3. However, Dr. Kulla offers no support for this statement. Moreover, she is wrong. According to the California Department of Toxic Substances Control, the background level for arsenic is several times lower, namely, 12 mg/kg. *See* G. Chernoff et al., Dept. of Toxic Substances Control, Determination of a Southern California Regional Background Arsenic Concentration in Soil, at 1 (available online at https://dtsc.ca.gov/wp-content/uploads/sites/31/2018/01/Background-Arsenic.pdf). During her deposition, Dr. Kulla tried to defend her opinion concerning the background level for arsenic in regional soils by arguing that levels would be higher in soils near oil fields. *See* Valenzuela Decl. Ex. 15, at 170-171 (J. Kulla Dep. Tr. at 88:1-89:8). Oil, the theory goes, is derived from shale, clay-rich rock with organic matter, and arsenic is "constant" in that matter. *Id*. However, this does not explain the heavy concentrations of arsenic in the **first 20 feet** of soil at the Patsouras Property, and it would be absurd to contend that historical operations at the property involved drilling for oil less than two dozen feet below ground.

were identified early as requiring remediation. Valenzuela Decl., Ex. 15, at 154-155 (J. Kulla, Dep. Tr. at 57:20-58:5).

Second, Defendants' contention that PCE and TCE were found only in "low concentrations" or "trace amounts" that were incapable of migrating to OU-2 Groundwater is baseless. Soil screening levels have been developed to protect against different types of exposure concerns, such as leaching of soil to groundwater. *See* Mutch Report § 3.2.1. Soils screening levels, developed by the San Francisco Regional Water Quality Control Board, and widely used throughout the state, are calculated specifically to be protective of groundwater. When exceeded, they identify levels of contaminants in soil that can pose a threat of migration to groundwater at levels that would preclude the use of the groundwater for drinking water or result in other exposure pathways of concern. Accordingly, if the concentration of soil contamination at one of the Defendants' Source Properties exceeds the screening level for that substance, that contamination threatens OU-2 Groundwater and is reasonably likely to adversely impact it. *See* Mutch Report, at 3-3 to 3-7. The more the concentration of a hazardous substance detected in soils exceeds the pertinent soil screening level, the greater the likelihood of actual groundwater contamination approaches certainty. *Id.*

Here, what the Patsouras Defendants call a "low concentration" of TCE in the soils at the property is nearly *triple* the soil screening level for TCE. The "trace amount" of PCE detected in the soils at the property is *6 times* higher. *Compare* Kulla Report, at 3 (PCE detected at 510 µg/kg, TCE detected at 270 µg/kg) *with* Mutch Report, at 3-6, 7-9 (270 µg/kg is nearly triple the soil screening level for TCE and 510 µg/kg of PCE is six times the screening level for PCE).

Moreover, Defendants conveniently neglect to mention that in the case of PCE, the detection was drawn from a depth of 25 feet bgs., which was within a few feet of the depth to groundwater during this time period. Mutch Report, at 7-11. Indeed, the

groundwater table could have been as shallow as 25 feet bgs at times during this period. *Id.* However, Dr. Kulla makes no mention of this, nor offers any analysis concerning the depth to groundwater during the relevant period – nor any other. It is simply not credible, therefore, to characterize this PCE detection, which was six times the screening level known to be protective of groundwater and present within a few feet or even closer to the water table as a "trace amount" that "posed no threat to groundwater."

Soils were removed at the property in 1998 (and more was removed in 2006, 2010, and 2014). *See* Valenzuela Decl., Ex. 16, at 175 (S. Unger, Executive Officer, Los Angeles Regional Water Quality Control Board, Letter to Larry Patsouras, Jan. 4, 2017, at 2). However, there is no record that the level of contamination in those was ever documented before excavation. Most importantly, the requirement to remove contaminated soils demonstrates that those soils were considered unsuitable and non-protective to remain in place. Yet those soils had been in place for many years.

### iii.   Defendants ignore the fact that the investigations into the potential impact of contaminants in the soil at the property have been woefully inadequate.

Despite the numerous violations and known disposals and releases at the property, meaningful efforts to investigate environmental contamination at the Property did not begin until 1994. Valenzuela Decl., Ex. 4, at 8-38 (AIG Consultants, Inc., Phase I Environmental Assessment, Jun. 30, 1994). Soil sampling at the property was limited to a few areas of a several-acre parcel. *See* Mutch Report, at 7-29. The monitoring well network at the property was also inadequate. *Id.* But perhaps the starkest example of the failure to adequately investigate the nature and extent of contamination at the Property is the lack of any meaningful inquiry into the apparent use of lagoons at the property. *See* Mutch Report, at 7-27 to -28. As noted above, Globe Oil almost certainly discharged rinse water from heat treating operations, which

contained hexavalent chromium, into the lagoons for years prior to diverting that waste stream to the sewer in 1970. The lagoons were present on the property from at least 1938 through 1973 and should have been a major focus of investigation, but, inexplicably, they were not. Also, there was very limited sampling of hexavalent chromium throughout the property. Given that was the form of chromium utilized by Globe Oil, and the far more toxic form of the chemical, the failure to monitor for it is unexplainable.

**b.    A plausible, if not actual, migration pathway exists between the property and OU-2 Groundwater**

Chromium, PCE, and TCE have been detected in the subsurface soils at the Property, and these same substances are in OU-2 Groundwater below and downgradient of the Property. *See* Valenzuela Decl., Exs. 5, at 43-45 (Professional Service Industries, Phase II Preliminary Contamination Assessment, Aug. 18, 1994, at 13 & Table 3), 9, at 85-88 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, Table 1), 10, at 98-103 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 1), 11, at 109-114 (Environmental Audit, Inc., Third Quarter 2013 Ground Water Monitoring Report, Oct. 23, 2013, Tables 2, 3); Mutch Report, Tables 3-1, 7-4 and 7-5. Thus, the first two prongs of the *Castaic Lake* test are easily met. *Castaic Lake* test. *See* 272 F. Supp. 2d at 1067.

There is no question that since the initial industrial use of the Property over fifty years ago, there has been a plausible migration pathway for hazardous substances in the subsurface soils at the property to reach OU-2 Groundwater. The entire OU-2 Groundwater area lies in a recharge area defined as an area where water from precipitation and other shallow water sources, such as leaking sewers and clarifiers, reaches the underlying groundwater from surface infiltration. See Mutch Report, at 2-4 to 2-8.

As noted, levels of PCE and TCE previously detected at this property exceed soil ESLs that are known to be protective of groundwater by very significant amounts. The extremely high soil concentrations of these compounds demonstrate that there is a plausible migration pathway for these substances to reach OU-2 Groundwater at levels that exceed protective levels for groundwater. See Mutch Report, at 2-4 to 2-8, 8-8 to 8-12, 8-23 to 8-26.

