PETER A. NYQUIST (SBN 180953)
pnyquist@GreenbergGlusker.com
SEDINA L. BANKS (SBN 229193)
sbanks@GreenbergGlusker.com
SHERRY E. JACKMAN (SBN 274030)
sjackman@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:  310.553.3610
Fax:  310.553.0687

ATTORNEYS FOR DEFENDANT UNION PACIFIC
RAILROAD COMPANY
[Additional Counsel Listed on Following Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCONIC INC., et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>APC INVESTMENT CO., et al.,<br><br>                    Defendants. | Case No.  2:14-CV-06456-GW (Ex)<br>Assigned to Honorable George H. Wu<br><br>**JOINT REPLY IN SUPPORT OF MSJS RE: CERCLA LIABILITY BY DEFS. (A) PMC SPECIALTIES GROUP, INC. AND FERRO CORPORATION (PMC PROPERTY)**<br>**(B) UNION PACIFIC RAILROAD COMPANY (CHRYSLER PROPERTY), (C) HALLIBURTON AFFILIATES, LLC.; INTERVENORS FIREMAN'S FUND INSURANCE COMPANY AND FEDERAL INSURANCE COMPANY, AS INSURERS OF PALLEY SUPPLY COMPANY; AND KEKROPIA, INC. (PATSOURAS PROPERTY)**<br><br>[Joint Response to Plaintiffs' Statement of Genuine Disputes; Declarations; Requests for Judicial Notice; and Requests for Evidentiary Rulings filed concurrently] |

| | |
|---|---|
| | **Date:** May 17, 2021 |
| | **Time:** 8:30 a.m. |
| | **Judge:** The Honorable George Wu |
| | **Place:** Courtroom 9D, 9th Floor |

AND RELATED CROSS
ACTIONS, COUNTERCLAIMS
AND THIRD-PARTY
COMPLAINTS

Additional Counsel

WILLIAM D. WICK (SBN 063462)
bwick@ww-envlaw.com
ANNA L. NGUYEN (SBN 226829)
anguyen@ww-envlaw.com
WACTOR & WICK LLP
3640 Grand Avenue, Suite 200
Oakland CA 94610-2023
Telephone: (510) 465-5750
ATTORNEYS FOR DEFENDANT HALLIBURTON AFFILIATES, LLC

EARL L. HAGSTRÖM, ESQ. (SBN 150958)
ehagstrom@behblaw.com
DANIEL E. TROWBRIDGE, ESQ. (SBN 301301)
dtrowbridge@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:  (415) 397-9006
Facsimile:   (415) 397-1339
ATTORNEYS FOR DEFENDANT PMC SPECIALTIES GROUP, INC. AND
FERRO CORPORATION

FARHEENA HABIB, ESQ. (SBN 243405)
fhabib@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:  (415) 397-9006
Facsimile:   (415) 397-1339
ATTORNEYS FOR INTERVENERS FIREMAN'S FUND INSURANCE
COMPANY AND FEDERAL INSURANCE COMPANY, AS INSURERS FOR
PALLEY SUPPLY COMPANY

VICTOR J. OTTEN (SBN 165800)
vic@ottenlawpc.com
OTTEN LAW, PC
5857 Pine Avenue, Suite B
Chino Hills, CA 91709
Telephone:   (310) 378-8533
Facsimile:   (310) 347-4225
ATTORNEYS FOR DEFENDANT KEKROPIA, INC.

**JOINT COMMON ISSUES REPLY IN SUPPORT OF MOVING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION ........................................................................... 2

II.  SUMMARY JUDGMENT STANDARD ...................................... 5

III. LEGAL ARGUMENT ................................................................. 6

    A.   PLAINTIFFS MUST PROVE MORE THAN A "PLAUSIBLE
        MIGRATION PATHWAY" TO ESTABLISH MOVING
        DEFENDANTS' LIABILITY FOR IMPACTS TO OU-2
        GROUNDWATER ............................................................... 6

    B.   PLAINTIFFS IMPROPERLY SEEK TO ESTABLISH IN THIS
        PHASE OF THE LITIGATION COMMON LIABILITY AGAINST
        MOVING DEFENDANTS FOR RESPONSE COSTS ................... 10

    C.   COMMON LIABILITY FOR PLAINTIFFS' RESPONSE COSTS
        CANNOT EXIST AS A MATTER OF LAW, ENTITLING MOVING
        DEFENDANTS TO SUMMARY JUDGMENT ............................. 12

IV.  CONCLUSION .......................................................................... 13

**PMC PROPERTY DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

I.  PMC SUMMARY OF THE ARGUMENT ................................................. 15

II.  APPLICABLE LEGAL STANDARD AND COMMON FACTS ............. 20

    A.  LEGAL STANDARD .......................................................................... 20

    B.  COMMON AND PMC PROPERTY SPECIFIC FACTS ................. 20

III.  ARGUMENT ............................................................................................ 20

    A.  PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROOF .... 20

    B.  PLAINTIFFS' EXPERT REBUTTAL REPORT SUPPORTS PMC'S
        POSITION THAT CONTAMINANTS FROM THE PMC
        PROPERTY HAVE NOT REACHED THE OU-2 PLUME ............ 22

        1.  Benzene ..................................................................................... 23

        2.  Naphthalene, Phenol and 2, 4 Dimethylphenol ....................... 24

IV.  CONCLUSION ........................................................................................ 25

**CHRYSLER PROPERTY DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ........................................................................ 28

II.   ARGUMENT ............................................................................. 30

    A.   UNION PACIFIC IS NOT WITHIN THE CLASSES OF PERSONS LIABLE UNDER CERCLA ................................................. 30

    B.   BECAUSE PLAINTIFFS ARE SEEKING RESPONSE COSTS FOR IMPACTS TO OU-2 GROUNDWATER, THEY MUST PROVE THAT DISPOSALS AND RELEASES OF HAZARDOUS SUBSTANCES IMPACTED OU-2 GROUNDWATER ................. 33

    C.   THE ALLEGED VIOLATIONS CITED BY PLAINTIFFS ARE NOT EVIDENCE OF CERCLA "DISPOSALS" SUFFICIENT TO ESTABLISH UNION PACIFIC'S LIABILITY ............................... 34

        1.   "Disposal" is a CERCLA defined term requiring discharges of "hazardous substances" to the "environment" ........................ 34

        2.   None of the alleged violations concern releases or disposals to surface land or OU-2 groundwater .......................................... 35

        3.   There is no soil or groundwater data to corroborate that disposals or releases of hexavalent chromium ever occurred on the Chrysler Property, let alone during Union Pacific's ownership .............................................................................. 37

    D.   PLAINTIFFS DO NOT RAISE A QUESTION OF MATERIAL FACT REGARDING UNION PACIFIC'S ALLEGED LIABILITY FOR RELEASES OR DISPOSALS FROM THE CHRYSLER CLARIFIER ........................................................................ 38

1. Plaintiffs have no evidence that Union Pacific owned the Chrysler Property at the time of a release from the Chrysler Clarifier or any other clarifier ................................................... 38

2. The evidence indisputably refutes Plaintiffs' assertion that the Chrysler Clarifier was installed when Union Pacific owned the Chrysler Property .................................................................... 40

   a. Environmental investigative reports and Plaintiffs' prior discovery responses state that the Chrysler Clarifier was a 750-gallon clarifier ........................................................ 40

   b. Environmental investigative reports and Mr. Mutch's reports identify the Chrysler Clarifier in the L-Shaped addition to the Body Works Building ........................... 42

   c. The October 16, 1973 officially-approved site plans do not depict the 1200 Gallon Clarifier.............................. 44

3. Mr. Mutch's Reports Do Not Rebut and Actually Lend Support to Mr. Ruiz's Expert Opinions ................................................. 46

III.   CONCLUSION ............................................................................ 47

**PATSOURAS PROPERTY DEFENDANTS'**
**REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION.................................................................................48

II.    SOIL CONTAMINANTS ON THE PROPERTY ......................................49

    A.     SOME CONTAMINANTS WERE FOUND IN SOIL ....................49

    B.     CONTAMINANTS IN SOIL GAS CAME FROM THE OMEGA
        PLUME, NOT THE PROPERTY......................................................51

III.   THE GROUNDWATER DATA SHOW NO CONTRIBUTION OF
    CONTAMINANTS FROM PATSOURAS PROPERTY SOIL..................53

    A.     THERE IS NO DATA SHOWING THAT ANY SOIL
        CONTAMINANTS CONTACTED THE WATER TABLE ............54

        1.     Soil Samples Above ESLs Do Not Mean that Contaminants in
              Soil Impacted Groundwater.......................................................54

        2.     Chromium Detected in a Two-Foot-Deep Sample Did Not
              Contact Groundwater..................................................................54

        3.     Two Borings with PCE Detections Do Not Show that PCE
              Contacted Groundwater.............................................................56

        4.     The Conjecture of Some Fire Department Employees (20 Years
              Before the Property Investigation Was Completed) Was Based
              on an Erroneous Reading of the Data.......................................58

    B.     THE DATA SHOW CONSISTENTLY HIGHER
        CONCENTRATIONS OF CONTAMINANTS COMING ONTO THE
        PROPERTY FROM UPGRADIENT PROPERTIES THAN ON THE
        PROPERTY .....................................................................................59

        1.     Plaintiffs' Expert Admits that Assessing What Is Flowing Onto
              a Property from Upgradient Properties Is Required, But Fails to
              Do So Here ...................................................................................60

2.    The Pilot Chemical Property Is Upgradient of the Patsouras Property.......................................................................60

a.    EAI Determined the Groundwater in the Property Area Flowed in a Westerly Direction ....................................61

b.    Dr. Kulla Agreed that Pilot Chemical Wells 5,6,7 and 8 Were Upgradient of the Patsouras Property Wells .......62

c.    Pilot Chemical's Consultant Determined that the Pilot Property Is Upgradient of the Patsouras Property.........62

IV.    PLAINTIFFS FAIL TO MEET THEIR BURDEN ....................................65

A.    PLAINTIFFS FAIL TO PROVIDE ADMISSIBLE EVIDENCE THAT PATSOURAS PROPERTY CONTAMINANTS HAVE MIGRATED INTO THE GROUNDWATER..................................65

B.    PLAINTIFFS FAIL TO MEET THEIR BURDEN REGARDLESS OF THE LEGAL STANDARD APPLIED .............................................66

V.    CONCLUSION .............................................................................67

# TABLE OF AUTHORITIES

**Page**

CASES

*ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,
    120 F.3d 351 (2d Cir. 1997)..................................................................31, 33, 36

*Acushnet Co. v. Coaters Inc.*,
    937 F.Supp. 988 (D.Mass.1996) ........................................................................9

*Amoco Oil Co. v. Borden, Inc.*,
    889 F.2d 664 (5th Cir.1989)...............................................................................9

*Asarco, LLC v. Cemex, Inc.*,
    21 F.Supp.3d 784 (W.D. Texas 2014) ..............................................................67

*Bland v. Norfolk & Southern R.R. Co.*,
    406 F.2d 863 (4th Cir.1969)...............................................................................5

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
    270 F.3d 863 (9th Cir.2001)........................................................................31, 36

*Castaic Lake Water Agency v. Whittaker Corp.*,
    272 F.Supp.2d 1053 (C.D. Cal. 2003) .......................................................passim

*Cleveland v. Policy Mgmt. Sys. Corp.*,
    526 U.S. 795 (1999)..........................................................................................38

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
    972 F.2d 453 (1st Cir.1992) ...............................................................................9

*Estate of Goldberg v. Goss-Jewett Co., Inc.*,
    2020 WL 4390385 (C.D. Cal. July 14, 2020) ..................................................38

*Ferguson v. Arcata Redwood Co., LLC*,
    2005 WL 1869445 (N.D. Cal. 2005).........................................................passim

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir 2009)...............................................................................5

*Great Am. Ins. Co. v. Evans*,
    269 F. Supp. 151 (N.D. Cal. 1967) ...............................................................4, 11

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
    629 F. Supp. 2d 175 (D. Conn. 2009) .............................................................6, 8

*Ironwood Homes, Inc. v. Bowen*,
    719 F. Supp. 2d 1277 (D. Or. 2010) ..............................................................4, 11

*J & J Sports Productions, Inc. v. Rivera*,
    No. 6:13-CV-01996-AA, 2014 WL 2809844 (D. Or. June 18, 2014) ...................11

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*,
   171 F.3d 1065 (6th Cir.1999)..................................................................8

4

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .............................................................................5

5

6

*Orr v. Bank of Am.*,
   285 F.3d 764 (9th Cir.2002)...............................................................38

7

*Solutia, Inc. v. McWane, Inc.*,
   2012 WL 2031350 (N.D. Ala. June 1, 2012) ................................7, 8

8

9

*Thomas v. FAG Bearings*,
   846 F. Supp. 1382 (W.D. Mo. 1994) ...............................................8, 67

10

*Thornhill's Publ'g Co., Inc. v. GTE Corp.*,
   594 F.2d 730 (9th Cir. 1979)..........................................................5, 37

11

12

*Triton Energy Corp. v. Square D Co.*,
   68 F.3d 1216 (9th Cir. 1995)..............................................................36

13

*United Steelworkers v. Phelps Dodge Corp.*,
   865 F.2d 1539 (9th Cir. 1989)............................................................40

14

15

*Voggenthaler v. Md. Square LLC*,
   724 F.3d 1050 (9th Cir. 2013).......................................................34, 35

16

*White v. County of Newberry*,
   985 F.2d 168 (4th Cir.1993)................................................................9

17

18

**STATUTES**

19

42 U.S.C. § 6903(3) ...........................................................................30, 34

20

42 U.S.C. § 9601(8) ...............................................................................34

21

42 U.S.C. § 9601(29) .....................................................................29, 30, 34

22

42 U.S.C. § 9601(40) ...............................................................................50

23

42 U.S.C. § 9607(a) ........................................................................8, 10, 28

24

42 U.S.C. § 9607(a)(2)...........................................................................30, 32

25

42 U.S.C. § 9607(a)(4)...............................................................................8

26

42 U.S.C. § 9613(f)(1) ...........................................................................2, 4

27

42 U.S.C. § 9613(g)(2)...............................................................................2

28

MOVING DEFENDANTS'
JOINT REPLY ISO OF MSJS

# TABLE OF AUTHORITIES
## (continued)

**Page**

**OTHER AUTHORITIES**

53 Fed. Reg. 5298, 5301 (Feb. 23, 1988)..............................................................49

Fed. R. Civ. P. 56............................................................................................5

Fed. R. Civ. P. 56(c)(1)(a)...............................................................................42

Fed. R. Civ. P. 56(e).......................................................................................5

Fed. R. Evid. 801(c).......................................................................................38

1    **JOINT COMMON ISSUES REPLY IN SUPPORT OF MOVING**

2    **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.   **INTRODUCTION**

In their Opposition, Plaintiffs assert: "Defendants incorrectly argue that Plaintiffs must establish that the hazardous substances released from Defendants' properties actually ended up in OU-2 Groundwater." (Dkt. 950-1, at 5:10-12). However, this directly contradicts Plaintiffs' position – expressed throughout the course of this action – as to what is required to establish Defendants' liability under CERCLA and, in particular, during this phase of the proceedings.

Plaintiffs have consistently acknowledged that to prevail against Defendants on their claims for contribution and declaratory relief under CERCLA sections 9613(f)(1) and 113(g)(2) (42 U.S.C. § 9613(f)(1) and 42 U.S.C. § 9613(g)(2)), they must prove Defendants' responsibility for releases of hazardous substances that have impacted OU-2 groundwater. For example, Plaintiffs' Fifth Amended Complaint alleges that "Defendants are responsible for releases of hazardous substances to the OU-2 Facility groundwater and therefore should bear the costs to clean up the resulting contamination." (Dkt. 526, ¶ 9).

