LATHROP GPM LLP
Nancy Sher Cohen.  Bar No. 81706
   nancy.cohen@lathropgpm.com
Ronald A. Valenzuela.  Bar No. 210025
   ronald.valenzuela@lathropgpm.com
2049 Century Park East, Suite 3500S
Los Angeles, California 90067-1623
Telephone:   (310) 789-4600
Facsimile:    (310) 789-4601

Attorneys for Plaintiffs
Arconic Inc. et al.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ARCONIC INC. et al.<br><br>Plaintiffs.<br><br>v.<br><br>APC INVESTMENT CO. et al.<br><br>Defendants. | Case No. 2:17-cv-06456 GW (Ex.)<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN ELEMENTS OF CERCLA LIABILITY (REPLY SUPPORTING PLAINTIFFS' OPENING BRIEF NO. 2)**<br><br>**Hearing:**<br>Date:     May 17, 2021<br>Time:     8:30 a.m.<br>Place:    Courtroom 9D, 9th Floor<br>          350 W. 1st Street<br>          Los Angeles, CA 90012<br>Judge:   Hon. George H. Wu |
| AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS | |

1

# TABLE OF CONTENTS

2

I.   INTRODUCTION ...................................................................................... 1

3

II.  COMMON ISSUES ................................................................................. 4

4

    A. EPA Special Notice Letters .................................................................... 4

5

    B. Defendants that are the subject of Plaintiffs' Motion for Partial Summary
       Judgment .............................................................................................. 6

6

III. ASSOCIATED PLATING PROPERTY ................................................. 6

7

    A. Introduction .......................................................................................... 6

8

    B. Argument ............................................................................................... 8

9

       1. Plaintiffs are entitled to partial summary judgment on the "facility"
          and "covered person" elements of CERCLA ...................................... 8

10

          a.  Plaintiffs have established the "facility" element under Section
             107(a). ........................................................................................ 8

11

          b.  Plaintiffs have established the "covered persons" element under
             Section 107(a). .......................................................................... 8

12

13

       2. Plaintiffs are entitled to partial summary judgment as to the "release"
          element. ......................................................................................... 11

14

15

          a.  Defendants' theory that the shallow groundwater beneath the
             Property might be "perched water" is unsubstantiated .................. 13

16

          b.  Even if Defendants' "perched water" theory is correct, it does not
             create a dispute of material fact. .................................................. 16

17

18

IV. EARL MFG. PROPERTY ....................................................................... 19

19

    A. Introduction ........................................................................................ 19

20

    B. Argument ............................................................................................. 20

21

       1. Plaintiffs are entitled to partial summary judgment against Defendants
          as to the "facility" and "covered persons" elements of Section 107(a).

22

          .................................................................................................... 20

23

       2. Defendants have not raised a dispute of material fact regarding the
          third judicial determination Plaintiffs seek, a release or threatened

24

          release from the Property to OU-2 Groundwater ............................... 22

25

          a.  Defendants' clay layer theory does not create a dispute of material
             fact. .......................................................................................... 22

26

27

            i.   The clay layer is not impermeable .......................................... 22

28

  ii. Dr. Tringale's report contradicts Defendants' admission that soil contamination at the Property has reached OU-2 Groundwater. ..................................................................25

 b. "Limited" OU-2 Groundwater contamination at the Earl Property is enough to satisfy CERCLA's "release" element. ................27

V. PHIBRO-TECH PROPERTY ...............................................................31

 A. Introduction ...............................................................................31

 B. Argument....................................................................................33

  1. Plaintiffs are entitled to partial summary judgment against Defendants as to the "facility" and "covered person" elements. ..........................33

   a. Plaintiffs have satisfied the "facility" element under Section 107(a). ...............................................................................33

   b. Plaintiffs have satisfied the "covered persons" element under Section 107(a). ..............................................................34

  2. Defendants do not dispute any of the facts required to satisfy the "release element" under the Castaic Lake test....................................35

  3. There has been a release or threatened release of hexavalent chromium from the soils at the Property to OU-2 Groundwater. .......36

   a. Defendants' contention that data from wells MW-4 and MW-9 are unreliable does not establish a dispute of material fact. ...............36

    i. Defendants' "flawed wells" theory is unsubstantiated............37

    ii. Even if true, Mr. Alger's faulty well theory does not create a dispute of material fact. ........................................................39

   b. Defendants' contention that Plaintiffs' expert ignored "critical" data from downgradient wells is meritless. ..................................40

    i. Defendants' argument is a red herring. ....................................41

    ii. DTSC has also concluded that wells along the southern Property boundary are insufficient to assess hexavalent chromium releases to OU-2 Groundwater................................44

  4. There has been a release or threatened release of PCE and TCE from the soils at the Property to OU-2 Groundwater. ................................46

   a. Whether Defendants' employees recall the use or handling of PCE or TCE at the Property is immaterial..............................................47

b. Conclusory denials that PCE and TCE soil contamination at the Property has impacted OU-2 Groundwater do not create a dispute of material fact. ............................................................47

5. Defendants' remaining attempts to create a dispute of material fact fail.................................................................................50

a. Defendants' claim that hexavalent chromium was reduced to trivalent chromium at the Property fails. ......................................50

b. Mr. Mutch's decision to use environmental screening levels does not create a dispute of material fact. ............................................52

VI. CHRYSLER PROPERTY ................................................................56

A. Introduction ............................................................................56

B. Argument................................................................................58

1. Plaintiffs have established the "facility" and "release" elements.......58

2. Union Pacific cannot create a dispute of material fact as to the "covered person" element by relying upon erroneous statements of the law. ......................................................................................58

a. Plaintiffs do not have to prove that a release to OU-2 Groundwater occurred when Union Pacific owned the Property. ......................59

b. Union Pacific's "Chrysler Clarifier" argument is a red herring. ...63

i. When the Chrysler Clarifier was installed is immaterial and does not create a dispute of material fact..................................63

ii. In addition to being wrong on the law, Union Pacific is also wrong on the facts as they relate to the installation of the "Chrysler Clarifier."...............................................................64

3. Even if Union Pacific were correct that Plaintiffs must show a release or threatened release during Union Pacific's ownership, Plaintiffs have done so. ......................................................................67

VII. PATSOURAS PROPERTY ................................................................72

A. Introduction ............................................................................72

B. Argument................................................................................74

1. Plaintiffs are entitled to partial summary judgment against Kekropia as to the "facility" and "covered persons" elements of CERCLA Section 107(a) ................................................................74

2. Plaintiffs are entitled to partial summary judgment against Kekropia as to the "release" element of CERCLA Section 107(a) ....................74

    a. Kekropia's "sufficient mass" argument does not create a dispute of material fact.....................................................................................75

        i. Kekropia's argument regarding PCE and TCE soil data is unsubstantiated...........................................................................75

        ii. Soil data regarding impacts of hexavalent chromium supports granting partial summary judgment...........................................79

    b. Kekropia has not created a dispute of material fact concerning the groundwater data at the Property. ..................................................83

        i. Groundwater data indicates that the Property has contributed hazardous substances to OU-2 Groundwater............................83

        ii. Kekropia's new groundwater contour map does not help it evade partial summary judgment..............................................85

VIII. CONCLUSION ............................................................................90

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3000 E. Imperial, LLC v. Robertshaw Controls Co.*,
No. 08-cv-3985 PA, 2010 U.S. Dist. LEXIS 138661at (C.D. Cal.
Dec. 29, 2010)........................................................................................8, 33, 74

*ABB Indus. Svs., Inc. v. Prime Tech, Inc.*,
120 F.3d 351 (2d Cir. 1997) .......................................................................61, 62

*Am. Int'l Specialty Lines Ins. Co. v. United States*,
No. CV 09-01734 AHM RZX, 2010 WL 2635768 (C.D. Cal. Jun.
30, 2010) .................................................................................................8, 21, 75

*Amland Properties Corp. v. Aluminum Co. of America*,
711 F.Supp. 784 (D.N.J. 1989).........................................................................59

*Bator v. State of Hawai'i*,
39 F.3d 1021 (9th Cir. 1994) .......................................................................25, 49

*Bond v. Knoll*,
No. EDCV 11-1929 PSG JC, 2014 WL 7076901 (C.D. Cal. Dec.
10, 2014) ....................................................................................................14, 79

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) .........................................................................9, 60

*Castaic Lake Water Agency v. Whittaker Corp.*,
272 F. Supp. 2d 1053 (C.D. Cal. 2003).....................................................*passim*

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ...............................................................................9

*City of Los Angeles v. San Pedro Boat Works*,
635 F.3d 440 (9th Cir. 2011) ..............................................................8, 21, 34, 74

*Cose v. Getty Oil Co.*,
4 F.3d 700 (9th Cir. 1993) .....................................................................12, 17, 28

*Ferguson v. Arcata Redwood Co.*,
   No. C 03-5632 SI, 2005 WL 1869445 (N.D. Cal. Aug. 5, 2005) ...............60, 61

*Guidroz–Brault v. Missouri Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001) ..............................................................................39

*Hinds Investments, L.P. v. Ryan*,
   No. SACV 07-00708 AG RNB, 2009 WL 951155 (C.D. Cal. Apr.
   6, 2009) .........................................................................................................*passim*

*Hous. Auth. Of Los Angeles v. PCC Technical Indus., Inc.*,
   No. 11-1626 FMO, 2015 U.S. Dist. LEXIS 192127 (C.D. Cal. Jan.
   26, 2015) .............................................................................................................59

*Keshish v. Allstate Ins. Co.*,
   959 F. Supp. 2d 1226 (C.D. Cal. 2013).............................................................17

*Liberty Leasing Co. v. Hillsum Sales Corp.*,
   380 F.2d 1013 (5th Cir. 1967) ......................................................................45, 49

*Lincoln Properties, Ltd. v. Higgins*,
   No. S–91–760DFL/GGH, 1993 WL 217429 (E.D. Cal. Jan. 21,
   1993) ......................................................................................................10, 59, 60

*Lizotte v. Praxair, Inc.*,
   640 F. Supp. 2d 1335 (W.D. Wash. 2009) .........................................................27

*Niagra Mohawk Power Corp. v. Jones Chem.*,
   315 F.3d 171 (2d Cir 2003) ................................................................................27

*Pinal Creek Grp. V. Newmont Mining Corp.*,
   218 F.R.D. 652 (D. Ariz. 2003).........................................................................63

*S. California Water Co. v. Aerojet-Gen. Corp.*,
   No. CV 02-6340ABCRCX, 2003 WL 25537163 (C.D. Cal. Apr. 1,
   2003) ................................................................................................................4, 5

*Save Our Bays & Beaches v. City & Cty. of Honolulu*,
   904 F. Supp. 1098 (D. Haw. 1994)....................................................................27

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011).............................................................49

*U.S. v. Bestfoods*,
   524 U.S. 51 (1998) ................................................................................. 8

*U.S. v. Various Slot Machines on Guam*,
   658 F.2d 697 (9th Cir. 1981) ............................................... 13, 17, 28

*United States v. Atchison, Topeka & Santa Fe Ry. Co.*,
   No. CV-F-92-5068 OWW, 2003 WL 25518047 (E.D. Cal. July 15,
   2003), *aff'd in part, rev'd in part sub nom. United States v.*
   *Burlington N. & Santa Fe Ry. Co.*, 479 F.3d 1113 (9th Cir. 2007) ............ 13, 16

**Statutes**

42 U.S.C. § 9601(9)(A) ..................................................................... 21

42 U.S.C. § 9607(a) ........................................................................... 77

42 U.S.C. § 9607(a)(4) ...................................................................... 76

**Other Authorities**

40 C.F.R. § 261.24 ............................................................................ 47

40 C.F.R. § 270.1(c) (2018) .............................................................. 31

# I.    INTRODUCTION

This is an environmental lawsuit involving a contaminated site east of Los Angeles, the Omega Chemical Corp. Superfund Site ("Omega Superfund Site"). At the center of this action is what EPA has identified as groundwater contamination at the Omega Superfund Site, designating it Operable Unit No. 2, or OU-2.[1] Plaintiffs contend that defendants, Phibro-Tech, Inc. et al. ("Defendants") have contributed to that contamination. Defendants are associated with various properties ("Properties or "Source Properties") where industrial operations occurred, in many cases for decades, and where contaminants in the soil have leached to OU-2 Groundwater.

Defendants claim that Plaintiffs are the ones who *caused* all the contamination. But that is not accurate. Plaintiffs are the ones who have stepped up to *address* the contamination in OU-2 Groundwater under a consent decree with the federal and state governments ("OU-2 Consent Decree").  Defendants have done nothing to address it.

Plaintiffs therefore brought this action and now move for partial summary judgment, seeking three judicial determinations against Defendants:

(1)    each Source Property is, or contains, a CERCLA "facility,"

(2)    each Defendant falls within one of four classes of "persons," subject to the liability provisions of CERCLA Section 107(a); and

---

[1] OU-2, is defined in the September 2011 EPA OU-2 Record of Decision and in the March 31, 2017 OU-2 Consent Decree, entered between Plaintiffs and EPA; it is composed of contaminated groundwater generally downgradient of OU-1, commingled with chemicals released from properties near or within the OU-2 boundary, which is shown graphically in both the 2011 EPA Record of Decision and the 2017 Consent Decree (hereafter, "OU-2 Groundwater").

(3)     there has been a "release," or "threatened release," of hazardous substances from each Source Property into OU-2 Groundwater.

Each Defendant concedes that the Property they are associated with constitutes a CERCLA "facility." All but one admits that they are "covered persons" under the statute. So the main issue that this Court must decide is the core question of this case: there has been a "release," or "threatened release," of hazardous substances from each Source Property into OU-2 Groundwater.  But nothing in Defendants' Opposition creates a dispute of material fact that would permit them to avoid partial summary judgment.

- **Associated Plating Property**. The Associated Plating Defendants **admit** that contaminants in the soils at their Property have reached OU-2 Groundwater (at least their expert thinks so). So their line of defense is that the groundwater underneath their Property is "not connected" to OU-2 Groundwater, and by that he means "perched water." But even if this were true it would not mean that the groundwater is trapped beneath the Property. It will migrate. Even Defendants' own expert does not think anything is impervious to the movement of water.

- **Earl Mfg. Property**. The Earl Defendants contend that there is an impenetrable layer of clay underlying their Property that stops contaminants from leaching into the OU-2 Groundwater beneath it. But their own expert refused to make such a categorical claim, and it turns out that the clay layer is not an impenetrable barrier. At best, it is merely slowing the migration of contaminants into OU-2 Groundwater. A slow release is still a release.

- **Phibro-Tech Property**. The Phibro-Tech Defendants do not even try to contest the fact that the soils at their Property have been heavily contaminated for decades. Instead, they blame faulty wells for falsely reporting elevated concentrations of hexavalent chromium in the OU-2 Groundwater beneath the Property. But it is apparent that the environmental consultant who has advocated this position only thinks it "**may**" be misrepresenting the data.

- **Chrysler Property**. Union Pacific, the former owner of the Property, essentially admits that soil contamination at the Property has impacted OU-2 Groundwater. Instead, its defense is that Plaintiffs must prove that the *release* occurred when Union Pacific owned the Property. But that is not the law. Plaintiffs need only show there was a *disposal* that occurred when Union Pacific owned the Property, some spill, leak or discharge that *may* enter the environment. And there were plenty of those.

- **Patsouras Property**. The Patsouras Defendants contend that the contaminants in the soil are too minute to migrate to the OU-2 Groundwater beneath the Property. But the concentrations of those contaminants exceed the threshold level (called a soil screening level) where one assumes according to the Regional Water Quality Control Board, that the chemical is leaching to groundwater absent evidence that it is not. Defendants' expert agrees, which, at a minimum, means that the detected soil contamination at the Property constituted a *threatened* release, which also triggers liability. Plaintiffs do not have to prove that an *actual* release occurred.

3

In light of this, Plaintiffs respectfully submit that the Court should grant this Motion and find against each Defendant on the three judicial determinations that Plaintiffs seek.

## II.   COMMON ISSUES

Several Defendants have asserted the same contention about the fact that the United States Environmental Protection Agency (EPA) did not send a Special Notice Letter to them. Rather than repeat their response throughout this brief, Plaintiffs briefly address that issue once here.

For the Court's convenience, Plaintiffs have listed the three judicial determinations they seek by this motion and the Defendants against whom Plaintiffs are moving for partial summary judgment.

### A.   EPA Special Notice Letters

Several Defendants make much of the fact that EPA did not issue Special Notice Letters ("SNL") to them. Some imply that it means EPA extensively investigated their properties and ultimately concluded that the properties were not contributing to the contamination in OU-2 Groundwater. This is not so.

For those Defendants that **did** receive an SNL from EPA, its importance should not be overlooked. EPA considers those parties liable, and but for the fact that Plaintiffs, and others, stepped up and agreed to address the OU-2 Groundwater contamination, those noticed parties might be "on this side of the v."

But failing to receive an SNL does not mean exoneration. "[W]hether the EPA has named a particular party a PRP or sought recovery from that party is immaterial to the party's status under CERCLA. *S. California Water Co. v. Aerojet-Gen. Corp.*, No. CV 02-6340ABCRCX, 2003 WL 25537163, at *5 (C.D.

Cal. Apr. 1, 2003) (citing *United States v. Compaction Sys. Corp.*, 88 F. Supp. 2d 339, 353–54 (D. N.J. 2000). This is so for several reasons.

First, as noted by the court in *S. California Water Co. v. Aerojet-Gen. Corp.*, EPA is not obligated to issue such notices to every PRP responsible for environmental contamination. Often, it does not do so for a variety of reasons, some having nothing to do with whether a party is responsible for the contamination. In this instance, EPA has been well aware, since 2014, that Plaintiffs are pursuing a CERCLA action against the moving defendants to compel them to pay their fair share of costs to address the OU-2 Groundwater contamination; thus, there is less urgency for EPA to pursue parties that are already subject to "private enforcement" of CERCLA's strict liability statute.

Second, the objective of the search for potentially responsible parties, or "PRPs," which is a prelude to issuing Special Notice Letters, is to enhance EPA's success in negotiating with PRPs to conduct the response activity under EPA's oversight.  Because Plaintiffs stepped up early to address the OU-2 Groundwater contamination, that goal was accomplished with the entry of the 2017 OU-2 Consent Decree without the need for a complete PRP search. *See, e.g.*, PRP Search Manual, U.S. EPA, Office of Enforcement and Compliance Assurance, EPA 330-B-17-001(Sept. 2017), at 5-6 (available online at https://www.epa.gov/sites/production/files/2017-10/documents/prp-search-man-cmp-17_0.pdf).

Third, nothing precludes EPA from issuing a Special Notice Letter to the Defendants that have not yet received one; it may still do so and has continued to issue additional notice letters after the initial round of Special Notice Letters was issued in 2012.

## B. Defendants that are the subject of Plaintiffs' Motion for Partial Summary Judgment

By their motion, Plaintiffs seek partial summary judgment against the following Defendants.

| Source Property | Defendants | |
|---|---|---|
| Associated Plating | APC Investment Co.<br>Associated Plating Co.<br>Associated Plating Co., Inc.<br>Gordon E. McCann | Lynnea R. McCann<br>Darrell K. Golnick<br>Clare S. Golnick<br>Cheryl A. Golnick |
| Earl Mfg. | Earl Mfg. Co., Inc.<br>Claudette Earl | |
| Phibro-Tech | Phibro-Tech, Inc.<br>First Dice Road Co.<br>Union Pacific Railroad Co. | |
| Chrysler | Union Pacific Railroad Co. | |
| Patsouras | Kekropia, Inc. | |

## III. ASSOCIATED PLATING PROPERTY

### A. Introduction

The Associated Plating Source Property (hereafter, for purposes of this Section III, the "Property") is located at 9636 Ann Street in Santa Fe Springs.  Pls.' Response to Statement of Material Facts ("RSUMF") 3.  For over forty years, since 1978, the Property has been the location of metal plating operations, where metal objects are coated with another metal to increase the object's hardness, corrosion resistance, or visual brilliance.  RSUMF 5, 8.

The Property has had two owners and two operators during this period. From 1977 to 1990, the Property was owned by the Golnick Family[2].  RSUMF 3. Since 1990, APC Investment Co., a private corporation held by members of the Golnick family, has owned the Property.  RSUMF 7.  Associated Plating Company ("Old Associated Plating"), a business privately owned by members of the Golnick Family, ran the metal plating business at the Property from 1978 to 1999.  RSUMF 5.  Since then, Associated Plating Company, Inc. has operated at the Property. RSUMF 8.

