UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6456-GW(Ex) | Date | March 11, 2022 |
|---|---|---|---|
| Title | *BASF Corporation, et al. v. APC Investment Co., et al.* | | |

Present: The Honorable **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** IN CHAMBERS - TENTATIVE RULING ON COMMON ISSUES OF LAW AS TO CERTAIN ELEMENTS OF CERCLA LIABILITY IN REGARDS TO THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Attached hereto is the Court's Tentative Ruling on Common Issues of Law as to Certain Elements of CERCLA Liability in regards to the Motions for Partial Summary Judgment, set for hearing on March 14, 2022 at 8:30 a.m. Counsel may appear in-person or telephonically by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information.

:

Initials of Preparer   JG

*Arconic, Inc. et al v. APC Investment Co. et al*; Case No. 2:14-cv-06456-GW-(Ex)
Tentative Ruling on Common Issues of Law as to Certain Elements of CERCLA Liability in regards to the Motions for Partial Summary Judgment

I.    Background

This Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Resource Conservation and Recovery Act ("RCRA") action arises from the activities of the Omega Chemical Corporation ("Omega Chemical"), which operated a refrigerant and solvent recycling and treatment facility located in Whittier, California. Omega Chemical operated the facility from approximately 1976 to 1991 and, as a result of its operations, the surrounding subsurface soil and groundwater were contaminated with high concentrations of tetrechloroethene ("PCE"), trichloroethene ("TCE"), and other contaminants. The contamination ultimately led the area to be designated by the United States Environmental Protection Agency ("EPA") as the Omega Chemical Corporation Superfund Site (the "Site" or "Omega Site").

Plaintiffs[1] are companies that allegedly sent chemicals to Omega Chemical for processing and recycling and that the EPA contends are responsible under CERCLA for helping to remediate the contamination at the Site.[2] They filed this lawsuit against the certain defendants, which owned or operated businesses near the Site and are potentially responsible parties, seeking contribution and a declaratory judgment under Sections 113(f) and 113(g)(2) of CERCLA.

Before the Court are fully briefed cross-motions for summary judgment. *See* Moving Defendants' Joint Motion for Summary Judgment[3] ("Def. Mot."), ECF No. 902; Plaintiffs'

---

[1] Plaintiffs are Alcoa Inc; Applied Micro Circuits Corp.; BASF Corporation; Baxter Healthcare Corporation; Cal-Tape & Label Co.; California Hydroforming Company, Inc; Cintas Corporation; Columbia Showcase & Cabinet Company, Inc.; County of Los Angeles; Crosby & Overton, Inc.; Disney Enterprises, Inc.; Gulfstream Aerospace Corporation; Hercules Incorporated; FHL Group; Forenco, Inc.; General Dynamics Corporation; Hexcel Corporation; International Paper Company; Los Angeles County Metropolitan Transportation Authority; Merck Sharp & Dohme Corporation; Raytheon Company; Masco Corporation of Indiana; Mattel, Inc.; Pilkington Group Limited; Quest Diagnostics Clinical Laboratories, Inc.; Safety-Kleen Systems, Inc.; Soco West, Inc.; Sparton Technology, Inc.; The Boeing Company; The Dow Chemical Company; The Regents of the University of California; TriMas Corporation; Univar USA Inc.; Hercules Incorporated. *See* Complaint, ECF No. 1.

[2] Omega Chemical itself declared bankruptcy. *See* Complaint ¶ 301.

[3] Defendants are separated into two groups for the purposes of the instant motions: Moving Defendants and Opposing Defendants. The Moving Defendants have affirmatively moved for summary judgment and include Halliburton Affiliates, LLC; Union Pacific Railroad Company; PMC Specialties Group, Inc.; Ferro Corp.; and the Fireman's Fund Insurance Company and Federal Insurance Company, as Insurers for Palley Supply Company. *See* ECF No. 902. The Opposing Defendants oppose Plaintiffs' motion for summary judgment and are: Union Pacific Railroad Company; Phibro-Tech, Inc.; First Dice Road Company; APC Investment Company; Associated Plating Company; Associated Plating Company, Inc.; Clark S. Golnick; Cheryl A. Golnick; Darrell K. Golnick; Gordon E.

1

Opposition to Defendants' Motion for Summary Judgment ("Pls. Opp."), ECF No. 948; Defendants' Joint Reply in Support of Motion for Summary Judgment ("Def. Reply"), ECF No. 958; *see also* Plaintiffs' Brief on Common Issues of Law in Support of Motion for Partial Summary Judgment ("Pls. Mot. Law"), ECF No. 903-1; Plaintiffs' Motion for Partial Summary Judgment as to Certain Elements of CERCLA Liability ("Pls Mot. Site"), ECF No. 903-2; Opposing Defendants' Joint Opposition on Common Legal Issues to Plaintiffs' Motion for Partial Summary Judgment ("Def. Opp."), ECF No. 930; Opposing Defendants' Joint Site-Specific Opposition to Plaintiffs' Motion for Partial Summary Judgment, ECF No. 933; Plaintiffs' Reply Brief on Common Issues of Law in Support of Motion for Partial Summary Judgment ("Pls. Reply Law"), ECF No. 972; Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls. Reply Site"), ECF No. 973.

