WILLIAM D. WICK (State Bar No. 063462)
    bwick@ww-envlaw.com
WACTOR & WICK LLP
3640 Grand Avenue, Suite 200
Oakland CA 94610-2023
Telephone: (510) 465-5750

Attorneys for Defendant, Counter-Complainant, and Cross-Complainant
HALLIBURTON AFFILIATES, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT COURT OF CALIFORNIA

| | |
|---|---|
| ARCONIC INC., et al., | Case No. 2:14-cv-06456 GW (Ex.) |
| Plaintiffs, | **SUPPLEMENTAL BRIEF OF THE PATSOURAS PROPERTY DEFENDANTS (HALLIBURTON AFFILIATES, LLC; INTERVENORS FIREMAN'S FUND INSURANCE CO. AND FEDERAL INSURANCE CO., AS INSURERS OF PALLEY SUPPLY CO.; AND KEKROPIA, INC.)  IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND KEKROPIA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| APC INVESTMENT CO., et al., | |
| Defendants. | |
| AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS | |

-0-

PATSOURAS PROPERTY DEFENDANTS' SUPPLEMENTAL BRIEF ISO MSJ &
KEKROPIA OPPN TO MSJ                    Case No. 2:14-CV-06456 GW (Ex.)

WACTOR & WICK LLP
3640 Grand Avenue, Suite 200

## I.   INTRODUCTION: CROSS-MOTIONS AND CONTESTED CERCLA ELEMENTS IN THIS PHASE OF THE CASE

The Patsouras Property pending cross-motions for partial summary judgment are: (1) the Patsouras Property Defendants'[1] motion against Plaintiffs and (2) Plaintiffs' motion against Kekropia, Inc. (the current Patsouras Property owner).

The contested CERCLA elements in this phase are: (1) whether a "release" to groundwater of a hazardous substance occurred at or from the Patsouras Property (the "Release Element")[2] and (2) whether Palley Supply Company[3] is within one of the classes of persons subject to CERCLA liability (the "Disposal Element").  Note that the Court can and should analyze whether Palley is a "covered person" independently from the other defendants, and because Plaintiffs did not file an affirmative summary judgment motion against Palley, any evidence contained in their affirmative motion against only Kekropia cannot be considered against Palley. The Patsouras Property Defendants, as moving parties without the ultimate burden of proof at trial, need negate only *one* of the two elements to prevail on their motion.[4]  However, Plaintiffs, as moving parties with the ultimate burden of proof at trial, "must affirmatively demonstrate that no reasonable trier of fact could find other than for [them]" on *both* contested elements on their motion.[5]

## II.   PLAINTIFFS HAVE NOT SHOWN A HAZARDOUS SUBSTANCE RELEASE FROM THE PROPERTY SOIL INTO THE GROUNDWATER ("RELEASE ELEMENT")
### A. The Government Agencies, On-Site Consultants, and Expert Dr. Kulla Find No Release.

Did hazardous substances in the Patsouras Property soil migrate from the soil surface into the groundwater, 35 to 74 feet below the soil surface?  No. More than five years ago, the L.A. Regional Water Quality Control Board determined—after

---

[1] Halliburton Affiliates, LLC; Intevenors Fireman's Fund Insurance Company and Federal Insurance Company, as Insurers for Palley Supply Company; and Kekropia, Inc.
[2] A "threatened release" won't suffice here; see footnote 7 and accompanying text.
[3] Intevenors Fireman's Fund and Federal Insurance Company are the insurers of now-defunct Palley Supply Company and are the named defendants in this case.
[4] *See Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos. Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).
[5] *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

an eight-year investigation—that the Property was *not* contributing to the groundwater contamination, issuing a "No Further Action Letter" to Defendant Kekropia, Inc., and ordering it to remove existing groundwater monitoring wells, since the Board's determination rendered them unnecessary.[6]  Plaintiffs must show an actual release (not a "threatened release") since the Regional Board determined that no "threatened release" exists and thus Plaintiffs have not and will not incur any "threatened release" costs.[7]

