1  WILLIAM D. WICK (State Bar No. 063462)
2      bwick@ww-envlaw.com
3  WACTOR & WICK LLP
   3640 Grand Avenue, Suite 200
4  Oakland CA 94610-2023
   Telephone: (510) 465-5750
5
6  Attorneys for Defendant, Counter-Complainant, and Cross-Complainant
   HALLIBURTON AFFILIATES, LLC
7
8              UNITED STATES DISTRICT COURT
9           CENTRAL DISTRICT COURT OF CALIFORNIA
10

| | |
|---|---|
| ARCONIC INC., et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>APC INVESTMENT CO., et al.,<br><br>              Defendants.<br><br>_____<br><br>AND RELATED CROSS ACTIONS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS | Case No. 2:14-CV-06456-GW (Ex)<br>Assigned to Honorable George H. Wu<br><br>**SEPARATE STATEMENT OF UNCONTROVERTED FACTS ISO CROSS MOTIONS FOR SUMMARY JUDGMENT [PATSOURAS PROPERTY]**<br><br>Hearing Date:  May 26, 2022<br>Time:           8:30 a.m.<br>Place:          Courtroom 9D, 9th Floor, 350 W. 1st Street, Los Angeles, CA 90012<br>Judge:          Hon. George H. Wu |

3398322

In connection with the property-specific summary judgment hearings regarding CERCLA liability, the Court made the following request:

> For the upcoming site-specific summary judgment hearings, please provide courtesy copies to the Court of all briefing and supplemental briefing relevant to each specific hearing. Please also include and file an updated Separate Statement of Uncontroverted Facts that contain only the relevant uncontroverted facts for that hearing.

Dkt. 1035 (Text-Only Entry).

The Patsouras Property Defendants are Halliburton Affiliates, LLC; Interveners Fireman's Fund Insurance Company and Federal Insurance Company, as Insurers for Palley Supply Company; and Kekropia, Inc. (hereinafter "The Patsouras Defendants").  Courtesy copies of The Patsouras Defendants' briefing and supplemental briefing will be provided to the Court shortly.

Attached hereto as Exhibit A is a copy of the previously-filed Separate Statement of Uncontroverted Facts as to The Patsouras Defendants' affirmative Motion for Partial Summary Judgment for the Patsouras Property which includes Plaintiffs' Response and The Patsouras Defendants' Reply (Dkt. 959, excerpts). Facts relevant to the Patsouras Property are Fact Nos. 200 to 261.

Attached hereto as Exhibit B is a copy of the previously-filed Separate Statement of Uncontroverted Facts as to Plaintiffs' affirmative Motion for Partial Summary Judgment for the Patsouras Property (against Defendant Kekropia, Inc. only) which includes Defendant Kekropia, Inc.'s Response and Plaintiffs' Reply (Dkt. 974, excerpts). Facts relevant to the Patsouras Property are Fact Nos. 33 to 36 (Plaintiff's original facts) and Fact Nos. 500 to 571 (Kekropia, Inc.'s additional facts).

3398322

Date:   May 2, 2022                    WACTOR & WICK LLP

                                              /S/ WILLIAM D. WICK

                                       By:_____
                                              William D. Wick

                                       Attorneys for Defendant Halliburton
                                       Affiliates, LLC

Date:   May 2, 2022                    EDLIN, GALLAGHER, HUIE & BLUM LLP

                                              /S/ FARHEENA A. HABIB

                                       By:_____
                                              Farheena A. Habib

                                       Attorneys for Interveners Fireman's Fund
                                          Insurance Company and Federal
                                          Insurance Company, as Insurers for
                                          Palley Supply Company

Date:   May 2, 2022                    OTTEN LAW, PC

                                              /S/ VICTOR OTTEN

                                       By:_____
                                              Victor Otten

                                       Attorneys for Defendant, Kekropia, Inc.

3398322

### III.  Patsouras Source Property

**Moving Defendants: Halliburton Affiliates, LLC; Intervenors Fireman's Fund Insurance Company and Federal Insurance Company, as Insurers of Palley Supply Company; and Kekropia, Inc.**

| | |
|---|---|
| 200.   On November 1, 2016, Plaintiffs filed a Fifth Amended Complaint ("FAC") against Defendants Halliburton Affiliates, LLC; Kekropia, Inc.; William K. Palley, an individual; and Palley Supply Company (the "Patsouras Property Defendants") alleging that | **Response:** Undisputed. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| each was a "covered person" within the meaning of 42 U.S.C. § 9607(a)(1)-(4).<br><br>Supporting Evidence: FAC ¶ 398; Ex. A to the Declaration of William D. Wick | |
| 200.   Moving Parties' Response<br><br>      No Response as Paragraph 200 is undisputed. | |
| 201.   EPA concluded that certain parties were potentially responsible parties ("PRPs") for the contamination of OU-2 groundwater, and sent Special Notice Letters to them.<br><br>Supporting Evidence:  FAC ¶ 4; Ex. A to the Declaration of William D. Wick | **Response:** Undisputed, but immaterial.<br><br>**Evidence:**  Plaintiffs object to paragraph 201 as immaterial for purposes of deciding this summary judgment because it does not bear on whether Plaintiffs can meet their burden to demonstrate the Patsouras Property is a CERCLA facility; (2) Defendants Halliburton Affiliates, LLC, Palley Supply Company and Kekropia, Inc. (collectively, the "Patsouras Defendants") are one of the four classes of persons that are liable under CERCLA; and (3) whether there has been a "release" or "threatened release" of hazardous substances from the Patsouras Property into OU-2 Groundwater (as defined in Footnote 1 above). *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014); *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 930 (C.D. Cal. 2018) ("A material fact for purposes of summary judgment is one that might affect the outcome of the |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | suit under the applicable law.") (citation omitted). |

201.   Moving Parties' Response

      Contrary to Plaintiff's response, the evidence is material.  It is material because it demonstrates that the US EPA, the governing regulatory agency, conducted its own analysis of which properties overlying the Omega Plume may have contributed to the groundwater contamination.  EPA's policy is to issue notice letters "to *all* parties where there is *sufficient evidence to make a preliminary determination* of *potential* liability under §107 of CERCLA." 53 Fed. Reg. 5298, 5301 (Feb. 23, 1988)(emphasis added).  EPA issued notice letters to 42 owners or operators of properties overlying the Omega Plume, but did NOT issue a notice letter to any of the Patsouras Property Defendants, indicating that there was not sufficient evidence to make a preliminary determination that the Patsouras Property Defendants were potentially liable.

| | |
|---|---|
| 202.  EPA has *not* sent a Special Notice Letter to any of the Patsouras Property Defendants.<br><br>Supporting Evidence:  FAC, p. 18 ("Non-Notice Letter Defendants PRPS,"), ¶ 93-96; Ex. A to the Declaration of William D. Wick | **Response:** Undisputed, but immaterial.<br><br>**Evidence:** Plaintiffs do not dispute EPA has not sent a Special Notice Letter to any of the Patsouras Property Defendants to date. Declaration of William D. Wick ("Wick Decl."), Ex. A (Docket No. 526, Fifth AC, ¶¶ 68, 93-96 (alleging each defendant received a SNL, GNL or has not yet received a notice letter)).<br><br>The OU-2 Remedial Investigation Report ("OU-2 RI"), portions of which the Patsouras Defendants cite below, plainly states that EPA recognizes its investigations to date "may not have identified all sources of contamination within the OU2 area, and the EPA may conduct additional investigations in the |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | future." *See* Hagstrom Decl., Ex. A, at 6 (Docket No. 902-47, at # 17799) (OMEGA OU-2 RI/FS, at 8-4). EPA could issue a GNL or SNL to the Patsouras Defendants in the future.<br><br>Under CERCLA, EPA is not required to send notice letters to all entities that contributed contamination to OU-2 Groundwater and the Agency has not done so. EPA acknowledges there are state-led actions to clean up known source properties that are continuing to contribute to the OU-2 Groundwater contamination and that those actions must work in parallel with the EPA OU-2 Groundwater containment remedy. *See* Docket No. 770-2, at #14433, #14440-14441 (Ex. A, 17, 24-25) (OU-2 ROD, at 1-2, 2-4 to 2-5).<br><br>Though strong circumstantial evidence of Defendants' liability, EPA's issuance of a notice letter to the Patsouras Defendants would not directly prove any of the elements of the Patsouras Defendants' liability under CERCLA and is, therefore, immaterial. *See* Plaintiffs' Response to Patsouras Defendants' paragraph 201. Plaintiffs incorporate their Response to paragraph 201 herein by reference. |

202.   Moving Parties' Response

   Contrary to Plaintiff's response, the evidence is material.  The fact remains that following many years of investigation, the EPA has <u>not</u> issued a Special

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Notice Letter to any of the Patsouras Property Defendants, and, as stated in the Response to Paragraph 201, it is a material fact for the Court to consider. Plaintiffs provide mere conjecture that the EPA *may* identify additional sources of contamination to OU-2, it *may* conduct additional investigations in the future, and that it *could* issue either a General or Special Notice Letter to the Patsouras Property Defendants but this is pure conjecture on Plaintiff's part (especially considering the LARWQCB has issued the Patsouras Property a No Further Action letter). The fact that cannot be disputed is that EPA has been issuing notice letters for 15 years relating to the properties overlying the Omega Plume and has not issued any letters to the Patsouras Property Defendants. The only actual evidence for the Court to consider is that the EPA has not issued these letters to the Patsouras Property Defendants and has not named them as PRPs with regard to OU-2 contamination. Moving parties incorporate their Response to paragraph 201 by reference. | |
| 203. EPA concluded that certain parties were potentially responsible parties ("PRPs") for the contamination of OU-2 groundwater warranting receipt of a General Notice Letter ("GNL") from EPA and sent GNLs to them.<br><br>Supporting Evidence: FAC ¶ 5; Ex. A to the Declaration of William D. Wick | **Response:** Undisputed, but immaterial.<br><br>**Evidence:** Plaintiffs incorporate their response to paragraph 201 herein. |
| 203. Moving Parties' Response<br><br>    This fact is material. See responses to Paragraph 201 and 202 incorporated by reference herein. | |
| 204. EPA has *not* sent a General Notice Letter to any of the Patsouras Property Defendants.<br><br>Supporting Evidence: FAC, p. 18 ("Non-Notice Letter Defendants | **Response:** Undisputed, but immaterial.<br><br>**Evidence:** Plaintiffs incorporate their responses to paragraphs 201, 202 and 203 herein. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| PRPS,"), ¶ 93-96; Ex. A to the Declaration of William D. Wick | |
| 204.   Moving Parties' Response<br><br>    This fact is material.  See responses to Paragraph 201, 202 and 203 incorporated by reference herein. | |
| 205.  The Patsouras Property is located at 11630-11700 Burke Street, Santa Fe Springs, CA.<br><br>Supporting Evidence:  FAC ¶ 343, Ex. A to the Declaration of William D. Wick | **Response:** Undisputed. |
| 205.   Moving Parties' Response<br><br>    No Response as Paragraph 200 is undisputed. | |
| 206.   From 1968 to 1972, Globe Oil Tools Company operated on the Patsouras Property, manufacturing and treating oil well drilling equipment and tools.<br><br>Supporting Evidence:  Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, Ex. B to the Declaration of William D. Wick<br><br>AIG Consultants, Inc. Phase I Environmental Site Assessment, June 30, 1994, pp. 10-11 (PTFS00024775-PTFS00024804); Ex. C to the Declaration of William D. Wick | **Response:** Disputed.<br><br>**Evidence:** Globe Oil operated on the Property from at least 1941, and perhaps as early as the 1930's. Opp'n RFJN, Exs. 15-A, at 117-125 (building permits for oil tool manufacturing plant on Sorenson Lane); Valenzuela Decl., Exs. 8, at 66_(Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3), 19, at 190-191 (Letter dated Mar. 19, 1959 addressed to Mr. John Bertaina" of Globe Oil Tool at "11630 Burke, Santa Fe Springs, Calif."); Mutch Report, Jan. 14, 2021, at 7-18 & Figs. 7-1, 7-12 |

Exhibit A
6

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Environmental Audit, Inc. Updated Site Conceptual Model and Request for Low Risk Closure, June 17, 2010, p. 1 [which corrects a typo in a March 3, 1997 EAI report which stated that operations began in "1958"](PTFS00024509-PTFS00024643); Ex. D to the Declaration of William D. Wick | (Docket No. 903-210 (1928 map indicating Burke Street used to be named Sorenson Lane & 1938 aerial photograph)). |

206.   Moving Parties' Response

     Undisputed. The *date* that Globe began operations is not material. Plaintiffs' Fifth Amended Complaint alleged that operations began in 1958.  The Regional Board, AIG, and EAI all stated that Globe began operations in 1968. Only recently did Plaintiffs argue that operations began at least as of 1941. Patsouras Property Defendants have not had an opportunity to assess Plaintiffs' most recent allegations, but do not dispute that operations could have begun earlier than 1968.

| | |
|---|---|
| 207.  On March 20,1970, the Los Angeles County Engineer issued a notice to Globe Oil Tools Company alleging that "the discharge of liquid waste from your rinse operation to ground" is in violation of Section #6301 of Santa Fe Springs City Ordinance No. 79 because the concentration of dissolved solids exceeded the allowable limitation.

Supporting Evidence: PTFS00022295, PTFS00023219-20; Ex. E to the Declaration of William D. Wick | **Response:** Undisputed. |

MOVING DEFENDANTS' RESPONSE TO STATEMENT OF GENUINE DISPUTES

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 207. Moving Parties' Response<br><br>No Response as Paragraph 207 is undisputed. | |
| 208. The County alleged that a sample of the liquid waste taken on March 9, 1970 showed "a concentration of dissolved solids that greatly exceeds the allowable limitation." The sample form indicated that "Chromium, hexavalent" was measured at a concentration of 19.5 parts per million.<br><br>Supporting Evidence: PTFS00022295, PTFS00023219-20; Ex. E to the Declaration of William D. Wick | **Response:** Undisputed. |
| 208. Moving Parties' Response<br><br>No Response as Paragraph 208 is undisputed. | |
| 209. After receiving a copy of the notice, the Globe plant manager "stated that he would have discharge discontinued at once."<br><br>Supporting Evidence: PTFS00022293; Ex. E to the Declaration of William D. Wick | **Response:** Undisputed. |
| 209. Moving Parties' Response<br><br>No Response as Paragraph 209 is undisputed. | |
| 210. On March 24, 1970, Globe submitted a formal application to the | **Response:** Undisputed. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| County Engineer for approval of an industrial waste disposal system to be installed on the Property in which liquid waste would flow into the sewer after passing through two interceptors.<br><br>Supporting Evidence: PTFS00022294; Ex. E to the Declaration of William D. Wick | |

210.  Moving Parties' Response

     No Response as Paragraph 210 is undisputed.

| | |
|---|---|
| 211.  The Globe plant manager "stated that all liquid waste would be collected in impervious containers and not discharged to ground until sewer system is completed."<br><br>Supporting Evidence: PTFS00022293; Ex. E to the Declaration of William D. Wick | **Response:** Undisputed. |

211.  Moving Parties' Response

     No Response as Paragraph 211 is undisputed.

| | |
|---|---|
| 212(a).  On June 19, 1970, the government determined that Globe's Industrial waste facilities were "constructed according to cleared plans." | **Response:** Disputed as incomplete.<br><br>**Evidence:** The referenced exhibit states that "the facilities constructed [to address Globe's violation of waste water disposal standards] were constructed according to cleared plans." Wick Decl., Ex. E (Docket No. 902-80, |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Supporting Evidence: PTFS00022291; Ex. E to the Declaration of William D. Wick | at #18397) (City of Santa Fe Springs, Industrial Waste Survey of Globe Oil Tool Co. (June 19, 1970)). However, the referenced plans were only put into place after Globe was ordered to "cease and desist" from discharging liquid waste to ground that contained dissolved solids that "greatly exceed[ed] the allowable limitation." *Id.* at # 18392 (Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Notice of Violation & Order to Comply to Globe Oil Tools Co. (Mar. 20, 1970)). |
| | Globe Oil conducted tooling and heat treating of oil tools, bits, and device, manufacturing hundreds of devices and pieces of equipment each month. *Id.* at # 18397 (City of Santa Fe Springs, Industrial Waste Survey of Globe Oil Tool Co. (June 19, 1970)). The metal heat treating operations generated wastewater heavily contaminated with hexavalent chromium. *Id.* at #18393 (Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Industrial Waste Division, Chemical Analysis, Job No. 3240.10 (Mar. 17, 1970)); *see also* RFJN, Ex. 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application (May 18, 1970)). |
| | Globe Oil used a degreaser and steam cleaned newly manufactured parts and equipment, which created waste streams contaminated with hazardous substances. Valenzuela Decl., Ex. 8, at |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation (Mar. 3, 1997) at 3); Wick Decl., Ex. E (Docket No. 902-80, at #18397) (City of Santa Fe Springs, Industrial Waste Survey of Globe Oil Tool Co. (June 19, 1970)). This waste undoubtedly included chlorinated solvents, given the common usage of those solvents in the metal fabricating industry during the pertinent time. <br><br> After 1970, the waste streams were run through permeable concrete or brick subsurface clarifiers, units now known to commonly result in subsurface releases, to settle out solids before being discharged to the public sewer system. Valenzuela Decl., Exs. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation (Mar. 3, 1997) at 3), 4, at 28 (AIG Consultants, Inc., Phase 1 Environmental Assessment (June. 30, 1994) at 18). Sewer pipes made of vitrified clay, the common material used during the early and middle part of the 20th century, also invariably leak, either through cracks, pipe joints, or simply via exfiltration. *See* Mutch Report, Jan. 14, 2021, at 5-9 to 5-11, 5-30. Given the permeability of these units and infrastructure, contaminated waste water carried through those systems is virtually certain to reach the environment. *Id.* |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| | In March 1970, Globe Oil was issued a Notice of Violation for discharging industrial waste to the ground. Wick Decl., Ex. E (Docket No. 902-80, at #18392-18393) (Los Angeles Cnty., Dept. of Cnty. Eng'r, Notice of Violation & Order to Comply (Mar. 20, 1970) & Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Industrial Waste Division, Chemical Analysis, Job No. 3240.10 (Mar. 17, 1970)). The discharge included rinse water from the heat-treating operations containing hexavalent chromium at 19.5 parts per million, a level 975,000 times higher than the current level considered protective in groundwater. *Id.* at #18393 (Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Industrial Waste Division, Chemical Analysis, Job No. 3240.10 (Mar. 17, 1970)); Mutch Report, Jan. 14, 2021, at 7-7. |

212(a).    Moving Parties' Response

     Plaintiffs' response that Paragraph 212 is "incomplete" is without merit. Moving parties proffered a straightforward piece of evidence which demonstrates that as of June 19, 1970, the government had deemed Globe's Industrial waste facilities were "constructed according to cleared plans." Plaintiffs do not dispute that fact, but go on to make irrelevant and unsubstantiated statements about other matters. Plaintiffs' non-responsive statement should be stricken and disregarded by the Court. The Moving Parties' evidence remains undisputed and complete.

| | |
| --- | --- |
| 212(b). On August 23, 1971, the City of Santa Fe Springs issued Industrial Waste Disposal Permit No. 4485 to Globe to discharge into the sewer | **Response:** Undisputed. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| washdown and wastes from manufacturing and processing oil well drilling tools.<br><br>Supporting Evidence: PTFS00022288; Ex. E to the Declaration of William D. Wick | |

212(b).    Moving Parties' Response

    No Response as Paragraph 212(b) is undisputed.

| 213.  In 1972, William D. Palley and Defendant William K. Palley acquired the Patsouras Property from Rucker.  In 1973, Defendant William K. Palley obtained sole ownership of the property.<br><br>Supporting Evidence: FAC ¶ 345; Ex. A to the Declaration of William D. Wick | **Response:** Undisputed. |

213.    Moving Parties' Response

    No Response as Paragraph 213 is undisputed.

| 214.  During Palley's ownership, the Property was occupied by a government surplus order house, by industrial auctioneers, by a paper box company, and by a plastic reprocessing business.<br><br>Supporting Evidence: Los Angeles Regional Water Quality Board Letter, | **Response:** Disputed as incomplete.<br><br>**Evidence:** Palley's use of the Property was not simply as a "government surplus order house." Instead, this business involved hydraulics and hydraulic equipment maintenance, aircraft, government surplus, and warehousing. Valenzuela Decl., Exs. 9, |

MOVING DEFENDANTS' RESPONSE TO STATEMENT OF GENUINE DISPUTES

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Jan. 4, 2017, Ex. B to the Declaration of William D. Wick | at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2), 14, at 140-142 (W. Palley Dep. Tr. at 20:9 to 21:5; 69:19-23). |

214.  Moving Parties' Response

    Plaintiffs' response that Paragraph 214 is incomplete is without merit. Paragraph 214 does not state that the Property was used during Palley's ownership solely as a "government surplus order house" and clearly states that the property was used by a paper box company and by a plastic reprocessing business.  Plaintiffs improperly insert additional evidence in response to this fact which remains undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 215.  On May 18, 1988, the Santa Fe Springs Fire Department issued a notice of violation alleging that "oil from 2 clarifiers spilled out onto Master Box Co. access/loading area."<br><br>Supporting Evidence:  EAI00897, Ex. F to the Declaration of William D. Wick | **Response:** Undisputed. |

215.  Moving Parties' Response

    No Response as Paragraph 215 is undisputed.

| 216.  On May 19, 1988, the Santa Fe Springs Fire Department issued a notice of violation alleging that two abandoned clarifiers contained "excessive oil and grease."<br><br>Supporting Evidence:  EAI00896, Ex. F to the Declaration of William D. Wick | **Response:** Undisputed. |

MOVING DEFENDANTS' RESPONSE TO STATEMENT OF GENUINE DISPUTES

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | |
| 216.  Moving Parties' Response<br><br>    No Response as Paragraph 216 is undisputed. | |
| 217.  Palley disposed of waste from the clarifiers and drums and the clarifiers were subsequently abandoned-in-place by filling with cement.<br><br>Supporting Evidence:  AIG Consultants, Inc. Phase I Environmental Site Assessment, June 30, 1994, p. 18; (PTFS00024775-PTFS00024804); Ex. C to the Declaration of William D. Wick | **Response:** Disputed as incomplete.<br><br>**Evidence:** The cited authority does not state that Palley disposed of waste from the clarifiers and drums—unless Palley is referring to his criminal prosecution in July 1988 for illegally transporting and disposing of hazardous waste. Valenzuela Decl., Ex. 4, at 29 (AIG Consultants, Inc., Phase I Environmental Site Assessment (June 30, 1994, at 19). In 1987, the County of Los Angeles Department of Health Services filed a criminal complaint against Palley Supply's owner for maintaining two subsurface structures containing a black oily liquid resembling waste oil. Valenzuela Decl., Ex. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3). A year later, on May 18, 1988, an inspection report noted that the abandoned clarifiers were filled with trash and oil, and that during a rainstorm, "industrial waste" was overflowing and discharging to the street. *Id.*; RFJN, Ex. 101 (Inspection Record for Talco Plastics, May 18, 1988.) Palley received two more notices of violation on the same day, one for excessive waste in two abandoned clarifiers and another notice |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| | of violation for overflow from a sump and two abandoned clarifiers, due to a plugged sewer line, that was discharging to ground at the property's access and loading area. Opp'n RFJN, Exs. 17, at_141 (Santa Fe Springs Fire Dept. ("SFSFD"), Notice of Violation No. 74 (May 18, 1988)), 18, at 142 (SFSFD, Notice of Violation No. 75 (May 18, 1988). |
| | Industrial waste from steam cleaning operations by Palley was discharged to the sanitary sewer through one or more clarifiers that had been present on the property since Globe Oil Tools operated there. Valenzuela Dec., Ex._9, at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2). Clarifiers leak and are common sources of groundwater contamination. *See* Mutch Report, Jan. 14, 2021, at 2-6, 3-5. |
| | This statement is further disputed to the extent it suggests that Palley properly and fully remediated all sources of contamination from the Property—this is not the case. In addition to 2 brick clarifiers which were historically used to store waste oil and solvents at the Property, there are also 3 USTs on the Property—one of which is not registered and regulatory agencies were not aware of its presence. Valenzuela Decl., Ex. 4, at 27-28 (AIG Consultants, Inc., Phase I |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Environmental Site Assessment (June 30, 1994, at 17-18). There was no documentation of the condition of the clarifiers or surrounding soil before they were abandoned in place or of the unregistered UST and surrounding soil that remains on the Property. *Id.* at 30 (AIG Consultants, Inc., Phase I Environmental Site Assessment (June 30, 1994, at 20).

