LATHROP GPM LLP
Nancy Sher Cohen, Bar No. 81706
    nancy.cohen@lathropgpm.com
Ronald A. Valenzuela, Bar No. 210025
    ronald.valenzuela@lathropgpm.com
2049 Century Park East, Suite 3500S
Los Angeles, California 90067-1623
Telephone:    310.789.4600
Facsimile:    310.789.4601

LATHROP GPM LLP
William F. Ford (*admitted pro hac vice*)
    bill.ford@lathropgpm.com
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
Telephone:    816.292.2000
Facsimile:    816.292.2001

Attorneys for Plaintiffs
BASF Corporation et al.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BASF CORPORATION, et al., | Case No.  2:14-cv-06456 GW (Ex.) |
|        Plaintiffs, | **JOINT SCHEDULING REPORT FOR PHASE 2** |
| v. | |
| APC INVESTMENT CO., et al., | |
|        Defendants. | |

Plaintiffs BASF Corporation et al. ("Plaintiffs") and defendants APC Investment Co. et al. ("Defendants") submit this Joint Scheduling Report for Phase 2, as required under the Court's May 23, 2022 Order (ECF No. 1094). The parties set out their respective positions below.

## I.      PLAINTIFFS' POSITION

### A.      Introduction

The parties agree that proceeding in phased and incremental steps in this case will not be an efficient use of party or judicial resources moving forward. Doing so, especially given the significant overlap amongst those issues, would only create unnecessary delay and result in duplicative work by the parties and the Court. Both sides, therefore, agree that the Court should adopt a schedule under which all remaining issues are litigated concurrently and adjudicated via a single trial.

However, the parties disagree about when to set this case for trial. Plaintiffs urge the Court to set trial for March 27, 2023, to finally resolve this matter which, through no fault of the Court, has been pending for nearly 8 years—far longer than the time it usually takes CERCLA actions in the Ninth Circuit that have gone to trial to reach that stage. Defendants, by contrast, ask the Court to set trial for 2025 – 2 ½ years from now – for no apparent reason other than to delay an adverse judgment against them for as long as possible.

The remaining issues in this case fall into three categories: (1) liability issues that were not resolved recently on summary judgment, (2) Plaintiffs' recoverable response costs, and (3) allocation. These issues are largely overlapping and at the very least will involve much of the same evidence. For example, Plaintiffs anticipate that the evidence Defendants intend to present to dispose of the unresolved issues from the parties' summary-judgment motions will **also** be presented by Defendants to attempt to disprove "causation" under the *Castaic Lake* test **and** to support their claims on allocation.

Given this overlap, and because the parties have already completed most, if

not all, of the discovery relating to the remaining issues (and can complete the remaining discovery within the next seven months), Plaintiffs believe that this case can be (and should be) efficiently and expeditiously resolved by early next year. Plaintiffs, therefore, ask the Court to issue a scheduling order setting trial for March 27, 2023. Doing so will promote judicial economy and conserve the parties' resources, as it will compel the parties to focus on the salient, disputed issues, promptly complete any remaining discovery, and either prepare their cases to be tried on the merits or avoid the expense and litigation risks of trial by engaging in serious efforts to resolve their dispute informally.

A March 2023 trial date will also promote a **global** resolution of Plaintiffs' pending and prospective CERCLA claims arising from Plaintiffs' obligations under the OU2 Consent Decree. In addition to the pending *Cal-Tron* action, there are several dozen PRPs that may be subject to **future** CERCLA contribution claims brought by Plaintiffs. A March 2023 trial in this matter would serve as a bellwether for the *Cal-Tron* parties and the other PRPs. Rulings in this case would allow those parties to realistically assess the strengths and weaknesses of their respective claims and defenses and pave the way for sober and meaningful settlement discussions. Put simply, a March 2023 trial date in this case could resolve *Cal-Tron* well before the January 2025 trial date in that case and help stave off future contribution actions against the several dozen other PRPs that Plaintiffs contend contributed to the OU2 groundwater contamination. Defendants' request for a 2025 trial date would delay any such global resolution and should be rejected.

The Court should also decline Defendants' request to consolidate this matter with the *Cal-Tron* action. As this Court is well aware in adjudicating the pending summary-judgment motions on liability, each defendant's properties at issue in this case, and in *Cal-Tron,* presents a unique set of facts. As such, individualized issues will predominate over any common legal or factual issues when each case is tried, and thus consolidating the cases would not save time or money. Instead,

- 2 -

consolidation and proceeding under the *Cal-Tron* scheduling order in both cases will do the opposite. It will **increase** the time, effort, and costs for the parties and the Court in this case. When parties are given more time than is necessary to prepare for trial, they inevitably "fill the time" rather than working diligently and efficiently to prepare their respective cases, focusing only on the salient issues, and seeking the court's intervention before trial only as to the substantial or dispositive issues in dispute.

This action and the *Cal-Tron* action are in very different stages of litigation. Indeed, discovery in *Cal-Tron* began only 2 months ago. Placing this case on *Cal-Tron's* schedule, so that *Cal-Tron* can "catch up," only serves Defendants' dilatory tactics, unnecessarily delays trial in this case, and severely prejudices Plaintiffs. Having incurred significant response costs to address the OU2 groundwater contamination, Plaintiffs filed this case in 2014 to compel Defendants to pay their fair share of those costs because Defendants also bear responsibility for that contamination. Now, almost 8 years later, Plaintiffs' costs stand at roughly $50 million, and those costs continue to rise steeply each month, and yet Defendants still have not contributed a penny. Defendants have dallied long enough. Plaintiffs are entitled to have their claims resolved, so they can obtain contribution from Defendants that is long overdue.

Plaintiffs ask the Court to enter an order adopting Plaintiffs' proposed schedule as set forth below.

**B.    Plaintiffs' Proposed Pretrial Schedule for Phase 2**

**1.    Background**

Twenty-two Defendants at nine different properties remain in this case.[1] One of them, Powerine Oil Company, has settled with Plaintiffs and, as previously

---

[1] Union Pacific Railroad Company is a defendant at two separate properties, the Chrysler Property and the Phibro-Tech Property.

reported (*see* ECF No. 1057), likely will be dismissed within several weeks.