Although soil investigations were extremely limited for chromium with virtually no soil samples analyzed for hexavalent chromium (*see* Mutch Report, at 7-11 to 7-12), significant chromium levels were found in the area of the clarifiers and hexavalent chromium was found in OU-2 Groundwater below the Patsouras Property. Valenzuela Decl., Exs. 12, at 121 (Environmental Audit, Inc., Removal of Clarifier Unit 6, Mar. 9, 2010, Table 2), 10, at 104-105 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 2), 11, at 114 (Environmental Audit, Inc., Third Quarter 2013 Ground Water Monitoring Report, Oct. 23, 2013, Table 3 at p. 3 of 3). In fact, the highest concentrations of hexavalent chromium detected in groundwater beneath the Property were drawn from monitoring wells in the middle of the Property—where clarifiers had been located. Valenzuela Decl., Ex. 11, at 114 (Environmental Audit, Inc., Third Quarter 2013 Ground Water Monitoring Report, Oct. 23, 2013, Table 3 at p. 3 of 3); Mutch Report, at 7-14 to 7-18 & Table 7-5.

In fact, the extent of soil contamination demonstrates not only a plausible pathway to groundwater but an actual pathway to OU-2 Groundwater. PCE was detected in a boring near a storage shed on the Property at depths of 10, 15, 20, and 24 feet bgs, the last soil sample taken before the groundwater table which, at that time, was present at around 30 feet bgs. Valenzuela Decl., Ex. 13, at 134 (Environmental Audit, Inc, Updated Site Conceptual Model, Jun. 17, 2010, Table 1 at p. 4 of 7); Mutch Report, at 8-10 to 8-11. A separate boring also revealed elevated levels of PCE

in soil samples extending vertically through the soils to the effective depth of the groundwater table, further indicating a completed pathway of PCE from subsurface soils to OU-2 Groundwater. Mutch Report, at 7-10 to 7-11. The boring was located near an abandoned clarifier at the Property, and samples from 15, 20, and 25 feet bgs detected PCE with the highest concentration of PCE, 510 µg/kg, a level exceeding the soil screening level, present in the sample taken from 25 feet bgs. *Id.* Given that the water table was historically higher than its level when those samples were drawn, perhaps as a high as 25 feet bgs, the contamination detected at that depth supports an actual pathway by which soil contamination reached OU-2 Groundwater. *Id.*

> ### c.    The Los Angeles County and Santa Fe Springs Fire Departments have concluded that VOCs from historical operations at the property have impacted OU-2 Groundwater.

On November 28, 1995, the Los Angeles County Fire Department ordered defendant Kekropia to "determine the nature, concentration, and the vertical and lateral extent of contamination" and submit a "site characterization plan" by the end of December, noting that there had been "releases" at the property. RFJN, Ex. 84 (T. Klinger, Supervisor, Los Angeles County Fire Dept., Health / HazMat Div., Letter to L. Patsouras, Kekropia, Nov. 28, 1995). The letter advised Kekropia that any questions should be directed to Kim Clark, who worked in the Health / HazMat Division. *Id.*  Kekropia's attorney, John Glasser, was copied on the letter. *Id.*

A month later, on December 18, 1995, Kekropia's consultant, Environmental Audit, Inc., completed its Subsurface Investigation Report. *See* Valenzuela Decl., Ex. 7, at 50-51 (Environmental Audit, Inc., Subsurface Investigation Report, Dec. 18, 1995, at 12-13). Kekropia's attorney, John Glaser, sent a copy of the Report to Kim Clark, a Hazardous Materials Specialist for the Health / HazMat Division of the Los Angeles County Fire Department on December 22. *See* RFJN, Ex. 92 (J. Glaser, Jaffee, Trutanich, Scatena & Blum, Letter to K. Clark, LACFD, Dec. 22, 1995). Ms.

Clark noted at the top of the letter that she received it on or about January 2, 1996, initialing it "recd 1/2/96 KC." *Id.*

A memorandum prepared on January 9, 1996 by someone in the Los Angeles County Fire Department concluded that the locations of clarifiers and a storage shed on the eastern parcel of the Patsouras Property were impacted with volatile organic compounds, such as PCE and TCE, and needed to be remediated. *See* RFJN, Ex. 92 (Los Angeles County Fire Dept., Memorandum, Jan. 9, 1996, at 1-2). The Fire Department further concluded that "**VOCs in this area have been found to extend to GW** [groundwater]." *Id.* (emphasis added).[28]

The Santa Fe Springs Fire Department reached the same conclusion in 1997. Steve Chase, an employee of the Santa Fe Springs Fire Department, Environmental Services Division, advised the director of that division, Dave Klunk, that "historic Palley site operations contamination probably contributed to the VOC portion" of groundwater contamination at the property. *See* RFJN, Ex.   (Steve Chase, Santa Fe Springs Fire Department, Environmental Services Division, Memorandum to Dave

---

[28] Defendants have challenged whether this memorandum was authored by the Department, however the record plainly establishes that it was. The history of the Fire Department's actions concerning the property around this time, and the Department's communications with Kekropia and its attorneys lead to no other conclusion. As noted above, the Ms. Clark of the Los Angeles County Fire Department received the December 1995 Subsurface Investigation Report a few days later, on January 2, 1996; the Memorandum is dated January 9, 1996, and several days later, Ms. Clark telephoned Kekropia's attorney to discuss the report. *See* RFJN, Ex.   (T. Klinger, Los Angeles County Fire Dept., Health / HazMat Div., Letter to L. Patsouras, Kekropia, Jan. 25, 1996). All of these communications, including the January 9, 1996 Memorandum, summarize the salient soil and groundwater data from the Subsurface Investigation Report. Plaintiffs would also note that footnote all bear the Bates numbers affixed to Plaintiffs' document productions in this matter, documents that were obtained from various regulatory agencies, including the Los Angeles County Fire Department, Health / HazMat Division. *See* Decl. of J. Keener in Support of Pls.' Mot. for Partial Summ. J (Docket No. 903-202) ¶¶ 7-10; Decl. of R. Valenzuela in Support of Pls.' Mot. for Partial Summ. J (Docket No. 903-201) ¶¶ 9-12.

Klunk, Director, Environmental Services Division, Santa Fe Springs Fire Department, Sept. 29, 1997). Mr. Chase further advised that groundwater at the property was first encountered at 35 feet bgs, and "PCE was found in a [soil] column" from 10 feet bgs to 35 feet bgs. *Id*. Like the Los Angeles County Fire Department, Mr. Chase identified the vicinity of the old clarifiers and the storage shed as the locations "where significant HVOC [halogenated volatile organic compounds] . . . contamination is demonstrated." *Id*. There was also a "demonstration of HVOC contamination to GW [groundwater] . . . at mid-site," namely, in the area of the old clarifiers. *Id.*; *see also* RFJN, Ex. _ (Dave Klunk, Director, Environmental Services Division, Santa Fe Springs Fire Department, Letter to Jim Ross, Los Angeles Regional Water Quality Control Board, Oct. 10, 1997).