Moreover, Plaintiffs have acknowledged that in this phase of the litigation the same showing is essential to defeat Defendants' Motions (or to prevail on their own motion).  In Joint Status Conference Reports filed in April-May 2017, Plaintiffs reiterated: (i) "the fundamental fact that is essential to the question of [Defendants'] liability, namely, that releases of hazardous substances from their respective properties have impacted OU2" (Dkt. 600, pp. 7-8); (ii) "[t]he entire purpose for the phasing of this case is to ensure that only those Parties that are responsible for the OU2 regional groundwater contamination advance to a later phase" (Dkt. 602, p. 3); and (iii) "whether hazardous substance releases from Defendants' respective source properties have contaminated regional groundwater in impacted OU2…**should be litigated during the current phase**." (Dkt. 615, n. 2.)(emphasis added).  Most recently, Plaintiffs' affirmative Motion for Summary Judgment once again conceded that "Plaintiffs seek a judicial determination on …

whether there has been a **release or threatened release** of hazardous substances from the soils at each Defendant's Source Property ["Properties"] **into OU-2 Groundwater**." (Dkt. 903-1, 3:19-24)(emphasis in original).[1]

As noted, Plaintiffs' claims against the Moving Defendants under CERCLA derive from allegations that "the hazardous substances present in the soil at [the Properties] have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater." (Dkt. 526, ¶ 355). On that basis, Plaintiffs seek recovery of costs "to address the contamination contributed to the OU-2 Facility by Defendants." (*Id.*, ¶ 404). As such, Plaintiffs have acknowledged, under the unique procedural circumstances of this case, that merely showing threatened or actual releases of hazardous substances into the <u>soil</u> on any of the Properties cannot be a sufficient basis to establish liability. Simply stated, Plaintiffs have never incurred (and will never incur) response costs to address or remediate soil contamination at any of the Properties, since these Properties have been or are being remediated under regulatory oversight. Instead, Plaintiffs must prove their allegation that "hazardous substances present in the soil" at the Properties during the Moving Defendants' ownership or operation of the Properties "have migrated and continue to migrate downward" <u>into OU-2 groundwater</u>.

The "Omega Plume" – the approximately 4.5-mile contaminant plume in groundwater emanating from the former Omega Chemical facility "that badly mishandled the chemicals its thousands of customers, like Plaintiffs, sent there…"

---

[1] This is also entirely consistent with the substance and purpose of the various "STIPULATION[S] OF UNDISPUTED FACTS RE LIABILITY UNDER CERCLA SECTION 113, 42 U.S.C. § 9613" entered into between Plaintiffs and various non-moving Defendants who sought to bypass this summary judgment phase of the proceedings. *See, e.g.,* Dkt. 678. Therein, non-moving Defendants stipulated that hazardous substances from their respective "Source Property" were "spilled, leaked, emptied, escaped, leached, poured, or were emitted, injected, discharged, dumped or disposed, into the soil at the … Source Property and into OU2 [groundwater]." *Id.,* ¶ 9.

(Plaintiffs' Brief on Common Issues, Dkt. 903-1, 1:24-28) – was designated by the United States Environmental Protection Agency ("EPA") as within the boundaries of "Operable Unit 2," or "OU-2."[2]  Faced with overwhelming culpability for the impacts to, and responsibility for funding cleanup of, the Omega Chemical Superfund Site (which includes OU-2 groundwater), Plaintiffs now seek to move the proverbial goal posts by trying to improperly redefine what is at issue in this phase of the litigation, as well as the applicable liability standards under CERCLA.

However, to be entitled to contribution under CERCLA section 113(f)(1), Plaintiffs must prove a common liability for the same harm.[3]  There can be no common liability and, correspondingly, no contribution remedy between any of the parties – including Plaintiffs against Moving Defendants – without commingling of contaminants from their respective sites in OU-2 groundwater and the Omega Plume.  (*See also* Opposing Defendants Joint Opposition Brief, Section III.A, Dkt. 930 at 3:9-6:15.)  By definition, this requires Plaintiffs to prove – at a minimum – that releases of hazardous substances from Moving Defendants' Properties have actually impaired OU-2 groundwater.[4]

Despite Plaintiffs' arguments, they fail to proffer any admissible evidence sufficient to make this showing or create a triable issue of fact. Therefore, Moving Defendants seek summary judgment, or alternatively partial summary judgment, on the grounds that they have no liability for contribution or declaratory relief under

---

[2] Final Remediation Investigation/Feasibility Study Reports, Omega Chemical Corporation Superfund Site, Operable Unit 2, Los Angeles County, California, Volume 1, CH2M HILL, Aug. 2010, § 8.1.2, p. 8-4; Declaration of Robert B. Martin III ("Martin Dec."), Exhibit 1 (Dkt. 930-1.)

[3] *Ironwood Homes, Inc. v. Bowen,* 719 F. Supp. 2d 1277, 1293 (D. Or. 2010); *see also Great Am. Ins. Co. v. Evans*, 269 F. Supp. 151, 154 (N.D. Cal. 1967) ("The right of contribution, where it exists, presupposes a common liability which is shared by the joint tortfeasors on a pro-rata basis.")

[4] Note, however, that Plaintiffs are not entitled to address whether there has been any commingling of alleged contaminant releases from each Moving Defendant's property with the Omega Plume, that in turn may have caused the incurrence of response costs. This issue is beyond the scope of this phase of the litigation.  (*See also,* Dkt. 930 at 5:5-6:15.)

CERCLA section 9613, since there is no evidence that Moving Defendants are responsible for any hazardous substances that have impacted OU-2 groundwater, let alone commingled with the Omega Plume.

## II.    SUMMARY JUDGMENT STANDARD

Moving Defendants set forth the applicable standard for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in Section II.A of its Joint Motion. (Dkt. 902.) Notably, summary judgment serves the important purpose of "conserv[ing] judicial time and energy by avoiding unnecessary trial and by providing a speedy and efficient summary disposition" of litigation in which the plaintiff fails to make some minimal showing that the defendant may be liable on the claims alleged. *Bland v. Norfolk & Southern R.R. Co.,* 406 F.2d 863, 866 (4th Cir.1969). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *See FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir 2009).  In addition, the evidence presented by the opposing party must be admissible. *See* Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Thornhill's Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

Here, Plaintiffs have the burden to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Plaintiffs have not met this burden.

Accordingly, summary judgment or, in the alternative, partial summary judgment should be granted in favor of the Moving Defendants on Plaintiffs' CERCLA claims in the Fifth Amended Complaint because the Plaintiffs cannot establish that Moving Defendants are CERCLA potentially responsible parties

and/or that releases of hazardous substances from Moving Defendants' Properties impacted OU-2, let alone commingled with contaminants in the Omega Plume, for which Plaintiffs allege they have incurred response costs.

## III.   LEGAL ARGUMENT

### A.   PLAINTIFFS MUST PROVE MORE THAN A "PLAUSIBLE MIGRATION PATHWAY" TO ESTABLISH MOVING DEFENDANTS' LIABILITY FOR IMPACTS TO OU-2 GROUNDWATER

Plaintiffs acknowledge this is a "two-site" case, "where the release or threatened release of a hazardous substance occurs at one location and the plaintiff incurs response costs at another." (Plaintiffs' Common Issues Brief, Dkt. 903-1 at 11:21-25.) As the Ninth Circuit has not yet established the standard of proof to be applied in two-site CERCLA cases, Plaintiffs rely on *Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053 (C.D. Cal. 2003), as the appropriate framework to evaluate Moving Defendants' alleged liability under CERCLA. However, the minimal causal nexus set forth in *Castaic* does not apply either in this phase of the litigation or, more generally, to the factual circumstances presented by this case.

First, *Castaic*'s "plausible migration pathway" discussion referred to the "causation" element of CERCLA liability which, as noted above, is not at issue in this phase of the litigation – i.e., whether or not a release of hazardous substances from a Moving Defendant's facility caused Plaintiffs to incur response costs.[5] *Castaic*, 272 F. Supp. 2d at 1062. However, as explained below, many courts "recognize that a plaintiff must provide some evidence linking its response costs to the … off-site release of contaminants." *Innis Arden Golf Club v. Pitney Bowes, Inc.,* 629 F. Supp. 2d 175, 185-87 (D. Conn. 2009)(granting defendant's motion for summary judgment.) Here, this means Plaintiffs must at least establish the off-site

---

[5] This issue of causation is part of the "Deferred Element" (*see infra,* Section III.B) that will be addressed in a subsequent phase of this litigation.

release of contaminants from soil at Moving Defendants' Properties to OU-2 groundwater.

Second, unlike the situation in *Castaic*, here, Plaintiffs are the responsible parties for the overwhelmingly primary, <u>upgradient</u> source of groundwater contamination. In fact, the case the *Castaic* court found "most instructive" illustrates why:

> "The plaintiff must prove only that contaminants which were once in the custody of the defendant <u>could have travelled onto the plaintiff's land</u>, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) <u>on plaintiff's land</u> <u>caused the plaintiff to incur response costs</u>."

*Id.* at 1065, quoting *Western Assocs. Ltd. Pshp. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 681 (4th Cir. 1995)(emphasis added, citations omitted).[6]

Instead, a CERCLA "two-site" case – or, more accurately, a "multi-site" case, such as here – is one in which the plaintiff "contends not that the defendant directly dumped or otherwise disposed of its wastes at the site but rather that hazardous materials migrated there from the defendant's facility or from a different dumpsite elsewhere." *Solutia, Inc. v. McWane, Inc.*, 2012 WL 2031350, at *8 (N.D. Ala. June 1, 2012). In multi-site cases, because "it may be 'much less obvious how [a defendant] could be responsible for contamination of the [site where the plaintiff has incurred response costs],'" courts have required plaintiffs to

---

[6] Plaintiffs cannot allege that hazardous substances from Moving Defendants' properties migrated in groundwater <u>upgradient towards the Omega property</u>, nor do they allege that hazardous substances from Moving Defendants' properties migrated in groundwater <u>to any downgradient facility</u> that Plaintiffs own or operate. Plaintiffs solely allege that Moving Defendants caused releases of hazardous substances to soil, which in turn impacted OU-2 groundwater. In addition, while Plaintiffs allege that OU-2 groundwater is a CERCLA "facility," the *Castaic* court held otherwise. The defendant in *Castaic* brought counterclaims against the downgradient plaintiffs as potentially responsible parties on the basis that the contaminated groundwater in the area was a CERCLA "facility." The court disagreed: "Groundwater is neither a 'site' nor an 'area,' at least as those terms are commonly understood."[6] The court ruled that to characterize the groundwater as a facility "stretches the definition beyond reason and common sense." *Id.*

prove that a release for which the defendant is responsible at one site (here, the soil on each Moving Defendant's property) caused the contamination of the second site (here, the Omega Plume). *Id.*

Many other decisions are in accord with this causal approach. For example, as previously noted the Sixth Circuit held that "[i]n a "two-site" [or multi-site] case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, the <u>plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up</u>.[7] *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065, 1068 (6th Cir.1999)(emphasis added)(granting defendants' motion for summary judgment based on lack of causal connection between defendant's alleged release of hazardous substances and plaintiff's response costs); *see also Innis Arden Golf Club,* 629 F. Supp. 2d at 185-87 (D. Conn. 2009).

Importantly, in granting summary judgment on the grounds the opposing party "cannot produce more than a scintilla of evidence at this time," the court in *Thomas v. FAG Bearings,* 846 F. Supp. 1382, 1386-87, 1399 (W.D. Mo. 1994) observed:

> "[u]se of the strict liability presumption ... without modification would hold liable anyone who released the same type of substance that has contaminated another site. A party who discovers TCE groundwater contamination in Missouri could successfully sue every party who released TCE in the entire country. Although CERCLA's liability provisions are far-reaching, there is no indication that Congress intended this absurd result."

*Id.*, 846 F. Supp. at 1386–87 (citations and footnote omitted); *see also Innis,* 629 F.

---

[7] Further support for this principle is found in the plain text of CERCLA section 107, which provides in part that liability attaches based on a "release, or a threatened release which causes the incurrence of response costs." 42 U.S.C. § 9607(a)(4).

Supp. 2d at 185-86. Along similar lines, in *Acushnet Co. v. Coaters Inc.,* 937 F.Supp. 988 (D.Mass.1996), the district court rejected the notion that a plaintiff in a multi-site case need not prove causation:

> "Under Plaintiffs' legal theory, as long as any response costs are being incurred by a plaintiff, any party that disposed of any hazardous substance is liable to compensate that plaintiff. It does not matter what type or amount of hazardous substance was disposed of by the party. Any hazardous substance in any quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party is not causing any harm, is not threatening to cause any harm, and is not any part of the reason a response is needed and costs of that response are incurred.... Plaintiffs' theory is not supported by statute, by precedent, or on policy grounds consistent with statutes and precedents.

*Id.* at 993.[8]

In other words, in a multi-site CERCLA case, a plaintiff seeking contribution must prove that a hazardous substance released from a defendant's facility caused plaintiff to incur response costs. This is entirely consistent with the notion that, at this stage of the proceedings, to sustain their CERCLA claims against Moving Defendants, Plaintiffs must prove that hazardous substance releases from Moving Defendants' Properties migrated from soil and actually impacted OU-2

---

[8] Other courts confronted with an issue of causation as framed in this manner similarly recognize that a plaintiff must provide some evidence linking its response costs to the off-site release of contaminants. *See, e.g., White v. County of Newberry,* 985 F.2d 168, 174–75 (4th Cir.1993) (requiring plaintiffs to prove release or threatened release of hazardous substance that caused incurrence of response costs); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 459–60 & n.3 (1st Cir.1992)(affirming district court's focus "on whether [defendant] somehow, or in some way, caused [plaintiff] to incur response costs" and noting that "without an affirmative finding of fact causally connecting these costs to a threat posed by [defendant], [plaintiff's CERCLA] claim is necessarily stillborn"); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 670 (5th Cir.1989) ("the question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions.").

groundwater.[9] Plaintiffs have presented no such evidence, let alone evidence that any alleged releases of hazardous substances from any Moving Defendant's property have commingled with the Omega Plume. In the absence of such evidence, Moving Defendants are entitled to summary judgment.

### B. PLAINTIFFS IMPROPERLY SEEK TO ESTABLISH IN THIS PHASE OF THE LITIGATION COMMON LIABILITY AGAINST MOVING DEFENDANTS FOR RESPONSE COSTS

In 2017, the parties agreed to segregate this litigation into phases. Specifically, the parties agreed this phase would be limited to whether: (1) each Moving Defendant's property is a "facility," (2) there was a release or threatened release of hazardous substances at or from each Moving Defendant's property into any part of OU-2 (as opposed to commingling with the Omega Plume), and (3) each Moving Defendant falls within one of four classes of "persons" subject to liability under CERCLA, 42 U.S.C. Section 9607(a).[10]

The parties agreed to defer to a later phase "whether the release or threatened release caused Plaintiffs to incur response costs that were necessary and consistent with the National Contingency Plan" ("Deferred Element"), at which point Plaintiffs would necessarily have to prove that each Moving Defendant's contaminants that reached OU-2 commingled with the Omega Plume.

This conclusion follows from the legal requirement that to be entitled to contribution pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1),

---

[9] As indicated earlier, Union Pacific's principal case for summary judgment as to the Chrysler Property is slightly different from the other Moving Defendants. Union Pacific maintains that Plaintiffs cannot establish Union Pacific is a CERCLA liable party because the only plausible source of OU-2 groundwater contamination from the Chrysler Property was a clarifier installed after Union Pacific sold the Chrysler Property.

[10] *See* Parties' Joint Status Conference Report filed on April 21, 2017 (Dkt. 600), the Parties' Supplemental Joint Status Conference Report filed on April 26, 2017 (Dkt. 602), and the Parties' Joint Status Conference Report filed on May 22, 2017 (Dkt. 615).

Plaintiffs must prove a common liability for the same harm.[11]  Put another way, there are multiple sites or multiple harms in the OU-2 area, each subject to site-specific cleanup requirements under regulatory oversight (in fact each of the Moving Defendants' properties has either been or is currently subject to a State-approved cleanup plan).  As among all of these sites there is no common liability and, correspondingly, no contribution remedy between Plaintiffs and any of the Defendants unless contaminants from a Defendant's property has commingled with the Omega Plume.  *See J & J Sports Productions, Inc. v. Rivera*, No. 6:13-CV-01996-AA, 2014 WL 2809844, at *6 (D. Or. June 18, 2014) ("As such, "[a] party seeking contribution must prove it has a 'common liability' with the party from whom the contribution is sought…. Because common liability is lacking … motion [for summary judgment] is granted as to … [the] contribution claim"); *Ironwood Homes, Inc. v. Bowen,* 719 F. Supp. 2d 1277, 1293 (D. Or. 2010)(party seeking contribution must prove it has "common liability" with party from whom contribution is sought); *Great Am. Ins. Co. v. Evans*, 269 F. Supp. 151, 154 (N.D. Cal. 1967) ("The right of contribution, where it exists, presupposes a common liability which is shared by the joint tortfeasors on a pro-rata basis").