Defendants' expert, Dr. Mark Trudell, freely admits that hazardous substances in soils at the Property have leached into the groundwater below it. That should end the matter.  The Associated Plating Property has contributed to the OU-2 Groundwater contamination.  However, Dr. Trudell theorizes that the groundwater beneath the Property might not be connected to OU-2 Groundwater. It is apparent that Dr. Trudell does not place much confidence in this theory, because he was asked four times during his deposition whether the groundwater beneath the Property was OU-2 Groundwater, and he gave a different answer each time.

But it does not matter.  Even if the groundwater beneath the Property is so-called perched water, that water will still migrate to OU-2 Groundwater. Plaintiffs' expert, Mr. Mutch, has explained that perched water is transitory, it will continue to migrate vertically and laterally and Defendants have not presented any evidence to the contrary.  The evidence establishes that there has been a release (or at a minimum, a threatened release) of hazardous substances from the Property into OU-2 Groundwater.

---

[2] As used here, the "Golnick Family" refers to Defendants Clare Golnick, Cheryl Golnick, Darrell Golnick, Gordon McCann, and Lynnea McCann.

**B.     Argument**

    **1.     Plaintiffs are entitled to partial summary judgment on the "facility" and "covered person" elements of CERCLA.**

        **a.     Plaintiffs have established the "facility" element under Section 107(a).**

Under CERCLA, a piece of real property that is contaminated with one or more CERCLA hazardous substances qualifies as a CERCLA "facility." *See, e.g., 3000 E. Imperial, LLC v. Robertshaw Controls Co.*, No. 08-cv-3985 PA, 2010 U.S. Dist. LEXIS 138661at *3, 7 (C.D. Cal. Dec. 29, 2010).  A factory or industrial plant where hazardous substances are used, handled, or stored, as well as the plant's buildings, equipment, and infrastructure also qualify as CERCLA facilities.  *Am. Int'l Specialty Lines Ins. Co. v. United States*, No. CV 09-01734 AHM RZX, 2010 WL 2635768, at *21 (C.D. Cal. Jun. 30, 2010).  Here, Defendants admit that the Associated Plating Property is contaminated with CERCLA hazardous substances and the businesses operated there involved the use, handling, and storage of such substances.  RSUMF 4, 6, 9, 10.  Thus, Defendants do not dispute that the Associated Plating Property constitutes or contains a CERCLA "facility.

        **b.     Plaintiffs have established the "covered persons" element under Section 107(a).**

Current or former owners and operators of a CERCLA facility qualify as "covered persons" subject to liability under CERCLA. *See City of Los Angeles v. San Pedro Boat Works,* 635 F.3d 440, 451-52 (9th Cir. 2011) (fee title holder is "owner" of a facility); *U.S. v. Bestfoods*, 524 U.S. 51, 66-67 (1998) ("operator" of a facility is someone who directs the workings of, manages, or conducts the affairs of the facility).  Establishing that a former owner or operator of a facility is liable requires the further showing that a "disposal" occurred at the facility when the

former owner owned the facility or the operator conducted business there. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 957 n.5 (9th Cir. 2013).

APC Investment Co. and the Golnick Family admit that they are the current and former owners, respectively, of the Associated Plating Property. RSUMF 3, 7. Associated Plating Company ("Old Associated Plating") admits that it used to operate a metal plating business at the Property, and Associated Plating Company, Inc. admits that it now operates the same type of business there. RSUMF 5, 8. The Golnick Family does not dispute that there was a disposal of a CERCLA hazardous substance when it owned the Property, and Old Associated Plating also concedes that a disposal occurred when it operated there. RSUMF 4, 6.

The Golnick Family argues that they cannot be held liable under CERCLA as a former owner of a facility, unless Plaintiffs also prove that a **release** of hazardous substances from the Property to OU-2 Groundwater occurred **when they owned the Property**."[3] Opp'n at 12-13 (boldface added). This is not the law.

As noted, the "covered person" element applies to former owners and operators and requires a plaintiff to show: (1) that defendant owned or operated a facility; and (2) a "disposal" (e.g., a spill or discharge) of a hazardous substance occurred when the defendant owned or operated the facility. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001); *Chubb Custom*, 710 F.3d at 957 n.5. Establishing a "disposal" does not require a plaintiff to show that the defendant discharged the hazardous substance directly onto soil or any other type of environmental media.

---

[3] Old Associated Plating apparently does not agree with the Golnicks that this is a requirement under CERCLA to hold former owners and operators liable, as they have not joined the Golnick Family in making this argument.

> A "disposal" under the statute includes any discharge or spill of waste "into or on any land or water so that [the waste] may enter the environment...." 42 U.S.C. § 6903(3) (emphasis added).  **Because the phrase "enter the environment" is qualified by the word "may" in the definition of "disposal," the statute cannot be interpreted to cover only spills that go directly and immediately into the groundwater.**  The statute contemplates that some spills may never enter the environment.  The definition covers more than direct spills.

*Voggenthaler*, 724 F.3d 1050, 1064 (9th Cir. 2013) (emphasis added); *see also Lincoln Properties, Ltd. v. Higgins,* No. S–91–760DFL/GGH, 1993 WL 217429, at *19–20 (E.D. Cal. Jan. 21, 1993).

Further, the statute does not require a plaintiff to show that a disposal **and a release** occurred during the time the defendant owned or operated the Property. To be clear, "disposal" and "release" are defined similarly under CERCLA, but they are **not** interchangeable terms. In *Hinds Investments, L.P. v. Ryan*, No. SACV 07-00708 AG RNB, 2009 WL 951155 (C.D. Cal. Apr. 6, 2009), plaintiff sued a former operator of a dry-cleaning business under CERCLA claiming that the former owner was responsible for PCE contamination at the property. *Hinds Investments*, 2009 WL 951155, at *1.  Plaintiff established that there had been a disposal of PCE at the property when the former operator was running the business. *Id.,* at *3. However, the former operator denied liability on the grounds that there had not be a **release** during the time he operated the business. *Id.* The district court rejected the claim, finding that the former operator qualified as a "covered person" under CERCLA, because plaintiff did not have to prove that a release occurred during the defendant's tenancy; plaintiff need only prove a disposal. *Id.*

10

1      Here, Plaintiffs have met the requirements to establish that each of the

2    Associated Plating Defendants is a "covered person" under CERCLA. Their claim

3    that Plaintiffs have failed to present direct evidence of a release from the Property

4    to OU-2 Groundwater when the Golnicks were the owners is without merit.

5              **2.    Plaintiffs are entitled to partial summary judgment as to the**

6                   **"release" element.**

7      Defendants concede that CERCLA hazardous substances, including PCE

8    and vinyl chloride, in the soils at the Associated Plaiting Property have reached the

9    groundwater beneath the Property.[4] Dr. Trudell flatly stated during his deposition

10   that the groundwater beneath the Property had been impacted.  *See* Declaration of

11   Ronald A. Valenzuela in Support of Reply ("Valenzuela Decl."), Ex. N, at pp. 155,

12   160-161, 164-165, 170-171, 178, 185, 187, 192-193, 196 (Trudell Dep. 39:1-6,

13   47:18-48:2, 59:12-25, 65:8-22, 83:15-84:3, 103:16-19, 120:8-25, 126:3-22,

14   143:24-144:11, and 155:2-21, Mar. 31, 2021); *see also* Opp'n at 12.

15     These admissions are sufficient to establish the "release" element under

16   CERCLA under both legal standards that the parties have argued are applicable

17   here.  They satisfy the *Castaic Lake* test requiring that Plaintiffs merely establish

18   the existence of a plausible migration pathway between the Property and OU-2

19   Groundwater. Defendants concede an actual, completed pathway (*id.*), which also

20

21

22   ───────────────────

23   [4] Mark Trudell, the hydrogeologist who submitted a declaration in support of
     Defendants' opposition, takes issue with Mr. Mutch's opinion that the vapor
24   degreaser used for many years by Old Associated Plating is a likely source of the
     extensive PCE contamination in the soil and OU-2 Groundwater at the Property.
25   Trudell Report ¶¶ 27-29.  Plaintiffs in no way concede the point, but a rebuttal is
     unnecessary.  Even Dr. Trudell acknowledges that VOCs in the soils at the
26   Property have leached into the groundwater.  Valenzuela Decl., Ex. N, at p. 196
     (Trudell Dep. 155:2-21).  The fact that Dr. Trudell may disagree with Mr. Mutch
27   concerning the onsite source of that contamination is immaterial.

28

satisfies the more stringent (though inapplicable) standard that they say applies here, namely, of an actual release to OU-2 Groundwater.

To avoid this result, Defendants offer a novel (though wholly unsubstantiated) theory, namely, that the shallow groundwater beneath the Property is not OU-2 Groundwater.  Mr. Trudell argues that there is no evidence that "groundwater beneath the Associated Plating Site, at a depth of about 35 feet, is in any way "hydraulically connected" to OU-2 regional groundwater contamination plume [*sic*].[5] *See* Trudell Decl. ¶ 12.  This argument is insufficient to create a dispute of material fact.[6]

---

[5] Dr. Trudell also questions Mr. Mutch's assessment of the concentrations of hexavalent chromium in the OU-2 Groundwater beneath the Property.  Decl. of Mark Trudell (Docket No. 940) ("Trudell Decl.") ¶¶ 17-19.  Dr. Trudell indicates that hexavalent chromium concentrations in groundwater never exceeded 10 µg/L, which used to be California's MCL for that substance.  *Id.* However, CERCLA does not impose a quantitative requirement to establish that there has been a release.  *Cose v. Getty Oil Co.*, 4 F.3d 700, 709 (9th Cir. 1993).  A plaintiff need only show the **presence** of hazardous substance to satisfy the release element. *Id.* (emphasis added).  The concentrations of hexavalent chromium in the OU-2 Groundwater beneath the Property, therefore, is immaterial.

[6] The Earl Defendants, along with several other Defendants, have challenged Plaintiffs' motion based upon Mr. Mutch's DNAPL analysis in his January 14, 2021 Expert Report. The objections are baseless, as Plaintiffs explain in their responses to Defendants' objections. Plaintiffs see no need to repeat those arguments here, because, as is apparent from the briefs submitted by Plaintiffs, the DNAPL analysis, though instructive, does not underpin Plaintiffs' motion. Plaintiffs' opening Memorandum of Points and Authorities (Brief No. 2) includes a brief discussion of DNAPL and LNAPL by way of background on the way contaminants migrate from Source Property soil to OU-2 Groundwater. Plaintiffs contend that the undisputed evidence amply supports granting the instant motion, even without the DNAPL analysis.

a.   **Defendants' theory that the shallow groundwater beneath the Property might be "perched water" is unsubstantiated.**

Dr. Trudell surmises that the groundwater beneath the Property "**might**" be what hydrogeologists call "perched water." Perched water is a subsurface area of lesser permeability where the downward path of groundwater is temporarily suspended until it continues migrate downward, though perhaps more slowly.  *See United States v. Atchison, Topeka & Santa Fe Ry. Co.*, No. CV-F-92-5068 OWW, 2003 WL 25518047, at \*29 (E.D. Cal. July 15, 2003), *aff'd in part, rev'd in part sub nom.  United States v. Burlington N. & Santa Fe Ry. Co.*, 479 F.3d 1113 (9th Cir. 2007); *see also* Mutch Report at 2-7 (Docket No. 903-204 Page ID#: 25286) (all perched water is transitory and continues to migrate often both laterally and vertically); Valenzuela Decl., Ex. G, at pp. 94-96 (Mutch Dep. 265:20-267:8, Feb. 10, 2021) (some perching reported in OU-2); Ex. H at pp. 100-101 (Mutch Dep. 383:15-384:12) (perched water is part of OU-2 Groundwater).

However, Dr. Trudell offers no evidence to support this notion.  He faults Mr. Mutch, Plaintiffs' expert, for failing to provide evidence, such as plume maps, that the groundwater beneath the Property is **not** perched water (*see* Trudell Decl. ¶¶ 12-16), but Mr. Mutch's expert report offers a lengthy discussion of the geology of OU-2 and the transport of contaminants in the OU-2 Groundwater system, including a discussion of perched water.  *See* Mutch Report at 2-4 to 2-9 (Docket No. 903-204 Page ID#:25283-88).  Mr. Mutch expressly states that perched water in OU-2 is transitory and will continue to migrate. Mutch Report at 2-7 (Docket No. 903-204 Page ID#: 25286). Given this evidence, it is not enough for Mr. Trudell to state, in conclusory fashion, that he does not agree.  *See U.S. v. Various Slot Machines on Guam,* 658 F.2d 697, 700 (9th Cir. 1981) (defendant cannot defeat summary judgment with conclusory statements).

In fact, it is unclear whether Dr. Trudell is fully committed to his perched water theory.  During his deposition, Dr. Trudell was asked *four times* whether the groundwater beneath the Property was part of OU-2, and he provided a different answer each time.  First, he declined to extend his opinion that far.  Valenzuela Decl., Ex. N, at pp. 157-158 (Trudell Dep. 44:22-45:3).  The second time he answered, "I don't believe it is." *Id.* at p. 158 (Trudell Dep. 45:4-8).  The third time, Dr. Trudell answered that the groundwater beneath the Property was "potentially perched." *Id.* at p. 159 (Trudell Dep. 46:3-10).  The fourth time he answered, "I don't know." *Id.* at p. 160 (Trudell Dep. 47:11-13).  Equivocal deposition testimony, without more, does not create a genuine issue of material fact to defeat summary judgment.  *Bond v. Knoll*, No. EDCV 11-1929 PSG JC, 2014 WL 7076901, at *8 (C.D. Cal. Dec. 10, 2014) (citing *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)).

Dr. Trudell's equivocation is unsurprising given that he did little, if anything, to understand how EPA defined OU-2 or OU-2 Groundwater or the hydrogeology at the Property.  According to Dr. Trudell, he did not review the 2011 OU-2 Interim Record of Decision or 2017 OU-2 Consent Decree to understand the definition of those terms, and was not even sure if those documents included any such definitions.  Valenzuela Decl., Ex. N, at pp. 153-154 (Trudell Dep. 27:24-28:10).  Further, the extent of his investigation of the hydrogeology at the Property was limited to "the shallowest" groundwater; he did not investigate the underlying layers of groundwater.  *Id.* at p. 159 (Trudell Dep. 46:3-19).  Dr. Trudell did review the OU-2 Feasibility Investigation report and various reports prepared by U.S. EPA and the California Department of Water Resources, but he reported still being unsure about what "OU-2" or "OU-2 Groundwater"

meant or whether the groundwater beneath the Property was OU-2 Groundwater. *Id.* at pp. 152-153, 159-160 (Trudell Dep. 26:8-27:12, 46:20-47:13).

The one time (out of four tries) that Dr. Trudell stated that the shallow groundwater beneath the Property is not OU-2 Groundwater, but rather perched water, the only basis he offered for that conclusion was that the flow of groundwater beneath the Property had recently (i.e., 2015) shifted to a northerly or northwesterly direction. Valenzuela Decl., Ex. N, at pp. 158, 180-181 (Trudell Dep. 45:9-23, 112:24-113:4). According to Dr. Trudell, if OU-2 Groundwater (which generally flows in a southerly direction in the area) were "connected" to the groundwater beneath the Property, they should have "similar groundwater flow direction." *Id.*

But there is nothing at all unusual about this. As observed by Plaintiffs' expert, the flow of OU-2 Groundwater could vary depending upon temporal changes in the depth to groundwater (depending upon the extent of recharge, e.g., precipitation) or by groundwater extraction. Mutch Report at 2-5 (Docket No. 9032041 Page ID#: 25284). In fact, when asked what accounted for the shift in the direction of groundwater flow underneath the Property, Dr. Trudell indicated that he did not know, but he noted that there was a 20-foot decline in the water table during this time. Valenzuela Decl., Ex. N, at pp. 180-181 (Trudell Dep. 112:24-113:21).

Moreover, Dr. Trudell glosses over the fact that as late as 2006, the groundwater beneath the Property flowed *in the same direction* as OU-2 Groundwater, namely, southwest (*see* Lintecum Decl., Ex. 7 at 471).[7]

_____

[7] The groundwater beneath the Property may have been flowing in a southwesterly direction as late as 2014, but we just do not know because Defendants stopped monitoring groundwater between 2007 and 2015. Valenzuela Decl., Ex. N, at pp.

1   *Id.* According to Dr. Trudell's logic, this means that the groundwater beneath the

2   Property **is connected** to OU-2 Groundwater.  Simply put, there is no basis in the

3   record upon which to conclude that the change in the direction of groundwater

4   flow underneath the Property means that the groundwater is "hydraulically

5   disconnected" to OU-2 Groundwater.

6

7

        **b.**      **Even if Defendants' "perched water" theory is correct, it does not create a dispute of material fact.**

8   Even if the groundwater below the Property is perched, it is still OU-2

9   Groundwater and thus Defendants are liable. As noted above, perched water in the

10   area is transitory; the groundwater will continue to migrate both laterally and

11   vertically.  Mutch Report at 2-7 (Docket No. 903-204 Page ID#: 25286); *see also*

12   *Atchison, Topeka*, 2003 WL 25518047, at *29 (describing perched groundwater as

13   continually migrating).  It is not (and has not been) permanently encased in an

14   impermeable barrier of sediment, prevented from migrating to other parts of the

15   OU-2 Groundwater system.  Indeed, even Dr. Trudell stated as much when he

16   dismissed the idea of an "aquiclude," a geological formation that is impervious to

17   movement of water.  Valenzuela Decl., Ex. N, at p. 179 (Trudell Dep. 110:17-24).

18   Dr. Trudell testified that he do[es]n't think **anything is impervious to the**

19   **movement of water.**" *Id.* (emphasis added).  The perched groundwater is OU-2

20   Groundwater.

21

22

23

---

24   189-190 (Trudell Dep. 128:4-129:14).  It also may have been flowing in that

25   direction years earlier.  And given that metal plating operations have been

    conducted at the Property since 1977 (RSUMF 5), Dr. Trudell ignores the fact that

26   a **historical** release from the Property to OU-2 Groundwater may have occurred

27   decades before the shallow groundwater flow beneath the Property shifted

    direction.

28

Dr. Trudell also admits that the shallow groundwater beneath the Property is, in fact, migrating laterally, though he claims not by much.[8] During his deposition, Dr. Trudell acknowledged that contaminants had been detected in offsite groundwater monitoring wells, one located to the north of the property, and one located to the south.  Valenzuela Decl., Ex. N, at 183-184 (Trudell Dep. 115:23-116:15).  Contaminants were detected in both wells at various times.  *Id.* Although Dr. Trudell could not say whether the groundwater contamination had originated from the Property or an offsite source, both alternatives indicate that the groundwater beneath the Property is migrating laterally.  *Id.*; *see also* 178, 188, 190-191 (Trudell Dep. 103:16-19, 127:14-24, 129:15-130:18).

In other words, even if Dr. Trudell is correct that the shallow groundwater beneath the Property is "perched," that "fact" does not: (1) preclude the existence of a plausible migration pathway from the Associated Plating Property to OU-2 Groundwater; (2) refute the evidence in the record showing that there has been a release of CERCLA hazardous substances from the Property to OU-2

---

[8] Dr. Trudell suggests that "reducing conditions" in the groundwater beneath the Property has "effectively remediated most of the localized historic VOC concentrations" in the groundwater.  Trudell Report ¶ 20.  Those conditions, he indicates, also cause hexavalent chromium to reduce to trivalent chromium. *Id.* ¶ 19.  However, Dr. Trudell offers nothing on this point beyond his conclusory statement.  *See Various Slot Machines,* 658 F.2d at 700 (in opposing summary-judgment motion, expert must back up his or her opinion with facts).  Bald assertions in an expert report do not create a dispute of material fact.  *Keshish v. Allstate Ins. Co.*, 959 F. Supp. 2d 1226, 1239 (C.D. Cal. 2013).  Moreover, even if Dr. Trudell's statement were true, remediating "most" of the contaminants in the OU-2 Groundwater would not help Defendants evade liability.  As noted, Plaintiffs are not required to establish that PCE is present in OU-2 Groundwater beneath the Property above a certain threshold concentration.  *Cose,* 4 F.3d at 709.  Its mere presence, in whatever concentration, is enough to trigger liability.  Perhaps recognizing this, Defendants have chosen not to include a "reducing conditions" argument in their opposition.

Groundwater; nor (3) negate the fact that contaminants in the soils at the Property constitute, at a minimum, constitute a *threatened* release to OU-2 Groundwater. Plaintiffs are entitled to partial summary judgment as to the "release" element of CERCLA liability.