    Owing to the complexity of factual and legal issues included in this matter and in order to provide the Court adequate time to consider the voluminous submissions filed by the parties, the Court – after entertaining comments from the parties – issued a modified hearing schedule that separated out the issues within the pending summary judgment motions into four different hearing dates. *See* Court's Ruling on Hearing Schedule, ECF No. 1012. The first hearing, and this order, concerns common issues of law and procedural matters that were raised during the briefing for the cross-motions for summary judgment. *Id.* The parties have filed supplemental briefs that focus on common legal issues. *See* Plaintiffs' Supplemental Brief on Common Issues of Law ("Pls. Supp."), ECF No. 1019; Certain Defendants' Joint Supplemental Brief on Common Legal Issues ("Def. Supp."), ECF No. 1023. Plaintiff has also filed a supplemental brief in response to the raised procedural issues. *See* Plaintiffs' Supplemental Brief on Untimely Opposition and Improper Sur-Reply ("Pls. Supp. Proc."), ECF No. 1022.

    A. <u>Procedural Background</u>

    This action is one of several arising from environmental contamination at the Omega Chemical Superfund Site located in Whittier and Santa Fe Springs, California. *See* Fifth Amended Complaint ("5AC") ¶ 2, ECF No. 526. In order to facilitate the cleanup of hazardous substances at the site, the EPA has divided the Site into three operable units ("OUs"): OU1, OU2, and OU3. *See* Declaration of Robert P. Doty ("Doty Decl."), Exh. 30 ("GNL") at 2, ECF No. 744. OU1

---

McCann; and Lyneea R. McCann. *See* ECF No. 930.

includes the Omega Chemical Corporation facility and the immediate vicitnity, also known as the "Phase 1A area." *Id.* The instant action concerns OU2, which the EPA defined as "contamination in groundwater generally downgradient and originating from the former Omega Chemical Corporation . . . facility in Whittier, California, much of which has commingled with chemicals released at other areas overlaying the OU2 groundwater plume." *See* Plaintiffs' Request for Judicial Notice ("PRJN"), Exh. 2 ("2011 OU2 Record of Decision") at 16, ECF No. 903-4.[4] Several previous actions have resulted in settlements and consent decrees that provide for remedial treatments at OU1 and OU2. The Court has extensively summarized the previous actions and consent decrees related to the Omega Site in a previous summary judgment order, so they will only be briefly discussed here. *See* Court's Ruling on Motion for Summary Judgment Re: Statute of Limitations ("MSJ Ruling"), ECF No. 809.

In 2000, in *United States v. Abex Aerospace Division*, Case No. 00-cv-12471-TJH-(JWJx), the United States sued a number of defendants under CERCLA Sections 106 and 107 related to the Phase 1a Area or OU1. The action was resolved with a consent decree that provided that the settling defendants would install three sentinel groundwater monitoring wells; would design and implement a groundwater containment and mass removal treatment system for a portion of the affected area; and would implement a Remedial Investigation/Feasibility Study ("RI/FS") for the contamination that resulted from the release of hazardous substances in the immediate vicinity of the Omega Site. *See* Doty Decl., Exh. 13 ("2001 Consent Decree"); PRJN, Exh. 1 ("2010 RI/FS") ¶ 28, ECF No. 903-9.[5]

In 2004, in the case of *Omega Chemical PRP Group LLC v. Aeroscientific Corp.*, Case No. 04-cv-1340-TJH-(JWJx), Omega Chemical PRP Group LLC sued over 200 defendants who were allegedly responsible for hazardous substances stored, treated, or disposed of at the Omega Site. The plaintiffs sought to recover response costs incurred in connection with the Omega Site, specifically OU1, pursuant to CERCLA Sections 107 and 113. The parties reached a settlement

---

[4] The Court took judicial notice of the 2011 OU2 Record of Decision ("ROD") in a previous order. *See* Court's Ruling on Motion for Summary Judgment Re: Statute of Limitations at 4 n.8, ECF No. 809. The 2011 OU2 ROD can be found at ECF No. 770-2.

[5] For the same reasons that the Court previously took judicial notice of the 2011 OU2 ROD in the MSJ Ruling, the Court takes judicial notice of the 2010 RI/FS Report because it is a public record and the contents of the report are not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

in 2007 that assigned the estimated $101.5 million in cleanup costs to the settling parties based on total volume of waste (in tons) attributable to the settling "potentially responsible parties." *See* MSJ Ruling at 10-13; *see also* Doty Decl., Exhs. 22-24. The approximated cleanup costs were based on estimated costs for extraction and treatment of contaminated groundwater (pump and treat) which included wells, water conveyance pipelines, and a treatment plant as components of the conceptual remediation system. *See* Doty Decl., Exh. 19 at 3. The pump and treat system would operate for 30 years with soil remediation taking 3 years. *Id.*

In 2010, in the case of *United States v. Alcoa Inc.*, Case No. 2:10-cv-05051-TJH-(PLAx), the plaintiff United States sued several defendants under CERCLA Section 107 to recover response costs in connection with OU1. *See generally* Case No. 2:10-cv-05051-TJH-PLA, ECF No. 1. The United States alleged that it had incurred at least $17 million in unreimbursed response costs in responding to the releases or threatened releases of hazardous substances at the former waste treatment and storage facility of Omega Chemical Corporation. *See id.* ¶¶ 6, 11. On October 6, 2010, the EPA and two groups of settling defendants, who promised to provide either work or cash, entered into a consent decree to address the remaining remedial actions required at OU1. *See generally* Doty Decl. Ex. 32. Under the consent decree, the settling defendants: (1) would pay $1.5 million towards the EPA's unrecovered costs; (2) would pay all future response costs not inconsistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 *et seq.*; (3) would perform various remedial work as to the Site; and (4) would satisfy various other payment obligations. *See id.* ¶¶ 9-16, 47-50.