Similarly, the U.S. EPA elected *not* to issue notice letters of potential liability to the Patsouras Property Defendants.[8]

Two different environmental consultants, after thoroughly investigating the Patsouras Property, also concluded the answer was "No":

● "*No threat exists to groundwater from metals, solvents, and total petroleum hydrocarbons*; petroleum and solvents at the Property "had *insufficient mass for vertical migration*, with sorption and desorption, in excess of a few feet." [9]

● Chlorinated compounds "*are not generally identified in soil at the Site* but are present in ground water at concentrations that are *consistent with the regional impact to ground water*"; "the chlorinated compounds detected in ground water at the Site are *not* the result of former site activities."[10]

Retained expert Dr. Jean Kulla—a geologist with a Ph.D. in geochemistry and decades of experience assessing soil and groundwater contamination— reviewed

---

[6] Dkt. 902-77.

[7] Moreover, "where the response costs are incurred solely as a result of and in response to actual contamination [as opposed to a "threatened release"], the plaintiff must prove that the release by the defendant actually caused the contamination at plaintiff's site." *Thomas v. FAG Bearings Corp.,* 846 F.Supp. 1382, 1390.

[8] The U.S. Environmental Protection Agency investigated properties overlying the Omega plume which may have contributed to the OU-2 contamination and issued notice letters to more than 42 owners and operators of properties which may have contributed, in accordance with EPA's policy to issue notice letters "to *all* parties where there is *sufficient evidence to make a preliminary determination* of *potential* liability under §107 of CERCLA."  Dkt. 958 at 60, fn. 1, 2.

[9] Dkt. 902-82 at 8.

[10] Dkt. 902-79 at 25.

TOR & WICK LLP

rand Avenue, Suite 200

more than ninety (90) reports with soil and groundwater data from the Property, neighboring properties, and the Omega Site, and concluded that "there is no evidence, historical or more recent, that shows that the Patsouras Property has been, is, or threatens to be a contributing source of hazardous substances to OU-2."[11]

To assess whether a property has contributed to groundwater contamination, hydrogeologists ask two questions:

(1) Is there a demonstration that chemical contaminants in the soil have migrated down through the soil and contacted the water table?

(2) Is there a consistent pattern of higher contaminant concentrations in the groundwater downgradient from the property (flowing off the property) than in the upgradient groundwater (flowing onto the property)?

Here the *data* clearly show that the answers to both questions are "no," and Plaintiffs have not identified any disputed material *facts* showing otherwise (i.e., that there is a genuine issue for trial).

## B. Plaintiffs Have Failed to Proffer Admissible Evidence Sufficient to Establish that There Was a Release to Groundwater

Plaintiffs could have collected site data at the Patsouras Property in discovery in this case, *but they chose not to do so* —instead relying solely on conjecture, suppositions, and speculation attempting to undermine the data-based conclusions of the government agencies, the consultants, and Dr. Kulla.  But conjecture, suppositions, and speculation do not and cannot create a genuine issue of material fact.  Plaintiffs don't—and can't—provide:

 (1) any *data* showing that any hazardous substances in the Property soil vertically migrated to the depth of the groundwater; and

(2) any *data* showing that the groundwater leaving the Property has been or is more contaminated than the groundwater coming onto the Property.

---

[11] Dkt. 902-86 at 1.

**1. Plaintiffs Proffer No Admissible Evidence Showing that Soil Contaminants Impacted the Groundwater**

**(a) Soil Samples Above Screening Levels Do Not Show that Soil Contaminants Impacted Groundwater.**

Of 260 soil samples taken on the Property over 16 years, PCE and TCE were found in *only a few soil samples at very low concentrations*.[12] Plaintiffs argue that because a *few* soil samples were above Environmental Screening Levels ("ESLs"), those contaminants likely reached groundwater. (Dkt. 948 at 47:7-15.)  Not so.  That's a complete distortion of the use and meaning of ESLs, which are a *preliminary screening* tool.  A chemical above an ESL does *not* mean that chemical migrated into the groundwater—it means *only* that additional evaluation is warranted."[13]  And here, after the "additional evaluation" *was* conducted, the Regional Board determined that the Patsouras Property was *not* impacting the groundwater.