This statement fails to recognize the contamination caused by the 2 clarifiers before (and after) they were purportedly "abandoned in place." In an August 18, 1988 letter, the County of Los Angeles Department of Health expressed great concern "over potential problems with two existing underground storage structures located on the west section of the site. We have observed two brick "clarifiers" built prior World War II which possibly contain[] waste oil or a similar material We also feel that these structures have long since lost their integrity to withhold any of its contents." RFJN, Ex. 87 (L.A. County DHS Letter to C. Sjoberg (Aug. 18, 1988)). These brick clarifiers pre-dated the connection of the property to the sewer system in 1970 and discharged to lagoons present on the Property. *See* Mutch Report, Jan. 14, 2021, at 7-27 to 7-28. No meaningful investigation of the role the lagoons had upon the nature and extent of the contamination of the Property |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | was ever completed. *Id.* The lagoons have been present on the Property from at least 1938 – 1973, but, inexplicably, have never been a major focus of investigation. *Id.*

On November 28, 1995, the Los Angeles County Fire Department ordered Kekropia to "determine the nature, concentration, and the vertical and lateral extent of contamination" and submit a "site characterization plan" by the end of December, noting that there had been "releases" at the Property. RFJN, Ex. 84 (T. Klinger, Supervisor, Los Angeles County Fire Dept., Health / HazMat Div., Letter to L. Patsouras, Kekropia, Nov. 28, 1995).

The Los Angeles County Fire Department concluded that the locations of clarifiers and a storage shed on the eastern parcel of the Patsouras Property were impacted with volatile organic compounds, such as PCE and TCE, and needed to be remediated. *See* RFJN, Ex. 92 (Los Angeles County Fire Dept., Memorandum, Jan. 9, 1996, at 1-2). |
| 217.   Moving Parties' Response

        Plaintiffs' response to Paragraph 217 is non-responsive to the simple factual statement that "Palley disposed of waste from the clarifiers and drums and the clarifiers were subsequently abandoned-in-place by filling with cement," which is supported by the proffered evidence.  Plaintiffs make a litany of | |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| irrelevant and unsubstantiated statements that do not controvert this fact or demonstrate any evidence that contaminants in the soil migrated to the groundwater. Palley Supply Company received notices of violation but they were "paper violations" - - that is, Palley was cited for not having applied for the applicable waste discharge permits. Plaintiffs list a litany of facts to confuse the Court as to the simple fact that the clarifiers were abandoned in place. Critically, none of the statements listed by Plaintiffs support any fact regarding contribution to groundwater contamination by Palley's operations. The Court should disregard Plaintiffs' assertion that this fact is disputed. | |
| 218. In 1994, AIG Environmental Consultants performed a Phase I Environmental Site Assessment of the Property. AIG concluded that "the greatest potential risk to the subject property" was the total of 37 sites less than ¼ mile away whose potential off-site contamination may have impacted the Property, and AIG also recommended additional investigation of the Property itself.<br><br>Supporting Evidence: AIG Consultants, Inc. Phase I Environmental Site Assessment, June 30, 1994, p. 3; (PTFS00024782); Ex. C to the Declaration of William D. Wick | **Response:** Disputed as incomplete<br><br>**Evidence:** The statement is necessarily qualified by the failure of AIG to investigate other sources of potential contamination. The AIG assessment specifically identified numerous other potential sources of contamination (including the unregistered UST, potentially hazardous materials in storage containers and 55-gallon drums located at the Property, and dark-stained soil in the area of "Bay Traps"), stated that AIG did not investigate these other sources, and recommended that these other potential sources be investigated and evaluated to determine their potential impact to the soil and groundwater. Mutch Rebuttal Report, Mar. 4, 2021, at § 3. AIG states that, based on the results of its inspection of the Property and its historical records of land use and regulatory inquiries, "there is evidence of past activity at the Site which may represent environmental risks and/or liabilities. The extent of these environmental risks |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | could possibly be determined with further investigation. Therefore, AIG recommends that additional investigation be performed to further evaluate the potential for impact to the soil, air, and/or ground water at the Site." *Id.* at 3. |

218. Moving Parties' Response

Plaintiffs' response is not responsive to the evidence provided in Paragraph 218. Plaintiffs' averment that Paragraph 218 is incomplete is without merit.

There can be no dispute that AIG concluded that "the greatest potential risk to the subject property" was the total of 37 sites less than ¼ mile away whose potential off-site contamination may have impacted the Property, and AIG also recommended additional investigation of the Property itself.

Plaintiffs cannot dispute this evidence and instead discuss what investigation was or was not done on the Patsouras Property, which is not relevant to the statement in Paragraph 218. Further, Moving Parties included the statement by AIG recommending additional investigation on the Property, therefore Plaintiffs' response is wholly without merit. The Court should disregard Plaintiffs' assertion that this fact is disputed.

| | |
|---|---|
| 219. In 1995, Kekropia, Inc. acquired the Patsouras Property from William K. Palley. In 1997, El Greco Wholesale Grocers, Inc. and its owner Larry Patsouras began operating on the Property as a wholesale grocery warehouse.<br><br>Supporting Evidence: FAC ¶¶ 347, 350; Ex. A to the Declaration of William D. Wick | **Response:** Undisputed. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 219.  Moving Parties' Response<br><br>No Response as Paragraph 219 is undisputed. | |
| 220.  Kekropia continues to own the Property today, which is still used for a wholesale grocery warehouse and a tattoo artist supply business.<br><br>Supporting Evidence: Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, Ex. B to the Declaration of William D. Wick | **Response:** Undisputed. |
| 220.  Moving Parties' Response<br><br>No Response as Paragraph 220 is undisputed. | |
| 221.  Kekropia retained Environmental Audit, Inc. (EAI) to perform an environmental investigation of the Property.  EAI's investigation indicated that "the majority of the soil contamination is heavy end petroleum product."  EAI considered a variety of in-situ technologies for remediation of the heavy end petroleum hydrocarbons in the soil, but determined that they were impracticable "for the relatively small volume of contaminated soil at the Site, and therefore recommended excavation and off-site disposal of the impacted soil.<br><br>Supporting Evidence: Environmental Audit, Inc., "Remedial Action Plan, | **Response:** Partially disputed.<br><br>**Evidence:** Plaintiffs do not dispute that Kekropia retained EAI to perform an investigation of the Patsouras Property. Wick Decl., Ex. H, Docket No. 902-83 at #18469 (Envtl. Audit, Inc., Remedial Action Plan (June 16, 1997) at 3 (PTFS0002242)). Plaintiffs do not dispute that EAI purported to investigate the Patsouras Property, however, the remedial action chosen at the property was excavation of a significant amount of contaminated soil. Valenzuela Decl., Ex. 16, at 175 (Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, at 2) (noting soil removal actions in 1998, 2006, |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 11630-11700 Burke Street," June 16, 1997, at PTSF00022451, 22453; Ex. H to the Declaration of William D. Wick | 2010 and 2014). In addition, the selected remedial action did not test for hexavalent chromium. Mutch Report, Jan. 14, 2021, at 7-11 to 7-13.<br><br>Plaintiffs do not dispute the report discusses considering in-situ technologies, but Plaintiffs dispute there was a relatively small volume of contaminated soil in light of the fact that a significant amount of soil was excavated. Wick Decl., Ex. H, Docket No. 902-83 at #18478 (Envtl. Audit, Inc., Remedial Action Plan (June 16, 1997) at 10 (PTFS00022451)); Valenzuela Decl., Ex. 16, at 175 (Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, at 2) (noting soil removal actions in 1998, 2006, 2010 and 2014). |

221.  Moving Parties' Response

Plaintiffs mischaracterize the statements made in the January 4, 2017 Los Angeles Regional Water Quality Control Board Letter (Valenzeula Decl., Ex. 16 at 175).  While the letter does refer to soil removal during the years 1998, 2006, 2010 and 2014, it does not provide, anywhere in the letter, the volume of soil removed.  It simply states that these removal actions "removed the majority of Wastes at the Site."  Plaintiffs' conflation of the number of times an unknown quantity of soil was excavated with the actual volume of soil excavated is misleading and incorrect.  Rather, the evidence in the EAI RAP that a "relatively small volume of soil" at the Patsouras Property was contaminated is the only valid evidence regarding the volume of contaminated soil at the Patsouras Property. Plaintiffs' partial dispute is without merit and should be disregarded by the Court. The Court should disregard Plaintiffs' assertion that this fact is partially disputed.

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 222. In 2006, Biophysics Environmental Assessments, Inc. ("BEA") performed confirmation testing and removal of environmentally impacted soil identified in previous site testing.<br><br>Supporting Evidence: Biophysics Environmental Assessments, Inc., Soil Remediation Report of Findings for El Greco, Inc., Sept. 14, 2006; (PTFS00023600-PTFS00023663); Ex. G to the Declaration of William D. Wick | **Response:** Undisputed. |
| 222. Moving Parties' Response<br><br>No Response as Paragraph 222 is undisputed. | |
| 223. BEA concluded that the sampling results "showed no threat to groundwater since boring B-7 demonstrated vertical attenuation of both PCE and TCE to non-detect at termination depth of 35' below grade surface (bgs)."<br><br>Supporting Evidence: Id. at PTFS00023604 | **Response:** Disputed.<br><br>**Evidence:** Testing performed at the B-7 boring was incomplete and failed to take into account the soil composition and the water table at the location. The data from samples taken from 15, 20, 25, and 35 feet bgs "can by no means be taken to indicate that the maximum depth of PCE penetration was limited to 25 feet at B-7" because:<br><br>1. No sample was taken at 30 feet, and it may have contained PCE. Mutch Report, Jan. 14, 2021, at 7-11.<br><br>2. The testing done by BEA, EAI and any others of this area only tested for |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | "vertical" migration when "[i]t is well-recognized that infiltrating moisture in the vadose zone can follow complex pathways because of capillary action and complex lithologies." *Id.* "Assuming purely vertically-downward migration in the vadose zone is a perilous and often incorrect assumption." *Id.* "[O]ne cannot reliably define the vertical extent of contamination in the vadose zone with a single boring. What may appear in a single borehole to be the base of the contamination may simply indicate that the plume has been diverted laterally due to lithologic variability and is now outside the vertical trajectory of the boring." *Id.* |
| | 3. The 35-foot sample was taken from a clay stratum. *Id.* at 7-11. It is probable that the PCE plume migrating downward through the vadose zone diverted around this low permeability stratum. *Id.* |
| | 4. In the late 1990s, the groundwater table was approximately 32 to 36 feet bgs. *Id.* Thus, the water table was above the 35-foot sample location. *Id.* Thus, the PCE plume migrating vertically-downward through the vadose zone was intercepted by laterally flowing groundwater in the upper part of the saturated zone and not carried further downward to the 35-foot depth. *Id.* Groundwater would have |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | been contaminated in this location by PCE migrating downward through the vadose zone. *Id.* The Los Angeles County Fire Department found that soil and groundwater contaminated with VOCs at the Property and indicated that VOCs in the eastern portion of the Property "have been found to extend to GW [i.e., groundwater]." RFJN, Ex. 92 (Los Angeles County Fire Department Memorandum re Palley Property, Jan. 1996). They further observed that the "clarifier area" at the Property is "contaminated to GW with VOCs." *Id.*

PCE was also continuously detected in boring E-9, near a storage shed, at depths of 10, 15, 20, 24, and 30 feet at concentrations between 23 and 104 ug/kg. Mutch Report, Jan. 14, 2021, at 7-11. This data indicates that PCE was transported through the vadose zone to the historic elevation of the groundwater table and impacted the groundwater with PCE. *Id.*

This statement is also disputed because it rests on the faulty premise that testing showed there was no PCE contamination. On the contrary, tests do not show the presence of PCE, TCE, hexavalent chromium or other VOCs <u>because they were not tested for these substances.</u> In the report cited as support for this statement, BEA clearly states that it was hired solely to remove soil from 2 areas identified by other |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | investigations in 1994 and 1997. Valenzuela Decl., Exs. 17, at 180 (Biophysics Environmental Assessments, Inc., Soil Remediation Report, Sept. 14, 2006, at 1). BEA did not test any other areas of the Property to determine whether they were contaminated by PCE, TCE, hexavalent chromium or other VOCs. *Id.* Despite evidence of discharge of waste containing <u>975,000</u> times more than the health-protective level amounts of hexavalent chromium (19.5 ppm), no follow up testing was ever done. Mutch Report, Jan. 14, 2021, at 7-7. No testing of the soil or groundwater was ever completed beneath the storm drain or the flood control channel where Globe—for decades—disposed of industrial waste before sewers were installed at the Property. *Id.* In 1988, the clarifiers were filled with trash and oil and waste was discharging <u>to the street</u>; however, no testing was done in these areas for TCE, PCE, or other VOCs. Mutch Report, Jan. 14, 2021, at 7-8. RFJN, Ex. 101 (Inspection Record for Talco Plastics, May 18, 1988). Stained ground surface was noted in the southwest corner of the Property in the area of four partially-filled 55-gallon drums; but, still, no testing for TCE, PCE, or other VOCs was completed. Valenzuela Decl., Ex. 4, at 31 (AIG Consultants, Phase I Environmental Site Assessment, June 30, 1994, at 21). No meaningful investigation of the role |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | the lagoons had upon the nature and extent of the contamination of the Property has ever been completed. *See* Mutch Report, Jan. 14, 2021, at 7-27 59 7-28. The lagoons have been present on the Property from at least 1938 – 1973, but, inexplicably, have never been a major focus of investigation. *Id.* |

223.   Moving Parties' Response

   This a simply a statement of *BEA's* conclusion.  The BEA document says what it says, and Plaintiffs do not dispute that it says what it says.  Instead, they re-argue their Opposition.  The fact that BEA's report says what it says is undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken.

| | |
|---|---|
| 224.  BEA concluded that "no threat exists to groundwater from metals, solvents, and total petroleum hydrocarbons, based upon the low level and isolated low volume of all potentially hazardous materials identified in initial testing by EAI in 1994."<br><br>Supporting Evidence: Id. at PTFS00023607 | **Response:** Disputed.<br><br>**Evidence:** Because minimal testing was done for TCE, PCE, hexavalent chromium or other VOCs, it is impossible to say that there is "no threat" from such substances. Mutch Report, Jan. 14, 2021, at 7-11. Total chromium measured in Phase II samples ranged from below detection limits (200 ug/kg) to 71,100 ug/kg, with the highest levels at B-8 which lies in a stained soil area identified in historical photos on the eastern parcel. *Id.* Hexavalent chromium was not tested for on these samples. *Id.* Supplemental assessments in1994, 1996, and 1999 tested samples from 31 locations across the Property. Of these 31 locations, only 1 was tested for total |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | chromium. *Id.* at 7-12. None were tested for hexavalent chromium. *Id.* The samples taken by BEA in its 2006 assessment were not tested for hexavalent chromium though total chromium ranged between 18 and 62 mg/kg. *Id.* |
| | EAI closed 5 subsurface units in 2009, but did not collect samples for 2 of the units. *Id.* Samples from the other 3 units were tested for total chromium, but were not tested for hexavalent chromium. *Id.* The "stockpile" of soil removed from these 3 units was tested for total chromium only, and was found to have the second highest concentration on the entire Property (224 mg/kg)—but, this soil was not tested for hexavalent chromium. *Id.* |
| | The failure to test for hexavalent chromium is inexplicable—particularly when there are at least 2 documented discharges of hexavalent chromium to the soil and/or groundwater of the Property. Mutch Report, Jan. 14, 2021, at 7-13 (citing 1970 discharge of waste containing <u>975,000</u> times more than the health-protective level amounts of hexavalent chromium and 1988 discharge from clarifiers to the street). Contaminated waste water from the clarifiers and other sources were disposed of—for decades—to a storm drain/flood control channel before the Property was connected to sewers. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Mutch Report, Jan. 14, 2021, at 7-7.<br><br>The ESL for arsenic in soil was exceeded at several locations at the Property from 2 feet to 35 feet bgs, which is indicative of release of arsenic from operations on the Property to the subsurface. *Id.* at 7-13. Because of the inadequacy and sparseness of the monitoring well network at the Property, arsenic impacts to groundwater may not be identifiable. *Id.* at 7-14.<br><br>Despite minimal investigations on the Property, the data that was obtained reveals the extent of groundwater contamination. *Id.* at 7-14. PCE was found in monitoring wells in the vicinity of the clarifiers, where vadose zone soil samples showed penetration of PCE to the depth of the groundwater table. *Id.* This indicates a contribution of PCE to groundwater from the Property. *Id.* Additionally, some higher levels of hexavalent chromium were found in MW-1, MW-1D, and MW-3 in the middle of the Property near the clarifiers than in MW-2, establishing releases of hexavalent chromium from the clarifiers, resulting in groundwater contamination. *Id.* at 7-14 and 7-17. TCE, a "daughter" product of PCE, is found in concentrations higher in MW-1D, MW-3, and MW-4 than in MW-2. *Id.* at 7-17. Concentrations exceeding groundwater ESLs were measured for |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | 1,1-dichloroethene, carbon tetrachloride, chloroform, tetrachloroethene (PCE), trans-1,2-dichloroethene, trichloroethene (TCE), chromium (total), chromium VI, nickel, and vanadium. *Id.*<br><br>Soil gas concentrations in excess of soil gas ESL values were noted for benzene, carbon tetrachloride, chloroform, PCE and TCE. *Id.* The spatial distribution of the PCE and TCE soil gas contamination, along with the shallow soil contamination, indicates that the PCE and TCE came from releases on the Property and not from off-gassing from the underlying groundwater. *Id.* Thus, the contaminated soil gas would serve as a source of OU2 groundwater contamination as it partitioned from the soil gas to recharging groundwater. *Id.*<br><br>PCE, TCE, and chromium, as well as other hazardous substances, have all been identified as present in the subsurface at levels about soil screening levels, meaning that these substances are present in soils at the Patsouras Property at levels that exceed those considered protective of groundwater. *See* Valenzuela Decl., Exs. 5, at 43-45 (Professional Service Industries, Phase II Preliminary Contamination Assessment, Aug. 18, 1994, at 13 & Table 3); 9, at 85-88 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, Table |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | 1); 10, at 98-103 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 1); Mutch Report, Jan. 14, 2021, Tables 3-1, 7-4. |
| | The Santa Fe Springs Fire Department, Environmental Services Division, found that "historic Palley site operations contamination probably contributed to the VOC portion " of groundwater contamination at the property. *See* Opp'n RFJN, Ex. 21, at 146-147 (Steve Chase, Santa Fe Springs Fire Department, Environmental Services Division, Memorandum to Dave Klunk, Director, Environmental Services Division, Santa Fe Springs Fire Department, Sept. 29, 1997). Mr. Chase further advised that groundwater at the property was first encountered at 35 feet bgs, and "PCE was found in a [soil] column" from 10 feet bgs to 35 feet bgs. *Id.* |
| | Even Defendants' expert admits that contamination to groundwater from 1970 hexavalent chromium discharge to ground may have moved off property by now). *See* Valenzuela Decl., Ex. 15, at 172 (J. Kulla Dep. Tr. at 119: 5-21). |
| | Chromium, PCE, and TCE have been detected in the subsurface soils at the Property, and these same substances are in OU-2 Groundwater below and downgradient of the Property. *See* |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Valenzuela Decl., Exs. 5, at 43-45 __ (Professional Service Industries, Phase II Preliminary Contamination Assessment, Aug. 18, 1994, at 13 & Table 3); 9, at 85-88 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, Table 1); 10, at 98-103 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 1); 11, at 109-114 (Environmental Audit, Inc., Third Quarter 2013 Ground Water Monitoring Report, Oct. 23, 2013, Tables 2, 3); Mutch Report, Jan. 14, 2021, Tables 3-1, 7-4 and 7-5.<br><br>The entire OU-2 Groundwater area lies in a recharge area defined as an area where water from precipitation and other shallow water sources, such as leaking sewers and clarifiers, reaches the underlying groundwater from surface infiltration. *See* Mutch Report, Jan. 14, 2021, 2-4 to 2-8. |

224.  Moving Parties' Response

    This a simply a statement of *BEA's* conclusion.  The BEA document says what it says, and Plaintiffs do not dispute that it says what it says.  Instead, they re-argue their Opposition.  The fact that BEA's report says what it says is undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken.

| 225. BEA concluded that the concentrations of petroleum and solvents identified in 1994 "had insufficient mass for vertical migration, | **Response:** Disputed.<br><br>**Evidence:** As discussed in response to #223, "[i]t is well-recognized that |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| with sorption and desorption, in excess of a few feet." <br><br> Supporting Evidence: Id. | infiltrating moisture in the vadose zone can follow complex pathways because of capillary action and complex lithologies." Mutch Report, Jan. 14, 2021, at 7-11. "Assuming purely vertically-downward migration in the vadose zone is a perilous and often incorrect assumption." *Id.* "[O]ne cannot reliably define the vertical extent of contamination in the vadose zone with a single boring. What may appear in a single borehole to be the base of the contamination may simply indicate that the plume has been diverted laterally due to lithologic variability and is now outside the vertical trajectory of the boring." *Id.* <br><br> Additionally, such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference. |

225.   Moving Parties' Response

    This a simply a statement of *BEA's* conclusion.  The BEA document says what it says, and Plaintiffs do not dispute that it says what it says.  Instead, they re-argue their Opposition.  The fact that BEA's report says what it says is undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken.