Eighteen Defendants recently participated in summary-judgment motion practice on three elements of CERCLA liability under Section 107(a): "facility," "covered person," and "release or threatened release" (the "Liability MSJs"). The Court elected to defer considering until Phase 2 the fourth element, namely, whether a release or threatened release from Defendants' facilities caused Plaintiffs to incur response costs that were necessary and consistent with the national contingency plan (what this Court has sometimes referred to as the "final" element).

The Court made certain tentative and final rulings against 13 Defendants: the Phibro-Tech, Associated Plating, and Earl Mfg. Property Defendants and Union Pacific Railroad Company at the Chrysler Property. The Court has not yet issued a ruling on three motions: (1) Plaintiffs' motion for partial summary judgment against one of the three Patsouras Property Defendants, Kekropia, Inc., on the "facility," "covered person," and "release or threatened release" elements;[2] (2) the PMC Property Defendants' motion for summary judgment;[3] and the Patsouras Property Defendants' motion for summary judgment. The Court did not rule on these last two motions because they were grounded exclusively upon the "causation" issue, an issue the Court decided to defer until Phase 2.

The three Defendants that did not participate in the Liability MSJs, Palmtree Acquisition Corp., Foss Plating Company, Inc., and Bodycote Thermal Processing, Inc., decided to forego motion practice and "move on" to Phase 2. They did so by stipulating to facts that support a finding against each of them as to the "facility,"

---

[2] Plaintiffs did not move for summary judgment against two of the three Defendants associated with the Patsouras Property: Halliburton Affiliates, LLC and Palley Supply Company, who is represent by Intervenors Fireman's Fund Insurance Company and Federal Insurance Company.

[3] Plaintiffs did not move for summary judgment against the two PMC Property Defendants, PMC Specialties Group, Inc. and Ferro Corp.

48993635v4
06/24/22

"covered person," and "release or threatened release" elements of Section 107(a). *See* ECF Nos. 596, 675, 678. They also stipulated to facts that satisfy the "causation" requirement under *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1056, 1066 (C.D. Cal. 2003). *Id.*[4]

### 2.   The issues remaining for Phase 2

The issues that remain for Phase 2 (the "Remaining Issues") fall into three categories: (1) liability issues that remain unresolved from the Liability MSJs; (2) Plaintiffs' recoverable response costs; and allocation. Regarding the first category, the following questions have not been adjudicated: (a) whether a release of VOCs to soil has occurred at the Phibro-Tech Property;[5] (b) whether Union Pacific Railroad Company is a "covered person" with respect to the Chrysler Property;[6] (c) whether the "facility," "covered person," and "release or threatened release" elements have been satisfied as to the Patsouras Property Defendants and the PMC Property Defendants; and (d) whether the releases or threatened releases from Defendants' "facilities," caused Plaintiffs to incur response costs.

### 3.   Plaintiffs' proposed schedule

Plaintiffs propose that the parties complete any outstanding discovery as to the Remaining Issues and that those issues be tried concurrently in a single trial set for March 27, 2023. Specifically, under Plaintiffs' proposed schedule, Initial Disclosures on the Remaining Issues must be served by July 29, 2022. The parties

---

[4] Plaintiffs maintain that this is a one-site case, and as such, they are not required to establish that releases from Defendants' facilities caused Plaintiffs to incur response costs.

[5] Plaintiffs understand that the Court's ruling on Plaintiffs' motion against the Phibro-Tech Property Defendants remains under submission. However, Plaintiffs note that these Defendants have conceded that: the property is a "facility," each Defendant associated with the property is a "covered person," and a "release" to soil of hexavalent chromium has occurred at the property.

[6] The Court's tentative ruling raised admissibility concerns about Plaintiffs' evidence of "disposals" of hazardous substances at the Chrysler Property when Union Pacific owned it.

would conduct fact discovery from July 1, 2022, through November 24, 2022 followed by expert discovery from December 1, 2022, through February 2, 2023. The parties must file all remaining pretrial motions, including motions in limine, Daubert motions, and summary-judgment or partial summary-judgment motions by February 6, 2023. All motions must be noticed for hearing on or before March 9, 2023. Mandatory ADR must be completed by February 27, 2023. The Final Pretrial Conference will be conducted on March 13, 2023. Trial on all Remaining Issues will begin on Monday, March 27, 2023. A table summarizing Plaintiffs' proposed schedule is set out in Attachment 1 for the Court's convenience.

### 4.    Efforts to reach agreement on a pretrial schedule

On June 3, 2022, Robert Martin, Defendants' Liaison Counsel, advised Plaintiffs' counsel, Ronald Valenzuela, that certain Defendants favored foregoing any phasing or sequencing of the remaining issues in this case. Mr. Martin clarified, however, that not all Defendants had expressed their views on the matter.

On June 10, as agreed to by the parties, Plaintiffs provided to Defendants a draft of this Joint Scheduling Report. The draft set out Plaintiffs' proposed pretrial schedule, which did not differ substantively from the schedule described here. **Plaintiffs' schedule proposed a March 27, 2023, trial date**.

On June 17, Defendants submitted their proposed pretrial schedule (*see* Attachment 2). Defendants' schedule was consistent with Plaintiffs' June 10 proposal in that Defendants agreed that the remaining issues in this case should not be phased or sequenced but instead should all be tried concurrently in a single trial. However, **Defendants' schedule proposed a January 14, 2025, trial date** and requested that the Court consolidate this case with the *Cal-Tron* action pending before this Court and adopt *Cal-Tron's* pretrial schedule and deadlines in this case.

On June 20, the parties conferred by telephone twice. During the first call, Mr. Martin indicated to Mr. Valenzuela that Defendants were not committed to consolidation. Defendants, according to Mr. Martin, were willing to keep this case

- 6 -

and *Cal-Tron* on different schedules if Plaintiffs agreed to a trial date that was much later than the March 27, 2023, date proposed by Plaintiffs. During a second call, Mr. Martin, Mr. Valenzuela, and Ms. Cohen, lead trial counsel for Plaintiffs, discussed Plaintiffs' desire for an earlier trial date and concluded that the parties would be unable to agree upon a pretrial schedule or trial date.