Dr. Kulla contends that both Fire Departments misread the data. Valenzuela Decl., Ex. 15, at 159-167 (J. Kulla Dep. Tr. at 75:23 to 79:25; 80:9 to 83:7). However, Dr. Kulla testified that she was not sure if she necessarily disagreed with the conclusion that "Palley site operation contamination probably contributed to the VOC portion of groundwater contamination." *Id.*, Ex. 15, at 167 (J. Kulla Dep. Tr. at 83:11-23). Regardless of whether there is any merit to that claim, as noted above, historical depths to the water table at the Patsouras Property have fluctuated and were much closer to the surface during this period, perhaps as close as 25 ft bgs. In any event, the data noted by the Fire Departments as presenting a possible impact to groundwater represents, at a minimum, a threatened release to OU-2 Groundwater, which is more than enough to hold Defendants liable in this action.

> **d.      There is no merit to Defendants' contention that groundwater data establishes that the Patsouras Property is not a source of OU-2 Groundwater contamination.**

Defendants essentially argue that the detections of hexavalent chromium in OU-2 Groundwater beneath the Patsouras Property should be ignored because the water is

47

safe to drink. The concentration of hexavalent chromium in the sampled groundwater, they argue, is below California's Maximum Contaminant Levels ("MCL") for drinking water, and thus Plaintiffs would not be required to incur costs to clean it up. This is nonsense. Defendants know full well that they are not simply liable for the OU-2 Groundwater contamination currently present at the property, but also for historical releases that have already left the property. *See, e.g.,* Valenzuela Decl., Ex. 15, at 172 (J. Kulla Dep. Tr. at 119:5-21) (noting that contamination to groundwater from 1970 hexavalent chromium discharge to ground may have moved off property by now).

Also, the MCL for total chromium is not protective for hexavalent chromium and California is in process of revising the MCL. That process will undoubtedly be completed during the time period during which Plaintiffs will be treating OU-2 Groundwater. Moreover, Plaintiffs will be required to treat extracted groundwater to levels more stringent than current total chromium groundwater levels.

Defendants also argue that the vast majority of groundwater sampling from wells upgradient of the property show detections of PCE and TCE that are "greater than or similar to" samples drawn from the downgradient wells on the property. *See* Mot. at 64. This, they argue, shows that the Patsouras Property is not a source of groundwater contamination. *Id.* There are three significant flaws with Dr. Kulla's analysis on this point. First, as Figure 6 of Dr. Kulla's report shows, the Pilot Chemical property is located generally to the *east* of the Patsouras Property and, as Dr. Kulla acknowledges, OU-2 Groundwater generally flows in a south, southwest direction (*see* Kulla Report, at 1), not in the more westerly direction suggested by the arrows in Figure 6. As such, many, if not most, of the Pilot Chemical wells may be cross-gradient, not upgradient, of the Patsouras Property. *See* Mutch Rebuttal Report, at ___.

Second, Dr. Kulla bases her opinion on the "fact" that OU-2 Groundwater is largely flowing onto the Patsouras Property from the Pilot Chemical property. To help establish this point, Dr. Kulla presents a map, Figure 6 of her report, purporting to show the OU-2 Groundwater flow in the area. However, to create Figure 6, Dr. Kulla apparently: (a) took a map (Figure 7) from a 2010 report prepared by Kekropia's consultant, Environmental Audit, Inc., which shows groundwater leaving the Pilot Chemical property and generally bypassing the Patsouras Property; (b) "erased" the arrows on the Environmental Audit, Inc. map; and (c) "drew" new arrows that point in a different direction, namely, directly at the Patsouras Property. *See* Exhibit _ (comparison of EAI Figure 7 and Kulla Figure 6). Although Dr. Kulla is entitled to her opinion about the direction of groundwater flow leaving the Pilot Chemical property, she *must* present evidence to support that opinion, but she has not. Dr. Kulla's report offers no basis whatever for her opinion concerning the groundwater flow depicted in Figure 6 of her report. *See also* Mutch Rebuttal Report, at _.

Third, the monitoring well network on the Patsouras Property is "inadequate to delineate flow direction and delineate groundwater contamination at the property." Mutch Report, at 7-16. Accordingly, the set of well data used by Dr. Kulla for her comparison, does not provide either sufficient or reliable data upon which to assess the quality of OU-2 Groundwater flowing across the Patsouras Property.[29]

---

[29] Defendants also contend that the chromium detected in groundwater underneath the property migrated there from the property owned by defendant Foss Plating, Inc., which is located almost two miles away from the Patsouras Property. [Insert rebuttal from Mutch report]. *See* Mutch Rebuttal Report, at _.

49

3.     **Defendants' position that the Patsouras Property did not impact or threaten to impact OU-2 Groundwater finds little support from the governmental agencies and environmental consultants identified in their motion.**

a.     **The governmental agencies have reached no conclusions concerning past releases from the property to OU-2 Groundwater.**

The Patsouras Defendants read too much into the actions taken, or not taken, by EPA and the Los Angeles Regional Water Quality Control Board. As already noted, EPA has not exonerated the Patsouras Defendants nor has its consultant, CH2M HILL, done so.

Similarly, the Los Angeles Regional Water Quality Control Board simply stated that the remediation done to date is sufficient and that no further soil cleanup at the property is required. Although the Regional Board requires no further investigative or corrective actions be taken at the Patsouras Property at this time, the Regional Board has chosen not to make a determination as to whether past releases of hazardous substances at the property ever impacted OU-2 Groundwater. Valenzuela Decl., Ex. 16, at 176 (S. Unger, Executive Officer, Los Angeles Regional Water Quality Control Board, Letter to Larry Patsouras, Jan. 4, 2017, at 3). To the contrary, the NFA Letter expressly states that "by issuing this NFA letter, the Regional Board has not made a determination as to whether discharges of waste to regional groundwater occurred as a result of historical activities at the [Patsouras Property]."[30] *Id.* The letter in no way made a conclusion on the historical impacts of this property on OU-2 Groundwater nor bars Plaintiffs' contribution claims against Defendants, nor entitles Defendants to summary judgment.

_____

[30] Further, the Regional Board appears to agree with Plaintiffs that EPA may still take action against Defendants, as EPA, not the Regional Board, "is addressing the impacts to groundwater as part of its federal Superfund program" and "may choose to make [its] own determination concerning this Site."

1

2

**b.     The conclusions reached by Dr. Kulla and Defendants'
         other environmental consultants are fundamentally
         flawed.**

3

4         Dr. Kulla reports that she was asked to "assess whether the [Patsouras] Property

5    has been or is contributing hazardous substances to the … Groundwater Plume (OU-2)

6    underneath the Property." Kulla Report, at 1. She has concluded that it has not. Kulla

7    Report, at 8. However, Dr. Kulla appears not to be aware of, or have evaluated,

8    critical facts that might have informed her opinion.