As addressed in Moving Defendants' Joint Motions (Dkt. 902), Plaintiffs cannot prove that hazardous substances released to soil (for which a Moving Defendant is responsible), if any, at Moving Defendants' Properties actually impacted OU-2 groundwater.  Beyond this, Plaintiffs have not submitted any evidence that hazardous substances released from any Moving Defendant's property have commingled with the Omega Plume (the contaminant plume originating from the Omega Chemical facility).  Additionally, as to the Deferred

---

[11] Restatement Third § 23(a); *Ironwood Homes, Inc. v. Bowen,* 719 F. Supp. 2d 1277, 1293 (D. Or. 2010); *see also Great Am. Ins. Co. v. Evans*, 269 F. Supp. 151, 154 (N.D. Cal. 1967) ("The right of contribution, where it exists, presupposes a common liability which is shared by the joint tortfeasors on a pro-rata basis.").

Element, Plaintiffs have yet to prove the incurrence of response costs to address any alleged commingling of any release of contaminants from Moving Defendants' Properties into OU-2 groundwater that mixed with the Omega Plume.[12] In short, Plaintiffs cannot establish as a matter of law that common liability exists under CERCLA as against Moving Defendants for any OU-2 response costs they have incurred or may incur in the future.

## C.   COMMON LIABILITY FOR PLAINTIFFS' RESPONSE COSTS CANNOT EXIST AS A MATTER OF LAW, ENTITLING MOVING DEFENDANTS TO SUMMARY JUDGMENT

Plaintiffs rely on the expert opinions of Robert Mutch. (Dkts. 903-204 ("Mutch Report") and 950-1, Section II.B.)  However, Mr. Mutch admits he made no attempt to address the potential commingling of hazardous substances that reached OU-2 groundwater and allegedly originated from any Moving Defendant's property with the Omega Plume. (*See generally* Dkt. 930, Section III.C.)  By his own admissions, this means the absence of commingling of any contaminant releases from the Moving Defendants' properties with the Omega Plume. In fact, according to Mr. Mutch, he didn't "particularly care, honestly, whether those upgradient constituents at a particular property came from the Omega site …"[13]

While not directly at issue during this phase of the litigation, based on Mr. Mutch's admissions, Plaintiffs lack sufficient evidence to establish <u>any</u> "pathway" necessary to demonstrate common liability for response costs. Therefore, even if common liability for response costs were at issue in this phase of the litigation, Moving Defendants' motions should be granted because Plaintiffs have presented no evidence that hazardous substances that may have been released from Moving Defendants' Properties have commingled with hazardous substances originating from the Omega Property, namely the Omega Plume.

---

[12] As noted above, this determination is not yet at issue in this phase of the case.
[13] Mutch Depo. at 64:4-9, Martin Dec., Ex. 2 (Dkt. 930-1).

IV.   **<u>CONCLUSION</u>**

Based on the foregoing, Moving Defendants respectfully seek the granting of summary judgment, or alternatively partial summary judgment, in their favor on the grounds that they have no liability for contribution or declaratory relief under CERCLA section 9613.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PMC PROPERTY DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.   PMC SUMMARY OF THE ARGUMENT

Groundwater flow direction and the transport of contamination in groundwater are not the same.  Mr. Mutch, Plaintiffs' expert, spends countless pages in his rebuttal report trying to conflate the two.  However, when deposed he concedes as he must, that the modeling and mapping of groundwater flow direction by drawing groundwater flow arrows "is not akin to contaminant transport" from Point A to Point B.  Declaration of Earl Hagström in Support of Moving Defendants Reply in Support of Moving Defendants Motion for Summary Judgment re CERCLA Liability ("Hagström Reply Decl.") ¶ 3, Exh. G, Mutch Depo VII, p. 825:3-6.  "It's just the how it is (sic) the groundwater flows.  *Id.*  The groundwater modeling relied upon by Mr. Mutch does not take into account the "diffusion, biodegradation, retardation and other factors" that "you include" in "contaminant transport modeling".  *Id.*  Those models only simulate groundwater flow direction not contaminant transport. Flow lines are just flow lines.  *Id.* at pp. 838:25; 839:1-16.

Plaintiffs' case rises and falls on their ability to prove that contaminants, not just groundwater, were transported from Point A, the PMC Property, to Point B, the OU-2 Plume. The burden to do so is Plaintiffs.[1]  Even under the most liberal standard Plaintiffs have not met their burden.  Knowing this to be true Mr. Mutch speculates that if Plaintiffs were to install an unspecified number of wells, to an unknown depth, with unknown pumping capacities and unknown capture zones, these hypothetical wells "threaten" to pull contamination from the PMC Property into OU-2.  *Id.* at 877:24-25; 878:1-14; 834: 9-25; 835:1-5.  Speculation piled upon

---

[1]  On summary judgment, the defense burden is triggered if plaintiff: (a) identifies [a] contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and *(c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. Castaic Lake,* 272 F. Supp. 2d at 1066.

speculation only serves to underscore the fallacy of Plaintiffs' claims, not bolster them.

Plaintiffs urge the Court to apply the liberal burden shifting "plausible pathway" standard here. At a minimum, to shift the burden from Plaintiffs to PMC Plaintiffs must first prove a "plausible pathway" exists. Plaintiffs have neither shown a plausible pathway exists for contaminants to be transported from the PMC Property to OU-2 exists now nor that a realistic threat exists that they will be transported in the future. Groundwater flow direction, the foundation of Plaintiffs Opposition, alone is not enough.

When questioned on the source of contaminants Mr. Mutch plotted on Figure 2-18 (*Id.* ¶ 4, Ex. H[2], Relevant Figures from Mutch Rebuttal Report) he admits that he has not done the "careful analysis" [to determine the contaminant source], which would include "field work" … additional drilling, well construction, soil sampling, and I think certain forensic technologies, certainly chemical fingerprinting, probably compound specific isotope analysis, what we call CSIA analysis in selected wells" to determine the source of the contamination shown in the area immediately adjacent to the OU-2 boundary as drawn by Mr. Mutch on Figure 2-18.[3] *Id.* ¶ 3, Ex. G., Mutch Depo VII at pp. 860:19-25; 861:1-10; 861:15-18.

A potential source of the contaminants, if one cared to look at the data, is the former drum recycling operations on what is commonly known as the "Beaumon Trust Property" from 1971 to 1984, located in the middle of Figure 2-18.[4]

---

[2] The yellow highlights on the version attached to the Hagström Reply Declaration were added by PMC and reflect those results which were unavailable, unreliable, estimated, and/or below the detection limit.

[3] Mr. Mutch does complain that Mr. Vogl has not completed that kind of analysis. Hagström Reply Decl. ¶ 3, Ex. G., Mutch Depo VII at p. 861:11-14. However, that begs the issue of Plaintiffs' burden to show that more than just groundwater has or may threaten to reach OU-2. The groundwater must transport contaminants from the PMC Property, *otherwise it's just water.*

[4] In July 2006, the Community Development Commission of the City of Santa Fe Springs (CDC) entered into an *Administrative Settlement Agreement and Order on Consent* (Administrative Settlement Agreement) with the California Environmental

"Chemical compounds, including compounds originating from drums collected from an Ameron facility in Brea, California, were released to the subsurface on and near 12525 Park Avenue by the drum recycling activities." *Id.* ¶ 5, Ex. I., IRAW Completion Report at p. 1. "Inspections performed at the time by the City of Santa Fe Springs and the Los Angeles County Department of Health Services indicated leakage of liquids to the underlying soil on the unpaved lot". *Id.*

The data confirms that Phenol and 2, 4, Dimethylphenol, identified by Mr. Mutch as PMC Marker Chemicals are found in 75 soil samples collected from ground surface to 30 feet below ground surface at the Beaumon Trust Property. *Id.* ¶ 5, Ex. J., IRAW Report, at Tables 5A and 11A; Figures 5 – 10. The same holds true for Benzene and Naphthalene. *Id.* The presence of these contaminants in soil demonstrate the contaminants were released and disposed of at the Beaumon Trust Property. Data, not speculation or surmise by Plaintiffs litigation expert, is the basis upon which to determine the source of the Phenol, 2, 4 Dimethylphenol, Benzene and Naphthalene shown on Figure 2-18. *Id.* ¶ 4, Ex. H. If these chemicals have reached OU-2 and Mr. Mutch's Figure 2-18 indicates they have not, the source is the former drum recycling facility that operated on the Beaumon Trust Property. Groundwater flow direction alone is not enough for Plaintiffs to meet their burden to prove PMC is the source and prevail.

Furthermore, the "colored pie charts" shown on Figure 2-18 provide additional data demonstrating that, not only is PMC not the source of the contaminants, but that the contaminants disposed of and released between 37 and 50 years ago at the Beaumon Trust Property (the drum recycling facility operated at the site between 1971 and 1984) *have not reached the OU-2 Plume.* This is true despite being located a mere few hundred feet from OU-2 as drawn by Mr. Mutch. The test data collected from 4 of the 13 wells located inside the OU-2 Plume boundary are reported as "either not detected or not analyzed". *Id.* The other 9

Protection Agency Department of Toxic Substances Control (DTSC).

wells located on or adjacent to the OU-2 Plume boundary are reported as being "estimates and below the reporting limits". *Id.* ¶ 4, Ex. H, at Fig. 2-18. The test data relied upon by Mr. Mutch are unreliable, they are what are commonly known as "J" values, which are considered by professionals like Mr. Mutch to be below "normal accuracy," i.e., unreliable. *Id.* ¶ 3, Ex. G, Mutch Depo VII, at p. 816:12-20. In other words the test data from the 13 wells Mr. Mutch relies upon to support his claims that "PMC Marker Chemicals" have reached the OU-2 Plume consist of wells with unreliable test data and wells with Non-Detect data of contaminants released by someone other than PMC. Mr. Mutch's claim that his Figure 2-18 supports Plaintiffs' claim that a "plausible pathway" exists between the PMC Property and OU-2 is rank speculation. The data proves otherwise.

In both his rebuttal report and deposition testimony Mr. Mutch disputes Mr. Vogl's expert opinion that contaminants from the PMC Property have not and will not reach the OU-2 Plume because Mr. Vogl's opinion lacks scientific rigor and should be discounted or ignored. Mr. Vogl relied upon actual test data in support of his opinions not models. The court need only consider the lack of scientific rigor underlying Mr. Mutch's opinions to conclude that Plaintiffs have not met their burden to prove a "plausible pathway" exists.

As Mr. Mutch testified in his deposition groundwater flow direction is not the same as contaminate transport. Mr. Mutch's "plausible pathway" opinion relies only upon modeling of groundwater flow direction. *Id.* ¶ 4, Ex. H, Mutch Rebuttal Report Figures, at Figs. 2-5, 2-6 2-7, 2-8 and 2-9. Neither of the reports relied upon by Mr. Mutch address the fate and transport of contaminants:

> "… the groundwater-flow and particle tracking model simulates advective transport only. It does not simulate physical processes that may affect solute migration, such as hydrodynamic dispersion and diffusion, and does not simulate chemical or

biological processes that may affect the fate and transport of contaminants". [5]

*Id*. ¶ 4, Ex. K, USGS Report, at p. 52.  In other words the modeling that forms the foundation for Mr. Mutch's opinions, *only predicts groundwater direction*.  The models do not address what contaminants, if any, the groundwater is or is not transporting.  Even if the direction of groundwater in the vicinity of the PMC Property flows in the general direction of OU-2, and as claimed by Mr. Mutch, is not deflected by the Santa Fe Anticline, which it is (Docket No. 902-66, Exhibit M to the Declaration of Richard Vogl in Support of Defendants PMC's Motion for Summary Judgment re CERCLA Liability ("Vogl Decl.")), unless that groundwater is transporting contaminants from the PMC Property – *it's just water.*

To recap, Mr. Mutch relied upon nine wells with "J" values, four wells with Non-Detect data, speculation that an undefined remediation system, which may or may not be built by Plaintiffs more than a half-mile away from the PMC Property with an unknown number of wells of unknown pumping capacity and capture zones may draw contaminants from the PMC Property into the OU-2 Plume.  Mr. Mutch takes this speculation and piles it upon Groundwater Flow Lines, which Mr. Mutch agrees only show direction not whether contaminants are being transported in groundwater to reach the conclusion that contaminants in the OU-2 Plume, known to have migrated downgradient after having been released and disposed of at OU-1, actually came from PMC.  Moreover, the distance, as measured by the Groundwater Direction Flow arrows relied upon by Mr. Mutch in his "plausible pathway" theory demonstrate that groundwater would have to travel between 5,000 feet and 10,000 feet horizontally to reach the outer edge of the OU-2 Plume, and even then – *it's*

---

[5] The Final Groundwater Flow Model Development and Calibration Report: INTERA May 2020, which Mr. Mutch also relies upon is also limited to groundwater flow direction and particle tracking. Like the USGS Report it does not consider or simulate the "fate and transport of contaminants".

*just water*.[6]  Hagström Reply Decl., ¶ 4, Ex. H, Mutch Rebuttal Report Figures, at Figs. 2-5 and 2-8.

Even applying the most liberal "plausible pathway" standard as Plaintiffs urge, Plaintiffs have failed to meet their burden of proof.  Because Plaintiffs have not and cannot meet their burden under *Castaic Lake* there no basis to shift the burden to PMC to "disprove causation", a burden PMC has nonetheless met.

## II.   APPLICABLE LEGAL STANDARD AND COMMON FACTS

### A.   Legal Standard

PMC adopts the legal standard set forth in the common section of this brief.

### B.   Common and PMC Property Specific Facts

The PMC Property lies outside of the OU-2 Plume, unlike those of its co-defendants.  The contaminants Plaintiffs allege have been transported from the PMC Property to the OU-2 Plume would have to be transported several thousand feet horizontally through low permeability strata and hundreds of feet vertically to reach the outer edge of the OU-2 Plume.  Plaintiffs do not dispute these facts and in fact, Mr. Mutch's rebuttal report confirms them.

PMC otherwise adopts the common facts set forth in the common section of this brief.

## III.   ARGUMENT

### A.   Plaintiffs Have Not Met Their Burden Of Proof

Plaintiffs apparently believe all they need prove to prevail is to allege that "Chemical A is present in the OU-2 Plume and Chemical A is present at a Defendant's Property" or that at "some undefined time in the future Chemical A may threaten OU-2" - therefore they win.  Docket No. 950-1, Plaintiffs' Memorandum of Points and Authorities in Opposition to Joint Motions for Summary Judgment ("Plaintiffs' Opposition"), pp. 5-6.  Plaintiffs must prove much

---

[6] Hagström Reply Decl., ¶ 4, Ex. H, Figure 2-6 of the Mutch Rebuttal Report shows the transport distance approaches 16,000 feet.

more.  Plaintiffs must, with admissible evidence, prove that Chemical A has been transported (migrated) from a Defendant's Property and comingled with chemicals in OU-2 groundwater that were released and disposed of at OU-1 and migrated downgradient in OU-2 groundwater.  No groundwater modeling or Groundwater Flow Lines are necessary to prove Plaintiffs are the source of the contamination in OU-2, their own data proves that.  Plaintiffs must prove contaminants from the PMC Property have been transported between 5,000 feet and 10,000 feet horizontally and have comingled with OU-2 groundwater otherwise, *it's just water....* [7] Hagström Reply Decl., ¶ 4, Ex. H, Mutch Rebuttal Report Figures, at Figs. 2-5 and 2-8.

Even applying the liberal standard Plaintiffs urge the court to adopt, Plaintiffs have not and cannot meet their burden to prove that a "plausible pathway" exists for contaminants to be transported thousands of feet from the PMC Property to the OU-2 Plume or that an actual and definable threat exists the contaminants will be transported into the OU-2 Plume at some undefined time in the future.  Plaintiffs rely solely upon the burden shifting approach in *Castaic Lake Water Agency v. Whittaker Corp.* 272 F.Supp.2d 1053, (C.D. Cal. 2003) to support their claims.  To avail themselves of this approach Plaintiffs agree they must first "provide evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to OU-2 Groundwater."  Citing *Castaic Lake,* 272 F.Supp.2d at 1066.  Plaintiffs' Opposition, p. 6:18-20 lines 18-20.   Plaintiffs have not met their burden with regard to the PMC Property.