1

2

## IV.    EARL MFG. PROPERTY

### A.    Introduction

3

4

5

6

7

8

9

10

11

12

13

The Earl Mfg. Property (hereafter, for purposes of this Section IV, the "Property") is located at 11862 Burke Street, Santa Fe Springs, California. RSUMF 13. For nearly 40 years, from the 1960s to 2001, the Property was the site of a plant, operating as Earl Mfg. Co., Inc. ("Earl Mfg.") that manufactured transmission jacks, spark plug cleaners, and testers, and machined aluminum castings. RSUMF 14. The Property has had several owners over the years, all of whom are intimately associated with Earl Mfg. For approximately thirty years, the Property was owned by William Earl, founder and owner of Earl Mfg., and his wife Dot, and by a family trust directed by Mr. Earl. Since 1990, Mr. Earl's daughter, Defendant Claudette Earl has owned the Property. RSUMF 13.

14

15

16

17

18

19

20

21

22

23

24

25

26

Undisputed evidence in the record establishes that CERCLA hazardous substances in the soils have impacted OU-2 Groundwater. Defendants attempt to avoid the legal consequences of this fact by claiming that there is a clay layer beneath the Property. But the effect of that clay layer is in dispute—**between Defendants and their own expert**.  Defendants' Opposition suggests that the clay layer will stop all contaminants in the soil from reaching OU-2 Groundwater beneath it.  However, their expert, Dr. Philip Tringale, says otherwise. Dr. Tringale testified that the clay layer may "impede" "delay," or "affect" the migration of contaminants in the soil, but when given multiple opportunities during his deposition to affirmatively state that the clay layer will categorically stop their migration to groundwater, he declined to go that far.  Nor could he, as the evidence shows that contaminants are deep in **the clay layer**—meaning the contaminants are continuing to move through it—and they have been detected below the clay layer.

27

28

(To this last point, all Dr. Tringale could say was that he did not know how they got there beneath the clay layer.)

But Dr. Tringale's clay layer theory should not be allowed to create a dispute of material fact.  On more than one occasion, defendant Claudette Earl's environmental consultants submitted reports to the California Department of Toxic Substance Control ("DTSC") **admitting** impacts to OU-2 Groundwater from the Property. Indeed, Ms. Earl personally certified those reports—under penalty of law.  Defendants may not now be allowed to deny what they have previously admitted to avoid being held liable to Plaintiffs.

In a last-ditch effort to stave off partial summary judgment, Dr. Tringale opines that the migration of CERCLA hazardous substances from the soils at the Property into OU-2 Groundwater is "limited."  But CERCLA does not include a "limited migration" defense to liability. If the contaminants leached from the soil to the groundwater beneath the Property, and they did, their purported lackadaisical nature is of no consequence.

The evidence establishes that there has been a release (or at a minimum, a threatened release) of hazardous substances from the Property into OU-2 Groundwater.

**B.    Argument**

**1.    Plaintiffs are entitled to partial summary judgment against Defendants as to the "facility" and "covered persons" elements of Section 107(a).**

Defendants admit that the Earl Mfg. Property is or contains one or more CERCLA "facilities." Opp'n at 15: 4-6.  Defendants stipulated that CERCLA hazardous substances have "come to be located" at the Property (Docket No. 597 ¶ 8), hazardous substances have been detected in the soils there and in an

underground storage tank.  RSUMF 17; Docket No. 597 ¶¶ 7, 11.  They also admit that PCE and 1,1,1-TCA have been used, handled, or stored at the Property. RSUMF 16; Docket No. 597 ¶ 6.  Each of these facts, standing alone, is sufficient to establish that the Earl Mfg. Property is a CERCLA "facility."  *See* 42 U.S.C. § 9601(9)(A); *3000 E. Imperial*, 2010 U.S. Dist. LEXIS 138661, at \*3, 7; *Am. Int'l Specialty Lines*, 2010 WL 2635768, at \*21.

Defendants do not genuinely dispute that each is a "covered person" under CERCLA. Opp'n at 15: 4-6.  Defendant Claudette Earl admits that she is a "person" under CERCLA (Docket No. 597 ¶ 13) and the current owner of a facility, the Earl Mfg. Property.  RSUMF 13.  Earl Mfg. admits that: it is a "person" under CERCLA; it operated an industrial manufacturing business at the Property from 1960 to 2001; and PCE was disposed of at the Property during that period.  RSUMF 14, 15; Docket No. 597 ¶¶ 4-6, 10, 12.  These facts establish that Claudette Earl is a "current owner" and Earl Mfg. is a "former operator" of a "facility."  42 U.S.C. §§ 601(20), (21), 6903(3); *City of Los Angeles v. San Pedro Works,* 635 F.3d 440, 443-44 (9th Cir. 2011) (fee title holder of contaminated property is "covered person"); *Hinds Investments, L.P. v. Ryan*, No. SACV 07-00708 AG RNB, 2009 WL 951155, at \*3 (C.D. Cal. Apr. 6, 2009) (former operator of dry cleaners where disposal occurred during ownership is a "covered person").

Plaintiffs are entitled to a finding in their favor as to the first two judicial determinations they seek.

1
2
3

        **2.**      **Defendants have not raised a dispute of material fact regarding the third judicial determination Plaintiffs seek, a release or threatened release from the Property to OU-2 Groundwater.**

4
5
6
7
8
9
10

        Defendants' opposition essentially makes only two substantive arguments to try to evade partial summary judgment.[9] First, they argue that a layer of clay sitting beneath the Property keeps hazardous substances in soils at the Property from reaching OU-2 Groundwater below. Opp'n at 19. Second, they argue that even if hazardous substances in soils have impacted OU-2 Groundwater, the extent of the resulting groundwater contamination is "limited." Neither argument can defeat partial summary judgment.

11
12

        **a.**      **Defendants' clay layer theory does not create a dispute of material fact.**

13
14

        **i.**      **The clay layer is not impermeable.**

15
16
17
18
19

        Defendants claim that a shallow layer of clay/silty-clay, a less permeable layer of sediment, extends across the entire subsurface of the Property. Opp'n at 19. Their expert, Dr. Philip Tringale, contends that it is about 8 to 15 feet thick, though it averages about 10 feet thick, and it sits about 8 to 20 feet below ground. Declaration of Philip Tringale ("Tringale Decl."), Ex. 2 (Tringale Report at 6, 10)

20
21
22
23
24
25
26
27

---

[9] Defendants also assert a variety of other arguments, though none remotely raises a dispute of material fact. For example, Defendants argue that the known violations and releases listed on Appendix B of Plaintiffs' opening brief do not "demonstrate" a release to OU-2 Groundwater. Opp'n at 18-19. The argument is meritless because Plaintiffs have not presented Appendix B as an inventory of releases to OU-2 Groundwater. It is one line of evidence that Plaintiffs' expert, Mr. Mutch, used to assess whether the Property had contributed to the contamination in OU-2 Groundwater. *See* Mutch Report at 3-1 (Docket No. 903-204 Page ID#:25301). Extensive violations and reported spills or discharges are indicative of poor housekeeping and makes it more likely that there have been releases to the environment.

28

(Docket No. 942-3 Page ID#: 28647, 28651).  However, during his deposition, Dr. Tringale seemed less certain about the depth of the clay-silty layer.  He indicated that his estimation of the depth was based upon "somewhat limited information," because the supporting data, namely, soil sampling, was obtained from locations (i.e., soil borings) that were "pretty far apart." Valenzuela Decl., Ex. J, at pp. 126-129 (Tringale Dep. 96:25-98:2, 98:10-99:15, Apr. 8, 2021). Dr. Tringale also clarified that the layer was "predominantly" though not exclusively clay.  *Id.,* Ex. J, at pp. 114-115 (Tringale Dep. 42:18-23, 44:2-6, Apr. 8, 2021).  Not every soil boring sample yielded results from which he could determine whether the soil was clay or not.  *Id.*

Still, Dr. Tringale's report indicates that the clay layer "**impedes** and **inhibits** vertical transport of releases at the Earl Site to groundwater." Tringale Decl., Ex. 2 (Tringale Report at 10) (Docket No. 942-3 Page ID#:28651).  He also describes it as a "substantial barrier." *Id.* (Tringale Report at 6, 13) (Docket No. 942-3 Page ID#:28647, 28654).  Defendants' opposition puts it a little more strongly, arguing that the clay layer is "generally impermeable," and "any hazardous substances released at the Earl Site would be ... obstructed from reaching the groundwater below."[10] Opp'n at 19.

---

[10] Defendants contend that contamination in the groundwater beneath the Property originated from upgradient sources, including Bodycote and the former Omega Chemical Corporation properties.  Opp'n at 21-23.  This contention is based exclusively on Defendants' interpretation of Dr. Tringale's clay layer theory, so the fact that groundwater contamination is migrating onto the Earl Property from upgradient sources is immaterial.  The Court may find in favor of Plaintiffs regardless of whether contamination in groundwater underneath the Property may have migrated there from upgradient sources.  So long as releases from soils at the Property are also contributing to the VOC contamination in OU-2 Groundwater, Defendants are liable.

EPA and the Regional Water Board disagree that hazardous substances in soils at the Property are "obstructed from reaching the groundwater." EPA has identified the Earl Property as a "known source" of OU-2 Groundwater contamination. *See* Pls.' RFJN, Ex. 1 at 34, 45. The Los Angeles Regional Water Quality Control Board ("Regional Water Board" or "Board") issued a draft Cleanup and Abatement Order providing that there was a VOCs plume in groundwater originating from ... [Property that] has migrated offsite." *Id.*, Ex. 51 at 953. The Board later issued a final order, finding Claudette Ear liable for discharging waste to groundwater. *Id.*, Ex. 55 at 972-73.

Even Dr. Tringale does not agree with Defendants' assertion that the clay layer will "obstruct" migration of contaminants in soil to OU-2 Groundwater. He is **not** saying that the clay layer is "impermeable" or would "obstruct" the migration of hazardous substances from soils at the Property to OU-2 Groundwater. In fact, during his deposition, Dr. Tringale was given at least four opportunities to clarify whether, in his opinion, the clay layer prevented soil contamination from reaching OU-2 Groundwater. Each time, Dr. Tringale refused to adopt such a categorical statement. *See* Valenzuela Decl., Ex. J, at pp. 106-108, 135 (Tringale Dep. 21:17-22:19, 23:1-22, 153:5-19, Apr. 8, 2021). Instead, Dr. Tringale indicated that what he meant by "impede" and "inhibit," words that he "chose carefully," was "restraint," "delay," "affect," and "possible prevention, or "substantial prevention." *Id.* at pp. 107-108, 116 (Tringale Dep. 22:3-10, 23:7-22, 45:5-15, Apr. 8, 2021). Accordingly, the most that Dr. Tringale would say when asked whether hazardous substances from soils at the Property had migrated to OU-2 Groundwater was, "probably not." *Id.*, at pp. 107, 122-125, 130, 133-134 (Tringale Dep. 22:3-10, 76:15-77:6, 82:11-83:9, 106:15-21, 117:22-118:14, Apr. 8, 2021).

The terms "restraint," "delay," "affect," "possible prevention, and "substantial prevention" hardly describe an impenetrable barrier.[11] Indeed, the fact that hazardous substances, such as PCE, continue to be detected in soils at depths of 15, 20, 25, and 30 feet bgs—depth which must be either **within** or **below** the clay layer—is proof that chemicals are able to migrate through the layer.[12] *See* Valenzuela Decl., Ex. L, at p. 145 (Tringale Dep., Ex. 174, Leymaster Environmental Consulting, LLC, Feasibility Study and Interim Remedial Action Plan for Soil and Soil Vapor, Oct. 15, 2019 ("Feasibility Study"), Fig. 3).  The layer is **not** impermeable, and thus Dr. Tringale's opinion that it "impedes" or "inhibits" migration of soil contamination does not create a dispute of triable fact.

> **ii.     Dr. Tringale's report contradicts Defendants' admission that soil contamination at the Property has reached OU-2 Groundwater.**

As noted, in 2015, the Regional Water Board issued a Cleanup and Abatement Order to Claudette Earl.  *See* Pls.' RFJN, Ex. 55.  The Board found that

---

[11] This is consistent with other statements Dr. Tringale made about how the clay layer may have influenced migration of soil contamination to OU-2 Groundwater. For example, Dr. Tringale indicated that the layer does not extend to defendant Bodycote Thermal Processing, Inc.'s property just across the street, so contaminants in the soil at Bodycote's property would "**more directly** impact groundwater beneath the Bodycote site." Tringale Decl., Ex. 2 (Tringale Report at 10 (Docket No. 942-3 Page ID#:28651) (emphasis added).  In other words, releases at the Bodycote Property could "more directly" impact groundwater beneath the Property, because they do not have to migrate through or around a clay layer.
[12] Given this evidence, and the fact that none of the regulatory agencies agrees that the clay layer is preventing leaching to groundwater, Dr. Tringale faces a heavier burden of establishing a dispute of material fact.  *See Bator v. State of Hawai'i,* 39 F.3d 1021, 1026 (9th Cir. 1994) ("if the factual context makes the nonmoving party's claim implausible, then that party 'must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial.'")

Ms. Earl had "caused or permitted waste to be discharged into the waters of the State" and ordered her to develop a Site Conceptual Model. *Id.* at 972-73. On July 15, 2015, Defendants' environmental consultant, Leymaster, subsequently submitted the Site Conceptual Model to the Regional Water Board. Valenzuela Decl., Ex. K, at pp. 137-141 (Tringale Dep., Ex. 171, Leymaster Environmental Consulting, LLC, Conceptual Site Model, Jul. 15, 2015 ("CSM")).

The model summarizes, among other things, the "current understanding of the waste constituents distribution, fate and transport of waste constituents in soil, soil vapor and groundwater ...." *Id.* K at p. 139 (Tringale Dep., Ex. 171, CSM at 1). The model provides that "[t]he recognized release mechanisms at the facility include COC [constituents of concern] releases/spills in three general areas of the site ... to vadose zone soils, **leaching of COCs from vadose zone soils to groundwater** and volatilization of COCs from soils and groundwater to soil vapor." *Id.* K, at p. 140 (Tringale Dep., Ex. 171, CSM at 7) (emphases added). Defendant Claudette Earl certified, under penalty of law, that "the information submitted in ... [the] Conceptual Site Model ... is ... true, accurate, and complete." *Id.* K, at p. 141 (Tringale Dep., Ex. 171).

Four years later, Leymaster submitted a Feasibility Study and Interim Remedial Action Plan for Soil and Soil Vapor to the Regional Water Board. *See* Valenzuela Decl., Ex. L (Tringale Dep., Ex. 174, Feasibility Study). The Feasibility Study provided that contamination at the Property "consists primarily of tetrachloroethene (PCE) and, to a lesser extent, the degradation products that have impacted soil, soil vapor **and groundwater beneath the subject site**." *Id.* at p. 144 (Tringale Dep., Ex. 174, Feasibility Study at 1). Again, Ms. Earl certified, under penalty of law, that "the information submitted in ... [the] Feasibility Study

& Interim Remedial Action Plan for Soil and Soil Vapor ... is ... true, accurate, and complete." *Id.* at p. 143 (Tringale Dep., Ex. 174).

Because these reports were submitted under penalty of law, they may be treated as admissions. *Save Our Bays & Beaches v. City & Cty. of Honolulu*, 904 F. Supp. 1098, 1138 (D. Haw. 1994). In fact, the reports may be treated as party admissions even if they had not been personally certified by Ms. Earl. *See Lizotte v. Praxair, Inc.*, 640 F. Supp. 2d 1335, 1339 (W.D. Wash. 2009) (citing *United States v. Chang*, 207 F.3d 1169, 1177 (9th Cir. 2000) (statement by party agent concerning matter within agency or employment is vicarious admission); *see also Niagra Mohawk Power Corp. v. Jones Chem.*, 315 F.3d 171, 177 n.1 (2d Cir 2003) (environmental report prepared at direction of party constitutes party admission). Defendants should not be able to avoid their own admissions by submitting an expert report that contradicts them.

> **b.     "Limited" OU-2 Groundwater contamination at the Earl Property is enough to satisfy CERCLA's "release" element.**

Defendants argue that partial summary judgment would not be warranted even if contaminants in soils at the Property have leached into OU-2 Groundwater. The plume, they assert, is "stable" and impact to OU-2 Groundwater "is severely limited and unlikely." Opp'n at 29. This is nonsense.

Mr. Tringale opines that the significant concentrations of hazardous substances in the groundwater beneath the Earl Property have decreased since 1999 and decrease in deeper parts of the aquifer. Opp'n at 29-30; Tringale Decl., Ex. 2 (Tringale Report at 13-14) (Docket No. 942-3 Page ID#:28654-55). Mr. Tringale also asserts that concentrations of PCE detected "around" the Earl Property decrease significantly immediately downgradient of the Property. In other words,

any groundwater migration has not traveled very far offsite.[13] Tringale Decl., Ex. 2 (Tringale Report at 14) (Docket No. 942-3 Page ID#:28655).

These facts, even if true, are immaterial.  CERCLA does not impose a quantitative requirement for releases.  *Cose,* 4 F.3d at 709.  A plaintiff need only show the **presence** of hazardous substance to satisfy the release element. *Id.* (emphasis added).  Nor does CERCLA provide a "my groundwater contamination has not traveled very far" defense to liability.  Defendants' liability under CERCLA's "release" element is premised solely on a release or threatened release from the Property to OU-2 Groundwater, that is, the mere presence of the contaminant in OU-2 Groundwater.  *Id.* Defendants do not contend that the groundwater beneath the Property is anything but "OU-2 Groundwater." Nor does Dr. Tringale.  Valenzuela Decl., Ex. J, at pp. 111-112, 118 (Tringale Dep. 32:4-18, 34:6-9, 52:2-19) (groundwater at the Property is "hydraulically connected" to "an aquifer within OU-2").

An impact to OU-2 Groundwater triggers liability under either test presented by the parties.  It more than satisfies the *Castaic Lake* test requiring that Plaintiffs merely establish the existence of a plausible migration pathway between the Property and OU-2 Groundwater.  It also satisfies the more stringent (though inapplicable) test advocated by Defendants, requiring proof of an actual release to OU-2 Groundwater.  Thus, whether concentrations of hazardous substances that have been released to OU-2 Groundwater from the soils at the Property are

_____

[13] Mr. Tringale cites to two documents for this broad statement: CH2MHILL's 2010 OU-2 Feasibility Study, which was prepared for EPA, and EPA' 2011 OU-02 Interim Action Record.  Tringale Decl., Ex. 2 (Tringale Report at 13-14) (Docket No. 942-3 Page ID#:28654-55).  However, he does not identify the data in these documents or explain how they support his conclusion.  *See Various Slot Machines,* 658 F.2d at 700 (in opposing summary-judgment motion, expert must back up his or her opinion with facts).

increasing, decreasing, remain the same, traveling or staying put, Defendants are still liable.

Defendants nevertheless argue that Plaintiffs will not incur response as a result of any releases to OU-2 Groundwater at the Property given how limited those releases are. Opp'n at 30. This argument overlooks two things.

First, it assumes that there have not been any **historical** releases of groundwater contamination that have already left the Property. Mr. Tringale has focused on post-1999 data in reaching his conclusion that groundwater contamination at the Property is "limited." But Earl Mfg. operated at the Property for roughly 40 years beginning in the early 1960s. RSUMF 14, 200. Defendants did not begin investigating the Property's environmental conditions until the late 1990s. *See* Tringale Decl., Ex. 2 (Tringale Report, Appendix A at 2-3 (Docket No. 942-4 Page ID#:28815-16). The fact that elevated concentrations of hazardous substances may be decreasing since 1999, says nothing about what may have begun migrating off the Property years before.

Second, Defendants discount any continuing releases from soils today, and in the future, until soil remediation is finally underway. Extensive contamination still exists at the Property. As recently as 2019, PCE was detected in soils at the Property (near the former location of the vapor degreaser) 30 feet bgs at a concentration of 180,000 µg/kg—a concentration that is over 2,000 times the soil screening level protective of groundwater. Valenzuela Decl., Ex. L, at p. 145 (Tringale Dep., Ex. 174, Feasibility Study, Fig. 3); Mutch Report at 3-9 (Docket No. 903-204 Page ID#:25309). But, to this day, Defendants have not performed any meaningful remediation to eliminate the extensive soil contamination at the Property. *See* Tringale Decl., Ex. 2 (Appendix A at 2-9) (Docket No. 942-4 Page

1   ID#:28815-22); Valenzuela Decl., Ex. M, at p. 147 (Cal. Environmental Protection
2   Agency, Fact Sheet, Mar. 1, 2021, at 2).