In the 2016 case of *United States v. Abex Aerospace*, Case No. 2:16-cv-02696-GW-(Ex), the United States and the State of California on behalf of the Department of Toxic Substances Control ("DTSC") sued a number of defendants under Sections 106 and 107 of CERCLA and Section 7003 of the RCRA for injunctive relief and recovery of costs associated with the release and threatened release of hazardous substances at OU2 or which have come to be located at OU2. *See* Case No. 2:16-cv-02696-GW-(Ex) ¶ 1, ECF No. 1. The United States alleged it incurred at least $20 million in unreimbursed response costs in responding to hazardous substances or threatened hazardous substances at or in route to OU2, while DTSC alleged it incurred at least $70,000 on response costs. *See id.* ¶ 18. Those response costs allegedly provided for remedial investigation, oversight of work by certain of the *Abex* defendants, community relations activities, and preparation of feasibility studies and decision documents. *See id.* In 2017, the parties reached

4

a settlement and the Court entered a consent decree that required the settling defendants to make cash payments to the United States and the DTSC in the amount of $8 million and $70,000 for past response costs, respectively.  *See* PRJN, Exh. 5 ("Corrected Consent Decree") ¶ 28, ECF No. 903-9.[6]  Additionally, the settling defendants agreed to pay all future response costs incurred by the EPA and DTSC in overseeing the response actions covered by the consent decree, as well as a performance guarantee of $70 million, which is the estimated cost of the remedial work.  *See id.* ¶¶ 21, 29.  The remedial work included groundwater extraction and treatment in the several extraction areas of the OU2 plume and investigations to assist the EPA in determining the appropriate remainder of the response efforts.  *See id* ¶¶ O-P.  In exchange for entering into the 2017 consent decree, the United States and DTSC covenanted not to sue or take administrative action against all settling defendants under CERCLA §§ 106 and 107, as well as RCRA § 7003 and parallel state provisions, for past OU2 response costs and the remedial work described in the consent decree.  *See id.* ¶¶ 59-60.

In the instant action, Plaintiffs first filed a complaint seeking cost recovery under CERCLA § 107.  After the 2017 consent decree discussed above, however, Plaintiff filed their Fifth Amended Complaint on November 1, 2016, including a CERCLA § 113(f) contribution claim as well as an RCRA § 7002 claim and a claim for declaratory relief as to liability under CERCLA § 113(f) for contribution.  *See* 5AC ¶¶ 396-426.  Plaintiffs allege that each named Defendant is associated with a property that is a source of OU2 groundwater contamination.  Plaintiffs seek reimbursement for costs Plaintiffs have incurred, or will incur, under the 2017 OU2 consent decree.  *See id.* ¶¶ 10-11.  The parties agreed to split the litigation into two phases.  *See* April 21, 2017 Parties' Joint Status Conference Report, ECF No. 600; Parties' Supplemental Joint Status Conference Report, ECF No. 602; May 22, 2017 Parties' Joint Status Conference Report ("Status Report"), ECF No. 615.  In the first phase of litigation, the parties agreed to focus on statute of limitations and three of the four elements of liability under CERCLA Section 113 – *i.e.*, (1) whether the site containing the hazardous substance is a facility under CERCLA; (2) whether a release or threatened release of a

---

[6] Plaintiffs request judicial notice of the Corrected Consent Decree, a public document from the docket of the Court's 2016 action, *United States v. Abex Aerospace*, Case No. 2:16-cv-02696-GW-(Ex).  See PRJN, Exh. 6.  Under Fed. R. Evid. 201(b), a court may take judicial notice of adjudicative facts that are not subject to reasonable dispute because they are generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja*, 899 F.3d at 999.  Accordingly, a court may take judicial notice of public records such as transcripts, orders, and reports from the underlying actions.  The Court thus grants Plaintiffs' request for judicial notice.

hazardous substances had occurred at or from the facility; and (3) whether the defendant falls within one of the categories subject to the liability provisions of CERCLA § 107(a). *See* Status Report at 1. The parties indicated that they would not litigate in the initial phase: (1) "[whether] Plaintiffs incurred response costs as a result of a release or threatened release and those costs were necessary and consistent with the national contingency plan;" and (2) "1) allocation; 2) liability of cross-defendants on Defendants' cross-claims; 3) Plaintiffs' liability (assuming a mutually accepted stipulation is entered on same); and 4) response costs, including the above response cost element (collectively 'Deferred Issues')."[7] *Id.*

However, the Status Report contained one major area of dispute as delineated in footnote 2:

> **Plaintiffs' Position**: While the Parties agree that the response cost element of CERCLA liability set out above, should be deferred to a later phase, the Parties disagree as to what that means concerning the issues that will be litigated during this current phase. For example, the Parties disagree about when to litigate the issue of whether hazardous substance releases from Defendants' respective source properties have contaminated regional groundwater in impacted OU2. Plaintiffs contend that this issue should be litigated during the current phase. Also, Plaintiffs understand that Defendants contend that Plaintiffs, as part of establishing the response cost element of CERCLA liability, must establish a connection between Plaintiffs' response costs and the releases at each Defendant's source property. Plaintiffs' contend, however, that they have no such obligation, as a matter of law, under the response cost element, or any other element, of CERCLA liability. **Defendants' Position**: The issue of whether hazardous substances from any given Defendant's facility have been released to OU2, is an issue that may or may not be appropriate for discovery for any given Defendant and any dispute should be resolved based on the specific request and circumstances of each Defendant. The Parties have agreed only to litigate certain elements of liability and the statute of limitations defense. As to Plaintiffs' burden in proving the response cost element, Defendants have not taken a uniform position regarding Plaintiffs' burden because this issue is to be litigated in a later phase. Some Defendants do disagree. In any event, this is an issue upon which the parties can meet and confer, or litigate, after this phase when we litigate the response cost element.