**(b) Chromium Detected in a Two-Foot-Deep Sample Did Not Contact Groundwater.**

Only *one* soil sample of 60 tested for chromium was above naturally-occurring background levels, taken *two feet below ground surface*.[14]  Plaintiffs' argument that the chromium was not naturally-occurring was rejected by the Regional Board, which applied the actual concentrations of naturally-occurring chromium found in *Los Angeles* soils, and ruled out chromium as a contaminant of concern.[15]  Plaintiffs also argue that even the background-level chromium *could* include hexavalent chromium, but the Regional Board ruled that out as well.[16]  Finally, two significant facts confirm that the Property has *not* contributed

---

[12] *Id.* at 3. The maximum PCE concentration was 0.51 mg/kg and TCE was 0.27 mg/kg.
[13] Dkt. 963-3 at 5.
[14] Dkt. 902-86 at 3.
[15] Dkt. 963-4 at 7-8.
[16] The Regional Board did not require sampling for hexavalent chromium because the Patsouras Property soil is anoxic (lacking oxygen), which means the soil is "reducing."  Thus, any hexavalent chromium in the soil would have been chemically reduced to harmless trivalent chromium long before it could have made its way 35 to 75 feet to groundwater, the chemical environment is reducing, transforming hexavalent chromium into harmless trivalent chromium. Dkt. 963-3 at 6.

hexavalent chromium to the groundwater: (1) upgradient groundwater flowing *onto* the Property *already* contains hexavalent chromium,[17] and (2) groundwater under the Patsouras Property contained only *de minimis* concentrations of chromium — *below* the *drinking water* standard (the Maximum Contaminant Level, or MCL).[18]

### (c) Two Borings with PCE Detections Do *Not* Show that PCE Contacted Groundwater.

Plaintiffs *argue* that PCE detected at low concentrations in two borings (B-7 and E-9) shows that PCE must have migrated deep enough to contact the groundwater table (Dkt. 948 at 50:1-6).  But there is no material *fact* in dispute here.  Plaintiffs' expert Mr. Mutch admitted that he was aware of no data indicating that the water table in the area of B-7 and E-9 was ever higher than 35.84 feet.[19]  The deepest samples with *any* concentration of PCE were found at 25 feet bgs in B-7 and at 30 feet bgs in E-9—*above* the highest level of the water table and, significantly, both soil samples were entrained in heavy oil, impeding their mobility.[20] Because the data confirm that the deepest borings in which PCE was detected did *not* contact the water table, Plaintiffs resort to pure conjecture—and to using a variety of creative adjectives—to suggest that the water table was higher.[21]

### (d) Contaminants in the Soil Gas Came from the Omega Plume, Not the Property.

Plaintiffs *argue* in a footnote that soil gas sample results "localized in a

---

[17] Dkt. 902-86 at 8.

[18] *Id.* at 5.  Plaintiffs argue that even though the levels currently in the groundwater are safe to drink, "historical releases" that "have already left the property" might have been higher (Dkt. 948 at 54:4-9).  The problem with Plaintiffs' conjecture is that there's no evidence of historical releases of chromium at the Property (see discussion, *infra*).

[19] Dkt. 963-5 at 6-8.

[20] Dkt. 963-3 at 6-7.

[21] Plaintiffs say that the water table was present at "*around*" 30 feet bgs (Dkt. 948 at 50:25-26) (emphasis added); that the borings revealed PCE to be at the "*effective depth*" of the groundwater table (*Id.* at 50:28-51:-3) (emphasis added); that water depths were "*perhaps*" as close as 25 feet bgs (*Id.* at 51:6-9) (emphasis added); that samples at 25 feet bgs were "down to, or *very nearly down to*, the water table" (*Id.* at 24-25) (emphasis added); that a depth of 25 feet bgs "was *within a few feet* of the depth of groundwater during this time period" (*Id.* at 47:26-28)(emphasis added); and that "the groundwater table *could have been* as shallow as 25 feet bgs at times during this period" (*Id.* at 47:28-42:-2) (emphasis added).