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 226. BEA concluded that "intrinsic biodegradation and weathering has removed all measurable solvents and continues to remove the petroleum hydrocarbons." <br><br> Supporting Evidence: Id. | **Response:** Disputed. <br><br> **Evidence:** The entire OU-2 Groundwater area lies in a recharge area defined as an area where water from precipitation and other shallow water sources, such as leaking sewers and clarifiers, reaches the underlying groundwater from surface infiltration. *See* Mutch Report, Jan. 14, 2021, 2-4 to 2-8. <br><br> Defendants' expert admits that contamination to groundwater from 1970 hexavalent chromium discharge to ground may have moved off property by now. *See* Valenzuela Decl., Ex. 15, at 172 (J. Kulla Dep. Tr. at 119: 5-21). |

226. Moving Parties' Response

    This a simply a statement of *BEA's* conclusion. The BEA document says what it says, and Plaintiffs do not dispute that it says what it says. Instead, they re-argue their Opposition. The fact that BEA's report says what it says is undisputed. The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken.

| | |
|---|---|
| 227. BEA concluded that "no mass of petroleum hydrocarbons and no measurable mass of chlorinated solvents are present in the soil column with capability for migration to the groundwater by moisture migration through adsorption and partitioning." <br><br> Supporting Evidence: Id. | **Response:** Disputed. <br><br> **Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 227.  Moving Parties' Response<br><br>     This a simply a statement of *BEA's* conclusion.  The BEA document says what it says, and Plaintiffs do not dispute that it says what it says.  Instead, they re-argue their Opposition.  The fact that BEA's report says what it says is undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken. ||
| 228.  BEA concluded that "[N]o further action is recommended based upon the very low levels of hazardous materials identified in site testing in 1994 and confirmed in 2006."<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference. |
| 228.  Moving Parties' Response<br><br>     This a simply a statement of *BEA's* conclusion.  The BEA document says what it says, and Plaintiffs do not dispute that it says what it says.  Instead, they re-argue their Opposition.  The fact that BEA's report says what it says is undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken. ||
| 229. EAI concluded that the majority of the soil contamination at the Patsouras Property "is heavy end petroleum product."<br><br>Supporting Evidence: Environmental Audit, Inc., "Remedial Action Plan, 11630-11700 Burke Street," June 16, | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1997, at PTSF00022451; Ex. H to the Declaration of William D. Wick | reference. |

229.  Moving Parties' Response

This a simply a statement of *EAI's* conclusion.  The EAI document says what it says, and Plaintiffs do not dispute that it says what it says.  Instead, they re-argue their Opposition.  The fact that EAI's report says what it says is undisputed.  The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken. .

| 230.  EAI concluded that "TGPH-G, TPH-D, and TPH-O have never been identified in ground water" at the Patsouras Property.  "Chlorinated compounds are not generally identified in soil at the Site but are present in ground water at concentrations that are consistent with the regional impact to ground water (see Section 3.0).  In EAI's opinion the chlorinated compounds detected in ground water at the Site are not the result of former site activities."<br><br>Supporting Evidence: Environmental Audit, Inc., "Updated Site Conceptual Model and Request for Low Risk Closure," June 17, 2010, at p. 21, at PTFS00024533; Ex. D to the Declaration of William D. Wick | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference.<br><br>PCE and TCE have been identified in the groundwater at the Property. Wick Decl., Ex. I, at 1 (Covenant and Environmental Restriction on Property recorded Oct. 12, 2016).<br><br>The hexavalent chromium on the Property is not derived from groundwater from other properties. Mutch Report, Jan. 14, 2021, at 7-16. In the first hexavalent chromium water analysis performed (February 2009), the highest levels of hexavalent chromium were found in monitoring wells in the middle of the Patsouras |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Property. *Id*. The nearest monitoring wells from adjacent properties are cross-gradient and were non-detect for hexavalent chromium, indicating that the hexavalent chromium on the Property did not migrate from other properties. *Id*. |

230. Moving Parties' Response

This a simply a statement of *EAI's* conclusion. The EAI document says what it says, and Plaintiffs do not dispute that it says what it says. Instead, they re-argue their Opposition. The fact that EAI's report says what it says is undisputed. The Court should disregard Plaintiffs' assertion that this fact is disputed and their response should be stricken.

| 231. On Sept. 15, 2016, Regional Board Executive Officer Samuel Unger executed the Covenant and Environmental Restriction on Property for the Patsouras Property.<br><br>Supporting Evidence: Covenant and Environmental Restriction; Ex. I to the Declaration of William D. Wick | **Response:** Undisputed. |

231. Moving Parties' Response

No Response as Paragraph 231 is undisputed.

| 232. The Covenant and Environmental Restriction approved by and for the benefit of the Regional Board stated as follows: "Chlorinated solvent compounds present in the groundwater beneath the Site appear to be consistent | **Response:** Disputed as incomplete.<br><br>**Evidence:** The cited document states that the Regional Board "has determined that the [Patsouras] Property is not suitable for unrestricted |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| with the site area regional chlorinated solvent impacts; no dissolved or free phase total petroleum hydrocarbons have been detected in the groundwater."<br><br>Supporting Evidence: Id. | use and that a land use restriction is necessary for the protection of present or future human health, safety, or the environment as a result of the presence of hazardous materials as defined in Section 25260 of the Health and Safety Code in the soil, soil gas, and groundwater at the [Patsouras] Property." Wick Decl., Ex. I at 1 (Covenant and Environmental Restriction on Property recorded Oct. 12, 2016). This Covenant also notes that both PCE and TCE have been found in groundwater sampling on the property. *Id.* at 3. In fact, it states that PCE was found in the groundwater at the level of 18.2 ug/L, more that three times higher than that allowed by the California Maximum Contaminant Level of 5 ug/L. *Id.* |

232.  Moving Parties' Response

Plaintiffs' do not dispute that the quoted statement from the Covenant and Environmental Restriction is in the document.  Instead, they add additional statements from the document.  Thus, Plaintiffs' "disputed" response is without merit.  Moving Parties cite an accurate excerpt from the Covenant and Environmental Restriction approved by the Regional Water Quality Control Board.  Plaintiffs insert extraneous and irrelevant additional information to confuse and mislead the Court.  These additional statements should be stricken. The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 233. On October 12, 2016, the Covenant and Environmental Restriction was recorded in the Official Records of the Los Angeles County Recorder's Office. | **Response:** Undisputed. |
|---|---|

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Supporting Evidence: Id. | |

233.   Moving Parties' Response

No Response as Paragraph 233 is undisputed.

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 234.  On Jan. 4, 2017, the Regional Board issued a "No Further Action" Letter to Kekropia for the Patsouras Property.<br><br>Supporting Evidence: Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017; Ex. B to the Declaration of William D. Wick | **Response:** Undisputed but immaterial.<br><br>**Evidence:** While it is uncontroverted that the referenced letter was sent to Kekropia, the Regional Board limited the findings that it made. Specifically, the referenced letter states: "Please note that by issuing this NFA letter, the Regional Board has not made a determination as to whether discharges of waste to regional groundwater occurred as a result of historical activities at the Site." Valenzuela Decl., Ex. 16, at 176 (Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, at 3). |

234.   Moving Parties' Response

Plaintiffs' response is without merit.  This is a statement of the Regional Board's action.  The evidence stands that the Regional Water Quality Control Board issued a "No Further Action" letter for the Patsouras Property and instructed the property owner to remove the monitoring wells on the site indicating that it did not expect any further investigation or remediation at the Property.  Plaintiffs insert extraneous and irrelevant statements to confuse the Court and the additional statement should be stricken.

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 235. The Regional Board concluded that the activities at the Patsouras Property resulted "in the cleanup or | **Response:** Undisputed but immaterial. |

MOVING DEFENDANTS' RESPONSE TO
STATEMENT OF GENUINE DISPUTES

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| abatement of wastes to assure protection of human health and the waters of the State at and near the Site for their beneficial use."<br><br>Supporting Evidence: Id. at p.3. | **Evidence:** CH2M Hill also concluded that "because [OU-2] flows under a densely developed commercial – industrial area, there are additional facilities whose releases of hazardous substances have reached groundwater and become commingled with the Omega contamination." Hagstrom Decl., Dkt. 902-47, Ex. A, at 6 (CH2M HILL, Final Remediation Investigation/Feasibility Study Reports, Aug. 2010, at 8-4). |

235. Moving Parties' Response

   Plaintiffs' response is without merit and is irrelevant. This is a statement of the Regional Board's conclusion. The evidence stands that the Regional Board reached a conclusion that cleanup and abatement has occurred at the Patsouras Property to assure protection of human health and the waters of the State. Plaintiffs insert extraneous and irrelevant statements to confuse the Court and the additional statement should be stricken.

| | |
| --- | --- |
| 236. The Regional Board determined that there was no reason to monitor groundwater at the Property and required Kekropia to decommission, abandon, and destroy all monitoring wells on the Property.<br><br>Supporting Evidence: Id. | **Response:** Undisputed. |

236. Moving Parties' Response

   No Response as Paragraph 236 is undisputed.

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 237.  EPA's consultant, CH2M Hill, concluded that the former Omega Chemical facility is the main source of groundwater contamination at OU2.<br><br>Supporting Evidence: Final Remediation Investigation/Feasibility Study Reports Omega Chemical Corporation Superfund Site Operable Unit 2 Los Angeles County, California, Volume 1, CH2M HILL, Aug. 2010, § 8.1.2, p. 8-4; Ex. J to the Declaration of William D. Wick | **Response:** Undisputed, but immaterial.<br><br>**Evidence:** CH2M Hill also concluded that "because [OU-2] flows under a densely developed commercial – industrial area, there are additional facilities whose releases of hazardous substances have reached groundwater and become commingled with the Omega contamination. Hagstrom Decl., Dkt. 902-47, Ex. A, at 6 (CH2M HILL, Final Remediation Investigation /Feasibility Study Reports, Aug. 2010). |

237.   Moving Parties' Response

        This is a statement of EPA's consultant's conclusion.  Plaintiffs' response and additional supporting evidence is non-responsive to the evidence provided by the moving party.  The evidence stands that EPA's consultant has concluded that the Omega Facility is the main source of groundwater contamination at OU-2. Plaintiffs cannot dispute this, so they respond with additional, irrelevant statements that should be disregarded and stricken by the Court.

| | |
|---|---|
| 238.  The Final Remedial Investigation Report by the US EPA environmental consultant, CH2M Hill, identified properties located over the OU-2 groundwater plume which were sources of chlorinated VOCs (PCE, TCE, 1,1,-DCE) to groundwater, but did not not identify the Patsouras Property as an on-going or historical source of these VOCs to the groundwater.<br><br>Supporting Evidence: Id., § 5.5, pp. 5-12 to 5-30. | **Response:** Undisputed but immaterial. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 238. Moving Parties' Response<br><br>This evidence is not immaterial. EPA's own consultant did *not* include the Patsouras Property as an on-going or historical source of VOCs to the OU-2 groundwater. This fact does not become immaterial simply because Plaintiffs deem it so. | |
| 239. The Final Remedial Investigation Report by the US EPA environmental consultant, CH2M Hill, identified properties located over the OU-2 groundwater plume which were sources of non-chlorinated VOCs to groundwater, but did not identify the Patsouras Property as an on-going or historical source of these VOCs to the groundwater.<br><br>Supporting Evidence: Id., § 5.5, pp. 5-12 to 5-30. | **Response:** Undisputed. |
| 239. Moving Parties' Response<br><br>No Response as Paragraph 239 is undisputed. | |
| 240. From 1994 through 2010, at least 123 soil samples were taken on the West Parcel of the Patsouras Property.<br><br>Supporting Evidence: Expert Report of Dr. Jean Kulla; Ex. K to the Declaration of William D. Wick | **Response:** Disputed.<br><br>**Evidence:** This statement is supported solely by the report of Defendants' "expert," Dr. J. Kulla. However, Dr. Kulla's opinions are unreliable, as she appears not to be aware of, or have evaluated, critical facts that might have informed her opinion. She testified that she knew PCE and TCE were in the soil at the Patsouras Property, but she |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | does not know how those substances came to be located in the soil or ever analyzed this issue. *See* Valenzuela Decl., Ex. 15, at 156-158 (J. Kulla Dep. Tr. at 69:24-70:11; 72:11-21). She did not even analyze whether contamination from historic Palley site operations may have contributed VOCs to OU-2 Groundwater contamination or whether Globe Oil released hazardous substances on the Patsouras property. *Id.*, at 152-153,_167 (J. Kulla, Dep. Tr. at 50:17-51:2; 83:11-23). |
| | Dr. Kulla was similarly unknowledgeable about Globe Oil's operations. She did not know how Globe handled waste water or what was in it. *Id.*, at 150-151 (J. Kulla, Dep. Tr. at 46:12-20; 49:11-13). Dr. Kulla also believed that Globe Oil operated at the property for only four years, from 1968 to 1972. *Id.,* at 146 (J. Kulla, Dep. Tr. at 37:3-9). She did not know that Globe Oil had been operating at the property for over thirty years. *See* Plaintiffs' response to Defendants' statement #206, which is incorporated herein by reference. Such holes in Dr. Kulla's knowledge of the property leads her to flawed and unreliable conclusions. |

240. Moving Parties' Response

   Plaintiffs' "Evidence" is non-responsive to the uncontroverted fact stated in Paragraph 240 which refers to *factual data* regarding the number of soil samples

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| taken at the Patsouras Property. Plaintiffs' response and the extraneous statements are irrelevant to this fact, are confusing, misleading and should be disregarded and stricken by the Court. The Court should disregard Plaintiffs' assertion that this fact is disputed. | |
| 241. No PCE, TCE, chloroform, or 1-1-dichloroethene were detected in any of the 123 soil samples taken on the West Parcel between 1994 and 2010.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** As stated in the responses to #223 and #224 (which are incorporated herein), testing performed at the Property was inadequate and, largely, did not test for VOCs or hexavalent chromium. Though insufficient, testing at the B-7 and E-9 borings found PCE and TCE. Mutch Report, Jan. 14, 2021, at 7-9 to 7-14. The data indicates that PCE and TCE were transported through the vadose zone to the historic elevation of the groundwater table and impacted the groundwater. Id. Any tests that are claimed not to have shown the presence of TCE, PCE, hexavalent chromium or other VOCs, did not test for these substances—despite evidence of significant releases of hazardous substances to the soil of the Property. *Id*.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **241. Moving Parties' Response**<br><br>Paragraph 241 states a simple factual statement based on actual data. Plaintiffs cannot dispute this so they include non-responsive and irrelevant statements regarding the adequacy of testing at the Patsouras Property and improperly call in to question Dr. Kulla's opinions.  In fact, this is not an opinion of Dr. Kulla's but a factual statement based on data which Plaintiffs cannot dispute.<br><br>Moving Parties also include their response to Paragraphs 223, 224 and 240 as though incorporated herein.  The Court should disregard Plaintiffs' assertion that this fact is disputed. | |
| 242.  CAM metals in soils, including total chromium, were within background levels for regional soils (i.e., within the range of concentrations normally found in natural, uncontaminated soil) in all of the 123 samples taken on the West Parcel between 1994 and 2010.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** Dr. Kulla opines that 71.1 mg/kc for total chromium is only "slightly above background levels"—though she never says what the "background levels" are. *See* Jean B. Kulla, Expert Opinion on the Patsouras Property ("Kulla Report"), at 3. According to the U.S. Geological Survey, background levels of total chromium roughly range from 30 to 36 mg/kg. *See* Smith, D.B. et al., U.S.G,.S., Geochemical and Mineralogical Data for Soils of the Conterminous United States: U.S. Geological Survey Data Series 801, 19. Defendant's consultant reported background levels of total chromium at and near defendant Phibro-Tech, Inc.'s facility were 20 to 24 mg/kg. *See* Cohen Decl., Ex. 18, at 343_ (Camp Dresser & McKee Inc., RCRA Facility |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Investigation Phase II Report, Apr. 23, 1993, Table 4-1). It reports background levels of hexavalent chromium at and near its facility range from 1 to 2 mg/kg. *Id*.

Additionally, such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference.

Patsouras' expert misstates the background levels for arsenic. Kulla contends that the level of arsenic which is "characteristic of background for regional soils" is 55 mg/kg. *See* Kulla Report, at 3. According to the California Department of Toxic Substances Control, the background level for arsenic is several times lower, namely, 12 mg/kg. *See* G. Chernoff et al., Dept. of Toxic Substances Control, Determination of a Southern California Regional Background Arsenic Concentration in Soil, at 1. The ESL for arsenic in soil was exceeded at several locations at the Property from 2 feet to 35 feet bgs, which is indicative of release of arsenic from operations on the Property to the subsurface. *Id*. at 7-13. Because of the inadequacy and sparseness of the monitoring well network at the Property, arsenic |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | impacts to groundwater may not be identifiable. *Id*. at 7-14.<br><br>Soil gas concentrations in excess of soil gas ESL values were noted for PCE and TCE. *See* Valenzuela Decl., Ex. 9, at 82, 89-93 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 11 & Tables 8, 9); Mutch Report, Jan. 14, 2021, Table 7-6. Sampling of soil vapor shows a pattern of elevated concentrations of soil gas PCE, as well as other chlorinated VOCs such as TCE (a daughter product of PCE), that are localized in a part of the Property with high PCE soil levels, signifying a definitive onsite source of these hazardous substances. Mutch Report, Jan. 14, 2021, at 7-17 to 7-18.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

242.   Moving Parties' Response

    The Regional Water Quality Control Board determined that metals in soils at the Property were within background levels and chromium and arsenic were dropped as contaminants of concern.

    Chromium concentrations in all samples were within the background

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| concentration levels normally found in uncontaminated soil, except for one sample.  That one outlier sample was found at two feet and was only slightly above the background level.  Moreover, because the heavy petroleum residues in Property soil have rendered the soil anoxic, the resulting reducing conditions convert any hexavalent chromium into trivalent chromium (a harmless substance consumed safely and often by humans). Wick Decl., Exh. C (Dr. Kulla Rebuttal of Mutch Expert Report at 7).  The arsenic concentrations found in the soil were within background levels for regional soils as well.  EAI so concluded, using the EPA-approved software to determine that the 95% confidence level for arsenic detected in soil at the Property was 12.99 mg/kg, which "is very close to (within the range of) the 12 mg/kg background concentration determined acceptable by DTSC for LAUSD school sites, one of DTSC's most sensitive (restrictive) land uses." (Wick Decl., Exh. B, excerpt from EAI, 2010 Updated Site Conceptual Model, PTDS00024525-26.)  These facts are undisputed and Plaintiffs' response should be stricken. Plaintiffs' response about PCE is immaterial to this material fact, which is only about metals. | |
| 243.  From 1994 through 2010, at least 137 soil samples were taken on the East Parcel of the Patsouras Property.  Supporting Evidence: Id. | **Response:** Undisputed. |
| 243.   Moving Parties' Response  No Response as Paragraph 243 is undisputed. | |
| 244. PCE and TCE were detected in only a couple of soil samples at very low concentrations in the 137 soil samples taken on the East Parcel between 1994 and 2010. | **Response:** Disputed.  **Evidence:** As stated in the responses to ## 223-224 and 241-242, testing performed at the Property was inadequate and, largely, did not test for |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Supporting Evidence: Id. | VOCs or hexavalent chromium. For sake of brevity, Plaintiffs incorporate by reference their responses to ## 223-224 and 241-242, as though set forth fully herein.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |
| 244.   Moving Parties' Response<br><br>    Plaintiffs' response is not responsive to Paragraph 244. Paragraph 244 is a statement of fact based on data about PCE and TCE in Property soil samples. Plaintiffs do not dispute the factual statement in their response. Plaintiffs' response about extraneous issues should be stricken.<br><br>    Moving Parties incorporate their responses to Paragraphs 223-224 and 241-242 herein. The Court should disregard Plaintiffs' assertion that this fact is disputed. | |
| 245.  The maximum concentration of PCE was 0.51 mg/kg and of TCE was 0.27 mg/kg in the 137 soil samples taken on the East Parcel between 1994 and 2010.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** As stated in the responses to ## 223-224 and 241-242 and 244, testing performed at the Property was inadequate and, largely, did not test for VOCs or hexavalent chromium. For sake of brevity, Plaintiffs incorporate by reference their responses to ## 223-224 and 241-242, and 244 as though set forth fully herein. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

245.   Moving Parties' Response

     Plaintiffs' response is not responsive to Paragraph 245.  Paragraph 245 is a statement of fact based on data about the maximum concentrations of PCE and TCE detected in Property soil samples.  Plaintiffs do not dispute the factual statement in their response.  Plaintiffs' response about extraneous issues should be stricken.

     Moving Parties incorporate their responses to Paragraphs 223-224 and 241-242 herein.  The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 246.  No chloroform or 1,1-dichloroethene (1,1-DCE) were detected in the 137 soil samples taken on the East Parcel between 1994 and 2010.<br><br>Supporting Evidence: Id. | **Response:** Undisputed. |

246.   Moving Parties' Response

     No Response as Paragraph 246 is undisputed.

| 247.  CAM metals in soils were within background levels for regional soils (i.e., within the range of concentrations | **Response:** Undisputed. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| normally found in natural, uncontaminated soil) in all of the 137 samples taken on the East Parcel between 1994 and 2010, with the exception of one chromium sample slightly above background levels (71.1. mg/kg) found at two feet below ground surface and lead found in some stockpiled soil.<br><br>Supporting Evidence: Id. | |

247. Moving Parties' Response

    No Response as Paragraph 247 is undisputed.

| 248. Methylene chloride (8.27 mg/kg), naphthalene (4.31 mg/kg), and lead (51,600 mg/kg) were found in one stockpiled soil sample, and the stockpiled soil has been removed from the Property.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** The sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

248. Moving Parties' Response

    Plaintiffs' response is wholly non-responsive to the uncontroverted fact and supporting evidence in Paragraph 248. Paragraph 248 simply provides a factual statement based on actual data. Plaintiffs' statement that this fact is based solely on Dr. Kulla's opinion is incorrect and baseless. Plaintiffs cannot credibly dispute this fact. The Court should disregard Plaintiffs' assertion that this fact is

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| disputed. | |
| 249. There is no evidence that the very low concentrations of PCE, TCE or other hazardous substances found in soil have migrated at least 35 feet to the OU-2 groundwater.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |
| 249. Moving Parties' Response<br><br>    Plaintiffs' response to uncontroverted fact is without merit and non-responsive this fact. Testing and data at the Patsouras Property supports the fact in Paragraph 249. Further, Plaintiffs' statements regarding the validity of Dr. Kulla's opinions is without merit.<br><br>    Moving Parties incorporate their responses to Paragraphs 223-224 and 240 herein. The Court should disregard Plaintiffs' assertion that this fact is disputed. | |
| 250. Groundwater monitoring was performed on the Property from 1995 through 2013 for petroleum hydrocarbons, VOCs, and metals. | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Supporting Evidence: Id. | inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

250.   Moving Parties' Response

Plaintiffs' response and supporting "evidence" is wholly meritless. Paragraph 250 states the simple fact that groundwater monitoring was performed on the Patsouras Property in a certain date range.  Plaintiffs do not dispute that fact.  Plaintiffs' "dispute" is without merit and should not be considered by the Court.

Moving Parties incorporate their response to Paragraph 240 herein.  The Court should disregard Plaintiffs' assertion that this fact is disputed.

| | |
|---|---|
| 251.  No petroleum hydrocarbon compounds have been found in groundwater beneath the Property even though petroleum hydrocarbons were detected in Property soil.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:**  Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

251. Moving Parties' Response

Plaintiffs' response and supporting "evidence" is wholly meritless. Paragraph 251 states the simple fact that no petroleum hydrocarbon compounds have been found in groundwater beneath the Patsouras Property. This is a fact based on data that Plaintiffs cannot dispute and do not actually dispute in their response. Plaintiffs' "dispute" is without merit and should not be considered by the Court.