C.      **Plaintiffs' Proposed Schedule Is Fair, Feasible, and Promotes a Global Resolution of Contribution Claims**

1.      **A trial in the first quarter of 2023 will ensure that this case is resolved next year.**

This lawsuit has been pending since August 14, 2014, approximately 8 years, which is far longer than the time it currently takes most CERCLA cases in the Ninth Circuit that have been tried to reach that stage. *See* Jun. 2022, Lex Machina Report on Federal District Court CERCLA Cases Pending in the Ninth Circuit from January 1, 2009, through June 21, 2022 (showing most cases that go to trial are tried within 5.1 years of filing date), submitted herewith as Attachment 3.[7]

Under Plaintiffs' proposal, setting a March 27, 2023, trial date will finally move this case toward resolution early next year by compelling the parties to: focus on the salient issues; promptly conduct any remaining discovery: and prepare the case for trial. Moreover, scheduling a firm date for trial has long been viewed as one of the most effective techniques for promoting settlements. Plaintiffs' proposed schedule serves that aim.

---

[7] The Lex Machina Report identifies district court cases in the Ninth Circuit that went to trial and estimates the number of days it took those cases to reach the trial stage (here, between 348 to 3,003 days), the median (947 days) and the number of days it took most of the cases to reach trial (between 624 to 1,867 days). As to this last statistic, according to the Report, most cases had reached the trial stage within 1,867 days (5.1 years) from the date on which the complaint was first filed. The Report also provides similar statistics for when the district court cases were terminated. The terminated cases include lawsuits that never went to trial, went to trial and were terminated shortly thereafter, and went to trial but were terminated several years later for various reasons, as where the trial judgment was appealed.

1     By contrast, Defendants' proposed trial date would further prolong this
2  litigation **an additional 2 ½ years**. It would force the parties—and this Court—to
3  commit additional time, effort, and money to a case that has already consumed a
4  tremendous amount of judicial and party resources. It would also all but guarantee
5  that this case will not settle in the foreseeable future, as an impending trial brings
6  mounting costs and the looming litigation risk sharply into focus.

7     A 2025 trial date would also be highly unfair to Plaintiffs. Much has changed
8  since this case was filed in 2014. At that time, Plaintiffs had incurred some
9  response costs to address the OU2 groundwater contamination, but they had not yet
10  entered into a settlement with the federal and state governments or otherwise agreed
11  to take on substantial commitments, mandated by EPA, to address that groundwater
12  contamination.

13     Since then, Plaintiffs entered into the OU2 Consent Decree, approved and
14  entered as an order of this Court, under which Plaintiffs are obligated to: (1)
15  reimburse millions of dollars of certain OU2 costs incurred by the federal and state
16  governments, and (2) perform the investigative and remedial work required under
17  that Consent Decree. That work includes designing, building, and operating the
18  OU2 containment remedy, an enormous undertaking requiring the capture and
19  treatment of all groundwater within the EPA-delineated boundary of the upper two-
20  thirds of OU2. Plaintiffs have now spent approximately $50 million to address the
21  OU2 groundwater contamination and will incur tens of millions of dollars more in
22  the next few years to build the containment remedy and millions more to operate it
23  over the next 30 years, if not longer.

24     Despite the fact that Plaintiffs have paid, and will continue to pay, tens of
25  millions of dollars to treat the OU2 groundwater, including the groundwater
26  beneath Defendants' properties that is contaminated with hazardous substances
27  released from those facilities, Defendants have not contributed a dime to Plaintiffs'
28  OU2 response costs. So Plaintiffs filed this lawsuit to force Defendants to pay their

- 8 -

1  fair share of those costs. But instead of adjudicating the substantive merits of those

2  claims, the parties have spent nearly 4 of the past 7 years litigating Defendants'

3  procedural challenges to Plaintiffs' claims. The parties spent over a year in 2015

4  and 2016 litigating whether Plaintiffs should have sued under Section 107 or

5  Section 113 and awaiting the Ninth Circuit's decision in *Whittaker Corp. v. United*

6  *States* which touched on that issue. And from 2018 through 2020, the parties'

7  litigation efforts were focused almost exclusively on Defendants' statute-of-

8  limitations defense and waiting for the Ninth Circuit to decide Plaintiffs' appeal of

9  the Court's ruling on that defense.

10  Plaintiffs would also note that Plaintiffs' Liability MSJs were not heard until

11  a year after they were briefed to allow the parties time to explore settlement. But as

12  previously reported to the Court, Defendants apparently were never serious about

13  exploring settlement. Several dawdled and took weeks, even months, simply to

14  execute a confidentiality agreement. And of the 19 Defendants who received a

15  settlement demand, only 3 presented counteroffers, none of which were even

16  remotely adequate. *See* Pls.' Opp'n to Request for Appointment of Special Master

17  (ECF No. 1004). In the end, almost an entire year was wasted.

18  Only Defendants would "benefit" from any further delay in an attempt to

19  stave off, for as long as possible, the prospect of a significant judgment against

20  them. This case can, and should be, resolved by early next year.

21  **2.  An earlier trial date in this case will also accommodate an earlier**

22  **resolution of other contribution claims relating to the OU2**

23  **groundwater contamination.**

24  In addition to the defendants in the pending *Cal-Tron* case, several dozen

25  other PRPs are responsible for contributing to the OU2 groundwater contamination.

26  These PRPs are subject to suit under CERCLA, though Plaintiffs—as yet—have

27  not filed contribution claims against them and instead hope to resolve those claims

28  informally, without this Court's intervention.

1    Trial early next year in this case would effectively function as a bellwether

2    for the *Cal-Tron* parties and dozens of other PRPs responsible for the OU2

3    groundwater contamination. This Court will be the fact finder in this case, the *Cal-*

4    *Tron* case, and any future CERCLA contribution actions brought against other

5    PRPs, so the Court's rulings at trial in this case will be closely analyzed by the *Cal-*

6    *Tron* parties and the other PRPs. Those rulings will significantly inform those

7    parties concerning the strengths and weaknesses of their claims and defenses and

8    will undoubtedly promote settlement.