9         She testified, for example, that she knew PCE and TCE were in the soil at the

10   Patsouras Property, but she does not know how those substances came to be located in

11   the soil or ever analyzed this issue. *See* Valenzuela Decl., Ex. 15, at 156-158 (J. Kulla

12   Dep. Tr. at 69:24-70:11; 72:11-21). She appears not to have even analyzed whether

13   contamination from historic Palley site operations may have contributed VOCs to OU-

14   2 Groundwater contamination or whether Globe Oil released hazardous substances on

15   the Patsouras property. *Id.*, at 152-153, 167 (J. Kulla, Dep. Tr. at  50:17-51:2; 83:11-

16   23).

17        Dr. Kulla's knowledge about significant aspects of Globe Oil's operations was

18   similarly lacking. She did not know how Globe handled waste water or what was in it.

19   *Id.*, at 150-151 (J. Kulla, Dep. Tr. at 46:12-20; 49:11-13). Dr. Kulla also believed that

20   Globe Oil operated at the property for only four years, from 1968 to 1972. *Id.,* at 146

21   (J. Kulla, Dep. Tr. at 37:3-9). She did not know that Globe Oil had been operating at

22   the property for over thirty years.

23        Dr. Kulla is not alone in this. There has been significant confusion over the past

24   25 years concerning when Globe Oil began industrial operations at the Patsouras

25   Property. The first environmental consultant to assess the "environmental conditions"

26   at the property, AIG Consultants, Inc., erroneously reported that Globe Oil began

27

28

51

operations there in 1968, some 30 years after the actual date.[31] Valenzuela Decl., Ex. 4, at 11, 20 (AIG Consultants, Inc., Phase I Environmental Assessment, Jun. 30, 1994, at 1, 10). Fifteen years later, in 2009, Kekropia's environmental consultant made the same error.[32] *Id.*, Ex. 9, at 77 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1).

The error regarding when Globe Oil began operations is important to the Patsouras Defendants' motion in two ways. First, Defendants heavily rely upon the fact that their consultant, Environmental Audit, Inc., has concluded that chlorinated compounds in OU-2 Groundwater underneath the property did not originate from the property. *See* Mot. at 55, 58-59. But understanding the historical activities at a property, namely, the operational history, may be critical to interpreting other data, such as soil or groundwater sampling results. *See* Mutch Report, at 3-1. A misconception about that history could significantly affect the conclusions drawn from the data.

Second, knowing the operational history at a property helps inform the decisions concerning how to proceed with the environmental assessment. Knowledge that industrial operations at a property had been conducted in the 1930s, 1940s, or 1950s, "when spills and releases were generally more common and quantitatively

---

[31] Plaintiffs' complaint alleges that Globe Oil began operations at the Patsouras Property in 1958. However, Plaintiffs recently were able to obtain building permits that clearly show that Globe Oil was operating at the property no later than 1941 as well as a Los Angeles Times news article that suggests operations may have begun in the 1930s. *See* RFJN, Exs. _ - _ (building permits); Valenzuela Decl., Ex. 2, at 6 (Los Angeles Times article).

[32] Environmental Audit, Inc. added to the confusion by stating that the property had been "undeveloped" before 1968, despite the fact that Environmental Audit relied upon the 1994 AIG Report as its source for the history of the property, and the AIG report explicitly stated that the property had been developed years earlier, as evidenced by a 1947 aerial photograph. *Id.*; *see also* Ex. 9, at 77 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1).

larger" and long before awareness of the environmental implications of waste management practices and the extent of hazards to groundwater had evolved (*see* Mutch Report at 2-16 to 2-19), would surely  influence decisions regarding where to investigate, what to investigate, and how much attention should be devoted to a particular area of the property.

Thus, the conclusions reached by both Dr. Kulla and Environmental Audit, Inc. concerning the Patsouras Property rest upon a fundamental misunderstanding of the history of that property. Defendants' motion, which rests upon those flawed conclusions, is similarly suspect. The motion must be denied.

## V.    PMC SOURCE PROPERTY

### A.    Overview

The PMC Property is located at 10051 Romandel Avenue in Santa Fe Springs, California. Mot. at 14. The property is located immediately east of OU-2 as EPA has defined OU-2, the area subject to EPA;s groundwater containment remedy. A refinery operated at the property from about 1938 to 1947; it was converted to a chemical manufacturing plant and for the next forty-five years, between approximately 1947 and 1992, the property was used to manufacture cresylic acid, naphthenic acid and alkylated phenols. *Id.* These compounds are used in the chemical and process industry for manufacturing of plastics, solvents, hydraulic fluids, gasoline additives, paints and other similar products. Decl. of Nancy Sher Cohen ("Cohen Decl."), Ex. 4, at 43 (J.H. Kleinfelder & Assocs., Envtl. Assessment Study for Ferro Corp. (Dec. 1986) at 1).

Defendants Ferro Corporation ("Ferro") owned and operated the specialties chemical plant from approximately 1976 until 1986, when it sold the plant to PMC Specialties Group, Inc. ("PMC Specialties"), which owned and operated it until about 1992. Mot. at 14; Cohen Decl., Ex. 2, at 21, 24 (Waterstone Environmental, Inc., Site Audit Report, Jan. 18, 1999, at 7, 10).

Ferro and PMC Specialties (collectively, "PMC") used a number of chemicals in their manufacturing processes and kept them onsite in their raw form, including naphthenic, cresylic and sulfonic acids, and benzene. Cohen Decl., Exs. 2, at 23-24 (Waterstone Environmental, Inc., Site Audit Report, Jan. 18, 1999, at 9-10), 10, at 172-173 (Waterstone Environmental, Inc., Environmental Characterization Report, Jul. 12, 2000, at 1-2); Decl. of R. Vogl ("Vogl. Decl.") ¶ 12b.

PMC are attempting to avoid liability to Plaintiffs for costs arising from the OU-2 Consent Decree entered by this Court in March 2017, including the enormous costs that will be incurred to design, construct, and maintain the OU-2 Groundwater containment remedy required under that consent decree. *See* Opp'n RFJN, Ex. 3, at 48-50, 54 (OU-2 Consent Decree (Oct. 6, 2016) at 14, 17, 23 & Appendix B at 286). But PMC Defendants do not deny that the PMC Property is contaminated. They acknowledge that hazardous waste management units like hundreds of sumps and above and below ground storage tanks were located at the property, that the PMC Property has been subject to regulatory oversight for environmental conditions since 1988, and that chemicals have been found in the soil at the property and in the groundwater underneath it and some have migrated off the property in what they call the "PMC Plume." *See* Vogl Decl. ¶ 12b-d.