PMC's alleged liability requires that *contaminants* from the PMC Property be transported in groundwater across the OU-2 Plume boundary.  While groundwater in the immediate vicinity of the PMC Property may flow in the general direction of the OU-2 Plume and there may be groundwater models that Mr. Mutch used to

---

[7] Hagström Reply Decl., ¶ 4, Ex. H, Figure 2-6 of the Mutch Rebuttal Report shows the transport distance approaches 16,000 feet.

draw his Groundwater Flow Direction arrows, unless that groundwater is transporting contaminants from the PMC Property more than a mile down gradient the flow direction is irrelevant. It is just the direction that the water is projected to flow. Contaminants from the PMC Property must be transported across the OU-2 Plume boundary, *otherwise it's just water*, and water alone does not make PMC a source of the contaminants found in OU-2 groundwater.

Realizing they have not met their burden that contaminants have been transported from the PMC Property, Mr. Mutch then speculates that if Plaintiffs were to install an unspecified number of wells, to an unknown depth, with unknown pumping capacities and unknown capture zones, these hypothetical wells "threaten" to pull contamination from the PMC Property into OU-2. Hagström Reply Decl. ¶ 3, Exh. G, Mutch Depo VII at 877:24-25; 878:1-14; 834: 9-25; 835:1-5.

Speculation piled upon speculation only serves to underscore the fallacy of Plaintiffs' claims, not bolster them.

Having not met their burden under the standard of their choice there is no burden to shift and PMC's motion should be granted.

### B. Plaintiffs' Expert Rebuttal Report Supports PMC's Position That Contaminants From The PMC Property Have Not Reached The OU-2 Plume

Data from Plaintiffs' expert rebuttal report supports PMC's position that contaminants from the PMC Property have not been transported into the OU-2 Plume. Plaintiffs claim that four "PMC Marker Chemicals" have made their way into the OU-2 Plume. That is not the case and data from Mr. Mutch's rebuttal report demonstrates none have done so. The four contaminants Plaintiffs alleged have been transported, Benzene, Naphthalene, Phenol and 2, 4, Dimethylphenol would, based upon Mr. Mutch's depiction of "Groundwater Flow Line[s]" (Hagström Reply Decl., ¶ 4, Ex. H, Fig. 2-5; Fig. 2-8) have to travel between 5,000 and 10,000 feet from the PMC Property to reach the OU-2 Plume Boundary.[8] The

---

[8] The distance when measured from PMC-MW-5 is approximately 5,000 feet. The

distances shown on Figure 2-6 approach 16,000 feet. *Id.* ¶ 4, Ex. H, Fig. 2-6.  PMC does not dispute that these chemicals are present on the PMC Property and that they have migrated a short distance off of the PMC Property.

There is however, no soil or groundwater test data cited by Mr. Mutch, because there is none, that shows that any of these four have been transported 5,000 to 10,000 feet down gradient into the OU-2 Plume.  It is important to keep in mind that groundwater flow direction mapped by Mr. Mutch is just that - flow direction.  The "Groundwater Flow Line[s]" drawn by Mr. Mutch do not mean that contaminants are being transported in tandem with groundwater.  Contaminant transport, also known as "fate and transport" is a separate and distinct issue.  *Id.* ¶ 3, Ex. G, Mutch Depo VIII, p. 825:3-6.  Mr. Mutch admits he has not undertaken a "fate and transport" analysis.  *Id.* p. 840:13-16.  Data, maps and figures from Mr. Mutch's rebuttal report demonstrate that no such transport of contaminants from the PMC Property has occurred.

## 1.   **Benzene**

Plaintiffs and Mr. Mutch claim that Benzene is present in OU-2 however, neither identifies where or at what concentration, but they do claim t it is present.  They also claim that Benzene is present in soil and groundwater at the PMC Property.   PMC does not dispute Benzene has been detected on its property.  Plaintiffs and Mr. Mutch also claim that Benzene has migrated off of the PMC Property.  Docket No. 949-80, Appendix A – Mutch PMC Property Addendum ("Mutch PMC Addendum"), p. 25, Fig. 1-4.  PMC does not dispute that Benzene has migrated a short distance off its property.

Figure 1-4 from Mr. Mutch's rebuttal report provides data showing that the Benzene concentrations in groundwater are Non-Detect in MW-12.  *Id.*  MW-12 is located approximately 1100 feet downgradient from T-81, identified as an UST that stored Benzene on Figure 1-4.  MW-12 sits several hundred feet from the eastern

distance when measured from PMC-MW-3 is approximately 10,000 feet.

most edge of the OU-2 Plume boundary as drawn by Plaintiffs.  The "Groundwater Flow Direction" arrow points in the direction of MW-12.  If as Plaintiffs and Mr. Mutch contend, groundwater flow direction proves that a plausible pathway exists between the PMC Property and the OU-2 Plume then Benzene should be present in MW-12, and *it is not*.  Furthermore, the data from wells located between MW-12 and the OU-2 Plume report a series of Non-Detects and/or "J" values for Benzene, adding additional support for PMC's position that Benzene in OU-2 did not migrate from the PMC Property.  Hagström Reply Decl., ¶ 4, Ex. H, Figures to Mutch Rebuttal Report Fig. 2-18.

### 2.    Naphthalene, Phenol and 2, 4 Dimethylphenol

Soil sample test data confirms that Naphthalene, Phenol and 2, 4, Dimethylphenol, identified by Mr. Mutch as "PMC Marker Chemicals," are found in 75 soil samples at the Beaumon Trust Property located between the PMC Property and the OU-2 boundary.  These soil samples were collected from the surface to 30 feet below ground surface.[9]  The presence of these contaminants in soil beneath the former drum recycling facility, which operated for 13 years, demonstrate the contaminants were released and disposed of on the Beaumon Trust Property and did not migrate from elsewhere.  Data showing the presence of Naphthalene, Phenol and 2, 4 Dimethylphenol, as shown on Figure 2-18 (Hagström Reply Decl., ¶ 4, Ex. H, Figures to Mutch Rebuttal Report) is the basis upon which to determine the source of contamination, not speculation or surmise by Mr. Mutch that because groundwater flows in a certain direction it must be transporting contaminants from the PMC Property.  The soil data demonstrates the PMC Property is not the source of Naphthalene, Phenol and 2, 4 Dimethylphenol as shown on Figure 2-18.  Groundwater flow direction alone is not enough to prove a plausible pathway.

---

[9] The same is holds true for Benzene.

The "colored pie charts" drawn by Mr. Mutch on Figure 2-18 provide additional data demonstrating that not only is PMC not the source of these contaminants, but, that despite the drum recycling facility source being less than a few hundred feet from the OU-2 Plume boundary the contaminants have not crossed the OU-2 Plume boundary.  The test data, dating back 26 years, collected from 9 of the 13 Monitoring Wells located on or within the OU-2 boundary are reported as "estimates and below the reporting limits".  In short, these are "J" values, which Mr. Mutch testified are unreliable.  Hagström Reply Decl. ¶ 3, Exh. G, Mutch Depo VII, p. 816:12-20.  The data reported for the four other "blank pie chart" Monitoring Wells located inside the OU-2 Plume are listed as "either not detected or not analyzed".  Mr. Mutch's reliance upon wells with unreliable test data and wells with Non-Detect data to support his claim that a "plausible pathway" exists between the PMC Property and OU-2 for these contaminants is pure speculation and should be treated as such by the Court.  There is no pathway, plausible or otherwise between the PMC Property and the OU-2 Plume.

## IV.   CONCLUSION

Plaintiffs Opposition to PMC's motion for summary judgement is based upon speculation piled upon speculation. Plaintiffs entire Opposition is premised upon "Groundwater Flow Lines", which as Mr. Mutch agreed only show the direction groundwater may be flowing based upon a model all the while disregarding the groundwater quality data. Plaintiffs' expert offers no evidence that groundwater is transporting or will transport contaminants that originated on the PMC Property 5,000 to 10,000 feet to OU-2.  Without contaminants, even if the groundwater flows in the direction Mr. Mutch claims - *it's just water*.  Even under the "plausible pathway" standard Plaintiffs would have this Court apply Plaintiffs have not met their burden to prove contaminants have been transported from the PMC Property to OU-2 or that some unknown, undefined speculative remediation system might at an unknown future time create a threat of contaminants being drawn into OU-2.

1
2
3
4
5
6

Recognizing they have fallen short of meeting their burden Plaintiffs attempted to create a disputed material issue of fact, as PMC predicted in its Moving Papers, by presenting an expert to offer opinions to create a dispute. As demonstrated above when the actual data is considered Mr. Mutch's rebuttal report supports PMC's Motion for Summary Judgment. Plaintiffs have failed on both fronts and PMC's motion should be granted.

7
8   DATED:  April 15, 2021                    BASSI EDLIN HUIE & BLUM LLP
9
10                                   By:        /s/ Earl L. Hagström
11                                   Earl L. Hagström
                                     Daniel E. Trowbridge
12                                   *Attorneys for Defendants PMC Specialties*
                                     *Group, Inc. and Ferro Corporation*
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CHRYSLER PROPERTY DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    **I.     INTRODUCTION**

2         Over thirty years ago, Catellus Development Corporation ("Catellus"),

3    predecessor to Defendant Palmtree Acquisition Corporation ("Palmtree"), first

4    notified the Los Angeles Regional Water Quality Control Board ("Regional

5    Board") of detected contamination on the Chrysler Property.[1] Years of investigative

6    and remedial work ensued, culminating in State regulatory closure for the Chrysler

7    Property in 1999. In May 2009, in response to EPA's General Notice Letter and

8    Request for Information for the Omega Chemical Superfund Site, Palmtree

9    acknowledged that the source of contamination on the Chrysler Property was the

10   "Chrysler Clarifier" which Chrysler, "a former Catellus tenant," operated on the

11   Chrysler Property.  Declaration of Sedina L. Banks in Support of Motion for Partial

12   Summary Judgment ("Banks Decl.") (Dkt. 902-7), Exh. 33, p. 213.  In August

13   2014, more than four decades after Union Pacific sold the Chrysler Property in

14   January 1974, Plaintiffs filed this action.

15        In the course of these events, over several decades, neither the United States

16   Environmental Protection Agency ("EPA") nor any State regulatory agency with

17   oversight of environmental conditions at facilities within or around the Omega

18   Chemical Corporation Superfund Site – including Operable Unit 2 ("OU-2") – have

19   ever designated Union Pacific as a potentially responsible party ("PRP") for the

20   Chrysler Property. This derives from the lack of any evidence that Union Pacific is

21   responsible under CERCLA for the disposal of any hazardous substance at the

22   Chrysler Property during its ownership.

23        Similarly, Plaintiffs cannot meet their burden of proving that any disposal or

24   release of hazardous substances occurred at the Chrysler Property during Union

25   Pacific's period of ownership or operations, and which subsequently impacted OU-

26   2 groundwater.  *See* 42 U.S.C. § 9607(a); Plaintiffs' Common Brief, Dkt. 903-1, at

27

28   _____

[1] All defined terms are as defined in Union Pacific's Motion for Partial Summary Judgment (Dkt. 902), unless otherwise stated.

3:19-24. In particular, Plaintiffs have no proof of any disposal or release of the chlorinated solvents at issue in this action – i.e., PCE, TCE and 1,2-DCE – which based on the evidentiary record all occurred <u>after</u> Union Pacific's ownership of the Chrysler Property ended in January 1974.[2] Further underscoring this point, Plaintiffs have no evidence that any products or wastes containing these chlorinated constituents were ever used or handled during the period of Union Pacific's ownership, let alone disposed of and/or released to the environment in a manner that impacted OU-2 groundwater.

Plaintiffs instead rely on pure conjecture, absent evidentiary support, regarding alleged disposals and/or releases of any hazardous substances to the environment during Union Pacific's ownership of the Chrysler Property. For example, while citing to several notices of violation issued to Union Pacific's former tenants for improper waste discharges, Plaintiffs' designated expert, Robert D. Mutch, Jr., P.HG., P.E., admits that he did not even "tr[y] to tie the general impact upon OU-2 groundwater from this site to each specific violation issued for this site." Declaration of Sedina L. Banks in Support of Reply ("Banks Decl."), Exh. 5 [Mutch Depo. Tr. 425:5-7]. As noted, there is nothing to indicate that any chlorinated solvents, including PCE, TCE or 1,1-DCE, were used at the Chrysler

---

[2] As noted in Union Pacific's Opposition to Plaintiffs' Motion (Dkt. 933), Plaintiffs incorrectly contend Union Pacific is liable under CERCLA in spite of the following key, undisputed facts: (i) Union Pacific has never been designated as a PRP for the Chrysler Property by EPA or any State agency; (ii) Palmtree, the successor owner of the Chrysler Property, has stipulated that: "Sometime <u>between 1974 and 2002</u>, in connection with operations conducted at the Chrysler Source Property, there was a "disposal," as that term is defined under CERCLA Section 101(29), 42 U.S.C. § 9601(29), of one or more Hazardous Substances, or waste containing Hazardous Substances, at the Chrysler Source Property …. [and] Sometime <u>between 1974 and 2002</u>, in connection with operations conducted at the Chrysler Source Property, Hazardous Substances, or waste containing Hazardous Substances, were spilled, leaked, emptied, escaped, leached, poured, or were emitted, injected, discharged, dumped or disposed, into the soil at the Chrysler Source Property <u>and into OU2 [groundwater] from the Chrysler Source Property</u>" (Dkt. 687, ¶¶ 8-9)(emphasis added); and (iii) the presumptive source of chlorinated solvent releases at the Chrysler Property – including "[s]olvents like PCE, TCE, and cis-1,2-DCE" (Dkt. 903-2, at 80:20-24) – that impacted OU-2 groundwater is a 750-gallon clarifier (the "Chrysler Clarifier") first installed and utilized almost <u>ten years after</u> Union Pacific sold the Chrysler Property.

Property during Union Pacific's ownership, let alone disposed of or released to the environment.

Plaintiffs misleadingly assert "[w]aste water containing hexavalent chromium was discharged to the ground in 1970." Opp. 18:18-19 (emphasis added). This alleged wastewater discharge in 1970 by a tenant of Union Pacific, as Plaintiffs concede in their affirmative motion, was to the "car wash storm drain" and there is no evidence of any release or impacts to soil at the Chrysler Property. Plaintiffs' MSJ. (Dkt. 903-2), 80:2-6; 89:11-13. In fact, Mr. Mutch admits there is no evidence that hexavalent chromium contamination is present, or ever was, in either soil at or groundwater beneath the Chrysler Property. This fact is dispositive on this issue.

For the reasons set forth herein, Moving Defendants' Joint Motions, and Union Pacific's moving papers, Union Pacific respectfully requests that the Court grant its Motion for Partial Summary Judgment as to the Chrysler Property.

## II.   ARGUMENT

### A.   Union Pacific is Not Within the Classes of Persons Liable Under CERCLA

"Under 42 U.S.C. § 9607(a)(2), liability under CERCLA can be attached to 'any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.'" *Ferguson v. Arcata Redwood Co., LLC*, 2005 WL 1869445, at *3 (N.D. Cal. 2005)(quoting 42 U.S.C. § 9607(a)(2).) CERCLA section 9601(29), 42 U.S.C. § 9601(29), adopts the definition of "disposal" from the Solid Waste Disposal Act ("RCRA"), 42 U.S.C. § 6903(3), which states, in pertinent part:

> "The term 'disposal' means the discharge, deposit, injection,
> dumping, spilling, leaking, or placing of any solid waste or
> hazardous waste into or on any land or water so that such solid
> waste or hazardous waste or any constituent thereof may enter

the environment or be emitted into the air or discharged into any waters, including ground waters."

*Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 875 (9th Cir.2001)(quoting RCRA, 42 U.S.C. § 6903(3)). Accordingly, to make out a prima facia case, Plaintiffs must "establish that a spill, discharge, leak, etc., occurred at the time [Union Pacific] controlled the site." *Id.*; *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997) (upholding grant of summary judgment in defendants' favor because plaintiff did not establish that a disposal occurred during defendants' ownership of the property).