3       Mr. Tringale is not relying on recent groundwater data.  He is relying on
4   data from 2010 and 2011 documents to support his claim that contaminated
5   groundwater has not traveled very far off site.  *See* Tringale Decl., Ex. 2 (Tringale
6   Report at 13-14) (Docket No. 942-3 Page ID#:28654-55).  And in arguing that
7   "elevated concentrations" of contaminants are decreasing, he is **not** saying that
8   elevated concentrations of contaminants in the groundwater beneath the Property
9   no longer exist.  Given the lack of any meaningful remediation despite the
10  significant concentrations of soil contamination that remains at the Property, it is
11  baseless to assert that Plaintiffs will not incur any response costs arising from the
12  releases and threatened releases that have occurred, are occurring, and may occur
13  from soils at the Property to OU-2 Groundwater.[14] The evidence establishes that
14  there has been a release (or at a minimum, a threatened release) of hazardous
15  substances from the Property into OU-2 Groundwater.

16
17
18
19
20
21
22
23

_____

24  [14] Defendants close their opposition with the argument that they are not financially
    viable and should have been settled out as "ability-to-pay" parties. Opp'n at 30-32.
25  The argument does not merit a rebuttal given that it is immaterial to the pending
    motion.  However, Plaintiffs would observe that what has "entangled" Defendants
26  in this litigation is their own conduct in refusing—for decades—to mitigate,
27  investigate, and remediate the contamination at the Property.
28

# V.   PHIBRO-TECH PROPERTY

## A.   Introduction

The Phibro-Tech Source Property (hereafter, for purposes of this Section V, the "Property") is located at 8851 Dice Road, Santa Fe Springs, California, a parcel covering almost 5 acres. RSUMF 20. For six decades, since at least 1958 and long before many environmental regulations and modern procedures for safe hazardous waste handling were developed, the Property has been the location of an inorganic chemical manufacturing and waste chemical reprocessing plant, and, since 1980, has been considered by EPA and California as a RCRA-regulated hazardous waste treatment, storage and disposal facility that may not operate without a RCRA hazardous waste permit. RSUMF 23; 40 C.F.R. § 270.1(c) (2018). The facility is currently operating under a 1991 RCRA permit that expired in 1996.

Chromium and hexavalent chromium have been utilized in processes at the Property for decades. In fact, Phibro-Tech employees have testified that a significant part of Phibro-Tech's business was to accept waste streams that contain hexavalent chromium to be used as raw materials in manufacturing etchants. Chemicals associated with operations at the Property also included chromic acid and chromic-sulfuric acid solutions. A leaking 3,000-gallon underground storage tank ("UST") containing chrome etching solution was located at the Property as were numerous ponds and lagoons used to manage chromium-containing wastes.

The Property has had two owners since 1903, and the chemical manufacturing plant has had essentially one owner for purposes of CERCLA liability. Defendant Union Pacific's predecessors-in-interest (collectively, "Union Pacific") owned the Property from 1903 until 1985. RSUMF 20. Defendant First Dice Road Company ("First Dice") has owned it since 1985. RSUMF 22. The chemical manufacturing and reprocessing business has been run

1  by Defendant Phibro-Tech and its predecessors-in-interest, which have leased the
2  Property, since at least 1958. RSUMF 23.

3         In the face of substantial evidence that hexavalent chromium in the soils at
4  the Property have leached into the OU-2 Groundwater beneath it, the Phibro-
5  Tech Property Defendants essentially blame the messenger for the bad news.
6  Specifically, they blame two groundwater monitoring wells that they say were
7  not constructed properly and yielded unreliable results with respect to the
8  elevated levels of hexavalent chromium in the groundwater beneath the Property.
9  Curiously, before this, Phibro-Tech's environmental consultant concluded that
10  the groundwater data pointed to the Property as being a source of contamination
11  in OU-2 Groundwater. But that consultant was subsequently fired and the "faulty
12  well" theory was born.

13         It is of no moment. Instead of presenting data and analysis—and
14  evidence—that the wells are faulty, Defendants have offered excerpts of a
15  transcript from a deposition one of their environmental consultants, Christopher
16  Alger, sat for three years ago in this case.[15] But Mr. Alger does not seem
17  convinced in Defendants' faulty well theory, saying only that the well data
18  "may" be unreliable.  The regulatory agencies are not convinced either, as they
19  continue to point to the Property as a source of groundwater contamination.
20  Moreover, the two "faulty" wells are not the only bearers of bad news. Two other
21  wells have reported elevated concentrations of hexavalent chromium,
22  concentrations that are greater than those detected in upgradient wells, which is a
23  tell-tale sign that the Property is a source of groundwater contamination.

24

25  _____

26  [15] Excerpts from Mr. Alger's 2017 deposition are insufficient to create "a battle of
    the experts" as Defendants contend. As noted in Plaintiffs' Responses to
27  Defendants' evidentiary objections filed contemporaneously herewith, the
    excerpted testimony does not qualify as an expert declaration nor expert testimony.
28

Defendants brush this off, arguing that Plaintiffs expert, Mr. Mutch, failed to analyze five wells that Defendants contend show concentrations of hexavalent chromium is greater in *upgradient* wells than the concentrations detected in the wells that Mr. Mutch "ignored." But he did not ignore them. Mr. Mutch rightly concluded that the wells are not downgradient of the suspected source of the contamination and thus not appropriate to include in the analysis. Defendants answer is merely "not so," with no data or facts to back it up.

Defendants similarly offer only conclusory statements in response to evidence that volatile organic compounds (VOCs) like PCE and TCE, have leached from soils at the Property to OU-2 Groundwater. Or they offer plume maps that they say show that the Property is surrounded by VOCs. But this is immaterial. The question is not whether upgradient sources of groundwater contamination may be flowing beneath the Property, the question is whether the Property is *contributing* to that contamination.

The evidence establishes that there has been a release (or at a minimum, a threatened release) of hazardous substances from the Property into OU-2 Groundwater.

### B.   Argument

#### 1.   Plaintiffs are entitled to partial summary judgment against Defendants as to the "facility" and "covered person" elements.

##### a.   Plaintiffs have satisfied the "facility" element under Section 107(a).

Defendants Phibro-Tech, First Dice Road and Union Pacific concede that the Property is a CERCLA "facility." Opp'n at 43:16-18; RSUMF 24-25.  Plaintiffs have satisfied the "facility" element under Section 107(a). *3000 E. Imperial,* 2010

U.S. Dist. LEXIS 138661, at *3, 7 (contaminated property qualifies as CERCLA "facility).

### b. Plaintiffs have satisfied the "covered persons" element under Section 107(a).

Phibro-Tech admits that it is the current operator of the facility, and First Dice Road admits that it is the current owner of the facility.  RSUMF 22, 23. These admissions are sufficient to establish that Phibro-Tech and First Dice Road are "covered persons" under Section 107(a).  *San Pedro Boat Works*, 635 F.3d at 443-44 (holder of fee title is covered person under CERCLA)

Union Pacific admits that it formerly owned that facility from 1903 to 1985 and that there was a "disposal" of CERCLA hazardous substances at the Property when it owned it.  RSUMF 20. The opposition includes a footnote stating that "Plaintiffs would be required to prove that Union Pacific was the owner [of the Property] at the time of a disposal of a hazardous substance **to OU-2**." See Opp'n at 47 n.  9 (citing 42 U.S.C. § 9607(a)(2)) (emphases added).  However, Defendants do not explain the import of the footnote nor argue in their papers that Plaintiffs have failed to establish that Union Pacific is a "covered person" under CERCLA. In any event, the footnote misstates the law and should be ignored.  As explained above (*see* Section III, *supra* (Associated Plating Property Section)), to satisfy the "covered person" element, Plaintiffs are **not** required to prove that there was a disposal "into OU-2" during Union Pacific's ownership of the Phibro-Tech Property. Accordingly, Plaintiffs have established that Union Pacific is a "covered person" under Section 107(a). *Hinds Investments*, 2009 WL 951155, at *3.

1
2

### 2.   Defendants do not dispute any of the facts required to satisfy the "release element" under the *Castaic Lake* test.

3
4
5
6
7
8

Defendants do not dispute that hazardous substances, including TCE, PCE, cis-1,2-DCE, 1,1-DCA, and hexavalent chromium, have been detected in the soils at the Property and that these same substances have been detected in OU-2 Groundwater below and downgradient of the Property.  RSUMF 25, 26.  These admissions satisfy the first two prongs of the *Castaic Lake* test.  *Castaic Lake*, 272 F. Supp. 2d 1067.

9
10
11
12
13
14
15
16
17
18
19
20
21

Defendants do not dispute the facts necessary to establish the third and final prong of the *Castaic Lake* test.  They do not dispute that the hydrogeology of OU-2 presents a pathway for hazardous substances discharged at the Property to reach OU-2 Groundwater beneath and downgradient of the Property given that OU-2 is a known recharge area.  *See* Mot. (Brief 2) at 62-63; RSUMF 27.  Nor do they dispute that subsurface soils at the Property pose no barrier to the downward migration of contaminants detected in Property soils at concentrations that vastly exceed soils screening levels.  *Id.* Defendants' opposition is similarly silent regarding the **direct pathway** from the surface to OU-2 Groundwater that DTSC discovered in 2014 when an inspection revealed several wells that were in such disrepair and so poorly maintained that Phibro-Tech had failed to prevent the wells from "acting as a conduit for contaminant transport." Pls.' RFJN, Ex. 74 at 1149-51.

22
23
24
25
26
27
28

In other words, Defendants concede that there is a plausible migration pathway between the Property and OU-2 Groundwater, satisfying the third prong of Castaic Lake.  *Castaic Lake*, F. Supp. 2d at 1067-68.  Defendants contend that the Plaintiffs must instead show an *actual* release from soils at the Property into OU-2 Groundwater.  Although Defendants are wrong on the law, it makes no

difference.  The undisputed facts establish that there has been a release or a threatened release from the soils at the Property into OU-2 Groundwater.

### 3.   There has been a release or threatened release of hexavalent chromium from the soils at the Property to OU-2 Groundwater.

Defendants try to create a dispute of material fact by attempting to raise questions about some of the groundwater data.  Defendants focus on two arguments.  First, they claim some of the well data is "potentially" suspect because the wells were improperly constructed.  Second, they argue that Plaintiff's expert, Mr. Mutch, "ignored" data from certain groundwater monitoring wells that purport to show that the Property is not a source of hexavalent chromium in OU-2 Groundwater.  Neither argument precludes partial summary judgment.

### a.   Defendants' contention that data from wells MW-4 and MW-9 are unreliable does not establish a dispute of material fact.

Defendants argue that groundwater data showing elevated concentrations of hexavalent chromium downgradient of the former chromic acid UST and Pond 1 area cannot be trusted.  Opp'n at 59-63.  The data, they say, comes from wells, wells, MW-4 and MW-9, that are "flawed" or improperly constructed.  Each of these wells, they argue, has a roughly 30-foot "screen," which is the intake portion, or opening, along the length of the well that permits water to enter the well.  *See* Walton Decl., Ex. 5 (Mutch Dep. Exs.  34-35 (Docket No. 938-5 Page ID#:28380, 28382)).  The screen purportedly traverses two layers: the bottom portion of what they call the "unnamed aquitard," which is less permeable (though they admit groundwater migrates through it); and the upper portion of the more permeable layer below the unnamed aquitard, which Defendants refer to as the Hollydale aquifer.  *Id.*; Opp'n at 59.

The design of the wells, Defendants contend, allows less contaminated groundwater in the more permeable layer to move up into the contaminated unnamed aquitard.  Opp'n at 59.  This, they say, made it appear that the groundwater drawn from the more permeable layer (the Hollydale aquifer) had more hexavalent chromium in it than there actually was.[16] *Id.* 60.  In other words, Phibro-Tech wants to shoot the messenger, blaming the wells for what everyone else appears to agree on: releases of hexavalent chromium from operations at the Property have contaminated OU-2 Groundwater.  The faulty well theory does not create a dispute of material fact.

### i.   Defendants' "flawed wells" theory is unsubstantiated.

Mr. Alger appears unconvinced by his own theory.  In 2007, Mr. Alger's firm indicated that "[e]levated hexavalent chromium detections in groundwater at wells MW-4 and MW-9 **may potentially** be related to" dissolved hexavalent chromium migration into the portion of the wells located in soils or sediments sitting above the groundwater thereby producing "unrepresentative values" for groundwater quality.  Walton Decl. Ex. 2 (Alger Dep. Ex. 6 (Addendum to Data

---

[16] Defendants contend that this design is inconsistent with DTSC guidance and that screen lengths should generally not exceed 10 feet.  Opp'n at 61.  However, their support for this statement is a DTSC document from 2014, some 29 years after the wells were built.  *See* Walton Decl., Ex. 5 (Mutch Dep. Ex. 33) (Docket No. 938-5 Page ID#:28284).  Contrary to Defendants' contention (Opp'n at 61), Plaintiffs' expert, Mr. Mutch, did **not** agree that the wells were improperly constructed. Instead, Mr. Mutch testified that the design used for MW-4 and MW-9 was common in the 1980s when those wells were built.  Walton Decl., Ex. 5 (Mutch Dep. 614:3-8) (Docket No. 938-5 Page ID#:28218).  Longer screens were considered better because they were more likely to intersect contamination, and both designs, pre- and post-2014, were meant to obtain samples of representative groundwater quality.  *Id.* (Mutch Dep. 617:18-618:21) (Docket No. 938-5 Page ID#:28219-20).  Defendants do not dispute this.

Gap Investigation Report, Oct. 24, 2007, at 3-1) (Docket No. 938-2 Page ID #:28100). And nearly 10 years after certifying this statement, Mr. Alger *still* had not conclusively determined whether data from MW-4 and MW-9 are, in fact, unreliable. In his 2017 deposition, Mr. Alger testified that "detections of chemicals in that upper zone [i.e., soils above the groundwater] are **potentially** misrepresented as representing the actual aquifer." Walton Decl., Ex. 2 (Alger Dep. 109:11-24) (emphasis added).

Mr. Alger is similarly non-committal when discussing wells MW-17S and MW-18S, which Defendants contend are "more reliable substitutes" to wells MW-4 and MW-9. His firm reported that the fact that hexavalent chromium was not detected in MW-17S and MW-18S "***may*** support a conclusion that hexavalent chromium concentrations are not as elevated ... as suggested by MW-04 and MW-09 data ... ***if substantiated by subsequent sampling***."[17] Walton Decl., Ex. 2 (Alger Dep. Ex. 6 (Addendum to Data Gap Investigation Report, Oct. 24, 2007, at 3-1) (Docket No. 938-2, Page ID #:28100)).

Defendants cannot defeat partial summary judgment by presenting "evidence" that, at the most, posits that the wells *might* be faulty. A party opposing summary judgment must "produce some evidence, other than speculation

---

[17] No regulatory authority appears convinced of the theory either. EPA, the LA-Regional Water Board, and DTSC are unanimous in identifying the Phibro-Tech Property as a known or suspected source of hexavalent chromium in OU-2 Groundwater—despite Phibro-Tech's complaint about faulty wells. *See, e.g.,* Pls.' RFJN, Ex. 74 at 1148, 1150 (DTSC concluding Property is source of hexavalent chromium in groundwater); Ex. 61 at 1040 (Regional Water Board concluding same). There also is no merit to Defendants' claim that in 1988, the Regional Board "concurred" that MW-4 and MW-9 were improperly constructed. Opp'n at 61. The document cited in support of this statement is vague about which wells were at issue and the precise nature of their deficiency. *See* Pls.' RFJN, Ex. 66 at 1056.

1    or guesswork" sufficient to create a genuine dispute of material fact. *Guidroz–*
2    *Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).

3                       **ii.    Even if true, Mr. Alger's faulty well theory does**
4                       **not create a dispute of material fact.**

5         Defendants' heavy reliance on Mr. Alger's faulty well theory is misplaced
6    for four additional reasons.  First, for purposes of establishing CERCLA liability, it
7    does not matter if the groundwater sampled from MW-4 and MW-9 came from the
8    unnamed aquitard rather than from the more permeable layer below it.  It is **all**
9    OU-2 Groundwater (*see* Mutch Report at 8-28 (Docket No. 903-204 Page
10   ID#:25472), and Defendants do not dispute this.  As such, the faulty well theory
11   does not change the fact that groundwater drawn from MW-4 and MW-9
12   (purportedly from the unnamed aquitard) had significantly higher concentrations of
13   hexavalent chromium than the groundwater drawn from upgradient wells.  Thus,
14   groundwater data points to an onsite source for the hexavalent chromium in the
15   OU-2 Groundwater underneath the Phibro-Tech Property even if the Court
16   assumes that wells MW-4 and MW-9 are "faulty" as Mr. Alger contends.

17        Second, under the faulty well theory, Defendants concede that the
18   groundwater in the unnamed aquitard is heavily contaminated with hexavalent
19   chromium.  Thus, Defendants agree that hexavalent chromium in the soils at the
20   Phibro-Tech Property has migrated deep into the subsurface—as early as the
21   1980s, and likely earlier—**into** OU-2 Groundwater.  *See* Mutch Report at 8-29
22   (Docket No. 903-204 Page ID#:25473).  In other words, Defendants acknowledge
23   that there has been a release of hexavalent chromium from the soils at the Property
24   into OU-2 Groundwater.

25        Third, wells MW-4 and MW-9 are not the only wells showing elevated
26   concentrations of hexavalent chromium in OU-2 Groundwater beneath the

39

Property.  Groundwater samples from wells MW-20S and MW-14S detected elevated concentrations of hexavalent chromium as compared with samples taken from upgradient wells. *See* Mutch Report at 8-29 (Docket No. 903-204 Page ID#:25473).  Defendants have not complained that any of these wells are faulty.[18]

Fourth, under Defendants' faulty well theory, wells MW-4 and MW-9 (and all other wells on the Property that are built like them) are **conduits** that permit hexavalent chromium in the unnamed aquitard to migrate into OU-2 Groundwater. Defendants themselves have created a release, or threatened release, of hexavalent chromium to OU-2 Groundwater beneath the Property and cannot evade partial summary judgment.

b.       **Defendants' contention that Plaintiffs' expert ignored "critical" data from downgradient wells is meritless.**

Defendants claim that Mr. Mutch's conclusion that groundwater data shows that the Property is a source of hexavalent chromium "ignored" five "critical" groundwater wells, MW-6A, MW-6B, MW-7, MW-15S, and MW-15D, in which little or no hexavalent chromium was detected.[19] Opp'n at 58-59.  However,

---

[18] DTSC also has not relied exclusively on well data from MW-4 or MW-9 in concluding that the Property is a source of hexavalent chromium contamination in OU-2 Groundwater.  *See, e.g.,* Pls.' RFJN, Ex. 74 at 1148 ("significant Cr+6 [hexavalent chromium] was found in on-site monitoring wells MW-14S and MW-19S ... consistent with a release and migration of $Cr^{+6}$ from the former chromic acid UST or from Pond 1").

[19] Defendants' opposition identifies a total of six wells: MW-6A, MW-6B, MW-6C, MW-7S, and MW-15S, and MW-15D. Opp'n at 58.  However, Plaintiffs can find no evidence of sampling data for wells MW-7S or MW-6C, nor have Defendants offered any such evidence in their opposition or supporting papers.  Defendants' counsel referred to well MW-7 when deposing Mr. Mutch, so Plaintiffs assume the reference to MW-7S in the opposition is a typographical error.  Accordingly, Plaintiffs understand Defendants' argument to focus on the following five wells: MW-6A, MW-6B, MW-7, MW-15S, and MW-15D.

Defendants offer no data, documentary evidence, or expert opinion or analysis demonstrating why sampling data from these five wells are relevant, let alone "critical." *See* Opp'n at 58-59; RSUMF 315.  Not even Mr. Alger offers any view on these five wells.

Defendants' **sole** basis for contending that these five wells carry any significance is that they are located on the southern boundary of the Phibro-Tech Property.  Opp'n at 58-59.  But merely being situated on or near the southern boundary does not automatically make these wells appropriate for evaluating whether there is an onsite source of the hexavalent chromium detected in groundwater underneath the Property.  In fact, they are not critical, appropriate, or necessary to that analysis.  And DTSC agrees.

### i. Defendants' argument is a red herring.

When comparing concentrations of hazardous substances in upgradient wells versus concentrations in downgradient wells, the appropriate wells must be chosen carefully.  Valenzuela Decl., Ex. V, at p. 236 (Mutch Dep. 952:1-8, Apr. 6, 2021).  The downgradient wells must be, as close as possible, directly downgradient of the upgradient wells and in line with the flow of groundwater at the Property.  *Id.* at pp. 236-237 (Mutch Dep. 952:9-953:2).  The downgradient wells should also be, to the greatest extent feasible, directly downgradient, vis-à-vis the flow of groundwater, of the known or suspected onsite sources of contamination.  *See* Walton Decl., Ex. 5 (Mutch Dep. 572:14-573:6) (Docket No. 938-5 Page ID#: 28191-92) (noting well was not appropriate to consider because it was not directly downgradient of source).