*See* ECF No. 615 at 3 of 28.

Plaintiffs and the Moving Defendants have filed cross-motions for summary judgment. The Moving Defendants consist of entities affiliated with the PMC Property, the Chrysler Property,

---

[7] In the Status Report, the parties agreed that the first phase would not include "prima facie liability under CERCLA section 113." *See* Status Report at 2. Defendants already sought summary judgment as to the CERCLA § 113(f) contribution claim and the claim for declaratory relief on statute of limitation grounds, but the Court denied the motion. *See generally* MSJ Ruling.

and the Patsouras Property. Defendants PMC Specialties Group, Inc. and Ferro Corporation are affiliated with the PMC Property and seek summary judgment on the grounds that Plaintiffs cannot demonstrate a plausible pathway or causal connection between the hazardous substances released on the PMC Property and the OU2 Plume. *See* Def. Mot. at 12-30. Defendant Union Pacific Railroad Company is affiliated with the Chrysler Property and seeks summary judgment asserting that Defendant Union Pacific is not one of the categories subject to the liability provisions of CERCLA § 107(a). *See id.* at 32-51. Defendants Halliburton Affiliates, LLC; Kekropia, Inc.; and Interveners Fireman's Fund Insurance Company and Federal Insurance Company, as Insurers for Palley Supply Company are affiliated with the Patsouras Property and seek summary judgment again on grounds of failure to demonstrate causation through a plausible migration pathway. *See id.* at 54-65.

Plaintiffs seek summary judgment against the entities affiliated with the Associated Plating Property, the Earl Manufacturing Property, the Phibro-Tech Property, the Chrysler Property, and the Patsouras Property. Plaintiffs move for summary judgment against Defendants Phibro-Tech, Inc.; First Dice Road Co.; and Union Pacific Railroad Co., who are affiliated with the Phibro-Tech Property, because the Phibro-Tech Property constitutes a CERCLA facility; each Defendant falls within one of four classes of "persons" subject to liability provisions of Section 107(a); and there has been a release or threatened release of hazardous substances from the Phibro-Tech Property into the OU2 Plume. *See* Pls. Mot. Site at 23-31. Plaintiffs make similar arguments against Defendant Earl Manufacturing and Defendant Claudette Earl who are affiliated with the Earl Manufacturing Property, *see id.* at 38-44; against Defendant Union Pacific Railroad Company and Defendant First Dice Road Company who are affiliated with the Phibro-Tech Property, *see id.* at 54-67; and against Defendant Union Pacific Railroad Company and Defendant Palmtree Acquisition Corp. who are affiliated with the Chrysler Property, *see id.* at 82-88.

Plaintiffs have separated their briefing into one that focuses solely with common legal issues and another that deals with the specific properties. *See generally* Pls. Mot. Law; Pls. Mot. Site. Defendants also include a section on common facts and issues of law, *see* Def. Mot. at 2-10, before devoting the remainder of their brief to the specific properties. As stated previously, this order will focus on the common legal issues raised by the parties.

B. Factual Background

Plaintiffs, or their predecessors, affiliated entities, assignees or obligees, are companies

7

that sent chemicals to the Omega Chemical for appropriate processing and recycling. *See* Defendants' Joint Response to Plaintiffs' Statement of Genuine Disputes ("DSUF") ¶ 1, ECF No. 959. The EPA contends that Omega Chemical failed to process, recycle, or dispose of those chemicals properly during its time of operation, from 1976 to 1991, causing ground water contamination. *Id.* The EPA has designated groundwater contamination from hazardous substances at the Omega Chemical Corporation Superfund Site as "Operable Unit No. 2" ("OU2" or the "OU2 Site" or the "OU2 Facility"). *See id*; Plaintiffs' Reply to Opposing Parties' Response to Statement of Uncontroverted Facts ("PSUF") ¶ 1, ECF No. 974. More specifically, the EPA in a 2011 Record of Decision defines OU2 as the "contamination in groundwater generally downgradient and originating from the former Omega Chemical Corporation . . . facility in Whittier, California, much of which has commingled with chemicals released at other areas overlaying the OU2 groundwater plume." DSUF ¶ 2. The EPA describes OU2 groundwater contamination as a "continuous plume that is approximately four and a half miles long and one and a half miles wide." *Id.*

The EPA asserts that Plaintiffs are responsible for remediating the OU2 groundwater contamination and EPA's environmental contractor found that Omega Chemical was the main source of groundwater contamination at OU2. DSUF ¶ 3. The EPA has been investigating the OU2 Site for more than a decade and found that "because [the plume] flows under a densely developed commercial-industrial area, there are additional facilities whose releases of hazardous substances have reached groundwater and become commingled with the Omega contamination." DSUF ¶ 4. The EPA evaluated many facilities in connection with the OU2 Facility and declared some of them "potentially responsible parties" ("PRPs"). Some PRPs received Special Notice Letters ("SNLs") from the EPA if they were determined to be potentially liable under CERCLA Section 107 for the OU2 groundwater contamination and for past and future costs to clean up that contamination. 5AC ¶ 4. The SNLs also provided information supporting those conclusions and solicited offers from the SNL Defendants to take remedial action and design remedial action as to OU2. *See id.* The EPA issued General Notice Letters ("GNLs") to other PRPs that were potentially liable for cleanup costs at the Omega Superfund Site, inviting the GNL recipients to explain why they should *not* receive an SNL. *See id.* ¶ 5. Some Defendants have received SNLs, some GNLs, and some no letters at all. *Id.* ¶ 68.