PATSOURAS PROPERTY DEFENDANTS' SUPPLEMENTAL BRIEF ISO MSJ &

portion of the Property with high PCE soil levels," signify "a definitive onsite source" (Dkt. 950-1 at 38, fn. 25.), but that argument was debunked by the Regional Board.  To assess whether the soil gas concentrations *might* indicate a soil source at the Property, the Board required four 70-foot-deep borings in the area with the highest soil gas readings, and soil samples were collected at depths of 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65 and 70 feet bgs.  *No volatile organic compounds were detected in any of the soil samples,*[22] *confirming that there was no soil source of PCE or TCE (or any other volatile organic compound).*  The Regional Board concluded that the soil gas vapor on the Property resulted from degassing off the contaminated Omega Plume, *not* from soil contaminants. Mr. Mutch's contrary *speculation*[23] is just that—it's *not* a disputed material *fact.*

### (e) The Conjecture of Two Fire Department Employees (20 Years Before the Property Investigation Was Completed) Was Based on an Erroneous Reading of the Data.

Plaintiffs *argue* that opinions of two fire department employees rendered more than twenty (20) years *before* the Patsouras Property site investigation was completed constitute a disputed material fact.  Because the opinions were based on an erroneous assumption about the facts, they do not.

Plaintiffs cite a memo authored by Steve Chase, "an employee" of the Santa Fe Springs Fire Department, opining that historic Palley contamination "probably" contributed to the VOC portion" of the groundwater under the Property and that PCE was found in a soil column [boring E-9] "from 10 feet bgs to 35 feet bgs." (Dkt. 950-1 at 46:4-47:1).  Plaintiffs also cite a letter from Chase's boss (Dave Klunk) echoing portions of Chase's memo verbatim. (Dkt. 950-1at 47:1-5.)[24]

---

[22] Dkt. 963-3 at 9-11.

[23] "These soil gas findings in conjunction with the earlier discussed soil and groundwater data, *strongly support* the conclusion that the Patsouras property has contributed PCE to soil, soil vapor, and groundwater." Dkt. 903-204 at 168)(emphasis added).

[24] Mr. Chase's boss, Dave Klunk, relies on and then enhances Mr. Chase's memo to say that there was "demonstration of HVOC contamination to GW" in a letter to the Regional

But Mr. Chase and his boss misinterpreted the sampling data.  PCE was *not* found "from 10 feet bgs to 35 feet bgs," as they both erroneously wrote: PCE was found at *30* feet bgs, not 35 feet.[25]  The fire department employees asked the Regional Board to take responsibility for oversight.  The Regional Board did just that, and after 8 years of investigation, the Board determined that the Property was *not* impacting groundwater.

### C. The Data Show Consistently Higher Concentrations of Contaminants Coming Onto the Property from Upgradient Sources than Leaving the Property.

The data show that the Property was *not* contributing contaminants to the OU-2 Omega Plume,[26] because the concentrations of PCE and TCE in the groundwater coming *onto* the Property from upgradient sources (including, of course, from Plaintiffs' wastes at the Omega Site) are and have been consistently *higher* than the concentrations *leaving* the Property.[27]  Plaintiffs' only retort was to argue that the Pilot Chemical wells used to assess upgradient impacts perhaps weren't upgradient. But even Plaintiffs' expert Mr. Mutch admitted that Pilot Chemical "is probably at least partially upgradient to some parts of the [Patsouras] property."[28]  Incredibly, however, Mr. Mutch failed to consider *any* of the Pilot Chemical wells.[29]  The Regional Board, the environmental consultants for the Patsouras *and* the Pilot Chemical properties, and Dr. Kulla *all* concluded that the Pilot Chemical wells *were* upgradient of the Patsouras Property.  Plaintiffs' clearly erroneous *argument* doesn't constitute a material disputed fact. Dr. Kulla's and Pilot Chemical's groundwater flow direction contours confirm that the wells Dr. Kulla used as upgradient to the

Board. (Dkt. 948 at 53:7-11).
[25] Dkt. 963-7 at 4-5.
[26] Dkt. 963-3 at 2.
[27] *Id.* at 14.
[28] Dkt. 963-5 at 7:25-8:8.
[29] Dkt. 963-3 at 13*;* Mutch Tr. at 775:21-778:1.