Moving Parties incorporate their response to Paragraph 240 herein. The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 252. Toluene and xylene were detected in only trace amounts (below their respective Maximum Contaminant Levels) only in one well in one sampling episode.<br><br>Supporting Evidence: Id. | **Response:** Undisputed. |

252. Moving Parties' Response

No Response as Paragraph 252 is undisputed.

| 253. All metals detected in groundwater were below their | **Response:** Disputed. |

MOVING DEFENDANTS' RESPONSE TO STATEMENT OF GENUINE DISPUTES

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| respective MCLs, including arsenic and hexavalent chromium, with the exception of one sample of 11.8 ug/L hexavalent chromium (slightly above the 10 ug/L conservative MCL used by California).<br><br>Supporting Evidence: Id. | **Evidence:** Despite minimal investigations on the Property, the data that was obtained reveals the extent of groundwater contamination. Mutch Report, at 7-14. PCE was found in monitoring wells in the vicinity of the clarifiers, where vadose zone soil samples showed penetration of PCE to the depth of the groundwater table. *Id.* This indicates a contribution of PCE to groundwater from the Property. *Id.* Additionally, some higher levels of hexavalent chromium were found in MW-1, MW-1D, and MW-3 in the middle of the Property near the clarifiers than in MW-2, establishing releases of hexavalent chromium from the clarifiers, resulting in groundwater contamination. *Id.* at 7-14 and 7-17. TCE, a "daughter" product of PCE, is found in concentrations higher in MW-1D, MW-3, and MW-4 than in MW-2. *Id.* at 7-17. Concentrations exceeding groundwater ESLs were measured for 1,1-dichloroethene, carbon tetrachloride, chloroform, tetrachloroethene (PCE), trans-1,2-dichloroethene, trichloroethene (TCE), chromium (total), chromium VI, nickel, and vanadium. *Id.*<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

253. Moving Parties' Response

Plaintiffs' response does not rebut the data that supports the fact stated in Paragraph 253. Paragraph 253 is a statement of *fact* based on *data* about metals in groundwater. Plaintiffs' response and supporting "evidence" is wholly meritless as it focuses on PCE, which is not a metal and has nothing to do with the facts in 253, and should be disregarded by the Court. The Court should strike Plaintiffs' response and disregard Plaintiffs' assertion that this fact is disputed.

| 254. The predominant VOC contaminants found in the OU-2 groundwater underlying the Property at concentrations above their respective MCLs were carbon tetrachloride (CT), PCE, and TCE. Other volatiles, including chloroform and 1,1-DCE, were below their MCLs.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

254. Moving Parties' Response

Plaintiffs' response does not rebut the *data* that supports the *fact* stated in

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Paragraph 254. Plaintiffs' response and supporting "evidence" is wholly meritless and should be disregarded by the Court.<br><br>Moving Parties incorporate their responses to Paragraphs 223-224 and 240 herein. The Court should disregard Plaintiffs' assertion that this fact is disputed. | |
| 255. A significant line of evidence in evaluating whether a property is a source of hazardous substances to groundwater is a comparison of the concentrations of a chemical in an upgradient well with the concentrations in an on-property well.<br><br>Supporting Evidence: Id. | **Response:** Undisputed. |
| 255. Moving Parties' Response<br><br>No Response as Paragraph 255 is undisputed. | |
| 256. The concentrations of carbon tetrachloride (CT) in wells upgradient of the Patsouras Property were greater than or similar to the concentrations in wells on the Property in all samples in the groundwater sampling from 2009-2013, except for a single sample of 10.4 ug/L in 2013.<br><br>Supporting Evidence: Id. | **Response:** Undisputed. |
| 256. Moving Parties' Response<br><br>No Response as Paragraph 256 is undisputed. | |
| 257. The concentrations of PCE in wells upgradient of the Patsouras | **Response:** Disputed. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Property were greater than or similar to the concentrations in wells on the Property in all samples in the groundwater sampling from 2009-2013, except for a single sample of 18.2 ug/L in 2013.<br><br>Supporting Evidence: Id. | **Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference. Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

257.  Moving Parties' Response

Plaintiffs' response does not rebut the *data* that supports the *fact* stated in Paragraph 257.  Plaintiffs' response and supporting "evidence" is wholly meritless and should be disregarded by the Court.

Moving Parties incorporate their responses to Paragraphs 223-224 and 240 herein.  The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 258.  The concentrations of TCE in wells upgradient of the Patsouras Property were greater than or similar to the concentrations in wells on the Property in all samples in the groundwater sampling from 2009-2013, except for a single sample of 21.7 ug/L in 2012.<br><br>Supporting Evidence: Id. | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Defendant's statements ## 223-224 which are incorporated herein by reference. |

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

258.    Moving Parties' Response

Plaintiffs' response does not rebut the *data* that supports the *fact* stated in Paragraph 258.  Plaintiffs' response and supporting "evidence" is wholly meritless and should be disregarded by the Court.

Moving Parties incorporate their responses to Paragraphs 223-224 and 240 herein.  The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 259.  In 2009, a soil gas vapor survey was conducted on the West Parcel of the Property at depths of 5 and 15 feet below ground surface.<br><br>Supporting Evidence: Id. | **Response:** Undisputed. |

259.    Moving Parties' Response

No Response as Paragraph 259 is undisputed.

| 260.  The results of the 2009 soil gas vapor survey showed only very minor amounts of PCE and TCE in soil gas, with the lowest concentrations found in the shallow 5-foot samples relative to higher concentrations in the deeper 15-foot samples. | **Response:** Disputed.<br><br>**Evidence:** Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to |

Exhibit A
59

MOVING DEFENDANTS' RESPONSE TO
STATEMENT OF GENUINE DISPUTES

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Supporting Evidence: Id. | Defendant's statements ## 223-224 which are incorporated herein by reference.

Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' statement # 240 which is incorporated herein by reference. |

260.   Moving Parties' Response

Plaintiffs' response does not rebut the *data* that supports the *fact* stated in Paragraph 260.  Plaintiffs' response and supporting "evidence" is wholly meritless and should be disregarded by the Court.

Moving Parties incorporate their responses to Paragraphs 223-224 and 240 herein.  The Court should disregard Plaintiffs' assertion that this fact is disputed.

| 261. The data indicate that PCE, TCE, and other minor VOCs are volatilizing off the OU-2 groundwater plume due to an upward diffusion process governed by Fick's law.

Supporting Evidence: EAI, 2010, at 17-18; Ex. D and Ex. K to the Declaration of William D. Wick | **Response:** Disputed.

**Evidence:** The spatial distribution of the PCE and TCE soil gas contamination, along with the shallow soil contamination, indicates that the PCE and TCE came from releases on the Property and not from off-gassing from the underlying groundwater. Mutch Report, at 7-14 to 7-17. |

261.   Moving Parties' Response

Plaintiffs' "evidence" is support its dispute against Paragraph 261 is

| MOVING DEFENDANTS' UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |

without merit. As for soil gas concentrations, the spatial distribution of the PCE and TCE soil gas, with the higher concentrations found in the 15 ft bgs samples and the lower concentrations in the shallower 5 ft bgs, indicate degassing off of a deeper source of contamination (i.e., the contaminated OU-2 groundwater), not shallow soil contamination as claimed by Mr. Mutch. Second, the discrete soil testing on the West Parcel showed no signs of shallow soil contaminated with PCE and TCE. In fact, in numerous investigations on the West Parcel, no chlorinated or volatile organic chemicals were detected in any of the discreet soil samples (see Table 2, Kulla Expert Report). (Id. at 8.) Additional soil vapor sampling was done on the West Parcel of the Patsouras Property. No volatile organic compounds were detected in any of the discreet soil samples. (The analytical detection limit was less than 0.005 mg/kg in all samples). These results confirmed that there was no discreet soil source of PCE or TCE (or any other volatile organic compound) in the soil on the West Parcel. Therefore, EAI concluded and the RWQCB agreed that the soil gas vapor measured on the West Parcel of the Patsouras Property resulted from degassing off the contaminated OU-2 groundwater plume. (Id. at 9.) An exceedance of the SFB ESLs in soil gas is not relevant to the evaluation of the partitioning of soil gas to groundwater as Mr. Mutch proposes. The ESLs in soil gas were derived and are relevant (according to SFB RWQCB) to the evaluation of the risk of soil gas vapors migrating into homes and buildings, causing toxic vapors in indoor air, and thus posing an inhalation impact to humans. On the Patsouras Property, the soil gas vapor survey was conducted under the direction of the RWQCB, for just for that reason—to determine if there would be a risk of soil gas vapor intrusion into a new building planned on the West Parcel. Soil gas vapor data was used in the site-specific model to evaluate the risk of vapor intrusion into a future building. The model information was documented and submitted to the RWQCB and the California Office of Environmental Health Hazard Assessment (OHHEA), and those agencies found no significant risk. (Id. at 9-10.) The Court should disregard Plaintiffs' assertion that this fact is disputed.



| | |
|---|---|
| **F.     Patsouras Property** | |
| **33.**     Kekropia Inc., a California corporation, has owned the real property at 11630 – 11700 Burke Street in Santa Fe Springs, California (the "Patsouras Property") from 1995 to the present.<br><br>**Supporting Evidence:**<br><br>Answer of Kekropia, Inc. to Fifth Am. Compl. (Docket No. 563) ¶¶ 93, 342<br><br>Lintecum Decl., Ex. 72, at pp. 4,170, 4,182, 4,182, 4,186, 4,188 (L. Patsouras Dep. Tr. 7:13-20, 19:20-24, 23:12-19, 25:4-8) | **33.**     Admit. |
| **34.**     One or more hazardous substances, including chromium, PCE, and TCE, have been detected in the soil at the Patsouras Property.<br><br>**Supporting Evidence:**<br><br>*Detections in soil above soil screening levels* | **34.**     Not disputed. |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| Lintecum Decl., 74, at p. 4,334-36 (Professional Service Industries, Phase II Preliminary Contamination Assessment (Aug. 18, 1994), at 13 & Table 3), 78, at pp. 4,352-55 (Environmental Audit, Summary of Site Assessments (Mar. 2009) Table 1), 79, at pp. 4,363-68 (Environmental Audit, Ground Water Samples, Confirmation Soil Samples (Aug. 6, 2013) Table 1); *see also* Mutch Report, Tables 3-1, 7-4<br><br>*Other detections in soil*<br><br>Lintecum Decl., Ex. 73, at pp. 4,328-29, 4,331 (AIG, Phase I Environmental Site Assessment (Jun. 30, 1994), at 12-13, 23), 76, at pp. 4,339-42 (EAI, Subsurface Investigation Report (Dec. 18, 1995), at 8-9, 11-12).<br><br>*Detections in soil gas*<br><br>Lintecum Decl., Ex. 78, at pp. 4,350, 4,356-60 Environmental Audit, Summary of Site Assessments (Mar. 2009), at 11 & Tables 8, 9)<br><br>40 C.F.R. § 302.4 | |
| **35.** One or more hazardous substances, including chromium, PCE, and TCE, have been detected in OU-2 Groundwater below or downgradient of the Patsouras Property. | **35.** Not disputed that one or more hazardous substances, including chromium, PCE, and TCE, have been detected in OU-2 Groundwater below or downgradient of the Patsouras |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| **Supporting Evidence:**<br><br>Lintecum Decl., Ex. 80, at pp. 4,373-78 (Environmental Audit, Third Quarter 2013 Ground Water Monitoring Report (Oct. 23, 2013) Tables 2, 3); *see also* Mutch Report, Table 7-5<br><br>40 C.F.R. § 302.4 | Property. Disputed that any of those hazardous substances in OU-2 Groundwater migrated from the Patsouras Property soil into the groundwater. |
| **35.     Moving Plaintiffs' Reply:** UNDISPUTED<br><br>Plaintiffs' RSUMF 35 is limited to hazardous substances, including chromium, PCE, and TCE, that have been detected in OU-2 Groundwater below or downgradient of the Patsouras Property. Kekropia does not dispute this part of RSUMF 35. | |
| **36.**     There has been a plausible, if not completed, migration pathway between the Patsouras Property and OU-2 Groundwater.<br><br>**Supporting Evidence:**<br><br>Mutch Report, at 2-4 to 2-8, 3-3 to 3-7, Section 7<br><br>*Soil contamination has exceeded soil screening levels*<br><br>Lintecum Decl., 74, at p. 4,334-36 (Professional Service Industries, Phase II Preliminary Contamination Assessment (Aug. 18, 1994), at 13 & Table 3), 78, at pp. 4,352-55 (Environmental Audit, Summary of Site Assessments (Mar. 2009) Table 1), | **36.**     Disputed.<br><br>Fact No. 36 is irrelevant for the following reasons:<br><br>The fact is irrelevant to this phase of the litigation.<br><br>Plaintiffs' cited fact is actually a legal conclusion which stems from section 3 of Castaic Lake Water Agency v. Whittaker Corp., 272 F. Supp. 2d 1053, 1062-68 (C.D. Cal. 2003) entitled "Did the Release . . . Cause Plaintiffs to Incur Response Costs," which pertains to the "response cost element" that the parties agreed will not be litigated in this phase of the litigation.  (Dkt. 615) |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| 79, at pp. 4,363-68 (Environmental Audit, Ground Water Samples, Confirmation Soil Samples (Aug. 6, 2013) Table 1); *see also* Mutch Report, Tables 3-1, 7-4<br><br>*Known historical operations at Patsouras Property involving hazardous substances*<br><br>*Globe Oil*<br><br>Lintecum Decl., Ex. 77, at p. 4,345 (EAI, Supplemental Subsurface Investigation (Mar. 3, 1997), at 3 (Globe Oil manufacturing operations), 75, at p. 4,337 (Grancich, J.B., Letter to Globe Oil Tools Co. re Investigation (Apr. 15, 1970), at 1) (sewer system not complete prior to 1970)<br><br>RFJN, Ex. 85 (LACE, Industrial Waste Survey (Jun. 19, 1970)) (Globe Oil manufacturing operations, waste containing hexavalent chromium, use of degreaser), 93 at 1207-1208 (City of SFS IWDP Application (May 18, 1970), at 1-2) (wastewater containing hexavalent chromium), 94 at 1209 (Application for Approval of the Proposed Industrial Waste Disposal System, Letter to Department of County Engineer (Mar. 24, 1970), at 1) (same), 88 (LACE Notice of Violation (Mar. 20, 1970)) (sewer system not complete prior to 1970); *see also* Mutch Report, at 7-3, 7-18 to 7-22 | Defendant Kekropia made an affirmative showing that there is no migration pathway (actual or plausible) between the soil at the Patsouras Property and the groundwater below.<br><br>**Supporting Evidence:**<br><br>Kulla Expert Report, at pp.1-8, Tables 1-5, Figure 2-8A, Ex. K to the Decl. of Victor Otten.<br><br>Kulla Rebuttal Expert Report, at pp. 1-12, Ex. S to the Decl. of Victor Otten.<br><br>Letter to Larry Patsouras of Kekropia, Inc. from the Executive Officer of the Los Angeles Regional Water Quality Control Board, dated January 4, 2017, (No Further Action letter to Kekropia, concluding that the cleanup was complete to "assure protection of human health and waters of the State at and near the Site for their beneficial uses.) Ex. B to the Decl. of Victor Otten.<br><br>Phase I Environmental Site Assessment, AIG Consultants, Inc., June 30, 1994, at p 22 ¶ 6, Ex. C to the Decl. of Victor Otten.<br><br>Soil Remediation Report of Findings for El Greco, Inc., Biophysics Environmental Assessments, Inc., Sept. 14, 2006 (It is concluded that no threat exists to groundwater from |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| (likely extensive use of lagoons for waste management)<br><br>*Palley Supply Co.*<br><br>Lintecum Decl., Exs. 78, at pp. 4,348-49 (EAI, Summary of Site Assessments (Mar. 2009), at 1-2) (Palley Supply operations, discharges and violations), 83, at pp. 4,600-01, 4,649 (W. Palley Dep. Tr. 20:9 to 21:5, 69:19-23) (operation of Palley Supply Co. from 1973 to at least 1986), 73, at p. 4, (AIG, Phase I Environmental Assessment (Jun. 30, 1994), at 18) (used of subsurface clarifiers)<br><br>RFJN., Exs. 86 (City of Santa Fe Springs, Application for Business Operation Tax Certificate (Aug. 20, 1973)) (operation of Palley Supply), 87 (L.A. County DHS Letter to C. Sjoberg (Aug. 18, 1988)) (use of clarifiers)<br><br>*Discharges of hazardous substances*<br><br>Lintecum Decl., Ex. 77, at p. 4,345 (EAI, Supplemental Subsurface Investigation (Mar. 3, 1997), at 3) (waste sent to clarifiers and sewer), 73 (AIG, Phase I Environmental Assessment (Jun. 30, 1994), at 18) (same), 75, at p. 4,337 (Grancich, Globe Oil Tools, Memo (Apr. 15, 1970), 78, at pp. 4,348-49 (Environmental Audit, Summary of Site Assessments (Mar. 2009), at 1-2 | metals, solvents and total petroleum hydrocarbons, based upon the low level and isolated low volume of all potentially hazardous materials identified in initial testing by EAI in 1994.) pp. 1-7, Tables 1-3, Ex. G to the Decl. of Victor Otten. This fact alone is evidence that there is no actual or plausible migration pathway between the Patsouras Property and OU-2 Groundwater.<br><br>*See also* SUMF Nos. 526-531.<br><br>Updated Site Conceptual Model and Request for Low Risk Closure, Environmental Audit, Inc., June 16, 2010, ("Chlorinated compounds are not generally identified in soil at the Site but are present in ground water at concentrations that are consistent with the regional impact to ground water (see Section 3.0)). In EAI's opinion the chlorinated compounds detected in ground water at the Site are not the result of former site activities." at pp. 3-15, 21, Tables 1-7 and 10, Ex. D to the Decl. of Victor Otten. This is further evidence that there is no actual or plausible migration pathway between the Patsouras Property and OU-2 Groundwater.<br><br>Remedial Action Plan, 11630-11700 Burke Street, Environmental Audit, |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| (listing various discharges and violations)<br><br>RFJN, Exs. 87, at 1,194 (L.A. County DHS Letter to C. Sjoberg (Aug. 18, 1988), at 1) (use of deteriorating clarifiers installed before WWII), 88, at p. 1,196 (LACE Notice of Violation (Mar. 20, 1970)) (discharge to ground), 91, at pp. 1,200, 1,202 (RWQCB-LA, Letter to L. Patsouras re NFA-With Environmental Restriction (Jan. 4, 2017), at 1, 3), 90 (County of Los Angeles Department of County Engineer, Chemical Analysis (Mar. 17, 1970), 93 (Inspection Record for Talco Plastics (May 18, 1988) (clogged clarifiers overflowing to street)<br><br>Mutch Report, at 5-9 to 5-11 (noting permeability of sewer lines); *see also* id., at 7-7 to 7-8 & Tables 7-2 and 7-3 (noting poor housekeeping, reported violations and known releases)<br><br>40 C.F.R. § 302.4<br><br>*See also* SUMF 34<br><br>*Hazardous substances have been detected in shallow soils all the way down to the water table*<br><br>Lintecum Decl., Ex. 82, at pp. 4,453, 4,480, 4,486 (EAI, Updated Site Conceptual Model (Jun. 17, 2010), at 4 & Tables 1 4/7, 3) (detections to water | Inc., June 16, 1997., Ex. H to the Decl. of Victor Otten.<br><br>Covenant and Environmental Restriction on Property, 11630-11700 Burke Street, Santa Fe Springs, CA, recorded on October 12, 2016, in the Los Angeles County Recorder's Office, Ex. I to the Decl. of Victor Otten.<br><br>Excerpts from the Final Remedial Investigation Report, Omega Chemical Corporation Superfund Site, CH2M Hill, August 2010, Ex. J to the Decl. of Victor Otten.<br><br>*See also* SUMF Nos. 501-504, 519, 521-522, 524-570.<br><br>*Soil contamination has exceeded soil screening levels*<br><br>Irrelevant. "The presence of a chemical at concentrations exceeding an ESL does not necessarily indicate adverse effects on human health or the environment, rather that additional evaluation is warranted." The User's Guide: Derivation and Application of Environmental Screening Levels (ESLs) Prepared by: San Francisco Bay Regional Water Quality Control Board INTERIM FINAL 2019 (Revision 1, p. ii) Ex. S to Otten Decl., p. 4. |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| table, estimated at 32 to 38 feet bgs), 78, at pp. 4,352-55 (EAI, Summary of Site Assessments (Mar. 2009) Table 1); *see also* Mutch Report, at 7-10 to 7-11<br><br>RFJN, Ex. 92, at pp. 1,204-05 (LACFD Memorandum re Palley Property (Jan. 9, 1996), at 1-2 (contamination near clarifier area VOCs extend all the way down to OU-2 Groundwater)<br><br>*Detections of hazardous substances in soil and groundwater have aligned with onsite sources*<br><br>Lintecum Decl., Exs. 81, at pp. 4,385 (EAI, Removal of Clarifier Unit 6 (Mar. 9, 2010) Table 2), 79, at pp. 4,369-70 (EAI, Ground Water Samples, Confirmation Soil Samples (Aug. 6, 2013) Table 2), 80, at p. 4,378 (EAI, Third Quarter 2013 Ground Water Monitoring Report (Oct. 23, 2013) Table 3, at 3) *see also* Mutch Report, at 7-14 to 7-18 & Table 7-5<br><br>RFJN, Ex. 92, at pp. 1,204-05 (LACFD Memorandum re Palley Property (Jan. 9, 1996), at 1-2 (contamination near clarifier area extends all the way down to OU-2 Groundwater)<br><br>*The investigation of the extent and nature of contamination at the Patsouras Property has been inadequate* | *Known historical operations at Patsouras Property involving hazardous substances*<br><br>*Globe Oil*<br><br>There is no evidence that the degreaser used by Globe and the steam cleaning operations utilized chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE). However, the contemporaneous evidence is to the contrary. Ex. E to Otten Decl., p. PTSF00022291 (City of Santa Fe Springs, 1970. Industrial Waste Survey for Globe Oil Tool Co. June 19, 1970.) Ex. T to Otten Decl., Mutch Dep., p. 707, lns. 12:18: "I'm not seeing any indication that the degreaser or degreasing activities necessarily contain chlorinated solvents. I don't -- I'm not sure we had that definitive information."<br><br>*See also* SUMF 568.<br><br>*Palley Supply Co.*<br><br>There is no evidence that the waste oil possessed by Pally Supply or Talco contained chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE). Mutch Expert Report, at §7-4. Mr. Mutch, opines on the presence of chlorinated organic compounds in waste oil on the Patsouras Property |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| Mutch Report, at 7-11 to 7-12 | using only a general 1984 EPA citation rather than any evidence relating to the Patsouras Property itself. Ex. T to Otten Decl., Mutch Dep., p. 713, lns. 15:18: "Q: Did you research the historic operational data to assess the composition of Talco's waste oil? A: I don't believe we had the information to be able to do that."

Ex. T to Otten Decl., Mutch Dep., p. 709, lns. 11-14: "Q Did your research of the historic operational data for Palley Supply indicate that chlorinated VOCs were used in the steam cleaning process? A I don't believe so, no."