9    Thus, contrary to Defendants' contention, efficiency would not be sacrificed

10   in setting a March 2023 trial date in this case. To the contrary, an earlier trial date in

11   this case offers the best opportunity for promptly and efficiently resolving not only

12   the claims in this case, but also a more global resolution of all pending and

13   prospective CERCLA contribution claims for the costs arising under the OU2

14   Consent Decree.

15       **3.     The parties can prepare this case for trial within the next 10**

16              **months.**

17   Plaintiffs and Defendants agree that expert discovery on the Remaining

18   Issues can be completed within 3 months. Where the parties disagree is over how

19   long it will take to complete fact discovery: Plaintiffs believe it can be

20   accomplished in 7 months, while Defendants claim it will take almost 4 times as

21   long to complete, namely, 27 months. Defendants are wrong.

22   Fact discovery concerning the first category of Remaining Issues, the

23   unresolved liability issues, has already been completed. The parties conducted

24   discovery, including expert discovery, on the "facility," "covered person," and

25   "release or threatened release" elements of CERCLA, as well as the facts

26   underlying *Castaic Lake*'s three-pronged test regarding causation. Defendants have

27   either stipulated to the facts underlying those issues or have submitted evidence in

28   support of their positions on those issues in connection with the Liability MSJs.

48993635v4
06/24/22

1  Thus, any additional discovery the parties may need to conduct on those issues

2  would be minimal and can be completed quickly.

3      Fact discovery concerning the second category of Remaining Issues,

4  Plaintiffs' response costs, has not been completed, but seven months is ample time

5  to complete it. The topic is a discrete one that primarily involves documentary

6  evidence, not fact witnesses, complex technical or scientific data, or experts.

7  Defendants cannot offer any explanation as to why fact discovery on this subject

8  will require more than 7 months to complete.

9      Nor will fact discovery concerning the third category of Remaining Issues,

10  allocation, require years to complete, as Defendants contend. In fact, much of this

11  discovery has already been completed. Evidence concerning the four elements of

12  liability under CERCLA Section 107(a), such as evidence of the presence, use,

13  handling, or storage of hazardous substances at Defendants' properties, evidence of

14  disposals at those properties, evidence of discharges of hazardous substances to

15  soils, soil and groundwater data showing the nature, location, and extent of

16  contamination at the properties, and evidence of notices of violation and sloppy

17  housekeeping, is also relevant to allocation. This is apparent from a cursory review

18  of the factors courts have used in considering how to allocate response costs

19  amongst liable parties.[8] Those factors include:

20  _____

21  [8] Federal courts have tremendous discretion concerning the factors they may consider given
that each contaminated site presents unique facts. *See AmeriPride Servs. Inc. v. Tex. E.*

22  *Overseas Inc.*, 782 F.3d 474, 480 (9th Cir. 2015). Some of the factors courts may consider

23  in allocating response costs are: (1) the extent to which cleanup costs are attributable to
wastes for which a party is responsible; (2) the party's level of culpability; (3) the degree to

24  which the party benefitted from disposal of the waste; (4) the party's ability to pay its share
of the cost (collectively known as the "Torres Factors") (*see Roberts v. Heating Specialist*

25  *Inc.*, No. 3:12-CV-01820-SI, 2014 WL 3845877, at *17 (D. Or. Aug. 5, 2014)); (5) the

26  ability of the parties to demonstrate that their contribution to a discharge, release or disposal
of a hazardous waste can be distinguished; (6) the amount of the hazardous waste involved;

27  (7) the degree of toxicity of the hazardous waste involved; (8) the degree of involvement by

28  the parties in the generation, transportation, treatment, storage, or disposal of the hazardous

- the extent to which cleanup costs are attributable to wastes for which a party is responsible;
- the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
- the amount of the hazardous waste involved;
- the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
- the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste;
- the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment; and
- a party's level of culpability.

The Court will immediately recognize that these same issues were raised in connection with the Liability MSJs.

To take one concrete example, as to causation, Defendants have argued in the

---

waste; (9) the degree of care exercised by the parties with respect to the hazardous waste concerned ...; (10) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment (collectively, the "Gore factors") (*see Port of Ridgefield v. Union Pac. R.R. Co.*, No. CV14-6024RBL, 2019 WL 479470, at 15 (W.D. Wash. Feb. 7, 2019)) as well as (11) the existence of agreements demonstrating the parties' intent to allocate liability among themselves, (12) the financial benefit that a party may gain from remediation of a site, (13) the potential for windfall double recoveries by a plaintiff, (14) the potential that a plaintiff might make a profit from the cleanup at the expense of another party, and (15) "unclean hands" in excluding another party from active involvement in remedial alternatives and cost-reduction measures (*id.* at 17). But to be clear, federal courts are not required to apply any of the above-listed factors or any other particular test. *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000).

Liability MSJs that they have contributed little, if any hazardous substances, to OU2 groundwater. The extent to which releases of hazardous substances at or from Defendants' Properties have impacted, or may impact, OU2 groundwater is relevant not only to the causation issue, but it is also one factor that the Court may consider in determining how to equitably allocate OU2 response costs amongst the liable parties.[9] Accordingly, the Court can be certain that Defendants will resurrect these same arguments again, using the same "causation" evidence presented in the Liability MSJs, in advocating for a smaller "slice of the pie" on allocation.