Instead, they argue that the contaminated groundwater migrating away from the PMC Property and towards OU-2 has never, and will never, reach or commingle with OU-2 Groundwater. *See* Mot. at 12. They assert that hydrogeologic features in the area of the PMC Property preclude the PMC Plume from commingling with OU-2 Groundwater, or what they call the "Omega OU-2 Plume." However, the evidence shows that the PMC Plume (which for some reason Defendants never represent graphically on a map) has reached OU-2 Groundwater and its migration into OU-2 will only continue, if not increase, once the OU-2 Groundwater containment remedy becomes operational and its powerful extraction wells draw groundwater toward them

in order to achieve the EPA-required remedy. And in light of this evidence, PMC's motion must be denied.

### B.   Argument

#### 1.   Groundwater at and near the PMC Property flows into OU-2 Groundwater.

Environmental consultants, on behalf of EPA and Plaintiffs have separately analyzed OU-2 Groundwater flow, using a robust set of sampling data collected over many years, and developed groundwater contour maps showing the results of their analysis. The groundwater flow mapping has covered the area within and adjacent to EPA's OU-2 boundary. The environmental consultant working on behalf of EPA at the Omega Chemical Superfund Site, CH2M HILL, has analyzed sampling data and developed contour maps in connection with EPA's regulatory oversight of the Omega Chemical Superfund Site, including its 2010 OU-2 Remedial Investigation. *See, e.g.,* CH2M HILL, Remedial Investigation/Feasibility Study Reports, Operable Unit 2, Aug. 2010, 6-13 to 6-17 (available at https://semspub.epa.gov/work/09/1122448.pdf). It has also developed maps between 2010 and 2015 as part of multiple Groundwater Monitoring Reports to support EPA's ongoing efforts to track OU-2 Groundwater contamination. Since 2016, Plaintiffs' consultants have continued this annual groundwater monitoring, developing groundwater flow paths as required and approved by EPA. *See* Mutch Rebuttal Report Section 2.1 & Figs. 2-5 to 2-9.

More recently, environmental consultant Intera, Inc. has developed a numerical groundwater model to support the design and performance evaluation of the OU-2 Groundwater containment remedy that Plaintiffs, and others, must implement under the OU-2 Consent Decree. Cohen Decl., Ex. 14, at 179-180 (Intera Incorporated, Final Groundwater Flow Model Development and Calibration Report, May 11, 2020, at i, 1). The parties obligated to perform that remedy, including Plaintiffs, were required under the OU-2 Consent Decree to develop the numerical groundwater model, which

55

EPA recently approved. *Id.*; Cohen Decl., Exs. 13, at 177 (W. Praskins, EPA Project Manager, USEPA, Letter to J. Keener, de maximis, Dec. 13, 2017) (EPA's approval), 12, at 176 (O. Shalev, EPA Region 9 Project Manager, USEPA, Letter to OU-2 Consent Decree Settling Work Defendants, May 15, 2020) (same). Like CH2M HILL, Intera prepared various OU-2 Groundwater contour maps using an even more robust set groundwater level measurements than were available to CH2M HILL. *See, e.g.,* Cohen Decl., Ex. 14, at 182-183 (Intera Incorporated, Groundwater Flow Model Development and Calibration Report, May 11, 2020, Figures, 4.7, 5.11). Those measurements included data from wells on the PMC Property. *See* Mutch Rebuttal Report Section 2.1.

The contour maps developed for EPA and used by Intera plainly show that **groundwater leaving the PMC Property will reach OU-2 Groundwater**.[33] In one model run, the groundwater leaving the PMC Property reached OU-2 Groundwater near the toe of the plume, rather than farther north as it did in all other runs. *Id.* Of course, this outlier, *which still shows impact to OU-2 Groundwater*, does not support PMC's position, as they contend that groundwater leaving the property *never* reaches OU-2 Groundwater. But it clearly does. *Id.* & Figs. 2-5 to 2-9. In other words, there is a plausible migration pathway from the releases at the PMC Property to OU-2 Groundwater.

---

[33] Even data represented in maps developed by Mr. Vogl's employer, Waterstone Environmental, Inc, indicate, once the flow paths on the maps are drawn accurately, that the contamination from PMC has a plausible path to intersect with OU-2 Groundwater. (The PMC groundwater flow direction varies somewhat over time depending on various factors including water level.). *See* Mutch Rebuttal Report, at 2-5 to 2-9 & Figs. 2-10 to 2-16.

### 2.   PMC's contention that the groundwater at and near its property runs parallel to OU-2 Groundwater is without merit.

#### a.   Mr. Vogl's groundwater flow maps are unsubstantiated.

In the expert declaration authored by Richard Vogel and proffered by PMC, Mr. Vogl presents several maps showing what he contends is the groundwater flow direction from the PMC Property. *See* Vogl Decl., Exs. C, I, O and N. However, three of the four maps are not supported by potentiometric contour mapping, and the fourth is of little use in determining whether the contaminated groundwater emanating from the PMC Property has, or will, reach OU-2.

In preparing the three the maps that lack potentiometric contour mapping, Mr. Vogl has taken simply taken a map of the OU-2 Groundwater area and crudely drawn lines depicting which direction he contends the groundwater flows.[34] Without potentiometric contour mapping, one cannot assess the accuracy of the flow direction postulated by Mr. Vogl.

Very generally speaking, potentiometric contour mapping involves obtaining groundwater data in the area at issue and using that data to draw lines across the ground surface (called "equipotential lines" and which look like ripples moving across the ground surface) that represent the height of the water table above sea level. *See, e.g.,* Mutch Rebuttal Report Fig. 2-9. To show groundwater flow in that area a line or arrow is drawn perpendicular to the equipotential lines. Without the equipotential lines, there is no way to assess whether the arrows representing the groundwater flow direction are properly drawn.

---

[34] As to the map where Mr. Vogl does include potentiometric contour mapping, Exhibit I, this map does not include the OU-2 area, and thus one cannot discern the interrelationship between the flow path represented on the map and OU-2 Groundwater. *See* Vogl Decl., Ex. I.

But, as indicated, Mr. Vogl generally did not do this and has basically asked the Court to take his word for it as to the direction of groundwater flow. In light of the contour mapping developed for EPA over many years, as appropriately rendered by Plaintiffs' expert hydrogeologist, Robert Mutch, PMC's unsubstantiated and flawed groundwater flow drawings are utterly insufficient to establish that there is no plausible migration pathway from the releases at the PMC Property to OU-2 Groundwater.[35]

> ### b. Mr. Vogl has failed to consider the impact of the OU-2 Groundwater containment remedy on groundwater flow.