Notwithstanding Plaintiffs' assertions to the contrary, Union Pacific cannot be held liable as a former "owner or operator" under CERCLA. Plaintiffs have no evidence that the chlorinated solvents of concern – PCE, TCE or 1,1-DCE – were ever used, discharged, or released to the environment at or from the Chrysler Property during Union Pacific's ownership. Plaintiffs likewise have no evidence that hexavalent chromium contamination was ever discharged to the ground, let alone released to the environment; indeed, Plaintiffs have no on- or off-site data to support such an allegation. As such, there is no evidence that any hazardous substances at issue in this action were disposed of or released on the Chrysler Property during Union Pacific's period of ownership, let alone that such hazardous substances were ever released to OU-2 groundwater.

The *Ferguson* decision, 2005 WL 1869445 (N.D.Cal 2005), is on point and particularly instructive. Therein, the court granted defendant's motion for summary judgment because the plaintiff "failed to present any evidence that hazardous substances were disposed of on the Property at issue during [defendant's] ownership." *Id.* While the plaintiff "present[ed] evidence regarding hazardous waste releases in other areas of the surrounding property owned by the company," there was "no evidence explaining how the release of hazardous waste in other areas owned by the company impacted the Property at issue in this case." *Id.* at *3-

4. On that basis, the court concluded defendant was "entitled to summary judgment on plaintiff's claim that he was a former 'owner or operator' under 42 U.S.C. § 9607(a)(2)." Notably, in rendering this conclusion, the court observed:

> "Although plaintiff presents a large amount of argument on this issue, argument is not sufficient at the summary judgment stage of the proceedings, as plaintiff must produce evidence in support [of its claims].... The Court rejects plaintiff's argument because it entirely lacks factual support [citation to plaintiff's brief] (containing assertions such as: "the site was very contaminated"; "there were numerous ... containers that used to contain hazardous wood treatment chemicals ... left around the site"; and "[t]here is no question that ... wood treatment chemicals used and released during his ownership and operation … found their way into this disposal pit.") Plaintiff has presented no evidence that any of the material found in the disposal pit originated with [defendant]."

*Id.* at *3-4.

For the reasons explained below, under the procedural circumstances of this case and their own admissions, Plaintiffs must prove more than the mere possibility that disposals of hazardous substances occurred during Union Pacific's ownership. Rather, Plaintiffs have conceded they must prove that any such discharges resulted in the release of hazardous substances to OU-2 groundwater. Since Plaintiffs have no evidentiary basis to support any such allegation, Union Pacific is entitled to summary judgment based on the same reasoning applied by the *Ferguson* decision.

///
///
///
///

**B.** **Because Plaintiffs are Seeking Response Costs for Impacts to OU-2 Groundwater, they Must Prove that Disposals and Releases of Hazardous Substances Impacted OU-2 Groundwater**

As further detailed in Defendants' Joint Reply addressing common issues, Plaintiffs have repeatedly acknowledged – and represented to this Court – that this phase of the bifurcated action includes the "critical question of whether Defendants' releases have impacted OU2" and that "[t]he entire purpose for the phasing of this case is to ensure that only those Parties that are responsible for the OU2 regional groundwater contamination advance to a later phase." (Dkt. 602, p. 3)(emphasis added).

Remarkably, Plaintiffs suggest they need only imply that a "single drop" of a hazardous substance "was placed anywhere on the [Chrysler Property]" to establish Union Pacific's liability as a former owner. (Dkt. 950-1, at 15:19-21.) To the contrary, Plaintiffs must prove that any waste disposals that occurred during Union Pacific's ownership of the Chrysler Property resulted in a release of hazardous substances to OU-2 groundwater, because Plaintiffs seek recovery of costs "to address the contamination contributed to the OU-2 Facility by Defendants." (FAC, ¶ 404)(emphasis added).[3] *See ABB Indus. Sys., Inc*, 120 F.3d at 356; *Ferguson, supra.*

As alleged by Plaintiffs, the "facility" at issue is the "OU-2 Facility." (FAC, ¶¶ 2, 106-17, 119, 404). Thus, even assuming Plaintiffs could establish that a discharge of hazardous substances to soil occurred during Union Pacific's ownership – for which Plaintiffs have provided no evidence whatsoever – such a finding would be of no consequence. Rather, Plaintiffs must also provide evidence

---

[3] Plaintiffs are not seeking, nor are they entitled to seek, costs to remediate any contamination of soils at the Chrysler Property that resulted from operations subsequent to Union Pacific's ownership. In fact, the Regional Board has already determined that no further clean-up needs to be undertaken at the Chrysler Property. Banks Decl., Exhs. 27, 28, 30, and 32 [Closure Letters].

that any hazardous substances allegedly disposed of during Union Pacific's ownership of the Chrysler Property were actually released into OU-2 Groundwater. They have failed to do so.

**C.** **The Alleged Violations Cited by Plaintiffs Are Not Evidence of CERCLA "Disposals" Sufficient to Establish Union Pacific's Liability**

**1.** **"Disposal" is a CERCLA defined term requiring discharges of "hazardous substances" to the "environment"**

Plaintiffs make the general assertion that wastewater "sent to the sewer system on the property constituted multiple pre-1974 disposals." Opp. 17:6-7. Merely alleging that wastewater was sent to the sewer system or storm drain does not satisfy Plaintiffs' burden of proof that "disposals" occurred during Union Pacific's ownership of the Chrysler Property. *See Ferguson*, 2005 WL 1869445, at *3. The entirety of Plaintiffs' evidence that disposals occurred is several alleged violations unrelated to soil or OU-2 groundwater impacts.  This is insufficient to find that a "disposal" occurred.[4]

Plaintiffs cite *Voggenthaler v. Md. Square LLC*, 724 F.3d 1050 (9th Cir. 2013) for the contention they need not prove that any contaminants discharged during Union Pacific's ownership actually entered the environment to qualify as a disposal.  Opp. 9:16-18. However, the factual circumstances addressed in *Voggenthaler* are readily distinguishable. Therein, a former dry cleaner operator was liable under CERCLA because hazardous substances from their operations were first released to the floor drain before eventually, and actually, impacting soil and groundwater. *Voggenthaler*, 724 F.3d at 1064.  The defendant admitted "that it used PCE in its operations and that it regularly spilled PCE on the concrete floor."

---

[4] "Disposal" is a legal CERCLA term of art requiring the hazardous substance be placed "into or on any land or water so that such ... hazardous waste ... may enter the environment."  42 U.S.C. § 6903(3); 42 U.S.C. § 9601(29).  CERCLA defines "environment" to include "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air." 42 U.S.C. § 9601(8).

*Id*. at 1063.  There was no dispute that the contaminants "went down the drain through the pipes beneath the floor and into the ground and groundwater," and site investigations proved the presence of PCE in the soil and groundwater.  *Id.* at 1057

By contrast, here there is no evidence of chlorinated solvent usage, or discharges or releases to soil or groundwater, during Union Pacific's ownership of the Chrysler Property.  Likewise, there is no evidence that hexavalent chromium was ever discharged to the ground, or was ever present in either soil at or groundwater beneath the Chrysler Property.  Plaintiffs' MSJ (Dkt. 903-2) at 81:3-4; Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 465:17-22]; *see also* Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 457:11-18; *see also* Mutch Depo. Tr. 433:20-23](Chrysler Clarifier is the source of contamination).

### 2.   None of the alleged violations concern releases or disposals to surface land or OU-2 groundwater

Plaintiffs' reliance on alleged notices of violations at the Chrysler Property during Union Pacific's ownership period does not provide a sufficient basis to impose liability upon Union Pacific.  First and foremost, all of the notices concern alleged discharges to the sewer system or storm drain.  Mr. Mutch acknowledged he could not connect any of the violations to impacts to soil or groundwater, nor did he even try.  Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 424:13-20; 425:5-8; 425:19-21; 426:12-16; 429:13-17; 432:4-6; 443:7-17; 450:17-23]. Second, Mr. Mutch admitted his "task" was not to identify whether specific releases or violations ever impacted OU-2 groundwater, responding: "My task was to evaluate whether the property has contributed to soil and groundwater contamination in OU-2, not whether specific violations led, or to what extent specific violations led to that observed and corroborated OU-2 groundwater contamination." Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 450:19-23].

Since the Chrysler Property has been owned by a succession of parties (Union Pacific, Palmtree, and Burke Street), it does not suffice for Plaintiffs to

generally allege that releases of hazardous substances from the Chrysler Property <u>may have impacted</u> OU-2 groundwater to establish liability against Union Pacific. Rather, Plaintiffs must present evidence that a disposal of relevant hazardous substances – that in turn were released to the environment and impacted OU-2 groundwater – occurred during Union Pacific's ownership.  *See Carson Harbor Village Ltd*., 270 F.3d at 875; *ABB Indus. Sys., Inc.*, 120 F.3d at 356; Plaintiffs' MSJ Common Brief ((Dkt. 903-1) at 3:19-24).  Plaintiffs fail to make this showing.

Finally, Plaintiffs seek to rely on Mr. Mutch's opinion to create an inference that since on-site wastewater was discharged to the sewer system, sewers may leak, that Union Pacific can be presumed liable.  This argument also fails. Plaintiffs never investigated, let alone show proof, whether the sewers actually leaked.  Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 415:9-12; 464:17-20; 465:3-5; 465:7-11]; Mutch January 2021 Report (Dkt. 903-204)("January Report") 5-11 ("sewer lines had not been investigated in 1992 and I would add that they have not been adequately investigated since that time"). More problematically, Mr. Mutch testified he does not have the results of exfiltration or infiltration rate testing for the sewers at the Chrysler Property, even though alleged exfiltration of the sewers is a cornerstone of his opinion.  Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 415:9-12]; *see* Mutch Report (Dkt. 903-204). Mr. Mutch admitted that he did not commission a smoke testing survey, CCTV camera survey, or a pressure testing survey of the sewers.  Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 415:2-12; 464:17-20; 465:3-5; 465:7-11].  Instead, he opines that the 1987 Whittier Narrows earthquake, which occurred more than <u>thirteen years after</u> Union Pacific sold the Chrysler Property, caused leaking of the sewers and allowed hazardous substances to reach soil and eventually groundwater.  January Report, p. 5-11. This is entirely irrelevant to establishing liability against Union Pacific.[5]

---

[5] An expert "opinion that is demonstrably unreliable cannot form the basis for showing a genuine issue of fact."  <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d <u>1216, 1222 (9th Cir. 1995)</u>(excluding expert's opinion regarding an alleged defect

3.   **There is no soil or groundwater data to corroborate that disposals or releases of hexavalent chromium ever occurred on the Chrysler Property, let alone during Union Pacific's ownership**

Plaintiffs set forth entirely unsubstantiated allegations that there were "multiple disposals of hexavalent chromium" during Union Pacific's ownership of the Chrysler Property, including a discharge "to the ground in 1970." *See e.g.,* Opp. 18:18-20, citing Plaintiffs' Request for Judicial Notice in Support of Opposition ("Opp.RFJN"), Exh. 14. To be clear, there was only <u>one</u> notice of violation issued during Union Pacific's ownership of the Chrysler Property, dated March 2, 1970, related to the alleged discharge of wastewater containing detectable hexavalent chromium.  Opp.RFJN, Exh. 14. The violation stated that this discharge went to the "storm drain," not the ground. [6] *Id*. There is simply no evidence of any disposal of hexavalent chromium to the ground that impaired on-site soils, and certainly not "multiple disposals." Plaintiffs' suggestion otherwise is unsubstantiated speculation insufficient to defeat Union Pacific's Motion.  *See Thornhill Pub. Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979)(conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment).

Plaintiffs also misleadingly assert that "[m]ore than one consultant" reported hexavalent chromium discharges in 1970.  Opp. 19-20:5. These consultant reports

---

of a circuit breaker that he never actually examined).

[6] Plaintiffs may be confusing the March 2, 1970 violation with a violation issued to another party.  In Plaintiffs' Response to Union Pacific's Statement of Undisputed Facts ("PRSUF"), Plaintiffs cite multiple times as evidence against Union Pacific a March 20, 1970 Notice of Violation issued to Globe Oil Tool Company for 11630 Burke Street, Santa Fe, Springs, CA. *See* PRSUF Nos. 107 and 111, citing Opp. RFJN Exh. 23.  This violation is wholly irrelevant because it was issued to a party unaffiliated with Union Pacific and for a different site than the Chrysler Property. The violation, however, references "liquid waste <u>discharge to ground</u>…that greatly exceeds the allowable limitation."  It is unclear whether Plaintiffs' assertion that hexavalent chromium on the Chrysler Property was "discharged to ground" is based on Plaintiffs confusing the two violations and sites as the March 2, 1970 violation makes no reference to any "discharge to ground."

were prepared two decades after the alleged violation occurred. Statements made in the reports regarding purported violations contain multiple levels of inadmissible hearsay, which cannot be used to prove that the violation actually occurred.  FED. R. EVID. 801(c); *Orr v. Bank of Am.*, 285 F.3d 764, 773, 778 (9th Cir.2002) (hearsay evidence is inadmissible and may not be considered on summary judgment); *see also Estate of Goldberg v. Goss-Jewett Co., Inc.*, 2020 WL 4390385, at *7 (C.D. Cal. July 14, 2020) (noting it would be hearsay to rely on Regional Water Board cleanup and abatement order finding that above ground tanks were leaking to "prove that the tanks did, in fact, leak and cause the contamination."). Moreover, these reports are referring to the same alleged violation on March 2, 1970.

Importantly, Plaintiffs and Mr. Mutch have admitted that there is no evidence that hexavalent chromium has ever been detected in either soil at or groundwater beneath the Chrysler Property.  Plaintiffs' MSJ. (Dkt. 903-2) at 81:3-4 (there has been "no testing for hexavalent chromium [] undertaken at the property"); *see also* Banks Reply Decl., Exh. 5 (testifying that there is no soil investigation for hexavalent chromium) [Mutch Depo. Tr. 465:17-22].  In other words, Plaintiffs seek to hold Union Pacific responsible for alleged hexavalent chromium contamination, when there is zero data to substantiate any such claim.

**D.** **Plaintiffs Do Not Raise a Question of Material Fact Regarding Union Pacific's Alleged Liability for Releases or Disposals from the Chrysler Clarifier**

**1.** **Plaintiffs have no evidence that Union Pacific owned the Chrysler Property at the time of a release from the Chrysler Clarifier or any other clarifier**

"Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (*citing Celotex*, 477 U.S. at 322).

An essential element of Plaintiffs' case is that there was a release of a hazardous substance from the Chrysler Property that impacted OU-2 groundwater, and for which Union Pacific is responsible.

In this regard, Plaintiffs and Mr. Mutch have admitted that the alleged releases of hazardous substances that may have impacted OU-2 groundwater originate from the Chrysler Clarifier.  *See* Plaintiffs' MSJ (Dkt. 903-2) at 86:19-87:10 and at 87, n. 60; January Report, 5-30 (the "most unequivocal evidence of [contaminants] from operations at the Property reaching groundwater" is from the Chrysler Clarifier); Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 457:11-18; *see also* Mutch Depo. Tr. 433:20-23].  Plaintiffs do not cite to any groundwater impacts from other potential on-site sources – e.g., additional clarifiers – on the Chrysler Property.  Prior environmental site investigations and Regional Water Board closure letters for the Chrysler Property did not identify any other on-site sources as contributing to potential groundwater impacts.  Banks Decl., Exhs. 22, p. 176; 23, p. 184; 25, p. 191 [Property Assessments] and Exhs. 27, 28, 30, and 32 [Closure Letters].  Mr. Mutch also testified that the Chrysler Clarifier, CL-2, was the source of groundwater contamination:

> Q: And which interceptor did create considerable soil
> contamination and groundwater contamination, sir?
> Which one do you have evidence of that you referenced
> in your prior statement?
> A: The clarifier that has the most evidence of both soil
> and groundwater contamination is clarifier No. 2 [the
> Chrysler Clarifier].

Banks Reply Decl., Exh. 5 [Mutch Depo. Tr. 457:11-18; *see also* Mutch Depo. Tr. 433:20-23].