The five wells that Phibro-Tech alleges are "critical" do not meet these criteria.  Defendants do not dispute that groundwater flows in a southwesterly direction underneath the Property.  However, wells MW-7, MW-6A, and MW-6B

do not lie **southwest** of the former chromic acid UST and Pond 1 area; they are situated **south/southeast** of that location.  *See* Mutch Report, Fig. 8-2 (Docket No. 903-211 Page ID#:25592) (showing former chromic acid tank area), Fig. 8-8 (Docket No. 903-211 Page ID#:25598) (graph plotting hexavalent chromium concentrations in downgradient wells); *see also* Figure 1, below.  Thus, groundwater flowing underneath the former chromic acid UST and Pond 1 area would not be expected to flow in the direction of wells MW-7, MW-6A, or MW-6B.

As for well MW-15S (and MW-15D, which is directly adjacent to it), Mr. Mutch testified that well MW-15S is west/southwest, "almost in the westernmost corner of the property," and "a little too far to the west to be directly downgradient to [MW-4]" or to the former chromic acid UST and Pond 1 area. *See* Walton Decl., Ex. 5 (Mutch Dep. Tr., at 572:14-573:6) (Docket No. 938-5 Page ID#: 28191-92).  As such, the wells do not meet the criteria for being appropriate, let alone "critical," for purposes of assessing concentrations of hexavalent chromium in groundwater that is emanating from the former chromic acid UST and Pond 1 area.  Valenzuela Decl., Ex. V, at pp. 236-237 (Mutch Dep. 952:1-953:2).

By contrast, and as illustrated below in Figure 1, the wells included in Mr. Mutch's analysis of groundwater data at the Property, wells MW-4, MW-9, MW-14S, MW-17S, MW-20S, and MW-24S, do meet the appropriate criteria. The wells are situated immediately downgradient and southwest of the former chromic acid UST.



Figure 1 – Locations of Groundwater Monitoring Wells The green box indicates approximate location of former chromic acid UST.  Monitoring wells downgradient of the chromic acid UST that are included in Figure 8-8 of the Mutch Report and in which hexavalent chromium was detected are circled in red; blue rectangles denote wells that Defendants allege Mr. Mutch "ignored." Valenzuela Decl., Ex. I.

Defendants do not dispute that these wells are appropriate to include in Mr. Mutch's analysis.[20] And in all these wells, in a significant number of instances, hexavalent

---

[20] As noted, Defendants claim that groundwater data from wells MW-4 and MW-9 are unreliable, but this argument has no merit and ignores the fact that *other* wells, MW-14S, MW-17S, MW-20S, and MW-24S point to an onsite source of hexavalent chromium groundwater contamination.  Importantly, Defendants have **never** objected that MW-4 and MW-9 are located in the wrong place to use to accurately assess whether the former chromic acid UST and Pond 1 area are a source of hexavalent chromium groundwater contamination.

1    chromium was detected in OU-2 Groundwater beneath the Property in

2    concentrations that were **greater** than concentrations in upgradient wells.  Mutch

3    Report at 8-27 (Docket No. 903-204 Page ID#:25471) & Fig. 8-8 (Docket No. 903-

4    211 Page ID#:25598).  Thus, Defendants' argument that Mr. Mutch "ignored critical

5    data" from five wells that are immaterial to his analysis is a red herring.[21]

6
               **ii.    DTSC has also concluded that wells along the**
7                        **southern Property boundary are insufficient to**
8                        **assess hexavalent chromium releases to OU-2**
                         **Groundwater.**
9
10        All five wells that Defendants contend that Mr. Mutch ignored were

11   installed on the Property no later than 1990.  *See* Walton Decl., Ex. 5 (Mutch Dep.,

12   Ex. 28 (CDM, Final Site Conceptual Model, Mar. 9, 2005), at 4-12 (Docket

13   No. 938-5 Page ID #:28236 & 28241) (MW-6A installed in 1985)), (Mutch

14   Dep. Ex. 30 (2012 Iris Groundwater Monitoring Report, Table 1, at 1) (Docket

15   No. 938-5 Page ID #:28241) (MW-6B and MW-7 sampled as early as 1985 and

16   MW-15S and MW-15D sampled as early as 1990)).  In 2014, 24 years *after* the

17   five wells had been installed, DTSC inspected the Property and reviewed

18   numerous documents including groundwater monitoring reports prepared by

19   ───────────────
     [21] Defendants also try to use misdirection in arguing that Mr. Mutch "cherry-
20   picked" data from certain offsite groundwater monitoring wells at the Los Nietos
     Business Center south of the Phibro-Tech Property.  Opp'n at 63-64.  Mr. Mutch
21   **did not** rely upon any offsite wells from that location in concluding that hexavalent
     chromium from soils at the Property have impacted OU-2 Groundwater.  *See*
22   Mutch Report at 8-45 to 8-47 (Docket No. 903has -204 Page ID#:25489-91).
     Mr. Mutch made this abundantly clear.  *See* Mutch Report at 8-30 (Docket
23   No. 903-204 Page ID#:25474); Walton Decl., Ex. 5 (Mutch Dep. 627:9-629:8)
24   (Docket No. 938-05 Page ID#:28221-22).  Had Defendants adequately delineated
     the hexavalent chromium plume, Defendants could themselves have determined
25   whether the groundwater contamination in the Los Nietos wells had migrated there
26   from the Phibro-Tech Property.  Walton Decl., Ex. 5 (Mutch Dep. 627:9-629:8)
     (Docket No. 938-05 Page ID#:28221-22).  But they have refused.  *Id.*
27

28
                                       44

1   Mr. Alger's firm at the time, Iris Environmental Inc. *See* Pls.' RFJN, Ex. 74 at

2   1141-45.  The purpose of the inspection was to "review ... Facility operations

3   related to the groundwater monitoring systems...." *Id.* at 1141.

4       After the inspection, DTSC advised Phibro-Tech that the agency "disputed"

5   two assertions maintained by Phibro-Tech: (1) claims that there was no evidence in

6   downgradient wells that hexavalent chromium was migrating in groundwater

7   underneath the Property, and (2) claims that dissolved metal concentrations,

8   including hexavalent chromium, at downgradient monitoring wells were near or

9   below reporting limits or were consistent with background levels (i.e., levels

10  detected in upgradient monitoring wells).  *Id.* at 1148.  DTSC noted that

11  "significant $Cr^{+6}$ [hexavalent chromium] was found in on-site monitoring wells

12  MW-14S and MW-19S ... consistent with a release and migration of $Cr^{+6}$ from the

13  former chromic acid UST or from Pond 1." *Id.* Importantly, DTSC also advised

14  Phibro-Tech that "additional down gradient monitoring wells ... [were] necessary

15  to assess the release" and additional wells should be installed.[22]  *Id.* at 1148, 1151.

16

17

18  [22] Mr. Alger has baldly asserted that in "**all [onsite] wells**" associated with the

19  Property were the same or lower than concentrations detected in upgradient wells.
    *See* Walton Decl., Ex. 2 (Alger Dep. 22:22-23:9) (Docket No. 938-2 Page

20  ID#:28076-77).  Defendants offer no evidence to support Mr. Alger's theory
    except conclusory statements from his 2017 deposition and an environmental

21  report from Mr. Alger's firm, Iris, that does little more than echo his conclusory
    deposition testimony.  *Liberty Leasing Co. v. Hillsum Sales Corp.*, 380 F.2d 1013,

22  1015 (5th Cir. 1967) (conclusory deposition testimony insufficient to create triable

23  issue of fact).  Defendants have also offered an OU-2 composite hexavalent
    chromium plume map prepared by EPA's consultant, CH2MHILL (see RSUMF

24  306; citing Mutch Dep. Ex. 32), but the map is also of no help.  There is no
    indication that Mr. Alger considered or relied upon any data on the map in

25  advancing his opinion, and the map was not prepared as part of an effort to

26  determine whether any particular property located within OU-2 was a source of the

27  groundwater contamination.  *See* Valenzuela Decl., Ex. E, at p. 86 (CH2MHILL,

28

No amount of misdirection can distract from these conclusions by DTSC. As to the five wells supposedly "ignored" by Plaintiffs' expert, MW-6A, MW-6B, MW-7, MW-15S, and MW-15D, DTSC puts little, if any, stock in them to provide data to properly evaluate the hexavalent chromium releases to groundwater at the Property. Additional downgradient wells were needed. *Id.* The data supports the conclusion that there was a "release and migration of Cr$^{+6}$ from the former chromic acid UST or from Pond 1" into OU-2 Groundwater. *Id.*

### 4.     There has been a release or threatened release of PCE and TCE from the soils at the Property to OU-2 Groundwater.

The data show that the Phibro-Tech Property is a source of VOCs in OU-2 Groundwater. Defendants attempt to rebut this conclusion by arguing that: (i) a handful of employees do not recall "using" or "handling" VOCs at the Property; and (ii) one of their environmental consultants has opined that the Phibro-Tech

---

Groundwater Monitoring Report for 2012, 2013, and 2014, Aug. 2015, at 1). Nor would it show historical releases of hexavalent chromium from the Property. It was created as part of EPA's groundwater monitoring effort to assess, among other things, the overall distribution of chemicals of concern in OU-2 Groundwater throughout the entire operable unit. *Id.* And even if Mr. Alger truly believed the truth of that statement in 2017, his firm has since admitted that it *has* observed hexavalent chromium concentrations in downgradient wells that exceed concentrations detected in upgradient wells. Mr. Alger's firm, Terraphase Engineering Inc., notified DTSC that significant levels of hexavalent chromium had been recently discovered in soil at the Property. Valenzuela Decl., Ex. B, at p. 34, 35 38; *see also id.*, Ex. C, at pp. 60, 62. Several groundwater monitoring wells were installed, including one, MW-29, near the southern boundary of the Property. *Id*, Ex. C, at pp. 54, 66 (red oval added by Plaintiffs). Elevated concentrations of hexavalent chromium were detected in soil samples drawn during the installation of MW-29, and in groundwater samples drawn from that well in June 2020, hexavalent chromium was detected in concentrations that **exceeded** concentrations detected in upgradient wells. *Id.*, Ex. A, at p. 24; *see also id.* Ex. D, at p. 78 (hexavalent chromium again detected in groundwater monitoring well MW-29).

Property is not a source of VOCs in groundwater beneath the property. Opp'n at 52-54. Neither contention gives rise to a dispute of material fact.

### a. Whether Defendants' employees recall the use or handling of PCE or TCE at the Property is immaterial.

In their response to Plaintiffs' Statement of Uncontroverted Facts, Defendants **concede** that PCE was used, handled, or stored at the Property. *See* RSUMF 24; RFJN, Ex. 68 at 1107 (PCE waste, identified by waste code D039, was handled at the Property; 40 C.F.R. § 261.24 (identifying D039 as waste code for PCE, otherwise known as Tetrachloroethylene). In any event, establishing that a defendant used, handled or stored hazardous substances is not required to show a release or threatened release to OU-2 Groundwater. Thus, it is irrelevant that a handful of employees do not recall (or are unaware of) PCE or TCE being used at the Property.

### b. Conclusory denials that PCE and TCE soil contamination at the Property has impacted OU-2 Groundwater do not create a dispute of material fact.

Citing – yet again – to an excerpt from Mr. Alger's 2017 deposition, Defendants contend that the Property is not a source of VOCs in OU-2 Groundwater. Opp'n at 52-54. The contention is based on three premises: (i) Mr. Alger never identified "any source of VOCs to ground water at the site;" (ii) data from groundwater monitoring wells indicate that there are upgradient sources of VOCs in groundwater, creating a VOC plume that "surrounds" the Property; and (iii) detections of VOCs in upgradient wells are equal to or exceed concentrations in downgradient wells on the Property. Opp'n at 53. The first two premises are immaterial, and the third is unsubstantiated and belied by the record.

Defendants do not dispute that PCE and TCE have been detected in soils at the Property. *See* RSUMF 25. Plaintiffs, then, need only show that there has been a release or threatened release of one of those hazardous substances from soils at the Property to OU-2 Groundwater (which is met by satisfying the *Castaic Lake* test). Whether Mr. Alger or his firm were ever able to identify how or where those VOCs were discharged to soil is immaterial.

Whether there are upgradient sources of VOCs in groundwater or whether a VOC plume "surrounds" the Property is immaterial. Here, the question this Court must decide is whether it is more likely than not that the Phibro-Tech Property is a source of VOC contamination in OU-2 Groundwater. The Court may find in favor of Plaintiffs on that question regardless of whether VOC contamination in groundwater underneath the Property may have migrated there from upgradient sources and now surround the Property. So long as releases from soils at the Property are **also** contributing to the VOC contamination in OU-2 Groundwater, Defendants are liable. *See T.W. Elec.  Serv., Inc. v. Pac. Elec.* Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) ("Factual disputes that are irrelevant or unnecessary will not be counted.").

Also of no help is Mr. Alger's assertion that "there are detections of multitude [*sic*] of VOCs in ground water wells that are up gradient occurring at concentrations that were equal to or exceed the concentrations at the Phibro[-]Tech facility. Walton Decl., Ex. 2 (Alger Dep. 148:13-24) (Docket No. Docket No. 938-2 Page ID#:28085). This threadbare statement offers no supporting facts upon which the Court could determine whether there exists a genuine dispute of material fact concerning releases or threatened releases of VOCs to OU-2 Groundwater.[23]

---

[23] In addition, Plaintiffs' soil gas evidence pointing to the Property as a source of VOC contamination in OU-2 Groundwater has gone completely unrebutted. That

1   *See Liberty Leasing*, 380 F.2d at 1015 (deposition proffered in opposition to

2   summary judgment does not give rise to genuine issue of material fact as it

3   contains no specificity, only general assertions and legal conclusions).

4       This is especially true where federal and state regulatory authorities are

5   unanimous in concluding that VOC soil contamination at the Property *has* leached

6   to OU-2 Groundwater.  *See* RSUMF 27; *see also Bator,* 39 F.3d at 1026  ("if the

7   factual context makes the nonmoving party's claim implausible, then that party

8   'must come forward with more persuasive evidence than would otherwise be

9   necessary to show that there is a genuine issue for trial.'") Indeed, in 2013, when

10  Mr. Alger's firm tried to submit a groundwater sampling report that denied Phibro-

11  Tech's responsibility for VOC groundwater contamination, DTSC instructed

12  Phibro-Tech to revise the statement in future reports to specify that the Property

13  was "a source of the VOC releases to soil and groundwater...." Pls.' RFJN, Ex. 73

14  at 1135.

15

16

17

18

---

19  evidence shows VOC concentrations in soil gas at the Property are spatially
20  aligned with elevated VOC concentrations in the soil and in OU-2 Groundwater.
    *See* Mutch Report at 8-39 (ECF 903-204 Page ID#:25483); *see also* Lintecum
21  Decl., Ex. 59 at 2,449 (admission that vapor extraction system designed to address
22  known VOC soil contamination at concentrations that threaten groundwater).  The
    Court may treat this silence as a concession as to a threatened release at the
23  Property entitling Plaintiffs to partial summary judgment on that element.  *See*
24  *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125,
    1132 (C.D. Cal. 2011) (generally speaking, a defendant's failure to respond in an
25  opposition brief to an argument put forward in an opening brief constitutes waiver
26  or abandonment in regard to the uncontested issue) (citing *Jenkins v. Cty. of*
    *Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) applying principle on summary
27  judgment).

28

**5.**     **Defendants' remaining attempts to create a dispute of material fact fail.**

**a.**     **Defendants' claim that hexavalent chromium was reduced to trivalent chromium at the Property fails.**

Defendants argue that Plaintiffs' expert, Mr. Mutch, failed to consider whether certain conditions in the soil and groundwater at the Property are conducive to reducing (i.e., changing) hexavalent chromium to trivalent chromium, a less toxic form of chromium.  Opp'n at 66-67.  If these conditions exist at the Property, they argue, it "*might* help explain why off-site downgradient wells have consistently detected hexavalent chromium at lower concentrations than upgradient wells." Opp'n at 68 (italics added).

Defendants offer no evidence to support the premise of their argument, namely, that appropriately located off-site wells in fact exist.  Mr. Mutch has testified that they do not (Walton Decl., Ex. 5 (Mutch Dep. 627:9-629:8) (Docket No. 938-05 Page ID#:28221-22)), and there is no evidence that Phibro-Tech has addressed DTSC's complaint that more downgradient wells were needed to assess hexavalent chromium releases from the Property (Pls.' RFJN, Ex. 74 at 1141-45).

Defendants' argument lacks merit for two additional reasons.  First, Defendants' claim about Mr. Mutch's analysis is false.  Mr. Mutch *did* consider whether reducing conditions might exist at the Property.  *See* Walton Decl., Ex. 5 (Mutch Dep. 519:15-520:22).  In fact, Mr. Mutch concluded that whatever reducing conditions on the Property may exist, the massive amount of hexavalent chromium discharged to the soils at the Property would overwhelm their reducing abilities.  Valenzuela Decl. Ex. W, at pp. 240-242 (Mutch Dep. 525:13-527:8).  Defendants have not presented any evidence to the contrary.

Second, whether or not reducing conditions exist at the Property does not change the fact that hexavalent chromium has been detected in soils at the Property at concentrations that **vastly exceed** environmental screening levels for soils (RSUMF 25).  It has not been reduced to trivalent chromium to any meaningful degree, as groundwater data indicates that it has reached OU-2 Groundwater.  *See* RSUMF 26); Mutch Report 8-27 to 8-35 (Docket No. 903-204 Page ID#:25471-79).[24]

Undeterred, Defendants nevertheless attempt to fault Mr. Mutch for not evaluating various characteristics of the soil and groundwater at the Property such as pH in groundwater and the presence of dissolved oxygen, organic carbon, and ferrous iron.  Opp'n at 67.  This critique is disingenuous.  Under the oversight of DTSC, Phibro-Tech has been injecting calcium polysulfide solution into the soils at the Property since at least 2012 in an attempt to reduce the significant concentrations of hexavalent chromium in soils to trivalent chromium.  *See* Valenzuela Decl., Ex. B, at p. 34 (Terraphase Engineering Inc., Interim Measure Work Plan, Jun. 23, 2020, at 1).  Phibro-Tech would have no cause to conduct these remedial measures if the conditions at the Property were such that hexavalent chromium was naturally reducing to trivalent chromium to a meaningful degree.[25]

---

[24] Phibro-Tech's recent discovery of a new area of significant hexavalent contamination in the soils at the southwestern portion of the Property are further evidence that the natural conditions at the Property are not significantly reducing hexavalent chromium to trivalent chromium.

[25] These remedial efforts involving calcium polysulfide solution ("CPS") also belie any claim by Defendants that a plausible migration pathway from the Phibro-Tech Property to OU-2 Groundwater does not exist.  Phibro-Tech has reported to DTSC that the CPS injections into soils at the Property in recent years have improved groundwater quality, as Phibro-Tech has reportedly observed a decrease in concentrations of hexavalent chromium in the groundwater beneath the Property. Valenzuela Decl., Exs.  B, at p. 34 (Terraphase Engineering Inc., Interim Measure

> **b.**   **Mr. Mutch's decision to use environmental screening levels does not create a dispute of material fact.**

In a final attempt to avoid partial summary judgment, the Phibro-Tech Defendants criticize the use of environmental screening levels ("ESLs") by Plaintiffs' expert.  Defendants argue that: (i) ESLs are not "binding regulatory standards" intended to establish policy or regulation nor intended to be used "in the context of determining potential impacts to groundwater;" and (ii) Mr. Mutch applied ESLs that are used to assess risks that are not applicable here.  Opp'n at 6869; *see also* RSUMF 309.  Neither argument creates a genuine dispute of material fact.

Defendants present no legal authority, nor are Plaintiffs aware of any, that mandates, in the context of litigation, the use of any particular screening value when assessing the extent of contamination at a particular property. As such, Mr. Mutch was free to exercise his judgment, based upon his extensive knowledge, unquestioned expertise, and decades of experience, concerning which screening values were appropriate.  *See* Mutch Report at 3-2 to 3-11 (Docket No. 903-204 Page ID#:25302-11) (explaining basis for using screening levels developed by the San Francisco Bay Regional Water Quality Control Board and U.S. EPA).

---

Work Plan, Jun. 23, 2020, at 1), Ex. A, at p. 24 (Terraphase Engineering, June 2020 Semiannual Sampling and Groundwater Monitoring Report, Sep.  21, 2020, at 13).  Phibro-Tech would not (and could not) make such a claim unless it believed that hexavalent chromium in soils at the Property has (or could) leach to groundwater and migrate offsite.  Moreover, hexavalent chromium has been present in the soil and groundwater beneath the Property since at least 1985 (and likely long before then), so any efforts in recent years to reduce the amount of hexavalent chromium leaching to OU-2 Groundwater have no bearing on **historical releases** to OU-2 Groundwater that have long since moved downgradient of the Property.  *See, e.g.,* Mutch Report at 8-28 to 8-31 (Docket No. 903-204 Page ID#:25472-75).