Defendants are PRPs that were affiliated at some point with several properties that could

have contributed to the OU2 groundwater plume originating from the former Omega Chemical Corporation.



*See* Def. Supp., Exh. 1.[8]

The Opposing Defendants are entities that were involved with the Associated Plating Property, the Earl Manufacturing Property, the Phibro-Tech ("PTI") Property, the Chrysler Property, and the Patsouras Property. *See generally* Def. Opp. The Moving Defendants are entities that were at once involved with the PMC Property, the Chrysler Property, and the Patsouras Property. *See generally* Def. Mot.

## II. Legal Standard

A. Rule 56

---

[8] Defendants' demonstrative map largely aligns with the maps provided by Plaintiffs in their supplemental brief. *Compare* Def. Supp., Exh. 1, *with* Pls. Supp. at 1 n.2, 9-10.

Summary judgment shall be granted when a movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citations omitted). However, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325. Rather, the moving party's initial burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*.

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248. At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *See id.* at 249. A court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B. CERCLA Liability

The Ninth Circuit provided helpful statutory context of CERCLA in *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108 (9th Cir. 2017), stating as follows:

> Congress enacted CERCLA in 1980 with two goals in mind: (i) to encourage the "'expeditious and efficient cleanup of hazardous waste sites,'" and (ii) to ensure that those responsible for hazardous waste contamination pay for the cleanup. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (en banc) (quoting *Pritikin v. Dep't of Energy*, 254 F.3d 791, 795 (9th Cir.

10

2001)); *see* S. Rep. No. 96–848, at 13 (1980). Hazardous waste sites—also known as Superfund sites—contain toxic substances often deposited by multiple entities. *See* 42 U.S.C. § 9607(a)(1)-(4). In order to spread responsibility among those entities, Congress included a provision in CERCLA providing for reimbursement of costs incurred by the government or a liable PRP. Section 107(a) provides a cause of action for a "cost recovery" claim against PRPs for a wide range of expenses, including "'any . . . necessary costs of response incurred'" that result from a release of a hazardous substance. *Whittaker Corp. v. United States*, 825 F.3d 1002, 1006 (9th Cir. 2016) (quoting 42 U.S.C. § 9607(a)).

"Response" is a term of art under CERCLA and means "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). Congress even gave those defining terms their own definitions. A "removal" means, *inter alia*, "the cleanup or removal of released hazardous substances from the environment" and any actions that may be necessary "in the event of the threat of release of hazardous substances into the environment." *Id.* § 9601(23). A "remedial action" means, *inter alia*, "actions consistent with permanent remedy taken instead of or in addition to removal actions . . . to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." *Id.* § 9601(24). Put simply, a "response action" covers a broad array of cleanup activities.

Section 107(a) is limited to recovery of response costs the suing PRP itself directly incurred. *See Atl. Research*, 551 U.S. at 139, 127 S.Ct. 2331 ("[Section] 107(a) permits recovery of cleanup costs but does not create a right to contribution."). At the time of enactment, CERCLA included no express right to contribution for a PRP that did not itself incur response costs, but that reimbursed another party that did incur response costs. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 162, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004). Such a situation arises under two circumstances: (i) where the PRP is the defendant in a CERCLA § 106 or § 107(a) action and a money judgment issues against it; or, as with the CERCLA Decree in the matter before us, (ii) where the PRP pays the United States' or a State's response costs pursuant to a settlement agreement. *See id.* at 160–61, 125 S.Ct. 577; *Atl. Research*, 551 U.S. at 138–39, 127 S.Ct. 2331; *Whittaker*, 825 F.3d at 1006–07.

Congress added an express right to contribution with the Superfund Amendments and Reauthorization Act of 1986 ("1986 CERCLA Amendments"), Pub. L. No. 99-499, to address these two circumstances. *See Atl. Research*, 551 U.S. at 132, 127 S.Ct. 2331. Section 113(f)(1) captures the first, and provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [§ 107(a)] of this title, during or following any civil action . . . under [§ 106 or § 107(a)] of this title." 42 U.S.C. § 9613(f)(1) . . . . Section 113(f)(3)(B), which is directly at issue [in *Atl. Richfield*], captures the second scenario, and provides that:

> [a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party

11

>> to a settlement [that immunizes such person from a contribution action].
>
> *Id.* § 9613(f)(3)(B). In other words, "a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution." *Atl. Research*, 551 U.S. at 139, 127 S.Ct. 2331; *see Cooper*, 543 U.S. at 163, 167, 125 S.Ct. 577 (recognizing that § 113(f)(1) and § 113(f)(3)(B) set forth separate rights of contribution).

866 F.3d at 1115-1117 (internal footnotes omitted).

Plaintiff originally included Section 107(a) cost recovery claims but has now substituted them with Section 113(f) contribution claims. To establish a prima facie case of CERCLA liability, for cost recovery under Section 107(a) or contribution under Section 113(f), the Plaintiff must establish that: (1) "the site on which the hazardous substances are contained is a 'facility' under CERCLA's definition of that term;" (2) "a 'release' or 'threatened release' of any 'hazardous substance' from the facility occurred"; (3) "such 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent' with the national contingency plan;" and (4) "the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a)." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d at 870-71 (9th Cir. 2001); *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999); *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1059 (C.D. Cal. 2003).