TOR & WICK LLP
rand Avenue, Suite 200

Patsouras Property wells (Pilot Chemical wells 5, 6, 7, and 8) are indisputably upgradient of those wells. [30]

### III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN ON THE "DISPOSAL ELEMENT" AS TO PALLEY.

Former owners and operators are liable under CERCLA if, *and only if*, they owned and operated the property "at the time of disposal of any hazardous substance," (42 U.S.C. §9607(a)(2)).  The "mere existence of a scintilla of evidence" is insufficient to meet plaintiffs' burden with respect to this motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Here, Plaintiffs do not even muster up a "mere scintilla," Rather, there is an indisputable absence of *any* evidence from which a trier of fact could conclude (as opposed to speculate) that Palley even *used* an OU-2 Hazardous Substance in its operations, let alone that there was a "disposal" of such a substance during Palley's ownership and operation of the Property from the late 1970s to the early 1980s. (Dkt. 902 at 57:10-19).  Because Plaintiffs' evidence fails to substantiate in any fashion whatsoever the disposal of an OU-2 Hazardous Substance, the Court must grant summary judgment to Palley.

### A.   Santa Fe Springs Fire Department NOV 74 (5/18/84)

Plaintiffs cite this Notice of Violation ("NOV") for an overflow from a sump and two abandoned clarifiers due to a plugged sewer line.[31]  But nothing in this NOV indicates a disposal of an OU2-hazardous substance.

### B.   Santa Fe Springs Fire Department NOV 75 (5/18/88)

Plaintiffs cite this NOV for excessive waste in two abandoned clarifiers,[32]  but the NOV actually states there was "oil and grease" in the clarifiers.  Nothing in it identifies an OU2-hazardous substance disposal; oil and grease are excluded from the CERCLA definition of "hazardous substance." 42 U.S.C. §9601(14).

---

[30] Dkt. 963-9 (Dr. Kulla Contours); Dkt. 963-10 (AECOM (Pilot Chemical's consultant) Letter and Figures; Figure 2 at 7.).
[31] Dkt. 950-1, 36:12-15; Opp'n RFJN, Ex 17 (Santa Fe Springs Fire Dept. Notice of Violation No. 74, May 18, 1988).
[32]  Dkt. 950-1, 36:12-15; Opp'n RFJN, Ex 17 (Santa Fe Springs Fire Dept. Notice of Violation No. 74, May 18, 1988).

-8-

TOR  & WICK LLP

rand Avenue, Suite 200

### C.    Inspection Record for Talco Plastics, May 18, 1988.

Plaintiffs cite this inspection report stating that the abandoned clarifiers were filled with trash and oil, and that during a rainstorm, "industrial waste" was overflowing into the street.[33]  But the report did not identify what the "industrial waste" constituted, there is no indication it included any OU2-hazardous substances, and Plaintiffs provide no facts to the contrary.

### D.    Environmental Audit, Inc. ("EAI") Supplemental Subsurface Investigation (4/4/97)

Plaintiffs cite this report for two things.  First, in 1978 Palley "received a NOV for discharging industrial wastewater from its steam cleaning operation to the public sewer system . . ."[34]  Plaintiffs did not produce the 1978 NOV, but Plaintiffs themselves note that the NOV refers only to "industrial wastewater" and do not argue it was an OU2-hazardous waste.  Second, Plaintiffs cite this report for a 1987 criminal complaint filed against Palley,[35] but, as Plaintiffs state, the complaint was associated with two subsurface structures containing a "black oily liquid resembling waste oil"; there is no identification of a disposal of an OU2-hazardous substance. EAI did not identify the particular constituents in any waste discussed in the report, let alone the OU2-hazardous substances at issue in this case.