Ex. T to Otten Decl., Mutch Dep., p. 712, lns:14-21, 24:25; 713:1: "Q Mr. Mutch, I'm going to try to phrase my question a little differently, because you're not answering my question. Aside from your general suspicions about what was done during that era, my question is: What evidence, if any, did you find that contradicts the statements made by Palley Supply about what they used in their steam cleaning operation? THE WITNESS: I don't believe there is any evidence from 1978 as to the contents of different cleaning materials that Palley Supply was using.

Ex. T to Otten Decl., Mutch Dep., p. 713 lns. 3-7: "Q Did your research of |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
| --- | --- |
| | the historic operational data indicate that Talco used any chlorinated organic solvents at the property during its tenure? A I don't recall coming to that conclusion. I don't think so." <br><br> *See also* SUMF 568 and 569. <br><br> The Plaintiffs have presented scant evidence that any hazardous substances were used and/or released on the Patsouras Property, which is consistent with the low concentrations and isolated detections found in the soil. <br><br> *Discharges of hazardous substances* <br><br> There is no evidence that the clarifiers on the Patsouras contained chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE). Ex. T to Otten Decl., Mutch Dep., p. 715, 16:18: "Q. And did the historical operational data you reviewed for purposes of your report identify what substances the clarifiers contained?" Ex. T to Otten Decl., Mutch Dep., p. 716, lns. 2:6: "A. Only -- I think only in the general sense that it would have included wastewater from, you know, these cleaning operations that were going on, which may or may not have included chlorinated solvents." |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| | There is no evidence that the various discharges and violations involved chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE). (Dark-stained soils were present at the Southwest corner of the Site during the Site inspection. In addition," ponded or discharged liquids were observed historically in the vicinity of "Bay Traps" and in the central part of the southern margin of the Site. It is recommended that soils in these areas be sampled and analyzed to evaluate potential impact to soil or ground water.) Ex. C to Otten Decl., p. 3 |
| | *See also* SUMF 512, 513, 532, 533, 534, 545, 546, 547, 548, 549, 550, 551, 552, 553 and 570. |
| | *Hazardous substances have not been detected in shallow soils all the way down to the water table* |
| | Hazardous substances have not been detected in shallow soils all the way down to the water table at the Patsouras Property. The deepest samples containing low concentrations of PCE was found at 25 ft bgs in B-7 and at 30 ft bgs in E-9. Mutch Expert Report, pp. 7-10, 7-11. "[B]oring E9 had levels of PCE extending from -- the shallow was ten feet, and at -- appears to be 15 feet, 20 feet, 25 feet, |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| | and 30 feet. So that would have been within, you know, five or six feet of the water table." Ex. T to Otten Decl., Mutch Dep., p. 739, 21:25. As Mr. Mutch shows in Table 7.4, PCE was found in soil boring B-7 (in 1994) at a concentration of 0.510 mg/kg at a depth of 25 ft bgs.   The PCE in this soil boring is not found contacting the groundwater table. *Id*. at p. 7-9, Table 4; p, 710. The soil sample taken at 35 ft bgs in soil boring B-7 was "non-detect"—it had no PCE in it. *Id*. at p. 7-10. The groundwater table, at the time of the investigation (in late 1994) was estimated at 35 ft bgs or greater at the location of the borings, according to EAI (EAI 1995). Ex. S to Otten Decl., p. 6.  This is evidence that hazardous substances have not been detected in shallow soils all the way down to the water table.<br><br>*Detections of hazardous substances in soil and groundwater have not aligned with onsite sources*<br><br>Kulla Expert Report, at pp.1-8, Tables 1-5, Figure 2-8A, Ex. K to the Decl. of Victor Otten.<br><br>Kulla Rebuttal Expert Report, at pp. 1-12, Ex. S to the Decl. of Victor Otten.<br><br>Letter to Larry Patsouras of Kekropia, Inc. from the Executive Officer of the Los Angeles Regional Water Quality |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| | Control Board, dated January 4, 2017, (No Further Action letter to Kekropia, concluding that the cleanup was complete to "assure protection of human health and waters of the State at and near the Site for their beneficial uses.) Ex. B to the Decl. of Victor Otten. |
| | Phase I Environmental Site Assessment, AIG Consultants, Inc., June 30, 1994, at p. 22 ¶ 6, Ex. C to the Decl. of Victor Otten. |
| | Soil Remediation Report of Findings for El Greco, Inc., Biophysics Environmental Assessments, Inc., Sept. 14, 2006 (It is concluded that no threat exists to groundwater from metals, solvents and total petroleum hydrocarbons, based upon the low level and isolated low volume of all potentially hazardous materials identified in initial testing by EAI in 1994.) pp. 1-7, Tables 1-3, Ex. G to the Decl. of Victor Otten. |
| | Updated Site Conceptual Model and Request for Low Risk Closure, Environmental Audit, Inc., June 16, 2010, ("Chlorinated compounds are not generally identified in soil at the Site but are present in ground water at concentrations that are consistent with the regional impact to ground water (see Section 3.0). In EAI's opinion the |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| | chlorinated compounds detected in ground water at the Site are not the result of former site activities." at pp. 3-15, 21, Tables 1-7 and 10, Ex. D to the Decl. of Victor Otten. This is evidence that hazardous substances in the soil at the Patsouras Property have not impacted groundwater. |
| | Remedial Action Plan, 11630-11700 Burke Street, Environmental Audit, Inc., June 16, 1997., Ex. H to the Decl. of Victor Otten. |
| | Covenant and Environmental Restriction on Property, 11630-11700 Burke Street, Santa Fe Springs, CA, recorded on October 12, 2016, in the Los Angeles County Recorder's Office, Ex. I to the Decl. of Victor Otten. |
| | Excerpts from the Final Remedial Investigation Report, Omega Chemical Corporation Superfund Site, CH2M Hill, August 2010, Ex. I to the Decl. of Victor Otten. |
| | *The investigation of the extent and nature of contamination at the Patsouras Property has been inadequate* |
| | The investigation and remediation of the environmental conditions at the Patsouras was performed with the regulatory oversight and approval of |

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|
| | the LARWQCB, which issued a "No Further Action" letter to the Patsouras Property owner. Ex. L to Otten Decl. and Ex. B to Otten Decl. |

**36.  Moving Plaintiffs' Reply:** UNDISPUTED

There is no "genuine" factual dispute. Plaintiffs address Kekropia's statements:

***Castaic Lake Challenge***

(1)  Immaterial. Kekropia states an incorrect legal conclusion in ¶ 1. Plaintiffs do not have to show a release or threatened release of hazardous substances to OU-2 Groundwater or trace a release to Kekropia specifically.

***Cited Evidence Does Not Support the Statement There Has Been a Plausible, if Not Completed Migration Pathway Between the Patsouras Property and OU-2 Groundwater.***

(2)  Kekropia admits that chromium, PCE and TCE are in the soils at the Patsouras Property. RSUMF 34.

(3)  Kekropia admits that chromium, PCE and TCE are in the OU-2 Groundwater beneath the Patsouras Property. RSUMF 35.

(4)  PCE, TCE and chromium present in soils at the Patsouras Property at levels above ESLs. Valenzuela Opp'n Decl., Exs. 5 (Docket No. 949-32) at 43-45), 9 (Docket No. 949-36) at 98-103, 15 at 167 (Kulla Dep. 83:11-23); Mutch Report, Tables 3-1, 7-4 (Docket No. 903-204 Page ID #:25308-10, 25422); Valenzuela Decl., Ex. O, at pp. 199-200 (Kulla Dep. 195:9-196:18, Apr. 2, 2021) (admitting default assumption is chemicals are leaching to groundwater when soil concentrations exceed soil leaching ESLs until demonstrated otherwise via site-specific evaluation); Pls.' RFJN, Ex. 92 (Los Angeles County Fire Dept., Memorandum, Jan. 9, 1996, at 1-2) (concluding VOC's near clarifiers

| MOVING PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING DEFENDANTS' RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|

and storage shed on eastern parcel have been found to extend to groundwater); Pls.' Opp'n RFJN, Exs. 22 (Docket No. 949-24), 19 (Docket No. 949-21).

***Kekropia's "Affirmative" Evidence is Flawed or Immaterial***

(5) **Flaws in Dr. Kulla's Analysis**: Mutch Rebuttal Report, § 3.3 (Docket No. 949-78) (groundwater monitoring wells on Pilot Chemical property considered by Dr. Kulla are not upgradient); Valenzuela Decl., Exs. R, at p. 220 (URS Corp., 2010 Second Semi-Annual Groundwater Contour Map, Fig. 3), S, at p. 226 (Envtl. Audit, Inc., Updated Conceptual Model and Request for Low Risk Closure, Fig. 7) (showing groundwater flowing southwesterly, not to west as Dr. Kulla contends); Mutch Report, at 7-16 (Docket No. 903-204); Plaintiffs incorporate their response to RSUMF 544.

(6) **Flaws in Prior Environmental Consultants' Reports**: Mutch Report, at 7-10 to 7-13 & Figs. 7-3, 7-7 (Docket Nos. 903-204 & 903-210) (insuffient sampling of soils and groundwater); Pls.' RFJN, Ex. 92 (Los Angeles County Fire Department Memorandum re Palley Property (Jan. 1996)) (Docket No. 903-96) (concluding VOC's in eastern portion of property extend to groundwater; clarifier is contaminated to groundwater with VOC's); Plaintiffs' incorporate their responses to RSUMF 527, 531 and 546.

(7) Otten Decl., Ex. B (Docket No. 931-2 Page ID #26229-30) (Los Angeles Regional Water Quality Board Letter (Jan. 4, 2017) at 1-2) ("Historical Site use for industrial activities resulted in discharges of waste to the subsurface, including total petroleum hydrocarbons (TPH), volatile organic compounds (VOCs), and metals listed in Title 22 of the California Code of Regulations. Specifically, the wastes discharged to the subsurface at the Site has been associated with storage and use of petroleum products, solvents, metal product manufacturing/fabrication, and use of multiple clarifiers."). See also Mutch Rebuttal Report, § 3.5 (Docket No. 949-78).

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
|  | ███████████████████ |

| E. Patsouras Property | |
|---|---|
| **500.** On November 1, 2016, Plaintiffs filed a Fifth Amended Complaint ("Fifth AC") against Defendants Halliburton Affiliates, LLC; Kekropia, Inc.; William K. Palley, an individual; and Palley Supply Company (the "Patsouras Property Defendants") alleging that each was a "covered person" within the meaning of 42 U.S.C. § 9607(a)(1)-(4).<br><br>**Supporting Evidence:**<br><br>FAC ¶ 398; Ex. A to the Declaration of Victor Otten | **500.** Undisputed. |
| **501.** EPA concluded that certain parties were potentially responsible parties ("PRPs") for the contamination of OU-2 groundwater and sent Special Notice Letters to them.<br><br>**Supporting Evidence:** | **501.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>*S. California Water Co. v. Aerojet-Gen. Corp.*, No. CV 02-6340ABCRCX, 2003 WL 25537163, at *5 (C.D. Cal. Apr. 1, 2003) (whether the EPA has |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| FAC ¶ 4; Ex. A to the Declaration of Victor Otten | named a particular party a PRP or sought recovery from a party is immaterial to the party's status under CERCLA). |
| **502.** EPA has not sent a Special Notice Letter to any of the Patsouras Property Defendants.<br><br>**Supporting Evidence:**<br><br>FAC, p. 18 ("Non-Notice Letter Defendants PRPS,"), ¶ 93-96; Ex. A to the Declaration of Victor Otten | **502.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Plaintiffs do not dispute EPA has not sent a Special Notice Letter to any of the Patsouras Property Defendants to date. Declaration of Victor Otten ("Otten Decl."), Ex. A (Fifth AC, ¶¶ 68, 93-96) (Docket No. 931-1 Page ID #:26136, 26145-46).<br><br>Plaintiffs incorporate their Response to RSUMF 501 herein by reference. |
| **503.** EPA concluded that certain parties were potentially responsible parties ("PRPs") for the contamination of OU-2 groundwater warranting receipt of a General Notice Letter ("GNL") from EPA and sent GNLs to them.<br><br>**Supporting Evidence:**<br><br>FAC ¶ 5; Ex. A to the Declaration of Victor Otten | **503.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Plaintiffs incorporate their response to RSUMF 501 herein. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **504.** EPA has not sent a General Notice Letter to any of the Patsouras Property Defendants.<br><br>**Supporting Evidence:**<br><br>FAC, p. 18 ("Non-Notice Letter Defendants PRPS,"), ¶ 93-96; Ex. A to the Declaration of Victor Otten | **504.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Plaintiffs incorporate their response to RSUMF 501 herein. |
| **505.** The Patsouras Property is located at 11630-11700 Burke Street, Santa Fe Springs, CA.<br><br>**Supporting Evidence:**<br><br>FAC ¶ 343,<br><br>Ex. A to the Declaration of Victor Otten | **505.** Undisputed but immaterial. |
| **506.** From 1968 to 1972, Globe Oil Tools Company operated on the Patsouras Property, manufacturing and treating oil well drilling equipment and tools.<br><br>**Supporting Evidence:**<br><br>Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, Ex. B to the Declaration of Victor Otten<br><br>AIG Consultants, Inc. Phase I Environmental Site Assessment, June 30, 1994, pp. 10-11 (PTFS00024775- | **506.** Disputed.<br><br>**Supporting Evidence:**<br><br>Globe Oil operated on the Property from at least 1941, and perhaps as early as the 1930's. Opp'n RFJN, Exs. 15-A, at 117-25 (building permits for oil tool manufacturing plant on Sorenson Lane); Valenzuela Opp'n Decl., Exs. 8, at 66 (Envtl. Audit, Inc., Supplemental Subsurface Investigation (Mar. 3, 1997) at 3), 19, at 190-191 (Letter dated Mar. 19, 1959 addressed to Mr. John |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| PTFS00024804); Ex. C to the Declaration of Victor Otten<br><br>Environmental Audit, Inc. Updated Site Conceptual Model and Request for Low Risk Closure, June 17, 2010, p. 1 [which corrects a typo in a March 3, 1997 EAI report which stated that operations began in "1958"](PTFS00024509-PTFS00024643); Ex. D to the Declaration of Victor Otten | Bertaina of Globe Oil Tool at 11630 Burke, Santa Fe Springs, Calif.); Mutch Report, at 7-18 to 7-19 & Figs. 7-1, 7-12 (Docket Nos. 903-204 & 903-210 (1928 map indicating Burke Street used to be named Sorenson Lane & 1938 aerial photograph)). |
| **507.** On March 20,1970, the Los Angeles County Engineer issued a notice to Globe Oil Tools Company alleging that "the discharge of liquid waste from your rinse operation to ground" is in violation of Section #6301 of Santa Fe Springs City Ordinance No. 79 because the concentration of dissolved solids exceeded the allowable limitation.<br><br>**Supporting Evidence:**<br><br>PTFS00022295, PTFS00023219-20; Ex. E to the Declaration of Victor Otten | **507.** Undisputed. |
| **508.** The County alleged that a sample of the liquid waste taken on March 9, 1970 showed "a concentration of dissolved solids that | **508.** Undisputed. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| greatly exceeds the allowable limitation." The sample form indicated that "Chromium, hexavalent" was measured at a concentration of 19.5 parts per million. **Supporting Evidence:** PTFS00022295, PTFS00023219-20; Ex. E to the Declaration of Victor Otten | |
| **509.** After receiving a copy of the notice, the Globe plant manager "stated that he would have discharge discontinued at once." **Supporting Evidence:** PTFS00022293; Ex. E to the Declaration of Victor Otten | **509.** Undisputed. |
| **510.** On March 24, 1970, Globe submitted a formal application to the County Engineer for approval of an industrial waste disposal system to be installed on the Property in which liquid waste would flow into the sewer after passing through two interceptors. **Supporting Evidence:** PTFS00022294; Ex. E to the Declaration of Victor Otten | **510.** Undisputed. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **511.** The Globe plant manager "stated that all liquid waste would be collected in impervious containers and not discharged to ground until sewer system is completed." **Supporting Evidence:** PTFS00022293; Ex. E to the Declaration of Victor Otten | **511.** Undisputed. |
| **512.** On June 19, 1970, the government determined that Globe's Industrial waste facilities were "constructed according to cleared plans." **Supporting Evidence:** PTFS00022291; Ex. E to the Declaration of Victor Otten | **512.** Disputed as incomplete. **Supporting Evidence:** The referenced exhibit states that "the facilities constructed [to address Globe's violation of waste water disposal standards] were constructed according to cleared plans." Otten Decl., Ex. E (Docket No. 931-5 Page ID #:26406) (City of Santa Fe Springs, Indus. Waste Survey of Globe Oil Tool Co. (June 19, 1970)). However, the referenced plans were only put into place after Globe was ordered to "cease and desist" from discharging liquid waste to ground that contained dissolved solids that "greatly exceed[ed] the allowable limitation." *Id.* at Page ID#:26401-03 (Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Notice of Violation & Order to Comply to Globe Oil Tools Co. (Mar. 20, 1970)). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| | Globe Oil conducted tooling and heat treating of oil tools, bits, and device, manufacturing hundreds of devices and pieces of equipment each month. *Id.* at Page ID#:26406 (City of Santa Fe Springs, Industrial Waste Survey of Globe Oil Tool Co. (June 19, 1970)). The metal heat treating operations generated wastewater heavily contaminated with hexavalent chromium. *Id.* at Page ID#:26402 (Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Industrial Waste Division, Chemical Analysis, Job No. 3240.10 (Mar. 17, 1970)); *see also* Pls.' RFJN, Ex. 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application (May 18, 1970)) (Docket No. 903-97). |
| | Globe Oil used a degreaser and steam cleaned newly manufactured parts and equipment, which created waste streams contaminated with hazardous substances. Valenzuela Opp'n Decl., Ex. 8, at 66 (Docket No. 949-35) (Envtl. Audit, Inc., Supplemental Subsurface Investigation (Mar. 3, 1997) at 3); Otten Decl., Ex. E (Docket No. 931-5, at #26406) (City of Santa Fe Springs, Industrial Waste Survey of Globe Oil Tool Co. (June 19, 1970)). This waste undoubtedly included chlorinated solvents, given the common |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | usage of those solvents in the metal fabricating industry during the pertinent time. After 1970, the waste streams were run through permeable concrete or brick subsurface clarifiers, units now known to commonly result in subsurface releases, to settle out solids before being discharged to the public sewer system. Valenzuela Opp'n Decl., Exs. 8, at 66 (Docket No. 949-35) (Envtl. Audit, Inc., Supplemental Subsurface Investigation (Mar. 3, 1997) at 3), 4, at 28 (Docket No. 949-31) (AIG Consultants, Inc., Phase 1 Envtl. Assessment (June 30, 1994) at 18). Sewer pipes made of vitrified clay, the common material used during the early and middle part of the 20th century, also invariably leak, either through cracks, pipe joints, or simply via exfiltration. *See* Mutch Report, at 5-9 to 5-11, 5-30 (Docket No. 903-204 Page ID #:25356-58, 25377). Given the permeability of these units and infrastructure, contaminated waste water carried through those systems is virtually certain to reach the environment. *Id.* In March 1970, Globe Oil was issued a Notice of Violation for discharging industrial waste to the ground. Otten Decl., Ex. E (Docket No. 931-5, at |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | #26401-02) (Los Angeles Cnty., Dept. of Cnty. Eng'r, Notice of Violation & Order to Comply (Mar. 20, 1970) & Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Industrial Waste Division, Chemical Analysis, Job No. 3240.10 (Mar. 17, 1970)). The discharge included rinse water from the heat-treating operations containing hexavalent chromium at 19.5 parts per million, a level 975,000 times higher than the current level considered protective in groundwater. *Id*. at #26402 (Cnty. of Los Angeles, Dept. of Cnty. Eng'r, Industrial Waste Division, Chemical Analysis, Job No. 3240.10 (Mar. 17, 1970)); Mutch Report, at 7-7 (Docket No. 903-204 Page ID #:25420). |
| **513.** On August 23, 1971, the City of Santa Fe Springs issued Industrial Waste Disposal Permit No. 4485 to Globe to discharge into the sewer washdown and wastes from manufacturing and processing oil well drilling tools.<br><br>**Supporting Evidence:**<br><br>PTFS00022288; Ex. E to the Declaration of Victor Otten | **513.** Undisputed. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **514.** In 1972, William D. Palley and Defendant William K. Palley acquired the Patsouras Property from Rucker. In 1973, Defendant William K. Palley obtained sole ownership of the property.<br><br>**Supporting Evidence:**<br><br>FAC ¶ 345; Ex. A to the Declaration of Victor Otten | **514.** Undisputed. |
| **515.** During Palley's ownership, the Property was occupied by a government surplus order house, by industrial auctioneers, by a paper box company, and by a plastic reprocessing business.<br><br>**Supporting Evidence:**<br><br>Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, Ex. B to the Declaration of Victor Otten | **515.** Disputed as incomplete.<br><br>**Supporting Evidence:**<br><br>Palley's use of the Property was not simply as a "government surplus order house." Instead, this business involved hydraulics and hydraulic equipment maintenance, aircraft, government surplus, and warehousing. Valenzuela Opp'n Decl., Exs. 9, at 77-78 (Docket No. 949-36) (Envtl. Audit, Inc., Summary of Site Assessments (Mar. 2009), at 1-2), 14, at 140-142 (Docket No. 949-41) (W. Palley Dep. 20:9-21:5, 69:19-23). |
| **516.** On May 18, 1988, the Santa Fe Springs Fire Department issued a notice of violation alleging that "oil from 2 clarifiers spilled out onto Master Box Co. access/loading area." | **516.** Undisputed. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **Supporting Evidence:**<br><br>EAI00897, Ex. F to the Declaration of Victor Otten | |
| **517.** On May 19, 1988, the Santa Fe Springs Fire Department issued a notice of violation alleging that two abandoned clarifiers contained "excessive oil and grease."<br><br>**Supporting Evidence:**<br><br>EAI00896, Ex. F to the Declaration of Victor Otten | **517.** Undisputed. |
| **518.** Palley disposed of waste from the clarifiers and drums and the clarifiers were subsequently abandoned-in-place by filling with cement.<br><br>**Supporting Evidence:**<br><br>AIG Consultants, Inc. Phase I Environmental Site Assessment, June 30, 1994, p. 18; (PTFS00024775-PTFS00024804); Ex. C to the Declaration of Victor Otten | **518.** Disputed because the cited evidence does not support the statement and incomplete.<br><br>**Supporting Evidence:**<br><br>The cited authority does not state that Palley disposed of waste from the clarifiers and drums—unless Kekropia is referring to Palley's criminal prosecution in July 1988 for illegally transporting and disposing of hazardous waste. Otten Decl., Ex. C (Docket No. 931-3 Page ID #:26257) (AIG Consultants, Inc., Phase I Envtl. Site Assessment (June 30, 1994), at 19. In 1987, the County of Los Angeles Department of Health Services filed a criminal complaint against Palley |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Supply's owner for maintaining two subsurface structures containing a black oily liquid resembling waste oil. Valenzuela Opp'n Decl., Ex. 8, at 66 (Docket No. 949-35) (Envtl. Audit, Inc., Supplemental Subsurface Investigation (Mar. 3, 1997), at 3). A year later, on May 18, 1988, an inspection report noted that the abandoned clarifiers were filled with trash and oil, and that during a rainstorm, "industrial waste" was overflowing and discharging to the street. *Id.*; Pls.' RFJN, Ex. 101 (Docket No. 903-105) (Inspection Record for Talco Plastics, May 18, 1988). Palley received two more notices of violation on the same day, one for excessive waste in two abandoned clarifiers and another notice of violation for overflow from a sump and two abandoned clarifiers, due to a plugged sewer line, that was discharging to ground at the property's access and loading area. Opp'n RFJN, Exs. 17, at 141 (Docket No. 949-19) (SFSFD, Notice of Violation No. 74 (May 18, 1988)), 18, at 142 (Docket No. 949-20) (SFSFD, Notice of Violation No. 75 (May 18, 1988). Industrial waste from steam cleaning operations by Palley was discharged to the sanitary sewer through one or more |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | clarifiers that had been present on the property since Globe Oil Tools operated there. Valenzuela Dec., Ex._9, at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2). Clarifiers leak and are common sources of groundwater contamination. *See* Mutch Report, Jan. 14, 2021, at 2-6, 3-5.<br><br>This statement is further disputed to the extent it suggests that Palley properly and fully remediated all sources of contamination from the Property—this is not the case. In addition to 2 brick clarifiers which were historically used to store waste oil and solvents at the Property, there are also 3 USTs on the Property—one of which is not registered and regulatory agencies were not aware of its presence. Valenzuela Opp'n Decl., Ex. 4, at 27-28 (Docket No. 949-31) (AIG Consultants, Inc., Phase I Environmental Site Assessment (June 30, 1994), at 17-18). There was no documentation of the condition of the clarifiers or surrounding soil before they were abandoned in place or of the unregistered UST and surrounding soil that remains on the Property. *Id.* at 30 (AIG Consultants, Inc., Phase I Environmental Site Assessment (June 30, 1994), at 20). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | This statement fails to recognize the contamination caused by the 2 clarifiers before (and after) they were purportedly "abandoned in place." In an August 18, 1988 letter, the County of Los Angeles Department of Health expressed great concern "over potential problems with two existing underground storage structures located on the west section of the site. We have observed two brick "clarifiers" built prior World War II which possibly contain[] waste oil or a similar material We also feel that these structures have long since lost their integrity to withhold any of its contents." Pls.' RFJN, Ex. 87 (Docket No. 903-91) (L.A. County DHS Letter to C. Sjoberg (Aug. 18, 1988)). These brick clarifiers pre-dated the connection of the property to the sewer system in 1970 and discharged to lagoons present on the Property.<br><br>*See* Mutch Report, at 7-27 to 7-28 (Docket No. 903-204 Page ID#:25440-41). No meaningful investigation of the role the lagoons had upon the nature and extent of the contamination of the Property was ever completed. *Id.* The lagoons have been present on the Property from at least 1938 – 1973, but, inexplicably, have never been a major focus of investigation. *Id.* |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | On November 28, 1995, the Los Angeles County Fire Department ordered Kekropia to "determine the nature, concentration, and the vertical and lateral extent of contamination" and submit a "site characterization plan" by the end of December, noting that there had been "releases" at the Property. Pls.' RFJN, Ex. 84 (Docket No. 903-88) (T. Klinger, Supervisor, Los Angeles County Fire Dept., Health / HazMat Div., Letter to L. Patsouras, Kekropia (Nov. 28, 1995)).<br><br>The Los Angeles County Fire Department concluded that the locations of clarifiers and a storage shed on the eastern parcel of the Patsouras Property were impacted with volatile organic compounds, such as PCE and TCE, and needed to be remediated. *See* Pls.' RFJN, Ex. 92 (Docket No. 903-96) (Los Angeles County Fire Dept., Memorandum (Jan. 9, 1996), at 1-2). |
| **519.** In 1994, AIG Environmental Consultants performed a Phase I Environmental Site Assessment of the Property. AIG concluded that "the greatest potential risk to the subject property" was the total of 37 sites less than ¼ mile away whose potential off-site contamination may have impacted | **519.** Undisputed the cited document includes the quoted language but mischaracterizes the evidence and immaterial.<br><br>**Supporting Evidence:**<br><br>The statement is necessarily qualified by the failure of AIG to investigate |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| the Property, and AIG also recommended additional investigation of the Property itself.<br><br>**Supporting Evidence:**<br><br>AIG Consultants, Inc. Phase I Environmental Site Assessment, June 30, 1994, p. 3; (PTFS00024782); Ex. C to the Declaration of Victor Otten | other sources of potential contamination. The AIG assessment specifically identified numerous other potential sources of contamination (including the unregistered UST, potentially hazardous materials in storage containers and 55-gallon drums located at the Property, and dark-stained soil in the area of "Bay Traps"), stated that AIG did not investigate these other sources, and recommended that these other potential sources be investigated and evaluated to determine their potential impact to the soil and groundwater. Otten Decl., Ex. C (Docket No. 931-3 Page ID #: 26241) (AIG Consultants, Inc., Phase I Environmental Site Assessment (June 30, 1994), at 3).<br><br>AIG states that, based on the results of its inspection of the Property and its historical records of land use and regulatory inquiries, "there is evidence of past activity at the Site which may represent environmental risks and/or liabilities. The extent of these environmental risks could possibly be determined with further investigation. Therefore, AIG recommends that additional investigation be performed to further evaluate the potential for impact to the soil, air, and/or ground water at the Site." *Id*. at 3. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | *See also* Mutch Rebuttal Report, at § 3 (Docket No. 949-78 Page ID #:30971-77).<br><br>Immaterial because Kekropia admits it is the current owner of the Patsouras Property, RSUMF 33, and hazardous substances have been detected in the soils at the Patsouras Property and in OU-2 Groundwater beneath and downgradient of the Patsouras Property, RSUMF 33, 34. |
| **520.** In 1995, Kekropia, Inc. acquired the Patsouras Property from William K. Palley. In 1997, El Greco Wholesale Grocers, Inc. and its owner Larry Patsouras began operating on the Property as a wholesale grocery warehouse.<br><br>**Supporting Evidence:**<br><br>FAC ¶¶ 347, 350; Ex. A to the Declaration of Victor Otten | **520.** Undisputed. |
| **521.** Patsouras sought regulatory oversight from LARWQCB of the assessment and cleanup of its Property.<br><br>**Supporting Evidence:** | **521.** Undisputed that Patsouras sought regulatory oversight from RWQCB-LA in 2008 but immaterial.<br><br>**Supporting Evidence:**<br><br>Otten Decl., Ex. L (Docket No. 931-12 Page ID #:26607) (RWQCB-LA, Ltr. to Larry Patsouras (Dec. 1., 2008) (stating |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Los Angeles Regional Water Quality Board Letter, Dec. 1, 2008, Ex. L to the Declaration of Victor Otten | releases of chemicals from industrial uses at the site have degraded the groundwater quality and beneficial uses of the State's waters and noting PCE, TCE and chromium were detected in soils).