Defendants offer no credible explanation as to why fact discovery will take over 2 years to complete. Instead, they attempt to inflate the number of remaining issues to justify the delay. Defendants' laundry list of remaining issues includes many that have already been litigated, issues that would not require extensive or prolonged fact discovery, or are altogether bogus issues. For example:

- Defendants argue that that the parties need time for fact discovery regarding causation, namely, "whether Plaintiffs incurred response costs because of the release or threatened release of hazardous substances by Defendants into OU2 groundwater." However, the parties have already conducted fact and expert discovery on this topic in connection with the

---

[9] To be clear, if the Court were to determine that this is a "two-site case," which it is not, to establish causation, Plaintiffs need not show that releases of hazardous substances at or from Defendants' Properties have impacted or threatened to impact OU2 groundwater. Under *Castaic Lake*, to establish a *prima facie* case for causation, Plaintiffs need only show: (1) the presence of a contaminant in OU2 Groundwater, (2) the same substance is at the Defendants' properties, and (3) a plausible migration pathway exists by which the substance in the soils at those properties could travel to the groundwater beneath the properties. *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1056, 1066 (C.D. Cal. 2003). **The burden then shifts to Defendants to disprove causation**. *Id.* It is Defendants, therefore, that would need to present evidence not only disproving any releases or threatened releases of hazardous substances from their facilities to OU2 groundwater, but also disproving the possibility that any such releases to soils could impact or threatened to impact OU2 groundwater. *Id.*

1   Liability MSJs.[10]

2   • Defendants argue that the parties need time for fact discovery regarding

3   whether Plaintiffs' "response costs were necessary and consistent with the

4   National Contingency Plan." However, this "issue" is merely a

5   component of the second category of remaining issues, Plaintiffs'

6   recoverable response costs. Plaintiffs' proposed schedule accounts for this

7   component, providing 7 months, more than ample time, in which the

8   parties can conduct fact discovery on that topic.

9   • Defendants also argue that the parties need time for fact discovery

10   regarding "whether each of the … plaintiffs … has a right to contribution

11   (i.e., whether they each paid out pertinent response costs in order to

12   establish a right to contribution)." *See* Attachment 2.  However, as this

13   Court is aware, Plaintiffs have offered unrebutted evidence that they act as

14   a group in dealing with the federal and state governments in connection

15   with the Omega Chemical Corporation Superfund Site and in addressing

16   the contamination at the Site. *See, e.g.,* ECF Nos. 770-18, 789-3. Further,

17   Defendants cannot credibly dispute that the OU2 Consent Decree gives

18   rise to contribution rights and that each Plaintiff is a signatory to that

19   Consent Decree. Any individualized discovery concerning Plaintiffs' right

20   to contribution based upon the payment of OU2 responses costs is wholly

21   unnecessary.

22   Defendants should not be permitted to impose any further delay in preparing

23   this case for trial unless they can describe, **with specificity**: (1) the outstanding fact

---

24   [10] Plaintiffs would also note that Defendants have misstated the issue. As this Court has

25   concluded, CERCLA merely requires that a contribution plaintiff establish that it has

26   incurred response costs as a result of a release or threatened release at or from defendant's

27   facility. Plaintiff is not required to show that it incurred response costs as a result of a release
   or threatened release "**by** Defendants." *See* May 9, 2022, In Chambers – Ruling at 14-15

28   (ECF No. 1072).

48993635v4
06/24/22

1   discovery that remains, (2) why such discovery is necessary to adjudicate the

2   Remaining Issues, and (3) an estimate as to how long it will take to conduct each

3   type of discovery. Defendants have not done so yet, and likely cannot do so, as their

4   request for a January 2025 trial is nothing more than an attempt to string out this

5   litigation as long as possible.

6   **D.     Defendants' Request to Consolidate this Action and the *Cal-Tron***

7   **Action Should Be Denied.**

8   Defendants' request for consolidation is merely a ruse to prolong this

9   litigation. As noted, when meeting and conferring with Plaintiffs to prepare this

10  report, Defendants conceded that they were willing to abandon their request for

11  consolidation if Plaintiffs would accept a trial date "much later" than the one

12  Plaintiffs have proposed. Moreover, the *Cal-Tron* matter has been pending since

13  March 2020, and yet only now, after Plaintiffs proposed a March 27, 2023, trial

14  date, did Defendants raise the issue of consolidation. Defendants' new-found desire

15  for consolidation to promote "efficiency" is transparently disingenuous.

16  Moreover, consolidation is not warranted on the merits.[11] Consolidation is

17  inappropriate where it leads to inefficiency, inconvenience, or unfair prejudice to a

18  party, and as such, the Court must weigh "the saving of time and effort

19  consolidation would produce against any inconvenience, delay, expense, or

20  prejudice it would cause." *Id.* at *2 (citing *Huene v. United States*, 743 F.2d 703,

21  704 (9th Cir. 1984), rev'd on reh'g, 753 F.2d 1081 (9th Cir. 1984)). The burden is

22  on the moving party to persuade the court that consolidation is warranted. *Id.*

23  Here, consolidation would not lead to any efficiencies or savings of time or

24  effort. Defendants are wrong in contending that "the only difference between *Cal-*

25  _____

26  [11] Defendants' request is also procedurally improper. Their request should have been
    presented via a noticed motion, not requested via a scheduling report. *See, e.g., Lum v.*

27  *Mercedes-Benz USA, LLC*, No. CV1109751MMMJCX, 2012 WL 13012454, at *3-4

28  (C.D. Cal. Jan. 5, 2012).

- 15 -

*Tron* and this matter are the named defendants" and conducting one trial for both matters would be more efficient. Each *Cal-Tron* defendant is associated with a different property from those at issue in this case.[12] As this Court well understands from adjudicating the Liability MSJs, each property in this case and in *Cal-Tron* must be considered separately as a source of OU2 groundwater contamination.

For example, none of the evidence presented in support of or opposition to Plaintiffs' motion for partial summary judgment against the Phibro-Tech Property Defendants was duplicative of the evidence presented in support of or opposition to Plaintiffs' motion for partial summary judgment against the Associated Plating Property Defendants. Each property presented a unique set of facts.

Individual issues, therefore, will necessarily predominate over common ones at trial in both this case and in *Cal-Tron*. Whether the two cases are tried at the same time or separately makes little difference, then, as to the amount of time and effort involved. A single trial would not avoid any duplication of effort, nor would it shorten the time it will take for the parties to present their evidence at trial.