As noted above, Plaintiffs, and others, are required to construct and maintain a groundwater containment remedy under the OU-2 Consent Decree. *See* section A, *supra*. The conceptual layout of the extraction area, as represented in Intera's Final Groundwater Flow Model Development and Calibration Report, indicates that the remedy will involve a series of extraction wells, generally aligned with Telegraph Road, situated to the west-southwest of the PMC Property with the easternmost extraction well roughly 400 feet west of the eastern boundary of the OU-2 Groundwater. Cohen Decl., Ex. 14, at 181 (Intera Incorporated, Final Groundwater Flow Model Development and Calibration Report, May 11, 2020, Fig. 2.5).

---

[35] The PMC Defendants are disingenuous when they argue that "no expert declaration" can be used "to create a disputed material fact." First, as they well know, the parties were not obligated to conduct expert discovery in Phase I, the liability phase, unless and until a party filed a motion for summary judgment or partial summary judgment. *See* Nov. 23, 2020 Order re Briefing and Expert Discovery Schedule – Liability Summary-Judgment Motions (Docket No. 888). Thus, any claim that Plaintiffs' must rely solely on their *factual* discovery responses, is nonsensical. No one, not even PMC, could deny that showing a plausible migration pathway in a CERCLA environmental matter would involve expert discovery. More importantly, PMC fundamentally misunderstands the legal standard under CERCLA Section 107(a). Plaintiff need not establish that an actual release has occurred. *See,* section II.A, *supra.* A *threatened* release is sufficient. *Id.*

Once the remedy becomes operational, the substantial pumping will significantly drawdown the water levels in the surrounding area and redirect groundwater flow paths toward the extraction wells. *See* Mutch Rebuttal Report, at 2-8 to 2-10. And even if the flow path of contaminated groundwater coming off of the PMC Property is not quickly captured by the wells in the system, most notably, the well closest to the PMC Property, that contaminated groundwater will nevertheless ultimately be drawn into the OU-2 Groundwater area. *Id.*

Mr. Vogl's declaration does not utter a word about the effect the OU-2 containment remedy will have on the flow path of groundwater near the PMC Property once it begins to extract groundwater. Groundwater from the PMC Property *already* has been drawn into OU-2 Groundwater, but even if there were any doubt about past and current flow paths, there cannot be any doubt about *future* flow paths. Mr. Vogl's silence on this issue in his declaration is all the more baffling given that he testified in his deposition that "groundwater extracting or pumping would have a **major influence** on the surface of the groundwater and which direction it may flow." Cohen Decl., Ex. 9, at 145 (R. Vogl Dep. Tr., at 23:2-13).

To succeed on their summary-judgment motion, it was incumbent upon PMC to establish that flow paths of contaminated groundwater emanating from the property would *not* be affected by the OU-2 containment remedy, but they have failed to do so.[36] This alone is a sufficient basis for denying PMC's motion.

---

[36] When asked during his deposition whether he considered the effect the OU-2 containment remedy might have on groundwater flow paths, if any, Mr. Vogl testified that he had, but conceded that he had not provided any analysis of the issue in his declaration. Cohen Decl., Ex. 9, at 149-150 (R. Vogl Dep. Tr., at 68:20 to 69:20). Perhaps realizing the significance of the omission, Mr. Vogl added that "the only place it [i.e., his analysis on the issue] would be in there [i.e., his declaration] is my statement regarding the plume would -- could never commingle in the future. And I took that into my analysis in that statement." *Id.* Of course, the rules require that an expert set out his or her opinion *in writing*. *See* Fed. R. Civ. P. 26(a)(2)(B). An expert

### c. The Santa Fe Springs Anticline is not a "barrier" that prevents groundwater at and near the PMC Property from flowing into OU-2 Groundwater.

Mr. Vogl opines that the Santa Fe Springs Anticline, a large, subsurface dome, sits between the "Omega OU-2 Plume" and the PMC Property and acts as a "barrier," precluding the contaminated groundwater plumes (Omega and PMC Plumes) from ever intersecting or commingling. However, the United States Geological Survey places the anticline at depths much deeper than the groundwater that conveys the PMC contamination into the Omega OU-2 Plume (i.e., roughly 200 feet). *See* Mutch Rebuttal Report Section 2.2 & Fig. 2-17. In other words, the "subsurface dome" is not tall enough in the area of the PMC Property to serve as a barrier to flow in the surficial aquifers or a barrier to the flow path of the PMC Plume that is migrating off the PMC Property.[37]

---

may not satisfy this requirement by asking the Court to read between the lines or otherwise go hunting for an opinion and the supporting analysis in what might be implied by the actual words written in the report. And as noted by Plaintiffs' expert, Robert Mutch, there is reason to doubt whether Mr. Vogl had conducted a *rigorous* analysis on this issue, if any analysis at all. *See* Mutch Rebuttal Report, at 2-9 to 2-10. Mr. Vogl testified that he had only a "vague" understanding of the OU-2 containment remedy and the location of the extraction wells. *See* Cohen Decl., Ex. 9, at 150-152, 160-161_(R. Vogl Dep. Tr., at 69:21 to 71:13; 160:14 to 161:9).

[37] Strangely, although Mr. Vogl extensively discusses the "PMC Plume" in his declaration, he does not provide a representation of that plume anywhere in his report or figures. During his deposition, Mr. Vogl admitted that he has not drawn the PMC Plume, but he knows where it is because he drew it "in his mind," not on paper. Cohen Decl., Ex. 9, at 146-147, 162 (R. Vogl Dep. Tr., at 40:22 to 41:14; 162:11-20). Surely, the bar for PMC to prevail on summary judgment is higher than one in which its expert can withhold critical information concerning the nature, location, and extent of the PMC Plume and instead is allowed to merely assure the parties that he knows where it is because he drew it in his mind. Moreover, it is unclear to Plaintiffs how PMC expects the Court to rule on the pending Motion when one of the "main characters," the PMC Plume, is absent from the stage.

In his report, Mr. Vogl fails to address the effect, or lack thereof, that the depth of the anticline has on the flow of contaminated groundwater emanating from the property. As such, his claim that it acts as a barrier is unsubstantiated.

> **d.    The low permeability of soils in the area of the PMC Property do not prevent groundwater from that property from reaching OU-2.**

Mr. Vogl contends that the subsurface soils on the eastern side of the anticline are less permeable, which slows down the groundwater flow rate. This, he argues, limits the distance the PMC Plume can travel, thus precluding its migration to OU-2 Groundwater.

There is no merit to this argument. As demonstrated above, the OU-2 Groundwater contour maps developed by CH2M HILL and Intera, Inc. tell the true story about groundwater flow in the relevant area. Mutch Rebuttal Report Sections 2.1, 2.4. The groundwater data upon which those maps are developed, and thus the maps themselves, capture the permeability of the soils. *Id.* And as indicated above, potentiometric contours prepared by EPA, CH2M HILL, and Intera, overwhelmingly show that flow paths from monitoring wells on or near the PMC Property flow into the OU-2 Groundwater area. *Id.* Sections 2.1, 2.3.