Importantly, Plaintiffs do not provide any evidence of a contaminant release from the Chrysler Clarifier during Union Pacific's ownership of the Chrysler

Property.  Instead, Plaintiffs now assert that the Chrysler Clarifier may have been <u>installed</u> during Union Pacific's ownership of the Chrysler Property. Even if Plaintiffs could make this showing – which they have not – it would be of no consequence. Plaintiffs' burden is to demonstrate that a disposal or release of hazardous substances from the clarifier actually occurred on or before January 21, 1974, when Union Pacific's ownership of the property ceased. *See Anderson*, 477 U.S. at 256 (opposing party must present "concrete evidence from which a reasonable jury could return a verdict in [their] favor.").[7]

**2.    The evidence indisputably refutes Plaintiffs' assertion that the Chrysler Clarifier was installed when Union Pacific owned the Chrysler Property**

Plaintiffs now contend that the Chrysler Clarifier was not a 750-gallon clarifier located within an L-shaped addition to the Body Works Building, but rather a 1200-gallon clarifier (the "1200 Gallon Clarifier") located some distance south and away from the Body Works Building. However, environmental investigative reports prepared contemporaneously during remediation work at the Chrysler Property approximately thirty years ago, the opinion of Plaintiffs' expert Mr. Mutch, and Plaintiffs' own discovery responses, all refute this contention.

**a.    Environmental investigative reports and Plaintiffs' prior discovery responses state that the Chrysler Clarifier was a 750-gallon clarifier**

Plaintiffs' assertion that the Chrysler Clarifier was a 1200-gallon clarifier depicted in some site drawings and not a 750-gallon clarifier is indisputably refuted

---

[7] Furthermore, the timing of the installation of the Chrysler Clarifier can only <u>negate</u> an essential element of Plaintiffs' claim (e.g., whether there was a disposal of hazardous substances from the Chrysler Clarifier during Union Pacific's ownership of the Chrysler Property), it cannot prove it.  *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989)("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support plaintiff's claim.").

by historic environmental reports and Plaintiffs' own discovery responses.

For example, a 1988 "Tank Removal Report" and the 1991 "Final Converse Report" both identify the removed clarifier as 750-gallons.  Banks Decl., Exh. 17, pp. 142 and 144 [Tank Removal Report]; 21, p. 161 ("This report is a culmination of work conducted at the former Chrysler facility to investigate the source(s) and extent of soil and groundwater contamination identified beneath and in the vicinity of the 750 gallon clarifier, previously used by Chrysler at the Body Works Building.")(emphasis added).  Mr. Mutch's March 4, 2021 Rebuttal Report ("Rebuttal Report") also cites to the Tank Removal Report and admits that it identifies the Chrysler Clarifier as a 750-gallon clarifier.  *See e.g*., Mutch Rebuttal Report 1-6.  Plaintiffs have not identified a single reference in any environmental documents or reports indicating the Chrysler Clarifier was 1200 gallons and not 750 gallons. None exists.

Notably, in response to Union Pacific's interrogatory requests regarding "disposals" or "releases" of "hazardous substances" on the Chrysler Property, Plaintiffs repeatedly asserted that the contamination was discovered beneath a 750-gallon clarifier near the Body Works Building:

> "in the course of performing an environmental due diligence for the property, elevated levels of halogenated hydrocarbons were discovered in soil beneath and in the vicinity of a former 750-gallon clarifier near the former Bodyworks Building, located on the Central Property portion of the CHRYSLER PROPERTY.
>
> . . .
>
> Groundwater sampling conducted on November 15, 1990, November 28, 1990, December 3, 1990, and December 11, 1990 indicated the presence of [hazardous substances] in the groundwater at the Central Property near the former 750-gallon clarifier."

Banks Reply Decl., Exh. 1 [Plaintiffs' Interrogatory Responses](emphasis added).

Plaintiffs' interrogatory responses make no reference to the existence of a 1,200 gallon clarifier. *Id*. Union Pacific is entitled to rely on Plaintiffs' discovery responses in support of its Motion. FED. R. CIV. P. 56(c)(1)(a)(citation to interrogatory answers appropriate to show absence of genuine dispute). Plaintiffs have no basis to suddenly contend the Chrysler Clarifier was actually a 1,200 gallon clarifier.

### b.   Environmental investigative reports and Mr. Mutch's reports identify the Chrysler Clarifier in the L-Shaped addition to the Body Works Building

Plaintiffs' assertion that the Chrysler Clarifier was not located within the overhang L-shaped addition of the Body Works Building, but instead some distance south of the building, is likewise refuted by every relevant site figure depicting the removed Chrysler Clarifier, as well as the opinion of their expert, Mr. Mutch.

The 1988 Tank Removal Report, the 1989 McLaren Environmental Engineering Environmental Assessment, the 1990 Preliminary Converse Report, the 1991 Final Converse Report, and the 1992 Dames & Moore Remedial Investigation Workplan all depict the Chrysler Clarifier in proximity to where the L-shaped addition was located. Banks Decl., Exhs. 17, p. 144-45 [Tank Removal Report]; 18, p. 152 and 21, p. 174 [Converse Reports]; Ruiz Decl., ¶¶ 5 & 6; Ford Decl., Exh. 2, p. 14 [McLaren Report]; January Report, Figure 5-10. Plaintiffs seek to create a question of fact by contending the Chrysler Clarifier must have been outside the Body Works Building, based on a statement made in the McLaren report that the Body Works Building was intact.[8] This is immaterial because the

---

[8] The McLaren report states that the Chrysler "facility consists of 17 buildings, the majority of which are open sided, metal framed sheds and open asphalt areas." Ford Decl., Exh. 2, p. 13. This explains why some reports draw the Chrysler Clarifier as outside of the rectangular building, but within the area where we know the L-shaped addition was located. It is also possible that the L-shaped addition to the Body Works Building was removed prior to removing the Chrysler Clarifier.

McLaren Report, like the Tank Removal Report, also depicts the Chrysler Clarifier in the same location as where the L-shaped addition to the Body Works building was located.[9]





Tank Removal Report, Figure 2B          McLaren Report, Site Plan

Based on Mr. Ruiz' analysis of aerial photographs, which Mr. Mutch admits "is adequate to assess the timing of the building expansion," Union Pacific has established that the L-shaped expansion did not occur until sometime between 1983 and 1987.  Mutch Rebuttal Report, 1-8.  Regardless of when the L-shaped expansion was removed, there is no dispute that it was built after Union Pacific sold the Chrysler Property on January 21, 1974.  *Id*.  It is also undisputed that the Chrysler Clarifier was located within this addition.

On this point, in both his initial and rebuttal expert reports, Mr. Mutch agrees that the Chrysler Clarifier was located within the L-shaped addition of the Body Works Building.  In Figure 5-10 to his January Report, Mr. Mutch identifies the location of the Chrysler Clarifier consistent with Mr. Ruiz' identification:

---

[9] The Tank Removal Report figure 2B may be referenced at Banks Decl. Exh. 17, p. 145; the McClaren Report Site Plan may be referenced at Ford Decl., Exh. 2, p. 14.



Ruiz Figure 1          Mutch Figure 5-10

Likewise, in his Rebuttal Report, Mr. Mutch admits that "[t]he annotated site photograph referenced by Mr. Ruiz <u>does indeed support that the Chrysler Clarifier was excavated from a location within the expanded footprint of the Body Work Building</u>." Rebuttal Report, p. 1-7 (emphasis added).

The foregoing admission by Mr. Mutch unequivocally refutes Plaintiffs' assertion that the "evidence does not support Mr. Ruiz's opinion that Clarifier 2 was inside the Body Works Building." Opp. 26:18-20.

> ### c.     The October 16, 1973 officially-approved site plans do not depict the 1200 Gallon Clarifier

In connection with Chrysler obtaining new wastewater discharge permits, two site plans for the Chrysler Property were approved by the Los Angeles County Sanitation District ("LACSD") in 1973 and 1974. Plaintiffs claim that the "1973 and 1974 site plans and maps … show the presence of a clarifier, before Union Pacific sold the property." *See* Opp. 29:13-15; Opp. 27:9-11. However, to the extent Plaintiffs seek to create an inference that an additional clarifier could have been a potential source of contaminant releases during Union Pacific's ownership, the 1973 site plan does not depict the 1200 Gallon Clarifier.

On October 16, 1973, the LACSD approved site plans in connection with Chrysler's Industrial Wastewater Discharge Permit No. 787. Banks Decl., Exhs. 8

[Site Plan Map] and 7 [Approval Letter].  On January 31, 1974 (10 days after Union Pacific sold the Chrysler Property), LACSD approved site plans in connection with Chrysler's Industrial Wastewater Discharge Permit Nos. 926, 927 and 928.  Banks Decl., Exhs. 10 [Plan Approval], 11 [Site Plan Map] and 13, p. 126 [Map].  Both sets of site plans depict the location of all current and proposed clarifiers and other structures on the Chrysler Property. Ruiz Decl., ¶¶ 7 & 8.

Notably, the site plan approved in 1973 plainly does <u>not</u> depict the 1200 Gallon Clarifier, while the plan approved in 1974 after Union Pacific sold the Chrysler Property, clearly does.[10]

 

1973 Approved Site Plan, blue circle added        1974 Approved Site Plan, Mutch Figure 1-4

This derives from the fact that the 1200 Gallon Clarifier was approved in connection with Permit No. 926.  Banks Decl., Exhs. 10 [Plan Approval] and 13, p. 126 [Map].  The County of Los Angeles did not issue Permit No. 926 until April 2, 1974 – <u>several months after Union Pacific sold the Chrysler Property</u>.  Banks Decl., Exh. 13 [Permit Approval].[11]

---

[10] The 1973 Approved Site Plan may be referenced at Banks Decl., Exh. 8, p. 111.
[11] Mr. Mutch's rebuttal report fails to acknowledge, or even address, that the 1973 approved site plan does not depict the 1200 Gallon Clarifier.  Instead, Mr. Mutch and Plaintiffs cite to a purported, and unauthenticated (*see* Union Pacific's Request for Evidentiary Ruling), 1971 site survey as evidence that the 1200 Gallon Clarifier was present on the Chrysler Property at that time.  Even were this true, it is immaterial to the present Motion because this clarifier – separate and apart from the Chrysler Clarifier – has never been identified, whether by the EPA, the Regional Board, or any consultants involved with investigating and/or remediating the Chrysler Property, as a potential source of contamination. Moreover, the site survey does not identify any relevant contaminants of concern – i.e., chlorinated solvents –

### 3.    Mr. Mutch's Reports Do Not Rebut and Actually Lend Support to Mr. Ruiz's Expert Opinions

In seeking to discredit Mr. Ruiz's expert opinions, Plaintiffs make the obvious observations that Mr. Ruiz "cannot say whether the soil contamination originated form the 1,200-gallon clarifier or the 750-gallon clarifier" [Opp. 29, n. 20] and that he "was not on expert on clarifiers, or industrial sewer systems." Mr. Ruiz, of course, was not designated as an expert as to these issues – he acknowledges that he is an expert on "aerial imagery" and "maps" and not hydrology, contamination, or clarifier and sewer design. Ruiz Decl., ¶ 2.[12]

Despite Plaintiffs' attempt to undermine Mr. Ruiz' testimony, Plaintiffs made no objections to Mr. Ruiz' opinions, evidence, or methodology. *See* Dkt. 949-81 [Plaintiffs' Request for Ruling on Specified Evidentiary Objections].  More importantly, Mr. Mutch concedes in his Rebuttal Report that: (1) "Mr. Ruiz's aerial photographic analysis is adequate to assess the timing of the building expansion" [p. 1-8]; (2) the "Chrysler Clarifier was excavated from a location within the expanded footprint of the Body Work Building;" and (3) the Tank Removal Report "illustrates the actual location of this clarifier and the area that PIC sampled." [p. 1-6].[13]   Therefore, Mr. Ruiz has provided credible expert opinion in support of Union Pacific's Motion.

as being used on the Chrysler Property at that time.  *See* Plaintiffs' Request for Judicial Notice, Exh. 77 (Dkt. 903-81).  Instead, the site survey only references "detergent, oil, grease, sand, silt, and paint dust."  *Id*. at p. 1157.  The site survey also states that there is no waste disposal to "ground."  *Id*.

[12] By contrast, Plaintiffs cast Mr. Mutch as an expert on a broad array of topics, including sewer and clarifier design, infiltration and exfiltration, hydrology, contaminant plumes, aerial photographic interpretation, and site plan/map interpretation.

[13] Although immaterial to Union Pacific's Motion, Plaintiffs also raise the issue that the clarifier may have been aboveground.  The applicable Los Angeles County requirements for clarifier installation stated that a clarifier/interceptor can only be "level with the floor" if "installed inside of [a] building."  Banks Decl., Exh. 7, p.109.  In other words, if the clarifier was located outside of a building, it would have to be partially aboveground.  Chrysler also stated in submitted site plans in connection with the clarifier associated with Permit No. 787 that the clarifier would be aboveground and under a metal roof.  *Id*. at p. 108.

1

## III.   <u>CONCLUSION</u>

2

For the foregoing reasons, Union Pacific respectfully requests that the Court

3

grant Union Pacific's Motion for Partial Summary Judgment.

4

Respectfully submitted,

5

6

DATED: April 15, 2021

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP

7

8

9

By:        /s/ Peter A. Nyquist

Peter A. Nyquist

10

Sedina L. Banks
Sherry E. Jackman

11

*Attorneys for Defendant Union Pacific
Railroad Company*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **PATSOURAS PROPERTY DEFENDANTS'**
2 | **REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
3 | **I.    INTRODUCTION**
4 | *Did hazardous substances which may have been released onto the soil*
5 | *decades ago at the Patsouras Property (which sits atop the path of the*
6 | *contaminated Omega OU-2 groundwater plume) travel from the soil surface to a*
7 | *depth of 35 to 74 feet to end up in the OU-2 groundwater?*

Plaintiffs and their expert toss hefty amounts of conjecture, suppositions, and speculation against the wall frantically trying to get to a plausible "yes" answer to that question.  But because conclusory, speculative testimony is all they have to offer, none of it sticks.  They don't—and can't—provide:

 (1) any site data showing that any hazardous substances in the soil migrated to the depth of the groundwater; and

(2) any data showing that the groundwater leaving the Patsouras Property was more contaminated than the groundwater coming onto the Property.

However, Moving Defendants and their expert provided:

(1) the site data showing that the groundwater depth was and is well below the depth of soil contaminants; and

(2) the data showing that the groundwater coming onto the Patsouras Property consistently had higher concentration of contaminants than the groundwater leaving the Property.

Based on that data, the Los Angeles Regional Water Quality Control Board formally concluded that the Property was *not* contributing to the groundwater contamination, issuing a "No Further Action Letter," acknowledging that the levels of contamination in the groundwater leaving the property were the same as the levels in the Omega plume coming onto the Property, and ordering the removal of existing groundwater monitoring wells because they were unnecessary.

Similarly, the U.S. Environmental Protection Agency has assessed properties in the path of the Omega Plume for more than 15 years pursuant to its policy of issuing notice letters "to *all* parties where there is *sufficient evidence to make a preliminary determination* of *potential* liability under §107 of CERCLA."[1]   EPA determined that there was sufficient evidence to make a preliminary determination of potential liability for 42 parties (other than Plaintiffs), and issued 42 notice letters to owners and operators of properties overlying the Omega Plume.[2] However, after more than a decade and a half of review, EPA has *not* found sufficient evidence to preliminarily determine that the Patsouras Property Defendants are liable for any groundwater contamination and has *not* issued notice letters to them.

The Patsouras Property Defendants can be liable to Plaintiffs under CERCLA *only* if hazardous substances in the Property soil traveled 35 to 74 feet[3] below ground surface, entered into the groundwater, and commingled with the Omega Plume, causing Plaintiffs to incur response costs.  Plaintiffs have not provided more than a scintilla of evidence that that has happened or that there is a "plausible pathway" for that to have happened.  The Motion for Summary Judgment should be granted.

## II.   SOIL CONTAMINANTS ON THE PROPERTY

### A.   SOME CONTAMINANTS WERE FOUND IN SOIL

Plaintiffs devote ten pages to their rendition of historic operations and their ruminations about operations that *might* have caused *soil* contamination. (Opp. at 32-42).   But their speculation is moot, because the Patsouras Property soil was thoroughly investigated under the auspices of and with the approval of the Los

---

[1] 53 Fed. Reg. 5298, 5301 (Feb. 23, 1988)(emphasis added).
[2] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.ars&id=0903349&doc=Y&colid=64480&region=09&type=AR
[3] The *minimum* depth from soil surface to the groundwater under the Property has been more than 35 feet and has been as deep as 74.7 feet below ground surface.