Defendants declined to challenge Mr. Mutch's judgment on this issue by presenting a rebuttal opinion from their own qualified expert. They may not, therefore, create a dispute of material fact by pretending that the law requires the use of some *other* screening level when it does not.

Defendants' contention that Mr. Mutch used the ESLs for a reason other than their intended purpose also lacks merit. As Defendants themselves acknowledge, ESLs are used "to evaluate whether concentrations of contaminants in environmental media may pose unacceptable risk." Opp'n at 68; *see also* Pls.' RFJN, Ex. 8 at 496-97 (SF-RWQCB ESL User Guide) ("ESLs serve as an aid in assessing the overall threat (pathways and threat level) at any given site"); Valenzuela Decl., Ex. F, at p. 89 (U.S. EPA, Regional Screening Levels (RSLs) – User's Guide, Nov. 2020) (screening levels "are chemical-specific concentrations for individual contaminants in air, drinking water and soil that may warrant further investigation or site cleanup").

This is precisely how Mr. Mutch utilized soil ESLs in his analysis, namely, to assess the **threat** (pathways and threat level) to the environment posed by the levels of contamination present at defendants' properties.[26] Mutch Report at 3-2 to

[26] Contrary to Defendants' suggestion (Opp'n at 68), Mr. Mutch did **not** use groundwater environmental screening levels, standing alone, to "evaluate contribution," that is, to support his conclusion that the Property was a source of the contamination found in groundwater beneath it. *See* Mutch Report at 3-7 (Docket No. 903-204 Page ID#: 25307). Instead, Mr. Mutch used groundwater ESLs to assess whether the concentrations of contaminants in the groundwater beneath the Property were significant enough to threaten the beneficial use of the groundwater. *Id.* In other words, groundwater ESLs were used to assess whether or not there was a groundwater contamination problem at the Property in the first instance. *Id.* Defendants do not dispute that there **is** a groundwater problem at their Property (thus any objection to the use of groundwater ESLs for this purpose is immaterial). Defendants instead contend that it is not a problem of their making; the contamination was coming from upgradient sources. Mr. Mutch also did not

53

3-11 (Docket No. 903-204 Page ID#:25302-11).  Specifically, Mr. Mutch used **soil** screening levels because they have been developed to be protective of groundwater.[27] They are used to identify soil contamination levels that, at a minimum, pose a threat of migration to groundwater (via leaching) at levels that would preclude the use of groundwater for drinking water or result in other exposure pathways of concern.  Pls.' RFJN, Ex. 8 at 498-99; Mutch Report at 3-3 to 3-7 (Docket No. 903-204 Page ID#:25303-07).  Plaintiffs have never taken the position that exceedance of soil ESLs, by themselves, establish impacts to OU-2 Groundwater.  *See* Mot. (Brief No. 2) at 14 n.11.  Soil screening levels are one of several lines of evidence Mr. Mutch used to assess the threat of soil contamination to OU-2 Groundwater, a use that is consistent with the purpose of ESLs as a threat-assessment tool.[28]

Defendants' final challenge to Mr. Mutch's use of ESLs essentially complains that the screening values Mr. Mutch used are not values that were developed to protect against the risks arising from the facts of this case.  Opp'n at

---

use soil vapor screening levels independently to support his conclusion that the Property was a source of the contamination found in groundwater beneath it. *Id.* Soil vapor screening levels were used to corroborate the presence of hazardous substances in soil (*id.*)—which, again, Defendants do not dispute (*see* RSUMF 25), so any objection to the use of soil vapor ESLs is immaterial.

[27] Any suggestion by Defendants that Mr. Mutch should have conducted this analysis using MCLs instead of soil screening levels developed by the SF-Regional Water Board is nonsensical.  There is no way to conduct the analysis using MCLs.  MCLs are threshold values developed to assess concentrations of chemicals in drinking water, not in soil.

[28] Defendants' baseless assertion to the contrary is all the more absurd given that they do not dispute that concentrations of VOCs in soils at the Property are 125 to 1,300 times the pertinent soil ESL and concentrations of hexavalent chromium in soils are as high 47 million times the ESL.  Defendants cannot argue with a straight face that such concentrations do not pose any threat to OU-2 Groundwater.

69.  For example, Defendants argue that rather than using the Regional Water Board groundwater ESL, which was developed to protect against exposure to tap water, California's MCL is the appropriate threshold value to use because it is the "binding regulatory standard" for drinking water.  Opp'n at 68-69.  Defendants also argue that Mr. Mutch's use of the soil gas ESL is not proper because it was developed to protect against soil vapor intrusion (i.e., chemical-forming vapor in soils that seeps into overlying buildings).  *See* RSUMF 311.

However, Defendants do not suggest what other value would have been the "correct one" to use. Moreover, Mr. Mutch used groundwater and soil gas ESLs merely as general benchmark values for the level of contamination in groundwater and level of soil gas concentrations in soil, respectively.  Mr. Mutch did not use groundwater and soil gas ESLs, independently, to assess the threat posed to groundwater, such that exceedances of those ESLs meant it was more likely that groundwater had been impacted.  Other values could have been used and it would not have affected any of the conclusions reached by Mr. Mutch.  Thus, Defendants' challenge to ESLs in this respect is like complaining that a football field is marked off in yards rather than meters.  The challenge is immaterial.

## VI.   CHRYSLER PROPERTY

### A.   Introduction

The Chrysler Source Property (hereafter, for purposes of this Section VI, the "Property") is a 40-acre piece of real property, formerly utilizing the address of 12140 Slauson Avenue, Santa Fe Springs, CA 90670. RSUMF 28. In early 1964, and continuing until 1988, the Property (mostly the central portion of the Property) was used to prepare newly manufactured cars for distribution to dealerships for sale. Such "prep work" included body work, mechanical work, tune-up, front-end alignment, emissions control testing, painting, washing, detailing, and road performance tests. Lintecum Decl., Exs. 62, 63. Operations at the Property were extensive; between 3,000 to 5,000 cars were prepped there every month. *See* RFJN, Ex. 77.

Various entities conducted these operations, including Dallas Smith Service Corporation, Automotive Precheck, and New Car Preparation System, Inc. Lintecum Decl., Exs. 62, 63. Union Pacific owned most of the Property between 1964 and 1988 (and all of it after 1967) when it was used for car prep work. RSUMF 28.

Union Pacific puts up little resistance to Plaintiffs' contention that there has been a release to OU-2 Groundwater from the Property. It all but concedes that a concrete clarifier caused extensive soil contamination the impacted OU-2 Groundwater beneath the Property. However, it argues that this clarifier was the only known source of groundwater contamination at the Property, it was installed after Union Pacific sold the Property, thus it cannot be liable. But even if Union Pacific was right about the clarifier (it is not), it is immaterial. Plaintiffs are not required to show that a release occurred during Union Pacific's ownership of the Property. As noted, Plaintiffs need only establish that a disposal occurred during that

period, some sort of spill, leak or discharge of hazardous substances in a way that the substances *may* enter the environment.

There were multiple disposals during Union Pacific's ownership, most notably, liquid waste containing an extraordinary amount of hexavalent chromium, was discharged to a storm drain in 1970. A sample of the discharge water contained 150,000 µg/L (parts per billion) hexavalent chromium. Union Pacific's answer to this is that Plaintiffs have not shown that the disposal reached the environment. But as explained, Plaintiffs do not have to show this. A disposal will do.

Car prep operations also involved discharging waste water to the sewer through vitrified clay sewer pipes. Plaintiffs have presented expert evidence that this type of sewer pipe invariably leaks. One study showed that, conservatively, 1,000 feet of six-inch vitrified clay sewer pipe could leak as much as 2.19 million gallons of wastewater over the course of a year. Union Pacific's response to this is that Plaintiffs failed to present any evidence of defects in the sewer pipe. But such evidence is not necessary since these pipes leak through the joints connecting the lengths of pipe.

At bottom, Union Pacific wants to pin the blame on Palmtree for any releases to OU-2 Groundwater from the Property. But the fact is, the **same company** that conducted car prep operations when Palmtree owned the Property **performed the same operations for years** when Union Pacific owned it.

The evidence establishes that there has been a release (or at a minimum, a threatened release) of hazardous substances from the Property into OU-2 Groundwater.

**B.    Argument**

    **1.    Plaintiffs have established the "facility" and "release" elements.**

Union Pacific admits that the Chrysler Property is a CERCLA "facility." Opp'n at 74; RSUMF 30.  Plaintiffs, then, are entitled to partial summary judgment against Union Pacific on the "facility" element of Section 107(a).

Plaintiffs have also satisfied the "release" element under both the *Castaic Lake* test and under the (inapplicable) legal standard advocated by Union Pacific. Union Pacific admits that CERCLA hazardous substances such as PCE and TCE have been detected in the soil at the Property and in OU-2 Groundwater beneath it. RSUMF 30, 31.  Union Pacific also does not dispute that the subsurface soils at the Property and hydrogeology of OU-2 present a pathway for hazardous substances discharged at the Property to reach OU-2 Groundwater beneath and downgradient of the Property.  *See* RSUMF 32.  Union Pacific contends that it is not conceding that there has been a release from the Property to OU-2 Groundwater (*see* Opp'n at 86 n.32), but Union Pacific has not put forward any evidence or argument establishing that Plaintiffs have failed to show an actual release to OU-2 Groundwater.  *See* RSUMF 32.  Accordingly, Plaintiffs have met the requirements of the *Castaic Lake* test and the legal standard that Union Pacific erroneously contends applies.

    **2.    Union Pacific cannot create a dispute of material fact as to the "covered person" element by relying upon erroneous statements of the law.**

Union Pacific admits that it is a former owner of the Chrysler Property. Opp'n at 74; RSUMF 28.  There also can be no dispute that there was a disposal of hazardous substances at the Property when Union Pacific owned it.  RSUMF 29. But Union Pacific contends that to prove that it is a "covered person," Plaintiffs

must show that the hazardous substances disposed of at the Property were **released to soils and impacted groundwater**.[29] *See, e.g.,* Opp'n at 74, 84.  Union Pacific is wrong.

### a. Plaintiffs do not have to prove that a release to OU-2 Groundwater occurred when Union Pacific owned the Property.

As noted, establishing a "disposal" does not require a plaintiff to show that the defendant discharged the hazardous substance directly onto soil or any other type of environmental media.  *See Voggenthaler,* 724 F.3d at 1064-65; *Lincoln Properties, Ltd. v. Higgins,* No. S–91–760DFL/GGH, 1993 WL 217429, at *19–20 (E.D.Cal. Jan.  21, 1993).  Thus, Union Pacific is wrong when it states that its discharge of hexavalent chromium to a storm drain or VOC-contaminated wastewater to the sewer is insufficient to establish its liability as a "covered person."[30] *See Lincoln,* 1993 WL 217429, at 19 (discharge into sewer lines constitutes a "disposal"); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 791 (D.N.J. 1989) (spillage of hazardous substances inside a plant constitutes 'disposal' under CERCLA as a matter of law).

---

[29] Union Pacific presents a variation of this argument elsewhere in its opposition (Opp'n at 87:12-14), contending that a "violation" or "disposal" for which Union Pacific is responsible must be "related" to a release of hazardous substances to soil that impacted OU-2 Groundwater.  However, Union Pacific offers no explanation of what it means for a disposal to be "related" to a release.  More importantly, Union Pacific offers no authority that stands for this proposition.

[30] Nor is there any requirement that the disposal meet some threshold quantity, concentration, or frequency.  *Hous.  Auth.  Of Los Angeles v. PCC Technical Indus., Inc.,* No. 11-1626 FMO, 2015 U.S. Dist. LEXIS 192127, at *35 n.9 (C.D. Cal. Jan.  26, 2015) (citing *Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342-43 (9th Cir. 1992).

Union Pacific's contention that *Voggenthaler* and *Lincoln Properties* are distinguishable on the facts is incorrect.  There, as here, contamination was found in both the soil and groundwater.  However, in each case, the court's decision regarding whether there had been a "disposal" at the property did **not** turn on a finding that contamination had been released **into the environment**.  *See Voggenthaler,* 724 F.3d at 1064 (spill onto floor inside building constitutes CERCLA "disposal"); *Lincoln Properties,* 1993 WL 217429, at *19 (discharge of waste into sewer lines qualifies as CERCLA "disposal").

Accordingly, Plaintiffs need not trace Union Pacific's disposal to a release to soil and OU-2 Groundwater nor prove that any other release to OU-2 Groundwater occurred before it sold the Chrysler Property.  Union Pacific cites to no authority holding otherwise, and its reference to *Carson Harbor* for the proposition that more is required here because there have been "a succession of parties" that have owned the Chrysler Property (Opp'n at 89) is misplaced.  The question in *Carson Harbor* was whether the "passive migration" of contamination on a piece of property during the time defendant owned it constituted a disposal where the contamination was placed on the property before that former property owner bought the land.  *Carson Harbor,* 270 F.3d at 867-68.  The Ninth Circuit did not consider, let alone decide, the question presented here.

The cases cited recently by Union Pacific in its reply brief supporting its own summary-judgment motion (Docket No. 958) similarly offer no help to Union Pacific.  In *Ferguson v. Arcata Redwood Co.*, No. C 03-5632 SI, 2005 WL 1869445, (N.D. Cal. Aug.  5, 2005), plaintiff Ferguson discovered that there was a "disposal pit" on her property, the "100 Timbers Blvd. Property" that contained various contaminated waste.  *Ferguson,* 2005 WL 1869445, at *1.  Ferguson filed suit against various former owners and operators of the 100 Timbers Blvd.

Property, including Leland Simonson ("Simonson"), the sole shareholder of Simonson Lumber Company, a former owner of 100 Timbers Blvd. Property and several surrounding parcels. *Id.* at *1-2. Ferguson asserted several claims against Simonson, including a claim for contribution under CERCLA. *Id.* at *1. Simonson moved for summary judgment on the CERCLA claim, arguing that there was no evidence of a "disposal" of CERCLA hazardous substances on the 100 Timbers Blvd. Property when it was owned by Simonson Lumber Company. *Id.* at *2-3.

In her attempt to avoid summary judgment, Ferguson submitted evidence that Simonson Lumber Company had disposed of hazardous substances at its *other* parcels of land surrounding the 100 Timbers Blvd. Property. *Ferguson,* 2005 WL 1869445, at *3. The court found that this evidence was insufficient to defeat summary judgment. *Id.* at *4. Ferguson's CERCLA claim was not based on contamination found at a *different* property owned by Simonson's lumber company, according to the court; it was based on contamination at the 100 Timbers Blvd. Property, and there was no evidence that contamination located at the other parcels had anything to do with the contamination found at the 100 Timbers Blvd. Property. *Id.* Ferguson does not stand for the proposition that to establish the "covered person" element under CERCLA, plaintiff must prove a disposal **and a release** at defendant's property, as Union Pacific contends. *See id.* *3-4.

Nor does *ABB Indus. Svs., Inc. v. Prime Tech, Inc.*, 120 F.3d 351 (2d Cir. 1997) lend any support to Union Pacific. *See* Opp'n 33, 36. In *ABB*, the current owner of contaminated real property brought a CERCLA claim against a former operator at the property, Prime Technology, Inc. and its operating division General Resistance, Inc. (collectively, "General Resistance"). *ABB,* 120 F.3d at 354. Plaintiff also sued a former owner of the property, Zero-Max, Inc. and its parent (collectively, "Zero-Max"). *Id.* The sole question addressed by the Second

Circuit in *ABB* was whether a disposal had occurred when General Resistance and Zero-Max operated and owned the property, respectively, such that those defendants were "covered persons" (referred to by the Second Circuit as "responsible parties") under CERCLA. *Id.* at 356.

The Second Circuit affirmed the district court's dismissal of General Resistance and Zero-Max on the grounds that there was no evidence that a disposal occurred when General Resistance operated, and Zero-Max owned, the Property. *ABB,* 120 F.3d at 356-57. Contrary to Union Pacific's suggestion, the Second Circuit did **not** hold that plaintiff was required (or failed) to prove not only that a disposal occurred at the property when General Resistance and Zero-Max were there, but also that the disposal **resulted in a release**.[31] *Id.*

At bottom, Union Pacific is conflating the "covered person" and "release" elements of CERCLA. These two elements are distinct and each carries its own requirements. Under the "covered person" element, a plaintiff does not have to prove that a release occurred during the time that the defendant was the owner of or operator at the property. *See Hinds Investments,* 2009 WL 951155, at *3 (former operator may be liable even if release did not occur when defendant leased and occupied the property).

---

[31] Of course, if Union Pacific were found to be a "covered person" in this case, it would be liable for contamination that has leached from the soils at the Property to OU-2 Groundwater underneath the Property and migrating downgradient from it. *See, e.g., Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053 (C.D. Cal. 2003). But this does not mean, as Union Pacific appears to suggest (Opp'n at 33) that Plaintiffs must trace a disposal that occurred during Union Pacific's ownership to OU-2 Groundwater underneath the Property or downgradient from it.

b.  **Union Pacific's "Chrysler Clarifier" argument is a red herring.**

i.  **When the Chrysler Clarifier was installed is immaterial and does not create a dispute of material fact.**

Union Pacific contends that the only potential onsite source of OU-2 Groundwater at the Property is a clarifier designated as "CL-2," or what Union Pacific calls, the "Chrysler Clarifier. Opp'n at 79-83, 86-87. That clarifier, Union Pacific contends, was installed after Union Pacific sold the Chrysler Property, so it cannot be liable for any releases to OU-2 Groundwater because those releases must have occurred after Union Pacific's ownership period. *Id.*

Union Pacific cannot evade partial summary judgment even if it is correct (and it is not) that (1) the clarifier was installed after Union Pacific sold the Property, and (2) the only releases to OU-2 Groundwater originated from that clarifier. Union Pacific's argument is premised on two erroneous notions. First, that there must have been a release, or threatened release, into OU-2 Groundwater **when it owned the Property**, but as noted, that is not the law. *See* Section VI.B.2.a, *supra*; *Hinds Investments,* 2009 WL 951155, at *3.

Second, Union Pacific's argument is premised on the notion that it cannot be held liable under CERCLA because it had nothing to do with contributing to the contamination in OU-2 Groundwater. It sold the Property before its former tenant installed the "Chrysler Clarifier" and caused all that contamination. This too is not the law.

In cases where multiple parties are alleged to have contaminated the environment, a plaintiff is not required to show which particular defendant is responsible for the release. *See Pinal Creek Grp. V. Newmont Mining Corp.*, 218 F.R.D. 652, 656 n.3 (D. Ariz. 2003) (citing *California v. Campbell*, 319 F.3d 1161

(9th Cir. 2003); *see also U.S. Alcan Alum. Corp.*¸ 964 F.2d 252, 265 (3d Cir. 1992) ("virtually every court that has considered the question has held that a CERCLA plaintiff need not establish a direct causal connection between the defendant's hazardous substances and the release").  Plaintiffs would not have to prove, for example, whether the operations of Dallas Smith Service Corporation (which operated at the Property from the early 1960s to 1967) or the activities of New Car Preparation Systems, Inc. (which operated there after 1973) caused the release to OU-2 Groundwater.  *See* Lintecum Decl., Ex. 10, at 654 (identifying Dallas Smith Service Corporation and New Car Preparation Systems, Inc. as former operators). So it does not matter who was the landlord when the release occurred, Union Pacific, or any subsequent owner of the Property.

> **ii.    In addition to being wrong on the law, Union Pacific is also wrong on the facts as they relate to the installation of the "Chrysler Clarifier."**

In support of its theory, Union Pacific offers two pieces of "evidence:" (i) a declaration by an imagery analyst, David Ruiz, who opines that Clarifier 2 was installed no earlier than 1983, and (ii) certain site plans and maps of the Chrysler Property that purport to show that Clarifier 2 had not been installed by 1974, when Union Pacific sold the property.  *See* Opp'n at 81-84.  Neither piece of evidence, however, establishes that Clarifier 2 was installed after 1974.

Mr. Ruiz contends that two figures from a consultant's report place the location of Clarifier 2 "inside" an addition constructed on the southeastern side of the Body Works Building at the Chrysler Property.  *See* Declaration of D. Ruiz (Docket No. 902-02) ¶¶ 4-6.  He then presents two aerial photographs showing the Body Works Building, one taken in 1983 in which the addition has not yet been constructed and a second photograph taken in 1987 which shows the completed addition.  *Id.* ¶ 15.  From this, Mr. Ruiz infers that Clarifier 2 could not have been

built prior to 1974, because the addition to the Body Works Building that "housed" the clarifier did not exist until sometime after 1983. *Id.* ¶¶ 11-16.