### III. Discussion

#### A. Tardy Filing

This order is focused on common legal issues and specific procedural problems that arose during briefing. The Court begins with the outstanding procedural issues. Defendants previously objected to Plaintiffs' tardiness in filing their Opposition and asked the Court to disregard it. *See generally* Moving Defendants' Objections to and Request to Disregard Plaintiffs' Untimely Opposition, ECF No. 951. Defendants also objected to the Plaintiffs' filing an improper sur-reply, accusing Plaintiffs of using the additional two weeks they were provided to respond to arguments in Defendants' Reply. *See* Moving Defendants' Objection to Plaintiffs' Improper Sur-Reply, ECF No. 982. In response, Plaintiffs filed a supplemental brief urging the Court that only a portion of the Opposition was arguably late and that disregarding the Opposition would be excessively harsh and punitive. *See* Pls. Supp. Proc. at 1-2. Plaintiffs further assert that they did not improperly respond to arguments made in Defendants' Reply brief and there is no prejudice because the Court

has required supplemental briefing. *See id.* at 3-4.

The Court agrees with Plaintiffs on both procedural issues. With respect to the Opposition, Defendants suffered no prejudice because the evidentiary support for the Opposition memo was filed 66 minutes late. The Court notes that the submissions in this action have had voluminous attachments, and Plaintiffs' Opposition had 81 supporting documents. *See* Declaration of Laura A. Brayton ("Brayton Decl.") ¶¶ 2-4, ECF No. 1022-1. Plaintiffs likely erred by not starting their filing process earlier to account for the number of attachments; but to disregard the Plaintiffs' entire Opposition, as Defendants suggest, is excessive and punitive. Defendants offer no authority supporting their requested relief. Further, the Court is engaged with the parties to properly resolve difficult issues of fact and law under a complex, statutory scheme related to the ongoing remedial efforts at the Omega Site and OU2. Disregarding the Plaintiffs' entire Opposition would only hamper the Court's efforts to fairly resolve the remaining issues.

With respect to the sur-reply, the Court again agrees with Plaintiffs. Even if Plaintiffs filed an improper sur-reply (and it does not seem that they did), the Court has now broken down the hearing for the cross-motions for summary judgment into more digestible portions and allowed the parties to provide supplemental briefing for each hearing. Defendants thus now have an opportunity to reply to anything that was allegedly improperly addressed in the sur-reply. The Court, however, will allow Defendants additional pages for their supplemental briefings if they desire it.

Turning to the common legal issues, the Court will address the following: (1) what issues the parties must focus on during this phase of the litigation; (2) what legal standard must be used when determining causation under CERCLA in phase two; and (3) what is required to prove a Defendant is "covered person" under CERCLA.

B. <u>Phases of Litigation</u>

In their Opposition and supplemental briefing, the Opposing Defendants assert that Plaintiffs are improperly trying to address Deferred Elements in the first phase of litigation by attempting to establish that contaminant releases from each of Defendants' properties have commingled with the OU2 Site. *See* Def. Opp. at 3; Def. Supp. at 2-3. The Moving Defendants and Plaintiffs do not squarely address the point, but both parties devoted sections of their brief to argue whether the CERCLA causation standard requires commingling of hazardous substances released from two contamination sites; or simply a plausible migration pathway between the two

13

contamination sites; or an actual release of contaminants at one site that caused the contamination on the second site. *See* Def. Mot. at 6-10; Pls. Opp. at 4-10.

Earlier in the action, the parties had agreed to split the litigation into two phases. *See* Status Report at 1-2. In the first phase of litigation, the parties would discuss three of the four elements of liability under CERCLA Section 113: (1) whether each Defendant's property is a facility; (2) whether each Defendant falls within one of the four classes of "persons" subject to liability under CERCLA; and (3) whether a release or threatened release of a hazardous substance had occurred at or from the facility. *See id.* The second half of litigation would be reserved for the Deferred Elements, which includes issues such as allocation, liability of cross-Defendants, and the final remaining element of CERCLA liability: (4) whether Plaintiffs incurred response costs as a result of a release or threatened release and those costs were necessary and consistent with the NCP. *Id.* The parties, however, never resolved whether Plaintiffs must establish, at the first phase, whether the release or threatened release of hazardous substances from Defendants' source properties have contaminated the regional groundwater in the impacted OU2. *Id.* at 2-3 n.2; *see* page 6, *supra*. Plaintiff's position was that the issue should be litigated in the first phase, while many Defendants thought the issue should be reserved for the second phase, although the Defendants did not adopt a uniform position on the issue. *Id.*

Based on the earlier agreement between the parties, the Court must agree with Defendants that Plaintiffs are improperly trying to address the deferred element of causation that was reserved for the second phase of litigation. In this phase of litigation, the parties agreed to only address: (1) whether each Defendant's property is a facility; (2) whether each Defendant falls within one of the four classes of "persons" subject to liability under CERCLA; and (3) whether a release or threatened release of a hazardous substance had occurred at or from the facility. *Id.* at 1-2. The Court does not view the third element, whether a release or threatened release of a hazardous substance had occurred at or from the facility, as sufficiently relating to causation. *See e.g., Castaic Lake Water*, 272 F. Supp. 2d at 1063 (C.D. Cal. 2003) (defining release under the third element and reserving the discussion on causation for the fourth element); *Kalamazoo River Study Grp. v. Rockwell Int'l*, 3 F. Supp. 2d 815, 818 (W.D. Mich. 1997), *aff'd sub nom. Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065 (6th Cir. 1999) (discussing causation under response costs); *City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1235 (E.D. Wash. 2006) (analyzing whether a release or threatened release occurred at the facility then addressing

14

causation of response costs as a separate element). The third element simply asks whether there was a release or threatened release of a hazardous substance from the Defendant's facility. Whether the release or threatened release caused response costs and whether those response costs are consistent with the NCP are issues reserved for the final element of CERCLA liability and for the second phase of litigation.