Thus, the evidence proffered by Plaintiffs shows that Palley was cited, at most, for trash, oil, and industrial wastewater.  Rank speculation cannot as a matter of law fill the evidentiary gap on a mandatory element of the statute. In the absence of any identifiable evidence that shows a disposal of an **OU2-hazardous** substance when Palley owned and operated the Property, Plaintiffs have failed their burden on the "Disposal Element," and summary judgment must be granted to Palley.

---

[33] Dkt. 950-1, 36:8-11; RFJN, Ex 101 (Inspection Record for Talco Plastics, May 18, 1988
[34] Dkt. 950-1, 36:2-5; Valenzuela Decl., Ex 6, at 66 (Environmental Audit, Inc. Supplemental Subsurface Investigation, Mar. 3, 1997 at 3)).
[35] *Id.* at 36:5-8; Valenzuela Decl., Ex 6, at 66 (Environmental Audit, Inc. Supplemental Subsurface Investigation, Mar. 3, 1997 at 3.)

TOR  & WICK LLP
rand Avenue, Suite 200

## IV.   CONCLUSION

Because Plaintiffs have failed to provide admissible evidence showing that hazardous substances from the Patsouras Property impacted groundwater, the Patsouras Property Defendants' motion should be granted, and Plaintiffs' motion should be denied.  Plaintiffs do not provide *any* evidence, not even a "scintilla," supporting the assertion that Palley Supply used or disposed of any *OU-2 hazardous substance* during its ownership or operation at the Property.  Thus, Palley is not a "covered person," and Plaintiffs cannot meet their burden of proof regarding the disposal element of their CERCLA claim.  Therefore, Palley is entitled to summary judgment on this additional ground.

DATED:  May 2, 2022                          WACTOR & WICK LLP

                                             By:          /s/ William D. Wick
                                             _____
                                             William D. Wick, Attorneys for Defendant
                                             Halliburton Affiliates, LLC

DATED:  May 2, 2022                          EDLIN GALLAHER HUIE + BLUM LLP

                                             By:          /s/ Farheena A. Habib
                                             _____
                                             Farheena A. Habib, Attorneys for Interveners
                                             Fireman's Fund Insurance Company and
                                             Federal Insurance Company, as Insurers for
                                             Palley Supply Company

DATED:  May 2, 2022                          OTTEN LAW, PC

                                             By:          /s/ Victor Otten
                                             _____
                                             Victor Otten, Attorneys for Defendant
                                             Kekropia, Inc.

PATSOURAS PROPERTY DEFENDANTS' SUPPLEMENTAL BRIEF ISO MSJ &

**Re**:   **Arconic, Inc., et al. v. APC Investment Co., et al.**
         **United States District Court, Central District Case No. 2:14-cv-06456-GW-E**

### PROOF OF SERVICE – ELECTRONIC TRANSMISSION

STATE OF CALIFORNIA/COUNTY OF San Francisco

I am a citizen of the United States and an employee in the County of San Francisco. I am over the age of eighteen (18) years and not a party to the within action. My business address is EDLIN GALLAGHER HUIE + BLUM, 500 Washington Street, Suite 700, San Francisco, California 94111.

On May 2, 2022, I electronically served the document(s) via USC CDCA ECF website, described below, on the recipients designated on the Transaction Receipt located on the USDC CDCA ECF website.

**SUPPLEMENTAL BRIEF OF THE PATSOURAS PROPERTY DEFENDANTS (HALLIBURTON AFFILIATES, LLC; INTER- VENORS FIREMAN'S FUND INSURANCE CO. AND FEDERAL INSURANCE CO., AS INSURERS OF PALLEY SUPPLY CO.; AND KEKROPIA, INC.)  IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND KEKROPIA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

On the following parties:

PLEASE SEE SERVICE LIST PROVIDED BY USDC CDCA WEBSITE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on May 2, 2022, at San Francisco, California.

*/s/ Bridgette C. Burdick*
BRIDGETTE C. BURDICK

3400469