Immaterial because Kekropia admits it is the current owner of the Patsouras Property, RSUMF 33, and hazardous substances, including chromium, PCE and TCE, have been detected in soils at the Patsouras Property and in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 34, 35. |
| **522.** Pursuant to the cost recovery program, Patsouras and his consultant began the process assessing the environmental conditions at the Property and remediation.

**Supporting Evidence:**

*Id.* | **522.** Undisputed that Ex. L to the Otten Declaration states the RWQCB-LA received a report titled "*Remedial Investigation Work Plan*" dated Nov. 3, 2008, prepared by Environmental Audit, Inc. on behalf of Mr. Patsouras, and the letter states it is being sent to Mr. Patsouras to provide him information regarding costs for regulatory oversight work. Immaterial.

**Supporting Evidence:**

Otten Decl., Ex. L (Docket No. 931-12 Page ID #:26607) (RWQCB-LA, Ltr. to Larry Patsouras (Dec. 1., 2008).

Immaterial because Kekropia admits it is the current owner of the Patsouras |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Property, RSUMF 33, and hazardous substances, including chromium, PCE and TCE, have been detected in soils at the Patsouras Property and in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 34, 35. |
| **523.** Kekropia continues to own the Property today, which is still used for a wholesale grocery warehouse and a tattoo artist supply business.<br><br>**Supporting Evidence:**<br><br>Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, Ex. B to the Declaration of Victor Otten | **523.** Undisputed. *See* RSUMF 33. |
| **524.** In 1994, AIG Environmental Consultants performed a Phase I Environmental Site Assessment of the Property. AIG concluded that "the greatest potential risk to the subject property" was not the property itself, but the upgradient properties (the "total of 37 sites less than ¼ mile away whose potential off-site contamination may have impacted the Property") and recommended additional investigation.<br><br>**Supporting Evidence:** | **524.** Undisputed that Patsouras sought regulatory oversight from RWQCB-LA in 2008 but immaterial.<br><br>**Supporting Evidence:**<br><br>Otten Decl., Ex. L (Docket No. 931-12 Page ID #:26607) (RWQCB-LA, Ltr. to Larry Patsouras (Dec. 1., 2008) (stating releases of chemicals from industrial uses at the site have degraded the groundwater quality and beneficial uses of the State's waters and noting PCE, TCE and chromium were detected in soils). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Phase I Environmental Site Assessment, dated June 30. 1994, Ex. C to the Declaration of Victor Otten | Immaterial because Kekropia admits it is the current owner of the Patsouras Property, RSUMF 33, and hazardous substances, including chromium, PCE and TCE, have been detected in soils at the Patsouras Property and in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 34, 35. |
| **525.** Kekropia retained Environmental Audit, Inc. (EAI) to perform an environmental investigation of the Property. EAI's investigation indicated that "the majority of the soil contamination is heavy end petroleum product." EAI considered a variety of in-situ technologies for remediation of the heavy end petroleum hydrocarbons in the soil, but determined that they were impracticable "for the relatively small volume of contaminated soil at the Site, and therefore recommended excavation and off-site disposal of the impacted soil.<br><br>**Supporting Evidence:**<br><br>Environmental Audit, Inc., "Remedial Action Plan, 11630-11700 Burke Street," June 16, 1997, at PTSF00022451, 22453; Ex. H to the Declaration of Victor Otten | **525.** Partially disputed.<br><br>**Supporting Evidence:**<br><br>Plaintiffs do not dispute that Kekropia retained EAI to perform an investigation of the Patsouras Property. Otten Decl., Ex. H, (Docket No. 931-8 Page ID #:26481) (Envtl. Audit, Inc., Remedial Action Plan (June 16, 1997) at 3 (PTFS00022442)). Plaintiffs do not dispute that EAI purported to investigate the Patsouras Property, however, the remedial action chosen at the property was excavation of a significant amount of contaminated soil. Valenzuela Opp'n Decl., Ex. 16, at 175 (Docket No. 949-43) (Los Angeles Regional Water Quality Board Letter (Jan. 4, 2017) at 2) (noting soil removal actions in 1998, 2006, 2010 and 2014). In addition, the selected remedial action did not test for hexavalent chromium. Mutch Report, at 7-11 to 7-13 (Docket No. 903-204 Page ID #:25424-26). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Plaintiffs do not dispute the report discusses considering in-situ technologies, but Plaintiffs dispute there was a relatively small volume of contaminated soil in light of the fact that a significant amount of soil was excavated. Otten Decl., Ex. H (Docket No. 931-8 Page ID#:26490) (Envtl. Audit, Inc., Remedial Action Plan (June 16, 1997) at 10 (PTFS000224451)); Valenzuela Opp'n Decl., Ex. 16, at 175 (Docket No. 949-43) (Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017, at 2) (noting soil removal actions in 1998, 2006, 2010 and 2014). |
| **526.** In 2006, Biophysics Environmental Assessments, Inc. ("BEA") performed confirmation testing and removal of environmentally impacted soil identified in previous site testing.<br><br>**Supporting Evidence:**<br><br>Biophysics Environmental Assessments, Inc., Soil Remediation Report of Findings for El Greco, Inc., Sept. 14, 2006; (PTFS00023600-PTFS00023663); Ex. G to the Declaration of Victor Otten | **526.** Undisputed. |
| **527.** BEA concluded that the sampling results "showed no threat to | **527.** Disputed. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| groundwater since boring B-7 demonstrated vertical attenuation of both PCE and TCE to non-detect at termination depth of 35' below grade surface (bgs)."<br><br>**Supporting Evidence:**<br><br>*Id.* at PTFS00023604. | **Supporting Evidence:**<br><br>Testing performed at the B-7 boring was incomplete and failed to take into account the soil composition and the water table at the location. Mutch Report, at 7-10 to 7-11 & Fig. 7-7 (Docket Nos. 903-204 Page ID #:25423-24 & 903-210 Page ID #:25573)<br><br>The data from samples taken from 15, 20, 25, and 35 feet bgs "can by no means be taken to indicate that the maximum depth of PCE penetration was limited to 25 feet at B-7" because:<br><br>1. No sample was taken at 30 feet, and it may have contained PCE. Mutch Report, at 7-11 (Docket No. 903-204 Page ID #:25424).<br><br>2. The testing done by BEA, EAI and any others of this area only tested for "vertical" migration when "[i]t is well-recognized that infiltrating moisture in the vadose zone can follow complex pathways because of capillary action and complex lithologies." *Id.* "Assuming purely vertically-downward migration in the vadose zone is a perilous and often incorrect assumption." *Id.* "[O]ne cannot reliably define the vertical extent of contamination in the vadose zone with |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | a single boring. What may appear in a single borehole to be the base of the contamination may simply indicate that the plume has been diverted laterally due to lithologic variability and is now outside the vertical trajectory of the boring." *Id.*

3. The 35-foot sample was taken from a clay stratum. *Id.* at 7-11 & Fig. 3 (Docket No. 903-210 Page ID #:25569). It is probable that the PCE plume migrating downward through the vadose zone diverted around this low permeability stratum. *Id.* at 7-11 (Docket No. 903-204 Page ID #:25424).