Defendants also incorrectly contend that consolidation promotes fairness in that the Court should have all defendants in both cases before it in order to consider the facts against all of them at one time when allocating response costs among the liable parties. But Defendants fail to explain how a single trial "promotes fairness" in this respect. Nor could they. There is no statutory provision under CERCLA requiring all PRPs to appear "before the Court … at one time" in a single action. *See, e.g., ASARCO LLC v. Atl. Richfield Co.*, No. CV 12-53-H-DLC, 2012 WL 5995662, at *4 (D. Mont. Nov. 30, 2012) ("[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit"). And federal courts are free to allocate response costs in the absence of all PRPs.

---

[12] The only exceptions to this are *Cal-Tron* defendants Dennis O'Meara, Omega Chemical Corporation, and Vanowen Holdings, all of which are associated with the former Omega Chemical property, the property that Plaintiffs are associated with in this case and *Cal-Tron*.

1   *See, e.g., Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 19 (1st Cir. 2004) (allocation

2   among all PRPs not required and suggesting shares can be allocated to non-parties

3   based on evidence submitted in the record); *Solvent Chemical Co. ICC Industries,*

4   *Inc. v. E. I. DuPont,* 242 F. Supp. 2d 196, 221-223 (W.D. N.Y., 2002) (rejecting

5   argument that consolidation preferable in order to allocate response costs amongst

6   all PRPs).

7          Rather than securing judicial economies and promoting fairness,

8   consolidation would do just the opposite. This case can be ready for trial in ten

9   months. By contrast, discovery in *Cal-Tron* began only 2 months ago. Providing the

10  parties in this case with an additional two years to prepare for trial (while the *Cal-*

11  *Tron* parties "catch up") invites the parties to "fill in" the additional time, draining

12  party and judicial resources, rather than working efficiently and expeditiously on

13  only the salient issues in dispute.

14         Any further delay in this case is hardly fair to Plaintiffs. Having filed this

15  case nearly 8 years ago to compel Defendants to pay their fair share of the costs to

16  address the OU2 groundwater contamination and having spent $50 million to date

17  to address that contamination, Plaintiffs are, at long last, entitled to their day in

18  court. When cases sought to be consolidated are at different stages of litigation and

19  consolidation risks delaying trial and prejudicing a party, as is the case here,

20  consolidation is inappropriate. *See Lum,* at *2. Defendants' request for

21  consolidation should be denied. Alternatively, if the Court is inclined to consolidate

22  this case with the *Cal-Tron* action, Plaintiffs ask the Court to vacate the March 7,

23  2022 Scheduling Order in *Cal-Tron* and adopt - in both cases - Plaintiffs' proposed

24  schedule for this case, including a March 27, 2023 trial date. The *APC Investment*

25  Defendants are some of the largest, well-funded, and most significant contributors

26  to the OU2 Groundwater contamination, whom Plaintiffs sued over 8 years ago. By

27  contrast, Plaintiffs initiated their claims against the smaller *Cal-Tron* entities only

28  recently. Thus, if the cases are to be consolidated, it makes no sense to slow down

- 17 -

1    this case simply to allow "the tail" to catch up.

2    **II.    DEFENDANTS' POSITION**

3          Defendants, through their liaison counsel, respectfully request the Court enter

4    a pre-trial scheduling order setting essentially the same schedule and trial date as

5    the Court recently approved in *BASF Corp. v. Cal-Tron Plating, Inc.*, No. CV20-

6    2586-GW ("*Cal-Tron*"), which concerns the same groundwater contamination, the

7    same cleanup costs, the same plaintiffs, and the same overarching legal claim—

8    contribution under CERCLA—as this matter.  Because the next phase of this case

9    and the *Cal-Tron* case will address the same substantive issues, principles of

10    judicial efficiency and economy warrant they be heard for trial together.[13]

11        **A.    The Common Issues in this Case and in *Cal-Tron* Require**

12           **Consolidation for Trial**

13          In both this case and *Cal-Tron*, Plaintiffs assert CERCLA Section 113

14    contribution claims over the groundwater contamination known as Operable Unit 2

15    of the Omega Chemical Corporation Superfund site, *i.e.*, the plume emanating from

16    the former Omega Chemical Corporation property, where Plaintiffs deposited their

17    wastes.  The operative complaints in both cases include nearly identical core factual

18    allegations—same plume, same EPA-mandated pump and treat program, same

19    remediation costs (*See* Doc. 526 here and Doc. 1 in *Cal-Tron*). Plaintiffs' central

20    legal claims under CERCLA in both cases are the same. Because identical issues of

21    law and similar facts exist in both cases, the Court should consolidate both cases for

22    trial. *See* Fed. R. Civ. P. 42(a) ("If actions before the court involve a common

23    question of law or fact, the court may: (1) join for hearing or trial any or all matters

---

[13] Because this submittal responds to the Court's request for the parties' views on scheduling, not on substantive legal issues, Defendants do not address here various non-scheduling, substantive topics raised by Plaintiffs during the meet and confer process. Plaintiffs' positions on earlier stipulations, and on all the other non-scheduling topics they raise, can be addressed by motion or other appropriate proceedings at a later date approved by the Court.

at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.").

The Plaintiffs in both cases are the same, and they are represented by the same counsel. *See Poulson v. Louisiana, Arkansas & Texas Transp. Co.*, 7 F.R.D. 484, 484 (D. La. 1947) (presence of one counsel for all plaintiffs is one factor suggesting suitability of consolidation). The defendants in *Cal-Tron* and in this case are also similarly situated. Plaintiffs allege that defendants in both cases are liable for contribution under CERCLA, based upon the defendants' location on the surface of a banana-shaped area thought to describe part of the horizontal extent of groundwater impacted by releases of Plaintiffs' chemical wastes from the site of past operations of the Omega Chemical Corporation. For example, Cal-Tron Plating, Inc., a *Cal-Tron* defendant, is located approximately one block to the west of Foss Plating (a defendant here). Santa Fe Rubber Products, Inc., another *Cal-Tron* defendant, is about three blocks to the east of Foss Plating. Similarly, Electronic Chrome & Grinding Co., Inc. (*Cal-Tron* defendant) is a block south of Phibro-Tech, Inc. (a defendant here), and Mid-West Fabricating Co. (*Cal-Tron* defendant) is a block north of Phibro-Tech. Every defendant in both cases is located within or adjacent to the banana-shaped area. Those facts necessitate consolidating the two cases for trial. *See Harbison v. United States Senate Comm.*, 839 F. Supp. 2d 99, 105 (D.D.C. 2012) (consolidation under Rule 42 warranted because plaintiff's complaints arose from same core factual allegations and involved mostly same parties).