> **3.    The PMC Plume has impacted, and threatens to impact, OU-2 Groundwater.**
>
> **a.    Benzene and other CERCLA hazardous substances have been detected in the soils at the PMC Property and in the groundwater underneath it.**

Benzene, napthalene, 2,4-DIMP, and phenol have been detected in the soils at the PMC Property.[38] Benzene was detected at 7.5 million µg/kg. *See* Cohen Decl., Ex.

---

[38] Benzene, phenols, napthalene, and 2,4-DIMP are CERCLA hazardous substances. *See* 40 C.F.R. § 302.4. They are substances directly related to operations at the PMC facility.

5, at 55-56, 68, 71, 73 (Waterstone Environmental, Inc., Final Environmental Characterization Report, Sept. 30, 2013, at 18-19 & Table 3 at 12, 15, 17). This concentration is an astounding 300,000 times the soil screening level for benzene. *See* Mutch Rebuttal Report, Appendix A, at 7; Mutch Report (Docket No. 903-204), at 3-8 to 3-10. Additionally, in 2012, benzene was detected at the property at nearly 3,000 times the soil screening level at 74,000 μg/kg. *Id.* Napthalene was detected in soils at 1.6 million μg/kg. *Id.*; Cohen Decl., Ex. 5, at 55-56 (Waterstone Environmental, Inc., Final Environmental Characterization Report, Sept. 30, 2013, at 18-19).

Benzene has been detected in groundwater underneath the property. Cohen Decl., Ex. 16, at 194 (Kaman Sciences Corp., Soil and Groundwater Assessment in the Vicinity of Tank T-81, Jun. 1988, at 3-5). Napthalene, 2,4-DIMP, and phenol have also been detected in groundwater at the property. *See* Mutch Rebuttal Report, Fig. 2-18.

### b.    The PMC Plume has migrated into OU-2 Groundwater.

Groundwater sampling data from between 1994 and 1999, and for a limited number of wells until 2004 or 2005, benzene, napthalene, or both, were detected in wells on the PMC Property and also to the west and southwest of the property just inside the OU-2 Groundwater eastern boundary and west of the boundary. Mutch Rebuttal Report, at 2-12 & Fig. 2-18. In other words, benzene and napthalene in groundwater has migrated off the PMC Property and into OU-2 Groundwater. Phenol and 2,4-DIMP have migrated offsite as well, and 2,4-DIMP has been detected just inside OU-2. *Id.* All four of these compounds, therefore, impacted OU-2 Groundwater no later than 2004 and perhaps earlier.[39] *Id.*

---

[39] This data plainly refutes Mr. Vogl's contention that sampling from groundwater monitoring wells on Bloomfield Avenue indicate that groundwater contamination emanating from the PMC Property has not migrated beyond Bloomfield. It has. Benzene, napthalene, and 2,4-DIMP have been detected in groundwater samples from

Mr. Vogl attempts to rebut this by stating that the chemicals detected most often in the highest concentrations (what he calls "marker chemicals") in each plume, namely, the Omega OU-2 Plume and the PMC Plume, are different, and you see very few marker chemicals of one plume in the other. This, he argues, establishes that the two plumes have not commingled or mixed. This is incorrect.

It is misleading to suggest that the contamination in OU-2 Groundwater is limited to just three chemicals: TCE, PCE, and 1,1-DCE, as Mr. Vogl suggests. There are more contaminants in OU-2 Groundwater than simply these three. *See* Mutch Rebuttal Report Section 2.5. EPA used the terms "contaminants of concern" and "contaminants of potential concern" to represent that larger group of hazardous substances, including those found naturally occurring, that are in OU-2 Groundwater at concentrations that exceed their respective screening levels. *See* Opp'n RFJN, Ex. 2, at 31 (CH2M HILL, Remedial Investigation/Feasibility Study Reports, Operable Unit 2, Aug. 2010, at 2-1). Moreover, chemicals that must be addressed by the OU-2 containment remedy include *any* hazardous substance that exceeds protective levels, regardless of whether that hazardous substance appears on a list that EPA included in the 2010 OU-2 Remedial Investigation/Feasibility Study. Opp'n RFJN, Ex. 3, at 55 (OU-2 Consent Decree (Oct. 6, 2016), Appendix B, at 287). Lists of contaminants subject to OU-2 containment remedy can change over time.

### c.    PMC cannot redraw the boundary of OU-2 Groundwater to suit their litigation goals.

PMC takes issues with how the outer boundaries of OU-2 have been drawn.[40] Mr. Vogl complains that the eastern boundary has been drawn too close to the PMC

---

monitoring well MW-12, which is downgradient of Bloomfield. *See* Mutch Rebuttal Report, Fig. 2-18.

[40] PMC also takes issue with how Plaintiffs prepared Exhibit B to its complaint. Mr. Vogl complains that the exhibit depicts the PMC Property as situated much closed to the eastern boundary of OU-2 than it really is. This is a distraction. Although

Property, though he concedes that EPA approved the boundaries.[41] Vogl. Decl., at 11; Opp'n RFJN, Ex. 3, at 52-53 (OU-2 Consent Decree (Oct. 6, 2016), Appendix A, at 273-74). It is obvious why the proximity of the currently drawn boundary would irritate his client, PMC, but Mr. Vogl is not entitled to gerrymander a new eastern boundary that is not supported by the data, which is precisely what he has done. The boundary of OU-2 was ***not*** casually selected by EPA without careful consideration or purpose or without a reasoned basis, as Mr. Vogl appears to think. It was established in EPA's 2011 OU-2 Interim Record of Decision, and that boundary forms the basis for the remedial work required under the March 2017 Consent Order.

Mr. Vogl justifies his revision by arguing that there is insufficient groundwater data to support maintaining the current boundary. *See* Vogl Decl. ¶¶ 16-17. Even if Mr. Vogl is correct, his argument is irrelevant for the purpose of this contribution case. However, Mr. Vogl is wrong for several reasons. First, there is sufficient groundwater data for the area he excised from the eastern plume boundary. *See* Mutch

_____

Plaintiffs stand by their demonstrative, PMC protests too much. The exhibit was prepared simply to provide the Court with a visual representing the area of Operable Unit No. 2 and the general locations of each of the source properties at issue in this case.

[41] This is not the only time Mr. Vogl has disputed a decision that he does not agree with. Regarding whether the PMC Plume has reached OU-2 Groundwater, his employer, Waterstone Environmental Inc., concluded in a 2009 report that the "Omega Plume" and the PMC Plume had both impacted a piece of property located a few hundred feet southwest of the PMC Property. Mr. Vogl did not agree with that conclusion. Cohen Decl., Ex. 9, at 144, 155-157 (R. Vogl Dep. Tr., at 19:5-7; 134:22 to 136:23), Ex. 1, at 7-10 (Waterstone Envtl., Inc., Conceptual site model report (Mar. 11, 2009) at 40-42, Fig. 3). Regarding how far the PMC Plume has migrated offsite, his employer, Waterstone Environmental Inc., concluded in a 2016 report prepared for PMC that the plume had migrated downgradient, to the southwest over 1,400 feet, not the few hundred feet that Mr. Vogl contends is the extent of the plume. Cohen Decl., Ex. 9, at 158-159 (R. Vogl Dep. Tr., at 141:1 to 142:18), Ex. 11, at 175 (Waterstone Environmental, Inc., Workplan for Three Offsite Groundwater Monitoring Wells (Nov. 3, 2016) at 10).