Angeles Regional Water Quality Control Board.  That investigation documented the *actual* contaminants and their concentrations on the Property.  Only minor amounts of PCE and TCE were found, and the extremely low concentrations, frequency, and locations of PCE and TCE are consistent with their degassing off of the Omega Plume.[4]

The site investigation showed that the primary compounds found on the Property were heavy petroleum hydrocarbons and arsenic. The heavy petroleum hydrocarbons did not make their way to OU-2 groundwater, wouldn't be soluble in the groundwater if they had, and aren't hazardous substances under CERCLA in any event.[5]  The arsenic concentrations found in the soil were within background levels for regional soils[6] and the Regional Board ruled out arsenic as a contaminant of concern on that basis.

Chromium concentrations also were within the background concentration levels normally found in uncontaminated soil, except for one sample.  That one outlier sample was found at two feet and was only slightly above the background level.  Moreover, because the heavy petroleum residues in Property soil have rendered the soil anoxic, the resulting reducing conditions convert any hexavalent

---

[4] Wick Decl., Exh. A (Dr. Kulla Expert Opinion at 4.)
[5] 42 U.S.C. § 9601(40)("petroleum, including crude oil or any fraction thereof," is excluded from the definition of "hazardous substance").
[6] Plaintiffs manufacture a silly straw-person attack on Dr. Kulla in a footnote (Opp. at 39-40, fn. 26), arguing that Dr. Kulla contended that an arsenic level of 55 mg/kg was "characteristic of background for regional soils," and then saying "she is wrong" because DTSC's background level is 12 mg/kg.  But Dr. Kulla actually wrote in her report that the "*maximum* concentration of arsenic was 55 mg/kg" at the Property, which is characteristic of background."  In other words, because the other samples were all either non-detect or lower-concentration samples, the overall levels are within background levels.  And EAI confirmed her statement, using the EPA-approved software to determine that the 95% confidence level for arsenic detected in soil at the Property was 12.99 mg/kg, which "is very close to (within the range of) the 12 mg/kg background concentration determined acceptable by DTSC for LAUSD school sites, one of DTSC's most sensitive (restrictive) land uses." (Wick Decl., Exh. B, excerpt from EAI 2010 Report)

50

chromium into trivalent chromium (a harmless substance consumed safely and often by humans).[7]

As for PCE and other chlorinated compounds, at least 123 soil samples were taken on the West Parcel between 1994 and 2010, and *no PCE, TCE, 1,1-DCE, or chloroform were detected*.[8]  On the East Parcel of the Property, at least 137 soil samples were taken between 1994 and 2010, and PCE and TCE were found in *only a few soil samples at very low concentrations*[9] and *no 1,1-DCE, or chloroform was detected*.[10]

### B.   CONTAMINANTS IN SOIL GAS CAME FROM THE OMEGA PLUME, NOT THE PROPERTY

Plaintiffs argue in a footnote that soil gas sample results "localized in a portion of the Property with high PCE soil levels," signify "a definitive onsite source." (Opp. at 38, fn. 25.)  Plaintiffs' choice of a two-sentence footnote to showcase that argument suggests their low confidence it, and for good reason. As Dr. Kulla noted, "the spatial distribution of the PCE and TCE soil gas, with the higher concentrations found in the 15 ft bgs (below ground surface) samples and the lower concentrations in the shallower 5 ft bgs, indicate degassing off of a deeper source of contamination (i.e., the contaminated OU-2 groundwater), not shallow soil contamination as claimed by Mr. Mutch."[11]

The Regional Board, DTSC, and California Office of Environmental Health Hazard Assessment (OHHEA) have required numerous properties (residential and commercial) in the path of the Omega Plume to perform shallow soil gas surveys

---

[7] Wick Decl., Exh. C (Dr. Kulla Rebuttal of Mutch Expert Report at 7).
[8] *Id.*, at 3.
[9] *Id.*  The maximum PCE concentration was 0.51 mg/kg and TCE was 0.27 mg/kg.
[10] *Id.*
[11] Moreover, "the discrete soil testing on the West Parcel showed no signs of shallow soil contaminated with PCE and TCE.  In fact, in numerous investigations on the West Parcel, no chlorinated or volatile organic chemicals were detected in any of the discrete soil samples (see Table 2, Kulla Expert Report)."  Wick Decl., Exh. C (Dr. Kulla Rebuttal Report, at 8).

because the agencies know that the toxic vapors degassing off of the contaminated Omega Plume pose a potential health risk to humans. That's why the soil gas survey on the West Parcel of the Patsouras Property was conducted, and why it was only performed on the shallow section of the soil column at 5 and 15 ft bgs—to measure the amount of the soil gas that might seep into a prospective new building.[12]

When the Regional Board and EAI observed that the pattern in the soil gas concentrations *might* indicate a soil source localized deep in the central portion of the West Parcel (i.e., Plaintiffs' allegation in footnote 25), the Regional Board directed EAI to perform additional investigation of the soil column in the central portion of the West Parcel with the highest soil gas concentrations. EAI drilled and sampled four 70-foot-deep borings (the groundwater in 2009 was *below* 70 feet bgs) in the area with the highest soil gas readings, collecting soil samples from each boring at depths of 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65 and 70 feet bgs. Each soil sample was analyzed for volatile organic compounds, including PCE and TCE, by the standard methodology using EPA Method 8260B. ***No volatile organic compounds were detected in any of the discreet soil samples.***[13] These results confirmed that there was no discrete soil source of PCE or TCE (or any other volatile organic compound) in the soil on the West Parcel. Therefore, EAI concluded—and the Regional Board agreed—that the soil gas vapor measured on the Patsouras Property resulted from degassing off the contaminated Omega Plume. This evidence debunks Plaintiffs' footnoted soil gas argument. And it's conclusive evidence that Mr. Mutch's speculation in his expert report[14] that the soil gas concentrations were caused by PCE and TCE in the Property soil was wrong.

---

[12] *Id.*

[13] *Id.* at 8-10.

[14] "These soil gas findings in conjunction with the earlier discussed soil and groundwater data, *strongly support* the conclusion that the Patsouras property has contributed PCE to soil, soil vapor, and groundwater." (Mutch Expert Report, Doc. #903-204 at 168)(emphasis added).

The soil contaminants, in any event, are not an issue in this motion (or in this case).  Plaintiffs didn't clean up any soil contaminants—the current property owner, Moving Defendant Kekropia, did.  The only issue germane for this motion, addressed next, is groundwater.  Have Plaintiffs provided admissible evidence showing that hazardous substances in Property soil migrated through the soil and contacted the groundwater table?  The answer is no.

### III.  THE GROUNDWATER DATA SHOW NO CONTRIBUTION OF CONTAMINANTS FROM PATSOURAS PROPERTY SOIL

Hydrogeologists employ two key lines of evidence to assess whether a property has contributed to groundwater contamination: (1) demonstration that chemical contaminants in the soil have migrated down through the soil and contacted the water table, and (2) a consistent pattern of higher contaminant concentrations in the downgradient (downstream) groundwater on the property than the contaminant concentrations coming from upgradient (upstream) groundwater onto the property."[15]

At the Patsouras Property, (1) the data do *not* show that any soil contaminants contacted the water table and (2) the data show a consistent pattern of higher contaminant concentrations in the upgradient wells compared to the wells on the Property.  Thus, both lines of evidence align, showing that the Property is *not* a source of groundwater contamination.  The Regional Water Quality Control Board agreed with that analysis.

Confronted by those undeniable facts, Plaintiffs argue that site environmental consultant EAI, the Regional Board, and Dr. Kulla all got it wrong.  But none of their arguments withstand scrutiny as anything more than conjecture and speculation, literally contradicted by the facts in the ground (and the groundwater).

---

[15] Wick Decl., Exh. C (Dr. Kulla Rebuttal Report, at 1).

A.    **THERE IS NO DATA SHOWING THAT ANY SOIL CONTAMINANTS CONTACTED THE WATER TABLE**

   1.    **Soil Samples Above ESLs Do Not Mean that Contaminants in Soil Impacted Groundwater**

Plaintiffs and their expert argue that because levels of PCE and TCE detected in a few soil samples at the Patsouras Property were above the San Francisco Bay Regional Water Quality Control Board Environmental Screening Levels ("ESLs"), then one can assume that those contaminants likely reached groundwater. (Opp. at 43:22-27.)  That is a complete distortion of the use and meaning of ESLs.

ESLs are a *preliminary screening* tool designed to be used very early in the site investigation process to focus the investigation.  The ESL User's Guide explicitly rejects Plaintiffs' assumptions about an ESL exceedance: "The presence of a chemical at concentrations exceeding an ESL does not necessarily indicate adverse effects on human health or the environment, rather that additional evaluation is warranted."[16]

When a chemical concentration exceeds the ESL it means *only* that "additional evaluation is warranted."[17]  Here, "additional evaluation" *was* conducted, which demonstrated to the satisfaction of the Regional Board that the Patsouras Property was *not* impacting the OU-2 groundwater.

   2.    **Chromium Detected in a Two-Foot-Deep Sample Did Not Contact Groundwater**

At least 60 soil samples were tested for chromium, and all were within background levels, except for one sample taken two feet below ground surface, which was 71.1 mg/kg, slightly above the background level of 64 mg/kg established

---

[16] *Id.* at 4 (citing The User's Guide: Derivation and Application of Environmental Screening Levels (ESLs) Prepared by: San Francisco Bay Regional Water Quality Control Board INTERIM FINAL 2019 (Revision 1, p. ii)(Wick Decl., Exh. K).
[17] *Id.*

by the County of Los Angeles.[18]  Plaintiffs cite the *national* background level of 30-36 mg/kg. to argue that the site chromium was not naturally occurring, but the Regional Board appropriately applied the actual concentrations of naturally-occurring chromium found in *Los Angeles* soils, and ruled out chromium as a contaminant of concern.

Plaintiffs also argue that even the background-level chromium concentrations *could* include hexavalent chromium, and that the site investigation didn't "adequately analyze" soil samples for hexavalent chromium.  But, in addition to the low concentrations of total chromium, the Regional Board did not require sampling for hexavalent chromium because the Patsouras Property soil is anoxic (lacking oxygen).  The Property soil contains rotting organic carbon and heavy oil from historical oil operations (which Plaintiffs say were conducted for at least 30 years (Opp. at 32:25-33-1)), which means the soil is "reducing."  Therefore, any hexavalent chromium in the soil would have been chemically reduced to harmless trivalent chromium long before it could have made its way 35 to 75 feet to groundwater, as Dr. Kulla explained:

> Under anoxic soil conditions, the chemical environment is reducing, transforming hexavalent chromium into trivalent chromium.  Any hexavalent chromium spilled into the soil at the Patsouras Property would have been readily chemically reduced to trivalent chromium.  Trivalent chromium is the harmless form of chromium often added to human vitamins to aid in sugar metabolism. [19]

Finally, two significant facts from the groundwater investigation at and around the Property confirm that the Property has not contributed hexavalent chromium to the groundwater: (1) the upgradient groundwater flowing onto the Property *already* contains hexavalent chromium,[20] and (2) only *de minimis*

---

[18] Wick Decl., Exh. D (County of Los Angeles Public Health, chart at 6)._
[19] Wick Decl., Exh. C (Dr. Kulla Rebuttal Report at 5).
[20] Wick Decl., Exh. A (Dr. Kulla Expert Report at 8).

concentrations of chromium were found in the groundwater under the Patsouras Property—*below* the *drinking water* standard (the Maximum Contaminant Level, or MCL).[21]

### 3. Two Borings with PCE Detections Do Not Show that PCE Contacted Groundwater

Plaintiffs argue PCE detected at low concentrations in two borings (B-7 and E-9) shows that PCE must have migrated far enough to contact the groundwater table (Opp. at 44-45.)

Not so. The concentrations were low,[22] and the deepest samples with *any* concentration of PCE were found at 25 feet bgs in B-7 and at 30 feet bgs in E-9. Moreover, both soil samples were entrained in heavy oil.[23]

At the time of these samples were taken (in late 1994), the groundwater table was estimated at *35 ft bgs* at the location of the borings, according to EAI.[24] Moreover, the fact that a soil sample was taken at 35 feet bgs in boring B-7 for soil analysis indicates that the groundwater table was *deeper* than 35 feet bgs at this location. Even Mr. Mutch admitted that he did not find any evidence the groundwater table in the area of B-7 and E-9 was ever shallower 35.84 feet.[25]

In boring B-7, PCE was found at a concentration of 0.51 mg/kg at a depth of 25 feet bgs. The soil sample taken in soil boring B-7 at 35 feet bgs—ten feet deeper than the 25-foot sample—was "non-detect"—*it had no PCE in it*. The PCE in this soil boring indisputably was *not* found contacting the groundwater table. (In

---

[21] *Id.* (Dr. Kulla Expert Report at 5). Plaintiffs argue that even though the levels currently in the groundwater are safe to drink, "historical releases that have left the property" may have been higher. (Op. at 47:21-48:3.) The problem for Plaintiffs' conjecture is that there's no evidence of historical releases of chromium at the Property (see discussion, *infra*).

[22] *Id.* (Dr. Kulla Expert Report at 4).

[23] *Id.*

[24] Wick Decl., Exh. F (PSI Report excerpt, 1994) and Exh. G (EAI Report expert, Dec. 18, 1995).

[25] Mutch Tr. at 926:23-927:1). (*upgradient* well MW-2 was at depth of 32.14 feet in 1997)(Mutch Tr. 957:10-959:5).

fact, a deeper boring (to 70 feet bgs) was drilled next to B-7, and samples were non-detect for PCE below 20 feet bgs all the way down to 70 feet bgs.[26])  Similarly, the detection in boring E-9 at 30 feet indisputably was *not* found contacting the groundwater table.[27]   Thus, the data confirm that the deepest borings in which PCE was detected did *not* contact the water table.

But in their Opposition, Plaintiffs ignore the key fact that their own expert admitted: *groundwater data show that groundwater was never higher than 35.84 feet bgs in the area of the PCE samples for B-7 and E-9.*  Instead, Plaintiffs resort to pure conjecture—and to using a variety of creative adjectives—to suggest that the water table *was* higher, apparently hoping that their false linguistic contortions would somehow retroactively raise the depth of the water table (or at least fool the Court into thinking the water table was ever higher than 35.84 feet in that area). Then, they incessantly repeat those false characterizations, as if the dint of repetition can drown out the facts.

Plaintiffs say that the water table was present at "*around*" 30 feet bgs,[28] that the borings revealed PCE to be at the "*effective depth*" of the groundwater table,[29] that water depths were "*perhaps*" as close as 25 feet bgs,"[30] and that samples at 25 feet bgs were "down to, or *very nearly down to*, the water table," [31]  that a depth of 25 feet bgs "was *within a few feet* of the depth of groundwater during this time period," [32]  and that "the groundwater table *could have been* as shallow as 25 feet bgs at times during this period."[33]

---

[26] Wick Decl., Exh C (Dr. Kulla Rebuttal Report, Table 2, p. 2).
[27] Wick Decl., Exh. G (EAI Subsurface Investigation Report, Dec. 18, 1995, at PTFS00022647-8).
[28] Opp. at 44:18-19 (emphasis added).
[29] Opp. at 44:21-23 (emphasis added).
[30] Opp. at 44:28-45:2; 47:11-13 (emphasis added).
[31] Opp. at 31:24-27 (emphasis added).
[32] Opp. at 41:17-19 (emphasis added).
[33] Opp. at 41:19-21 (emphasis added).

All false.  Plaintiffs know full well that the water table was *never* as "close as 25 feet bgs," and that the PCE was not detected at the depth of the groundwater table.  Plaintiffs and Mr. Mutch provide no evidence—*because there is none*—that the groundwater table was *ever* shallower than 35.84 feet bgs at the location of soil borings B-7 and E-9.

**4.**     **The Conjecture of Some Fire Department Employees (20 Years Before the Property Investigation Was Completed) Was Based on an Erroneous Reading of the Data**

In the absence of actual site data to make their case, and with the Regional Board confirming after the Patsouras Property investigation was complete that soil contaminants did *not* contact the water table, Plaintiffs pin their hopes on two memos and a letter prepared by fire department employees.  Plaintiffs say those documents show that the employees thought that contaminants in Property soil made their way to groundwater.  However, that conjecture was made more than twenty (20) years *before* the Patsouras Property site investigation was completed, and the employees misinterpreted the data.