The linchpin of Mr. Ruiz's opinion is false; numerous documents indicate that Clarifier 2 was located *outside* the Body Works Building, not inside of it or in any other enclosed area. *See, e.g.*, Decl. of William F. Ford (Docket No. 949-57) ("Ford Decl."), Ex. 2, at 14-15. Even the documents upon which Mr. Ruiz bases his opinion that the clarifier was inside the building do not support that opinion.[32] *See id.* Ex. 1, at 11, 4 at 43.

Moreover, documents show that it took cranes and a track-mounted backhoe to remove the clarifier and excavate a deep hole to remove contaminated soil on. Ford Decl., Ex. 1, at 6-8. Yet, when the property was inspected less than two weeks later, inspectors found the Body Works Building fully intact concrete floor and all. *Id.*, Ex. 2, at 13, 15. This is hardly what one would have expected had the clarifier been installed (and removed) inside the building. Further, the Chrysler

---

[32] Elsewhere, Union Pacific argues that Mr. Mutch's Rebuttal Report submitted in opposition to Union Pacific's summary-judgment motion admits that the clarifier associated with the Body Works Building was actually inside. *See* Reply in Support of Mot. for Summ. J. (Docket No. 958) ("Defs.' Reply"), at 44. Of course, this is false. Throughout the rebuttal report, Mr. Mutch states that the evidence shows that the clarifier was outside and adjacent to the Body Works Building. *See, e.g.,* Mutch Rebuttal Report at 1-6 (Docket No. 949-78 Page ID#:30947) (noting that a 1989 inspection of the Body Works Building after the clarifier was removed and a large area of soil surrounding it was excavated observed that the Body Works Building was intact—with a concrete floor—and the clarifier had been removed "just outside"). Thus, Mr. Mutch was not agreeing with Mr. Ruiz's analysis in the portion of his report that was excerpted in Union Pacific's Reply brief. Instead, Mr. Mutch was simply agreeing that the photograph does indeed represent what Mr. Ruiz claims it does, but they are both wrong, as such clarifiers are ordinarily located outside and Mr. Ruiz has failed to prove that the clarifier's installation was tied to the expansion of the Body Works Building. *Id.* at 1-7 to 1-8 (Docket No. 949-78 Page ID#:30948-49).

Clarifier was almost certainly installed below ground.  *See* Mutch Rebuttal Report at 1-7 (Docket No. 949-78 Page ID#:30948).  Thus, the clarifier would not have been visible in the aerial photographs that Mr. Ruiz reviewed if it were located outside, as the documents show.[33]

Union Pacific further argues that site plans and maps purporting to depict the Chrysler Property in 1973 and 1974 do not show a clarifier in or near the Body Works Building, and this proves that Clarifier 2 had not yet been built.  But these documents are no help to Union Pacific.[34] Several documents in the record **do** depict a clarifier near the southeast corner the Body Works Building.  *See* Pls.' RFJN, Exs.  77, at 2, 4); Pls.' Request for Judicial Notice in Support of Opp'n to

---

[33] Union Pacific tries to come to Mr. Ruiz's rescue by arguing that if the clarifier was outside, it would have been partially above ground.  *See* Defs.' Reply at 46 n.13.  But to support this argument, Union Pacific misquotes what Union Pacific purports is the Los Angeles County requirements for clarifier installation. *Id.* Those requirements plainly provide that if a clarifier is installed inside a building, the interceptor may be level with the floor, so long as wastes enter only through the inlet pipe.  *See* Decl. of Sedina Banks, Ex. 7, at 109.  But Union Pacific reads this statement to provide that a clarifier may be level with the floor only if it is installed inside a building, and thus if a clarifier is installed outside, it must be partially above ground.  Defs.' Reply at 46 n.13.  Union Pacific's interpretation is untenable.

[34] Union Pacific's reliance on the fact that the 1973 Approved Site Plan purports to be missing the 1,250-gallon clarifier is misplaced.  *See* Defs.' Reply at 44-45.  It lends no support to Union Pacific's claim that the clarifier associated with the Body Works Building was installed after 1983, as that clarifier is present in the 1974 Approved Site Plan and, more importantly, in the 1971 site survey.  *See* Pls.' RFJN, Ex. 77, at 1160.  And Union Pacific's claim that the 1,250-gallon clarifier was never identified by EPA as being a source of OU-2 Groundwater contamination is nonsensical, as it assumes that there were two clarifiers in the same location (or very close to each other) both treating the same wastewater stream.

Defs.' Mot. for Summ. J, (Docket No. 949-01), Ex. 13, at 115; Decl. of Sedina Bank, Exs. 11 (Docket No. 902-18), at 121, 13 (Docket No. 902-20), at 126.

Plaintiffs and their expert, Mr. Mutch, have identified numerous other problems with Union Pacific's theory that the clarifier was installed after 1974. They are outlined in Plaintiffs' opposition to Union Pacific's summary-judgment motion (*see* Docket No. 950-1 at 23-29) and need not be repeated here.  Suffice it to say the evidence presented by Union Pacific does not support Mr. Ruiz's opinion that Clarifier 2 was inside the Body Works Building and installed after 1983.[35]

> **3.    Even if Union Pacific were correct that Plaintiffs must show a release or threatened release during Union Pacific's ownership, Plaintiffs have done so.**

Solvents, or waste water contaminated with solvents, from onsite operations were discharged to concrete clarifiers and carried through permeable clay or concrete pipes to the sanitary sewer, raising concerns amongst environmental consultants that "a significant potential exists for impact to underlying soils from these systems." Ford Decl., Ex. 2, at 16, 18; *see also* Ex. 6, at 63, 66 & 68 (floor washdown and liquid car wash waste sent to sewer); Pls.' RFJN, Exs. 80 (1964 discharge of waste water to sewer), 77 (1971 discharge).

Union Pacific argues that "it is unclear" if some of the known violations "even concern a hazardous substance." Opp'n at 92.  For example, it argues that car wash operations involved only "detergents." *Id.* However, the evidence

---

[35] Union Pacific's suggestion that Plaintiffs' interrogatory responses somehow confirm Union Pacific's theory about the date of the clarifier's installation is baseless.  *See* Defs.' Reply at 41-42.  Those responses make no representations concerning when the clarifier was installed, which is the linchpin of Union Pacific's meritless claim.  The size of the clarifier is immaterial.

suggests that those operations involved chlorinated hydrocarbons, such as PCE and TCE.  The cars brought onto the Property for "prep" were coated with a waxy material (cosmoline) to protect the automobile during shipping.  *See* Lintecum, Decl., Ex. 63, at 2916.  As noted by an environmental consultant retained by defendant Palmtree Acquisition Corp.'s predecessor (collectively "Palmtree"), use of chlorinated solvents was common in the automotive industry to remove that coating.  *Id.* Importantly, in 1973, Chrysler Nu Car Prep System, Inc. ("Nu Car") submitted a permit application for industrial wastewater discharge listing "decosmoline" and solvent as raw materials that would be discharged to the sewer.  Pls.' RFJN, Ex. 78, at 1161.  Subsequently, when investigation of environmental conditions at the Property finally began, a 1990 inspection confirmed that Nu Car used numerous hazardous substances, including chlorinated solvents (PCE and TCE) for car wash operations as well as degreasing.  Ford Decl., Ex. 10, at 655; Lintecum, Decl., Ex. 63, at 2916.

Union Pacific suggests that because these documents post-date its ownership of the Property, they are irrelevant.  However, car washing operations had been conducted at the Property since the early 1960s.  Pls.' RFJN, Ex. 82, at 1186.  And Nu Car had been operating there since 1967 (though under a different name, Automotive Precheck)—six years before Union Pacific sold the Property.  Ford Decl., Ex. 10, at 654.  And we know that Chrysler was using solvents no later than 1971, as Automotive Precheck (which operated at the Property from 1967 to 1973) received a Notice of Non-Compliance due to "heavy oil & solvent" in traps on the Property.  Pls.' RFJN, Ex. 83.  It is unreasonable to conclude that the same company, performing the same operations for years while Union Pacific owned the Property, would suddenly stop using "merely detergents" and begin using chlorinated solvents just around the time that Union Pacific sold the Property.

Further, by 1971, there were *seven* clarifiers on the Chrysler Property.  Pls.' RFJN, Ex. 77.  And given the permeability of all sewer pipes, contaminated waste water carried through those pipes were virtually certain to reach the environment in relatively short order.  *See* Mutch Report at 5-9 to 5-10 (Docket No. 903-204 Page ID#:25356-57) (noting that 1,000 feet of six-inch, vitrified clay sewer pipe, like the pipe present at the Chrysler Property, could conservatively leak 2.19 million gallons of wastewater over the course of a year).[36]

Union Pacific faults Plaintiffs for not having their expert excavate the sewer system or commission a smoke testing survey or pressure testing to identify any defects in the sewer lines.[37] Opp'n at 91.  However, vitrified clay pipes, like the ones at the Chrysler Property, leak even without cracks or defects.  Mutch Report at 5-30 (Docket No. 903-204 Page ID#:25377).  The wastewater escapes through the pipe joints.  *Id.; see e.g.,* Lincoln, at *5, 19 (groundwater contamination caused by PCE leaking from sewer pipe joints).  Moreover, Union Pacific cannot overcome Mr. Mutch's expert opinion on this subject with mere speculation as to whether or not the sewer pipes had "defects," especially given Palmtree's consultant's stated concern over the potential for the pretreatment systems to impact soils.

---

[36] Discharges to the flood control channel were also prone to impacts to the environment through direct impact to exposed soils beneath the channel, through seepage from cracked concrete or at expansion joints, or through exfiltration.  See Mutch Report at 5-8 to 5-11 (Docket No.903-204 PAGE ID#:25355-58).

[37] The argument is disingenuous.  Union Pacific well knows that the buildings where their tenants conducted car prep operations over 50 years ago have long since been razed, and the Property has been transformed into a business park.  Decl. of Sedina Banks (Docket No. 902-39), Ex. 32 at 209.

Waste water containing hexavalent chromium was also a significant issue at the Property. In 1970, Automotive Precheck Corp., received a Notice of Violation from the Los Angeles County Department of Engineers, Pollution Control Division, ordering Automotive Precheck Corp. to immediately stop discharging liquid waste to the storm drain. A sample of the waste indicated that it contained 150 mg/L of hexavalent chromium, a concentration that "greatly exceed[ed] the allowable limitation." *Id.* The high level of hexavalent chromium detected in the sample is unsurprising given that the waste at issue came from spot plating operations, where one would expect significant use of chromium. *See* RFJN, Ex. 77 (identifying spot chrome building); Ford Decl., Ex. 6, at 64 (spot chroming performed at property). For years prior to 1970, the operator at the property allowed liquid waste from the spot plating area to discharge to the storm drain and into the flood control channel, and it was not until the operator received the March 1970 Notice of Violation described above that it plugged the drain. *See* Ford Decl., Ex. 6, at 59.

Union Pacific argues that it should not be held liable for its tenant's disposal of liquid waste containing hexavalent chromium because there is no soil or groundwater data establishing the presence of hexavalent chromium in soil at the Property or the OU-2 Groundwater beneath it. Opp'n at 91-92. This argument, like many others put forward in the opposition, is disingenuous. Despite the known use and disposal of chromium at the Property, no one ever bothered to test the soil or groundwater for it. And to suggest that hexavalent chromium was not present is misleading. Total chromium was detected in the soil and in the groundwater. *See* Mutch Report at 5-25 (Docket No. 903-204 Page ID#:25372). Two groundwater monitoring wells located downgradient of the "Chrysler Clarifier" had higher concentrations of total chromium than upgradient wells.

70

1    *Id.* How much of that consisted of hexavalent chromium cannot be known.  *Id.* But

2    what is known is that Union Pacific cannot credibly claim that there is no evidence

3    that operations at the Chrysler Property were "unrelated" to the soil and OU-2

4    Groundwater contamination at the Property.

5         The undisputed evidence establishes that Union Pacific is a "covered

6    person" under CERCLA Section 107(a).  Accordingly, Plaintiffs are entitled to

7    partial summary judgment against Union Pacific as to all three judicial

8    determinations they seek.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

71

## VII.   PATSOURAS PROPERTY

### A.   Introduction

The Patsouras Source Property (hereafter, for purposes of this Section VII, the "Property") is located at 11630 – 11700 Burke Street in Santa Fe Springs, California, occupying approximately 8.5 acres. RSUMF 33. Defendant Kekropia, Inc. ("Kekropia") holds title to the Property, having purchased it in 1995. *Id.*

Since at least 1941, and perhaps years earlier, the Property was used to manufacture oil well drilling equipment and tools by a company which no longer exists, Globe Oil Tool, Inc. ("Globe Oil"). Globe Oil conducted tooling and heat treating of oil tools, bits, and devices, manufacturing hundreds of devices and pieces of equipment each month. The metal heat treating operations generated wastewater heavily contaminated with hexavalent chromium. Palley Supply Company took over the Property in 1973 and used it to conduct hydraulics and hydraulic equipment maintenance, government surplus and warehousing until 1987. The former locations of certain clarifiers and a storage shed are widely considered to be onsite sources of contamination, areas impacted with volatile organic compounds.

Kekropia's main defense is that the VOCs detected in the soils at the Property, such as TCE and PCE, were found only in "trace amounts" and were of "insufficient mass" to migrate to the groundwater beneath the Property.  However, the concentration of TCE in the soils was nearly *triple* the soil screening level for TCE, and the concentration of PCE detected in the soils was *6 times* its soil screening level.

Kekropia's expert, Dr. Jean Kulla, claims not to put much stock in the environmental screening levels developed by the San Francisco Regional Water Board, and used here in Southern California. However, during her deposition, Dr.

Kulla conceded that she agreed with the San Francisco Board that if the concentration detected in soil exceeds the soil screening level, **one should assume that the hazardous substance is being leached to groundwater** absent evidence to the contrary. Thus, Defendants' own expert must concede that given TCE and PCE were detected in concentrations that exceeded their respective soils screening levels, they presented, at a minimum, a threatened release to OU-2 Groundwater.

However, Kekropia argues that groundwater data indicates that concentrations of hazardous substances detected in upgradient groundwater monitoring wells are higher or the same as concentrations detected in downgradient wells.  From this, it argues that upgradient sources of groundwater contamination account for the groundwater contamination beneath the Property.

Not so.  Kekropia's conclusion is based upon Dr. Kulla's analysis using wells located on the property across the street, to the east, of the Patsouras Property. These wells, she argues are the appropriate upgradient wells to use for the analysis. However, four others who have looked at the same data have concluded that these wells, saving perhaps one, are not upgradient of the Patsouras Property. In other words, Dr. Kulla was using the wrong wells.  The wells Plaintiffs' expert used for his analysis are upgradient and do indicate in several instances that concentrations of VOCs detected in those upgradient wells are lower than concentrations detected in downgradient wells.  This data, coupled with Dr. Kulla's admission concerning the import of hazardous substances detected in concentrations exceeding soil screening levels, establishes that it is more likely than not that the Patsouras Property has contributed to the contamination in OU-2 Groundwater.

The evidence establishes that there has been a release (or at a minimum, a threatened release) of hazardous substances from the Property into OU-2 Groundwater.

### B.    Argument

#### 1.    Plaintiffs are entitled to partial summary judgment against Kekropia as to the "facility" and "covered persons" elements of CERCLA Section 107(a)

Kekropia admits that the Patsouras Property is a CERCLA "facility." RSUMF 34; *3000 E. Imperial,* 2010 U.S. Dist. LEXIS 138661 at *3 (contaminated parcel of real estate qualifies as a CERCLA "facility"). Kekropia also admits that it is the current owner of the Patsouras Property. RSUMF 33; *San Pedro Boat Works*, 635 F.3d at 451-52 (fee title owner of contaminated real property is "owner" under Section CERCLA 107(a)). Accordingly, Plaintiffs are entitled to partial summary judgment against Kekropia as to the "facility" and "covered persons" elements of Section 107(a).

#### 2.    Plaintiffs are entitled to partial summary judgment against Kekropia as to the "release" element of CERCLA Section 107(a)

Kekropia disputes that the *Castaic Lake* test applies here, but that is immaterial. The undisputed evidence in the record satisfies **both** the *Castaic Lake* test and the test advocated by Defendants (though Plaintiffs need not satisfy this second test).

The first two prongs of the *Castaic Lake* test are satisfied. Kekropia admits that chromium, PCE, and TCE are in the soils at the Patsouras Property. RSUMF 34. It also admits that these same substances are in the OU-2 Groundwater beneath the Property. RSUMF 35. *See Castaic Lake,* 272 F. Supp. 2d at 1067.

1
2
3
4
5
6
7

As to the third prong of the *Castaic Lake* test, Kekropia's opposition argues that the concentrations of chromium, PCE, and TCE in the soil at the Property are (and were) too low to be of "sufficient mass" to migrate to OU-2 Groundwater.  It also that the groundwater data is not indicative of a contribution of hazardous substances to OU-2 Groundwater from the Patsouras Property.  Opp'n at 118-20.  Neither argument, the "sufficient mass" argument nor the "groundwater data" argument raises a dispute of material fact.

8
9

        **a.**     **Kekropia's "sufficient mass" argument does not create a dispute of material fact.**

10
11

                **i.**     **Kekropia's argument regarding PCE and TCE soil data is unsubstantiated.**

12
13
14
15
16
17
18
19
20
21

PCE, TCE, chromium, nickel and vanadium, as well as other hazardous substances, have all been identified as present in the subsurface at levels **above soil screening levels**, meaning that these substances are present in soils at the Patsouras Property at levels that exceed those known to be protective of groundwater.  *See* Valenzuela Decl., Ex. 5 (Docket No. 949-32) at 43-45, Ex. 9 (Docket No. 949-36) at 85-88, Ex. 10 (Docket No. 949-37) at 98-103; Mutch Report, Tables 3-1, 7-4 (Docket No. 903-204 Page ID#:25308-10, 25422).  The mere presence of hazardous substances in an environmental media at a site, such as subsurface soils, is sufficient evidence that CERCLA "releases" have occurred.  *See, e.g., Am. Int'l Specialty Lines*, 2010 WL 2635768, at *23.

22
23
24
25
26
27
28

Here, what the Kekropia calls a "low concentration" of TCE in the soils at the property is nearly *triple* the soil screening level for TCE. The "trace amount" of PCE detected in the soils at the property is *6 times* higher.  *Compare* Kulla Report, at 3 (PCE detected at 510 µg/kg, TCE detected at 270 µg/kg) *with* Mutch Report, Tables 3-1, 7-4 (Docket No. 903-204 Page ID#:25308-10, 25422) (270 µg/kg is

nearly triple the soil screening level for TCE and 510 µg/kg of PCE is six times the screening level for PCE).

Nevertheless, Kekropia contends that it cannot be held liable because they are of "insufficient mass" and thus could not reach OU-2 Groundwater.  Kekropia is wrong for two reasons.[38]  First, Kekropia's position is predicated on the notion that only an **actual** release to OU-2 Groundwater triggers liability under Section 107(a).  This is incorrect.  CERCLA imposes liability where there has been a release—or *threatened* release.  42 U.S.C. § 9607(a)(4).  By insisting that Plaintiffs show an actual release, Kekropia reads the phrase "threatened release" right out of the statute.

Second, Kekropia's own expert, Dr. Jean Kulla, disagrees with her client.  During her deposition, Dr. Kulla was questioned about the soil screening levels developed by the San Francisco Regional Water Board.  *See* Valenzuela Decl., Ex. O, at pp. 199-200 (Kulla Dep. 195:9-196:18, Apr. 2, 2021).  Dr. Kulla was asked whether she agreed with the following statement in the User's Guide prepared by that Water Board:

> For sites where soil concentrations exceed the soil leaching ESL, **the default assumption is that chemicals**

---

[38] Plaintiffs would also observe that soils were removed at the property in 1998, 2006, 2010, and 2014.  *See* Valenzuela Decl., Ex. 16 (Docket No. 949-42), at 175.  There is no record that the level of contamination in those soils was ever documented before excavation.  Most importantly, the requirement to remove contaminated soils demonstrates that those soils were considered unsuitable and non-protective to remain in place.  Yet those soils had been in place for many years.  Kekropia does not account for these facts and the fact that leaving those soils in place for so long significantly increases the likelihood of past releases to OU-2 Groundwater even before any environmental investigation of the Property took place.