    Here, to show that there was a release at the facility, Plaintiffs need only provide evidence that a hazardous substance was spilled, leaked, pumped, poured, emitted, emptied, discharged, injected or disposed into the environment, or that it escaped or leached into the environment. *See* 42 U.S.C. § 9601(22) (defining "release"); *Castaic Lake*, 272 F. Supp. 2d at 1063. And while a "threatened release" is not defined by the statute, courts have found threatened releases to include ownership of corroding and deteriorating tanks, a lack of expertise in handling hazardous wastes, or even the failure to license the facility. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1152 (1st Cir. 1989); *Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784, 793 (D.N.J. 1989) (finding evidence that the PCBs in the concrete flooring of the plant have migrated further into the core of the concrete as evidence of threatened release). Whether that release or threatened release occurred is for the first phase. Whether that release or threatened release then caused response costs must be reserved for the second phase of litigation, as was agreed by the parties.

    In sum, in order to obtain partial summary judgment over the issues litigated in the first phase of this action, the parties must simply follow the plan they agreed to. In the first phase, the parties must prove or disprove: (1) whether each of Defendant's property is a facility; (2) whether each Defendant falls within one of the four classes of "persons" subject to liability under CERCLA; and (3) whether a release or threatened release of a hazardous substance had occurred at or from the facility. *See* Status Report at 1-2. The parties agreed to hold the remaining element, whether Plaintiffs incurred response costs as a result of a release or threatened release and whether those costs were necessary and consistent with the NCP, for the second phase. *Id.* As certain Defendants have steadfastly objected to dealing with causation in the first phase of litigation, *see* Status Report at 2-3 n.2; Def. Opp. at 3; Def. Reply at 10-12; Def. Supp. at 2-3, the Court must hold the parties to their earlier agreement.

    C. <u>Legal Standard for Causation</u>

    While the issue of whether a release or threatened release caused Plaintiffs to incur

15

response costs is reserved for the second phase, the parties already extensively briefed the issue of what legal standard to use for the CERCLA causation analysis. *See* Def. Mot. at 6-10; Pls. Mot. Law at 9-15. Both parties then devoted the majority of their supplemental briefs to addressing the legal standard to be used for causation. *See generally* Def. Supp.; Pls. Supp. The Court elects to discuss the issue of what legal standard governs causation now in order to give the parties more direction heading into the next stages of discovery. To be crystal clear, the parties should not discuss causation in the upcoming hearings for the specific source properties in this phase; the legal standard delineated below will only be applied in the second phase.

Plaintiffs' position as to the appropriate standard for causation has shifted over time. In their opening brief, Plaintiffs conceded that this action was a "two-site" CERCLA action and identified the correct causation requirement as the burden-shifting framework from *Castaic Lake Water*, 272 F. Supp. 2d at 1066. *See* Pls. Mot. Law at 10-13. Plaintiffs, however, now assert in their supplemental brief that the OU2 is a single, widespread area of groundwater contamination. *See* Pls. Supp. at 1-7. Defendants have always asserted that this is a two-site, or multi-site, CERCLA action and have steadfastly argued for the more stringent and traditional causation standard from *Kalamazoo River*, 171 F.3d 1065 (6th Cir. 1999), that requires an actual release from a Defendant's property to commingle with the OU2 Plume. *See* Def. Mot. at 8-10; Def. Supp. at 4-6.

To start, the Court rejects Plaintiffs' eleventh-hour attempt to frame the action as a single-site CERCLA action. In a single-site or one-site CERCLA action, "the site of the release or threatened release of a hazardous substance and the site where the Government has incurred cleanup costs are one and the same." *See Asarco LLC v. Cemex, Inc.*, 21 F. Supp. 3d 784, 803 (W.D. Tex. 2014). In contrast, in a two-site or multi-site CERCLA action, the "release or threatened release of hazardous substances occur at one site, and the Government incurs response costs as another." *Id.*; *see also Castaic Lake Water*, 272 F. Supp. 2d at 1064-65 (defining a two-site CERCLA case as one where a "contaminant at one location . . . has migrated to reach a different location"); *Kalamazoo River*, 171 F.3d at 1068 ("In a 'two-site' case such as this, where hazardous substances are released at one site and allegedly travel to a second site, . . ."). Here, the principal release or threatened release of hazardous chemicals occurred at the location of the Omega Chemical Corporation. OU2 is only one of the Operable Units in the Omega Chemical Superfund Site created to maintain the contamination of hazardous chemicals caused by the

16

activites of the Omega Chemical Corporation. OU2 is defined as the contamination in the groundwater generally downgradient and originating from the former Omega Chemical Corporation, including under each of the Defendants' Source Properties. As the contamination of hazardous chemicals originated at the Omega Chemical Site and the response costs will be incurred at locations separate from the Omega Chemical Site at Defendants' properties in the OU2 Site, this is a multis-site CERCLA action.