4. In the late 1990s, the groundwater table was approximately 32 to 36 feet bgs. *Id.* Thus, the water table was above the 35-foot sample location. *Id.* Thus, the PCE plume migrating vertically-downward through the vadose zone was intercepted by laterally flowing groundwater in the upper part of the saturated zone and not carried further downward to the 35-foot depth. *Id.* Groundwater would have been contaminated in this location by PCE migrating downward through the vadose zone. *Id.* The Los Angeles County Fire Department found that soil and groundwater contaminated with VOCs at the Property and indicated that |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | VOCs in the eastern portion of the Property "have been found to extend to GW [i.e., groundwater]." Pls.' RFJN, Ex. 92 (Docket No. 903-96) (Los Angeles County Fire Department Memorandum re Palley Property (Jan. 1996). They further observed that the "clarifier area" at the Property is "contaminated to GW with VOCs." *Id.* |
| | PCE was also continuously detected in boring E-9, near a storage shed, at depths of 10, 15, 20, 24, and 30 feet at concentrations between 23 and 104 ug/kg. Mutch Report, at 7-11 (Docket No. 903-204 Page ID #:25424). This data indicates that PCE was transported through the vadose zone to the historic elevation of the groundwater table and impacted the groundwater with PCE. *Id.* |
| | This statement is also disputed because it rests on the faulty premise that testing showed there was no PCE contamination. On the contrary, tests do not show the presence of PCE, TCE, hexavalent chromium or other VOCs <u>because they were not tested for these substances.</u> In the report cited as support for this statement, BEA clearly states that it was hired solely to remove soil from 2 areas identified by other investigations in 1994 and 1997. Otten Decl., Ex. G (Docket No. 931-7 Page |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | ID #:26415) (Biophysics Envtl. Assessments, Inc., Soil Remediation Report (Sept. 14, 2006) at 1). BEA did not test any other areas of the Property to determine whether they were contaminated by PCE, TCE, hexavalent chromium or other VOCs. *Id.* Despite evidence of discharge of waste containing 975,000 times more than the health-protective level amounts of hexavalent chromium (19.5 ppm), no follow up testing was ever done. Mutch Report, at 7-7 (Docket No. 903-204 Page ID #:25420). No testing of the soil or groundwater was ever completed beneath the storm drain or the flood control channel where Globe—for decades—disposed of industrial waste before sewers were installed at the Property. *Id.* In 1988, the clarifiers were filled with trash and oil and waste was discharging to the street; however, no testing was done in these areas for TCE, PCE, or other VOCs. *Id.* at 7-8; Pls.' RFJN, Ex. 101 (Docket No. 903-105) (Inspection Record for Talco Plastics, May 18, 1988). Stained ground surface was noted in the southwest corner of the Property in the area of four partially-filled 55-gallon drums; but, still, no testing for TCE, PCE, or other VOCs was completed. Valenzuela Opp'n Decl., Ex. 4, at 31 (Docket No. 949-31) (AIG Consultants, Phase I |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Environmental Site Assessment (June 30, 1994) at 21). No meaningful investigation of the role the lagoons had upon the nature and extent of the contamination of the Property has ever been completed. *See* Mutch Report, at 7-27 to 7-28 (Docket No. 903-204 Page ID #:25440-41). The lagoons were present on the Property from at least 1938 – 1973, but, inexplicably, have never been a major focus of investigation. *Id.* |
| **528.** BEA concluded that the concentrations of petroleum and solvents identified in 1994 "had insufficient mass for vertical migration, with sorption and desorption, in excess of a few feet." **Supporting Evidence:** *Id*. at PTFSO0023607. | **528.** Disputed. **Supporting Evidence:** As discussed in response to RSUMF 527 "[i]t is well-recognized that infiltrating moisture in the vadose zone can follow complex pathways because of capillary action and complex lithologies." Mutch Report, 7-11 (Docket No. 903-204 Page ID #:25424). "Assuming purely vertically-downward migration in the vadose zone is a perilous and often incorrect assumption." *Id.* "[O]ne cannot reliably define the vertical extent of contamination in the vadose zone with a single boring. What may appear in a single borehole to be the base of the contamination may simply indicate that the plume has been diverted laterally |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | due to lithologic variability and is now outside the vertical trajectory of the boring." *Id*.<br><br>Additionally, such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |
| **529.** BEA concluded that "intrinsic biodegradation and weathering has removed all measurable solvents and continues to remove the petroleum hydrocarbons."<br><br>**Supporting Evidence:**<br><br>*Id*. at §6.0. | **529.** Disputed.<br><br>**Supporting Evidence:**<br><br>The entire OU-2 Groundwater area lies in a recharge area defined as an area where water from precipitation and other shallow water sources, such as leaking sewers and clarifiers, reaches the underlying groundwater from surface infiltration. *See* Mutch Report, 2-4 to 2-8 (Docket No. 903-204 Page ID #:25283-87).<br><br>Defendants' expert admits that contamination to groundwater from 1970 hexavalent chromium discharge to ground may have moved off property by now. *See* Valenzuela Opp'n Decl., Ex. 15, at 172 (Docket No. 949-42) (J. Kulla Dep. Tr. at 119: 5-21). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **530.** BEA concluded that "no mass of petroleum hydrocarbons and no measurable mass of chlorinated solvents are present in the soil column with capability for migration to the groundwater by moisture migration through adsorption and partitioning."<br><br>**Supporting Evidence:**<br><br>*Id*. at §7.0. | **530.** Disputed.<br><br>**Supporting Evidence:**<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |
| **531.** BEA concluded that "[N]o further action is recommended based upon the very low levels of hazardous materials identified in site testing in 1994 and confirmed in 2006."<br><br>**Supporting Evidence:**<br><br>*Id*. | **531.** Disputed.<br><br>**Supporting Evidence:**<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil. *See also* Plaintiffs' responses to Kekropia's RSUMF 527 and 546 which are incorporated herein by reference.<br><br>Minimal testing was done for TCE, PCE, hexavalent chromium or other VOCs. Mutch Report, at 7-8 to 7-14 (Docket No. 903-204 Page ID #:25421-27). Total chromium measured in Phase II samples ranged from below detection limits (200 ug/kg) to 71,100 ug/kg, with the highest levels at B-8 which lies in a stained soil area identified in historical photos on the eastern parcel. *Id.* at 7-11. Hexavalent chromium was not tested |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | for on these samples. *Id.* Supplemental assessments in 1994, 1996, and 1999 tested samples from 31 locations across the Property. *Id.* at 7-12 & Figs. 7-2, 7-3 (Docket Nos. 903-204 & 903-210). Of these 31 locations, only 1 was tested for total chromium. *Id.* at 7-12. None were tested for hexavalent chromium. *Id.* The samples taken by BEA in its 2006 assessment were not tested for hexavalent chromium though total chromium ranged between 18 and 62 mg/kg. *Id.* |
| | EAI closed 5 subsurface units in 2009, but did not collect samples for 2 of the units. *Id.* & Fig. 7-4 (Docket Nos. 903-204 & 903-210). Samples from the other 3 units were tested for total chromium, but were not tested for hexavalent chromium. *Id.* The "stockpile" of soil removed from these 3 units was tested for total chromium only, and was found to have the second highest concentration on the entire Property (224 mg/kg)—but, this soil was not tested for hexavalent chromium. *Id.* |
| | The failure to test for hexavalent chromium is inexplicable—particularly when there are at least 2 documented discharges of hexavalent chromium to the soil and/or groundwater of the Property. *Id.* at 7-13 (citing 1970 |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | discharge of waste containing <u>975,000</u> times more than the health-protective level amounts of hexavalent chromium and 1988 discharge from clarifiers to the street). Contaminated waste water from the clarifiers and other sources were disposed of—for decades—to a storm drain/flood control channel before the Property was connected to sewers. *Id*. at 7-7. The ESL for arsenic in soil was exceeded at several locations at the Property from 2 feet to 35 feet bgs, which is indicative of release of arsenic from operations on the Patsouras Property to the subsurface. *Id*. at 7-13. Because of the inadequacy and sparseness of the monitoring well network at the Patsouras Property, arsenic impacts to groundwater may not be identifiable. *Id*. at 7-14. Despite minimal investigations on the Patsouras Property, the data that was obtained reveals the extent of groundwater contamination. *Id*. PCE was found in monitoring wells in the vicinity of the clarifiers, where vadose zone soil samples showed penetration of PCE to the depth of the groundwater table. *Id*. This indicates a contribution of PCE to groundwater from the Patsouras Property. *Id*. Additionally, some higher levels of hexavalent |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | chromium were found in MW-1, MW-1D, and MW-3 in the middle of the Patsouras Property near the clarifiers than in MW-2, establishing releases of hexavalent chromium from the clarifiers, resulting in groundwater contamination. *Id.* at 7-14 and 7-17. TCE, a "daughter" product of PCE, is found in concentrations higher in MW-1D, MW-3, and MW-4 than in MW-2. *Id.* at 7-17. Concentrations exceeding groundwater ESLs were measured for 1,1-dichloroethene, carbon tetrachloride, chloroform, tetrachloroethene (PCE), trans-1,2-dichloroethene, trichloroethene (TCE), chromium (total), chromium VI, nickel, and vanadium. *Id.*<br><br>Soil gas concentrations in excess of soil gas ESL values were noted for benzene, carbon tetrachloride, chloroform, PCE and TCE. *Id.* The spatial distribution of the PCE and TCE soil gas contamination, along with the shallow soil contamination, indicates that the PCE and TCE came from releases on the Property and not from off-gassing from the underlying groundwater. *Id.* Thus, the contaminated soil gas would serve as a source of OU2 groundwater contamination as it partitioned from the soil gas to recharging groundwater. *Id.*<br><br>PCE, TCE, and chromium, as well as |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | other hazardous substances, have all been identified as present in the subsurface at levels about soil screening levels, meaning that these substances are present in soils at the Patsouras Property at levels that exceed those considered protective of groundwater. *See* Valenzuela Opp'n Decl., Exs. 5, at 43-45 (Professional Service Industries, Phase II Preliminary Contamination Assessment, Aug. 18, 1994, at 13 & Table 3) (Docket No. 949-32), 9, at 85-88 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, Table 1) (Docket No. 949-36), 10, at 98-103 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 1) (Docket No. 949-37); Mutch Report, at Tables 3-1 & 7-4 (Docket No. 903-204 Page ID #:25308-09, 25417).  The Santa Fe Springs Fire Department, Environmental Services Division, found that "historic Palley site operations contamination probably contributed to the VOC portion " of groundwater contamination at the property. *See* Opp'n RFJN, Ex. 21, at 146-147 (Steve Chase, Santa Fe Springs Fire Department, Environmental Services Division, Memorandum to Dave Klunk, Director, |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Environmental Services Division, Santa Fe Springs Fire Department, Sept. 29, 1997) (Docket No. 949-23). Mr. Chase further advised that groundwater at the property was first encountered at 35 feet bgs, and "PCE was found in a [soil] column" from 10 feet bgs to 35 feet bgs. *Id.* |
| | Even Defendants' expert admits that contamination to groundwater from 1970 hexavalent chromium discharge to ground may have moved off property by now). *See* Valenzuela Opp'n Decl., Ex. 15, at 172 (Kulla Dep. 119: 5-21) (Docket No. 949-42). |
| | Chromium, PCE, and TCE have been detected in the subsurface soils at the Property, and these same substances are in OU-2 Groundwater below and downgradient of the Property. *See* Valenzuela Opp'n Decl., Exs. 5, at 43-45 (Professional Service Industries, Phase II Preliminary Contamination Assessment, Aug. 18, 1994, at 13 & Table 3) (Docket No. 949-32), 9, at 85-88 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, Table 1) (Docket No. 949-36), 10, at 98-103 (Environmental Audit, Inc., Ground Water Samples, Confirmation Soil Samples, Aug. 6, 2013, Table 1); 11, at 109-114 (Environmental Audit, Inc., Third |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Quarter 2013 Ground Water Monitoring Report, Oct. 23, 2013, Tables 2, 3) (Docket No. 949-37); Mutch Report, Jan. 14, 2021, Tables 3-1, 7-4 and 7-5.  The entire OU-2 Groundwater area lies in a recharge area defined as an area where water from precipitation and other shallow water sources, such as leaking sewers and clarifiers, reaches the underlying groundwater from surface infiltration. *See* Mutch Report, at 2-4 to 2-8 (Docket No. 903-204 Page ID #25283-87). |
| **532.** EAI concluded that the majority of the soil contamination at the Patsouras Property "is heavy end petroleum product."  **Supporting Evidence:**  Environmental Audit, Inc., "Remedial Action Plan, 11630-11700 Burke Street," June 16, 1997, at PTSF00022451; Ex. H to the Declaration of Victor Otten | **532.** Disputed.  **Supporting Evidence:**  Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |
| **533.** Pursuant to closure authorization issued by uhe SFSFD on Jarmary 7, 1999, the storm water clarifier located west of the office building situated on the West Parcel of | **533.** Undisputed the 2010 Updated Site Conceptual Model and Request for Low Risk Closure prepared by EAI 11-years later supports this statement. Immaterial. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| the Site was removed. On August 25, 1999, the SFSFD issued a closure ce~fication for the storm water clarifier.<br><br>**Supporting Evidence:**<br><br>Environmental Audit, Inc., "Updated Site Conceptual Model and Request for Low Risk Closure," June 17, 2010, at p. 5, at PTFSO0024517; Ex. D to the Declaration of Victor Otten | **Supporting Evidence:**<br><br>Otten Decl., Ex. D (Docket No. 931-4 Page ID #:26273) (Envtl. Audit, Inc., Updated Site Conceptual Model & Request for Low Risk Closure (June 17, 2010) at 5).<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. |
| **534.** EAI concluded that "TGPH-G, TPH-D, and TPH-O have never been identified in ground water" at the Patsouras Property. "Chlorinated compounds are not generally identified in soil at the Site but are present in ground water at concentrations that are consistent with the regional impact to ground water (see Section 3.0). In EAI's opinion the chlorinated compounds detected in ground water at the Site are not the result of former site activities."<br><br>**Supporting Evidence:**<br><br>Environmental Audit, Inc., "Updated Site Conceptual Model and Request | **534.** Disputed.<br><br>**Supporting Evidence:**<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference.<br><br>PCE and TCE have been identified in the groundwater at the Property. Otten Decl., Ex. I, at 1 (Docket No. 931-9 Page ID #:26513) (Covenant and Environmental Restriction on Property executed July 5, 2016). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| for Low Risk Closure," June 17, 2010, at p. 21, at PTFS00024533; Ex. D to the Declaration of Victor Otten | The hexavalent chromium on the Patsouras Property is not derived from groundwater from other properties. Mutch Report, at 7-16 & Fig. 7-9 (Docket Nos. 903-204 Page ID #:25429 & 903-210 Page ID#25575). In the first hexavalent chromium water analysis performed (February 2009), the highest levels of hexavalent chromium were found in monitoring wells in the middle of the Patsouras Property. *Id*. at 7-16 The nearest monitoring wells from adjacent properties are cross-gradient and were non-detect for hexavalent chromium, indicating that the hexavalent chromium on the Property did not migrate from other properties. *Id*. |
| **535.** On Sept. 15, 2016, Regional Board Executive Officer Samuel Unger executed the Covenant and Environmental Restriction on Property for the Patsouras Property. **Supporting Evidence:** Covenant and Environmental Restriction; Ex. I to the Declaration of Victor Otten | **535.** Undisputed. |
| **536.** The Covenant and Environmental Restriction approved by and for the benefit of the Regional | **536.** Disputed as incomplete. **Supporting Evidence:** |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Board stated as follows: "Chlorinated solvent compounds present in the groundwater beneath the Site appear to be consistent with the site area regional chlorinated solvent impacts; no dissolved or free phase total petroleum hydrocarbons have been detected in the groundwater."<br><br>**Supporting Evidence:**<br><br>*Id.* | The cited document states that the Regional Board "has determined that the [Patsouras] Property is not suitable for unrestricted use and that a land use restriction is necessary for the protection of present or future human health, safety, or the environment as a result of the presence of hazardous materials as defined in Section 25260 of the Health and Safety Code in the soil, soil gas, and groundwater at the [Patsouras] Property." Otten Decl., Ex. I at 1 (Covenant and Environmental Restriction on Property executed July 5, 2016). This Covenant also notes that both PCE and TCE have been found in groundwater sampling on the property. *Id.* at 3. In fact, it states that PCE was found in the groundwater at the level of 18.2 ug/L, more than three times higher than that allowed by the California Maximum Contaminant Level of 5 ug/L. *Id.*<br><br>It also states the soil and soil gas at the Burdened Property were contaminated by historical leaks, primarily from clarifiers and past on-site historical activities. *Id.* at 1. It also identifies sampling locations by year/depth where residual concentrations of contaminants remain in soil, at depths greater than 10 feet bgs, and above soil screening levels intended for protection of |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | groundwater quality from potential leaching of contaminates to groundwater. *Id*. at 2 (PCE: 0.51). |
| **537.** On October 12, 2016, the Covenant and Environmental Restriction was recorded in the Official Records of the Los Angeles County Recorder's Office.<br><br>**Supporting Evidence:**<br><br>*Id*. | **537.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Plaintiffs incorporate their response to RSUMF 538 by reference. |
| **538.** On Jan. 4, 2017, the Regional Board issued a "No Further Action" Letter to Kekropia for the Patsouras Property.<br><br>**Supporting Evidence:**<br><br>Los Angeles Regional Water Quality Board Letter, Jan. 4, 2017; Ex. B to the Declaration of Victor Otten | **538.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>While it is uncontroverted that the referenced letter was sent to Kekropia, the Regional Board stated the following with respect to historical industrial activities at the Patsouras Property: "Historical Site use for industrial activities resulted in discharges of waste to the subsurface, including total petroleum hydrocarbons (TPH), volatile organic compounds (VOCs), and metals listed in Title 22 of the California Code of Regulations. Specifically, the wastes discharged to the subsurface at the Site has been associated with storage and use of petroleum products, solvents, metal product manufacturing/fabrication, and |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | use of multiple clarifiers." Otten Decl., Ex. B (Docket No. 931-2 Page ID #26229-30) (Los Angeles Regional Water Quality Board Letter (Jan. 4, 2017) at 1-2). It also states: "Please note that by issuing this NFA letter, the Regional Board has not made a determination as to whether discharges of waste to regional groundwater occurred as a result of historical activities at the Site." *Id.* at 3.<br><br>Mutch Report, 7-23 to 7-29 (Docket No. 903-204 Page ID #:25435-42) (describing Patsouras Property contribution to OU-2 contamination)<br><br>Mutch Rebuttal Report, at §§ 3.1, 3.5 (Docket No. 949-78 Page ID #:30971-72, 30975-77) (describing historic contamination and continuing obligations imposed by environmental covenant). |
| **539.** The Regional Board concluded that the activities at the Patsouras Property resulted "in the cleanup or abatement of wastes to assure protection of human health and the waters of the State at and near the Site for their beneficial use."<br><br>**Supporting Evidence:** | **539.** Undisputed the Jan. 4, 2017, letter includes the quoted language but immaterial and mischaracterizes the letter.<br><br>**Supporting Evidence:**<br><br>Plaintiffs incorporate their response to RSUMF 538. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| *Id.* at p.3. | Mutch Report, 7-23 to 7-29 (Docket No. 903-204 Page ID #:25435-42) (describing Patsouras Property contribution to OU-2 contamination)

Mutch Rebuttal Report, at §§ 3.1, 3.5 (Docket No. 949-78 Page ID #:30971-72, 30975-77) (describing historic contamination and continuing obligations imposed by environmental covenant).

*See* Otten Decl., Ex. B (Docket No. 931-2) (Los Angeles Regional Water Quality Board Letter (Jan. 4, 2017). |
| **540.** The Regional Board determined that there was no reason to monitor groundwater at the Property and required Kekropia to decommission, abandon, and destroy all monitoring wells on the Property.

**Supporting Evidence:**

*Id.* | **540.** Undisputed but immaterial.

**Supporting Evidence:**

Plaintiffs incorporate their response to RSUMF 538.

Mutch Report, 7-23 to 7-29 (Docket No. 903-204 Page ID #:25435-42) (describing Patsouras Property contribution to OU-2 contamination)