Defendants estimate that trial in this case will take four to six weeks, and because of the common issues in this case and *Cal-Tron*, it would be more efficient to have one trial with all defendants from both cases, rather than proceeding with two trials each of four to six weeks in length. There is no reason why Plaintiffs should demand that the Court hold <u>two</u> complex and lengthy trials when <u>one</u> will not only suffice, but is necessary to ensure a fair and final allocation of the parties'

1    respective shares of liability (if any) under CERCLA contribution principles.

2          In this regard, placing the two matters on the same pre-trial schedule with the

3    same trial date is required for allocation, in that an allocation determination as to

4    one defendant will affect the allocation determination as to others. For example, an

5    issue that will be presented in both cases is how to allocate any responsibility of

6    other potentially viable responsible parties that have documented releases of

7    hazardous substances to soil and/or groundwater, but have not been sued by

8    Plaintiffs. The court should address that issue once and in a consistent fashion. The

9    general rule in CERCLA cases is that a plaintiff seeking contribution must absorb

10   allocation shares that are attributable to viable nonparties that plaintiff has failed to

11   add to the litigation. In *Trinity Industries, Inc. v. Greenlease Holding Co.,* 903 F.3d

12   333 (3d Cir. 2018), the court observed: "[a] court may equitably allocate among the

13   parties before it the share of hazardous waste contamination belonging to

14   responsible third-party entities not before it . . . if such orphan shares belong to

15   entities that are unknown, insolvent, or immune from suit." *Id.* at 368 n.6; *see also*

16   *City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Tr.*, 306 F.

17   Supp. 2d 1040, 1129 (D. Kan. 2003) (holding that plaintiffs' failure in a Section

18   113 action to meet their burden of proving that a Potentially Responsible Party was

19   insolvent, dead, or defunct, resulted in plaintiffs being liable for the shares of such

20   nonparties); *United States v. Davis*, 31 F. Supp. 2d 45, 68 (D.R.I. 1998) aff'd, 261

21   F.3d 1 (1st Cir. 2001) (refusing to allocate costs associated with transporters and

22   owners/operators to generators because plaintiff presented no evidence that parties

23   were unknown or insolvent). It is Plaintiffs' burden to demonstrate that any non-

24   joined parties are orphans, or otherwise agree to accept whatever share may be

25   allocable to any such parties. But consolidation of this case with *Cal-Tron* will

26   enable the Court to make allocation decisions as to all the defendants in both cases

27   at the same time and in the same way, minimizing the likelihood of inconsistent

28   results.

Another threshold question is whether any one or more of the 30-odd Plaintiffs can establish that it has to date paid, or will pay, more than its fair share of response costs. Until a plaintiff makes such a showing, it has no right to contribution under CERLCA. It makes no sense to convert thirty issues (*i.e.*, is each of the 30 plaintiffs entitled to contribution?) into sixty issues by trying the same set of issues twice.

Plaintiffs here will suffer no prejudice from consolidation of the trials. In consolidation decisions, delay is the principal measure of prejudice (*see Nat'l Ass'n of Mortg. Brokers v. Bd. Of Governors*, 770 F. Supp. 2d 283, 286 (D.D.C. 2011)), but consolidation will not result in delay of this case. This case is not ready for trial, nor for the reasons explained below would it be within the ten-month pre-trial schedule proposed by Plaintiffs. As shown below, many issues require substantial discovery, which will take much longer than ten months.

Instead, the threshold questions for consolidation—commonality of facts and law, and judicial efficiency—are met here. In such a case, the Court should consolidate the matters for trial. *See Willard v. Town of Lunenburg*, 202 F.R.D. 57, 59 (D. Mass. 2001) (if threshold questions are resolved in favor of consolidation, it will usually be allowed unless opposing party can demonstrate prejudice).

**B.     Substantial Fact and Expert Discovery Are Necessary Before this Case Is Ready for Trial, and Such Discovery Will Take Much Longer than Ten Months**

Defendants will require substantial time to take discovery and prepare this case for trial. In the first phase of this litigation, the Court evaluated Defendants' statute of limitations defense and considered whether the various sites at issue in this case are facilities, whether Defendants are covered persons, and whether releases or threatened releases occurred from the various facilities. During the recent summary judgment hearings, the Court decided some limited liability issues but determined disputed facts prevented granting summary judgment as to

- 21 -

1  significant core issues. Even the limited decided issues were not resolved as to all

2  Defendants.

3       More significantly, there has been absolutely no discovery to date on

4  causation and allocation. In that regard, Defendants in this case stand essentially in

5  the same shoes as the defendants in *Cal-Tron* from a trial preparation standpoint.

6       Much remains to be done. The parties need to conduct fact and expert

7  discovery on (and present to the Court any disputes arising therefrom), among other

8  issues:

9       (a) whether there are releases or threatened releases of hazardous substances

10 by Defendants into OU-2 groundwater;

11      (b) whether Plaintiffs incurred response costs because of the release or

12 threatened release of hazardous substances by Defendants into OU-2 groundwater;

13      (c) the full extent of those response costs;

14      (d) whether the responses costs were necessary and consistent with the

15 National Contingency Plan;

16      (e) whether each of the approximately 30 Plaintiffs in this case has any right

17 to any contribution whatsoever (*i.e.*, whether each has paid pertinent response costs

18 in excess of their fair shares of the cleanup costs, a threshold requirement that must

19 be satisfied in order to establish a right to any contribution at all);

20      (f) the proportional responsibility of those Plaintiffs for the OU-2

21 groundwater contamination;

22      (g) the proportional responsibility of unnamed parties; and

23      (h) a myriad of allocation issues as to Defendants' alleged liability, including

24 what equitable standards to apply and the facts behind those standards. This would

25 also include discovery between Defendants as to various allocation issues.