Rebuttal Report, at 2-20 to 2-21. The area includes a number of former wells that were sampled in the 1990s from the Oil Field Reclamation Project Study Area (OFRP), an area that included the PMC Property and a large area to the west of it. Mutch Rebuttal Report at 2-20; Cohen Decl., Exs. 17, at 200, 298-299 (McLaren-Hart, Oil Field Reclamation Project Study Area (Jul. 31, 1996), at v, Fig. 4, Fig. 5), 9, at 153-154 (R. Vogl Dep. Tr., at 100:25 to 101:2). That same data was used by Mr. Vogl's employer, Waterstone Environmental, to support installation of offsite wells for the PMC Property. Mutch Rebuttal Report, at 2-21 (citing Waterstone Environmental, Inc., Workplan for Three Offsite Groundwater Monitoring Wells, Nov. 3, 2016).

Second, Mr. Vogl does not dispute that there is sufficient groundwater data just north of his "Area of NO DATA" or that the OU-2 Groundwater just north of that supposed data dead zone is contaminated. And yet he offers no explanation as to why—even if there had not been a single well in the area of no data, the contaminants in the OU-2 Groundwater would stop migrating through it. *See* Mutch Rebuttal Report, at 2-21.

Third, PMC is essentially asking the Court to redraw the boundaries of OU-2 Groundwater, at least for purposes of determining liability for PMC. Plaintiffs respectfully submit that the Court should decline that request and reject Mr. Vogl's Area of NO DATA theory.

### d.   PMC's suggestion that remediation has been underway for years is inaccurate.

PMC suggests in their motion that they have taken steps to prevent chemicals from leaching into OU-2 Groundwater since operations ceased in the early 1990s. *See, e.g.*, Mot. at 15, 28. Such actions purport to include demolishing the buildings and capping portions of the property with asphalt. *Id*. But razing buildings and laying asphalt is obviously not the same as removing the significant amount of soil

contamination that has been there for decades and remains there today. Mutch Rebuttal Report Section 2.7.

Beginning in 1993 and continuing for years after PMC took the limited actions that Mr. Vogel suggests were sufficient to prevent groundwater contamination, California environmental agencies have continued to be very concerned about groundwater contamination coming from this site.[42] In fact, DTSC has been asking for soil and corrective action since 2005. Yet as of 2021, PMC has not yet remediated the soil contamination, and this soil contamination is the very reason PMC must undertake remediation, so last May, the PMC Defendants submitted a workplan to the California Department of Toxic Substances Control ("DTSC"), the governmental entity with regulatory oversight of the property. *See* Cohen Decl., Ex. 3, at 31-37 (Waterstone Environmental, Inc., Removal Action Workplan (May 22, 2020), at 40-46); Mot. at 14-15. PMC also submitted a remedial design implementation plan late last year, but it has not yet been approved by DTSC. Mot. at 15.

---

[42] In February 1993, for example, the Los Angeles Department of Public Works wrote to the Regional Water Quality Control Board stating: "Based on our previous review, there is significant soil and groundwater contamination at this site." Opp'n RFJN, Ex. _4, at 59_(C. Sjoberg, County of Los Angeles Dept. of Public Works, Letter to H. Kang, Regional Water Quality Control Board, Feb. 8, 1993, at 1). Thereafter, Regional Board continued to request a comprehensive investigation of the full lateral and vertical extent of groundwater contamination from PMC. *See, e.g., id.*, Ex. _ (J. Ross, Regional Water Quality Control Board, Letter to R. Prast, Productol, Inc., April 7, 1998). Then, in August 1998, the Regional Board asked PMC to participate with the Regional Board in a group to address the regional groundwater contamination. *Id.*, Ex. _, at _ (J. Ross, Regional Water Quality Control Board, Letter to R. Prast, Productol, Inc., Aug. 5, 1998, at 1). Finally, in 2005, the DTSC sent a letter to PMC stating that corrective action was required since the groundwater beneath the facility and downgradient of the facility was contaminated with PMC-related compounds. *Id.*, Ex. _, at _ (E. Matthews, DTSC, Letter to M. Miller, PMC Specialties Group, Inc., Nov. 21, 2005, at 1). As of 2021, while PMC has submitted plans for corrective action of contaminated soils, no actual remedial work has yet occurred.

But even if approved, the planned remedy does not address the groundwater contamination that has already left the PMC Property and has, or threatens to, impact OU-2 Groundwater. Cohen Decl., Ex. 3, at 31-37 (Waterstone Environmental, Inc., Removal Action Workplan (May 22, 2020), at 40-46). Instead, the remedy PMC is seeking approval for is focused exclusively upon remediating *soils* at the PMC Property and addressing *onsite* groundwater contamination below the property. *Id.* In the meantime, chemicals remain in the soils at the PMC Property, are being released to groundwater, and are continuing to migrate offsite towards, and into, OU-2 Groundwater.

In other words, PMC's suggestion that "everything is under control at the Property" and "the PMC Plume will never reach OU-2 Groundwater" is simply not accurate. PMC's motion should be denied.[43]

Dated: March 4, 2021                     Lathrop GPM LLP

                                         By:  /s/ Nancy Sher Cohen

                                              Nancy Sher Cohen
                                              Ronald Valenzuela
                                              Attorneys for Plaintiffs
                                              Arconic Inc., et al.

---

[43] Plaintiffs contend that PMC have failed to meet their burden on summary judgment. However, if there is any doubt regarding whether PMC is responsible for contributing to OU-2 Groundwater contamination, an incident in 1981 should dispel that doubt. Plaintiffs recently learned of a spill of hazardous substances that PMC cannot claim did not reach OU-2 Groundwater. On June 22, 1981, a railroad car from PMC carrying an antioxidant fuel additive consisting of 70% alkyl phenols (primarily 6-butyl-2,4, xylenol, 20% 2-4 xylenol and 10% miscellaneous hydrocarbons) spilled over 3,800 gallons of PMC's hazardous substances along the railroad and unpaved railroad track bed. The spill occurred near the corner of Sorensen Ave. and John St., which is unquestionably in OU-2. *See* Opp'n RFJN, Ex. 1, at 8-12 (County of Los Angeles, Dept. of County Engineer, Investigation Report, Jun. 23, 1981). Plaintiffs would, if necessary, seek leave to amend their complaint to allege an "arranger" theory of liability against PMC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28