Plaintiffs cite a memo authored by Steve Chase, "an employee" of the Santa Fe Springs Fire Department, stated that "historic Palley site operations contamination probably contributed to the VOC portion" of the groundwater under the Property and that PCE was found in a soil column [boring E-9] "from 10 feet bgs to 35 feet bgs." (Opp. at 46:4-47:1).  Plaintiffs also cite a letter from Chase's boss (Dave Klunk) incorporating portions of Chase's memo verbatim. (Opp. at 47:1-5.) [34]

There is no indication that the fire department employees had the expertise to assess—or that they actually did assess—the issue of whether soil contaminants at

---

[34] Mr. Chase's boss, Dave Klunk, relies on and then enhances Mr. Chase's memo to say that there was "demonstration of HVOC contamination to GW" in a letter to the Regional Board. (Opp. at 47:1-5.)

the Property migrated into the groundwater.  However, the fact that Mr. Chase misinterpreted the sampling data indicates they did *not* have the expertise and did *not* carefully assess the migration issue. PCE was *not* found "from 10 feet bgs to 35 feet bgs," as Mr. Chase erroneously wrote, and as his boss Dave Klunk erroneously parroted in his letter.  PCE was found at 30 feet bgs, *not* at 35 feet bgs.[35]

In any event, the fire department employees, realizing that they were metaphorically out of their depth (if not literally), asked the Regional Board to take responsibility for oversight of the Property.  The Regional Board did, of course, and after overseeing an eight-year investigation, the Board concluded that the Property was *not* impacting groundwater.

**B.** **THE DATA SHOW CONSISTENTLY HIGHER CONCENTRATIONS OF CONTAMINANTS COMING ONTO THE PROPERTY FROM UPGRADIENT PROPERTIES THAN ON THE PROPERTY**

Kekropia's environmental consultant EAI appropriately relied on the upgradient wells on the Pilot Chemical Property to assess whether contaminants from the Patsouras Property were being added to the groundwater contamination coming onto the Property from Pilot Chemical and other upgradient sources.  The Regional Water Quality Control Board agreed with EAI that the Pilot Chemical wells were appropriate upgradient wells for assessing the Patsouras Property and concluded that the Patsouras Property was *not* contributing contaminants to the OU-2 Omega Plume.[36]  The concentrations of PCE and TCE in the groundwater coming onto the Patsouras Property from upgradient sources are and have been consistently *higher* than the concentrations leaving the Property.[37]

---

[35] Wick Decl., Exh. G (EAI Subsurface Investigation Report, Dec. 18, 1995, at PTFS00022647-8).
[36] Wick Decl., Exh. C (Dr. Kulla Rebuttal Report at 7-8).
[37] *Id.* at Table 1.

1

### 1. Plaintiffs' Expert Admits that Assessing What Is Flowing Onto a Property from Upgradient Properties Is Required, But Fails to Do So Here

Plaintiffs' expert Mr. Mutch admitted that to evaluate whether a property is contributing contaminants to groundwater "requires, among other things, that I evaluate what is flowing from upgradient onto those properties."[38]  He even admitted that the Pilot Chemical property "is probably at least partially upgradient to some parts of the [Patsouras] property."[39]  (Similarly, Plaintiffs really hedge their bets in their Opposition, saying that "*many*, if not *most*, of the Pilot Chemical wells *may* be cross-gradient, not upgradient, of the Patsouras Property." (Opp. at 48:13-21.)  But if that language is parsed carefully, it means that Plaintiffs are acknowledging that *some* of the Pilot Chemical wells must be upgradient—as Mr. Mutch himself actually did acknowledge).[40]

However, Mr. Mutch violated his own admonition that in evaluating whether the Patsouras Property contributed contaminants to groundwater "*requires*" evaluating what is "flowing from upgradient" onto the Patsouras Property, because he admitted he did not consider *any* of the Pilot Chemical wells.[41]  Perhaps his otherwise inexplicable failure to consider the upgradient Pilot Chemical wells was because he knew that the data from those wells was fatal to Plaintiffs' case against the Patsouras Property Defendants.

### 2. The Pilot Chemical Property Is Upgradient of the Patsouras Property

Plaintiffs argue that there are "three significant flaws" to what they call "Dr. Kulla's analysis" that the Pilot Chemical wells are upgradient. (Opp. at 48:9-49:12.)

---

[38] Wick Decl., Exh. E (Mutch Tr. at 62:16-64:13).
[39] *Id.* (Mutch Tr. at 769:25-770:8).
[40] *Id.*
[41] *Id.* (Mutch Tr. at 775:21-778:1).

Although it certainly is Dr. Kulla's analysis, it's not hers alone—it's also the analysis of the Regional Water Quality Control Board, EAI, and the consultant for Pilot Chemical Company (AECOM) that the Pilot Chemical property is upgradient of the Patsouras Property.  Plaintiffs say the state regulatory agency, the environmental consultants for the two properties, and Dr. Kulla are wrong for the following reasons:

First, Plaintiffs say the Pilot Chemical property is "generally to the *east* of the Patsouras Property" (emphasis in original), and that the groundwater "generally" flows in a "south, southwest direction," citing Dr. Kulla, "not in the more westerly direction suggested by the arrows in Figure 6." (Opp. at 48:14-19.)

Plaintiffs are correct that the Pilot Chemical property is generally to the east of the Patsouras Property, as Dr. Kulla's Figure 6 shows.  Plaintiffs are also correct that Dr. Kulla noted that "the contaminated groundwater originating from activities on the Omega Site is flowing *from the [Omega] site* in a *general* south, southwestward direction."[42]  Then Plaintiffs argue that those two facts somehow discredit Dr. Kulla's analysis and the Regional Board's conclusion.

### a.     EAI Determined the Groundwater in the Property Area Flowed in a Westerly Direction

In fact, however, while Dr. Kulla was correct in describing the groundwater flow *from the Omega Site property* in a general south, southwest direction, the flow is a bit different in the area of the Patsouras, Pilot Chemical, and Phibro-Tech properties.  EAI determined, using groundwater elevation data from the Pilot Chemical and Phibro-Tech properties, that there was a "*westerly* ground water flow direction beneath the [Patsouras] Site, which is consistent for the area."[43]  Thus, EAI concluded that the Pilot Chemical Property was upgradient of the Patsouras

---

[42] Wick Decl., Exh. A (Dr. Kulla Expert Report at 1).
[43] Wick Decl., Exh. H (Excerpt from EAI Supplemental Site Assessment and First Quarter 2010 Ground Water Monitoring Report, at 11).

Property—i.e., groundwater flows west from Pilot to Patsouras.

    **b.**  **Dr. Kulla Agreed that Pilot Chemical Wells 5,6,7 and 8 Were Upgradient of the Patsouras Property Wells**

  Plaintiffs also take issue with the fact that Dr. Kulla added her own interpretive arrow (even though she explicitly noted that she did so) to Figure 6 in her expert report, and Plaintiffs argue that Dr. Kulla offered "no basis whatever" for her opinion about groundwater flow (that was the "second flaw") (Op. at 48:22-49:7.)  Actually, Dr. Kulla's opinion about the groundwater flow direction was formed after she reviewed of all the environmental reports submitted to the Regional Board relating to the Patsouras Property.  She placed her interpretive groundwater flow arrow in a more westerly direction based on that review.  She also corroborated her interpretation with additional analysis or her own, plotting the water level data from the relevant Pilot Chemical and Patsouras Property wells (based on where they were screened) and showing the gradient contours.[44]

  Plaintiffs' "third flaw" is that the monitoring well network on the Patsouras Property alone is "inadequate to delineate flow direction," and as a result Dr. Kulla's set of well data is not "sufficient or reliable." (Op. at 49:8-12.)  Well, using data from upgradient properties near the Patsouras Property *combined* with data from the Patsouras Property is the best way to delineate flow direction—and that's the approach Dr. Kulla, EAI and the Regional Board took; they *didn't* rely solely on the Patsouras Property data.[45]

    **c.**  **Pilot Chemical's Consultant Determined that the Pilot Property Is Upgradient of the Patsouras Property**

  The nail in the coffin of Plaintiffs' argument that Pilot Chemical is not upgradient is the fact that the consultant for the Pilot Chemical property, AECOM, independently concluded that Pilot *was* upgradient of the Patsouras Property.

---

[44] Wick Decl., Exh. I (Dr. Kulla Contours).
[45] See footnotes 43 and 44.

Pilot Chemical was asked by the Regional Board to assess the *downgradient flow* of contaminants in groundwater from Pilot Chemical well MW-9 (located in the most southwestern corner of the Pilot property). [46]  Pilot Chemical's consultant determined that the groundwater flowed *almost due west* from Pilot Chemical well MW-9 to the red-hatched area of the Patsouras Property. [47] [See AECOM Figure 2 at the bottom of the next page, with yellow highlights added showing MW-9 and the groundwater flow to the red-hatched area on the Patsouras Property.  At the top of the next page is Dr. Kulla's Figure 6, showing the same groundwater flow direction.]  AECOM's determination that Pilot Well MW-9 is *upgradient* of the southernmost portion of the Patsouras Property means that *all* the Pilot Chemical wells are upgradient of the Patsouras Property.

Indeed, the groundwater flow direction contours on all three documents (Dr. Kulla's Figure 6, Dr. Kulla's Contours, and Pilot Chemical's Figure 2 Contours), are virtually identical (all westerly/very slightly southwesterly). Most importantly, the contours all confirm that the wells Dr. Kulla used as upgradient to the Patsouras Property wells (Pilot Chemical wells 5, 6, 7, and 8) are indisputably upgradient of those wells.

In short, the consistent pattern of lower contaminant concentrations in the downgradient groundwater in the Patsouras Property wells compared to the contaminant concentrations coming from upgradient groundwater onto the property from the Pilot Chemical wells shows that the Patsouras Property has *not* contributed contaminants to the groundwater.

---

[46] Wick Decl., Exh. J (Pilot Chemical Letter and Figures, Figure 2).
[47] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





IV.   **PLAINTIFFS FAIL TO MEET THEIR BURDEN**

    A.   **PLAINTIFFS FAIL TO PROVIDE ADMISSIBLE EVIDENCE THAT PATSOURAS PROPERTY CONTAMINANTS HAVE MIGRATED INTO THE GROUNDWATER**

Hydrologists ask two questions to assess whether a property has contributed to groundwater contamination:

(1) Is there a demonstration that chemical contaminants in the soil have migrated down through the soil and contacted the water table?

(2) Is there a consistent pattern of higher contaminant concentrations in the downgradient groundwater on the property than the contaminant concentrations coming from upgradient groundwater onto the property?

Here the data show that the answers to both questions are "no."

Have Plaintiffs met their burden to designate specific facts showing that there is a genuine issue for trial?

No.

On the first question, there is no data showing that contaminants have migrated down through the soil and contacted the water table. In response, Plaintiffs make bald assertions, but those assertions are contradicted by their own expert's admission that the water table in the area of the contaminants has never been lower than 35.84 feet bgs. Plaintiffs have failed to provide admissible evidence sufficient to raise a genuine issue of material fact about contaminants contacting the water table.

On the second question, the data show that there is a consistent pattern of higher contaminant concentrations in the upgradient groundwater than in the wells on the Property. Environmental consultant EAI used groundwater elevation data from the adjacent Pilot Chemical and Phibro-Tech properties to determine the groundwater flow direction, which showed that groundwater was flowing onto the Patsouras Property from the Pilot Chemical property. The Regional Water Quality

Control Board agreed with that conclusion, issued a No Further Action letter for the Property, and ordered the Property wells to be removed because there was no reason to monitor those wells for any Property contribution to the groundwater.  Dr. Kulla came to the same conclusion.  In response, Plaintiffs speculate that the upgradient wells may not have been upgradient.  However, their own expert admitted that some of those wells were upgradient, but that he didn't bother to assess those or any of the Pilot Chemical upgradient wells.  Plaintiffs have failed to provide admissible evidence sufficient to raise a genuine issue of material fact contradicting the data-driven conclusions of EAI, the Regional Board and Dr. Kulla that contaminants from the Property did not impact the groundwater.

## B.  PLAINTIFFS FAIL TO MEET THEIR BURDEN REGARDLESS OF THE LEGAL STANDARD APPLIED

The Patsouras Property Defendants incorporate by reference the Moving Defendants' Joint Reply Brief on Common Issue of Law.  To defeat Moving Defendants' motion, Plaintiffs must provide admissible evidence that hazardous substances present in the soil at the Patsouras Property during the Moving Defendants' ownership or operation of the Property have contacted the groundwater table and that the groundwater under the Property has more contaminant concentrations that the groundwater flowing onto the Property from upgradient properties.

Notably, even if the Court applies the "plausible pathway" standard Plaintiffs desperately seek, the result is the same because Plaintiffs have failed to provide admissible evidence sufficient to raise a genuine issue of material fact that there is a "plausible pathway" at the Patsouras Property for contaminants found in the soil to contact the groundwater.  There may be a *possible* pathway," of course, but there's a "possible pathway" on *any* property located above groundwater, and that would make anyone whose property happens to overly the Omega Plume liable.  That's why it's not sufficient for Plaintiffs to produce admissible evidence of a mere

"possible pathway." *Asarco, LLC v. Cemex, Inc.*, 21 F.Supp.3d 784, 807 (W.D. Texas 2014).  Plaintiffs must show, with more than a scintilla of admissible evidence, that there is a "plausible pathway" for contaminants found in the soil to enter the groundwater and they have not done so:

> The Court notes that a 'possible' migration pathway … is not a 'plausible' migration pathway.  … A speculative migration pathway is not a plausible one. Rather, the Court must conduct an  inquiry into the facts as a whole—considering factors such as the location of the cleanup site and defendant's facility, the geology and hydrology of the area, and the nature and quantity of the contamination—to determine whether it is more likely than not that the release from defendant's facility could have migrated to the cleanup site. *Cf. Thomas*, 846 F. Supp. at 1390 (listing possible factors to weigh when determining causation).

*Id.*

In Thomas, the court concluded that the expert's opinions were "concocted of impermissible bootstrapping of speculation upon conjecture," because all the expert could say was that there was a "likelihood" that someone "could" have contributed to the contamination, or there is "reason to believe" that someone could be a "potential contributor."  Thomas v. Fag Bearings Corp., 846 F.Supp. 1382, 1394 (W.D. Mo. 1994).

Sound familiar?  That aptly describes Plaintiffs' expert's speculation and conjecture here.  Plaintiffs have not provided admissible evidence of a "plausible pathway" between the deepest contaminants in the soil and the deeper groundwater table.

## V.    <u>CONCLUSION</u>

The Patsouras Property Defendants can be liable to Plaintiffs under CERCLA *only* if hazardous substances in the Property soil traveled 35 to 74 feet below ground surface, entered into the groundwater, and then commingled with the Omega Plume, causing Plaintiffs to incur response costs.  There isn't more than a

1    scintilla of evidence that that has happened, or that there is a "plausible pathway"

2    for that to have happened.

3          The Motion for Summary Judgment should be granted.

4

5    DATED:  April 15, 2021              WACTOR & WICK LLP

6

7                                By:  _____/s/ William D. Wick_____

8                                     William D. Wick
                                      *Attorneys for Defendant Halliburton*
9                                     *Affiliates, LLC*

10   DATED:  April 15, 2021              BASSI EDLIN HUIE & BLUM LLP

11

12

13                               By:  _____/s/ Farheena A. Habib_____

                                      Farheena A. Habib
14                                    *Attorneys for Interveners Fireman's Fund*
                                      *Insurance Company and Federal Insurance*
15                                    *Company, as Insurers for Palley Supply*
16                                    *Company*

17   DATED:  April 15, 2021              OTTEN LAW, PC

18

19                               By:  _____/s/ Victor Otten_____

20                                    Victor Otten
                                      *Attorneys for Defendant Kekropia, Inc.*

21

22

23

24

25

26

27

28

1

## **CERTIFICATION OF CONCURRENCE FROM ALL SIGNATORIES**

I, Peter A. Nyquist, am the ECF user whose ID and password are being used to file MOVING DEFENDANTS JOINT REPLY IN SUPPORT OF MSJS RE: CERCLA LIABILITY.  In compliance with C.D. Cal. Civ. L.R. 5-4.3.4(a)(2)(i), I hereby attest that I have obtained the concurrence of each signatory to this document.

DATED: April 15, 2021

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP

By:    /s/ Peter A. Nyquist
     Peter A. Nyquist
     Sedina L. Banks
     Sherry E. Jackman
     *Attorneys for Defendant Union Pacific Railroad Company*