**are being leached to groundwater** until demonstrated otherwise via site-specific evaluation.

*Id.* After a bit of stalling, Dr. Kulla finally stated: "Basically, yes." *Id.* In other words, Dr. Kulla agrees that when the concentration of a hazardous substance, such as PCE and TCE, exceeds the soil screening level (i.e., soil leaching ESL), **one should assume that the hazardous substance is being leached to groundwater** absent evidence to the contrary. For all of Dr. Kulla's critique of Plaintiffs' expert, Mr. Mutch, concerning his use of ESLs, Dr. Kulla agrees with the basic premise that is core to Mr. Mutch's use of those ESLs.

With that admission, Dr. Kulla has agreed with Plaintiffs on three important points. First, the PCE and TCE detected in the soils at the Property, which are **six times** the screening level for PCE and **almost three times** the screening level for TCE, are assumed to be leaching to OU-2 Groundwater. Second, if the PCE and TCE are assumed to be leaching to OU-2 Groundwater there *is* a plausible migration pathway between the Property and OU-2 Groundwater. The concentrations of those detections of PCE and TCE, are **not** of "insufficient mass" to reach OU-2 Groundwater. Third, Dr. Kulla's admission means that, at a minimum, the presence of PCE and TCE in soils at the Property in concentrations that exceed soils screening levels continue to present a **threatened release** to OU-2 Groundwater, thus satisfying CERCLA Section 107(a) that there be a release **or threatened release** to trigger liability under the statute. 42 U.S.C. § 9607(a).

Further, Dr. Kulla has not ruled out that there have been past releases from the Property. A January 9, 1996 memorandum, which appears to have been prepared by Kim Clark of the Los Angeles County Fire Department, concluded that the locations of clarifiers and a storage shed on the eastern parcel of the Patsouras Property were impacted with volatile organic compounds, such as PCE

and TCE, and needed to be remediated.  *See* RFJN, Ex. 92 (Los Angeles County Fire Dept., Memorandum, Jan. 9, 1996, at 1-2).  The Fire Department further concluded that "**VOCs in this area have been found to extend to GW** [groundwater]." *Id.* (emphasis added).[39]

The Santa Fe Springs Fire Department reached the same conclusion in 1997.  Steve Chase, an employee of the Santa Fe Springs Fire Department, Environmental Services Division, advised the director of that division, Dave Klunk, that "historic Palley site operations contamination probably contributed to the VOC portion" of groundwater contamination at the property.  *See* Opp'n RFJN, Ex. 21.  Mr. Chase further advised that groundwater at the property was first encountered at 35 feet bgs, and "PCE was found in a [soil] column" from 10 feet bgs to 35 feet bgs.  *Id.* Like the Los Angeles County Fire Department, Mr. Chase identified the

---

[39] Kekropia has challenged whether this memorandum was authored by the Department, however the record plainly establishes that it was.  The history of the Fire Department's actions concerning the property around this time, and the Department's communications with Kekropia and its attorneys lead to no other conclusion.  Kekropia's attorney, John Glaser, sent a copy of a December 18, 1995 Subsurface Investigation Report prepared by Environmental Audit, Inc. to Kim Clark, a Hazardous Materials Specialist for the Health / HazMat Division of the Los Angeles County Fire Department on December 22.  *See* Pls.' RFJN, Ex. 92.  Ms. Clark noted at the top of the letter that she received it on or about January 2, 1996, initialing it "recd 1/2/96 KC." *Id.* The challenged Memorandum is dated January 9, 1996, and several days later, Ms. Clark telephoned Kekropia's attorney to discuss the report.  *See* Opp'n RFJN, Ex. 16.  All of these communications, including the January 9, 1996 Memorandum, summarize the salient soil and groundwater data from the Subsurface Investigation Report.  Plaintiffs would also note that these documents all bear the Bates numbers affixed to Plaintiffs' document productions in this matter, documents that were obtained from various regulatory agencies, including the Los Angeles County Fire Department, Health / HazMat Division.  *See* Decl. of J. Keener in Support of Pls.' Mot. for Partial Summ. J (Docket No. 903-202) ¶¶ 7-10; Decl. of R. Valenzuela in Support of Pls.' Mot. for Partial Summ. J (Docket No. 903-201) ¶¶ 9-12.

vicinity of the old clarifiers and the storage shed as the locations "where significant HVOC [halogenated volatile organic compounds] . . . contamination is demonstrated." *Id.* There was also a "demonstration of HVOC contamination to GW [groundwater] . . . at mid-site," namely, in the area of the old clarifiers.  *Id.*; *see also* Opp'n RFJN, Ex. 19.

Dr. Kulla contends that both Fire Departments misread the data.  Valenzuela Decl., Ex. 15 (Docket No. 949-42), at 159-167 (J. Kulla Dep. Tr.  at 75:23 to 79:25; 80:9 to 83:7).  And although Kekropia belittles these Fire Department employees in its Reply Brief, it cannot escape the fact that Dr. Kulla has **conceded** that she is not so sure that the Fire Departments were wrong after all.  During her deposition, Dr. Kulla testified that she was not sure if she necessarily disagreed with the conclusion that "Palley site operation contamination probably contributed to the VOC portion of groundwater contamination." *Id.*, Ex. 15, at 167 (J. Kulla Dep. Tr.  at 83:11-23).  Such equivocation cannot create a dispute of material fact. *See Bond*, 2014 WL 7076901, at *8.

### ii. Soil data regarding impacts of hexavalent chromium supports granting partial summary judgment.

Kekropia does not dispute that in March 1970, Globe Oil Tools Company, a former metal tools and oil drill bits manufacturer and defendant Halliburton Affiliates, LLC's predecessor-in-interest, was issued a Notice of Violation for discharging industrial wastes to the ground.  Opp'n at 104-05; Pls.' RFJN, Exs. 88, 90; Valenzuela Decl., Ex. 6 (Docket No. 949-33), at 46.  The discharge included rinse water from the heat-treating operations containing hexavalent chromium at 19.5 parts per million, a level 975,000 times higher than the current level considered protective in groundwater.  *Id.*; Mutch Report at 7-7 (Docket No. 903204 Page ID#:25420).

Kekropia suggests that this 1970 violation was the first—or only—time that rinse water containing hexavalent chromium had been discharged to ground, arguing that Globe Oil worked at "warp speed" to stop the discharge and route the waste to the sewer after passing through clarifiers. But this is simply not credible. As noted, sewers were not installed and utilized at this Property until 1970. Valenzuela Decl., Ex. 8 (Docket No. 949-35), at 66, Ex. 4 (Docket No. 949-31), at 28. Thus, these discharges, presumably to the lagoons on the property, likely were ongoing for 30 or 40 years, from the start of operations, in the 1930s or 1940s, until the sewer system was installed.

Nor did diverting the rinse water to clarifiers and then the sewer eliminate disposals of hexavalent chromium at the property. Clarifiers leak and are common sources of groundwater contamination.[40] *See* Mutch Report, at 2-6, 3-5 (Docket No. Docket No. 903-204 Page ID#:25285, 25305). Sewer pipes made of vitrified clay, the common material used during the early and middle part of the 20th century, also invariably leak, either through cracks, pipe joints, or simply via exfiltration. *See id.* at 5-9 to 5-10, 5-30 (Docket No. 903-204 Page ID#:25356-57, 25377). Given the permeability of these units and infrastructure, contaminated waste water carried through those systems is virtually certain to reach the environment. *Id.* Moreover, the 1970 industrial waste survey noted that the interceptors generated 15-20 cubic yards of sediments monthly which needed to be

---

[40] Globe Oil, and later Palley supply, utilized *multiple* clarifiers on the Patsouras Property. *See, e.g.,* Valenzuela, Ex. 9 (Docket No. 949-36), at 79, 81. Two of them were of such vintage and type that it is inconceivable that they did not release their hazardous contents into the environment. In 1988, the Los Angeles County of Engineers described two brick clarifiers, built *before* World War II, as having "long since lost their integrity to withhold any of its [*sic*] contents." Pls. RFJN Ex. 87 (Docket No. 903-91).

removed.  In other words, waste was continuously present in the clarifiers.  *See* Pls.' RFJN, Ex. 93.

Kekropia's expert, Dr. Jean Kulla, opines that a concentration of 71.1 mg/kg for total chromium, found at 2 feet bgs, is only "slightly above background levels." *See* Kulla, Expert Opinion on the Patsouras Property (Docket No. 902-86) at 3. However, according to the U.S. Geological Survey, background levels of total chromium roughly range from 30 to 36 mg/kg.  *See* Smith, D.B.  et al., U.S.G.S., Geochemical and Mineralogical Data for Soils of the Conterminous United States: U.S. Geological Survey Data Series 801, 19 (available at http://pubs.usgs.gov/ds/801/).

In its reply supporting its own summary-judgment motion, Kekropia faults Plaintiffs for referencing the national background level and purports to provide a "localized" level from the County of Los Angeles.  Defs.' Reply at 54-55. However, if Kekropia wants truly localized levels, it need only look across the street at Phibro-Tech, Inc.'s data.  There, as reported by that defendant's consultant, the levels are 20 to 24 mg/kg.  *See* Cohen Decl., Ex. 18 (Docket No. 949-77), at 343.  Apparently, Dr. Kulla believes that concentrations that are *more than twice* the background levels of total chromium, as reported by the USGS and one of the defendant's consultants qualify as "slightly above background levels."

More importantly, Kekropia utterly ignores the fact that the total chromium concentrations detected in soil at the Patsouras Property could include significant concentrations of hexavalent chromium.  The environmental consultants that have assessed the property over the years did not adequately analyze soil samples for hexavalent chromium.  *See* Mutch Report, at 7-12 to 7-13 (Docket No. 903-204 Page ID#:25425-26).  More generally, testing of soils for hexavalent chromium,

total chromium, and other metals was extremely limited.  *See id.* at 7-9, 7-13 (Docket No. 903-204 Page ID#:25422, 25426).  For example, of the 31 locations sampled between 1994 and 1999, where dozens of samples were taken, only 1 was analyzed for hexavalent chromium.  *Id.* at 7-12 (Docket No. 903-204 Page ID#:25425).  However, what was found was telling.  Significant chromium levels were found in the area of the clarifiers.  Valenzuela Decl., Ex. 12 (Docket No. 949-39), at 121, Ex. 10 (Docket No. 949-37), at 104-105, Ex. 11 (Docket No. 949-38), at 114.

As indicated, background levels of hexavalent chromium at and near defendant Phibro-Tech, Inc.'s facility, as reported by that defendant's consultant, range from 1 to 2 mg/kg.  *See* Cohen Decl., Ex. 18 (Docket No. 949-77), at 343.  A concentration of 71.1 mg/kg is *orders of magnitude higher* than the background levels reported by Phibro-Tech, Inc.'s consultant.  Given these facts, it is baffling that Dr. Kulla would so cavalierly brush aside a detected concentration of 71.1 mg/kg for total chromium.

Citing Dr. Kulla, Kekropia suggests that the hexavalent chromium detected in soils at the Property can be ignored because the soil at the Property is anoxic and will reduce hexavalent chromium to the non-toxic form, trivalent chromium.  Opp'n at 110.  However, when questioned during her deposition why two other companies, defendant Phibro-Tech, and former defendant Pilot Chemical, which are both located just across the street from the Patsouras Property, were testing for hexavalent chromium, Dr. Kulla had no answer.  Valenzuela Decl., Ex. O, at pp. 201-204 (Kulla Dep. 265:1-268:10).  Given these facts, it is more likely than not that there have been releases, or threatened releases, of hexavalent chromium from soils at the Property to OU-2 Groundwater.

####           b.      **Kekropia has not created a dispute of material fact concerning the groundwater data at the Property.**

#####               i.      **Groundwater data indicates that the Property has contributed hazardous substances to OU-2 Groundwater.**

Based upon his analysis of soil data and groundwater monitoring data, Plaintiff's expert, Mr. Mutch, concluded that the Patsouras Property was contributing PCE, TCE, and hexavalent chromium to OU-2 Groundwater beneath the Property.  Mutch Report at 7-16 to 7-17 (Docket No. 903-204 Page ID#: 2542930).  Although Mr. Mutch is confident in his analysis, he has been honest and frank in noting the difficulty in fully delineating groundwater contamination at the Patsouras Property given that Kekropia has been willing to install very few monitoring wells.  Mutch Report, at 7-16 (Docket No. 903-204 #:25429).

Kekropia, relying upon Dr. Kulla's evaluation of groundwater flow (represented in Figure 6 of her original report), argues that the vast majority of groundwater sampling from wells upgradient of the property show detections of PCE and TCE that are "greater than or similar to" samples drawn from the downgradient wells on the property.  *See* Opp'n at 110.  This, it argues, shows that the Patsouras Property is not a source of groundwater contamination.  *Id.* There are three significant flaws with Dr. Kulla's analysis on this point.

First, as Figure 6 of Dr. Kulla's report shows, the Pilot Chemical property is located generally to the *east* of the Patsouras Property and, as Dr. Kulla acknowledges, OU-2 Groundwater generally flows in a south, southwest direction (*see* Kulla Report, at 1), not in the more westerly direction suggested by the arrows in Figure 6.  As such, many, if not most, of the Pilot Chemical wells may be cross-gradient, not upgradient, of the Patsouras Property.  *See* Mutch Rebuttal Report, section 3.3 (Docket No. 949-78).

Second, Dr. Kulla bases her opinion on the "fact" that OU-2 Groundwater is largely flowing onto the Patsouras Property from the Pilot Chemical property. To help establish this point, Dr. Kulla presents a map, Figure 6 of her report, purporting to show the OU-2 Groundwater flow in the area. Wick Decl., Ex. K, Fig. 6 (Docket No. 902-86 Page ID#: 18573). However, to create Figure 6, Dr. Kulla apparently: (a) took a map (Figure 7) from a 2010 report prepared by Kekropia's consultant, Environmental Audit, Inc., which shows groundwater leaving the Pilot Chemical property and generally bypassing the Patsouras Property; (b) "erased" the arrows on the Environmental Audit, Inc. map; and (c) "drew" new arrows that point in a different direction, namely, directly at the Patsouras Property. *See* Valenzuela Ex. 18 (Docket No. 949-35) (comparison of EAI Figure 7 and Kulla Figure 6). Initially, Dr. Kulla provided no data justifying how she determined the groundwater flow direction. After being challenged by Mr. Mutch on this in his expert rebuttal report, Dr. Kulla has now prepared another version of her figure that purports to be based upon groundwater data from the 2010 period. As indicated below, the new version continues to suffer from the same flaw as the original draft.

Third, the monitoring well network on the Patsouras Property is "inadequate to delineate flow direction and delineate groundwater contamination at the property." Mutch Report, at 7-16 (Docket No. 903-204 #:25429). Accordingly, the set of well data used by Dr. Kulla for her comparison, does not provide either sufficient or reliable data upon which to assess the quality of OU-2 Groundwater flowing across the Patsouras Property.

1

2

### ii. Kekropia's new groundwater contour map does not help it evade partial summary judgment.

3

4

Kekropia has subsequently tried to address these flaws in Dr. Kulla's analysis – but to no avail. As noted, Dr. Kulla has hastily prepared a new graphic purporting to be a groundwater contour map for the Property using groundwater data from the 2010 time period. *See* Wick Decl., Ex. I (Docket No. 963-9). As shown in the graphic, Dr. Kulla continues to insist that OU-2 Groundwater flows to the west at the Patsouras Property and that **all** the groundwater monitoring wells located on the adjacent Pilot Chemical property are **upgradient** of the Patsouras Property. *Id.* Kekropia makes two arguments in defense of this new graphic.

5

6

7

8

9

10

11

12

First, Kekropia argues that Pilot Chemical, through its environmental consultant, AECOM, sought permission in 2019 to obtain a groundwater sample from an area in the southernmost portion of the Patsouras Property, because AECOM believed that area to be downgradient of Pilot Chemical's groundwater monitoring well MW-9R. *See* Wick Decl., Ex. J (Docket No. 963-10). Because the proposed sample area on the Patsouras Property is due west of MW-9R, Kekropia concludes that "**all** the Pilot Chemical wells ... are indisputably upgradient of those wells. Defs.' Reply Brief at 63 (emphases added). Second, Kekropia argues that its environmental consultant, Environmental Audit, Inc., has determined that groundwater flows in a westerly direction. Reply Brief at 61. Both arguments are baseless.

13

14

15

16

17

18

19

20

21

22

23

Regarding AECOM, Plaintiffs' expert, Mr. Mutch, has never denied that a portion of the Patsouras Property, the eastern, southeastern portion, may be downgradient of the Pilot Chemical property at times. *See* Wick Decl., Ex. 5 (963-5 Page ID#:31670-71). However, that is not even remotely close to admitting that **all** the wells, or even a significant number of them, are appropriate to use as

24

25

26

27

28

85

1    upgradient wells in analyzing whether the Property is contributing to the OU-2

2    Groundwater contamination (as Dr. Kulla has done).

3          Moreover, Pilot Chemical's consultant in 2010, URS Corporation, plainly

4    disagrees with Dr. Kulla's groundwater contour map.  *See* Valenzuela Decl., Ex. R,

5    at p. 220 (URS Corp., 2010 Second Semi-Annual Groundwater Contour Map,

6    Fig. 3); *see also* Wick Decl., Ex. I (Docket No. 963-9).  URS created a

7    groundwater contour map of the Pilot Chemical property using data from 2010,

8    just as Dr. Kulla did to create her contour maps.  *Id.* URS's map plainly shows that

9    the groundwater at that property—which sits directly across the street from the

10   Patsouras Property—flows **southwesterly**, not to the west as Dr. Kulla contends.

11   *Id.*  Similarly, Iris Environmental Inc., environmental consultant of defendant

12   Phibro-Tech, Inc., created a groundwater elevation map using 2010 groundwater

13   data—just as Dr. Kulla did to create her contour maps.  Valenzuela Decl., Ex. Q, at

14   p. 217 (Iris Environmental Inc., October 2010 Quarterly Sampling and 2010

15   Annual Groundwater Report, Fig. 3); Wick Decl., Ex. I (Docket No. 963-9).  Iris's

16   map also shows the groundwater at the Phibro-Tech property, which sits directly

17   across the street from the Patsouras Property—flows **southwesterly**, not to the

18   west.  *Id.*

19

20         Regarding Kekropia's second argument, that its consultant, Environmental

21   Audit, also agrees that the groundwater at the Patsouras Property flows to the west,

22   this too is inaccurate.  Environmental Audit created a map of the Patsouras

23   Property showing the groundwater flow direction at the Property.  Valenzuela,

24   Ex. S, at p. 226 (Environmental Audit, Inc., Updated Conceptual Model and

25   Request for Low Risk Closure, Fig. 7).  To create the map Environmental Audit

26   used groundwater data that was contemporaneous with the data Dr. Kulla used to

27   create her new groundwater contour maps.  *Id.*; Wick Decl., Ex. I (Docket

28

No. 963-9).  Environmental Audit's map also shows that the groundwater flowing beneath the Property flows **southwesterly**, not to the west as Dr. Kulla contends. *Id.* Plaintiffs would also note that if groundwater beneath the Patsouras Property truly flows to the west as Dr. Kulla contends, then Kekropia's environmental consultants surely did a poor job of selecting locations for **upgradient** monitoring wells, as there is **not a single well placed on the eastern portion of the Patsouras Property**.  *See* Wick Decl., Ex. K, Fig. 6 (Docket No. 902-86 Page ID#: 18573).

Put simply, as the following graphics show, Kekropia is the only entity that believes the groundwater beneath its Property was flowing to the west in 2010.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

### DEFENDANT KEKROPIA & DR. KULLA



**Wick Decl., Ex. K (Kulla Report, Fig. 6) (Docket No. 902-86)**

### EVERYONE ELSE



**Figure 3, URS Corp., 2010 Second Semi-Annual Groundwater Contour Map**

15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Fig. 2 Iris Environmental Inc., 2010 Groundwater Elevation**



**Fig. 7 Environmental Audit, Inc., 2010 Updated Site Conceptual Model**

Accordingly, Plaintiffs respectfully submit that the Court cannot put any stock in Kekropia's contention that concentrations of hazardous substances detected in "upgradient" wells is the same as or greater than concentrations detected in downgradient wells.  No factfinder could reasonably find otherwise. Kekropia has failed to raise a dispute of material fact on this issue.

## VIII.  CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully submit that the Court should grant Plaintiffs' motion, finding that:

(4)     each Source Property is, or contains, a CERCLA "facility,"

(5)     each Defendant falls within one of four classes of "persons," subject to the liability provisions of CERCLA Section 107(a); and

(6)     there has been a "release," or "threatened release," of hazardous substances from each Source Property into OU-2 Groundwater.

DATED: April 29, 2021                LATHROP GPM LLP

                                     /s/ Nancy Sher Cohen
                                     _____
                                     Nancy Sher Cohen
                                     Ronald A. Valenzuela
                                     Attorney for Plaintiffs
                                     ARCONIC INC., et al.