Turning to the appropriate legal standard to use in this multi-site CERCLA action, the Court is inclined to follow the burden-shifting framework advanced in *Castaic Lake*, 272 F. Supp. 2d at 1065. The burden-shifting framework from *Castaic Lake* states that the plaintiff "meets its burden on summary judgment if it (a) identifies contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. If the plaintiff meets this burden, the defendant must then proffer evidence sufficient to create a genuine issue of fact as to its ability to *disprove* causation." *Id.* (emphasis in original). The Court will apply the burden-shifting framework from *Castaic Lake* over the stricter causation standard advanced by the Sixth Circuit in *Kalamazoo River* because the burden-shifting framework has seen widespread adoption by district courts in this circuit over the previous twenty years. *See e.g., Tesoro Refining and Mktg Co. LLC v. City of Long Beach*, 2:16-cv-06963-VAP-(FFMx), 2018 WL 11348067, at *3-4 (C.D. Cal. Nov. 21, 2018); *California City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1237-38 (E.D. Wash. 2006) (applying the burden-shifting framework for causation); *Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, 622 F. Supp. 2d 918, 927-28 (N.D. Cal. 2009) (same); *Ameripride Servs., Inc. v. Valley Indus. Servs., Inc.*, No. 2:00-CV-113-MCE-EFB, 2016 WL 3753267, at *5 (E.D. Cal. July 13, 2016) (same); *see also* Pls. Supp. at 7. In contrast, Defendants have yet to cite any cases where district courts in our circuit have adopted the more stringent causation standard from *Kalamazoo River*, 171 F.3d 1065 (6th Cir. 1999).[9] *See* Def. Supp. at 4-6.

---

[9] As observed in *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. and Power Dist.*, 39 F.Supp.3d 1059, 1073-74 (D. Ariz. 2014):

> [A]s discussed in *United States v. Washington State Department of Transportation*, the causation standard espoused in *Kalamazoo* is perhaps inconsistent with the "minimum casual nexus" most courts require under CERCLA; rather, the court in *Washington* expressed support for the causation approach set forth in *Castaic Lake* as more consistent with the CERCLA objectives. *See United States v. Wash. State Dept. of Transp.*, No. 08–5722RJB, 2010 WL 4723718, at *3 (W.D.Wash.

17

In addition, the Court agrees with the district court's analysis in *Castaic Lake* and would find that the burden-shifting framework "is in keeping with CERCLA's broad remedial purpose" and the "minimal causal nexus" usually reserved for CERCLA, making a stricter causation standard "unpersuasive." *See Castaic Lake*, 272 F. Supp. 2d at 1066 n.15. The Court takes heed that Plaintiffs in this matter were not necessarily bad actors, but simply erred in relying on the Omega Chemical for processing and recycling their hazardous substances. The Plaintiffs in this action were also burdened with providing remedial actions based on a minimal causal nexus, so the Court views the burden-shifting framework appropriate for the unique circumstances of a multi-site CERCLA action.

In conclusion, in the second phase of litigation, the Court will apply the burden-shifting framework from *Castaic Lake* to determine causation: a plaintiff "meets its burden on summary judgment if it (a) identifies contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. If the plaintiff meets this burden, the defendant must then proffer evidence sufficient to create a genuine issue of fact as to its ability to *disprove* causation." *Castaic Lake*, 272 F. Supp. 2d at 1065. This causation standard will be employed when discussing causation in the second phase.

### D. "Covered Person" under CERCLA

Defendants argue that to qualify as a "covered person" under CERCLA, a Defendant must own or operate a facility "from which there is a release, or threatened release *which causes the incurrence of response costs*, of a hazardous substance. *See* Def. Mot. at 6-7 (citing 42 U.S.C. § 9607(a)(4)) (emphasis in original). Plaintiffs assert that a "covered person" includes any person who owned or operated a facility at the time of disposal of any hazardous substance. *See* Pls. Opp. at 8-9. A quick review of the definition of "covered person" in 42 U.S.C. § 9607 reveals the error of Defendants' position. Sections 9607(1)-(2) clearly state that a covered person includes: "(1) the owner and operator of a vessel or facility," as well as "(2) any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of." *See* 42 U.S.C. § 9607(1)-(2). Defendants language concerning the incurrence

---

Nov. 17, 2010) (citing *Castaic Lake*, 272 F.Supp.2d at 1066).

of response costs is pulled from 42 U.S.C. § 9607(4), which fully states that a "covered person" also includes "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance."  The requirement of a release or a threatened release only applies for a person who "accepts or accepted any hazardous substances for transport," not a former owner and operator of a facility.  *Compare* 42 U.S.C. § 9607(4)*, with* 42 U.S.C. § 9607(2).  Furthermore, the "disposal" referenced in 42 U.S.C. § 9607(2) has been held to not even require hazardous waste to enter the environment, let alone cause the incurrence of response costs.  *See Voggenthaler v. Maryland Square LLC*, 724 F.3d 1050, 1064 (9th Cir. 2013) ("Because the phrase 'enter the environment' is qualified by the word 'may' in the definition of 'disposal,' the statute cannot be interpreted to cover only spills that go directly and immediately into the groundwater.").  The Court thus rejects Defendants attempts to add a causation requirement to the definition of a "covered person" under CERCLA.

**IV.  Conclusion**

Based on the foregoing discussion, the Court finds that the parties agreed to reserve causation for the second phase of this litigation; the Court will adopt the burden-shifting framework from *Castaic Lake* in that second phase; and the definition of "covered person" does not have a causation element as to the owner or operator of a facility.