Mutch Rebuttal Report, at §§ 3.1, 3.5 (Docket No. 949-78 Page ID #:30971-72, 30975-77) (describing historic contamination and continuing obligations imposed by environmental covenant). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | *See* Otten Decl., Ex. B (Docket No. 931-2) (Los Angeles Regional Water Quality Board Letter (Jan. 4, 2017). |
| **541.** EPA's consultant, CH2M Hill, concluded that the former Omega Chemical facility is the main source of groundwater contamination at OU2.<br><br>**Supporting Evidence:**<br><br>Final Remediation Investigation/Feasibility Study Reports Omega Chemical Corporation Superfund Site Operable Unit 2 Los Angeles County, California, Volume 1, CH2M HILL, Aug. 2010, § 8.1.2, p. 8-4; Ex. J to the Declaration of Victor Otten | **541.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Immaterial because CH2M Hill also concluded that "because [OU-2] flows under a densely developed commercial – industrial area, there are additional facilities whose releases of hazardous substances have reached groundwater and become commingled with the Omega contamination. Otten Decl., Ex. J (Docket No. 931-10 Page ID #:26547) (CH2M HILL, Final Remediation Investigation /Feasibility Study Reports (Aug. 2010), at 8-4).<br><br>Immaterial because the relevant question in Plaintiffs' Motion is whether the Patsouras Property is *also* a source of OU-2 Groundwater contamination. |
| **542.** The Final Remedial Investigation Report by the US EPA environmental consultant, CH2M Hill, identified properties located over the OU-2 groundwater plume which were sources of chlorinated VOCs (PCE, TCE, 1,1,-DCE) to groundwater, but | **542.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Mutch Report, 7-23 to 7-29 (Docket No. 903-204 Page ID #:25435-42) |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| did not identify the Patsouras Property as an on-going or historical source of these VOCs to the groundwater.<br><br>**Supporting Evidence:**<br><br>*Id.*, § 5.5, pp. 5-12 to 5-30. | (describing Patsouras Property contribution to OU-2 contamination)<br><br>Mutch Rebuttal Report, at §§ 3.1, 3.5 (Docket No. 949-78 Page ID #:30971-72, 30975-77) (describing historic contamination and continuing obligations imposed by environmental covenant). |
| **543.** The Final Remedial Investigation Report by the US EPA environmental consultant, CH2M Hill, identified properties located over the OU-2 groundwater plume which were sources of non-chlorinated VOCs to groundwater, but did not identify the Patsouras Property as an on-going or historical source of these VOCs to the groundwater.<br><br>**Supporting Evidence:**<br><br>*Id.*, § 5.5, pp. 5-12 to 5-30. | **543.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>Mutch Report, 7-23 to 7-29 (Docket No. 903-204 Page ID #:25435-42) (describing Patsouras Property contribution to OU-2 contamination)<br><br>Mutch Rebuttal Report, at §§ 3.1, 3.5 (Docket No. 949-78 Page ID #:30971-72, 30975-77) (describing historic contamination and continuing obligations imposed by environmental covenant). |
| **544.** From 1994 through 2010, at least 123 soil samples were taken on the West Parcel of the Patsouras Property.<br><br>**Supporting Evidence:** | **544.** Disputed.<br><br>**Supporting Evidence:**<br><br>This statement is supported solely by the report of Defendants' "expert," Dr. Jean Kulla. However, Dr. Kulla's opinions are unreliable, as she appears not to be aware of, or have evaluated, |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Expert Report of Dr. Jean Kulla; Ex. K to the Declaration of Victor Otten | critical facts that might have informed her opinion. She testified that she knew PCE and TCE were in the soil at the Patsouras Property, but she does not know how those substances came to be located in the soil or ever analyzed this issue. *See* Valenzuela Opp'n Decl., Ex. 15, at 156-158 (Docket No. 949-42) (Kulla Dep. 69:24-70:11, 72:11-21, Feb. 25, 2021). She did not even analyze whether contamination from historic Palley site operations may have contributed VOCs to OU-2 Groundwater contamination or whether Globe Oil released hazardous substances on the Patsouras property. *Id.*, at 152-153, 167 (Kulla Dep. 50:17-51:2; 83:11-23).<br><br>Dr. Kulla was similarly unknowledgeable about Globe Oil's operations. She did not know how Globe handled waste water or what was in it. *Id.* at 150-151 (Kulla Dep. at 46:12-20, 49:11-13). Dr. Kulla also believed that Globe Oil operated at the property for only four years, from 1968 to 1972. *Id.* at 146 (Kulla Dep. 37:3-9). She did not know that Globe Oil had been operating at the property for over thirty years. *See* Plaintiffs' response to Defendants' RSUMF 506, which is incorporated herein by reference. Such holes in Dr. Kulla's knowledge of the |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | property leads her to flawed and unreliable conclusions. |
| **545.** No PCE, TCE, chloroform, or 1-1-dichloroethene were detected in any of the 123 soil samples taken on the West Parcel between 1994 and 2010.<br><br>**Supporting Evidence:**<br><br>*Id.* | **545.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>As stated in the responses to RSUMF 527, 531 and 546 (which are incorporated herein), testing performed at the Patsouras Property was inadequate and, largely, did not test for VOCs or hexavalent chromium. Though insufficient, testing at the B-7 and E-9 borings found PCE and TCE. Mutch Report, at 7-8 to 7-14 (Docket No. 903-204 Page ID #:25421-27). The data indicates that PCE and TCE were transported through the vadose zone to the historic elevation of the groundwater table and impacted the groundwater. *Id.* at 7-10 to 7-11, Figs. 7-2, 7-3 & 7-7 (Docket Nos. 903-204 Page ID #:25423-24 & Docket Nos. 903-210 Page ID #:25568-69, 25573). Any tests that are claimed not to have shown the presence of TCE, PCE, hexavalent chromium or other VOCs, did not test for these substances—despite evidence of significant releases of hazardous substances to the soil of the Property. *Id.*<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference.<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. |
| **546.** CAM metals in soils, including total chromium, were within background levels for regional soils (i.e., within the range of concentrations normally found in natural, uncontaminated soil) in all of the 123 samples taken on the West Parcel between 1994 and 2010.<br><br>**Supporting Evidence:**<br><br>*Id.* | **546.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Mutch Rebuttal Report, § 3.1 (Docket No. 949-78 Page ID #:30971-72).<br><br>Mutch Report, 7-10 to 7-13 & Fig. 7-6 (maximum total chromium concentration of 308,000 µg/kg was measured on a sample of debris (SP-101) from Vault 3 at the southwest corner of the property) (Docket Nos. 903-204 & 903-210).<br><br>Dr. Kulla opines that 71.1 mg/kc for total chromium is only "slightly above background levels"—though she never says what the "background levels" are. *See* Otten Decl., Ex. K (Docket No. 933-11 Page ID #:26551) (Expert |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Report of Dr. Jean Kulla (Jan. 2021), at 3). According to the U.S. Geological Survey, background levels of total chromium roughly range from 30 to 36 mg/kg. *See* Smith, D.B. *et al*., U.S.G.S., Geochemical and Mineralogical Data for Soils of the Conterminous United States: U.S. Geological Survey Data Series 801, 19. A consultant reported background levels of total chromium at nearby defendant Phibro-Tech, Inc.'s facility were 20 to 24 mg/kg. *See* Cohen Decl., Ex. 18, at 343 (Camp Dresser & McKee Inc., RCRA Facility Investigation Phase II Report, Apr. 23, 1993, Table 4-1) (Docket No. 949-77). It reports background levels of hexavalent chromium at and near its facility range from 1 to 2 mg/kg. *Id*. |
| | Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |
| | Kekropia's expert misstates the background levels for arsenic. Dr. Kulla contends that the level of arsenic which is "characteristic of background for regional soils" is 55 mg/kg. *See* Kulla Report, at 3 (Docket No. 931-11). According to the California Department |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | of Toxic Substances Control, the background level for arsenic is several times lower, namely, 12 mg/kg. Mutch Report, at 7-13 (Docket No. 903-204 Page ID #:25426) (citing G. Chernoff *et al.*, Dept. of Toxic Substances Control, Determination of a Southern California Regional Background Arsenic Concentration in Soil (2008), at 1). The ESL for arsenic in soil was exceeded at several locations at the Patsouras Property from 2 feet to 35 feet bgs, which is indicative of release of arsenic from operations on the Property to the subsurface. Mutch Report, at 7-13. Because of the inadequacy and sparseness of the monitoring well network at the Property, arsenic impacts to groundwater may not be identifiable. *Id.* at 7-14. |
| | Soil gas concentrations in excess of soil gas ESL values were noted for PCE and TCE. *See* Valenzuela Opp'n Decl., Ex. 9, at 82, 89-93 (Envtl. Audit, Inc., Summary of Site Assessments (Mar. 2009), at 11 & Tables 8, 9) (Docket No. 949-36); Mutch Report, at Table 7-6 (Docket No. 903-204 Page ID #:25430-31). Sampling of soil vapor shows a pattern of elevated concentrations of soil gas PCE, as well as other chlorinated VOCs such as TCE (a daughter product of PCE), that are |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | localized in a part of the Patsouras Property with high PCE soil levels, signifying a definitive onsite source of these hazardous substances. Mutch Report, at 7-17 to 7-18 (Docket No. 903-204 Page ID #:25430-31).<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference.<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. |
| **547.** From 1994 through 2010, at least 137 soil samples were taken on the East Parcel of the Patsouras Property.<br><br>**Supporting Evidence:**<br><br>*Id.* | **547.** Undisputed.<br><br>*But see* Plaintiffs' Response to RSUMF 544. |
| **548.** PCE and TCE were detected in only a couple of soil samples at very low concentrations in the 137 soil | **548.** Disputed and immaterial. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| samples taken on the East Parcel between 1994 and 2010.<br><br>**Supporting Evidence:**<br><br>*Id*. | **Supporting Evidence:**<br><br>Mutch Rebuttal Report, § 3.1 (Docket No. 949-78 Page ID #:30971-72).<br><br>Mutch Report, at § 7.2.3 (pp. 7-8 to 7-14) (Docket No. 903-204).<br><br>As stated in the responses to RSUMF 527, 531 and 546, testing performed at the Patsouras Property was inadequate and, largely, did not test for VOCs or hexavalent chromium. For sake of brevity, Plaintiffs incorporate by reference their responses to RSUMF 527, 531 and 546 as though set forth fully herein.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference.<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **549.** The maximum concentration of PCE was 0.51 mg/kg and of TCE was 0.27 mg/kg in the 137 soil samples taken on the East Parcel between 1994 and 2010.<br><br>**Supporting Evidence:**<br><br>*Id*. | **549.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Mutch Rebuttal Report, § 3.1 (Docket No. 949-78 Page ID #:30971-72).<br><br>Mutch Report, at § 7.2.3 (pp. 7-8 to 7-14) (Docket No. 903-204).<br><br>As stated in the responses to RSUMF 527, 531 and 546, testing performed at the Patsouras Property was inadequate and, largely, did not test for VOCs or hexavalent chromium. For sake of brevity, Plaintiffs incorporate by reference their responses to RSUMF 527, 531 and 546 as though set forth fully herein.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference.<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **550.** No chloroform or 1,1-dichloroethene (1,1-DCE) were detected in the 137 soil samples taken on the East Parcel between 1994 and 2010.<br><br>**Supporting Evidence:**<br><br>*Id.* | **550.** Undisputed but immaterial.<br><br>**Supporting Evidence:**<br><br>*But see* Plaintiffs responses to RSUMF 527, 531 and 546 regarding the inadequacy of testing for VOCs at the Patsouras Property.<br><br>The sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Kekropia's RSUMF 544 which is incorporated herein by reference.<br><br>Mutch Rebuttal Report, § 3.1 (Docket No. 949-78 Page ID #:30971-72).<br><br>Mutch Report, at § 7.2.3 (pp. 7-8 to 7-14) (Docket No. 903-204).<br><br>Otten Decl., Ex. I (Covenant and Environmental Restriction on Property executed July 5, 2016) (Docket No. 931-9 Page ID#:26515) (chloroform detected at 15.3 µg/L).<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | defendant's period of ownership or operation.<br><br>Immaterial because ignores releases from operations at the Patsouras Property prior to 1994. |
| **551.** CAM metals in soils were within background levels for regional soils (i.e., within the range of concentrations normally found in natural, uncontaminated soil) in all of the 137 samples taken on the East Parcel between 1994 and 2010, with the exception of one chromium sample slightly above background levels (71.1. mg/kg) found at two feet below ground surface and lead found in some stockpiled soil.<br><br>**Supporting Evidence:**<br>*Id*. | **551.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Plaintiffs incorporate by reference their response to RSUMF 546 as though set forth fully herein.<br><br>Immaterial because Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.<br><br>Immaterial because ignores releases from operations at the Patsouras Property prior to 1994. |
| **552.** Methylene chloride (8.27 mg/kg), naphthalene (4.31 mg/kg), and lead (51,600 mg/kg) were found in one stockpiled soil sample, and the stockpiled soil has been removed from the Property.<br><br>**Supporting Evidence:** | **552.** Disputed.<br><br>**Supporting Evidence:**<br><br>Mutch Rebuttal Report, § 3.1 (Docket No. 949-78 Page ID #:30971-72).<br><br>Mutch Report, at § 7.2.3 (pp. 7-8 to 7-14) (Docket No. 903-204). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| *Id.* | Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference.<br><br>The sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Kekropia's RSUMF 544 which is incorporated herein by reference. |
| **553.** There is no evidence that the very low concentrations of PCE, TCE or other hazardous substances found in soil have migrated at least 35 feet to the OU-2 groundwater.<br><br>**Supporting Evidence:**<br><br>*Id.* | **553.** Disputed.<br><br>**Supporting Evidence:**<br><br>Mutch Report, at 7-14 to 7-17, 7-23 to 7-29 (Docket No. 903-204).<br><br>Mutch Rebuttal Report, at §§ 3.2, 3.3 (Docket No. 949-78).<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |
| **554.** Groundwater monitoring was performed on the Property from 1995 through 2013 for petroleum hydrocarbons, VOCs, and metals.<br><br>**Supporting Evidence:**<br><br>*Id.* | **554.** Undisputed that some groundwater monitoring was performed at the Patsouras Property from 1995 through 2013 for petroleum hydrocarbons, VOCs and metals. Disputed that it was adequate.<br><br>**Supporting Evidence:**<br><br>Plaintiffs incorporate their responses to Kekropia's RSUMF 527, 531 and 546 herein by reference.<br><br>Mutch Report, at 7-14 to 7-17, 7-23 to 7-29 (Docket No. 903-204).<br><br>Mutch Rebuttal Report, at §§ 3.2, 3.3 (Docket No. 949-78). |
| **555.** No petroleum hydrocarbon compounds have been found in groundwater beneath the Property even though petroleum hydrocarbons were detected in Property soil. | **555.** Disputed.<br><br>**Supporting Evidence:**<br><br>Otten Decl., Ex. B (Docket No. 931-2 Page ID #26229) (Los Angeles Regional Water Quality Board Letter |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **Supporting Evidence:** *Id.* | (Jan. 4, 2017) at 1) ("Historical use for industrial activities resulted in discharges of waste to the subsurface, including total petroleum hydrocarbons (TPH)"). |
| **556.** Toluene and xylene were detected in only trace amounts (below their respective Maximum Contaminant Levels) only in one well in one sampling episode. **Supporting Evidence:** *Id.* | **556.** Undisputed. **Supporting Evidence:** *But see* Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546. Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |
| **557.** All metals detected in groundwater were below their respective MCLs, including arsenic and hexavalent chromium, with the exception of one sample of 11.8 ug/L hexavalent chromium (slightly above the 10 ug/L conservative MCL used by California). **Supporting Evidence:** *Id.* | **557.** Disputed but immaterial. **Supporting Evidence:** Despite minimal investigations on the Patsouras Property, the data that was obtained reveals the extent of groundwater contamination. Mutch Report, at § 7.2.4 (pp. 7-14 to 7-17) (Docket No. 903-204); Mutch Rebuttal Report, §§ 3.2, 3.3 (Docket No. 949-78). PCE was found in monitoring wells in the vicinity of the clarifiers, |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | where vadose zone soil samples showed penetration of PCE to the depth of the groundwater table. *Id.* at 7-14 This indicates a contribution of PCE to groundwater from the Patsouras Property. *Id.* Additionally, some higher levels of hexavalent chromium were found in MW-1, MW-1D, and MW-3 in the middle of the Property near the clarifiers than in MW-2, establishing releases of hexavalent chromium from the clarifiers, resulting in groundwater contamination. *Id.* at 7-14 & 7-16. TCE, a "daughter" product of PCE, is found in concentrations higher in MW-1D, MW-3, and MW-4 than in MW-2. *Id.* at 7-17. Concentrations exceeding groundwater ESLs were measured for 1,1-dichloroethene, carbon tetrachloride, chloroform, tetrachloroethene (PCE), trans-1,2-dichloroethene, trichloroethene (TCE), chromium (total), chromium VI, nickel, and vanadium. *Id.*<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Immaterial because CERCLA imposes no quantitative requirement. |
| **558.** The predominant VOC contaminants found in the OU-2 groundwater underlying the Property at concentrations above their respective MCLs were carbon tetrachloride (CT), PCE, and TCE. Other volatiles, including chloroform and 1,1-DCE, were below their MCLs.<br><br>**Supporting Evidence:**<br><br>*Id*. | **558.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Immaterial because CERCLA does not impose a quantitative requirement.<br><br>Mutch Report, at 7-14 to 7-17, 7-23 to 7-29 (Docket No. 903-204).<br><br>Mutch Rebuttal Report, at §§ 3.2, 3.3 (Docket No. 949-78).<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference.<br><br>Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |
| **559.** A significant line of evidence in evaluating whether a property is a | **559.** Undisputed. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| source of hazardous substances to groundwater is a comparison of the concentrations of a chemical in an upgradient well with the concentrations in an on-property well.<br><br>**Supporting Evidence:**<br><br>*Id.* | |
| **560.** The concentrations of carbon tetrachloride (CT) in wells upgradient of the Patsouras Property were greater than or similar to the concentrations in wells on the Property in all samples in the groundwater sampling from 2009-2013, except for a single sample of 10.4 ug/L in 2013.<br><br>**Supporting Evidence:**<br><br>*Id.* | **560.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Immaterial because ignores releases prior to 2009 and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.<br><br>Mutch Report, at 7-14 to 7-17, 7-23 to 7-29 (Docket No. 903-204).<br><br>Mutch Rebuttal Report, at §§ 3.2, 3.3 (Docket No. 949-78).<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |
| **561.** The concentrations of PCE in wells upgradient of the Patsouras Property were greater than or similar to the concentrations in wells on the Property in all samples in the groundwater sampling from 2009-2013, except for a single sample of 18.2 ug/L in 2013.<br><br>**Supporting Evidence:**<br><br>*Id.* | **561.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Immaterial because ignores releases prior to 2009 and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.<br><br>Mutch Report, at 7-14 to 7-17, 7-23 to 7-29 (Docket No. 903-204).<br><br>Mutch Rebuttal Report, at §§ 3.2, 3.3 (Docket No. 949-78).<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |
| **562.** The concentrations of TCE in wells upgradient of the Patsouras Property were greater than or similar to the concentrations in wells on the Property in all samples in the groundwater sampling from 2009-2013, except for a single sample of 21.7 ug/L in 2012.<br><br>**Supporting Evidence:**<br><br>*Id*. | **562.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Immaterial because ignores releases prior to 2009 and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.<br><br>Mutch Report, at 7-14 to 7-17, 7-23 to 7-29 (Docket No. 903-204).<br><br>Mutch Rebuttal Report, at §§ 3.2, 3.3 (Docket No. 949-78).<br><br>Such a determination is impossible to make due to the inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Defendants' RSUMF 544 which is incorporated herein by reference. |
| **563.** In 2009, a soil gas vapor survey was conducted on the West Parcel of the Property at depths of 5 and 15 feet below ground surface.<br><br>**Supporting Evidence:**<br><br>*Id.* | **563.** Undisputed. |
| **564.** The results of the 2009 soil gas vapor survey showed only very minor amounts of PCE and TCE in soil gas, with the lowest concentrations found in the shallow 5-foot samples relative to higher concentrations in the deeper 15-foot samples.<br><br>**Supporting Evidence:**<br><br>*Id.* | **564.** Disputed and immaterial.<br><br>**Supporting Evidence:**<br><br>Immaterial because ignores releases prior to 2009 and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.<br><br>Mutch Report, at 7-17 to 7-18 (Docket No. 903-204 Page ID #:25430-31).<br><br>Such a determination is impossible to make due to the inadequate testing and |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference. Further, the sole basis of this statement is an opinion of Dr. Kulla, whose lack of information about the property and its historic uses causes her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Kekropia's RSUMF 544 which is incorporated herein by reference. |
| **565.** The data indicate that PCE, TCE, and other minor VOCs are volatilizing off the OU-2 groundwater plume due to an upward diffusion process governed by Fick's law. **Supporting Evidence:** EAI, 2010, at 17-18; Ex. D and Ex. K to the Declaration of Victor Otten | **565.** Disputed. **Supporting Evidence:** The spatial distribution of the PCE and TCE soil gas contamination, along with the shallow soil contamination, indicates that the PCE and TCE came from releases on the Property and not from off-gassing from the underlying groundwater. Mutch Report, at 7-14 to 7-17 (Docket No. 903-204 Page ID #:25427-30). |
| **566.** While exceedances of groundwater screening levels confirm the presence of impacted groundwater at a given property, they do not | **566.** Undisputed but immaterial. **Supporting Evidence:** Mr. Mutch did not use groundwater ESLs standing alone to determine |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| necessarily support contribution from the overlying property.<br><br>**Supporting Evidence:**<br><br>Mutch Expert Report, § 3.2.2 | whether the Patsouras Property contributed to OU-2 Groundwater contamination. Mutch Report, at 3-7, 7-7, 7-14 to 7-17, 7-26 to 7-27 (Docket No. 903-204). |
| **567.** At the Patsouras Property, whether there was any pure phase PCE, TCE, and other chlorinated organic chemicals was investigated numerous times by the consultants and regulators and not found to exist.<br><br>**Supporting Evidence:**<br><br>Kulla Expert Report, at pp.1-8, Tables 1-5, Figure 2-8A, Ex. K to the Decl. of Victor Otten.<br><br>Kulla Rebuttal Expert Report, at pp. 1-12, Ex. S to the Decl. of Victor Otten.<br><br>Letter to Larry Patsouras of Kekropia, Inc. from the Executive Officer of the Los Angeles Regional Water Quality Control Board, dated January 4, 2017, (No Further Action letter to Kekropia, concluding that the cleanup was complete to "assure protection of human health and waters of the State at and near the Site for their beneficial uses.) Ex. B to the Decl. of Victor Otten. | **567.** Disputed as unsupported by the cited evidence.<br><br>**Supporting Evidence:**<br><br>Disputed as unsupported by the cited evidence due to inadequate testing and investigation of hazardous substances in the soil, as set out in Plaintiffs' responses to Kekropia's RSUMF 527, 531 and 546 which are incorporated herein by reference.<br><br>Dr. Kulla's lack of information about the property and its historic uses cause her opinions to be flawed and unreliable, as set out in Plaintiffs' response to Kekropia's RSUMF 544, which is incorporated herein by reference.<br><br>Otten Decl., Ex. L (Docket No. 931-12 Page ID #:26607) (RWQCB-LA, Ltr. to Larry Patsouras (Dec. 1., 2008), at 1) (stating releases of chemicals from industrial uses at the site have degraded the groundwater quality and beneficial uses of the State's waters and noting |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Phase I Environmental Site Assessment, AIG Consultants, Inc., June 30, 1994, at p. 22 ¶ 6, Ex. C to the Decl. of Victor Otten.<br><br>Soil Remediation Report of Findings for El Greco, Inc., Biophysics Environmental Assessments, Inc., Sept. 14, 2006 (It is concluded that no threat exists to groundwater from metals, solvents and total petroleum hydrocarbons, based upon the low level and isolated low volume of all potentially hazardous materials identified in initial testing by EAI in 1994.) pp. 1-7, Tables 1-3, Ex. G to the Decl. of Victor Otten.<br><br>Updated Site Conceptual Model and Request for Low Risk Closure, Environmental Audit, Inc., June 16, 2010, ("Chlorinated compounds are not generally identified in soil at the Site but are present in ground water at concentrations that are consistent with the regional impact to ground water (see Section 3.0). In EAI's opinion the chlorinated compounds detected in ground water at the Site are not the result of former site activities." at pp. 3-15, 21, Tables 1-7 and 10, Ex. D to the Decl. of Victor Otten.<br><br>Remedial Action Plan, 11630-11700 Burke Street, Environmental Audit, | PCE, TCE and chromium were detected in soils).<br><br>Otten Decl., Ex. B (Docket No. 931-2 Page ID #26229-30) (Los Angeles Regional Water Quality Board Letter (Jan. 4, 2017) at 1-2) ("Historical Site use for industrial activities resulted in discharges of waste to the subsurface, including total petroleum hydrocarbons (TPH), volatile organic compounds (VOCs), and metals listed in Title 22 of the California Code of Regulations. Specifically, the wastes discharged to the subsurface at the Site has been associated with storage and use of petroleum products, solvents, metal product manufacturing/fabrication, and use of multiple clarifiers.")<br><br>Mutch Report, 7-23 to 7-29 (Docket No. 903-204 Page ID #:25435-42) (describing Patsouras Property contribution to OU-2 contamination)<br><br>Mutch Rebuttal Report, at §§ 3.1, 3.2, 3.3, 3.4, 3.5 (Docket No. 949-78 Page ID #:30971-77) (describing historic contamination and continuing obligations imposed by environmental covenant). |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Inc., June 16, 1997., Ex. H to the Decl. of Victor Otten. | |
| **568.** There is no evidence that the degreaser used by Globe and the steam cleaning operations utilized chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE). However, the contemporaneous evidence is to the contrary.<br><br>**Supporting Evidence:**<br><br>Ex. E to Otten Decl., p. PTSF00022291 (City of Santa Fe Springs, 1970. Industrial Waste Survey for Globe Oil Tool Co. June 19, 1970.) Ex. T to Otten Decl., Mutch Dep., p. 707, lns. 15:18: "I'm not seeing any indication that the degreaser or degreasing activities necessarily contain chlorinated solvents. I don't -- I'm not sure we had that definitive information." | **568.** Undisputed the quoted testimony is accurate but mischaracterizes the evidence and immaterial.<br><br>**Supporting Evidence:**<br><br>Pls.' RFJN, Exs. 85 (Industrial Waste Survey, Jun. 19, 1970) (Docket No. 903-89), 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application, May 18, 1970) (Docket No. 903-97); Valenzuela Opp'n Decl., Exs. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3) (Docket No. 949-35), 7, at 50 (Environmental Audit, Inc., Subsurface Investigation Report, Dec. 18, 1995, at 12) (Docket No. 949-34), 9 at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2) (Docket No. 949-36), 14, at 140-142 (W. Palley Dep. 20:9 to 21:5, 69:19-23) (Docket No. 949-41).<br><br>Mutch Report, at 7-1 to 7-8 (Docket No. 903-204); Mutch Rebuttal Report, at § 3.4 (Docket No. 949-78).<br><br>Immaterial because the fact rests on a legal argument. Fed. R. Evid. 703. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Immaterial because Kekropia admits it is the current owner of the Patsouras Property, RSUMF 33, and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.

Further, Kekropia admits hazardous substances, including PCE and TCE, have been detected in soils at the Patsouras Property, RSUMF 34, and hazardous substances, including PCE and TCE, have been detected in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 35. |
| **569.**   There is no evidence that the waste oil possessed by Pally Supply or Talco contained chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE).

**Supporting Evidence:**

Mutch Expert Report, at §7-4. Mr. Mutch, opines on the presence of chlorinated organic compounds in waste oil on the Patsouras Property using only a general 1984 EPA citation rather than any evidence relating to the Patsouras Property itself. Ex. T to Otten Decl., Mutch Dep., p. 713, lns. 15:18: "Q: Did you | **569.**   Undisputed the quoted testimony is accurate but mischaracterizes the evidence and immaterial.

**Supporting Evidence:**

Pls.' RFJN, Exs. 85 (Industrial Waste Survey, Jun. 19, 1970) (Docket No. 903-89), 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application, May 18, 1970) (Docket No. 903-97), 92 (Los Angeles County Fire Department Memorandum re Palley Property (Jan. 1996)) (Docket No. 903-96) (concluding VOC's in eastern portion of property extend to groundwater; clarifier is contaminated |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| research the historic operational data to assess the composition of Talco's waste oil? A: I don't believe we had the information to be able to do that." | to groundwater with VOC's); Valenzuela Opp'n Decl., Exs. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3) (Docket No. 949-35), 7, at 50 (Environmental Audit, Inc., Subsurface Investigation Report, Dec. 18, 1995, at 12) (Docket No. 949-34), 9 at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2) (Docket No. 949-36), 14, at 140-142 (W. Palley Dep. 20:9 to 21:5, 69:19-23) (Docket No. 949-41). Mutch Report, at 7-1 to 7-8 (Docket No. 903-204); Mutch Rebuttal Report, at § 3.4 (Docket No. 949-78). Immaterial because the fact rests on a legal argument. Fed. R. Evid. 703. Immaterial because Kekropia admits it is the current owner of the Patsouras Property, RSUMF 33, and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. Further, Kekropia admits hazardous substances, including PCE and TCE, have been detected in soils at the Patsouras Property, RSUMF 34, and |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | hazardous substances, including PCE and TCE, have been detected in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 35. |
| **570.** There is no evidence that the clarifiers on the Patsouras contained chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE).<br><br>**Supporting Evidence:**<br><br>Ex. T to Otten Decl., Mutch Dep., p. 715, lns. 16:18: "Q. And did the historical operational data you reviewed for purposes of your report identify what substances the clarifiers contained?" Id. at Mutch Dep., p. 716, lns. 2:6: "A. Only -- I think only in the general sense that it would have included wastewater from, you know, these cleaning operations that were going on, which may or may not have included chlorinated solvents." | **570.** Undisputed the quoted testimony is accurate but mischaracterizes the evidence and immaterial.<br><br>**Supporting Evidence:**<br><br>Pls.' RFJN, Exs. 85 (Industrial Waste Survey, Jun. 19, 1970) (Docket No. 903-89), 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application, May 18, 1970) (Docket No. 903-97), 92 ((Los Angeles County Fire Department Memorandum re Palley Property (Jan. 1996)) (Docket No. 903-96) (concluding VOC's in eastern portion of property extend to groundwater; clarifier is contaminated to groundwater with VOC's); Valenzuela Opp'n Decl., Exs. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3) (Docket No. 949-35), 7, at 50 (Environmental Audit, Inc., Subsurface Investigation Report, Dec. 18, 1995, at 12) (Docket No. 949-34), 9 at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2) (Docket No. 949-36), 14, at 140-142 (W. Palley Dep. |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | 20:9 to 21:5, 69:19-23) (Docket No. 949-41). |
| | Mutch Report, at 7-1 to 7-8 (Docket No. 903-204); Mutch Rebuttal Report, at § 3.4 (Docket No. 949-78). |
| | Immaterial because the fact rests on a legal argument. Fed. R. Evid. 703. |
| | Immaterial because Kekropia admits it is the current owner of the Patsouras Property, RSUMF 33, and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation. |
| | Further, Kekropia admits hazardous substances, including PCE and TCE, have been detected in soils at the Patsouras Property, RSUMF 34, and hazardous substances, including PCE and TCE, have been detected in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 35. |
| **571.** There is no evidence that the steam cleaning process used by Pally Supply contained chlorinated organic compounds like tetrachloroethene (PCE) and trichloroethene (TCE). | **571.** Undisputed the quoted testimony is accurate but incomplete and immaterial.<br><br>**Supporting Evidence:** |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **Supporting Evidence:**<br><br>Ex. T to Otten Decl., Mutch Dep., p. 709, 11-14: "Q Did your research of the historic operational data for Palley Supply indicate that chlorinated VOCs were used in the steam cleaning process? A I don't believe so, no."<br><br>Ex. T to Otten Decl., Mutch Dep., p. 712:14-21; 712:24-713:1: "Q Mr. Mutch, I'm going to try to phrase my question a little differently, because you're not answering my question. Aside from your general suspicions about what was done during that era, my question is: What evidence, if any, did you find that contradicts the statements made by Palley Supply about what they used in their steam cleaning operation? THE WITNESS: I don't believe there is any evidence from 1978 as to the contents of different cleaning materials that Palley Supply was using.<br><br>Ex. T to Otten Decl., Mutch Dep., p. 713, lns. 3-7: "Q Did your research of the historic operational data indicate that Talco used any chlorinated organic solvents at the property during its tenure? A I don't recall coming to that conclusion. I don't think so." | Pls.' RFJN, Exs. 85 (Industrial Waste Survey, Jun. 19, 1970) (Docket No. 903-89), 93 (City of Santa Fe Springs, Industrial Waste Disposal Permit Application, May 18, 1970) (Docket No. 903-97), 92 (Los Angeles County Fire Department Memorandum re Palley Property (Jan. 1996)) (Docket No. 903-96) (concluding VOC's in eastern portion of property extend to groundwater; clarifier is contaminated to groundwater with VOC's); Valenzuela Opp'n Decl., Exs. 8, at 66 (Environmental Audit, Inc., Supplemental Subsurface Investigation, Mar. 3, 1997, at 3) (Docket No. 949-35), 7, at 50 (Environmental Audit, Inc., Subsurface Investigation Report, Dec. 18, 1995, at 12) (Docket No. 949-34), 9 at 77-78 (Environmental Audit, Inc., Summary of Site Assessments, Mar. 2009, at 1-2) (Docket No. 949-36), 14, at 140-142 (W. Palley Dep. 20:9 to 21:5, 69:19-23) (Docket No. 949-41).<br><br>Mutch Report, at 7-1 to 7-8 (Docket No. 903-204); Mutch Rebuttal Report, at § 3.4 (Docket No. 949-78).<br><br>Immaterial because the fact rests on a legal argument. Fed. R. Evid. 703.<br><br>Immaterial because Kekropia admits it is the current owner of the Patsouras |

| OPPOSING PARTIES' ALLEGEDLY UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | MOVING PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Property, RSUMF 33, and Plaintiffs do not have to trace "releases" or "threatened releases" of hazardous substances back to a specific defendant or to a specific defendant's period of ownership or operation.

Further, Kekropia admits hazardous substances, including PCE and TCE, have been detected in soils at the Patsouras Property, RSUMF 34, and hazardous substances, including PCE and TCE, have been detected in OU-2 Groundwater below or downgradient of the Patsouras Property, RSUMF 35. |

**Re**:   **Arconic, Inc., et al. v. APC Investment Co., et al.**
        **United States District Court, Central District Case No. 2:14-cv-06456-GW-E**

## PROOF OF SERVICE – ELECTRONIC TRANSMISSION

STATE OF CALIFORNIA/COUNTY OF San Francisco

I am a citizen of the United States and an employee in the County of San Francisco. I am over the age of eighteen (18) years and not a party to the within action. My business address is EDLIN GALLAGHER HUIE + BLUM, 500 Washington Street, Suite 700, San Francisco, California 94111.

On May 2, 2022, I electronically served the document(s) via USC CDCA ECF website, described below, on the recipients designated on the Transaction Receipt located on the USDC CDCA ECF website.

**SEPARATE STATEMENT OF UNCONTROVERTED FACTS ISO CROSS MOTIONS FOR SUMMARY JUDGMENT [PATSOURAS PROPERTY]**

On the following parties:

PLEASE SEE SERVICE LIST PROVIDED BY USDC CDCA WEBSITE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on May 2, 2022, at San Francisco, California.

*/s/ Bridgette C. Burdick*
BRIDGETTE C. BURDICK

3400469