26      Indeed, during the meet-and-confer process between Plaintiffs and

27 Defendants in preparation for this joint filing, Plaintiffs suggested fifteen potential

28 factors that the Court may need to consider in determining allocation (just one of

the issues noted above). Those factors may include:

"(1) the extent to which cleanup costs are attributable to wastes for which a party is responsible;

(2) the party's level of culpability;

(3) the degree to which the party benefitted from disposal of the waste;

(4) the party's ability to pay its share of the cost …;

(5) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(6) the amount of the hazardous waste involved;

(7) the degree of toxicity of the hazardous waste involved;

(8) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(9) the degree of care exercised by the parties with respect to the hazardous waste concerned ...;

(10) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment …;

(11) the existence of agreements demonstrating the parties' intent to allocate liability among themselves,

(12) the financial benefit that a party may gain from remediation of a site,

(13) the potential for windfall double recoveries by a plaintiff,

(14) the potential that a plaintiff might make a profit from the cleanup at the expense of another party, and

(15) "unclean hands" in excluding another party from active involvement in remedial alternatives and cost-reduction measures."

Plaintiffs expressly acknowledged that "[t]he parties have not yet completed discovery concerning these factors."[14]

---

[14] Defendants quote these factors as provided earlier by Plaintiffs solely for purposes of

In addition to those issues, Defendants also need answers and require extensive fact and expert discovery as to the following non-exhaustive list of issues:

(a) the complexity of the groundwater at the site;

(b) the relative mass of contaminated material contributed by Plaintiffs and Defendants;

(c) the degree of downgradient migration of contamination within the OU-2 groundwater from the site of former Omega Chemical Corporation operations;

(d) what contaminants (if any) have reached OU-2 groundwater from each Defendant's property, how far that contamination has moved, and whether it commingled with contamination originating from the site of former Omega Chemical Corporation operations;

(e) agreements between EPA and Plaintiffs concerning response costs;

(f) efforts by Plaintiffs and Defendants to remediate the contamination;

(g) settlements with Plaintiffs by unnamed parties;

(h) the existence of other unnamed parties potentially responsible for the contamination and/or contribution;

(i) amounts already recovered or to be recovered by Plaintiffs pursuant to insurance, agreements, or otherwise; and

(j) who is implementing remediation for the OU-2 groundwater contamination, how it is being done, when remediation will actually occur, what costs have been and will be incurred in the remediation, and what role has been played by governmental entities.

Plaintiffs skip over all these issues, suggesting that only response costs and allocation are remaining to be determined in this litigation. As shown above, that suggestion is simply not true. And even if it were, discovery on those issues will be substantial and has not even begun. Indeed, Plaintiffs have not produced anything

---

resolving scheduling issues and take no position now as to their applicability to this case.

concerning their response costs, even in their initial disclosures. Simply put, this case is nowhere close to being ready for trial, and the Court should not endorse Plaintiffs' attempt to deprive Defendants of their due process rights to prepare adequately for trial.

## C.   The Court Should Enter the Attached Proposed Scheduling Order Which Tracks the Scheduling Order Entered in *Cal-Tron*

Defendants respectfully submit a proposed Order, attached as Exhibit A to this Joint Scheduling Report. Defendants have made the following modifications to the *Cal-Tron* scheduling order for the proposed Order in this case:

1.   Because Plaintiffs have not provided any initial disclosures concerning their alleged response costs in this case, the attached proposed Order sets a deadline for the parties to update their initial disclosures, including response costs claimed by Plaintiffs, of August 31, 2022.

2.   In *Cal-Tron*, the last day to add parties is March 18, 2024. The proposed Order includes the same deadline to add parties, but also adds it as the last day for the parties to add cross-claims, counterclaims, or third-party claims. The parties will seek leave of the Court to add such claims if required by the FRCP.[15]

3.   In *Cal-Tron*, the last day to complete mandatory ADR (private mediation) is November 15, 2024. The same deadline applies in the proposed Order, but the reference to private mediation has been removed because the parties have not yet met and conferred about an agreed-upon ADR process.

---

[15] Defendants must reserve the right to join additional parties in relation to "orphan share" issues. As noted above, the general rule in CERCLA cases is that a plaintiff seeking contribution must absorb allocation shares that are attributable to viable nonparties that plaintiff has failed to name as defendants. Thus, unless Plaintiffs either agree to assume any such orphan shares attributable to nonparties, or otherwise prove that any such nonparty PRPs are insolvent or defunct, there must be a mechanism, with a reasonable deadline (i.e., per the proposed order), to allow joinder of additional PRPs to ensure a fair, reasonable and final allocation of alleged liability under CERCLA.

4.      Pursuant to item 2 above, the proposed Order includes a November 18, 2024 Post-ADR Status Conference, rather than a Post-Mediation Status Conference as reflected in the *Cal-Tron* scheduling order.

Defendants thus respectfully request the Court enter the proposed Order, attached as Exhibit A, setting forth the pre-trial deadlines and a trial date of January 14, 2025.

DATED: June 24, 2022                    LATHROP GPM LLP


By:              /s/ Nancy Sher Cohen
                 _____
                 Nancy Sher Cohen
                 Attorneys for Plaintiffs BASF Corporation et al.

DATED: June 24, 2022                    SSL LAW FIRM LLP


By:              /s/ Robert B. Martin
                 _____
                 Robert B. Martin III
                 Defendants' Liaison Counsel

- 26 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATION OF CONCURRENCE FROM ALL SIGNATORIES**

I, Nancy Sher Cohen, am the ECF user whose ID and password are being used to file this Joint Scheduling Report for Phase 2. In compliance with C.D. Cal. Civ. L.R. 5-4.3.4(a)(2)(i), I hereby attest that I have obtained the concurrence of each signatory to this document.

/s/ Nancy Sher Cohen
Nancy Sher Cohen

48993635v4
06/24/22